IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. IP99-1693 C-M/S |
| | ) | |
| CINERGY CORP., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON EMISSIONS TEST AND IN
OPPOSITION TO CINERGY'S CROSS-MOTION**

TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      A.    Whether a Project Results in a Significant Net Emissions Increase is Determined
            by Comparing Actual Pre-Project Emissions with Projected Post-Project
            Emissions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      B.    PSD Calculations are Based on Annual Emissions Which Require Consideration
            of Hours of Operation and Hourly Emissions Rate. . . . . . . . . . . . . . . . . . . . . . . 5
            1.    Contrary to Cinergy's Argument, the Statute Does Not Negate the PSD
                  Program by Incorporating  the NSPS Regulatory Program into the
                  Definition of "Modification" for PSD and N-NSR. . . . . . . . . . . . . . . . . 6
            2.    Cinergy's "Design Capacity" Argument Finds No Support in the Statute,
                  Legislative History, Regulations, or Caselaw . . . . . . . . . . . . . . . . . . . . 11
            3.    The Plain Language of the 1980 and 1992 PSD Regulations Requires
                  Consideration of Annual Emissions, not Hourly Rates. . . . . . . . . . . . . 15
            4.    The 1992 WEPCo Rule Applies to This Case. . . . . . . . . . . . . . . . . . . . 19
      C.    EPA's Interpretation of Its Regulations Is Entitled To Deference. . . . . . . . . . . 20
            1.    EPA's Contemporaneous and Historical Interpretations of the 1980
                  Regulations Require Consideration of the Hourly Rate and Hours of
                  Operation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
            2.    The United States' Position Is Not Merely A Litigation Position. . . . . . 27
            3.    EPA's Interpretation of the PSD Regulations, That Both Hours Of
                  Operation and Hourly Rate Are Relevant to Calculations, Was Known in
                  the Industry and By Cinergy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

I.    **INTRODUCTION**

Cinergy attempts to avoid liability for its failure to install pollution control devices at six

of its plants by arguing for an interpretation of the NSR regulations that is premised on

misleading statements and strained interpretations.  In December 2004, the United States asked

this Court to rule on two issues: (1) whether emissions calculations performed under the New

Source Review ("NSR") programs known as non-attainment NSR (N-NSR) and prevention of

significant deterioration ("PSD") require a projection of expected future emissions and (2)

whether those calculations are based on annual emissions, including a consideration of both

projected hours of operation and hourly rate.  Cinergy cross-moved for summary judgment,

claiming that pollution controls and permits under the NSR program are only required if a

physical change causes an increase in the hourly rate of emissions.   As to the first point, Cinergy

barely even attempts to challenge the fact that this Court has already found that the requirement

to obtain a preconstruction permit applies to electric utilities when there is a "projected" increase

in emissions.

As to the second point,  Cinergy makes essentially two arguments to support its position,

each of which is fatally flawed.  First, Cinergy claims that the NSR requirements apply only to

those modifications that increase the hourly rate of emissions.  In doing so, Cinergy fails to

mention that the Seventh Circuit expressly rejected this argument when it was made by

Wisconsin Electric Power Company (WEPCo) almost 15 years ago.  That Court held that

WEPCo's project to restore lost capacity to deteriorated units could certainly trigger PSD.

Cinergy also fails to mention a critical fact – that the 1980 regulations never mention an hourly

rate.  Instead, the plain language of the 1980 regulations measures "actual emissions" and

significance levels in annual tons per year.   Further, having to concede that the 1992 regulations, which explicitly require consideration of hours of operation and hourly rate (and thus "clarify" the 1980 regulations, according to their preamble), Cinergy pretends that these regulations are not at issue in the lawsuit.  However, the 1992 regulations are very much at issue in this lawsuit because the 1992 regulations became applicable in Indiana and Ohio when they were adopted on July 21, 1992.  Cinergy cannot attempt to opt-out of the applicable law and persuasive authority to accommodate its argument.

Second, while attempting to discredit EPA's interpretation of the PSD regulations, Cinergy develops its own emissions test, claiming that NSR requirements only apply to "new emissions" resulting from "design capacity increases."  Cinergy's innovative test in fact transforms the emissions test into nothing more than a fool-proof way to avoid PSD review.  This radical test is inconsistent with the plain text of the regulations, EPA's interpretations of the regulations, the Seventh Circuit's reading of the regulations, the electric utility industry's interpretation of the regulations, and the understanding of Cinergy's own employees.

Amongst its unsupported arguments, Cinergy erroneously claims that the United States' interpretation of the regulations is a "litigation position" entitled to no deference.  To support this claim, Cinergy takes snippets of deposition testimony and interrogatory responses out of context.  The clear fact, apparent from the face of the 1980 regulations and subsequent authoritative statements of the agency, is that it has always been the position of the United States that the NSR requirements apply whenever a physical change or change in the method of operation will significantly increase the annual emissions of the pollutants – regardless of whether that increase results from an increase in the hours of operation or in the hourly rate of

2

emissions (or both).

## II.    ARGUMENT

As this Court held in *SIGECO*, the NSR requirements are *pre-construction* programs, and therefore, in determining whether a PSD or N-NSR permit is required the Court must determine whether a project results in a significant net emissions increase by comparing actual pre-project emissions with projected post-project emissions.  This Court should affirm this holding which Cinergy has not seriously questioned.

The Court should also rule that the NSR requirements apply whenever a physical change to an emissions unit would result in an increase in annual emissions and that, therefore, both hours of operation and hourly rates of emissions should be considered in measuring emissions increases for purposes of determining the applicability of PSD and N-NSR requirements. Contrary to Cinergy's argument, Congress did not incorporate the 1977 NSPS regulatory definition of "modification" into the PSD statutory provisions.  Nor did Congress define the key component terms of "modification," or mandate how to measure emissions increases under the PSD (or for that matter, the NSPS) program.  EPA retains authority to interpret "modification" and its component terms through rulemaking, as it did in 1980 and again in 1992 and 2002.

The Court should defer to EPA's interpretation of its PSD regulations unless they are "plainly erroneous or inconsistent with the regulations."  *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).  Under the plain language of the 1980 regulations, an emissions increase includes any increase in actual total annual emissions.  Therefore, EPA's interpretation of its PSD regulations as considering hours of operation and hourly rates is consistent with the regulation.  Furthermore, EPA's reading deserves particular deference as being longstanding and

3

consistently presented in authoritative EPA statements. Cinergy's attempt to show that "actual emissions" does not mean "actual emissions" depends on a tortured reading of the 1980 regulations, a misplaced emphasis on inapplicable provisions, and mischaracterizations of EPA statements. It does not raise any substantive issue of material fact with regard to EPA's interpretation. As such, the United States should prevail on this issue. Finally, contrary to Cinergy's protestations, the 1992 *WEPCo* rule applies to those modifications that Cinergy undertook after July 21, 1992.

**A.**   **Whether a Project Results in a Significant Net Emissions Increase is Determined by Comparing Actual Pre-Project Emissions with Projected Post-Project Emissions.**

In our opening brief, we asked this Court to affirm its holding in *SIGECO* that NSR requires post-project emissions to be measured by a projection. US Mot., at 5-10. In response, Cinergy argues that this Court has never addressed the argument of how to calculate post-project emissions. Cin. Opp'n, at 2. However, this Court expressly addressed this question, "conclud[ing] that the issue of whether SIGECO's projects required a preconstruction permit must be determined by reviewing evidence of the projected post-project emissions increases, and not by reviewing evidence of the actual post-project emissions data." *SIGECO*, 2002 WL 1629817, *3.[1]

---

[1]Cinergy then claims that EPA agrees that after-the-fact emissions are relevant to the PSD inquiry. *See* Cin. Opp'n, at 2, n. 2. Cinergy's claim is misleading and incorrect. EPA's response to the Interrogatory cited in note 2 of Cinergy's brief is entirely consistent with the United States' position in our Motion for Partial Summary Judgment, that Defendants should have made projections of post-project emissions prior to undertaking the projects at issue in this case. Specifically, EPA stated that "EPA did not rely on an actual-to-actual comparison for the projects [at issue in this case] because regulations at 40 C.F.R. Part 52 and corresponding SIP provisions did not contemplate such a test. This Court has recently affirmed this fact . . . ." Pls.' Am. Supp. Resp. Interrogs. 1-2, 5, 7-8 and 37, Supp. Am. Resp. Interrogs. 3 and 4, and Third

