UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>    Plaintiff, )<br>)<br>STATE OF NEW YORK, STATE OF )<br>CONNECTICUT, STATE OF NEW JERSEY, )<br>    Plaintiff-Intervenors, )<br>)<br>HOOSIER ENVIRONMENTAL COUNCIL, )<br>OHIO ENVIRONMENT COUNCIL, )<br>    Third-Party Plaintiffs, )<br>)<br>    vs. )<br>)<br>CINERGY CORPORATION; PSI ENERGY, )<br>INC.; CINCINNATI GAS & ELECTRIC CO., )<br>    Defendants. ) | 1:99-cv-01693-LJM-VSS |

### ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT REGARDING THE APPLICABLE TEST FOR EMISSIONS INCREASES

This matter is before the Court on the parties' request for the Court to decide the purely legal question of what test applies to determine whether an emissions increase occurs so as to trigger the Clean Air Act's ("CAA") New Source Review ("NSR") permit provisions. The United States of America (the "USA") filed a Motion for Partial Summary Judgment on Emissions Test. In response, defendants Cinergy Corporation; PSI Energy, Inc.; and Cincinnati Gas & Electric Co. (collectively, "Cinergy") filed a Motion for Summary Judgment on the Applicable Test for Emission Increases. The parties have fully briefed the issue and it is now ripe for ruling. For the reasons explained herein, the USA's motion is **GRANTED**, and Cinergy's motion is **DENIED**.

## I. **BACKGROUND**

The USA has brought this action against Cinergy alleging, *inter alia*, that it violated NSR[1] provisions when it made physical changes to its units that were "modifications" without first having obtained a pre-construction permit. The Prevention of Significant Deterioration ("PSD") program requires that: "No major emitting facility on which construction [or modification] is commenced after August 7, 1977, may be constructed [or modified] . . . unless (1) a permit has been issued for such proposed facility in accordance with this part . . . ." 42 U.S.C. § 7475(a). The Nonattainment New Source Review ("NNSR") program requires "permits for the construction or operation of new or modified major stationary sources anywhere in the nonattainment area." *Id.* § 7502(c)(5). Central to this lawsuit, then, is whether the changes Cinergy made to its emitting sources were modifications.

Congress enacted the CAA in 1970, including the New Source Performance Standard ("NSPS") provisions, which directed the Environmental Protection Agency ("EPA") to promulgate technology-based performance standards for new or modified emitting facilities. *Id.* § 7411. The EPA promulgated the regulatory PSD program in 1974, in response to litigation over its obligation under the CAA to require states to implement plans to prevent significant deterioration of air quality in areas where minimum standards had been attained. *See Alabama Power Co. v. Costle*, 636 F.2d 323, 347 (D.C. Cir. 1980). The "NSPS" regulatory definition of "modification" specifically directed that emission rates be measured in kilograms per hour, 40 C.F.R. § 60.14, but the PSD regulatory definition of "modification" did not. Rather, the PSD regulation defined "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the

---

[1] NSR includes both the Prevention of Significant Deterioration ("PSD") provisions and the Nonattainment New Source Review ("NNSR") provisions.

2

emission rate of any [regulated] pollutant." 39 Fed. Reg. 42,510, 42,514 (Dec. 5, 1974). In 1977, Congress amended the CAA to include a statutory PSD program, as well as the NNSR program.

When Congress first enacted the statutory PSD program in 1977, the permit provisions applied only to the "construction" of major emitting facilities. *See* Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685, 735 (1977). Just a few months later, Congress passed "technical and conforming amendments" to the CAA, which added to the "Definitions" section of the PSD provisions the following: "The term 'construction' when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility." Pub. L. No. 95-190, 91 Stat. 1293, 1402 (1977); *see* 42 U.S.C. § 7479(1)(C). Section 7411(a), part of the NSPS provisions, defines "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411. The definition of "modification" in NNSR also refers to section 7411(a). *Id.* § 7501(4).

EPA regulations further define "modification" for NSPS purposes as "any physical or operational change to an existing facility which results in an increase in the emissions rate to the atmosphere of any [regulated] pollutant . . . expressed as kg/hr." 40 C.F.R. § 60.14(a) & (b). In 1980, after several rule changes that defined "modification" for NSR purposes, the final regulation defined the term "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 45 Fed. Reg. 52,676, 52,735 (Aug. 7, 1980); see *New York v. U.S. EPA*, 413 F.3d 3, 12 (D.C. Cir. 2005) for discussion of regulation's history.

