10/27/2005  Biewald, Bruce

1              IN THE UNITED STATES DISTRICT COURT

              FOR THE SOUTHERN DISTRICT OF INDIANA

2                   INDIANAPOLIS DIVISION

3

4            ------------------------------ X

            UNITED STATES OF AMERICA,    )

5                   Plaintiffs,    )

            STATE OF NEW YORK, STATE OF    )

6            NEW JERSEY, STATE OF         )

            CONNECTICUT, HOOSIER         )

7            ENVIRONMENTAL COUNCIL, and    )  Civil Action

            OHIO ENVIRONMENTAL COUNCIL,    )  No IP99-1693

8                Plaintiff-Intervenors,)  C-M/S

                    vs.           )

9            CINERGY CORP., PSI ENERGY,    )

            INC., THE CINCINNATI GAS &    )

10          ELECTRIC COMPANY, and CINERGY )

            SERVICES, INC.,          )

11               Defendants.

            ------------------------------ X

12

13           CONFIDENTIAL - BUSINESS INFORMATION -

14            PURSUANT TO PROTECTIVE ORDER

15

16         Videotaped Deposition of Bruce E. Biewald

17            Thursday, October 27, 2005

18               Washington, D.C.

19

20        Pages 1 - 281

21        Job No.: 170615

22        Reported by:  Deborah Larson Hommer, RPR

1

**10/27/2005  Biewald, Bruce**

1     A.   I'm not sure what --

2     Q.   Regulatory matters.

3     A.   Oh, I see.  Basically, that's

4     right.  Occasionally -- I am not a lawyer, but

5     we will sort of evaluate a situation and make

6     recommendations to the client.

7     Q.   And you advise lawyers -- you give

8     lawyers strategic advice in legal matters,

9     right?

10    A.   I would say so.  Within our

11    technical areas that we specialize in, I would

12    say so, yes.

13    Q.   In how many court cases have you

14    testified, Mr. Biewald?

15         MS. BEHLES:  Objection.  Vague.

16         THE WITNESS:  You mean court cases

17    separate from public utility commission cases?

18         BY MR. NORTH:

19    Q.   Yes.  Court cases --

20    A.   That's the distinction?

21    Q.   Yes.  State or federal courts.

22    A.   If you count depositions and cases

**10/27/2005 Biewald, Bruce**

```
1    videographer do that.

2              THE VIDEOGRAPHER:  This is the end

3    of tape 1.  Off the record at 11:16:02.

4              (Recess.)

5              THE VIDEOGRAPHER:  This is the

6    beginning of tape 2 in the deposition of Bruce

7    Biewald.  On the record at 11:25:17.

8              BY MR. NORTH:

9         Q.   Mr. Biewald, you are not an

10   engineer; is that correct?

11        A.   I am not an engineer.  I do

12   economic engineering studies and system

13   simulation analyses that can sometimes involve

14   engineering issues, but I wouldn't say that

15   I'm myself an engineer.

16        Q.   You've never held an engineering

17   license?

18        A.   I have not.

19        Q.   You have never been employed by an

20   electric utility, correct?

21        A.   Other than the consulting

22   assignments I have done, that's right.
```

**10/27/2005  Biewald, Bruce**

1    power system for various clients, including

2    the coalition of -- collaborative, I guess

3    would be the more accurate term, of utilities,

4    government agencies and nonutility parties,

5    looking at, basically, avoided costs in the

6    New England grid.

7        Q.   And what model did you use for

8    that?

9        A.   I believe that was with Elfin.  I

10   have also used the Elfin model in cases in

11   Vermont, including the -- some of the

12   tax-related -- property tax-related matters

13   that we talked about, and I believe public

14   service board proceedings.

15       Q.   You've obviously done an extensive

16   amount of modeling, and I think I might burn

17   up my whole time going through them, so let me

18   just shift gears a bit and ask you some

19   broader questions so that we won't cover every

20   last one of them you have ever done.  You've

21   obviously done quite a few.

22            You mentioned that you've used

111

**10/27/2005 Biewald, Bruce**

1   Elfin, EXMOD, PROSYM, SYSGEN and ELMO, I

2   believe.  Did I miss any of those?  Are there

3   other models that you have used that are the

4   electric utility simulation-type models?

