IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

CIVIL ACTION NO. IP99-1693 C-M/S

UNITED STATES v. CINERGY

EXPERT REPORT OF BRUCE BIEWALD

ON BEHALF OF THE UNITED STATES

CONFIDENTIAL REPORT

May 19, 2005

# TABLE OF CONTENTS

1. EXPERIENCE ........................................................................................................ 1
2. INTRODUCTION AND SUMMARY .................................................................. 2
3. STATE REGULATION OF ELECTRIC UTILITIES .......................................... 2
4. FORECASTING SALES AND RESOURCE REQUIREMENTS ...................... 5
   Electric System Sales ............................................................................................ 5
   Forecasts of Demand ............................................................................................ 9
   Electric System Reliability and Capacity Requirements .................................... 10
   Forecasts of Capacity Requirements .................................................................. 12
5. ELECTRIC SYSTEM PLANNING AND ECONOMIC ANALYSIS .............. 12
   System dispatch and planning models ............................................................... 12
   System modeling purposes ................................................................................. 14
   Model input and output files .............................................................................. 16
   System Planning Objectives .............................................................................. 17
6. POWER PLANT CAPTIAL INVESTMENT PLANNING AND ECONOMIC ANALYSIS ......................................................................................................... 19
   Planning Analysis of Specific Capital Projects ................................................. 19
   PSI Method for Economic Analysis of Capital Projects ................................... 19
   CG&E Method for Economic Analysis of Capital Projects .............................. 24
7. PLANNING EXAMPLES: PSI AND CG&E ..................................................... 24
   PSI Planning Examples ...................................................................................... 24
   CG&E Planning Examples ................................................................................ 30
8. THE RELATIONSHIP BETWEEN UNIT GENERATING AVAILABILTY AND UNIT OPERATION ..................................................................................... 32

## INFORMATION REQUIRED BY FEDERAL RULES OF CIVIL PROCEDURE

1. This report contains my opinions, conclusions, and reasons therefore.

2. A statement of my qualifications is contained in Attachment A.

3. Attachment A includes a listing of prior testimony in the last four years and publications in the last ten years.

4. Attachment B lists the documents and other information considered in forming my opinions.

5. Attachment C contains tables and graphs that I considered in my analysis and deemed useful to reproduce as support to my text.

6. The compensation to Synapse Energy Economics, Inc. for our work in this matter is $125 per hour for services for Bruce Biewald, plus staff support.

1. EXPERIENCE

My name is Bruce Edward Biewald, and I am the President of Synapse Energy Economics Inc., a consulting company in Cambridge, Massachusetts specializing in analysis of electric power systems. I have twenty four years of experience advising state agencies, consumer and environmental advocates, utilities and others on issues related to the production and consumption of energy. I have testified in more than eighty utility regulatory proceedings in twenty-six states and two Canadian provinces, in cases in State and Federal Courts, and in proceedings of the Federal Energy Regulatory Commission and the Nuclear Regulatory Commission's Atomic Safety and Licensing Board. I have co-authored more than one hundred reports, including studies for the Electric Power Research Institute, the US Department of Energy, the US Environmental Protection Agency, the Office of Technology Assessment, the Ozone Transport Commission, the New England Governors' Conference, the New England Conference of Public Utility Commissioners, and the National Association of Regulatory Utility Commissioners. My papers have been published in the Electricity Journal, Energy Journal, Energy Policy, Public Utilities Fortnightly, and numerous conference proceedings.

As president of Synapse Energy Economics, I oversee a staff of sixteen individuals, conducting dozens of consulting assignments each year. Our work includes consulting projects dealing with electric industry restructuring, stranded costs, system benefits, market power, mergers and acquisitions, generation asset valuation and divestiture, rate cases, power plant costs and performance, power supply contracts and performance standards, electric power system reliability, renewable power generation, demand-side management, air emissions from power plants, and electricity market simulation modeling for price forecasting and market power analysis. Synapse's governmental clients include federal agencies such as the Environmental Protection Agency, state Attorneys General, Consumer Advocates, utility regulatory commissions, and a variety of cities and towns. We also work for a number of non-governmental consumer advocates and environmental organizations, as well as associations of agencies, foundations, and private clients.

Prior to founding Synapse, I was with Energy Systems Research Group (later Tellus Institute) where I was the manager of the electricity program, and consulted on a wide range of electric system regulatory and economic issues. I have a B.S. from the Massachusetts Institute of Technology where I studied Architecture, Building Technology, and Energy Use in Buildings.

