> This document contains data for evaluating distribution, power, substation and transmission projects. It supersedes the 1989 Power Economic Evaluation Guide, the 1990 Construction Project Evaluation Guide and the handout from the Engineering Economics Course by System Planning presented at the first PSI Engineering Conference.[43]

In subsequent Project Evaluation Guides, purposes 2 thorough 4 are listed as the purposes.

PSI's method for evaluating projects focuses on the costs and benefits, on a net present value, or discounted, basis. The guides refer to "PROVAL" as the software used to evaluate projects. PROVAL was a spreadsheet model implemented in Lotus 1-2-3. It was made available on computer disks to PSI employees who were evaluating capital projects. The Guides explain, and the PROVAL model implements, a straightforward economic analysis of projects. The core of the approach is standard present value arithmetic. This is essentially a unit-specific application of the system approach to analysis taken with, for example, PROSCREEN.

Economics are not, of course, the only consideration in utility planning, but they are central to the process. The 1990 guide explains the relationship between economic and other requirements as follows:

> Construction budget projects normally require economic justification. However, projects necessitated by any of the following may also be included in the construction budget:
>
> 1. Personnel or Equipment Safety
> 2. Environmental Control
> 3. Total Operating Cost Reduction
> 4. Need for Continued Station/System Operation
>
> For projects of the type listed above, economic analysis is used to determine which alternative should be chosen to minimize the costs of the project.[44]

Each of the Project Evaluation Guides contains, among other things, a tutorial on present value arithmetic, a set of input data assumptions, and examples to illustrating how the approach should be applied.

---

[43] Construction Project Evaluation Guide, PSI Energy, March 1, 1991, page 1-1. Bates PSI-0521985.
[44] 1990 Construction Project Evaluation Guide, System Planning, George Stevens, February 16, 1990, page 5-1. Bates PSI-0522334.

The inputs to evaluation of capital projects include the expected life of the project, the cost of the project, financial assumptions to annualize the project costs and to discount the annual cash flows, the replacement energy costs to value additional generating unit output caused by the project, and projected unit capacity factors and utilization factors used in projecting the additional generation caused by the project.

For project life, the guides offer the following "project life expectancy" of 35 years for pulverized coal units, and 25 years for construction projects.[45] Low and high case values are also provided.

The 1986 "Future Planning for Generating Plants" document lists the "life extension milestone dates" shown in the following table.[46]

|  | Commercial Date | Original Book Retirement Date (Without Refurbishment) | Extended Life Retirement Date (With Refurbishment) | Life Extension Recommendation Date | Extended Unit In-Service Date |
|---|---|---|---|---|---|
| Edwardsport 6 | 1944 | 1990 | 2003 | 1990 | 1994 |
| Edwardsport 7 | 1949 | 1990 | 2004 | 1993 | 1994 |
| Noblesville 1 | 1950 | 1990 | 2005 | 1992 | 1996 |
| Noblesville 2 | 1950 | 1990 | 2005 | 1993 | 1996 |
| Edwardsport 8 | 1951 | 1990 | 2006 | 1989 | 1994 |
| Wabash River 1 | 1953 | 1993 | 2008 | 1989 | 1991 |
| Wabash River 2 | 1953 | 1993 | 2008 | 1988 | 1991 |
| Wabash River 3 | 1954 | 1993 | 2009 | 1990 | 1991 |
| Wabash River 4 | 1955 | 1993 | 2010 | 1988 | 1991 |
| Wabash River 5 | 1956 | 1993 | 2011 | 1993 | 1991 |
| Gallagher 2 | 1958 | 1995 | 2013 | 1989 | 1991 |
| Gallagher 1 | 1959 | 1995 | 2014 | 1989 | 1991 |
| Gallagher 3 | 1960 | 1995 | 2015 | 1987 | 1991 |
| Gallagher 4 | 1961 | 1995 | 2016 | 1986 | 1991 |
| Wabash River 6 | 1968 | 2003 | 2023 | 1993 | 1997 |
| Cayuga 1 | 1970 | 1999 | 2025 | 1999 | 2003 |
| Cayuga 2 | 1972 | 2001 | 2027 | 1997 | 2002 |
| Gibson 2 | 1975 | 2004 | 2030 | -- | -- |
| Gibson 1 | 1976 | 2005 | 2031 | -- | -- |
| Gibson 3 | 1978 | 2007 | 2033 | -- | -- |
| Gibson 4 | 1979 | 2008 | 2034 | -- | -- |
| Gibson 5 | 1982 | 2011 | 2037 | -- | -- |

---

[45] See, for example, 1992 Project Evaluation Guide, PSI Energy, April 1, 1992, page 6-7, Bates PSI-0522225.

