IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

CIVIL ACTION NO. IP99-1693 C-M/S

UNITED STATES v. CINERGY

EXPERT REPORT OF BRUCE BIEWALD

*signature*

ON BEHALF OF THE UNITED STATES

CONFIDENTIAL REBUTTAL REPORT

September 15, 2005

TABLE OF CONTENTS

INFORMATION REQUIRED BY FEDERAL RULES OF CIVIL PROCEDURE

1. This report contains my opinions, conclusions, and reasons therefore.

2. A statement of my qualifications and listing of prior testimony is contained in Attachment A to my May 19, 2005 Report in this case.

3. Attachment A to this report lists the documents and other information considered in forming my opinions.

4. The compensation to Synapse Energy Economics, Inc. for our work in this matter is $125 per hour for services for Bruce Biewald, plus staff support.

1. EXPERIENCE

My name is Bruce Edward Biewald, and I am the President of Synapse Energy Economics Inc., a consulting company in Cambridge, Massachusetts specializing in analysis of electric power systems.  My experience is described in my May 19, 2005 Report in this case and Attachment A to that report.

2. INTRODUCTION AND SUMMARY

I prepared a report in this case, dealing with various utility regulatory, planning and economic issues.  That report was dated May 19, 2005.

Here, in my rebuttal report, I address several specific issues from the August 3, 2005 reports of Mr. Matt Harris and Dr. Gary L. Liberson.

3. MR. HARRIS' REPORT

Mr. Harris' report makes a distinction between project justification and generation planning.  In his view project justification was rather unimportant and did not involve rigorous economic analysis while generation planning was the place where Cinergy[1] focused its effort on realistic analysis of the future.  For example, Mr. Harris asserts that "Cinergy utility engineers used UF [utilization factor] in justifying projects solely for purposes of capital budgeting."[2]  This was in the context of the project and unit specific economic analyses.  He refers to the project evaluations as "comparative economic studies"[3] implying that they are not realistic analyses but rather merely for comparison and prioritization of possible projects.

This view of the project justifications is inconsistent with reasonable economic decision-making and with the agreement that Cinergy made with its regulators.  Specifically, the proper way to analyze projects is to look at the benefits and the costs of the project, and if the benefits exceed the costs then the project is justified and should be implemented. "Prioritization" considerations matter only in situations where the projects are mutually exclusive alternatives, such as two different modifications that could be made to same piece of equipment.  In order for Cinergy to provide electricity at the lowest possible cost to its customers, it is important that projects with net benefits actually be implemented and that projects with negative net benefits (i.e., net costs) not be implemented.  This is not a matter of prioritization.  It is a matter of good planning and sound utility practice.  It

---

[1] In this report I use "Cinergy" to refer to Cinergy and its predecessor Companies PSI and CG&E.
[2] Harris, Matt, *Expert Report of Matt Harris on Behalf of Cinergy, et al*, August 3, 2005, page 32.
[3] Ibid, page 34.

1

is also a requirement in order that the Company would fulfill its obligations to its regulators and to its customers under the agreement that it signed in 1986.[4] I do not mean to state or to imply that every aspect of a particular project can be incorporated into a project benefit cost analysis. There will sometimes be factors and considerations that do not lend themselves well to expression in dollar terms. Nonetheless, the basic structure of the project-specific benefit cost analyses as presented in the Company's "PROVAL" models and "Project Evaluation Guides" is a sound one. Moreover, it is not designed as a prioritization tool, but rather to evaluate projects in terms of benefits and costs individually.

Mr. Harris' discussion of "generation planning" (starting on page 6 of his report) emphasizes the myriad details involved in system models, and the complexity and rigor of the system analysis. For analysis of its system, Cinergy and its predecessor Companies, used a number of models that I discuss in my May 19, 2005 report. The primary two models used were PROMOD and PROSCREEN. I also discuss the various types of input data and the purposes to which system models are applied. Cinergy and its predecessors certainly used system models. Indeed, they produced hundreds of computer files related to their system modeling activities over the years. Still, it is important to have a balanced and realistic view of the role of system modeling and project specific analysis. Mr. Harris would, apparently, disregard project-specific analysis altogether for purposes of emissions calculations, and focus exclusively on system modeling. There are many reasons that this is not reasonable.

