PREVENTION OF SIGNIFICANT

DETERIORATION

WORKSHOP MANUAL

U.S. ENVIRONMENTAL PROTECTION AGENCY
Office of Air, Noise, and Radiation
Office of Air Quality Planning and Standards
Research Triangle Park, North Carolina 27711

October 1980

## NOTICE

The purpose of this manual is to help those people who may be unfamiliar with the PSD program (and its implementation) to gain an understanding of it. Because this manual tends to condense the basic regulations, it may not precisely reflect the regulations and preamble thereto announced in the Federal Register on August 7, 1980 (see 45 CFR 52676). Should there be any apparent inconsistency between this manual and the regulations published on August 7 (including any policy decisions made pursuant to those regulations), such regulations and policy decisions shall govern.

ii

PREFACE

This manual is intended for use in conjunction with the 1980 PSD workshops. Although not essential, it is suggested that the reader attend a PSD workshop before using this manual for reference.

The PSD workshop and this manual serve two prime purposes:

1. To describe in simple terms the requirements of the 1980 PSD regulations found in 40 CFR 52.21; and

2. To provide suggested methods of meeting these requirements, which are illustrated by examples.

It must be noted, however, that this manual pertains only to the requirements of the Federal regulations and does not describe the requirements that will be designed into each State's implementation plan (SIP). Within the confines of the Federal requirements, States may revise portions of the PSD regulations to conform to their existing or proposed methods of implementing the PSD regulations. Generally, any provisions of an SIP that are different from those described in this manual will be more restrictive. The reader is cautioned to keep this in mind when using this manual for general guidance.

The detailed examples presented in this manual are presented for illustration only; numbers and values presented do not necessarily reflect any existing policies or U.S. Environmental Protection Agency (EPA) positions regarding their use. Although based on actual cases, these examples are fictitious and are designed to highlight many of the subtle aspects of the PSD regulations.

The single most important message transmitted in the PSD workshop and manual strongly suggests that the prospective PSD applicant work very closely with the PSD reviewing authority. Communication between the applicant and reviewing authority should be initiated well in advance of preparing a PSD application. The technical requirements of demonstrating compliance with the PSD regulations, such as modeling, are in processes of evolution. Therefore, a good working relationship between the applicant and reviewing authority can serve to minimize time and resources in processing a PSD application.

iii

CONTENTS

|  | Page |
|---|---|
| Notice. | ii |
| Preface | iii |
| List of Tables. | vii |
| List of Figures | ix |
| Acknowledgment. | x |

PART I: APPLICATION GUIDANCE
A.   APPLICABILITY. . . . . . . . . . . . . . . . . . . . . . .   I-A-1
    A.1   Determination of Applicability. . . . . . . . . .   I-A-1
    A.2   Definition of Source. . . . . . . . . . . . . . .   I-A-2
    A.3   Potential to Emit . . . . . . . . . . . . . . . .   I-A-3
    A.4   Sources Subject to PSD Review . . . . . . . . . .   I-A-7
    A.5   Level of PSD Review Required. . . . . . . . . . .   I-A-21
    A.6   Exemptions. . . . . . . . . . . . . . . . . . . .   I-A-22
    A.7   Applicability Determination Example . . . . . . .   I-A-25
    A.8   Conclusion. . . . . . . . . . . . . . . . . . . .   I-A-38
B.   BEST AVAILABLE CONTROL TECHNOLOGY. . . . . . . . . . . .   I-B-1
    B.1   Definition and Purpose of Best Available Control Technology. . . . . . . . . . . . . . . . . . . .   I-B-1
    B.2   Format for BACT Analysis. . . . . . . . . . . . .   I-B-2
    B.3   Impact Analyses . . . . . . . . . . . . . . . . .   I-B-8
    B.4   Best Available Control Technology Analysis Example . . . . . . . . . . . . . . . . . . . . .   I-B-14
C.   AIR QUALITY ANALYSIS . . . . . . . . . . . . . . . . . .   I-C-1
    C.1   Introduction. . . . . . . . . . . . . . . . . . .   I-C-1
    C.2   Establishing the Impact Area. . . . . . . . . . .   I-C-10
    C.3   Establishing the Emissions Inventories. . . . . .   I-C-16
    C.4   Determining Existing Ambient Concentrations . . .   I-C-20
    C.5   Performing the Screening Analysis . . . . . . . .   I-C-23
    C.6   Determining Projected Air Quality . . . . . . . .   I-C-24
    C.7   Other Modeling Considerations . . . . . . . . . .   I-C-24
    C.8   Air Quality Analysis Example. . . . . . . . . . .   I-C-25

|   |   | Page |
|---|---|---|
| D. | ADDITIONAL IMPACTS ANALYSIS | I-D-1 |
|  | D.1 Definition and Purpose | I-D-1 |
|  | D.2 Format for the Additional Impacts Analysis | I-D-3 |
|  | D.3 Additional Impacts Analysis Example | I-D-10 |

