IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. IP99-1693 C-M/S |
| | ) | |
| CINERGY CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FILED UNDER SEAL**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE*
TO EXCLUDE EVIDENCE AND JURY INSTRUCTIONS RELATED TO
UNNECESSARY AND IMPROPER POINTS OF LAW**

Cinergy's pleadings and proposed jury instructions indicate that it plans to raise irrelevant and factually unjustifiable contentions at trial. If permitted, these sideshows will inevitably divert the jury from the issues that are truly in play. Particularly in a complex case tried to a jury, it is critical to exclude evidence, arguments, and jury instructions related to legal topics that are not viable. With this motion, Plaintiffs seek a ruling that the following contentions are legally or factually infirm and may not be advanced or supported at trial:

1.     That the alleged failure of U.S. EPA to establish "increments" for nitrogen oxides ("$NO_X$") precludes finding Cinergy liable;

2.     That the emissions increases presented by Plaintiffs may be reduced by net emissions decreases unrelated to the project (netting); and

3.      That a "potential to potential" emissions calculation test – rather than the

actual to projected actual test affirmed by this Court – controls for certain projects.

Each of these concepts is precluded by the applicable law or the lack of competent

evidence, and these topics should thus be barred at trial to avoid distracting from the

issues that are legally relevant and factually supported.  *See Wilson v. Williams*, 182 F.3d

562, 566 (7th Cir. 1999) ("Motions *in limine* are designed to avoid the delay and

occasional prejudice caused by objections and offers of proof at trial . . . ."); *Jenkins v.*

*Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002) (noting trial courts' "broad

discretion in ruling on evidentiary questions during trial or before on motions *in limine")*;

*Brown v. Joswiak*, No. 02 C 4622, 2004 WL 407001 at *1 (N.D. Ill. Feb. 24, 2004) ("A

federal district court's authority to manage trials includes the power to exclude evidence

pursuant to motions in limine.").

## ARGUMENT

## I.      NO$_X$ Increments Are Irrelevant To Cinergy's Liability

Cinergy argues that "EPA lacks authority to enforce the PSD program against

Cinergy as it relates to NO$_X$ emissions because the Agency has failed to promulgate

specific standards."  Ex. 1, Defendants' Reponses to Plaintiffs' Third Set of

Interrogatories (Jan. 18, 2008).  Contrary to Cinergy's contention, Plaintiffs clearly have

the authority to enforce the PSD program in the liability phase as it relates to physical or

operation changes, such as the ones at issue, which would result in significant net

emissions increases of NO$_X$ emissions.  Cinergy's Thirtieth Defense, however, seeks to

bring a remedy issue – the NO$_X$ increment standards to be evaluated in PSD permitting if

Cinergy's projects are found to trigger New Source Review – into the liability phase

simply so that it can mischaracterize the regulatory history and suggest that Cinergy's

violations are actually the fault of EPA.  Cinergy's defense, however, fails as a matter of

law because it misstates the applicable standard for determining liability and

misrepresents the status of the $NO_X$ increment regulations.  $NO_X$ increments are simply

irrelevant to the issue in this trial: whether Cinergy violated the law by not obtaining

NSR permits.

### A.     Background

Cinergy proposes instructing the jury on its $NO_X$ increment affirmative defense.

*See* Doc. # 1018 ("Def. Instr.") at p. 46.  Cinergy was also recently ordered to provide

Plaintiffs with a narrative summary of the bases for the affirmative defenses it contends

are relevant to the liability phase of this case.  In those responses, Cinergy states that its

Thirtieth Defense "is relevant, in whole or in part, to both the liability and remedy phases

of this case."  In support of that defense, Cinergy stated:

> EPA lacks the authority to enforce the [PSD] program against Cinergy as
> it relates to NOx emissions because the Agency has failed to promulgate
> specific standards [as] required by the CAA PSD provisions.

