**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| STATE OF NEW YORK, STATE OF NEW JERSEY, | ) | |
| STATE OF CONNECTICUT, HOOSIER | ) | |
| ENVIRONMENTAL COUNCIL, and  OHIO | ) | |
| ENVIRONMENTAL COUNCIL, | ) | |
| | ) | Civil Action No. 1:99-cv-1693- |
| Plaintiff-Intervenors, | ) | LJM-JMS |
| | ) | |
| v. | ) | |
| | ) | |
| CINERGY CORP., PSI ENERGY, INC.,  THE | ) | |
| CINCINNATI GAS & ELECTRIC COMPANY, and | ) | |
| CINERGY SERVICES, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CINERGY'S RESPONSE TO PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE
EVIDENCE AND JURY INSTRUCTIONS RELATED TO UNNECESSARY AND
IMPROPER POINTS OF LAW**

**EXHIBIT A**

**Indiana's 1982 Nonattaintment New Source Review State Implementation Plan**

**("1982 NNSR SIP")**

*13104-2 - 107*

OCT 10 1980

Air Programs Branch
AHMD, US EPA, Region V

AIR POLLUTION CONTROL BOARD

OF THE STATE OF INDIANA

CODIFICATION OF AIR POLLUTION CONTROL BOARD REGULATIONS

<u>Section 1</u> - The following is hereby adopted as Article 1.1 of Title 325 of the Indiana Administrative Code:

ARTICLE 1.1

GENERAL PROVISIONS

Rule 1 - Definitions

Rule 2 - Ambient Air Quality Standards

Rule 3 - Geographical Classification

Rule 4 - Episode Alert Levels

Rule 5 - Malfunctions

Rule 6 - Stack Height Provisions

Rule 7 - Miscellaneous Provisions

AIR POLLUTION CONTROL BOARD
OF THE STATE OF INDIANA

325 IAC 1.1-1

DEFINITIONS

Section 1.    Applicability - Definitions used in Title 325 of the Indiana Administrative Code (Indiana Air Pollution Control Regulations) are set forth in this Rule.  Any definitions set forth in specific other air pollution control Rules shall be governing for that rule if there is a conflict.

Section 2.    Allowable Emissions - The emission rate calculated using the maximum rated capacity of the facility (unless the facility is subject to enforceable permit conditions which limit operating rate, or hours of operation, or both) and the most stringent of the following:

(a)  Applicable new source performance standards or standards for hazardous pollutants set forth in 40 CFR Part 60 or 61, of the Code of Federal Regulations.

(b)  Applicable SIP emission limitations, or

(c)  The emission rate specified as an enforceable permit condition.

Section 3.    Air Pollution Control Equipment (Also pollution control equipment, pollution control device, emission control device) - Control equipment which is not, aside from air pollution control requirements, vital to production of the normal product of the source or to its normal operation.  Equipment is vital if the source could not produce its normal product or operate without it.

Section 4.    Applicable State and Federal Regulations - Regulations adopted by the Air Pollution Control Board concerning air pollutant emission limitations and air quality established pursuant to Indiana Law, including regulations promulgated by the Board, and all requirements established pursuant to the Federal Clean Air Act.

Section 5.    Attainment Area - A geographical area designated by the Board as meeting the ambient air quality standards established for a specific pollutant in 325 IAC 1.1-2 (formerly known as APC 14).

Section 6.    Board - The Indiana Air Pollution Control Board.

Section 7.  Baseline Concentration - The ambient concentration level reflecting actual air quality as of August 7, 1977, minus any contribution from any major facility or modification thereto on which construction commenced on or after January 6, 1975.  The baseline concentration shall include contributions from:

(a)  The actual emissions of other facilities in existence on August 7, 1977, except that contributions from facilities within such existing sources for which a plan revision proposing less restrictive requirements was submitted on or before August 7, 1977, and was pending action by the Administrator (EPA) on that date shall be determined from the allowable emissions of such facilities under the plan as revised; and

(b)  The allowable emissions of major facilities and modifications thereto which commenced construction before January 6, 1975, but were not in operation by August 7, 1977.

Section 8.  Best Available Control Technology (BACT) - An emission limitation (including a visible emission standard) or equipment standard based on the maximum degree of reduction of each pollutant subject to regulation under the Clean Air Act and applicable Indiana laws or rules which would be emitted from or which results from any proposed major facility or modification thereto which the Board, on a case-by-case basis, taking into account energy, environmental and economic impacts and other costs, determines is achievable for such facility or modification through application of production processes and available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant.  In no event shall application of Best Available Control Technology result in emissions of any pollutant which will exceed the emissions allowed by any applicable standard.

Section 9.  Bulk Gasoline Plant - A gasoline storage and distribution facility which receives gasoline from bulk terminals by transport, stores it in tanks, and subsequently dispenses it via account trucks to local farms, businesses, and service stations.

Section 10.  Bulk Gasoline Terminal - A gasoline storage facility which receives gasoline from refineries primarily by pipeline, ship, barge or rail, and delivers gasoline to bulk gasoline plants or to commercial or retail accounts primarily by transport.

Section 11.  Catalytic Cracking Unit - A unit composed of a reactor, regenerator, and fractionating tower which is used to convert certain petroleum fractions into more valuable products by passing the material at elevated temperature, through a bed of catalyst in the reactor.  Coke deposits produced on the catalyst during cracking are removed.

Section 12.    Charging - The introduction of coal into a coke oven .  The charging period begins with the first introduction of coal into the coke oven and ends with the replacement of the last charge port lid.

Section 13.    Charge Port - An opening in the roof of a coke oven through which coal is introduced.

Section 14.    Coal Processing - The breaking, crushing, and screening of coal in preparation for charging to any combustion facility.

Section 15.    Coating Line - One or more apparatus or operations which include a coating applicator, flash-off area, and oven wherein a surface coating is applied, dried and/or cured.

Section 16.    Coke Oven Battery - Any series of jointly operated slot-type coke ovens, the operation of which results in the destructive distillation of coal for conversion to coke.

Section 17.    Coke Oven Topside - The top of any coke oven, including, but not limited to, the charge port, charge port lids and off-take piping associated with an oven.

Section 18.    Coke-Side - That side of a coke oven from which the coke is removed for quenching.

Section 19.    Combustion for Indirect Heating - The combustion of fuel to produce usable heat that is to be transferred through a heat-conducting materials barrier or by a heat storage medium to a material to be heated so that the material being heated is not contacted by, and adds no substance to the products of combustion.

Section 20.    Commence Construction - Construction or modification of a facility shall be deemed as having begun when the owner or operator either has:

(a)  Begun, or caused to begin, a continuous program of physical on-site construction of the facility, or;

(b)  Entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility.

Section 21.    Construction - Fabrication, erection, or installation of an emission source, air pollution control equipment, or a facility.

Section 22.    Cutback Asphalt - Asphalt cement liquified by blending with volatile organic compounds, and which is used for the purpose of paving and/or repairing a road surface.

Section 23.    Electric Arc Furnaces - An electric arc furnace is defined as any furnace that produces molten steel and heats the charge materials with electric arcs from carbon electrodes. Furnaces from which the molten steel is cast into the shape of the finished products, such as in a foundry, are not affected facilities included within the scope of this definition. Furnaces which, as the primary source of iron, continuously feed prereduced ore pellets are not affected facilities within the scope of this definition.

Section 24.    EPA - The United States Environmental Protection Agency.

Section 25.    Excess Air - That air supplied in addition to the theoretical quantity necessary for complete combustion for all fuel and/or combustible waste material present.

Section 26.    Existing Facility - Any facility which has commenced construction or is in operation at the time of promulgation of the applicable regulation.

Section 27.    Facility - Any one structure, piece of equipment, installation or operation which emits or has the potential to emit any air contaminant.  Single pieces of equipment or installations with multiple emission points shall be considered a facility for the purpose of this regulation.

