```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
 2                     INDIANAPOLIS DIVISION

 3
      UNITED STATES OF AMERICA,      )
 4          Plaintiff,               )
                                     )
 5    STATE OF NEW YORK, STATE OF     )1:99-cv-1693-LJM-JMS
      NEW JERSEY, STATE OF CONNECTICUT,)
 6    HOOSIER ENVIRONMENTAL COUNCIL   )
      and OHIO ENVIRONMENTAL          )
 7    COUNCIL,                        )
            Plaintiff-Intervenors,    )Indianapolis, Indiana
 8                                    )May 5, 2008
            -vs-                      )1:30 p.m.
 9    CINERGY CORP., PSI ENERGY, INC., )
      and THE CINCINNATI GAS &        )
10    ELECTRIC COMPANY,               )
            Defendants.               )
11

12

13

14                         BEFORE THE
                   HONORABLE LARRY J. McKINNEY
15

16           OFFICIAL REPORTER'S TRANSCRIPT OF

17                      ORAL ARGUMENT

18

19

20  Court Reporter:     Cathy Easley Jones, RPR, FCRR
                        Official Court Reporter
21                      46 East Ohio Street, Room 291
                        Indianapolis, IN  46204
22

23

24

25         PROCEEDINGS TAKEN BY MACHINE SHORTHAND
              COMPUTER-AIDED TRANSCRIPTION
```

2

1                          A P P E A R A N C E S

2

3     FOR THE PLAINTIFF:          Mr. Phillip Brooks
                                  Ms. Sarah Dale Himmelhoch
4                                 U.S. DEPARTMENT OF JUSTICE
                                  P.O. Box 7611
5                                 Ben Franklin Station
                                  Washington, DC  20044

6
      FOR THE PLAINTIFF-          Ms. Carmel Alicia Motherway
7     INTERVENOR STATE            ASSISTANT CONNECTICUT ATTORNEY
      OF CONNECTICUT:             GENERAL
8                                 55 Elm Street
                                  Hartford, CT  06141-0120
9

10    FOR THE DEFENDANTS:         Mr. Mark D. Hopson
                                  Mr. Thomas Charles Green
11                                Ms. Kathryn B. Thomson
                                  SIDLEY AUSTIN LLP
12                                1501 K Street, NW
                                  Washington, DC  20005
13
                                  Mr. Robert R. Clark
14                                SOMMER BARNARD
                                  One Indiana Square
15                                Suite 3500
                                  Indianapolis, IN  46204
16

17

18

19

20

21

22

23

24

25

1                    *(In open court)*

2     *(Voir dire was conducted and preliminary instructions were*

3 *given.)*

4          MS. HIMMELHOCH:  Your Honor, there is one matter we

5 would like to take up before --

6          THE COURT:  What's that?

7          MS. HIMMELHOCH:  Cinergy filed a brief last night

8 arguing that -- or over the weekend arguing that the Court

9 should not instruct the jury in either the preliminary or

10 final instructions on the WEPCo backstop.  Obviously we

11 haven't had an opportunity to file a responsive brief.  I do

12 intend to mention the WEPCo backstop in my opening, and I

13 wanted to make sure that if you wanted to resolve that brief

14 before we did openings --

15          THE COURT:  Well, I'm glad to know.  I did not think

16 you would have that in your opening statement but if it's in

17 your opening statement, let's hear what you have to say.

18          MS. HIMMELHOCH:  Actually, if I could have my

19 colleague, Mr. Brooks, to address it.

20          MR. BROOKS:  Thank you, Your Honor.  Basically, this

21 motion is like a motion to reconsider.  We brought this to

22 your attention the first time, Your Honor, in response to the

23 motion in limine on post-project data.  We said however, there

24 is an exception here, and we want to make sure we are clear

25 about this.

4

1          As we wrote in this brief, the WEPCo rule in 1992

2    specifically says that if a utility projects that a physical

3    change will not trigger New Source Review, will not result in

4    a 40-ton increase in emissions, that's fine.  The utility can

5    move forward with this project.  But it does have to submit or

6    retain five years of data for -- after the project so that, in

7    fact, EPA can come back and see whether or not that prediction

8    was reasonable.

9          Now, this rule really echoes what had been the rule

10   at Common Law, Louisiana Pacific, and other cases saying sure,

11   you make a projection, but you have to be right.  And that

12   idea was codified in the WEPCo rule in the WEPCo backstop.

