<pre>
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
 2                      INDIANAPOLIS DIVISION

 3
      UNITED STATES OF AMERICA,        )
 4          Plaintiff,                 )
                                       )
 5    STATE OF NEW YORK, STATE OF      )1:99-cv-1693-LJM-JMS
      NEW JERSEY, STATE OF CONNECTICUT,)
 6    HOOSIER ENVIRONMENTAL COUNCIL    )
      and OHIO ENVIRONMENTAL           )
 7    COUNCIL,                         )
            Plaintiff-Intervenors,     )Indianapolis, Indiana
 8                                     )May 8, 2008
             -vs-                      )8:00 a.m.
 9    CINERGY CORP., PSI ENERGY, INC., )Volume 4
      and THE CINCINNATI GAS &         )
10    ELECTRIC COMPANY,                )
            Defendants.                )
11

12

13

14                          BEFORE THE
                    HONORABLE LARRY J. McKINNEY
15

16            OFFICIAL REPORTER'S TRANSCRIPT OF

17                    TRIAL PROCEEDINGS

18

19

20   Court Reporter:     Cathy Easley Jones, RPR, FCRR
                         Official Court Reporter
21                       46 East Ohio Street, Room 291
                         Indianapolis, IN  46204
22

23

24

25          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
               COMPUTER-AIDED TRANSCRIPTION
</pre>

1                    **A P P E A R A N C E S**

2

3   FOR THE PLAINTIFF:            Mr. Thomas Andrew Benson
                                  Mr. James A. Lofton
4                                 Ms. Sarah Dale Himmelhoch
                                  Mr. Phillip Brooks
5                                 Mr. Ignacio Arrazola
                                  U.S. DEPARTMENT OF JUSTICE
6                                 P.O. Box 7611
                                  Ben Franklin Station
7                                 Washington, DC  20044

8

9   FOR PLAINTIFF-               Mr. R. Keith Guthrie
    INTERVENORS:                 ATTORNEY AT LAW
10                               13242 South 600 East
                                 Elizabethtown, IN  47232
11

12  FOR THE DEFENDANTS:          Mr. Mark D. Hopson
                                 Mr. Thomas Charles Green
13                               Ms. Kathryn B. Thomson
                                 Ms. Meghan Delaney
14                               Mr. Samuel B. Boxerman
                                 SIDLEY AUSTIN LLP
15                               1501 K Street, NW
                                 Washington, DC  20005
16
                                 Mr. Robert R. Clark
17                               SOMMER BARNARD
                                 One Indiana Square
18                               Suite 3500
                                 Indianapolis, IN  46204
19

20

21

22

23

24

25

1                        **INDEX OF WITNESSES**

2                                                        PAGE

3  ALAN HEKKING

Cross-examination (Continuing) by Mr. Green ...426
4  Redirect examination by Mr. Lofton ...........469

5

6  HUGH LARKIN

Direct Examination by Ms. Rosengarten .........476
7  Cross-examination by Mr. Volpe ................504
Redirect examination by Ms. Rosengarten .......518

8

9  ROBERT KOPPE

Direct Examination by Ms. Himmelhoch ..........528

10

11

12

13

14

15                        **INDEX OF EXHIBITS**

16                                                        PAGE

Plaintiffs' Exhibit No.:
17
1666 .........................................586
18  1750 .........................................498
1760 .........................................488
19  1762 .........................................490

20  Defendants' Exhibit No.:

21  2123 .........................................469

22

23

24

25

Vol. 4-426

1                      (In open court)

2          THE COURT:  Good morning.  Are we ready to proceed.

3      (Jury in.)

4          THE COURT:  Good morning, ladies and gentlemen.

5  We're ready to continue with the cross-examination.

6          Mr. Green.

7          MR. GREEN:  Thank you, Your Honor.  Good morning,

8  everyone.

9                      **CROSS EXAMINATION**

10 BY MR. GREEN:

11 Q   Good morning, Mr. Hekking.

12 A   Good morning.

13 Q   Mr. Hekking, I would like to pick up from where we left

14 off yesterday by first asking you whether you are registered

15 as a professional engineer in any state or certified as a

16 professional engineer in any state?

17 A   I am not.

18 Q   Did you ever attempt to be registered or certified?

19 A   No.

20 Q   You indicated that in I believe it was 2001 yesterday that

21 you began to work for the Department of Justice; is that

22 right?

23 A   I think it was really 2000.

24 Q   2000.  Okay.  In the ensuing years, you went and visited

25 how many different utilities, sir?

HEKKING − CROSS (Continuing)/GREEN    Vol. 4−427

1  A    On the order of 10 to 12.

2  Q    Do you have any idea how many projects at those various

3  utilities in total you have analyzed over those years?

4  A    Well, first let me say that all of the utilities and the

5  plants that I visited, I did not necessarily produce an expert

6  report.  The case may have been settled or something.  So all

7  of them that I visited, I did not look at detailed projects.

8  Q    That was not my question.  My question was how many

9  projects did you analyze in all those years that you've been

10 working for the Department of Justice?

11 A    On the order of 100 to 150.

12 Q    And who selected the projects for you to look at or

13 analyze?

14 A    Department of Justice attorneys.

15 Q    In looking at those 100 or so projects, was it your

16 conclusion that each and every one of them possessed the

17 characteristics of a large capital investment?

18 A    I remember one that I didn't think was.  So the large

19 majority, yes, I considered them to be large capital

20 investments.

21 Q    Now, sir, I need to ask you this.  I presume that you've

22 been compensated for your efforts, have you not?

23 A    Yes.

24 Q    Can you tell us the total amount of the compensation

25 you've received since the time you went to work for the

*HEKKING - CROSS (Continuing)/GREEN*     Vol. 4-428

1  Government in this endeavor up and through today?

2  A    No.

3  Q    Well, can you give me an estimate?

4  A    Yes.

5  Q    Okay.

6  A    Understanding that compensation -- I had expenses, taxes,

7  all those sorts of things.

8  Q    We all do, sir.

9  A    I would say on the order of $250,000.  No more than that.

10 Q    Mr. Hekking, I want to go back to one of the documents

11 that I showed you yesterday, and that is Defendants'

12 Exhibit 2123.  I believe you all have a copy.  That's the TVA

13 document.

14       This is the document I showed you yesterday.  Do you

15 recall this, sir?

16 A    Yes, I do.

17 Q    Now, Mr. Hekking, let me just ask you generally, your

18 signature we confirmed is on this document, is it not?

19 A    Yes, that is mine.

20 Q    You wouldn't sign any document that you knew to be false

21 or misleading, would you?

22 A    No, I wouldn't.

23 Q    So will you tell me when you signed this document, what

24 was your understanding of the word "routine"?

25 A    My understanding was that this paragraph or sentence meant

HEKKING — CROSS (Continuing)/GREEN    Vol. 4–429

1  that I was spending ratepayers' money for this project and not

2  appropriated funds.  That's my recollection.

3  Q   I'm not really asking you to interpret the entirety of the

4  paragraph at the bottom, but I will in a minute.  I'll follow

5  up on what you just said.

6        The first clause states this project is a routine

7  improvement of existing TVA facilities.  I want to know what

8  your understanding was of the word "routine."

9  A   To use your term from yesterday, this was boilerplate

10 language that was on every major capital improvement project.

11 It was on every form for every capital improvement project.

12 This is boilerplate language.

13 Q   May I just interrupt you?

14       MR. LOFTON:  Excuse me, Your Honor --

15 Q   I'm sorry.  Go ahead.  Finish, please.  Finish your

16 answer.

17 A   It was boilerplate language.  I did not undertake any

18 analysis.  I knew what it meant.  It was a yes or no.  There

19 was no analysis.

20 Q   Well, it's boilerplate language, but it's written in the

21 English language, isn't it?

22 A   Yes, it is.

23 Q   You just said you knew what it meant.  So I'm asking you

24 what is your understanding of the word "routine"?

25 A   I did not analyze it word by word, sir.  It was

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-430

1  boilerplate.  To me, it meant I was spending ratepayers'

2  money.  That's what it meant.

3  Q   All right.  Well, let's talk about that for a minute.

4  First of all, you said that this language was on, what, every

5  capital project document that came through the system at TVA;

6  is that right?

7  A   No.  There was a series of forms associated with these

8  major capital improvement projects.  This was on this form.

9  It was on every form for every project.

10 Q   I'm sorry.

11 A   I just didn't want to mislead you.  This is one of many

12 forms.  It was on this form.

13 Q   How many forms like this did you sign while you were at

14 TVA that said, "This project is a routine improvement of

15 existing TVA facilities"?

16 A   It would -- I would have to estimate.  I certainly can't

17 give you a very exact number.

18 Q   Okay.  I'm not looking for an exact number.  I'll take

19 your best estimate, sir.

20 A   I would estimate on the order of 20.

21 Q   Order of 20.  And each of those 20 forms that you signed

22 was for the type of project which you called a large capital

23 project; is that right?

24 A   Yes.

25 Q   And on each of those forms, notwithstanding your

*HEKKING - CROSS (Continuing)/GREEN*   Vol. 4-431

1  description of it as a large capital project, the form carried

2  the phrase "This project is a routine improvement of existing

3  TVA facilities"; is that right?

4  A   That's my recollection.  Let me qualify that and say this

5  is within a period of time that I can't tell you exactly, but

6  forms change over the years.  I want to say over my career

7  this statement was always there.

8  Q   It would be your testimony that on each and every

9  occasion, the 20 times when you signed this form, you had no

10 understanding of what the word -- specifically no

11 understanding of what the word "routine" meant; is that right?

12 A   I did not -- I do not recall ever studying this phrase,

13 analyzing it.  I knew what it meant.

14 Q   That's what I'm trying to find out.

15      MR. LOFTON:  Excuse me, Your Honor.  He's

16 interrupting again.

17 A   Appropriated money, that's what it meant.  When I signed

18 it, when I read it, yes.  I'm not spending appropriated money.

19 Nothing more, nothing less.  That's what it meant.

20 Q   So you equate routine improvement with spending customers'

21 money, is that right, ratepayers' money?

22 A   Yes, that's what it meant to me.

23 Q   So you're telling me the cost of all these large capital

24 expenditures were not going to be paid by TVA but were going

25 to be paid by ratepayers?  In other words, the expenses were

*HEKKING − CROSS (Continuing)/GREEN*    Vol. 4-432

1  going to be passed through -- in particular on this form, this

2  $7,998,000 was going to get charged to the people who pay TVA

3  for electricity; is that right?

4  A   That's my understanding, yes.

5  Q   That's pretty much the custom throughout the utility

6  industry in the United States, is it not?

7  A   It is.

8  Q   So that repairs and replacements and improvements to units

9  at utilities, those expenses are passed on to the ratepayers

10  if they're approved by the public utility commissions; is that

11  right?

12  A   That's my understanding, yes.

13  Q   Okay, sir.  Now, I take it that you would tell us that at

14  the time you were at TVA and in 1991 when you signed this

15  form, you did not have familiarity with the New Source Review

16  regulations?

17  A   That's correct.  The one feature of New Source regulations

18  that I was aware of was the 50 percent reconstruction rule.

19  I'd always heard that in making investments in these plants,

20  we were limited to less than 50 percent of the cost of a new

21  unit or we would trigger requirements.  That's my

22  understanding was the extent.

23  Q   Now, at the time you signed this form in 1991, you had

24  been at TVA for approximately what, 20 years?

25  A   Yes.

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-433

1          MR. LOFTON:  I'm sorry.  Did you say TVA?

2          MR. GREEN:  I meant TVA.

3          MR. LOFTON:  I think you said EPA.

4          MR. GREEN:  EPA?  I meant TVA, Tennessee Valley.

5  BY MR. GREEN:

6  Q   So let me just restate it so we have it correct.

7        At the time you signed this form, you had been at TVA

8  for about 20 years; is that correct?

9  A   That's correct.

10 Q   Had you heard of the Clean Air Act in those 20 years at

11 TVA?

12 A   Yes.

13 Q   Had you ever bothered to read any of the provisions of the

14 Clean Air Act inasmuch as you were in the utility business?

15 A   It was not part of my job responsibilities in any way.

16 There would have been no reason for me to read it.

17 Q   It didn't concern you?

18 A   No.  I had people that I depended upon to do that for me.

19 Q   But I gather you had heard something about the New Source

20 Review regulations because you just told us you were familiar

21 with a part of it; is that right?

22 A   I told you the extent of my knowledge.  That does not mean

23 I was familiar with New Source Review regulations.

24 Q   Did you know that the New Source Review regulations could

25 possibly apply to utility units, electrical generating units?

1  Did you know that much?

2  A    I just gave you the extent of my knowledge.  If we spent

3  more than 50 percent of the cost of a new unit, we could

4  trigger additional environmental requirements.  That's it.

5  Q    So you didn't find it necessary to familiarize yourself

6  when you were at TVA as a plant manager signing off on large

7  capital projects?  You didn't think it was necessary to

8  familiarize yourself with the provisions of the New Source

9  Review regulations; is that right?

10  A    I'll put it this way.  I had corporate people that took

11  care of taxes.  I didn't worry about taxes.  They took of

12  environmental.  I didn't worry about environmental.  They took

13  care of legal matters.  I did not worry about legal matters.

14  It was outside of my basic responsibility.  So I did not

15  pursue it.

16  Q    But then there did come a time, did there not, when you

17  became familiar with the New Source Review regulations,

18  Mr. Hekking?

19  A    There did.  There came a time.

20  Q    And that time came after you began to work for the

21  Government; is that right?

22  A    If you mean by "Government" when I worked for Shelby

23  County Government, that's when I became aware.

24  Q    Let's focus then on that period.  When you worked for the

25  Shelby County Government in Tennessee, correct?

HEKKING – CROSS (Continuing)/GREEN    Vol. 4-435

1  A   Memphis, yes.

2  Q   In Memphis.  Did you then read the New Source Review

3  regulations at that time?

4  A   I did more than read them.  I studied them.

5  Q   You studied them.  Do you know what the -- did you study

6  and read the provision in the New Source Review regulations

7  that pertains to routine maintenance, repair and replacement?

8  A   Yes.

9          MR. GREEN:  Your Honor --

10         MR. LOFTON:  Your Honor, I'm going to object.  I

11  think we're about to get outside the scope of direct

12  examination, and I also think we're about to get into a legal

13  matter.  So I have two objections.

14         THE COURT:  I want to hear where he's going.

15         MR. GREEN:  I'm working on the definition of

16  "routine" because he's signed documents with "routine."

17         THE COURT:  All right.  Let's get with it.

18         MR. LOFTON:  Your Honor, I think the Court has

19  already defined it in this proceeding.

20         THE COURT:  If he sticks with what he told me, and we

21  have every reason to believe that he will, he's examining this

22  witnesses' understanding of the definition of "routine" at the

23  time he was with the Memphis, Tennessee Government; is that

24  right?

25         MR. GREEN:  I'm going to extrapolate and seek to

*HEKKING — CROSS (Continuing)/GREEN*    Vol. 4-436

1  generally explore with him his understanding of the word

2  "routine."

3            THE COURT:  Well, we'll see how this goes.

4            MR. GREEN:  All right, Your Honor.  Thank you.

5  BY MR. GREEN:

6  Q   Mr. Hekking, let me show you a portion of the NSR

7  regulations from the Code of Federal Regulations, Part 52.

8  This has now been marked as Defendant's Exhibit 2146.  I'll

9  put this on the screen.  I'll focus this down a little bit.

10 Do you see the portion there, Mr. Hekking, where it states in

11 the regulation "A physical change or change in the method of

12 operation shall not include routine maintenance, repair and

13 replacement"?  Do you see that, sir?

14 A   Yes, I do.

15 Q   Now, based on your study of the regulations when you went

16 to the Shelby County Health Department, can you tell me

17 whether the term "routine" is further defined in those

18 regulations?

19            MR. LOFTON:  I renew my objection, Your Honor.  He's

20 asking for a legal conclusion?  He's asking for a definition

21 and this Court has already defined that in its preliminary

22 instructions.  He's trying to back door the issue --

23            THE COURT:  He's not bootstrapping and back dooring,

24 is he?

25            MR. LOFTON:  One or the other or both.

HEKKING – CROSS (Continuing)/GREEN    Vol. 4-437

1          MR. GREEN:  I would like to be heard on this.  Do you

2     want me to just do it right here?

3          THE COURT:  Do it right there.

4          MR. GREEN:  Your Honor has submitted for the jury's

5     consideration and asked them to determine whether six projects

6     in this case consist of or qualify as routine maintenance,

7     repair and replacement.  The issue has been given to the jury.

8     The jury needs some framework around these terms so that they

9     have assistance in understanding what their responsibility is

10    and how they come to a conclusion as to what these terms mean.

11         THE COURT:  Yes.

12         MR. GREEN:  I believe that it is fair because the

13    instructions do not instruct them on the meaning of the terms.

14    So I think it is incumbent upon me and certainly appropriate

15    to explore how those terms have been used, particularly by

16    this individual whom the Government proffers as an expert and

17    who has used the word "routine" in his work at TVA.

18         THE COURT:  First of all, the term "routine

19    maintenance" will be –– I will tell the jury in these

20    instructions –– one of the factors that go into whether or not

21    it's routine maintenance or not.  So whether there's an

22    outside definition of "routine maintenance" used by somebody

23    else doesn't matter.

24         Next –– well, I guess that satisfies the objection.

25    I don't think we need to do that.  So I'm going to sustain the

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-438

1  objection.

2       MR. GREEN:  All right, sir.  May I ask -- I would

3  like to ask one more question.  If there's an objection,

4  you'll rule.  May I do that?

5       THE COURT:  Yes.

6  BY MR. GREEN:

7  Q   Is, in your view, sir, Mr. Hekking -- does the term

8  "routine," as used in this regulation, the meaning of

9  "routine," is that different, sir, from the meaning of

10 "routine" as that word appears in Exhibit 2123 when you were

11 at TVA?

12 A   Well, I never thought about it.  I never thought about it

13 that way.

14      MR. LOFTON:  I would renew my objection, Your Honor.

15 He is asking whether the definition under the Clean Air Act is

16 the same definition that's used under a different statute in a

17 different context.

18      THE COURT:  As you know, he's entitled to see if

19 there is in inconsistency in this witness' testimony or his

20 understanding.  He's entitled to examine that.  So he can

21 answer this question.

22 Q   Do you need the question --

23 A   No.  I think I'm understanding what you're asking me.  As

24 I think about it, you know, "routine" is an adjective.  When I

25 read this statement on the TVA form, I see "routine"

*HEKKING − CROSS (Continuing)/GREEN*    Vol. 4-439

1  improvement.  In the federal regulations I saw a minute ago, I

2  see "routine maintenance, repair and replacement."

3       So "routine improvement" is one thing.  "Routine

4  maintenance, repair and replacement" is another thing.

5  Q   You're drawing a distinction now between the word

6  "improvement" and the words "maintenance, repair and

7  replacement"?  Do I understand you correctly?

8       MR. LOFTON:  Your Honor, that is not his answer and

9  he's continuing to ask the witness about the interpretation

10 of --

11      THE COURT:  I'll let him answer this last question.

12 Go ahead, sir.  You had an answer.

13 A   It's an adjective that -- how should I say -- has to do

14 with improvement in this form.  It's an adjective that has to

15 do with maintenance on the other form.  So they're two

16 different --

17 Q   I understand that, but I'm asking about the adjective

18 "routine."  Does it have a different meaning in the TVA

19 document from the meaning that it has in this regulation?

20 That's my question.

21 A   I guess I would have to fall back on what "routine" means

22 out of a dictionary.  I mean, "routine" would have certain

23 characteristics.

24 Q   Common sense meaning?

25 A   Yes.

*HEKKING − CROSS (Continuing)/GREEN*     Vol. 4-440

1  Q   Let me move on to another subject here.  I want to show

2  you Plaintiffs' Exhibit 1319 which was shown to you yesterday.

3  I want to see if you can -- if you have trouble seeing this on

4  the screen as I use it, you let me know; but you were shown --

5  you were shown this page with this table; is that right?  Do

6  you remember that?

7  A   Several times, yes.

8  Q   Several times.  Okay.  Let me just --

9        THE COURT:  Excuse me just a second.  I need to know

10  that's Table 1.0 from Exhibit --

11       MR. GREEN:  I'm sorry, Your Honor.  I'm not

12  understanding.

13       THE COURT:  I just need for the record to reflect

14  exactly what that is.

15       MR. GREEN:  This is Plaintiffs' Exhibit 1319.

16       THE COURT:  I got that, but I want the page number.

17       MR. GREEN:  Oh, 1-2, sir.

18       THE COURT:  That's good.  Thank you.

19       MR. GREEN:  1-2.

20  BY MR. GREEN:

21  Q   Now, this is a report that was written for Public Service

22  Indiana, one of the Cinergy companies, correct?

23  A   Correct.

24  Q   And it was written by Gilbert/Commonwealth, right, not

25  written by Cinergy itself but written by an outside

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-441

1  contractor; is that right?

2  A    That's correct.

3  Q    Then if we go to the chart on 1-2, which you saw, as you

4  say, several times, you were directed to the column that said

5  "Current Life Expectancy," do you see that?

6  A    I do.

7  Q    You can note that there's a 40-year interval between the

8  date of commercial operation and current life expectancy for

9  these units.  If you go down, I think it's just 40 years added

10  to each one of those dates of commercial operation.  Do you

11  agree?

12  A    I degree.

13  Q    Now, did you mean to suggest during your testimony that

14  Cinergy, or in this case PSI, had actually made a decision to

15  retire any of the Wabash River stations, that is, actually

16  retire them and take them down and cease operating in those

17  years listed under Current Life Expectancy?  Do you understand

18  my question?

19  A    No.

20  Q    No?  So you are not suggesting that Cinergy had made a

21  decision to take those units out of service in 1993 and the

22  successive years in 2008, correct?

23  A    I think this specific document says differently.  They

24  planned to run them much beyond this date.  That's what this

25  document is about.

*HEKKING – CROSS (Continuing)/GREEN*   Vol. 4-442

1  Q   Let's look at that then.  Now, this is basically an

2  analysis done, first of all, by Gilbert/Commonwealth for

3  Public Service Indiana, and essentially it's got the

4  ingredients of an analysis, a final report, and it's got the

5  signoff that "It was a pleasure working with Public Service on

6  this project."

7        So let's turn then to page 1-1, which is the Executive

8  Summary.  I'd like to read a couple of those paragraphs to you

9  and then ask you some questions.  The first paragraph that is

10 highlighted there reads "Public Service Indiana (PSI) operates

11 a number of coal-fired generating plants, such as the Wabash

12 River Generating Station, which include units that are

13 currently approaching the end of their nominal design life.

14 However, due to conservative design and conscientious

15 operation and maintenance over their lifetime, many of these

16 units still provide reliable economic service to PSI's

17 system."

18        Do you see that statement?

19 A   Yes, I do.

20 Q   Do you take issue with anything that the contractor wrote

21 there?

22 A   No, I don't.

23 Q   Okay.  Let's move to the second paragraph:  "One of PSI's

24 options for providing the lowest electrical rates to its

25 customers while meeting future energy needs is to extend the

1  operating life of these units beyond their normal design

2  life."

3          Do you take issue with that?

4  A    No, sir.

5  Q    The rest of the paragraph reads, "To evaluate this option,

6  two questions must be answered.  If these plants continue

7  serving PSI's system for a period of years beyond their

8  nominal design life, then what refurbishment actions and

9  equipment replacements must be planned to provide continued

10 reliable service; and are these expenditures as cost-effective

11 as other means of obtaining needed generation capacity?"

12         Do you take any issue with that?

13 A    No, sir.

14 Q    Now, this document makes quite clear, sir, that one of the

15 objectives of the life extension, at least with respect to the

16 Wabash River units, was to meet future energy needs using the

17 current generating units, extending their lives so as to

18 perpetuate the lowest electrical rates to Cinergy's customers.

19 Is that not correct?

20 A    That's what I read.

21 Q    All right.  Now, when you were answering questions about

22 the Wabash River projects while you were on direct examination

23 and Mr. Lofton was asking you questions, were you trying to

24 suggest that PSI had some other motive to do these life

25 extension projects other than to keep the rates to its

HEKKING – CROSS (Continuing)/GREEN    Vol. 4-444

1  customers as low as possible?

