1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
2               INDIANAPOLIS DIVISION

3
    UNITED STATES OF AMERICA,         )
4           Plaintiff,                )
                                      )
5   STATE OF NEW YORK, STATE OF       )1:99-cv-1693-LJM-JMS
    NEW JERSEY, STATE OF CONNECTICUT, )
6   HOOSIER ENVIRONMENTAL COUNCIL     )
    and OHIO ENVIRONMENTAL            )
7   COUNCIL,                          )
            Plaintiff-Intervenors,    )Indianapolis, Indiana
8                                     )May 13, 2008
            -vs-                      )8:00 a.m.
9   CINERGY CORP., PSI ENERGY, INC.,  )Volume 7
    and THE CINCINNATI GAS &          )
10  ELECTRIC COMPANY,                 )
            Defendants.               )

11

12

13

14                      **BEFORE THE**
               **HONORABLE LARRY J. McKINNEY**

15

16        OFFICIAL REPORTER'S TRANSCRIPT OF

17            TRIAL PROCEEDINGS

18

19

20  Court Reporter:    Cathy Easley Jones, RPR, FCRR
                       Official Court Reporter
21                     46 East Ohio Street, Room 291
                       Indianapolis, IN  46204

22

23

24
         PROCEEDINGS TAKEN BY MACHINE SHORTHAND
25            COMPUTER-AIDED TRANSCRIPTION

Vol. 7– 995

1                        **A P P E A R A N C E S**

2

3    FOR THE PLAINTIFF:           Mr. Thomas Andrew Benson
                                 Mr. James A. Lofton
4                                Ms. Sarah Dale Himmelhoch
                                 Mr. Phillip Brooks
5                                Mr. Ignacio Arrazola
                                 Ms. Danielle Rosengarten
6                                U.S. DEPARTMENT OF JUSTICE
                                 P.O. Box 7611
7                                Ben Franklin Station
                                 Washington, DC  20044
8

9    FOR PLAINTIFF-              Mr. R. Keith Guthrie
     INTERVENORS:                ATTORNEY AT LAW
10                               13242 South 600 East
                                 Elizabethtown, IN  47232
11

12   FOR THE DEFENDANTS:         Mr. Mark D. Hopson
                                 Mr. Thomas Charles Green
13                               Ms. Kathryn B. Thomson
                                 Ms. Meghan Delaney
14                               Mr. Samuel B. Boxerman
                                 Mr. Frank Volpe
15                               SIDLEY AUSTIN LLP
                                 1501 K Street, NW
16                               Washington, DC  20005

17

18

19

20

21

22

23

24

25

Vol. 7- 996

1                       **INDEX OF WITNESSES**

2                                                **PAGE**

3  RICHARD A. ROSEN

4  Direct Examination (Resumed) by Mr. Brooks ....999
   Cross-examination by Mr. Hopson ..............1006
5  Redirect examination by Mr. Brooks ..........1079
   Recross-examination By Mr. Hopson ...........1087
6

7

8

9

10

11

12

13

14

15

16

17

18

19                      **INDEX OF EXHIBITS**
                                               **PAGE**
20 Defendants' Exhibit No.:

21 2144 .......................................1014
   2159 .......................................1044
22

23

24

25

Vol. 7- 997

1                    *(In open court)*

2           MR. VOLPE:  I want to make a proffer.  As the Court

3   ruled, we could not offer the WEPCo backstop.  Once the jury

4   is out, I want to proffer an exhibit of that.

5           The other thing is I don't want to take up time while

6   the jury is here.  I want to move for admission of Rosen

7   Demonstrative 2, which is the summary chart that the witness

8   testified to that result.  I think's it's sufficiently

9   complicated that it would aid the jury.

10          THE COURT:  Which one is that?

11          MR. BROOKS:  No. 2, tab 2.

12          MR. HOPSON:  Your Honor, we included yesterday 1549,

13  which is the calculation pages from the expert report; and all

14  those are are the final numbers on the page --

15          THE COURT:  Let me stop you right there.  I'm not

16  going to admit this.  It is a demonstrative piece of evidence.

17          Let me just warn you today that when we get done with

18  this case and I've sent the jury upstairs, they're going to

19  ask me for copies of all these demonstrative pieces of

20  evidence.  So think about which ones you're going to say okay

21  to, but now is no.

22          MR. BROOKS:  Yes, Your Honor.

23          MS. HIMMELHOCH:  Can I ask one more minor piece of

24  business?  We had suggested to Cinergy that it might aid the

25  jury to display the text of the deposition designations as

Vol. 7- 998

 1  they were being read.  I believe Cinergy has objected, and we

 2  want to place that burden in front of you.

 3          THE COURT:  That's all right.  I don't mind.  I can

 4  handle it.  The answer is no.

 5          MR. HOPSON:  Your Honor, I don't think the jury

 6  should be reading the deposition --

 7          MR. GREEN:  He said no.

 8          THE COURT:  I said no.

 9          MR. HOPSON:  That's another problem with the

10  acoustics, Your Honor.  I'm sorry about that.

11          THE COURT:  Some of us don't quit when we're ahead

12  either.  You go to some churches, they even have the hymns up

13  on the board.  Next thing, there will be 15 different kinds of

14  learning going on at the same time; but I think one source is

15  enough, although I have several of my judicial colleagues that

16  think they have to have all their senses working to read

17  documents.  They don't like to read them off the screen.  How

18  many senses do you need?  You have to hold it.  You have to

19  smell it, and you have to read it all at the same time.  I

20  don't know.

21          All right.  Let's bring in the jury.

22      (Jury in.)

23          THE COURT:  You may be seated.  Good morning, ladies

24  and gentlemen.  This is Tuesday and Friday.

25          You may continue, sir.

1        MR. BROOKS:  Thank you, Your Honor.  Good morning,

2   ladies and gentlemen.

3          **RICHARD A. ROSEN, PLAINTIFF'S WITNESS, RESUMED**

4                    **DIRECT EXAMINATION**

5   BY MR. BROOKS:

6   Q   Dr. Rosen, you are aware, are you not, that Cinergy has

7   said that before each of these projects was undertaken, each

8   of the projects that you reviewed, that the company expected

9   that the overall demand on its system was going to rise over

10  time?

11       Are you familiar with that?

12       MR. HOPSON:  Objection, Your Honor.  It misstates

13  facts in evidence.

14       MR. BROOKS:  Your Honor, they've made the claim in

15  expert reports.

16       MR. HOPSON:  The experts haven't testified yet.

17       THE COURT:  I'm going to let him answer it.

18       Go ahead.

19  A   I'm aware that for Cinergy, as is true for most electric

20  utilities in the United States, demand does tend to rise

21  gradually over time.  In the United States demand rises for

22  electricity at around 2, 2 1/2 percent a year typically.

23  BY MR. BROOKS:

24  Q   Are you certain that the projections that you did in this

25  case weren't just caused by the growth in demand?

ROSEN – DIRECT (RESUMED)/BROOKS      Vol. 7-1000

1  A   Yes, I am, because my methodology was specifically

2  designed to exclude the impact of demand growth on the

3  operation of each generation unit.  So I isolated specifically

4  just the impact of each project on the generation of each

5  unit.

6  Q   Have you prepared a slide to help you explain to the jury

7  how that's done?

8  A   Yes, I have.

9        MR. BROOKS:  I would like to show the jury, Your

10 Honor, Rosen Demonstrative 31.

11        MR. HOPSON:  Is there an objection to this?  There

12 is?

13        Your Honor, the objection to this slide is that it

14 constitutes a legal argument put into graphics here.  This is

15 an argument about the interpretation of the demand growth

16 exclusion regulation.

17        THE COURT:  Excuse me.  This is also an explanation

18 of this witness's testimony and he can answer this.

19        You can show the slide.  Go ahead.

20        MR. BROOKS:  Thank you, Your Honor.

21 BY MR. BROOKS:

22 Q   Dr. Rosen, can you explain to the jury what this slide

23 represents?

24 A   Yes, I can since I designed it.  The key thing is this

25 goes back to a couple of the slides we looked at yesterday.

ROSEN - DIRECT (RESUMED)/BROOKS    Vol. 7-1001

1  So I'm trying to build off slowly, step by step the way my

2  methodology works.  So again, we're looking at a situation

3  where it's going back to again we have capacity of the unit,

4  say, at 100 percent of output, the bar on the far left.

5  Again, you've seen all the pieces of this before in terms of

6  the red bars, right, and the blue -- light blue, shaded parts.

7  What's new is, of course, the yellow shaded parts.  So let me

8  explain how the yellow parts relate to the rest.

9        Again, we have the situation where for the EAF bar,

10  the second bar from the left, that's the equivalent

11  availability factor.  So there we input the improvement to

12  availability that the project causes.  Again, this is an

13  example.  And again, the project was assumed to have caused a

14  10 percentage point increase in availability in itself,

15  bringing the availability from before the project was

16  implemented from 80 percent up to 90 percent after the project

17  was implemented.

18        Okay.  Now, the important new addition, as I say, is

19  the yellow piece; and that first appears on the utilization

20  factor bar.  So the utilization factor now is the thing that's

21  affected typically by demand growth.

22        So it's simply this.  Let me try to make it as simple

23  as possible.  Given the way a particular generation unit was

24  actually operated in the system at a lower demand growth

25  level -- so typically in the baseline period, demand would

ROSEN — DIRECT (RESUMED)/BROOKS      Vol. 7-1002

1  have been lower because it was earlier in time.  Over time

2  demand grows.  So when you go from the baseline period to the

3  post-project period, demand is higher in the first

4  post-project period because it's later in time and demand

5  grows over time.

6        So typically, a generation unit will run more when

7  demand is higher.  I think that's, you know, sort of common

8  sense; but, in fact, technically, it's correct.  So the

9  utilization factor might go up also by 10 percentage points.

10  That's my little yellow piece there on the utilization factor

11  bar.  So before the utilization factor was only 70 percent,

12  meaning again that when that unit was available to operate, it

13  actually did operate 70 percent of the time it was available.

14  Now, with demand growth, it might operate at 80 percent of the

15  time it's available because there's more demand and it has to

16  run more hours of the year to meet that demand.

17        Now, if you multiply the equivalent availability

18  factor by the utilization factor, we're now multiplying

19  90 percent by 80 percent instead of just 70 percent, right?

20  So now with demand growth, you multiply 90 percent times

21  80 percent.  That gives you a generation capacity factor —

22  actual generation at 72 percent.  So 72 you see on the far

23  right is the total height of the bar.  So now —

24  Q   Dr. Rosen, that's 72 percent of what?

25  A   72 percent of the hours of the year the plant would run

ROSEN – DIRECT (RESUMED)/BROOKS    Vol. 7-1003

1  effectively at full output.

2        So now we get a little complicated because when you do

3  this multiplication, you're multiplying an adjustment to two

4  different factors, the EAF and the UF.  So when you do the

5  multiplication you actually get three different little pieces

6  that result from the multiplication of two different things,

7  sort of like in algebra when you used to multiply X plus Y

8  times X plus Z, you get four terms because it's two terms,

9  then two terms.

10       So now we have four pieces on the bar.  The good old

11 56 percent, the red piece on the capacity factor bar, that's

12 the way the plant would have output generation if this project

13 had never occurred and if there had been no demand growth,

14 56 percent.

15       The 7 percent of the little blue bar on the capacity

16 factor side there, as we discussed yesterday, is the increment

17 that's due solely to the project that's labeled there in

18 English.

19       Then skipping up to the yellow piece, the 8 percentage

20 point increase in capacity factor, that's the increase in

21 capacity factor that's solely due to demand growth because

22 it's the EAF increase times the utilization factor.  So it's

23 the 10 percent times 80 percent gives you that 8 percent.

24       Then there's that little bit where you can't see the

25 color really that's marked 1 percent between the 8 percent

ROSEN – DIRECT (RESUMED)/BROOKS     Vol. 7–1004

1  piece and the 7 percent piece.  That's the compound effect of

2  the fact that there's an improvement in availability from the

3  project and there's some demand growth.  So that 1 percentage

4  point increase in capacity factor is the compound effect of

5  both demand growth and availability improvement and it just

6  means that that couldn't have happened unless there was demand

7  growth, even if the project had occurred.

8  Q   Just to clarify that 1 percent, is that the extra

9  utilization of the improved availability?

10 A   Again, it's the combined effect of better availability and

11 more demand that needs to be met.  So you can see my

12 methodology by looking strictly at the effects of each

13 separately and the effects of each factor together.  Demand

14 growth and availability improvement shows that the yellow bar,

15 the 8 percentage point on the far right, is what in my view

16 can be excluded under the demand growth exclusion.

17       MR. BROOKS:  May I have image 2, please, Rosen

18 Demonstrative 2?

19 BY MR. BROOKS:

20 Q   Dr. Rosen, this is the summary of your projections where

21 you took out everything that did not cause a significant net

22 increase; is that right?

23 A   That's correct.  This is an accurate summary of my

24 results.

25 Q   Is it your testimony, sir, that the numbers that the jury

ROSEN – DIRECT (RESUMED)/BROOKS    Vol. 7-1005

1  has been given for your projected increases do not include a

2  component due to demand growth?

3  A    That's absolutely the case.  I always excluded the part of

4  any increase in the generation unit's output that might be

5  attributable to demand growth.  That was built into my

6  methodology, that the demand growth was always excluded.

7  Q    Sir, do you have an opinion about the cause of these

8  increases that you have projected?

9  A    Yes.  Again, by design my methodology strictly isolates

10  the impact of each project and the improvement and

11  availability that was caused by each project.  It isolates

12  that impact on the emissions increases from these generating

13  units.

14  Q    Dr. Rosen, is there any doubt that an electric utility is

15  able to forecast its future generation?

16  A    No.  This is routinely done.

17  Q    Is there any question, sir, about whether a utility can

18  project the effect of a reduction in the forced outage rate on

19  a single unit?

20  A    No.  Again, this is a routine calculation.  As I described

21  yesterday, one can do it very easily, and it's routinely done.

22  Q    Based on your 30 years of study and review of the electric

23  utility industry, in the real world, if the availability of a

24  coal fired generating unit like the ones we've discussed here

25  with this jury -- if the forced outage rate is reduced in the

ROSEN - DIRECT (RESUMED)/BROOKS    Vol. 7-1006

1  real world, what's the most likely thing to happen?

2  A   Well, if the forced outage rate is reduced, then the

3  equivalent availability factor increases; and, therefore, the

4  generating unit will almost certainly generate more

5  electricity.

6          MR. BROOKS:  No further questions, Your Honor.

7          THE COURT:  Thank you.  Cross-examine?

8          MR. HOPSON:  May I turn the podium slightly, Your

9  Honor?

10         THE COURT:  Yes.

11                    **CROSS EXAMINATION**

12  BY MR. HOPSON:

13  Q   Dr. Rosen, good morning.

14         Good morning, Your Honor.  Good morning, ladies and

15  gentlemen.

16         We didn't meet until yesterday in the courtroom,

17  right?

18  A   As far as I can remember, yes.

19  Q   And I told you you would have to -- you told me you have

20  to be on your plane this afternoon and I promised to get you

21  there, right?

22  A   I appreciate that.

23  Q   Dr. Rosen, can you tell us, you were first hired to work

24  on these NSR cases in 1999 or 2000; isn't that correct?

25  A   Roughly around the year 2000, yes.

*ROSEN - CROSS/HOPSON*          Vol. 7-1007

1  Q   And your role, your basic approach, including your use of

2  the five-step formula, I think you said has been basically

3  consistent since then; is that correct?

4  A   Yes.  I believe it has been consistent since the first

5  case I worked on.

6  Q   When I say as I did in that last question "your formula,"

7  you and I can agree -- for purposes of this examination I

8  hope -- that we're talking about all five steps of the formula

9  as set forth here in Rosen Demonstrative No. 6.  Is that okay?

