1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
2                 INDIANAPOLIS DIVISION

3
   UNITED STATES OF AMERICA,        )
4          Plaintiff,               )
                                    )
5   STATE OF NEW YORK, STATE OF     )1:99-cv-1693-LJM-JMS
   NEW JERSEY, STATE OF CONNECTICUT,)
6   HOOSIER ENVIRONMENTAL COUNCIL   )
   and OHIO ENVIRONMENTAL           )
7   COUNCIL,                        )
          Plaintiff-Intervenors,    )Indianapolis, Indiana
8                                   )May 19, 2008
          -vs-                      )8:00 a.m.
9   CINERGY CORP., PSI ENERGY, INC.,)Volume 8
   and THE CINCINNATI GAS &         )
10  ELECTRIC COMPANY,               )
          Defendants.               )

11

12

13

14                    **BEFORE THE**
              **HONORABLE LARRY J. McKINNEY**

15

16        OFFICIAL REPORTER'S TRANSCRIPT OF

17              TRIAL PROCEEDINGS

18

19

20 Court Reporter:    Cathy Easley Jones, RPR, FCRR
                     Official Court Reporter
21                   46 East Ohio Street, Room 291
                     Indianapolis, IN  46204

22

23

24
          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
25            COMPUTER-AIDED TRANSCRIPTION

Vol. 8–1103

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:           Mr. Thomas Andrew Benson
                                 Mr. James A. Lofton
4                                Ms. Sarah Dale Himmelhoch
                                 Mr. Phillip Brooks
5                                Mr. Ignacio Arrazola
                                 Ms. Danielle Rosengarten
6                                U.S. DEPARTMENT OF JUSTICE
                                 P.O. Box 7611
7                                Ben Franklin Station
                                 Washington, DC  20044
8

9   FOR PLAINTIFF-               Mr. R. Keith Guthrie
    INTERVENORS:                 ATTORNEY AT LAW
10                               13242 South 600 East
                                 Elizabethtown, IN  47232
11

12  FOR THE DEFENDANTS:          Mr. Mark D. Hopson
                                 Mr. Thomas Charles Green
13                               Ms. Kathryn B. Thomson
                                 Ms. Meghan Delaney
14                               Mr. Samuel B. Boxerman
                                 Mr. Frank Volpe
15                               SIDLEY AUSTIN LLP
                                 1501 K Street, NW
16                               Washington, DC  20005

17

18

19

20

21

22

23

24

25

Vol. 8-1104

1                    **INDEX OF WITNESSES**

2                                              **PAGE**

3  JIM STANLEY
   Direct Examination by Mr. Green ..............1110
4  Cross-examination ...........................1123
       Questions by Ms. Himmelhoch
5  Redirect Examination ........................1134
       Questions by Mr. Green
6  Recross-examination .........................1135
       Questions by Ms. Himmelhoch

7

8  BARRY PULSKAMP
   Direct Examination by Mr. Green ..............1141
9  Cross-examination ...........................1221
       Questions by Ms. Himmelhoch
10 Redirect examination by Mr. Green ...........1286

11

12 ROBERT BATDORF
   Direct Examination by Mr. Hopson .............1291

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 8−1105

1                          **INDEX OF EXHIBITS**

2                                                    **PAGE**

3  Defendants' Exhibit:

4  D31 ........................................1140
   509 ........................................1206
5  1979E ......................................1168
   2162 .......................................1147

6

7

8

9

10

11

12

13 Plaintiffs' Exhibit:

14 362 ........................................1257
   1559 .......................................1261

15

16

17

18

19

20

21

22

23

24

25

 1                        *(In open court)*

 2            THE COURT:  Good morning.  Well, I missed you.  Yes,

 3   I did.

 4            Are we ready to proceed?  Yes?

 5            MR. GREEN:  We have some preliminaries, Your Honor.

 6            THE COURT:  All right, let's have it.

 7            MR. GREEN:  Your Honor.  There was a flurry of

 8   filings over the weekend.  What is, I think, principally

 9   pending from our perspective, is our request for a curative

10   jury instruction.  I am particularly concerned about the

11   references both in opening statement by the Government and the

12   portion of Mr. Orender's testimony that was played that go to

13   motive and the reasons for undertaking, in particular, Life

14   Extension projects.  The Government was quite explicit --

15            THE COURT:  You can sit down.

16            MR. GREEN:  -- suggesting to the jury that the Life

17   Extension represented a change in the industry's philosophy

18   about aging plants and what to do about them; and

19   specifically, they said up until the '70s when a plant reached

20   that point -- I'm reading from the transcript now, a portion

21   of the opening up until the 1970s when a plant reached that

22   point, which was usually 20, 25, 30 years, and the intention

23   was to retire the plant and build a new one.

24            In reaction to the requirements to put pollution

25   controls on new plants and other factors going on at the time,

Vol. 8-1107

1  utility companies began looking at their old plants and saying

2  we've got these existing units, and if we put some money into

3  them, maybe we can keep them going, et cetera, et cetera, and

4  figure out where to put it, and go through the permitting

5  process; rather than having to build a new plant, figure out

6  where to put it and go through the permitting process and all

7  of that.

8       It's just been one of the references to motive; and

9  then Mr. Orender was asked -- I don't have that snippet of

10  deposition testimony in front that was read, but he did

11  mention undertaking Life Extension for various purposes, one

12  of which was permitting issues which were looming and so

13  forth.  I think it's fair -- the whole idea of going into the

14  rate structure which you have now prohibited us from doing,

15  and which we will obviously abide by, was to counter the

16  references to motive, to explain to the jury that we had

17  absolutely no motive, to save money in this respect because of

18  the interesting aspect of pass through ratemaking in the

19  electric utility business; but nevertheless, we think the

20  curative instruction would be appropriate under these

21  circumstances; and also in the Government's opposition to the

22  curative instruction, they do not want you to correct the fact

23  that very deliberately Dr. Rosen was asked whether Gibson 2

24  was controlled, and he said, no, it wasn't.

25       I think that question was inserted in there for a

Vol. 8-1108

1  purpose.  You don't have to be too sophisticated to figure

2  that out, but all the Gibson units are controlled.  They're

3  controlled with scrubbers.  Scrubbers are the pollution

4  control device for SO2.

5        You know, I just think that record ought to be

6  corrected.  Whether the Court does it or whether I do it

7  through the direct examination of a witness is really

8  irrelevant to me, but I do ask the Court that the Court allow

9  us to correct that because I think it's not only as a matter

10  of impeachment, it's just wrong, and it was done for effect.

11        So those are my principal preliminary observations

12  with a request -- with respect, rather, to the notice to

13  object to certain testimony that may be coming down the line

14  in direct.  I think that is clearly without basis, and we

15  should be permitted just to proceed with our direct case, Your

16  Honor.

17        THE COURT:  Well, I've got -- I had a couple things I

18  wanted to say about that.

19        In at least one of the orders that was issued, what,

20  Friday, I think I mentioned that the references to pollution

21  are probably not well taken.  We're talking about emissions.

22  We're talking about the volume, 40 tons or more.  I'm trying

23  to keep this case to a case where the jury listens to the

24  evidence and determines those issues that I've told them it's

25  about.

Vol. 8-1109

1          We're not retrying the policy of the United States

2     Congress and we're not doing anything other than focusing on

3     those numbers, and what a reasonable plant operator would know

4     in discussing the issues of routine maintenance.  I think that

5     I -- well, I did address that.  I'd say at this point on that

6     the phrase "pollution" ought not to be brought up.  We're

7     really talking about emissions.

8          That is of concern to me because I don't want -- I

9     don't want the jury doing anything other than addressing the

10    issues that I've outlined for them.  It's a narrower case than

11    it could be if one side is hollering about pollution and those

12    people on the other side and their nasty motives, and the

13    other side needs to address that.  I'd rather not have that

14    brought out.

15         I'm not going to issue a further instruction at this

16    point.  I will review the final instructions and make sure

17    that the jury -- or that they're clear on what the jury is to

18    address.  And we'll take your witnesses as they come.  So let

19    us proceed.

20         *(A discussion was held off the record.)*

21         *(Jury in.)*

22         THE COURT:  It appears that the cleaning staff didn't

23    walk off with your notebooks over the weekend.  That's a good

24    thing.  All right.  We're ready for the defense's first

25    witness.

Vol. 8-1110

1        MR. GREEN:  Thank you, Your Honor.  We call Jim

2   Stanley to the stand.

3              **JIM STANLEY, DEFENDANT'S WITNESS, SWORN**

4                     **DIRECT EXAMINATION**

5        MR. GREEN:  Good morning, Your Honor, ladies and

6   gentlemen of the jury.

7   Q    Good morning, Mr. Stanley.

8        For the record, sir, keep your voice up so we can all

9   hear you; and would you state your name again, please?

10  A    Jim Stanley.

11  Q    Where are you currently employed, sir?

12  A    I'm employed by Duke Energy Indiana, which is the

13  operating company for Duke Energy.

14  Q    What is your position there?

15  A    I hold the position of president of Duke Energy Indiana.

16  Q    And is Duke Energy the successor company to Cinergy, sir?

17  A    Yes, it is.

18  Q    When did those two companies merge?

19  A    Duke Energy and Cinergy merged effective April 3rd of

20  2006.

21  Q    When did you join Cinergy?

22  A    I joined Cinergy out of school after graduating from Ball

23  State in 1977.

24  Q    Actually, you joined PSI; is that right?

25  A    I joined PSI in 1977, yes.

STANLEY - DIRECT/GREEN          Vol. 8-1111

1  Q   I'm going to call PSI one of the Cinergy companies and use

2  the word "Cinergy" if that's all right with you.

3  A   I'm comfortable with that.

4  Q   What did you major in at college?

5  A   I was an accounting major.  I hold a BS in accounting.

6  Q   What was your first job with Cinergy, Mr. Stanley?

7  A   I went to work in 1977 in our general accounting group.

8  Responsibilities primarily were for closing the books on a

9  monthly basis and putting together financial statements, both

10 monthly and annually.

11 Q   And how long did you work in the Accounting Department,

12 sir?

13 A   I worked in the accounting group for approximately three

14 years.

15 Q   And after that, where did you work?

16 A   I moved into a series of positions in our Human Resources

17 group.

18 Q   Can you generally describe for the ladies and gentlemen of

19 the jury and His Honor what your responsibilities were in that

20 position?

21 A   My first assignment in Human Resources was in our college

22 relations, college recruiting effort.  I then became

23 responsible for our overall employment services group, overall

24 hiring for the company; and a couple of other positions, one

25 including employee services, and ultimately I was promoted to

STANLEY – DIRECT/GREEN           Vol. 8–1112

1  manager of Union Relations, responsible for negotiating

2  contracts with our local.

3  Q   And how long did you work in that area?

4  A   In Human Resources probably for a total of seven or eight

5  years.

6  Q   And then where did you go after that, sir?

7  A   1989 I was promoted to District Manager in Bedford,

8  Indiana.  That's about 20 miles south of Bloomington; district

9  operations responsibility for Lawrence and Orange Counties

10 basically.

11 Q   Did your job title change after the merger between Cinergy

12 and Duke?

13 A   Yes.  After the Cinergy Duke merger in 2006, I was named

14 Vice President of Field Operations for our Midwest operations.

15 Basic responsibilities was field operations for Kentucky, Ohio

16 and Indiana.

17 Q   How long were you in that position?

18 A   I held that position for just a few months.  In November

19 of 2006, I was named President of Duke Energy Indiana.

20 Q   Now, what are your responsibilities in your position

21 today?

22 A   Presently, the president of this operating company, just

23 like our other two operating companies, basic responsibility

24 is to ensure that we meet the regulated operating obligations

25 for the state, including customer satisfaction, system

1  reliability, environmental obligation requirements, et cetera.

2  Q    How many people work for Duke Energy in Indiana?

3  A    Duke Energy Indiana employs 2450 -- 2,450 employees.

4  Q    In your capacity as president of the operating company

5  here in Indiana, do you monitor how well you are doing with

6  regard to customers?

7  A    We monitor a lot of things, but customer satisfaction is

8  one of the primary things that we focus on, yes, routinely.

9  Q    Do you have any goals or objectives that you pay

10 particular attention to in terms of customer service?

11        MS. HIMMELHOCH:  Objection, relevance.

12        THE COURT:  He can answer.  Go ahead.

13 A    We do.  Customer satisfaction in my experience is a

14 derivative of several things.  One is system reliability and

15 availability of our product.  Another is price, making sure

16 our rates are competitive and are fair in the eyes of

17 customers; and obviously meeting our environmental obligations

18 as well are important things to our customers.

19 Q    Is the company -- if I can put it this way, is the company

20 the only entity that monitors customer satisfaction?

21 A    Not at all.  We are regulated by a number of agencies,

22 both state and federal.

23 Q    And they pay attention to that?

24 A    They pay close attention to it, yes.

25 Q    Let me switch tracks here for a moment.  Have you worked

STANLEY - DIRECT/GREEN          Vol. 8-1114

1  with the FERC accounting standards over the years?

2  A   I have.  In my initial time in our accounting group a long

3  time ago, but since then, since 1989, I've been responsible

4  for budget construction -- budget preparation and budget

5  review.  So obviously I've become generally knowledgeable of

6  FERC standards, yes.

7  Q   Can you tell us what the difference is between expenses

8  and capital expenditures?

9       MS. HIMMELHOCH:  Objection, Your Honor.  May we

10 approach?

11      THE COURT:  No. I'm going to let him answer that.  Go

12 ahead.

13 A   I think -- I'll take expenses first.  I think of expenses

14 as items or cost items the value of which will be consumed in

15 the present year or in the short term.  I think of capital

16 expenditures are those things we spend money on that will add

17 value on into the future.  They're longer term investments.

18 Q   Can you give us an example of what would constitute an

19 expense?

20 A   Something that's on everyone's mind these days is fuel.

21 We buy coal or natural gas for our power stations, generating

22 stations.  That would be an expense.  We buy it, consume it.

23 Fuel for our trucks is another example.

24 Q   How about a capital expenditure, can you give me an

25 example of that?

STANLEY - DIRECT/GREEN              Vol. 8-1115

1 A   Capital expenditures could be anything from component

2 replacements in generating stations that we've talked a lot

3 about already the last couple of weeks.  It could be adding a

4 new roof onto a building.  It could be building --

5 constructing a new building, a new office building.  Those are

6 capital types of expenses.

7 Q   Do the FERC rules about capital apply in a way that

8 distinguishes large expenditures from small expenditures?

9 A   No.  I mean, the FERC rules simply define the types of

10 things you charge either capital or maintenance.  We have

11 small capital expenditures.  We have very large capital

12 expenditures.  We have small maintenance expenditures and we

13 have very large maintenance expenditures.

14 Q   Do the FERC capitalization rules relate to environmental

15 standards or definitions as far as you know?

16       MS. HIMMELHOCH:  Objection.  Calls for an expert

17 opinion that was not previously disclosed.

18       THE COURT:  He can answer that.  Go ahead.

19 A   No, it does not.

20 Q   Could you change the way -- could Cinergy, and now Duke

21 Energy, change the way that they account for project expenses

22 if they just wanted to do it differently?

23 A   No.  Like I said, we are regulated and monitored.  We take

24 the definitions and apply those definitions.

25 Q   Now, you've had the opportunity to sit in this chair for

STANLEY – DIRECT/GREEN                Vol. 8–1116

1  the duration of the case up to this point.  Do you believe

2  you're familiar generally with the issues in this case?

3  A    Generally, yes.

4  Q    Mr. Stanley, do you know how many repair and maintenance

5  projects were undertaken per year in the Cinergy system

6  between 1985 and 2001, which is roughly the period covered by

7  this case?

8  A    Are you looking for a total number?

9  Q    I'm looking for a per year figure.

10 A    Probably in the ballpark of a thousand per year.

11 Q    So how many projects would have been undertaken and

12 completed between 1985 and 2001?

13 A    '85 to 2001 would be 16– to 17,000.

14 Q    And how many of these projects are at issue in this case,

15 sir?

16 A    Fourteen.

17 Q    Are they mandatory or economic projects?

18 A    The projects in this case?

19 Q    Yes.

20 A    The projects in this case are termed "economic" projects.

21 Q    What does that mean to say that it's an "economic"

22 project?

23 A    Economic project -- economic project would be one that we

24 take -- that we decide to take upon and construct or do, and

25 we have flexibility whether we do it or not.  It's not a

1  mandatory project.  It's a project we do for either efficiency

2  improvement or make the plants run better, for example.  It's

3  one of those things that it's a project that we don't have to

4  take upon -- we choose whether we do them or not.  They're not

5  mandatory projects.

6  Q   Are they done on a cost/benefit basis or analysis?

7  A   Yes.

8  Q   How critical are the types of projects at issue in this

9  case to the company's mission as you previously described it?

10 A   Projects like these are important because availability of

11 our generating units are important to us.  Availability of our

12 generating units add value to us and then to our customers.

13 Q   Are you generally familiar with the type of cost/benefit

14 or project evaluation documents that have been displayed in

15 the courtroom here and discussed among various of the

16 witnesses?

17 A   Yes.

18 Q   What function, sir, do these documents serve?

19 A   The documents I've seen used or at issue in this case,

20 just like the ones I've reviewed in my career, are used to

21 simply rank projects, that is, prioritize which projects get

22 completed in any given year.

23 Q   Do you do similar project evaluations on the transmission

24 or in the generation side of the business?

25 A   Yeah.  We do similar types of analysis to rank projects on

STANLEY - DIRECT/GREEN               Vol. 8-1118

1  our transmission and distribution side of the business as

2  well, yes.

3  Q   Mr. Stanley, are you able to summarize for us the kind of

4  analysis that is typically contained in these project

5  evaluation documents?

6  A   Well, generally -- generally, those documents are put

7  together based on assumptions the engineer in charge of the

8  project makes.  We're very familiar with the cost side of a

9  project, what actions we take are going to cost.  The real

10 trick or art is to add the value component.  And that value

11 component is derived at using assumptions and an educated

12 guesstimate, if you will.

13 Q   How does this kind of analysis help you to prioritize

14 these kinds of projects?

15 A   Well, when you're comparing projects, you want to compare

16 value derived.  Like I said, the value part of the equation is

17 the harder part to derive.  It's simply an attempt to make

18 projects more on an apples-to-apples basis so you can compare

19 the two so you can decide as a company which projects get done

20 in any given year and what particular order.

21 Q   Let me show you one of these project evaluation documents,

22 if I may.  It's Plaintiffs' Exhibit 1592 which has already

23 been moved into evidence.

24         MR. GREEN:  May I approach, Your Honor?

25         THE COURT:  Yes.

STANLEY – DIRECT/GREEN          Vol. 8–1119

1  BY MR. GREEN:

2  Q   Do you recognize that document, sir?

3  A   Yes.

4  Q   I would like you to turn to page 1–1 in the document, if

5  you will.

6        All right, sir, this is page 1–1 of the document.  It

7  lists the purposes of this project evaluation tool.  Could you

8  read those to us, please?

9  A   Sure.  There are four of them.  The purpose of this guide

10  is to 1, introduce the new Proval model, which is the

11  preferred tool for product justification studies at PSI

12  energy;

13        2, Document and review economic methods that can be

14  used for performing project justification studies;

15        3, Document the generally–accepted criteria used by

16  PSI in evaluating construction budget projects;

17        And 4, Provide a convenient source of data for

18  evaluating project economics that can be updated annually.

19  Q   All right.  Mr. Stanley, looking at Plaintiffs'

20  Exhibit 1592, which describes how to prepare project

21  evaluation documents, is this used by Cinergy to predict

22  future generation at Cinergy's units, this kind of document?

23  A   No, it's not.

24  Q   What is the purpose of this again?

25  A   The purpose of this document is to provide a tool by which

STANLEY – DIRECT/GREEN             Vol. 8-1120

1  engineers or anyone in the company can rank projects, can

2  provide an apples-to-apple's basis project to project so we

3  can decide which projects get funded in any given year.

4  Q   Now, as you sat in the courtroom in the days leading up to

5  this morning, did you see or hear about any project evaluation

6  documents that spoke in terms of availability or megawatt

7  hours of generation?

8  A   Yes, I did.

9  Q   Based upon your understanding, sir, of the capital

10 budgeting process, are those statements intended to be

11 predictions of future unit operation?

12 A   No, they are not.

13 Q   Would you personally use those evaluations to conclude

14 that the project under analysis would indeed cause increased

15 generation and unit availability?

16 A   I would not count on those documents for that purpose, no.

17 Q   Do you have an understanding of the concept of

18 availability as it is used by Cinergy in its various

19 assessments of performance?

20 A   Yes, I do.

21 Q   Can you explain what that concept means, sir?

22 A   Sure.  Both from a transmission and distribution side of

23 our business and a generation side of our business, having

24 units or your system available to serve customers is

25 important.

STANLEY – DIRECT/GREEN           Vol. 8–1121

1          It provides flexibility.  It provides a means to meet

2     demand of your customers at any given time.  The more flexible

3     your system, the more available, the better service you can

4     provide to customers.

5     Q    Have you ever heard of any units having 100 percent

6     availability?

7     A    No.

8     Q    To the extent that you know, Mr. Stanley, has Cinergy ever

9     attempted to assess availability of a generation unit by

10    isolating on only one component in the unit, even a large

11    component?

12    A    With thousands of components and moving parts in a

13    station, no.  That's not what we do.

14    Q    Are you familiar, sir, with how the company dispatches its

15    units?

16    A    Generally, yes.

17    Q    Can you always run the most economical unit, Mr. Stanley?

18    A    You wish you could always run the most economic, but you

19    cannot.  I mean, there are a lot of things that happen both in

20    an individual unit, individual plant; but there are also

21    things that happen out on your General Electric system that

22    could prohibit you from running the most economic unit at any

23    given time.  So you can't always count on doing so, no.

24    Q    What is the newest unit in the Cinergy system, sir?

25    A    The newest coal–fired unit, the types of units that are in

STANLEY - DIRECT/GREEN          Vol. 8-1122

1  question in this case, the newest one is the Gibson 5 unit

2  which went on line in 1983.

3  Q    Did the company apply for a New Source Review permit for

4  that unit?

5  A    Yes, we did.

6  Q    Have you applied for any other New Source Review permits

7  for new or modified units, sir?

8  A    Yes.  Every time we added a unit that's a new source, we

9  apply, yes.

10 Q    Has the company ever modified an existing plant and

11 applied for a New Source Review permit?

12 A    Yes, we have.

13 Q    Can you explain that?

14 A    Most recently, our Edwardsport IGCC plant in Edwardsport,

15 Indiana, was a modification of an existing unit.  We applied

16 and received.

17 Q    How does that kind of plant differ from the typical

18 coal-fired plant that we've been talking about in this case?

19          MS. HIMMELHOCH:  Objection, relevance.

20          THE COURT:  He can answer.  Go ahead.

21 A    The IGCC technology -- IGCC stands for integrated

22 gasification combined cycle, it's a type of technology we're

23 employing at the Edwardsport plant -- the basic difference is

24 it takes coal as its fuel source and converts it to gas prior

25 to combustion, and gas burns much more cleanly than coal does.

STANLEY - DIRECT/GREEN          Vol. 8-1123

1          So the benefits derived from the technology is a much

2   cleaner burning generating source, much lower levels of SO2

3   and NOX, mercury, really any of the emissions that we look to

4   control.

5   Q    And you applied for and did receive the New Source Review

6   permit for that, correct?

7   A    Yes, we did.

8               MR. GREEN:  No further questions, Your Honor.

9               THE COURT:  Cross-examine.

10              Before you start, let me just mention to the jury

11  that I know as we've gone along in this case, counsel have

12  asked for bench conferences.  I think I've almost always said

13  yes.  Counsel asked for one and I told her no.  That is more

14  of a tribute to her ability to let me know what's going on

15  before we start to me than it is to me just not wanting to

16  hear from her today.  So don't think that because that

17  occurred that that means anything in this case.

18              Go ahead.

19              MS. HIMMELHOCH:  Thank you, Your Honor.  Good

20  morning, ladies and gentlemen.

21                     **CROSS-EXAMINATION**

22  BY MS. HIMMELHOCH:

23  Q    Good morning, Mr. Stanley.

24  A    Good morning.

25  Q    Now, you testified that expenditures must be capitalized

STANLEY- CROSS/ HIMMELHOCH          Vol. 8-1124

1  if they are expected to add value to the asset; isn't that

2  correct?

3  A    Generally, yes.

4  Q    And Cinergy capitalized every single one of the projects

5  at issue in this case, did it not?

6  A    Yes.

7  Q    Cinergy spent money on those projects knowing they would

8  improve the value of those units, did they not?

9  A    We spent money knowing it would provide availability which

10 adds value to our system, yes.

11 Q    And you yourself have never been involved in the dispatch

12 of units, correct?

13 A    Not directly, no.

14 Q    You yourself have never analyzed whether or not the -- a

15 particular project would result in an increase in availability

16 or generation at a unit; isn't that correct?

17 A    On a hands-on basis, no, I have not.

18 Q    Now you indicated Cinergy had undertaken about 14,000

19 projects of a repair or maintenance nature.  Do you recall

20 making that statement?

21 A    I believe I said 16 to 17.

22 Q    I'm sorry.  I got my math wrong or I can't read my notes.

23 I don't know which one it is.

24      What were those 16- or 17,000 other projects?  Were

25 they all of the same size as the projects at issue in this

STANLEY- CROSS/ HIMMELHOCH          Vol. 8-1125

1  case?

2  A   Well, I haven't reviewed all 16- to 17,000, but like some

3  of my previous testimony, our capital -- specific capital

4  projects come in all shapes and sizes.  So I would say no,

5  they were not.

6  Q   About how many were over $5 million?

7  A   I could not tell you that.

8  Q   About how many were over a million dollars?

9  A   I could not tell you that.

10 Q   About how many involved the complete replacement of an

11 entire component?

12 A   I do not know.

13 Q   About how many were replacements of a complete component

14 that occurred more than once at any particular unit?

15 A   Repeat that, please.

16 Q   Sure.  How many of those replacement repair or maintenance

17 projects involved the replacement of an entire component that

18 had already been replaced once at a unit?

19 A   Within the 16- to 17,000?

20 Q   Yes.

21 A   I do not know.

22 Q   You don't know how often the superheaters had been

23 replaced at Wabash River, for instance?

24 A   No, I do not.

25 Q   You don't know, for instance, how often Cinergy has

STANLEY- CROSS/ HIMMELHOCH          Vol. 8-1126

1  undertaken one-shot refurbishment projects at Beckjord, do

2  you?

3  A    I do not.

4  Q    Now, you indicated that availability has value for the

5  company, correct?

6  A    Yes.

7  Q    And it has value because it is potential generation,

8  correct?

9  A    It is a unit available to be dispatched if needed, yes.

10  Q    And that means that it's a potential for generation,

11  correct?

12  A    It's a potential for generation given that other things

13  don't go wrong with that unit, then we can dispatch it, yes.

14  Q    You're not familiar with the history of each of the

15  individual units at issue in this case, correct?

16  A    I'm not sure what you mean by that.

17  Q    Well, have you examined what was going on at the unit

18  other than the problems giving rise to these particular

19  projects?

20  A    Not in any specific way if that's your question.

21  Q    Can you identify a single cause of recurring outages that

22  Cinergy expected to increase after the projects at any of the

23  units at issue?

24  A    Could you repeat that, please?

25  Q    Sure.  Let's take an individual unit.  At, say, Wabash

STANLEY- CROSS/ HIMMELHOCH          Vol. 8-1127

1  River Unit 5, you heard testimony from Mr. Koppe that that was

2  causing approximately 500 hours of outage every year before

3  the project.  Do you recall that?

4  A    I do generally, yes.

5  Q    Do you have any specific evidence to refute that estimate?

6  A    No, I do not.

7  Q    So are you aware of anything else that Cinergy expected to

8  cause 500 hours of outage in the post-project period --

9          MR. GREEN:  Your Honor --

10 Q    -- at Wabash River unit --

11         MR. GREEN:  Your Honor, this is really outside the

12 scope.  He was called as a financial operational manager and

13 not really as a technical operator of the units.

14         THE COURT:  I think he can still answer this question

15 as the president of the outfit.

16         Go ahead.

17 A    Not specifically, but we're also aware that in any given

18 year, lots of things go wrong with all of our units.  So

19 whether one event could cause 500 hours I do not know; but is

20 there a potential for several types of outages to cause and

21 take the place of that 500, it could happen, yes.

22 Q    Well, you recall Mr. Koppe analyzed everything else that

23 was causing outages at Wabash River Unit 5.  Do you recall

24 that?

25 A    I --

STANLEY- CROSS/ HIMMELHOCH          Vol. 8-1128

1          MR. GREEN:  Objection.  It misstates the evidence.

2  Mr. Koppe didn't analyze anything else.

3          MS. HIMMELHOCH:  Mr. Koppe presented a chart that

4  showed the GADS events caused by everything else.  It was Copy

5  Demonstrative 11, and he can testify to that.

6          THE COURT:  Yes, he can answer this question if he

7  knows.

8  A    Could you repeat, please?

9  Q    Do you recall the graph that Mr. Koppe put up where he

10  showed the effects of Wabash River Unit 5 economizer outages

11  and then all other outages at the unit?

12  A    I recall review of the GADS data if that's what you're

13  referring to.

14  Q    Mr. Koppe testified that everything else was causing

15  approximately 600 hours of outage at the unit, correct?

16  A    I don't recall to be honest with you.

17  Q    Could we please -- do we have Copy Demonstrative 11?

18          Do you recall this graph (indicating)?

19  A    Yes.

20  Q    Do you see that the cream color is everything else, and

21  the purple is the Wabash River Unit 5 economizer and

22  superheater, correct?