4

Cinergy's failure to make any substantive argument demonstrates that Cinergy cannot deny the clear, persuasive authorities on this issue. As explained in the United States' Motion, for units that have begun normal operations, the 1980 and 1992 regulations require a projection of post-construction emissions for purposes of assessing NSR/PSD applicability. The plain language of the NSR regulations also requires a projection. Moreover, this Court has found that PSD regulations require a projection. *See United States v. SIGECO*, 2002 WL 1629817, *3; *see also United States v. Ohio Edison,* 276 F. Supp. 2d 829, 865 (S.D. Ohio 2003). In light of this overwhelming support for the United States' position, and Cinergy's virtual silence on the issue, the United States believes this issue is ripe for resolution and should be granted in the United States' favor. As this Court recently confirmed, "EPA's current interpretations of the NSR rules are consistent with the language of the CAA and do not constitute new, post-1996 rules." Order on the USA's Motion for Partial Judgment on the Pleadings, May 18, 2005 at 9 (citing *SIGECO 4*, 2002 WL 31427523 at *10).

### B.     PSD Calculations are Based on Annual Emissions Which Require Consideration of Hours of Operation and Hourly Emissions Rate.

Cinergy advocates two arguments in support of its claim that its projects that increase actual annual emissions, but not hourly rate of emissions, can escape the requirements to install pollution controls and obtain a permit. Cinergy's arguments, however, rely upon distortions of the statute and are contrary to the plain language of the regulations and EPA's authoritative interpretations of its own regulations. As demonstrated in the United States' opening brief, and

---

Supp. Resp. Interrogs. 6 and 9 of the Defendants' First Set of Interrogatories, served on Nov. 22, 2004, at 72. Whether the regulators reviewed real post-project emissions in order to test the soundness of the prediction, as the Interrogatory response explained, is irrelevant to the process the regulations require a source to follow when determining whether a PSD permit is necessary.

confirmed by this Court recently (*id*.), because the issue of whether EPA's interpretation is consistent with the statutory language has now been resolved, the Court should defer to EPA's interpretation and affirm its ruling in *SIGECO* that PSD calculations are based on annual emissions under the 1980 and 1992 rules, requiring consideration of both hours of operation and hourly emissions rate.

1.    **Contrary to Cinergy's Argument, the Statute Does Not Negate the PSD Program by Incorporating the NSPS Regulatory Program into the Definition of "Modification" for PSD and N-NSR.**

Cinergy argues that because EPA chose to measure emissions increases for NSPS using an hourly rate, it must adopt the identical test for PSD and N-NSR. Cinergy bases this argument on Congress' decision to cross-reference the NSPS statutory definition of "modification" into the PSD statutory provisions.

Cinergy references Technical Amendments which, seeking to cure an oversight in the 1977 Clean Air Act Amendments, added "modification" as a triggering event for PSD by referring to the already-existing definition of "modification" in the NSPS statutory program. 42 U.S.C. § 7479(2)(C). Cross-referencing the NSPS definition was a simple, sensible way for Congress to adopt that statutory definition in PSD. Cinergy urges the Court to use that cross-reference as a springboard to leap to the faulty conclusions that Congress intended to constrain EPA's authority by requiring that NSPS *regulations* regarding modifications would also bind the PSD program – essentially blurring the line between two *regulatory* programs with one simple cross-reference of *statutory* terms. Nothing in the cross-referencing of *statutory* definitions implies that NSPS *regulations* would determine the interpretation of PSD *statutory* language.

6

Cinergy's argument, in other words, has the regulatory "tail" wagging the statutory "dog".[2]

In short, Cinergy has proffered no real support for its claim that Congress intended emissions increases to be measured the same way under NSPS and PSD. Rather, the key terms within the definition of modification – including "emissions increase" – were left undefined by Congress. EPA, however, has defined those constituent terms and done so differently under the NSPS and NSR. This was a conscious choice by EPA designed to effectuate the different purposes of those two programs. The D.C. Circuit has recognized that the fundamental differences between the PSD and NSPS programs allow different regulatory interpretations of common statutory terms. Specifically, that court's seminal decision in *Alabama Power* stated: "EPA has latitude to adopt definitions of the component terms of 'source' [for PSD purposes] that are different in scope from those that may be employed for NSPS and other clean air

---

[2]    Notably in 1990, Congress decided to defer to EPA's interpretation of the PSD emissions test and not to require an hourly rate test when presented with the option. Specifically, following the *WEPCo* matter, as part of its consideration of the 1990 Amendments to the CAA, Congress was specifically asked to *change* the existing PSD emissions test to focus on hourly emissions increases rather than utilization. Amendment 1348, offered by Senator McClure, was offered to solve "all of the problems that EPA has created with the *WEPCo* interpretations," by allowing a unit to avoid PSD "so long as it does not emit more than it was designed to emit." 1990 CAA Leg. Hist. 6946, 6948, 6964-65 (Sen. McClure, Senate Debate on S. 1630, Apr. 3, 1990) (Exh. 19). Specifically, the amendment would have provided that a physical or operational change at a unit would not increase emissions under PSD unless the change would "increase the maximum potential capacity of the unit." *Id.* at 6951. The amendment was opposed on the grounds that it "would have the effect of exempting the modification of utility plants from EPA review no matter how much additional pollution resulted from the modification." *Id.* at 6966 (statement of Sen. Chafee). The amendment was tabled (*i.e.*, defeated) by a vote of 64-33. *Id.* at 6978. In considering – and ultimately rejecting – this proposed change, Congress clearly recognized EPA's interpretation that hourly rate increases are not necessarily a prerequisite to PSD applicability, which can be triggered by increased utilization in appropriate circumstances. *See id.* at 6966; *see also* 1990 CAA Leg. Hist. 6860, 6869-71 (Senate Debate on S. 1630, Apr. 2, 1990) (colloquy between Senators Lugar and Baucus recognizing and expressing approval of EPA interpretation under which changes that cause an increase in capacity utilization can trigger NSR) (Exh. 20).

7

programs, due to differences in the purpose and structure of the two programs." *Alabama Power v. Castle*, 636 F.2d 323, 397-98 (D.C. Cir. 1979); *see also National Mining Ass'n v. EPA*, 59 F.3d 1351, 1358 (D.C. Cir. 1995) (holding that "[d]ifferent programs have different objectives and structures. EPA is not bound to any one definition of 'major source.'"). The Seventh Circuit, this Court, and others have agreed that EPA can take different regulatory approaches in PSD and NSPS. *See, e.g., WEPCo*, 893 F.2d at 913-18 (approving "fundamentally distinct" applicability tests); *United States v. SIGECO*, 245 F. Supp. 2d 994, 998 (S.D. Ind. 2003); *see also N. Plains Res. Council v. EPA*, 645 F.2d 1349, 1355-57 (9th Cir. 1981) (finding PSD definition of term "commenced" inapplicable to NSPS); *U.S. v. Ohio Edison*, 276 F. Supp. 2d 829, 875-76 (S.D. Ohio 2003); *Potomac Elec. Power Co. v. E.P.A.*, 650 F.2d 509 (4th Cir. 1981).