After it promulgated the 1980 rule, EPA advocated using an "actual-to-potential" test to measure increased emissions for PSD permitting purposes. The actual-to-potential test compared a source's past annual emissions to its potential future annual emissions after the physical change, assuming the source would operate at full capacity in the future. *See Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 916-18 (7th Cir. 1990). The Seventh Circuit rejected the actual-to-potential test in *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990). Instead, the court agreed with Defendant WEPCO that the EPA should measure future emissions based on a projection of future actual emissions. This has become known as the "actual-to-projected-actual" test.

Following *WEPCO*, Congress amended the CAA in 1990. The 1990 Amendments included some changes related to NSR, but did not address the issue raised in *WEPCO* of the correct way to measure future emissions, and did not revisit the statutory definition of modification. *See New York*, 413 F.3d at 15-16. The EPA subsequently adopted the actual-to-projected-actual test. *See* 40 C.F.R. § 52.21 (a)(2)(iv)(c) (2004).

The issue to be decided herein is the purely legal question of what is the appropriate method of determining whether a physical change at a source has caused an increase in emissions for purposes of NSR. The parties and their experts may then apply this method to the facts of this case in preparation for trial.

## II. STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal procedural rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S.

317, 327 (1986); *see United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Summary judgment is granted if the all the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *See id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Wollin v. Gondert*, 192 F.3d 616, 620 (7th Cir. 1999); *Schroeder v. Barth, Inc.*, 969 F.2d 421, 423 (7th Cir. 1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *See Wollin*, 192 F.3d at 621.

When considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Id.* at 621; *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*, 184 F.3d 672, 677 (7th Cir. 1999); *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322; *Thomas & Betts Corp.*, 138 F.3d at 291; *Shields Enters., Inc.*, 975 F.2d at 1294.

### III. DISCUSSION

The appropriate test for measuring emissions under the PSD program has been the subject of numerous judicial opinions over the years, including one from this Court, *United States of America v. Southern Indiana Gas and Electric Co.*, No. IP 99-1692-C-M/F, 2002 WL 1629817 (S.D. Ind. July 18, 2002) ("*SIGECO*"), and from the Seventh Circuit Court of Appeals, *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"). In *SIGECO* this Court held that the PSD program requires an owner or operator to determine whether a preconstruction permit is required *before* construction begins. *SIGECO*, at *3. In *WEPCO* the Seventh Circuit addressed *inter alia*, how to assess emissions increases for PSD purposes. Specifically, the court ruled that the EPA could not assume a unit would operate at its full potential after physical change, but must consider past operating conditions. *WEPCO*, at 917-18.

More recently the District of Columbia and Fourth Circuit Courts of Appeals have issued opinions that bear directly on this issue. In *United States v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005), the Fourth Circuit Court of Appeals found that once Congress incorporated the statutory definition of "modification" from the NSPS program into the PSD statute, the EPA could not interpret the definitions differently. *Duke Energy*, 411 F.3d at 546-47. The court looked to the plain language of the CAA to find that because the terms are defined identically, Congress could not have intended contradictory interpretations. *Id.* at 548 (relying on *Rowan Cos. v. United States*, 452 U.S. 247 (1981)). The court also found that the legislative history of the PSD statutes supported the view that Congress intended EPA to use the same definition for both programs. *Id.* (citing 123 Cong. Rec. 36,253 (Nov. 1, 1977) (amending the statute to "conform to usage in other parts of the Act")).

In *New York v. U.S. EPA*, 413 F.3d 3 (D.C. Cir. 2005), the District of Columbia Court of Appeals held that nothing in the statutory language or history suggested that in enacting the 1997 CAA Amendments Congress intended to incorporate the NSPS regulatory definition of "modification" into the PSD statute. *New York*, 413 F.3d at 19-20. However, the court purposefully did not address whether Congress intended to require the EPA to provide identical regulatory definitions for "modification" throughout the NSPS and NSR programs. *Id.* at 20.