5       A.   SYSGEN, ELMO.

6       Q.   Elfin, EXMOD, ELMO, PROSYM.

7       A.   Right.  Where -- PROSYM includes

8   that whole family of other models by the same

9   license -- by the same vendor.  Also --

10      Q.   Which are what?

11      A.   PROSYM, MULTISYM, MARKETSYM.  All

12  essentially the same --

13      Q.   And that vendor is Henwood?

14      A.   Now called Global Energy, I think.

15  Henwood has either ceased to exist or been

16  consumed.

17      Q.   Is that the same company as New

18  Energy Associates?

19      A.   No.

20      Q.   Okay.

21      A.   So -- I've also run the CASM model,

22  C-A-S-M.

10/27/2005 Biewald, Bruce

```
1          Q.   What is CASM?

2          A.   It's a model, I believe, owned or

3    controlled -- developed and controlled by, at

4    this point, Charles River Associates, I

5    believe.  It may have moved around over the

6    last few years.  And it's a model with

7    similarities and differences to the other

8    models we have been talking about.

9               Its main focus or application I

10   would say is market power analysis.  It

11   calculates market shares and Herfindahl

12   indices and that kind of thing.

13         Q.   Sadly, I remember Herfindahl from

14   school.  I can't believe -- I haven't heard

15   that word in 20 years.

16         A.   So CASM.  And then there is an

17   associated model with CASM that I think --

18   whose name I'm forgetting; it's also a

19   four-letter name beginning with C -- that

20   looks at strategic bidding analyses, strategic

21   bidding scenarios.  And I've -- so I've run

22   those models.
```

**10/27/2005 Biewald, Bruce**

```
1              And then with regard to the -- some

2      of the other models, like EGEAS and MAPS and

3      PROMOD, I haven't run those models myself in a

4      hands-on way in my own shop, but I have worked

5      in some cases very closely with the people

6      running those models, so -- you know,

7      suggesting inputs, reviewing outputs, and that

8      sort of thing.  So I'm familiar these other

9      models as well.

10             And if -- and if the question was,

11     you know, did I run those models in a

12     particular case, maybe it's in a gray area

13     where I didn't push the button or actually

14     execute the model run, but we would have

15     reviewed inputs, suggested inputs, reviewed

16     the results and so on.  So depending on the

17     question, those may be responsive as well.

18        Q.   Have you or Synapse or any of the

19     other entities you've worked for had a license

20     to PROMOD?

21        A.   Yes.  Oh, sorry.

22        Q.   PROMOD.  It's hard to get all these
```

**10/27/2005  Biewald, Bruce**

1       things straight.  PROMOD.

2                  THE WITNESS:  Can you please read

3       the question back?

4                  BY MR. NORTH:

5           Q.   I can say it again.  Have you or

6       any of the companies you've worked for held a

7       license for PROMOD?

8                  MS. VANDERHOOK:  Objection.

9       Foundation.

10                 THE WITNESS:  By "worked for" do

11      you mean as an employee or as a --

12                 BY MR. NORTH:

13          Q.   In any capacity.

14          A.   In any capacity.

15          Q.   Strike -- let me clarify that,

16      because I think I do see --

17          A.   I think the answer is -- the answer

18      is yes to that question.

19          Q.   Have you or any of the companies

20      for whom you have been employed or a partner

21      in or shareholder in, owned, held a license to

22      PROMOD?

**10/27/2005 Biewald, Bruce**

```
1          A.    No.

2          Q.    Have you used Strategist?

3          A.    Yes, in the manner that I was just

4    describing with regard to some of the other

5    models.

6          Q.    Meaning you didn't run the model,

7    but you were working with people who did?

8          A.    Correct.

9          Q.    And you mentioned -- well, correct

10   me if I'm wrong, but did you -- you didn't run

11   a PROMOD simulation, but you worked with some

12   folks who did run some PROMOD models?

13         A.    That's essentially correct.

14         Q.    Okay.  And what were those matters?

15         A.    PROMOD is, like PROSYM and some of

16   these other models, pretty widely used.  And

17   particularly when I go back further in time,

18   sometimes it's difficult to keep the models

19   straight.  They have so many similarities.

20               I recall that in one or more of the

21   Maryland cases listed at the bottom of page 5,

22   I think it is, on my resume, the companies ran
```