My experience with electric system simulation modeling began in 1981, on projects to evaluate the economics of power system expansion plans. My experience includes programming these computer models, applying them in various types of analyses, and critiquing the application of these models by others. My own modeling work has involved simulation modeling of electric systems throughout the United States, including the PacifiCorp system in the Northwest; the MAPP, MAIN, and ECAR regions of the

Midwest; the MACC, New York, and New England system in the Northeast, the Entergy and Southern Company systems in the South; and a large number of smaller regions and utility systems.

In January of 2000, Synapse Energy Economics entered into a license agreement with Henwood Energy Services for the use of PROSYM. Synapse has applied PROSYM in a dozen different projects for clients including the US Environmental Protection Agency, the Ozone Transport Commission, the Arkansas Public Service Commission Staff, the Vermont Department of Taxes, the Iowa Office of Consumer Advocate, the City of New York, and a number of environmental organizations.

I was contacted by the Department of Justice early in 2001 about the enforcement actions under the New Source Review program. My work for the DOJ in this matter has focused on computer simulation modeling and electric system operations and planning.

My prior work in and around Indiana and Ohio includes testimony before the Indiana Legislature's Regulatory Flexibility Committee (in 1997), testimony in several cases before the Indiana Utility Regulatory Commission (in 1986, 2001, 2002, 2003 and 2005), work for the Ohio Consumers' Counsel (2004), development of a regional clean energy plan for the Midwest (2001), and various other projects.

## 2. INTRODUCTION AND SUMMARY

This report discusses issues of utility regulation, electric system sales and forecasting, electric system planning and economic analysis, and power plant capital investment planning and economic analysis. I use examples from PSI, CG&E, and Cinergy over the last twenty five years. I address the connections between generating unit availability and unit operation in the context of a power system.

## 3. STATE REGULATION OF ELECTRIC UTILITIES

Electric utilities in the United States have traditionally operated as regulated monopolies within specific geographic service territories. The utilities were granted the right to sell electricity to customers without competition from other companies and were provided with a reasonable opportunity to earn a fair return on their investments incurred in serving those customers. In exchange, the utilities took on the obligation to serve all customers at an adequate level of reliability and at a reasonable cost.

State utility regulatory commissions play an important role in overseeing the ratemaking process for electric utilities. The "rate case" is central to this process. In an electric utility rate case the utility will prepare and file information about its costs of serving customers and the sales made to different types of customers. The utility's overall

"revenue requirement" is determined, based upon the utility's expenses and investments. Expenses include fuel, operations and maintence, and other costs. Investments include the construction costs of new poles, wires, other transmission and distribution equipment such as transformers and circuit breakers, and generating capacity as well as capital invested in existing T&D equipment and generating capacity. The utility's investments are recovered from customers over time with an allowed "return on equity." The total revenue requirement is allocated to different types of customers, generally on the basis of a "cost-of-service study" and rates are designed for different types of customers such that the utility can recover its costs from those customers over time. The rates and rate structures are generally contained in retail "tariffs" that are approved by the public utility commissions.

A rate case will typically include a filing by the utility with written testimony that explains the factors that influence its costs of serving customers, outlines the utility's various plans and projections, and supports the various analyses, programs, and policies of the utility. Organizations representing customers or other interests will often "intervene" in a utility rate case. Such intervenors could include state agencies (especially consumer advocates and state attorneys general), large customers or associations of large customers, groups representing small customers (such as a "citizens utilities board"), and environmental organizations. The intervenors generally review aspects of the utility's filing, and sometimes file testimony of their own. There is usually a hearing before the state utility commission in which witnesses are cross-examined. And the utility commission generally issues an "order" in which it summarizes the evidence, reaches conclusions, and orders certain rates to be implemented. The utility then implements the commission order by filing appropriate rate schedules and using those rates in the monthly bills that it sends to its customers.

In Indiana, PSI is regulated by the Indiana Utility Regulatory Commission. In Ohio, CG&E is regulated by the Public Utilities Commission of Ohio. The predecessors to these regulatory agencies were originally established in 1913 and 1867, respectively.[1] Both states have agencies that represent consumer interests. These are the Indiana Office of Utility Consumer Counselor (originally established in 1933 as Office of Public Counselor) and the Ohio Consumers' Counsel (established in 1977).[2] Both states have active environmental organizations that include the Hoosier Environmental Council and the Ohio Environmental Council. There is also an environmental organization headquartered in Chicago, the Environmental Law and Policy Center, that is active on energy and environmental issues throughout the Midwest states.