[46] "Future Planning for Generating Plants," prepared by J.W. Cross, T.L. McLarty, B.R. Orender, presented to Public Service of Indiana First Engineering Conference, September 24, 1986. Exhibit A. Bates GAL-028713. The original table lists day and month for some dates, but only the years are reproduced in the table here, in order to simplify the presentation. Also, the original tables lists "life extension inspection dates," which are just prior to the "life extension recommendation dates."

21

The 1991 and 1992 Guides also lists station retirement dates, including planned retirement of Wabash River 1-2 in 2007.[47] The 1994 Guide includes the follow planned retirements:[48]

| Station | Year |
| --- | --- |
| Edwardsport | 2003 |
| Connersville | 2004 |
| Noblesville | 2005 |
| Wabash River 2 | 2007 |
| Wabash River 3 | 2008 |
| Wabash River 4 | 2009 |
| Wabash River 5 | 2010 |
| Gallagher 1 | 2013 |
| Gallagher 2 | 2014 |
| Gallagher 3 | 2014 |
| Gallagher 4 | 2015 |
| Wabash River 7 | 2001 |
| Cayuga 3 | 2006 |

On the benefits side of a PROVAL analysis, the key item is the value of the savings in system energy costs resulting from increased generation at the unit. This is estimated as the difference between the operating cost of the unit itself and the "replacement power cost" for the system. The replacement power costs are calculated using a simple formula which appears in each of the Project Evaluation Guides. Specifically, section 3.5 (from the 1991 Project Evaluation Guide states the following:

> When performing cost justifications for power plant availability improvement the utilization factor is used to compute the savings in replacement energy costs resulting from an improvement in availability at Gibson and Cayuga stations. The capacity factor is used for this type of calculation at Gallagher, Wabash River, Edwardsport and Noblesville stations.
>
> The random nature of forced outages causes the replacement energy cost to be independent of the forced outage rate for a unit. Although the amount of displaced power increases with an increase in forced outages, the relative mix of units and fuel types replacing the unavailable unit remains unchanged. Section 6.3.4 contains the projections for replacement energy cost.

---

[47] 1991 Project Evaluation Guide, March 1, 1991, page 6-11 (Bates PSI-0522066) and 1992 Project Evaluation Guide, April 1, 1992, page 6-7 (Bates PSI-0522225).
[48] 1994 Project Evaluation Guide, May 10, 1994, page 6-10. Bates PSI-0522482. All of the retirements are listed as planned for December 31 of the year indicated.

> Utilization is useful for computing the change in a unit's generation resulting from improved availability. In can also be thought of as the capacity factor of the unit based only on the time that the unit is available.
>
> IF:
>
> CF  = Projected unit capacity factor
> EAF = Projected unit equivalent availability factor
> UF  = Utilization factor from section 6.3.3
>
> MWH    = equivalent mwh's unavailable (GADS)
> RE  = replacement energy cost from section 6.3.4
> RES = Replacement Energy Savings
>
> THEN:      RES = MWH * UF * RE   where UF = CF/EAF
>
> Section 6.3.3 contains the projection of station utilization factors and section 6.3.2 has the capacity factor projection. The engineer doing the justification should adjust the equivalent mwh's from GADS for the portion of the equivalent mwh's expected to be regained in the project.[49]

Each of the other Project Evaluation Guides has a section 3.5 that is identical, or nearly identical, to the text quoted above from the 1991 Project Evaluation Guide.

This method is a straightforward application of engineering economics to the evaluation of specific investments in specific generating units. The utilization factor reflects that expectation that an increase in availability of the unit, in terms of MWH, may not translate into an increase in MWH generation from the unit on a one for one basis. Rather, the relationship between availability and generation is a linear one, with the specific numerical coefficient depending upon the role of the unit in the context of the system. A "baseload" generating unit will tend to run most of the time that it is available, and hence will have relatively high utilization factors. A "peaking" unit will tend to be idle for much of the time that it is available, because it is not needed economically to serve customer loads, and so will have relatively low utilization factors.

The Project Evaluation Guides have specific figures to be used in PSI planning for generating unit capacity factors and generating unit utilization factors. These numerical values are generally increasing over the planning period covered by the guide.