First, the manner in which the company retained and documented its system modeling runs suggests that the model results are not the sole or final word on its planning and decision-making. The input and output files from the Company's PROMOD and PROSCREEN runs are a mess, retained in such a way that it is nearly impossible to match inputs with outputs, and outputs with purposes. According to Company 30(b)(6) witness on modeling, Diane Jenner, the Company cannot identify the input and output files associated with final runs that were relied upon by the Company.

Second, the resource planning department within the Company apparently worked in a fairly isolated way from the other departments. Diane Jenner was responsible for running PROMOD and PROSCREEN at PSI and Cinergy. In the 30(b)(6) deposition, she was unable to explain how various model inputs were developed and unable to explain the how her department's model runs were used and applied by others within the Company. The project evaluation process was quite detailed, and involved station personnel and unit-specific engineering analysis. It was quite separate from "system planning."

Third, while the Company regularly developed system resource plans, it perhaps did not take those plans as seriously as one might think. In his deposition, Company 30(b)(6) witness Bloemer (who was responsible for running system models at CG&E) stated that the annual plans that it filed with the Public Utilities Commission of Ohio were prepared in order to satisfy the requirement, and implied that the Company didn't necessarily intend to implement the plan in the long-term forecast reports.[5]

---

[4] Settlement Agreement, dated January 31st, 1986. Bates CGE-0444806.
[5] Deposition transcript, John G. Bloemer, August 4, 2004, pages 107 to 108, and 120 to 135.

2

Fourth, while Mr. Harris emphasizes the role of system modeling in forecasting how individual generating units will operate in the future, the individual at the Company who actually did many of the system modeling studies, Mr. Bloemer, emphasizes the difficulties in relying upon such results for Cinergy's generating units. In his 30(b)(6) deposition, Mr. Bloemer explained that many of CG&E's generating units are located along the same river system, and so coal deliveries could be adjusted and made to different generating plants.[6]

Fifth, I was able to find no evidence that the Company actually ever applied its system models to the evaluation of a specific capital project at a particular generating station. It would be possible for a Company to use a model such as PROMOD to evaluate a capital project at an existing power station. However, my staff and I looked through the files provided by the Company in the case and found no examples in which this Company, or its predecessors, actually did apply a system model to evaluate a specific project.

Sixth, in the Company's PROMOD inputs they did not actually use unit-specific forced outage rates. Rather, it was common practice for the company to use identical forced outage rates for multiple generating units. For example, the following set of forced outage rates, in Table 1, was found in many of PSI's PROMOD input files form the early 1990s.

---

[6] Ibid, pages 85 and 86.

Table 1[7]

| Unit | Forced Outage Rate Input (%) |
|---|---|
| Gibson 1 | 7.20 |
| Gibson 2 | 7.20 |
| Gibson 3 | 7.20 |
| Gibson 4 | 7.20 |
| Gibson 5 | 7.20 |
| Cayuga 1 | 8.75 |
| Cayuga 2 | 8.75 |
| Wabash River 1 | 13.60 |
| Wabash River 2 | 13.60 |
| Wabash River 3 | 13.60 |
| Wabash River 4 | 13.60 |
| Wabash River 5 | 13.00 |
| Wabash River 6 | 12.00 |
| Gallagher 1 | 10.00 |
| Gallagher 2 | 10.00 |
| Gallagher 3 | 10.00 |
| Gallagher 4 | 10.00 |
| Edwardsport 6 | 17.00 |
| Edwardsport 7 | 17.00 |
| Edwardsport 8 | 17.00 |
| Noblesville 1 | 15.00 |
| Noblesville 2 | 15.00 |

---

[7] Source: Model files "budg0293.gaf.txt" and "cinoper.dat.txt".

4

These forced outage rate inputs can hardly be characterized as "unit-specific." Mr. Harris's report states that "…Cinergy has always used a five-year rolling average of historical unit forced outage rates for projections of unit operations"[8] This apparently does not mean that they actually used individual unit-specific averages for unit-specific projections, but rather that units were lumped together in the historical data and in the projections. Mr. Harris would, for purposes of emissions calculations, ignore project-specific analyses in the project evaluations and instead focus on the "advanced generation planning models, like PROMOD."[9] But Cinergy's use of the PROMOD model shows that it clearly was not emphasizing unit-specific results, since its forced outage input assumptions were not even unit-specific.