PART II: APPLICATION REVIEW

| A. | APPLICABILITY | II-A-1 |
|---|---|---|
|  | A.1 Permitting Process Steps | II-A-3 |
|  | A.2 Evaluation of Applicability | II-A-4 |
|  | A.3 Common Oversights and Errors | II-A-6 |
|  | A.4 Recommendations | II-A-11 |
|  | A.5 Conclusion | II-A-13 |
| B. | BEST AVAILABLE CONTROL TECHNOLOGY | II-B-1 |
|  | B.1 BACT Analysis Review | II-B-2 |
|  | B.2 Conclusions | II-B-4 |
| C. | AIR QUALITY ANALYSIS | II-C-1 |
|  | C.1 Air Quality and Modeling Review | II-C-1 |
|  | C.2 Summary | II-C-10 |
| D. | ADDITIONAL IMPACTS ANALYSIS | II-D-1 |
|  | D.1 Growth Analysis | II-D-2 |
|  | D.2 Soils and Vegetation Analysis | II-D-4 |
|  | D.3 Visibility Analysis | II-D-5 |
|  | D.4 Conclusions | II-D-6 |

APPENDICES

1. Preliminary Determination Summary . . . . . . . . . . . . 1-1
2. PSD Completeness Data Summary . . . . . . . . . . . . . 2-1

BIBLIOGRAPHY

## ACKNOWLEDGMENT

This manual was prepared in conjunction with the PSD Workshops for the U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina by TRW Incorporated Environmental Engineering Division, Research Triangle Park, North Carolina.

The project was directed and managed by Mr. Leigh Hayes. Principal authors were Mr. Leigh Hayes, Mr. Jeff Shumaker, Mr. James Avery, and Mr. William Warren-Hicks. Assistance was provided by Ms. Lori Carter.

Mr. James Weigold was the PSD Workshop Project Officer for the U.S. Environmental Protection Agency, and his guidance and assistance were greatly appreciated. The authors also thank Mr. Mike Trutna and Ms. Charlotte Hopper of EPA for their assistance.

PART I: APPLICATION GUIDANCE

A.   APPLICABILITY

The basic goal of prevention-of-significant-deterioration (PSD) regulations is to ensure that air quality in clean air areas does not significantly deteriorate while maintaining a margin for future industrial growth. The new PSD regulations continue to focus on those industrial plants, both new and modified, that create large increases in the emissions of certain air pollutants. The new PSD regulations, recently promulgated in response to an opinion of the U.S. Court of Appeals for the District of Columbia Circuit, redefine many basic PSD concepts.

This section should give the applicant an understanding of key PSD concepts. It offers specific guidance on how to determine if PSD review is required for proposed new and modified air pollution sources and on the review requirements that must be met by sources subject to PSD review.

The overall goals of applicability are to determine: (1) what proposed construction is subject to PSD review and (2) what analyses must be performed if PSD review is required. This section answers these questions.

A.1   DETERMINATION OF APPLICABILITY

PSD review requirements apply only in certain geographic areas of the United States. Specifically, PSD applies to construction in those

I-A-1

areas designated as attainment or unclassifiable areas under Section 107 of the Clean Air Act for any criteria pollutant. Construction involving only pollutants for which an area is designated nonattainment does not require a PSD permit. The construction, though, must be reviewed in accordance with the nonattainment provisions of the applicable State implementation plan (SIP). Any part of the country with an attainment or unclassifiable designation for at least one criteria pollutant is known as a PSD area. Proposed new sources and modifications in these areas are potentially subject to PSD review. The types of construction subject to PSD review are new major sources and major modifications. Several criteria determine if proposed new construction is major. First, though, it is important to understand the PSD definition of a source.