Ex. 1 at 136.  Cinergy states that EPA cannot enforce the clear standard of the Prevention

of Significant Deterioration ("PSD") regulations, which require a permit whenever a

modification results in a net emissions increase of 40 tons per year or more of $NO_X$

because EPA has not promulgated a $NO_X$ increment pursuant to Section 166(c) of the

Clean Air Act, 42 U.S.C. § 7476(c), which requires EPA to "conduct a study and not later

than two years after August 7, 1977, promulgate reulgations to prevent the significant

deterioration of air quality which would result from the emissions" of, among other

pollutants, $NO_X$.  Cinergy argues that the

> numerical standards against which a PSD permit application can be
> evaluated are a crucial component of the PSD permitting process.  In order
> to obtain a permit, the owner or operator of a facility at which a "major
> modification" is planned must demonstrate that emissions associated with
> the proposed modification will not cause or contribute to an exceedence
> [of these increments.] . . . Without such standards, the owner or operator
> of a facility has no notice of what is required with respect to the control of
> NOx under the PSD program.

Ex. 1 at 137.

Cinergy's argument conflates the requirements for triggering the PSD permit requirement with the standards to be included in the permit.  As Cinergy acknowledges, in the 1977 Amendments to the Clean Air Act, Congress adopted the PSD program for the prevention deterioration of air quality in attainment areas.  42 U.S.C. §§ 7470-7479.  This program prohibits the construction of any major air pollutant emitting facility that has not installed the "best available control technology" or "BACT."  42 U.S.C. § 7475(a)(4).  One of the pollutants subject to NAAQS and the PSD program is $NO_X$.  Under these provisions, no "major emitting facility," including any source emitting more than 250 tons of $NO_X$, may be constructed or modified unless a PSD permit has been issued for the facility.  42 U.S.C. §§ 7475(a)(1), 7479(1).  A PSD permit will not issue unless the constructed or modified facility is subject to BACT for each pollutant that is subject to the applicable regulatory requirements.  42 U.S.C. §§ 7475(a)(4), 7479(3) (defining BACT as an "emissions limitation").  In addition to meeting BACT, an applicant for a PSD permit must demonstrate that the facility will not violate either the National Ambient Air Quality Standards ("NAAQS") *or* the established increment for each applicable pollutant.  42 U.S.C. § 7475(a)(3).

In order to implement the modification provision of the PSD program, EPA promulgated a set of PSD regulations on August 7, 1980.  These regulations, among other

things, defined which increases of $NO_X$ emissions from a "major stationary source"

qualify as a "major modification" and thus are required to apply for pre-construction

permits or become subject to potential enforcement actions.  40 C.F.R. § 52.21.

Specifically, these provisions provide that "any physical or operational change" which

increases $NO_X$ emissions by over 40 tons per year shall constitute a "major

modification."  40 C.F.R. § 52.21.  EPA provided its rationale for the 40 tons number as

the threshold number in the 1980 Preamble.  *See* 45 Fed. Reg. 52,708 (Aug. 7, 1980).

This number, the significance number, is thus the value that is used to "determine the

need to review modifications and determine which pollutants require BACT and air

quality impact analyses for any new source or modification requiring review."  45 Fed.

Reg. 52,709.  The 1980 PSD regulations also included a list of "air quality concentrations

for each pollutant as criteria for exempting sources from monitoring requirements at the

discretion of the reviewing authority."  45 Fed. Reg. 52,709.  In the 1980 Preamble, EPA

also further acknowledged that not all modifications subject to the BACT analysis would

also be subject to a separate increment analysis because increments were only established

for sulfur dioxide ("$SO_2$") and particulate matter at that time.  45 Fed. Reg. 52,716.

### B.      $NO_X$ Increments Are Irrelevant to Liability Issues

There is no question that the PSD regulations clearly establish an enforceable

$NO_X$ level.  $NO_X$ increments, by contrast, are a component of PSD permitting: they will

come into play only at such time as Cinergy is order to obtain permits.