Section 28.    Farming Operation - That business concerned with the planting, harvesting, and/or marketing of crops and the raising of animals.  This does not include nurseries, tree farms, or sod production.

Section 29.    Flare - An elevated combustion device that burns waste gases.

Section 30.    Fugitive Dust - Particulate matter composed of soil which is uncontaminated by pollutants resulting from industrial activity.  Fugitive dust may include emissions from haul roads, wind erosion of exposed soil surfaces and soil storage piles and other activities in which soil is either removed, stored, transported or redistributed.  Note that a different definition for fugitive dust is established in 325 IAC 6-4 (formerly Regulation APC 20) for use therein.

Section 31.    Garbage - All putrescible animal solid, vegetable solid, and semi-solid wastes resulting from the processing, handling, preparation, cooking, serving, or consumption of food or food materials.

Section 32.    Gas Collector Main - The pipe or duct through which the gaseous by-products of coking are transported from the offtake piping of coke ovens to the by-product plant.

Section 33.    Gasoline - A petroleum distillate having a Reid vapor pressure of 27.6 kilo Pascals (4 psi) or greater.

Section 34.    Governmental Unit - Any agency which has air pollution
               control, law-making and enforcement jurisdiction, excluding
               the federal government, which represents any city, county or
               other local government unit.

Section 35.    Incinerator - An engineered apparatus that burns waste
               substances with controls on combustion factors including,
               but not limited to, temperature, retention time, and air.

Section 36.    Larry Car - A vehicle which transfers and introduces coal
               into a coke oven.

Section 37.    Lowest Achievable Emission Rate (LAER) - For any facility,
               that rate of emissions which reflects the more stringent of
               the following:

               (a)  The most stringent emissions limitation and/or the
                    limitation resulting from equipment standards which are
                    contained in any State Implementation Plan for such
                    class or category of facility unless the owner or
                    operator of the proposed facility demonstrates to the
                    Board that such limitations are not achievable or;

               (b)  The most stringent emissions limitation resulting from
                    equipment standards or which has been achieved in
                    practice by such class or category of facility.

Section 38.    Luting Material - A mud/slurry mixture used to obtain a seal
               and to minimize emissions from the charge port lids and
               standpipe caps.

Section 39.    Major Facility - Any facility which has the potential to
               emit 100 tons or more per year of any one regulated pollutant.

Section 40.    Malfunction - Any sudden, unavoidable failure of any air
               pollution control equipment, process, or combustion or
               process equipment to operate in a normal and usual manner.

Section 41.    Material - Includes all biodegradable and non-biodegradable
               substances including garbage, rubbish, ashes, commercial,
               industrial, and institutional wastes, wood and wood products.

Section 42.    Military Specifications - Any specifications relating to or
               controlling the volatile organic compound make-up of paints
               used for covering military goods and which have been estab-
               lished as a requirement by any branch of the United States
               Armed Services.

Section 43.    Modification - An addition to an existing facility or any
               physical change, or change in the method of operation of any
               facility which increases the potential or legally allowed
               emissions (whichever is more stringent) of any pollutant that

could be emitted from the facility or which results in emissions of any pollutant not previously emitted, except that the exceptions set forth in Section 1 in 325 IAC 2-1 (formerly Regulation APC 19) also shall not be considered a modification unless previously limited by enforceable permit conditions.

Section 44.    Natural Growth - Trees, brush, or other vegetation in its natural state either dead or alive.

Section 45.    Necessary Preconstruction Approvals for Permits - Those permits or approvals required by the permitting authority under the Indiana State Implementation Plan as a precondition to undertaking construction.

Section 46.    New Facility - Any facility which commences construction after the promulgation date of the applicable section of this Title.

Section 47.    Nonattainment Areas - A geographical area designated by the Board as not meeting the ambient air quality standards established for a specific pollutant in 325 IAC 1.1-2 (formerly known as APC 14).

Section 48.    Noncombustible Container - A container that can withstand a temperature of 1500 degrees F.

Section 49.    Nonphotochemically Reactive Hydrocarbon - Methane, Ethane, 1, 1, 1 trichloroethane (methyl chloroform), dichloromethane (Methylene Chloride), and trichlorotriflouroethane (Freon 113).

Section 50.    Offtake Piping - Piping extending from the connection on the top of a coke oven to and including the connection on the gas collector main.  Offtake piping includes the standpipe and gooseneck.

Section 51.    Open Burning - The combustion of any matter in the open or in an open dump, and (a) the products of combustion are emitted directly into open air without passing through a stack or chimney; or (b) combustion occurs in a device other than an approved incinerator or boiler.

Section 52.    Oven Door - The vertical face of a coke oven between the bench and the top of the battery and between two adjacent back-stays.

Section 53.    Owner or Operator - Any person who owns, leases, controls, operates or supervises a facility, an air pollutant emission source or air pollution control equipment.

Section 54.    Particulate Matter - Any material, except water, that exists in a finely divided form as a liquid or a solid.

Section 55.    Person - Any individual, partnership, co-partnership, firm, company, corporation, association, joint stock company, trustee, estate, political subdivisions or any other legal entity or their legal representatives, agents, or assigns.

Section 56.    Portable Incinerator - Incinerators that can be readily moved to and operated in different locations.

Section 57.    Positive Net Air Quality Benefit - The net result of offsetting new allowable emissions with reduced actual or allowable emissions such that the net sum of the projected changes in the ambient air quality in the affected area will be positive and that at no receptor will there be a significant increase in the pollutant levels due to the projected changes.

Section 58.    Potential Emissions - Emissions of any one pollutant which would be emitted from a facility if that facility were operated without the use of pollution control equipment unless such control equipment is (aside from air pollution control requirements) necessary for the facility to produce its normal product or is integral to the normal operation of the facility.  Potential emissions shall be based on maximum annual rated capacity unless hours of operation are limited by enforceable permit conditions.  Potential emissions from a facility shall take into account the hours of operation per year and shall be calculated according to Federal emission guidelines in AP 42-most recent edition-Compilation of Air Pollution Factors, or calculated based on stack test data or other data acceptable to the Board.

Section 59.    Pre-carbonization - The process by which coal is pulverized, preheated, and conveyed hot to the oven to be charged.

Section 60.    Primary Chamber - The chamber in which waste material is ignited and burned.

Section 61.    Process - Any action, operation, or treatment and the equipment used in connection therewith, and all methods or forms of manufacturing or processing that may emit air contaminants.

Section 62.    A.  Process Weight - The total weight of all materials introduced into any source operation.  Solid fuels charged will be considered as part of the process weight but liquid and gaseous fuels and combustion air will not.

               B.  Process Weight Rate -

                   (1) For continuous or long-run, steady-state source operations, the total process weight for the entire period of continuous operation or for a typical portion thereof, divided by the number of hours of such period or portion thereof.

     (2)  For a cyclical or batch source operation, the total process weight for a period that covers a complete operation or an integral number of cycles, divided by the hours of actual process operation during such a period.

When the nature of any process or operation or the design of any equipment is such as to permit more than one interpretation of this definition, the interpretation that results in the minimum value for allowable emission shall apply.

**Section 63.**   <u>Pushing</u> - The operation by which coke is removed from the coke oven and transported to the quench area.  The operation begins with the first visible movement of coke and ends when the quenching operation is commenced.

**Section 64.**   <u>Push-Side</u> - That side of a coke oven in which a ram is inserted to push the coke out through the coke-side door.

**Section 65.**   <u>Qualified Observer</u> - Any person who has successfully completed a State or U.S. EPA approved visible emission evaluation course and is currently certified as such.

**Section 66.**   <u>Quenching</u> - The operation by which the combustion of hot coke is stopped by the application of water or any other means achieving the same effect.