13         Now, the WEPCo backstop calculation that we would

14   present relates to Wabash 4.  That backstop calculation was

15   contained in the expert report of Dr. Rosen back in 2005.

16   Defendants took the deposition of Mr. Rosen.  They asked one

17   or two questions about the backstop and moved on.

18         Now, it is true that as we neared what we thought was

19   going to be the trial date in 2005, the United States filed a

20   motion and said you can't use post-project data, and we did

21   specifically have a footnote that disavowed our intent to use

22   that backstop.

23         Defendants, however, have not been prejudiced by

24   that, as I say.  We argued that in the motion in limine.  They

25   did not respond in their reply, at least not to my

1  recollection.

2          It was raised again in connection with the jury

3  instructions.  And again, we pointed to that same argument

4  saying that we thought this should be in the final jury

5  instruction.

6          Now, why is that?  And, of course, it is in the final

7  jury instruction.  The reason that we are entitled to use a

8  backstop calculation is precisely because using the

9  methodology that we use for all of these claims, the projected

10 increase of SO2 for the Wabash project is 33 tons, less than

11 40.  But if you look at the five years of actual data

12 following that project, emissions increased dramatically, and,

13 in fact, if you go back through and use the same calculus that

14 we use on the projection, you see that there is a net increase

15 of emissions attributable to this project in excess of 175

16 tons a year.

17         Now, the Defendants want to say that, of course, we

18 can't do that.  What they say in their brief is "Oh, but

19 you've projected 141 tons."  Well, that's just not true and

20 they know it.  I don't expect the Court to remember this, but

21 I can direct you to their Memorandum in Support of Limine and

22 the Daubert challenge to exclude the proposed testimony of

23 Dr. Richard Rosen.  There on pages 29 and 30, the Defendants

24 argue that the calculation that they're referring to, which

25 Dr. Rosen called his Type 2 calculations was inferred, at

1  least for purposes of New Source Review, and the point that

2  they made, which we have never disagreed with is, is that

3  right?  Those calculations are a reality check.  They are some

4  way to have a feel for what it is the company was actually

5  thinking; but there's no way to say what the baseline for

6  those calculations is.  And Dr. Rosen clearly stated that in

7  his deposition testimony and, in fact, they cite it.

8        We're not relying on those Type 2 calculations and,

9  to my knowledge, we've never asserted that those Type 2

10  calculations are sufficient for New Source Review liability.

11  And therefore, because the calculation that we believe is

12  appropriate for New Source Review shows that there would be --

13  that a reasonable operator would have predicted a 33-ton

14  increase, or at least that's what our methodology comes up

15  with, we're entitled to use the WEPCo backstop and show this

16  jury that, in fact, that project caused an increase of 175

17  tons of SO2 emissions a year.  Thank you.

18        THE COURT:  Thank you.

19        MR. BROOKS:  I'm sorry.  Was I dismissed?

20        THE COURT:  I just said "Thanks."

21        MR. GREEN:  Your Honor, this is just an artful

22  attempt to work around the ruling of the Court that there

23  won't be any post-project data admitted into this trial.  The

24  Government has come to grips with the fact that their

25  methodology or their formula, as testified to by the experts,

1   doesn't find an increase in excess of 40 tons and they're

2   concerned about that.

3        It's remarkable that they say also that the -- all of

4   the Type 2 calculations of their experts, particularly

5   Dr. Rosen, they're not relying on. I must ask -- if they're

6   not relying on them, you know, why are we going to spend

7   probably five days listening to Dr. Rosen testify about them.

8        But the real problem with their argument is that this

9   backstop calculation is a safe harbor.  It was written into

10  the regulations as an optional safe harbor system, if you

11  will, whereby an operator or a utility, if it wants to, can

12  essentially say that we're going to predict that the emissions

13  following the replacement are the same as the actual emissions

14  before the replacement.  And then if they want to avail

15  themselves of that type of approach, then they can submit data

16  for five years to prove that they were right.

17       But this is not a calculation which is permissible

18  other than if the utility -- or it can't be reviewed, so to

19  speak, other than the utility opting into avail itself of -- I

20  hate to use the word "methodology" but I'll use it here,

21  methodology.

22       The predictions that the utility needs to make prior

23  to commencing the replacement, whether or not there will be a

24  significant increase in emissions caused by the replacement

25  stand, that's the standard.  That's the measurement of the

1 prediction.