2  A   Would you restate that question, please?

3  Q   Yes.  I'm trying to understand if you were suggesting,

4  while you were testifying about the Wabash River life

5  extension projects, whether PSI –– I'll call it Cinergy –– had

6  some other motive to do those life extension projects other

7  than to keep rates to its customers as low as possible?

8           MR. LOFTON:  I'm going to object, Your Honor.  I

9  think we got some objections yesterday when counsel –– when

10 there was an implication that he was reaching into the mind of

11 PSI.  I think that's exactly what Mr. Green is doing at this

12 point.

13          THE COURT:  Well, he can answer this question if he

14 knows.  Go ahead.

15 A   Let me see if this answers your question.  I certainly was

16 looking for the purpose of these projects.  The purpose of the

17 projects, as best I understood it –– and I'll exclude Wabash

18 5, I think that had a little different purpose.  But the

19 purpose, as I saw it and as I testified and as I saw in the

20 documents such as these, was to extend the life of these

21 units; and I knew extending the life maybe intuitively –– and

22 I'm sure I saw numbers that indicated to me that yes, this was

23 the least cost option for them.

24 Q   I want to go back to this summary chart that you were

25 shown yesterday by Mr. Lofton.  I'll zoom out here.  Do you

*HEKKING – CROSS (Continuing)/GREEN*     Vol. 4–445

1  remember this, sir?  Do you remember that?

2  A    No.  I remember -- I remember a similar --

3  Q    You remember the bullet point thing that came up?

4  A    I remember the bullet -- yes.

5  Q    Is this essentially the same?

6  A    Give me a minute and let me read it.

7  Q    Absolutely.

8        MR. LOFTON:  Your Honor, I would represent that it is

9  not the same.

10       THE COURT:  Is this a -- what is the number of this?

11  Where does this exhibit come from?

12       MR. GREEN:  I'm going to get the bullet point, Your

13  Honor.

14       THE COURT:  Okay.

15  A    That would help me.  They're very similar.  I can say

16  that.  Without having them side by side, I can't tell you that

17  they're the same.

18       MR. GREEN:  If I may have a moment.

19  Q    How's this look, this summary chart, characteristics of

20  large capital investments.  Then here's the second page.

21  Okay?  Does that look more familiar?

22  A    Yes.

23  Q    So let me just put the first page back up there.

24       When you testified -- let me start it this way.  At

25  the very end of your testimony, Mr. Lofton asked you to

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-446

1  summarize your testimony.  Do you remember that?

2  A    Yes.

3  Q    This exhibit was used as a kind of a -- well, to help you

4  summarize your testimony; is that right?

5  A    Yes.

6  Q    But this is an accurate summary of your testimony; is that

7  correct?

8  A    I read from this verbatim yesterday.

9  Q    Now, when you testified about the characteristics of large

10  capital investments, were you testifying as a fact witness or

11  as an expert witness?

12  A    Those are legal terms.  It would help me if you

13  differentiated between the two.  I think I know but I don't

14  want to assume anything.

15  Q    What do you think you testified as?

16  A    I'm here as an expert witness.

17  Q    As an expert witness.  Okay.

18        Now, have you received any prior training in the

19  characteristics of large capital investments?  I should say I

20  suppose in the utility industry.  Gone to any training courses

21  on the characteristics of large capital investments in the

22  utility industry?

23  A    I'm sure I have.

24  Q    You have?

25  A    In my utility career, yes.

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-447

1  Q   What were those courses?  Where were those courses?

2  A   Was that two questions?  What were they and where were

3  they?

4  Q   What were those courses?  Let's try that.

5  A   I can't remember details, but I do recall -- I mean, we've

6  talked about forms.  There were a lot of forms.  There were

7  processes.  It involved -- you know, I've talked about

8  economic analyses, how to develop scopes.  It's a drawn-out

9  process; and I can remember meetings, instructions,

10 procedures.

11 Q   Mind you that my question, sir, is directed specifically

12 to any training on the characteristics of large capital

13 investments which you identified during your testimony,

14 specifically that subject?

15 A   I recall being trained in various features of how this

16 process worked, how to do it, those sorts of things.  I recall

17 that.

18 Q   All right.  Have you read any treatises that discuss the

19 characteristics of large capital investments such as you've

20 identified here on this summery chart?

21 A   I don't recall reading any treatises.

22 Q   Did you have any help from anyone in any way to assemble

23 the characteristics of large capital investments which are

24 listed on this exhibit?

25 A   Yes.

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-448

1  Q    Who did you have help from?

2  A    Do you want names?

3  Q    Names or just generally generically.

4  A    Department of Justice.

5  Q    Department of Justice, okay.

6        I want to look at these items one by one.  Let's take

7  the first one.  "Are larger in scope and more complex than

8  day-to-day maintenance, repair and replacement activities."

9  Where do you draw the line between "more complex" and "less

10  complex," sir?

11  A    I don't and I haven't drawn any lines.

12  Q    So if you haven't drawn any lines, does this first

13  category that we're looking at represent a subjective

14  assessment on your part in contrast to an objective

15  assessment?

16  A    Let me see if I can put it this way.  I know what it takes

17  to maintain a coal-burning power plant on a day-to-day basis.

18  Over here, I've got the six major capital improvement projects

19  that I have described and testified to.  They are -- they're

20  not close.  It was not difficult.  I didn't have to draw any

21  lines.  These are significantly larger in scope, more complex

22  than this.  It's an easy choice.  There's no -- I didn't have

23  to chop and figure out, you know, how much -- it's easy.  It's

24  very clear.  It's easy.

25  Q    I hear you, but there has to be a line somewhere between

*HEKKING - CROSS (Continuing)/GREEN*    Vol. 4-449

1  more complex and less complex, does there not?

2  A  I don't think so.  I mean, I have seen no need to draw a

3  line.  I have not drawn a line.

4  Q  Let's go to the next one.  "Long lead time to plan,

5  prepare and implement.  Require unit outages that are long

6  duration jobs that last four weeks or more."  Let's take the

7  first sentence, "long lead time."  Where do you draw the line

8  there between long and not long enough as to lead time?

9  A  As I answered in the first bullet, I have not drawn lines.

10  I have not attempted to, and I didn't see a need to attempt to

11  in this situation.

12  Q  If I went through every one of these -- I don't want to

13  take unnecessary time with the jury here.  If I went through

14  every one of these categories, would you tell me the same

15  thing, that you didn't draw any lines at all?

16  A  I did not draw any lines for the same reason that I told

17  you.  It was easy.  It was a great difference.  I saw a

18  significant difference between the two.  It was easy judgment

19  for me.

20  Q  So just to make the point one more time, if you look at

21  this page up here, "generally more expensive than regular

22  maintenance activities," generally more expensive, is there a

23  line between "generally more expensive" and something that is

24  "not quite generally more expensive," if you understand my

25  question?

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-450

1  A   I think I do, and I'll attempt to answer it.  If I don't

2  do a good job, ask me again.

3       The reason that I said "generally" is because I have

4  seen projects that cost -- in fact, I've got one in mind that

5  cost in the neighborhood of $400,000 that -- how shall I

6  say -- met all of the other characteristics; but its cost was

7  not that much.

8  Q   I'm sorry, sir?

9  A   Its cost was not that much.  Again, I didn't draw any

10 lines, but I used the term "generally" in that particular

11 bullet because I have seen relatively inexpensive projects

12 still that I would not consider to be any type of regular

13 maintenance activity that you do at a coal-burning power

14 plant.  And I can give you an example if you like.

15 Q   But again, you don't have a line that 400,000 above is a

16 large capital investment, and everything below it is not?

17 A   There are no lines that I have drawn.  I look at every

18 project on its own merits on a case-by-case basis.

19 Q   Let's look at the very last bullet point that was on

20 the -- on your chart.  "Frequency."  It reads as follows,

21 "Regular maintenance is done on an ongoing basis to keep the

22 unit in its current operating condition.  Major capital

23 improvement projects are done infrequently at the unit."

24       Now, Mr. Lofton, during his questioning of you, did

25 explore with you the frequency of these projects -- some of

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-451

1  these projects that are at issue and which you testified

2  about.  Is that not correct?

3  A  I remember being asked about the frequency of each

4  individual project, had it been done before at that particular

5  unit.

6  Q  So in other words, your position was that each of the

7  projects that you were looking at had never been undertaken

8  before at that unit; is that right?

9  A  I believe that was -- that's what I testified, yes.

10 Q  But he did not ask you any questions about how frequently

11 these types of projects are done in the entire utility

12 industry, did he?

13 A  I don't recall any such question.

14 Q  But in your expert report, you do say something about

15 that, do you not?

16 A  It would help me if you refresh my memory.

17 Q  I'm going to help you.  Do you have your report in front

18 of you?

19 A  I do.

20 Q  If you would turn to page 8 of your report.  Do you have

21 it there, sir?

22 A  I'm on page 8.

23 Q  Let's put page 8 up on the machine here.  Now, I'm down at

24 the bottom of page 8.  Do you see that?

25 A  Yes, I do.

*HEKKING – CROSS (Continuing)/GREEN*   Vol. 4-452

1  Q   Let's look at that first paragraph.  "At the Paradise,

2  Johnsonville and Allen plants, I was heavily involved in many

3  major capital improvement projects including boiler component

4  replacement projects.  Components replaced include burners and

5  cyclones, boiler floors and walls, economizers, primary and

6  secondary superheaters and reheaters.  My involvement included

7  project scope development, project authorization, detailed

8  planning and implementation, budgeting and control of

9  expenditures and evaluation of results."  Have I read that

10  correctly?

11  A   Yes.

12  Q   Now, in there you are telling the reader that while at

13  TVA, you were involved in many repair and replacement projects

14  which were exactly similar or very close to the types of

15  repair and replacement projects you testified about on direct

16  examination.  Is that not right or am I misreading that?

17  A   Well, I think the next paragraph goes on to --

18  Q   Well, I'll get to the next paragraph, I assure you.

19  A   I think it answers your question.

20  Q   Can you answer the question I asked, however?  Were you

21  involved at TVA with many of the same types of projects that

22  you testified about while you were on direct examination?

23  A   Yes.

24  Q   Now, let's look at the next paragraph.  "The many capital

25  projects I was responsible for in my career with TVA were very

*HEKKING - CROSS (Continuing)/GREEN*    Vol. 4-453

1  similar in nature and purpose to those projects being

2  performed at other electric utilities around the country, such

3  as those at issue in this case."  Is that a correct statement?

4  A    You read it correctly.

5  Q    I know I read correctly.  Is that a correct statement that

6  you made?

7  A    It certainly is.  I didn't lie in this report.  It is

8  correct.

9  Q    You actually believe that the kinds of projects that you

10 testified about on direct examination are plentiful in the

11 industry; isn't that right?

12 A    I don't recall ever using that word.

13 Q    You don't?  All right, sir.

14        MR. GREEN:  May I approach, Your Honor?

15        MR. LOFTON:  I would like to see what he just showed

16 the witness.

17        MR. GREEN:  I'm showing him his deposition in this

18 case that was taken on October 5, 2005.

19 BY MR. GREEN:

20 Q    Do you recognize that, sir, as your deposition?

21 A    It certainly appears to be, yes.  This is about the right

22 time.

23 Q    If you would turn to page 208.

24        Do you have it?  If you would look at line 3.

25        During your deposition in October of 2005 when you

HEKKING - CROSS (Continuing)/GREEN   Vol. 4-454

1  were under oath, were you asked the following question and did

2  you give the following answer?

3          "Question:  And what analysis in your expert

4  report in the Cinergy case did you undertake to determine

5  whether the projects are routine in the industry?

6          "Answer:  What analysis?  I think I've already

7  testified today -- I -- I looked to see how many times it had

8  been done on individual -- that individual unit.  I also have

9  a large body of experience and knowledge on what else has been

10 done in the industry, but I, as you know -- you know, starting

11 in the late '80s, I'm well aware that these projects became

12 plentiful -- as you told me at the begin -- so I -- I -- I'm

13 aware that there were a lot of them."

14      Is that your testimony in the Cinergy deposition?

15 A   Yes.  And obviously I did use the word plentiful.  I'm

16 sorry for misleading you.

17 Q   That's quite all right.  If that gets in your way, I'll

18 come take that if you want.

19 A   Are we finished with it?

20 Q   Yes, I'll take it for now.

21          MR. GREEN:  May I, Your Honor?

22          THE COURT:  Yes.

23 BY MR. GREEN:

24 Q   I want to show you a document that's been marked

25 Defendants' Exhibit 0113.

*HEKKING – CROSS (Continuing)/GREEN*   Vol. 4-455

1          MR. GREEN:  Would you like to see this, Your Honor?

2          THE COURT:  I don't need to.  Go ahead.

3          MR. GREEN:  Pardon?

4          THE COURT:  I said "I don't need to."  Go ahead.

5    BY MR. GREEN:

6    Q   I think this is in a form that it's ready to be admitted.

7    I think it's an exhibit that's been admitted?  Is that

8    correct, sir?

9          MS. HIMMELHOCH:  There's no objection -- there's no

10   objection to hearsay or authenticity but there is an objection

11   to relevance.

12         THE COURT:  All right.  Then we'll have to have this

13   identified by the witness and then I'll make a ruling.

14         MR. GREEN:  If I may?

15         THE COURT:  You may.

16   BY MR. GREEN:

17   Q   Mr. Hekking, I'm showing you a pamphlet or a manual

18   entitled "Routine Maintenance of Electric Generating

19   Stations."  It's a manual published by the Tennessee Valley

20   Administration, TVA.  It appears to have been written by

21   Mr. Jerry L. Golden, manager of Production Technology Fossil

22   Power Group.  Have you ever laid eyes on this document?

23         MR. LOFTON:  Your Honor, I have an objection to the

24   term Mr. Green has used.  It's not a manual.  It's a report

25   that was written for purposes of litigation.

HEKKING – CROSS (Continuing)/GREEN    Vol. 4–456

1    MR. GREEN:  Your Honor, I'll take whatever

2 description –– if you want to call it a report, I'll call it a

3 report.

4    THE COURT:  Okay.

5 BY MR. GREEN:

6 Q   Have you ever seen this report before?

7 A   Yes.

8 Q   Have you read this report?

9 A   Yes.

10 Q   Does this report make reference to the frequency of repair

11 and replacement projects in the industry as well as at TVA?

12 A   Certainly TVA.  I recall four other utilities besides TVA

13 being involved in the data that Mr. Golden used to develop his

14 analysis.

15 Q   Okay.  Let's take a look at that at page 29, if you may.

16    THE COURT:  Are you offering this?

17    MR. GREEN:  May I offer this, please?

18    THE COURT:  The objection is?

19    MR. LOFTON:  Relevancy, Your Honor.

20    THE COURT:  What help is this going to give us here,

21 Mr. Green?

22    MR. GREEN:  It's going to enlighten the subject of

23 frequency in the industry, Your Honor, which is one of the

24 factors that you've identified for consideration.

25    THE COURT:  Now, is it for impeachment of this

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-457

1  witness on the subject?  Is it for further evidence on the

2  subject?  Which is it?

3         MR. GREEN:  It is to elicit from him a confirmation

4  as to the frequency of these types of repair and replacement

5  projects, not only at TVA but in the industry as well.

6         THE COURT:  Hasn't he testified that those occurred

7  frequently in the industry?  Haven't we already got that?

8         MR. GREEN:  Well, Your Honor, if you believe --

9         THE COURT:  Don't you agree with that, counsel?

10        MR. LOFTON:  He did say "plentiful."

11        MR. GREEN:  Plentiful is enough?

12        THE COURT:  I think plentiful is enough.

13        MR. GREEN:  Plentiful it is then.

14  BY MR. GREEN:

15  Q   Part of Mr. Lofton's examination with you, sir, is that he

16  asked you to compare the cost of these repair and replacement

17  projects that you looked at with I think the maintenance

18  budget at the various power stations.  Did I understand that

19  correctly?

20  A   Yes.

21  Q   And you -- you rendered the view or expressed the view

22  that these projects were of a sufficient magnitude that they

23  would have eaten up a large portion of the maintenance budget;

24  is that right?  Did I understand --

25  A   I think that's fair.

*HEKKING – CROSS (Continuing)/GREEN*   Vol. 4-458

1  Q   One of the things that Mr. Lofton didn't talk to you about

2  or didn't ask you to compare was the cost of these projects to

3  the cost of what it would take to build a brand new unit.

4  Isn't that another form of comparison that would be

5  appropriate to look at?

6  A   No.

7  Q   In deciding whether something is RMRR, why would it not be

8  appropriate to look at the cost of the project in comparison

9  to what it would cost to replace and build a new power station

10  or new unit?

11       MR. LOFTON:  Objection, Your Honor.  He's asking for

12  a legal conclusion.  I'm assuming by RMRR, he means "routine,

13  repair and replacement."

14       THE COURT:  I think that is a proper assumption.

15       MR. GREEN:  That is a proper assumption.  I don't

16  believe I'm asking for a legal conclusion at all.

17       THE COURT:  I don't think so either.  He can answer

18  this question.

19  BY MR. GREEN:

20  Q   Do you need the question repeated?

21  A   Please.

22  Q   I asked you whether it would not be appropriate in

23  assessing whether a project qualifies as routine maintenance,

24  repair and replacement to compare the cost of the project to

25  the cost of replacing that unit -- the entire unit.

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-459

1  A    I see little or no relationship between the cost of

2  building something and the cost of maintaining it.  To me,

3  I -- I don't see the relationship.

4  Q    The cost of performing a repair and a replacement keeps

5  the unit in operation and available to generate electricity,

6  does it not?

7  A    Generally, yes.

8  Q    And if the repair and replacements aren't made, ultimately

9  you're going to lose the capacity of that unit; and it then

10 would have to be replaced with a new unit.  Is that not right?

11 A    I'll say it's possible.  I can't -- I can't jump from the

12 one to the other.  That's a larger jump than I can make.

13 Q    Have you never seen in all of your experience a comparison

14 between the cost of the project weighed against the cost of a

15 new generation unit?  You've never seen comparisons like that?

16 A    Give me the comparison again.  I'm not sure I understood

17 you.

18 Q    Comparing the cost of the project -- the repair and

19 replacement project -- against the cost of a new generation

20 unit, have you not seen comparisons like that in your entire

21 work history in this industry?

22 A    I think I've already testified earlier that -- today that

23 I was aware of a -- how shall I say -- a regulatory

24 requirement that said if you spend more than 50 percent of the

25 cost -- the original cost of construction of that facility,

*HEKKING — CROSS (Continuing)/GREEN*    Vol. 4-460

1  then you trigger the environmental requirements.  I have seen

2  in that context, yes.

3  Q   First of all, none of these projects exceeded 50 percent

4  of the cost of the unit.  Isn't that right?

5  A   That's right.

6  Q   So now back to my question, my specific question.  In all

7  of the time that you've been in this industry and been a

8  consultant to the Government, for all those many years, have

9  you seen comparisons between the cost of repair and

10 replacement projects and the cost of a new generation unit?

11 A   Yes.

12 Q   I would like to ask you if we could agree -- and I want to

13 use the time period 1990, 1991 because it's kind of in the

14 middle of the years covered by this case.  Can we agree that a

15 conservative estimate for the cost of a new generating station

16 would be a million dollars per megawatt of pour?

17          MR. LOFTON:  Objection, Your Honor, relevance.

18          THE COURT:  I'll let him answer.  Go ahead.

19 A   This is a coal-fired --

20 Q   Coal-fired?

21 A   -- power plant?

22          I've got no problem with that number.

23 Q   So that if a -- if a generating unit, just using the

24 standard of measurement that I just suggested to you, to build

25 a 200-megawatt unit at a million dollars per megawatt, that

HEKKING − CROSS (Continuing)/GREEN    Vol. 4−461

1  unit would cost $200 million, simple arithmetic, right?

2  A   Yes.

3  Q   Now, sir, what I would like to do is see if I can −−

4         MR. GREEN:  I need to just take one second, Your

5  Honor.

6  Q   I'll do it this way just to save time.

7         Mr. Hekking, let me put up on the ELMO −− now, these

8  are the six units which Cinergy contends qualify as RMRR; and

9  you'll see in the third column I have the costs that you

10  determined for each of these projects −− the total cost that

11  you determined for each of these projects−−

12         THE COURT:  Excuse me, Mr. Green.  I don't think the

13  record reflects the exhibit number of this.

14         MR. GREEN:  This is a demonstrative, Your Honor.

15         MS. THOMSON:  We marked it as 2150 yesterday.

16         THE COURT:  Okay.

17         MR. GREEN:  Thank you, sir.

18  BY MR. GREEN:

19  Q   Can you confirm for me that I've represented that

20  correctly?  Let's see if I can make it a little clearer.  Does

21  that look about right, those numbers?

22  A   Yes.

23  Q   Now, let me show you what I've done here.  Using the

24  figures that we've talked about, the −− let's just go down.

25  Wabash River, 85 megawatts at a million dollars a megawatt

*HEKKING − CROSS (Continuing)/GREEN*    Vol. 4−462

1  comes out to $85 million for a new plant.  And we've done the

2  arithmetic that 1,183,658 is 1.4 percent of that 85 million.

3  I'll confirm or represent to you that I used a calculator, and

4  I believe that to be correct.  Do you take any issue with my

5  arithmetic?

6  A    No, sir.

7  Q    Okay.  So the −− for these six projects that are at issue,

8  they range from a low of .41 −− I guess I'll have to do it

9  this way −− a low of .41 percent −− 41 hundredths of 1 percent

10 up to 3.6 percent for the Wabash River 3 project; is that

11 correct?

12 A    I see that but I also see that I do need to take issue

13 with your math.

14 Q    Okay.

15 A    I'm looking at Wabash River 5.  You've got 85 megawatts.

16 I recall that being a 125−megawatt unit.  I could be wrong,

17 but I believe −−

18 Q    So what that's going to do, if I up the presumed cost from

19 85 million to 125 million, it's going to reduce that 2.8

20 considerably, isn't it, that 2.8 percent?

21 A    Yes.

22 Q    It's going to make it much smaller?

23 A    Yes.

24 Q    Thank you for pointing that out.

25         Now, I think I'm getting close to the end but I just

HEKKING – CROSS (Continuing)/GREEN    Vol. 4-463

1    want to ask you a couple of other quick questions.

2          When we were discussing the Gallagher units, the

3    pulverizer in particular, the pulverizer replacement on I

4    think it was Gallagher 3, do you recall that?  We talked about

5    that yesterday?

6    A    In the cross?

7    Q    Yes.

8    A    Yes.  In the cross?

9    Q    In my questioning of you?

10   A    That's what -- I was trying to figure out what you were

11   talking about.

12   Q    You used the phrased, I think, "instantaneous capacity."

13   Do you remember that?  We were talking about the maximum

14   capacity of that unit; and you used the phrase "the

15   instantaneous capacity"?

16   A    Yes, I recall that.

17   Q    I think you testified that the -- that the maximum

18   instantaneous capacity was 150 megawatts?

19   A    That's what I remember.  It's 150-megawatt unit -- or was.

20   Q    Replacing the pulverizers at Gallagher 3 can't, can't,

21   increase the instantaneous capacity beyond 150 megawatts, can

22   it?

23   A    It did.

24   Q    It did?

25   A    It did.

*HEKKING - CROSS (Continuing)/GREEN*    Vol. 4-464

1  Q   How did it do that?

2  A   Counsel -- my counsel told me last night --

3  Q   Well, wait a minute.  You're saying your lawyer told you

4  something last night?

5  A   Yes.

6  Q   Which lawyer is that?

7  A   Mr. Lofton.

8  Q   Pardon?

9  A   Mr. Lofton.

10 Q   Okay.  So he -- are you now repeating something that --

11 you're going to repeat here something that Mr. Lofton told

12 you?

13 A   No -- well, in a manner of speaking.  I'm aware of the

14 fact.  What he told me was the information that I'm about to

15 relay to you has already been decided by this Court as --

16 what's it called, a matter of fact or it's already agreed

17 upon.