10 A   It's okay, except that again, I wouldn't say it's a

11 formula.  There are many formulas, right, at least five here.

12 Most of these steps, as I explained previously, are merely

13 definitions that are utilized in the industry.

14 Q   We can agree, for purposes of this conversation we're

15 having, you didn't invent the availability factor, right?

16 A   I did not invent the concept of availability factor.

17 That's correct.

18 Q   And you didn't invent the concept of utilization factor,

19 correct?

20 A   That is correct.

21 Q   And you didn't invent the concept of capacity factor,

22 correct?

23 A   That is correct.

24 Q   But we spent all day yesterday hearing how you put these

25 five steps together in this simple schematic to predict

1  emissions increases for NSR purposes, right?

2  A   That's exactly right.  I was probably the first one to put

3  these concepts down on a chart in exactly this way, but other

4  people have obviously done it in similar fashion.

5  Q   Well, when you were first hired in this case to give your

6  opinion, you discovered that the NSR rules didn't require any

7  particular methodology or formula to make a prediction or to

8  analyze whether emissions will increase; isn't that correct?

9  A   I would say that I discovered that there were no

10 mathematical formulas embedded in the actual regulations, so

11 that one of my tasks as an expert on electric utility systems

12 was to come up with the mathematical interpretation of the

13 regulations.

14 Q   Would you say yes to the question I just asked you?

15 A   I say basically, yes.

16 Q   Thank you.

17 A   There was no mathematical formulas, therefore, to do a

18 forecast of emissions as required by the regulations.  One had

19 to utilize standard industry formulas and concepts to do that.

20 Q   So the answer to the question two times ago is yes?

21 A   Yes, with the explanation that I provided.  I want to

22 explain the general context of the "yes."

23 Q   The idea then of organizing, as you say, these commonly

24 known definitions in this manner and putting them into this

25 schematic was your idea?

1  A   Of course.  It first appeared in my testimony and I

2  thought it would be helpful, first for the judges in the cases

3  that I tried, and I hope it's helpful for the jury in this

4  case to see these concepts neatly organized together.

5  Q   When you suggested yesterday that you had been doing

6  similar things for 30 years, one of the similar things that

7  you weren't doing over these 30 years was using this formula,

8  right?

9  A   If you mean I wasn't using this precise diagram for every

10 piece of work I did, of course --

11 Q   I'm sorry.  Go ahead, sir.

12 A   I just want to explain what I think would be fairly

13 obvious, which is I routinely used these concepts in my work

14 part by part, okay.  Again, when you're preparing a report,

15 the first report I prepared was in a similar NSR case for the

16 Ohio Edison Company.  I said to myself when writing a report,

17 as I think any of us would, how could I present a figure in

18 that report that would hopefully clarify for people that were

19 not familiar with electric industry concepts the relationships

20 between these concepts?  How would you clarify how you would

21 get from a change in availability to a change in emissions?  I

22 hope this clarifies the situation.

23 Q   Well, that certainly clarifies it for me.

24     I just want to establish though, putting aside the

25 fact that the definitions are well known, you developed the

*ROSEN – CROSS/HOPSON*          Vol. 7-1010

1  five-step formula that you're using to make your emissions

2  calculations for this litigation; isn't that true?

3  A    Of course.  Of course.  I explained that I was the one to

4  put this set of relationships down on a piece of paper as a

5  clarifying figure.

6  Q    And before you were hired in this case, you had never

7  before attempted to predict whether a component replacement, a

8  tube replacement should cause an increase in emissions; isn't

9  that correct?

10 A    That's correct, because most of the emissions increase

11 changes that I worked with were at a slightly higher scale

12 where I was looking at perhaps a whole generating unit, not

13 just a component; but ultimately, a component affects the

14 generating unit.  So it's a very similar calculation to things

15 I had examined before.

16 Q    Before you were hired in this case, you had never given

17 any opinion on the applicability of NSR or any other

18 environmental regulation to a utility; isn't that correct?

19 A    Is the emphasis on your question to a utility, that I had

20 not given environmental advice to a utility?

21 Q    Do you want to answer a different question, Dr. Rosen?

22 A    No, I'm trying to understand --

23 Q    Why don't you answer the one I asked you then?

24 A    Well, I'm trying to get to the essence of it.  If the

25 essence is to a utility, the answer is yes.  I gave

ROSEN - CROSS/HOPSON            Vol. 7-1011

1  environmental policy recommendations to many other

2  institutions but not directly to a utility.

3  Q   In the early stages of this litigation before this formula

4  was created, you participated in a number of conference calls

5  to discuss the kind of formula or methodology or approach you

6  were going to take in this case, didn't you?

7  A   Yes, that's right.

8  Q   And Mr. Koppe participated in those conference calls; is

9  that correct?

10  A   He often did.  That's correct.

11  Q   Mr. Hekking participated in those conference calls,

12  correct?

13  A   Yes, he did sometimes.  Less frequently than Mr. Koppe.

14  Q   Tell us who else participated in those conference calls?

15  A   There were some calls in which a Mr. -- I'm sorry --

16  Dr. Sahu participated and then, as far as I remember, several

17  of the attorneys involved in the Ohio Edison case participated

18  in those initial phone calls.  I don't think any of those

19  attorneys are present here today.

20  Q   But those are Justice Department attorneys involved in NSR

21  cases, right, sir?

22  A   Some were Justice Department attorneys.  Some were New

23  York state attorneys.  Some might have been attorneys from

24  other states, Attorney Generals.

25  Q   And you would characterize those calls as brainstorming,

1  correct?

2  A    Yes.  We had discussions, give and take of various views

3  on what an appropriate methodology would be under the NSR

4  regulations; and over time, that methodology developed, and I

5  think I made a contribution to developing it.

6  Q    Well, the methodology didn't instantly leap to mind based

7  on your 30 years of experience.

8         You sat around and you said let's review all this and

9  let's think about what's the best way to make these

10 computations at this point in time, right, sir?

11 A    I would say we tried to figure out what the best way to

12 make the computations consistent with the NSR regulations.

13 This point in time isn't really relevant.  Once you have the

14 regulations, it doesn't matter when you're doing it.  So, yes,

15 I absolutely agree.  We're trying to figure out the best way

16 of meeting the needs of the regulations.

17 Q    And you're brainstorming or thinking about this formula --

18 or the brainstorming I should say -- that led to this formula

19 went on for about six months, right?

20 A    I would say it went on and off for about six months, yes,

21 in the first case I did.

22 Q    In the course of brainstorming what formula you were going

23 to use in this litigation, you did consider and reject some

24 other methods; isn't that correct?

25 A    There were probably some thoughts that I didn't end up

*ROSEN – CROSS/HOPSON*          Vol. 7–1013

1  following.  I'm sure there must have been.  Anyway, this is

2  the general scheme that emerged based on again standard

3  industry approaches to these kind of issues.  Obviously some

4  issues were more straightforward.  Some were less

5  straightforward.

6  Q   Sir, there weren't just thoughts you considered and

7  rejected.  There were actually emissions calculations that you

8  considered and rejected; isn't that true?

9  A   No, I don't think that's true.  No.  I don't remember ever

10  being presented with some explicit emissions calculation

11  methodology that I remember rejecting at the moment.  There

12  may have been, but I can't think of one.

13  Q   Did you and your colleagues at the Tellus Institute

14  actually prepare emissions calculations under different kinds

15  of formulas?

16  A   I don't think so, no.

17  Q   Let me show you what's been marked as Defendant's

18  Exhibit 2144 for identification.

19          MR. HOPSON:  May I approach, Your Honor?

20          THE COURT:  Yes.

21  BY MR. HOPSON:

22  Q   Can you identify this document, Dr. Rosen?

23  A   Yes.  This document is a set of bills for the time spent

24  by people at the Tellus Institute on various NSR cases.

25  Q   And these are bills that you and the Tellus Institute

ROSEN - CROSS/HOPSON          Vol. 7-1014

1  prepared in the ordinary course of business and sent out to

2  the various government agencies involved in Plaintiffs in

3  these NSR litigations, right?

4  A    That's what they appear to be, yes.

5  Q    You don't have any doubt that's what they are, do you?

6  A    No. I just don't know how many cases are contained here;

7  but yes, these are a set of our bills.

8         MR. HOPSON:  Can I move the admission of Defendant's

9  Exhibit 2144, Your Honor?

10         THE COURT:  It's been moved.

11         MR. BROOKS:  No objection.

12         THE COURT:  The exhibit's admitted.

13         MR. HOPSON:  Thank you, sir.

14    (Defendants' Exhibit 2144 was received in evidence.)

15  BY MR. HOPSON:

16  Q    Let's look, Dr. Rosen -- there's a Bates stamp down at the

17  bottom that says 5572.  See if you can find that page.

18  A    Okay.

19  Q    Now, first, tell the jury who Mr. Sverrisson is.

20  A    Mr. Sverrisson was my research associate at the Tellus

21  Institute for awhile.  Then he became an independent

22  contractor that I still use on these NSR cases.  He does a lot

23  of numerical analysis with me.

24  Q    As a research associate, he kind of helps you crunching

25  numbers; is that correct?

1  A   He helps me crunch numbers, as you say, find data, load

2  impact, review documents, draft parts of the expert reports.

3  He does a lot of work on the cases along with me.

4  Q   One of the things he would help do is actually plug the

5  numbers into a formula or formulas so that you could do

6  emissions calculations, right?

7  A   Well, yes, in that in our spreadsheets, as I showed

8  outputs of our spreadsheet yesterday, we have the formulas

9  that follow from the 5 step conceptual diagram.  So, yes.  I

10  mean There were always formulas in the spreadsheets.

11  Q   The page we put up on the screen, Dr. Rosen −− will you

12  confirm for us −− is a bill that you sent out in November of

13  2001?

14  A   Yes, that's absolutely correct.

15  Q   So this does confirm that in November 2001, Mr. Sverrisson

16  was working on 10 kinds of emissions calculations; is that

17  correct?

18  A   Yes.  And by the word "kinds," it doesn't mean that we

19  used different methodologies of formulas.  It means we used

20  different data or different assumptions and −− I mean, all the

21  calculations are consistent with the formulas −−

22  Q   Did you −−

23  A   Can I finish?

24  Q   Sure, please.

25  A   I just want to make sure all the calculations are always

ROSEN – CROSS/HOPSON            Vol. 7-1016

1  consistent with the basic concepts that are listed in the 5

2  step diagram.  It's a matter of what time period you use, how

3  you define the baseline period and that kind of thing.  So

4  it's –– my recollection is that it's more the input data for

5  different calculations.  I don't think the formulas ever

6  changed to my knowledge.

7  Q    You did bill the Government for 112 hours of working on 10

8  kinds of emissions calculations, right?

9  A    That's certainly true.

10  Q    Proceeding forward, when you were brainstorming and

11  working on the development of this formula for use in

12  litigation, as far as you knew, no one at the EPA had used

13  this formula prior to the time that you were hired in this

14  case; is that correct?

15  A    I did not –– I don't believe that I communicated with any

16  technical analysts at EPA.  So I don't know.

17  Q    Let me hand you, sir, your deposition in this case.

18          MR. HOPSON:  Mr. Brooks, I have a copy for you.

19          MR. BROOKS:  I've got one, thank you.  Which one are

20  we talking about?

21          MR. HOPSON:  We're talking about the earlier one in

22  2005.

23  BY MR. HOPSON:

24  Q    I would ask you to draw your attention to page 67 of that

25  deposition and specifically draw your attention to line 8.

1  You can let me know when you've found that.

2  A    I see it, yes.

3  Q    I want to ask you if you were asked the following question

4  and gave the following answer:

5         "Question --"

6         MR. BROOKS:  Your Honor, I object.  I don't see

7  anything inconsistent.

8         THE COURT:  I'll let him read it.  Go ahead.

9  BY MR. HOPSON:

10 Q    "Question:  Are you aware of any instance prior to

11 November 1999 when the U.S. EPA used the methodology that you

12 describe in your report to calculate projected emissions

13 increases for purposes of the New Source Review regulations --

14 programs, I'm sorry?"  Then there's an objection.

15         And the answer is -- the answer is:  "No; but as far

16 as I know, I am not aware of how EPA calculated or advocated

17 calculating emissions calculations."

18         Did I read that properly?

19 A    Yes.  And that's precisely consistent with what I just

20 said, that I don't remember having any contact with any

21 emissions analysts at EPA and discussed emissions

22 methodologies.  So I don't know if they made any emissions

23 forecasts and what methodology or equations they used.

24 Q    You had no knowledge whatsoever, as that answer just

25 confirms, of any method or approach that EPA used prior to

*ROSEN – CROSS/HOPSON*          Vol. 7-1018

1  1999; isn't that correct?

2  A   I agree.  As I said, I don't even know if they made

3  emissions forecasts.

4  Q   And you don't remember discussing the way EPA approached

5  this issue prior to 1999 in your brainstorming session, do

6  you?

7          MR. BROOKS:  Your Honor, I'm going to object.  The

8  Court has -- we've been through long briefings about what the

9  rules are, and the Court has determined exactly what the rule

10  is and that Cinergy was aware of the rule.

11          THE COURT:  I understand that, but this is a yes or

12  no question.  I'll let him answer.

13          MR. BROOKS:  Okay.

14  A   Again, I was not aware of whether EPA made emissions

15  calculations, what methodologies they might have used, whether

16  it was before or after 1999.  So the answer is yes, I was not

17  aware because I never had a conversation with an analyst at

18  EPA on this subject.

19  BY MR. HOPSON:

20  Q   When you were trying to figure out the best way to do

21  this, you didn't ask anybody to discuss any approaches or

22  methods that had been used in the past, right?

23          You didn't request that information?

24  A   No -- now, that's not correct.  I don't think I ever said

25  that.  I certainly asked for relevant materials, and I was

*ROSEN — CROSS/HOPSON*          Vol. 7-1019

1  given some previous material such as some materials from an

2  old TVA NSR case.  I remember reading some testimony in that

3  case.

4  Q   What do you remember about that, Dr. Rosen?

5  A   Well —— I must say at this point, because that's probably

6  seven or eight years ago; but I do remember reading some

7  testimony in a TVA case.

8  Q   So the answer, though, just so we're clear, is you

9  never —— you never asked anyone from the EPA or the DOJ, with

10 whom you were brainstorming, how did you do these emissions

11 calculations in the past, right?

12 A   I never asked that precise question, I think; but I did

13 ask for relevant material and I was provided it.  But no one

14 ever gave me material that demonstrated that EPA had made any

15 calculations of this sort.  I guess I could have asked that

16 question; but I never did, and I was never given materials

17 from EPA of this sort.

18 Q   You decided, Dr. Rosen, that looking at how the EPA had

19 approached this question prior to the time you got hired was

20 nothing you needed to know, right?

21 A   As I say, I didn't exactly say that to myself.  I asked

22 the attorneys for relevant materials.  I was provided with

23 some relevant materials.  I assumed, perhaps naively, that

24 those were the most relevant materials and I proceeded from

25 there.

ROSEN – CROSS/HOPSON          Vol. 7-1020

1  Q    Does that question suggest to us that if something's

2  missing or something's wrong, that it's the attorney's fault?

3  A    No.  I don't know that anything's missing or wrong.  Let's

4  see if there is anything missing or wrong.

5  Q    While we're talking about the brainstorming, you also know

6  and you understand that there's nothing in the rules or the

7  statute that contains this five-step formula, right?

8  A    That's correct.  I would say that's typical of most

9  regulations, that they don't provide mathematical formulas for

10 executing the regulation.

11 Q    And there's nothing in any NSR applicability determination

12 or any guidance document from EPA that says use Dr. Rosen's

13 five-step formula to calculate emissions increases, right?

14 A    That's certainly true.

15 Q    And there's nothing in any treatise such as *Steam* that

16 should say, "Utilities, you should use Dr. Rosen's five-step

17 formula to calculate emissions increases," correct?