23  A    There's no legend on it, but --

24  Q    I'll represent to you that that's what Mr. Koppe

25  testified.

STANLEY- CROSS/ HIMMELHOCH          Vol. 8-1129

1  A   Okay.

2  Q   Now, Mr. Koppe testified that if you replaced the

3  economizer and superheater tubes as were done at Unit 5, you

4  would expect to eliminate those average of 500 hours a year,

5  correct?

6  A   That was his testimony, I believe, yes.

7  Q   Do you have any specific basis to dispute the fact that

8  the 500 hours per year loss due to the superheater and

9  economizer would be at least substantially reduced pursuant to

10 the post-project?

11         MR. GREEN:  Your Honor, this is really argumentative,

12 and beyond the scope.  This witness was not put up to comment

13 on Mr. Koppe.  The subject areas were direct.

14         THE COURT:  Well, and they were and that's true.

15         MS. HIMMELHOCH:  The witness testified to

16 availability and the company's expectation with respect to

17 availability.  I'm simply exploring his understanding of the

18 company's expectations.

19         THE COURT:  And we've got a general idea of what this

20 witness knows about and what he doesn't know about.  I'm going

21 to sustain this objection.

22         MS. HIMMELHOCH:  We can go ahead and bring that down,

23 please.

24 BY MS. HIMMELHOCH:

25 Q   Now, Mr. Stanley, you indicated that the project

STANLEY- CROSS/ HIMMELHOCH          Vol. 8-1130

1  evaluations that we've examined in the course of the trial
2  were not used to predict future generation, correct?
3  A    That's correct.
4  Q    And you indicated that they were simply used to rank
5  projects, correct?
6  A    That's correct.
7  Q    What were the criteria used to rank one project over
8  another?
9  A    I wasn't involved in the ranking those particular years.
10 I'm not sure what specific criteria was used.
11 Q    Well, you indicated you are making them apples-to-apples
12 comparisons.  In general, that was the purpose, correct?
13 A    Right.
14 Q    What was the nature of the apple that was used to compare
15 one project to the next?
16 A    I think the question that was put to me was around
17 predicted generation.  My point in testimony is that you can
18 use that to rank projects; but to count on that generation
19 would not be an assumption you should make simply because
20 there are lots of things that go wrong with units on a daily
21 basis and you can't predict those.
22 Q    I understand that.  We'll get to that second point in a
23 minute.  I'm just asking you I think a simple question; which
24 is you indicated that the project evaluation analysis was done
25 to make apples and apples, to make them comparable?

STANLEY— CROSS/ HIMMELHOCH          Vol. 8–1131

1  A   Yes.

2  Q   I'm asking what feature of that apple, was it the skin

3  color -- that kind of idea.  What was the feature that you

4  were comparing between the two projects?

5  A   Well, you could use generation but you use it knowing that

6  it's an assumption, and that it's not a guarantee and it's not

7  necessarily something you can count on.

8  Q   But the thing that was used to rank one project versus

9  another was the expected pay back in generation, correct?

10  A   I would say it's more likely the availability of the unit,

11  not the generation capability of the unit; the availability of

12  having the unit available to us if needed.

13  Q   But the project evaluation document that we've put up

14  spoke in terms of generation, did they not?

15  A   Some did, yes.

16  Q   And the project evaluation guide that you discussed also

17  talks in terms of converting the benefit into expected

18  generation, does it not?

19  A   Yes.

20  Q   And, in fact, it assumes that if the project results in

21  increased availability, it will reduce the amount of

22  replacement energy necessary that the company needs to buy;

23  isn't that correct?

24  A   Emphasis on the word "assumes."  It's an assumption.

25  Q   Right, but it's an assumption the company makes?

*STANLEY– CROSS/ HIMMELHOCH*          Vol. 8–1132

1  A    It's an assumption the company makes, but operators of

2  units know that they can't necessarily count on that.  It's

3  not a predictor.  It's not a crystal ball.

4  Q    Can you identify for me a single document that is

5  contemporaneous with these projects that indicates that the

6  engineers did not expect to utilize the availability gained

7  from these projects?

8  A    Can I point to a document?

9  Q    Yes.

10  A    I'm not sure I can.

11  Q    Is there any industry study that indicates that companies

12  should not expect availability increases resulting from

13  projects like this?

14  A    I'm not sure that there is, but there's experience on the

15  basis of our operators and plant managers that tell them, in

16  any given year, availability you can't count on.  It's not a

17  guarantee.

18  Q    But you have not located a single industry study

19  indicating that, in fact, you cannot expect availability

20  increases from projects such as those at issue?

21  A    I personally have not looked for one.

22  Q    And you have no basis to dispute Mr. Koppe's testimony

23  that, in fact, industry has experienced increases in

24  availability as a result of projects such as these?

25  A    Well, I'm not -- I would -- I'm not sure I would tie our

STANLEY– CROSS/ HIMMELHOCH        Vol. 8–1133

1  units with the general industry.  There may be some tie; but

2  specific to us are the performance of our units.

3  Q   Can you locate any -- have you identified any document

4  that indicates Cinergy has examined whether the $5 million

5  pulverizer replacement at Gallagher Unit 1 actually resulted

6  in increased generation?

7  A   I'm not aware of any.

8  Q   You didn't look for that?

9  A   I did not.

10 Q   Would you be surprised if the project engineer wrote a

11 memo indicating that, in fact, increased generation was

12 possible and occurred after the Unit 1 pulverizer replacement.

13         MR. GREEN:  I object again.  It's argumentative and

14 outside the scope.  There wasn't one question asked --

15         THE COURT:  I'll sustain that objection.

16         MS. HIMMELHOCH:  Just a moment.

17    (A discussion was held off the record.)

18 BY MS. HIMMELHOCH:

19 Q   Now, you talked about other New Source Review permits that

20 Cinergy has obtained.  It did not obtain any New Source Review

21 permits for the projects at issue; isn't that correct?

22 A   I believe that's the point of contention.

23 Q   So Cinergy did not obtain New Source Review permits,

24 correct?

25 A   Did not.

STANLEY– CROSS/ HIMMELHOCH          Vol. 8–1134

1  Q   Are you aware of any calculations or analyses done to

2  determine whether or not these projects would result in a

3  significant net emissions increase?

4  A   I'm not personally knowledgeable of any.

5          MS. HIMMELHOCH:  Nothing further, Your Honor.

6          THE COURT:  Redirect?

7                  **REDIRECT EXAMINATION**

8  BY MR. GREEN:

9  Q   Just very briefly.  In your position, sir, are you

10 responsible for maintaining the operational status of the

11 individual generating units?

12 A   No, I'm not.

13 Q   Are you responsible for keeping track of how many, let's

14 say, 17,000 projects consist of reheater replacements?  Is

15 that part of what you do every day?

16 A   No, it is not.

17 Q   I put this project evaluation document, Plaintiffs'

18 Exhibit 1592, on the ELMO before, and if I could bring it up.

19          I asked you to look at the introduction and the

20 explicit purposes of the guide.  Do you see anything there

21 with respect to those purposes about using that document to

22 predict future generation?

23 A   No, I do not.

24          MR. GREEN:  Okay, sir.  Thank you.  I think that's

25 all I have.

*STANLEY— REDIRECT/ GREEN*          Vol. 8–1135

1     THE COURT:  Any recross?

2                **RECROSS—EXAMINATION**

3  BY MS. HIMMELHOCH:

4  Q    Have you read the remainder of that document?

5  A    I've glanced through it.  It's heavy reading.

6  Q    Have you ever been responsible for implementing the

7  guidance contained in that document?

8  A    I've been responsible for implementing and overseeing, in

9  a very general leadership way, projects that are derived out

10 of that document, yes.

11 Q    And those project justifications that are sent out speak

12 in terms of lost generation; isn't that correct?

13 A    I haven't personally reviewed one of those types of

14 documents in my capacity.

15 Q    Well, you saw some of the ones that went up prior to your

16 becoming president of the company, correct?

17 A    Yes.

18     MR. GREEN:  This is asked and answered.  This is

19 repetitive now.

20     THE COURT:  I want the next question and then we'll

21 see.

22 BY MS. HIMMELHOCH:

23 Q    And those spoke in terms of lost generation, did they not?

24 A    Yes.

25 Q    And it's true, is it not, that Cinergy regularly projects

*STANLEY— RECROSS/ HIMMELHOCH*      Vol. 8-1136

1  generation from its various generating units?  Does it not?

2  A   But it also uses historical data in terms of outages to

3  help project availability is the way I would term it.

4  Q   But Cinergy doesn't project how much generation it will

5  produce from each of its units?

6  A   Well, we —— in a very general sense.  We're responsible

7  for meeting customer demand.  In order to do that, we have to

8  have a feel —— we have to have an idea of how much generation

9  we're capable of producing, plus we have to have a feel for

10 how much generation we would be required to purchase when

11 outages do occur on various units.

12 Q   And you also have to know how much coal to order, correct?

13 A   Absolutely.

14 Q   And that is a unit-by unit-analysis, is it not?

15 A   Yes.  I mean, all units don't burn the same types of coal.

16      MS. HIMMELHOCH:  Thank you.  Nothing further.

17      MR. GREEN:  Nothing further.

18      THE COURT:  You may step down, sir.

19      THE WITNESS:  Thank you.

20      THE COURT:  Your next witness, sir.

21      MR. GREEN:  If Your Honor please, I would like to

22 read to the jury a very small snippet of deposition testimony

23 and then —— which lays the foundation for an exhibit and then

24 show them the exhibit if I may, sir.

25      THE COURT:  All right.

STANLEY— RECROSS/ HIMMELHOCH        Vol. 8–1137

1           MR. GREEN:  Ladies and gentlemen, I'm going to read

2    you a very, very small portion of the deposition of David

3    Schulz and a little background on Mr. Schulz is as follows:

4           At the time of his deposition, Mr. Schulz was

5    employed by the United States Environmental Protection Agency

6    in its Region 5 office in Chicago, Illinois.  And he held the

7    position of Combustion Process National Oracle.

8           In that position, Mr. Schulz coordinates and

9    implements compliance assessments dealing with combustion

10   process sources, including utility industry sources,

11   industrial boilers and other combustion sources.

12          As of May 2005, Mr. Schulz had been employed by EPA

13   for approximately 33 years.  And here's the very short

14   snippet.

15          (An excerpt of the deposition of Mr. Schulz was read

16   into the record.)

17          MR. GREEN:  This has been relabeled as Defendants'

18   Exhibit 31; is that correct?

19          MS. THOMSON:  Yes.

20          (An excerpt of the deposition of Mr. Schulz was read

21   into the record.)

22          MS. HIMMELHOCH:  Your Honor, at this point I would

23   request to approach.

24          THE COURT:  Yes.

25       (A bench conference was held on the record.)

1          MS. HIMMELHOCH:  We would request a proffer as to how

2   this is relevant given your limiting instruction on what they

3   could not use their inspection for.

4          THE COURT:  Where are we going with this?

5          MR. HOPSON:  The simple answer to this is, Your

6   Honor, the question at the end of the day is reasonableness.

7   He's there in 1988.  He sure wasn't adding up hours of

8   availability.  He saw the single biggest project in the case,

9   didn't make any calculation of availability, didn't make any

10  calculation of future generation.  It just goes to

11  reasonableness, which is the ultimate issue in the case.  It's

12  not a fair notice argument.  We understand your ruling on fair

13  notice, and we're not going to use it for fair notice.

14          MR. GREEN:  Fair notice is really about confusion

15  over the --

16          MS. HIMMELHOCH:  Your Honor, the witness has

17  testified that he didn't -- in the deposition that he did not

18  have sufficient information to perform an emissions

19  calculation as a result of the inspection.  So the fact that

20  he did not perform an emissions calculation is not probative

21  of what EPA's interpretation of the regulation was or whether

22  Cinergy's interpretation was reasonable.

23          MR. GREEN:  It's not an issue of interpretation.  I'm

24  not fighting interpretation.  I'm fighting the fact that he

25  is -- and I'm -- I'm establishing the fact that he's standing

*STANLEY— RECROSS/ HIMMELHOCH*        Vol. 8–1139

1  right there at the unit, makes no mention of New Source

2  Review.  That's not a fair notice issue, and it goes to the --

3  you know, the whole reason of the approach that the Government

4  is using in this case --

5          THE COURT:  I'm going to let you do it for that

6  reason.  It's not fair notice.  It's what happened at the

7  time.

8          MR. GREEN:  Exactly.

9          MS. HIMMELHOCH:  Does he have a sponsoring witness

10 for the document?

11         THE COURT:  Who is your sponsoring witness for the

12 document?

13         MR. GREEN:  He's the foundation.

14         MS. HIMMELHOCH:  So you're just going to put the

15 document up and then stop?

16         MR. GREEN:  I'm going to put the document up.  I'm --

17 I may read the document to the jury so --

18         THE COURT:  But this is a sponsoring witness.

19         MS. HIMMELHOCH:  I object to counsel reading the

20 document to the witness.

21         MR. GREEN:  I can leave it up there and let them read

22 it for themselves.  You tell me how to do it.

23         THE COURT:  How long is it?

24         MR. GREEN:  It's three little pages.

25         THE COURT:  It's probably best to not read the jury

*STANLEY– RECROSS/ HIMMELHOCH*       Vol. 8–1140

1  three pages of stuff.

2         MR. GREEN:  Can I read some of it?

3         MS. HIMMELHOCH:  No.

4         THE COURT:  I think that you're entitled when you put

5  in a piece of evidence, you can highlight what you want.

6         MS. HIMMELHOCH:  But, Your Honor, by allowing counsel

7  to read it, he's putting –– well, Your Honor, I will note my

8  objection.

9         THE COURT:  Thank you.

10     *(End of bench conference.)*

11                      *(In open court)*

12        MR. GREEN:  Let me back up, if I may, to put this

13 again to you, the very short snippet.

14        *(An excerpt of the deposition of Mr. Schulz was read*

15 *into the record.)*

16        MR. GREEN:  So now let me show you –– I move into

17 evidence, Your Honor, Defendants' Exhibit D31.  I believe it's

18 not objected to.

19        MS. HIMMELHOCH:  Plaintiffs continue to object to

20 relevance, but recognize we've been overruled.

21        THE COURT:  The exhibit is admitted.

22     *(Defendants' Exhibit D31 was received in evidence.)*

23 BY MR. GREEN:

24 Q  Let me just point out a couple of things here.  I will not

25 read this entire document to you, ladies and gentlemen.

*STANLEY– RECROSS/ HIMMELHOCH*        Vol. 8–1141

1        Under the letterhead of United States Environmental

2   Protection Agency Region V, dated March 14, 1988, Inspection

3   Report, Cinergy Gas and Electric Company, Beckjord Generating

4   Station, New Richmond, Ohio; Date of Inspection, February 10,

5   1988, and the personnel participating.  Then Mr. Schulz

6   describes the project.

7        On his Findings on the second page, he wrote as

8   follows:  "On the date of inspection, Units 3–6 were in

9   service.  Unit 1 was out for a 13–week Life Extension major

10  overhaul estimated to cost approximately 15 million.  Unit 2

11  was out for a 4–week period for a turbine overhaul."

12        MR. GREEN:  That's what is pertinent with respect to

13  this exhibit, Your Honor.  Thank you, sir.

14        Now we call Barry Pulskamp.

15        THE COURT:  This is the witness chair up here, sir.

16  If you'll come up here, I'll swear you in, please.

17        **BARRY PULSKAMP, DEFENDANT'S WITNESS, SWORN**

18        THE COURT:  You may inquire.

19        MR. GREEN:  Thank you, sir.

20               **<u>DIRECT EXAMINATION</u>**

21  BY MR. GREEN:

22  Q   Mr. Pulskamp, keep your voice up so that everyone can hear

23  you.

24        Let me start by asking you again to state your name

25  for the record.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1142

1  A   My name is Barry Edward Pulskamp.

2  Q   Where are you employed, sir?

3  A   I'm employed with Duke Energy, Incorporated.

4  Q   Can you tell us where you grew up, Mr. Pulskamp?

5  A   I grew up in Cincinnati, Ohio.

6  Q   I would like to ask you to take us briefly through your

7  education, if you can.

8  A   I have a Bachelor's of Science degree in mechanical

9  engineering from the University of Cincinnati.  I graduated in

10 1977.

11 Q   Are you officially certified as an engineer in any

12 jurisdiction?

13 A   Yes, sir.  I'm registered in the State of Ohio as a

14 professional engineer and have been since 1981.

15 Q   Mr. Pulskamp, where did you go to work after becoming an

16 engineer, sir?

17 A   Well, almost immediately, ten days after graduation in

18 1977, I started with Cincinnati Gas & Electric Company, and I

19 was with them until 1994.

20 Q   And then in 1994, what happened, Mr. Pulskamp?

21 A   In 1994, CG&E merged with Public Services of Indiana or

22 PSI to form Cinergy, Incorporated.  I became an employee of

23 Cinergy.

24 Q   Are you still employed by Cinergy, sir?

25 A   No.  I'm employed by Duke Energy.  In 2005, Cinergy merged

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1143

1  with Duke Power of Charlotte, North Carolina, to form Duke

2  Energy.

3  Q   What is your current position then with Duke Energy?

4  A   I'm a senior vice president of regulated fossil

5  hydrogeneration.

6  Q   That's a long term.  What's that mean?

7  A   Well, basically, it means I'm responsible for the

8  operation and maintenance of our generating assets.  We have

9  51 coal-fired units, 90 or so oil and gas-fired units, and

10 about 100 hydroelectric generating facilities.

11 Q   Are you able to think back and break out for me the units

12 that the Cinergy system had in 19 –– let's say 1999 when this

13 case was filed?

14 A   In 1999 we would have had 32 coal-fired units, 28 oil or

15 gas-fired units, most of those combustion turbines, and then

16 we had three hydroelectric units.

17 Q   I'd like to move to ask you a few questions about the

18 electrical generation business, and my first question is is

19 Cinergy a public utility, and if it is, what does that mean,

20 sir?

21 A   Yes.  Cinergy is a public utility and what that means is

22 that we have an obligation to serve our customers.  In this

23 case, it's electricity at the lowest reasonable cost we can.

24 Q   I want to show you this slide that I showed the ladies and

25 gentlemen of the jury in my opening statement, which we'll

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1144

1  mark as demonstrative -- well, it's marked for identification

2  as -- is it 27, 20?

3          MS. DELANEY:  2120.

4  Q   2120 if I may, sir.  Can you see that in front of you?

5  A   Yes, sir.

6  Q   Let me ask you:  How does the electricity that's generated

7  at these various power stations, how does that get delivered

8  to the people and the businesses who need it in Indiana and

9  Ohio?

10 A   Well, all those yellow squares on the diagram are our

11 power plants which are located all over the state of Indiana

12 and Ohio.  They are connected together to the substations.  We

13 have some of our substations shown.  It appears as the red

14 dots.

15         From the substations, the load is distributed to our

16 customers.  It's all interconnected.

17 Q   Is it interconnected on some kind of a grid?

18 A   Yeah, we call that the power grid.

19 Q   What does that consist of?

20 A   Well, the power grid is just -- really just the connection

21 of all of our generation units to substations and then

22 eventually to our customers.

23 Q   Is the Cinergy grid connected to some larger or regional

24 grid?

25 A   Yes.  The Cinergy grid would be connected to the

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1145

1  neighboring utilities through at least one interconnection,

2  which each one of those neighboring utilities, it gives it a

3  little bit more reliability across the region.

4  Q    Is that the specific reason why they're tied together into

5  a local grid and a regional grid?

6  A    Yes, sir.

7  Q    What function does the grid serve?

8  A    Well, it's the most efficient way of getting electricity

9  to our customers.  There is no practical way to store

10 electricity.  It's got to be created, made and transmitted and

11 used all in the same split second; and that occurs at

12 approximately 186,000 miles a second.

13        So the moment the customer flips a switch, we've got

14 to have that power produced and delivered and sent to that

15 device that they're using.  That happens constantly during the

16 day.  It's a 24 hour a day, 365 day a year process.

17 Q    In the period from 1985 to, again, 2001, which is roughly

18 the years covered by this lawsuit, sir, what determined how

19 much power Cinergy generated on any particular day?

20 A    On any day it's -- well, it's no different today than it

21 was back then.  The amount of power we generate each day is

22 based on customer demand.  That demand will change with time

23 of day or season or weather or general economic conditions.

24 Q    What kinds of customers contribute to the demand for

25 electricity on the Cinergy system on any given day?

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1146

1  A   Well, we have three classes of customers.  We have

2  residential customers, which are your homes and apartment

3  buildings.  We have commercial customers, which are office

4  buildings and retail stores and those kind of facilities; and

5  then we have industrial customers, which are the largest

6  users.  They have the higher demand.  They are plants and

7  factories, steel mills and things like that.

8          MR. GREEN:  I want to put up, Your Honor, a

9  demonstrative exhibit that's been marked 2161 if I may.

10  BY MR. GREEN:

11  Q   Mr. Pulskamp, I want to use this demonstrative that talks

12  about residential demand.  Can you show us or describe for us,

13  take us through what this demonstrative is going to show?

14          Can we have the whole system here?

15  A   Yes.  This is showing how residential demand changes

16  throughout the day; and as you can see in the morning, there

17  is a peak in demand.  That's when people get up and turn their

18  lights on and start their day, start some appliances.

19          In this particular case, the demand has dropped off

20  some during the day.  Now, that may change if it was a hot day

21  and it needed air conditioning.  It may go up.  In this

22  particular case, it came down.

23          Then in the evening, you see it again pick up.  In our

24  area traditionally, the peak occurs for the day and the

25  evening, usually between 5 and 6 when people get home from

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1147

1  work.  They once again turn some of their appliances on, throw

2  a load in the dishwasher and those kind of things, start

3  lights for evening.  So that just shows how the demand is

4  constantly changing through the day.

5  Q   If this demonstrative were showing, let's say, commercial

6  or industrial demand, would we see that dip in the center rise

7  during the day?

8  A   No.  You'd probably see that dip –– it would actually

9  start rising through the day because most commercial load and

10  industrial load –– the commercial load would start their air

11  conditioning, turn a lot of devices on in office buildings and

12  stores that use power.  So it tends to go up through the day.

13  Q   Let me have the next demonstrative, which is 2162, and if

14  you could run that through, please.

15  A   Yes.  This is a –– shows the demand as it changes through

16  the year.

17        MS. HIMMELHOCH:  Your Honor, I'm sorry to interrupt.

18  We had objected to this demonstrative as relevance.  It only

19  describes one of the elements of the customer base.

20        MR. GREEN:  He's going to describe all of it in some

21  detail.

22        THE COURT:  I'll admit this as a demonstrative.

23    *(Defendants' Deposition Exhibit 2162 was received in*

24  *evidence.)*

25  A   As you can see, we start off in this case at the end of

1  spring and demand is low.  When customers are neither using

2  their electricity for heating or cooling is usually the lowest

3  of demand.  It picks up in peaks during the summer months as

4  air conditioning picks up, and then drops off again in the

5  fall of the year.

6        We show a little rise again in the wintertime.  That's

7  as winter heating load picks up and more lighting, and then

8  we'll often see a peak around the holiday season, too, as our

9  customers use outdoor lighting for decoration, things like

10 that.  That's just typical for a residential load in this

11 area.

12 Q   Mr. Pulskamp, on any given day, can there be an unexpected

13 or sudden change in demand?

14 A   Yes.  You could have a very unseasonably cold day in the

15 summer or unseasonably hot day in the winter.  That will

16 change demand.  I've actually been in our operations center

17 when a storm moves through Indiana, for example.  That front

18 will move through, like a cold wave with a lot of cloud cover,

19 and you can watch the load just drop off drastically as that

20 front moves through.  When that happens, we've got to react to

21 that demand and adjust our generation to meet that.

22 Q   I asked you kind of a quick question about commercial and

23 industrial demand; but let me direct your attention to that

24 for a minute and ask you whether that kind of demand

25 fluctuates through the day as well, sir.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1149

1  A    Yeah, commercial demand can fluctuate because of load.

2  Office buildings, for example, normally are open Monday

3  through Friday.  So you'll see demand drop off after five

4  o'clock there and on the weekends.

5       Industrial demand has a lot of fluctuations; and in

6  our service territory, we've got a number of steel mills and

7  steel customers, and when a steel mill starts a rolling mill

8  up or starts a process where they're inserting their

9  electrodes to melt steel, we'll see significant changes in

10 demand that really only a large system could handle.

11 Q    Will changing economic conditions impact the demand for

12 electricity on the Cinergy system?

13 A    Yes, very much so.  When things are good, times are good,

14 plants put on shifts.  They work weekends.  They do all kinds

15 of things.  They build plants, and that changes demand.

16      When things aren't as well, the economy turns bad,

17 they lay people off.  They shut down shifts.  Places close up.

18 We see that.

19      Now with four dollar gas, I'm sure we're going to see

20 some influence on just the gasoline prices on our demand

21 because people have a fixed amount of resources to get

22 everything they want to do done.  So that may be cutting back

23 on some of their electric use.

24 Q    Does Cinergy have a legal obligation to generate power on

25 demand?

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1150

1  A   Yes.  That is our legal obligation, and we take that very,

2  very seriously.

3  Q   So how do you —

4       MS. HIMMELHOCH:  Objection, calls for a legal

5  conclusion.

6       THE COURT:  I'll leave it in.

7  BY MR. GREEN:

8  Q   How does Cinergy ensure that it can perform its mission

9  and deliver power on demand?

10 A   Well, we need to have all our units available and ready to

11 run when needed.  The key component to that is maintenance.

12 We do the maintenance to keep those units available and

13 prepared to run.

14 Q   Let me switch a little bit here from how the demand for

15 electricity changes during the day and the seasons and so

16 forth, and ask you on any given day how does the company match

17 the demand of its customers for electricity to its generating

18 capacity?  How do you match that up?

19 A   Okay.  Well, basically we use a sophisticated computer

20 system which is taking the demand from our customer, the

21 increases and decreases of their load, their demand; and we're

22 matching our generation to that, increasing or decreasing our

23 output so it matches.

24      We do that with a computer system that sends a pulse

25 out to each of our generating units to tell them to ramp up or

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1151

1  ramp down.  Now, we do have some older units that aren't tied

2  into the computer system, and we have to make a traditional

3  phone call sometimes to tell them to ramp up or ramp down, but

4  for the most part, it's a computer system that's --

5  Q   How frequently --

6  A   -- handling that.

7  Q   I'm sorry.

8       Let me ask this:  How frequently do you have to make

9  adjustments to the output of your units to match that output

10 to customer demand during the day?

11 A   Well, basically, it's being adjusted constantly; but the

12 computer system is sending that signal out every four seconds.

13 Q   What happens if there's a mismatch between the demand for

14 electricity and the generation that's coming from the Cinergy

15 system?

16 A   Well, that's not a good thing if there's a mismatch.  We

17 have to match demand and generation in order to keep voltage

18 within parameters on the system and frequency on the system.

19      If you don't, you can burn up motors.  You can burn up

20 other equipment.  You can destroy equipment, your customers'

21 equipment.  Clocks can run slow, clocks can run fast, all

22 those kind of things.  So it's very important that we keep

23 that demand match between generation and load.

24 Q   Now, we've heard -- in this trial, we've heard the terms

25 "base-loaded units" and we've heard references to "cycling

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1152

1  units," and I think we've heard references to "peaking units."

2  Can you explain the difference to His Honor and the jury

3  between those kinds of generating units?

4  A   Yes.  A base-loaded unit –– most of all base-loaded

5  units –– all of them are really –– are coal-fired units.

6  They're the most efficient, most economical.

7         We try to load the base units up first, but there's

8  some factors that may go into whether or not we do that.  But

9  they are loaded first.  They cover the base.

10        Then at the other extreme is the peaking units.  Those

11  are gas and oil-fired combustion turbines.  They're the most

12  expensive to operate.  They use gas or oil.

13        Some of those units can start and get up to full load

14  in as little as 10 minutes, whereas a base-load unit may take

15  you three days to get from a cold start to get heated.  So we

16  use the peaking units for the extreme temperature cases,

17  extreme load, or to help us out in emergencies.

18        Now, in between there, we call our cycling units.

19  Most of our cycling units are coal as well; but they're not as

20  efficient.  They're some of our older coal units.

21        MR. GREEN:  Can I have the list of projects?

22        MS. HIMMELHOCH:  Your Honor, we have objected to this

23  list.  There is an irrelevant objection to this list.

24        MR. GREEN:  We've been using this list all through

25  the trial.  It's kind of a day late.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1153

1          MS. HIMMELHOCH:  The same could be said of some of

2   the objections Cinergy raised.

3          THE COURT:  Well, can you tell me which one it is

4   that's your problem?

5      *(A bench conference was held on the record.)*

6          MS. HIMMELHOCH:  It's this, the date the lawsuit was

7   filed; and he says it's relevant to any issue.

8          THE COURT:  You know, everybody knows the date this

9   lawsuit was filed.  I don't think this is going to cause us a

10  problem with this time.  So I'm going to leave it.  You can do

11  it.

12     *(End of bench conference.)*

13                     *(In open court)*

14  BY MR. GREEN:

15  Q   Sir, this is the list of the units and the projects in

16  this case.  Would you look at the list of the units on the

17  left and tell me which of those were base-loaded units, say,

18  back in the 1990s?

19         THE COURT:  I don't think we've got the number in the

20  record, if you would.

21         MR. GREEN:  I'm sorry, Your Honor.  It's 2119.

22  Defendants' 2119.

23         THE COURT:  Thank you.

24  A   None of those units would have been base-loaded in the

25  1990s.

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1154

1   Q    Okay, sir.

2        MR. GREEN:  You can take that down.

3   BY MR. GREEN:

4   Q    Now, is there a name for the way that generating units are

5   dispatched, which means –– I mean turned on?