Further, a ruling that Congress incorporated the NSPS regulatory definition of "modification" into the PSD statute would implicitly invalidate many of the regulatory differences between the PSD and NSPS regulations. The following table illustrates some of the differences between the 1980 PSD regulations and the NSPS regulations in effect in 1980:

| 1980 PSD Regulations | 1980 NSPS Regulations |
|---|---|
| Allows sources to net contemporaneous increases and decreases to determine whether an emissions increase results from the change. 40 C.F.R. § 52.21(b)(2) ("netting"). | Does not allow sources to net contemporaneous increases and decreases. 40 C.F.R. § 60.14(a). |
| Emissions increase must be over "significance level". 40 C.F.R. § 52.21(b)(23)(i). | Emissions must only increase; no requirement that increases be over significance level. 40 C.F.R. § 60.14(a) |
| Measures emission changes based on changes in annual emissions. 40 C.F.R. § 52.21(b)(2) | Measures emission changes based on changes in hourly rate. 40 C.F.R. § 50.14(a) |

| | |
|---|---|
| Does not specify what data can be used to determine whether a change constitutes a modification.  40 C.F.R § 52.21(b). | Prescribes certain methods and types of data for determining whether a change would result in an emissions increase. 40 C.F.R. § 60.14. |
| The measurement of "pre-change" emissions is based on actual emission data or where actual emissions data does not exist, it may be based on certain permit limits. 40 C.F.R. § 52.21(b)(2); 52.21(b)(21). | The measurement of "pre-change" emissions is based on a measurement of actual current capacity by hourly rate, for utilities. 40 C.F.R. § 60.14(b). |
| No express pollution control project exclusion.  40 C.F.R. § 52.21(b)(2). | An express pollution control project exclusion.  40 C.F.R. § 60.14. |

A ruling that Congress intended to incorporate the NSPS regulations into the PSD statutory definition of modification would call the validity of each of these provisions into question because they are part of the PSD definition of "modification" and differ from the NSPS regulations applicable at the same time.  In fact, accepting Cinergy's argument would explicitly contradict the D.C. Circuit's evaluation of the authority of EPA to promulgate these provisions. *See Alabama Power*, 636 F.2d at 397-401 (cited in U.S. Mot., at 18-19) (approving EPA's authority to promulgate two elements of the definition of "modification" – significance levels and netting –  that do not appear in the NSPS definition of "modification").[3]

Not only have courts upheld the general principle that the regulatory definitions of the components of "modification" are appropriately different in the NSPS and NSR programs, based on Congress' stated purpose for enacting the NSR programs, but both this Court and the *WEPCo* court have specifically found that the treatment of how to calculate emissions under these two

---

[3]Cinergy's argument leaves open the question of which regulations were incorporated into the statute. Cinergy also fails to resolve whether, if EPA amends the NSPS regulations, that would also amend the statutory definition of "modification" for the NSR programs.  These unanswered questions point out the fundamental flaw in the idea that a statutory cross-reference could be read to incorporate regulatory provisions.

9

programs can be different. In other words, both courts have determined that 1980 and 1992 PSD

regulations require examination of total annual emissions. *SIGECO*, 245 F. Supp. 2d at 998;

*WEPCo*, 893 F.2d at 915. The *WEPCo* court summarized the legislative history which led to the

different methods of measuring emissions under PSD and NSPS:

> Congress revised the NSPS so that regulated sources of pollution would have to
> use 'the best system of continuous emission reduction . . .' 42 U.S.C. §
> 7411(a)(1)(C). In addition, Congress added a program for the Prevention of
> Significant Deterioration ("PSD"), concerned with increases in total annual
> emissions . . . . Congress also essentially adopted its NSPS definition of
> "modification" for the PSD program. 42 U.S.C. § 7479(2)(C). . . . To determine
> whether a physical change constitutes a modification for purposes of NSPS, the
> EPA must determine whether the change increases the facility's *hourly rate* of
> emission. 40 C.F.R. § 60.14 (1988). For PSD purposes, current EPA regulations
> provide that an increase in the *total amount* of emissions activates the
> modification provisions of the regulations. 40 C.F.R. § 52.21(b)(3) (1988).

*WEPCo,* 893 F.2d at 904-05. Thus, the *WEPCo* court expressly recognized that, while the PSD

program adopted the NSPS statutory definition of "modification", it did not deprive EPA of its

authority to promulgate PSD regulations measuring emissions differently from how they are

measured under NSPS.

Cinergy's arguments, in fact, acknowledge that EPA can treat the definition of

modification differently under the two regulatory programs. Cinergy states that it is not claiming

that the NSPS and NSR regulatory definitions of "modification" need to be identical. *See* Cin.

Opp'n, at n.29. In short, Cinergy acknowledges the premise of EPA's regulatory distinction

between NSPS and NSR: "NSPS and NSR are different programs with different regulations."

*Id*. Cinergy claims, however, that those regulatory distinctions are somehow undone by a

*statutory* cross-reference which precludes application of the NSR regulations to "existing

sources that were grandfathered under NSPS." Cinergy cites no legal authorities that suggest

Congress intended to limit the application of PSD to a subset of modifications that had already

triggered NSPS. In fact, such an argument was explicitly rejected in *Alabama Power, WEPCo,*

and *SIGECO*.

**2.     Cinergy's "Design Capacity" Argument Finds No Support in the
Statute, Legislative History, Regulations, or Caselaw**.

Cinergy next argues that the NSR programs apply only if a modified source exceeds its

permitted limits. As the *WEPCo* court held, "[t]he Clean Air Act Amendments were enacted to

'speed up, expand, and intensify the war against air pollution in the United States with a view to

assuring that the air we breathe throughout the Nation is wholesome once again.'"  *WEPCo,* 893

F.2d 901, 909-10 (quoting H.R.Rep. No. 91-1146, 91st Cong., 2d Sess. 1, 1, *reprinted in* 1970

U.S.Code Cong. & Admin.News 5356, 5356).  This war was to be fought with increasingly

sophisticated technology, the development of which would be driven by the requirements of the

Act.  The *WEPCo* court pointed to this technology-advancing purpose of the CAA Amendments

to support its conclusion that a modification need not increase capacity to trigger the NSR

requirements, concluding that "[t]he development of emissions control systems is not furthered if

operators could, without exposure to the standards of the 1977 Amendments, increase production

(and pollution) through the extensive replacement of deteriorated generating systems." *WEPCo,*

893 F.2d at 909-10 (quoting S.Rep. No. 91-1196, 91st Cong., 2d Sess. 17 (1970) ("'Standards of

performance should provide an incentive for industries to work toward constant improvement in

techniques for preventing and controlling emissions from stationary sources....'")).

Cinergy's position that PSD was only intended to regulate sources that increased their

design capacity is contrary not only to the Seventh Circuit's holding, but also to the plain

language of the 1980 and 1992 regulations.  Cinergy's "design capacity" theory – that projects

11

that are undertaken to restore lost capacity of a deteriorated unit are not modifications –
nowhere appears in the statutory or regulatory language.

Under the express language of the Act, the NSR programs apply to all modifications of
existing sources and a modification includes "any physical change in, or change in the method of
operation of, a stationary source which increases the amount of any air pollutant emitted by such
source." 42 U.S.C. 7411(a)(4), 7479(2)(C).  To limit the application of this language, Cinergy
cannot point to statutory language.  Rather, Cinergy argues that this definition was not intended
to apply to sources that have already received a permit limit under a state implementation plan
(SIP), since emissions limits established in SIPs to meet National Ambient Air Quality Standards
(NAAQS) are based on sources' design capacity.  Cin. Opp'n, at 8-9.  That argument ignores the
fact that Congress added PSD in 1977 precisely because previous programs including NAAQS
were insufficient to address economic growth.  U.S. Mot., at 16-17.[4]  Indeed, the declared
purpose of PSD includes protecting against adverse effects of air pollution "notwithstanding
attainment and maintenance of" NAAQS.  42 U.S.C. § 7570.[5]

---

[4]Cinergy argues (Cin. Opp. Fn 16) that if an activity did not result in a violation of the NAAQS
or the applicable SIP, there is no NSR violation.  To the contrary, Congress intended that
modified sources, such as those at issue in this case, be subject to NSR requirements - regardless
of its impact on the NAAQS or the applicable State Implementation Plan ("SIP").  *See* 42 U.S.C.
§ 7470 (purpose of PSD to protect against adverse impact of air pollution, *"notwithstanding
attainment and maintenance of all ambient air quality standards"*). First, Cinergy offers no
support for its contention that all states base their SIPs on the assumption of maximum emissions
of sulfur dioxide ("$SO_2$") or nitrogen oxide ("$NO_x$"). Second, Defendants conflate the issues of
when the NSR provisions are triggered with whether or not an NSR permit should be issued once
the source is subject to New Source Review.  *See* 42 U.S.C. § 7411(a); 45 Fed. Reg. 52,666,
52,667-68 (explains the issue of when and under what circumstances a PSD permit should issue).