### A. PROJECTED EMISSIONS

The first part of determining the correct emission test is whether the post-project emissions should be determined by a pre-project projection or a post-project measurement. The USA argues that the EPA must estimate post-project emissions before construction begins. Cinergy does not raise this argument in its own cross-motion, but recognizes in its reply memorandum that this Court has previously decided the issue. *See SIGECO*. Thus, in line with the purpose and logical interpretation of the PSD permit requirement, this Court reaffirms that an owner or operator must make a preconstruction projection of whether and how much emissions will increase at a particular unit following construction.

### B. EMISSIONS CALCULATION

The second and more complicated issue is whether an owner or operator under the NSR provisions must calculate an "increase[ in] the amount of any air pollutant emitted" by a source based on an hourly or yearly emissions rate. *See* 42 U.S.C. § 7411. This Court previously has adopted the view that the PSD permit provisions apply when there will be an increase in the total

annual emissions. *See United States v. Southern Ind. Gas & Elec. Co.*, 245 F. Supp.2d 994, 998 (S.D. Ind. 2003).

### 1. **Congressional Language and Intent**

The parties' most formidable dispute is about how Congress intended the EPA to make the calculation. This Court begins by following the line of analysis the Fourth Circuit used in *New York*. When Congress altered the definition of "construction" to include "modification" under PSD as it is used for NSPS, it did not, expressly or otherwise, incorporate the regulatory definition. *See New York*, 413 F.3d at 19-20. Nothing in the Congressional history indicates Congress intended to incorporate the regulatory definition. *See id.* By contrast, Congress did expressly incorporate regulatory provisions in other areas of the CAA. *See id.* at 19 (citing Pub. L. No. 95-95, § 129(a)(1), 91 Stat. 685, 745 (1977)).

Further, Congress did not limit the EPA's authority to further define "modification" in the regulations as it deemed fit to serve the purposes of the PSD program. *See, e.g., Alabama Power*, 636 F.2d at 397-98 (recognizing that the EPA had the authority to adopt different regulatory definitions for "source" in NSR and NSPS in light of the "differences in the purpose and structure of the two programs"). Nor did Congress direct the EPA to change its regulatory definition, which differed from the NSPS regulatory definition at the time Congress promulgated NSR in 1977. *See, e.g.*, 39 Fed. Reg. 42,510, 42,514 (Dec. 5, 1974). Finally, nothing about the EPA's definition of "modification" contradicts the statutory definition.

## 2. EPA's Language and Intent

Next, the Court must address Cinergy's argument that the EPA's own rules require it to hold the hours of operation and production rates constant when determining whether a net emissions increase will occur. Cinergy first argues that EPA's current litigation position is contrary to its own earlier acknowledgments that Congress intended for the EPA to conform the meaning and usage of "modification" in PSD to that in NSPS. Second, Cinergy argues that EPA's current litigation position is contrary to its own rules.

### a. Prior Construction

The Court rejects Cinergy's argument that the EPA's current litigation position is contrary to earlier acknowledgments that Congress intended for the EPA to define "modification" for NSR as it does for NSPS. Cinergy has mistaken the circumstances surrounding some of these "acknowledgments." For example, when the EPA stated in 1984 that Congress intended the NSPS statute to also apply to EPA regulations implementing section 111(a)(4), the EPA was referring to the inclusion of "fugitive emissions" in the concept of overall emissions. *See* 49 Fed. Reg. 43, 211, 43,213 (Oct. 26, 1984). When the EPA stated in 2003 that "We have understood [Congress' statements] to be a reference to our preexisting rules interpreting the term 'modification' in the NSPS context" it was a reference to what is excluded from "modification," specifically, the routine maintenance, repair and replacement exception. 68 Fed. Reg. 61248, 61269 (Oct. 27, 2003). Later in that same rulemaking, the EPA reiterated that it takes the same general approach to what constitutes an increase in emissions for NSPS and NSR, *except* that the NSR rule uses an *annual* measurement. *Id.*

9

The 1980 rule defines "major modification" as a change that causes a significant net increase in a unit's "actual emissions." *See* 45 Fed. Reg. 52,676, 52,698 (Aug. 7, 1980). "Actual emissions" are to be measured using the unit's actual operating hours and production rates. 40 C.F.R. § 52.21(b)(21)(ii). The Court disagrees with both Cinergy and the *Duke Energy* court that the EPA's definition of "actual emissions," means that " a net emissions increase can result only from an increase in the hourly rate of emissions." *See Duke Energy*, 278 F. Supp. 2d at 640. Consistent with the 1980 rule defining "actual emission," in an actual-to-projected-actual comparison, the projected actual emissions would be measured using projected actual operating hours and projected actual production rates. Thus, if a physical change will result in a unit increasing its operating hours, the projected actual operating hours would include the increase.