**10/27/2005  Biewald, Bruce**

```
1      PROMOD, and we suggested inputs -- reviewed

2      the outputs, suggested inputs, and were

3      provided with runs.

4           Q.   Have you ever developed -- you said

5      you -- I noted you said suggested inputs.

6      Have you ever suggested or developed EFOR

7      inputs for any of these models?

8                MS. VANDERHOOK:  Objection.  Vague.

9                THE WITNESS:  Yes.

10               BY MR. NORTH:

11          Q.   Tell me about that.

12          A.   Well, the forced outage rates would

13     be required inputs in one form or another to

14     virtually all of the models.

15          Q.   When you say virtually all the

16     models, you mean virtually all the models

17     you've named off this morning?

18          A.   Except for, perhaps, EXMOD.  The

19     models may accept a full forced outage rate or

20     an equivalent forced outage rate or, you know,

21     some -- the form of the forced outage rate

22     inputs might vary depending on the model and
```

**10/27/2005  Biewald, Bruce**

1    techniques in electric system planning

2    studies.

3        Q.   Do you have any formal training in

4    statistics?

5        A.   No academic training, but my work

6    has included quite a few projects where

7    statistics are an aspect of the work.

8        Q.   I take it you've never published

9    any papers on statistics; is that correct?

10           MS. VANDERHOOK:  Objection.  Vague.

11           THE WITNESS:  I haven't published

12   papers specifically on a statistical method or

13   topic.  I have written papers dealing with

14   uncertainty and -- where statistical

15   techniques are employed in the analysis.  That

16   sort of thing.

17           BY MR. NORTH:

18       Q.   Sure.  You said that you have

19   applied statistical technologies in the

20   electric industry.  What do you mean by that?

21       A.   I don't think I said that.

22       Q.   Techniques.  I'm sorry.

**10/27/2005  Biewald, Bruce**

```
1    statistical techniques in order to implement

2    them myself in order to evaluate approaches

3    that others would propose or use in a

4    particular, say, planning study or

5    decision-making exercise.  So I consider

6    myself an expert in statistics, again, as

7    applied.

8              I haven't gone off to get a

9    graduate degree in statistics or -- or studied

10   that field in and of itself.  It's always as a

11   practical -- there is a decision to be made.

12   There is an application, and there is a wide

13   range of such applications:  Power plant

14   performance, projecting power costs, valuing

15   assets, and so on, where statistical

16   techniques are used and are one of the

17   important sets of tools.

18             MR. NORTH:  I think we have to

19   change tapes.

20             THE VIDEOGRAPHER:  Off the record

21   at 1429:14.

22             (Pause.)
```

**10/27/2005  Biewald, Bruce**

1       THE VIDEOGRAPHER:  This is the

2   beginning of tape 3 in the deposition of Bruce

3   Biewald.  On the record at 1432:50.

4       BY MR. NORTH:

5       Q.   Mr. Biewald, does Synapse have a

6   statistician on staff?

7       A.   We have three people on staff who I

8   would consider statisticians.

9       Q.   Okay.  What are their names?

10      A.   William Steinhurst, David White,

11  and Ezra Hausman, H-a-u-s-m-a-n.

12      Q.   Did any of those individuals assist

13  you in your critique of Dr. Liberson's work

14  that's in your rebuttal report?

15      A.   No.

16      Q.   Mr. Biewald, you are not an expert

17  in PSD, are you?

18      MS. VANDERHOOK:  Objection.  Vague.

19      THE WITNESS:  Well, I think in

20  aspects of PSD related to the issues that I

21  have been testifying in these cases and

22  working on over the last few years, yes.  As

**10/27/2005 Biewald, Bruce**

1        BY MR. NORTH:

2        Q.   Did the Department of Justice ask

3    you to express an opinion on anything, a

4    particular opinion?

5        A.   You mean did they tell me what to

6    say or -- no.

7        Q.   No?  Did they ask you for a

8    particular opinion?

9            MS. VANDERHOOK:  Objection.  Vague.

10   Ambiguous.

11           THE WITNESS:  They would ask me

12   questions, you know, what do I think of

13   this -- what do -- that sort of thing.

14           BY MR. NORTH:

15       Q.   All right.  What is the opinion

16   you're going to express at trial in this case,

17   Mr. Biewald?

18           MS. VANDERHOOK:  Objection.  Calls

19   for speculation.

20           MR. NORTH:  Speculation about what

21   he is going to testify to at trial?

22           MS. VANDERHOOK:  I stated my

1    objection.  Are you asking for a

2    classification?