The details of utility ratemaking process and utility rate structures vary by state and by utility company. They also vary over time. For example, some utilities have "fuel clauses" or "fuel and purchased power clauses" that provide for frequent changes in the portion of utility rates that recovers fuel and purchased power cost, without going through a full rate case process. These clauses typically have some filing requirement and some

---

[1] "Membership Directory" of the National Association of Regulatory Utility Commissioners, February 2005.
[2] "NASUCA Directory," National Association of State Utility Consumer Advocates, 2000.

provision for "truing up" over and under recovery of the "revenue requirement." For example, in Indiana there have been fuel adjustment clause ("FAC") proceedings on a quarterly basis for many years.

PSI's retail rates (tariffs) include quite a few of these rate adjustment mechanisms, called "trackers" in Indiana. They include trackers for fuel costs, qualified pollution control property, emission allowances, demand-side management program costs, purchased power costs, and environmental construction work in progress ("CWIP").[3] Indiana also has state laws specifically dealing with cost recovery in utility rates for investments in qualifying pollution control equipment.

In the last decade or so state utility regulation in the US has been shifting as the generation portion of the utility business has been deregulated. This process, commonly referred to as "restructuring" has taken place in many states, including Ohio, and has been discussed but not implemented in many other states, including Indiana. The previously "vertically integrated" utility companies have themselves often reorganized, such that the regulated businesses (e.g., distribution) are distinct from the unregulated businesses (e.g., generation), although these units are frequently affiliates within one corporate holding company structure.

In the case of Cinergy, PSI, and CG&E, the 1994 merger of the two vertically integrated utilities, PSI and CG&E formed the holding company, Cinergy. Subsequent reorganizations have resulted in the current structure with Cinergy as the parent company with various subsidiaries including the regulated utility in Indiana (PSI), the regulated utility in Ohio (CG&E), a merchant generating company, and other business units. The regulatory environment is quite different in Indiana and Ohio. Indiana has not restructured the electric industry, and so PSI remains a vertically integrated and regulated utility. Ohio, on the other hand, has restructured, and so CG&E's transmission and distribution business remains regulated while its generation is a competitive business in which customers, at least in an abstract sense, have retail choice.

The partially regulated and partially de-regulated context for Cinergy's operating companies creates some challenges. For example, the jointly dispatched system has needed a special agreement, known as the joint generation and dispatch agreement ("JGDA"), to address the treatment of purchases and sales between the two operating companies and purchases and sales with companies outside of the Cinergy system. This agreement allowed for inter-company transfer pricing schemes between PSI and CG&E, while the unregulated generation function of CG&E did all the off-system selling of surplus energy. With the start up of spot energy markets administered by the Midwest Independent System Operator this spring, the Cinergy companies generating unit dispatch and power transactions take place in the context of a large regional electricity market.

State utility regulation can also include siting cases and various sorts of planning cases. When utility mergers are proposed, the state utility regulators will often hold hearings in order to consider whether the merger is consistent with the public interest. States

---

[3] Testimony of Bruce E. Biewald in IURC Cause No. 42359, page 8.

4

sometimes require utilities to develop and justify plans to implement demand-side management measures such as energy efficient appliances and peak demand reductions. States sometimes require regular planning and reporting by utilities. Ohio's requirement for annual long term forecast reports is an example of this.

There are tight connections between environmental regulation and economic regulation. For example, state utility regulatory commissions will be responsible for setting rates that are fair and allow a utility an opportunity to recover investments prudently incurred in power plants that are used and useful. This can include investments in construction of new power plants, capital investments in life extension or repowering of existing power plants, and investments in emission control retrofits. Utilities should anticipate environmental regulatory requirements in their planning in order to make prudent decisions among compliance options that will minimize costs over time subject to various reliability and regulatory constraints, and risk management considerations.

## 4. FORECASTING SALES AND RESOURCE REQUIREMENTS

Electric System Sales

Electric utilities generate and purchase electricity in order to sell power to native load customers and to other companies. Forecasting electricity sales is a key aspect of electric system planning.

PSI and CG&E "sales to ultimate customers" for the period 1995 through 2003 are listed in the Table below. These were obtained from the Energy Information Administration's "EIA-826" data.[4]

Table 1. Annual Sales to Ultimate Customers (GWH)

|      | PSI    | CG&E   |
| ---- | ------ | ------ |
| 1995 | 22,710 | 18,084 |
| 1996 | 23,037 | 18,605 |
| 1997 | 23,300 | 18,509 |
| 1998 | 24,290 | 19,243 |
| 1999 | 26,084 | 20,072 |
| 2000 | 25,975 | 20,300 |
| 2001 | 26,066 | 19,342 |
| 2002 | 27,272 | 18,463 |

---

[4] The From EIA-826 databases, http://www.eia.doe.gov/cneaf/electricity/page/eia826.html.