---

[49] Construction Project Evaluation Guide, PSI Energy, March 1, 1991, page 3-20. Bates PSI-0522012.

CG&E Method for Economic Analysis of Capital Projects

CG&E had a approach for analyzing capital projects at generating units that was analogous to PSI's PROVAL model discussed above. CG&E's Economic Evaluation Program" (EEP) was also implemented in spreadsheet software and made available to company employees on computer disks. The basic objectives of the methods were quite similar.

CG&E's stated procedure was that

> The Electric Production Department shall use EEP:
> to determine if a project is economically justified,
> as a tool for comparison among alternative projects, and
> as a tool for prioritizing projects in the construction
> budget process.[50]

The manual points out that EEP need not be used for every project.[51] It also states that "GED personnel may use the program to conduct detailed economic analyses of unit efficiencies, availability, etc."[52] The documentation of EEP is much less thorough than the PROVAL documentation. It appears from the documentation that EEP, like PROVAL, would calculate availability benefits based upon a system incremental power cost.[53]

## 7. PLANNING EXAMPLES: PSI AND CG&E

In the preceding sections of this report I have provided some regulatory context, discussed demand forecasting and capacity requirements, system planning, unit capital investment. In this section I will discuss events and documents from PSI and CG&E history that illustrate these concepts and the connections among them.

PSI Planning Examples

In the early 1980s PSI was focused on its Marble Hill nuclear construction project. Construction of Marble Hill was terminated in January, 1984.[54] At that point PSI filed a "Petition for Interim Emergency Rate Relief," which was followed by two years of litigation, hearings, and negotiations related to PSI financial condition and rates. An initial settlement agreement in early 1984 provided for an interim emergency revenue

---

[50] "Electric Production Dept. Procedure Manual, Volume No. 1," CG&E, last revision date October 29, 1990. Bates WCB056785.
[51] Ibid., page 1. Bates WCB056785.
[52] Ibid., page 2. Bates WCB056786.
[53] Ibid., page 4. Bates WCB056788.
[54] Settlement Agreement, dated January 31st, 1986. Bates CGE-0444802.

increase of 5 percent. This was approved by the IURC on March 8, 1984. It left the major issues about the extent to which costs spent on Marble Hill construction would be recovered from customers in rates, and the overall financial health of the Company was strained and its future uncertain. This extended rate case, PSCI Cause No. 37414, was filed in 1984 and concluded in 1986. It addressed Marble Hill nuclear costs and a variety of planning and investment issues related to PSI's coal-fired power plants.

In this extended rate case, one of the major issues was PSI investment in its existing fossil generating units. James E. Benning, then PSI's "Executive Director – Fossil Power Operations Support," filed testimony on PSI's proposed "refurbishment plan." Mr. Benning's testimony explains what he meant by the term:

> Q. WHAT DO YOU MEAN BY "REFURBISHMENT PLAN"?
> A. I am using the term to refer to the Company's program designed to allow operation of its existing generating plants at the same, or possibly even greater, levels of reliability and efficiency through the year 2003. What I am referring to as a "refurbishment plan" could also be called a "renovation plan." Others in the industry sometimes refer to it as a "plant life extension plan" since the ultimate goal of the plan is to extend the life of existing generating plants so as to defer the need to build new, costly generating units. Because of the high costs associated with new generating units, electric utilities such as PSI are developing and implementing refurbishment or plant life extension programs where it is determined that the costs of extending the life of an existing generating plant is less than the cost of retiring that unit and replacing it with new generating capacity.[55]

Mr. Benning's testimony goes on to explain that the proposed refurbishment plan has three "major phases" and that these are inspection, evaluation and implementation. The evaluation phase is the one that involves planning and economic analysis. Specifically, Mr. Benning states that in the evaluation phase

> …the Company will evaluate in detail each of the specific refurbishment projects listed during the inspection phase to determine the economic feasibility of each project. The economic analysis will consider capital costs, operation and maintenance costs and procedures and performance gains to be achieved by each project. Those projects which are determined to be cost justified and economically feasible will then be prioritized for implementation. Those which will

---

[55] Testimony of James E. Benning in Cause No. 37414, pages 2 and 3. Bates PSI-0083172 and PSI-0083173.

have the greatest impact upon safety, reliability and capacity improvement will be given the highest priority.[56]