And finally, it is important to understand that the development of inputs to a particular project evaluation or system generation planning model will correspond to the decision being made. That is, a project evaluation that is being done in order to decide whether or not to invest in a particular modification at a specific power plant will tend to have input assumptions designed specifically to represent the effect of that modification at that plant. On the other hand, in a system modeling exercise being done for purposes of overall corporate financial planning or fuel procurement there are literally thousands of input items. An increase in availability of a single generating unit by several percentage points might not be included in the long-term system modeling even if the individuals at the Company responsible for the project expected such an increase to occur.

Mr. Harris' fixation upon the system modeling to the exclusion of the project level analysis, leaves one with some "theory" (discussed in his report) but with no practical approach for calculating changes in emissions.

As a side note, there is a point made by Mr. Harris regarding constant available that is incorrect. In discussing and dismissing the Project Evaluation Guides, Mr. Harris states that "In using such projections, the Cinergy engineers implicitly assumed that the generating units would be maintained at a relatively constant availability such that if the plant was needed, for purposes of meeting customer load demand, these units could be used to the full availability."[10] Rather than "relatively constant availability," the Company's Project Evaluation Guides show capacity factor and utilization factor projections that increase over time for many of its generating units. This can been seen in the tables on pages 6-7 and 6-8 of the 1991 guide, and pages 6-9 and 6-10 of the 1992 guide.

In my view, both the project specific analyses and the system analyses offer some insight into what the Company expected at a particular point in time. In the case of Cinergy and its predecessors, however, the practicality of drawing meaningful conclusions from the system modeling is quite limited for the reasons mentioned above.

Mr. Harris comments specifically upon the generating unit availability assumptions in the Company's system planning:

---

[8] Harris, Matt, *Expert Report of Matt Harris on Behalf of Cinergy*, et al, August 3, 2005, page 16. Footnotes omitted.
[9] Harris, Matt, *Expert Report of Matt Harris on Behalf of Cinergy*, et al, August 3, 2005, page 32.
[10] Settlement Agreement, dated January 31st, 1986. Bates CGE-0444806, pages 34 and 35.

5

> …Cinergy generation planning staff has consistently used generating unit reliability statistics developed over a five-year period when performing their generation planning studies. Cinergy planners have not assumed that a single component replacement would improve overall unit availability. Instead, Cinergy has always used a five-year rolling average of historical unit forced outage rates for projections of unit operations.[11]

This statement does not convey the full picture of Cinergy's modeling assumptions for unit availability. First, as I mentioned above, the Company's PROMOD input files had identical forced outage rates for some units at the same station. While these were based upon "unit" data for past years, those units were lumped together, and so the projections were not "unit-specific." It would be more accurate to say that they used "plant-specific" forced outage rate averages for developing the model inputs, although that also is not entirely true. For example, in some cases, the forced outage inputs for Wabash River units 1 though 4 would be identical, but those for Wabash River 5 and 6 would vary. Moreover, the planned outage inputs to PROMOD do not appear to be based on unit-specific 5 year rolling averages. Similar units at the same station would typically have identical planned outage schedules input to PROMOD.[12]

Consider, for example, the planned outage inputs for Cayuga unit 2. In many of the PROMOD input files from the mid-1990s the planned outage cycle (identical to that of Cayuga unit 1) was a five year cycle, in which the annual pattern in days of planned outages was as follows: 21, 21, 21, 49, 0. This averages 22.4 days per year of planned outage over the five-year period. The actual planned outages for Cayuga unit 2 in the 1987 to 1993 period (from the NERC GADS data) were as shown in Table 2.

---

[11] Harris, Matt, *Expert Report of Matt Harris on Behalf of Cinergy*, et al, August 3, 2005, page 16. Footnotes omitted.

[12] By "identical" I do not mean that they would have the outages occurring at the same time, but rather that the amount of planned outage over the course of an outage cycle would be the same. The times of the outages during the year could differ, and the overall cycles could be staggered as well. These differences in timing would not, however, cause the average number of days per year of planned outage to differ if considered over a full cycle.