A.2 DEFINITION OF SOURCE

A source is defined as all emissions units in the same industrial grouping located on contiguous or adjacent properties and under common ownership or control. An emissions unit is any part of a stationary source that emits or has the potential to emit any pollutant subject to regulation under the Act. The "major groups" or two-digit codes contained in the Standard Industrial Classification (SIC) manual define industrial groupings. The introduction and major group descriptions in the manual explain how primary industrial activity serves as the basis of classification.

In most cases, a source can clearly be defined on the basis of the property boundary and ownership criteria of the definition. However, when a large industrial complex under common control is considered, it

I-A-2

may be necessary to segregate emissions units by industrial grouping and thus separate the complex into two or more correctly defined sources. However, since the major groups defined by two-digit SIC codes are broad, very few instances occur in which emissions units at a single location fall under different major groups. An example to illustrate this point is a chemical complex under common ownership manufacturing polyethylene, ethylene dichloride, vinyl chloride, and numerous other chlorinated organic compounds. Each product is made in separate processing equipment with each piece of equipment containing several emission units; all of the operations fall under SIC code 28, the major group for chemicals and allied products. Thus the complex and all its associated emissions units constitute one source.

## A.3 POTENTIAL TO EMIT

Once a source is defined, the second step in determining PSD applicability is to determine if the stationary source is a major or minor (nonmajor) source. This determination is made on the basis of the source's potential to emit pollutants that are regulated by the Act. Potential to emit, or PE, is defined as the capability at maximum design capacity to emit a pollutant after air pollution control equipment has been applied, considering all federally enforceable permit restrictions that limit the design capacity utilization, hours of operation, or type or amount of material processed or stored. In the absence of federally enforceable limits, the potential to emit is based on full capacity and year-round continuous operation. Control equipment is incorporated into the potential to emit only to the degree that resulting emission reductions are federally enforceable.

I-A-3

The term "enforceable restrictions," in estimating the PE, generally refers to requirements for which an operator of a source can be held liable by EPA. Enforceability, therefore, is determined by two conditions: (1) the restriction must be required by a Federal or State permit granted under the applicable SIP or must be embodied in the SIP itself, and (2) the source and/or enforcement authority must be able to show compliance or noncompliance. For instance, the PE of a boiler with a designed capacity of 200 million Btu/hr could be based on a 100-million-Btu/hr fuel input rate if the State permit requires that a continuously recording fuel meter demonstrate capacity utilization not exceeding 50 percent, and that the boiler not exceed 100-million-Btu/hr heat input. In the case of a citrus dryer that only operates during the growing season, the PE could be limited by a permit requirement that the dryer not operate between November and March. Without such permit or other SIP conditions, the restrictions would not be enforceable and, therefore, could not be considered in determining the PE.

When determining the PE for a new source, emissions should be estimated using an engineering approach. Actual performance test data on units similar in design is the preferred basis for estimating PE. In all cases, PE should be estimated for individual emissions units; the individual values should then be summed for the source in question. For each emissions unit, <u>the estimate should be based on the most representative data available</u>. For proposed new emissions units, potential emissions are considered to equal proposed allowable emissions.

Methods of estimating PE may include:
- Federally enforceable allowable emission limits,
- Performance test data on similar units,

I-A-4

- Equipment vendor emissions data and guarantees,
- Emission limits and test data from EPA documents, including background information documents for new source performance standards, national emissions standards for hazardous air pollutants, and Section 111d standards for designated pollutants,
- AP-42 emission factors (see Table A-1, Reference 2),
- Emission factors from technical literature, and
- State emission inventory questionnaires for comparable sources.

Note that estimates must be made for individual emissions units before the PE of the entire source can be determined. These emissions should include all emissions from a source expected to occur on a continuous or regular basis.

### A.3.1 Fugitive Emissions

Fugitive emissions, where quantifiable, are included in the potential emissions accounting procedure to determine if a source is major. Fugitive emissions are those emissions that cannot reasonably be expected to pass through a stack, vent, or other functionally equivalent opening, such as a chimney, roof vent, or roof monitor. Because fugitive emissions vary widely from source to source, they must be quantified through a source-specific engineering analysis. Common quantifiable fugitive emission sources include coal piles, road dust, and quarry emissions of particulate matter (PM). Other common quantifiable sources are fugitive hydrocarbon (HC) emissions from leaking refinery and organic chemical processing equipment. Suggested references for fugitive emission data and associated analytic techniques are discussed in the preamble to the 1980 PSD regulations and are listed in Table A-1.

I-A-5