The PSD and NNSR regulations that Plaintiffs are enforcing *do* establish and have

established specific standards by which $NO_X$ emissions increases trigger NSR

requirements, as Cinergy itself recognizes.  *See* Def. Instr. at p. 36.  Under these rules,

increases of $NO_X$ emissions over 40 tons per year from a "major stationary source"

qualify as a "major modification."  40 C.F.R. § 52.21.  As these are the regulations that

Plaintiffs are enforcing here, Cinergy's $NO_X$ increment defense fails as a matter of law.

By contrast, the $NO_X$ increment requirements upon which Cinergy premises its

Thirtieth Defense simply do not apply to this phase of the case.  *See* Cinergy's Interr.

Responses at 138 (citing 53 Fed. Reg. 3698).  They apply to the next phase – the remedy

phase.  Notably, the 1988 Rule Cinergy cites did not alter the PSD requirements for what

types of changes constitute a "major modification."  *See* 53 Fed. Reg. 3698.  Rather, this

rule set up a new requirement for a PSD applicant by requiring sources which are found

to trigger PSD requirements for $NO_X$ emissions to evaluate the impact of the

modification on applicable $NO_X$ increments.  *Id.*  This evaluation is a separate

requirement from the requirement to determine BACT.  *See, e.g.,* 40 C.F.R. § 52.21.

More importantly, this evaluation is a separate requirement from that analysis necessary

to determine whether a given project is a major modification that requires a PSD permit

in the first instance.

Cinergy itself tacitly acknowledges that, to establish its liability for violating the

PSD requirements, Plaintiffs need offer no proof related to the $NO_X$ increment.  In its

proposed jury instructions, Cinergy listed the elements of liability without reference to

the $NO_X$ increment.  Def. Instr. at p. 29.

Importantly, as will be discussed further in the next phase of the case, the $NO_X$

increment regulations are clearly in effect today, *Environmental Defense v.*

*Environmental Protection Agency*, 489 F.3d 1320 (D.C. Cir. 2007), and these increment

requirements are relevant for evaluating any projects that are found to trigger PSD

requirements for increases in $NO_X$ emissions in this phase of the case. *See, e.g.*, EPA Memorandum, "BACT/LAER Determination Cut-off Date" (Jan. 11, 1990) (EPA's longstanding policy has been that the determination of what injunctive relief under PSD should apply is made at the time the permit is issued, not at the time of the violation).

In addition, it is worth noting that the regulations Cinergy claims EPA lacks authority to enforce have always remained in effect. While Cinergy suggests that the $NO_X$ increment rules were vacated by the D.C. Circuit, that court expressly "did not vacate the regulations" when it evaluated the 1988 $NO_X$ Increment Rule. *Environmental Defense v. EPA*, 489 F.3d 1320 (D.C. Cir. 2007) (citing *Environmental Defense v. EPA*, 898 F.2d 190 (D.C. Cir. 1990)). The court reasoned: "No party to the litigation asks that the court vacate the EPA's regulations, and to do so would at least temporarily defeat petitioner's purpose, the enhanced protection of the environmental values covered by the PSD provisions." 898 F.2d at 190.

Finally, contrary to Cinergy's assertion, EPA has provided other specific standards to evaluate PSD permits for $NO_X$ emissions since long before the first project in this case. For example, the PSD rules applicable to this case provide that sources may be exempt from monitoring requirements if the modification would cause "air quality impacts" less than 14 ug/m3 on an annual average. 45 Fed. Reg. 52,739.

Whatever the status of the $NO_X$ increments, sources must comply with the law. Cinergy cannot use an asserted EPA failure to promulgate certain rules as a blanket exemption from Cinergy's responsibilities under the Clean Air Act and the rules that have been established.

**II.**      **Cinergy Should Be Precluded From Producing Netting Evidence At Trial**

Cinergy has produced no evidence in discovery that could show that emissions increases for the projects at issue in this case could be overcome by contemporaneous emissions decreases, a process known as "netting" under the NSR regulations.  Plaintiffs have repeatedly asked for any evidence of creditable net emissions decreases, only to be rebuffed at every turn and told that such evidence would be presented by Cinergy's expert witnesses.  With discovery now essentially complete, however, none of Cinergy's disclosed experts have presented any analysis that the emissions increases calculated by Plaintiffs could be overcome through netting for the claims remaining at issue.