**Section 67.**   <u>Reasonable Further Progress</u> - The annual incremental reductions in emissions of a pollutant which are sufficient in the judgment of the Board to provide reasonable progress towards attainment of the applicable ambient air quality standards established by 325 IAC 1.1-2 (Regulation APC 14) by the dates set forth in the Clean Air Act.

**Section 68.**   <u>Reconstruction</u> - A facility shall be considered to be reconstructed when the fixed capital cost of the new components exceed fifty (50) percent of the fixed capital cost of a comparable entirely new facility.

**Section 69.**   <u>Regulated Pollutant</u> - Any pollutant for which an Air Pollution Control rule establishing emission limitations or requirements has been promulgated pursuant to Indiana law.

**Section 70.**   <u>Reid Vapor Pressure</u> - The absolute vapor pressure of volatile crude oil and volatile nonviscous petroleum liquids except liquified petroleum gases as determined by American Society for Testing and Materials, Part 17, 1973, D-323-72 (Reapproved 1977).

**Section 71.**   <u>Related Facilities</u> - Any group of facilities within a source (other than major facilities) which, in combination, have the potential to emit 25 tons or more per year of any one regulated pollutant and which in the judgement of the Board

contribute so much together (rather than individually) to the facility's or source's emissions that a single operating **permit** (rather than individual permits for each facility) is warranted.

Section 72.    <u>Respirable Dust</u> - Particles in the range of 0.5 microns to 6.0 microns in diameter.

Section 73.    <u>Secondary Chamber</u> - The chamber in which combustible solids, vapors, and/or gases from the primary chamber either are collected or are ignited and burned.

Section 74.    <u>Shutdown Condition</u> - The cessation of operation of emission control equipment for any purpose.

Section 75.    <u>Solvent</u> - Organic materials which are liquid at standard conditions and which are used as dissolvers, viscosity reducers, or cleaning agents.

Section 76.    <u>Source</u> - An aggregation of one or more facilities which are located on one piece of property or on contiguous or adjacent properties, and which are owned or operated by the same person (or by persons under common control).

Section 77.    <u>Stack</u> - A vertical duct originating within the facility, the area and other physical parameters of which are quantifiable (including the quantity of pollutants emitted) and the use of which results in any immediate, physical pollutant plume whose characteristics continuously are determined by the operation of the facility.  Any stack as defined herein with a horizontal discharge, or an elevated flare shall be considered to be a stack for the purpose of this regulation and all applicable APC Regulations.

Section 78.    <u>Standard Conditions</u> - A gas temperature of 70° F. and a gas pressure of 14.7 pounds per square inch absolute (psia).

Section 79.    <u>Staff</u> - Staff of the Indiana Air Pollution Control Division.

Section 80.    <u>Startup Condition</u> - The setting in operation of a facility or of emission control equipment for any purpose.

Section 81.    <u>Standpipe Lid</u> - The lid covering the opening on the gooseneck which can be opened to provide access to remove constricting carbonaceous buildup in the piping.  The standpipe lid is also used for purposes of decarbonizing the oven.

Section 82.    <u>State Implementation Plan (SIP)</u> - The State plan of the Indiana Air Pollution Control Division which provides for implementation, maintenance and enforcement of the primary and secondary ambient air quality standards in Indiana.

Section 83.    <u>Stationary Incinerator</u> - Incinerators installed and operated in one location and not intended to be moved for the lifetime of the apparatus.

Section 84.  **Tank Wagon** - A straight four- or six-wheel truck with a tank mounted on the chassis typically with a capacity of approximately 2,000 gallons and used to dispense liquid petroleum products.

Section 85.  **Temporary Emissions** - Those emissions resulting from operations not exceeding two years in duration at one location.

Section 86.  **Theoretical Air** - The exact amount of air required to supply the required oxygen for complete combustion for a given quantity of a specific fuel or waste.

Section 87.  **Transfer Efficiency** - The weight (or volume) of coating solids adhering to an object divided by the total weight (or volume) of coating solids used in application processes. Determination procedure will be in accordance with Board Policy.

Section 88.  **Transport** - A tractor semi-trailer capable of hauling a maximum load permissible by law of liquid petroleum products with various sized compartment and typically a total capacity of approximately 8,000 gallons.

Section 89.  **True Vapor Pressure** - The equilibrium pressure exerted by a petroleum liquid as determined in accordance with methods described in American Petroleum Institute Bulletin 2517, "Evaporation Loss from Floating Roof Tanks," 1962.

Section 90.  **Unclassifiable (Unclassified) Areas** - A geographical area which cannot be classified as attainment or nonattainment on the basis of available information, but for the purpose of establishing emission limitations in the applicable Rule, an area comparable to an attainment area.

Section 91.  **Underfire** - The term used to describe the combustion mechanism by which coke ovens are heated.

Section 92.  **Vapor Balance System** - A combination of pipes and/or hoses which creates a closed system between the vapor spaces of an unloading tank and a receiving tank such that vapors displaced from the receiving tank are transferred to the tank being unloaded.

Section 93.  **Vapor Control System** - A system that prevents release to the atmosphere more than 80 mg/l of organic compounds in the vapors displaced from a tank during the transfer of gasoline.

Section 94.  **Volatile Organic Compound (also denoted as VOC)** - Any organic material that has a vapor pressure greater than 0.014 kPa (0.1 millimeter of mercury, or 0.0021 psi) at $20^{\circ}$ C ($68^{\circ}$ F) and 760 millimeters of mercury (29.92 inches of mercury) excluding non-photochemically reactive hydrocarbons.

Section 95.    <u>Wood Products</u> - Material derived from or consisting of wood or vegetation including, but not limited to, paper, cardboard, rags, boards, branches, brush, grass, and leaves.

AIR POLLUTION CONTROL BOARD

OF THE STATE OF INDIANA

CODIFICATION OF AIR POLLUTION CONTROL BOARD REGULATIONS

**Section 2** - The following is hereby adopted as Article 2 of Title 325 of the Indiana Administrative Code:

ARTICLE 2

PERMITS AND NEW SOURCE REVIEW

**Rule 1 - Permits, PSD, Offset**

AIR POLLUTION CONTROL BOARD
OF THE STATE OF INDIANA

325 IAC 2-1
Formerly APC 19

PERMITS, PSD, EMISSION OFFSET

Section 1.    <u>Applicability</u>

(a)  Any person proposing to operate any existing facility
     which has the potential to emit 25 tons per year or
     more of any regulated pollutant shall comply with the
     requirements set forth in Sections 4, 5 and 6 of this
     Rule.

(b)  Any person proposing to begin, after the promulgation
     of this Rule, construction, modification or
     reconstruction of any facility which will result in a
     potential increase in emissions of 25 tons per year or
     more of any regulated pollutant shall comply with the
     requirements of Sections 4 and 6 of this Rule.

(c)  Any person proposing the modification of an existing
     facility, which will increase the facility's potential
     emissions of any one regulated pollutant by the amounts
     specified below or any person proposing to begin, after
     the promulgation date of this Rule, construction or
     operation of a facility which has the potential to emit
     any regulated pollutant in the following minimum amounts:

     (1)  Particulate matter in excess of either five pounds
          per hour or 25 pounds per day,

     (2)  Sulfur dioxide in excess of either ten pounds per
          hour or 50 pounds per day,

     (3)  Nitrogen oxides in excess of either five pounds
          per hour or 25 pounds per day,

     (4)  Volatile organic compounds in excess of either
          three pounds per hour or 15 pounds per day,

     (5)  Carbon monoxide in excess of either 50 pounds per
          hour or 250 pounds per day,

     but which <u>does</u> <u>not</u> have the potential to emit 25 tons
     per year or more of the regulated pollutant shall
     comply with the requirements set forth in Section 3 of
     this Rule.