2          The prediction doesn't have to be right.  I don't

3 need to go through all of there for the Court.  The Court's

4 well aware of that.  In our memo, you will see where we cite

5 that the Government has taken this same position in their

6 briefs, and in their other submissions and in other courts and

7 so forth.  They had virtually conceded that this is an

8 optional backstop -- correct me -- correction -- optional safe

9 harbor calculation that has to be opted into.  We didn't do

10 that.

11          THE COURT:  Do you want to say anything else?

12          MR. BROOKS:  If I might, just briefly.

13          All I know is about everything that he just told you

14 is wrong.  This is not something that a utility can do if it

15 wants to.  It is, in fact, the law; and the utility has an

16 obligation to make these projections.

17          It does have an option.  If it doesn't want to deal

18 with projected emissions, it can live with the actual to

19 potential rule.  That was really the option there.  They could

20 have, you know, lived with the old regime, but I will tell you

21 that never has there been a project that doesn't trigger, as

22 far as I know, under the actual to projected, and that's

23 because -- to the potential, and that's because in order to

24 understand the potential emissions, you take 108,760 hours and

25 multiply that times 100 percent of the unit's capacity.

1          Well, none of these power plants ever run like that.

2   That's why in the WEPCo decision itself, the Court of Appeals

3   said, "No, no, no, that's not appropriate for utilities."  And

4   that's where the whole WEPCo rule came from.  This is not an

5   opt-in, opt-out situation.  And so at this point where we are,

6   the methodology that we used -- and we'll put this up here

7   when we see the case -- it uses an assumption that says that

8   we won't even look at the increase in the use of --

9          THE COURT:  You're going to have to help me with this

10  because I thought that what we were doing was telling this

11  jury that their responsibility was to decide what a reasonable

12  power company would have projected.

13         MR. BROOKS:  Yes.

14         THE COURT:  Now, why is it that any post-project data

15  matters at all?

16         MR. BROOKS:  Well, precisely because the law was

17  changed in 1992, and in order to have this projection, it is

18  somewhat of a safe harbor.  You get to make a projection; but

19  the question is really how does one protect the air shed and

20  that's what --

21         THE COURT:  Well, just help me with this because if

22  you're trying to be the reasonable energy producer and you

23  make your projection in a reasonable way, does this mean then

24  that you can be found responsible later because there is all

25  this post-project data that shows you've been dumping a lot

10

1 more stuff in the air than you thought?

2      MR. BROOKS:  Oh, sure.  Well, the first question, of

3 course, is --

4      THE COURT:  Don't tell me "Oh, sure."

5      MR. BROOKS:  I'm sorry?

6      THE COURT:  I said don't tell me "Oh, sure."  Is that

7 an "Oh, sure"?

8      MR. BROOKS:  I believe it is, Your Honor.

9      THE COURT:  That's an "Oh, sure" because of what?

10      MR. BROOKS:  It's that way because of two reasons.

11 First of all, I mean, you're assuming it was a recent

12 calculation.

13      THE COURT:  Yes, I am.

14      MR. BROOKS:  All right, fine.  It may well have been,

15 but the whole purpose of the WEPCo backstop is to ensure that,

16 in fact --

17      THE COURT:  Where's it come from?

18      MR. BROOKS:  Where does it come from?

19      THE COURT:  Why can I look at post-project data?  You

20 say there's a change in the law.  What's the language in the

21 law that says that?

22      MR. BROOKS:  If I might?

23      THE COURT:  Yes, you might.

24      MR. BROOKS:  You know, unfortunately, what I can do

25 is cite the Court to the rule.  It's 40CFR Section 52.21 (B)

1  (21) (V).

2          I'm sorry, yes, ma'am?  (Indicating).

3          It's 40CFR Section 52.21(B)(21)(V).

4          THE COURT:  B or V?

5          MR. BROOKS:  V, as in Victor, Your Honor.

6          THE COURT:  And that says --

7          MR. BROOKS:  It says exactly what I have said, Your

8  Honor.  I can't quote it chapter and verse.  I would be happy

9  to see --

10          MR. GREEN:  Would Your Honor like to see it?

11          THE COURT:  Yes, I would.

12          Now, what I'm looking at has an "E" in front of it,

13  and I didn't hear any Es in your citation.