18         What I'm speaking about is the instantaneous increase

19 of 7 megawatts.

20 Q   I'm not -- I know what you're wanting to talk about, but I

21 have a question, okay?  The maximum instantaneous capacity --

22 using your term, the maximum instantaneous capacity of that

23 unit is 150 megawatts; is that not correct?

24 A   Now or before the project?

25 Q   I'm talking about the nameplate instantaneous capacity.

HEKKING — CROSS (Continuing)/GREEN    Vol. 4-465

1  All of these units have a maximum capacity.  They're built

2  with a maximum capacity, are they not?

3  A   Sir, I don't mean to quibble, but this project increased

4  that capacity.  So to answer your question, you're going to

5  have to tell me whether you want to know before the project or

6  after the project.

7  Q   I want to know without regard to the project.  I want to

8  know about the maximum capacity -- nameplate capacity of the

9  boiler.  I don't want to talk -- I'm not talking about

10 problems that the boiler had.  I'm talking about its

11 theoretical maximum instantaneous capacity can't go beyond

12 150 megawatts, can it, whether you change pulverizers or not?

13 A   It's my understanding that it was one capacity before the

14 project.  That capacity increased after the project.

15 Q   Let me finish with these few questions because I may have

16 garbled them up when I was up here before.  We were talking

17 about tube replacements yesterday, and I was talking about

18 whether a tube -- replacing a tube emits any emissions.  Do

19 you remember that?

20 A   Yes.

21 Q   I didn't ask very good questions.  So let me see if I can

22 ask them in a little clearer fashion.

23      This case involves nitrogen oxides emissions and

24 sulfur dioxide emissions, okay?

25 A   Okay.

*HEKKING – CROSS (Continuing)/GREEN*    Vol. 4-466

1  Q    So I want to ask about those kinds of emissions.

2  A    Okay.

3  Q    So if I cut a defective tube out of a boiler and I put a

4  new tube in -- of course, that boiler is offline, right?  It's

5  not fired up?

6  A    Certainly.

7  Q    That new tube isn't going to emit any NOX or SOX, is it?

8  A    The tube itself will not.

9  Q    That new tube by itself isn't going to cause the boiler to

10  emit any NOX or SOX; isn't that right?

11  A    The tube is a part of the boiler.  The tube itself does

12  not emit.

13  Q    Okay.  Thank you.  And that same principle would hold true

14  for a superheater?  If you took all the superheater tubes out

15  and put in all new superheater tubes, those new superheater

16  tubes aren't going to emit NOX or SOX, are they?  By

17  themselves?

18  A    You're changing the scope on me a little bit.  The

19  superheater - a tube is one of thousands of tubes.  When you

20  start replacing a big section --

21  Q    The boiler is still turned off.  How can replacing the big

22  section of tubes emit NOX or SOX?

23  A    I've told you.  The tubes don't emit NOX or SOX.  The

24  boiler does.

25  Q    The unit does?

*HEKKING - CROSS (Continuing)/GREEN*    Vol. 4-467

1  A    The boiler does.

2  Q    Somebody has to fire it up.  It has to be turned back on?

3  A    Right, you have to have a coal fire.

4  Q    And it's not before it's fired up and turned on can it

5  emit NOX or SOX; isn't that right?

6  A    If there is no fire in that boiler, I don't believe you've

7  got any NOX or SOX coming out of the stack.

8  Q    Do the maintenance personnel, the men and women who work

9  in the maintenance side of these jobs that were depicted in

10  the animation, do they determine whether or not the boiler is

11  going to be fired up?  Is that their decision to make?

12  A    The workers?  No, sir.

13  Q    The person or persons who determine whether that boiler is

14  going to be fired up and that unit is going to be turned on

15  and that unit is going to generate electricity is the

16  dispatcher; is that correct?

17  A    I'd say it's maybe a two-party decision, the plant manager

18  or my operations superintendent will release the unit for

19  service.  So that has to happen.  Then the dispatcher will say

20  whether he needs it or not.

21  Q    But when it's released, it's not emitting anything, is it?

22  A    As I said, it doesn't emit until you've got a fire in it.

23  Q    And it's not going to, you know -- and it's going to be

24  the dispatcher who's going to decide whether or not to turn

25  that unit on and start it up; isn't that right?

*HEKKING - CROSS (Continuing)/GREEN*    Vol. 4-468

1  A    Yes.

2  Q    And it's going to be the dispatcher who's going to

3  determine how hard to run that unit; isn't that correct?

4  A    I don't want to mislead this Court.  He does not have

5  independent judgment over the matter.  He is operating a

6  system, and he basically does -- he dispatches units according

7  to a procedure which he follows.  So he does not have

8  independent judgment.  I don't want to make it sound like he

9  does.

10 Q    You don't think a dispatcher can -- you don't think that

11 if a dispatcher encounters trouble in the system, such as a

12 forced outage at one of the units where that unit is taken

13 offline and no longer generating electricity -- you don't

14 think the dispatcher can increase the output from the other

15 generating units to make up for the unit that just went

16 offline?

17 A    He does it according to -- how should I say it -- an

18 economic formula that is provided to him.  He does not have

19 independent judgment to say, well, I'd kind of like to run

20 Wabash today.  He has a formula that he follows.  He does it

21 economically.  There is a -- I'll just leave it at that.  He

22 has a formula that he follows.

23 Q    You think it's always done exclusively by the formula; is

24 that right?

25 A    I'm not a dispatcher.  I can't describe all the

*HEKKING − CROSS (Continuing)/GREEN*    Vol. 4-469

1  circumstances; but I know generally speaking, his

2  responsibility is to see that the most economical unit is

3  loaded first.

4        MR. GREEN:  Okay, sir.  I think that's all I have,

5  Your Honor.

6        THE COURT:  Thank you.

7        Redirect?

8        MR. GREEN:  Your Honor, I'm reminded, if I may, that

9  we've not yet admitted the TVA document that has "routine" on

10 it which is Defendant's Exhibit 2123.  So I would ask that

11 that be admitted, sir.

12       THE COURT:  2123 has been offered.

13       MR. LOFTON:  We have no objection, Your Honor.

14       THE COURT:  It's admitted.

15       MR. GREEN:  Thank you, Your Honor.

16   *(Defendant's Exhibit 2123 was received in evidence.)*

17       MR. LOFTON:  Good morning, ladies and gentlemen.

18                **REDIRECT EXAMINATION**

19 BY MR. LOFTON:

20 Q   Now, Mr. Hekking, I want to go back to 2123, but let's go

21 back to your compensation for this case.

22 A   What is 2123?

23 Q   One of their exhibits.  We'll get back to it in just a

24 minute here.

25       You told the jury that your compensation has been less

HEKKING – REDIRECT / LOFTON      Vol. 4-470

1  than $250,000.  Over how many years is that?

2  A    Seven or eight years.

3  Q    Now, everybody just did their taxes recently.  I'm

4  guessing you did yours.  How much were you paid last year by

5  EPA or the Government?

6  A    By the Government?

7  Q    By the Government, yes, sir.

8  A    I think I made about $1,500 last year --

9  Q    All right.

10  A    -- from Government work.

11  Q    Okay.  Let's turn back to the exhibit that Mr. Green was

12  so interested in.  Let's put this back on the screen here.

13          THE COURT:  Let's try not to give it the editorial

14  comment.

15          MR. LOFTON:  Yes, sir.  Sorry.

16  BY MR. LOFTON:

17  Q    This is Defendant's Exhibit 2123.  Mr. Green focused your

18  attention on the environmental review.  Does this have

19  anything to do with the Clean Air Act?

20  A    The box title, Environmental Review, no.  No, it does not.

21  Q    Did this have anything to do whether at the time you

22  signed this form you thought that this was the types of normal

23  maintenance activities that you described for us at the

24  beginning of your testimony?

25          MR. GREEN:  Objection, leading.

*HEKKING – REDIRECT / LOFTON*      Vol. 4-471

1      THE COURT:  Let me read the question again off my

2  screen.

3      MR. GREEN:  I'm sorry, sir?

4      THE COURT:  I said just a minute, I want to read the

5  question again off my screen.

6      Yes, it is a leading question.

7      MR. LOFTON:  Let me try it again, Your Honor.

8  BY MR. LOFTON:

9  Q   Is a reheater replacement a normal maintenance activity?

10 A   No.

11 Q   At the time that you signed this form, did you think that

12 a reheater replacement was or was not a normal maintenance

13 activity?

14 A   I never thought that was a normal maintenance activity,

15 not then or now.

16 Q   Now, let's focus on the --

17      MR. LOFTON:  Your Honor, I think I'm dangerous up

18 here.  Can I get some help focusing this a little bit?

19      THE COURT:  I don't want you to be a danger to

20 yourself.

21      MR. LOFTON:  I might be a danger to the equipment.

22      COURT CLERK:  You want to zoom in?

23      MR. LOFTON:  Yes, right there (indicating).  Thank

24 you.  Okay.

25

*HEKKING – REDIRECT / LOFTON*        Vol. 4–472

1  BY MR. LOFTON:

2  Q   You want to look at the problem statement on this

3  particular project, Mr. Hekking.  Can you tell us what the

4  problem was with this reheater and how long it had been in

5  service?

6  A   This reheater had been in service 30 years.  Using

7  colloquial terms, it was breaking my back.  Numerous tube

8  leaks.  I started to explain one circumstance where I didn't

9  get to do a good repair and it leaked and it leaked and it

10 leaked.  It was a real problem.  I had many, many forced

11 outages associated with reheater tube leaks.

12 Q   Okay.  Now, can we go back to the last image that we

13 showed in Mr. Hekking's direct examination, the bullet chart?

14      Can you pull that up for us, Jeff?  The very last

15 demonstrative exhibit.

16      Okay.  Here we are.  Did the reheater replacement that

17 we've seen on this work authorization have all of the

18 characteristics of a large capital investment?  First of all,

19 was it larger in scope and more complex than day–to–day

20 maintenance, repair and replacement activities?

21 A   Yes.

22 Q   No. 2, did it take a long time to plan, prepare and

23 implement?

24 A   Yes, it did.

25 Q   We saw the Approval page.  Did it require high level

*HEKKING – REDIRECT / LOFTON*        Vol. 4-473

1  approval?

2  A   It was higher than me.  I was the plant manager.

3  Q   The next bullet, did it require outside contractors,

4  engineers and architects because of its complexity?

5  A   I remember I asked for a redesign.  So I certainly did use

6  an outside design firm.  In fact, Babcock & Wilcox designed

7  this boiler and I used them because, like I said, I needed

8  some redesign.

9       As far as the implementation of the work, we had, as I

10  say, an organization in TVA, fossil and hydromodification --

11  fossil and hydromodifications group, I believe is what it was

12  called.  And they performed the work.

13  Q   I'm sorry.  What was the name of the group within TVA that

14  performed the installation?

15  A   Fossil and hydromodifications group I believe is what they

16  were called.

17  Q   Was this an organization at your plant?

18  A   No.  This was in Chattanooga.

19  Q   So they came from Chattanooga -- a group of boilermakers

20  came from Chattanooga to actually install the new reheater?

21  A   No.  That organization at Chattanooga had project

22  managers.  They had welding engineers.  They had rigging

23  experts.  They had the management and the supervision required

24  to do this job.

25       At the plant, I hired through the union halls the

*HEKKING − REDIRECT / LOFTON*        Vol. 4−474

1  boilermakers, Ironworkers and other crafts necessary to do

2  this work.  I hired those people for them, but I relied on the

3  Chattanooga people to manage the job for me.

4  Q    Okay.  Let's go to the next several bullets here.  Did

5  this reheater replacement require special equipment or access

6  at the plant?

7  A    Yes, it did.

8  Q    Was it paid for from a construction budget or a corporate

9  budget instead of the maintenance budget?

10 A    Capital dollars were used to finance this project.

11 Q    Was it more expensive than the regular maintenance

12 activities at the plant?

13 A    Very much so.

14 Q    Now, the next bullet says "Done to increase unit

15 availability and reliability and/or extend the life of the

16 unit."  I want to stop and ask you again to look at the

17 project statement here and what this says.

18        MR. LOFTON:  May I approach, Your Honor?

19        THE COURT:  Yes.

20 BY MR. LOFTON:

21 Q    Could you read the second sentence here, Mr. Hekking, on

22 the −−

23 A    "Reheater tube failures have increased in frequency and

24 have begun to reduce unit availability."

25 Q    Was the purpose of this project to improve unit

*HEKKING – REDIRECT / LOFTON*         Vol. 4-475

1  availability?

2  A    Yes, it was.

3  Q    One final question about this reheater project.  Did the

4  Environmental Protection Agency take an action -- a compliance

5  action against the Tennessee Valley Authority that involved

6  this very project?

7  A    Yes.

8  Q    Okay.  Now, one final area that I want to re-cover because

9  I think there was some confusion about this.  You were asked

10 some questions on cross-examination about how many components

11 there are in a unit and questions about components in a

12 boiler.  Are there thousands of boiler components the size of

13 a superheater?

14 A    No, sir.

15 Q    How many components -- let's call it major components in

16 the boiler that are the size of a superheater or a reheater or

17 an economizer?

18 A    Somewhere between five and ten.

19 Q    Just to be clear, are there thousands of major components

20 in the boiler the size of a superheater?

21 A    No, sir.

22 Q    One final question.  Mr. Green asked you some questions

23 about your experience in capitalization.  How many years of

24 experience do you have in assessing, implementing, budgeting,

25 preparing and looking at major capital improvement projects?

*HEKKING – REDIRECT / LOFTON*        Vol. 4–476

1  A   I'm trying to think of when I saw the first project.  It

2  would have been in my first year of employment with TVA.

3  Q   Okay.

4  A   So 20 years.

5          MR. LOFTON:  Your Honor, may I have just a moment?

6          THE COURT:  Yes.

7          MR. LOFTON:  No further questions, Your Honor.

8          THE COURT:  Thank you.

9          Any recross?

10         MR. GREEN:  No, sir.

11         THE COURT:  You may step down, sir.

12         THE WITNESS:  Thank you, sir.

13         THE COURT:  Your next witness, please.

14         MS. ROSENGARTEN:  Good morning, Your Honor, my name

15  is Danielle Rosengarten; and I'm here on behalf of the United

16  States of America this morning.

17         Good morning, ladies and gentlemen of the jury.

18         The Plaintiffs call Hugh Larkin to the stand.

19    *(A discussion was held off the record.)*

20         THE COURT:  Step right up here, sir.  This is the

21  witness stand.  If you'll step right up here and raise your

22  right hand, please.

23

24

25

HEKKING — REDIRECT / LOFTON        Vol. 4-477

1          **HUGH LARKIN, PLAINTIFF'S WITNESS, SWORN**

2                    **DIRECT EXAMINATION**

3          THE COURT:  You may be seated.  There's a microphone

4  on your right next to you.  If you would attach the smaller

5  end next to your tie, please.

6          MS. HIMMELHOCH:  Your Honor, may I approach?

7          THE COURT:  Yes.

8          MS. HIMMELHOCH:  May I approach the witness?

9          THE COURT:  Yes, you may.

10         You may inquire.

11 BY MS. ROSENGARTEN:

12 Q   Good morning, Mr. Larkin.

13 A   Good morning.

14 Q   Would you please introduce yourself to the jury?

15 A   My name is Hugh Larkin, Jr.  I'm a certified public

16 accountant.  I'm the senior partner at Larkin & Associates,

17 Certified Public Accountants, with offices at 15728 Farmington

18 Road, Livonia, Michigan, 48154.

19 Q   Mr. Larkin, could you tell us a little bit about what

20 Larkin & Associates does?

21 A   I'm sorry.

22 Q   I'm happy to repeat.  Would you mind telling the jury a

23 little bit about the work Larkin & Associates does?

24 A   Larkin & Associates specializes in assisting public

25 service commissions, public councils and attorneys general in

HUGH LARKIN - DIRECT/ROSENGARTEN      Vol. 4-478

1  analyzing rate increases that utilities ask for on behalf of
2  consumers.
3  Q    Now, you mentioned in your introduction that you're a
4  certified public accountant.  What year were you certified?
5  A    I was certified as a certified public accountant in 1966.
6  Q    Are you a member of any trade organizations?
7        Are you a member of any trade organizations?
8  A    I'm a member of the Michigan Association of Certified
9  Public Accountants and the American Institute of Certified
10 Public Accountants.
11 Q    Let's go a little farther back into your history, sir.
12 Where did you go to college?
13 A    I graduated from Michigan State University in 1960 with a
14 Bachelor of Science degree in accounting.
15 Q    What did you do after college?
16 A    I spent two years in the Army as an officer.
17 Q    After you left the Army, where did you go to work?
18 A    I was employed as a junior accountant at the national
19 public accounting firm of Peat Marwick Mitchell.
20 Q    Can you briefly explain the experience that you gained at
21 that first job?
22 A    Certainly.  At Peat Marwick Mitchell, I gained practical
23 experience in cost accounting, auditing and analyzing
24 financial statements.  I was the supervising senior in charge
25 of all the railroad audits at the Detroit office of Peat

HUGH LARKIN – DIRECT/ROSENGARTEN        Vol. 4-479

1  Marwick Mitchell, and I was also the supervising senior in

2  charge of the audit of the State Highway Department.

3  Q   Where did you work after you left that job?

4  A   I was with Peat Marwick Mitchell until about October of

5  1969, and then I was a partner in the small CPA firm of

6  Tichler & Lipson for about six months.

7        COURT REPORTER:  I'm sorry, sir?

8        THE WITNESS:  Tichler, T-I-C-H-L-E-R, Lipson,

9  L-I-P-S-O-N.

10 Q   And after Tichler & Lipson, where did you go?

11 A   I organized my own CPA firm in March of 1970.

12 Q   And that's where you're working now?

13 A   That's correct.

14 Q   Now, you also mentioned already that the firm has a

15 specialty.  Do you have a particular specialty in the field of

16 accounting?

17 A   Yes.  I do the same kind of work.  I analyze rate filings

18 on behalf of public service commissions, consumer advocates

19 such as public councils and attorney generals.

20 Q   Do you provide expert testimony in those cases?

21 A   Yes, I do.

22 Q   How much of the time that you spend working on those cases

23 do you spend actually testifying in court?

24 A   Well, about 99 percent of the time is spent analyzing the

25 data and understanding the increases that have been requested

HUGH LARKIN – DIRECT/ROSENGARTEN      Vol. 4–480

1  by the utility; and the small portion of the time, one or two

2  percent, is actually spent going to a hearing and testifying

3  about the rates.

4  Q   And in addition to those types of cases, have you ever

5  testified as an expert in any other New Source Review

6  enforcement cases?

7  A   Yes, I have.

8  Q   Which were those?

9  A   I've testified in the Ohio Edison case and the Illinois

10  Power case.

11  Q   Now, in addition to the New Source Review enforcement

12  cases in which you've testified, have you offered expert

13  reports in any other similar cases?

14  A   Yes.

15  Q   Which were those, sir?

16  A   I've offered expert reports in approximately five other

17  cases.

18  Q   And were you hired by the Plaintiffs in all of those

19  cases?

20  A   Yes, I was.

21  Q   What were you asked to evaluate in those cases?

22  A   Well, I was asked to determine whether the utility

23  involved followed the accounting rules; and if they followed

24  the accounting rules, what the implication of following those

25  accounting rules were.  It was also asked to determine

HUGH LARKIN – DIRECT/ROSENGARTEN      Vol. 4-481

1  whether –– how many times this particular project had been

2  done at that plant and the cost of the project at that plant.

3  Q    Were you asked to discuss the significance of the

4  accounting treatment?

5  A    Yes.

6  Q    Mr. Larkin, what were you asked to evaluate with regard to

7  the projects at issue in this case?

8  A    The very same thing, whether Cinergy followed the

9  accounting rules in recording the costs associated with these

10  projects, what that recording of those costs meant to the

11  management of the company, what the total cost was and how

12  often this type of project was done at that plant.

13  Q    What types of information did you look to in order to

14  reach those conclusions?

15  A    Well, I followed the same accounting documentation that

16  the company would have followed.  I looked at budgets and

17  authorizations and the same thing the management would have

18  authorized in reviewing this project, authorizing it and

19  completing it and recording it on the books and records of the

20  company.

21  Q    So just to be clear, were you looking to the company's own

22  documents in drawing your conclusions?

23  A    Yes.

24  Q    Why did you look to those types of data?

25  A    Because that's the logical approach.  That's what the

HUGH LARKIN - DIRECT/ROSENGARTEN      Vol. 4-482

1  company did.  This is what the management did.  This is what

2  they review, what they authorize, what they thought about

3  these projects.

4  Q   Is that the same type of information that you reviewed in

5  your other cases to draw your conclusions in those cases?

6  A   Yes.

7  Q   Thank you, Mr. Larkin.

8        Now we're going to spend a minute getting familiar

9  with some of the vocabulary that Mr. Larkin is going to be

10 using in his testimony.  I just want to make sure we're all on

11 the same page.

12       COURT REPORTER:  I'm sorry.  Please slow down.

13       MS. ROSENGARTEN:  I'm sorry, just getting familiar

14 with the vocabulary Mr. Larkin's going to be using.

15 BY MS. ROSENGARTEN:

16 Q   Mr. Larkin, can you explain to the jury what the term

17 "capital improvement project" means?

18 A   Well, a capital improvement project is an improvement to

19 an asset.  It's an expenditure of money that makes the asset

20 more useful, more efficient, of greater durability or greater

21 capacity.

22 Q   Can you think of an example that might really help us

23 understand what that means?

24 A   Well, if we're a homeowner and we've been in a home for,

25 say, 30 years or so, and the kitchen is outdated, and we

HUGH LARKIN – DIRECT/ROSENGARTEN        Vol. 4–483

1  decide to refurbish that kitchen, we take out all the

2  cabinets.  We take out all the counters.  We take out all the

3  appliances and we put in new cabinets, granite countertops,

4  the most efficient refrigerators, the most efficient stoves,

5  the most efficient dishwasher.

6        We've made an improvement to our home that has

7  increased the value of that home.  It's made it more valuable

8  to us and it's made it more valuable into the future as we use

9  that particular kitchen.

10 Q   In a few minutes, we're going to get into the projects at

11 issue in this case; but just to be clear at this point, is a

12 capital improvement project the same thing as a capital

13 expenditure?

14 A   Yes, it is.

15 Q   What does the word "expenditure" mean?

16 A   It simply means that you're expending money.  You're

17 taking cash and you're using it to acquire something.

18 Q   Now, if a project is not a capital improvement project,

19 how else might it be treated for accounting purposes?

20 A   If you're spending money on a piece of equipment at a

21 plant, there are only two options.  It's either a capital

22 expenditure improving the value of that plant, or it's a

23 maintenance cost.  You're doing something to prevent the

24 deterioration of that piece of equipment.

25 Q   Now, bringing us back to the kitchen example for a moment,

HUGH LARKIN – DIRECT/ROSENGARTEN        Vol. 4-484

1  could you give us an everyday example of something that might

2  be considered maintenance as opposed to the capital

3  improvement project you described?

4  A   Well, if we return to my example of the kitchen, if we had

5  a dishwasher that was malfunctioning and it was malfunctioning

6  because a handle was deficient and we had that handle

7  repaired, replacing the handle would allow the dishwasher to

8  return to the same level of service it had provided in the

9  past; but it wouldn't improve it any.  It wouldn't make it

10  more efficient.  It wouldn't make it last longer.  It would

11  only allow it to complete its level of service that had

12  already -- we had already anticipated.

13  Q   Let's change gears for a minute and talk about the way

14  accountants use these terms.  Mr. Larkin, are you familiar

15  with the Generally Accepted Accounting Principles?

16  A   Yes.

17  Q   Can you tell us a little bit about those principles?

18  A   Well, Generally Accepted Accounting Principles are rules

19  and regulations that every corporation, partnership or any

20  entity that provides financial information to stockholders or

21  regulators or the public has to follow.