18 A    That's certainly true.

19 Q    And there's nothing --

20        MR. BROOKS:  Your Honor, I'm going to object.  I

21 think it would be best if we approach --

22        THE COURT:  How many more questions --

23        MR. HOPSON:  One more.

24        THE COURT:  Ask your one more question, and we'll

25 move on.

ROSEN – CROSS/HOPSON          Vol. 7-1021

1  BY MR. HOPSON:

2  Q    There's nothing in any peer-reviewed journal of

3  engineering or even a peer-reviewed journal of theoretical

4  physics that says to use these five steps to calculate

5  emissions increases; is that correct?

6  A    That's correct.  Now, let's be clear that in theoretical

7  physics people would not be dealing with this subject matter.

8  Q    Okay.

9  A    And No. 2, in terms of peer-reviewed journals dealing with

10  engineering or economic engineering for utility applications,

11  these concepts are so fundamental and so basic that I don't

12  think any journal would publish an article at this level of

13  simplicity.

14  Q    You never submitted it though, did you?

15  A    No, but why would you?  It's like submitting something

16  that thousands of engineers know and use all the time.  What

17  would be new about it?  Why would a journal publish such an

18  article?

19  Q    It's your position in this courtroom that the -- it's just

20  so obvious, it's just not worthy of discussion, right?

21  A    I would say the relationships of the concepts are obvious

22  to anyone in the industry.  How the concept is applied is

23  never obvious.  That requires careful analysis.

24  Q    And that's the careful analysis that you brought to this

25  litigation in 1999, right, sir?

ROSEN - CROSS/HOPSON          Vol. 7-1022

1  A    I believe that I facilitated some careful analysis, yes.

2  Q    Good.  Without belaboring the point, your position has

3  been that because NSR rules require a prediction, looking at

4  any after the fact data to see if the predictions you get out

5  of this formula are accurate is really not relevant or

6  appropriate?  Is that the position --

7         MR. BROOKS:  Your Honor, we're about to open --

8         THE COURT:  Sustained.

9  BY MR. HOPSON:

10  Q    Well, is it true, Dr. Rosen, you've never done a

11  statistical analysis to test the accuracy of your predictions

12  in this case?

13        MR. BROOKS:  Again, I'm going to object --

14        THE COURT:  Sustained.

15  BY MR. HOPSON:

16  Q    Dr. Rosen, I want to just take a brief look at what was

17  marked yesterday as Rosen Demonstrative 8.

18        Do you recall that?

19  A    Certainly.

20  Q    I think you testified yesterday -- I don't have your exact

21  words, but you said something to the effect of this is a very

22  important part of your predictive formula; is that right?

23  A    That's right.  And I explained this morning how that can

24  be used in dealing with the demand growth exclusion as well.

25  So it is definitely very important and central to my analysis.

ROSEN – CROSS/HOPSON          Vol. 7-1023

1  Q    When we're looking at this hypothetical unit here, I take

2  it what you're attempting to show is the unit in the

3  post-project period; is that right?

4  A    No.  I believe this chart, as I explained, illustrates

5  what goes on in the pre-project period as well as in the

6  post-project period.

7  Q    Well, would it be fair then, just in simple terms, to

8  suggest that because we're looking at the blue section there

9  of approved availability, that's in the post-project

10 section -- post-project period, right?

11 A    Yes.  I think I explained that the blue additions to the

12 bars are what's added by -- what's caused by the project.  The

13 red portions are what preexisted the project.

14 Q    The red portion is what preexists in the pre-project

15 period; is that correct?

16 A    Yes.

17 Q    And the blue is what is added through Mr. Koppe's

18 contribution to this formula; is that right, sir?

19 A    Right.  Mr. Koppe provides the equivalent of the 10

20 percentage points that I used here for the improved

21 availability.  Then I make this simple calculation and get the

22 7 percentage points increase in generation.

23 Q    So when the formula operates, the blue part on this chart

24 is the -- in simple terms, the GADS hours attributable to the

25 project that are added up by Mr. Koppe, correct?

1  A    That are assumed to be repaired by the project, yes.

2  Q    The blue part referenced here in the second column is what

3  is assumed to be recovered from the component repair project,

4  right?

5  A    Right.  Well, I don't know if we should use the word

6  "assumed."  I mean, this is the results of Mr. Koppe's hard

7  analysis of the data.

8  Q    Well, isn't one premise or assumption of your entire

9  formula that a single component replacement will result in

10 reduced outage at the whole unit?

11 A    Yes, but I believe that's the thrust of Mr. Koppe's

12 testimony.

13 Q    Well, it's a premise or assumption of the formula; isn't

14 that correct?

15 A    Yes.  Once he gives me the input as to the improved

16 availability for whatever reason, then I put that into this

17 formula.

18 Q    You don't check Mr. Koppe's work, right?

19 A    No.  I have no reason to check Mr. Koppe's work.

20 Q    So once we have that assumption in this hypothetical of

21 10 percent, we put it on top of the preexisting equivalent

22 availability factor that you calculate from the pre-project

23 period; is that correct?

24 A    That's correct.

25 Q    So, in addition to the blue being an assumption, we also

1  assume that the equivalent availability factor remains

2  constant, correct?

3  A    Well, again, that's the result of Mr. Koppe's analysis.

4  He testified on that subject, I believe.

5  Q    Well, but it's an assumption that's built into the

6  formula; right, sir?

7  A    Well, I wouldn't call it an assumption.  It's a data input

8  based on hard analysis.

9  Q    I realize you wouldn't call it an assumption, so let me

10 ask this way.

11        Doesn't the formula assume that the equivalent

12 availability factor is the same before and after the project

13 but for the blue change calculated by Mr. Koppe?

14 A    Well, the formula doesn't assume it.  I assume it based on

15 Mr. Koppe's analysis.

16 Q    And then utilization factor is the next column over,

17 second from the left, right?

18 A    Yes, that's correct.

19 Q    And that's also based on the assumption that the

20 utilization factor before the project period is the same as

21 the utilization factor after the project period, right?

22 A    Yes.  And as I explained yesterday, it's an assumption

23 based on analysis that I do of the relevant utility system

24 subject to the demand growth exclusion.

25 Q    It's an assumption, right, sir?

1  A    No.  It's a result of analysis.  These assumptions don't

2  just fall from the sky.  It's part and parcel of my work

3  that's explained in great detail in the expert report that I

4  prepared, which I realize is not evidence here.

5  Q    Well, you say the constant utilization factor is not an

6  assumption?

7  A    No.  I say it's the result of analysis of utility systems

8  and how they behave.

9  Q    Well, you will tell us also though, despite the fact you

10  have 30 years of experience, you haven't done any statistical

11  tests to confirm that the utilization factor is constant in

12  the pre-project period and the post-project period, correct?

13          MR. BROOKS:  Objection, Your Honor.

14          MR. HOPSON:  It's an assumption, Your Honor.

15          MR. BROOKS:  I object.  If he wants to know about

16  what analyses have been done to say these formulas are

17  correct, we can do that.  The Court's ruling has been we can't

18  get into looking at the post-project period.

19          THE COURT:  I did say that.  The issue here is

20  whether the witness is going to agree with counsel that it's

21  an assumption:  Yes or no.  He can answer that.  I think he

22  has actually.

23  A    I would say it's part of the forecast.  To make a forecast

24  of emissions, you need to forecast the utilization factor.  I

25  forecasted it based on analysis of the relevant parameters of

1  utility system operations.

2  BY MR. HOPSON:

3  Q   You haven't tested whether utilization factor goes up or

4  down, not just in these cases but in a broader statistical

5  sense, right?  You haven't done a statistical test to that?

6         MR. BROOKS:  I'm going to object that it's a

7  nonsensical question.  It's still trying to cross a line that

8  isn't fairly clear.  What I'm worried about is it gives an

9  implication to the jury that's not so.

10         MR. HOPSON:  Can we approach very briefly, Your

11  Honor?

12         THE COURT:  Sure.

13     *(A bench conference was held on the record.)*

14         THE COURT:  Now, you have established in this case

15  that this is a formula that this guy looked at and put

16  together for the purposes of this case.  You've established

17  that.

18         MR. HOPSON:  Right.

19         THE COURT:  And you have established that Mr. Koppe

20  gave him all this information and he used it?

21         MR. HOPSON:  Right.

22         THE COURT:  I have ruled that you can't get into

23  looking at post-project data and seeing if this formula is

24  right because the issue is what would the reasonable power

25  plant operator have done, not whether they offered something

*ROSEN - CROSS/HOPSON*          Vol. 7-1028

 1  else.

 2         Now, as we look at whether -- or where this

 3  utilization factor comes from, where is it you want to go with

 4  this?

 5         MR. HOPSON:  I just want to get him to confirm that

 6  despite the fact that he says over and over again everybody

 7  knows utilization factor remains constant, there's no

 8  statistical test.  There's no industry wide studies.  There's

 9  nothing underlying this but an assumption.

10         THE COURT:  Isn't the question whether the reasonable

11  power operator, what he had thought of is that utilization

12  factor?

13         MR. HOPSON:  I guess, at the end of the day, that

14  probably is the ultimate issue.

15         THE COURT:  That is the issue.  So the question here

16  really doesn't matter, does it?

17         MR. HOPSON:  Well, it matters, Your Honor.  I don't

18  think that it's prohibited, and I understand your point that

19  we're not going to talk about post-project data; but it's a

20  very unusual circumstance to have an expert witness on the

21  stand testifying to conclusions and you can't ask him if he's

22  ever tested his conclusions.

23         THE COURT:  Well, it's an unusual situation to find

24  yourself in a position where the law is clear on what the

25  tests are and the issues are what they are.  I give that to

ROSEN - CROSS/HOPSON            Vol. 7-1029

1  you.  That's an unusual situation.

2       But in an attempt to allow both of you to make the

3  arguments that you want to make at the end of the day so that

4  this jury can decide whether this policy decision by the

5  Congress and all the work that was done to write these

6  regulations and all of the graduates of wonderful law schools

7  that wrote this law -- whether in the actual practice, how it

8  works out, that's what -- this jury is going to see if this

9  really works in actual application.

10      The only way that I can see to do that is to put

11  these limitations on where you can go and allow you to get

12  into the other area so that you can make the real arguments

13  that you want to make.  And the real argument you want to make

14  it seems to me is, "Hey, these guys come in at the last minute

15  with a formula and they test -- and they tell us what that

16  formula is.  We don't think that's the right formula.  What

17  they said isn't true," this or that.  That's where you're

18  going.  That's what your argument is.  So I'm not going to let

19  you go any further with this.  I just don't think it's

20  appropriate.

21          MS. HIMMELHOCH:  Thank you, Your Honor.

22          MR. HOPSON:  Thank you, Your Honor.  Sorry about the

23  bench conference.  I know you don't --

24          THE COURT:  That's all right.  I haven't seen your

25  shoes for a week.

ROSEN – CROSS/HOPSON          Vol. 7-1030

1    *(End of bench conference.)*

2                        (In open court.)

3    BY MR. HOPSON:

4    Q   All right, sir, back to the chart here.

5        The bottom line on this chart is that to the extent

6    that this is showing how the formula works in operation in the

7    post-project period, everything in the equivalent availability

8    factor column and everything in the utilization factor column

9    are built upon assumptions, right?

10   A   Again, they're not assumptions in the sense that implies

11   that they're somehow arbitrary or I just choose numbers.

12   They're based on analysis of how the Cinergy system was

13   operating at the time of the analysis.

14   Q   Well, that's your opinion, that they're based upon

15   analysis, right?

16   A   I know I did the analysis.  I was working hard.

17   Mr. Sverrisson was working hard.  So we did an analysis.

18   Whether the analysis is accurate enough you can dispute, but

19   we think we did a very careful set of projections of emissions

20   increases due to these projects.

21   Q   Let me ask you this, sir.  Under the formula, a change in

22   availability, if I understand it correctly, will always result

23   in a change in generation; is that right?

24   A   That's true, if everything else is kept equal.

25   Q   And if you keep everything equal after that, the formula

*ROSEN - CROSS/HOPSON*          Vol. 7-1031

1  will always show a change in emissions, right?

2  A   That's what I said.  If everything is held constant

3  between the baseline period and the future, then an increase

4  in equivalent availability factor will always cause an

5  emissions increase.  How much is up to the numbers.

6  Q   Well, let's see what's not held constant.

7       At Beckjord 1 and Beckjord 2, you calculated a change

8  in heat rate; is that correct?

9  A   I don't remember calculating a change in heat rate, no.

10 Q   If I represent to you that you did calculate a change in

11 heat rate at two units, would you accept that?

12 A   Well, yesterday we discussed what would be the case if the

13 heat rate did change by 1 1/2 percent, and I indicated how my

14 results based on what I believe was a constant heat rate

15 assumption would change.

16 Q   Dr. Koppe gave you heat rate changes for four units and on

17 two of them you put them into the calculation and two of them

18 you didn't.

19       Do you recall that?

20 A   What I recall is not using the -- two of the heat rate

21 changes.  Yes, that's correct.  Two I might have used.  Okay.

22 Q   So two out of four -- and the two that you did change --

23 the heat rate were Beckjord 1 and Beckjord 2, right?

24 A   Okay, thank you.  Yes, I think that's correct.

25 Q   I'll represent to you that, to the best of my knowledge,

*ROSEN - CROSS/HOPSON*          Vol. 7-1032

1  it is correct.

2          MR. BROOKS:  Your Honor, we're happy if -- we've got

3  the demonstratives if counsel wants to call --

4          THE COURT:  I think that's a nice gesture, but I

5  think counsel is capable of calling for what he needs.

6  BY MR. HOPSON:

7  Q   One other change that you didn't hold constant, the second

8  yellow box here, unit capacity.

9          You took Mr. Koppe's input on a 7-megawatt change in

10  unit capacity at Gallagher 1 and Gallagher 3; is that correct?

11  A   That is correct, yes.

12  Q   So in doing your SO2 calculations, which you shared with

13  us yesterday, you held everything else constant in all five

14  steps of this formula, right?

15  A   No.  In addition, as we discussed yesterday, I modified

16  the utilization factor for four small units.

17  Q   We'll talk about the modified utilization factor later;

18  but you treat that as just a different type of utilization

19  factor, right?

20  A   Well, no.  I mean, it's a -- I gave it a name.  I said it

21  was a modified utilization factor, but it was the analysis

22  that we did that led to a change in the value of the

23  utilization factor from the baseline period to the forecasted

24  period.  It's not a different type, no.

25  Q   Putting aside the few circumstances where you changed a

*ROSEN – CROSS/HOPSON*          Vol. 7-1033

1  few things here and there, whether heat rate, utilization

2  factor or unit capacity, the heart of this formula –– as

3  Mr. Brooks said yesterday –– is the change in availability,

4  right?

5  A   I would say it's the heart in that that was the parameter

6  that changed in most of the cases –– well, in all the cases.

7  But it's not like there was some minor attention paid to

8  whether other parameters should be changed.  Mr. Koppe, as far

9  as I understand, reviewed the heat rates, the capacities,

10 the –– you know, and the availabilities for all the units.

11 The changes that he gave me were the ones that you've

12 mentioned.  If he didn't change heat rate or the capacity for

13 other units, that's because he didn't believe that changes

14 were warranted.  So we made all the changes that were

15 appropriate based on Mr. Koppe's analysis.

16 Q   Yesterday Mr. Brooks said to you if the change in

17 availability is wrong, the outcome of the formula is going to

18 be wrong, speaking, of course, about the numerical inputs; is

19 that correct?

20 A   Certainly, if you put wrong data in, you'll get wrong

21 results out.

22 Q   Garbage in, garbage out, right?

23 A   Absolutely.

24 Q   The real outcome of this formula then, holding everything

25 constant, is simply dependent upon whether there are enough

*ROSEN - CROSS/HOPSON*          Vol. 7-1034

1  hours plugged into the first step of the formula; isn't that

2  right?