6   A    Yes, we call that the stacking order.

7   Q    How does a stacking order work?

8   A    Well, basically, each of our generators, each of our

9   generating units has a cost associated with production of a

10  megawatt of power.  The stacking order generally puts those

11  units in relation to their cost.  But there are a number of

12  factors that influence how we're going to use the units in the

13  stacking order.

14       It may be, you know, what other generation is

15  available in the area or transmission constraints or other

16  local restrictions; whether or not we can buy power in the

17  marketplace.  That will all determine how those units fit into

18  that stacking order.

19  Q    Would scheduled or unplanned outages impact that?

20  A    Yeah.  Unplanned outages and scheduled outages both will

21  impact that order in the stacking order.

22  Q    How about the cost of fuel?  Would that impact the

23  stacking order and the dispatch of units?

24  A    Yes, sir.

25  Q    How do you meet –– how does the system meet customer

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1155

1  demand when one of your generating units is taken out of

2  service for a planned outage or an unplanned outage?

3  A   Well, if it's a planned outage, it's a little bit easier

4  because it's planned, and we know it's not going to be

5  available.  We take that unit out to do maintenance, whatever.

6  We schedule other units to take its place.  We know we're

7  going to use those units to meet the load obligation.

8       Now, if it's an unplanned outage, it all depends.  It

9  really depends on the demand at the time and the -- how big an

10 outage it is and how quickly that outage is coming.  If it's

11 off immediately or if it's -- if we've got some time and how

12 quickly we can make a repair.

13      But, for example, if it's a very hot day and a high

14 demand, we may be able to -- and we know that the failure that

15 we're having, we can hold onto it for awhile -- for example,

16 if it's a tube leak and it's not too bad a tube leak, we may

17 hold onto it till the end of the day till we get out of that

18 peak.

19 Q   To keep the unit running; is that what you mean?

20 A   Yeah, to keep it running until we can get out of that peak

21 period.  At the same time, we're ramping other units up to

22 cover that load so we can ramp this one down, so it can have

23 minimal effect.

24      If it's a hot day and there's a high demand and it's a

25 big unit and it comes off suddenly, a tube bursts, we may have

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8-1156

1  to bring that unit off immediately.  In that case, we may have

2  to start some of our gas turbines that I mentioned that can

3  get going in 10 minutes and ramp up everything else on the

4  system very quickly.

5          If it's a really bad day, we may even have to put a

6  call out -- we call it emergency reserve sharing, where we

7  call out to our other utilities surrounding us to help us for

8  a few minutes to keep up with the demand, the load, until we

9  can get some of our stuff started and brought up.

10          If we don't do things like that, you result in

11  brownouts or blackouts.  So it's very important that we be

12  able to respond to all those conditions.

13  Q   Before I kind of focus down here on the subject of

14  maintenance, I want to ask you whether again during this

15  period of 1985 to 2001 were the units in Cinergy's system

16  required to have operating permits from the states of Ohio and

17  Indiana?

18  A   Yes, all --

19          MS. HIMMELHOCH:  Objection, relevance.

20          THE COURT:  He can answer.  Go ahead.

21  A   Yes.  All of our units are required to have operating

22  permits.

23  Q   Is that the same for today, sir?

24  A   Yes, sir.

25  Q   What was and is the state agency here in Indiana that

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1157

1  issues Cinergy its permits?

2  A    In Indiana, it would be the Indiana Department of

3  Environmental Management, or IDEM is what we call it.

4  Q    What about in the State of Ohio, sir?

5  A    It's the Ohio Environmental Protection Agency or the Ohio

6  EPA.

7  Q    Now, Mr. Pulskamp, this case pertains to emissions of

8  nitrous oxide, sometimes referred to as NOX, and sulfur

9  dioxide, sometimes referred to as SO2, from certain of

10  Cinergy's coal-fired units.  Did the state permits which you

11  just described set emission levels for SO2 and NOX?

12  A    Yes.

13        MS. HIMMELHOCH:  Objection, relevance, Your Honor.

14        THE COURT:  He can answer.

15  A    Yes.  Each of our coal-fired units have limitations of NOX

16  and SO2, and it's based on full-load capacity for the unit.

17  So what that is is you take the hourly emissions rate for 24

18  hours a day, 365 days a year, and that's the limit in those

19  operating permits.

20  Q    So the permits permit maximum emissions 24 hours a day; is

21  that right?

22  A    Yes, sir.

23  Q    Now, just out of curiosity, has it ever happened that all

24  of the Cinergy units have all run at complete maximum power

25  simultaneously?

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1158

1  A    No, sir.  It's never happened that way.

2  Q    Prior to the time that this case was filed in 1999, had

3  Cinergy ever received any notice from either the Ohio or

4  Indiana regulators that it had violated its permits setting

5  the emissions levels for SO2 and NOX?

6          MS. HIMMELHOCH:  Objection, relevance.

7          THE COURT:  He can answer.

8  A    No, sir.

9  Q    Let me turn to talk about New Source Review permits which

10 are at issue in this case.  Are they different from the state

11 operating permits that you and I have just been discussing?

12 A    Yes.  A New Source Review permit, or NSR permit, is a

13 different type of permit, and they deal with new sources of

14 emissions such as new capacity, or for increased emissions

15 that may have resulted from certain projects or component

16 replacements.

17 Q    Over the years, has Cinergy obtained New Source Review

18 permits when it constructed new generating capacity?

19          MS. HIMMELHOCH:  Objection, relevance.

20          THE COURT:  He can answer.

21 A    Yes.  We had New Source Review permits for our Woodsdale

22 Station, for Cayuga 4 CT.  We had it for our East Bend

23 station.  We had it for Zimmer station.  We had it for Gibson

24 5, and we had it for Noblesville station.

25 Q    Prior to 1999 when this litigation started, had Cinergy

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1159

1  ever been notified by any state or federal authority that it

2  had failed to obtain an NSR permit?

3          MS. HIMMELHOCH:  Objection, relevance.

4          THE COURT:  Yeah, that wouldn't matter.  Go ahead.

5          MR. GREEN:  Pardon?

6          THE COURT:  I sustained that objection.

7          MR. GREEN:  All right, sir.

8  BY MR. GREEN:

9  Q   Before the Cinergy merger in 1994, did you work at CG&E?

10 A   Yes.

11 Q   What responsibilities did you have for repair and

12 maintenance projects at CG&E, Mr. Pulskamp?

13 A   Well, I started as a mechanical project engineer in 1977.

14 I was responsible for various projects on our generating units

15 for design and implementation of those projects.

16 Q   How many such projects do you think you worked on when you

17 were a project engineer at CG&E?

18 A   I worked on hundreds of projects.

19 Q   Were most of those projects, sir, performed on coal-fired

20 units?

21 A   Yes, sir.  Most of our generation comes off of the

22 coal-fired units.  Coal-fired units require most of the work

23 anyway.  So yes, it would have been on coal-fired units.

24 Q   Did there come a time when your responsibilities changed?

25 A   Yes.  In 1989, I was named directer of plant betterment,

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1160

1  or at one point in time, we called it generation and process

2  engineer.  But in that capacity, I had other engineers doing

3  project type work for me.  I was basically supervising the

4  work that they did on maintenance projects.

5  Q   Did you hold any other positions at CG&E after becoming

6  what you've called the director of plant betterment

7  engineering?

8  A   Yes.  In 19 –– well, not at CG&E.  In 1994, when we merged

9  with PSI and formed Cinergy, I was named general manager of

10  construction and special projects.  In 1995, I was named

11  process owner of Cinergy's Transformation Now program, which

12  is a reengineering effort around the power generation

13  business.  So in that role, I was responsible for identifying,

14  coming up with initiatives to improve the power generation

15  operation maintenance processes.

16  Q   Did you assume another position in 1998?

17  A   Yeah, in '98, I became general manager of power

18  operations.  So I was kind of made responsible for those

19  recommendations that I had made up a few years before in that

20  other job; and in 1999, I became vice president of power

21  operations and stayed in that position until the merger with

22  Duke.

23  Q   Is there any common thread that kind of ties all these

24  positions together, Mr. Pulskamp?

25  A   Yes.  If there's a common thread, it's in the fact that in

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1161

1  all of these jobs throughout my career, I was in some role

2  that dealt with the availability and keeping our units

3  operating in good condition; the only difference being that I

4  kind of moved up through the organization and did less

5  hands-on and more administrative work.

6  Q   So how long have you actually been in the boiler

7  maintenance business?

8  A   Well, I've been in it almost 31 years and eaten a lot of

9  coal dust in that period of time.

10  Q   During the period 1985 to 2001, can you give us a feel for

11  the number of maintenance projects that were performed on

12  Cinergy's coal-fired units in every year?

13  A   Well, in those -- well, in that period of time, we had 32

14  boilers, 32 units; and I would say that easily, we would have

15  done 30 projects on a unit.  So 32 gives you about a thousand

16  projects a year on the system.  I think I'm being very

17  conservative with that number.

18  Q   So if my math is right, over the period covered by this

19  case, it gets you to about 16- or 17,000 projects; is that

20  right?

21  A   Yes, sir.

22  Q   Do you know how many of those 16- or 17,000 projects are

23  involved in this case?

24  A   I believe it to be 14.

25  Q   Now, would all of the 16- or 17,000 projects have been

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1162

1  capital improvement projects, Mr. Pulskamp?

2  A    No.   Some of those would have been maintenance projects.

3  A lot of them would have been what we call maintenance

4  projects, or R & M projects that we expense, but they were all

5  important to the performance of our unit.

6  Q   Would many of those 17,000 projects have been boiler

7  tubing replacements?

8  A   Yes, many of them.   The boiler and boiler tubing projects

9  consisted of a great deal of the projects that we do.   They

10  take a lot of maintenance.

11  Q   The projects in this case have been referred to sometimes

12  as component replacement projects.   Do you have an

13  understanding of that term, and if so, can you tell us what it

14  is?

15  A   Yes.   A lot of work that we do is replacement of tubes,

16  but there's many times that we'll also do all the tubes in a

17  section or an element or a bank.

18        When we do multiple tubes like that, we call that a

19  component.   Basically, it's a tube replacement, but we're

20  doing the whole section.   So that's a component replacement.

21  Q   In your view, sir, how complex a piece of machinery is a

22  coal-fired generating unit?

23  A   It's a very, very complex piece of machinery.   In fact,

24  sometimes it amazes me that they run.   They have hundreds of

25  miles of tubing in them.   There's hundreds of fans and motors

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1163

1  and pumps that are part of the unit.  There's thousands of

2  valves, thousands of other devices that are all connected

3  through hundreds of miles of wire.  They are very complex

4  pieces of equipment, many, many parts.

5  Q   Let me –– if I may, let me put up Demonstrative

6  Exhibit 2163, if I may.

7          MS. HIMMELHOCH:  Your Honor, may I see whether or not

8  we object?

9          We don't have a copy but we do not object.

10          THE COURT:  Thank you.

11  BY MR. GREEN:

12  Q   Do you recognize this photograph, sir?

13  A   Yes, sir.  This is our Gibson generating station.

14  Q   Mr. Pulskamp, just how large is this generating station,

15  this power station here?

16  A   This is a big station.  There's five units there.  So

17  there's five turbines, five boilers and all the associated

18  equipment that goes with it.

19          Each of those units is rated for about 635 megawatts,

20  which is enough power from each one of these to light up about

21  6 million 100–watt light bulbs.

22  Q   How many acres does this plant sit on?

23  A   There's over 5,000 acres at this site.

24  Q   If you can take yourself back to the mid–1990s or perhaps

25  the early 1990s, how difficult would it have been for Cinergy

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1164

1  to find a site where the company could have constructed a

2  plant like this plant or a plant half its size or a third of

3  its size?

4              MS. HIMMELHOCH:  Objection, relevance.

5              THE COURT:  He can answer.

6  A   It would have been very difficult in that period of time.

7  For one thing, you need a site near water.  In this case, you

8  can see the Wabash River over to the left in the photograph.

9  There's actually a huge cooling lake to the right of the

10 picture that's not shown; but the plant needs water.  It needs

11 a large site.  It needs access for rail or barge to get your

12 fuel in.  It needs transmission lines out.

13         Then you've got to permit or zone it for that use.

14 That's sometimes difficult.  Then you have to permit for that

15 use.  You have to go through an environmental impact statement

16 and model the effects on the vegetation and the animals, and

17 you have to look at all the archeological effects in there.

18 It's virtually impossible to site a site.  It's a very

19 difficult, time-consuming process on a new site.

20 Q   Are the problems with finding a new site any less severe

21 today, Mr. Pulskamp?

22 A   No.  I would say it's worse today than back in the '90s.

23 Q   What would a new plant cost today?

24 A   Well, a new plant cost today, depending on size, easily a

25 mill -- a billion and a half, $2 billion.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1165

1  Q   Let me ask you a little bit about what we're looking at in

2  this photo, if I may.  In the lower left, I take it that's the

3  coal pile or where the coal is stored?

4  A   Yes.  That's what we call the coal yard.

5  Q   Then if we go behind the stacks and look at those tall

6  buildings that seem to have horizontal -- could be either

7  scaffolding or what, what are we looking at behind the stacks

8  in that photograph?

9  A   Well, I can point here and it puts an arrow?

10 Q   You did it.  Thank you.

11 A   Those items are what we call SCRs.  They remove nitrous

12 oxide from the flue gas.  All that structural steel is

13 required because this area of the country, it's actually down

14 in southwest -- or southwest Indiana; but it's near the Fault.

15 In fact, the earthquake a few weeks ago was only about

16 30 miles away from this plant.  So all that structural steel

17 is required to support those SCRs.

18      On the other side of the SCRs further away is the

19 boiler building.  It's hard to see.  Then you don't see this

20 but on the other side of the boiler building would be the

21 turbine building.  It's lower.  It's only about four or five

22 stories high.

23      Down low in this picture are the precipitators in this

24 area here and they go across the plant.  That's what removes

25 ash and particulate from the flue gas.  Then in the forefront

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1166

1  here, all this equipment is -- are scrubbers that remove SO2.

2  Q   All right.  We'll get to that in a minute.  It looks like

3  there's smoke coming out of the stacks.  Is that the right

4  description of that?

5  A   No, that's not smoke.  It's water vapor or moisture in the

6  flue gas.  Because we pass our flue gas, when it exits the

7  boiler, it goes through what we call a wet scrubber, which

8  removes SO2; and it picks up moisture and that's why you see

9  the smoke.  It's like seeing your breath in it.

10       MS. HIMMELHOCH:  Your Honor, this witness has spoken

11  at length about matters that are irrelevant to this basic

12  litigation.

13       THE COURT:  Yeah, I'm letting him do it just to give

14  us some background on what this is and what it looks like.

15       MR. GREEN:  Also, I want to correct the misimpression

16  that was left by one of the Government's witnesses.

17       MS. HIMMELHOCH:  That has been corrected.  At this

18  point --

19       THE COURT:  I think we're ready to move on.

20  BY MR. GREEN:

21  Q   Looking at Gibson here, and with particular attention to

22  the generating unit itself and the boiler where the steam is

23  heated and so forth, how high does the steam pressure and

24  water temperature get inside the boiler's tubes?

25  A   Inside the tubes -- most of our units are designed for

1  1,005 Fahrenheit degrees steam temperature.  We do have two

2  units that are designed for 1,050, but most of them are 1,005.

3  The steam pressure varies on the unit, but the highest that we

4  go to -- and we have a number of units that are rated at

5  3,600 pounds per square inch.

6  Q   How hot does it get inside the area where the fire is

7  inside the unit?

8  A   Inside the unit where the fire is -- we call that the

9  furnace.  It can reach temperatures of 2,700 degrees or so.

10 Q   What kind of maintenance issues, Mr. Pulskamp, do these

11 high temperatures and high pressures create for the company?

12 A   Those high temperatures and high pressures create a lot of

13 maintenance items.  Because of those pressures and

14 temperatures, tubes fail and we have to replace them and do

15 maintenance.

16 Q   Can the burning of coal also contribute to tube failure?

17 A   Yes.  Coal has in it things like sulfur and other

18 constituents that make it corrosive at high temperatures; and

19 it's also very abrasive because it contains ash, and that ash

20 has silica, sand, things like that in it.

21        So a lot of our problems that we have are a result of

22 not just the stress on our tubes, but corrosion on those

23 tubes, abrasion on those tubes.  Those coals that we burn --

24 we try to burn Indiana, Ohio coals which are higher -- some

25 are higher in sulfur, some are higher in ash.  Although they

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1168

1  are economic and it's good to use those kind of coals from

2  this area, they do cause more maintenance problems.

3  Q    I'd like to show you another photograph; and this has been

4  marked as an exhibit actually, 1979E.  I don't believe there's

5  any objections.

6          MS. HIMMELHOCH:  No objection, Your Honor.

7          THE COURT:  It's admitted.

8    *(Defendants' Exhibit 1979E was received in evidence.)*

9  Q    Can you help us understand what we're looking at here,

10  sir?

11  A    Yes.  This is actually the inside of a boiler.  I call

12  this the furnace; but as you can see, this is one wall of the

13  furnace.  There's four walls to a furnace, another wall over

14  here, another wall over here, and you can't see the fourth

15  wall.

16          We're actually looking up into the top of the furnace;

17  and just over right here in the corner, you can see maybe

18  where a burner is.  That's where we would introduce our coal

19  and air mixture for combustion; but this particular boiler is

20  about 20 stories high.  It's all covered with tubing.

21  Q    Where would the fire be?

22  A    The fire would be throughout this.  It would be basically

23  a 20-story inferno in there.

24  Q    Okay.

25          MR. GREEN:  Your Honor, if you please, we'll going to

1  put some marker on this as Demonstrative Exhibit D1267.  If I

2  may walk this up and show this to the witness, sir?

3          THE COURT:  You may.

4          MR. GREEN:  Thank you.

5  BY MR. GREEN:

6  Q   Mr. Pulskamp, that obviously is a piece of tubing.  Can

7  you explain to us what we're looking at there?

8  A   Yes.  This is a section of reheat tube that was removed

9  from Wabash River Station Unit 2.  It has -- you can see where

10 it has two holes in it where we've had a leak.  If you look at

11 it on the cross section as well, you can see where there's

12 been a lot of erosion of the tube.

13         What would have happened -- and there is a weld in

14 this tube as well.  What would have happened is this would

15 have leaked -- started leaking.  It's so smooth that it

16 appears that the leak was probably caused by abrasion, but the

17 wall got thick enough -- or thin enough that it just burst

18 because it's under pressure.

19         We would have got in there and took the unit off, got

20 in there and cut this off or out.  And depending on how dense

21 it was in this reheater, sometimes you've got to cut your way

22 in to get to it and then weld your way back out.

23         We would have made this replacement and started the

24 unit up.  Eventually, we would have probably replaced the

25 whole component or all the tubes in the section because of

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1170

1  wear like this.

2          MR. GREEN:  If Your Honor please, I don't know

3  whether the Court or the Government has any objection to

4  actually just letting the jury see this.

5          MS. HIMMELHOCH:  No objection, Your Honor.

6          THE COURT:  All right, go ahead.

7          MR. GREEN:  Can I just pass it to them?

8          THE COURT:  You may.

9          THE WITNESS:  It's got a sharp edge on it, so just be

10  careful.

11  BY MR. GREEN:

12  Q   We'll continue, Mr. Pulskamp, while the jury looks at that

13  demonstrative.  I want to ask you to tell us a little bit

14  about the difference between a planned outage and an unplanned

15  or forced outage.  Can you explain to us what the difference

16  is?

17  A   Well, an unplanned (sic) outage is one that you plan for.

18  You know you have to do a certain amount of maintenance on a

19  unit so you plan for that.  You bring the unit down

20  controlled.  You take it off line.  You've got all your jobs

21  ready to do and you go about doing them.

22          An unplanned outage is one that catches you by

23  surprise that could happen for any reason at any time.  It's

24  random.  It's unpredictable.  When it happens, you've got to

25  deal with the situation.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1171

1  Q   How often do you take a unit down for a scheduled or

2  planned outage?

3  A   Well, we try to take our units down -- well, we have to do

4  boiler inspections every two years.  That's a state

5  requirement both in Indiana and Ohio.  So at the very least,

6  we're doing unplanned outages every two years.

7        More often than that, one thing that we try to do

8  is -- like in this time of year, in the spring of the year

9  when demand is down, we try to get in there for a week or so

10 just to take a look at things.  It's kind of like pulling your

11 car in the pit when there's a yellow flag.  We can get some

12 things done before the big race -- the green flag comes out

13 again.

14       Those planned outages may range anywhere from four

15 weeks to -- or one week to four weeks to eight to ten weeks.

16 We've got some big units that we're just bringing back out of

17 outages right now that have been down for eight weeks.  When

18 we do a turbine overhaul, it may take us eight weeks, ten

19 weeks to do that.

20 Q   Can you predict when a unplanned outage or forced outage

21 is going to occur?

22 A   No.  I mean, there's some predictive technologies out

23 there; but generally, they don't -- they won't tell you when

24 it's going to fail.  So outages are really random and really

25 unpredictable.  They happen at any time.  That's why they're

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1172

1  called "forced" outages.

2  Q   So when you -- you know, when you get down to the bottom

3  line, Mr. Pulskamp, how frequently do you have to perform

4  repairs on Cinergy's generating units?

5  A   Well, we're in a constant state of repair.  When we do

6  repairs, we do maintenance to keep our availability from

7  declining.  We really -- we are in a constant state of repair.

8  Q   Now, when you talk about a constant state of repair, are

9  you including all the components of the unit?

10 A   Yes, every component.

11 Q   So we're talking about the turbines and --

12 A   They call them turbines -- or boilers, like I say, take

13 the most work; but turbines, generators.  And then on the

14 balance of plant equipment, or all the pumps and compressors

15 and all that, heat exchangers, all the other equipment that

16 make up a unit.

17        MR. GREEN:  Do you want to -- shall I forge on or do

18 you want to take your break, whatever you wish?

19        THE COURT:  If now is a good time, we'll go ahead and

20 take our break at this time.

21        COURT CLERK:  All rise.

22        This court stands aside in brief recess.

23    (Jury out.)

24    (A recess was taken.)

25    (Jury in.)

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1173

1          THE COURT:  You may proceed, sir.

2          MR. GREEN:  May I proceed, sir?

3          THE COURT:  Yes.

4  BY MR. GREEN:

5  Q   Let me show you what has previously been admitted into

6  evidence as Defendants' Exhibit 2135.

7          MR. GREEN:  Your Honor, indulge me.  We're going to

8  see if we can pull this up.

9  BY MR. GREEN:

10 Q   This -- well, let me ask you, sir, that's probably the

11 better way to do it.  Can you tell me what this is, what

12 you're looking at?

13 A   Yes.  This is a GADS report for Gallagher 3.

14 Q   Can you, by looking at this document, Defendants' Exhibit

15 2135, tell us what period of time the pages relate to?

16 A   This starts on February 1st, 1994, and runs through

17 April 14th, 1999.

18 Q   What is the GADS system recording?  What's being recorded

19 on this Document 2125 (sic).

20 A   Well, what this is is every problem on the unit on

21 Gallagher 3 that would have affected availability of the unit

22 or operating hours of the unit.

23 Q   Can we -- are you able to just kind of page -- I don't

24 want to -- if you can just kind of page through (indicating).

25         Are you saying that every line entry on each of these

1  pages impacts availability at Gallagher 3 in a negative way?

2  Is that what you're saying?

3  A   Yes, sir.  Each and every one of these items would have

4  affected availability in a negative way.

5  Q   Thank you.  Do you have to take the unit down -- this

6  Gallagher 3 unit -- do you all have to shut the unit down to

7  take care of every one of these line item problems that's

8  impacting availability in a negative way?

9  A   No.  Some of these would have been derates, and -- you

10 would eventually have to take the unit down to fix it; but it

11 does appear that more than half of these -- at least more than

12 half of these are problems which would have resulted with the

13 unit coming off line, with it being shut down.

14 Q   Okay, sir.

15        MR. GREEN:  You can probably take that down.  Thank

16 you very much.

17 BY MR. GREEN:

18 Q   If you were going to try to assess the availability of

19 this Gallagher 3 unit during the period that's reflected there

20 on the document you have in front of you, do you believe it

21 would be appropriate to focus on only one component out of all

22 those entries on those pages that you saw?

23 A   No.  Common sense would tell you you have to look at all

24 these and all the incidents, not just that one component.

25 Q   Well, if you were going to try to predict if availability

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1175

1  would increase beyond the end date here of February 19th,

2  1999, if you were going to try to predict whether availability

3  would increase beyond that date, including the fact that

4  there's a component replacement that takes place right at the

5  end of this period, would you focus only on that component

6  replacement?

7        MS. HIMMELHOCH:  Objection, Your Honor.  This calls

8  for expert testimony.  They have designated the expert.  They

9  should call that expert.

10        THE COURT:  He can answer this question.

11  A    Well, I would have looked at all of the items that

12  historically have affected availability.  I would have trended

13  backwards from all those things and considered all of the

14  problems that have kept us from being available, not just the

15  one item.

16  Q    Now, I'm going to get back to this subject of availability

17  in a moment, sir; but based on your experience, can you tell

18  us approximately how many times on average you have to shut

19  down a Cinergy coal-fired generating unit because of forced

20  outages?

21  A    Well, it varies; but, you know, it'll range from a handful

22  of times a year to maybe as much as 25 times a year that we

23  would be forced off.  Those aren't good years, but that

24  happens.

25  Q    Are they predictable, the number of those outages?

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1176

1  A    No.  They're totally unpredictable.  It's random.  They

2  could happen at any time for any reason.

3  Q    What could or would go wrong with a coal-fired generating

4  unit if you didn't maintain it?

5  A    Well, if you don't maintain a unit, eventually the

6  availability is going to decline to a point where it won't run

7  at all.

8        Then the other concern with not maintaining a unit is

9  the safety of our employees because of the pressures and

10 temperatures that we operate.  We maintain to ensure the

11 safety as well.

12 Q    I can take that from you or you can put it on the ledge

13 there, whatever is more comfortable for you (indicating).

14       Do you have to shut down a generating unit and make a

15 repair every time there's a maintenance issue such as when you

16 detect that some tubes in the boiler are leaking?

17 A    No.  You may not have to.  Sometimes we can even ramp a

18 unit up and get more output out for a period of time, but a

19 lot of times we'll reduce the output.  We'll throttle back on

20 the unit.  When we do that, we call it a derate.

21 Q    How long can you continue to run the unit even though it

22 has some maintenance problems or maintenance issues?

23 A    Well, you can't run it indefinitely.  It really depends on

24 the demand on the unit at the time and whether or not -- you

25 know, how fast we can get it off.  Demand has a big impact;

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1177

1  but the other thing is how much risk that we're willing to

2  take on on the unit by operating with a problem.

3        For example, a tube can be leaking; and if it's

4  spraying out into the inside of the boiler where there's no

5  other components that are being damaged, you might be able to

6  hold on for awhile until we can get into the weekend or into a

7  scheduled outage.

8        But if it's a severe leak that's blowing on other

9  tubes, it may damage ten other tubes and cost us five times as

10 much time, or ten times as much money to do the same repair.

11 So it kind of depends on how much is the demand and how much

12 risk that we're going to take.  We've kept units on for hours

13 and we've kept it on for months depending on what the

14 conditions are.

15 Q   Now, a moment ago you mentioned something about derating a

16 unit.  Can you give us an example of a derate, Mr. Pulskamp?

17 A   Yeah.  Let me give you just a simple one.  Every one of

18 our boilers has at least two fans that force air into the

19 boiler.  If you're going to burn coal, you've got to have air,

20 and if you have air, you've got to get it in there.  So we

21 have two fans on both of those boilers.

22        It only takes one fan to keep the boiler operating.

23 If you lose a fan -- for example, if you lose a motor that

24 drives a fan, we've got to shut that motor down.  We'll lose

25 half -- about half of the ability to generate, half the

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1178

1   capacity off that unit.  We don't have to shut the unit down

2   entirely, but we can run at 50 percent capacity.  That's

3   called a derate.  We may do that until we can get that motor

4   fixed and back on and remove that derate.

5   Q   How about a tube failure?  Can a tube failure result in

6   your derating the unit as well?

7   A   Yes.  We've derated because of tube failures as well.

8   What we'll do then is reduce pressure on the unit.  And at

9   reduced pressure, the steam can't do the same amount of work

10  than at full pressure.  So we won't be able to get the same

11  capacity out of the unit, but it will help keep that leak from

12  getting any worse hopefully, and maybe get us through, like I

13  say, until we're out of the peak for the day or until the

14  weekend when loads are reduced, demand's reduced.

15  Q   How do repairs to boiler tubes, or even the replacements

16  of components which are essentially comprised of tubes, how

17  does that repair and replacement affect the availability of

18  the unit, sir?

19  A   We do repairs.  We do replacements of components or parts

20  to keep the availability from declining.  All we're trying to

21  do is restore and maintain availability.

22  Q   Do you ever do repairs or replacements to increase

23  availability?

24  A   No, let me -- let me explain it this way.  You know, we're

25  humming along with a unit.  It's generating power, and then

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1179

1  all of a sudden we'll have a tube leak and availability will

2  drop.  We'll fix that tube leak and come back.

3        You know, maybe a day later or a month later, we have

4  another leak and we have another problem, and availability

5  comes down and we fix it and we get it back up.  We do that

6  over time.  All we're trying to do is maintain availability,

7  not increase it, just maintain availability over the long

8  term.

9  Q   Now, if you take out one of these kind of major boiler

10 tube components that there's been testimony about in this

11 case, and you put in a new one, a new component to replace it,

12 why wouldn't that increase the unit's overall availability?