[5] Moreover, the "design capacity" theory is inconsistent with even Cinergy's argument that
Congress incorporated NSPS regulations into PSD statutory provisions.  Those regulations take
into account "actual current capacity to produce emissions" not "maximum design capacity."

Cinergy also attempts to bolster its "design capacity" theory using legislative history from PSD's enactment in 1977. Its attempt is unpersuasive. For example, Cinergy cobbles together an out-of-context Federal Register statement from 2003 with a 1977 House of Representatives Report as if they were causally connected for the proposition that existing sources' "emissions' capacity" is grandfathered.[6] *See* Cin. Opp'n, at 12-13. Cinergy ignores the previous sentence in the legislative history, however, which makes explicit that "modified major stationary sources are required to obtain a State permit prior to construction." H.R. Rep. No. 95-294, at 144 (1977); *see Alabama Power*, 636 F.2d at 399-403, n.47.

Cinergy attempts to support its wishful thinking by asserting that the terms "expansion" and "modification" were used interchangeably. (Cin. Opp'n, at 12, n.24.) This assertion is contrary not only to prevailing law, but also to historical fact. The *Alabama Power* court described the legislative history surrounding the attempted use of "expansion" to limit the definition of "modification" for PSD purposes:

> Describing the scope of the Senate bill, Senator Buckley stated, 'No significant deterioration is a policy that has no effect on existing sources, unless a source undertakes a major expansion program. Senator Buckley was ranking minority member of the Subcommittee on Environmental Pollution at the time the bill was

*WEPCo*, 893 F.2d at 913 & n.5. Design capacity and actual capacity obviously differ at deteriorated units that can operate only at decreased levels of production or for limited hours.

[6]Furthermore, the 2003 Federal Register Notice that Cinergy cites for this proposition is completely inapposite, for three reasons: (1) as the text of the Notice itself makes clear that the rulemaking is *prospective only*, and therefore does not apply to activity prior to its passage; (2) even if it were not prospective only, it would still be irrelevant to determining the proper emissions test because it describes a test for the "routine maintenance" exclusion, not the "emissions increase" test, and (3) the D.C. Circuit has stayed this Rule. *See* 68 Fed. Reg. 61248, 61263-64 (Oct. 27, 2003)*; New York v. Environmental Protection Agency*, No. 02-1387, slip op. (Dec. 23, 2003) (Exh. 35)*;* 69 Fed. Reg. 40278 (July 1, 2004). As this Court has just held, "the new rules will not aid Cinergy in its defense of the merits". *See* Order on the USA's Motion for Partial Judgment on the Pleadings, May 18, 2005 at 9.

> drafted . . . . When this debate took place, the statutory language did not apply PSD preconstruction review to source 'modification.' In November 1977, the Senate and House passed technical amendments, one of which had the effect of defining 'construction' to include 'modifications.' It was this new language that had the effect of overriding Senator Buckley's interpretation of the meaning of 'no significant deterioration.'

*Alabama Power,* 636 F.2d at 400 n.47 (some internal quotations omitted).

Cinergy bases its "design capacity" argument on the unsupported premise that Congress only intended to regulate "new" emissions, or changes that increased a unit's capacity. Cin. Opp'n, at 10-14. This supposed intention is nowhere mentioned in the statutory text and is contrary to other portions of the Act. Indeed, nothing Cinergy cites establishes that Congress made a unit's design capacity determinative of PSD applicability. Instead, Cinergy cites to several quotes from Congressional debates to support the unremarkable proposition that Congress did not intend *plants which have not been modified* to be subject to PSD. *See* Cin. Opp'n, at 12-13. That is true, but beside the point. The question, of course, is how to measure increased emissions for the purposes of the PSD program's definition of "modification". Unfortunately for Cinergy, that question has been answered in EPA's favor, by both this Court in *SIGECO* and the *Alabama Power* court, among others. As the *Alabama Power* court concluded, "The statutory scheme intends to 'grandfather' existing industries; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program. *If these plants increase pollution, they will generally need a permit*." *Alabama Power*, 636 F.2d at 400 (emphasis added). The *Alabama Power* court recognized that the permit requirement found in the 1980 regulations for increased pollution follows by necessity from the PSD program's statutory purpose:

> According to their stated purposes, the PSD provisions seek "to assure that any

14

> decision to permit increased air pollution in any area to which this section applies
> is made only after careful evaluation of all the consequences of such a decision
> and after adequate procedural opportunities for informed public participation in
> the decisionmaking process."

*Id.*, at 401.  Thus, the D.C. Circuit held that it is *increased pollution* (compared to the pre-project baseline[7]) that triggers the PSD permit requirement.  It is *not*, as Cinergy would have it, "new" pollution or increased capacity.  In other words, existing sources are not grandfathered if they are modified, no matter how much Cinergy wishes that it might be otherwise.

### 3. The Plain Language of the 1980 and 1992 PSD Regulations Requires Consideration of Annual Emissions, not Hourly Rates.

Cinergy next claims that the 1980 regulations support its claim that the NSR regulations only apply if a modification causes an increase in hourly rate of emissions.  Cin. Opp'n, at 17-19; 21. Its argument, however, flies in the face of the plain language of the regulations.

The United States' opening brief demonstrated that, under the plain language of the 1980 regulations, the NSR emissions increase test is based on annual and not hourly emissions changes.  *See* US Mot., at 24-28; *see also WEPCo* 893 F.2d at 915-916 (observing through regulation's plain language that "[u]nlike NSPS, PSD is concerned with changes in *total annual emissions*, expressed in tons per year") (original emphasis).  To summarize, the 1980 regulations defined "major modification" as

> any physical change in or change in the method of operation of a major stationary
> source that would result in a significant net emissions increase of any pollutant

_____

[7]Cinergy's argument clearly contradicts the plain language of the regulations.  After all, if the only question is whether the project would increase pollution above existing permit limits, why would there be provision for determining a baseline?  The identification of a period "representative of normal source operations" would be unnecessary, because it would not be a comparison to past actual emissions, but rather a comparison to past permit limits. 40 C.F.R. § 52.21(b)(21)(ii).

subject to regulation under the Act.

40 C.F.R. § 52.21(b) (2)(i). Of the second, emissions, prong of this test, both key terms –

"significant" and "net emissions increase" – are further defined and measured in terms of tons

per year. *See* 40 C.F.R. § 52.21(b) (3), (21), (23). Equally notable, nowhere in the plain text of

the NSR regulations are hourly emissions rates mentioned. This regulatory language clearly

calls for an annual test. *See* Dep. of S. Pearl at 51, 85-86 (Exh. 36) (FILED UNDER SEAL).

Despite the testimony of its own employee, Cinergy claims that it has a plain text

argument that the 1980 NSR regulations require an hourly rate emissions test. Cin. Opp'n, at 17-

19.[9] The obvious flaws of this argument are evidenced by Cinergy's failure to cite any

regulatory language to support its "plain language" contentions. For instance, Cinergy cites no

support for its contention that "the 1980 Rules require a comparison of pre- and post-change

annual emission rates while holding hours of operation and production rates constant for units

that have begun normal operation." Cin. Opp'n, at 17-18. In fact, in its entire "plain text"

argument, beyond a few cites that provide generic and off-point definitions, Cinergy relies on

only two citations to the regulations. Neither supports Cinergy's position.

First, Cinergy relies on 40 C.F.R. § 52.21(b)(21)(ii), which notes that "actual emissions

shall be calculated using the unit's actual operating hours, production rates, and types of

materials processed, stored, or combusted during the selected time period." However, "using"

the unit's pre-project operating hours, production rates and fuel type to help establish the

baseline does not mean holding such variables constant for projecting post-project emissions.

---

[9]Cinergy is forced to make this strained argument because it is barred from arguing to this Court
that the regulations themselves are invalid. 42 US.C. §7607(b)(1).