Cinergy argues that the *WEPCO* decision and the EPA's own interpretation of the 1980 rules compels that a net emissions increase under NSR must be measured holding hours of operation and production rates constant. This Court reads *WEPCO* only to have rejected the actual-to-potential comparison and EPA's assumption in that case of continuous operations. *See WEPCO*, 893 F.2d at 917. Instead, the Seventh Circuit thought "'a more realistic assessment of [a source's] impact on ambient air quality levels is possible.'" *Id.* (quoting *Alabama Power*, 636 F.2d at 379). The issue in that case was not the same issue this Court must address; the issue was simply whether the actual-to-potential comparison was appropriate. Nothing in the *WEPCO* decision directed EPA to ignore the impact a physical change would have on the actual future operating hours of a unit. The Seventh Circuit in *WEPCO* recognized that for NSPS purposes, the EPA would determine whether a source's hourly rate increased and that for PSD purposes, the EPA would determine whether a source's total amount of emissions would increase. *See id.* at 905.

### b. Increased Hours Exclusion

Cinergy fears that allowing the EPA to interpret "modification" this way for NSR will eliminate a causation element. Cinergy argues that the EPA would not be able to discern when an increase in emissions was caused by a "modification" rather than another factor, such as demand. Cinergy's fear is unfounded. The definition of "modification" in NSR and NSPS has several exceptions, including routine maintenance, repair and replacement, as well as an increase in hours or emissions not tied to a physical change. *See* 40 C.F.R. § 52.21(b)(2).

The PSD regulations state that an increase in hours or production rate are not considered physical changes. *Id.* § 52.21(b)(2)(iii)(f). A reference back to the definition of "major modification" demonstrates that it is a physical change that results in an emissions increase. *Id.* § 52.21(b)(i). Thus, the plain meaning of the increased hours exclusion is that an increase in hours or production rate are not a "physical change" and thus cannot, alone, be a modification. Increased hours and production rate are not excluded from the definition of "modification"; that is, if a physical change results in an increase in hours of operation that causes a net emissions increase, a modification has occurred. Not only is this the plain and most logical reading of the regulation, it prevents the very situation about which Cinergy is concerned – that in which an increase in hours or production rate *unrelated to any physical change* would be considered a modification and subject the source to PSD review. The EPA confirmed this view by way of the "Clay Memorandum" issued on September 9, 1988.[2]

---

[2]"The preamble to the rule (45 FR 52676, 52704 (August 7, 1980)), makes it clear that this exclusion is intended to allow a company to lawfully increase emissions through a simple change in hours or rate of operation up to its potential to emit . . . without having to obtain a PSD permit. . . . However, . . . the exclusion for increases in hours of operation or production rate does not take the project beyond the reach of PSD coverage if those increases to not stand alone but

Cinergy argues that two statements Edward Reich, then-Director of EPA's Division of Stationary Source Enforcement, made in 1981 (the "Reich Memos") indicate otherwise, and also that the Reich Memos demonstrate an EPA interpretation that is contrary to its current litigation position. This Court agrees with the Southern District of Ohio's view that the Reich Memos are contrary to the plain language of the CAA and EPA's regulations. *See United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 877 (S.D. Ohio. 2003). The Reich Memos are not authoritative here.

## IV. **CONCLUSION**

For all of the reasons set forth above, the USA's motion for summary judgment is **GRANTED** and Cinergy's motion for summary judgment is **DENIED**.

IT IS SO ORDERED this 29th day of August, 2005.

_____
LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

---

rather are associated with non-excluded physical or operational changes." Clay Memorandum at 6-7.