3            MR. NORTH:  I will move on.

4            BY MR. NORTH:

5        Q.   What opinion are you going to

6    express at trial, Mr. Biewald?

7            MS. VANDERHOOK:  Objection.  Calls

8    for speculation.

9            MR. NORTH:  I don't think it's

10   speculative about what an expert witness who

11   is here testifying about his opinions in the

12   case -- I don't think that's speculation at

13   all.

14           MS. VANDERHOOK:  Again, I've stated

15   my objection.  You can ask for your answer.

16   If you would like clarification I would be

17   happy to give it.

18           BY MR. NORTH:

19       Q.   Can you answer the question,

20   Mr. Biewald?

21       A.   I expect to offer the opinions on

22   the topics of this report dealing with the

10/27/2005 Biewald, Bruce

1    conclusion?

2            MS. VANDERHOOK:   Excuse me.   Are

3    you finished answering his previous question?

4            THE WITNESS:   I think that with

5    regard to PROMOD, yes, but there are other

6    areas --

7            BY MR. NORTH:

8       Q.   Okay.   Those are other opinions.

9    We will go to those, but I want to get what

10   those opinions are on PROMOD.   All right?

11      A.   Is there a question?

12           (Discussion held off record.)

13           BY MR. NORTH:

14      Q.   You said something about one of

15   your conclusions was that PROMOD runs weren't

16   really useful for some purposes that you had

17   in mind, and you mentioned that there were

18   millions of pages of PROMOD runs.   How many

19   pages of PROMOD runs did you review in this

20   case, Mr. Biewald?

21           MS. VANDERHOOK:   Objection.

22   Compound.   Mischaracterizes his prior

**10/27/2005 Biewald, Bruce**

1    testimony.

2           THE WITNESS:  They are -- I didn't

3    say that they were all PROMOD runs.

4           BY MR. NORTH:

5       Q.   Production cost modeling runs.

6       A.   And associated -- and associated

7    documents.  I think there was something in the

8    neighborhood of 5 million pages, counting the

9    electronic files.

10      Q.   Okay.

11      A.   And your question about that?

12      Q.   How many of those 5 million pages

13   did you review?

14      A.   Oh.  With regard to the

15   electronic -- those that were in electronic

16   format, we worked with the -- my staff and I

17   worked with the whole data set.  So in a

18   sense, we reviewed the set of --

19      Q.   I want to know how many pages you

20   reviewed.

21           MS. VANDERHOOK:  Excuse me.  He was

22   in the middle of a sentence, and you keep

**10/27/2005  Biewald, Bruce**

```
1    interrupting him when he is trying to answer,

2    and I would just ask that you stop doing that.

3              MR. NORTH:  Well, he is being

4    totally nonresponsive.  That's the problem.

5              MS. VANDERHOOK:  Well, I

6    respectfully disagree.  If you would like to

7    let him answer your questions, perhaps you

8    would find it more responsive.

9              BY MR. NORTH:

10        Q.   Mr. Biewald, out of the 5 million

11   pages, how many did you review?

12        A.   What I was trying to say is that my

13   review included most of those pages, but to be

14   clear, it didn't mean that I literally looked

15   at each page of a 500-page, say, PROMOD

16   fragmentary input file.  What I did do was

17   have my staff extract information from those

18   files and summarize it.

19              So to the extent the information

20   was gleaned from that set of electronic files,

21   they were all a part of my review.  My answer

22   has to do with the nature of my review.
```

10/27/2005 Biewald, Bruce

1     Q.   My question was how many pages did

2     you review?

3     A.   It depends what you mean by

4     "review."

5     Q.   Read.

6     A.   I would say several thousand.

7     Q.   Several thousand meaning less than

8     10,000?

9     A.   It might have been 10,000.

10    Q.   10,000 tops?

11         MS. VANDERHOOK:  Objection.  Asked

12    and answered.

13         THE WITNESS:  In terms of actually

14    reading the page, I would say that's a -- that

15    would be an upper limit.

16         (Discussion held off record.)

17         (The reporter read the record as

18    requested.)

19         BY MR. NORTH:

20    Q.   Your expert opinion is that the

21    maintenance-forced outage rates were different

22    from the historical forced outage rates; is

**10/27/2005  Biewald, Bruce**

1      Q.   And what do you mean by in

2    conjunction with other government evidence you

3    could see that?  What did you mean by that?