During the rate case there was considerable discussion of PSI's capital requirements. The Company argued that it needed capital immediately for the rehabilitation of existing generating units and for expansion of its transmission and distribution facilities, and in the longer term it would need access to capital markets for additional generating capacity and environmental controls.[57]

PSI convinced the Commission that the Company was close to bankruptcy, that there was an emergency, and that continuation of the situation would "adversely affect the availability of its generating units and the reliability of its service to customers," among other consequences.[58] The Company had been deferring preventative maintence, and availability of PSI's older generating stations had deteriorated significantly.[59]

While there was a clear need for some investment in the older generating units there were also concerns about the cost of the refurbishment plan. The Settlement Agreement contained provisions for capping the overall capital expenditures in existing plants through 1988, for quarterly reporting on the costs and progress, and an economic requirement. The economic requirement specifically stated that "Any specific refurbishment project will not be implemented by PSI unless the long-term benefit of the project exceeds the cost of the project."[60]

Soon after the Settlement was signed, and before it was approved by the Commission, Mr. J. U. Bott sent a memo to his colleagues at PSI explaining that the economic requirement in the Settlement Agreement had be the subject of an intervenor interrogatory, and that there was some uncertainty about the language but that "It certainly applies to any projects coming our of the Gallagher 4 and subsequent life extension inspections, but can be read more broadly."[61] Mr. Bott goes on to discuss the implementation of the economic justification provision of the settlement agreement:

> As a precaution, I would suggest attaching justification to each Construction Work Order which bears an "R" designation in the current budget. The justification should typically address:

---

[56] Testimony of James E. Benning in Cause No. 37414, pages 4 and 5. Bates PSI-0083174 and PSI-0083175.
[57] Public Service Commission of Indiana Order in Cause No. 37414, March 7, 1986, page12. Bates PSI-437296.
[58] Public Service Commission of Indiana Order in Cause No. 37414, March 7, 1986, pages 12 and 13. Bates PSI-437297 and PSI-437298.
[59] Public Service Commission of Indiana Order in Cause No. 37414, March 7, 1986, page 39. Bates PSI-437323.
[60] Settlement Agreement, dated January 31st, 1986, page 5. Bates CGE-0444806.
[61] Memo from J.U. Bott, Power Department, Subject: Economic Evaluations, February 18, 1986. Bates PSI-0166594.

26

- traditional long-term utility economics (e.g., levelized fixed charges applied over the life of the proposed project combined with yearly O&M, fuel, or other appropriate study costs, all combined and present-worthed to beginning day dollars)
- a shorter term (e.g., two to four years, depending on the plant) evaluation to examine the impact on our present financially-constrained condition
- one alternative which is to do nothing.[62]

PSI's series of annual Project Evaluation Guides discussed in Section 6, above, spanned from 1989 to 1994. The methodology in those guides, applying the PROVAL model to evaluating specific projects, fits with the 1986 Settlement Agreement (and Commission Order) and with the approach outlined in Mr. Bott's testimony in the 1995 FERC case. That is, these all take a similar, or identical, approach in evaluating generating unit investments from an economic perspective focused upon unit improvements and net present value of the costs and benefits of those improvements.

Into the 1990s, PSI continued to comply with the 1986 Settlement Agreement and the IURC Order Approving the Settlement Agreement. PSI witness John U. Bott Jr. explained in testimony in 1995 that its Engineering Condition Assessment Program (ECAP) was different from normal maintence, and that was done in compliance with the IURC's 1986 Order:

> This program is in accordance with Ordering Paragraph 12 of the Indiana Utility Regulatory Commission's ("IURC") March 7, 1986 Order in Cause No. 37414. Once it is determined which projects are necessary to maintain operation of a generating unit, these projects are evaluated and scheduled into the Company's normal maintenance and construction budgets.
> Q. HOW DOES PSI'S ECAP PROGRAM DIFFER FROM ORDINARY MAINTENANCE ON GENERATING UNITS?
> A. The primary difference between PSI's ECAP and PSI's normal maintenance program is in the detailed inspection and engineering analyses performed with respect to the Company's generating units. The Company has had a predictive maintenance program for its generating units for a number of years; however, the goal of this predictive maintenance program is the normal operation of the units. The goal of the ECAP is more long range, and is intended to allow the Company to operate its units in a reliable and

---

[62] Memo from J.U. Bott, Power Department, Subject: Economic Evaluations, February 18, 1986. Bates PSI-0166594.