6

Table 2

| Year | Planned outage days (actual) |
|------|------------------------------|
| 1987 | 41 |
| 1988 | 22 |
| 1989 | 23 |
| 1990 | 45 |
| 1991 | 30 |
| 1992 | 22 |
| 1993 | 56 |

There is no way to calculate a five-year rolling average of these actual planned outage days and get a result near 22.4 days. The actual annual planned outages over the period range from a low of 22 days to a high of 56 days. Clearly there is something going on in the development of inputs to PROMOD that is more complex than the use of simple unit-specific availability on a five-year average basis.

Because overall unit availability is a function of forced *and* planned outages in a situation such as that for Cayuga 2 noted above, the forecast of total availability after the project (in this case a 1994 replacement of boiler front reheater pendants) was for improved availability relative to the past actual.

4. DR. LIBERSON'S REPORT

Dr. Liberson, in his August 3, 2005 report on behalf of Cinergy, claims that the Company had no reason to believe that the generating unit modifications would lead to an increase in emissions. I understand that in Dr. Richard Rosen's rebuttal report in this case he explains his view that Dr. Liberson's statistical analysis is irrelevant. I will focus here upon its inapplicability to the question it purports to address, and particular aspects of the Runs test as applied by Dr. Liberson to issues in the context of electric power plant operations and electric system dispatch.

This claim rests upon the argument that:

> "If, as the Government argues, Cinergy should have been able to predict an improvement in EFOR as a result of the cited projects, we would expect EFOR to have a pattern that indicated that a component or system was breaking down and once repaired would

7

return EFOR to its historically lower value.  If no such pattern appears during the periods prior to the initial cited projects, then CINERGY could not have predicted a change in EFOR as a result of the cited projects."[13]

Dr. Liberson then claims that for 27 of the 29 projects analyzed, prior to the initiation of each of the modifications, there was no pattern of change in the equivalent forced outage rates of the units.  To demonstrate this, Dr. Liberson conducts a series of Runs tests on the monthly equivalent forced outage rates of the generating units.  As a result of the tests, Dr. Liberson concludes that the equivalent forced outage rates for the units fail to demonstrate any underlying pattern in 27 of 29 cases.  According to Dr. Liberson, for those 27 cases, the rates themselves are purely random and, therefore, have no predictable trend.  Hence, according to Dr. Liberson, prior to the modifications, Cinergy could not have identified a trend of decreasing reliability, and as such, could not have predicted that the modifications would serve to increase unit reliability.  Dr. Liberson concludes that because of this, Cinergy could not have predicted the modifications to result in an increase in emissions.

Dr. Liberson's claim that equivalent forced outage rates are random rests upon the statistical results of his Runs test.  This test is used to determine the randomness of statistical samples.  It works by counting the number of "runs" present in a sequence of binary values.  For example, the sequence

   11111000001111

contains three runs.  The initial sequence,

   11111

counts as one run, while the sequence

   00000

marks the end of the first run while itself counting as an additional run.  The third run counts as the final sequence of 1s.  The test identifies the number of runs within a sequence, and then compares this actual value with the expected distribution of runs.  If the sequence contains either a very high or a very low number of runs, one can reasonably conclude that it is not random.

To use the Runs test in the evaluation of generation reliability, Dr. Liberson begins by quantifying reliability in terms of an equivalent forced outage rate.  This rate provides a measure of the amount of time a unit is prevented from running on account of system failure.  It is defined by the Generating Availability Data System as

(Forced Outage Hours + Equivalent Forced Derated Hours) / (Forced Outage Hours + Service Hours + Equivalent Forced Derated Hours During Reserve Shutdown) X 100[14].

---

[13] See Liberson, G.L. *Expert Report of Dr. Gary L. Liberson on Behalf of Cinergy*. August 3, 2005. Page 20.
[14] See North American Electric Reliability Council; *GADS Data Reporting Instructions*, Appendix F: Performance Indexes and Equations.  October 2000.

8

The equivalent forced outage rate of a unit can be measured in terms of any time period. Dr. Liberson measures the reliability of the Cinergy units in terms of months. Reliability over a period of time is therefore measured by identifying the equivalent forced outage rate for each month in that period of time.