**A.**      **Background**

Under the NSR regulations, a major modification is a physical or operational change that would result in a significant net emissions increase.  *See, e.g.*, 40 C.F.R. § 52.21(b)(2).  There are two steps to determine whether a project would result in the "net emissions increase."  *See, e.g.*, 40 C.F.R. § 52.21(b)(3)(ii).  First, the source must determine whether emissions increases from the project will be significant.  *Id.*  If the project's emissions increases are above the significance level for a pollutant, the source may evaluate whether other emissions increases and decreases allow the project to "net out" of NSR requirements.  *Id.*  The netting process involves identifying and quantifying "[a]ny other increases and decreases in 'actual emissions' that would be contemporaneous with the particular change and otherwise creditable."  40 C.F.R. § 52.21(b)(3).

Plaintiffs repeatedly sought from Cinergy information relevant to any netting analyses and were met at every turn with the response that such evidence would be

presented by Cinergy's experts.  *See* Doc. # 659 (describing in detail Plaintiffs' discovery efforts and Cinergy's responses).  In responding to Plaintiffs' interrogatory requests, Cinergy failed to provide any information on the types of non-project increases or decreases that are relevant to netting and stated that it anticipated that at least some of the evidence relevant to the issue of netting might be developed and presented through expert witnesses.  *See* Ex. 2, Cinergy's Response to Plaintiffs' Sixth Set of Interrogatories at 36-38.  Plaintiffs also noticed depositions under Fed. R. Civ. P. 30(b)(6) for each of the projects at issue seeking information on potential netting increases and decreases.  *See, e.g.,* Ex. 3, 30(b)(6) Deposition Notice for Cayuga.  The witnesses Cinergy provided in response again provided no information other than to refer to potential expert testimony, as the following example illustrates:

> Q.      To your knowledge – the companies' knowledge, did anyone perform any kind of netting analysis to determine whether any increase or decreases that might occur at the unit following the project would be netted out of the requirement to obtain a permit under the new source review program?
>
> MR. NORTH: Objection, vague and ambiguous.
>
> A.      I don't know the answer to that.  The company does not know the answer to that; if that analysis was done.
>
> Q.      Are there any facts in the companies' possession that relate to and consideration whether there were other projects undertaken on that unit that would have the effect of offsetting any emissions that might take place at the unit?
>
> MR. NORTH: Objection, vague and ambiguous.
>
> A.      The company is not in possession of any facts – of any facts at the time that would lead to that conclusion.  It could certainly be reviewed as part of the expert witness preparation.

Ex. 4, Cinergy 30(b)(6) Beckjord 3 Life Extension Deposition, Moreland at 202-203 (June 27, 2005).  As described further in Plaintiffs' opposition brief on emissions increases, similar discussions were had for the other plants.  *See* Doc. # 659.

At this point, however, discovery is closed – save for the unrelated deposition of Plaintiffs' expert Myron Adams – and Cinergy's experts have not presented any netting analyses.  Cinergy's original emissions expert Matthew Harris examined some information that arguably could be considered relevant to netting, but failed to even identify, much less analyze, the full set of contemporaneous emissions increases and decreases.  Ex. 5, Harris Report at 28-29.  Moreover, Cinergy has made clear that it has replaced Mr. Harris with Kenneth Slater due to Mr. Harris's illness.  *See, e.g.*, Doc. # 1040 at 1.  Mr. Slater has also failed to present a netting analysis, and indeed focuses exclusively on the emissions that should be expected at the unit after the project, rather than the facts relevant to netting: any increases or decreases from other changes at the plant.  *See, e.g.*, Ex. 6, Slater Report at 15-16 (summarizing his analysis, which was limited to projects at issue).