(d)   Any person proposing construction, modification, reconstruction or operation of an emission control device for a facility required by (a), (b) or (c) above to meet either Sections 3, 4 or 5 of this regulation shall comply with requirements set forth in Section 3 of this Rule.

(e)   Any person proposing to modify a stack through which potential emissions of 100 tons or more per year of any regulated pollutant may be emitted shall comply with Section 4 of this Rule.

(f)   Any other person proposing to construct or operate any facility (in the case of the Prevention of Significant Deterioration requirements, any major facility) determined by the Board to be causing or contributing to a violation of an ambient air quality standard established in 325 IAC 1.1-2 (formerly known as APC 14) or a Prevention of Significant Deterioration increment established in Section 7 of this Rule, shall be required to obtain a construction or operation permit and also to reduce emissions of any pollutant to the levels necessary to attain or maintain the ambient air quality standards or the Prevention of Significant Deterioration increments.

(g)   Any person proposing construction, modification or operation of any facility which is not required by (a) thru (f) above to comply with this Rule shall not be required to meet the registration, construction permit or operating permit requirements of Sections 3, 4 and 5 of this Rule.

Section 2.   Major Modifications - For the purposes of Section 7 of this Rule, a major modification shall be defined as any addition to an existing facility or any physical change in the method of operation of any existing facility which increases either the potential or legally allowed emissions of any pollutant (including any pollutant not previously emitted and taking into account all accumulated increases in potential emissions occurring at the facility since the enactment of this Rule or since the time of the last construction approval issued for the facility pursuant to such regulations approved concerning Section 7 of this Rule, whichever time is more recent, regardless of any emission reductions achieved elsewhere in the facility by either 100 tons per year or more for any facility category identified in Section 7(a)(1) of this Rule or by 250 tons per year or more for any facility that could be emitted from the facility or which results in emissions of any pollutant not previously emitted. The following, notwithstanding the above definition, shall not be considered a major modification unless previously limited by enforceable permit conditions:

(a)   Any routine maintenance or repair that cannot be classified as reconstruction;

2-1

(b)  An increase in the production rate not exceeding the operating design capacity of the facility;

(c)  An increase in hours of operation.

Section 3.     Registration

(a)  No person required by Sections 1(c) or (d) of this Rule to comply with this section shall commence construction, modification, reconstruction or operation of a facility or emission limitation device without registering the same with the Board.

(b)  The registrant shall submit the following information to the Board:

   (1)  A description of the nature, location, design capacity and operating schedule of the facility, and/or emission limitation device, including the design specifications.

   (2)  A time schedule for construction, modification or reconstruction of the facility or emission limitation device.

   (3)  Information on the nature and amount of pollutants to be emitted, and any other information determined by the Board as necessary to demonstrate compliance with either the ambient air quality standards set forth in 325 IAC 1.1-2 (formerly known as APC 14) or the Prevention of Significant Deterioration increments set forth in Section 7 of this Rule, whichever is applicable.

(c)  Upon receipt of the registration information requested above, the Board shall have no more than 90 days to accept the registration or request any necessary additional information or the registration shall be deemed to be accepted.

Section 4.     Construction Permits

(a)  No person required by Section 1(b) of this Rule to comply with Section 4 herein shall commence construction, modification, or reconstruction of any facility without first applying for and obtaining a construction permit from the Board.

(b) No construction permit shall be issued to any person for construction, modification, or reconstruction of any facility, unless that person can demonstrate to the Board that the facility will meet the following requirements.

(1) Regulated air pollutants will not be emitted in amounts which will:

(A) Interfere with attainment or maintenance of any ambient air quality standard set forth in 325 IAC 1.1-2 (formerly known as APC 14).

(B) Interfere with attainment or maintenance of either the Prevention of Significant Deterioration Standards set forth in Section 7 of this Rule or the Prevention of Significant Deterioration Standards established by any adjoining state.

(2) That for any major facility construction, reconstruction or modification which will emit either carbon monoxide or volatile organic compound and which is located in a nonattainment area for which an extension beyond December 31, 1987, for meeting the applicable ambient air quality standards set forth in 325 IAC 1.1-2 (formerly known as APC 14), has been granted pursuant to Section 172 of the Clean Air Act, no construction permit shall be issued without prior analysis of:

(A) Alternative sites, sizes, production processes, and environmental control techniques.

(B) A demonstration that the benefits of the proposed construction or modification significantly outweigh the environmental and social cost(s) proposed as a result thereof.

(3) Any person proposing the construction, modification or reconstruction of a major facility which will impact on the air quality of an attainment area or unclassified area or which will be located in an attainment area or unclassified area shall comply with the requirements of Section 7 of this Rule as applicable in addition to the requirements of this Section and Sections 5 and 6.

(4) Any person proposing the construction, modification or reconstruction of a major facility which will impact on the air quality of a nonattainment area or which will be located in a nonattainment area shall comply with the requirements of Section 8 of this regulation, as applicable in addition to the requirements of this Section and Sections 5 and 6.

(c)   This Subsection applies to both construction and operating permits.  The applicant shall submit the following information in the permit application:

(1)   A description of the nature, location, design capacity and typical operating schedule of the proposed facility and/or emission limitation device, including design specifications.

(2)   A detailed schedule for construction, modification or reconstruction of the facility.

(3)   Information on the nature and amount of the pollutants to be emitted, estimates of offset credits for facilities to be constructed, modified or reconstructed in nonattainment areas and any other information (such as the air quality impact) determined by the Board as necessary to demonstrate compliance with either the ambient air quality standards set forth in 325 IAC 1.1-2 (formerly known as APC 14) or the Prevention of Significant Deterioration increments set forth in Section 7 of this Rule, whichever is applicable.

(d)   Plans and specifications submitted with each permit application must be prepared or approved by a professional engineer registered to practice in the State of Indiana in accordance with the provisions of IC 25-31-1.  This requirement shall not apply to a facility or emission control device which costs less than $10,000.

(e)   This Subsection applies to both construction and operating permits.  Each application shall be signed by an authorized individual whose signature constitutes agreement that the applicant assumes the responsibility of assuring that the facility or emission control device will be constructed and/or will operate in compliance with all applicable Indiana Air Pollution Control rules and regulations.  Such signature shall also constitute affirmation that the statements in the application are true and complete, (as known at the time of completion of the application) and shall subject the applicant to liability under State laws forbidding false or misleading statements.

(f)   Prior to issuing a construction permit to an applicable facility as required by Sections 1(a) or (b), the proposed permit application shall be reviewed in the following manner:

(1)   This Subsection (1) applies to both construction and operating permits.  Within thirty (30) days of the receipt of the application by the staff, the staff shall preliminarily review the application

for completeness.  If the application is not complete, the staff shall request additional information necessary to review the application. At the request of the applicant, any controversy regarding the completeness of any application shall be resolved by the Board.  If the Board finds the application to be incomplete or if the applicant agrees that the application is incomplete, the applicant shall forward to the staff the required additional information.  If the applicant refuses to complete the application, the permit shall be considered denied as a result of the incomplete application.  This denial may be appealed in accordance with the procedures set forth in Section 11 of this Rule.  Staff review of the application shall begin upon receipt of all information necessary to constitute a complete application.

(2)   The staff shall notify the public of the proposed construction by publishing, in a minimum of one newspaper of general circulation in the county where the construction is proposed, a notice which includes:

   (A)   Notification of receipt of the application,

   (B)   Staff's proposed approval or disapproval of the permit,

   (C)   Notification to the public of at least a thirty (30) day period for submitting written comments to the staff,

   (D)   Notification to the public of the opportunity for a public hearing for consideration of the application,

   (E)   Notification to the public that a copy of the application and staff's analysis thereof are available for inspection in a convenient public office (generally the local health department office) in the area to be affected by the proposed construction.

   (F)   Notification of the amount of increment the proposed facility will consume (facilities subject to Section 7 of this Rule).