14          MR. BROOKS:  I didn't have any Es on what was in

15  front of me, but that -- I can't say that I'm right.

16          THE COURT:  I've got CFR --

17          MR. BROOKS:  Your Honor, would it help you if I just

18  took that and I can probably find it by scanning it quickly.

19          THE COURT:  If it's different than what he just

20  handed me.  You see where he is (indicating).

21          MR. BROOKS:  Yes.

22          THE COURT:  That's where you were.

23          MR. BROOKS:  Let me --

24          THE COURT:  Yes.

25          MR. BROOKS:  It says for "An electric utility steam

1  generating unit, other than a new unit or replacement of an

2  existing unit, actual emissions of the unit following the

3  physical or operational change --

4          COURT REPORTER:  Could you slow down.

5          MR. BROOKS:  Yes, ma'am.

6          "For an electric utility steam unit, other than a new

7  unit or the replacement of an existing unit, actual

8  emissions -- and remember, in this world, actual emissions are

9  those ones that follow the change -- "actual emissions of the

10  unit following the physical or operational change shall equal

11  the representative actual annual emissions of the unit

12  provided the source owner or operator maintains and submits to

13  the reviewing authority on an annual basis for a period of

14  five years from the date of the unit resumed regular

15  operation.  Information demonstrating that the physical or

16  operational change did not result in an emission increase."

17          Then it goes on to say a longer period can be

18  specified.

19          And in the regulations -- may I approach the bench

20  and return this?

21          THE COURT:  Yes.

22          MR. BROOKS:  In the Federal Register notice, Your

23  Honor, it is explained that that is precisely the purpose of

24  this regulation is because the public does need to be

25  protected, and because EPA may need to come back and see

1  whether this projection was, in fact, correct.

2          And if it is not, then the source must go through

3  permitting.  It's that simple.  As I say, that is a principal

4  that I think was clearly enunciated in Louisiana Pacific.

5          THE COURT:  So, in fact, if I'm trying to run a

6  reasonable operation, I can do my best to get it right, and

7  then I keep track of my emissions for five years, and if they

8  show that that reasonable projection was wrong, then I have to

9  come back in and get a permit?

10          MR. BROOKS:  Well, that's right -- well, to get a

11  permit or to take other actions.  Remember, there are things

12  that the company could have done to avoid the permitting

13  issue.  I mean, it could have put on controls in the first

14  place.  It could have taken limits on its operation.  There

15  are a number of things that could have been done.

16          THE COURT:  But in any case, if they don't do

17  anything, consequences could follow; is that right?

18          MR. BROOKS:  Sure.  And the consequences may be that

19  they have to go through permitting.

20          THE COURT:  Or they could get sued?

21          MR. BROOKS:  Yes.

22          THE COURT:  And is that your position on this Wabash

23  5?

24          MR. BROOKS:  Wabash 4.

25          THE COURT:  Is that what you're alleging happened,

1    that regardless of whether it was reasonable or not?  Is that

2    it?  Regardless of what this Defendant did on Wabash 4, they

3    followed it five years later and then should have done

4    something afterwards?

5         MR. BROOKS:  Let's be clear here, Your Honor.  The

6    Defendants did nothing.  The Defendants made no projections

7    and, in fact, that is an established fact in this case.  They

8    did nothing.

9         THE COURT:  But if you went on that, what difference

10   does it make if the five years went by -- now, wait a minute.

11   You have to get a permit if you have a reasonable view that

12   you're going to put 40 tons in the air, right?

13        MR. BROOKS:  Correct, Your Honor.

14        THE COURT:  And their reasonable view -- or their

15   view was you've got 33 tons in the air?

16        MR. BROOKS:  Their reasonable view -- remember, they

17   didn't do anything.  What we did was we have a methodology

18   that says taking what we can know now, how would you project

19   the emissions?

20        THE COURT:  Do they win on the -- even if they didn't

21   do anything, what happens?

22        MR. BROOKS:  If they didn't do anything --

23        THE COURT:  If they didn't do anything and you come

24   in and say "Well, it was 33 tons," then what happens?

25        MR. BROOKS:  They win.  Without the backstop, that is

1  the end of the inquiry.

2          THE COURT:  Now, how does this work?  How does this

3  backstop work then in your view?

4          MR. BROOKS:  Well, the backstop works because we use

5  a consistent methodology.  It is rational and it is

6  intellectually rigorous.  We believe it's appropriate.  But we

7  also believe that it's very conservative.