22        And they have to follow those rules so that

23  transactions with similar economic impact are reported the

24  same way regardless of which company is completing the

25  transaction.  So that if we have a utility in Indiana that

HUGH LARKIN — DIRECT/ROSENGARTEN       Vol. 4-485

1  replaces a component of a plant, it's reported the same way as

2  if a utility in Hawaii did the same thing, so that we don't

3  have two different utilities reporting the same, similar

4  transaction different ways because they both have the same

5  economic impact.  They both have the same impact on the

6  company, and so they should —— they're two different

7  companies, so they should be reported the same way.

8  Q    So these principles, do they tell companies how to keep

9  their books —— their accounting books?

10 A    Yes, they do.

11 Q    Under those principles, would the fact a project is

12 capitalized tell you anything about a company's management's

13 perception of that project?

14        MR. VOLPE:  Objection, Your Honor.  He can't testify

15 by looking at documents what the company's management thinks.

16        THE COURT:  Well, I suppose that's right.  Sustained.

17 Next question.

18 BY MS. ROSENGARTEN:

19 Q    Your Honor —— I'm sorry, excuse me, Mr. Larkin, under the

20 Generally Accepted Accounting Principles, the principles

21 themselves, would accounting treatment say anything about the

22 way a company's management thinks about a project, not

23 specifically referring to the projects at issue in this case,

24 just the principles themselves?

25        MR. VOLPE:  Same objection.

HUGH LARKIN – DIRECT/ROSENGARTEN      Vol. 4–486

1      THE COURT:  I think he can answer generally.

2  A   When a transaction is reported on the financial

3  statements, it gets there through a certain level of

4  understanding and approvals that the management of the company

5  has made.

6      So when the management of the company approves the

7  project, they are in effect deciding that it is either a

8  capital expenditure project that improves the value of the

9  asset or it's an expense that's chargeable against the current

10  income.

11      When they do that and they report it as a capital

12  improvement project, they are saying to their stockholders, to

13  the regulators --

14      MR. VOLPE:  Objection, Your Honor.  It's the same

15  problem.  Now he's getting into very specific --

16      THE COURT:  I guess I don't think so.  I guess, as a

17  CPA, he can give us what these general rules are.  Go ahead.

18  A   When they're reporting on the financial statements as a

19  capital improvement project, we're in effect saying to them --

20  the public in general, the investors, to the regulator, even

21  to the users of that service of that public utility, that

22  there has been an improvement in the value of that asset that

23  will provide service into the future.

24      That's what capitalizing an expenditure means.  It

25  means you've done something to improve it in some way, and

HUGH LARKIN – DIRECT/ROSENGARTEN        Vol. 4–487

1  that's why you report it that way.

2  Q    Are these Generally Accepted Accounting Principles written

3  down anywhere?

4  A    Well, they're reflected in a number of publications; but

5  one of them is basic accounting textbooks.  Intermediate

6  accounting textbooks would reflect those.

7  Q    Intermediate accounting textbooks?  Can you think of a

8  specific example of a textbook that you would consider

9  reliable and authoritative with regard to these particular

10 principles?

11 A    One that's used throughout the country, in most colleges

12 and universities, is "Intermediate Accounting" by Kieso and

13 Weygandt.

14 Q    Have you reviewed that book?

15 A    Yes.

16 Q    Can you tell us a little bit about it?

17 A    Well, it's how you learn basic accounting.  You go to

18 class and it's a two–volume text.  The instructor, the

19 professor, takes you through each chapter and explains to you

20 what each chapter means and how you apply it in keeping books

21 and making sure accounting is done consistently from company

22 to company.

23        MS. ROSENGARTEN:  Your Honor, the chapter of the book

24 that we will be discussing is located in your exhibit book

25 behind Plaintiffs' Exhibit 1760.

HUGH LARKIN - DIRECT/ROSENGARTEN      Vol. 4-488

1        THE COURT:  Do you want to offer that at this point?

2        MS. ROSENGARTEN:  I will.  Your Honor, we offer

3   Plaintiffs' Exhibit 1760 into evidence.

4        MR. VOLPE:  I have no objection, Your Honor.

5        THE COURT:  The exhibit is admitted.

6   *(Plaintiffs' Exhibit 1760 was received in evidence.)*

7        MS. ROSENGARTEN:  May I have permission to display an

8   image of the relevant portions of the text?

9        THE COURT:  Yes, you may.

10  Q   Mr. Larkin, is this the book we've been talking about?  Do

11  you see that on the screen?

12  A   Yes.

13  Q   Can we advance to the second page of the image, please.

14       Now, Mr. Larkin, first, can you put this page into

15  context for us?  What is this chapter of the book discussing?

16  A   Well, as I explained, the chapters of -- the accounting is

17  broken down into chapters, and there's a specific chapter

18  about the acquisition and deposition of property plant

19  equipment.  This is the chapter where students who were taking

20  accounting courses would be explained -- or would be taught

21  what a proper approach is in keeping books and records related

22  to property plant equipment.

23  Q   Could we call up the highlighted paragraph, please.

24       Mr. Larkin, what does this text say about the

25  difference between a maintenance expense and a capital

HUGH LARKIN – DIRECT/ROSENGARTEN      Vol. 4–489

1  expenditure, if you wouldn't mind just reading the highlighted

2  text?

3  A   It says "In general, costs incurred to achieve greater

4  future benefits should be capitalized, whereas expenditures

5  that simply maintain a given level of services should be

6  expensed."

7  Q   Do you agree with that discussion of the distinction?

8  A   Absolutely.

9  Q   Now, we've talked about the two terms, "capital

10 expenditure" and "maintenance expense" under the principles.

11 Do the principles use the terms "maintenance" and "repair"?

12 A   Yes.

13 Q   Do they mean the same thing?

14 A   Yes.  Basically, they're used interchangeably.

15 Q   Do electric utility companies use the terms that we've

16 been discussing this morning?

17 A   Electric utility --

18 Q   Do electric utility companies use the terms "maintenance"

19 and "capital expenditure"?

20 A   Yes.

21 Q   Now, we've talked about a place that an accountant can

22 look to get a definition of the distinction.  Is there a place

23 electric utility companies could look to find definitions of

24 those terms?

25 A   Yes.  There is a publication by the Edison Electric

HUGH LARKIN - DIRECT/ROSENGARTEN      Vol. 4-490

1  Institute, which is a trade -- a trade group for electric
2  utilities, and they publish a publication that's called the
3  Glossary of Electric Utility Terms.  So it has definitions in
4  it about terms that are used throughout the electric utility
5  industry.
6  Q   Does the glossary only include accounting terms?
7  A   No.  It includes definitions of electric terms.
8  Q   And with regard to the terms "capital improvement project"
9  and "maintenance expense" in that glossary, do the definitions
10 listed in the document comply with the way you've seen those
11 terms used within the industry?
12 A   They comply with the way they're used within the industry.
13 They comply with Generally Accepted Accounting Principles.
14      MS. ROSENGARTEN:  Your Honor, Plaintiffs offer
15 Exhibit 1762 into evidence.
16      MR. VOLPE:  I don't believe they've laid the
17 foundation for it.  It isn't clear he's relied upon it.  He
18 said electric utilities relied upon it.
19      THE COURT:  I think it's admissible with this
20 foundation.  1762 is admitted.
21   *(Plaintiffs' Exhibit 1762 was received in evidence.)*
22      MS. ROSENGARTEN:  Thank you, Your Honor.  May I have
23 permission to publish a portion of the text to the jury?
24      THE COURT:  You may.
25

HUGH LARKIN - DIRECT/ROSENGARTEN      Vol. 4-491

1  BY MS. ROSENGARTEN:

2  Q   Can we have the image, Jeff?

3        Now, Mr. Larkin, I'm going to ask you a few questions

4  about the definitions contained in the glossary.  Can we have

5  image 3, please?

6        For the record, this is page 9 of the glossary, if you

7  wouldn't mind calling out the highlighted text.

8        Mr. Larkin, how does the glossary -- the electric

9  utility industry glossary define the term "capital

10 expenditure"?

11 A   It defines it as "Capital expenditure" in brackets,

12 "Capital outlay, cost of construction of new utility plant

13 (additions, betterments and replacements) and expenditures for

14 the purchase or acquisition of existing utility plant."

15 Q   Now, I think you mentioned this earlier but just to be

16 clear, does this definition comply with the Generally Accepted

17 Accounting Principles we were discussing?

18 A   Yes, it does.

19 Q   Thank you.  Let's contrast that with the way maintenance

20 is defined in the glossary.  If we could have image 4, please,

21 and if you could call out the highlight, please.  For the

22 record, this is page 42 of the glossary.

23       Mr. Larkin, how does the glossary define the term

24 "maintenance expense"?

25 A   "Maintenance expense, a subdivision of operating expenses,

HUGH LARKIN – DIRECT/ROSENGARTEN      Vol. 4–492

1  including labor, material and other direct and indirect

2  expenses incurred for preserving the operating efficiency or

3  physical condition of a utility plant used for power

4  production, transmission, distribution of energy and

5  administrative and general operations."

6  Q   Now, I see that the words that are used there are

7  different than the ones we saw in the textbook; but does this

8  definition comply with the Generally Accepted Accounting

9  Principles?

10  A   It means the same thing.

11  Q   And is this the way you've seen the term used within the

12  utility electric industry?

13  A   Yes.

14  Q   Now that we know how the industry uses the terms we've

15  been discussing, let's talk about the way those terms apply to

16  Cinergy.

17       Mr. Larkin, are there regulations that tell major

18  electric utility companies how to keep their accounting

19  records?

20  A   Yes.

21  Q   What are those called?

22  A   They're called the Uniform System of Accounts.

23  Q   Who publishes those regulations?

24  A   The Federal Energy Regulatory Commission, which is the

25  federal regulator.  Similarly, it would be the regulator for

HUGH LARKIN - DIRECT/ROSENGARTEN        Vol. 4-493

1  the country for wholesale transactions as the Indiana Public

2  Service Commission regulates the rates interstate --

3  intrastate.  They regulate rates interstate or between states.

4  Q   Mr. Larkin, you're familiar with the Uniform System of

5  Accounting?

6  A   I am.

7  Q   Is there an abbreviation accountants typically use when

8  referring when referring to those rules?

9  A   It's commonly referred to by those that use it as the

10  USOA.

11  Q   Now, you said the rules contained in the USOA apply to

12  electric utilities.  How do they impact Cinergy?

13  A   Cinergy is a regulated utility.  It's subject to the rules

14  and regulations of the Indiana Public Service Commission.

15  It's subject to the rules and regulations of the Ohio Public

16  Service Commission.  It's subject to the rules and regulations

17  of the Kentucky Public Service Commission, and it's subject to

18  the rules and regulations of the Federal Energy Regulatory

19  Commission.

20  Q   Are the Uniform System of Accounts rules consistent with

21  Generally Accepted Accounting Principles?

22  A   They are.

23          THE COURT:  Let's take our morning break at this

24  time.

25          COURT CLERK:  All rise.

HUGH LARKIN – DIRECT/ROSENGARTEN     Vol. 4–494

1          This court stands aside in brief recess.

2     *(Jury out.)*

3     (*A recess was taken*.)

4     *(Jury in.)*

5          THE COURT:  I have to tell you, ladies and gentlemen,

6    I've never seen a jury come in quite the way you do, but

7    you're consistent.  You may inquire.

8    BY MS. ROSENGARTEN:

9    Q   Do you have that set, Mr. Larkin?

10   A   I believe I have it on.  Is it working?

11   Q   I'm not sure we can hear you?

12   A   It's on.

13   Q   Okay, great.

14          Just before the break, we had started talking about

15   the Uniform System of Accounts, which were the rules for

16   electric utilities to keep their books by.

17          Mr. Larkin, does the Uniform System of Accounts define

18   the terms "capital improvement project" and "maintenance

19   expense"?

20   A   Yes, it does.

21   Q   Are those definitions the same as the ones we saw in the

22   textbook and in the glossary?

23   A   Yes, they are.

24   Q   Do the Uniform System of Accounts tell electric utilities

25   what types of projects must be capitalized?

HUGH LARKIN – DIRECT/ROSENGARTEN        Vol. 4-495

1  A   Yes.

2  Q   What does it say about that?

3  A   It says that if it's a retirement unit, it must be

4  capitalized; and if it's a minor item of property that results

5  in a betterment, that makes the property more useful, more

6  efficient, of greater durability or greater capacity, it

7  should be capitalized.

8  Q   Can you explain why there are rules for capitalizing

9  certain projects but not other ones?

10 A   Well, because they have different economic effects, that

11 if you started capitalizing things that have no long-term

12 effect on the utility as an asset, then you will be misstating

13 the financial statements, and you will be misleading the

14 investor, the regulator and anybody that's using those

15 financial statements.

16      So the rules are there to get consistency in reporting

17 so that when we look at a similar transaction, regardless of

18 where it's performed, whether it's General Motors that's

19 improving its plant or it's Cinergy or it's Hawaii Electric,

20 we're going to get consistent treatment between those

21 transactions.

22      If it's a capital improvement project, it will be

23 shown as an addition to the plant.  If it's a maintenance

24 expense, it's merely keeping the plant from deteriorating,

25 then it will be shown as an expense.  Pretty simple stuff.

HUGH LARKIN – DIRECT/ROSENGARTEN        Vol. 4-496

1  Q   Under the Uniform System of Accounts, these rules that

2  we're discussing, do electric utility companies get to choose

3  whether a project should be classified as a capital expense or

4  a maintenance expense?

5  A   No.  The rules are there to ensure consistency.

6  Q   With regard to the projects that you reviewed, the

7  projects that are at issue in this case, did Cinergy follow

8  the rules laid out in the Uniform System of Accounts?

9  A   They followed the Uniform System of Accounts.  They

10 followed Generally Accepted Accounting Principles, and they

11 capitalized each of the projects involved that I reviewed.

12 Q   Now that we have a better sense of the rules that teach

13 electric utility companies how to keep their books, let's talk

14 specifically about Cinergy's accounting practices.

15        Did you evaluate how Cinergy accounted for the

16 projects at issue in this case?

17 A   Yes.

18 Q   Can you explain your method for deciding whether Cinergy

19 capitalized those projects?

20 A   Well, Cinergy has, like all corporations, a method of

21 reviewing, approving, completing and accounting for all the

22 dollars they spend.  And I reviewed the documentation that

23 started with their analysis of the need for this project,

24 their inclusion of the project in the construction budget, the

25 approval of the construction budget by the management, the

HUGH LARKIN – DIRECT/ROSENGARTEN      Vol. 4-497

1  authorization of the work orders where the cost was

2  accumulated, the completion of the project and the return of

3  the unit to service; and I traced the dollar amounts into

4  their plant accounting records which is the assets that they

5  report to their stockholders and the regulators which says

6  "Look, we've done something good.  We've improved this asset

7  and it's going to give us more useful life, greater

8  efficiency, greater durability or more capacity into the

9  future."  That's what it means.

10 Q   I'm sorry.  In your answer just now, you said that the

11 accounting treatment tells the regulators we've done something

12 good.  Does the accounting treatment make a value

13 assessment regarding -- I'm sorry.  Does the accounting

14 treatment characterize the project in that way or does it just

15 talk about the value expectation?

16 A   Does it categorize --

17 Q   Do you understand what I'm asking?

18 A   Oh, yes.  If you're completing a project on a boiler, it

19 has to go into a specific account.

20 Q   So it's not actually a value judgment for regulators?

21 It's just talking about fiscal issues?

22 A   No.  This is a analysis of the economic reality of the

23 transaction, and it's recording the economic reality of that

24 transaction in an account that everybody can look at and say

25 that's the value of this asset.

HUGH LARKIN - DIRECT/ROSENGARTEN      Vol. 4-498

1  Q   Mr. Larkin, are you familiar with Cinergy's Power

2  Operations Plant Account manual?

3  A   I am.

4  Q   Have you reviewed that manual?

5  A   Yes, I have.

6        MS. ROSENGARTEN:  Your Honor, Plaintiffs offer

7  Exhibit No. 1750 into evidence.  Cinergy has already

8  stipulated to the authenticity and nonhearsay status of this

9  document, Your Honor.

10        MR. VOLPE:  We have no objection, Judge.

11        THE COURT:  Exhibit is admitted.

12     (Plaintiffs Exhibit 1750 was received in evidence.)

13        MS. ROSENGARTEN:  May I have permission to display

14  the manual to the jury?

15        THE COURT:  You may.

16  BY MS. ROSENGARTEN:

17  Q   Can we have image 5, Jeff?

18        Mr. Larkin, what do you understand the purpose of this

19  document to be?

20  A   This is a internal accounting document that instructs the

21  employees -- the accounting employees and other employees of

22  Cinergy how to treat expenditures of cash for accounting

23  purposes.

24  Q   Does the manual comply with Generally Accepted Accounting

25  Principles?

HUGH LARKIN - DIRECT/ROSENGARTEN        Vol. 4-499

1  A    It complies with Generally Accepted Accounting Principles,

2  it complies with the Uniform System of Accounts and it

3  complies with the Glossary of Electric Utility Terms.

4  Q    Can we have image 6, please?

5        MS. ROSENGARTEN:  Your Honor, this is the page of the

6  manual that ends with Bates No. 320.

7        THE COURT:  Thank you.

8  BY MS. ROSENGARTEN:

9  Q    Mr. Larkin, can you tell us a little bit about the sectio

10  of the manual entitled "Capital Versus Operation and

11  Maintenance"?

12  A    It's similar to the Glossary of Electric Utility Terms.

13  It defines what those terms mean for the accountants that are

14  using this manual or for anybody else within the company that

15  is trying to figure out what capital expenditure and

16  maintenance means.

17  Q    Jeff, would you mind calling out the whole square on both

18  highlights just so we can see Cinergy's definition.

19        Now, mr. Larkin, does Cinergy's definitions of these

20  words comply with the principles and rules that we've been

21  discussing?

22  A    They do.

23  Q    And did Cinergy follow its own accounting rules when

24  deciding whether to capitalize the projects --

25        COURT REPORTER:  Please slow down.

HUGH LARKIN - DIRECT/ROSENGARTEN        Vol. 4-500

1          MS. ROSENGARTEN:  No problem.  Sorry about that.

2    Q    Did Cinergy follow its own accounting rules when deciding

3    whether to capitalize the projects in this case?

4    A    They did.

5    Q    Can we have image 7, please.

6          MS. ROSENGARTEN:  Your Honor, this is the page of

7    Cinergy's accounting manual with the Bates stamp ending in the

8    numbers 322.

9          Jeff, can you actually just call out the top -- yes,

10   the part with the highlighting.

11   BY MS. ROSENGARTEN:

12   Q    Mr. Larkin, can you read Cinergy's words with regard to

13   what this page was about?

14   A    It is to inform its employees that whether you decide

15   whether it's capital or maintenance, it's not just flipping a

16   coin.  It's not a guess or you don't do it one way one time or

17   another way another time.  There are specific rules you have

18   to follow.

19   Q    Jeff, can we have the whole page back again?

20          Now, can you tell us in your own words what the

21   entirety of the page describes?

22   A    It is a decision tree where you can go down it and ask

23   yourself questions about the particular transaction, and it

24   helps you decide whether it's capital or whether it's

25   maintenance.

HUGH LARKIN – DIRECT/ROSENGARTEN      Vol. 4–501

1  Q   Is the methodology outlined here consistent with the way

2  you understand Cinergy to have made these decisions?

3  A   Yes.

4  Q   And under Cinergy's model, what type of project would be

5  charged as a capital expenditure?

6  A   One that is a retirement unit that had the effect of

7  making the unit more useful, more efficient, of greater

8  durability or greater capacity.

9  Q   And under Cinergy's model, what type of project would not

10 be charged as a capital expenditure?

11 A   Any project that had the effect of maintaining the unit in

12 its current operating level or returning it to its current

13 operating level would be considered maintenance.

14 Q   I just have a few more questions, Mr. Larkin.

15      Can you tell us why the decision to capitalize a

16 project is significant for accounting purposes?

17 A   Well, I've touched on this a number of times before, but

18 what it is is we're telling people when we capitalize things

19 that this capitalized cost has a value that we're going to

20 recover in the future by being able to provide additional

21 service, additional efficiency, additional durability or more

22 capacity over a longer period of time.

23      It tells the stockholder that you've got –– that this

24 expenditure improved the value of your investment.  It tells

25 the regulator that the company has made an investment that

HUGH LARKIN - DIRECT/ROSENGARTEN        Vol. 4-502

1  should benefit the customer, that this investment is going to

2  allow the company to generate energy more efficiently, more --

3  more efficiently, the plant would be more durable and that it

4  will be a benefit to the ratepayer into the future.

5  Q   When you analyze the projects at issue in this case,

6  Mr. Larkin, how many of them were recorded in Cinergy's books

7  as maintenance expenses?

8  A   None of them were.

9  Q   And of all of the projects at issue, how much did Cinergy

10 spend on the least expensive one?

11 A   The least expensive project was the replacement of the

12 condenser tubes at Gallagher 2 and the capitalized cost was

13 about $855,000.  The total cost of the project was about

14 925,000.

15 Q   Just to be clear, Mr. Larkin, when you looked at Cinergy's

16 books about the projects at issue in this case, was every

17 single one of them capitalized?

18 A   Yes.  Every single one was capitalized.

19 Q   What do you conclude from that fact?

20       MR. VOLPE:  Objection, Your Honor.  It's not an

21 accounting question.  Again, we're asking to read into the

22 minds --

23       THE COURT:  Why don't you rephrase your question and

24 see.

25       MS. ROSENGARTEN:  Thank you, Your Honor.

HUGH LARKIN – DIRECT/ROSENGARTEN      Vol. 4–503

1   BY MS. ROSENGARTEN:

2   Q   As an accountant, having reviewed these accounting

3   records, are you able to draw a conclusion from the fact that

4   the projects you looked at were capitalized?

5          MR. VOLPE:  Same objection, Judge.

6          MS. ROSENGARTEN:  I'm asking him for his opinion as

7   an accountant as to the treatment of these projects.

8          THE COURT:  I'll let him answer that.

9   A   In my opinion, after reviewing the projects and seeing

10  they were capitalized, and reviewing the underlying documents,

11  I think the company said to its stockholders, to the

12  regulators --

13         MR. VOLPE:  Judge, objection.  Now we're into -- he's

14  reading the documents and he's saying this is what the company

15  said.  That's hearsay.

16         THE COURT:  Well, we've heard what his background is

17  and he's entitled to make this conclusion and give it to the

18  jury.  Go ahead.

19  BY MS. ROSENGARTEN:

20  Q   Mr. Larkin, would you start again?

21  A   When I reviewed these documents and I traced them through

22  to the accounts that they were in, they increased the value of

23  these assets; and when you do that and you report that to your

24  stockholders in the balance sheet, you're saying I've done

25  something to increase the value of this plant.  I've made it

HUGH LARKIN – DIRECT/ROSENGARTEN        Vol. 4–504

1   more useful, more efficient, of greater durability or greater

2   capacity; and you're going to benefit from that sometime in

3   the future.

4           And they're saying the same thing to the regulator.

5   That's the only message that it can give.  It can't give you

6   any other message.

7           MS. ROSENGARTEN:  Your Honor, have the exhibits

8   admitted into evidence been properly recorded?

9           THE COURT:  Recorded?

10          MS. ROSENGARTEN:  Do you have the exhibit numbers of

11  all the documents I've discussed?

12          THE COURT:  I do.

13          MS. ROSENGARTEN:  I have no further questions, Your

14  Honor.

15          THE COURT:  Cross-examine?

16          MR. VOLPE:  Yes, sir.

17                      **CROSS EXAMINATION**

18  BY MR. LARKIN:

19  Q   Good morning, ladies and gentlemen.  Good morning,

20  Mr. Larkin.  Good morning, Judge.  My name is Frank Volpe on

21  behalf of the Defendants.

22          Mr. Larkin, can you confirm for me that none of the

23  opinions you've expressed this morning are based upon a review

24  of the routine maintenance and repair regulations?

25          MS. ROSENGARTEN:  Objection, Your Honor.  This is

1 beyond the scope of Mr. Larkin's direct.

2          THE COURT:  I think he can answer that.  Go ahead.

3 A   My opinions go to the fact that none of these projects

4 were maintenance and repair as those terms are generally used

5 in accounting.