3  A    No.  As I explained, other parameters, as you yourself

4  listed, might change due to these projects.  And Mr. Koppe

5  reviewed that issue systematically.  So it's not the case

6  that --

7  Q    I'm sorry?

8  A    It's not the case that the change in emissions is solely

9  due to change in availability.

10        In most of the instances, it was primarily due to the

11  change in availability.  That's correct.

12  Q    The last question I asked you, sir, was premised upon if

13  you hold everything constant.

14        Did you hear that part of the question?

15  A    Yes, and I think I answered that question earlier.  If you

16  hold everything but availability constant, of course the

17  result depends on the change in availability because

18  everything else is constant.  That's just logic.

19  Q    The first step in the formula, the change in availability,

20  is based upon, as I understand it, Mr. Koppe's study of GADS

21  data; is that correct?

22  A    That's my understanding.

23  Q    And as I understand it, he's adding up in simple terms --

24  he's adding up outage hours; isn't that correct?

25  A    Well, again, that's one part of his analysis; but you

1  should ask Mr. Koppe further questions on his methodology if

2  you have some.

3  Q   Do you not know the answer to that question, sir?

4  A   I said that adding up outage hours is part of his

5  analysis.

6  Q   You already know that Mr. Koppe's testified here today,

7  right -- testified in this courtroom before, right?

8  A   I am aware of that, yes.

9  Q   So the answer to my question is yes, Mr. Koppe gets the

10 change in availability by adding up outage hours, right,

11 Dr. Rosen?

12 A   No.  I say that's -- my understanding is that's part of

13 his analysis.  He brings a lot of engineering judgment to the

14 analysis.  He looks at many aspects of how these plants

15 operate and what they've been undergoing in the past.  It's

16 much more complicated than some simple -- the way you're

17 characterizing it sounds too simplistic to me.  Let me just

18 say that.

19 Q   I didn't ask you about his engineering analysis of heat

20 rate in that question, did I?

21 A   I didn't respond to heat rate issues.

22 Q   I just asked you how he calculates the number on change in

23 availability.

24        Do you understand that that's what we're talking

25 about?

1  A    Yes, I do.

2  Q    And do you understand he calculates the number on change

3  in availability by adding up outage hours out of GADS

4  attributable to the project in question?

5  A    My understanding is that he produces a change in

6  availability by analyzing all the relevant outages and then,

7  once he decides which outages would be eliminated by the

8  project in the future, yes, then, of course, he adds up the

9  results.  I'm sure that's true.

10  Q    So what he's really –– what the formula –– if you step

11  back from it, what the formula is doing is translating that

12  change in availability based on what you just described into a

13  change in emissions, correct?

14  A    Yes, that's the whole point of the scheme.  That's the

15  mission that we have to achieve is to look at how emissions

16  change when component replacements and repairs change unit

17  availability.  That's the whole point of being here.

18  Q    Okay.  So in a very simple sense, what the formula is

19  doing is making a calculation of the extent to which forced

20  outage rate is going to be reduced or as the formula says it,

21  availability is going to change; and there are going to be

22  additional emissions in the post–project period, right?

23  A    Again, that's one aspect of the formula, if everything

24  else is held equal, yes.  That's the whole point.

25  Q    But you know that predicting the future outage rate of one

1  of these generating units is like flipping a coin, right,

2  Dr. Rosen?

3  A    No, I never said that.

4  Q    Haven't you said that forced outage –– the forced outage

5  rate or forced outages are close to random?

6  A    But that's completely from what you implied in your

7  question.

8  Q    Explain that.

9  A    Yes.  Forced outage rates are probably more or less

10  random, although not exactly random.  But that says nothing

11  about the magnitude of forced outage rates for a particular

12  unit on average.

13        So, for example, a unit could have a 10 percent forced

14  outage rate; namely, it's out of commission 10 percent of the

15  year an those forced outages might happen roughly randomly

16  during the year but roughly it's out 10 percent of the year.

17  Another unit could have a 50 percent outage rate.  Those

18  outages could also be somewhat random or close to random but

19  that unit is out five times more.  So the randomness of

20  outages has actually no or little relevance –– I won't say no

21  relevance but little relevance to what the change in

22  equivalent availability should be for a particular unit.

23  Q    Well, your formula –– did you just use the term magnitude

24  in that question?

25  A    I did.  By magnitude, I mean size, the size of the effect,

ROSEN – CROSS/HOPSON                Vol. 7-1038

1  yes.

2  Q    Your formula doesn't just predict whether outage rate goes

3  up or down.  The formula predicts the exact magnitude of the

4  change in outage rate, right?

5  A    No. my formula doesn't predict anything about outage rate.

6  That's Mr. Koppe.

7  Q    Mr. Koppe --

8  A    My formula inputs Mr. Koppe's results.  I do not predict

9  changes in equivalent availability.

10 Q    Mr. Koppe uses outage rate to predict a precise magnitude

11 of change in forced outage rate, right?

12 A    That I agree with.  That I agree with.  The results of his

13 engineering judgment results in a magnitude of the change in

14 the equivalent availability factor based on his analysis of

15 the magnitude of changes in forced outage rates.

16 Q    And you have said, sir, that predicting future outage rate

17 is like coin flipping in the sense that there's a fairly

18 random process at work, right?

19 A    No.  I said just now the opposite, which is the outages

20 might be somewhat random like you get with coin flipping, but

21 the size of the outages on average has nothing to do with coin

22 flipping.

23 Q    You have haven't said that predicting forced outage rate

24 is like coin flipping in the sense that there is a fairly

25 random process at work?

ROSEN - CROSS/HOPSON          Vol. 7-1039

1  A    That's right but there's --

2  Q    Have you said it or not said it, Dr. Rosen?

3         MR. BROOKS:  Objection, Your Honor.  May I have a

4  cite to what counsel is referring to?

5         THE COURT:  He can answer this question first, and

6  then you'll get your cite.

7  Q    Can I get a yes or no answer?

8  A    I believe you're quoting from my deposition, and I believe

9  what I said was exactly what I just said now.  I might not

10 have fleshed it out as fully, but the distinction I was trying

11 to make was between how often or what pattern forced outages

12 faced and the magnitude of the forced outages.  What I was

13 referring to in the deposition was the pattern of occurrence

14 of forced outages, not their magnitude.  Okay.  So for

15 example, you know, we could use a coin flip to bet $10 that

16 we'll get a head or a tail or we could use a coin flip to bet

17 $1,000.  That's a very different situation.

18 Q    Was the answer to the question yes with an explanation or

19 no with an explanation?

20 A    The answer is yes.  If you quoted my deposition correctly,

21 I said it.  I will accept that and I'm explaining how it's

22 exactly consistent with what I was just stating a moment ago.

23 Q    You mentioned a little earlier, Dr. Rosen, a discussion

24 that was had yesterday about service factor as opposed to

25 availability; is that correct?  You referenced that when we

ROSEN – CROSS/HOPSON          Vol. 7-1040

1  were talking about what was held constant and what's not held

2  constant?

3  A    Well, the service factor is part of what goes into the

4  entire unit availability.  It's part of --

5  Q    Generally in your formula -- if you'll allow me to speak

6  generally for a moment, you used utilization factor to convert

7  Mr. Koppe's calculation of change in availability to a change

8  in generation, right?

9  A    I always used utilization factor in all my calculations.

10 Q    And you have told us that -- I think you said several

11 times you used the industry standard definition; isn't that

12 correct?

13 A    That's correct.

14 Q    But for four projects you used a modified definition of

15 utilization factor; isn't that correct?

16 A    I modified -- it's correct that I modified the way the

17 utilization factor was computed, yes, to reflect the increase

18 in generation from the increase in availability.

19 Q    That has something to do with a notion of service factor,

20 right?

21 A    The way I modified the calculation of utilization factor

22 had to do with service factor, yes.

23 Q    Let me show you what's already been entered into evidence

24 as Defendants' 123.

25        Can we have 123, please?

1    While we're digging out on 123, let me ask you this.

2  If I understand it correctly, what happens in your modified

3  definition of utilization factor is that you take the reserve

4  shutdown unit hours out of your calculation of availability;

5  is that correct?

6  A   Well, again, I wouldn't say I use a modified definition of

7  utilization factor.  I would say I use the definition of

8  utilization factor as always and I modified the way the

9  calculation was made.

10  Q   Well, can we call it a modified utilization factor so

11  there is a way to distinguish the way you do it 10 times as

12  opposed to the way you do it the other four times?

13  A   Okay.  I can go with that.

14  Q   Thank you.  Let me show you what's been marked as 123 and

15  moved into evidence.

16          MR. HOPSON:  May I approach, Your Honor?

17          THE COURT:  Yes.

18  BY MR. HOPSON:

19  Q   This is already in evidence, and we've heard a little bit

20  about it.  So just let me ask you, if we focus in right up

21  here, we see utilization factor is calculated as capacity

22  factor over service factor; is that correct?

23  A   That's what it states under Method 1, yes.

24  Q   Is that how you calculated generally in this case or is

25  that how you calculated for the four instances that are the

1  exception?

2  A    That's basically how I calculated the utilization factor

3  that we're calling the modified approach to utilization

4  factor.

5  Q    Again, as I understand it, this modified utilization

6  factor takes the reserve shutdown hours out of the equivalent

7  availability factor, correct?

8  A    That's basically right.  The idea is to look at what the

9  utilization factor, in fact, was when the unit was not on

10  reserve, yes.

11  Q    By GADS definition, reserve shutdown hours are hours in

12  which the unit is available, are they not?

13  A    The question is, was the unit truly available during the

14  relevant hours that we excluded?  Again, this was analyzed

15  with Mr. Koppe and the extent to which these units were on

16  reserve shutdown were so extreme in these four cases that

17  there was no reasonable basis for including all the reserve

18  hours as part of availability as you indicated is typically

19  done.

20  Q    Are you saying that Mr. Koppe made an analysis that these

21  units were not really available during the hours that they

22  were on reserve shutdown?

23  A    I'm saying this issue -- yes.  This issue was discussed

24  with Mr. Koppe, and as far as we could tell, some of these

25  units, these four that you're mentioning, were typically not

ROSEN – CROSS/HOPSON          Vol. 7-1043

1  connected to the grid and properly synchronized, as I think I

2  footnoted in my report for the relevant number of hours.

3  Q   Are you saying these units were having some

4  equipment-related problems that prevented them from being

5  synchronized and available?

6  A   That's my understanding.  I don't remember the detail

7  offhand, but that's my general understanding.

8  Q   Well, if that's the decision or the opinion that Mr. Koppe

9  rendered, you know that he is deviating from standard GADS

10 definitions, don't you?

11 A   No.  You would have to discuss that with him.

12 Q   You know what GADS definition of reserve shutdown is,

13 don't you, Doctor?

14 A   I don't remember at the moment.  I've read it before, but

15 I don't remember.

16 Q   You've read it before?

17 A   Certainly.

18 Q   Let's look at Defendant's Exhibit 2159.

19       Will you confirm for us, Dr. Rosen, that I've handed

20 you a section of the GADS data reporting instructions?

21 A   That's what it's labeled, yes.

22       MR. HOPSON:  Your Honor, we would move the admission

23 of 2159.

24       MR. BROOKS:  Objection, Your Honor.  This is an

25 incomplete document.  I don't mind if they've got the entire

ROSEN – CROSS/HOPSON          Vol. 7–1044

1  thing.

2          THE COURT:  I'm sorry.  I didn't hear you.

3          MR. BROOKS:  I wouldn't have a problem if they want

4  to make this an entire document, but I'm a little troubled

5  that it starts at Section 3.

6          MR. HOPSON:  We already have another section of this

7  in evidence --

8          THE COURT:  I'm going to allow this.

9          Go ahead.  It's admitted.

10     (Defendants' Exhibit 2159 was received in evidence.)

11 BY MR. HOPSON:

12 Q   Go ahead then, sir, and turn to page 319.

13         Are you on 319?

14 A   Yes, I am.

15 Q   Will you confirm for me that we're looking at the

16 definition of reserve shutdown as defined by GADS?  Right,

17 sir?

18 A   Again, that's what it appears to be, yes.

19 Q   And what reserve shutdown is defined as is an event that

20 exists when the unit is available for load but is not

21 synchronized due to lack of demand.

22         Is that the definition that GADS provides for reserve

23 shutdown?

24 A   Yes, it is.

25 Q   It goes on to say, "This type of event is sometimes

1  referred to as an economy outage or an economy shutdown.  If a

2  unit is shut down due to any equipment-related problems,

3  whether or not the unit was needed by the system, report an

4  unplanned (forced outage), maintenance outage or planned

5  outage" -- and then it says in bold "not a reserve shutdown."

6  Right?

7  A   Yes, that's what it says.  My understanding is that

8  Mr. Koppe felt that that last sentence was the more applicable

9  sentence, that the unit was really not available to operate.

10 Whether you technically call it a reserve shutdown or not, the

11 third sentence would be applicable.

12 Q   Mr. Koppe deviated from the standard industry definition

13 for these four units, right?

14         MR. BROOKS:  Objection, lack of foundation.

15         THE COURT:  He can answer, if you know.

16 A   As I say, you would have to ask Mr. Koppe his opinion on

17 that because he is certainly more of a GADS expert than I am.

18         I am saying that my understanding is that he believed

19 that this last sentence was the more relevant one since these

20 units were out such a high fraction of the year and that they

21 were not truly available to operate because of equipment

22 problems.

23 BY MR. HOPSON:

24 Q   You're not testifying that the four units had equipment

25 problems.  You're just repeating what Mr. Koppe told you,

ROSEN – CROSS/HOPSON          Vol. 7-1046

1  right?

2  A    That's my understanding.  That's my understanding.  That's

3  my area of analysis.

4  Q    Can you tell us –– back to your area of analysis –– that

5  when you use your modified utilization factor as a simple

6  matter of mathematics, you always get higher generation; isn't

7  that true?

8  A    It's true that if you raise the numerical value for the

9  utilization factor you will get a higher emissions change,

10  yes, absolutely.

11  Q    The question is, doesn't the modified utilization factor

12  for the four projects we're talking about always result in a

13  larger calculation of generation under your formula?

14  A    And I think I said yes, when compared to a lower value;

15  but again, the whole point is that you have to exercise

16  engineering and system operation judgment in inputting any

17  particular value for these parameters.  Nothing should be done

18  blindly.

19        If there are four units like these units that you're

20  referring to that are out so much of the year, you have to

21  determine why and what's the relevance of that for calculating

22  the utilization factor.

23  Q    Well, I'm glad you brought this up.

24        That wasn't done blindly, was it, Dr. Rosen?

25  A    Of course not.

*ROSEN - CROSS/HOPSON*          Vol. 7-1047

1  Q   In fact, what happened here is you and your colleagues at

2  the Tellus Institute ran the numbers using the standard

3  utilization factor.

4        You didn't get a change in emissions that was

5  significant enough to prove a violation in this case and you

6  got together and decided to change it, right?

7  A   Frankly, I do resent the implication of that question

8  because as you know, there are many analyses that I did of

9  projects that showed that they did not -- the results were not

10  in excess of the significance threshold.  So if you're

11  implying --

12        MR. HOPSON:  Your Honor, this is the same thing we

13  had objection to yesterday, talking about other projects.

14  It's a nonresponsive answer, and I ask that it be stricken.

15        THE COURT:  Just answer the question, if you would,

16  Doctor.

17  BY MR. HOPSON:

18  Q   Let's review the chronology, sir.

19        Isn't it true that your research associate who we've

20  already heard about performed the calculations for these four

21  units we're talking about using your standard utilization

22  factor; isn't that true?

23  A   I don't know if that was done, no.

24  Q   You have no idea whether he did the calculation using the

25  standard utilization factor?