13 A   Well, because the unit's availability is dependent upon

14 all those parts, not just one part.  There's hundreds and

15 thousands of other parts that can affect availability, just

16 like in that GADS data we looked at.  Not just one item is

17 affecting availability.  It's hundreds of other things that

18 affect availability over the long term.

19 Q   Okay.  Have you ever encountered a situation where you

20 replace a component in a boiler and within a very short period

21 of time there's another failure or component failure which

22 requires you to take the boiler right back offline for a

23 substantial period of time?

24 A   Yeah.  Let me give you an example of that.  A few years

25 ago, we had a very hot summer, and it was a high demand day.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1180

1  We had a leak -- a boiler leak on one of our Gibson units, and

2  it was a big leak.  It was one where the tube failed and the

3  water was gushing out.  We couldn't keep enough water in the

4  boiler.  We had to bring it down immediately.

5        So we got in.  Very hot day.  We got in there and, of

6  course, you can find the leak very easily.  We got in there

7  and repaired it.  We put the unit back on -- because the next

8  day was a high demand day, too.  We got the unit back on and

9  don't you know, 12 hours later it failed again, exactly the

10  same tube.

11        So this time we go in and we take a camera, one of

12  those little cameras that you can run up, and we ran it up the

13  tube, and we find an obstruction in the tube about 80 feet

14  away.  So we had to get up there, cut the tube out and replace

15  it.  It turns out that obstruction is a ball bearing that the

16  manufacturer uses when he's doing quality control on the

17  tubes.

18        Before he ships them to us, he shoots ball bearing in

19  there.  That's to make sure there's nothing stuck in the

20  tubes.  Well, the lesson learned is you've got to get the ball

21  bearing out at the end.  With one of those kind of events,

22  it's unfortunate it happens.  I think the plant manager's

23  still got the ball bearing on his shelf in his office.  Those

24  kinds of things happen.  You fix up and you expect it because

25  at high demand you're really limited, and then you lose it 12

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1181

1  hours later.

2  Q   Let me just change that question just a few degrees and

3  ask you whether you've ever experienced a situation where you

4  replace, you know, a particularly large component comprised of

5  tubes, and then there's a problem or issue with that large

6  component after you get it in and replace the failed one?

7  A   Yeah, actually that happened yesterday.  When I was

8  driving over here yesterday afternoon, I got a call that one

9  of our units that we were bringing up after an eight-week

10  outage and getting it started again -- we had just brought it

11  up Friday night, had run all day Friday, Saturday, and then on

12  Sunday morning we've got a reheater leak in it.

13       We had just replaced that reheater.  So I don't know

14  what the reason was yet.  I haven't found out.  It might be a

15  bad weld.  That's usually one of the things that happens.  No

16  matter how good we try to do with quality control and welding,

17  those kind of things happen.

18       But yeah, you could have a whole component replaced

19  and result in a failure.  We don't like when that happens, but

20  it happens.

21  Q   Let me move from the boiler to the other components that

22  comprise an entire generating unit.  Have you ever had a

23  turbine failure after you made a repair to the turbine?

24  A   Yeah.  There was a few weeks ago we had replaced a turbine

25  rotor on one of our units.  We have a spare rotor, and we put

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1182

1  that rotor in; and we closed the unit up and folded it all up

2  and started the unit back up, started putting steam through

3  it, and noticed that we had a steam leak on the steam chest.

4         It was in an area where there's a flange and we had

5  not done any work.  We didn't have to remove that flange in

6  order to replace the rotor, but sure enough we had to take the

7  unit down, replace that flange; and it was probably a five

8  dollar item that had failed on us; but we fixed -- replaced

9  the gasket and started it back up.  It even happens on turbine

10 components.

11 Q   Now, you've used in answer to the last couple of

12 questions, you've used some recent examples of issues that

13 you've had following repairs.  You're not trying to suggest

14 that this only pertains to the year 2008, are you?  I mean,

15 this has been historical experience as well, right?

16         MS. HIMMELHOCH:  Objection, pleading.

17         THE COURT:  It is a leading question.

18         MR. GREEN:  But a lovely one.

19 A   Do I answer?

20 Q   I'll rephrase it.  Do the issues with replaced parts and

21 replaced tubes, have they been fairly universal over the

22 history of these units?

23         MS. HIMMELHOCH:  Objection, leading.

24         THE COURT:  I think he can answer that.

25 A   Yes.  What happens today has happened forever in the

1   history of generating units.

2   BY MR. GREEN:

3   Q   Mr. Pulskamp, based on your 30 years of experience in

4   boiler maintenance, have you come to have any view whether or

5   not the rate of occurrence of unplanned outages or forced

6   outages is constant over time?  Do you understand my question?

7          MS. HIMMELHOCH:  Your Honor, this calls for expert

8   testimony and an opinion.  They have an expert who has offered

9   this opinion.  If they want to offer this opinion, they should

10  call that expert.

11         THE COURT:  He can answer this question.  Go ahead.

12  A   It's all random and unpredictable.  There's nothing

13  constant about it.  Failures can occur at any time.

14  Q   Have you heard of the term or phrase "a like part

15  replacement"?

16  A   Yes, sir.

17  Q   What is the significance of that term to you, sir?

18  A   Well, "a like part replacement" is basically just

19  replacing a part with another part.  It's not changing its

20  design, not changing its function, basically replacing parts

21  for parts.

22  Q   Does that term describe the kind of maintenance you do at

23  Cinergy?

24  A   About everything we do in maintenance is like kind

25  replacements.

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1184

1  Q   And when you do -- I think you may have just mentioned

2  this in passing, but I think it's important to nail down.

3  When you do a like part replacement, like part for like part,

4  does that change how the generating unit operates or

5  functions?

6  A   No.  It doesn't change how it functions or how the unit

7  will be dispatched or anything.  It's just a part for part

8  type replacement.

9  Q   Would that be the same if you took out an entire component

10  of a lot of tubes and stuck a new component in there?

11  A   Yeah.  It's still -- whether it's a component or a part,

12  it's still just a part for part type replacement.

13  Q   Can a like part replacement improve the availability of

14  the entire generating unit?

15  A   No.  Individual components can't improve the availability

16  of the entire unit.  It takes all components to make the unit

17  operate.

18  Q   Mr. Pulskamp, do you believe a like part replacement can

19  ever cause a coal-fired generating unit to run more in the

20  future than it did before the repair?

21        MS. HIMMELHOCH:  Objection, calls for an opinion.

22  The witness is testifying as an expert but he has not been

23  previously designated.

24        THE COURT:  I'm going to let him answer this

25  question.

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1185

1  A   No.  Parts don't result in units operating more or cause

2  units to operate more.  It's the dispatchers which are acting

3  in relationship to customer demand that causes units to run

4  more.

5  Q   As far as you know, do the dispatchers whom you just

6  mentioned –– do they make their decisions about which

7  generating units to run on the basis of repairs or whether a

8  component has been taken out and replaced with a new

9  component?

10          MS. HIMMELHOCH:  Objection, foundation.  There's been

11  no evidence this witness is familiar with the dispatch system.

12  Q   Do you know whether that happens?

13  A   Yes, sir.

14          MR. GREEN:  May he answer?

15          THE COURT:  He may answer.

16  A   The dispatchers don't make their decisions based on

17  whether a component's been replaced.  Many times they don't

18  even know.  All they know is that the unit is available or

19  not, and they make their decision based on what other units

20  are available on the system, what other constraints are on the

21  system such as transmission; what other local conditions there

22  are, fuel prices, availability of additional generation in the

23  area, planned, unplanned outages.  All those things go into

24  their decision, not whether there's a part replaced.

25  Q   I want to ask you now some questions about some of the

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1186

1  specific repairs that were made to units in the old CG&E

2  system where you were initially, sir.

3         Can you tell me, if you know, how many of these 14

4  projects occurred at Ohio plants that were in the CG&E system?

5  A   Yes, sir.  There were six of those projects.  Five were in

6  Ohio -- five were at Beckjord, one was at Miami Fort Station.

7  Q   Let's start with the Life Extension projects,

8  Mr. Pulskamp, that occurred at Beckjord Units 1, 2 and 3 in

9  the mid to late 1980s.  Were you involved in those projects,

10 sir?

11 A   Yes.  I was responsible for those projects.

12 Q   Where did that term "Life Extension" come from, if you

13 know?

14 A   I'm not sure exactly where it came from.  I thought at one

15 time I thought Boston Edison had first quoted it, but it

16 really was a term that was being used by many utilities in the

17 industry to describe continued operation of units past their

18 design life of 30 to 40 or so years.

19 Q   Now, you mentioned this concept of design life of 30 to 40

20 years.  What's your understanding of that, sir?

21 A   Well, design life is more of an accounting term that when

22 you install new equipment, the accountants want some basis for

23 depreciation of that asset over time.  So they established,

24 that is, 30 to 40 years in our industry as a design life.

25 It's very similar to -- every other industry does similar

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1187

1  things.

2  Q   In your field of, you know, boiler maintenance, unit

3  maintenance, do you pay a lot of attention to the concept of

4  design life?

5  A   I don't pay a lot of attention to it.  In fact, if you

6  maintain --

7        MS. HIMMELHOCH:  Objection, Your Honor.  He's asking

8  for his current view.  It is not relevant.  The question is

9  what was your view in 1985.

10 Q   In 1985, did you pay a lot of attention to the concept

11 design life?

12 A   No.  In 1985, it would have -- really, if you maintain a

13 unit properly and it's running good, there's no reason that

14 you would want to retire it after a certain period of time

15 just because you had depreciated the asset down.

16 Q   Were the -- were these Beckjord Units 1, 2 and 3 good

17 candidates for Life Extension?

18 A   Yes.  I think they were great candidates for Life

19 Extension.

20        Do you remember how I mentioned before how difficult

21 it is to find a new site for a plant?  These were at an

22 existing site.  They were on the Ohio River.  They had access,

23 barge access for getting your fuel in.  They had established

24 transportation networks for getting their power out.  They had

25 employees.  They were accepted in by the neighbors.  They were

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1188

1  well maintained.  They had good availabilities.  They had good

2  efficiencies.  They were excellent candidates for continuing

3  to operate.

4  Q    What did the Life Extension projects at Beckjord 1, 2 and

5  3 consist of, sir?

6  A    It was work that -- project work that we did on the

7  turbines, the boilers, and the balance of plant equipment on

8  each of those three units.

9  Q    Do you have any recollection of what those projects cost

10 back then?

11 A    Yeah.  Each one of them cost in the range of 15 to

12 $18 million.

13 Q    Let me ask you this:  How different were those Life

14 Extension projects at Beckjord 1, 2 and 3 from the other kinds

15 of repair, maintenance and replacement activity that went on

16 at Cinergy's other units and its generating system?

17         MS. HIMMELHOCH:  Objection, relevance.  Cinergy's not

18 contended these projects were RMRR.

19         MR. GREEN:  I think it's perfectly relevant to show

20 that the repairs at Beckjord, the projects, were essentially

21 the same as those done everywhere else.

22         THE COURT:  Plaintiffs' counsel makes a good point.

23 The objection is sustained.

24 BY MR. GREEN:

25 Q    Why do all the repairs at once, sir?

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1189

1  A   Well, we did all those repairs at once because we had a

2  special circumstance at CG&E at the time.  We were in the

3  middle of a nuclear construction program.  We were building a

4  nuclear unit.  It's called Zimmer.  I'm talking the early '80s

5  when we're making decisions.

6          After Three Mile Island in 1979 occurred, there were a

7  lot of changes in the industry.  Although we had stuck a lot

8  of money into a nuclear unit, we were very uncertain whether

9  or not we were going to be able to get it permitted to

10 operate.

11         So we still had load growth increasing.  We still had

12 customers to serve.  We still had the demand; but

13 unfortunately, we didn't have this new unit, this new nuclear

14 unit, that we were going to have available to us.  So what we

15 saw is Life Extension in the continued operation of Beckjord

16 Unit 1, 2 and 3 as a way of filling that load growth, meeting

17 that demand in that period of time until we could get the next

18 big unit on.

19         We had decided to convert Zimmer to a coal-fired unit

20 in 1984, but it wasn't going to come on line until 1991.  So

21 the load, like I say, was increasing.  We didn't have -- the

22 reserve margins were going to get tight in that period of

23 time.

24 Q   So when you did the Beckjord Life Extension projects at

25 Units 1, 2 and 3, did you have an expectation that you'd have

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1190

1  to run them more after the projects?

2  A    Absolutely.  We knew they were going to run more after

3  that project.

4  Q    Did the company have any expectation how it would use the

5  Beckjord units after Zimmer -- you know, after the conversion

6  of Zimmer from nuclear back to coal would take place in 1991?

7  A    Yes.  After Zimmer came on line in '91, the Beckjord units

8  would be used less, and that's what occurred.

9  Q    Would CG&E have done these Beckjord Life Extension

10 projects in the mid 1980s if the Zimmer nuclear plant had not

11 been cancelled?

12 A    No.  We wouldn't have spent the money during that time,

13 no.

14 Q    I'd like to ask you a couple of very specific questions

15 about the Beckjord Life Extension projects.  Let me start with

16 this:  could the Beckjord Units 1, 2 and 3 -- we're talking

17 about the units where there were Life Extension projects --

18 could they have met the increased demand that you forecasted

19 until Zimmer came online in the coming years without doing the

20 Life Extension projects?

21 A    Yes.

22 Q    I want to get even more specific, sir.  The Life Extension

23 project on Beckjord 1 was started in 1987.  If in the year

24 before that project you needed an additional 10,000-megawatt

25 hours of generation from Beckjord 1, could the unit have

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1191

1  generated that additional amount of power?

2          MS. HIMMELHOCH:  Objection, calls for a hypothetical.

3          THE COURT:  He can answer.

4  A   Yes.  The 10,000 more megawatt hours equates to about 100

5  hours of operation or four days of operation.  The unit was

6  available when we brought it down to do the work.  It had the

7  additional capacity.  It had the additional ability to run

8  hours.  It could have easily ran another four days without the

9  Life Extension work.

10 BY MR. GREEN:

11 Q   I'm going to ask you a similar question about Beckjord 2,

12 which was also started in 1987.  So if in the year before that

13 project commenced you needed an additional 12,500-megawatt

14 hours of generation from Beckjord 2, could the unit have

15 generated that additional amount of power without the Life

16 Extension project?

17         MS. HIMMELHOCH:  Objection, hypothetical.

18         THE COURT:  He can answer.

19 A   Yes.  That would have been another 125 hours or so, about

20 five days.  For the reasons I just gave on Unit 1, we had the

21 capacity.  It could have easily met the additional operating

22 hours.

23 BY MR. GREEN:

24 Q   One more similar question like that about Beckjord 3,

25 which was started back in 1985.  If in the year before that

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1192

1  project you needed an additional 15,000–megawatt hours of

2  generation from Beckjord 3, could that unit have generated

3  that additional amount of power without doing the Life

4  Extension project?

5         MS. HIMMELHOCH:  For the record, objection,

6  hypothetical.

7         THE COURT:  It's overruled.  You may answer.

8  A   Yes.  That would have been about four and a half full days

9  of operation or nine days at half load.  It could have easily

10 met that.  And it had the generation available, had the

11 capacity available, just like the other two.

12 BY MR. GREEN:

13 Q   Now, were there any other factors other than the

14 cancellation of the Zimmer nuclear plant that contributed to

15 the decision to do these Life Extension projects?

16 A   Yeah.  One of the things that has occurred in kind of the

17 evolution of power generation is we saw advancements in power

18 generation from the day Edison built the first power plant to

19 light the light bulb.  Each time, the technology advanced and

20 other technologies became obsolete.

21        When you got into the 1950s, the technology we have in

22 the 1950s with the alloys that were developed after World War

23 II or through World War II, and the technology that's there in

24 the '50s, isn't much different than what we use today.

25 Basically, we're still using 50–year–old technology.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1193

1        So we looked at -- even the temperatures and pressures

2   that we had 50 years ago we have today; we're using today.  So

3   we didn't see something coming into the picture that would

4   make that technology obsolete and felt that we could continue

5   to use those old plants even though they were old and

6   depreciated.

7   Q    Did other utilities do these Life Extension projects as

8   well?

9   A    Yes, sir.

10        MS. HIMMELHOCH:  Objection, relevance.

11        THE COURT:  I think we've heard that.

12        MR. GREEN:  We have heard that before.

13  BY MR. GREEN:

14  Q    Mr. Pulskamp, in your mind back then, did you expect that

15  the Life Extension projects would cause Cinergy to run the

16  Beckjord units more than they had been run before the Life

17  Extension projects?

18  A    No.  What we expected is that customer demand was going to

19  run those units, and the whole of our generating system

20  because of the unit, the new unit not getting complete, was

21  going to cause those units to run more.

22  Q    Did you apply for New Source Review permits in connection

23  with these Life Extension projects?

24  A    No, sir.  We didn't feel they were required.

25  Q    Did you consider the Beckjord plants to be a new source of

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1194

1  emissions --

2          MS. HIMMELHOCH:  Objection, calls for a legal

3  conclusion.

4          THE COURT:  He can answer that.

5  A    No, they were not new sources of emissions.

6  Q    So did you make a prediction about whether the projects

7  would cause an increase in emissions?

8  A    Yes.  I predicted that the work that we were doing, the

9  projects that we were doing on these Life Extensions would not

10 increase emissions.

11 Q    Can you help us kind of to understand what your approach

12 was, what your thinking was in respect to making that

13 prediction?

14 A    Yes.  Basically, we were looking at projects.  We were

15 doing projects that were one, either parts for parts-type

16 replacements; two, that we weren't increasing the capacity of

17 the boiler or the capacity to burn additional fuel; and 3, we

18 weren't changing the function of the part or having an impact

19 on how that unit would be dispatched in the future.  We

20 weren't doing any of those three things.

21 Q    In your view, could the projects undertaken at Beckjord

22 during Life Extension ever by themselves cause an increase in

23 emissions?

24 A    No.  The projects by themselves don't increase emissions.

25 It's all by demand or how the unit's dispatched.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1195

1  Q   Did any of these Beckjord Life Extension projects at Units

2  1, 2 and 3 ever change the boilers' hourly rates of emissions?

3  A   No.  The hourly rates of emissions did not change, and the

4  existing permits -- operating permits --

5          MS. HIMMELHOCH:  Objection, nonresponsive.

6          THE COURT:  Yes.  Let's ask one question at a time.

7  BY MR. GREEN:

8  Q   Let me ask you specifically, did the projects change the

9  boilers' hourly rates of emissions?

10  A   No, sir.

11  Q   Now, in your view, were you in the Maintenance Department,

12  you gentlemen who were responsible for maintenance and doing

13  these projects -- in your view, did anything that you were

14  doing in the Maintenance Department cause emissions increases

15  or decreases during these projects?

16  A   No.  The Maintenance Department just fixes parts.  They

17  don't determine how the units are going to be used.

18  Q   Do they determine how hard the units are going to be run?

19  A   No.  The dispatch office determines that based on customer

20  demand and a whole number of other factors that I've gone

21  through.

22  Q   Now, sir, if the units did run more -- if it turned out

23  that the units did run more after the Life Extension projects

24  were complete, and it was because of customer demand, did you

25  feel that you had to count those emissions in your prediction?

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1196

1          MS. HIMMELHOCH:  Objection.  Calls for a legal
2    conclusion.
3          THE COURT:  He can answer.
4    A    No.  My understanding was that if you had increased
5    emissions as a result of customer demand, then you could
6    exclude those emissions from your prediction.
7    Q    Now, in making your prediction, did you use any kind of
8    specific formula or mathematical calculation or computation?
9    A    No.  I relied on my experience and knowledge of the
10   boilers and the units and the system of dispatch in making
11   that.  I didn't use a formula or calculation.
12   Q    Did you write anything down in connection with making your
13   prediction?
14   A    No, I didn't write anything down.  The NSR rules didn't
15   give us any formulas or calculations to use and didn't require
16   us to write anything down.
17          MS. HIMMELHOCH:  Objection, Your Honor.  May we
18   approach?
19          THE COURT:  Yes.
20      (A bench conference was held on the record.)
21          THE COURT:  This is getting a little close to the
22   notice problem here.
23          MR. GREEN:  It's not notice at all.  He's simply
24   going to say the rules didn't require him to write anything
25   down.  That's what he understood.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1197

1          MS. HIMMELHOCH:  He established that.  If you get any
2   further, it gets into fair notice.
3          THE COURT:  What's your next question?
4          MR. GREEN:  I don't think he answered that.  I think
5   she stopped him from answering it.  The NSR rules didn't give
6   us any formulas or calculations to use and didn't require us
7   to write anything down.  That's what he said.
8      *(End of bench conference.)*
9                      *(In open court)*
10  Q   Mr. Pulskamp, let's shift.  Are there any types of repair
11  or replacement projects that might cause an increase in
12  emissions from the unit?
13  A   Yes.  I could see those projects which increase the
14  capacity of the unit would increase the capacity to burn more
15  coal and create more emissions, yes.
16  Q   Is there anything else that you can think of or is that
17  it?
18  A   That's basically it.
19  Q   Did any of the Life Extension projects at Beckjord Units
20  1, 2 or 3 increase the capacity of those units?
21          MS. HIMMELHOCH:  Objection, cumulative.  This has
22  already been answered.
23          THE COURT:  I'll let him answer it again.
24  A   No, sir.
25

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1198

1  BY MR. GREEN:

2  Q    Before we leave the Beckjord Life Extension projects, I

3  want to ask you if any EPA inspector was on site during the

4  time these inspections were underway?

5            MS. HIMMELHOCH:  Objection, relevance.

6            MR. GREEN:  I thought we hashed this out, Your Honor.

7            THE COURT:  He can answer.

8  A    Yes.  I remember one occurrence.

9  BY MR. GREEN:

10 Q    Tell me what you know about that.

11 A    There was an EPA inspector named David Schulz who was from

12 Region 5, which is a Chicago-based region that covers Indiana

13 and Ohio.  He was at the site -- I think it was in the period

14 of '87, '88, during one of the Life Extension outages.

15 Q    During that occasion when he was there, did he come to you

16 and raise any concerns that any Life Extension project

17 underway might need a New Source Review permit?

18            MS. HIMMELHOCH:  Your Honor, it has already been

19 determined that the only question here was what were the

20 regulations -- whether or not Cinergy should have expected an

21 increase in emissions.  Where Mr. Green is going goes to a

22 question of what was in an inspector's mind.  It's simply not

23 relevant to this question.

24            THE COURT:  Yes.  I'm going to sustain this

25 objection.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1199

1  BY MR. GREEN:

2  Q   Okay, sir.  Let me ask you about some similar repair

3  projects also at the Beckjord station.  Do you recall being

4  involved in a project to retube the condenser at Beckjord 5 in

5  1991?

6  A   Yes, sir.  I approved that project.

7  Q   How about another condenser retubing project at Beckjord 6

8  in 1994.  Do you recall that?

9  A   Yes, sir.  I approved that project as well.

10 Q   What does this kind of retubing project entail, sir?

11 A   Well, a condenser is the last -- it's really a heat

12 exchanger; and it's the last heat exchanger in this cycle.  So

13 when the steam from the turbine exits the turbine -- all the

14 work has been done out of the steam, and we need to condense

15 it back into a liquid.  That's why it's called a condenser.

16      So the condenser is just a whole series of about

17 one-inch diameter tubes where we pass, in this case, river

18 water through.  The steam passes on the other side of the tube

19 and condenses back into a liquid.

20      So when we talk about a retubing, all we're talking

21 about is cutting out these copper tubes or copper alloy tubes,

22 cutting them out and putting new tubes in.

23 Q   Mr. Pulskamp, I want to talk to you a little bit about

24 this concept of RMRR, routine maintenance, repair and

25 replacement.  Have you heard of RMRR?

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1200

1  A    Yes, sir.

2  Q    What is your understanding of the RMRR provision in the

3  New Source Review rules?

4          MS. HIMMELHOCH:  Objection, Your Honor.  His

5  understanding is not relevant.  The standard has been

6  established and the Clean Air Act is a strict liability

7  statute.

8          MR. GREEN:  He has to have an understanding, Your

9  Honor, because that's the basis on which he determines that

10 something is or is not RMRR.

11         THE COURT:  I think he can tell us what he thinks

12 about whether this project was an RMRR project.  So go ahead.

13 BY MR. GREEN:

14 Q    Let me back up and approach it this way.

15         Did you ever recall seeing any guidance from the EPA

16 about how you should determine if a component replacement can

17 qualify as RMRR?

18         MS. HIMMELHOCH:  Objection, Your Honor, relevance.

19         MR. GREEN:  It's very relevant.

20         THE COURT:  He can answer this question.

21 A    Yes.  I recall that in the preamble to the NSR rules in

22 1992, there was a discussion about if it was routine in the

23 industry.

24 Q    Did you read that?

25 A    Yes, sir.

BARRY PULSKAMP – DIRECT/GREEN      Vol. 8–1201

1          MS. HIMMELHOCH:  Your Honor, may we approach?

2          THE COURT:  Yes.

3      *(A bench conference was held on the record.)*

4          THE COURT:  Where are you going with this "routine in

5  the industry" business?

6          MR. GREEN:  I need to bring you the exhibit.  May I?

7          THE COURT:  Yes.

8          MS. HIMMELHOCH:  He's reading the regulation, Your

9  Honor.

10         MR. GREEN:  The only guidance that the EPA ever gave

11  to the industry is contained in this preamble -- may I be

12  heard for one minute?

13         MS. HIMMELHOCH:  I apologize.

14         MR. GREEN:  In the meantime, EPA is today clarifying

15  that the determination of whether the repair or replacement of

16  a particular item of equipment is routine under the NSR

17  regulations, while made on a case-by-case basis, must, must be

18  based on the evaluation of whether that type of equipment has

19  been repaired or replaced by sources within the relevant

20  industrial category.

21         THE COURT:  I know.  And we talked about just because

22  everybody in the country has got the wrong interpretation of

23  an RMRR doesn't mean that it's not right.

24         MR. GREEN:  He is simply going to say that that

25  guidance -- I mean, they published it.  The EPA published it.

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1202

1  It informed his decision.

2          THE COURT:  That's right.  I shouldn't have

3  interrupted you.  I drive my court reporter crazy when I do

4  that.  I should let you finish.

5          The point here is you are entitled to rebut any

6  presumption that your clients are just walking up doing

7  whatever they want.  You're entitled to have them say that

8  they were reading these EPA publications and that they were

9  responding in their way to it.

10          MS. HIMMELHOCH:  Your Honor, a couple of things.

11  It's patently false that this is the only guidance EPA gave to

12  the industry.  It made numerous applicability determinations.

13  There was the WEPCo applicability determination.  It is simply

14  patently false that this is the only statement.

15          Second of all, the Court has made it clear that the

16  legal standard of what is RMRR is not the subject of the

17  witness testimony but the proffer principles of this Court.

18  By placing this out of context, what they're getting into is

19  Cinergy's understanding of the law, which goes to either fair

20  notice or it goes to intent.  The Clean Air Act is a strict

21  liability statute.  There is no --

22          THE COURT:  Wait a minute.  Parts of it are.  Parts

23  of it are not.  Any time you throw in a reasonable engineering

24  standard, then it's not strict liability.

25          MS. HIMMELHOCH:  Well, but it --

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1203

1        THE COURT:  Unless you're trying to tell me it's

2   strictly reasonable or not, which doesn't make any sense in

3   the way we talk about reasonableness in the law, not just here

4   but every time we use that term.

5        MS. HIMMELHOCH:  We can set aside emissions.  We can

6   argue that separately.  For routine maintenance, there is no

7   reasonable engineer statement.

8        THE COURT:  That's true.

9        MS. HIMMELHOCH:  It's a strict liability statute, and

10  there is no reasonableness factor here.  Therefore, there is

11  no relevance of what Cinergy understood these rules to be.

12       THE COURT:  I still have standards I give to this

13  jury to make a determination as to whether there was RMRR or

14  not.  You look at this, you look at this, you look at this.

15  You look at this.

16       MS. HIMMELHOCH:  One of the statements is frequency

17  in the industry, and you have instructed on that and you will

18  instruct on that.

19       THE COURT:  I understand that.  Go ahead.

20       MR. GREEN:  These gentlemen who are in this industry

21  are obliged to follow the law, and they're obliged to perceive

22  it as it is explained to them, okay?  If the EPA sends this

23  out, an official document, tells them what to do, that they're

24  clarifying it, it may be that she can argue that they should

25  never have relied --

1          THE COURT:  But you still can't argue that that's the

2     standard.  Your argument -- I tell them what the standard is.

3     The bottom line is this:  I'll let him tell them that he read

4     the regulation and that he did what he did.

5          MR. GREEN:  I think that's what I'm going to try to

6     have him do.

7          MS. HIMMELHOCH:  He's done that.

8          MR. GREEN:  I haven't even started.

9          THE COURT:  Let's not -- let's be mindful of my prior

10    rulings.  The issue of fair notice has already been

11    determined.  That's the best I can do.  I think in terms of

12    he -- because I can't just let him sit here and be accused of

13    not having done anything, having ignored the rules, I'm going

14    to have to let him testify.

15         MS. HIMMELHOCH:  Your Honor, may I ask that he not be

16    permitted to publish the regulation to the jury?

17         MR. GREEN:  He needs to be able to say what he did.

18         MS. HIMMELHOCH:  He can state his understanding of

19    the regulation without having to publish the regulation.

20         THE COURT:  Why would you want him to do that without

21    seeing the regulation?

22         MS. HIMMELHOCH:  Because it invites the jury to

23    speculate, and it invites the jury to believe this is the only

24    guidance; and that's not accurate.