16

*See WEPCo*, 893 F.2d at 917-918 (quoting *Alabama Power*, 636 F.2d at 379 for the proposition that if "the source is an established operation, a more realistic assessment of its impact on ambient air quality levels is possible, and thus directed").[9]  Cinergy's argument contradicts the regulatory language.  Actual emissions "as of a particular date" depend on what a source "actually emitted" during a representative period that "precedes the particular date."  40 C.F.R. 51.166(b)(21)(ii).  Thus, as EPA has consistently explained, this provision addresses the baseline – how to measure past emissions, not how to predict future emissions.  57 Fed. Reg. 32,314, 32,316-17 (1992); *see WEPCo*, 893 F.2d at 916.

Second, Cinergy points to the "hours of operation and production rate" exclusion to "physical change" to argue that hours of operation must be held constant when predicting post-project emissions.  *See* Cin. Opp'n, at 18, n.35 (citing 40 C.F.R. § 52.21(b) (21)(iii)(f)).  Anticipating Cinergy's reliance on this argument, the United States demonstrated in our opening brief that Cinergy's reading of the "hours of operation and production rate" exclusion is contrary to the plain terms of the regulation and to the Seventh Circuit's analysis in *WEPCo*.  US Mot., at 26-28.  Specifically, to make this argument, Cinergy incorrectly collapses the elements of a "major modification" and so obscures the actual plain language of the regulations.  A major modification is: (1) a physical or operational change that (2) would result in a significant net emissions increase.  The exclusion for hours of operation and production rate, by its plain terms, applies to the first element; that is, whether a "physical or operational" change has occurred.  40

---

[9]Cinergy attempts to undermine the fundamental holdings of *WEPCo* by claiming that n. 14 of that opinion, which references this regulatory language, holds that in estimating future actual emissions, one must hold production rates and hours of operation constant.  For the reasons explained above, that is simply not what n. 14 says.

C.F.R. § 52.21(b)(2)(iii)(f). However, Cinergy mistakenly argues that this exclusion may also be applied to the second, emissions, element of modification to prevent a project from triggering the requirement of the PSD program. Cin. Opp'n, at 18. By collapsing the two elements, Cinergy does violence to the plain language of the PSD regulations.[10] Moreover, as our opening brief relates, the Seventh Circuit soundly rejected this argument when it was raised by the Wisconsin Electric Power Company, holding that the hours of operation exclusion "was provided to allow facilities to take advantage of fluctuating market conditions, not construction or modification activity." *WEPCo*, 893 F.2d at 916, n.11.

These two provisions do not support Cinergy's plain text argument. To the contrary, they demonstrate that Cinergy's logic contradicts the regulation's plain language and the law of this Circuit. Moreover, the provisions make it abundantly clear that Cinergy's reading of the regulations would transform the emissions test into nothing more than a fool-proof way to avoid PSD review. If the variables listed in both of these provisions - hours of operation and production rates – were to be held constant, an "emissions increase" would only result in the rare instance that a source becomes less efficient or decides to switch to a more-polluting fuel as a result of a change. This is because absent a change in efficiency or fuel characteristics, production rate increases are directly proportional to hourly rate increase (i.e., an increase in the amount of electricity produced per hour generally corresponds directly to increased fuel

---

[10] Cinergy's reading of the hours of operation and production rate exclusion also ignores the fact that the NSPS regulations likewise contain an exclusion for increases in hours of operation and production rate. 40 C.F.R. § 60.14(e)(3). If the hours of operation exclusion were sufficient to convert an emission increase test into an hourly rate test, there would have been no reason for the NSPS regulations to specify that the NSPS emissions increases are to be measured in kilograms per hour. *See id.* § 60.14(b).

consumption and hence increases hourly emissions). So, if you hold production rate constant,

you will automatically hold emissions rates constant. Even more amazingly, Cinergy's reading

of 40 C.F.R. § 52.21(b) (21)(ii) would require that fuel type should be held constant as well –

even if the fuel type in fact is changed! Under such a scenario, virtually *no project* would ever

trigger PSD. This interpretation is so far beyond the pale that it is clearly wrong as a matter of

law and

 raises no genuine issue of material fact contradicting the United States' plain text regulatory

argument.

### 4.     The 1992 WEPCo Rule Applies to This Case.

Finally, Cinergy attempts to minimize the harm that the *Ohio Edison* decision does to its

hourly rate argument by asserting that the law interpreted by that court, the 1992 WEPCo rule,

does not apply to Cinergy's modifications. Cin. Opp'n, at 21. Cinergy then argues that the *Ohio*

*Edison* case, and therefore presumably the 1992 regulations, have "no bearing on the specific

issue presented in this Motion;" i.e., how to measure PSD emissions increases. *Id.* However,

Cinergy cannot wish away the 1992 regulations, which explicitly provide for an emissions

calculation that considers "hourly rate plus hours of operation."

This case involves 28 modifications that Cinergy made to 22 of its units between 1984

and 2001. Cinergy's modified units are located in Ohio and Indiana. The federal PSD

regulations appearing at 40 C.F.R. § 52.21 have been incorporated into and are part of the

Indiana and Ohio SIPs at all times relevant in this action.

In 1980, EPA issued PSD regulations that set forth the minimum PSD requirements for

SIPs. *See* 45 Fed. Reg. 52,676, 52,730 (Aug. 7, 1980) (originally promulgated at 40 C.F.R. §

51.24 and later redesignated as 40 C.F.R. § 51.166 (1987) (Exh. 5).  On August 7, 1980, EPA

also disapproved Ohio's and Indiana's proposed PSD programs.  Accordingly, EPA incorporated

by reference the PSD regulations of 40 C.F.R. § 52.21 (b) through (w) into the Ohio and Indiana

SIPs.  *See* 40 C.F.R. §§ 52.793, 52.1884.  Therefore, on July 21, 1992, the date EPA

promulgated the final WEPCo rule, which amended the regulations that are incorporated by

reference into the Ohio and Indiana SIPs and which automatically became law in Indiana and

Ohio.  Any modification that Cinergy undertook after this date, then, is governed by the 1992

regulations.

Faced with this reality, that the 1992 WEPCo rule has been automatically incorporated

into Ohio's and Indiana's SIPs, Cinergy then relies on a ruling by the *Duke* court, that utilities

can "opt out" of the 1992 rules and seek application of the earlier regulations.  Cin. Opp'n, at 20

n. 36.  However, nowhere in the 1992 preamble does EPA state that sources may opt-out of the

new rule.  In fact, the 1992 preamble makes it clear that by ending the distinction for utilities of

having or not having "begun normal operations," the 1992 rule sets out a test under which it is

harder to establish an emissions increase.  *See* Deposition of S. Pearl, Exh. 36, at 79-80 (FILED

UNDER SEAL).

### C.    EPA's Interpretation of Its Regulations Is Entitled To Deference.

Perhaps recognizing that its reading of the 1980 regulations is, at best, tortured, Cinergy

goes to great lengths to argue that EPA's reading of its own regulations is not entitled to

deference.  If the Court finds that the regulatory language is ambiguous, EPA's interpretation is

in any event entitled to deference because it is reasonable and consistent with the regulation.

*See Bowles*, 325 U.S. at 414 (agency construction of its regulations must be upheld unless it is

"plainly erroneous or inconsistent with the regulation"); *Chevron* ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"); *WEPCo*, 893 F.2d at 906-907 (citing cases); U.S. Mot., at n. 28 (citing cases).  In its opposition, Cinergy does not support the argument that EPA's interpretation is inconsistent with the language of the regulations – nor could it when the logical reading of the PSD regulation is that "actual" emissions are measured in tons per year.  Likewise, Cinergy's argument against deference fails to meet the *Seminole Rock* standard.

Cinergy's secondary argument, that EPA's position does not merit the "particular deference" due to longstanding and consistent interpretations, also fails.[1]  Cinergy's only evidence against decades of EPA's consistent interpretation of its PSD regulations consists of a few isolated statements by EPA employees.  Parties that have based their arguments for inconsistency on the same statements have repeatedly been rebuffed.  *See, e.g., WEPCo*, 893 F.2d at 911 n.2; *Puerto Rican Cement v. EPA*, 889 F.2d 292, 298-99 (1st Cir. 1989); *U.S. v. Ohio Edison*, 276 F. Supp. 2d 829, 876-78 (S.D. Ohio 2003)*; but see United States v. Duke Energy*, 278 F. Supp. 2d 629 (M.D. N.C. 2003) (currently on appeal in Fourth Circuit).  Cinergy's attempt to recycle this old and failing argument should be rejected.