Distributed to:

Scott R. Alexander
SOMMER BARNARD ATTORNEYS, PC
salexander@sommerbarnard.com

Kevin P. Auerbacher
STATE OF NEW JERSEY, DEPT. OF LAW & PUBLIC SAFETY
auerbkev@law.dol.lps.state.nj.us

Christopher D. Ball
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
christopher.ball@dol.lps.state.nj.us

Deborah Nicole Behles
U.S. DEPARTMENT OF JUSTICE
deborah.behles@usdoj.gov

Samuel B. Boxerman
SIDLEY AUSTIN BROWN & WOOD LLP
sboxerman@sidley.com

David T. Buente
SIDLEY AUSTIN BROWN & WOOD LLP
dbuente@sidley.com

Robert R. Clark
SOMMER BARNARD ATTORNEYS, PC
rclark@sommerbarnard.com

Larry Martin Corcoran
ENVIRONMENTAL AND NATURAL RESOURCES DIVISION
larry.corcoran@usdoj.gov

Michael E. DiRienzo
KAHN DEES DONOVAN & KAHN
miked@k2d2.com

Steven David Ellis
ENVIRONMENTAL & NATURAL RESOURCES
steven.ellis@usdoj.gov

Julie L. Ezell
CINERGY SERVICES INC
julie.ezell@cinergy.com

Richard Mark Gladstein
U.S. DEPARTMENT OF JUSTICE
richard.gladstein@usdoj.gov

Thomas Charles Green
SIDLEY AUSTIN BROWN & WOOD LLP
tcgreen@sidley.com

Maurice A. Griffin
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
maurice.griffin@dol.lps.state.nj.us

R. Keith Guthrie
kgmail@comcast.net

Sarah Dale Himmelhoch
U.S. DEPARTMENT OF JUSTICE
sarah.himmelhoch@usdoj.gov

Ann Renfrew Johnston
LAW OFFICE OF ANN JOHNSTON
annrjohnston@aol.com

Eugene J. Kelly Jr.
NEW YORK STATE ATTORNEY GENERAL
epaejk@oag.state.ny.us

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

James A. King
PORTER WRIGHT MORRIS & ARTHUR LLP
jking@porterwright.com

Christine F. Lewis
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
christine.lewis@dol.lps.state.nj.us

James A. Lofton
U.S. DEPARTMENT OF JUSTICE
jim.lofton@usdoj.gov

Debra McVicker Lynch
SOMMER BARNARD ATTORNEYS, PC
dlynch@sommerbarnard.com

Jon C. Martin
STATE OF NEW JERSEY
martijon@law.dol.lps.state.nj.us

Carmel Alicia Motherway
CONNECTICUT ATTORNEY GENERAL
carmel.motherway@po.state.ct.us

Michael Joseph Myers
NEW YORK STATE DEPARTMENT OF LAW
michael.myers@oag.state.ny.us

Stephen M. Nickelsburg
SIDLEY AUSTIN BROWN & WOOD LLP
snickels@sidley.com

Scott E. North
PORTER WRIGHT MORRIS & ARTHUR LLP
snorth@porterwright.com

John D. Papageorge
SOMMER BARNARD ATTORNEYS, PC
jpapageorge@sommerbarnard.com

Crissy Lyn Pellegrin
ENVIRONMENTAL PROTECTION AGENCY
pellegrin.crissy@epa.gov

Jean Patrice Reilly
STATE OF NEW JERSEY
reilljea@law.dol.lps.state.nj.us

Robert T. Rosenthal
NEW YORK ATTORNEY GENERAL'S OFFICE
robert.rosenthal@oag.state.ny.us

Jeffrey K. Sands
UNITED STATES DEPT. OF JUSTICE
jeffrey.sands@usdoj.gov

J. Jared Snyder
OFFICE OF THE ATTORNEY GENERAL
jared.snyder@oag.state.ny.us

Jose A. Suarez
OFFICE OF THE ATTORNEY GENERAL
jose.suarez@po.state.ct.us

Kathryn B. Thomson
SIDLEY AUSTIN BROWN & WOOD LLP
kthomson@sidley.com

Katherine Lynn Vanderhook
UNITED STATES DEPARTMENT OF JUSTICE
katherine.vanderhook@usdoj.gov

Gaylene Vasaturo
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
vasaturo.gaylene@epa.gov

Frank R. Volpe
SIDLEY AUSTIN BROWN & WOOD LLP
fvolpe@sidley.com


Distributed via U.S. Postal Service to:

Barbara Fruehling Gambill
CINERGY SERVICES INC.
Atrium II 25th Floor
P O Box 960
Cincinnati, OH 45201-0960