4      A.   Well, my understanding is that

5    there are other witnesses for the government

6    who did analyses of the specific planning for

7    the projects and emission calculations.  And

8    as I understand the evidence and opinions that

9    I'm expressing in this case, they relate to

10   that analysis.  They put the company's

11   planning and decision-making in context.  I

12   deal with the tools that the company uses, how

13   they use them, what purposes different tools

14   were put to at different points in time, about

15   specific points made by Mr. Harris and

16   Dr. Liberson and that sort of thing.

17     Q.   So you're referencing the work of

18   other witnesses in the case in your last

19   answer; is that right?

20     A.   Yes.

21     Q.   Nothing in your work, in your view,

22   contradicts the company's testimony that the

**10/27/2005 Biewald, Bruce**

1     essential -- an essential aspect of that is to

2     undertake economic dispatch.  And so in the --

3     in any particular actual period of dispatch --

4     of system operation, economic dispatch would

5     be applied and the company could not

6     reasonably deviate from economic dispatch

7     except for legitimate system constraints,

8     transmission constraints, ramp rates, unit

9     commitment, those kind of things that figure

10     into economic dispatch.

11     So it couldn't just decide to run a

12     unit, you know, say, an intermediate unit as a

13     baseload unit because that would -- it might

14     be physically able to do that, but it wouldn't

15     be feasible in an economic or a regulatory

16     sense, given the company's obligation to --

17     related to its monopoly service territory.

18     The PSI, in particular, had an

19     obligation in the State of Indiana to analyze

20     capital projects at its plants in an economic

21     method -- cost/benefit method using present

22     value arithmetic, standard engineering

1      economic approaches.

2           PSI, CG&E and Cinergy all did have

3      methodologies that they used for planning

4      their capital projects that are described, in

5      the case of PSI, in the PROVAL, project

6      evaluation tool, manuals.  And in the case of

7      CG&E, the method is described in the EEP

8      method of its electric production department.

9           There are relationships between

10     generating unit availability and a company's

11     ability to serve its load reliably, and I

12     discuss those relationships in my report.

13     Essentially, higher levels of unit or plant

14     availability tend to allow the company to

15     serve load at a consistent level of

16     reliability with lower amounts of capacity;

17     that is, lower reserve margin requirements.

18          In terms of demand and system

19     sales, the company -- companies in general and

20     these companies in particular had -- did

21     forecasts of their demand and also make

22     significant amounts of off-system sales.  And

**10/27/2005  Biewald, Bruce**

1    legal conclusion, but the case is about PSD

2    liability, this phase of it.

3            MS. VANDERHOOK:  I have stated my

4    objection.  My objection stands.

5            THE WITNESS:  I believe I listed

6    the expert opinions related to economic

7    dispatch in the first portion of my response

8    to your question.

9            BY MR. NORTH:

10    Q.   What is your opinion in this case

11    with respect to economic dispatch?

12            MS. VANDERHOOK:  Asked and

13    answered.

14            THE WITNESS:  That the company has

15    an obligation to dispatch its resources in an

16    economical manner and provide -- thereby

17    provide reliable service at reasonable costs

18    to customers, and that deviations from

19    economic dispatch would -- would essentially

20    violate the -- violate the expectations of the

21    regulatory commissions and customers that

22    service be provided at a reasonable cost.

**10/27/2005 Biewald, Bruce**

```
1           BY MR. NORTH:

2           Q.   Okay.  Are you saying the company

3    deviated from that responsibility?

4                MS. BEHLES:  Objection.

5    Mischaracterizes his testimony.

6                THE WITNESS:  No, I did not.

7                BY MR. NORTH:

8           Q.   Okay.  What issue does that go to

9    in the case?

10               MS. BEHLES:  Objection to the

11   extent that it calls for a legal conclusion.

12               THE WITNESS:  I believe I saw

13   calculations interpreting the -- I'll call it

14   "capable of accommodating" language in which

15   the PSI -- or in which the company generating

16   units would hypothetically or for purposes of

17   that calculation be operated above their

18   actual capacity factors during the -- during

19   some actual period.  And my opinion speaks to

20   that.

21               BY MR. NORTH:

22          Q.   You saw company documents that said
```

**10/27/2005 Biewald, Bruce**

1  accommodating" in the PSD regulations.  And

2  specifically what I was responding to is the

3  idea that that can be interpreted as a

4  generating unit running up to -- say, above

5  its capacity factor in a particular period,

6  because they couldn't.