In measuring reliability prior to each of the modifications, Dr. Liberson analyzes varying amounts of data. The number of months analyzed ranges for most of the modifications is 24. However, for some of the modifications Dr. Liberson uses an even smaller data set. In the case of the Wabash River 4 modification in 1996, Dr. Liberson's sample is only 8 individual data items (monthly EFOR for June 1995 through January 1996).

Because the Runs test is capable of analyzing only sequences of binary values, the sequence of monthly equivalent forced outage rates must be altered before the test can be performed. This is done by identifying the median rate for each sequence and then transforming each equivalent forced outage rate into either a 1 or a 0 depending upon whether or not it is greater than the median. The resulting sequence of 1s and 0s is then counted in determining the number of runs.

It is through this process that Dr. Liberson distills a sequence of binary values from an initial data set consisting of forced outage hours and equivalent forced derated hours. The Runs test can be performed only after this distillation process has been completed.

Because Dr. Liberson's application of the Runs test to Wabash River 4 uses a particularly short time period, only 8 months of data, it is a simple example to present and to understand – and it highlights the inability of the Runs test to reach meaningful conclusions in this case. Dr. Liberson begins his analysis with 8 months of EFOR data. Those data are shown in Table 3 below. He then calculates the median value and compares the individual monthly EFORs with the median. One half of the monthly EFORs are above the median and one half are below (by definition). These are assigned "1"s and "0"s, respectively. In this string of "1"s and "0"s there is a number of "runs" – in this case there are 5. These are counted in the right-hand column of the table.

Table 3

|  | EFOR (%) | Above (1) or below (0) the median? | Number of Runs (cumulative) |
|---|---|---|---|
| June, 1995 | 14.51 | 1 | 1 |
| July | 2.67 | 0 | 2 |
| August | 33.75 | 1 | 3 |
| September | 0.42 | 0 | 4 |
| October | 0.48 | 0 | 4 |
| November | 0 | 0 | 4 |
| December | 30.75 | 1 | 5 |
| January, 1996 | 15.55 | 1 | 5 |

Dr. Lieberson calculates threshold values for the observed number of runs. In this case, if the number of runs were found to be less than 2 or greater than 7 then he would conclude that for this unit the runs test "failed." In this case the number of runs, 5, so he concludes that the unit "passed" the runs test and he cannot reject the hypothesis that the EFORs are random. In fact, this conclusion means nothing. It would not be possible for the number of runs to less than 2, since the data is created by comparing the monthly EFOR data with the median. It could not be all "1"s nor could it be all "0"s. And the only way for the number of runs to be greater than the upper bound of 7 would be if each monthly value changed from the prior one, effectively oscillating regularly around the median.

I find unjustified Dr. Liberson's decision to use the Runs test as a means of evaluating Cinergy's decision to implement the generating unit modifications. The proper discipline through which to decide whether Cinergy should reasonably have predicted the modifications to lead to an increase in emissions is that of engineering, not statistics. In questioning the likely effects produced by a replacement of a component of a power plant, companies should and do look to engineers, not statisticians. The conclusions arrived at in Dr. Liberson's report are based upon statistical methods that are not and should not used for power plant decision making. Rather, utilities project on a reasonable expectations basis using engineering analysis and system simulation modeling.

The Statistical Runs test used by Dr. Liberson is not in actual practice used to predict emissions. Cinergy has not presented any information demonstrating that Runs tests, of the type performed by Dr. Liberson, were actually carried out by Cinergy prior to any of the modifications. The Runs test is not a standard test used in the calculation of future emissions. The Runs test is not a statistical test used by the electric industry.

Dr. Liberson's analysis does not provide an adequate representation of the type of reasoning employed by Cinergy in analyzing its generating units and its system. Dr. Liberson argues that reliability is random and that because of this, maintenance should not have been expected to increase reliability. This makes Cinergy's decision to implement the modifications appear irrational. Dr. Liberson's analysis raises the unanswered question of why the unit modifications were actually initiated. If Cinergy believed that reliability were randomly determined and that the modifications were to have no positive effect upon reliability, why were the modifications actually performed? If Dr. Liberson's analysis is correct, then Cinergy's actions are mysterious.