As Cinergy conceded in its motion for summary judgment on emissions increases, Plaintiffs' expert Richard Rosen analyzed potential increases and decreases that could be relevant for netting purposes and found significant net emissions increases for the projects remaining at issue after the Court's summary judgment decision.  Ex. 7, Rosen Report at pp. 61-63, App. 8; Doc. # 572; *United States v. Cinergy Corp.*, No. 99-cv-1693, 2007 WL 2914543 (S.D. Ind. Sept. 28, 2007).  Dr. Rosen's analysis satisfies Plaintiffs' burden of demonstrating a net emissions increase for the projects remaining in the case.  *Cinergy Corp.*, 2007 WL 2914543, at *3 (finding burden was on Plaintiffs).

**B.      Cinergy's Failure to Disclose any Netting Analysis Precludes Presenting Such Evidence at Trial**

This Court has already granted Cinergy summary judgment for projects where Dr. Rosen found that netting could reduce the projected emissions increase.  *Id.* at *3-4.  For the remaining projects, Dr. Rosen found a significant emissions increase even after accounting for netting, and Cinergy has failed to produce any evidence on the subject. Moreover, Cinergy cannot present any netting evidence at trial without violating discovery rules, since Plaintiffs have repeatedly asked for such information without receiving anything.  Therefore the evidence presented and conclusions reached by Dr. Rosen are undisputed and there is no issue to present to the jury.

Nonetheless, Cinergy seeks a jury instruction that jurors may take into account "other increases or decreases in actual emissions" at the plant – in other words, to consider eliminating what would otherwise be emissions increases through netting.  Def. Instr. at p. 36.  The lack of evidence makes this an improper subject for an instruction. *Aerotronics, Inc. v. Pneumo Abex Corp.*, 62 F.3d 1053, 1062 (8th Cir. 1995) (instructions not supported by the evidence "should be avoided because they are irrelevant to any finding the jury properly could make and they are thus a potential source of needless confusion.") (internal citation and quotation marks omitted); KEVIN F. O'MALLEY, ET AL., 1 FEDERAL JURY PRACTICE AND INSTRUCTIONS: CIVIL § 7:3 (6th ed. 2006) ("Only instructions pertinent to the issues being litigated should be proposed by counsel or be given by the court."); *see also United States v. Hill*, 252 F.3d 919, 923 (7th Cir. 2001) ("Unless it is necessary to give an instruction, it is necessary not to give it, so that the important instructions stand out and are remembered.") (internal citations omitted). While Plaintiffs also included netting instructions, we did so strictly as a prophylactic

- 11 -

measure.  Doc. # 1015-2, Plaintiffs' Proposed Case-Specific Final Jury Instructions at pp. 18-19.

Despite requests by Plaintiffs, Cinergy has disclosed no evidence relevant to netting out of emissions increases for the projects remaining at issue in the case, and it is simply too late now for the company to produce such evidence.  Thus there are no netting issues for the jury to consider.

**III.   The Same Fundamental Emissions Methodology Applies To All Projects**

The parties differ on the correct emissions test for certain Indiana projects that took place before 1994.  Cinergy reads the relevant provisions of the Indiana State Implementation Plan ("SIP") for that era to require a "potential to potential" test to determine whether a particular project is a major modification under the Non-attainment New Source Review ("NNSR") program.  Cinergy's reading would thwart the program and is at odds with decisions from this Court, the Seventh Circuit, and the Supreme Court.

The parties have already litigated the meaning of the emissions test set forth in federal regulations, and both this Court and the Seventh Circuit have made clear that the test requires a comparison of pre-project actual annual emissions to projected post-project annual emissions.  *United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2007); *United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272 (S.D. Ind. 2005).  In its proposed jury instructions and supporting materials, however, Cinergy makes clear that it does not yet fully accept this standard.  Cinergy proposes a distinct emissions test for Indiana NNSR claims for projects that took place before 1994.  *See* Def. Instr. at pp. 39-40.  This proposed instruction would apply to all five $SO_2$ claims – not four as Cinergy incorrectly

asserts, Def. Instr. at p. 39 – at the Wabash River units (two claims at Wabash River 2 and one each at Wabash River 3 through 5).  Cinergy proposes a single actual to projected actual emissions analysis for all other projects in the case, Def. Instr. at p. 34 (setting forth general emissions test); *id*. at p. 39 (Wabash River projects "require you to apply a different test"), conceding that the actual to projected actual standard outlined by this Court controls all other projects.