(3)   A copy of the above notice shall also be provided to appropriate federal, state or local agencies.

(4)   All comments received during the public comment period shall be considered by the staff before the Board issues the permit.

2-1
p. 6

(5)  There shall be an opportunity for a public
     hearing, if deemed necessary, after staff review
     of adverse comments concerning the air quality
     impact of the proposed construction or modification.
     A permit may be denied on the basis of adverse
     comment if the comment demonstrates that:

     (A)  The ambient air quality standards in 325 IAC 1.1-2
          (formerly known as APC 14) will not be maintained;

     (B)  The PSD requirements of Section 7 of this
          Rule are not met;

     (C)  The offset requirements of Section 8 of this
          Rule are not satisfied.

(6)  The Board may impose such conditions on the permit
     as necessary to insure both that the facility will
     comply with all applicable regulations and that
     ambient air quality standards established in
     325 IAC 1.1-2 (formerly known as APC 14) and
     Prevention of Significant Deterioration standards
     established in Section 7 of this Rule will be
     attained and maintained.

(7)  To the extent practicable, the procedures in this
     Subsection (f) and Subsection 4(g) below shall be
     undertaken concurrently to avoid duplication of
     time and effort.

(g)  This Subsection applies to both construction and operating
     permits.  Emission limitations may be established as
     conditions of construction and operating permits for
     any facility for the purpose of insuring that the
     applicable regulations, the ambient air quality standards
     and the Prevention of Significant Deterioration standards
     are attained and maintained.  In some cases, requirements
     for the establishment of emission limitations are set
     forth in the Indiana air pollution control regulation
     which regulates the applicable pollutant.  In all
     cases, emission limitations established in both
     construction and operation permits shall be established
     according to the following procedures:

     (1)  The Board, shall notify the owner or operator of
          the source of the proposed emission limitation
          prior to establishing said emission limitations as
          conditions of construction and operating permits
          and shall:  (1) publish notice of the proposed
          emission limitations in a newspaper of general
          circulation in the area where the affected facilities
          are located; (2) provide a document supporting the
          Board's proposed emission limitations for public

inspection in the offices of the local air pollution control agency or the local health department; (3) allow a period of at least thirty (30) days opportunity for public comment; and (4) allow opportunity for a public hearing.  The notice requirements of this Subsection (1) may be satisfied by the notice issued pursuant to Section 4(f) above (if required) for the issuance of a construction permit, provided said notice also satisfies the requirements set forth herein.

(2)   After careful consideration of all legal considerations set forth in IC 13-7-7 and also all comments received during the public comment period and after the holding of a public hearing, if requested by the affected facility or if significant adverse comment is received, the Board shall issue permits establishing emission limitations which assure that the applicable regulations, the ambient air quality standards set forth in 325 IAC 1.1-2 (formerly known as APC 14) will be attained and/or maintained and the applicable Prevention of Significant Deterioration increments set forth in Section 7 of this Rule will not be exceeded.

(3)   Any revision of an emission limitation shall constitute a revision to the State Implementation Plan, and shall require a public hearing which shall be held in addition to and in accordance with, the public hearing requirements set forth in Subsection (1) above and Section (f)(5).  Any proposed revision to an emission limitation shall necessitate the issuance of a new permit.  Said permit shall be evaluated in accordance with Sections 4 and 5 of this Rule.  In addition, compliance timetables established pursuant to the applicable regulations may be issued by the Board in a letter signed by the Technical Secretary provided that said timetables have been submitted to EPA as a SIP revision.

Revisions (other than emission limitation revisions or compliance timetable approvals) to conditions on construction and/or operating permits may also be issued by the Board in a letter signed by the Technical Secretary of the Board.

(4)   Emission limitations established in construction permits may be included in the subsequent operating permit without repeatedly complying with the requirements in this Section 4(g) herein, if all terms and conditions of this Section 4(g) were satisfied in the processing of the construction permit.

    (5)  Emission limitations established in construction and operating permits may be appealed in accordance with the procedures set forth in Section 11 of this Rule.

    (6)  Existing facilities which are required to meet new emission limitations established pursuant to this Rule shall achieve compliance in accordance with the procedures set forth in the regulation establishing the same for the pollutant in question.

(h)  From the date of the staff's receipt of all information necessary to constitute a complete application, a construction permit shall be issued or denied within:

    (1)  One (1) year for facilities required to meet the requirements set forth in Subsections (f) and (g) above, or

    (2)  Ninety (90) days for all other facilities.

If no permit approval or denial is issued within the above time limits, the permit shall be deemed issued.

(i)  The Board may require the owner or operator of a facility to provide for the monitoring of emissions.  Such requirements may include:

    (1)  The location of sampling ports of a size, number, and location as the agency may require.

    (2)  Safe access to each port.

    (3)  Instrumentation to monitor and record emission data.

    (4)  Any other sampling and testing facilities determined necessary by the Board.

    (5)  Records and reports which shall be maintained for a period of two (2) years for all monitoring devices associated with the affected facility. Such records and reports required shall be available to the staff upon request.

(j)  The Board shall establish and periodically revise as needed requirements covering the schedules and methods for the monitoring of emissions, the calibration of monitoring instruments and the reporting of data to the staff.

Section 5.     Operation Permit

(a)  No person shall operate any facility which has the potential to emit 25 tons or more per year of any one regulated pollutant without first applying for and obtaining a permit to operate said facility from the Board.

(b)  An operating permit shall be issued to any facility which has received a construction permit, provided, however:

(1)  No operating permit shall be issued to any person for operation of any facility, modification or reconstruction thereto, unless the Board has been satisfied that the facility will meet the following requirements:

(A)  No operating permit will be issued to a facility which has not completed all requirements set forth in the applicable construction permit.

(B)  That regulated air pollutants will not be emitted in amounts which will:

(i)  Violate any applicable State or Federal emission limitation or interfere with attainment or maintenance of any ambient air quality standards set forth in 325 IAC 1.1-2 (formerly known as APC 14).

(ii)  Interfere with either the Prevention of Significant Deterioration standards set forth in Section 7 of this regulation or the Prevention of Significant Deterioration Standards established by any adjoining state.

(C)  If necessary the Board may require the applicant to demonstrate that the requirements and emission limitations set forth in the applicable construction permit have been met.

(c)  If a demonstration that the requirements of Section 5(b)(1)(B) is made pursuant to obtaining a construction permit from the Board, said demonstration shall be adequate to satisfy the requirements set forth in (A) and (B) above.

(d)  Each application shall be submitted and signed in accordance with the procedures set forth in Sections 4(c) and 4(e) of this Rule.

(e) The staff shall review the application for completeness in accordance with Section 4(f)(1) of this Rule.

(f) The Board may require performance testing when necessary to prove that a facility is in compliance or will be in compliance with all applicable regulations. Said performance testing shall be done in accordance with methods and under operating conditions approved by the Board. The owner or operator of the facility shall furnish the Board a written report of the results of such performance test(s).

    (1) Such tests shall be at the expense of the owner or operator of the facility.

    (2) The staff may monitor such test(s) and may also conduct performance tests.

    (3) The owner or operator shall provide the staff fifteen (15) days prior notice of the performance test to afford the staff the opportunity to have an observer present.

(g) The Board may require the owner or operator of a facility to provide for the monitoring of emissions in accordance with provisions set forth in Sections 4(i) and (j) of this Rule.

    (1) If necessary the Board may require the applicant to demonstrate that the requirements set forth in Subsection (1) above will be met.

(h) Emission limitations may be established by the Board in operating permits. Said limitations shall be established in accordance with the procedures set forth in Section 4(g) of this Rule, except that if said limitations were established in a corresponding construction permit, the procedures need not be repeated.