8          THE COURT:  What I want to know is, what I want to

9  know is where is it that the United States Government comes in

10  and makes another -- makes another allegation if they don't do

11  anything, you come in and test it and it isn't up to 40, where

12  do we go from there?  Where does this notion that we can start

13  measuring from here on and then they're in trouble?  Where

14  does that come from?  That's my question.

15          MR. BROOKS:  Well, that's my understanding of how the

16  two provisions work together.  Remember that this is a

17  situation that is outside the regulations in this respect.

18  The Defendants never followed the law in the first place.

19  That's why we're in the situation now of having to look back

20  at what they would have projected.  To my knowledge, they will

21  offer not only did they not do any projections, they don't

22  intend to come in and offer any projections.

23          MR. GREEN:  That's absolutely --

24          THE COURT:  Just a minute.

25          I'm afraid my question isn't getting answered.

16

1        MR. BROOKS:  I'm sorry.

2        THE COURT:  Where I want to focus is when they don't

3   test at all, you come in and find it's below the standard,

4   below the standard of substantial increase.  Then where can

5   you -- where do you go then to come in and say, "Well, now,

6   it's 175 tons"?  Where's that come from?

7        MR. BROOKS:  Our interpretation of the regulations is

8   that for projects that commenced after July 21st, 1992, they

9   are all under the WEPCo rule.  And the WEPCo rule says find

10  the user projection.  You may use a projection, but if your

11  projection does not show that this physical change will result

12  in a significant net increase in emissions, you may go about

13  your business.

14        However, there is a look-back provision that says for

15  five years of data, five years of operating history has to be

16  maintained so that the regulator can look back to see whether,

17  in fact, there was an increase.  The backstop is aptly named

18  because it back stops calculations that are projections,

19  because this projection that the United States would offer

20  would show an increase of 33-tons of SO2, it would not trigger

21  as of the date of the project; but the five years of data

22  after show a significant increase.

23        And the reason for that is simple, and it's because

24  in using our methodology, we didn't look at the fact that they

25  were going to ramp up dramatically the use of this unit.

1  Well, that's, in fact, what they did.

2         Now, they probably knew that they were going to do

3  that.  We didn't have -- our methodology doesn't really allow

4  for us --

5         THE COURT:  Now, does this work if they do a

6  projection themselves or does this only work when they don't?

7         MR. BROOKS:  It works both times.  It clearly works

8  under the regulations if they do --

9         THE COURT:  So if they do it themselves --

10        MR. BROOKS:  Yes.

11        THE COURT:  And they show you that and they don't

12  have to get -- they don't have to get -- or they can go on

13  about their business, as you say --

14        MR. BROOKS:  I would say, Your Honor, that if they

15  had done a whiz bang projection prior to the Wabash 4 project,

16  looked pretty reasonable, and looking at five years of data

17  post-project, you could show that, in fact, this project

18  resulted in a significant net increase in emissions, then it

19  is time for them to put on controls and get a permit.  Yes,

20  that is exactly our position.

21        THE COURT:  All right.  That's good.

22        MR. GREEN:  Your Honor, would you allow me to have my

23  notebook back?

24        THE COURT:  Sure.  I don't mean to keep your

25  notebook.

1    MR. HOPSON:  Tom, I have another one.

2    MR. GREEN:  First of all, eight years following the

3  filing of the complaint in this case, for Mr. Brooks to stand

4  here and say Cinergy didn't make any predictions, and he knows

5  that and represents that to the Court is really incredible.

6  There will be lots of testimony from Cinergy witnesses about

7  the predictions that were made in advance of every one of

8  these repair and replacement projects.

9    The jury will have to weigh whether or not our

10  prediction was reasonable.  If the Government wants to prove

11  or offer proof that our prediction was unreasonable or that we

12  should have predicted an increase in emissions, I say take it

13  away, and that's what this trial is all about.

14    So there's going to be evidence that there was a

15  prediction, an adequate and fulsome prediction, made in

16  advance of every replacement project, and that none of those

17  predictions ever predicted a significant increase in emissions

18  following the project.

19    Now, this provision that Mr. Brooks is now talking

20  about, which they now call the backstop -- you'll notice that

21  "backstop" isn't in the regulations anywhere -- it is a

22  provision that has a very special word in the middle of it,

23  and that's the "provided" clause as Your Honor can see there.