6 Q   What about as they're reused in the routine maintenance,

7 repair and replacement regulations?  Are you expressing an

8 opinion about that?

9 A   No.  I'm saying that to the extent that they are the same

10 thing, then that same conclusion could be reached from that.

11 Q   Well, the fact is, Mr. Larkin, all your opinions are based

12 on review of accounting regulations, correct?

13 A   That's what I reviewed.

14 Q   And accounting manuals.  That's what I have here?

15 A   Yes.

16 Q   And you can confirm for me that none of these manuals or

17 regulations mention New Source Review, can't you?

18 A   Mention what?

19 Q   New Source Review?

20 A   No, they do not.

21 Q   And none of these manuals and these accounting regulations

22 talk about other environmental issues, do they?

23 A   They do not.

24 Q   Just so we're clear, when we're talking about accounting

25 regulations, can I use as a shorthand the FERC regulations?

*LARKIN – CROSS/VOLPE*          Vol. 4-506

1  Do we understand each other when I use --

2  A    They're not just FERC regulations.  They're Generally

3  Accepted Accounting Principles.  They're regulations that

4  everybody would use the same term.  When they use the words

5  "maintenance" and "repair," regardless of where they're used,

6  I think they have the same meaning.

7  Q    I understand what you think.  I was just asking you to

8  help me out here a little bit so that when I refer to the FERC

9  regulations -- I'll just refer to them as FERC and GAAP

10  regulations, and then we'll understand each other.  Okay?

11  A    To the extent I can, I will.

12  Q    And you can confirm for me, can't you, Mr. Larkin, that

13  the FERC regulations and the GAAP regulations do not refer or

14  cross-reference any environmental regulations, can't you?

15  A    To my knowledge, they do not.

16  Q    Likewise, as far as you know, the environmental

17  regulations don't cross-reference the FERC and GAAP accounting

18  rules, do they?

19  A    I've not looked at them, but, you know, terms are used

20  to -- or words are used to mean the same thing in the same

21  place.

22  Q    Mr. Larkin, if you'll just answer my question.  Do they

23  cross-reference each other?

24  A    I haven't reviewed them and I don't know that they do.

25  Q    All right.

*LARKIN — CROSS/VOLPE*                Vol. 4-507

1        Now, you talked about FERC accounting.  I confess I'm

2   not very good at accounting, so you'll have to help me out a

3   little bit here.  I want to understand the accounting rules

4   and why FERC thinks it's important to set up these rules.

5        I think what you said -- and this is a long question

6   apparently.  I think what you said is that they want a uniform

7   system so that everybody knows what they're talking about,

8   correct?

9   A    Yes.

10  Q    So when utilities expense something as a capital

11  expenditure, everybody will know what that means, right?

12  A    That same economic transaction is treated the same way

13  regardless of where you are or what utility you're dealing

14  with.

15  Q    One of the entities that cares about the FERC accounting

16  rules are the public utility --

17  A    The Public Utility Commissions and the Federal Energy

18  Regulatory Commission.

19  Q    And the reason why the public utilities care about the

20  FERC accounting is because what the companies tell them about

21  their expenditures is used to determine rates; isn't that

22  true?

23  A    It's the starting point for the determination of rates.

24  Q    And can you tell the ladies and gentlemen of the jury what

25  rates mean?  What does that mean?

LARKIN – CROSS/VOLPE                Vol. 4–508

1  A   Well, rates are –– you know, you get a utility bill.  We

2  all get those.  But if you look at your utility bills, your

3  electric bill will be divided into two parts.  You will have

4  kilowatt hours and then it'll have a fuel rate.

5       The fuel rate is multiplied by the kilowatt hours to

6  get the component of your bill that results in fuel costs.

7  Then there is another component below that that's called "base

8  rates," and that's all the other costs other than fuel.  They

9  take a rate, a cents per kilowatt hour and multiply that times

10 said kilowatt hour to get the other portion of the bill.

11      They add the two together and add sales tax on that if

12 there's sales tax in Indiana and that's the rate you pay.  So

13 that in that bill, you're paying the cost of the plant –– in

14 the second part of the bill called the base rates.

15 Q   I'm sorry.  You're saying the consumers pay for the cost

16 of the plant?

17      MS. ROSENGARTEN:  Your Honor, I have an objection ––

18 A   They pay for the return on the plant and of the plant.

19 They pay a return for the use of the plant and they pay the

20 depreciation on the plant.

21 Q   And the cost of constructing plants, too, correct?

22      MS. ROSENGARTEN:  Your Honor, may we approach the

23 bench, please?

24      THE COURT:  Sure.

25    (Beginning of bench conference.)

1          THE COURT:  Where are you going to go with this?

2          MR. VOLPE:  Just a little more and I'm done.  Am I

3  done now?

4          THE COURT:  Yeah, you are.  You've got enough.

5          MS. ROSENGARTEN:  Thank you, Your Honor.

6      *(End of bench conference.)*

7                          *(In open court)*

8  BY MR. VOLPE:

9  Q   All right, Mr. Larkin.  Thanks for that lesson on the

10 rates.

11         Now, when I look through the FERC regulations -- and I

12 confess they're dense -- I didn't see any dollar thresholds

13 for when you capitalize a project and when you don't.  Did I

14 miss something?

15 A   There isn't, but usually the dollar threshold is set by

16 the company itself.

17 Q   The reason why it's not in the regulations is because you

18 can capitalize a hundred dollar project, correct?

19 A   You could.

20 Q   Or a million dollar project, correct?

21 A   You would have to probably capitalize a million.

22 Q   You have to capitalize a million dollar project?

23 A   Well, I think you'd be misstating the financial statements

24 if you got into substantial dollar amounts that were capital

25 and you expensed them.

*LARKIN – CROSS/VOLPE*                    Vol. 4-510

1  Q   What about the size of the project?  I looked through

2  these regulations and I didn't see anything about the size of

3  the project that was relevant to determining whether I

4  capitalize or whether I don't capitalize.  Did I miss

5  something?

6  A   No, you didn't miss anything.  There's nothing in there

7  about the size of the project because the regulations are

8  written for all different size utilities.

9  Q   And if I ask you the same question about the duration of

10 the project, is that the same answer?

11 A   Duration has nothing to do with capitalization.

12 Q   What about how frequently the project is done at the unit?

13 A   If it's done yearly, then it's obviously maintenance.  If

14 it's done every five or ten years and it has the effect on the

15 plant of making it more useful, more efficient, more durable,

16 of greater capacity, then it should be capitalized.

17 Q   All right, I understand.  Again, so I understand this

18 clearly, the FERC rules control this, not the company,

19 correct?

20 A   The FERC what?

21 Q   The FERC rules control this, not the company?

22 A   Well, it's Generally Accepted Accounting Principles that

23 control, and the company is required to file -- to follow and

24 record economic transactions the way they should be recorded.

25 Q   Mr. Larkin, you're not testifying that capital projects

1  are unusual, are you?

2  A    No, they're not unusual.

3  Q    In fact, through all the documents you looked at, all the

4  Cinergy documents you looked at, you probably saw that Cinergy

5  does capital projects all the time, correct?

6  A    They do a number of capital projects every year.

7  Q    And companies like Cinergy do capital projects all the

8  time, correct?

9  A    That's correct.

10  Q    I wanted to ask you -- you mentioned the dishwasher

11  analogy.  Let me see if I can understand that a little better.

12         You said that if I replaced a handle, then I bring the

13  performance to the same level that it was at before, correct?

14  A    Correct.

15  Q    Was that the point of the analogy?

16  A    Yes.

17  Q    Now, you've been working in this industry a long time --

18  the energy industry for a long time, correct?

19  A    That's correct.

20  Q    And you understand that boilers are much more complicated

21  than dishwashers, don't you?

22  A    They are, but they have the same kinds of problems

23  dishwashers have.  They have breakdowns.

24  Q    They probably have a lot more of them because they're more

25  complex, correct?

LARKIN – CROSS/VOLPE                 Vol. 4-512

1  A    Little parts that have to be replaced.  Well, they have to

2  have continuous maintenance.

3  Q    What about continuous replacements?

4  A    There are continuous replacements of small parts.

5  Q    All right.  So if I repair a component at a boiler, say,

6  it's equivalent to a handle -- I'm not sure, say a tube.

7  That's a fairly common part of the boiler, right?

8  A    Yes.

9  Q    I might get equivalent performance, correct?

10 A    I didn't follow that part.

11 Q    Once I put that tube in, I might get equivalent

12 performance, correct?

13        MS. ROSENGARTEN:  Objection, Your Honor, I think this

14 is beyond the scope of direct...

15        COURT REPORTER:  I'm sorry, I can't hear you.

16        MS. ROSENGARTEN:  My objection was that this question

17 is beyond the scope of the direct.

18        MR. VOLPE:  It's his analogy, Judge.

19        THE COURT:  It is his analogy and we'll let this

20 proceed.

21 BY MR. VOLPE:

22 Q    Let me state that question again.  If you replace the

23 equivalent to a handle on a dishwasher -- so I'm just going to

24 call it a tube right now.  If you replace a tube, you might

25 get equivalent performance, correct?

LARKIN – CROSS/VOLPE                Vol. 4–513

1  A    Yes.

2  Q    You might get improved performance, correct?

3  A    Highly unlikely from the replacement of one tube that you

4  can improve performance.

5  Q    What if I replace 20 tubes?

6  A    What?

7  Q    What if I replace 20 tubes?

8  A    It depends.  There's a level of tube replacement that you

9  would have to capitalize.  That's in your power operations

10 manual.

11         So at the point where the company has decided that the

12 replacement of a substantial number of tubes improves the

13 performance, they've decided that that's a capital

14 expenditure.

15 Q    When you gave me the dishwasher analogy, were you giving

16 me that -- giving us that analogy as an accountant or as a

17 person that uses dishwashers?

18 A    Well, as an accountant to give an example of what would be

19 maintenance.

20 Q    When you replace the tube, you might get improved

21 performance.  I already said that.  I said that.  But you

22 might not get improved performance as well, correct?  I mean,

23 you don't know.  These units are complex, correct?

24 A    They're complex.

25 Q    It's not the same as replacing a handle, is it,

LARKIN – CROSS/VOLPE                    Vol. 4–514

1  Mr. Larkin?

2  A    Replacing one tube is -- or patching a tube or when a tube

3  leaks, they generally cut out a section of it and put in

4  what's called a Dutchman.

5  Q    We've heard that phrase.

6  A    You don't get improved performance.  What you get is the

7  unit returning to the prior level of service.

8  Q    From an accounting perspective or an engineering

9  perspective?

10  A    That's from an accountant's perspective, and what I've

11  read and understood from the documents I've looked at for

12  years and years.

13  Q    Can you confirm for me that the FERC regulations are

14  accounting principles and not engineering principles?

15  A    I guess I couldn't agree with you because there are

16  engineering underlying decisions in the FERC manual.  For

17  instance, when they define "account 312 boiler plant," they

18  say it starts with a description of a piece of equipment and

19  it ends with the description of a piece of equipment.

20         Well, an accountant didn't do that.  That was an

21  engineer that said this is how we're going to define the

22  boiler.  And the same thing with the turbo generator.  It says

23  it starts with this flange and it ends with this condenser.

24  So that wasn't an accountant that did that --

25  Q    All right --

LARKIN – CROSS/VOLPE          Vol. 4-515

1  A   -- that was an engineer that did that.

2  Q   Excuse me.  I'm sorry.  Are you finished with your answer?

3  A   Yes.

4  Q   You're describing a description in the regulations of what

5  a boiler looks like, correct?

6  A   What a boiler is.

7  Q   But these FERC regulations say nothing about how to run a

8  power plant, do they?

9  A   No, they do not.

10  Q   And these FERC regulations and the GAAP regulations and

11  these accounting manuals, they say nothing about when repair

12  projects should be undertaken at power plants, do they?

13  A   They do not.

14  Q   And they say nothing about whether a replacement project

15  should be undertaken at a power plant, do they?

16  A   No.  That's left up to management.

17  Q   And they say nothing about how much money a utility should

18  spend on a project, do they?

19  A   They do not.  That's left up to the management.

20  Q   And they say nothing about the availability of the units

21  that are part of a power company's portfolio, do they?

22  A   They do not say anything about availability.

23  Q   And do they -- they don't say anything about the rate of

24  occurrence of forced outages; is that correct?

25  A   They say nothing about forced outages.

LARKIN - CROSS/VOLPE                    Vol. 4-516

1  Q   They say nothing about how to calculate emissions

2  increases, do they?

3  A   They say nothing about calculating emissions increases.

4  Q   So as I understand your purpose here today after looking

5  at all the manuals and the accounting regulations, it's your

6  conclusion that the projects are not repair and maintenance

7  for purposes of accounting.  Am I right?

8  A   Yes.  For purposes of accounting and to the extent that

9  those words mean the same thing in the emissions regulations,

10 that they should be interpreted the same way.

11 Q   You're not expressing any opinion about whether any of

12 these projects are routine, are you?

13 A   I am not.

14 Q   And you're not -- that's a yes or no question, Mr. Larkin.

15 Yes, you are or yes -- or no, you're not?

16 A   I'm not expressing an opinion about whether the projects

17 are routine, but I am expressing an opinion that I could not

18 find that they were done more than this once in their

19 company's accounting records.

20 Q   Did they look how often they were done throughout the

21 utility industry?

22 A   No, I did not.

23 Q   As I understand it, you're not expressing any opinion on

24 whether these projects are replacement projects, are you?

25 A   Well, replacement can be maintenance and it can be

LARKIN − CROSS/VOLPE          Vol. 4−517

1  capital, but to me it modifies the words "repair" --

2  "maintenance and repair."

3  Q    Well, those are three different words, correct?

4  A    They're three different words.

5  Q    Are you expressing an opinion on whether the 14 projects

6  at issue in this case are replacement projects or not

7  replacement projects?

8        MS. ROSENGARTEN:  Your Honor, I object.  I think this

9  question calls for a legal conclusion.

10        THE COURT:  I think this witness can handle the

11  question.  He can answer the question.

12  Q    Thanks, Judge.

13  A    They did replace all the pieces of equipment but by

14  definition, they're replacements.

15  Q    All right.  So your ultimate opinion, I believe, is that

16  Cinergy did the right thing, accounted for these projects

17  correctly.  Am I right?

18  A    They did the right thing in that these projects are not

19  maintenance and repair.

20  Q    And they did the right thing because the FERC regulations

21  told them what they had to do; isn't that correct?

22  A    The FERC regulations and the economic reality of the

23  transaction.

24  Q    Okay.  I think you agree with me that the FERC regulations

25  and the Clean Air Act regulations are different regulations

*LARKIN — CROSS/VOLPE*                Vol. 4-518

1  used in different contexts.  Do you agree with me?

2  A   They're different regulations, but I don't know whether

3  they're used in different contexts.

4  Q   Well, the FERC regulations are accounting regulations,

5  correct?

6  A   Right.

7  Q   And the Clean Air Act regulations are environmental

8  regulations, correct?

9  A   That's correct.

10 Q   So here we have accounting principles over here and we

11 have environmental principles over here, correct?

12 A   Yes, but we all speak the same language.  When you use the

13 same term in the environmental regulation that's defined in

14 the accounting regulation, how could you reach a different

15 conclusion?

16 Q   I don't know, Mr. Larkin, but are you familiar with the

17 phrase "trying to pound a round peg into a square hole"?

18 A   Yes.

19 Q   What does that phrase mean?

20 A   It means it doesn't fit.

21        MR. VOLPE:  Thank you.  I have no further questions,

22 Judge.

23        THE COURT:  Redirect?

24

25

*LARKIN − REDIRECT / ROSENGARTEN*    Vol. 4−519

1            **REDIRECT EXAMINATION**

2  BY MS. ROSENGARTEN:

3  Q   Mr. Larkin, when you analyzed the projects at issue in

4  this case, did you make the decision as to whether or not

5  those projects were capitalized?

6  A   No.

7  Q   Who did?

8  A   Cinergy did.

9          MS. ROSENGARTEN:  Thank you.  No further questions,

10 Your Honor.

11         THE COURT:  Thank you.

12         Do you have anything else, Mr. Volpe?

13         MR. VOLPE:  I do not, Judge.

14         THE COURT:  You may step down, sir.

15         Your next witness.

16         MS. HIMMELHOCH:  Our next witness comes by a

17 deposition designation, Your Honor.

18         THE COURT:  Are we going to have a series of

19 depositions at this time?

20         MS. HIMMELHOCH:  Yes, approximately an hour.

21         MR. GREEN:  Your Honor, may I ask Government counsel

22 a question?

23         THE COURT:  You may, sir.

24    *(A discussion was held off the record.)*

25         THE COURT:  Ladies and gentlemen, before we hear

Vol. 4-520

1  depositions, I don't think I mentioned to you on the record

2  what depositions are, although I expect by now you do know

3  what they are.  In this case, the sworn testimony of several

4  witnesses was taken by deposition prior to the trial.  The

5  testimony of a witness who for some proper reason can't be

6  present to testify in person may be presented in this form.

7  Such testimony is given under oath and in the presence of the

8  attorneys for the parties who question the witness.  A

9  stenographer records the testimony and a transcript so that

10 you may later hear the questions asked and the answers given.

11        Some of this sworn testimony will be presented to you

12 by reading the transcript to you; and of course, you know,

13 some testimony is presented to you in live witnesses, and some

14 we'll hear, I suspect before we're all over, in a videotape.

15        But you must consider this evidence in the same light

16 and subject to the same test that applied to the testimony of

17 any other witness.  Everybody understands?  Yes?

18        You may proceed, sir.

19        MR. BENSON:  Thank you, Your Honor.

20        Good morning, ladies and gentlemen.  My name is Tom

21 Benson.  I'm an attorney with the United States Department of

22 Justice representing Plaintiffs.  And I'll be reading, along

23 with my colleague, Ignacio Arrazola, from the U.S. EPA, we'll

24 take turns reading a few of the deposition designations today.

25        We've split them up so we're not going to do too many

Vol. 4-521

1  at any one time.  I hope nobody objects, we've cut them down

2  substantially so they shouldn't run on too long.

3         It does mean there will be some gaps and there will

4  be some documents referred to that you won't have in front of

5  you so I'll just ask you to bear with us.  I think you'll be

6  able to put all the pieces together but we've tried to curtail

7  this as much as possible so we can move through this quickly.

8         One final thing, we will also be adding portions of

9  the deposition that Cinergy has asked us to read to make the

10 record complete.  So this reading is both from the United

11 States, from all Plaintiffs and from Defendants.

12        The first deposition that we'll be reading today is

13 the deposition of Bernard Orender and he's a Cinergy employee.

14 This deposition was taken October 26th, 2004.

15    (*At this time, the deposition of Bernard Orender was read*

16 *into the record.*)

17        MR. BENSON:  At this point, we had a question from

18 Cinergy counsel and saying we are referring to coal-fired

19 units unless I say otherwise and then back to the question.

20        (*The reading of the deposition continued and was*

21 *concluded.*)

22        MR. BENSON:  We'll read a different deposition with a

23 different reader.

24        MR. ARRAZOLA:  Good morning, ladies and gentlemen of

25 the jury.  Good morning, Your Honor.  My name is Ignacio

Vol. 4-522

1 Arrazola.  I'm an attorney with the Environmental Protection

2 Agency.  I'm going to first read to you a very brief summary

3 of the deposition of James R. Messmer taken on December 7th,

4 2004.

5        This is the deposition testimony of James R. Messmer.

6 He served as a co-op engineer while getting his bachelor's

7 degree in mechanical engineering technology.

8        After he graduated in May 1982, he began working for

9 PSI as an engineer.  He was manager of Plant Improvements

10 between 1990 and 1994 for PSI.  He has also served as station

11 manager at Edwardsport, Gallagher, Beckjord and Miami Fort

12 stations.

13        Between September 15th, 2004, and the time of his

14 deposition, he was general manager in the commercial business

15 unit, strategic sourcing and supply management for Cinergy.

16 I'm just going to go ahead and read a few excerpts from his

17 deposition.

18        (*Excerpts of the deposition of James R. Messmer were*

19 *read into the record.*)

20        MR. ARRAZOLA:  Onto the next one.

21        MR. BENSON:  Okay, ladies and gentlemen.  Our next

22 deposition designation -- and I'll tell you there are only

23 five of these, so we're getting to the halfway point is from

24 John Bott, another Cinergy employee at the time.

25        He was deposed on November 19th, 2004; and I'll begin

Vol. 4-523

1  by reading just a summary of his experience, and then go into

2  the questions and answers which allows us to move through the

3  questions a little faster.

4          This is the deposition testimony of Mr. John Irvin

5  Bott, Jr. who resides in Avon, Indiana.  At the time of his

6  deposition, he was employed by Hendricks Regional Health as a

7  construction manager and owner's representative.

8          Mr. Bott received a Bachelor of Science in Mechanical

9  Engineering from Rose Polytechnic Institute in 1961, and a

10  master's degree in nuclear engineering from Purdue University

11  in 1978.

12          He also received additional training from Babcock &

13  Wilcox relating to nuclear power plants and took a three-month

14  course at the University of Michigan Business School.

15          At the time of his deposition, Mr. Bott was licensed

16  as a professional engineer in Indiana, Ohio and Illinois.

17  During his employment with PSI, Mr. Bott served on an electric

18  power research institute tasks force on fluidized bed

19  combustion.

20          When Mr. Bott graduated from college, he went know to

21  work for Detroit Edison Company as an engineer in their

22  generating stations.  In 1966, Mr. Bott resigned from Detroit

23  Edison Company and went to work for PSI until he retired on

24  January 1, 1995.

25          When he began with PSI, he worked on the development

Vol. 4-524

1  of the nuclear plant at Marble Hill.  When the Marble Hill

2  project was terminated by the governor, Mr. Bott became the

3  temporary executive directer of quality assurance and tried to

4  recover or save what assets could be recovered from the Marble

5  Hill plant.

6        Mr. Bott later became manager of betterment programs

7  managing the group of engineers providing support engineering

8  service for the generating stations.  In 1992, he became

9  executive directer of power plant engineering, a position he

10 held until January 1, 1995, when he retired.

11       And I apologize.  I misspoke a moment ago when I said

12 he was an employee at the time of the deposition.  As you just

13 heard, he was retired at the time of the deposition.

14       Now I'm going to go into the questions and answers.

15       (Excerpts of the deposition of John Bott were read

16 into the record.)

17       MR. ARRAZOLA:  First I'm going to read to you a

18 summary of the deposition of Mr. Leonard Baughman, a former

19 Cinergy employee.  That was taken on January 11, 2005.  Then

20 I'll read a few excerpts from his deposition.

21       This is the deposition testimony of Mr. Leonard

22 Baughman who resides in Greenwood, Indiana.  Mr. Baughman --

23       MR. GREEN:  Your Honor, could we ask counsel to just

24 raise his voice a little bit?

25

Vol. 4-525

1          MR. ARRAZOLA:  Absolutely.  I'll start all over

2   again.

3          This is the deposition testimony of Mr. Leonard

4   Baughman who resides in Greenwood, Indiana.  Mr. Baughman

5   received a Bachelor of Sciences in mechanical engineering from

6   Rose Hulman Institute of Technology in Terre Haute, Indiana,

7   1977.

8          He became a licensed professional engineer in the

9   State of Indiana in 1981.  At that time of his -- at the time

10  of his deposition was still licensed.  Mr. Baughman began

11  working with PSI upon graduating from college working in PSI's

12  corporate headquarters as an engineer between 1977 to 1983.

13         During that time, he worked in project engineering

14  preparing work orders, soliciting bids, writing purchase

15  requisitions and following through with capital projects,

16  including their design and installation.

17         He was laid off from the company in 1983; and between

18  1983 and 1985, he worked for Chieftan Coal.  In 1985,

19  Mr. Baughman was rehired by PSI to work at the Wabash River

20  generating station.  He worked at Wabash River as a production

21  engineer who assisted maintenance with planning of activities,

22  outage coordination and collection of data for determining

23  conditions of equipment.