ROSEN – CROSS/HOPSON          Vol. 7–1048

1  A   I am not aware of whether there was a calculation for the

2  four units you're referring to since I'm supposed to limit my

3  answer to those four units.  I'm not aware of whether there

4  was a calculation of emissions changes using what you're

5  calling the standard utilization factor as opposed to the

6  modified utilization factor that we felt was appropriate.

7  Q   Well, do you recall later in the case after the emissions

8  calculations had started that you participated in some

9  additional conference calls with Mr. Koppe and the lawyers on

10 this very subject of whether to use the standard or modified

11 utilization factor?

12        You do remember those calls, don't you?

13 A   I don't know if "calls" is the right word.  There may have

14 been a call.  I don't remember if there was more than one.  I

15 remember discussing the issue.

16 Q   You remember discussing the issue about whether we should

17 use -- you should use a modified utilization factor for four

18 of the projects in this case, right?

19 A   Certainly.  That I definitely remember.

20 Q   And you recall agreeing with Mr. Koppe and the lawyers

21 that you would use a modified utilization factor for four of

22 the projects in the case, right?

23 A   That's correct.  Generally, the way these discussions go

24 are, you know, we discuss the issues, the technical issues.

25 Usually, it's myself, Mr. Sverrisson and Mr. Koppe and we

ROSEN – CROSS/HOPSON          Vol. 7-1049

1  discussed the issues; and ultimately, I usually -- in fact, I
2  think ultimately, I always go with his judgment because he's
3  the engineer that's the expert on outages and then we -- based
4  on his advice, we calculated what you're calling the modified
5  utilization factor because he recommended that that was most
6  appropriate.
7  Q   And the result, the mathematical result of using the
8  modified utilization factor was to make the bottom right-hand
9  box on your chart, the emissions increase calculation, larger,
10 right?
11 A   There's no question about that, of course.
12 Q   Let's talk about one of the other yellow boxes on your
13 chart, which is heat rate.
14      You testified yesterday that heat rate is one of the
15 things you need to look at in converting the megawatt hours of
16 generation into the emissions calculation that you make.
17      Have I got that right?
18 A   Certainly.
19 Q   And if heat rate -- this gets a little confusing for me;
20 but if heat rate goes down and you hold everything else
21 constant, then emissions will go down; is that right, sir?
22 A   Yes, because heat rate is a measure of the efficiency.  If
23 you need less heat to make a certain amount of electricity,
24 then you need less fuel and emissions go down.
25 Q   If the unit becomes more efficient as a result of these

ROSEN – CROSS/HOPSON          Vol. 7-1050

1  tube replacements or component replacements, you have to burn

2  less coal to get the same amount of electricity.

3          Is that a fair way of stating the proposition?

4  A   Exactly.  I think I said exactly the same thing.

5  Q   Mr. Koppe told you that there were four projects that in

6  his opinion resulted in a reduction in heat rate, right?

7  A   No, I don't think that's correct.  I think there was some

8  evidence that company documents assumed a reduction in heat

9  rate in a couple of those cases that we discussed earlier, and

10 Mr. Koppe suggested that we not use the change in heat rate in

11 two cases but we use it in the other two.

12 Q   Well, you told us yesterday repeatedly about your reliance

13 on company documents, didn't you?

14 A   Well, no -- well, I think the basic answer is no, in the

15 sense that I did not rely on company documents in general for

16 my calculations that I presented here yesterday.

17 Q   Let me --

18 A   I have reviewed company documents.

19 Q   Sure.  And we spent -- this is a very simple question.  We

20 spent some considerable time with you in the courtroom

21 yesterday looking at company documents, right?

22 A   Well, that's true.  I was asked questions about company

23 documents, yes.

24 Q   Let me show you, sir, your expert report in this case.

25          MR. HOPSON:  May I, Your Honor?

ROSEN - CROSS/HOPSON          Vol. 7-1051

1          THE COURT:  You may.

2   BY MR. HOPSON:

3   Q    I would like to ask you to direct your attention,

4   Dr. Rosen, to page 20 of your report.

5          Well, actually, why don't you direct your attention to

6   page 19 first?  I just want to ask you to confirm one sentence

7   here, if I can zoom in a little bit.

8          I want to confirm that you wrote in this report,

9   "Table 2 contains a list of all the activities analyzed in

10  this report that resulted in heat rate and capacity changes,

11  as supported by Mr. Koppe."

12          Is that correct?

13  A    I think, actually, you need to read that in context of the

14  footnote to table 2 to page 20.

15  Q    Let's look at the footnote to table 2 on page 20.

16          Just so we understand this, table 2 on page 20 lists

17  four units:  Gallagher 1, Gallagher 3, Beckjord 1 and

18  Beckjord 2; is that correct?

19  A    That's correct.

20  Q    And the fourth column over shows a change in heat rate for

21  all four units; is that correct?

22  A    That's correct.  The footnote I was referring to was the

23  little star there which says that it was -- that certain two

24  heat rates, as you mentioned earlier, were not included in our

25  calculations.  And how that relates to the sentence you asked

ROSEN – CROSS/HOPSON          Vol. 7-1052

1   me about on page 19 is I think actually that sentence should

2   have stated what was also stated in the footnote; that

3   ultimately, Mr. Koppe decided that those two heat rate changes

4   were not appropriate on balance.

5   Q   Let's see if I can break this down into pieces.

6        Mr. Koppe did, as we just saw on page 19, find that

7   there would be a heat rate improvement at four units, right?

8        Not –– put aside, sir, whether you put them into your

9   calculations or whether they were offset or whether there was

10  reason to ignore them.

11       He did find four heat rate improvements, right?

12  A   Well, that's what I'm saying.  That sentence may not be

13  totally accurate because it doesn't seem to have accurately

14  reflected Mr. Koppe's other judgment which is written up in

15  this footnote to table 2.  So if you want to be absolutely

16  precise, that sentence that I wrote on page 19 might not be

17  worded in the optimal way, the most accurate way.

18  Q   Let's see what you're talking about because I think now

19  I'm confused.

20       You're saying that the sentence I read, table 2,

21  containing a list of all the activities analyzed in this

22  report that resulted in heat rate and capacity changes, as

23  supported by Mr. Koppe, is inaccurate?

24  A   No.  What I am saying, it is somewhat inaccurate in light

25  of the footnote on the next page, yes.  It probably should

*ROSEN - CROSS/HOPSON*          Vol. 7-1053

1  have been written slightly differently.  And if there's any

2  confusion, I certainly take responsibility for that; but it

3  should have cited to the footnote and said that for two of the

4  plants, Mr. Koppe ultimately decided on balance that those

5  heat rate changes should not be reflected in my calculations.

6  Q    You wrote those words in May of 2005; is that correct,

7  sir?

8  A    That's correct.

9  Q    All I want to know is when did you learn that the

10 statement in your expert report was inaccurate?

11        Did you learn it in the preparation for your testimony

12 yesterday?

13 A    I'm just discussing it with you right now.  If you want --

14 if you're asking could that sentence on page 19 have been

15 written somewhat more accurate, I agree with you.  It could

16 have been written more accurately.  It could have reflected

17 the footnote that, in fact, appears on the next page.  I have

18 no problem with admitting that that sentence is not as

19 accurate as it should have been.

20 Q    You like the footnote on page 20, but you don't like the

21 sentence on page 19?

22 A    It's not a matter of liking.  It's a matter of what

23 Mr. Koppe ultimately decided on this issue.

24 Q    Well, let's look at what Mr. Koppe ultimately decided on

25 this issue, and let's read the footnote that you keep

1  referring to.

2       You say that for Gallagher 1 and Gallagher 3, the

3  change in heat rate, the improvement in heat rate is not

4  reflected in emissions calculations, right?

5       Tell the ladies and gentlemen of the jury, confirm for

6  them that that means that when you got to this step in your

7  formula for Gallagher 1 and Gallagher 3, you did not include

8  the change in heat rate, right?

9  A   I agree totally, yes, exactly.  That's why counsel asked

10 me what would the effect be if I had included it, and I put

11 that on the record yesterday.

12 Q   I'm just trying to make it clear, Dr. Rosen.

13      You didn't put the change in heat rate -- whether

14 Dr. Koppe believed in it or not, you didn't put it in your

15 calculation, right?

16 A   That's absolutely correct, and I believe we discussed it

17 yesterday in detail.

18 Q   Well, we're going to discuss it today if that's all right

19 with you.

20 A   That's fine.

21 Q   You say you didn't put it in your emissions calculations

22 because of Cinergy's projected increase in generation due to

23 increased unit dispatch.

24      If I understand that correctly, the word "unit

25 dispatch" is referring to the dispatch order; is that correct?

*ROSEN – CROSS/HOPSON*          Vol. 7–1055

1  A   It refers to the way the plants are operated, yes,

2  according to the dispatch order.

3  Q   And in simple terms –– well, let's go forward.

4       You say, "As a result of reduced heat rate" –– that is

5  a change in the dispatch order –– "as a result of reduced heat

6  rate was expected to cancel out any reducing effect of the

7  lower heat rate on unit emissions"; is that right?

8       Did I read that correctly?

9  A   Yes, you did.

10 Q   Now, if I understand this, again, trying to put it in

11 simple terms, what you're saying there is that you and

12 Mr. Koppe collectively or individually came to the conclusion

13 that because the two units, Gallagher 1 and Gallagher 3, would

14 become more efficient, they would change in the dispatch order

15 and be dispatched more frequently.

16       Is that a fair summary of what's said there?

17 A   Yes, that is.

18 Q   And will you confirm for the ladies and gentlemen of the

19 jury that this footnote relating to Gallagher 1 and 3 is the

20 only time in your expert opinion where you looked at dispatch

21 order?

22 A   Well, again, this comment, this analysis came from

23 Mr. Koppe, okay.  So again, the basis for this you would have

24 to talk to him about.

25 Q   Pick up your deposition, sir, and turn to page 156.

ROSEN — CROSS/HOPSON          Vol. 7-1056

1          MS. HIMMELHOCH:  Which deposition, sir?

2          MR. HOPSON:  The one in this case.  The one we've

3 already showed him.

4          MS. HIMMELHOCH:  So the October 2005?

5 BY MR. HOPSON:

6 Q   I'm sorry, sir.  I gave you the wrong page number.

7          MR. HOPSON:  Yes, it is.

8          MS. HIMMELHOCH:  Thank you.

9          MR. HOPSON:  I have a hard time reading the small

10 print, too.

11 A   What page should I be looking at?

12 BY MR. HOPSON:

13 Q   Why don't you start, sir, at the bottom of page 157 at

14 line 23.  Were you asked the following question and did you

15 give the following answer:

16          "Question:  Did you evaluate whether any of the

17 Cinergy projects resulted in any of the units following —

18 falling to a lower position on the dispatch?

19          "Answer:  I didn't study what impact the activities

20 would have on dispatch order, no."

21          So that was the testimony you gave under oath.

22          The only exception to that is for these two cases and

23 the footnote we're looking at where you did predict —

24          MR. BROOKS:  Mischaracterizes the testimony that we

25 heard.

 1          MR. HOPSON:  Somebody's got to summarize --

 2          THE COURT:  Is that a question?

 3          MR. HOPSON:  Yes.

 4          THE COURT:  Let's have your question.

 5          MR. HOPSON:  Not sure if I can do it again.

 6  BY MR. HOPSON:

 7  Q    Isn't it true that the only time you looked at dispatch

 8  order in all your work in this case is reflected in this

 9  footnote on page 20?

10  A    And my answer is no.  As I said in my deposition, I

11  believe I left this analysis to Mr. Koppe.  I think I relied

12  solely on Mr. Koppe's judgment in this regard.

13  Q    Dr. Rosen, back to the documents we looked at -- do you

14  want me to take that away if that stuff is piling up up there?

15  A    No.  I have a nice place to put it.

16  Q    Back to the documents we looked at, you've looked at and

17  discussed yesterday in the courtroom, quite a few of Cinergy's

18  project evaluation documents; is that correct?

19  A    Yes.  I was asked questions about one or two of those

20  documents.

21  Q    And you would agree with me, I think, that the function of

22  those Cinergy project evaluation documents is basically to

23  perform a cost/benefit analysis; isn't that correct?

24  A    I believe that the basic function was to perform

25  cost/benefit analyses for projects exactly of the type that

ROSEN - CROSS/HOPSON          Vol. 7-1058

1  we're talking about here, yes.

2  Q   In fact, as you know from your experience, all utilities

3  have various capital projects that they need to or want to

4  engage in, and they need some method of ranking capital

5  projects based on a cost/benefit analysis or a return on

6  investment or some other economic formula, right?

7  A   I would say yes, that's part of it.  But of course, if a

8  power plant is falling apart so it can't be operated, it's

9  often somewhat clear on an engineering basis, you know, what

10 needs to be done.  But I agree with you that most utilities

11 want to have cost/benefit analyses to rank projects.

12 Q   You also talked a little bit in your testimony yesterday,

13 I believe, about other kinds of tools that utilities use;

14 isn't that correct?

15 A   Yes.

16 Q   And I believe that you mentioned, for example, project --

17 I'm sorry.  You mentioned dispatch models; is that correct?

18 A   Yes, I did.

19 Q   And you mentioned generation planning models; is that

20 correct?

21 A   Yes.

22 Q   And you suggested, if I heard you correctly, that for

23 example, dispatch models use similar concepts of availability

24 as your formula in this case?

25 A   Of course, yes.

1  Q    I'm sorry, sir.  I didn't hear your answer?

2  A    Yes, of course.  Dispatch models have to have input data

3  on plant availability usually in the form of forced outage

4  rates, scheduled outage rates, when the scheduled outage is

5  planned to occur.  There's a lot of data that goes into a

6  dispatch model that reflects availability of a unit to run

7  because the model has to decide when it can run and how much.

8  Q    Isn't it true, sir -- and I'm just going to ask you

9  once -- dispatch models don't make any predictions of

10 availability; isn't that true?

11 A    Dispatch models don't predict availability.  They use

12 availability to predict generation.  That's correct.

13 Q    You also mentioned generation planning models; and I think

14 you suggested that generation planning models were another

15 type of modeling or planning that electric utilities do,

16 right?

17 A    Certainly.

18 Q    If I understand it correctly, generation planning is a

19 process of planning many years or decades out in the future

20 how these utilities are going to meet demand; isn't that

21 correct?

22 A    That's a good basic definition, yes.

23 Q    And the truth is -- well, you mentioned PROMOD.

24      What is PROMOD?  Is it just a computerized way of

25 doing that?

1  A    The core of PROMOD is a computerized dispatch models.

2  There are other models that PROMOD -- has to do more of the

3  generation planning functions that you just mentioned.

4  Q    When PROMOD is used for generation planning, it uses a

5  measure of availability that doesn't predict the future.  It

6  looks five years back; isn't that the right?

7  A    Absolutely not.  How you generate the data for

8  availability to input it into PROMOD is done differently

9  depending on who is using the model and for what purpose.

10 Five years back is not a golden rule.  Some people may use

11 five-year average data in the past to input the PROMOD for the

12 future or not, but the key thing is that PROMOD does forecast

13 the future.  It forecasts generation in the future.

14 Q    Right.  But when PROMOD is used by Cinergy for generation

15 planning, they don't use a prediction of availability.  They

16 use a five-year historical average of availability; isn't that

17 right, sir?

18 A    That may be right at times.  I don't know if Cinergy

19 always has done that.  But if they have, it doesn't matter how

20 the analyst generates the data to input to PROMOD.  The data

21 is input for a base year.  Then what PROMOD does is calculate

22 what happens to the next year and the next year and the next

23 year --

24 Q    By definition --

25 A    Can I finish?  I think it's pretty important to get this

1  clear.

2       PROMOD takes the data for availability, again,

3  typically in the form of forced outages for each generating

4  unit.  It knows the -- basically the maintenance outage

5  periods.