25         THE COURT:  I don't think he's going to tell them

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1205

1  that's the only guidance.  He's going to get guidance from the

2  Court.  I don't think there's a problem with publishing that.

3          MS. HIMMELHOCH:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5      *(End of bench conference.)*

6                          *(In open court)*

7          THE COURT:  Are you still with me over there?

8  BY MR. GREEN:

9  Q    Let me just back up.  I think it's probably best to just

10 rewind one minute and just ask you again, so we can put this

11 in context, whether you ever recall seeing any guidance from

12 the Environmental Protection Agency about how you should

13 determine whether a component replacement can qualify as RMRR?

14 A    Yes, sir, I did.

15 Q    What is the guidance that you saw?

16 A    There was a paragraph in the preamble from the 1992 NSR

17 rules that talked about something as routine if it's routine

18 in the industry.

19         MR. GREEN:  Your Honor, let me show, if I may, the

20 witness what's been marked as Defendant's Exhibit 509; if I

21 may approach, Your Honor?

22         THE COURT:  You may.

23 Q    I'll ask you, sir, whether you can identify this document,

24 and then you'll look at the page that's got the flag.  Why

25 don't you look at the document first.  Is that the document

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1206

1  you were referring to?

2  A   Yes, sir.  It was the Federal Register.

3  Q   From what date?

4  A   July 21st, 1992.

5  Q   Do you see the part that you read --

6         MR. GREEN:  Just a minute, don't go forward

7  (indicating).

8  BY MR. GREEN:

9  Q   Do you see the part that you read that you were referring

10 to?

11 A   Yes.

12        MR. GREEN:  Your Honor, may this be admitted into

13 evidence?

14        THE COURT:  Yes.

15    *(Defendants' Exhibit 509 was received in evidence.)*

16        MR. GREEN:  Can we bring up the part -- can you focus

17 in on it (indicating)?

18 BY MR. GREEN:

19 Q   Can you read -- you can either read it on the screen or

20 you can read it out of the regulation, but I want you to read

21 the part that you testified that you saw that helped inform

22 your decision as to what could qualify as RMRR.

23 A   "EPA is today clarifying that the determination of whether

24 the repair or replacement of a particular item of equipment is

25 routine under the NSR regulations, while made on a

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1207

1  case-by-case basis, must be based on the evaluation of whether

2  that type of equipment has been repaired or replaced by

3  sources within the relevant industrial category."

4  Q    Take that down (indicating).

5        The guidance that you read in that document in 1992,

6  was that consistent with your prior understanding of RMRR?

7            MS. HIMMELHOCH:  Objection, relevance, Your Honor.

8            THE COURT:  He can answer that.

9  A    Yes, sir.  It confirmed what we had believed to be true

10  about routine.

11  Q    Now, with that in mind, did you believe that the condenser

12  projects undertaken on Beckjord 5 and 6 amounted to routine

13  maintenance, repair or replacement?

14            MS. HIMMELHOCH:  Objection, Your Honor.  This is

15  exactly the area that the Plaintiffs were instructed not to go

16  into.  We believe it's improper for the Defendants to be able

17  to, Your Honor.

18            MR. GREEN:  I think he's got to be able to testify as

19  to what his thinking process was, Your Honor, because he made

20  a decision, and I think the jury is entitled to know the basis

21  for his decision.

22            MS. HIMMELHOCH:  The basis for his decision is not

23  relevant.  The question is what are the facts that the jury

24  can weigh to determine whether or not based on the cost, the

25  frequency, the purposes, nature and extent of these projects

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1208

1  were routine maintenance, repair and replacement.  The intent

2  of the company will be considered by this court at a different

3  phase.  It's simply not relevant at this point in the

4  litigation.

5          MR. GREEN:  If I may, the jury will be asked to

6  decide whether he's right or wrong, but I think he can --

7          THE COURT:  Actually, the jury will be asked to take

8  factors that I will give them and measure this.  It's not

9  whether he was right or whether he was wrong.  I think this

10  objection is well taken.  It's sustained.

11  BY MR. GREEN:

12  Q   Can you recall the cost of these condenser projects?

13  A   Yes.  The Beckjord 5 condenser was a little over a million

14  dollars.  Beckjord 6 was 1.6 million.

15  Q   How would the cost of those projects, sir, compare to the

16  costs in the early 1990s to build a new unit comparable to

17  Beckjord 5 or 6?

18          MS. HIMMELHOCH:  Objection, relevance.

19          THE COURT:  He can answer.

20  A   Well, back then, we could probably use a thousand dollars

21  of KW as a conservative number for a new unit.  That would

22  have put Beckjord 5 and 6 in the range of 300 to $500 million.

23  So the cost of the retubings would be less than three-tenths

24  of a percent.

25  Q   Three-tenths of one percent?

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1209

1  A    Three-tenths of one percent of a new unit.

2  Q    Okay, sir.

3        Now, were these repairs that we've been talking about

4  done by in-house maintenance staff?

5  A    No, sir.  Contractors were used.

6  Q    If the condenser replacements were routine repairs, as you

7  believed them to be, why would you use outside contractors on

8  a project like this?

9        MS. HIMMELHOCH:  Objection, misleading and misstates

10  facts in evidence.

11        THE COURT:  He can answer.  Go ahead.

12  A    We would have used contractors because it was more

13  economic.  It's not any different than taking your car to

14  Midas to get a muffler repaired or replaced instead of trying

15  to do it yourself.

16        There are people that specialized in this type of work

17  and did it better, more economical, and in less time than we

18  could have done it.

19  Q    Does the fact that these and some other repair projects

20  were treated as a capital expense and not a current year

21  expense disqualify them from being a routine repair, sir?

22        MS. HIMMELHOCH:  Objection, calls for a legal

23  conclusion and is irrelevant.  I withdraw the last objection.

24        THE COURT:  And why would this --

25        MR. GREEN:  Because I think the company, in its

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1210

1  defense, is entitled to give some context to these factors.

2         THE COURT:  I understand that.  That's what the

3  president of the company has already testified to.  This is

4  your chief engineer, isn't he?

5         MR. GREEN:  Well, I think that he's the one that's

6  making this decision and not the president.  So I think it's

7  germane for his testimony, Your Honor.

8         MS. HIMMELHOCH:  Again, Your Honor, the question is

9  not what -- whether his decision was right or wrong but what

10  the jury concludes based on the factors you give them.

11         THE COURT:  I think that's true.  I'm going to

12  sustain this objection.

13         MR. GREEN:  All right, sir.

14  BY MR. GREEN:

15  Q   Mr. Pulskamp, before starting the Beckjord 5 and

16  Beckjord 6 condenser projects, did you make any prediction,

17  even though you thought they may be RMRR, did you make any

18  prediction about whether or not those projects would cause an

19  emissions increase?

20         MS. HIMMELHOCH:  Object to the form of the question.

21         THE COURT:  He can answer.

22  A   Yes.  I predict that there wouldn't be any increase in

23  emissions.  Basically they were just part for part

24  replacement.  We weren't changing their function, weren't

25  going to change how they were dispatched.

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1211

1  BY MR. GREEN:

2  Q   What does it mean when you say that you weren't going to

3  change how the units would be dispatched?

4  A   It means that we weren't –– the work that we were doing on

5  these part replacements on the condensers wasn't going to

6  fundamentally affect the unit and how it operates and how it

7  would stack up in the stacking order; basically, parts for

8  parts type replacements.

9  Q   Now, let me talk about the final replacement project on

10 the Ohio side, sir, which was a replacement of a boiler –– of

11 boiler slope tubes at Miami Fort 5 in 1995.

12          Did you approve this project?

13 A   Yes, sir, I did.

14 Q   Are you familiar with it?

15 A   Yes, sir, I am.

16 Q   As I have with all the other projects, I want to ask you

17 did you make any prediction about whether or not this project

18 at Miami Fort 5 would cause an increase in emissions?

19 A   Yes, sir.  I predicted there would be no increase of

20 emissions as a result of that project.

21 Q   Can you just flush out for us a little bit what your

22 reasoning was?

23 A   They were parts for parts or component for component type

24 replacement.  They weren't increasing the capacity of the

25 boiler, and they weren't changing the function of the boiler.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1212

1  They weren't going to change our position in the stacking

2  order that would change how we use the unit.

3  Q   Before leaving these three projects, I want to ask you if

4  in the year before these projects you needed an additional

5  20,000-megawatt hours of generation from Beckjord 5, and

6  13,000-megawatt hours from Beckjord 6, and 15,000 more

7  megawatt hours from Miami Fort 5, could these units have

8  generated that amount of additional power before these repair

9  and replacement projects?

10 A   Yes.  Each one of those three units had additional

11 capacity, and we could have easily generated that without

12 those projects.

13 Q   Okay.  I want to go to a couple more projects.  They're

14 really the last couple of projects I have to discuss with you,

15 and they're the pulverizer replacement projects at Gallagher 1

16 and Gallagher 3.

17        First of all, Mr. Pulskamp, are you aware of other

18 pulverizer replacements at other Cinergy generating units

19 besides the projects at Gallagher 1 and 3?

20        MS. HIMMELHOCH:  Objection, relevance.  RMRR is not

21 at issue for either of these projects.

22        MR. GREEN:  It's just some background information,

23 Your Honor, to ask him -- you know, he's the head of the

24 maintenance and ask him --

25        THE COURT:  I think he can tell us "we're aware of

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1213

1  them" and then we can get on and look at Gallaghers 1 and 3.

2  A   Yes.  We replaced pulverizers at Gibson and I am aware of

3  other utilities thereafter replaced pulverizers as well.

4  Q   And in your system as well?

5  A   Yes.

6  Q   Can you tell us how the original pulverizers at Gallagher

7  1 and Gallagher 3 performed, you know, before they were

8  replaced?

9  A   Yeah, they were poor performers.  We had problems with

10  those pulverizers for many years.  What a pulverizer does is

11  grinds up the coal so we can-- you want it like face powder

12  consistency, so it will combust well in the furnace.  These

13  pulverizers, if there was any moisture in the coal, if the

14  coal was wet, they just couldn't handle pulverizing it

15  properly.

16         All of our coal at Gallagher Station is received by

17  barge.  The barges are open to rain and barges can leak and

18  get water in them.  So it's typical to have wet coal.  When

19  that happened, those pulverizers performed miserably.

20         In fact, the LOI, which is loss on ignition, we call

21  it, from those pulverizers was 24 percent.  That means about

22  24 percent of the carbon isn't getting burned and results in

23  other problems.

24  Q   But was that related to wet coal?

25  A   Yes, sir.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1214

1  Q   Are you aware of any repairs to these pulverizers at

2  Gallagher 1 and Gallagher 3 prior to the installation of the

3  replacement pulverizers, I think it was 1998 and 1999?

4  A   Yes.  There had been a lot of work that had been done over

5  the years by both ourselves and the original equipment

6  manufacturer to make those pulverizers work.  And, you know,

7  some of the diffusers and the crusher dryers had been

8  replaced.  The end castings had been replaced.  The fuel

9  conduits had been replaced.  Just about every component on

10  those pulverizers had been replaced at some point in time.  I

11  think there's only probably two of those pulverizers left in

12  the country still running.

13  Q   What finally caused the company to replace the pulverizers

14  at Gallagher 1 and 3?

15  A   Well, we had looked over the years at replacing those

16  pulverizers and we always used new pulverizers as a

17  replacement.  The cost of the new pulverizers, we just

18  couldn't make the economics work out for us.

19       We found some used pulverizers up in Ontario, Canada,

20  that were available; and they were the type of design that we

21  were very familiar with.  We've had a number of other of those

22  type pulverizers already in our system working on other units

23  and working very well.  So we were able to get these used

24  pulverizers and install those.  That's really what made the

25  economics work.

BARRY PULSKAMP – DIRECT/GREEN          Vol. 8–1215

1  Q   Did you expect that the replacement pulverizers would have

2  any effect on the emissions coming from the entire generating

3  unit?

4  A   Yes, sir ––

5         MS. HIMMELHOCH:  Objection, relevance –– I'm sorry.

6  Never mind.  I misheard the question.  I thought he said

7  "generating station."  I apologize.

8         THE COURT:  Go ahead.

9  A   Actually, we expected emissions to go down.

10 Q   Why is that, sir?

11 A   Well, I mentioned earlier that the pulverizers had

12 problems processing the coal and grinding it up to the

13 consistency we needed.  That was the old pulverizers.

14        The new pulverizers did a much better job of that; and

15 when you don't grind coal up the way you should, it doesn't

16 combust as well and it adds to increased visible emissions.

17        So we felt that the new pulverizers would help with

18 visible emissions, one; and the second benefit was that we

19 thought we would open ourselves up to a broader range of

20 coals.  The old pulverizers could only run on a certain grind

21 of coal, certain hardness of coal.  These pulverizers could

22 run other coals; and some of those would be lower sulfur coals

23 which would lower our SO2 emissions.

24 Q   Notwithstanding that answer you just gave, I think I need

25 to nevertheless ask you whether if before commencing the

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1216

1 projects did you predict any increase in emissions?

2 A   No, sir.  We predicted there would be no increase in

3 emissions as a result of that project.

4 Q   If there were a suggestion that by replacing the

5 pulverizers the unit would gain an additional 7 megawatts of

6 capacity, would you agree with that assessment, sir?

7       MS. HIMMELHOCH:  Objection, Your Honor, may we

8 approach?

9       THE COURT:  Yes.

10    (A bench conference was held on the record.)

11       THE COURT:  Try and keep your deep breaths to

12 yourself there.

13       MR. GREEN:  I'm sorry, Your Honor.

14       MS. HIMMELHOCH:  Your Honor, at this point it is an

15 undisputed fact -- I understand I can't read it to the jury.

16 I believe it's improper for Cinergy to challenge the accuracy

17 of the Court's finding that there was, in fact, a 7 megawatt

18 increase.

19       THE COURT:  I don't think he's challenging it.  He's

20 asking if he could expect it.

21       MS. HIMMELHOCH:  He's talking about both Unit 3 and

22 Unit 1.  Seven megawatts was after that was achieved.

23       MR. GREEN:  He's going to say this was their

24 position.  He didn't expect a 7-megawatt increase for the

25 following reasons.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1217

1          MS. HIMMELHOCH:  For Unit 1?  For Unit 3 they knew

2    they had achieved a 7-megawatt increase.

3          THE COURT:  I'll let him testify to it.

4      *(End of bench conference.)*

5                          *(In open court)*

6    BY MR. GREEN:

7    Q   Would you agree with someone's assessment, if indeed it

8    was testified to, that by replacing these pulverizers at

9    Gallagher 1 and 3 you would gain or expect an additional 7

10   megawatts of capacity?

11   A   No, sir.

12   Q   Can you explain that?

13   A   Yes.  I'd mentioned that these pulverizers did a poor job

14   of grinding the -- the old pulverizers did a poor job of

15   grinding coal up.  When that happened, when we had wet coal,

16   we'd had intermittent derates on a unit.  That means we

17   weren't able to generate at the full capacity.

18          Those intermittent derates were on the order of

19   magnitude of about 7 megawatts.  So by replacing the

20   pulverizers and getting those new pulverizers in that could

21   handle the higher moisture coal, we eliminated or removed the

22   7-megawatt decrease.  We didn't increase the capacity of the

23   unit.  We just removed the derate.

24   Q   You're saying the pulverizer units cured the derate

25   problem?

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8-1218

1  A   Yes, sir.

2  Q   Now, were there any other issues with Gallagher 1 that you

3  can recall that relate to its potential output?

4  A   Yes.  The other thing that –– the other situation with

5  Wabash –– or Gallagher, I'm sorry –– is that the unit is what

6  we call "fan limited."  You can't put any more air into the

7  boiler.  The fans are rated for a certain amount; and it takes

8  both fuel and air in order to combust coal.

9       We're limited on the amount of air that we can force

10 into the boiler through our forced draft fans.  We're limited

11 on the amount of air that we can take out of the boiler or gas

12 out of the boiler for our induced draft fans.

13      So we don't have the ability to increase the output on

14 the unit without doing something to the fans.  That's probably

15 just the first step.  But if you're going to burn more coal

16 and put more air through it, you're also probably going to

17 probably have to change the surfaces in the boiler to be able

18 to absorb that additional heat, and we didn't do anything to

19 change the surfaces in the boiler.

20      You may even have to go as far as to change some of

21 the equipment that forces water through the boiler to be able

22 to absorb the heat that you put in there.  So it's a very

23 complicated process.  It all kind of hits together, but

24 because of the first step being fan limited, we couldn't have

25 increased the capacity of the unit.

BARRY PULSKAMP - DIRECT/GREEN        Vol. 8-1219

1  Q   Now, the remarks that you just made about Gallagher 1, do

2  they apply equally to Gallagher 3 as well?

3  A   Yes, sir.

4  Q   Did the replacement of the pulverizers at either

5  Gallagher 1 or 3 increase the availability of the entire

6  generating unit?

7  A   No, sir.  The entire generating unit is depending on all

8  those other parts of the unit, not just the pulverizer.

9  Q   Would replacing the pulverizers at Gallagher 1 and 3 cause

10 those units to move in the dispatch order?

11 A   No, sir.  We didn't change the function.  We were just

12 basically grinding coal, grinding coal with a different mill

13 instead of the old one; but it didn't change the function and

14 didn't change the dispatch order.

15 Q   Mr. Pulskamp, I want to conclude your direct examination

16 by asking a couple of questions.  The first is I'd like you to

17 explain for us why you believe that replacing a component will

18 not increase the availability of the entire generating unit?

19          MS. HIMMELHOCH:  Objection.  Calls for an opinion.

20          THE COURT:  He can answer.

21 A   You know, I know this.  I've been in and around generating

22 units for over 30 years, and I know it takes all the parts in

23 order -- the sum of all the parts in order to make the unit

24 operate.

25          You know, we have a part fail and we replace it and we

BARRY PULSKAMP - DIRECT/GREEN          Vol. 8-1220

1  repair it.  Then we have another part fail and we replace it.

2  There's nothing -- we can't ensure future -- or eliminate

3  future failures.  They're going to come.  In two weeks or two

4  months from now, we're going to have another failure.  It's

5  all random and unpredictable.

6  Q    What do you think is the best indicator of future

7  availability of a generating unit?

8  A    I really think the best indicator is its history.  Look at

9  its historical availability.  You know, we don't have a

10  crystal ball.  We can't look out in the future.  So we have to

11  base how things will run on what history we had, what has

12  caused us unavailability in the past.  When you look at

13  unavailability and you look at availability over a long term,

14  you'll see it remains pretty constant.

15  Q    When you do your maintenance and repair on these units,

16  are you trying to improve availability or preserve

17  availability?

18  A    We're just trying to preserve availability.  We're trying

19  to maintain availability.  I think if you can just maintain

20  availability, you're doing a heck of a job.

21  Q    Do you believe that component replacements -- you know, by

22  themselves -- can cause a unit to be run more and therefore

23  cause an increase in emissions?

24  A    No.  Component replacements by themselves don't cause the

25  unit to run more.  Demand and how a unit is dispatched will

BARRY PULSKAMP – DIRECT/GREEN        Vol. 8–1221

1  determine how a unit runs and its emissions.

2  Q   And who is that that determines whether the unit will run

3  and how it will run?

4  A   That would be our dispatch office.

5  Q   So in conclusion, sir, do you stick by the predictions you

6  made for the units we discussed regarding any expected

7  increase in emissions?

8  A   Yes, sir.

9        MR. GREEN:  That's all I have, Your Honor.

10        THE COURT:  Cross-examine.

11        MS. HIMMELHOCH:  Excuse me.  Let me take the cough

12  drop out of my mouth.

13                     **CROSS-EXAMINATION**

14  BY MS. HIMMELHOCH:

15  Q   Good morning, Mr. Pulskamp.  I don't think we've ever

16  officially met.  My name is Sarah Himmelhoch.  I represent the

17  United States in this case.  Hello.

18        You indicated early in your testimony that the company

19  has undertaken about 16– to 17,000 projects between 1985 and

20  the present, correct -- or 1999 was the end date?

21  A   Yes.

22  Q   And you indicated that not all of those were full

23  component replacements, correct?

24  A   Not all of those projects would have been full component

25  replacements, correct.

1  Q    About how many were?

2  A    Boy, I don't know.  I mean, it would vary.  There's many

3  projects that would have been single component -- or single

4  part replacements.

5  Q    So some of those were single tube replacements?

6  A    Some of those could have been single tube replacements,

7  yes.

8  Q    And some of those were Dutchmen?

9  A    Some of those could have been Dutchmen which could have

10  been single tube replacement.  Normally we wouldn't have

11  done -- we may have gone in and said we're going to do a whole

12  series of Dutchmen.  We would not have called that a

13  component.

14  Q    But your estimate of 16- to 17,000 included both

15  maintenance and capital projects, correct?

16  A    Yes.

17  Q    Does it include pad welding?

18  A    No.  We wouldn't have included pad welding as component or

19  parts replacements.

20  Q    So the 16- or 17,000 are component or part replacements?

21  A    Pretty much so, yes.

22  Q    How many of those 16- or 17,000 were parts that were not

23  tubes in the boiler?

24  A    I don't know.

25  Q    You don't know how many were on the turbine?

1  A    Some of them could have been on the turbine.  Some of them

2  could have been on the generator.  Some of them could have

3  been on boiler feed pumps.  Some of them could have been on

4  compressors.

5  Q    But you don't know how many were on boiler tubes?

6  A    Not off hand, no.

7  Q    And you don't know how many were complete replacements of

8  a component?

9  A    No, but it's easy -- I mean, typically, we would do much

10  more than 30 projects a year on a unit.  I just gave you a

11  rough estimate.

12  Q    When you say "30 projects a year," what are the types of

13  projects that are included?

14  A    Well, they could have been tube replacements or component

15  replacements or pump replacements or fan replacements or

16  igniter replacements or burner replacements, anything like

17  that.

18  Q    Other than the Beckjord 1, 2 and 3 Life Extension

19  projects, are you aware of any other plant -- any other time

20  in this time period in which Cinergy replaced 30 full

21  components in a single year at a single unit?

22  A    Oh, yes.

23  Q    Where?

24  A    It probably happens on any one of our units.

25  Q    That you replace 30 full components in a single year at a

*PULSKAMP– CROSS/ HIMMELHOCH*        Vol. 8–1224

1  single unit?

2  A    Yeah, that could happen, yes.

3  Q    Can you give me one specific example?

4  A    You know, we just came out of an outage last week or this

5  week on Gibson 5.  We probably had 30 different components we

6  replaced.

7  Q    How many of those were boiler tube sections?

8  A    Probably half of them.

9  Q    How big was the smallest component that was replaced in

10  that project?

11  A    I don't know.

12  Q    Was it as large as any of the components that were

13  replaced in any of the projects that are at issue today?

14  A    We replaced sections of the reheater which are components.

15  Q    Was that the smallest component that was replaced?

16  A    No.

17  Q    Did you replace any single tubes?

18  A    I'm sure we also replaced single tubes, yes.

19  Q    And you counted that single tube as a single project?

20  A    I don't know if I would have counted that single tube in

21  that 30, no.

22  Q    Other than that one instance, how common is it in a single

23  year to replace 30 full components of boiler tubes at a single

24  unit?

25  A    Well, it's not common to do 30 boiler tubes.  I'm talking

PULSKAMP– CROSS/ HIMMELHOCH        Vol. 8–1225

1   about 30 components or parts.

2   Q    And I'm restricting myself to boiler tubes at this point.

3   A    I don't think it's common to do 30 components of boiler

4   tubes.

5   Q    Now, you testified that you have an obligation to produce

6   electricity at the lowest reasonable cost; is that correct?

7   A    Yes, ma'am.

8   Q    Does that obligation also come with an obligation to

9   follow the law?

10  A    Yes, ma'am.

11  Q    And that includes environmental laws; is not that correct?

12  A    Absolutely.

13  Q    Now, you also indicated that you have operating permits;

14  is that correct?

15  A    Yes, ma'am.

16  Q    And those operating permits are not authority under the

17  New Source Review permits, correct?  They're separate permits?

18  A    Could you repeat the question?

19  Q    Your operating permits are not New Source Review permits,

20  correct?

21  A    That's correct.

22  Q    And they do not -- they did not authorize the construction

23  projects at issue in this case; is that correct?

24  A    The operating permits do not authorize construction of

25  projects, no.

1  Q   And the limits in those permits are simply a statement of

2  the maximum capability of the unit; is not that correct?

3  A   The limits are the limits.  They're based on operation at

4  the maximum capacity.

5  Q   Right, but it doesn't, in fact, limit the plant since it's

6  set at the maximum capacity of the plant, correct?

7  A   It limits the plant to emit those levels of emissions.

8  Q   At the maximum capacity of the plant?

9  A   That's correct.

10 Q   Now, you indicated that New Source Review permits can

11 apply to two different things.  They can apply to new plants

12 and they can apply to modifications.  Do you recall that?

13 A   I said they could apply to new emissions from new

14 generation, new capacity and from certain projects.

15 Q   And those projects are known as modifications, correct?

16 A   That's your terminology.  I just said certain replacement

17 or repair projects.

18 Q   So it doesn't have to be a new plant in order to be

19 subject to New Source Review, correct?

20 A   That's correct.

21 Q   Now, you indicated at the conclusion of your testimony

22 that boiler tube leaks are random and unpredictable.  Do you

23 recall that?

24 A   Yes, ma'am.

25 Q   Is it not true that there are times when a plant operator

1  can know that there are —— that a particular area of the

2  boiler is more likely than another area to have leaks?

3  A    Yes, ma'am.

4  Q    So as a unit ages, the plant operator who is familiar with

5  that plant may know that, for instance, the superheater is in

6  more difficulty than, say, the economizer, correct?

7  A    That could happen, yes.

8  Q    And in that instance, the plant operator would expect more

9  outages in the superheater than in the economizer, correct?

10 A    You could expect more.  It doesn't happen that way all the

11 time.

12 Q    But more often than not, correct?

13 A    That it could happen, yes.

14 Q    Though you don't know which tube in the superheater is

15 going to go or exactly which day, you do have a sense of the

16 pattern of decay in the superheater for instance, do you not?

17 A    We know that if a condition is deteriorating, that you may

18 have another failure, yes.

19 Q    And that those failures are likely to become more

20 frequent?

21 A    It can become more frequent, yes.

22 Q    And in that sense, they do become somewhat predictable, do

23 they not?

24 A    Well, it may become more frequent but it still doesn't

25 become it predictable.  It may happen at any time.

PULSKAMP– CROSS/ HIMMELHOCH          Vol. 8–1228

1  Q   But you know that it's likely to happen in that area of

2  the boiler?

3  A   It can happen in that area of the boiler, yes.

4  Q   And you know that if you replace it with new

5  nondeteriorating material, that it's less likely to happen in

6  that area of the boiler; do you not?

7  A   It could be less likely but you could have other failures

8  and repeat failures in the components you just replaced.

9  Q   But it's less likely; do you agree with that?

10  A   It can be less likely, yes.

11  Q   Now, you described an instance in which the manufacturer

12  had left the ball bearing in the tube.  After you replaced it

13  with a new ball bearingless tube, no ball bearing in it, did

14  you have another failure in that tube?

15  A   I'm not aware of another failure in that tube.

16  Q   How often –– you indicated that the plant manager had that

17  ball bearing on his shelf in his office.  Is that because it's

18  a fairly unusual occurrence?

19  A   Yes.  Finding a component –– a ball bearing in the tube

20  that was supposed to have been put in there to protect you

21  is –– yes, is an unlikely event.  It just shows you how random

22  and unpredictable some of this stuff is.

23  Q   Right.  But once you've gotten up and running after an

24  outage, there tends to be a period of stabilization, does

25  there not?

*PULSKAMP– CROSS/ HIMMELHOCH*      Vol. 8–1229

1  A   You could still have outages, forced outages after we get

2  up and running.

3  Q   But it tends to be fewer after you're up and running?

4  A   It could be, but not necessarily.

5  Q   It's sort of like airplanes.  The takeoff and landing are

6  the hard parts, isn't that right, that the ramping up and the

7  ramping down is where you're most likely to encounter the

8  problems?

9  A   No.  Ramping up and ramping down adds to stresses but that

10 doesn't necessarily mean that's the only time we're going to

11 have problems.

12 Q   Not the only time, but let me put it to you a different

13 way.  Are you familiar with what's been called "the bathtub

14 curve"?

15 A   Yes.

16 Q   Do you know what that is?

17 A   Yes.  It's –– it shows in the life of a unit that there's

18 more unavailability in the first several years.

19 Q   And then it stabilizes?

20 A   And then it stabilizes.

21 Q   And then it increases exponentially, correct?

22 A   It can.

23 Q   If we could call up Exhibit 1767, the second image.  If we

24 could focus in on the graph (indicating).

25         This is the graph we were discussing, correct?

*PULSKAMP– CROSS/ HIMMELHOCH*          Vol. 8–1230

1  A    That's the bathtub curve, yes.

2  Q    If you look on the bottom of the axis, those are years,

3  correct?

4  A    Yes.

5  Q    And this suggests that failures increase significantly

6  after about 25, 30 years; is that correct?  Is that what this

7  graph indicates?

8  A    Yes, but this ––

9  Q    And absent intervention, is that not the experience of the

10  industry?

11  A    That was the experience of the industry when this graph

12  was prepared.

13  Q    And what changed?

14  A    Well, this was based on units that were 30 to 40 to

15  50–year old then.  They're not necessarily the same technology

16  as today.  I mentioned earlier that there had been leap frogs

17  in technology.  Technology was becoming obsolete.

18        If you look at the date that this was published,

19  probably in 1984, '83 ––

20  Q    1993, sir.

21  A    1993?

22  Q    Yes, sir.

23  A    Still, there's –– it's not –– well, in 1993, a unit would

24  have been 50 –– at 50 years old would have been built in 1943.