1. **EPA's Contemporaneous and Historical Interpretations of the 1980 Regulations Require Consideration of the Hourly Rate and Hours of Operation.**

Not only does the plain language of the NSR regulations clearly require consideration of both hours of operation and hourly rate, but (as explained in the United States' opening brief) EPA's interpretation of the 1980 regulations – as reflected in the 1980 Preamble, the *WEPCo*

---

[1]*See Barnhart v. Walton*, 535 U.S. 212, 220 (2002).

determination, the *WEPCo* remand letter, and the 1992 Preamble – also support this position. *See* U.S. Mot., at 28-30.

In its brief, Cinergy does not refute that the 1980 Preamble interprets the PSD rules as requiring consideration of both hours of operation and hourly rate.[12] Nor can it.  Consistent with the regulatory text, the preamble explains that the regulations measure increases in "actual emissions," calculated in tons per year.  The preamble indicates that EPA "[f]ollows the [D.C. Circuit's] lead" in *Alabama Power*, 636 F.2d 323, by focusing on increases in actual rather than potential emissions, and quotes the decision: "If these plants *increase* pollution, they will generally need a permit."  45 Fed. Reg. at 52,700 (emphasis added).

The preamble also presents a revealing example, in which "Source A plans to increase the hours of operation at [existing units]" that would "result in [a] significant net increase[] in actual emissions."  Id. at 52,705.  That statement refutes Cinergy's assertion that the regulations require calculations of emissions increases to assume constant hours of operation.

The preamble, like the plain language of the regulations, also refutes Cinergy's assertion that PSD coverage is limited to NSPS coverage.  The preamble rejected a comment that PSD should apply to certain pollutants only if NSPS applies: "the Act requires PSD review, regardless

---

[12]EPA has never construed the CAA to require NSPS and PSD to have identical "modification" tests.  Attempting to imply that it has, Cinergy cites to a 1984 notice of proposed rulemaking by EPA stating that the legislative history reference to "usage in other parts of the Act" referred "most probably" not only to NSPS statutory provisions but also to NSPS regulations in effect in 1977.  Cin. Opp'n, at 13.  EPA did not thereby indicate, however, that Congress required "modification" under PSD to be defined by those regulations.  Instead, EPA's statement indicates that Congress had "most probably" approved the NSPS regulations as *one* acceptable application of the term.  49 Fed. Reg. At 43,213; *see* 68 Fed. Reg. at 61,273.  That statement, therefore, is squarely in line with EPA's position that it has the authority to interpret emissions increases differently under the PSD and NSPS programs based on the programs' different purposes.

of whether another rule already applies to the source." 45 Fed. Reg. at 52713.  Similarly, the

preamble states that BACT (a PSD requirement) "is required for net significant increases of any

pollutant regulated under the Act, regardless of the . . . emissions standards generally applicable

to it" and that "BACT can complement the NSPS process by extending coverage to additional

source types and units." *Id.* at 52,723; *see also id.* at 52,729 (stating that coverage under the

1980 PSD rules would be broader than it was under the 1978 PSD rules: "the new regulations

require more extensive review for some sources, as well as review of sources which were not

previously covered.").

The preamble is also notable for what it does not say.  If Cinergy's reading were correct,

one would expect some discussion of a test based on maximum hourly rates.  There is none, nor

is there any discussion of how the "increased hours" exclusion requires holding hours of

operation constant in calculating emissions increases.  In fact, the preamble's discussion of the

hours of operation exclusion refutes Cinergy's interpretation.  U.S. Mot., at 29.

The 1988 WEPCo Determination also conclusively rejects a test limited to a comparison

of maximum hourly rates.  The initial determination rejects WEPCo's argument that the 1980

regulations are insensitive to increases in hours of operation or rate of production.  EPA's

Administrator then agreed that these regulations "apply[] to increases in emissions due to

increases in hours of operation or production rate, where . . . such operational or production

increases are closely related to physical or operational changes."  Exh. 22 at 5.  Then, in a

revised final determination, EPA confirmed that an increase in hours of operation, "if

attributable to a physical change or operational change can trigger an emissions increase for PSD

purposes."  Exh. 32  at 9.  Cinergy ignores these discussions.  In response to the remand from

the Seventh Circuit, EPA rejected any test limited to a comparison of maximum hourly rates as "not fairly discernible from any reading of the [1980] regulations".   Exh. 23, at 6-7.

The 1992 rule and preamble again confirmed that the 1980 regulations turn on total annual emissions, not maximum hourly rates.  57 Fed. Reg. at 32,316-17.   Furthermore, Cinergy errs in arguing that EPA added the actual-to-projected-actual test which explicitly considers increases in utilization (hours of operation) in 1992 and that the 1980 regulations did not consider increases in utilization.  The 1992 preamble describes EPA's earlier application of the test and explains that the new rule "clarif[ied]", rather than changed, the methodology for utilities that had begun normal operations.  57 Fed. Reg. at 32317 n.10, 32,323.   Indeed, in the preamble to the proposed 1992 rule, EPA had noted that the test applied on remand from *WEPCo* – that is the actual to projected actual test – would continue to apply under the 1980 regulations to units that have "begun normal operations."  56 Fed. Reg. 27630, 27,633 & n.10 (1991).

As anticipated, Cinergy relies largely on two 1981 statements made by Edward Reich to make its "contemporaneous" interpretation argument.  As the Seventh and First Circuits have previously found, neither statement can be read to override EPA's authoritative interpretation of the hours of operation regulatory exclusion.   In addition, Cinergy relies on EPA memoranda from 1982 and 1999.  As shown below, however, neither of these memoranda supports the "hourly rate" test that Cinergy is advocating.

Cinergy's heavy reliance on the 1981 Edward Reich statements is unfounded.  First, the Seventh Circuit has already rejected these statements as altering the plain meaning of the regulations.  *WEPCo*, 893 F.2d at 916 n.11; *see* US Mot. at 29.  Second, Cinergy's reading of those statements conflicts with the regulatory test and the contemporaneous preamble.  Third, an

24

EPA employee could not change EPA's regulatory interpretation through these letters. Fourth, authoritative EPA pronouncements definitively reject Cinergy's reading of the Reich statements. Cinergy does not dispute as much, but argues that later pronouncements could not alter the regulations' original meaning. That assertion merely underscores the invalidity of Cinergy's reading of Reich's statements, which is inconsistent with the 1980 preamble and regulations.

Similarly, Cinergy relies on a portion of a 1982 question and answer memorandum from EPA Region 4 (Def.s' Exh. 20) as definitive evidence that EPA interpreted the PSD test as an hourly rate test. Cin. Opp'n, at 23. A close review of the memo, however, reveals that it provides no clear support for this proposition. Although it is lacking in many details, the memo does not contradict EPA's interpretation of the hours of operation exclusion – that a simple increase in hours of operation, standing alone (i.e., not caused by a physical change) will generally not trigger PSD review. The circumstances addressed in this memo are only briefly described in a question and answer format, but they appear to encompass the following assumptions: (1) a source is undertaking a modification that will trigger PSD for purposes of sulfur dioxide ("SO2"), and (2) after the SO2 modification, hourly PM (particulate matter) emissions are not expected to increase. Def. Exh. 20 at 3. The "question" posed is simply whether, if the source were to ramp up operations by 3000 additional hours per year, would that increased operation result in a PM emissions increase for PSD purposes. The memo provides no evidence of whether this anticipated increase in hours of operation was a result of a physical change, nor any evidence concerning the nature of the physical or operational change that apparently resulted in the SO2 increase and whether that change would result in this increase in the hours of operation. Thus, the "answer" portion of the memo states that PSD would not apply

25

for purposes of PM "[s]ince the modification does not <u>cause</u> any increase in emissions." Id. (underline in original).    This is consistent with the EPA's interpretation of the NSR regulations which are triggered when a physical or operational change <u>would result</u> in a significant net emissions increase.  Therefore, a change in the hours of operation, without a physical or operational change, which is what this memo described, does not trigger NSR requirements.