7          BY MR. NORTH:

8      Q.   You mean they couldn't because

9  you're claiming that the law wouldn't allow

10  them, or physically it's impossible to do

11  that?

12          MS. VANDERHOOK:  Objection.

13  Compound.  Mischaracterizes his testimony.

14          THE WITNESS:  Yes.  The point that

15  I'm making is that the -- the regulatory

16  arrangements in the state to require them to

17  do economic dispatch that would not allow

18  that.

19          BY MR. NORTH:

20      Q.   Okay.  What is your expert opinion

21  with respect to PROVAL you mentioned?

22          MS. VANDERHOOK:  Objection.  Asked

**10/27/2005 Biewald, Bruce**

1    and answered.

2              THE WITNESS:  That in the case of

3    PSI they had an obligation to do the sort of

4    economic evaluation required -- the sort of

5    economic evaluation described in the PROVAL

6    guides, and that that obligation grew out of a

7    regulatory concern in the mid-1980s that the

8    company -- the company's projects be

9    economically justified.

10             So the settlement -- there was a

11   settlement agreement that required an economic

12   evaluation.  There was a method designed by

13   the company to implement those economic

14   engineering evaluations, and that that method

15   is, in my view, a standard present value of

16   cost/benefit cash flows, cost/benefit

17   analysis, and that that was the method that

18   the company had for evaluating capital

19   projects at existing plants in that time

20   period.

21             BY MR. NORTH:

22        Q.   So your opinion is the company had

**10/27/2005  Biewald, Bruce**

1     a legal requirement, and it complied with it;

2     is that right?

3                MS. BEHLES:  Objection.

4     Mischaracterizes his testimony.  And compound.

5                THE WITNESS:  As well as some of

6     the specifics of that method.  So I -- I

7     conclude that that method uses a utilization

8     factor and essentially values the recaptured

9     outage hours at the system marginal costs.

10               BY MR. NORTH:

11          Q.   Now, PROVAL used a comparison of

12     two future scenarios, didn't it?

13               MS. VANDERHOOK:  Objection.  Vague

14     and ambiguous.

15               THE WITNESS:  Essentially, yes.

16     It's a standard economic engineering

17     evaluation method.  And to that -- and it

18     compares for a particular decision, say,

19     compared to the no-action alternative, it

20     looks at differences in the flows of future

21     costs and benefits.

22               That's not to say one can't compare

10/27/2005  Biewald, Bruce

```
 1              THE WITNESS:  The responsibility to

 2      provide service at lowest reasonable cost

 3      would be violated if a company ran a unit less

 4      than was called for under economic dispatch

 5      principles.

 6              BY MR. NORTH:

 7          Q.   We were discussing PROVAL before

 8      our break, and I wanted to ask you some

 9      further questions about your opinions there.

10      The -- at PSI, PROVAL used a comparison of a

11      future scenario where the status quo was

12      completely maintained and a future scenario

13      where a component was replaced or repaired; is

14      that right?

15              MS. BEHLES:  Objection.  Compound.

16              THE WITNESS:  No.

17              BY MR. NORTH:

18          Q.   What's incorrect about that?

19          A.   My understanding of the PROVAL

20      methodology, as described in the company's

21      manuals, is that it included recommended

22      changes in future unit utilization.  And so I
```

**10/27/2005 Biewald, Bruce**

| | |
|---|---|
| 1 | Q.   You read that testimony, right? |
| 2 | A.   And the PROVAL manuals, yes. |
| 3 | Q.   And what is your expert opinion |
| 4 | with respect to PROVAL in this case? |
| 5 | MS. VANDERHOOK:  Objection.  Asked |
| 6 | and answered. |
| 7 | THE WITNESS:  That the PROVAL |
| 8 | method is a standard sort of economic |
| 9 | engineering evaluation.  The assumption in |
| 10 | PROVAL is not necessarily that the company |
| 11 | would have to purchase electricity to replace |
| 12 | a unit generating [sic]; that it was required |
| 13 | to implement the PROVAL-type analysis pursuant |
| 14 | to the settlement agreement and the commission |
| 15 | order approving that settlement agreement, and |
| 16 | that it would compare different actions and |
| 17 | the consequences of those actions in the |
| 18 | future, but -- not status quo, but with things |
| 19 | changing in the future exogenous to the |
| 20 | implement of the capital investment itself. |
| 21 | BY MR. NORTH: |
| 22 | Q.   And what issue in the case does |

**10/27/2005  Biewald, Bruce**

1         THE WITNESS:  I didn't say that.

2         BY MR. NORTH:

3     Q.   For how many projects in this case

4  was PROVAL used, Mr. Biewald?