The power industry does not use Runs testing of the type applied by Dr. Liberson. Dr. Liberson's statistical approach ignores the methods of prediction actually utilized by the power industry. Dr. Liberson's techniques identify the complexity of an electric generating unit and the subsequent difficulty of determining, with a high degree of certainty, the effects of future actions. He concludes, in effect, that because events cannot be predicted with a 95% level of confidence, they should be taken as random. If this were accepted as standard then attempts at producing change within electric generating units would accordingly be identified as most likely ineffective, and the accepted course of action would generally be no action at all. If Dr. Liberson's techniques are taken seriously, then it would follow that if there are a significant number of forced outages caused by a boiler component, then fixing that component will most likely fail to increase reliability. This is counterintuitive and incorrect. The adoption of this type of thinking by power plant owners would create problems in the utility industry.

Take the example of the replacement of a boiler component. If a planner knows that the company plants to replace the equipment, then she can use this information (not information regarding past sequences of reliability values) to predict changes in reliability. Were predictions made solely based on past sequences of data, then a statistician might be the individual most appropriate for the task of predicting future emissions. Because this is not the case, Dr. Liberson's report fails to speak properly to the issue at hand, which is one of reasonable expectation and causation within the system of an electrical generating unit.

The inadequacy the Runs test is particularly well demonstrated by an examination of the use which Dr. Liberson makes of it in forming his opinion. The Runs test is a statistical test performed to evaluate a null hypothesis. In this case, Dr. Liberson's null hypothesis is that the equivalent forced outage rates for the Cinergy units are randomly distributed. What the Runs test determines, for each of the modifications, is that Dr. Liberson cannot, as a result of the Runs test, reject his null hypothesis. It is extremely important to note that this is all the Runs test itself demonstrates. The Runs test does not demonstrate that the equivalent forced outage rates for the Cinergy units are random. There is a difference between failing to reject his null hypothesis and demonstrating that the equivalent forced outage rates are in fact random. Dr. Liberson's conclusion goes beyond what his statistical analysis actually demonstrates. The proper conclusion to draw from the Runs test is that no recommendation can be made, that information is limited and other sources information and analysis will be needed to determine future reliability.

In addition to questioning the conclusions he draws from the Runs test, I also question Dr. Liberson's decision to implement a Runs test. In particular, I question the type of data used by the Runs test, finding that the requirements of the test serve merely to cloud the available reliability information. As mentioned above in the description of Dr. Liberson's methodology, Dr. Liberson measures his equivalent forced outage rates in terms of months. However, the month itself is an arbitrary period of time determined by historical chance. Moreover, trends within the particular months are ignored by averaging reliability over the entire month's time. An understanding of trends in outages is thereby impaired through generalization as particular failure events are lost when examined from the perspective of overall reliability. The accuracy of Dr. Liberson's results grows even more questionable in the methodology's next step as he proceeds to convert the monthly equivalent forced outage rates into binary values. Precision is limited as widely different values, if in the same position with regard to the median, are made identical. In order to use the Runs test on a particular unit, Dr. Liberson must simplify detailed data on the unit's reliability history, clouding over relevant information so as to produce a data set with which he can perform his desired test. Instead of inquiring into the engineering principles behind the reliability of the Cinergy units, Dr. Liberson elects to simplify the available data.

# Attachment A

List of Documents Considered

1) The documents listed in Attachment B, List of Documents Considered, submitted by Bruce E. Biewald with the May 19, 2005 report in this case (IP99-1693-C-M/S).
2) Harris, Matt. Expert Report, submitted in *United States v. Cinergy,* August 3, 2005.
3) Liberson, Gary L. Expert Report, submitted in *United States v. Cinergy,* August 3, 2005.
4) Workpapers of Matt Harris.
5) Workpapers of Gary Liberson.
6) North American Electric Reliability Council, Generating Availability Data System, Data Reporting Instructions, October 2000.
7) Proposed Redesigned Capital Budget Process DRAFT, and associated communications. Bates CAY-043647 to CAY-043656.
8) Deposition Transcript, Deposition of Raymond Anthony Kaelin, Southern District of Indiana, Indianapolis Division Cause No. IP99-1693, June 30, 2005.