Cinergy's proposed jury instruction 37 sets forth an emissions standard that is not countenanced by the NSR program.  *See* Def. Instr. at pp. 39-40.  The Supreme Court has made clear that – beginning at least by 1980 – EPA's NSR rules required comparing actual annual emissions.  *Environmental Defense v. Duke Energy Corp.*, 127 S. Ct. 1423, 1434 (2007); *see also Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 915 (7th Cir. 1990) ("WEPCo") (finding PSD program "is concerned with changes in *total annual emissions*, expressed in tons per year."); *New York v. EPA*, 413 F.3d 3, 14 (D.C. Cir. 2005); *Alabama Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979).  While these cases focus primarily on PSD, the underlying statutory definition of modification is the same for PSD and NNSR, and the substance of EPA's rules the same for each.  *See* 42 U.S.C. §§ 7501(4) (NNSR definition of modification), 7479(2)(C) (PSD definition of modification); 44 Fed. Reg. 51,924, 51,925 (Sept. 5, 1979) (EPA notes that *Alabama Power* only applies directly to PSD, but that PSD and NNSR have similar provisions, so amending both programs in response to *Alabama Power*).  While the Clean Air Act allows states to implement their own regulations, no state rules can be *less* stringent than the federal program.  40 C.F.R. §§ 51.165(a)(1), 51.166(a)(7).

Cinergy's proposed jury instruction No. 37, however, proposes a reading of the Indiana NNSR rules that would be inconsistent with the statute and federal regulations and that would make showing a violation all but impossible for the projects at issue in this case. Cinergy's instruction calls for a potential to potential emissions calculation, with the unit operating at maximum output every minute of the year in both cases. Doc. # 1018-2 ("Def. Br.") at p. 21; Def. Instr. at p. 39. This Court – along with several others – has already rejected precisely these types of emissions comparisons. *United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272, 1276-78 (S.D. Ind. 2005) (rejecting "Cinergy's argument that the EPA's own rules require it to hold the hours of operation and production rates constant"); *see also Duke Energy*, 127 S. Ct. at 1434; *New York v. EPA*, 413 F.3d at 14, 20; *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 876 (S.D. Ohio 2003).

Contrary to Cinergy's claims, its proposed emissions test is *not* mandated by the Indiana SIP. EPA approved *a portion* of the Indiana SIP on February 16, 1982. *See* 47 Fed. Reg. 6621, 6622 (Feb. 16, 1982); *cf.* Def. Br. at p. 19 (noting approval without noting the limitation). However, EPA had earlier rejected the definitions sections of the Indiana regulations with respect to NSR. 46 Fed. Reg. 54,941, 54,942 (Nov. 5, 1981). The agency found that the definitions, which had been enacted before *Alabama Power*, were not consistent with the new regulatory regime, so EPA approved the definitions only for "purposes other than new source review." *Id.* Cinergy relies on these definitions outside the scope of EPA's approval, and they are not controlling. *See* Def. Br. at pp. 20-21 (citing Indiana definitions for "modification" and "Potential emissions").

Because the Indiana definitions were not approved for NSR purposes, the federal definitions must control.  *See* 44 Fed. Reg. 20,379 n.36 (Apr. 4, 1979) (EPA NNSR rules apply until SIP approved).  As this Court has already ruled, the federal definitions make clear that a 'major modification' [is] a change that causes a significant net increase in the unit's 'actual emissions.'" *United States v. Cinergy Corp.*, 495 F. Supp. 2d 892, 907 (S.D. Ind. 2007); *see also* 40 C.F.R. Part 51 App. S (federal NNSR rules).  Thus the proper reading of the Indiana regulations, considering the partial nature of EPA approval, is that they required comparing actual emissions to projected or potential[1] future emissions.