(i) At least ninety (90) days prior to the expiration date of an operating permit, the applicant shall reapply for a new operating permit from the Board if the applicant wishes to continue operation of the facility. Any such reapplication shall comply with the requirements set forth in this Section (5). In the event the new permit is not issued, denied, or deemed issued, prior to the expiration of the existing permit, the limitations and conditions set forth in the existing permit shall remain in force and effect until the new permit is issued, denied or deemed issued. Any permit renewal request received after the beginning of this 90 day period, shall be considered a late renewal and shall result in the assessment of a late renewal fine which is equal to, and charged in addition to, the cost of the renewed permit.

(j)   An operating permit will be effective for a period of up to five (5) years. However, permits shall be issued for a period of four (4) years unless the Technical Secretary of the Board determines that for administrative reasons a different period is necessary.

Section 6.     Transfer of Permits

(a)   In the event that ownership of the facility is changed, the Board shall be notified by the current owner or operator within thirty (30) days of the change. Notification shall include the date or proposed date of said change in ownership. The written notification required above shall be sufficient to transfer the permit from the current owner or operator of the facility to the new owner or operator. A new permit may then be issued by the Board.

(b)   Any portable facility which has been issued a valid operating permit may be issued a site Approval Letter which shall be adequate to authorize operation of the facility at the approved site. The Board shall be notified of any proposed relocation of such a facility at least 30 days prior to said relocation. The new site will be deemed approved if the Board has not disapproved the same within 30 days of receipt of the notification of the proposed relocation, or unless the relocation will cause or contribute to a violation of the ambient air quality standards or unless the source is not meeting an applicable emission limitation.

Section 7.     Prevention of Significant Deterioration

(a)   Sources and facilities set forth in the following Subsections (1) or (2) which are proposing to locate in or impact upon an attainment area or an unclassified area for the applicable pollutant shall comply with the Prevention of Significant Deterioration requirements established in this Section.

(1)   Any construction, major modification or reconstruction of a facility which has the potential to emit 100 tons or more of any pollutant in any of the categories set forth below.

(A)   Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input.

(B)   Fossil fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input.

(C)  Municipal incinerators capable of charging more than 250 tons of refuse per day.

(D)  Coal cleaning plants (with thermal dryers).

(E)  Fuel conversion plants.

(F)  Kraft pulp mills.

(G)  Portland cement plants.

(H)  Lime plants.

(I)  Phosphate rock processing plants.

(J)  Taconite ore processing plants.

(K)  Iron and steel mills.

(L)  Sintering plants.

(M)  Coke oven batteries.

(N)  Charcoal production plants.

(O)  Primary aluminum reduction plants.

(P)  Primary copper, lead, and zinc smelters.

(Q)  Secondary metal producing plants.

(R)  Petroleum refineries.

(S)  Sulfur recovery plants.

(T)  Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels.

(U)  Carbon black plants (furnace process).

(V)  Chemical process plants.

(W)  Hydrofluoric, sulfuric and nitric acid plants.

(X)  Glass fiber processing plants.

(Y)  Ferroalloy production facilities.

(2)  Any other proposed construction, modification or reconstruction, which has the potential to emit 250 tons per year of any pollutant.

(b)   Any owner or operator of any facilities required,
      pursuant to Subsection (a) above, to comply with the
      requirements of this Section shall comply with the
      construction permit requirements set forth in Section 4
      of this Rule (including the public notice requirements,
      if applicable).

(c)   Any owner or operator of any facilities required,
      pursuant to Subsection (a) above, to comply with the
      requirements of this Section but which either has
      allowable emissions less than all of the following
      amounts:  50 tons per year, 1,000 lbs. per day and 100
      lbs. per hour or which is being modified, but no increase
      in the net amount of emissions for any pollutant subject
      to an ambient air quality standard set forth in 325 IAC 1.1-2
      (formerly known as APC 14) and no adverse air quality
      impact would occur shall be exempt from complying with
      the requirements set forth in paragraphs (f)(1-7) of
      this Section.  However, in the event the impact is on
      an attainment or unclassified area where the increment
      has been consumed, the facility shall be required to
      meet all provisions of this Section.

(d)   Temporary fugitive dust associated with the construction,
      modification or reconstruction of a facility shall be
      exempted when determining compliance with the requirements
      set forth in this Section.

(e)   The following shall be exempt from complying with the
      requirements set forth in paragraphs (f)(1-7) of this
      Section if the owner or operator of the facility can
      demonstrate that there will not be a violation of the
      Ambient Air Quality Standards established in 325 IAC 1.1-2
      (formerly known as APC 14).

      (1)   Any facility modified or proposed to be modified
            to use:  an alternative fuel or raw material as a
            result of the Energy Supply and Coordination Act;
            a higher sulfur content fuel pursuant to the
            Federal Power Act; an alternative fuel or raw
            material if prior to January 6, 1975, the facility
            was capable of accommodating such fuel material;
            or the use of an alternative fuel by reason of an
            order under Section 125 of the Federal Clean Air
            Act.

      (2)   Any proposed facility, for which it can be demonstrated
            that the emissions of the applicable pollutant are
            of a temporary nature, including but not limited
            to emissions from a pilot plant, a portable facility,
            construction or exploration, and whose owner or
            operator meets the requirements set forth in
            Section 6(b) of this Rule.

(f)   Facilities subject to Prevention of Significant Deterioration Review pursuant to Subsection (a) above, and not exempted pursuant to Subsections (c), (d) or (e) shall comply with the requirements of paragraphs (1)-(7) below.

   (1)   The owner or operator of the facility shall provide the following information in addition to that information provided in the construction permit application required by Section 4 of this Rule.

      (A)   An analysis of the air quality impact of the proposed construction, modification or reconstruction including meteorological or topographical data necessary to estimate such impact.

      (B)   An analysis of the nature and extent of any or all general commercial, residential, industrial and other growth which has occurred since August 7, 1977, and the associated air quality impacts in the area which the proposed construction, modification or reconstruction would affect.

      (C)   Any additional impact analysis requested by the Board which may include more detailed information concerning the impact of the proposed construction.

   (2)   The owner or operator of the proposed facility to be constructed, modified or reconstructed shall conduct such ambient air quality monitoring as the Board determines is necessary to establish the effect which emissions from the facility may have, or are having, on air quality.

   (3)   Any permit application shall include an analysis of air quality monitoring data for the area affected by the proposed construction, modification or reconstruction for any pollutant emitted by the facility for which a State ambient air quality standard exists.  Such data shall relate to, and shall have been gathered over, the year preceding receipt of the complete application, unless the owner or operator demonstrates to the Board's satisfaction that such data gathered over a portion or portions of that year or another representative year would be adequate to determine that the proposed facility would not cause or contribute to a violation of any State ambient air quality standard.

(4)  All air quality monitoring shall be done in accordance with State and Federal monitoring procedures as set forth in the most recent editions of the following references:  Environmental Protection Agency "Ambient Air Monitoring Guidelines for Prevention of Significant Deterioration" and Indiana "Quality Assurance Manual," Volumes I and II.

(5)  The owner or operator of the proposed facility, modification or reconstruction shall demonstrate that allowable emissions increases from the proposed facility in conjunction with all other applicable emission increases or reductions, will not cause or contribute to a violation of any ambient air quality standard established in 325 IAC 1.1-2 (formerly known as APC 14) or any applicable Prevention of Significant Deterioration maximum allowable increase established in Section 7(f)(6) of this Rule.  Any estimates of ambient air concentrations used in the demonstration process required by this Section, shall be based upon the applicable air quality models, data bases and other requirements specified in the Environmental Protection Agency "Guidelines on Air Quality Models," most recent edition.

   (A)  Where an air quality impact model specified in the Guidelines cited above is inappropriate, a model may be modified or another model substituted, provided that all applicable guidelines are satisfied.