24  And it is a provision which allows the utility essentially not

25  to make a prediction.

1          If they just want to assume that the emissions after

2    the project will be equal to the emissions before the project,

3    they have the option of tracking that for five years and

4    submitting that data to the regulators, which will either

5    confirm their assumption or not.  But that's not the mechanism

6    that is at work in this case.  That's not the safe harbor that

7    we availed ourselves of.

8          No utility in the United States of America has ever

9    availed itself of this safe harbor provision in the

10   regulations.  We made a prediction, and our liability should

11   stand and fall on the reasonableness of that prediction, and

12   post-project data, given that we made the prediction, has

13   absolutely no relevance in this case.

14         THE COURT:  How can we be this far in this case for

15   all these years and one side says there's no prediction and

16   the other side says there isn't?

17         MR. GREEN:  I frankly am dumbfounded.

18         MS. HIMMELHOCH:  Your Honor, for the record, in the

19   summary judgment briefing and ruling, you ruled that Cinergy,

20   while aware of the tests the EPA was using, did not attempt to

21   do any emissions calculations prior to making its

22   modification, and pursuant to --

23         THE COURT:  And that's on this project that we're

24   talking about, Wabash value?

25         MS. HIMMELHOCH:  No, on the ruling that you made.

1    MR. GREEN:  We don't have to make a calculation --

2    MS. HIMMELHOCH:  Moreover, Your Honor -- I'm sorry.

3    MR. GREEN:  We don't have to make a calculation.  We

4  don't have to use arithmetic.  We don't have to use a formula.

5  We are obliged to make a prediction, and we will explain that.

6  I know that these worthy adversaries of mine understand

7  exactly how Cinergy's engineers made the prediction.  At least

8  I've got a very good idea of how they made it; but I represent

9  to you that our engineers will take that stand and testify at

10 length and in detail how they made the predictions.

11    True, they didn't do a calculation.  They didn't do a

12 mathematical formulation.  They didn't brainstorm one up as

13 the Government did.

14    THE COURT:  All right.  So I now understand how you

15 can say that there wasn't one and he can say that he did

16 something to make his prediction.  He based it on something

17 that might not have been a mathematical formula; is that

18 right?

19    MR. GREEN:  That's right.

20    THE COURT:  All right.  Well, my thought as I read

21 the brief and as I listened to you, I thought this notion of

22 trying this case on the idea of the liability as outlined by

23 the instructions that I've had so far was the best way to do

24 it; and to make an exception or to make an additional argument

25 on one project is probably more confusing than it's worth.

1          And so, I'm going to say we're going to try this

2   Wabash 4 on the same -- without what you call the "backstop

3   data" as I had anticipated.  So that's what we're going to do

4   and you can conform your opening statement to that effect.

5          Now, I think we're ready for the jury...

6          Did I say an hour apiece?

7          MS. HIMMELHOCH:  Yes, you did, Your Honor.

8          THE COURT:  So there goes the jury going home early I

9   guess.

10         MS. HIMMELHOCH:  We would not object to starting

11   opening statements tomorrow if you would prefer, Your Honor.

12         THE COURT:  Well, what does that do in the long run

13   to the length of this case is my question?  Are we going to

14   wish on the third day of June that we'd had our opening

15   statements this afternoon?

16         MS. HIMMELHOCH:  I don't believe so.  We would be

17   narrowing our evidence.  Frankly, your ruling this morning

18   narrows our evidence a little bit more.  We still think we can

19   stay within the 17 days.  I am prepared to go forward now or

20   if you would prefer to send the jury home, I can do it in the

21   morning.

22         THE COURT:  Well, I thought -- you know, this voir

23   dire took some time, it took a lot out of these people.  I

24   think they probably need to go rest.  So I'm going to bring

25   them back in and I'll tell them there's no sense me going over

22

1  the preliminary instructions before they -- tonight -- well,

2  there is.  I'll do the preliminary instructions tonight and

3  then we'll hear the opening statements tomorrow.

4                    (*A recess was taken.*)

1                           CERTIFICATE OF REPORTER

2

3        I, Cathy Jones, certify that the foregoing is a true and

4   correct transcript of the proceedings in the above-entitled

5   matter.

6

7

8

9
                                _____
10                              CATHY JONES, RPR, FCRR
                                OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25