24         In approximately 1987, Mr. Baughman was promoted to

25  senior and production engineer who was responsible for

Vol. 4-526

1  coordinating the activities of all the capital projects.

2         As part of his work duties, Mr. Baughman prepared the

3  budget scope description for the Gallagher Unit 3 pulverizer

4  replacement.  He was the project engineer for the project at

5  Wabash River Unit 5 and did the estimates and the

6  justifications that were submitted with the work order.

7         Similarly, he was responsible for reviewing the work

8  orders for the 1989 Wabash River Unit 2 replacement of the

9  reheater and superheater tubes' capital project and had

10 responsibility for making sure the project fit into the

11 budget.

12        In addition, he collected data and reviewed -- excuse

13 me, reviewed some of the test results during the plant life

14 extension assessment and evaluation study on Wabash River

15 Unit 2.

16        Mr. Baughman left PSI in 1993 to work for Enviroplan,

17 but was represented at deposition by Cinergy's counsel.  Now

18 I'll read a few excerpts from Mr. Baughman's deposition.

19        (*Excerpts of the deposition of Mr. Baughman were read

20 into the record.*)

21        MR. BENSON:  Good morning again, ladies and

22 gentlemen.  This is the last deposition excerpt we're going to

23 present today from a Cinergy engineer.  This is the

24 deposition -- from the deposition of Gerald Merk.  It was

25 taken on September 17th, 2004.  As we've done a couple times

Vol. 4-527

1  before, I'll begin by reading a brief synopsis of who Mr. Merk

2  was and then go into the testimony.  Here's the synopsis.

3          This is the deposition testimony of Gerald Merk who

4  received a Bachelor's degree in mechanical engineering from

5  Rose Hulman Institute of Technology in May 1979.  After

6  graduating from college, Mr. Merk began working for the

7  Cincinnati Gas & Electric Company as a junior engineer at the

8  Beckjord plant.

9          He was promoted through the engineering ranks until

10 1987 when he became maintenance superintendent for the

11 Beckjord plant.  Mr. Merk held that position until 1994 when

12 he was promoted to station manager at the Edwards station.  He

13 then became manager of Measures and eventually manager of

14 Equipment Services.

15         And now, on to Mr. Merk's testimony.

16         (*Excerpts from the deposition of Mr. Gerald Merk were*

17 *read into the record.*)

18         MR. BENSON:  We have no further depositions.

19         THE COURT:  Thank you.

20         MS. HIMMELHOCH:  Plaintiffs call Mr. Bob Koppe.

21         May I approach, Your Honor?

22         THE COURT:  Yes.  Thank you.

23         This is the witness chair up here, sir.  If you will

24 come up here, I'll swear you in.

25         MS. HIMMELHOCH:  We're making him do his own manual

Vol. 4-528

1  labor, Your Honor (indicating).

2           THE COURT:  Would you raise your right hand, please.

3           You may be seated.  There's a microphone there on the

4  right.  If you will attach the smaller part to your tie

5  someplace, please.

6           You may inquire.

7           **ROBERT KOPPE, PLAINTIFF'S WITNESS, SWORN**

8                  **DIRECT EXAMINATION**

9  BY MS. HIMMELHOCH:

10 Q   Please state your name for the jury, please.

11 A   My name is Robert H. Koppe.

12 Q   Where do you reside?

13 A   I live in Boulder, Colorado.

14 Q   You're here to testify as an expert, are you not?

15 A   Yes, I am.

16 Q   What will you testify about?

17 A   I will testify about 14 major construction projects, major

18 equipment replacements that the company did at various of its

19 generating units; and specifically, I'll talk about the

20 effects that the company should have expected those projects

21 to have on the ability of the units to generate electricity.

22 Q   And how will that information be used?

23 A   Dr. Rosen then took the information that I developed and

24 used it to calculate the increases in emissions of pollutants

25 that would result from these projects.

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–529

1  Q   Before we get into your opinions, why don't we go ahead

2  and introduce you to the jury.  Can you begin with your

3  educational background and describe that for the jury?

4  A   Yes.  I received a Bachelor of Science degree in wood

5  products engineering from the New York State College of

6  Forestry in 1965.

7        I received a Master of Science degree in nuclear power

8  plant engineering from Ohio State in 1966.  And then I spent

9  two years completing the course work towards a Ph.D. in

10  nuclear power plant engineering at MIT.

11  Q   When did you study at MIT?

12  A   I was at MIT from 1966 to 1968.

13  Q   Why did you leave in 1968?

14  A   There were a number of things going on at that time, but

15  the main thing was that I discovered that I wasn't really

16  suited for laboratory-type research, and I wanted to do

17  something more practical.

18  Q   Where did you go after you left MIT?

19  A   I went to work for the utility that provides electricity

20  in New York City.  Its official name is the Consolidated

21  Edison Company of New York but most people refer to it as

22  ConEd.

23  Q   How long did you work for ConEd?

24  A   I worked for ConEd for six years, from 1968 to 1974.

25  Q   What were your work duties while you were at Consolidated

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–530

1  Edison?

2  A    When I first started, I was an engineer in what was called

3  the Nuclear Engineering Division, which is a group of 10 to 15

4  engineers working on the nuclear power plants.  After two

5  years, they put me in charge of that division.  So I was the

6  manager of that division for the last four years I was there.

7  Q    And what kind of engineering did you do while at

8  Consolidated Edison?

9  A    It was all work having to do -- at that point, ConEd had

10 five different nuclear power plants in various stages.  There

11 was one that was operating and two that were being constructed

12 and two more that were being designed.

13        We did -- we managed the interface between the company

14 and what was then the Atomic Energy Commission, which is the

15 federal agency that regulates nuclear power plants.

16        We did various safety analyses, and we did actual

17 engineering on some of the safety-related systems for these

18 units.

19 Q    During the time period that you worked for ConEd, did you

20 have occasion to visit power generating plants?

21 A    Yes.  I was at the various nuclear plants at least a

22 couple times a month during that six years.

23 Q    You left ConEd in 1974; is that correct?

24 A    That's correct.

25 Q    Where did you go next?

1  A   I went to work for a consulting company in Boulder,

2  Colorado, called the S.M. Stoller Corporation.

3  Q   How long did you work for S.M. Stoller?

4  A   15 years, until 1989.

5  Q   What happened in 1989?

6  A   In 1989, Stoller was bought by another consulting company

7  called RCG Hagler Bailly.

8  Q   Did you continue on with that company?

9  A   Yes, for another five years I continued -- I was now

10  working for Hagler Bailly, but I was doing -- working with the

11  same people and doing the same work I had done before.

12  Q   After those five years, what did you do?

13  A   In 1994, I left Hagler Bailly and I formed my own

14  consulting company.

15  Q   What is the name of that consulting company?

16  A   Koppe Consultants, Inc.

17  Q   Are you still working there today?

18  A   Yes.

19  Q   Please describe the work that you did while you were

20  employed by S.M. Stoller, and its successor, between 1974 and

21  1994 -- well, why don't you start in 1974 and we'll go from

22  there?  How about that?

23  A   I'm sorry.  I was confused about the dates.

24       When I first started, I was just consulting for

25  utilities on the safety and design of nuclear generating

1  units; but within a couple of years, I became involved in

2  studying the availability of generating units, and that's

3  basically what I've done ever since.

4  Q   What do you mean by "generating unit availability"?

5  A   Well, a generating unit is an assembly of equipment, but

6  it's basically a boiler that makes steam and then the steam

7  turns the turbine to turn the generator to make electricity.

8  And many power stations have more than one unit.  The

9  fundamental thing is a single generating unit, which is one

10  boiler and one turbine generator.

11        And as far as availability, it's simply that -- there

12  are times when a unit is not able to run.  It has to be shut

13  down for maintenance work or to repair some equipment that's

14  failed.  And when a unit is shut down because it can't run, we

15  say it's unavailable.  And the rest of the time when it can

16  run, it's available.  Even if it doesn't run, it's still, in

17  theory at least, available to run.

18  Q   What did your work on availability involve?

19  A   There are a number of different things that I did.  I

20  operated some databases where we collected information about

21  the availability of the generating units in the United States.

22  I helped develop other databases of information about

23  generating units.

24        I did a variety of studies where we looked at what was

25  happening throughout the industry, all the many hundred of

1  generating units in the United States and how they were doing

2  and what problems they were experiencing.

3       I helped utilities to set performance goals for their

4  generating units, you know, what should they strive for for

5  their availabilities to be in the future.  I projected the

6  future availabilities of many generating units; and I did

7  audits, management reviews, of various utilities looking at

8  what they were doing to maintain and improve the

9  availabilities of their units.

10  Q   Since we're going to be talking a lot about availability

11  during the course of your testimony, I'd like to call up an

12  illustration that will help you emphasize what "availability"

13  means.

14       I believe there's been no objection to the

15  demonstrative.  We did not receive any objections to

16  demonstratives?

17       MR. BOXERMAN:  We did send a list with objections.

18       MS. HIMMELHOCH:  Can you see the first image in your

19  book?  We did not receive it, so we're going to be a little

20  bit awkward.  Was it this one that you objected to?

21

22       MR. BOXERMAN:  No.

23       MS. HIMMELHOCH:  Could we call up image No. 1,

24  please.  We'll straighten this out on the break, Your Honor.

25

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-534

1  BY MS. HIMMELHOCH:

2  Q   Mr. Koppe, using this image, can you just explain for us

3  what you mean by "availability"?

4  A   This is a very idealized picture of a leak in the history

5  of a generating unit.  What I've shown here is that the unit

6  was available; that is to say, it was able to operate on six

7  of the days of the week, but on Wednesday, some kind of a

8  problem came up and prevented the unit from operating.  So it

9  was unavailable on Wednesday.

10 Q   And the jury's heard about the different kinds of outages

11 there can be.  Can you describe what the white area in that

12 graph means between the days?  Each day has some yellow and

13 some white.  Can you explain what that represents?

14 A   Yes.  I haven't tried doing the pointing here yet, but

15 many coal units will operate at full power during the

16 daytime -- during the daytime, and when customers are using

17 the most electricity, and then at nighttime -- all right -- at

18 nighttime, the units will operate at reduced load.

19      It gets to be ten o'clock in the evening, people turn

20 off the lights, turn off the computers, turn off the

21 television.  Businesses close down.  And the amount of

22 electricity that's being used decreases.  So most of the coal

23 units in the United States will operate at reduced load during

24 the nighttime.

25      MS. HIMMELHOCH:  Your Honor, we're approaching the

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–535

1  next hour mark, and because we've had this mixup about

2  demonstratives, this would be a good time to take a break?

3           THE COURT:  We'll take our morning break at this

4  time, ladies and gentlemen.

5           COURT CLERK:  All rise.

6           This court stands aside in brief recess.

7      (*A recess was taken.*)

8           THE COURT:  Are we ready?

9           MS. HIMMELHOCH:  There are some objections to some of

10  our demonstratives.

11          THE COURT:  I need your book.

12          MS. HIMMELHOCH:  The objections are to, first, this

13  exhibit -- I mean this demonstrative.  There is a graph out of

14  the document that is considered by papers.  It is used simply

15  to demonstrate the point of what was happening to availability

16  during the time period covered by the graph.

17          THE COURT:  And this graph includes the availability

18  where?

19          MS. HIMMELHOCH:  It is all coal units of a certain

20  size.

21          THE COURT:  In the world?

22          MS. HIMMELHOCH:  In the United States.

23          THE COURT:  And the objection is?

24          MR. GREEN:  Well, my objection is that this is not

25  really dealing with the units in the case, and the factors

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-536

1  that impact the availability of coal-fired units generally

2  over decades because of programmatic or other types of

3  improvements really aren't germane to what's happening at

4  these units; and I think for that reason it's misleading.  I

5  don't even think it's very relevant.

6          MS. HIMMELHOCH:  It simply lays the foundation --

7          THE COURT:  Excuse me just a second.

8          MS. HIMMELHOCH:  I'm sorry.

9          THE COURT:  We need to have a background on all this.

10  We've heard from day one how the older these things get, the

11  worse off they are.  The more deratings we get, the more

12  outages we get.  So I don't have any problem with this.

13          What's the next one?

14          MS. HIMMELHOCH:  The next one is a graph that covers

15  a later time period, same point.

16          THE COURT:  Which --

17          MS. HIMMELHOCH:  Tab 3.

18          THE COURT:  Three?  Do you have the same objection?

19          MS. HIMMELHOCH:  You were looking at Tab 3 when you

20  were making your objection.

21          MR. BOXERMAN:  Your Honor, we don't have a copy of

22  Tab 3.

23          MR. GREEN:  I may not have been looking at the same

24  thing the Court and the Government were looking at.

25          THE COURT:  It was the right objection.

KOPPE - DIRECT/HIMMELHOCH        Vol. 4-537

1        MR. GREEN:  It was the right objection anyway?

2        THE COURT:  Yes.

3        MS. HIMMELHOCH:  Mr. Green, you may have mine.

4        MR. GREEN:  Just call me the generic objector.

5        THE COURT:  What am I --

6        MS. HIMMELHOCH:  This is the same point for the later

7   period of time.  Also, the origin is from -- is considered by

8   papers.

9        MR. GREEN:  May I see what I should have been

10  objecting to before?  That's what I want to know.

11       MS. HIMMELHOCH:  Tab 2.

12       MR. GREEN:  I don't even understand what Tab 2 is, so

13  I don't care.

14       THE COURT:  Tab 3?

15       MS. HIMMELHOCH:  Tab 3 is the same point but for a

16  later time period.

17       MR. GREEN:  All right.  Now, 3 is -- I'll -- what I

18  stated before pertains to this.  I don't think that the

19  discussion of decades of availability due to factors that are

20  essentially not germane to the units in this case are helpful

21  to the jury.  I think it's irrelevant, and I think it's

22  potentially confusing.

23       MS. HIMMELHOCH:  Your Honor --

24       THE COURT:  Excuse me.  This is all coal units 400 to

25  599 megawatts.  We've only got one of those in this case,

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-538

1    don't we?

2            MS. HIMMELHOCH:  That's correct, Your Honor; but

3    Mr. Green made a statement in his opening statement that

4    availability has remained constant over this time period.

5            MR. GREEN:  I didn't say that.  I said the

6    availability --

7            THE COURT:  Excuse me a second.  This one's out.

8    What's the next one?

9            MS. HIMMELHOCH:  Okay.

10           I apologize, Your Honor.  I'm getting there.

11           THE COURT:  That's all right.  We don't want to give

12   the jury the misimpression that we're down here settling this

13   case.

14           MS. HIMMELHOCH:  Tabs 35, 41 --

15           THE COURT:  35, 41.

16           MS. HIMMELHOCH:  And 48.  These are simply lists of

17   the projects that were undertaken as part of the life

18   extension program -- projects at Beckjord.  Mr. Koppe is going

19   to be offering opinions about what the effect of these

20   projects should have been.

21           THE COURT:  Where does this come from?

22           MS. HIMMELHOCH:  This is directly out of his report.

23           THE COURT:  Out of his report?

24           MS. HIMMELHOCH:  Yes.

25           THE COURT:  And he got it from?

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–539

1          MS. HIMMELHOCH:  From Cinergy's documents.

2          MR. GREEN:  I think these are just like the summaries

3   that you have already excluded.  They look to me just kind of

4   a reworked version.

5          THE COURT:  There's a big difference between a

6   summary being offered as an exhibit and a summary being

7   offered as a demonstrative to hold up after a witness is done.

8          The ones -- the exhibits that I saw that I excluded

9   were to be used as exhibits during the course of the case and

10  to be admitted and, therefore, taken up to the jury room so

11  they could read parts of what would look like a transcript of

12  the individual's testimony.  That's why they're not

13  appropriate in the exhibit form.

14          In the form of letting -- helping him with his

15  testimony, I don't have a problem with any of those.

16          What's the next one?

17          MR. BOXERMAN:  There was one other graph.

18          MS. HIMMELHOCH:  There's one additional graph.

19          THE COURT:  Where is that?

20          MS. HIMMELHOCH:  It's near the end.

21          THE COURT:  I have "The Expected Effects of a

22  Pulverizer."  That's not it, is it?

23          MS. HIMMELHOCH:  Yes, Tab 61, Your Honor.  This graph

24  does not come from his report; but what this is -- this is

25  simply an aid for Mr. Koppe to explain the numbers that he

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-540

1  sets forth in his report.

2        In his report, he gives a 7-megawatt increase.  He

3  actually uses that number.  He uses the number for the

4  increase in availability, a number for the decrease in heat

5  rate, and then says that the effect of additional dispatch

6  would be greater than heat rate.  And this graph simply puts

7  that on a line for the jury.

8        MR. GREEN:  There is no calculation in his report at

9  all for any increase in dispatch.  The visual here suggests

10  that there's been a rather significant increase in dispatch.

11  It's not supported by any calculation.

12        THE COURT:  So you're objecting to the conclusion of

13  the graph?

14        MR. GREEN:  Yes, I do, because it's not in his

15  report; and there's no calculation with respect to the

16  increased dispatch.

17        THE COURT:  I hate to do that, but we're going to

18  have to leave this until you get to it so that I have a little

19  more information so that I don't just shoot somebody because I

20  want to.

21        So are we ready?

22        MS. HIMMELHOCH:  We are, Your Honor.

23        THE COURT:  All right.  Would you bring the jury down

24  here before they think Judge Ito is running this show.

25        MS. HIMMELHOCH:  I apologize, Your Honor.

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-541

1    *(Jury in.)*

2         THE COURT:  You may be seated.  Ladies and gentlemen,

3    you've given me a question here, and it doesn't tell me who

4    asked the question.  Can I have a hand up on who asked that

5    question?

6         The question is this, ladies and gentlemen:  "While

7    being questioned under oath, can the witness on the stand be

8    given answers by the attorneys by either lip motion or any

9    visual signals?"

10        The answer to that is clearly "No."  If I get anymore

11   easy ones like this, no problem.

12        You may inquire.

13   BY MS. HIMMELHOCH:

14   Q   Mr. Koppe, when we left off for the jury, you had

15   explained what availability was, and had indicated that you

16   began working on the question of availability and how to

17   analyze it 33 years ago.  When you started 33 years ago, what

18   kind of plants did you focus on?

19   A   I started in 1975, and for the first year or two, I was

20   focused entirely on nuclear generating units.  Then I branched

21   out into also to study various fossil-fired units, units that

22   burned coal or oil or gas, and I've continued to do that ever

23   since.

24   Q   When doing this work on power plant availability and

25   projecting future plant performance, who were your clients?

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–542

1  A   Throughout the time up through the year 2000, probably

2  80 percent of my clients were utilities or organizations that

3  are funded by utilities.

4       Then the other 20 percent included state agencies that

5  regulate utilities, customers of utilities, and people who

6  were opposed to utilities in some way.

7  Q   Now, you said you worked for some utilities.  Can you give

8  us a couple of examples of the utilities that you worked for?

9  A   Over the years, I've worked for something like 40

10 different utilities.  Just to kind of bracket the country

11 everywhere from Boston Edison in the northeast to southern

12 California Edison, from Houston Lighting & Power to Wisconsin

13 Electric and Ohio Edison.

14 Q   Now, you indicated that you also worked for some utility

15 organizations.  Can you tell us which of those you worked for?

16 A   A large piece of my work for many years was for an

17 organization called the Electric Power Research Institute.

18 Q   What is the Electric Power Research Institute?

19 A   It's an organization that was formed by utilities and is

20 funded by utilities to do research in areas that are related

21 to the generation and transmission and distribution of

22 electricity.

23       COURT REPORTER:  "Transmission and"?

24       THE WITNESS:  Transmission and distribution of

25 electricity.

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–543

1   Q    Now, why did you begin focusing on the question of

2   availability 33 years ago?

3   A    Well, the simple answer is that in 1975, availability was

4   a hot topic.  The -- throughout the industry, the

5   availabilities of coal units, especially the new coal units

6   that were being built, and the availabilities of nuclear units

7   were much worse, much lower than what utilities had been

8   expecting.  So there was just a great deal of interest in why

9   that was happening and what could be done about it.

10  Q    Why were these low availabilities a problem?

11  A    Utilities had spent many billions of dollars building

12  these units expecting to get a lot of electricity out of them.

13  The units were producing electricity but not nearly as much as

14  had been expected, which means -- which meant that other units

15  had to be built to generate the electricity that had been

16  expected.

17  Q    If you could call up Image 2, please.

18       Mr. Koppe, this is a graph that we're going to use for

19  demonstrative purposes.  Can you tell us what this graph is?

20  A    This is one of many graphs from a report that I wrote for

21  the Electric Power Research Institute in the 1980s.

22  Q    And what does the graph show?

23  A    This shows a number of different groups of coal-fired

24  units, but you saw the same pattern for every group of

25  coal-fired units, which is that the availabilities were

1  high -- let's see how I do with these arrows this time.

2        If you look here, for example, in the 1960s,

3  availabilities were between 80 and 90 percent.  Then they went

4  down to between, say, 70 percent and 80 percent by 1975, 1977.

5  So the availabilities were down by more than 10 percentage

6  points, which is a lot.

7        So it's in that time period, 1975-1979 that I and many

8  other people became involved in looking at availability.  The

9  federal government was involved.  The state regulators were

10 putting pressure on the utilities.  Utilities themselves were

11 concerned about why these availabilities were so low and what

12 could be done about them.

13       Then this -- you can see here for most of these groups

14 by the early 1980s, the things had started to turn around and

15 some of the efforts that were being made had started to pay

16 off and the availabilities of the units were starting to

17 increase again.

18 Q   Mr. Koppe, can you indicate on the graph the approximate

19 time period in which you began working on the question of

20 availability?

21 A   Right here at the low point, around 1975 when

22 availabilities had bottomed out.

23 Q   Let's turn now to some of your experience -- and we can go

24 ahead and bring this image down.

25       Let's turn now to your experience in projecting future

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-545

1  availability of generating units.  Have you provided testimony

2  on this topic?

3  A    Yes.  I've provided testimony on the subject of projecting

4  the future availability of generating units probably 30

5  different times.

6  Q    When was the first time you testified regarding the

7  availability of electric generating units?

8  A    The first time I actually testified on that subject was

9  1976.

10  Q    Please describe the circumstances of that testimony.

11  A    This was a case where a utility -- Puget Sound Power &

12  Light in Washington State -- was proposing to build a new

13  nuclear unit.  People who were opposed to that unit said,

14  "Look how badly these units that are already operating are

15  doing.  Their availabilities are very low.  You shouldn't be

16  allowed to build this new unit because it will have low

17  availability, too; and it won't be economical.  It won't make

18  enough electricity to pay for itself."

19        The utility believed that, in fact, it had made design

20  improvements to this new unit that would solve some of the

21  problems the older units were having; that the new unit would

22  have a higher availability, and therefore would be

23  economically justified, and they asked me to explain that to

24  the Atomic Energy Commission.

25  Q    Which was the utility that hired you in that instance?

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-546

1  A    It was Puget Sound Power & Light, a utility in Washington

2  State.

3  Q    What was your approach to this question?

4  A    What I have done over the years in projecting the future

5  availability of a unit is I start with the history of that

6  unit, look at what problems have caused the unit to be shut

7  down, look at what's being done to resolve those problems, and

8  then see to what extent resolving those problems would cause

9  an increase in the availability in the future.

10         In this case with this -- did I mention the name of

11 the unit was Skagitt -- this unit hadn't been built yet.  So I

12 started with the histories of some similar units that were

13 already operating, looked at what problems had affected those

14 units, looked at what had been done to resolve those problems

15 in the new design, and then calculated how much better the new

16 unit would do than the old ones had done because of these

17 improvements.

18 Q    And the logic behind this approach was?

19 A    The problems that were affecting the earlier units were

20 causing outages.  If you fix the problem, you won't have those

21 outages in the future.  The unit will run more.

22 Q    What were your projections based on that analysis?

23 A    I started with the history of these units that were

24 already operating in 1975; and they had been running an

25 availability of about 58 percent, and I projected that the

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–547

1  improvements in the Skagitt unit would cause it to run an

2  availability of about 72 percent.

3  Q   Did you have an opportunity after performing this work to

4  look at your result and compare them to what actually

5  happened?