6       And then PROMOD -- however that data on availability

7  is developed, whether it's from the past five years, the past

8  20 years, the past year, PROMOD takes all that availability

9  data, okay, and then steps forward in time as demand changes

10  and as other things change.  Fuel prices may change.  Many

11  things may change into the future.

12       PROMOD calculates the generation expected from each

13  generating unit based on all that input data.  That's very

14  important.  So there are forecasts involved; and the result of

15  the availability assumption means that PROMOD, in fact, then

16  calculates the availability in the future.  It does, because

17  it will tell you what the availability is as a function of the

18  schedules that you put in, for example, for plan maintenance.

19       So PROMOD will tell you what the availability is in

20  the future based on the input assumptions, but the key thing

21  it does is tell you the generation that results from those

22  availability assumptions.

23  Q   Are you done now?

24  A   I am.

25  Q   Will you confirm for us that when you're doing real

*ROSEN - CROSS/HOPSON*          Vol. 7-1062

1  generation planning using PROMOD or anything else, you don't

2  hold everything constant to the extent you do in this formula;

3  isn't that correct?

4  A   When you do generation planning for the long run, then, of

5  course, in the long run many things changed.

6        Also, when you do generation planning, you're not

7  trying to make your calculations consistent with a regulation

8  like the New Source Review regulations.  So all the same

9  principles apply to how utility systems operate and behave,

10  but it depends on your goal in terms of the precise

11  calculation you're going to be making.

12        So generation planning yields certain types of results

13  because you have a different goal from calculating an

14  emissions change, for example, after a project is performed.

15  Q   You mentioned in your last answer over the long run, lots

16  of things change.

17        Is that what you said?

18  A   That's typically true, yes.

19  Q   And you understand that as you sit in that witness chair,

20  that over two years, lots of things changed at this unit as

21  well, right?

22  A   Not necessarily.  Things change.  Things always change.

23  We all know that from our personal lives.  But over two years,

24  things change typically less than they do over 20 or 30 years.

25  So you have to again use your judgment in estimating and

*ROSEN - CROSS/HOPSON*          Vol. 7-1063

1  forecasting changes of each parameter.  Different parameters

2  change to a different degree as you're forecasting them.

3  Q   Even though everything changes and you know everything

4  changes, you bring us a formula with a few exceptions,

5  everything remains constant, right?

6  A   No.  That's a complete distortion.  The formula says

7  nothing about what data changes or not.  The formula is true

8  no matter what data changes, to what degree it changes, et

9  cetera.  The formula is based on fundamental principles and

10 definitions.  Again, mostly, it's simply definitional.

11      How you apply the formula to any particular exercise,

12 whether it's calculating emissions changes, generation

13 changes, et cetera, is a separate issue.  Okay.  All sorts of

14 the data may change in this formula.  The formula does not

15 specify that X parameter or Y parameter does change or does

16 not change.  So you're completely mischaracterizing --

17 Q   You and Mr. Koppe specify when you change and when you

18 don't change issues like heat rate; is that correct?

19 A   Of course the analysts -- the user of any particular

20 formula, dispatch model or what have you, has to decide on the

21 appropriate data to input into the model.

22      MR. HOPSON:  Your Honor, I think this would be an

23 appropriate time for a break.

24      THE COURT:  All right.  We'll take a short break.

25      COURT CLERK:  All rise.  This court stands aside in

*ROSEN – CROSS/HOPSON*          Vol. 7-1064

1  brief recess.

2      *(Jury out.)*

3      (A recess was taken.)

4      *(In open court)*

5          THE COURT:  Yes?

6          MS. HIMMELHOCH:  You had indicated we could not put

7  the transcript up.  We did have closed captioning at the

8  bottom.

9          May we be permitted to play it with that captioning?

10  Simply because we're worried that the jurors won't be able to

11  hear.

12          THE COURT:  Well, it's already built into the thing?

13          MS. HIMMELHOCH:  We can turn it off, Your Honor.

14  Unfortunately, I have to admit it.

15          MR. HOPSON:  We don't care, Your Honor.  If they only

16  use it when the video is bad, that's fine.

17          THE COURT:  All right.

18          MR. GREEN:  We're very agreeable.

19          THE COURT:  Once again --

20          MR. GREEN:  We want to make life smooth here.

21          MR. HOPSON:  Mr. Green gave me enough questions for

22  another three hours, Your Honor.

23          THE COURT:  And then wants to blame it all on you,

24  right?

25          MR. HOPSON:  Including the one too many, of course.

ROSEN – CROSS/HOPSON            Vol. 7-1065

1    *(Jury in.)*

2          THE COURT:  You may be seated.  I think there's a

3    gremlin that comes and sets that clock up five minutes every

4    time when we come back in.

5          All right.  You may inquire.

6    BY MR. GREEN:

7    Q   Dr. Rosen, what I would like to do with you, if you will

8    indulge me, is just make a simple chart of some data before

9    the project; that is, pre-project data.  And then I want to

10   ask you a couple of questions about it.  So I'm going to hand

11   you what's been previously marked for identification as

12   Plaintiffs' Exhibit 1549.  I'm sure you will agree, sir, that

13   Plaintiffs' Exhibit 1549 is a very familiar document to you.

14         It's your work papers in the case, right?

15   A   That's right.

16   Q   And your work papers in the case include a calculation of

17   equivalent availability factor and capacity factor in the

18   pre-project period; is that correct?

19   A   Correct.

20   Q   Can you tell us what the equivalent availability factor

21   was at Gallagher 1 in the relevant period that you calculated

22   before the project?

23         And could you just round it for me?  Because I know

24   you went out to two decimal points.  Do you mind rounding?

25         If you mind it, we won't do it.

ROSEN – CROSS/HOPSON          Vol. 7–1066

1  A    EAF equals 82.4 percent.  Do you want it rounded to the --

2  Q    Whatever you're comfortable with.

3        What's the capacity factor?

4  A    Capacity factor is 56.2 percent.

5  Q    The Gallagher 2 condenser project?

6  A    Equivalent availability is 76.0.  Capacity factor is 41.1.

7  Q    How about the Gallagher 3 pulverizers?

8  A    82.2 percent and 54.0.

9  Q    Gibson 2 upper reheater?

10  A    90.8 percent and 64.0.

11  Q    How about the Wabash River 2 radiant front superheater --

12  radiant front wall?  I'm sorry.

13  A    65.6 percent, 36.7 percent.

14  Q    The next Wabash River 2, the finishing superheater

15  project?

16  A    74.3 percent, 40.7 percent.

17  Q    And the next project is Wabash River 3 superheater?

18  A    59.2 percent and 27.9 percent.

19  Q    What's the next project on our list here?

20        It's the Wabash River 5 economizer; is that correct?

21  A    Yes.

22  Q    What is the availability factor there?

23  A    68.3 percent and 23.2 percent for capacity factor.

24  Q    How about the Beckjord 1 Life Extension?

25  A    94.8 percent and 6.1 percent.

ROSEN - CROSS/HOPSON          Vol. 7-1067

1   Q    Beckjord 2 Life Extension?

2   A    97.5 percent, 5.8 percent.

3   Q    The Beckjord 3 Life Extension?

4   A    89 percent and 14.3 percent.

5   Q    And the Beckjord 5 condenser tube project?

6   A    89.6 percent and 59.5 percent.

7   Q    Two more to go.

8        How about the Beckjord 6 condenser tube project?

9   A    84.6 percent and 63.8 percent.

10  Q    And, finally, Miami Fort 5?

11  A    85.7 percent and 3.0 percent.

12  Q    All right.

13       MR. HOPSON:  I apologize, Your Honor.  I should have

14  given this a number so we would know what we're talking about.

15  I'm going to call it Defendants' D2157 for identification.

16  BY MR. GREEN:

17  Q    Now, this data, sir, is data that you calculated based on

18  what you believe to be the relevant baseline period in the

19  pre-project period; is that correct?

20  A    That's correct.

21  Q    And these are, as you've told us many times, standard

22  definitions in the industry, correct?

23  A    Yes.

24  Q    And equivalent availability factor, if I understand this,

25  is basically the percentage of time based on full capacity in

1  the year that these units were available to run, right?

2  A   Yes.  Basically correct.

3  Q   And capacity factor is also a percentage of time during

4  the year that the units were actually running and generating

5  electricity; is that correct?

6  A   That's correct.

7  Q   So if we look just at a couple of examples here, we know

8  based on the data that you calculated that, for example at

9  Beckjord 2, the unit was available to run based on standard

10 industry definitions more than 90 percent of the time in the

11 year above its capacity factor, right?

12 A   Well, again, that's part of the issue we discussed

13 earlier:  Was it truly available?

14      Based on the standard definition for equivalent

15 availability factor, it appears it was available; but that's

16 precisely what wasn't the case according to Mr. Koppe.  It was

17 not truly available.

18 Q   Mr. Koppe didn't want to use the equivalent availability

19 factor here because there is such a big difference between

20 capacity factor and equivalent availability factor, right?

21 A   No, I wouldn't frame it that way.  It's not like he

22 arbitrarily didn't want to use this number.  Based on analysis

23 of what was happening at the four units that have the

24 extremely low capacity factors, it was his judgment that these

25 units were not truly available to operate.

ROSEN – CROSS/HOPSON          Vol. 7-1069

1  Q   It was his judgment that the GADS data for these units --

2  calling them available was wrong.  Is that a way of putting

3  it?

4  A   That it didn't reflect accurately the situation that would

5  yield a good estimate of the utilization factor for

6  purposes -- and this is critical -- for purposes of analyzing

7  how much generation would increase after the projects occurred

8  due to a change in equivalent availability.

9       It's very important to understand that the whole

10 purpose of modifying utilization factor and calling into

11 question the right basis for measuring equivalent availability

12 before the project occurred was solely for the purpose of

13 getting an estimate of the proper utilization factor for the

14 period after the project occurred.

15 Q   When you use your formula, which we've seen before as

16 Rosen Demonstrative 6, your utilization factor is capacity

17 factor above availability factor, right?

18 A   When that's the appropriate measure.  And it usually is,

19 but there were a couple of exceptions, four exceptions to be

20 precise.

21 Q   Let's look at another one of the differences between the

22 time the unit was available and the time the unit was

23 generating in the pre-project period, okay?

24 A   Certainly.

25 Q   Let's look at Wabash River 5.

ROSEN – CROSS/HOPSON                Vol. 7-1070

1       Now, it looks to me like Wabash River 5 was available

2  about 45 percent of the time in the year and not generating

3  electricity in the pre-project period; isn't that correct?

4  A   That's certainly reflected in this data, yes.

5  Q   And this isn't one of the projects in which you use your

6  modified utilization factor, right?

7  A   That's correct.

8  Q   So you and Mr. Koppe accept the GADS data on equivalent

9  availability factor and capacity factor for this project as

10 being accurate, correct?

11 A   Again, there was no issue raised by Mr. Koppe to me, in my

12 recollection, that there's a need in that case for a modified

13 calculation of the utilization factor.  So...

14 Q   Let's look at one more just quickly here.

15      Beckjord 6 is one of the units on this little chart

16 you and I have prepared together where there is a

17 relatively -- relative to the 14 we have here -- small gap

18 between availability factor and capacity factor; isn't that

19 correct?

20 A   Yes.  The gap is smaller.  It's about 20 percent.

21 Q   And 20 percent in that case means 20 percent of the 8,760

22 hours in the year this unit was available to run and not being

23 called on to generate electricity before these projects were

24 done, correct?

25 A   That's correct.

ROSEN – CROSS/HOPSON          Vol. 7-1071

1  Q    Let's look at one last one, which is the Gibson 2 unit.

2        Will you confirm for the ladies and gentlemen of the

3  jury that of our projects here and of our units here, Gibson 2

4  has the highest capacity factor?

5  A    Yes, that's correct.

6  Q    There are 14 units in this case.  Gibson 2 runs and

7  generates more power a greater percentage of the year than

8  haul the other units, correct?

9  A    That's true, for the different baseline periods.  These,

10 of course, are for different periods in time.

11 Q    Just for purposes of this question, I'm going to accept

12 your baseline periods.

13       Gibson 2 was also, according to your numbers,

14 available almost 91 percent of the hours in the year even

15 before they did these projects that are at issue in the case;

16 isn't that right?

17 A    That's correct, yes.

18 Q    So that means again, that roughly 27 percent of the time

19 this Gibson 2 unit was available to generate but not being

20 called upon to generate electricity; is that correct?

21 A    Yes.  That's the standard interpretation, yes.

22 Q    Now, again, I don't want to give you math problems, but

23 you're probably much better at it than I am.

24       Can you confirm for me that 27 percent of the hours in

25 the year is about 2300 hours?

ROSEN – CROSS/HOPSON          Vol. 7–1072

1  A    I accept that, yes.

2  Q    Just following up on this, if I can grab my data here for

3  Gibson 2 –– I should say your data for Gibson 2, you

4  predict –– your formula predicts –– or however you want to say

5  it –– you calculate a 1.41 percent increase in availability

6  for Gibson 2 based on the component replacement project that

7  was done, correct?

8  A    Yes.  The 1.41 increase in equivalent availability is

9  derived from Mr. Koppe's data.  That's correct.

10 Q    Yes.  So that comes out to 1.41 percent of the hours in a

11 year –– comes out to about 124 hours of increased availability

12 that you calculate, right?

13 A    That's correct.

14 Q    And a minute ago, we just said that this unit was already

15 available 2300 hours not being called on to generate in the

16 pre-project period.  Is that correct also?

17 A    That's correct.

18 Q    So at the end of the day, your formula predicts a

19 1 percent increase in generation if you subtract the

20 post-project capacity factor –– I'm sorry –– if you subtract

21 the pre-project capacity factor to a post-project capacity

22 factor, you see about a 1 percent increase in generation,

23 correct, sir?

24 A    That is correct.

25 Q    And that's about 88 hours; is that correct?

ROSEN – CROSS/HOPSON                Vol. 7–1073

1  A    A 1 percent increase in capacity factor, yes, translates

2  into about 88 hours more of full output equivalent, yes.

3  Q    So you're relying on a formula at the end of the day that

4  predicts that changing the tubes in the Gibson 2 boiler are

5  going to cause 88 hours of increased generation even though we

6  know that there are 2300 hours of generation available and

7  unused in the pre–project period; is that right?

8  A    That's right.  That's exactly the kind of calculation the

9  company made in analyzing the project itself.

10  Q    But the answer to the question is yes?

11  A    Of course.  And as I said, it's very standard and the

12  company itself did the exact same kind of calculations based

13  on relatively small changes in equivalent availability in its

14  own evaluation manuals.

15  Q    We've looked at dozens of such documents, haven't we?

16  A    I haven't reviewed dozens here in this courtroom.

17  Q    You reviewed dozens in preparing your report, right?

18  A    I have used dozens in the past, yes.

19  Q    You understand that the function of those documents is to

20  do a cost/benefit analysis, as you've already testified to

21  here today, right?

22  A    The function is to do a cost/benefit analysis, which

23  requires you to do a forecast of generation changes due to the

24  projects.

25  Q    Well, let's go back to this for a minute.

ROSEN – CROSS/HOPSON          Vol. 7–1074

1          You told Mr. Brooks that you understood that your

2    formula, if it was going to be effective and appropriate,

3    needed to prove that the component changes here –– or I should

4    say be evidence of the fact that the component changes

5    actually cause the increase in emissions; isn't that correct?

6    A    Well, again, I wouldn't quite say yes to that question

7    because it's not that the formula proves it.  It's that the

8    overall methodology, including the proper preparation of the

9    input data to the formula, would demonstrate a causal

10   relationship, yes.

11   Q    But you would answer the question yes with that

12   qualification?

13   A    Yes.  I just said yes at the end of my statement.  Yes.

14   Q    The way –– well, let's put it simply.  The truth is your

15   formula doesn't evidence a causal relationship between the

16   tube replacements and any increased generation.

17          Your formula assumes a relationship between tube

18   replacements and increased generation, right, sir?