25  I will agree that a 1943 unit wouldn't have had the same curve

1  as a 1953 unit.

2  Q   Well, but a unit that had been online 25 years would have

3  been built in the '70s or late '60s, correct?

4  A   Yes.

5  Q   And that's when Gallagher was built, correct?

6  A   Yes.

7  Q   And so in the '90s when Gallagher replaced its condenser

8  at Unit 2, it was in this -- the beginning of the escalation,

9  was it not, of outages?

10 A   I don't recall Gallagher replacing its condenser on Unit 2

11 in that time.

12 Q   Well, in 1990 it did.

13 A   I don't recall that.

14 Q   Okay.  Well, I'll ask someone who does.

15      Now, you indicated that you did not expect emissions

16 to increase because of three things.  You weren't changing the

17 hourly rate of the unit, correct?

18 A   That's correct.

19 Q   You weren't changing the capacity of the unit, correct?

20 A   That's correct.

21 Q   And you weren't changing the function of the part you were

22 replacing, correct?

23 A   Correct, and we were just replacing parts for parts.

24 Q   Right.  Now, you did not list in that list hours of

25 operation, correct?

1  A    That's correct.

2  Q    Now -- and you did not consider that?

3  A    Well, we considered it.  What we considered that if a

4  unit -- that if a replacement was as a result of increased --

5  or any emissions were as a result of increased demand, that we

6  excluded those emissions from our prediction.

7  Q    Even if that demand could not have been met without the

8  project?

9  A    No.

10  Q    You excluded it in that instance?

11  A    We excluded those as a result of that project if it was

12  from increased demand.

13  Q    Are you aware that in this case, the Plaintiffs are

14  alleging that the losses of availability were caused as a

15  result of forced outages?  You're aware of that, correct?

16         In other words, that the components were causing

17  forced outages before the project?

18  A    I haven't --

19  Q    Well, no, that's what we are asserting.

20         Let me ask you this.  What is a forced outage?

21  A    A forced outage is when a unit is removed from service

22  when it's not planned.

23  Q    And it's usually when they're trying to run the unit; is

24  that not correct?

25  A    Normally that's when it occurs.

1  Q    So a forced outage occurs at a time when the unit is

2  called upon to operate but cannot?

3  A    In most cases, yes.  The demand could also have dropped

4  off and the unit still be forced off.

5  Q    But it's still being called upon to operate at some level

6  if it's sent into a forced outage, correct?

7  A    Any time a unit is not available to run because of a

8  problem, we call it a forced outage.  It's that way until we

9  repair it.  Then it's available.

10  Q    And you indicated that the product that you all generate

11  has to be manufactured and delivered within a split second.

12  Do you recall that testimony?

13  A    Yes.

14  Q    So that means that an hour that you could generate

15  electricity at midnight doesn't have value if the demand for

16  that electricity occurs at 10 in the morning; isn't that

17  correct?

18  A    Could you ask that question again?

19  Q    Well, let's say that the unit was capable of producing an

20  hour of electricity at midnight, but it was in a forced outage

21  at 10 a.m.  The fact that you could have produced at midnight

22  doesn't help you produce at 10 a.m.; isn't that correct?

23  A    That's true.

24  Q    Now, let's go onto another issue.  You indicated that --

25  if we could have Defendants' Exhibit 2162.

*PULSKAMP- CROSS/ HIMMELHOCH*        Vol. 8-1234

1        We were going through the GADS data for the Gallagher

2   pulverizer.  Do you recall that?

3        MS. HIMMELHOCH:  I'm sorry.  I gave you the wrong

4   number.  2135.  My apologies.

5   BY MS. HIMMELHOCH:

6   Q   And you recall looking at this and saying that this

7   document shows every instance that affected availability,

8   correct?

9   A   It was every problem that we had on the unit in that

10  period of time that affected availability or ability to

11  generate, yes.

12  Q   And you see this third from the right column titled "Equiv

13  hrs"?  Do you see that?

14  A   Equivalent hours, yes.

15  Q   What does that signify?

16  A   That means it's the equivalent operating hours.

17  Q   That means how many full power hours were lost as a result

18  of the problem, correct?

19  A   Yes.

20  Q   On the first page, there are approximately 32 entries,

21  isn't that correct?

22  A   I'd have to count them but I'll take your word for it.

23  Q   If you look down at each of the problems that caused zero

24  equivalent hours of lost availability, that's approximately

25  17.  You can take the time to count if you want.

*PULSKAMP– CROSS/ HIMMELHOCH*          Vol. 8–1235

1          Is that correct?

2    A    Yes.

3    Q    Okay.  The reserve shutdown hours that are reported there

4    were a choice by the company not to run that unit, correct?

5    A    That was a choice based on demand, yes.

6    Q    So that was not a forced outage.  That was not a time when

7    the company wanted to run the unit but couldn't?

8    A    That was a time when the unit was not being called upon.

9    So it was put in reserve shutdown, yes.

10   Q    And if we looked through the rest of this exhibit, we

11   would see additional numbers of incidents that had zero hours

12   of equivalent availability loss; isn't that correct?

13   A    Yes.

14   Q    In fact, on some of these pages, the majority of the

15   entries have zero equivalent hours lost, correct?

16   A    Yes.  Some of those are all on the same day at the same

17   time, just different codes.

18   Q    So several different things were happening, but none of

19   them were causing losses in availability?

20   A    No.  It appears that some of these when they have zero

21   hours, it's because they're in some type of scheduled outage,

22   too.

23   Q    Okay.  So there again is a time when the company is not

24   trying to run that unit?

25   A    That would be true.

PULSKAMP– CROSS/ HIMMELHOCH          Vol. 8–1236

1   Q    If somebody went through this and added up all of the

2   hours that were caused by the pulverizers, either the wet coal

3   problems or problems from the pulverizers themselves, do you

4   know how many hours they would get?

5   A    No, I do not.

6   Q    Do you know how many hours they would get from every other

7   problem being caused at the unit?

8   A    I'd have to add those up myself.

9   Q    And you have not done that?

10  A    No, I haven't.

11  Q    Do you know whether there were any problems that Cinergy

12  expected to occur when they were planning the Gallagher 3

13  pulverizer replacement that would have caused the same amount

14  of forced outages or derates as were caused by the Gallagher

15  pulverizers?

16  A    No, I do not.

17  Q    Have you seen any documents identifying any problem that

18  Cinergy expected to arise with equivalent effect on

19  availability?

20  A    No, I haven't.

21  Q    Now, you indicated that the components don't make the

22  plant run more.  Dispatchers do.  Do you recall that?

23  A    Yes, ma'am.

24  Q    But the dispatchers rely on reports of availability, do

25  they not?

1   A   They rely on whether or not the unit's availability.

2   Q   And that report is given to them by plant station

3   managers, isn't that correct?

4   A   Well, the plant calls in every day and lets them know

5   whether the unit's available or not.

6   Q   So it is a joint decision whether to dispatch the unit

7   between the plant and the dispatcher; isn't that correct?

8   A   No.

9   Q   Well, if the dispatcher is told that the unit is not

10  available, can the dispatcher dispatch that unit?

11  A   No.  He can't dispatch it if it's not available; but he

12  doesn't make the decision -- the plant doesn't make the

13  decision to make it unavailable.

14  Q   But the plant makes decisions about how to improve

15  availability; isn't that correct?

16  A   The plant makes decisions on how to maintain availability,

17  restore availability.

18  Q   When you say "restore availability," what do you mean?

19  A   Well, what I mean is, like I've demonstrated before, kind

20  of talking about how we're humming along and we have a tube

21  leak and it drops, and, you know, we get our availability

22  back.  You know, when the unit's down, it's unavailable.  It's

23  got zero availability.  We fix it.  We make it available

24  again.  So when I talk about restoring, it's bringing that

25  availability back to that historic level.

1  Q   Did you examine, before undertaking these projects, what

2  the historic level of availability of any of these units were

3  in the two years immediately preceding the project?

4  A   I don't know if I personally did that.  I don't recall.

5  Q   Are you aware of anyone in the company looking at that?

6  A   No.

7  Q   Are you aware of anyone in the company examining whether

8  the projects at issue would result in increased availability

9  above the average availability during the two years preceding

10 the project?

11 A   No.

12 Q   During the planning of these projects, are you aware of

13 anyone identifying a time period other than the two years

14 preceding the project that was representative of normal

15 operation?

16 A   No.

17 Q   And you don't -- you did not examine historical

18 availability of the units during that time period of normal

19 operation; is that correct?

20 A   Well, we know what availability is.  I mean, it's -- and

21 it changes depending on what period of time you're looking at.

22 Q   You did not examine a two-year average for any period in

23 the five years preceding any of these projects; isn't that

24 correct?

25 A   Yes.

1  Q   Now, you indicated with respect to the Beckjord Life

2  Extension project that Cinergy did intend to operate those

3  units more; isn't that correct?

4  A   Yes, absolutely.

5  Q   And they intended to operate those units more at least

6  until Zimmer came on line; isn't that correct?

7  A   That's correct.

8  Q   And that was in 1991, correct?

9  A   Yes, it was.

10 Q   When was the last unit completed in the Life Extension

11 projects at Beckjord Units 1, 2, 3?

12 A   In 1987, '88.

13 Q   So two years before -- it was more than two years after

14 the projects that Zimmer would come online, correct?

15 A   Zimmer came online on New Year's Eve of '91.

16 Q   And it was expected to come on in 1991, correct?

17 A   Yes.

18 Q   And that was expected to be two years after the completion

19 of the last of the three Life Extensions, correct?

20 A   Yes.

21 Q   Now, you indicated with respect to the Gallagher

22 pulverizers that the projects removed a 7-megawatt derate.  Do

23 you recall that?

24 A   Yes, I do.

25 Q   How long had that 7-megawatt derate been in place prior to

1  the project?

2  A    That 7–megawatt derate may have been as long as that

3  unit's been operating.  I don't know.  I didn't look back that

4  far.

5  Q    You didn't look?

6  A    No.

7  Q    And you don't know whether in the two years representative

8  of normal source operations prior to this project that –– what

9  the historical availability was or whether that derate was in

10  place?

11  A    No.

12  Q    Now, you indicated that the Gallagher units were fan

13  limited.  Do you recall that?

14  A    Yes, I do.

15  Q    What documents, if any, are you relying upon for that

16  statement?

17  A    I'm relying on my experience and my knowledge of the unit.

18  Q    Have you tried to run the Gallagher unit at 157 megawatts?

19  A    Well, 157 megawatts is a gross output of that unit.  Okay.

20  That's based on the 2,780,000 pounds per hour or BTUs per

21  hour.  That's from each unit.

22  Q    That's what the unit was designed to do; is that not

23  correct?

24  A    The unit was designed for 157 megawatts.  That's it's

25  maximum capacity.  Now, there's about 10 megawatts of

1  auxiliaries.

2  Q   Correct.

3  A   Which makes a net –– net capacity maybe 147, but that's

4  under perfect conditions, the right coal, the right

5  temperatures and everything.  We can sometimes get 147, 146.

6  Most of the time, it's 140 megawatts, and that's what we rate

7  the unit at.

8  Q   Is the unit fan limited in the winter?

9  A   It would be less fan limited in the winter than it is in

10 the summer because the air is denser.

11 Q   Is it fan limited in the fall?

12 A   It can be fan limited in the fall.

13 Q   How much?

14 A   I don't know how often it occurs.  It depends on a lot of

15 factors, on temperature, on humidity.

16 Q   If you remove a 7-megawatt derate from a unit, is that not

17 the equivalent of increasing the capacity of that unit 7

18 megawatts?

19 A   No, it's removing –– the unit has the capacity.  It always

20 has the capacity.

21 Q   And you're making it available for use?

22 A   It's just removal of that intermittent derate.

23 Q   And making it available for use?

24 A   Yes.

25 Q   Now, you testified that none of the units at issue here

PULSKAMP– CROSS/ HIMMELHOCH          Vol. 8–1242

1  were base-loaded units.  Do you recall that?

2  A   That's correct.

3  Q   But they were cycling units, were they not?

4  A   They cycled, yes.

5  Q   And you indicated that there's a spectrum of cycling units

6  from the most frequently called on to the least frequently

7  called on, correct?

8  A   Yes.

9  Q   And Gibson, Gallagher and Wabash River are on the spectrum

10 closest to being called --

11      COURT REPORTER:  Could you please slow down --

12 Q   My apologies.

13      Gallagher, Gibson and Wabash River are on the end of

14 the spectrum closer to being called upon than the end of the

15 spectrum indicating they're unlikely to be called upon; isn't

16 that correct?

17 A   No, it is not.

18 Q   Okay, where do they fall?

19 A   Gibson would have been one of the units that would have

20 been first called upon.  Gallagher and the Wabash units would

21 have been in that spectrum that would have been -- would have

22 been last to have been called upon.

23      And we're talking about in the period of when, 1985 to

24 2001?  It really depends on what additional generation has

25 been placed on the system as you go along.  That changes.

PULSKAMP- CROSS/ HIMMELHOCH          Vol. 8-1243

1  Q    What additional generation was placed on the system

2  between 1989 and 1992?

3  A    Well, Zimmer came online in 1991.

4  Q    And that was in the CG&E system, correct?

5  A    That's correct.

6  Q    At the time of the Wabash River project, CG&E and PSI had

7  not merged, correct?

8  A    Not until 1995.

9  Q    So between 1989 and 1992, Zimmer would not have been new

10 capacity that would have adjusted the dispatch of Wabash

11 River; isn't that correct?

12 A    That's correct, but there could have been other reasons,

13 too, for the change.  I don't know what contracts that PSI may

14 have had for power off market.  That was not unusual to buy

15 power from someone else to make swaps on power.  If you were a

16 winter peaker and they were a summer peaker -- someone else is

17 a summer peaker, you would trade megawatts throughout the

18 year.  All of those things were possible to change how units

19 would be dispatched.

20 Q    It's also true, is it not, that you don't serve only

21 residential, commercial and industrial customers.  You also

22 have off system sales; isn't that correct?

23 A    That's correct.

24 Q    Those sales are profitable for the company, are they not?

25 A    Yes.

1  Q   And they are made with excess capacity within the system

2  after you've met your reliable load requirements; isn't that

3  correct?

4  A   They are using the excess –– they are using the capacity

5  that isn't being used to serve native–load customers.

6  Q   Now, you indicated that the life of a power plant is a lot

7  of maintenance; do you recall that?

8  A   It's continuous maintenance, yes.

9  Q   And that continuous maintenance is generally conducted by

10 onsite workers; isn't that correct?

11 A   No.

12 Q   What percentage of the daily maintenance work at any of

13 the units at issue is performed by contractors?

14 A   I would say at this point in time, probably 50 percent of

15 our maintenance may be done with our own employees and

16 50 percent would be done –– on a day-to-day basis with

17 contractors.

18 Q   In 1985, what was the percentage at Beckjord?

19 A   In 1985, the percentage was probably a little bit greater

20 with our own employees.  The contractors have always been a

21 big part of our maintenance work.

22 Q   Could Cinergy have performed the projects at issue in this

23 case using only in–house maintenance staff?

24 A   Could –– which project in this case?

25 Q   Any of the projects at issue in this case.

*PULSKAMP– CROSS/ HIMMELHOCH*        Vol. 8–1245

1  A   No.

2        MS. HIMMELHOCH:  Your Honor, this would be a good

3  time for our break.

4        THE COURT:  All right.  We'll break for the next 15

5  minutes.

6        COURT CLERK:  All rise.

7        This court stands in brief recess.

8     *(Jury out.)*

9     (*A recess was taken*.)

10    *(Jury in.)*

11       THE COURT:  Ladies and gentlemen, at the end of this

12  next round, I will give you a fairly decent idea of when we're

13  going to be done with this case so you can quit stewing about

14  it.

15       You may proceed.

16  BY MS. HIMMELHOCH:

17  Q   Welcome back, Mr. Pulskamp.  Before we took the break and

18  actually when you were testifying for Mr. Green, you indicated

19  that in your view, a component replacement could not increase

20  the availability of a unit; is that correct?

21  A   Yes.

22  Q   Are you familiar with a gentleman named James Benning?

23  A   Yes.

24  Q   And who is he?

25  A   James Benning was a vice president for PSI prior to the

PULSKAMP- CROSS/ HIMMELHOCH        Vol. 8-1246

1  merger.

2        MS. HIMMELHOCH:  Your Honor, at this time I move the

3  admission of Exhibit 1664.  Cinergy has stipulated to its

4  authenticity and nonhearsay status.

5        May I approach the witness, Your Honor.

6        MR. GREEN:  Your Honor, one moment.

7        THE COURT:  Yes.

8        MR. GREEN:  If Your Honor, please, it looks to me

9  from a quick review of this document that this is rate-making

10 testimony -- testimony in the rate-making hearing, unless I'm

11 misunderstanding what you have ruled in this case --

12        THE COURT:  Well, I'm sure that's not the case.

13        MR. GREEN:  Well, then --

14        MS. HIMMELHOCH:  It is not being offered -- I'm

15 sorry.

16        MR. GREEN:  I believe that this would be off limits,

17 and in any event, asking him to comment on the testimony of

18 someone else would be improper.

19        THE COURT:  I see it here.  What's the purpose here,

20 Ms. Himmelhoch?

21        MS. HIMMELHOCH:  It is testimony by PSI before the

22 PUC regarding its expectations as a result of component

23 replacement projects and their impact on availability.

24        The witness has testified that such component

25 replacement projects cannot result in increased availability.

PULSKAMP- CROSS/ HIMMELHOCH        Vol. 8-1247

1  This is a document showing that PSI believed to the contrary

2  and represented to the contrary.

3         MR. GREEN:  You know, it's completely -- it's apples

4  and oranges and it's been ruled out.  If we're going to get

5  into the whole rate making --

6         THE COURT:  Now, don't threaten me with two or three

7  more weeks of trial.

8         MS. HIMMELHOCH:  There is no testimony in here with

9  regard to rates and how they are set.

10        THE COURT:  What page are we on?

11        MS. HIMMELHOCH:  I would focus on -- why don't I give

12 you my highlighted copy, Your Honor?

13        THE COURT:  All right.  That will make it easy.

14        MS. HIMMELHOCH:  That's just to establish who he is.

15        THE COURT:  And you want him to read what you've got

16 highlighted here?

17        MS. HIMMELHOCH:  Some portions of it.  I confess I

18 may have been overly eager with the highlighter.

19        MR. GREEN:  First of all, he wasn't even part of the

20 PSI -- I don't know what the date of that is.

21        MS. HIMMELHOCH:  1985.

22        MR. GREEN:  He wasn't part of the PSI system.  I

23 don't believe that it's appropriate to call on him to comment

24 on other people's testimony as to context.  I would have to

25 see the entirety in order to understand what's happening here.

1          MS. HIMMELHOCH:  Your Honor, as counsel has argued,

2   it is a reasonableness standard.  It is whether a reasonable

3   power plant operator would have concluded that component

4   replacements could result in a significant net emissions.

5          THE COURT:  I'm going to have to sustain his

6   objection having seen what I saw.

7          MS. HIMMELHOCH:  Thank you.

8   BY MS. HIMMELHOCH:

9   Q    Now, Mr. Pulskamp, you were involved in the Life Extension

10  projects at Beckjord Units 1, 2 and 3, were you not?

11  A    Yes, I was.

12  Q    The purpose of these projects was to make them to be able

13  to run another 30 years or so; correct?

14  A    The purpose was to, yes, keep them reliable through that

15  extended service life.

16  Q    And you anticipated that the unit would be called upon to

17  start up and shut down more frequently than it had before the

18  projects, correct?

19  A    I'm not sure if they were going to be more than they had

20  in the past, but we were planning on those units being called

21  upon to start up and shut down in the future, correct.

22  Q    And particularly in the two years after the projects,

23  correct?

24  A    Yes.

25  Q    And you're aware that that's the time period that the New

 1  Source Review regulations look at for increase in generation,

 2  are you not?

 3  A    Yes.

 4  Q    So during the two years that are relevant post-project,

 5  you expected to use these Beckjord units more than you had in

 6  the periods preceding the project, correct?

 7  A    Yes.  We expected to use those units more but that was

 8  because of customer demand.

 9  Q    We'll get to that.

10       Let me ask you this:  Why did you first begin to

11  consider Life Extension at Beckjord Units 1, 2 and 3?

12  A    Well, we first considered it because, as I explained

13  earlier about our failed nuclear program, and the fact that

14  our generation -- our demand was continuing to grow, our

15  reserve margins were getting smaller, and we had needs to

16  fill, customer demand to fill.

17  Q    And you spent 15 to $18 million on each of these projects

18  to meet that customer demand, correct?

19  A    We spent 15 to $18 million to -- with those Life Extension

20  outages, and they helped ensure reliability during those

21  periods that we knew the unit was going to be called upon.

22  Q    And if you hadn't have done those projects, the units

23  would have had more forced outages in the two years following

24  the projects than if you did do the projects?

25  A    I don't know that.  All I know is that they were available

1  when we brought them down.  They had additional capacity

2  available when we brought them down.  What we wanted to do is

3  make sure that they were going to be reliable, but I can't

4  speculate actually on what would have happened if I didn't do

5  it.

6  Q   Now, let me ask you this.  You indicated that they had

7  capacity, and I want to go back to a point that we talked

8  about a little bit before the break.  Each of these units were

9  not run full power 24 hours a day, correct?

10 A   No, they were not dispatched at full capacity factor every

11 day.

12 Q   In fact, the capacity factor for Beckjord Unit 1 prior to

13 the project was six percent about; isn't that correct?

14 A   I don't remember.

15 Q   Do you have any reason to dispute that number?

16 A   No.

17 Q   That means that it was generating about six percent of the

18 power it could, correct?

19 A   If the capacity factor was six percent, that would have

20 been true.

21 Q   Now, Mr. Koppe's analysis focused on outages that

22 occurred -- forced outages, and looked at forced outages in

23 the two years preceding this project; and Mr. Koppe found that

24 there were forced outages due to these components as a result

25 of -- well, there are forced outages due to tube leaks in

PULSKAMP- CROSS/ HIMMELHOCH          Vol. 8-1251

1  these components.  Do you have any reason to dispute that?

2  A    No, I do not.

3  Q    In fact, the expected recovery of the availability lost

4  due to those tube leaks was used in the justification of the

5  projects to company management, was it not?

6  A    I don't know what you mean by that.

7  Q    Well, in the project justification documents, the capital

8  expenditure authorization, for instance, the document

9  referenced hours lost due to tube leaks in the years prior to

10 the project, did they not?

11 A    I don't remember if they did or not.

12          MS. HIMMELHOCH:  Do you have a question, Mr. Green?

13          MR. GREEN:  Just burning calories.

14          MS. HIMMELHOCH:  Okay.

15 BY MS. HIMMELHOCH:

16 Q    We'll turn now to Exhibit 9, which is in evidence.

17          MS. HIMMELHOCH:  May I approach the witness and give

18 a copy?

19          THE COURT:  You may.

20 BY MS. HIMMELHOCH:

21 Q    I'm sorry -- this is the wrong document.  I'm sorry.

22 Could you please set that aside?  We'll get back to it later.

23 Let me ask you a different question.

24          Do you have any reason to believe that the

25 availability hours that Mr. Koppe identified were hours that

1  occurred when Cinergy was trying to run the Beckjord units?

2          MR. GREEN:  Objection, Your Honor.  This witness

3  wasn't present when Mr. Koppe testified.  I don't think he has

4  any idea what Mr. Koppe's testimony is.

5          THE COURT:  Well, let's ask him.  Let's have your

6  question again.

7          MS. HIMMELHOCH:  Sure.  I can probably do a better

8  job of it, too.

9  BY MS. HIMMELHOCH:

10 Q   Do you have any reason to believe that the hours of

11 availability that are being presented by the Plaintiffs as

12 having been lost due to components prior to the projects were

13 hours that were lost as a result of forced outages?

14         MR. GREEN:  Objection, I don't think --

15         THE COURT:  He can answer that if he understands the

16 question.

17 A   Well, first, I don't understand the question.  Second, I

18 wasn't -- I'm not -- I haven't look at Koppe's information.

19 Q   Well, let me ask you a different question.  If you are

20 operating Beckjord Unit 3 in the years before the project and

21 you have a forced outage at ten o'clock in the morning, does

22 the fact that that unit could produce the electricity that was

23 needed at 10 a.m. at midnight assist the company in meeting

24 the customer demand at 10 a.m.?

25         MR. GREEN:  That's been asked and answered, Your

1  Honor.

2        THE COURT:  He can answer.

3  A   I still don't understand that question.

4  BY MS. HIMMELHOCH:

5  Q   Okay.  You indicated that electricity has to be dispatched

6  at the time it's generated?

7  A   That's -- yes.

8  Q   So even if -- and we'll agree that the Beckjord units did

9  not run at full power 24 hours a day, will we not?

10  A   That's correct.

11  Q   And if what we're looking at is a forced outage that

12  occurred at ten o'clock in the morning, does the fact that the

13  unit could have produced full power at midnight that night

14  mean that that hour lost at 10 a.m. could somehow have been

15  made up by that twelve o'clock midnight hour?

16  A   No, there was no way to store electricity.  So what was

17  lost at 10 a.m. would have had to have been made up with

18  another unit.

19  Q   And if you made a change that prevented an outage like

20  that in the future so you didn't have another one at 10 a.m.,

21  you wouldn't have had to go somewhere else for that power,

22  correct?

23  A   Yes, if that was the only thing that would have brought

24  that unit down at 10 a.m.; but there are a thousand other

25  components that could have caused it, too.

1  Q    When you say thousands of other components can cause

2  forced outages, how many components cause repeated patterns of

3  outages over several years?

4  A    Could you repeat that question?

5  Q    Sure.  The forced outages that we've looked at in the

6  project justifications and in the GADS data for these projects

7  were forced outages that lasted two or three days and were

8  followed frequently by similar outages very soon thereafter.

9  In other words, there was a pattern of recurring outages

10 caused by the same component?

11         MR. GREEN:  I'm going to object to the

12 characterization of the testimony in the form of that

13 question, if Your Honor please.  Also, I think it

14 mischaracterizes the testimony.  The witness wasn't here.  He

15 hasn't heard any of this testimony.  So I think formulating

16 questions that are predicated on Ms. Himmelhoch's rendition of

17 what she heard is improper.

18         THE COURT:  He can answer this question if he

19 understands it.

20 Q    Have you seen patterns of forced outages like that in your

21 experience?

22 A    I have seen patterns of forced outages, yes, when the same

23 problem occurs; but I've also seen where other problems can

24 occur in between or on top of the same type of problems.

25 Q    And in the planning of the Beckjord Life Extension

1 projects, CG&E looked at the entirety of the unit and looked

2 at all of the components that could cause problems, did it

3 not?

4 A   Yes.  We looked at every component on those units to

5 determine if we had some critical flaw.  As I mentioned

6 earlier, you know, the technology hadn't changed in 50 years.

7 So we were wondering if there was something that would be

8 considered a fatal flaw on the unit that would prevent you

9 from operating for an extended life.  We didn't find anything.

10 Q   And you were familiar then with the condition of the unit,

11 including the components that were being replaced and the

12 components that weren't being replaced?

13 A   Generally familiar with all the components, yes.

14 Q   And CG&E understood that the unit, except for the parts

15 that were being replaced, the components that were being

16 replaced, was in fairly decent shape.  That was the conclusion

17 of the Life Extension Study, correct?

18 A   The conclusion was that the unit was generally in good

19 shape and had been well maintained.

20 Q   Right, and that these Life Extension projects would

21 address those components that were causing the unit to have

22 forced outages, correct?

23 A   It was more like when my daughter went away to school and

24 she had -- she had to drive 150 or 200 miles away to school.

25 She had a car that was -- it was available every day when she

*PULSKAMP– CROSS/ HIMMELHOCH*          Vol. 8–1256

1  needed to use it around town; but just to make sure that it

2  was going to be available for her going back to school, we

3  replaced the tires and the belts and the hoses.  We were

4  looking for reliability.

5       And the same way on the plant because of that period

6  of time when reserve margins were going to get really low, and

7  we had this demand that we had to meet, and our customers were

8  kind of uncertain about everything anyway because of our

9  failed nuclear program, we wanted to be sure that we could

10 meet that demand.

11      So the equivalent of putting tires and belts on the

12 unit is what we did.  We took care of those problems to

13 increase reliability.

14 Q   Had your daughter's car been having blowouts on the tires

15 on a regular basis?

16 A   No.

17 Q   But the superheater and other components replaced at

18 Beckjord had been having forced outages on a repeated basis

19 prior to these projects, correct?

20 A   We had leaks, yes.

21 Q   The goal of these projects was to restore the units to

22 their original operating capacity and availability; is that

23 not correct?

24 A   It was to restore maintenance –– or availability to those

25 consistent levels.

*PULSKAMP– CROSS/ HIMMELHOCH*        Vol. 8–1257

1  Q    To the level of a new unit; isn't that correct?

2  A    Not necessarily because you showed me the bathtub curve

3  that said a new unit would have been higher unavailability.

4  We wanted to maintain the availability at historic levels.

5        MS. HIMMELHOCH:  Your Honor, at this time, I move for

6  the admission of Exhibit 362.  It's a document authored by

7  Mr. Pulskamp.  Cinergy has stipulated to its authenticity but

8  has not stipulated to its nonhearsay status.

9        May I approach, Your Honor?

10       THE COURT:  Yes.

11       MS. HIMMELHOCH:  It's not in the binder because it's

12  a document to be used on Cross.

13       THE COURT:  Okay.  It's being offered.  Exhibit 362

14  is being offered?

15       MS. HIMMELHOCH:  I'm sorry, I believe I misspoke.

16  Cinergy has not stipulated to its authenticity but

17  Mr. Pulskamp identified it as a document he offered in his

18  deposition.