Cinergy also wrongly asserts that an EPA guidance shows that EPA interpreted its PSD regulations as having incorporated the NSPS hourly rate emissions increase test.  Cin. Opp'n, at 23.  A full reading of the letter shows that Mr. Toensing thought it appropriate to consider the question of whether an activity increases a unit's hourly emissions rate in connection with whether the activity constitutes routine maintenance.  In this document, Mr. Toensing reasoned that an activity that increased hourly emission rates would not qualify as routine maintenance, and that such an increase could conveniently be used to screen for potential PSD violations.  An NSPS emissions increase thus would be a "red flag" of a capacity increase that would not be routine.  Mr. Toensing did *not* state that any activity that did not increase hourly emission rates would be exempt as routine maintenance.  To the contrary, the letter specifically stated that "[T]his letter is not intended to address changes which extend the normal useful life of a unit . . . Such changes generally do not qualify for the routine repair/replacement exemption of the regulation."  Def. Exh. 21 at 2.  (Of course, the crux of the emissions increase dispute between the parties is that physical changes which extend the normal life of a unit do not necessarily increase emissions on an hourly rate basis but may increase emissions on an annual basis through increased utilization.)

Nor did the letter suggest, as Cinergy implies, that EPA thought that the PSD emissions

26

increase calculations must first consider whether hourly emission rates increase. The Toensing letter clearly reflected that emissions increase calculation is the second step, after determining whether an activity is a physical or operational change. Mr. Toensing considered the hourly emission rates in relation to his first step:

> Simply stated, the first determination (using a suggested lb/hr assessment) addresses whether a particular change constitutes a physical/operational change as interpreted under the PSD regulation. If the answer is yes, the second determination (using an actual-to-P[otential]T[o]E[mit] test) addresses whether the change is subject to PSD preconstruction permitting.

*Id.* In short, the Toensing letter does not contradict EPA's longstanding and consistent interpretation of its PSD regulations.

### 2.     The United States' Position Is Not Merely A Litigation Position.

Another way Cinergy argues that EPA's interpretation is not longstanding and consistent is to accuse EPA of manufacturing its interpretation for litigation purposes. In support of this specious argument, Cinergy cites: (a) statements that have been made in litigation briefs for other Clean Air Act enforcement cases; (b) statements EPA officials have made regarding expectations of the application of the NSR regulations; and (c) statements EPA employees have made regarding the emissions calculations performed in the utility cases. None of these statements supports the notion that EPA's interpretation of its PSD regulations has been inconsistent or that the interpretation is a recent creation born out of litigation. To the extent Cinergy can point to differing interpretations held by EPA, such quotes reflect EPA's reading of its 1980 regulations as providing two emissions tests, depending on whether a source had or had not "begun normal operations," and EPA's use of its enforcement discretion to rely, in one case, on the test most favorable to the defendant. As shown above and throughout this brief, EPA has

been consistent in its approach to calculating PSD emissions increases for decades, as reflected in the *WEPCo* determination, the *WEPCo* litigation, the *WEPCo* remand letter, and the 1992 PSD regulations. Cinergy's sparse quotations, taken out of context, cannot transform this consistent interpretation into merely a recent litigation position.

One example Cinergy uses of alleged EPA inconsistency is EPA's use of "actual-to-potential" or "actual-to-projected future actual" emissions increase tests as circumstances require in the utility cases. Cin. Opp'n, at 32-33 (citing United States' briefs). Of course, *both* the "actual-to-potential" and "actual-to-projected future actual" tests are annual emission increase tests that compare pre-project actual emissions with a projection of future (post-project) emissions. Notably, neither test would apply if PSD required, as Cinergy asserts, an hourly rate test instead of an annual test. That EPA has articulated these tests for two decades is evidence that EPA has always understood the PSD emissions test as an annual and not hourly rate test. Moreover, the existence of two tests can easily be explained.

At the time of *WEPCo*, EPA interpreted its 1980 PSD regulations, where a source made a physical or operational change, as assuming that such a modified source had "not begun normal operations" (in its modified state). Accordingly, EPA applied the provision in its regulations for sources that have "not begun normal operations," which plainly set forth an "actual-to-potential" emissions test. It was in that context when the issue arose in *WEPCo* that EPA argued that the 1980 regulations did not provide for an "actual-to-projected actual" (sometimes called "actual-to-future actual" or "past actual to future projected") test under which a source could use past operating data to project future emissions.

After the Seventh Circuit disagreed with EPA's predicate assumption (that the facility

28

had "not begun normal operations") on the specific facts presented there, on remand, EPA was

presented with a decision: how to comply with the court's mandate.  The Seventh Circuit

instructed EPA to recalculate post-change emissions by considering past operating conditions,

where possible, to make an assessment of future emissions that is more realistic than assuming

100% utilization of the source's potential.  Alternatively, the court stated that EPA could

conduct a new rulemaking "to apply the potential to emit concept to like-kind replacements ...

but existing regulations do not seem to us to support such an application."  893 F.2d at 918.

For purposes of the remand, EPA declined the court's invitation to initiate a new

rulemaking, but rather sought to comply with the court's instruction "within the present

regulatory framework".  US Exh. 23, at 1.  In other words, EPA conducted the analysis required

under the PSD regulations where a unit <u>has</u> "begun normal operations."  EPA summarized the

analysis as follows:

> [F]or WEPCO's 'like-kind replacements,' EPA will compare representative actual
> emissions for the baseline period to estimated future actual emissions based on all
> the available facts in the record.  Specifically, in calculating post-renovation
> actual emissions, this approach takes into account 1) physical changes and
> operational restrictions that would affect the hourly emissions rate following the
> renovation, 2) WEPCO's pre-renovation capacity utilization, and 3) factors
> affecting WEPCO's likely post-renovation capacity utilization.

*Id.* at 7-8.  EPA described this as an "actual-to-actual" test, but because it *predicts* emissions, it

is more aptly called the "actual-to-projected-actual" test.  *Id.* at 1; *see also* 57 Fed. Reg. at 32317

n.10 (US Exh. 12).

Subsequently, EPA did promulgate, through notice and comment rulemaking, a new

regulation that essentially eliminated the issue for utilities of whether a modified source had or

had not begun normal operations.  The new rule gave utilities the option of making use in their

emissions projections of the "actual-to-projected actual" test, which had always been provided in the 1980 regulations for sources that had begun normal operations, and which EPA used in the *WEPCo* remand. This was the 1992 "*WEPCo* Rule". With respect to enforcement actions EPA has prosecuted against utilities where the 1980 PSD provisions are still applicable (and the WEPCo Rule is not), EPA is perfectly free to use its enforcement discretion to prove violations under the "actual-to-projected actual" test, which is more favorable to the defendant (it allows emissions projections based on less than full utilization), rather than proceeding under the more stringent "actual-to- potential" test (which assumes 100% utilization). None of this amounts to inconsistency on the part of EPA, much less inconsistency that deprives EPA of deference for its interpretation of its own regulations.

Cinergy also cites various statements by EPA officials as allegedly demonstrating that the NSR regulations have the hourly rate emissions test that Cinergy advocates, and therefore a test that is different than the one EPA is asserting in this litigation. Cin. Opp'n., at 31-32. Specifically, Cinergy cites a 1990 General Accounting Office (GAO) report (Def Exh. 28), a 1989 letter from an EPA Administrator (Def Exh. 29), portions of the Acid Air Program Debates (Def Exh. 14), and testimony from an EPA Administrator (Def Exh. 15) predicting that NSR regulations would not be broadly triggered. Notably, nothing in these documents discusses the scope of EPA's PSD modification test. Nor do these documents imply that this prediction reflects an interpretation that refurbishment projects which cause increased annual emissions will not trigger PSD.

Cinergy also argues that Congress would not have enacted the CAA acid rain (Title IV) legislation had it thought existing plants might already be (or become) subject to PSD (Cin.