5     A.   I don't know the answer to that.  I

6  testified that I -- my analysis was not about

7  specific projects; it was about the planning

8  methods and tools.

9     Q.   Well, assuming it wasn't used for a

10  single project at issue in this case, how does

11  that affect your opinion?

12         MS. VANDERHOOK:  Objection.

13  Incomplete hypothetical.  Assumes facts

14  certainly not in evidence.

15         THE WITNESS:  It wouldn't affect my

16  opinions because my opinions are about the

17  tools and methods for planning and

18  decision-making that the company used.

19         BY MR. NORTH:

20     Q.   You would agree, Mr. Biewald, that

21  the PSD regulations require that any baseline

22  be grounded in actual emissions?

10/27/2005  Biewald, Bruce

```
1               THE WITNESS:  I don't just ignore

2       that testimony, but I look at the documents

3       and the PROVAL manuals.  And I'm testifying

4       that, in my opinion, these are not -- these,

5       the PROVAL manuals and the settlement

6       agreement that the commission approved are not

7       about prioritization; they're about economic

8       evaluation of the projects.

9               BY MR. NORTH:

10          Q.  So you draw a conclusion from a

11      document and you give it more weight than the

12      sworn testimony of the company; is that right?

13              MS. VANDERHOOK:  Objection.

14      Mischaracterizes his testimony.

15              BY MR. NORTH:

16          Q.  Right?

17              MS. VANDERHOOK:  Same objection.

18              THE WITNESS:  I suppose in this

19      case that's a fair characterization.  I'm

20      reaching my conclusions based on the documents

21      as I read them and my understanding of

22      regulatory requirements and economic
```

**10/27/2005 Biewald, Bruce**

```
1     results of modeling using a model like PROVAL

2     submitted to regulators as a generation

3     forecast?

4              MS. VANDERHOOK:  Objection.  Vague

5     and ambiguous.

6              THE WITNESS:  Not that I can

7     recall.

8              BY MR. NORTH:

9        Q.   That wouldn't be an appropriate

10    generation forecast for an IRP filing, would

11    it?

12             MS. VANDERHOOK:  Objection.

13    Mischaracterizes his testimony.

14             THE WITNESS:  Well, there are

15    baseline capacity factor forecasts in the

16    PROVAL manual, so those wouldn't be so much

17    PROVAL results as PROVAL inputs.

18             But as I understand the purpose of

19    the PROVAL analysis or the PROVAL-type

20    analysis, it's to make decisions about

21    investments in existing power plants or, you

22    know, other sorts of incremental decisions
```

**10/27/2005 Biewald, Bruce**

 1  whether or not PROVAL was even used in the

 2  company?

 3       A.   Well, the documents that I look at

 4  say that it should be used for evaluations of

 5  certain types and that the settlement

 6  agreement with the regulatory commission that

 7  was approved by the IURC calls for this type

 8  of analysis.  So the combination of having the

 9  requirement to do this type of analysis with

10  the statement in the guides or in the

11  documents related to the guides that this is

12  the method to implement that analysis, I

13  concluded that this is the company's

14  methodology for these sorts of evaluations.

15       I -- like I said, I didn't review

16  specific applications of this methodology or

17  have them that I could offer to you, sitting

18  here today.

19       Q.   How do you know that this was the

20  analysis that the company did to comply with

21  these legal requirements you've described?

22       A.   What I have is the settlement

**10/27/2005  Biewald, Bruce**

```
 1                    *      *      *

 2

 3              ACKNOWLEDGMENT OF DEPONENT

 4

 5        I, Bruce E. Biewald, do hereby acknowledge I

 6    have read and examined the foregoing pages of

 7    testimony, and the same is a true, correct and

 8    complete transcription of the testimony given

 9    by me, and any changes and/or corrections, if

10    any, appear in the attached errata sheet

11    signed by me.

12

13    _____    _____

14    Date                   Signature

15

16

17

18

19

20

21

22
```