EPA could have rejected the Indiana regulations altogether.  Instead, it chose to supplement them with its own definitions to ensure compliance with *Alabama Power* and the statute.  Thus EPA's interpretation of the resulting Indiana-federal hybrid merits deference.  As one court has found, if a SIP provision is susceptible to two interpretations, EPA's interpretation trumps because EPA's approval of the SIP reflected approval of its own interpretation – and without such approval the SIP would not control. *United States v. Congoleum Corp.*, 635 F. Supp. 174, 177 (E.D. Pa. 1986); *see also Sierra Club v. Leavitt*, 368 F.3d 1300, 1304 n.9 (11th Cir. 2004) (court "suspect[s]" that state air rules are "sufficiently intertwined with the administration of the CAA that [they] can be considered part of the federal law of air pollution control."); *American Cyanamid Co. v. EPA*, 810 F.2d 493, 497 (5th Cir. 1987) (upholding EPA SIP interpretation despite contrary state position); *United States v. General Dynamics Corp.*, 755 F. Supp. 720, 722-23 (N.D. Tex. 1991) (same).

---

[1] EPA's 1980 regulations at the time called for an actual to potential comparison, but the United States does not propose that here given the Seventh Circuit's ruling in *WEPCo*, 893 F.2d at 918.

Cinergy's proposed instruction does not match federal law or Indiana's regulations, as approved by EPA.  Moreover, raising another emissions standard runs the risk of confusing the jury unnecessarily.

## CONCLUSION

As described above, there is no legitimate purpose to the three legal propositions Cinergy offers.  In order to allow the jury to focus on the legal issues that are truly relevant, Plaintiffs ask the Court for a ruling *in limine* precluding evidence, argument, and jury instructions on the following contentions:

1.      That the alleged failure of U.S. EPA to establish $NO_X$ "increments" precludes finding Cinergy liable;

2.      That the emissions increases presented by Plaintiffs may be reduced by netting; and

3.      That a "potential to potential" emissions calculation test – rather than the actual to projected actual test affirmed by this Court – controls for any projects.


DATED: February 7, 2008          Respectfully submitted,

                                 RONALD J. TENPAS
                                 Assistant Attorney General
                                 Environment & Natural Resources Division

                                 By:  /s/ Thomas A. Benson
                                 SARAH D. HIMMELHOCH
                                 DEBORAH BEHLES
                                 KATHERINE VANDERHOOK
                                 THOMAS A. BENSON
                                 DANIELLE ROSENGARTEN
                                 Environmental Enforcement Section
                                 Environment & Natural Resources Division
                                 U.S. Department of Justice
                                 P.O. Box 7611

Washington, D.C. 20530
(202) 514-0180
sarah.himmelhoch@usdoj.gov

TIMOTHY M. MORRISON
Acting United States Attorney
Southern District of Indiana

THOMAS E. KIEPER
Assistant United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN  46204-3048

ANDREW CUOMO
ATTORNEY GENERAL
OF THE STATE OF NEW YORK

MICHAEL MYERS
JOSEPH KOWALCZYK
Assistant Attorneys General
The Capitol
Albany, NY 12224
(518) 402-2594

ANNE MILGRAM
ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

MAURICE GRIFFIN
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-4503
(609) 984-2845

RICHARD BLUMENTHAL
ATTORNEY GENERAL
OF THE STATE OF CONNECTICUT
CARMEL MOTHERWAY
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120
(860) 808-5101

HOOSIER ENVIRONMENTAL COUNCIL
OHIO ENVIRONMENTAL COUNCIL

JONATHAN LEWIS
CLEAN AIR TASK FORCE
337 Squire Canyon Road
San Luis Obispo, CA 93401
(805) 269-0133

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing memorandum in support was filed under seal with the Court via ECF on February 7, 2008.  Copies of the materials shall be emailed to counsel of record.

/s/ Thomas A. Benson<br>THOMAS A. BENSON