   (B)  Modification or substitution of any model may only be done in accordance with guideline documents and with written approval from the Board and shall be subject to public comment procedures set forth in Section 4(f) of this Rule.

(6)  Any demonstration pursuant to Subsection (5) of this Section should demonstrate that increased emissions caused by the proposed construction, modification or reconstruction will not exceed eighty (80) percent of the following maximum allowable increases over the baseline concentrations for sulfur oxides and particulates.  At any time that 80% of the allowable increment is consumed, 80% of the remaining increment shall be available on a continuing basis until such time that no allowable increment remains.  However, on a case-by-case basis, a facility may petition the Board to use in excess of this eighty (80) percent.  The Board may authorize such use provided the facility adequately demonstrates the need for the same.

2-1

(A)   The following allowable increments reflect the PSD increments for a Class II area (as defined in the federal Clean Air Act). Indiana has no Class I or III areas; however, should some areas of the State be classified as Class I or III, the PSD increments for the same must be followed.  The allowable increments are as follows:

| Pollutant | Allowable Increment (micrograms per cubic meter, $ug/m^3$, Limits) |
|---|---|
| (i)   Particulate Matter: | |
| Annual Geometric Mean | 19 |
| 24-Hour Maximum | 37 |
| (ii)  Sulfur Dioxide: | |
| Annual Arithmetic Mean | 20 |
| 24-Hour Maximum | 91 |
| 3-Hour Maximum | 512 |

(B)   For any period other than the annual period, the applicable maximum allowable increase may be exceeded during one such period per year at any one location.

(7)   The proposed construction, modification or reconstruction shall apply Best Available Control Technology for each applicable pollutant.

(g)   Where air quality modeling, which has been submitted to the Board pursuant to the requirements set forth in Subsection (f)(5) of this Section, shows that emissions from the proposed construction, modification or reconstruction will significantly impact on a nonattainment area in any State, the applicant shall provide offset credit for that area and shall comply with all provisions of Section 8 of this Rule except Section 8(a)(4).  A significant impact is an impact which exceeds the levels of impact set forth in Section 8(d) of this Rule.  Where no offset credit can be obtained for the area to be impacted by the proposed construction, modification or reconstruction, the applicant shall be denied a construction permit by the Board.

(h)   When an applicant proposes to construct, modify or reconstruct a facility in an area designated as attainment or unclassified and when the Prevention of Significant Deterioration increments have been consumed, the increased emissions from the proposed construction, modification or reconstruction may be offset in accordance with the

requirements set forth in Section 8 of this Rule.  Any offset calculations must be expressed in terms of <u>actual</u> emissions as of August 7, 1977 (which shall be established as an enforceable emission limitation in the facility's operating permit) except for construction, modification or reconstruction of a major facility which commenced prior to January 6, 1975, but for which said facility was not operating by August 7, 1977.  In this case, the offset calculations are to be expressed on the basis of <u>allowable</u> emissions.

(i)   Any construction, modification or reconstruction subject to the requirements of this Section shall demonstrate to the staff that the degree of emission limitation required for control of any regulated pollutant under the provisions of this Section will not be affected in any manner by:

(1)   So much of a stack height not in existence before December 31, 1970, as exceeds good engineering practice as defined in 325 IAC 1.1-6 (Stack Height Provisions).

(2)   Any other dispersion technique not implemented before December 31, 1970.

Section 8.   <u>Emission Offset</u>

(a)   No person proposing the construction, modification or reconstruction of a major facility in a nonattainment area or any other proposed major facility which will impact on a nonattainment area shall receive a construction or operation permit unless the applicant demonstrates that:

(1)   Emissions resulting from the proposed construction, modification or reconstruction will not cause or contribute to a further violation of the applicable ambient air quality standards.

(2)   Emissions resulting from the proposed construction, modification or reconstruction will be offset by a reduction in emissions of the same pollutant by existing facilities.  This emission offset shall not be satisfactory unless the increased emissions resulting from the proposed construction, modification or reconstruction are equal to 90% or less of the offsetting emissions.

(3)   The applicant will apply emission limitation devices or techniques to the proposed, construction, modification or reconstruction such that the lowest achievable emission rate for the applicable pollutant will be achieved.

(4)   Reasonable further progress toward achieving the applicable ambient air quality standards will be achieved by the proposed offset.

(5)   No emission offset shall be approved, unless said offset guarantees a net air quality benefit.

(b)   Facilities whose increased allowable emissions will not exceed 50 tons per year, 1,000 pounds per day, or 100 pounds per hour, whichever is most restrictive, will be exempt from the requirements of this Section.

(c)   In any case where a person is proposing construction of a facility in any area currently designated by the Board as a nonattainment area, and where said area is projected by the control strategy of the Indiana SIP to be classified as an attainment area at the time of the facility's startup date, the facility will not be subject to the offset requirements established in this Section of the regulation.

(d)   When any construction, modification or reconstruction of a major facility is proposed for a nonattainment area and when the applicant can demonstrate to the satisfaction of the Board that in reality the proposed construction, modification or reconstruction will be located in a "clean portion" of that nonattainment area (an area where the applicable standards are actually being met), the impact of emissions resulting from the proposed construction, modification or reconstruction on any part of the nonattainment area not proven to be a "clean portion" should not exceed the following values (if emissions do exceed the following, the requirements set forth in Section 8 of this Rule shall be met):

All values are expressed in micrograms per cubic meter ($ug/m^3$)

| Pollutant | Annual | 24-Hour | 8-Hour | 3-Hour | 1-Hour |
|-----------|--------|---------|--------|--------|--------|
| Sulfur Dioxide | 1 | 5 | X | 25 | X |
| Total Suspended Particulate | 1 | 5 | X | X | X |
| Nitrous Oxides | 1 | X | X | X | X |
| Carbon Monoxide | X | X | 500 | X | 2000 |

(e)   The following provisions shall apply to all emission offset evaluations:

(1)   Emission offset shall be determined on a pound-per-hour basis and offset calculations shall reflect the expected maximum production rates.

(2) Emission offset calculations shall reflect allowable emissions whenever possible.

(3) In cases where no emission limitations are in effect at the time that an application for construction, modification or reconstruction is made, the emission offset baseline shall be the actual emissions of facilities existing at the time the application is submitted for each pollutant for which the area has been designated nonattainment.

(4) In cases where emission limits for existing facilities allow greater emissions than the potential emission rate for the facility, emission offset credit shall only be allowed for emission control below the potential emission rate.

(5) A facility may receive offset credit from emission reductions achieved from the shutdown of an existing facility or permanent curtailed production below that level of production which existed at the time the construction application was submitted; provided, that the work force to be affected by the shutdown or curtailment has previously been notified of the proposed action and provided that the facility shutdown or curtailment must have occurred less than one (1) year prior to the date the construction permit application is filed.  Such credits may be banked subject to the limitations set forth in the banking provisions of Subsection (8)(g) and (h) herein.

(6) No emission reduction may be approved to offset emissions which cannot be legally enforced by the Board except as provided for in Subsection (e)(11) herein.  Offsetting emissions shall be considered legally enforceable if the reduction is included as a condition in the applicable construction or operation permit.

(7) For the pollutants sulfur dioxide, carbon monoxide and total suspended particulates, the staff shall require atmospheric simulation modeling to insure that the emission offsets provide a net air quality benefit.  If the emission offsets are obtained from an existing facility on the same premises or within the immediate vicinity of the new construction, modification or reconstruction and the pollutants are dispersed from substantially the same effective stack height, atmospheric simulation modeling may be waived and net air quality benefit may be assumed if the offset meets the requirements set forth in Section 8(a) herein.

(8)  For the pollutants nitrous oxides and volatile organic compounds, offset shall be required from facilities located within 75 miles of a monitor in an area exceeding the ambient air quality standard unless specific data is available to define the impact of said facility.  If the staff determines that the said facility impact will be more localized, the staff may require that offsets be obtained within a more restricted area.