6  A   Yes and no.  In one sense, no, because like so many other

7  nuclear units that were proposed in the 1970s, the Skagitt

8  unit got canceled after the accident at Three Mile Island, but

9  yes, in the sense that there were a number of other units that

10  were very similar to Skagitt that were proposed at that same

11  time.

12       In fact, two of those units, the Susquehanna units in

13  Pennsylvania, I also testified about them in Pennsylvania; and

14  they did get built.  So I've gotten to see what they did

15  subsequently.

16  Q   What happened to -- what conclusion did you reach about

17  the accuracy of your projections?

18  A   The performance -- the availabilities of those units were

19  generally consistent with what I was projecting at the time.

20  Q   Did you have an opportunity to examine what happened to

21  the units from which you drew the history to analyze and

22  project for Skagitt?

23  A   Yes.  Eventually those units made the same kinds of

24  improvements that were planned for Skagitt.  Eventually it's

25  sometimes quite difficult, especially in a nuclear unit, but

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–548

1  eventually they removed the pieces of equipment in those

2  earlier units that had been causing the major problems,

3  replaced them with better equipment, and the availabilities of

4  those units also increased.

5  Q   Before we move on from this work, can you describe what an

6  increase in availability from 58 percent to 72 percent means

7  in real terms?

8  A   Well, it means that the unit would be able to operate for

9  about 1,200 hours more each year than it had been before.

10 Q   Now, you've described a bit of your work relating to the

11 determination of availability at nuclear power plants.  When

12 did you first begin looking at the availability of coal-fired

13 plants?

14 A   Around 1977.

15 Q   Does the work that you did in analyzing the availability

16 of nuclear plants translate at all to the work you did with

17 respect to coal-fired plants?

18 A   Yes, it does.  Obviously, there are some differences, some

19 pretty significant differences between coal units and nuclear

20 units; but the kinds of data that are collected and the ways

21 one goes about analyzing the availability of the unit, it's

22 the same whether you're looking at a nuclear unit or a coal

23 unit or a gas-fired unit.

24 Q   But have you analyzed availability of any coal-fired

25 plants before your work in this case?

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-549

1  A    Yes.

2  Q    Can you give an early example of that?

3  A    One example is analysis I did of 12 coal-fired units that

4  were operated by Duke Power in North Carolina.

5  Q    Is that the same Duke that eventually wound up merging

6  with Cinergy?

7  A    Yes.

8  Q    What were you evaluating in that instance?

9  A    In that case, Duke –– I did this in 1986.  At that point,

10 Duke was proposing to perform what's called "life extension"

11 on these 12 units.

12         I was asked by the state regulatory agency in North

13 Carolina to determine how much the availabilities of those

14 units would increase as a result of those life extension

15 projects.

16 Q    Who hired you to perform that?

17 A    It was the state regulatory agency, the Public Utilities

18 Commission in North Carolina.

19 Q    Specifically, what did the North Carolina PUC ask you as a

20 member of the team to do?

21 A    The overall project was bigger than what I did, involved

22 some other things; but the specific part that I did was I

23 looked at the availabilities of these units in the past,

24 looked at the kinds of equipment improvements that Duke was

25 planning to make to those units, and then calculated how much

1   the availability of each unit would increase in the future

2   after those improvements had been made.

3   Q   Why did the North Carolina PUC tell you they were asking

4   you to look at this question?

5   A   Well, they were interested in a bigger picture which had

6   to do with the overall planning and the units that the company

7   was building.  But as I say, my piece of it was to look at the

8   availabilities of these 12 life extension units.

9   Q   Why did the North Carolina PUC want to know the answer to

10  that question, what would happen to the availability of the

11  units?

12  A   To the extent that the -- these older units -- and these

13  were units that were at that time 30 to 40 years old.  They

14  had run well for many years, and then they started to wear

15  out.  A number of pieces of equipment started causing

16  problems.  The units were shut down a lot.  They didn't work

17  very well.

18       To the extent that this life extension work could make

19  those units run well again, they'd be able to produce a lot

20  more electricity and that would reduce Duke's need to build

21  other plants.

22  Q   What was your conclusion at the end of the analysis that

23  you performed?

24  A   I came up with specific numbers for each of the plants;

25  but I concluded for all 12 of these units that there would

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-551

1  be -- that the life extension programs per se would cause very

2  substantial increases in the availabilities of the units.

3  Q    Did you present your conclusion to the North Carolina PUC?

4  A    Yes.

5  Q    Did Duke file any objections to that testimony?

6  A    As I remember, Duke had some comments, but they did not

7  object to them -- to the overall method that I used and they

8  did not object to the results I came up with.

9  Q    What sort of data did you use in performing your

10 evaluation of Duke's life extension program?

11 A    I used data on the -- on what all the problems were that

12 had been affecting these units and how much outage time each

13 of those problems had caused.

14 Q    Where did you get that data from?

15 A    At that time, the data were from a data system called the

16 Generating Availability Data System, usually referred to as

17 GADS.

18 Q    What is the Generating Availability Data System or GADS?

19 A    It's a data system that covers all of the United States

20 and Canada.  It's operated by an organization that's funded by

21 utilities, and the -- the database collects all this

22 information -- each utility records for each of its units,

23 records what the problems were and how much outage time each

24 problem caused.  Then they report that data to GADS.  The GADS

25 system collects all that data and analyzes it.

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-552

1  Q   Now, we earlier in your testimony defined what the term

2  "availability" means.  Does the availability in Generating

3  Availability Data System relate at all to that definition you

4  gave?

5  A   Yes.  It's the same thing.

6  Q   So GADS is a method of collecting data on when plants are

7  able to operate?

8  A   When they're able to operate and when they're not able to

9  operate and what the reasons are when they're not able to

10 operate.

11 Q   What prompted the development of the GADS system or GADS?

12 A   In the mid-1950s when everyone became so interested --

13 everyone in the utility industry became so interested in

14 availability --

15 Q   May I interrupt just a moment.  You said in the 1950s.

16 A   Did I?  I'm sorry.

17         In the 1970s, when the utility industry and Government

18 agencies all became so interested in availability, there were

19 various organizations did many studies as to what could be

20 done to improve the availability of these units.  I worked on

21 a number of those studies that were funded by the Electric

22 Power Research Institute.

23         One of the things we concluded was that the data

24 system that already existed, which collected this kind of

25 data, wasn't good enough, and we suggested that it should be

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-553

1  improved.

2      After deliberation, the industry agreed that it should

3  be improved, and as a result, this GADS system was developed.

4  Q   Were you involved in the development of GADS?

5  A   Yes.

6  Q   How were you involved?

7  A   Of course, I had done many of the studies that looked at

8  what GADS should do and talked about what the new system

9  should look like.  As a result of that work, my company, and

10 specifically me were hired to take the lead in developing the

11 new GADS system.

12 Q   Who hired you and your colleagues?

13 A   It was kind of a funny situation because the work was for

14 what's called the North American Electric Reliability Council,

15 which is NERC.  It's another utility organization.  They're

16 the ones that actually operate the GADS system, but the money

17 came from the Electric Power Research Institute.

18 Q   Is there a system or a manual that standardizes how data

19 is entered into GADS?

20 A   Yes.

21 Q   Who prepared that manual?

22 A   I was the lead person.  I got a lot of help from Mike

23 Fedie who worked with me, and also Ron Niebo, who was the

24 person at NERC at the time who was in charge of this, also had

25 a major input into it.

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-554

1  Q   Have you given any training on the use of the Generating

2  Availability Data System or GADS?

3  A   Yeah, in the early 1980s, around 1980, 1982, when GADS was

4  first starting up, NERC presented a series of workshops for

5  the power plant people to tell them how to keep the data, how

6  to report the data to GADS; and I helped NERC with some of

7  those workshops.

8        Around that same time, Electric Power Research

9  Institute, EPRI, funded my company and another company to

10 provide workshops for utility engineers as to how to use this

11 new data to help improve the availabilities of generating

12 units.

13 Q   What are the intended uses of the data in GADS?

14 A   There were a number of different things we had in mind.

15 One is just to allow people -- utilities to follow the

16 availability of their units.

17       Another is to allow utilities to compare how their

18 units are doing with how other units are doing.  Another was

19 to allow utilities to identify what problems were causing the

20 unavailability at a unit, what problems were causing a unit to

21 shut down.

22       Another was to provide data to help utilities perform

23 economic evaluations to decide what projects they should do to

24 improve availability.

25       Another was to help utilities to project the future

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–555

1  availability of units.

2  Q    Is GADS used widely in the industry?

3  A    Yes.  About 90 percent of the generating units in North

4  America report data to GADS.

5  Q    Does Cinergy report data to GADS?

6  A    Yes.

7  Q    If we could, please, have image 5 on the screen.

8         Mr. Koppe, can you tell us what this image represents?

9  And for the record, this is an excerpt of Exhibit 1518, which

10 is not objected to as either –– on grounds of either

11 authenticity or hearsay status.

12 A    This is a small selection of GADS data for one of

13 Cinergy's units, Wabash River 5.

14 Q    There are a lot of numbers and information on that page.

15 Could you just explain for the jury what the information is on

16 this page?

17 A    Yes.  Each line on this page is one –– what's called an

18 "event."  So there would be one line if a unit was shut down.

19 There would be another line if a unit was –– had some problem

20 that didn't force it to shut down but made it operate at

21 reduced power.

22        And there were also some lines for equipment problems

23 that don't actually reduce the power from the unit.  So there

24 are a number of different kinds of events.

25        This covers –– is it from May of 1987 through August

1  of 1987.  So this is the events at one unit for a few months.

2  Q    Using the top line, can you explain the entries in the

3  data?

4  A    Yes.

5  Q    You can point.

6  A    Oh, I see.  Someone else is making that arrow.  Could we

7  enlarge the top line there?  Yeah, that helps me (indicating).

8        Some of this is just bookkeeping sort of stuff.  If

9  you look at that very top line, which is highlighted in

10  yellow, the very first column it says "WR5."  That's just

11  Wabash River 5.

12        The second column is just a sequential number for the

13  events.  It doesn't mean anything for our purposes.

14        The next line says this was the "U1."  There are a set

15  of codes for what kind of an event it was.  A "U1" is a sudden

16  shutdown of the unit.  So the unit is running along and

17  crashes, it shuts down.  So this was a U1.

18  Q    Can you give an example of something that would be a U1

19  event?

20  A    Oftentimes boiler tube leaks cause U1 events.  If a hole

21  just blows in a tube and you have a really bad leak, the

22  operators will instantly shut the unit down.  A lot of times

23  control failures will cause a sudden shutdown.

24  Q    Okay.  Can we move on to the next column?

25  A    The next column is just the date on which the event in

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-557

1  this case -- it's an outage.  It started on May 18th, 1987;

2  and it started at 9:46 in the morning.  That's the next

3  column.

4         Then the next column is the date the unit -- the event

5  ended.  So that would be when the unit started back up again.

6  So it started back up the next day at almost eleven o'clock in

7  the evening.

8  Q   And that's the 22:56?

9  A   That's 22 -- yes.

10 Q   Then what does the "1080" mean?

11 A   The next column is what's called the "cause code."

12 Q   The "cause code"?

13 A   "Cause code."

14 Q   Can you explain what a "cause code" is?

15 A   This is a set of codes that Mike Fedie and I developed

16 that -- where each code just represents one part of the unit

17 or one problem.  So it's a way that you can -- that the people

18 reporting the data can indicate which piece of equipment had

19 the problem, what the problem was; and this is a good example

20 because this is Code 1080.

21        There aren't too many of them that I remember, but

22 this is one of them.  1080 is a leak in the economizer tube

23 section of a boiler.

24 Q   And then after the 1080, there is a note that says "No. 5

25 boiler tube leak-economizer."  What does that mean?

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–558

1  A   This next column is the data system allows and, in fact,

2  encourages the utility that's reporting the data to write a

3  brief description in words about what happened.

4        So this says that this was Unit No. 5, Wabash River 5;

5  that it was a boiler tube leak in the economizer.

6  Q   Then there are three -- the number 37.150 is repeated in

7  the next three columns.  What does that number represent?

8  A   It would take a little while to explain why there are

9  three separate columns, but I think for our purposes here,

10  it's probably enough to say that this means that the outage

11  lasted 37 hours and 15 minutes.  If you just take the

12  difference between the start date and time and the end date

13  and time, that's what you'll get.

14  Q   So now that we have a little bit of an understanding of

15  what GADS is, let's go back -- and you can bring that image

16  down.

17        Let's go back to talking about the work that you've

18  done in the past on availability.  Before 1999, had you ever

19  testified as an expert witness?

20  A   Yes, many times.

21  Q   In what forum or where did you provide such testimony?

22  A   I testified roughly 30 different times before various

23  state agencies that regulate utilities.  I think I testified

24  in maybe 12 or 13 states, and it gets to 30 because I

25  testified more than once in some states.

1          I also testified four different times before the

2    Atomic Energy Commission.   Then I testified one time in

3    Federal Court.

4    Q   Let's start with the testimony that you gave to the state

5    regulatory agencies.  What was the general subject matter of

6    that testimony?

7    A   Well, there were a few that were unusual that aren't

8    relevant here; but for most of those cases, I was testifying

9    about the expected future availability of generating units.

10   You're going to hear that a lot.

11          In some cases, in addition to testifying about

12   availability, I testified about cost or other things; but in

13   most of these cases, at least part of what I was testifying on

14   was the availability of generating units.

15   Q   Who were your clients during that testimony?

16   A   For almost all of those testimonies, my client was a

17   utility; a different utility each time but one utility or

18   another.

19   Q   In each of those instances, did you perform an analysis of

20   the availability or projected availability of the units you

21   were discussing?

22   A   Yes, with the few exceptions I alluded to earlier; for the

23   vast majority of them, I projected the future availability for

24   one unit or many units, depending on the situation.

25   Q   Did you use the same approach in each instance?

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-560

1  A    Yes.  Because the situations were different in some cases,

2  some of the details of the arithmetic, some of the specifics

3  were different; but the overall approach was the same every

4  time.

5  Q    You testified -- or you indicated that you had also

6  testified in Federal Court before 1999.  What was that

7  testimony about?

8  A    This was a dispute between -- several utilities all own

9  shares of one nuclear generating unit, and they had a dispute

10 about problems that had occurred at that unit.

11 Q    And who was your client in that testimony?

12 A    My clients were the two utilities that were suing the

13 third utility.

14 Q    So we've now gone through a long time period, from 1975 to

15 1999.  You've been at this for a long time.  Had you ever

16 thought about retiring at this point?

17 A    Yes.  By 2000, I had always said I was going to retire

18 early and do other things that interest me.  And by 2000, I

19 was -- I had been winding down my consulting work.  I had gone

20 back to college and was planning to be retired.

21 Q    What happened?

22 A    I got one phone call from the Environmental Protection

23 Agency in the summer of 2000.

24 Q    What did they want?

25 A    The federal government and some of the states had started

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-561

1 bringing these lawsuits against a number of different

2 utilities, and they were looking for people who were expert in

3 various aspects of power plants to help with those suits.

4 Q    Have you ever heard the phrase "utility enforcement

5 initiative"?

6 A    Yes.

7 Q    What does that refer to?

8 A    Well, at the limited level of my understanding, that is an

9 initiative that the Federal Government started roughly 10

10 years ago to try to force -- enforce some of the provisions of

11 the Clean Air Act.

12 Q    Have you provided expert testimony in the course of that

13 initiative?

14 A    Yes.

15 Q    Have you actually been called to testify in Federal Court?

16 A    Yes.

17 Q    In which cases?

18 A    I testified in Columbus, Ohio, in the case against Ohio

19 Edison.  I testified again in Columbus, Ohio, in the case

20 against American Electric Power.

21        I testified in East St. Louis, Illinois, in the case

22 against Illinois Power; and this is my fourth one.

23 Q    Have you provided analyses of availability in any of the

24 other utility enforcement cases?

25 A    Yes.  I've provided analyses in, I think it's now nine

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–562

1  other cases, that for one reason or another so far there

2  hasn't been a trial in those cases; but I've done the analysis

3  in those nine other cases.

4  Q   Do those analyses include any administrative proceedings?

5         MS. HIMMELHOCH:  May I clarify my question, Your

6  Honor?

7  A   Please do.

8  Q   Did you perform any analyses of availability relating to

9  the TVA units?

10  A   I did, but that was in the context of lawsuits, not the

11  administrative proceeding.

12  Q   I apologize.  Now, what method did you use to analyze

13  availability in each of these cases?

14  A   It was the same basic method that I used in all the cases

15  starting in 1975 and, in fact, the same method I used in this

16  case.

17  Q   And in each circumstance in which you were offered as an

18  expert witness, did the court accept your testimony?

19  A   Yes.

20  Q   Mr. Koppe, as an expert witness, you get paid, don't you?

21  A   Yes.

22  Q   What is your hourly rate?

23  A   My company gets paid $100 an hour for my time.

24  Q   Since 2000, how much have you earned from your consulting

25  work on these utility enforcement cases?

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-563

1  A   Well, of course, my company has expenses.  So I don't get

2  all of that hundred dollars an hour.  Over the last seven

3  years, I've averaged about $65,000 a year.

4  Q   Who were your clients in these utility enforcement cases?

5  A   In a number of the cases, including this one, it was the

6  Department of Justice, United States Department of Justice.

7  In a couple of cases, it was states, and in a couple of cases

8  it was citizens groups.

9  Q   Mr. Koppe, have you ever operated a coal-fired boiler?

10 A   No.  I've studied hundreds of units.  I've done management

11 audits and reviews of many units, but I've never actually

12 operated a unit myself.

13 Q   Before we leave your background and get into the analysis

14 you did for this case, can you estimate over the length of

15 your career, dating back to 1976, about how many projects you

16 have analyzed to project their effect on availability?

17 A   I've -- well, I've done analyses in the course of

18 something like 60 different consulting jobs that I've worked

19 on in terms of the -- as well as then the 11 cases that I've

20 worked on here so far.  I think that overall in terms of how

21 many units I've looked at, it's three or four hundred.

22 Q   Have you used the same analytical framework in every

23 instance?

24 A   Yes.  Again, the details change depending on the

25 circumstances, but the basic circumstance is always the same.

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-564

1  Q   Have you had an opportunity to review your projections of

2  availability in the period before 2000 and determine whether

3  your projections were accurate?

4  A   In some cases, yes.

5  Q   What did you determine?

6  A   In general, what happened was consistent with what I

7  predicted.  Of course, for some units, the units actually did

8  better and some actually did worse; but overall, the results

9  were consistent with what I was projecting.

10 Q   Let's turn now to your work in this case.  What were you

11 asked to do in this case?

12 A   I was asked to look at a number of major equipment

13 replacement projects at different Cinergy units.  For each of

14 those units, I was asked to determine what effect the company

15 should have expected the project to have on the availability

16 of the unit, on the capability of the unit, and on the heat

17 rate of the unit.

18 Q   Well, we've talked at length already about availability,

19 but let's focus on the other two terms you've used.  What do

20 you mean by "capability"?

21 A   The capability of a unit is how much electricity it can

22 generate when it's going at its maximum output and that it can

23 sustain hour after hour.  So it's what the unit can produce if

24 it tries to run at full power and just keep going.

25 Q   And you used the term "heat rate."  What do you mean by

1  "heat rate"?

2  A    Heat rate is the amount of heat that it -- that you have

3  to put into the boiler to get one kilowatt hour of

4  electricity.  So it's a measure of the efficiency of the unit.

5         The more efficient the unit is, you have to put in

6  less heat to get a kilowatt hour.  The less efficient the unit

7  is, then you have to put more heat in to get the same amount

8  of electricity.

9  Q    And overall, what were your conclusions after the analysis

10 you performed?

11 A    For the 14 projects that are at issue in this case, I

12 concluded that the company should have expected each project

13 to cause an increase in the availability of the unit.  For two

14 of the projects, I concluded that the company should have

15 expected an increase in the capability of the unit; that is,

16 it could produce more electricity at maximum output after the

17 project.  And for a few of the projects, I included -- I

18 concluded that the company should have expected an

19 improvement, that is to say, a decrease in the heat rate.

20 Q    Can you generally characterize the projects you were

21 looking at?

22 A    These were all projects that involved replacement of some

23 major part of the unit.  Most of them involved replacing large

24 sections of tubes either in the boiler or in the condenser.

25 Q    Now, you indicated that you came to the conclusion that

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-566

1  Cinergy should have expected these projects to increase

2  availability.  Is availability related to generation?

3  A   Yes.

4  Q   How?

5  A   If the unit isn't available, you can't make electricity

6  with it.  The more it's available, the more electricity you

7  can make, and generally, the more electricity you will make.

8  Q   What information did you rely upon to reach your

9  conclusions in this case?

10 A   I looked at a number of Cinergy documents, various letters

11 and memos and e-mails and specifications, studies.  I looked

12 at the data for each of the units that Cinergy reported to

13 GADS; and of course, I made use of my own experience.

14 Q   So now that we've had this prelude, let's turn to the

15 first project that you analyzed.  Let's start with the Wabash

16 River Unit 5 project.  How did you go about familiarizing

17 yourself with that project?

18 A   I searched through the documents that Cinergy has provided

19 to the Plaintiffs in this case and picked out documents that

20 were related to this project, read through them to find out

21 what was done and why it was done.  Then I also looked at the

22 GADS data for Wabash River 5.

23 Q   About how many documents did you review for this project?

24 A   It's different for each project; but typically for a

25 project, I looked at somewhere between 30 and 50 documents for

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-567

1  each project.

2  Q   How did you get access to these documents?

3  A   My understanding is that as part of the discovery process

4  in this case, the company provided the Department of Justice

5  with immense amounts of paper, many, many thousands of

6  documents.

7        These were scanned and put on the computer so they

8  would be computer searchable.  All of those documents were put

9  on a Department of Justice website, so from home, I could log

10 into the website, go to the Cinergy database, and say Give me

11 all documents that have the word "Wabash River 5" in the title

12 and have "superheater" somewhere in the text, those kinds of

13 key word searches, searching on dates.

14 Q   Did you have unrestricted access to the documents in that

15 database?

16 A   Yes, I could do any search I wanted to.

17 Q   Did you perform those searches yourself?

18 A   Yes.  In some cases -- I had an assistant who helped me do

19 some initial screening on some of the searches; but basically,

20 I did them all myself.

21 Q   Okay.  The jury's already heard in detail from Mr. Hekking

22 about this project; but let's reorient ourselves by giving a

23 brief description of what this project was, the Wabash River

24 Unit 5 economizer replacement.

25        Can you tell me what that was?  I apologize.

1  A   Yes.  This was an unusual situation.  I've looked at

2  hundreds of generating units in my life.  I can't think of

3  another one where quite this particular thing happened.

4  The -- I don't know exactly what Mr. Hekking described; but

5  contrary to what you might think at first, all the equipment

6  in a boiler, even though it's 100 or even 200 feet high, will

7  hang from structural steel from up above.  It doesn't actually

8  sit on the floor.

9        Then all these big groups of tubes, economizers and

10  superheaters and reheaters that are within the boiler also are

11  hung from above.

12        And in this particular unit, these hangers, these

13  supports -- these are big pieces, they're not coat hangers,

14  they're big pieces of steel -- failed.  Part of the economizer

15  section of the tubing in the boiler dropped down, and the

16  tubes in the economizer were damaged and also some tubes in

17  the superheater section which had the misfortune of being in

18  the way were also damaged.

19  Q   Once you familiarized yourself with the project, what did

20  you do to go about analyzing what effect the project would

21  have on availability?

22  A   Well, the first thing I wanted to know was what were the

23  problems that were causing outages at this unit.  What were

24  the problems that were causing this unit to be shut down or

25  unavailable.

1        So I went through the documents and found what I just

2    said, that it was damage to the tubes in the economizer and

3    the superheater as a result of this structural failure.

4        The next thing I wanted to know was what was the

5    company -- what -- this project was supposed to solve that

6    problem.  What did the company do and what should it have

7    expected would be the result of that.