19   A    No, I disagree completely.  A formula provides evidence of

20   a causal relationship if two things are true:  if it's the

21   correct formula or methodology, and if the data is input into

22   the formula or methodology correctly, then it exhibits a

23   causal relationship.  That's going back to physics, since

24   that's my background.  That's what physics does.  Physics

25   tries to enumerate the correct equations to describe the

ROSEN − CROSS/HOPSON          Vol. 7−1075

1  natural world.

2       Here I'm trying to develop the correct equations based

3  on standard industry concepts to describe the unnatural world;

4  namely, the world of power plants.

5  Q   The way your formula assumes that the change in

6  availability translates into a change in capacity factor is by

7  using a constant utilization factor?

8       MR. BROOKS:  I would object to the form of the

9  question.

10      THE COURT:  I'll let him answer.

11 A   Again, my formula assumes it because I use the standard

12 definition of utilization factor in the formula.  So if you

13 want to say the formula assumes, you can say I assume.  I

14 assume because I determined that this was the correct formula.

15 BY MR. GREEN:

16 Q   There's nothing we can find, outside of the reports from

17 you and Mr. Koppe, that says when you're making a prediction

18 of increased emissions for purposes of NSR you use a constant

19 utilization factor, right, Dr. Rosen?

20 A   That may be true.  That was one of the areas that I

21 believe I contributed to in terms of further understanding the

22 right formula for computing changes in pollution based on

23 changes in availability under the dictates of the regulation

24 and especially the demand growth exclusion aspect of the

25 regulation.

ROSEN - CROSS/HOPSON          Vol. 7-1076

1  Q   You keep on referencing the demand growth exclusion in

2  your testimony; and I just want to confirm that when you're

3  talking to us about the demand growth exclusion, you're

4  talking about your own legal interpretation of the demand

5  growth exclusion.  Is that correct?

6  A   No, that's not correct at all.  I'm not --

7  Q   Isn't it correct --

8  A   Can I please finish?

9  Q   Obviously.  Of course.

10 A   I'm not coming here as a lawyer testifying on the law, as

11 you know.  I am here as a technical expert witness testifying

12 on what I believe is the correct translation of the dictates

13 of this regulation into mathematical quantities so that a

14 quantitative forecast can be made of changes in air pollution.

15 The rule clearly requires a numerical result to be compared to

16 the significance threshold.  Without a numerical result,

17 there's no way of comparing a forecast of pollution changes to

18 that significance threshold.

19 Q   Am I correct in saying that the methods, the opinions that

20 you bring, at least as far as they're reflected in this

21 formula, are based on your interpretation of the rules and

22 regulations that are at issue here?

23 A   Yes.  It's based on my quantitative mathematical

24 interpretation of the rules based on standard industry

25 concepts.

ROSEN - CROSS/HOPSON          Vol. 7-1077

1  Q    Let me ask you this, sir.  You do understand, apart from

2  any assumptions or analysis embodied in this formula, that

3  there are many real world factors that affect generation,

4  right?

5  A    Certainly, and I've talked about many of them today.

6  Q    Okay.  Well, let's talk about them one more time.

7        You understand, for example, that demand is going to

8  affect the generation in emissions that come out of these

9  units, correct?

10 A    In general, that's correct.

11 Q    And you understand that whether or not there are more or

12 less planned or unplanned outages in the future are going to

13 impact generation and emissions, right?

14 A    That's correct, as I mentioned earlier.

15 Q    You also understand that in the real world issues that

16 affect system operations, transmission issues, could affect

17 the use of a generating unit; isn't that correct?

18 A    Yes, that's certainly true.  Whether transmission lines

19 are functioning properly or not can affect the amount of

20 generation that the lines are tied to.

21 Q    And you understand, for example, that the cost of fuel,

22 which you said yesterday varies over time, is going to affect

23 the future -- I'm sorry -- generation and emissions from these

24 units, correct?

25 A    That is correct.

ROSEN – CROSS/HOPSON          Vol. 7–1078

1  Q    In fact, you would agree that anything that affects

2  systems operations could impact what happens at these units in

3  terms of their generation or emission over a future one or

4  two-year period, correct?

5  A    In general that's true, yes.

6  Q    As you said a couple times while we've discussed your

7  formula today, Dr. Rosen, you're not an engineer, right?

8  A    I'm not an engineer in that I don't have an engineering

9  degree.  Obviously, I studied physics which is the principles

10 behind engineering.

11 Q    Your Ph.D. is in theoretical physics, if I heard that

12 right?

13 A    That's right.

14 Q    And you've never been employed at a utility, correct?

15 A    That's correct, I've never been employed at a utility.

16 Just at the Tellus Institute and the Brookhaven National

17 Laboratory, which is a branch of the U.S. Department of

18 Energy.

19 Q    And you've also never been employed at the EPA; is that

20 correct?

21 A    That's correct, not EPA, just the Department of Energy.

22 Q    But you have spent -- and you told us yesterday over some

23 length of time -- some significant time of your life appearing

24 as an expert and offering your opinions in various

25 proceedings; isn't that right, Dr. Rosen?

ROSEN – CROSS/HOPSON          Vol. 7–1079

1  A    That's correct.  I started appearing as an expert in 1979

2  I believe.

3  Q    And I think you testified, in response to Mr. Brooks'

4  question, that you, in fact, have experience testifying in

5  these very types of NSR cases; isn't that correct?

6  A    Yes.  I think I stated I had participated in two prior NSR

7  cases in federal court.

8  Q    And can you confirm for us that the total amount of

9  payment you or the Tellus Institute has received for your

10 participation in the NSR cases is about $500,000?

11 A    I would say that's roughly correct, yes.

12 Q    Could it be more than $500,000?

13 A    It could be more by now because there are other cases that

14 I haven't appeared in yet that I'm starting to work on.  So it

15 could be more, yes.

16 Q    Could it be $600,000?

17 A    It is a possibility.  I really haven't made an estimate.

18 Q    Could it be $700,000?

19 A    I don't think it's that much yet, no.

20         MR. HOPSON:  I have no further questions.  Thank you,

21 Dr. Rosen.

22         THE COURT:  Redirect?

23         MR. BROOKS:  Yes, Your Honor.

24

25

ROSEN — REDIRECT / BROOKS        Vol. 7–1080

1                    **REDIRECT EXAMINATION**

2   BY MR. BROOKS:

3   Q   Dr. Rosen, the money the Tellus Institute has earned

4   working for the Government on these NSR cases, how many years

5   does that cover?

6   A   That would cover approximately the period we discussed

7   before, from around 1999 or 2000 to the present day.

8   Q   Seven to eight years?

9   A   At least seven to eight years.

10  Q   Are you the only one who billed time to these cases?

11  A   Not at all.  Mr. Sverrisson obviously billed a significant

12  amount of time.  Also, some secretarial work was done on these

13  cases and clerical work.  So a few other people besides myself

14  billed time to these cases.

15  Q   Dr. Rosen, maybe I just read something into the questions;

16  but in case there's any question with the jury, I want to ask

17  you this:  you were shown a chart.  It was Defendant's

18  Exhibit 2157, and you went down and you wrote down the

19  equivalent availability factor and the capacity factor.

20          Do you recall doing all that?

21          And you were asked questions about how that was

22  calculated and what it meant.  Counsel pointed out to you that

23  for Gibson 2 there was something on the order of I think 2300

24  hours of availability before the project.

25          So what I understood the implication to be is, why in

1  the world would you think that improving the availability of

2  Gibson 2 by 1.43 percent would cause an increase in emissions?

3      Can you answer that?

4  A   Yes.  Actually, I drew the same implication from the

5  question as you did.

6      Yes, I think the general question you're posing is,

7  why would you expect a relatively small increase in

8  availability at a single generating unit to cause an increase

9  in generation when there were so many other hours that the

10  unit could have generated more?  And the answer basically is

11  the following, and this is why it's good to run a dispatch

12  model for these purposes of calculating.

13      The answer why there's more generation is because yes,

14  there are many hours when the plant may not have been

15  available before the project was done.  Again, the reason that

16  the plant wasn't called on to operate in those hours was

17  because the demand didn't get sufficiently high up, what's

18  called the dispatch order.

19      In other words, it didn't get high enough up in the

20  order -- remember I talked yesterday about the low cost plants

21  are turned on first and then the medium cost plants and then

22  the higher cost plants are turned on less, obviously to try to

23  reduce cost.  So you didn't get high enough in the dispatch

24  order to want to turn the plant on in those 2,300 hours that

25  it was available in the baseline period.  But when you make

ROSEN – REDIRECT / BROOKS        Vol. 7-1082

1  the repair to the component, then the plant is available on a

2  random but pretty continuous basis through the year.  So then

3  it's more available in the hours when you want -- when you

4  would have wanted to turn that plant on based on the economics

5  of the dispatch order, but you couldn't because it was out due

6  to the failure of that component before it was repaired.

7        So the point is that now the plant becomes available

8  in hours where it would have wanted to be dispatched based on

9  the economics.  Therefore, now, even if it's only 88 hours,

10  there are still a fraction of those 88 hours that it would get

11  turned on now, after the repair is made, than it wouldn't have

12  gotten turned on before the repair.

13  Q   How do you know they wanted to turn it on but couldn't?

14  A   Because that's exactly what a dispatch does.  That's what

15  a dispatch order tells you.  It tells you there are times in

16  the dispatch where you want to turn it on and you can't.

17  That's what the utilization factor tells you.  That's why you

18  calculate a utilization factor.

19  Q   How do you know that they wanted to turn it on at any

20  point in the past?

21  A   Because the utilization factor is less than 100 percent.

22  Whenever the utilization factor is less than 100 percent, it

23  means -- as the attorney mentioned -- that the plant wasn't

24  able to operate when it was available.

25  Q   Is Gibson a base-loaded unit?

ROSEN – REDIRECT / BROOKS        Vol. 7-1083

1  A   Gibson, yes.  I would say it's in the base-load category,

2  yes.

3  Q   What does that mean?

4  A   The term "base-load" is somewhat arbitrary, but it

5  basically means a plant that is low enough in the dispatch

6  order; namely, cheap enough to operate on a per unit basis

7  that you want to try to operate it whenever it's available.

8       A strict definition of a base-load plant would be one

9  with a very high utilization factor.  Gibson had a pretty high

10 one.  So it was roughly in that category.

11 Q   What's the implication of being a base-load unit for

12 purposes of this?

13 A   Again, the implication of a base-load unit is you want to

14 try to run the unit whenever it's available.  So that any time

15 it becomes available for more hours, like in this example of

16 Gibson 2, 88 hours a year, then you would want to turn it on

17 most of those hours.

18 Q   Dr. Rosen, you were asked about these dispatch models,

19 PROMOD in particular.

20      Do you remember that?

21 A   Yes.

22 Q   There was a discussion about whether PROMOD predicted

23 availability.

24      I want to ask you, how would you use PROMOD -- if you

25 wanted to test this theory, how would you do that?

1          The theory that you've put forward in this case --

2          MR. HOPSON:  Your Honor, I object for the same

3    reasons we discussed at the bench conference.

4          MR. BROOKS:  Your Honor, he was asked -- may I

5    respond?

6          THE COURT:  I think you can answer this question.

7    How would you use it?

8    A    It would actually be very simple to use from -- to do what

9    my five-step formula has -- Defendants' counsel characterized

10   it.  All you would basically do is you would load all your

11   baseline data into PROMOD on the generating units, for demand,

12   availability, et cetera, fuel.  Then all you have to do is --

13   and you do a run on a PROMOD for a few years out to the future

14   including the two years --

15   BY MR. BROOKS:

16   Q    Tell the jury what it means to "do a run"?  What does that

17   mean?

18   A    I think I started to tell the jury about this earlier; but

19   what it means to do a run is, again, you load data.  You turn

20   on the model and it produces outputs for, you know, a month at

21   a time or a year at a time as you go forward in time.

22          So if you do a run with your baseline data in it, that

23   would be run No. 1.  That would predict generation from each

24   generating unit from each year into the future.

25          Then all you have to do to model the impact of a

1  component and repair a replacement on the system, as well as

2  that particular generation unit, is you just increase the

3  availability of that particular unit that's being repaired,

4  okay; and you do a second run, run No. 2.  And you just let

5  the model compute the generation for the system and that unit

6  for each year in the future.

7       Then you can just compare the generation from run 2,

8  which would be slightly higher, to the generation from run 1

9  for the unit which would be slightly lower.  Take the

10  difference.  That's the increase in generation and then

11  calculate your increase in emissions from that.

12  Q   Cinergy have such a model?

13  A   Well, we just said that Cinergy had used PROMOD at various

14  times from, I believe the mid−1980s to also the present day,

15  if not the present day.

16  Q   Seen any model runs done by Cinergy that shows that what

17  you told this jury about the relationship between equivalent

18  availability factor and what would be predicted in terms of

19  generation and emissions is wrong?

20  A   No.  I've seen no runs by Cinergy using PROMOD that would

21  analyze these kinds of generation increases the way I've

22  indicated, but they could have easily done so.

23  Q   You were asked whether or not in the industry at least

24  some utilities in doing projections might look back five years

25  at equivalent availability as the basic starting assumption

ROSEN – REDIRECT / BROOKS          Vol. 7–1086

1  for a PROMOD run.

2       Do you recall that?

3  A   Yes, I do.

4  Q   You don't deny that utilities do that, do you?

5  A   No.  Sometimes they do that for various reasons.

6  Q   Would that make any sense if you were trying to evaluate

7  the impact of a project that was thought to change the

8  availability of a unit?

9  A   Well, again, to evaluate the impact of a project that was

10 going to change the availability of a unit, you have to make

11 two runs, like I just indicated.

12      So if you weren't particularly conscientious about the

13 requirements for selecting a baseline period under the NSR

14 regulations, you might use a five-year average sort of as a

15 baseline and then again change the availability according to

16 how that project would impact that generating unit and run it

17 again.  But you always need two runs to measure a change.  You

18 need a change between two things, two runs.

19      So, as I say, but in this case -- and -- in this kind

20 of an NSR case we need to be more precise about the baseline

21 period.  We shouldn't use a five-year period.  We should use a

22 two-year period that's appropriate.

23 Q   Sir, in your career, have you ever seen a utility change

24 the availability assumptions in its PROMOD runs to reflect the

25 impact of a component replacement project?

*ROSEN − REDIRECT / BROOKS*          Vol. 7−1087

1  A   No, I haven't seen that specific analysis done.

2         MR. BROOKS:  Thank you.  No further questions, Your

3  Honor.

4         THE COURT:  Recross?

5                  **RECROSS−EXAMINATION**

6  BY MR. HOPSON:

7  Q   Just a quick clarification.  Mr. Brooks just asked you

8  your opinion about whether Gibson 2 was a base−load unit.

9         Do you recall that?

10 A   Yes, I do.

11 Q   And you gave him that opinion, right?

12 A   That's correct.

13 Q   You don't have the opinion that any of the other units at

14 issue in this case are base−load units, do you?

15 A   Again, the term base−load is a very rough

16 characterization.  So I haven't gone down the list to make

17 that assessment.

18        MR. HOPSON:  No further questions, Your Honor.

19        THE COURT:  Anything else of this witness?

20        MR. BROOKS:  No, Your Honor.

21        THE COURT:  You may step down, sir.

22        THE WITNESS:  Thank you.

23        (The witness was excused.)

24        THE COURT:  Your next witness.

25        MS. HIMMELHOCH:  We now move to deposition

Vol. 7-1088

1 designations, Your Honor.  Mr. Benson will be handling that.

2        MR. BROOKS:  May I have permission to exit the well?

3        THE COURT:  Yes.

4        MR. BENSON:  Your Honor, may I adjust the podium a

5 little farther so I can face the jury?

6        THE COURT:  Yes.

7        MR. BOXERMAN:  Counsel, if you wait one second while

8 we get organized here.