19       MR. GREEN:  I have no objection, Your Honor.

20       THE COURT:  The exhibit is admitted.

21    *(Plaintiffs' Exhibit 362 was received in evidence.)*

22       THE COURT:  Would you like it back or do you need

23  this copy?

24       MS. HIMMELHOCH:  I can give him another document,

25  Your Honor.  May I approach.

1          THE COURT:  Yes, you may.

2   BY MS. HIMMELHOCH:

3   Q    Mr. Pulskamp, do you recognize this document?

4   A    Yes, I do.

5   Q    And if you could please turn to page -- the Bates number

6   ending 76588, and let's stop there for a moment.

7          This paper you authored while you were an employee of

8   CG&E, correct?

9   A    Yes.

10  Q    And it discusses the Life Extension projects at Beckjord

11  1, 2 and 3, correct?

12  A    That is correct.

13  Q    And you were accurate when you wrote this paper, were you

14  not?

15  A    Yes, I hope I was.

16  Q    I want to direct your attention to two points on page

17  ending 76588.  Oh, okay, I'll use the ELMO.  The first thing,

18  if you could call up the first paragraph.

19          Mr. Pulskamp, can you please read the first paragraph

20  into the record?

21  A    "In 1981, we first considered the idea of extended life

22  operation for Beckjord Units 1, 2 and 3.  At that time, we

23  were faced with a major decision with respect to continued

24  operation of Unit 1."

25  Q    And the paper goes on to describe a problem that had

PULSKAMP– CROSS/ HIMMELHOCH          Vol. 8–1259

1  occurred at Unit 1, correct?

2  A    That is correct.

3  Q    And the major decision was whether or not to continue

4  operating Unit 1 or to retire it; isn't that correct?

5  A    That was a decision, yes.

6  Q    And an investigation was done and it was determined that

7  it would be cost effective to extend the life of Units 1, 2

8  and 3, correct?

9  A    Yes.  Do you remember --

10  Q    I'm sorry?

11  A    Do you remember what date this was written?

12  Q    If we could go to the first page again.  I don't believe

13  you dated the document, sir.

14  A    Okay.

15  Q    If we could go back to that page, my apologies.  And now

16  if we could go to the paragraph that begins "Our preliminary

17  evaluations."

18       Mr. Pulskamp, can you read that paragraph into the

19  record?

20  A    "Our preliminary evaluations of the unit is its condition

21  showed that Unit 1 could be restored to near new condition for

22  about $200 a KW."

23  Q    So you were aiming for near new condition, correct?

24  A    That's correct.

25  Q    And this unit was 30 years old at the time the project was

PULSKAMP- CROSS/ HIMMELHOCH          Vol. 8-1260

1  undertaken; isn't that correct?

2  A   Yes.

3  Q   So you were looking to take a 30-year old unit back to

4  near new condition; isn't that correct?

5  A   Yes.

6  Q   In fact, the first Life Extension project was performed on

7  Unit 3; isn't that correct?

8  A   That is correct.

9  Q   And when that work was completed, you used what you had

10 learned from Unit 3 to plan Unit 1 and 2, correct?

11 A   We learned from our experiences on 2 and 1, yes.

12 Q   But you used what you learned at Unit 3 to help with

13 Unit 2 and Unit 1?

14 A   Yes.

15 Q   And with respect to Beckjord Unit 2, the intention was to

16 return the unit again to its original operating capacity,

17 rating and efficiency; isn't that correct?

18 A   Yes, a like new...

19 Q   And to increase its availability to the system; isn't that

20 correct?

21 A   That was to restore availability, maintain availability.

22         MS. HIMMELHOCH:  Your Honor, at this time, I move the

23 admission of Exhibit 1559.  It's the annual report of CG&E for

24 the year 1986.  Cinergy has stipulated to its authenticity --

25         May I approach?

1          THE COURT:  Yes.

2          MS. HIMMELHOCH:  -- and nonhearsay status.

3          MR. GREEN:  Object to relevance, Your Honor.

4          MS. HIMMELHOCH:  There's a statement in here

5   regarding the expectations with respect to the Unit 2 Life

6   Extension.  It is on page CG&E 0222687 -- I'm sorry, 22687, my

7   apologies.

8          And if you're looking for it, it's in the second

9   column about midway down right where the hole-punch mark is.

10          MR. GREEN:  Your Honor, please, just one second.

11          I don't have any objection, Your Honor.

12          THE COURT:  The exhibit is admitted.

13     *(Plaintiffs' Exhibit 1559 was received in evidence.)*

14          MS. HIMMELHOCH:  May I approach the witness?

15          THE COURT:  You may.

16   BY MS. HIMMELHOCH:

17   Q   Mr. Pulskamp, I've handed you what's been admitted as

18   Exhibit 1559.  This is the annual report for CG&E in 1986;

19   isn't that correct?

20   A   That's correct.

21   Q   If you turn to the page with the Bates number ending 2687,

22   in the middle column, there's a paragraph that begins "A

23   program" in the second column.  Mr. Pulskamp, can you read

24   this annual report statement into the record, please, the

25   paragraph that begins, "A program"?

PULSKAMP- CROSS/ HIMMELHOCH          Vol. 8-1262

1  A   Yes, "A program to refurbish older generating units was

2  continued during 1986 when work began on a second unit at

3  Beckjord station.  The project is designed to return the unit

4  to its original capacity rating and efficiency, increasing its

5  available (sic) to the system.  Work includes" --

6  Q   Its availability to the system?

7  A   "Its availability to the system.  Work includes the

8  replacement of boiler tubing and selected turbine blading and

9  the installation of a skin casing on the boiler."

10 Q   And the expectation for Unit 1 was also to increase the --

11 or to achieve the levels of availability of a new unit, wasn't

12 it?

13 A   Yes.  The purpose was to maintain that availability of

14 those units.

15 Q   Had it been achieving the availability of a new unit prior

16 to the Life Extension project?

17 A   Could you repeat that question?

18 Q   Had Beckjord Unit 1 had the availability levels of a new

19 unit prior to the Life Extension project in the two years

20 immediately preceding?

21 A   Well, it was consistent with a new unit, yes.

22 Q   Even though it was 30 years old?

23 A   Yes.

24 Q   And even though Unit 1, the decision was being made

25 whether to retire or to life extend?

*PULSKAMP- CROSS/ HIMMELHOCH*          Vol. 8-1263

1  A   Well, you would have to look at that period of time -- one

2  of the things that happened on Unit 1 was we had to put

3  that -- a new rotor in because of the damage that had occurred

4  by one of our contractors.

5        So when you say "availability like a new unit," if you

6  take a unit out of service for two weeks to do scheduled

7  maintenance, that's five percent right there that it's

8  unavailable, two weeks out of 52.  So you take something out

9  of what is scheduled ten weeks for maintenance, that's

10 20 percent unavailability.  So it really depends on what time

11 frame you're looking at when you say is it like a new unit.

12 Q   Well, and the regulations require you to look at the two

13 years immediately preceding the project, do they not?

14 A   Yes, I believe they do.

15 Q   And you did not do that before you undertook this project;

16 isn't that correct?

17 A   We did not because our prediction was they weren't going

18 to increase emissions.  Any increase in emissions was because

19 of customer demand, which you could exclude those emissions

20 from the calculation and the prediction.

21 Q   When you say it was due to customer demand, are you

22 contending you could have met that demand even in the absence

23 of these Life Extension projects?

24 A   Yes.  I said that --

25 Q   And why do you say that?

1  A    Because they were good, well-built units.  They had hours

2  available to operate.

3  Q    Those hours, were they occurring at times when Cinergy was

4  trying to use the unit?  In other words, the hours that it had

5  available were hours that Cinergy had not called upon the unit

6  to operate; is that correct?

7  A    Yes, they could have been, but you're asking me to

8  speculate on something that didn't happen.

9  Q    Well, there wasn't a forced outage or evidence that the

10  unit was running -- well, you've testified that these were

11  hours available, correct?

12  A    That's correct.

13  Q    That means the unit was not running, correct?

14  A    There was periods of time when the unit were not running

15  or was running but wasn't fully loaded, too.

16  Q    Let's focus on the hours where it wasn't running.  It

17  wasn't running because Cinergy wasn't calling on it, correct?

18  A    It wasn't running because the dispatchers weren't calling

19  for it at the time.

20  Q    If we don't look at those hours but we only look at the

21  hours in which Cinergy was planning to use the unit, in other

22  words, when it had a forced outage, if we replace those hours,

23  wouldn't you increase the hours of operation of the unit?

24  A    If it was going to be called upon more?  Yes, we would

25  have increased the hours of operation.

1  Q   Well, let's take another issue on.  With respect to the

2  Beckjord condenser projects, condensers are a common cause of

3  boiler tube leaks, are they not?

4  A   When a condenser --

5  Q   Condensers are a common cause of outages?  My apologies.

6  The condenser is not in the boiler.  I recognize that.

7  Condensers are a common cause of unit availability, are they

8  not?

9  A   They can be.

10  Q   And the condensers at Units 5 and 6 had become frequent

11  causes of unavailability at Beckjord 5 and 6 before these

12  projects; isn't that correct?

13  A   I can't remember if that was the case.  With a condenser,

14  there's two sections of the condenser and you can isolate one

15  section and get into repair or take a derate on a unit without

16  taking the unit off.  It may have been just derates that the

17  condenser leaks were causing.

18  Q   But you don't know?

19  A   I'd have to go back and look through the data.

20  Q   And you have not done that?

21  A   I have not looked through all the data.

22  Q   So sitting here today, you can't testify whether or not

23  the condensers at Beckjord 5 and 6 were causing losses of

24  availability in the two years immediately preceding those

25  projects?

1  A    I haven't looked at that data in that way, no.

2  Q    So you can't say whether they were or not?

3  A    No, I can't say.

4  Q    If they were causing losses of availability, would

5  retubing the entire condenser reduce the unavailability losses

6  due to the condensers themselves?

7  A    If they were causing unavailability by retubing the

8  condenser, we would have restored that availability.

9  Q    Back to historical operating levels?

10  A    Yes, ma'am.

11  Q    And is there any reason to expect that the unit would be

12  called on less after these projects than before these

13  projects?

14  A    Could you repeat that question?

15  Q    Well, you had indicated that these units tended to fall in

16  particular places in the dispatch spectrum, if I can use that

17  phrase.  Is there any reason to believe that they would move

18  towards the less frequently used end of the spectrum after

19  these projects?

20  A    No.  If they would have been used less as well as if they

21  would have been used more, it all depends on how our

22  dispatchers dispatched them.  That depended on customer demand

23  and a whole lot of other factors.

24  Q    Isn't one of the factors that affects where you fall on

25  the dispatch spectrum the forced outage rate of the unit?

 1  A    No, I don't believe that's part of it.

 2  Q    Well, the forced outage rate of the unit is the measure of

 3  availability, is it not?

 4  A    Forced outage rate contributes to the availability --

 5  unavailability.

 6  Q    So if you have a high forced outage rate, you have a lot

 7  of unavailability, correct?

 8  A    You could have a lot of unavailability if you have a high

 9  forced outage rate.

10  Q    And if you have a high forced outage rate, is that a unit

11  you're likely to call on more frequently than a unit that

12  doesn't have a high forced outage rate?

13  A    You're going to call on that unit based on if it's

14  available or not.  And then the cost and how it stacks up in

15  the stacking order.

16  Q    If it's available is determined by whether it has a forced

17  outage or not, or a planned outage, correct?

18  A    Well, certainly, yes, if it's forced off, it's unavailable

19  and not available to be dispatched.

20  Q    And if it's available more, it's more likely to be called

21  on?  It's just statistically more often available when they're

22  looking for a unit to dispatch, correct?

23  A    It depends.  You could have a unit that's 100 percent

24  available and never gets called upon.

25  Q    Right, but if you have a unit that was 60 percent

1  available and became 65 percent available, there's a greater

2  chance that it would be called upon because more of the times

3  they're looking for a unit to dispatch, that unit is available

4  to be dispatched?

5  A    I don't agree.  It depends on where it comes in the

6  stacking orders.

7  Q    But there are -- there are -- but a more available unit

8  can be run more, correct?

9  A    If it's called for.  If there's demand for it, if the

10  dispatchers need it.  And it can be 100 percent.  Today we

11  have combustion turbines that sit there and have 100 percent

12  availability and are never called on because they're not

13  needed.  So just because it's high availability doesn't mean

14  it's going to run more.

15  Q    Right, but combustion turbines are not coal-fired boilers,

16  correct?

17  A    No, they're not.

18  Q    You indicated coal-fired boilers tend to be the first in

19  line to dispatch; isn't that correct?

20  A    Certain coal-fired boilers.  We have coal-fired boilers

21  that are almost considered peaking units, too, that aren't

22  called on very often.

23  Q    Are any of the units at issue in this case peaking units?

24  A    I would put Miami Fort 5 at the edge between a peaking

25  unit and a cycling unit.

PULSKAMP– CROSS/ HIMMELHOCH          Vol. 8–1269

1  Q    But none of the others would even be close to a peaking

2  unit; isn't that correct?

3  A    Well, it's kind of how you –– where you want to draw the

4  line on a peaking unit, but most of our coal–fired units are

5  running during the week and maybe shut down on the weekends.

6  Q    And that would include Wabash River, Gallagher and Gibson?

7  A    Yes.

8  Q    And Beckjord 1 through 6?

9  A    Yes.

10  Q    And Miami Fort 5 is a peaking unit, but it can have forced

11  outages when they're trying to run it during peak periods,

12  can't it?

13  A    It could, yes.

14  Q    And if you reduce the number of forced outages that occur

15  during peak periods, they will be able to run that unit during

16  more peak periods; isn't that correct?

17  A    If they needed it during those peak periods.

18  Q    You did not examine –– have you examined –– strike that.

19  I guess I can't say that.  You're the only one that can say

20  that, Your Honor.  I apologize.

21        Let's turn to the Gallagher pulverizer for a few

22  minutes.  How often –– strike that.

23        Do you disagree that Cinergy expected an increase in

24  availability of the units as a result of the pulverizer

25  replacements?

PULSKAMP- CROSS/ HIMMELHOCH          Vol. 8-1270

1  A   Say that -- could you repeat that?

2  Q   Do you disagree that Cinergy expected an increase in the

3  availability of Gallagher Units 1 and 3 as a result of the

4  pulverizer projects?

5  A   We did not expect an increase in availability of the units

6  as a result of the pulverizer projects.

7  Q   If we could please turn to Exhibit 651.  This has

8  previously been admitted, Your Honor.  May I approach the

9  witness?

10         THE COURT:  Yes.

11         MS. HIMMELHOCH:  Would you like an extra copy, Your

12  Honor?

13         THE COURT:  No.

14  BY MS. HIMMELHOCH:

15  Q   If we could call up the cover page, please.  Thank you.

16         Mr. Pulskamp, do you recognize this document?

17  A   Yes.

18  Q   What is it?

19  A   This is a report on the pulverizer project at Gallagher

20  station.

21  Q   And this is a study of opportunity -- or the costs and

22  benefits of replacing the pulverizers including the

23  pulverizers at Gallagher 1 and 2 -- Gallagher 1 and 3?

24  A   That is correct.

25  Q   Included in the study is an analysis of the economics of

1  this choice, isn't there?

2  A   Yes, I believe so.

3  Q   And if you turn to –– it's fairly deep in the document ––

4  page No. GAL014482, the top of the page says "Gallagher

5  Generating Station, Profitability Analysis, Pulverizer

6  Replacement, Model Assumptions."

7          Mr. Pulskamp, this is a discussion of the assumptions

8  that were put into the model that determined the economic

9  cost/benefit analysis; isn't that correct?

10 A   Yes, it is.

11 Q   And if you look at paragraph little D towards the bottom

12 of the page there, it says, "The current pulverizer system

13 experiences significant derates due to fuel–related problems.

14 A review of the past 15 years of GADS data indicates an

15 average loss of 1.8 percent EFOR due to these problems."  An

16 "EFOR" is an abbreviation for "Equivalent Forced Outage Rate,"

17 isn't that correct?

18 A   That's correct.

19 Q   "The new pulverizer system is projected to add only

20 .5 percent to the EFOR; and therefore, a reduction of 1.3

21 percent in the EFOR can be reasonably expected."  In other

22 words, they're saying you can reasonably expect that forced

23 outage rates will decrease by 1.3 percent; isn't that correct?

24 A   It's saying the equivalent forced outage rate would

25 decrease, and there's a difference between forced outage rate

1  and equivalent forced outage rate.

2  Q   And the difference is that this takes into account the

3  deratings.  It converts the deratings to full power hours,

4  correct?

5  A   That's correct.

6  Q   And so it's saying by eliminating both forced outages and

7  derates, you should see an increase in availability; isn't

8  that what this says?

9  A   Well, I don't see any words in here about increase in

10  availability, and --

11        MR. GREEN:  Your Honor, he wasn't finished.

12  Q   I'm sorry.  Go ahead.

13  A   What it's saying is that the pulverizers are going to

14  eliminate some of the causes of derates in the unit because

15  the EFOR is going to go down.  EFOR is equivalent forced

16  outage rate.

17        So as I mentioned earlier, there were times when we

18  processed wet coal that we would lose 7 megawatts or so of

19  capability.  And that's all this is talking about, I believe,

20  is that we would get rid of that derate.

21  Q   Is 7 megawatts equivalent to 1.1 percent EFOR?

22  A   I don't know.  It depends on the number of hours that it

23  happens.

24  Q   And you don't know for sure that he's referring to the 7

25  megawatts here?

*PULSKAMP– CROSS/ HIMMELHOCH*        Vol. 8–1273

1  A    I believe is what it's referring to.

2  Q    Why do you believe that?

3  A    Because that's the only thing it would have referred to.

4  That's the derates that we had.  The forced outages were being

5  caused by derates.

6  Q    There were no forced outages due to the pulverizer in your

7  view?

8  A    Well, there could have been other forced outages by the

9  pulverizers, but the intermittent derates was a predominant

10  problem with those pulverizers.

11  Q    And they expected to eliminate those derates?

12  A    Yes.

13  Q    And that would increase the availability of the unit,

14  would it not?

15  A    That would increase the equivalent availability, restore

16  the availability back to that level of availability that we

17  had.

18  Q    And that level of availability had not been achieved in

19  the two years prior to the project, correct?

20  A    I don't recall.

21  Q    And it hadn't been achieved in any of the five years prior

22  to this project; isn't that correct?

23  A    I don't recall.

24  Q    You don't know one way or the other?

25  A    I don't.

1  Q   You don't know anything about the condenser replacement at

2  Gallagher Unit 2; is that correct?

3  A   I don't recall the condenser replacement at Gallagher 2.

4  Q   And you're not familiar with the projects that were

5  undertaken at Wabash River, correct?

6  A   Not generally.  They were done before PSI merged with

7  CG&E.

8  Q   Now, the project at Miami Fort Unit 5, do you recall that

9  project?

10 A   Yes, I do.

11 Q   That was necessary because the tubes were causing forced

12 outages; isn't that correct?

13 A   Well, there was two reasons for that project.  The tubes

14 were failing, but I think more importantly, the reason we

15 replaced those tubes is because it was a safety concern.  The

16 tubes were failing; and as they failed, they would blow out

17 outside the boiler, not inside.

18         They were the lower slopes, and they would direct

19 steam outside the boiler into areas where our employees pass

20 through.  In fact, on the design of Miami Fort 5, our

21 employees, to get to the control room, had to go past the

22 Unit 5 boiler.  So we didn't want to take the chance of safety

23 of our own employees.

24 Q   But there was also an expectation that tube leaks in that

25 area would decrease post-project, correct?

1  A   Well, yes, by eliminating -- by replacing the components,

2  we would hope that we would eliminate at least those types of

3  tube leaks that were blowing out.

4  Q   And how many hours of equivalent availability were lost as

5  a result of tube leaks in these areas in the two years prior

6  to the project?

7  A   I don't recall.

8  Q   Do you know how many hours of availability were lost in

9  any two-year period in the five years preceding the project?

10  A   No, but I would say it was very minimal.

11  Q   Why do you say that?

12  A   Because the unit was very seldom called upon.

13  Q   But it was called upon during peak periods, correct?

14  A   It could have been called upon in peak periods, but that

15  might have been very infrequently.  It only takes one of those

16  times for a tube to blow and hurt someone.  So that was our

17  primary reason for replacement of those tubes.

18  Q   And I'm not asking about that.  I'm asking about the

19  expectation as a result of the replacement of the tubes.

20       Now, the forced outages that occurred at Miami Fort

21  prior to this project were -- occurred while they were trying

22  to run the unit, correct?

23  A   Yes.  They probably would have, yes.

24  Q   And you don't know the quantity of those tube leaks?

25  A   I don't.

*PULSKAMP– CROSS/ HIMMELHOCH*          Vol. 8–1276

1  Q   And you would agree, would you not, that the quantity of

2  tube leaks would be expected to at least substantially reduce

3  in the two years immediately following the project, would you

4  not?

5  A   I would expect them ––

6       MR. GREEN:  Object to the form of the question.  Are

7  you referring to the units –– is counsel referring to the

8  units or to the component?

9       MS. HIMMELHOCH:  Yes, I'm referring to the unit.

10  Q   You would expect –– the forced outages due to tube leaks

11  in the component that was replaced would decrease or disappear

12  in the two years immediately following the project; isn't that

13  correct?

14  A   No, not necessarily, not as it related just to that

15  component.  There were other components that would have caused

16  unavailability of the unit.

17  Q   Right, and I'll get to that.  But my question is forced

18  outages due to this component would decrease or disappear in

19  the two years immediately following the project?

20  A   It could decrease, yes.

21  Q   And are you aware of any other components or combination

22  of components that were expected to increase outages in an

23  amount equivalent to the availability recovered as a result of

24  this component replacement project?

25  A   It could have been any of the other components on that

*PULSKAMP- CROSS/ HIMMELHOCH*        Vol. 8-1277

1  unit.

2  Q    Let me ask you again.  Are you aware of any specific

3  components that Cinergy had identified, alone or in

4  combination, that would offset the increased availability

5  achieved as a result of replacing the component?

6  A    I'm not aware specifically of anything we would have

7  identified that would have lost any of that.  That's not the

8  type of calculation that we would have done.

9  Q    Are you aware that that's the type of calculation that's

10  required by the rules?

11          MR. GREEN:  Objection, Your Honor.

12          MS. HIMMELHOCH:  He was asked to testify about his

13  understanding of the regulations.

14          MR. GREEN:  There is no specific calculation required

15  by the rules, so that is a misstatement.

16          MS. HIMMELHOCH:  That is not a misstatement, Your

17  Honor.  It is a statement of the principles set forth in the

18  regulations.

19          THE COURT:  There is no -- and I think we all agree

20  with this -- that there isn't specific calculation; isn't that

21  right?

22          MS. HIMMELHOCH:  Right, but there is a methodology

23  that requires a consideration --

24          THE COURT:  Let's talk about methodologies here

25  instead of calculation.

1          MS. HIMMELHOCH:  Will do.

2          MR. GREEN:  I'll also note that there's no

3    methodology specified in the calculation.

4          THE COURT:  Let's try a different question, then we

5    may get the same objection, but let's try a different

6    question.

7    BY MS. HIMMELHOCH:

8    Q   You are aware, are you not, that the methodology required

9    by the regulations requires a comparison of the two years

10   baseline to the two years immediately following the project,

11   correct?

12   A   Yes.

13   Q   And you're aware that you must consider both potentials

14   for increases in capacity and --

15         COURT REPORTER:  Please slow down --

16   BY MS. HIMMELHOCH:

17   Q   I apologize.

18         And you're aware that the regulations require you to

19   consider both increases in capacity or emissions rate and

20   increases in hours of operation, are you not?

21   A   Yes, but I'm also aware that if a project is -- or if

22   emissions are going to increase because of customer demand,

23   then you can exclude those emissions from your prediction.

24   Q   Can you exclude any emissions related to demand?  Is that

25   your understanding of the regulations?

PULSKAMP— CROSS/ HIMMELHOCH          Vol. 8-1279

1  A    That's my understanding.  Any emissions related to

2  customer demand.

3  Q    Whether or not they had any connection to the project?

4  A    That's my understanding.

5  Q    And if your understanding of the regulations is incorrect,

6  then your assumption that there wasn't an emissions increase

7  is incorrect as well, isn't that correct?

8        MR. GREEN:  Objection, argumentative.

9        THE COURT:  It is.

10        MS. HIMMELHOCH:  I'll move on, Your Honor.

11  BY MS. HIMMELHOCH:

12  Q    If we could have 1767, the graph, up again, please.  Could

13  you highlight the graph, please?

14        Now, on this theoretical curve, Beckjord Units 1, 2

15  and 3 were 30 years old at the time of the Life Extensions; is

16  that correct?

17  A    That's correct, about --

18  Q    I'm sorry.

19  A    About 30 years old.

20  Q    Can you place a green arrow where that would occur on this

21  curve?

22  A    (Witness complied.)  Well, my finger didn't point exactly

23  where I wanted it to.

24  Q    You're not the only one who's had that experience.  That

25  suffices.  I understand.

1        The engineers who described the components being

2   replaced during the Beckjord Life Extensions described several

3   of the components as being at the end of their useful life,

4   did they not?

5   A    That's correct.

6   Q    And if major components are at the end of their useful

7   life, they cause outages, correct?

8   A    They could cause outages, yes.

9   Q    And in fact, Cinergy's experience was that components at

10   the end of their life will tend to cause increasing hours of

11   outage each year; isn't that correct?

12   A    Yes, they could cause increasing hours.

13   Q    And, in fact, there was a concern about whether Gallagher

14   Station would even be viable in the 1990s if no component

15   replacements were done; isn't that correct?

16   A    I'm not familiar with the Gallagher Life Extension outage.

17   Q    And you've not reviewed the Gallagher Life Extension

18   Study?

19   A    No.

20   Q    In fact, the goal of Life Extension at Beckjord Units 1, 2

21   and 3 was to restore the units to a condition where the outage

22   rates were much more like a new unit than an older unit; isn't

23   that right?

24   A    Absolutely.  What we were trying to do is catch this curve

25   and flatten it out before it started going up so that we were

1  able to maintain that availability over the long term.  That's

2  exactly what we did.

3  Q    But the availability of a new unit would be over here,

4  would it not (indicating)?  A like new unit would be at the

5  five-year mark which is below where it is at 30, is it not?

6  A    You know, this curve -- it's probably not real accurate.

7  It's just a demonstration-type curve.

8  Q    But do you dispute that typically a five-year old unit

9  will have a lower forced outage rate than a 30-year old unit?

10 A    Will you repeat the question?

11 Q    Do you dispute that typically, a five-year old coal-fired

12 boiler will have a lower forced outage rate than a 30-year

13 coal-fired boiler?

14 A    No, not necessarily.  It depends on how well maintained

15 it's been.

16 Q    But you intended to bring the Beckjord units back to

17 like-new condition?

18 A    What we intended to do is keep it at like-new condition

19 and --

20 Q    And the -- but the document --

21 A    Before this curve goes off on us.

22 Q    My apologies.  Sometimes I don't hear very well.  I do not

23 intend to cut you off.  So if I do, tell me and I will stop.

24 A    Okay.

25 Q    The documents referred to restoring the units to like-new

*PULSKAMP- CROSS/ HIMMELHOCH*        Vol. 8-1282

1 availability; isn't that correct?

2 A    I used those words, yes.

3 Q    Now, when a unit is on reserve shutdown, it's reported as

4 available; is that correct?

5        It's reported in GADS as available?

6 A    Would you repeat the question?

7 Q    When a unit is placed in reserve shutdown, it's reported

8 as available in GADS; is that not correct?

9 A    Yes.  It would be reported in GADS as in reserve shutdown.

10 However, if we would take the unit apart, do something when it

11 was in reserve shutdown, we would change that over to a

12 scheduled outage.

13 Q    Did you always do that?

14 A    Yeah.  Any time the unit -- any time we work on a unit and

15 we do something to make it not available, we take it out of

16 reserve shutdown and make it unavailable.

17 Q    Have you reviewed the GADS data for the Beckjord units to

18 determine whether, in fact, when work was performed during a

19 reserve shutdown the -- that was reported to GADS?

20 A    I haven't personally reviewed that information, no.

21 Q    Were you responsible for reporting to GADS during the time

22 period leading up to the Beckjord Life Extension projects?

23 A    No, I would not have been responsible for reporting that

24 information.

25 Q    So you don't have any personal knowledge as to how work

1  done during a reserve shutdown was reported to GADS?

2  A   I have a general knowledge on how it was done then.   I

3  know how it's done today.

4  Q   But only a general knowledge as to the past?

5  A   Yes.

6  Q   Are you familiar with an individual named Mr. Gendreau?

7  A   Yes, somewhat.

8  Q   Who is he?

9  A   I think he was one of the expert witnesses.

10      MR. GREEN:  Wait a minute, Your Honor.  I object.  I

11  would like to know where this is headed, if I may.

12      THE COURT:  Yes.

13      MS. HIMMELHOCH:  Mr. Pulskamp has testified ––

14      MR. GREEN:  Can we discuss this at the bench?

15      THE COURT:  Yes.

16      MS. HIMMELHOCH:  Sure.

17   *(A bench conference was held on the record.)*

18      MS. HIMMELHOCH:  Mr. Pulskamp has testified that

19  problems and components such as the ones replaced in these

20  projects would not result in unit unavailability.

21  Mr. Gendreau has stated the opposite in his expert report.  I

22  intend to use it to impeach Mr. Pulskamp's statements.

23      MR. GREEN:  Wait a minute.  First of all, that's not

24  what this witness has said.  He has not said that a project

25  will –– I may be –– go ahead.  What did you say was your first

1  point?