30

Opp'n, at 32). However, the enactment of Title IV does not bear on the correct interpretation of the PSD regulation's annual emissions test, as PSD focuses on local air quality whereas Title IV focuses on nationwide air quality. Regardless of how broadly PSD might be applied, it would certainly never apply to all sources. Therefore, it made sense for Congress to enact legislation addressing a particularly serious air pollution problem, acid rain, that was applicable to all sources (and not just those that might become subject to NSPS or PSD by being modified).

To complete its inconsistency argument, Cinergy accuses EPA of having created emissions tests just prior to and during the lawsuits. In support of this accusation, Cinergy cites deposition testimony by current and former EPA employees taken in the parallel utility cases. *See* Cin. Opp'n, at 33. Cinergy has cited this testimony several times to this Court while being less than candid about the subject at issue in the testimony.

The testimony Cinergy cites relates not to the emissions increase test, or methodology for calculating an emissions increase, but rather to discussions about the application of available evidence to make the determination. Under the 1980 and 1992 regulations, for units that had begun normal operations, the general formula used to calculate a net emissions increase is a comparison of pre-change actual emissions and projected post-change actual emissions. This general formula has long been applied by the Agency to determine whether a source, such as Cinergy, should have expected the projects at issue to increase emissions. Since the second part of the calculation is a prediction, it must be made by evaluating evidence the source has available to it *before* it undertakes the projects. The regulations do not mandate, and EPA had not interpreted the regulations to mandate, a particular type of data to make this projection.

The utility industry generates many different types of data that can be used to determine

31

whether the source should have predicted a project would increase emissions. Some of this data

includes outage information that is reported in the industry's Generating Availability Data

System (GADS), and company-specific modeling information. Many EPA engineers were

unfamiliar with these utility-specific types of evidence before the initiation of this litigation

because, by and large, utility companies never asked EPA for PSD applicability determinations

prior to undertaking projects that might trigger PSD requirements. *See* Exh. 37 at 9 (May 17,

1989 Letter to MAPP Environmental Committee from Eric Hennen, Chairman, MAPP Air

Quality Subcommittee).

Thus, at the outset of the utility enforcement initiative, EPA had to decide what utility-

specific data to use to determine whether each company should have projected significant

emissions increases resulting from its projects. EPA's use of this data was based upon and

consistent with the methodology set forth in EPA's PSD regulations. As a general matter, any

given formula or calculation will necessarily vary depending on the specific data that are

available and are used to evaluate emissions, consistent with the methodology specified in the

PSD regulations. The regulations do not specify how to use any particular types of data.

Contrary to Cinergy's wholly misleading implication, nothing in this process of determining how

to make use of the available data in calculating emissions represented the creation of a new test

for measuring emissions increases, or any departure from EPA's longstanding and consistent

interpretation of its regulations.

### 3. EPA's Interpretation of the PSD Regulations, That Both Hours Of Operation and Hourly Rate Are Relevant to Calculations, Was Known in the Industry and By Cinergy.

Cinergy's claim that EPA has manufactured its emissions position for litigation is

perplexing considering the fact that documents and testimony establish Cinergy's and the utility industry's knowledge of EPA's interpretation for nearly 20 years.[13]  *See, e.g.*, US Mot., at 26 n.17 (quoting UARG's 1990 comments in Exh. 25 that "NSPS regulations apply if an emissions increase measured in kilograms per hour occurs . . . . PSD regulations, in contrast, apply if an emissions increase measured in tons per year occurs, *which is typically associated with an increase in capacity factor*").  S. Pearl Dep. at 85-86 (Exh. 36.) (FILED UNDER SEAL).

More generally, the utility industry has carefully tracked and understood EPA's consistent interpretation.  In the September 9, 1988 WEPCo determination, EPA noted that WEPCo's proposed projects would be "major modifications" subject to PSD review, because

> there would be a 'significant net emissions increase' within the meaning of the PSD regulations as a result of the proposed renovations as currently planned, because potential emissions after the project – *reflecting the restoration of 80 megawatt capacity at each unit* – would greatly exceed representative actual emissions prior to the physical changes.  (*The fact that the project is intended to restore the plant's original design capacity is irrelevant to that calculation*.)

Exh. 21, at 7 (emphasis added).  In their Amicus Brief to the *WEPCo* Court, the group of 63 independent utility companies (including both Cincinnati Gas and Electric and Public Service Indiana) revealed their understanding of EPA's position, that a company undertaking "renovation work . . . [to] restore the physical and operational capability of each unit to its original . . . nameplate capacity" would trigger PSD.  Exh. 28 at 8.  Indeed, the utilities expressed their great concern that EPA's position "raise[d] substantial questions as to whether repair or replacement activity [could] be undertaken with respect to deteriorated equipment . . . without triggering new source requirements."  Id. at 10.  *See also* Exh. 38, June 5, 1989 Letter

---

[13]Cinergy is one of the largest members of the two major industry lobbying organizations: the Utilities Air Regulatory Group (UARG) and the Edison Electric Institute (EEI).

from Henry Nickel to Dept. of Energy, 4-5 of Attachment (warning that "[a] utility experiencing increased forced outages at its units due to equipment problems cannot undertake repairs needed to avoid serious electric reliability problems without applying for and receiving a PSD permit, even though these repairs will only improve reliability and efficiency and will not increase the emission rate of the units".)

The *WEPCo* Court agreed with EPA that "[the 1980] PSD [regulations were] concerned with changes in *total annual emissions*, expressed in tons per year," 893 F.2d at 915, and that the "hours of operation and production rate" exclusion should not be applied to the emissions calculation. (*id.*, at 916 n.11). The Seventh Circuit's approval of most of EPA's interpretation was not surprising to the industry. Yet the very same day the Seventh Circuit issued its ruling, UARG urged EPA to reconsider its WEPCo determination, stating its concern that EPA's position meant "that repairs undertaken to restore the plant to its original capacity level triggered application of new source performance standards and prevention of significant deterioration (PSD) requirements." Exh. 25, at 5.

As discussed above, EPA revisited the WEPCo units without promulgating new regulations. EPA recognized that the Seventh Circuit had held "that EPA could not wholly disregard past operating history" Exh. 23 at 4. EPA then calculated estimated future actual emissions based on the projected utilization of the unit. *Id.*, at 8-9.

After the *WEPCo* remand letter, the utility industry went to Congress seeking to modify the statute to address the *WEPCo* ruling. UARG submitted a study to Congress, estimating the potential impact the WEPCo determination could have on the industry. An Administration statement to Congress noted that the costs in the UARG study were exaggerated, in part because

"those projects that did not increase maximum hourly emissions would be subject only to the PSD provisions."  1990 Clean Air Act Legislative History at 10738, 10742 ("Administration Testimony Regarding S. 1848," at 14-15.)

In this litigation, EPA is relying on its historical interpretations of its PSD regulations. These interpretations have been shared with the utility industry and the general public for nearly 20 years.  The problem is not that the industry was not aware of or did not understand EPA's interpretation, but that they disagreed with it.  Cinergy's unfounded contentions of inconsistency do not render EPA's longstanding and consistent interpretation of its regulations "clearly erroneous" or "inconsistent with the regulations."  *Bowles*, 325 U.S. at 414.

### III.     CONCLUSION

For the foregoing reasons, the United States respectfully requests entry of the order it attached to its opening brief in support of its Motion for Partial Summary Judgment.

Dated: May 31, 2005                    Respectfully Submitted,

                                       KELLY A. JOHNSON
                                       Acting Assistant Attorney General
                                       Environment & Natural Resources Division

                                       /s/ Katherine L. Vanderhook

                                       SARAH HIMMELHOCH
                                       RICHARD GLADSTEIN
                                       JEFFREY K. SANDS
                                       KATHERINE L. VANDERHOOK
                                       LARRY M. CORCORAN
                                       Environmental Enforcement Section
                                       Environment & Natural Resources Division
                                       United States Department of Justice
                                       P.O. Box 7611
                                       Washington, D.C.  20530
                                       202-514-3163

SUSAN W. BROOKS
United States Attorney
Southern District of Indiana

THOMAS E. KIEPER
Assistant United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN  46204-3048

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Notice of Filing was filed on May 31, 2005 using the Court's ECF system and that, therefore, service was accomplished upon counsel of record by the Court's system.

/s/ Katherine L. Vanderhook

Katherine L. Vanderhook