(9)  If an existing facility commits to switch to a cleaner fuel, emission offset credit, based on the allowable emissions for the fuels involved, is acceptable; provided, that the permit is conditioned to require the use of a specified alternate control measure which will achieve the same degree of emission reduction should the facility switch back to a less clean fuel at a later date.  Emission reductions from converting fuel cannot be used to offset emissions in any case where the staff determines that supplies of the new fuel are not available for at least the next 10 years.

(10)  Only intra-pollutant offsets shall be allowed as an offset credit.

(11)  Any emission reduction within adjoining states necessary for use as an offset by a facility located in Indiana cannot be recognized unless the construction or operation permit require that said permit will be voided should the necessary offset not materialize or not be maintained.

(f)  Emissions from temporary facilities such as pilot plants or portable facilities which will be relocated outside the nonattainment area after a short period of time, emissions resulting from the construction phase of a new facility and fugitive dust shall only require compliance with the requirements of Subsection (a)(3) of this Section.

(g)  Emission reduction by a facility in excess of the reductions necessary for obtaining offsetting credit may be banked after January 16, 1979, and used as future offset credit unless the Board determines that such future construction, modification or reconstruction, utilizing said banked emissions, will interfere with the reasonable further progress requirements of the Federal Clean Air Act, or will violate any provisions of this Section.  Such banked emissions shall be the property of the person providing the offset and shall be identified and registered by the staff and shall be incorporated into the permit.

2-1
p. 21

(h)   Offset credits may be banked for a period of five (5) years from the date of the actual emission reduction in excess of that determined by the Board as necessary for obtaining offset credit, upon request by the applicant, this five year period may be extended for an additional five-year term.

(i)   No permit shall be issued for construction, modification or reconstruction of a major facility where the applicant owns or operates additional facilities within the State which are not in compliance with, or on a schedule to achieve compliance with all Indiana air pollution control regulations.

Section 9.   <u>Compliance Using the Bubble Approach</u>

(a)   Compliance with the requirements of any of 325 IAC 4-2, 6-1, 6-2, 6-3, 7-1, 8-1, 11-1, and 11-2 (formerly known as APC 7, 23, 4, 5, 13, 15, 6, and 10) may be achieved on a source wide basis by controlling emissions from facilities in combination, provided that:

(1)   All applicable facilities are subject to the requirements of these regulations.

(2)   All applicable facilities are within the same source.

(3)   The total emissions from all applicable facilities do not exceed the sum of the allowable emissions from each facility.

(4)   Equivalent emission reductions must be accomplished in the time interval as would be required for individual facilities.

(b)   The owner or operator of the facility may submit a petition to the Board requesting compliance via the above "Bubble Approach". Said petition shall include a detailed account of all facilities and proposed control strategies demonstrating compliance with (1) through (4) above. If approved, the plan will be made part of an operating permit and submitted to EPA as a SIP revision. Failure to operate in the manner specified in the plan is a violation of this Rule.

Section 10.   <u>Revocations of Permits</u>

(a)   Any permit to construct or operate granted by the Board may be revoked for any of the following causes:

(1)   Violation of any conditions of the permit.

(2) Failure to disclose all the relevant facts, or misrepresentation in obtaining the permit.

(3) Changes in regulatory requirements that mandate either a temporary or permanent reduction of the discharge of contaminants, however, where feasible, modification of the appropriate sections of the permit may be deemed the necessary action.

(4) Noncompliance with orders issued pursuant to 325 IAC 1.1-4 (formerly known as APC 12) to reduce emissions during an air pollution episode.

(5) For any other cause which establishes in the judgement of the Board the fact that continuance of the permit is not consistent with the purposes of this Rule.

(b) . The Board may revoke a permit to construct if the construction of the facility is not begun within 18 months from the date of the issuance of the permit, or if during the construction of the facility, work is suspended for a continuous period of one (1) year or more.

**Section 11.**   Appeals of Permit Denials, Revocations or Conditions

(a) The applicant shall have up to thirty (30) days after receipt of a construction or operating permit to state, to the Board in writing, why he believes conditions of the permit are inappropriate and to request, in writing, a hearing on the matter. If no written request for a hearing is received during this period, the applicant shall be deemed to have accepted all provisions of the permit. In the event a hearing is held, it shall be held in accordance with requirements set forth in IC 4-22-1 and the burden of proof shall lie with the applicant to demonstrate why the permit conditions being appealed are inappropriate.

(b) If a construction or operating permit is denied by the Board the applicant shall have up to fifteen (15) days from the date of receipt of the denial letter to appeal, in writing, said denial. Any such appeal shall be done in accordance with the provisions set forth in IC 13-7-10.

(c) If a construction or operating permit is revoked by the Board, the owner or operator of the facility whose permit was revoked shall have up to fifteen (15) days from the date of receipt of the revocation letter to appeal the revocation in writing to the Board. Any such appeal shall be conducted in accordance with the provisions set forth in IC 4-22-1.

Section 12.    <u>Permit No Defense</u> - The issuance and possession of any permit shall not alone constitute a defense against an alleged violation of any law, regulation or standard.

Section 13.    <u>Local Jurisdiction</u> - Nothing contained in this Rule shall be deemed to effect or modify the terms or requirements of any ordinance or regulation of any governmental unit within the State of Indiana, whose ordinance or regulation establishes requirements equal to or more restrictive than both the Board's rules and regulations and also the laws which govern the Board.  Any governmental unit having such a regulation or ordinance may be delegated the duties otherwise designated herein as those of the Board subject to such qualifications as the Board may require.

Section 14.    <u>Fees</u>

(a)   The applicant shall pay a fee approximating the cost of processing and reviewing the applicable construction or operating permit and the cost(s) of implementing and enforcing the terms and conditions of said permits. The fees are established as follows:

   (1)   Construction permits

      (A)   A charge of $235.00, shall be assessed for the staff evaluation and issuance of any construction permit application for any major facility.

      (B)   A charge of $125.00 shall be assessed for the staff evaluation and issuance of any construction permit application for any facility which is not a major facility.

      (C)   No fee will be assessed to any applicant for any application, for which it is determined that a permit is not required for construction or operation of the facility, and subsequently no permit is issued.

      (D)   If the applicant submits an air quality impact study, a charge of $100.00 shall be assessed for the review and verification of the model.

      (E)   If the Board conducts a hearing pertaining to the issuance of the construction permit, an additional charge of $250 shall be assessed.

   (2)   Operating permit - a charge of $65 per permit shall be assessed for the Board's issuance thereof.

(3)   Any group of facilities determined to be related facilities may be assessed a single operating permit fee for such facilities.

(b)   Any applicant who can demonstrate to the satisfaction of the Board that the fees assessed for any permit will cause undue economic hardship, may have (part or all of) said fee requirements waived by the Board.

(c)   Checks shall be made payable to the Indiana State Board of Health.  Nonpayment shall result in cancellation of the permit.

(d)   Fees shall be non-refundable.  If the permit is denied or revoked, the fees shall neither be refunded nor applied to any subsequent application or reapplication.

(e)   The operator of a facility shall maintain the applicable permit on the premises of the facility (or source, if applicable) and shall make said permit available for inspection by any of the staff or other public official having jurisdiction.

(f)   When a document becomes lost or damaged, a replacement shall be requested within fifteen (15) days of such status.  No fee shall be charged for replacing the lost document.

(g)   No fee shall be charged for registration pursuant to Section (3) herein, or for the issuance of a new permit, for any change in name only, due to a transfer made pursuant to Section 6 of this Rule.

Section 15.   Board Discretion - Any discretionary action by the Board which is authorized by this or any other Air Pollution Control Regulation shall be established as a revision to the Indiana Implementation Plan in accordance with the requirements set forth in the Federal Clean Air Act.