8        So in this case, the company replaced the damaged

9    tubes in both the economizer and the superheater and also

10   replaced the hangers that had failed, and improved the design

11   of those hangers so they wouldn't fail again, and also there

12   were sections of the casing around the boiler, some of the

13   other parts of the boiler that were nearby that had been

14   damaged.  Those were fixed also.

15   Q    So did you use GADS in that analysis?

16   A    Well -- so I determined that by fixing -- yes, I did.

17   Q    Could you tell us how?

18   A    I determined that -- by replacing these tubes at the

19   time -- this project was done in 1990.  At that time, this

20   unit had operated for 35 years.  But like a lot of other units

21   that were built in the 1950s, many sections of the boiler in

22   those units will run for 50 or 60 years or even more if they

23   don't get dropped.  Not all of them will, but many of them

24   will.

25        So these sections had failed because the supports,

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–570

1  these hangers had failed.  So I concluded that if the company

2  replaced these tubes, which despite the fact that they were

3  still in pretty good shape, still had the wear and tear of 35

4  years of operation in them, if they were replaced with brand

5  new tubes and the design flaw that was originally in those

6  hangers was resolved, that that should eliminate all of the

7  tube leaks in the economizer and in the superheater.  I never

8  did get to how I used GADS.

9       Then I went through the GADS data, and I identified

10 all of the outages in the five years before the project that

11 had been due to these tube leaks and the economizer and the

12 superheater.

13 Q  Now, you indicated that they replaced the economizer.  Did

14 the new economizer differ from the old economizer?

15 A  There was some differences but the economizer itself was

16 essentially the same as what was originally there, except, of

17 course, that it was brand new.  It didn't have 35 years of

18 wear and tear on it.

19 Q  Now, they also replaced some superheater tubes; is that

20 right?

21 A  Yes.

22 Q  Was there any change in the nature of the superheater

23 tubes?

24 A  The same answer.  The tubes, of course, were new.  So they

25 didn't have 35 years of wear and tear on them, but they were

KOPPE – DIRECT/HIMMELHOCH                Vol. 4–571

1  not -- there was not a substantial design change.

2  Q    Then they changed the header of the -- or not the header.

3  I apologize -- the support system for the economizer; is that

4  correct?

5  A    Yes, and that actually included the header.  But the main,

6  the place -- the original problem was because these supports

7  had failed.  So the design change that was needed to make

8  these tubes last for many decades into the future was to fix

9  that design problem with the headers so that that failure

10  wouldn't happen again.

11  Q    Now, you indicated that you looked at GADS data and pulled

12  out events.  What time period of GADS data did you examine?

13  A    I looked at the five years and specifically 60 months, so

14  it isn't five calendar years but 60 months, which is five

15  years, before the start of the project.

16  Q    Why did you choose five years?

17  A    The regulations say that when one is analyzing the effect

18  of a project on a unit, one should start with a baseline

19  period, which is obviously before the project, and that that

20  baseline period should be chosen within the five years before

21  the project.

22  Q    Now, did you actually select the baseline period that was

23  used in the emissions calculations?

24  A    No.  Dr. Rosen, who you will hear from in the next few

25  days, actually did that.  I provided Dr. Rosen with data for

KOPPE – DIRECT/HIMMELHOCH            Vol. 4–572

1  the whole five years before the project.  He picked the

2  baseline period and analyzed the data for that period.

3  Q    If we could bring up image 6 again.

4        I don't want to spend too much time on this, but can

5  you just point to -- well, let me first ask you is any of the

6  data that you used in analyzing the Wabash River 5 project on

7  this image?

8  A    Yes.

9  Q    Can you point out one of the lines that you used?

10 A    This economizer and superheater were really quite badly

11 damaged; and there were a lot of outages during the five years

12 before the project that were due to tube leaks in the

13 economizer or the superheater; and in this few-month period,

14 I've highlighted in yellow the outages that were due to either

15 the economizer or the superheater.

16 Q    After going through the GADS data -- and you can bring

17 that down, if you wish.  Thank you.

18        After going through all the GADS data and pulling out

19 the events, did you quantify the amount of availability that

20 you believe was lost in the period before the project as a

21 result of the economizer problems?

22 A    Yes.

23 Q    Have you determined the total for the five-year period?

24 A    For the five-year period, Wabash River 5 was shut down for

25 a total of 2,500 hours to repair leaks in the economizer and

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–573

1  the reheater tubes.

2  Q   If you could speak up a little bit.

3  A   I'm sorry.  My voice gets tired.  Will that help?

4  Q   Thank you.  And have you figured out the average loss each

5  year during that five-year period?

6  A   Yes.  It was 2,500 years over five years.  So it was an

7  average of 500 hours of outage per year.

8  Q   You said 2,500 years.  Did you mean --

9  A   Sorry.  The tube leaks caused a total of 2,500 hours of

10 outage time over the five years.  So that's 500 hours of

11 outage time per year.

12 Q   So we've looked at the pre-project period.  Let's talk a

13 little about the post-project period.

14      Have you developed an opinion regarding whether

15 Cinergy should have expected any outages in the areas replaced

16 during this project in the five years following the project?

17 A   Yes.

18 Q   What is that opinion?

19 A   I concluded that Cinergy should have expected that the new

20 tubes, the replacement equipment, would not cause any outages

21 during the years after the project.

22 Q   Why do you say that?

23 A   There are two reasons.  One is that there's a lot of

24 industry experience that indicates that well-designed new

25 sections of boiler tubes will operate for at least 20 years

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-574

1  and often for a lot longer than that with few, if any, leaks.

2          The other reason is that it's traditional in the

3  industry when doing analyses of the effects of projects to

4  make the assumption that the new tubes will not cause any

5  outages in the years after they're installed.

6  Q   Is it your opinion that it is absolutely certain there

7  will be no outages attributable to these areas replaced in the

8  five years following the project?

9  A   No.

10  Q   Did you take into account the chance that there might be

11  some outages attributable to the components that were replaced

12  in the five years following the project?

13  A   I did.  While many new sections of boiler tubes, in fact,

14  have no outages for five years or longer, there are occasional

15  outages in new tubes; and sometimes you get a situation where

16  in the months right after new tubes have been installed, some

17  of the thousands of welds that were done to install those new

18  tubes were not good.  You sometimes see a few leaks very early

19  on; and then after that, you get many years of operation.  But

20  sometimes you do see a little cluster of leaks right at the

21  beginning.

22  Q   So if there are -- in that little cluster of leaks, how

23  did you deal with that chance in your analysis?

24  A   First, what we're interested in is what the performance of

25  this equipment will be for the long term after the project.

1   So even if there's a cluster of leaks in the first month or

2   two, that still means that for many years in the future you

3   will have very few leaks or none.  So that's part of it.

4        The other part is that the GADS data for the time

5   before the project, the GADS data tends to understate the

6   amount of outage time that's attributable to the tubes.

7        So understating slightly the amount of outage time

8   after the project, understating it slightly before the

9   project, those two things tend to cancel out.  It's because

10  they understand that that's the case that utility people

11  generally just assume no outage time after the project.

12  Q   You say that GADS tends to understate availability losses

13  pre-project.  Can you explain why that is?

14  A   Yes.  Usually when a unit is shut down for -- to repair a

15  boiler tube leak, it takes a few hours to shut the unit down.

16  So the unit will be operating at full power, and it takes

17  typically maybe three or four hours.  The operators will run

18  the power down fairly quickly, but not precipitously until

19  they get to a low power.  Then they'll shut it off.

20       And -- then afterwards when the unit is starting up

21  again, they'll run it very quickly up to maybe 20 or

22  30 percent power.  But then it takes anywhere from a few hours

23  to a day or two to run the power all the way up to full power.

24       So during these what we'll call ramps, shutting the

25  unit down -- if you'll think of it as a graph, the power is

1 ramping down.  I'm turned around here, but as you're starting

2 up again, the power is ramping up again.

3        During that time, the unit -- it's operating but it's

4 not operating at full power.  So it doesn't generate some

5 electricity.  The GADS data ignores that.

6        There's a provision in GADS for utilities to report

7 those so-called ramping losses; but most utilities don't do

8 it, and Cinergy didn't do it.  So the GADS just -- the GADS

9 data just gives you the hours the unit was shut down.  It does

10 not give you the amount of electricity that wasn't generated

11 because of these ramps.  So for each outage, the GADS data

12 understates the amount of electricity that could be generated.

13 Q   I would like to turn to a slightly different topic on this

14 project.  You've described the replacement of all of one

15 component and a little bit -- or not a little bit -- a section

16 of another component.  This was just one project at the unit.

17 How many equipment replacements and maintenance activities

18 occur at any particular unit during a year?

19 A   It varies a lot depending on the size of the unit.  Bigger

20 units obviously have more work to be done.  And it also varies

21 a lot depending on the condition of the unit.

22        So depending on the unit, it can be anywhere from

23 hundreds to thousands of maintenance and repair activities

24 each year.

25 Q   Would you expect all of those maintenance and repair

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–577

1  activities to result in an increase in availability?

2  A   No.  In fact, with very rare exceptions, I would not

3  expect any of them to result in an increase in availability of

4  the unit.

5  Q   Why not?

6  A   Well, if -- because typically what's done is if a part

7  breaks, you know, you have a valve and the packing goes bad,

8  the valve starts to leak.  You open up the valve, take out the

9  packing, replace it with a new packing.  You haven't -- that

10 valve won't leak again for awhile, but there are hundreds of

11 other valves and another one will leak next week, and another

12 one will leak the week after that.  It's kind of a full-time

13 job going around replacing packing leaks.  You haven't made

14 any fundamental change in the condition of the unit.

15 Q   Why is the Wabash River unit we've been talking about

16 different than that?

17 A   Well, there are a very limited number of situations and

18 primarily they involve boiler tubes, and to somewhat of an

19 extent, condenser tubes.  That's why the projects we're

20 talking about in these cases are mostly boiler tubes and

21 condenser tubes where you get a very different situation.

22 Q   How is the situation different?

23 A   A single section of boiler tubes -- again, it varies with

24 the section.  It varies with the particulars -- how big the

25 unit is, but a section of boiler tubes contains anywhere from

1  miles to as much as a hundred miles of tubing.

2       When a section of tubing -- say, 10 miles of tubing is

3  degrading, maybe it's corroding, maybe it's being sand-blasted

4  by the ash and the coal, maybe there's some kind of cracking

5  going on, that degradation goes on over many, many years.

6       And finally, sometimes after 20 or 30 or 40 years, a

7  lot of this tubing is degraded to the point where you're

8  starting to get places where it's not strong enough anymore to

9  hold the pressure inside.

10      At that point, 1 inch or 1 foot of tubing will burst;

11  and the unit has to shut down to fix that.  But what's done is

12  that that foot of tubing -- and, you know, maybe for good

13  measure a foot or two on either side, but a short section of

14  tubing is cut out to replace with brand new tubing.  That

15  solves that problem, but the whole other 10 miles of tubing in

16  this section is still degrading, still is full of places where

17  it's getting close to failing.

18      So when you get something like we saw there where

19  you're getting a failure every couple of weeks, you can just

20  go on for years and years and years if you don't do something

21  dramatic.

22      You get another leak.  You shut down for a couple of

23  days.  You cut out that couple of feet of tubing, replace it

24  with new tubing.  That solves that problem.  You start back up

25  again.  You run a few more weeks, a month, a few months.

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–579

1  Somewhere else in all of that it finally gets to the point

2  where it can't hold it anymore and it bursts, and you get

3  another leak.

4          Because there's 10 miles of tubing in there, and

5  you're only replacing a few feet each time, you know, that

6  could go on for years and years and years.

7  Q   How does replacing the economizer all at once differ from

8  replacing injured tubes one at a time?

9  A   Well, what was done replacing the economizer is you just

10  wait for the next leak and the next leak.  They took all

11  10 miles of tubing that was all degraded, removed it all,

12  replaced all of it with brand new tubing and fixed the support

13  so they wouldn't collapse the next time.

14          So you go from a situation where the economizer is

15  causing whatever it is, three leaks or five leaks or ten leaks

16  a year, causing outage after outage after outage, to a

17  situation where you're not going to get any leaks, or at least

18  very, very few leaks in the future.

19  Q   Now, you indicated that the number of components that can

20  have this pattern is a fairly small number, but it's still

21  more than one, right?

22  A   Yes.

23  Q   So how do you know that one of these other five or ten

24  components wouldn't immediately start causing, or very shortly

25  thereafter, start causing the same problem that you just

KOPPE – DIRECT/HIMMELHOCH          Vol. 4–580

1  solved at the economizer?

2  A    There are a couple of things.  First, when we say there

3  are a number but depending on how you count, a typical boiler

4  might have eight sections of tubing.  Then you have the

5  economizer.

6        So you have eight or ten sections of tubes, either

7  economizer tubes or boiler tubes that are susceptible to this

8  kind of mechanism that I just described.

9        Some of those -- some of those sections, especially in

10 these units like Wabash River 5 that were designed in the '50s

11 when people put a lot of margin into their designs, many

12 sections of a boiler like that will last for 60 years.

13       There are lots of units that out there now that have

14 been running for 60 years and still have the original water

15 wall tubes, still have the original economizer.  So that's one

16 piece of it.  So that only leaves a few other sections of

17 tubes that might fail in the future.

18 Q    Why do you conclude that those shouldn't be expected to

19 offset any availability you gain from fixing the economizer or

20 replacing the economizer?

21 A    Another thing is that -- I can't remember specifically at

22 Wabash River 5 but for some of these projects that are at

23 issue in this case, the company was also replacing other

24 sections of tubing.  Even though that isn't at issue in the

25 case, they had a few years earlier, a few years later they

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-581

1  were replacing another section.  So that further reduces the

2  chance of having some other section cause problems in the

3  future.

4          Then the final thing is that for many of the

5  projects -- it's not quite all of them, but for many of the

6  projects, including Wabash River, the company did what's

7  called a Life Extension Study.  This project at Wabash River 5

8  was in 1990, and the Life Extension Study had been done, I

9  think it was 19 -- what did I say?  This project was 1990 and

10 the Life Extension Study was just a year or two earlier than

11 that.

12 Q   What does the Life Extension Study tell you about whether

13 Cinergy should have expected offsetting decreases that would

14 basically make the availability gains from this project go

15 away?

16 A   The -- one of the key features for Life Extension Study,

17 what the company is trying to do is find out what it has to do

18 to take a unit that was originally designed to operate for,

19 say, 30 or 35 years, and now has operated for 30 or 35 years.

20 What do you have to do to make it so that that unit will

21 operate reliably for another 20 years or more?

22         For reasons I've been explaining, one of the key

23 things you have to do is you have to make sure you're not

24 going to get other sections of boiler tubes that have problems

25 because that's one of the main ways that you can get very poor

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-582

1  availability out of a unit is if you have deteriorated

2  sections of boiler tubes.

3        So part of the Life Extension Study is to do visual

4  inspections of the tubing throughout the boiler, to do

5  measurements of the thickness of the tubes, to measure how

6  much corrosion there has been of the tubes, to look for cracks

7  in the tubes.  They take -- they cut out samples of tubes in

8  high risk areas and bring them into the lab and examine them

9  metallurgically to see how they've degraded.

10        As a result of a study like that and a study that was

11  done at Wabash River 5, the company then knows that it has

12  some sections of boiler tubes that are in good shape and

13  they're going to last for another 20 years.  And there may be

14  a section -- in this case, for example, these economizer

15  tubes -- of course, the company already knew that, but where

16  the Life Extension Study says you have to replace these tubes.

17        Then if there's a section where there's some risk, the

18  tubes are still okay, but they're deteriorating, and you might

19  have problems three years, five years, ten years down the

20  road, studies typically recommend doing periodic inspections

21  and monitoring of those tubes so that you can anticipate when

22  they're going to reach the point where they need to be

23  replaced.

24  Q   So how does this life extension information help the

25  company, or what does that -- third try is the charm.

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-583

1        What does all this information that's gathered in the

2   course of a life extension tell the company or inform the -- I

3   guess the third time wasn't the charm.

4        How does all the information that's gathered in the

5   Life Extension Study help the company know what's going to

6   happen in the future?

7   A   Well, it knows -- if it has a section of boiler tubing,

8   say, that is about to fail, it knows that that's the case and

9   it has to replace it.  It also knows that it has some sections

10  of boiler tube that are in great condition, and it knows where

11  the potential problems are in the future so it can monitor

12  those problems and take care of it -- take care of them before

13  they get to the point of causing a lot of outage time.

14  Q   At the time that the Wabash River Unit 5 project was

15  undertaken, did industry have any experience with these kinds

16  of projects and whether they would affect the operating

17  availability of the units?

18  A   Oh, yes.

19  Q   How are you familiar with that experience?

20  A   Well, I personally worked for a number of different

21  utilities that were undertaking similar projects.  I talked

22  about Duke in 1986.  In that case, I was working for the

23  regulatory agency, but I was working on the Duke plants; and

24  Duke expected that doing this work would increase the

25  availability of those units.

KOPPE - DIRECT/HIMMELHOCH          Vol. 4-584

1          I've worked with other utilities where they already

2   had made improvements and they had gotten improvements --

3   improvements to the plant, and they had gotten increases in

4   the availabilities of the units as a result.

5          I've read many papers that utility people wrote that

6   say something like "We were having a lot of problems with this

7   piece of equipment at our coal-fired unit.  We replaced that

8   piece of equipment with better -- new equipment with a better

9   design, and our unit's been running now for the last few years

10  and it's having much higher availability than it had before."

11         You don't see very many papers like that recently

12  because it's become old hat, but when you go back into the

13  late 1970s and the late 1980s when people were first doing

14  these kinds of projects, there were papers and magazine

15  articles everywhere about how we've improved the availability

16  of our unit by replacing equipment.

17  Q   Do you have -- have you seen any documents indicating that

18  Cinergy, before this project, had a similar expectation that

19  projects like this could result in an increase in

20  availability?

21  A   Yes.

22         MS. HIMMELHOCH:  I'd like to turn now to Exhibit

23  1666.  This has been admitted as authentic and nonhearsay, and

24  I move for its admission at this time.

25         MR. GREEN:  I need to just look at it.

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-585

1          THE COURT:  Yes.

2          MR. GREEN:  What number was it?

3          MS. HIMMELHOCH:  1666.

4          MR. GREEN:  I can't tell, Your Honor, who authored

5    this document.

6          MS. HIMMELHOCH:  Your Honor, it's been stipulated as

7    authentic and nonhearsay.

8          MR. GREEN:  All I can say is I don't know where it

9    comes from.

10         MS. HIMMELHOCH:  Your Honor, it came from Cinergy's

11   files and they have --

12         THE COURT:  Excuse me a second.

13         And your objection is?

14         MR. GREEN:  My objection is that I don't know who

15   authored this and how it was created.  There's no indication

16   that it's a Cinergy document.

17         MS. HIMMELHOCH:  Your Honor, there are two

18   indications --

19         THE COURT:  Just a minute.

20         MS. HIMMELHOCH:  I'm sorry, Your Honor.

21         MR. GREEN:  By the looks of it, I haven't reviewed

22   every page here; but by the looks of it, there's no

23   confirmation for me that this was prepared by Cinergy.

24         THE COURT:  That's your objection?

25         MR. GREEN:  Yes.

1      MS. HIMMELHOCH:  Your Honor, there are two

2  indications that it was prepared by Cinergy.  First, it was

3  produced to us out of the files of Cinergy in response to a

4  request for production of Cinergy's documents relating to

5  these matters.

6      Second, Cinergy has stipulated to its authenticity

7  and stipulated that is not hearsay, indicating that it has

8  acknowledged that it is a statement by the Cinergy companies.

9      THE COURT:  Anything else, Mr. Green?

10     MR. GREEN:  The fact that it's produced pursuant to a

11 request and it's found in a file somewhere would not

12 necessarily make it a Cinergy document.

13     THE COURT:  Anything else?

14     MR. GREEN:  Pardon me?

15     THE COURT:  Anything else?

16     MR. GREEN:  No.

17     THE COURT:  Exhibit is admitted.  Go ahead.

18     *(Plaintiffs' Exhibit 1666 was received in evidence.)*

19 BY MS. HIMMELHOCH:

20 Q   If you could call up the image of Exhibit 1666.

21     Mr. Koppe, do you recognize this document?

22 A   Yes.

23 Q   If you could please now go to image 8 and call out

24 paragraph 3.6.2.

25     THE COURT:  Image 8 is page --

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-587

1          MS. HIMMELHOCH:  I apologize, Your Honor.  It is

2    page –– the last three Bates numbers are 909.

3          THE COURT:  There is a number at the top of the page,

4    isn't it?

5          MS. HIMMELHOCH:  It is 5.

6    BY MS. HIMMELHOCH:

7    Q    Mr. Koppe, is this one of the documents you reviewed in

8    the course of your analysis of the projects that Cinergy

9    undertook?

10   A    Yes.

11   Q    And if you could please read into the record the first

12   paragraph under the title there?

13   A    The heading is, "Availability Effects."  And the first

14   paragraph reads, "Historical data covering PSI facilities over

15   the period 1979-1983 was analyzed and used to develop capacity

16   state availability figures for individual units.  These

17   figures describe the average effective level of capacity

18   (equivalent availability) expected to be provided by a given

19   unit.  In developing these figures, adjustments were made to

20   account for major availability problems which were in effect

21   during the 1979-1983 period, but are now resolved and not

22   expected to impact future availability, e.g., Gallagher

23   pulverizers, Cayuga economizers.  After incorporating these

24   adjustments, it is our judgment that the base conditions

25   represent the best expected conditions regarding generation

KOPPE – DIRECT/HIMMELHOCH          Vol. 4-588

1   availability.  Our results over the past few years have been

2   quite good."

3   Q   Mr. Koppe, based on your experience and your familiarity

4   with other Cinergy documents, what do you understand the

5   author of this document to be saying?

6   A   This is similar to what I've seen in many other utilities

7   and, in fact, it's very much what I have done in this case and

8   many other cases.

9       I interpret this to say that whoever did this at

10  Cinergy looked at the availability of the units in the recent

11  past and then said, "Okay, but the availability was low

12  because we had a particular problem."  Say they mentioned the

13  Cayuga economizers.  "We've resolved that problem.  Either we

14  replaced the equipment or did something to fix that problem.

15  Therefore, the availability of the unit is going to be higher

16  in the future as a result."

17      MS. HIMMELHOCH:  Your Honor, I've reached a

18  convenient breaking point if we wanted to break for the day.

19  I don't think it will impact the final schedule of the case.

20      THE COURT:  All right.  We can do that.

21      MS. HIMMELHOCH:  Thank you.

22      THE COURT:  I want to address this question I have.

23  I think I was a little cavalier with it.

24      Again, it says, "While being questioned under oath,

25  can witnesses on the stand be given answers by the attorneys

Vol. 4-589

1  by either lip motion or any visual signals?"

2          We talked earlier -- I think we had a leading

3  question, and a leading question is inadmissible because the

4  answer that the lawyer expects is contained in the question;

5  and we don't allow that.  We want our testimony coming from

6  the witness, not from the lawyer; and this is the same kind of

7  thing.

8          You don't want to have lawyers suggesting the answer

9  to the witness by pulling their left ear three times for a yes

10 and their right ear once for a no.  You don't want that.  You

11 want the evidence coming from the witness.

12         If you see something like that that's troublesome to

13 you, raise your hand.

14         All right --

15         MR. HOPSON:  Of course, Your Honor, you should

16 clarify leading questions are appropriate on

17 cross-examination.

18         THE COURT:  You're exactly right, counsel.  Leading

19 questions are appropriate on cross-examination as lawyers

20 attempt to test the testimony that was given on direct.

21         Thank you very much.  I have that written down right

22 here, and I skipped right over it.  Thank you.

23         See you in the morning, ladies and gentlemen.

24         COURT CLERK:  All rise.

25         This court will stand aside in recess until 8 a.m.

Vol. 4-590

1 tomorrow morning.

2          *(The proceedings concluded at 1:37 p.m.)*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3        I, Cathy Jones, certify that the foregoing is a true and

4   correct transcript of the proceedings in the above-entitled

5   matter.

6

7

8

9                              _____

10                             CATHY JONES, RPR, FCRR
                               OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25