9        THE COURT:  Everybody where they're going to be for

10 awhile now?  I was afraid the jury was going to get up and

11 change seats.

12        MR. BENSON:  They wouldn't want to do that, Your

13 Honor.

14        THE COURT:  I don't know.  I don't know.

15        MR. BENSON:  Good morning again, ladies and

16 gentlemen.  My name is Tom Benson with the United States

17 Department of Justice representing Plaintiffs.

18        We have five sets of deposition designations for you

19 this morning.  We are going to do it a little differently.  As

20 you've heard before, they're edited; and you're not going to

21 have the documents that they refer to in front of you.  But I

22 think you'll be able to get the gist of what's going on.

23 Today, though, we have a couple of the depositions in video

24 format.

25        What we will do is you'll see it up on the screens.

Vol. 7-1089

1   It's the same routine.  The witness is under oath.  They're

2   being questioned by the attorney.  They're represented by

3   their counsel, but you'll just be able to see live what the

4   witness looked like and hear his testimony directly.

5           In a couple cases, because of the quality of the

6   video, we weren't able to get the clips.  So I will -- I'll

7   read in the sort of in between spaces that we'll need to read

8   in.  But for the large part, two of our witnesses will be done

9   by video.  Again, this includes the designations that Cinergy

10  has made as well.

11          The first witness we're going to hear from is Robert

12  Batdorf.  As we've done before, we're going to read a summary

13  of his background and then go into the testimony that he gave.

14          Mr. Batdorf received a three-year diploma on

15  mechanical technology from Williamson Trade and Technical

16  School in May 1971.  After graduating, Mr. Batdorf began

17  working at Public Service of Indiana in the traveling mechanic

18  workforce traveling the state of Indiana doing turbine

19  generator inspection and overhauls as well as other plant

20  maintenance work.

21          Over subsequent years, he held various engineering

22  and maintenance positions at the Cayuga, Gallagher and other

23  generating stations.  He was promoted to station manager of

24  Cayuga station in August 1983.  While he was working at the

25  Cayuga station in 1994, the merger took place and Cinergy was

Vol. 7-1090

1    formed.

2         Also, while he was station manager at the Cayuga

3    station, Mr. Batdorf attended a seminar put on by the Electric

4    Power Research Institute, or EPRI.  In 1996, Mr. Batdorf

5    transferred and became station manager at the Wabash River

6    station.

7         We'll now go to the video designations that we have

8    of Mr. Batdorf's testimony; and the first set is from his

9    deposition given on June 24, 2005.

10        *(Excerpts of the deposition of Mr. Batdorf were*

11   *presented by videotape and read in open court.)*

12        MR. BENSON:  That's all we have for Mr. Batdorf.

13        We have four additional, but I can tell you they will

14   all be significantly shorter.  I will ask my colleague,

15   Ignacio Arrazola to read the next one.

16        MR. ARRAZOLA:  Good morning, ladies and gentlemen,

17   ladies and gentlemen.  I'm going to read the deposition of

18   Barry E. Pulskamp taken on January 2004.  We don't have a

19   summary, so I will jump right into the excerpts.

20        *(Excerpts of the deposition of Barry E. Pulskamp were*

21   *read into the record.)*

22        MS. HIMMELHOCH:  Your Honor, may we have a bench

23   conference for a brief moment on one of these designations?

24        *(A bench conference was held on the record.)*

25        MS. HIMMELHOCH:  One of Cinergy's

Vol. 7-1091

1  counter-designations on this designation goes to the actual

2  post-project performance at Beckjord Unit 6, and we object on

3  those grounds.

4         THE COURT:  Which one is it?

5         MS. HIMMELHOCH:  It's, "After the project, what

6  experience did you have in terms of the frequency?"

7         THE COURT:  That's all we got?

8         MS. HIMMELHOCH:  And it continues to go on about

9  availability.

10        THE COURT:  "I don't know about the availability of

11  the unit overall"?

12        MS. HIMMELHOCH:  It's about the actual experience

13  post-project.

14        THE COURT:  So what are you worried about?  He

15  doesn't know the answer to your question.

16        MS. HIMMELHOCH:  It's just that your order was clear

17  on post-project.

18        THE COURT:  I understand.

19    (End of bench conference.)

20    (In open court)

21        MR. BENSON:  Okay, ladies and gentlemen.  I will now

22  read excerpts from the deposition of Alan C. Burck, which was

23  taken on June 21st, 2004.  First, a brief summary of who

24  Mr. Burck is.

25        At the time of deposition he was an employee of

Vol. 7-1092

1  Cinergy Services, Inc.  He started with CG&E when he was a

2  co-op student at the University of Cincinnati in 1979.  He

3  graduated from college in 1983 and went to North Carolina to

4  work for Duke Power.  He returned to CG&E in December 1986.

5  He became a licensed professional engineer in April of 1987.

6  He worked in the Engineering Department of Cincinnati Gas &

7  Electric until the merger in 1994 and continued to work as an

8  engineer for the Cinergy companies after the merger.

9          He was involved with starting up and checking all the

10  logic for the combustion controls that were installed during

11  the Unit 2 Life Extension outage.  Mr. Burck was on second

12  shift during the outage for the retubing of the condenser at

13  Beckjord Unit 5.

14          For the Beckjord Unit 6 replacement of the turbine

15  blades and retubing the condenser, he wrote the engineering

16  service request for retubing the condenser but during the

17  outage did not have any involvement in the project.

18          Now we move into his testimony.

19          (Excerpts of the deposition of Mr. Alan Burck were

20  read into the record.)

21          MR. BENSON:  That's all we have for Mr. Burck's

22  deposition.  We'll switch now to the deposition of Mr. Robert

23  Moreland, which was also taken on a couple of different dates

24  and for most of which we have video.  We don't have video for

25  every portion, so I'll be reading some of it in the record.

Vol. 7-1093

1          We actually start out with a portion being read.

2    This is the deposition of Robert Moreland taken on June 23,

3    2005.

4        *(Excerpts of the deposition of Mr. Robert Moreland were*

5    *presented by videotape and read in open court.)*

6          MR. BENSON:  Ladies and gentlemen?  Can you hear this

7    okay?  Or shall we have it read.

8          THE COURT:  You probably should let me ask the jury

9    that.

10         MR. BENSON:  I'm sorry, Your Honor.

11         THE COURT:  That's all right.  Can you hear it all

12   right?  Okay.  We can hear it.

13       *(A continuation of excerpts of the deposition of*

14   *Mr. Moreland were presented by videotape and read in open*

15   *court.)*

16         THE COURT:  Is this the last one?

17         MR. BENSON:  We are very close to being done with

18   Mr. Moreland, just a couple clips left.

19         THE COURT:  So we can finish all these this morning?

20         MR. BENSON:  Well, there's one more.  It will take

21   about 10 minutes.

22         THE COURT:  Okay.  Go ahead.

23       *(A continuation of excerpts of the deposition of*

24   *Mr. Moreland were presented by videotape and read in open*

25   *court.)*

Vol. 7-1094

1          MR. BENSON:  Your Honor, we do have one more

2     designation to read.  Should we do that now?

3          THE COURT:  Might as well.  If it only takes 10

4     minutes, we'll do that.

5          MR. ARRAZOLA:  Hope he was right about the 10

6     minutes.

7          I'm going to read to you from the deposition of

8     Steven Wodtke that was taken on August 26th, 2004.  First I'm

9     going to read to you a summary.

10         This is the deposition testimony of Steven E. Wodtke

11    who was at the time of the deposition an employee of Cinergy

12    Services.  Mr. Wodtke had been employed by Cinergy Services

13    and its predecessors since 1979.

14         He received a Bachelor of Science degree from Purdue

15    University in 1986.  He had been a member of the American

16    Society of Mechanical Engineers.  His current position at the

17    time of the deposition was Engineering and Construction Group

18    team leader at Cinergy's Cayuga station.

19         His responsibilities in this position included the

20    direction of technical support by the group for the production

21    of electricity at Cayuga.

22         From 1980 to 1998 he worked at Cinergy's corporate

23    office in Plainfield, Indiana.  From 1996 to 1998, he was a

24    sourcing specialist which included the procurement of services

25    associated with projects designated as capital projects.

Vol. 7-1095

1          From 1992 to 1996, he was a senior engineer involved

2  with the design, procurement and installation associated with

3  maintenance at PSI's generating stations in Indiana, including

4  the Cayuga, Wabash River, Gibson, Gallagher and other

5  stations.  As a senior engineer, he worked on projects

6  designated as "capital."

7          Now I'm going to read a few excerpts from his

8  testimony.

9          *(Excerpts of the deposition of Mr. Wodtke were read*

10  *into the record.)*

11          MS. HIMMELHOCH:  Plaintiffs rest, Your Honor.

12          THE COURT:  All right, ladies and gentlemen, that

13  will be all the evidence we'll here today.  We will be back

14  Monday at eight o'clock.

15          While we're out, don't discuss the case among

16  yourselves or form or express any opinion or conclusion on it

17  until I give it to you for your final determination.  With

18  that in mind, you can step aside until Monday at eight

19  o'clock.

20          COURT CLERK:  All rise.

21      *(Jury out.)*

22          THE COURT:  The rest of you may be seated.

23          Mr. Green?

24          MR. GREEN:  I would like to move for judgment as a

25  matter of law on the basis of Rule 50 and the fact that the

Vol. 7-1096

1    Court should find that a reasonable jury would not have a

2    legally sufficient evidentiary basis to find for Plaintiffs on

3    the ultimate issue in this case.

4           It is clear that the formula methodology that has

5    been sponsored by the experts is a contrived methodology that

6    was created simply for purposes of litigation.  It was never

7    used by the EPA prior to 1999 and is subject to manipulation

8    of the input, at the whim of the expert, to arrive at a

9    predicted increase in emissions.

10          Mr. Hopson reminds me, of course, that my comments go

11   to all 14 projects here.

12          In addition, with respect to Mr. Koppe's input as to

13   availability, I think it is clear that no reasonable juror

14   could conclude that his analysis which focuses exclusively and

15   totally on one component out of a thousand components in the

16   overall generating unit and disregards completely every other

17   availability degrader, could lead to a conclusion that there

18   is, in fact, an increase in availability that is predictable

19   and certain enough to support the further computations of

20   Mr. Rosen.  Therefore, I do not believe that the Plaintiffs

21   have carried their burden with respect to that issue.

22          Now, on RMRR, there are a number of projects that the

23   jury has received evidence on; and all of those projects are

24   very common throughout the industry that have been established

25   indisputably by a number of the witnesses.

Vol. 7-1097

1       The projects are all limited in scope and have

2  limited purpose within the configuration of an entire

3  generating unit.  The cost of each and every project are less

4  than 1 percent.  I think probably in truth less than half of

5  1 percent of the replacement cost of the units, and I believe

6  there is no way that a reasonable juror could conclude that

7  the projects do not qualify as RMRR, sir.

8       MS. HIMMELHOCH:  May I be heard, Your Honor.

9       THE COURT:  No, I don't think so, although it seems a

10  shame when the Defendant has to make the motion, that I don't

11  let the Defendant hear the Plaintiffs' final argument; but

12  that would be the only reason to do it.

13       This is such an interesting case.  I recall -- in

14  fact, I had some litigation when I was a state court judge on

15  the Marble Hill event, and to see the response of the energy

16  industry in Indiana to that and its attempts to deal with what

17  it had to deal with.

18       And in the meantime, we get this Clean Air Act that

19  comes in and a lot of people certainly filled with goodwill

20  trying to solve a problem; but the fact is in this case -- the

21  fact is that this is the right place.  This is the right group

22  to decide what happens when we have a clash of those

23  interests.

24       There is evidence in this case from which the jury

25  could conclude that the NSR regulations have been violated in

Vol. 7-1098

1  this case, and I'm not going to list all of what those are

2  because I don't want to make the Plaintiffs' argument in this

3  case either.

4        With that said, your motion is overruled.

5        Now --

6        MS. HIMMELHOCH:  Your Honor, we did want to make the

7  proffer that we mentioned this morning.

8        THE COURT:  Just a second.

9        MS. HIMMELHOCH:  Sorry.

10       THE COURT:  That's all right.

11       With that said, when the jury comes back Monday

12 looking forward to five days next week and four days the week

13 after and two days the week after, can I disabuse them of some

14 of that time?

15       What can I tell them Monday that I could expect or

16 what could I expect?

17       MR. HOPSON:  We're going to make some final decisions

18 over the weekend, but I'm confident our case will conclude

19 next week.

20       MS. HIMMELHOCH:  We don't anticipate, depending on

21 Defendants, anything more than a day --

22       THE COURT:  You're not going to bring in a long list

23 of rebuttal witnesses who were hiding in the basement the

24 whole time?

25       MS. HIMMELHOCH:  I do not have a basement, nor have I

Vol. 7-1099

1  been hiding any witnesses anyplace else.  I do not

2  anticipate --

3          THE COURT:  So you want to make your offer of proof?

4          MS. HIMMELHOCH:  Plaintiff has marked this for

5  identification as Exhibit 1858.  May I approach?

6          THE COURT:  Yes.

7          MS. HIMMELHOCH:  This document is proffered as what

8  evidence we would submit had we been permitted to present the

9  WEPCo backstop calculation to the jury.

10          Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. HOPSON:  Your Honor, one more thing.  Can I move

13  the admission of Defendant's Exhibit 2157, which is the chart

14  I prepared with Dr. Rosen?

15          MS. HIMMELHOCH:  We object for the same reason that

16  Dr. Rosen's own chart was not permitted into evidence.  It's a

17  summary of the testimony and, therefore, should not be

18  permitted anymore than Dr. Rosen's summary.

19          THE COURT:  Well, at this point I'm going to grant

20  that objection; but again, I have kept out all these summaries

21  and we've used them all as demonstrative exhibits.  I may come

22  to regret that as the jury continues to ask for them.

23          Our alternative is, of course, at the end of the

24  case, they're liable to ask me for a transcript of the case,

25  which in all the time I've heard cases over these years I've

Vol. 7-1100

1  never allowed.  I've never done that before, but I might have

2  to consider it in this case.  Maybe for five minutes and

3  reject it, but I might have to consider it.

4        There's so many numbers, there's so many exhibits, so

5  many things.  Think about it, as I will think about it, in the

6  next two or three days.

7        MR. HOPSON:  Do you have a sense, Your Honor, how

8  that might work?

9        THE COURT:  How what?

10        MR. HOPSON:  Putting together a summary of all the

11  data that would come from Your Honor?  Is that what you're

12  suggesting?

13        THE COURT:  No.  It would simply be selecting a group

14  of these exhibits that we've used as demonstratives and

15  saying, "Okay, send this to the jury."  They might, in fact,

16  want exactly what you filled out today, and they might want

17  exactly what you suggested they ought to have.

18        MS. HIMMELHOCH:  Your Honor, we can confer over the

19  break on whether the parties can come to a mutual agreement on

20  what demonstratives would be --

21        THE COURT:  I'm not requiring you to do that, but it

22  might anticipate some difficulties that the jurors might

23  otherwise have.  So I'll see you all on Monday.

24        Have you got designations or things I haven't looked

25  at, other than the second half of that?

Vol. 7-1101

1          MS. THOMSON:  Your Honor, we filed designations, I

2     believe, Sunday night for probably presentation Tuesday or

3     Wednesday.

4          MR. HOPSON:  You've already seen it.

5          THE COURT:  I'll have that ruling out to you today.

6          All right.  Thank you.

7          COURT CLERK:  All rise.

8          This court stands in recess until 8 a.m. Monday

9     morning.

10          *(The proceedings concluded at 12:26 p.m.)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      CERTIFICATE OF REPORTER

2

3        I, Cathy Jones, certify that the foregoing is a true and

4    correct transcript of the proceedings in the above-entitled

5    matter.

6

7

8

9                        _____

10                       CATHY JONES, RPR, FCRR
                         OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25