2       MS. HIMMELHOCH:  He has stated that component

3  replacements cannot affect the availability of the unit.

4  Mr. Gendreau has stated in his expert report that problems in

5  components such as these affect unit availability.  That is

6  contrary to Mr. Pulskamp's testimony.

7       MR. GREEN:  I lost my point.  He does not say that

8  these projects do not affect unit availability.  He says that

9  when the unit goes down, availability drops; and when you do

10  the project, you increase availability and restore it to its

11  historical levels.  So he doesn't say that these projects

12  don't impact availability.  He said that over and over again.

13  And it would be improper, I think, to take --

14       THE COURT:  Stop right there so you don't have to get

15  any further.  Why isn't that what he said?  I thought he said

16  that, too.

17       MS. HIMMELHOCH:  Maybe I just didn't see I made my

18  point yet.

19       THE COURT:  Okay.

20    *(End of bench conference.)*

21                   *(In open court)*

22  BY MS. HIMMELHOCH:

23  Q   Now, Mr. Pulskamp, you said that Cinergy spent between 15

24  and $18 million on each of the Life Extensions at Beckjords 1,

25  2 and 3, correct?

PULSKAMP- CROSS/ HIMMELHOCH        Vol. 8-1285

1  A    That's correct.

2  Q    With that money, Cinergy intended to run the units more,

3  correct?

4  A    No.  With that money, we intended to make those units more

5  reliable.  If we intended to run them more, it was because of

6  customer demand on the whole that we had in our generation.

7  Q    But you made them more reliable so they could run when

8  called upon, correct?

9  A    We made them more reliable so they could run when called

10  upon, yes.

11  Q    And you took a 30-year old plant and made it like new?

12          MR. GREEN:  Objection.  We've been through this now

13  about three times.  I think this is just --

14          MS. HIMMELHOCH:  It's my final question, Your Honor.

15          THE COURT:  I was going to say, I think we're just

16  about done anyway.  Go ahead.

17  BY MS. HIMMELHOCH:

18  Q    You took a 30-year old plant and restored it to like new

19  capacity and availability, correct?

20  A    Yes.

21  Q    And you did that for 1, 2 and 3, correct?

22  A    That's correct.

23          MS. HIMMELHOCH:  Thank you.  No further questions.

24          THE COURT:  Redirect?

25          MR. GREEN:  Yes, sir.

1              **REDIRECT EXAMINATION**

2  BY MR. GREEN:

3  Q    Just a couple of points, if I may, Mr. Pulskamp.  Do you

4  remember the graph that Ms. Himmelhoch had on the screen here

5  just a moment ago?

6  A    Yes.

7  Q    Sir, if you indeed, as she suggests, have increasing

8  outages as a unit gets older, would that increase the

9  availability of that unit or decrease the availability of that

10 unit?

11 A    It would decrease the availability, sir.

12 Q    When you attempt to restore a generating unit to like-new

13 condition, are you achieving 100 percent availability?

14 A    Absolutely not.  That's impossible.

15 Q    Can you ever achieve 100 percent availability?

16 A    No, you cannot.

17 Q    Why can't you?

18 A    Well, availability includes not just forced outages.  It

19 includes scheduled outages.  So each time you remove a unit

20 from service, that's an impact on availability.  So if -- the

21 only way you would have 100 percent availability is if you

22 never touched it, never used it.

23 Q    When you did the Life Extension projects at Beckjord 1, 2

24 and 3, did you have an expectation that there would never be

25 another forced outage in the history of those units for the

 1  next 30 years?

 2  A   No, that would --

 3      MS. HIMMELHOCH:  Objection, relevance, Your Honor.

 4  The standard is the two years immediately following the

 5  project.

 6      MR. GREEN:  All right.  I'll rephrase the question

 7  then.

 8  Q   Did you have an expectation that there would never be any

 9  other outage in the two years following the Life Extension

10  project?

11  A   No, sir.  That would be impractical.

12  Q   Now, let me show you -- go back and show you -- if I may

13  have the chart.

14      Here's a page out of the GADS exhibit on Gallagher 3

15  that I was showing you.  I want to just have you look at --

16      THE COURT:  Could we have that exhibit number again

17  and give us a page number if you can.

18      MR. GREEN:  I'm sorry, sir.  Defendants' 2135 and it

19  is the page that starts at the top with a date of 6-10 of '96;

20  and the last entry is dated 2-19-97.

21  BY MR. GREEN:

22  Q   And I want to direct your attention, Mr. Pulskamp, to this

23  entry on 2-19-97, "install new liner in B stack, 2,721.28

24  hours."  Do you see that, sir?

25  A   Yes, sir.

*PULSKAMP - REDIRECT / GREEN*        Vol. 8-1288

1  Q   Then below it, we have some zeros.  Do those zeros

2  indicate to you that those items that are listed in those

3  lines below the "new liner" entry caused no outages

4  whatsoever?

5  A   No.

6  Q   What -- how do you interpret and read that GADS page with

7  those zeros under that 2,721.28 hour outage?

8  A   Well, there was one outage.  That's where the 2,721 hours

9  are.  All these other things are problems that we've worked on

10 and corrected during that single outage.  You didn't break the

11 hours down to each one of those.  You collected and rolled it

12 all up into one.

13 Q   So that's how GADS handles these zeros; is that correct?

14 A   Yes, sir.

15 Q   Now, let me just ask this -- just a couple more questions

16 and I'm outta here.

17         "Reserve shutdown," do you see the references to

18 "reserve shutdown"?

19 A   Yes, sir.

20 Q   Can a unit be put into forced outage after it's on reserve

21 shutdown?  You may have been discussing this with

22 Ms. Himmelhoch right at the end of your testimony.

23 A   Yes.

24 Q   So it can go into reserve shutdown and then it can become

25 a forced outage; is that right?

*PULSKAMP – REDIRECT / GREEN*          Vol. 8-1289

1  A   That's correct.  What will happen, a unit may be in

2  reserve shutdown and then we notice something that needs to be

3  fixed, needs to be repaired.  Well, we can't make that unit

4  available to the dispatcher.  So we put it into a scheduled

5  outage.  It's another form of outage until we fix that

6  problem.  Then it returns either to reserve shutdown or we

7  start the unit back up.

8  Q   So that situation that you just described, sir, does that

9  produce a situation where the unit is both unavailable and not

10 needed?

11 A   Absolutely.

12         MR. GREEN:  Nothing further, Your Honor.

13         MS. HIMMELHOCH:  No recross, Your Honor.

14         THE COURT:  You may step down, sir.

15         Your next witness?

16         MR. HOPSON:  We're going to call Bob Batdorf.

17         MS. HIMMELHOCH:  Your Honor, before Mr. Batdorf comes

18 on the stand, there is one exhibit -- it's the first one in

19 your notebook to which we object.  We would like to be heard.

20         THE COURT:  Which one is that?  The first one in

21 the --

22         MS. HIMMELHOCH:  D0931.

23         THE COURT:  D0931?  Let me take a look.

24         MS. HIMMELHOCH:  I would like to approach unless you

25 think --

Vol. 8-1290

1          MR. HOPSON:  Why don't we try to let me lay a

2     foundation as a business record, Your Honor.

3          MS. HIMMELHOCH:  Your Honor, it's not a business --

4          THE COURT:  Why don't you just step up here and we'll

5     talk about it.

6     *(A bench conference was held on the record.)*

7          MS. HIMMELHOCH:  We don't object whether or not it's

8     a business record.  Our objection is it's an expense list just

9     like the ones you excluded in our motion in limine ruling.

10    When we asked Cinergy in a 30(b)6 to produce all evidence of

11    frequency in a unit -- in the industry, this was not produced

12    to us in the 30(b)(6) deposition.  We have not had an

13    opportunity to cross-examine the company and it is exactly

14    like the expense list that you excluded.  It simply identifies

15    projects.  It doesn't have any other information other than

16    the number of tubes replaced and the cost.

17         THE COURT:  What's the point of this?

18         MR. GREEN:  The point is simple.  He's going to

19    testify that one of the things they looked at when they were

20    getting ready to do these kinds of projects like Wabash River

21    projects was the experience of the people who were doing the

22    work, whether they were formula -- whether they had the

23    experience.

24         THE COURT:  You can do that without going through

25    this whole list of stuff.

Vol. 8–1291

1        MR. GREEN:  I wasn't going to go through the list of

2   stuff.  I was just going to use it as an example.

3        THE COURT:  I would have to sustain this objection.

4        MS. HIMMELHOCH:  There are other documents we object

5   to, but we'll deal with them as they come up.

6     *(End of bench conference.)*

7                          *(In open court)*

8        THE COURT:  Please step over here, and I'll swear you

9   in.  Right there will be fine.

10          **ROBERT BATDORF, DEFENDANTS' WITNESS, SWORN**

11        THE COURT:  There's a microphone there on your right.

12   Attach the smaller end towards the top of your tie, please.

13        You may inquire, sir.

14        MR. HOPSON:  Thank you, Your Honor.

15                     **DIRECT EXAMINATION**

16   BY MR. HOPSON:

17   Q   Could you please state your name for the record, sir?

18   A   Yes, sir.  My name is Robert Batdorf.

19   Q   Can you spell your last name for us?

20   A   Yes, sir, it's B-A-T-D-O-R-F.

21   Q   Are you currently employed, Mr. Batdorf?

22   A   No, sir, I am currently retired.

23   Q   Where did you work before you retired?

24   A   Immediately prior to my retirement, I worked for the

25   Cinergy Company.  Prior to the formation of Cinergy, I worked

BATDORF - DIRECT/HOPSON          Vol. 8-1292

1  for PSI Energy, and prior to that, it was known as Public

2  Service Company of Indiana.

3  Q   Let's go back to the beginning then and start there.  How

4  did you come to be employed at Cinergy or PSI?

5  A   Yes, sir.  After graduating from Williamson, I had the

6  good fortune of being extended the job offer by Public Service

7  Company of Indiana, and I was assigned to their traveling

8  maintenance workforce.

9  Q   So we don't have to keep switching names and getting me

10 confused, from now on I'm going to refer to all the companies

11 you worked for as "Cinergy" unless you object.  Is that okay?

12 A   Yes, sir, that's fine.

13 Q   For how many years in total did you work for Cinergy?

14 A   I worked for Cinergy for 34 years.

15 Q   Were you employed by Cinergy throughout the time period at

16 issue in this case from 1985 to 2001?

17 A   Yes, sir, I was.  I was employed for that entire period.

18 Q   Let me just go back just very briefly and ask you to tell

19 the ladies and gentlemen of the jury a little bit about your

20 background and education.

21 A   Yes, sir, I -- after high school, I attended Williamson

22 Trade & Technical School.  I graduated with a diploma in

23 mechanical technology.

24 Q   Where is Williamson Trade & Technical School located?

25 A   It's located in Media, Pennsylvania.

BATDORF – DIRECT/HOPSON                Vol. 8–1293

1  Q   Just tell us, if you will, Mr. Batdorf, what was the

2  course of study at Williamson?

3  A   It was mechanical technology.

4  Q   Again, what year did you graduate?

5  A   I graduated in June of 1971.

6  Q   What was your first job then with Cinergy or PSI upon

7  graduation?

8  A   After graduation, I started with the Cinergy Company as a

9  station engineering assistant working for the traveling

10 mechanic workforce.  We traveled the entire state of Indiana

11 working at our generating stations, performing turbine

12 generator inspections and also performing other large

13 maintenance projects.

14 Q   Did you do the component replacements at various boilers

15 and units during your time with the traveling workforce?

16 A   Yes, sir, I did.  As we performed the turbine generator

17 inspections and overhauls, we replaced components in the

18 turbines.  We replaced turbine blades, turbine blade droves,

19 we replaced diaphragms which are the --

20      COURT REPORTER:  Please slow down.

21 Q   You've got to slow down a little bit.

22 A   I'm sorry.  We replaced components in the turbines.  We

23 replaced turbine blades, turbine blade droves.  We replaced

24 diaphragms, which are stationary blade droves.  We replaced

25 the nozzle block which is the stationary blade droves where

1  the steam first enters into a turbine.  We replaced bearings.

2  We replaced expansion joints.

3       And then when we worked on the balance of plant

4  equipment.  We replaced components in burners.  We replaced

5  components in pumps, compressors, traveling screens, and a lot

6  of other plant equipment.

7  Q   Let me ask you, how long did you remain in that job?

8  A   I believe I worked for traveling maintenance for about a

9  year, year and a half.

10 Q   What was your next job then at Cinergy?

11 A   I then transferred to the Dresser generating station, also

12 working there as a station engineering assistant.

13 Q   Did you get another transfer in 1975?

14 A   Yes, sir.  I was transferred to the Gallagher generating

15 station where I also began my employment there as a station

16 engineering assistant.

17 Q   Again, can you tell us just briefly, what's the job

18 description?  What did you do as a station engineering

19 assistant?

20 A   Yes, sir.  As a station engineering assistant, I would

21 assist employees in the plant, both operations and maintenance

22 employees, and trouble-shooting equipment problems, process

23 problems; also planned maintenance projects and had some

24 administrative responsibilities such as performance reporting

25 and budget preparation.

BATDORF - DIRECT/HOPSON          Vol. 8-1295

1  Q   Did you, while you were at Gallagher, receive a series of
2  promotions?
3  A   Yes, sir, I did.  I was promoted from the station
4  engineering assistant position to engineer to production
5  engineer, then to mechanical maintenance supervisor and then
6  to the maintenance superintendent's position.
7  Q   Again, without going into detail in every position, can
8  you just give us a sense of what your job responsibilities
9  were in the positions you just described for us?
10 A   Yes, sir, I can.  Again, in each of the engineering roles,
11 I assisted employees at the station with the equipment and
12 process problems, as well as the planning of the maintenance
13 projects.  When I was promoted into the supervisor's position,
14 I supervised a group of our own internal employees in
15 maintaining the station equipment.
16        Then when I was promoted to the maintenance
17 superintendent's position, I had ultimate responsibility for
18 all of the maintenance at the station; mechanical, electrical,
19 instrument and controls.  This included both planning for the
20 daily, weekly, monthly, annual and long-term maintenance needs
21 of the station.
22 Q   Did there come a time, sir, when you were promoted to
23 station manager?
24 A   Yes, sir, there was.  I was promoted to the station
25 manager's position in 1983 August.

BATDORF – DIRECT/HOPSON          Vol. 8–1296

1  Q    What station was that at?

2  A    That was at the Cayuga generating station.

3  Q    Where else have you worked, then, subsequent to that as a

4  station manager?

5  A    Yes.  After being the manager of the Cayuga generating

6  station, I also became the manager of the Wabash River

7  generating station, and then later to the manager at the

8  Gibson generating station where I then retired.

9  Q    Again, we've done this before, can you give the ladies and

10 gentlemen of the jury just a flavor of what your job

11 responsibilities were as the station manager at the various

12 stations in which you worked?

13 A    Yes, sir, I can.  I had the good fortune at each of the

14 plants that I managed to work with a good group of employees.

15 I provided them guidance, leadership, direction and support.

16 When they had specific needs that they had, I would support

17 them in that.

18        However, ultimately the responsibility for operations

19 of the station, maintenance of the station, and environmental

20 compliance rested with me as the station manager.  This

21 included the safe and efficient operation of the units.  It

22 included all of the maintenance that was performed on the

23 units, environmental compliance with our operating permits,

24 which included air permits, as well as NPDS permits, which

25 regulated the emissions from our ash ponds, and then also our

1  thermal operating permits which regulated the temperature that

2  we could discharge into the waterways.

3  Q   Do station managers have any responsibilities beyond the

4  specific station?

5  A   Yes, sir, we do.  We would meet periodically and discuss

6  operations issues, maintenance issues, safety issues,

7  budgeting issues, both O and M and capital.  And there were

8  periods of time when we were given special assignments as a

9  station manager.

10 Q   Have you seen, Mr. Batdorf, a list of the projects at

11 issue in the particular case we're talking about here?

12 A   Yes, sir, I have.

13 Q   Can you identify -- you don't need to do it by name, but

14 you certainly can identify which are Indiana and which are

15 Ohio projects; is that fair?

16 A   Yes, sir, I can.

17 Q   So I'm just going to refer to the Indiana projects and ask

18 you if you were familiar with the Indiana projects, the ones

19 at issue in this case, at the time they occurred and then in

20 the years leading up to them?

21 A   Yes, sir, I was, with the exception of the pulverizer,

22 which I understand Mr. Pulskamp testified to today.

23 Q   Why did you have less familiarity with the pulverizer

24 projects?

25 A   That was a project that was handled more at a corporate

BATDORF - DIRECT/HOPSON            Vol. 8-1298

1  level than us collectively as station managers.

2  Q   Were you involved -- let me make this simple, I hope.  If

3  I refer to the Indiana projects from now on, I'm going to

4  refer to all the Indiana projects in this case excluding the

5  pulverizers.  Is that okay?

6  A   Yes, sir.

7  Q   So focusing on the Indiana projects, were you involved at

8  the time the capital budgeting and general planning was done

9  for those projects?

10  A   Yes, sir, I was.

11  Q   Did you personally participate in meetings and discussions

12  relating to what we're calling the Indiana projects?

13  A   Yes, sir, I was.  As I said, we met periodically to

14  discuss those and other issues.

15  Q   When you say "we met periodically," who are you referring

16  to in that answer?

17  A   I'm referring to myself and the other station managers,

18  and then our direct report who was in charge of production at

19  that time.

20  Q   Was there also a more formal meeting that occurred on a

21  regular basis to discuss capital budget and large maintenance

22  projects?

23  A   Yes, sir, there was.  Those meetings were held on an

24  annual basis where we collectively got together as station

25  managers to discuss, review, evaluate and make

1  recommendations.

2  Q    And again, without reference to specific documents because

3  I know there are many, but are you generally familiar with the

4  type of cost/benefit and cost evaluation documents in the

5  process of evaluating these types of projects?

6  A    Yes, sir, I am.  Those kinds of evaluations were performed

7  on each of the economic projects that were being considered by

8  the managers to be done at the respective stations.

9  Q    Are all the projects we're talking about the Indiana

10  projects capital budget projects?

11  A    Yes, sir, they are.  We have both annualized maintenance

12  projects and we have capitalized maintenance projects.  It's

13  just a matter of an accounting function of how you do that and

14  why you do that.

15        There are some maintenance projects that we recover

16  our costs from our ratepayer in the year in which they occur.

17  There are other projects such has the capital projects, those

18  in question in this case --

19        MS. HIMMELHOCH:  Objection, Your Honor.  Has the

20  witness been cautioned about what he can testify regarding a

21  ruling?

22        THE COURT:  I expect he has.

23        MR. HOPSON:  He has.  I think that was just a

24  spontaneous utterance, Your Honor.

25  Q    I'm not going to call upon you to answer any questions

BATDORF - DIRECT/HOPSON            Vol. 8-1300

1  about rate making.  So I just want you to be careful,

2  Mr. Batdorf, that in the course of just explaining something

3  like capital budgeting, you don't make reference to

4  rate-paying or rate processing, okay?

5  A   Yes, sir.

6  Q   With that in mind, had you concluded your answer?

7  A   Yes.  We just followed the established Government

8  guidelines on how to account for those budgets.

9  Q   Let me turn back to your responsibilities as a station

10 manager for a moment.  Let me focus on Gibson where you

11 retired.  Can you tell us approximately how many people were

12 working at the Gibson station when you were the station

13 manager there?

14 A   Yes, sir.  We had approximately 340 employees.  Some of

15 those were direct reports to me, with the other employees then

16 reporting to those people.

17 Q   You earlier mentioned environmental responsibility.  Was

18 that also something that was on your plate as the station

19 manager?

20 A   Yes, sir, I was.  As the station manager, I had ultimate

21 responsibility for compliance with our air permits, our NPDS

22 permits, and our thermal permits.

23 Q   Let me show you what's been marked as Defendants'

24 Exhibit 1787.

25         MS. HIMMELHOCH:  Objection, Your Honor, relevance.

BATDORF – DIRECT/HOPSON          Vol. 8–1301

1      THE COURT:  And this is relevant because?

2      MR. HOPSON:  We're just going to step through it,

3  Your Honor, as we did with Mr. Pulskamp.  We're not going to

4  dwell on this.  We're not going to talk about specific limits

5  or so forth.  It just lays foundation to talk generally about

6  these issues.  We can do it without the document if the Court

7  prefers.

8      THE COURT:  We have already –– we already know that

9  there are certain state permits that Cinergy gets and that

10 those state permits don't have anything to do with these ––

11 with the enforcement of the matter before us.  We know that,

12 right?  So I don't know why we need to do this.

13     MR. HOPSON:  Well, I don't want to be cumulative or

14 redundant.  If you think Mr. Pulskamp covered that adequately,

15 I'll just talk about something else.

16     THE COURT:  I think he did.  So let's go to something

17 else.

18 BY MR. HOPSON:

19 Q   Let's focus back again on the projects in this case that

20 we talked about as the Indiana projects.  Besides the projects

21 at issue in this case, can you tell us if Cinergy undertook

22 other large scale component replacement projects at coal-fired

23 units between, say, 1985 and 2001?

24 A   Yes, sir.  We've performed literally hundreds of component

25 replacement projects in that period of time.

BATDORF - DIRECT/HOPSON          Vol. 8-1302

1  Q    As a person who was involved in recommending or

2  greenlighting those projects, what was your general purpose in

3  recommending or promoting those types of projects?

4  A    The general purpose of recommending those kinds of

5  projects was to maintain the availability of the units at the

6  respective stations.

7  Q    Is that goal of maintaining the units -- the availability

8  of the units an important one to you?

9  A    Yes, sir.  It's a very important goal.  I mean, a

10  generating station exists to be available to produce energy

11  when our customers have a demand.  That's why we're there, to

12  maintain the units so they're in an available and reliable

13  state.

14  Q    Was it a challenge during your years to maintain the

15  availability of these units?

16  A    Yes, sir, it most certainly was.  When you look at the

17  size, you look at the complexity of the generating station,

18  and all the many pieces of equipment that you have that can

19  impact a unit, it was most certainly one of the more difficult

20  challenges that I had.

21  Q    When you're talking about maintaining the units or doing

22  maintenance, does that include work on the boiler component of

23  the unit?

24  A    Yes, sir, it does.  You can perform maintenance on the

25  boiler with it in service, but that maintenance is limited to

1  those components that are external to the boiler.  The only

2  time that you can do maintenance on the internal parts or the

3  parts that we deem to be the hot parts of the boiler is during

4  a outage.

5  Q   Between 1985 and 2001, if we focus on what we've

6  characterized as larger or longer-term maintenance projects,

7  when were those traditionally done on the boiler?

8  A   Yes, sir.  Those kind of large maintenance projects, much

9  like those in this case, and others, are performed during the

10 planned maintenance outage.

11 Q   Is there a schedule for planned maintenance outages?

12 A   Yes, sir, there is.

13 Q   Has it changed over the time period in this case?

14 A   Yes, sir.  Indiana law initially required utility boilers

15 to be removed from service on an annual basis so you could

16 perform a internal or certificate inspection.  In 1996, the

17 law was changed to allow those inspections to occur on a

18 two-year interval.

19 Q   When Indiana was inspecting these units either every two

20 years or every one year, what is their purpose?  What is their

21 interest in inspecting your boilers?

22 A   The whole purpose there is safety concerns.  They

23 recognize that utility boilers operate under extreme high

24 temperatures, high pressures.  Temperature inside the fire box

25 is 2,700 degrees in the furnace, 1,005 degrees steam

BATDORF – DIRECT/HOPSON          Vol. 8–1304

1  temperature.

2       Then depending on the unit, the pressure will be

3  anywhere from 3,600 pounds at Gibson to the 15– and

4  1,400–pound units elsewhere in our system.  So the state

5  required that a certificate inspection be performed either by

6  the state, an authorized inspector, or by an insurance

7  carrier; and the whole purpose there being is the unit safe to

8  operate for another one year or two-year period.

9  Q   When did the law change from every year to every two

10 years?

11 A   1996.

12 Q   Putting aside this planned outage work we've been

13 discussing –– and I know we understand this, but I want to

14 review it briefly.  What happens if you have an unexpected

15 problem within this boiler?

16 A   It depends on the magnitude of what the problem is.  If

17 we're referring to a tube leak which can occur with the unit

18 in service, it will depend on the location of the tube leak.

19 It will depend on the magnitude of how that leak is.  Very

20 often, if it's in a reheat section or a lower pressure section

21 of the unit, you can continue to operate that unit and take it

22 off at a later point in time.

23 Q   So it is possible to continue to run a boiler that's

24 suffering a leak in one of these tubes?  Is that what you're

25 saying?

BATDORF - DIRECT/HOPSON          Vol. 8-1305

1  A   Yes, sir.  I'm sure you've seen pictures.  These boilers

2  are ten stories high and there's miles and miles and miles of

3  tubes inside.  The mere fact that you have a leak in one or

4  several tubes does not necessarily stop that unit from

5  continuing to operate.

6  Q   Let me show you --

7          MS. HIMMELHOCH:  Where is this from?  Beckjord 5.  No

8  objection, Your Honor.

9          THE COURT:  Do we have it marked?

10          MR. HOPSON:  We're going to put a sticker on the

11  inside.  We had one on and it fell off.  It's hard to put

12  exhibit stickers on steel.  We tried to put one on and it fell

13  off.  They don't think of that when they make

14  exhibit stickers.

15  Q   The number again is 2169 for the record.  Will you tell us

16  what it is you're holding in your hand, Exhibit 2169?

17  A   Yes, sir.  This is a tube sample out of one of our

18  boilers.  It happens to be Beckjord Unit No. 5.  The whole

19  purpose is to show you the slag deposits that actually can

20  occur from the combustion process that will deposit itself

21  onto the tube.

22          That deposit has chlorides and other minerals and

23  chemicals in it.  It will cause what we call fire side

24  corrosion.  The other thing that is interesting to look at is

25  if you look at the cross section of the tube, you'll see here

1   at the top the nominal wall thickness of what it normally

2   would be; and you can see down here at the bottom it's

3   extremely thin.  If you look at the side of the tube, you will

4   see erosion, corrosion.  What this is, then it's just a mean

5   time to failure.  If that tube would remain in the boiler, at

6   some point due to loss of wall thickness, you would have a

7   failure.

8   Q   You referenced a term there -- I just want to make sure we

9   caught it -- you referenced the term "slag."  What is slag?

10  A   Slag is a deposit that is left over after burning coal.

11  The slag has certain characteristics, ash, fusion, temperature

12  and so forth that will cause it to want to adhere to surfaces.

13      When it adheres, it impacts the heat transfer of the

14  fire to the water or steam that's inside the tube.  We have

15  soot blowers that will actually traverse into the boiler

16  periodically to blow that slag and knock that slag off so

17  again you restore the capability for the heat transfer from

18  the fire to the steam or water.

19      MR. HOPSON:  Your Honor, if the Court doesn't mind,

20  this is a good time to break.  We're going to go into a little

21  subject here and a series of questions here that's relatively

22  lengthy.

23      THE COURT:  All right.  Step up here and we'll talk

24  about when we're going to be done so I can let these folks

25  know.

BATDORF - DIRECT/HOPSON          Vol. 8-1307

1    *A bench conference was held on the record.)*

2         THE COURT:  So we got a little further than we

3    thought?

4         MR. HOPSON:  I think I have about an hour left with

5    Mr. Batdorf.  Tom and I are going to confer overnight.  We

6    have a fourth witness from dispatch.  If he goes on, he's got

7    half hour, 45 minutes direct.

8         MS. HIMMELHOCH:  We do intend to call Mr. Adams, a

9    metal expert witness.

10        MR. HOPSON:  We want to be heard about that.

11        MS. HIMMELHOCH:  I think we want to talk about a

12   30-minute direct.

13        THE COURT:  I think we'll start Wednesday morning at

14   8 in the morning you think?  The later we get tomorrow, the

15   more chance we have of -- well, I don't know if they can

16   finish in a day anyway, but I think we'll give it to them

17   Wednesday morning.

18        MR. HOPSON:  Closing and jury instructions in a day?

19        THE COURT:  I think we'll start Wednesday morning

20   with closings.  That will give you all day tomorrow to fuss at

21   me about instructions.

22        MR. GREEN:  We want to fight about those.

23        THE COURT:  I know that you do.  We may burn up a few

24   calories for you tomorrow.

25        *(End of bench conference.)*

BATDORF – DIRECT/HOPSON          Vol. 8–1308

1              *(In open court)*

2         THE COURT:  All right, ladies and gentlemen.  I

3    wanted to be sure I could tell you this afternoon when we'll

4    be finished.  I think without question we'll start final

5    arguments Wednesday morning of this week.  So we've got more

6    evidence tomorrow.  We'll probably finish a little earlier

7    tomorrow but rather than take it up tomorrow, I'll send you on

8    home and then we'll start final arguments on Wednesday.  I

9    know you're disappointed.

10        MR. HOPSON:  We could stretch it out a little, Your

11   Honor, if you really want us to.

12        THE COURT:  You'll have to learn to live with it.  So

13   with that in mind, I'll see you in the morning at eight

14   o'clock.  Thank you.

15        COURT CLERK:  All rise.

16        This court stands aside in recess until 8 a.m.

17   tomorrow morning.

18     *(Jury out.)*

19     *(The proceedings concluded at 1:56 p.m.)*

20

21

22

23

24

25

BATDORF – DIRECT/HOPSON

1       CERTIFICATE OF REPORTER

2

3        I, Cathy Jones, certify that the foregoing is a true and

4   correct transcript of the proceedings in the above-entitled

5   matter.

6

7

8

9

10                          _____
                            CATHY JONES, RPR, FCRR
11                          OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25