1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
2                 INDIANAPOLIS DIVISION

3

   UNITED STATES OF AMERICA,          )
4          Plaintiff,                  )
                                       )
5  STATE OF NEW YORK, STATE OF         )1:99-cv-1693-LJM-JMS
   NEW JERSEY, STATE OF CONNECTICUT,   )
6  HOOSIER ENVIRONMENTAL COUNCIL       )
   and OHIO ENVIRONMENTAL              )
7  COUNCIL,                            )
           Plaintiff-Intervenors,      )Indianapolis, Indiana
8                                      )May 20, 2008
             -vs-                      )8:00 a.m.
9  CINERGY CORP., PSI ENERGY, INC.,    )Vol. 9
   and THE CINCINNATI GAS &            )
10 ELECTRIC COMPANY,                   )
           Defendants.                 )

11

12

13

14                      **BEFORE THE**
                **HONORABLE LARRY J. McKINNEY**

15

16          OFFICIAL REPORTER'S TRANSCRIPT OF

17                 TRIAL PROCEEDINGS

18

19

20 Court Reporter:    Cathy Easley Jones, RPR, FCRR
                      Official Court Reporter
21                    46 East Ohio Street, Room 291
                      Indianapolis, IN  46204

22

23

24        PROCEEDINGS TAKEN BY MACHINE SHORTHAND
25           COMPUTER-AIDED TRANSCRIPTION

Vol. 9-1310

# A P P E A R A N C E S

FOR THE PLAINTIFF:          Mr. Thomas Andrew Benson
                            Mr. James A. Lofton
                            Ms. Sarah Dale Himmelhoch
                            Mr. Phillip Brooks
                            Mr. Ignacio Arrazola
                            Ms. Danielle Rosengarten
                            U.S. DEPARTMENT OF JUSTICE
                            P.O. Box 7611
                            Ben Franklin Station
                            Washington, DC  20044


FOR PLAINTIFF-             Mr. R. Keith Guthrie
INTERVENORS:              ATTORNEY AT LAW
                            13242 South 600 East
                            Elizabethtown, IN  47232


FOR THE DEFENDANTS:        Mr. Mark D. Hopson
                            Mr. Thomas Charles Green
                            Ms. Kathryn B. Thomson
                            Ms. Meghan Delaney
                            Mr. Samuel B. Boxerman
                            Mr. Frank Volpe
                            Mr. Kosta Stojilkovic
                            SIDLEY AUSTIN LLP
                            1501 K Street, NW
                            Washington, DC  20005

Vol. 9-1311

1                   **INDEX OF WITNESSES**

2                                           **PAGE**

3  ROBERT BATDORF
   Direct Examination by Mr. Hopson .............1313
4  Cross-examination by Ms. Himmelhoch ..........1370

5


6  JOHN SWEZ
   Direct Examination by Mr. Volpe ..............1424
7  Cross-examination Mr. Brooks .................1447

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 9–1312

1                    **INDEX OF EXHIBITS**

2                                              **PAGE**

3  Defendants' Exhibit:

4  D1979 .......................................1428
   D1979J .....................................1428
5  1981 .......................................1359
   1989 .......................................1359
6  2115 .......................................1324
   2115 .......................................1328

7

8

9

10

11

12 Plaintiffs' Exhibit:

13 1072 .......................................1410
   1210 .......................................1418
14 1256 .......................................1416

15

16

17

18

19

20

21

22

23

24

25

Vol. 9-1313

1          *(In open court)*

2          THE COURT:  Good morning.  We're ready to proceed,

3  yes?

4          All right.  Let us proceed.

5     *(Jury in.)*

6          THE COURT:  Good morning, ladies and gentlemen.

7          Let us proceed.

8          MR. HOPSON:  Thank you, Your Honor.  Good morning.

9          **ROBERT BATDORF, DEFENDANT'S WITNESS, RESUMED**

10                        **DIRECT EXAMINATION**

11  BY MR. HOPSON:

12  Q   Good morning, Mr. Batdorf.  Welcome back.  When we left

13  off yesterday, you were talking about that boiler tube.  I was

14  asking you how it is that you can run a boiler that has a leak

15  in a tube like that?

16  A   You can run a boiler with a leak like this.  In this case,

17  this one doesn't have a leak.  It's a condition that if you

18  don't address it, it would result in a leak; but the way we

19  can run a unit with a leak is depending on the location and

20  the severity of that leak.

21          The leak can be in a reheat section of the boiler

22  which is a lower pressure than what the other sections of the

23  boiler are.  It could be a pinhole.  It could be a small

24  crack.  You need to understand these boilers are ten stories

25  high, and they've got miles and miles of tubes in it.

BATDORF - DIRECT/HOPSON          Vol. 9-1314

1          So the mere fact that you have a leak in one tube or

2     multiple tubes does not necessarily mean the unit has to come

3     off line.  Sometimes it does.

4          What we do if the leak is relatively minor, we'll

5     perform what they call a leakage test.  We'll fill our hot

6     water -- or hot wall to a certain level, we'll isolate it, and

7     we'll monitor over a period of time how much water we lose in

8     that unit.  That helps us know how severe the leak is and then

9     to make an informed decision on when to take it off.

10          In addition to that, we use diagnostic tools like leak

11     detection.  We go up there with a sonic gun and listen to the

12     sound, the decibels of that leak.  We'll check that

13     periodically.  If that decibel level changes, we know that the

14     leak is getting worse.

15          So there are times that we can, and then using that

16     information, we'll make an informed decision of when to remove

17     the unit from service for those repairs.

18          MR. HOPSON:  Your Honor, if we may, Mr. Batdorf would

19     like to publish the boiler tube he's using while he answers

20     these questions.

21          THE COURT:  That's fine.

22          MR. HOPSON:  If you hold it by the plastic, you won't

23     get your fingers dirty.

24     BY MR. HOPSON:

25     Q   While the jury is looking at the boiler tube you brought,

BATDORF - DIRECT/HOPSON          Vol. 9-1315

1  Mr. Batdorf, let me just ask you the question, if you do have

2  to shut down, as you just said in that last answer, and you

3  need to make a repair or replacement in a section of tube like

4  that or a section of tube three or six feet long, tell us

5  briefly how that would be done.

6  A   I'll try to summarize it because it is a long, drawn-out

7  process because the unit is in service.  You've got

8  temperatures inside the furnace 2,700 degrees. your steam

9  temperature's 1,005 degrees.

10          COURT REPORTER:  Could you please slow down.

11  A   I'm sorry, I apologize again.

12          What you have to do is you have to have a controlled

13  shutdown of that unit.  You actually will decrease load at a

14  certain ramp rate to remove that unit from service.

15          Once the unit's removed from service, you have to

16  drain the boiler of all the water to try to dissipate the

17  heat.  We will then force cool the unit by running our fans,

18  trying to take that temperature away so when our employees or

19  contractors get into the boiler, the temperatures will be such

20  that they can work on it.

21          Before they get into the boiler to make those repairs,

22  we have a hold card procedure.  It's an isolation procedure to

23  make sure that all energy sources are removed so it's safe for

24  the people performing that repair to do that.

25          Once that is done, then we actually get into the

BATDORF – DIRECT/HOPSON          Vol. 9–1316

1  boiler.  We'll locate the leak.  We'll cut out the defective

2  tubes, and many times because you do have a failure, there

3  will be other tubes adjacent to it that are damaged because

4  the high pressure steam or water that impinges upon those

5  tubes.  We'll cut out those tubes as well.  And then often, if

6  it's in a soot blower path, we use soot blowers to blow slag

7  off the boiler tubes.  It too can cause erosion in other

8  areas.

9        We'll inspect those other areas as well, and if we

10  find tubes that are thin, we'll replace them at that time to

11  avoid a future forced outage.  That's all completed with

12  certified welders.  We have welding procedures that are

13  qualified.

14        They then will often request a hydrostatic test.  That

15  is where you actually pump that component up under pressure to

16  make sure that there's no other leaks that you didn't see and

17  didn't find; and if there are, you go through that same

18  process of making those repairs.

19        We then report all through and in the clear.  We

20  report off on the boiler.  We return it to operations, and

21  they will begin the process of starting up and returning that

22  unit to service.

23  Q   How long does that process that you just described

24  generally take?

25  A   On an average, it would take three to four days for a

BATDORF – DIRECT/HOPSON          Vol. 9–1317

1  single tube leak; often longer if there's more.

2  Q    You talked about planned and unplanned outages; and I just

3  want to ask you, Mr. Batdorf, what advantage, if any, is there

4  to doing these type of tube replacements during a planned

5  outage as opposed to a unplanned or unscheduled outage?

6  A    Yes, sir.  The distinct advantage is it's, first of all,

7  the most economical way to do that.  During a forced outage,

8  you're just getting into the boiler, cutting out a single tube

9  or several tubes that are damaged; whereas during a planned

10  outage, you're taking advantage of that larger window to

11  replace more tubes, and as in this case, components in that

12  boiler.

13  Q    Let me ask you this, sir.  In a planned outage, do you

14  ever undertake to repair sections of tubes or replace

15  components that are not yet causing leaks, not yet causing

16  forced outages?

17  A    Yes, sir, we do.

18  Q    Why do you do that?

19  A    Well, the whole purpose is while that unit is down for

20  that planned outage, in addition to doing the routine repair

21  and replacement projects that are in question in this case, we

22  also will examine other components in the boiler to see if

23  there are tubes that are meantime to failure, meaning that

24  they're thin.  They're going to fail in the near future.

25          We will then try to address those areas either through

BATDORF - DIRECT/HOPSON          Vol. 9-1318

1  pad welding, tube shielding, or in some cases, you will cut

2  out and replace those sections.  We will never catch all of

3  them.  That's why we continue to have forced outages, but our

4  whole effort in that process is to minimize those forced

5  outages.

6  Q    Is part of your effort in minimizing forced outages

7  minimizing starting up and stopping the unit?

8  A    Yes, sir, it is.

9  Q    Why is that important?

10 A    Well, any time you start up and shut down a unit, you're

11 inducing cyclic stresses.  You're taking the temperature from

12 inside that fire box or furnace from 2,700 degrees to ambient

13 temperature.  You're taking the steam temperatures from

14 1,005 degrees down to ambient temperature.  You're taking the

15 pressure on the pressure side of those components, in Gibson's

16 case from 3,600 pounds pressure down to zero, and some of the

17 other units in our system that are drum pipe units, you'll be

18 taking them from 14-, 1,500 pounds down to zero.

19        Just that process of thermal changes, pressure

20 changes, you induce stresses into the materials in that

21 boiler.

22 Q    And focusing on the larger projects, not just two or four

23 or six feet, are those done by Cinergy personnel, Cinergy

24 employees, or are they done by contractors or both?

25 A    Over the years, they've been done by both; but the

1  majority in the recent years have been contractors.

2  Q   We've heard a lot about conditions in the boiler and

3  you've mentioned it a couple times, but I want to ask you a

4  slightly different question.

5        Why don't the boiler tube manufacturers try to build

6  boiler tubes so they can withstand those heats and pressures

7  and all the things that you've described?

8  A   The boiler tube manufacturers do do their best.  I mean,

9  when they design and engineer a boiler and they select the

10 tubes, they try to make them as durable as they can; but over

11 the life of a boiler, over its use, you're going to have tube

12 leaks.

13       Any boiler, every boiler across this country will have

14 tube leaks.  I don't know of any manufacturer that would

15 manufacture a boiler that they would not expect those units to

16 develop leaks.

17 Q   Let me ask you this:  We've heard about different alloys.

18 Some numbers have been run around like T22 and so forth.  And

19 I just want to ask you to what extent have boiler tubes

20 changed during the 31 or so years that you spent in the

21 industry?

22 A   Yes, sir.  There have been some changes in alloys over the

23 years, but you need to understand the units in our system in

24 Indiana, all of them, are over 25 years of age.  Gibson

25 station, which is the newest station in our system, built back

1  in the '75 to '82 time period, does have some newer materials

2  in it than what our other units do.

3       That's more a factor of it being a super-critical

4  unit.  It's a once through.  It does not have a drum.  It

5  operates at much higher pressures than what our other units

6  do.  So A lot of times the alloys selected for a

7  super-critical unit are driven by it being a different design,

8  a different type boiler.

9       Gibson has SA213T22 --

10 Q   Wait.  Say it slowly, sir.

11 A   I'm sorry, sir.

12      Gibson station has SA213T22 which has a chrome-moly

13 alloy in it, much like what Gallagher does, much like what

14 Wabash River does, but Gibson does have some of the higher

15 alloys than what the other units do.  I apologize.

16      MR. HOPSON:  Your Honor, at this time we're just

17 going to put up the list of projects which is D2119.  We've

18 had it up in the courtroom before.

19 Q   All I want to do at this point is direct your attention,

20 Mr. Batdorf, to a single project which is the 1989 front wall

21 radiant superheater tube replacement at Wabash River 2, and

22 start out with a simple question which is how is what was done

23 at that project at Wabash River 2 different from the type of

24 tube repairs you've been describing for us this morning?

25 A   There is no difference.  It's just more of the tubes

1  during that replacement than what you would do during a forced

2  outage.

3  Q   Just to be clear, we've heard a lot about terms like

4  "availability."  Just to make sure we're on the same page, can

5  you tell me your definition of "availability" and specifically

6  how that relates to forced outages?

7  A   Yes.  Availability is just a measure of whether that unit

8  is available to produce power.

9        As far as the forced outage, any time you have a

10  forced outage on a unit, that unit is not available.  It's

11  basically the opposite.  Availability outages, whether it's a

12  forced outage or planned outage, they're the opposite.  Any

13  time a unit is forced off line or has a planned outage, it is

14  not available to generate.

15  Q   Are outages the only thing that causes this statistical

16  measure of availability to go down?

17  A   No, sir.  There are times -- again, a power plant is a

18  very complex piece of equipment.  We have hundreds of pieces

19  of equipment that can impact a unit.

20        You could have a problem with a component.  It could

21  be -- it could be something simple in your ash handling system

22  that prevents that unit from operating at full load.

23        In essence, you're derated.  It's not capable of

24  producing its full power.  It's producing at a lower level and

25  that's a condition that we call "derate."  The unit is still

BATDORF - DIRECT/HOPSON          Vol. 9-1322

1  available to run, still available to produce energy, but not

2  at its full capability.  You can almost compare it to a

3  partial outage.

4  Q    Can a tube leak cause a derate?

5  A    Yes, sir, it can.  There's been times that when we've

6  developed tube leaks, we've gone through this leakage test,

7  sonic, and we would call the load center dispatch and say,

8  hey, we've got a tube leak.  We'd like to drop load in that

9  unit.  We think we can make it to the weekend, and take the

10 unit off and make repairs at that time because our load on

11 weekends is less than what it is during the week because of

12 businesses and industries that are shut down.

13 Q    If you, sir, generally, and we'll get to the specific

14 projects in a minute, but if you generally replace something

15 like the front wall radiant superheater tubes, are you going

16 to expect running that unit to have fewer outages from that

17 component in the future?

18 A    Any time we do any project like that, whether it be the

19 radiant superheat tube or any other component replacement, we

20 fully expect that we will have less tube leaks in that section

21 that was replaced.

22 Q    Is that always true?

23 A    Most times; but like anything, there's always exceptions.

24 Q    When you replace a component or a section of the tubes in

25 the boiler, to what extent did you expect fewer outages from

BATDORF - DIRECT/HOPSON          Vol. 9-1323

1  the unit in the next two years?

2  A   We didn't.  The fact that we replaced a component did not

3  cause us to expect any difference in the performance of that

4  unit.  All's we did was address one component.  There's too

5  many other factors that influence the unit.

6  Q   Well, if you didn't expect an increase in unit

7  availability when you replace a component like front wall

8  radiant superheater tubes, why do you spend the money and the

9  time to do those products?

10 A   We spent the money to do those projects in an effort to

11 maintain the availability of that unit.

12 Q   Did you believe, based on your 31 years of experience,

13 when you were approving and supervising these projects, that

14 it was possible to predict the number or extent of forced

15 outages that would occur in the two years after you replaced a

16 component or a number of components?

17 A   No, sir.  Forced outages are random, unexpected events.

18 You have no idea when they're going to occur or what the

19 duration will be; and I have 34 years of experience.

20 Q   I don't want to shortchange you, Mr. Batdorf.  I'm sorry.

21 Math is not my strong point.

22      MR. HOPSON:  We're going to put up at this point,

23 Your Honor, Defendants' Exhibit 2115, to which I understand

24 there is no objection.

25      THE COURT:  Is there any objection to 2115?

BATDORF - DIRECT/HOPSON          Vol. 9-1324

1          MS. HIMMELHOCH:  Oh, I'm sorry, no.

2          THE COURT:  All right.  It's admitted.

3     (Defendants' Exhibit 2115 was received in evidence.)

4     BY MR. HOPSON:

5     Q    Can you tell us what Defendants' Exhibit 2115 is,

6     Mr. Batdorf?

7     A    Yes, sir, this is a availability degrader report for the

8     period of September through -- I'm sorry, January through

9     September of 1991.

10    Q    How do you refer to this document or these types of

11    documents?

12    A    Well, internally we call them availability degrader

13    report.  I had a canned phrase that I called it my Excedrin

14    headache list.

15    Q    What do you mean by the term "availability degrader"?  Can

16    you just define the term for us?

17    A    Yes, sir.  Availability degrader is anything, anything

18    that can impact a unit's ability to produce generation.

19    Again, it could be those forced outages.  It could be those

20    derates.  All of those affect availability.

21    Q    Is such a list prepared on a regular basis?

22    A    Yes.  In fact, as you can see from this, it's prepared

23    monthly and updated monthly.

24    Q    Why is such a list prepared?

25    A    Well, what it does, it keeps those Excedrin headaches on

BATDORF - DIRECT/HOPSON          Vol. 9-1325

1  the radar screen.  It keeps them in front of us.  From month

2  to month, they'll change.  They'll increase.  There will be

3  new ones that will develop.  And it helps us look at that and

4  make plans to say what are we going to do to address that --

5  Q   And --

6  A   -- what can we do to minimize that.

7  Q   Sorry.

8       At the time you prepared this list in October 1991,

9  was there a plan to fix everything that's on the availability

10  degrader list?

11  A   No, sir, not at all.  Unfortunately, we have a limited

12  amount of money in which to spend for problems like that.

13       MR. HOPSON:  Can we see the -- actually, let me, for

14  purposes of not making you strain to see the screen, Your

15  Honor, if I may approach, I have a hard copy.

16       THE COURT:  Yes.

17       THE WITNESS:  Thank you.

18  BY MR. HOPSON:

19  Q   If we can see the second page of 2115, can we get a little

20  closer to the second page?  Let's do it on the ELMO, if we can

21  switch over to that.

22  A   I think you went one too far.

23  Q   They tricked me by putting two-sided copies here and being

24  environmentally conscious, so I'll flip that over.

25       All right.  What are we looking at on the second page

BATDORF - DIRECT/HOPSON          Vol. 9-1326

1  of this exhibit?

2  A    What you see on the second page -- now, this is a summary

3  for our system; and if you'll look across the top, it'll

4  reflect the respective generating stations.  Listed down the

5  side where you see a rank is 1 through 13.  Those are just 13

6  of the Excedrin headaches.  The list goes on to identify 21 on

7  subsequent pages.

8        For example, on this one, the number one cause of

9  availability losses in our system was thermal discharge

10 limits.  Those are limits that are in place in our generating

11 stations that we are required, because of those permits, to

12 either decrease load or take that unit out of service to

13 remain in compliance with that permit.

14       It totals 222,774-megawatt hours of lost availability

15 as a result of that lost generation.

16 Q    What's the biggest impact on thermal discharge limit?

17 What factor affects thermal discharge limits?

18 A    The factor again is it's in compliance with the

19 temperature.  The numbers that you see there is

20 222,774-megawatt hours.

21 Q    Are you going to have more problems with thermal discharge

22 limits when it's hot or when it's cold?

23       MS. HIMMELHOCH:  Objection, relevance, Your Honor.

24 The thermal discharge limits have no effect on these plants at

25 issue according to this document.

BATDORF - DIRECT/HOPSON        Vol. 9-1327

1        MR. HOPSON:  I think they have the largest impact on

2   Wabash River.

3        THE COURT:  Go ahead and answer.

4   Q   Does it have a greater impact from thermal discharge

5   limits when it's hot or when it's cold?

6   A   Absolutely during the hot weather.  I mean, this is one

7   item on the list that we cannot do anything about it.  God's

8   in control.  He governs the temperatures, the ambient

9   temperatures.  He determines how much rainfall we get.  So

10  it's an issue on here that can affect the unit that we don't

11  have any control over.

12  Q   What's the fourth largest impact on Gallagher, Gibson and

13  Wabash River?

14  A   The fourth largest impact, as you can see on there, is

15  opacity.

16  Q   If we went through this document, which we're not going to

17  do, is the same -- well, first of all, the top list goes

18  through what number system-wide in Indiana?

19  A   Just through 21.

20  Q   And if we continue to flip through this document, would we

21  see a list specific to every station?

22  A   Yes.  The first several pages are just summary pages.  The

23  following pages would then reflect each respective station and

24  the units at those respective stations.

25  Q   Let me take this down.

BATDORF - DIRECT/HOPSON          Vol. 9-1328

1        MR. HOPSON:  Your Honor, I do move the admission of

2   2115.

3        MS. HIMMELHOCH:  No objection, Your Honor.

4        THE COURT:  It's admitted.

5     (Defendants' Exhibit 2115 was received in evidence.)

6   BY MR. HOPSON:

7   Q   If you did fix everything on this list that was fixable,

8   that was within your control, would you then expect the units,

9   particularly Gibson and the other Indiana units we talked

10  about, to run without problems in the future?

11  A   No, sir.  It would be nice if that's the way it would

12  work, but if you would look at one list from one year to the

13  next or even in the same year, new problems continue to arise

14  that will come on that list that weren't there before.

15  Q   And if you -- well, let me ask about another aspect of

16  planning.  In your experience, did you expect changes in

17  availability at the unit to the extent that they were up or

18  down to directly impact the generation you obtained from that

19  unit?

20  A   Well, any time you have issues that arise, they can impact

21  that component; but all they're doing is trying to make the

22  unit available.  Our responsibility at the station is to make

23  the unit available.  Generation is driven by other factors.

24  Q   Let me put up the project list again very briefly just so

25  I can focus your attention and we see what unit we're talking

BATDORF - DIRECT/HOPSON          Vol. 9-1329

1  about.

2        I'm going to ask you a series of questions about the

3  Gibson 2 project in 2001, okay, Mr. Batdorf?

4  A    Yes, sir.

5  Q    And can you tell us just as a starting place what's going

6  on with that project?  What were you doing?

7  A    Yes, sir.  With respect to the Gibson 2, we were replacing

8  the pendant reheater tubes in that unit.  We were taking

9  boiler tubes out that had failed previously and replacing

10 those components.

11 Q    At the time this project was done, and I mean in the time

12 period immediately before the project physically started, what

13 effect did you expect this project at Gibson 2 to have on unit

14 availability?

15 A    We didn't on unit availability.  Regardless of what we

16 expected with availability, generation was always driven by

17 other factors.

18 Q    To what extent, if any, did you expect the Gibson 2

19 replacement of the reheater tube section to have an impact on

20 the way this unit was dispatched?

21 A    It has no impact on the way the unit is dispatched.

22 Dispatch doesn't know of those projects, which ones we do and

23 which ones we don't.  It's not factored into their decision.

24 Q    We have heard some extensive evidence about the size and

25 dimensions and the amount of labor that was involved in this

1  project.  Let me just ask you first:  While this project was

2  going on in 2001, were you doing other maintenance and repair

3  and replacement on the boiler?

4  A   Yes, sir, we do.  You take advantage of the planned outage

5  to do that kind of work.

6  Q   How many man-hours of maintenance, repair and replacement

7  was being done on things other than the reheater tube section

8  just during the time this project was going on?

9  A   Just during that outage window specifically to Unit 2

10 during that same period of time the reheater components were

11 being replaced, we spent over 130,000 man-hours doing other

12 maintenance on that unit.

13 Q   From 1985 to 2001 during the time you were involved with

14 these projects, were there projects that you reviewed, looked

15 at, that had the effect of causing you to predict that there

16 would or might be an increase in generation or emission from

17 those particular projects?

18 A   Yes, sir, there were.

19 Q   Can you give us an example of one?

20 A   Yes.  Our company, when we were looking at making a change

21 or a modification on our Wabash River Unit No. 1, we saw that

22 there would be an increase in capability of that unit and a

23 possible associated or increase in emissions.  As a result of

24 that, we did seek the necessary NSR permits for that project.

25 Q   And to your knowledge and your involvement in these

1 projects, did Cinergy seek or obtain other New Source Review

2 permits in Indiana or Ohio during the years in question?

3 A    Yes, sir.  When I was the station manager at the Cayuga

4 generating station, we made a decision to install some

5 combustion turbines, which are peaking units.  Because that's

6 a new source, again we sought the necessary permits for that

7 project.

8 Q    Were there other projects that you were involved in and

9 supervised and worked on during your years at which you had a

10 question whether there would be an increase in emissions that

11 would require an NSR permit?

12 A    Yes, sir.  There was a period of time that we were looking

13 at modifying the burners on our Gibson station, and that

14 modification was going to change the combustion process

15 significantly.  I mean, you were modifying the way coal was

16 injected into the furnace, the way it was combusted.  You were

17 staging the process.

18        So we wrote a letter to the Indiana Department of

19 Environmental Management saying "We're looking at doing this

20 project, we're seeking guidance, should we or should we not?

21 Is this one that requires an NSR permit."  Their response was

22 "No, it did not."

23 Q    Can you describe for the jury in general terms the types

24 of projects that caused you personally to predict or expect or

25 have a concern about an increase in emissions being caused by

BATDORF - DIRECT/HOPSON          Vol. 9-1332

1  the project?

2  A    Yes, sir.  We would look at those projects and ask does it

3  change the function?  Is it a major modification?  Does it

4  affect the capability of the unit?  Will it change the

5  location of that unit and the stacking order which would means

6  it would change how it's dispatched in the system.

7  Q    I want to go back and focus on this Gibson 2 project, and

8  I'd like to put up Defendants' Exhibit D2168, which is just a

9  demonstrative exhibit.

10            MS. HIMMELHOCH:  No objection, Your Honor.

11            THE COURT:  All right.  You may do so.

12            MR. HOPSON:  Let's put up 2168.

13  BY MR. HOPSON:

14  Q    Now, I don't want to spend a lot of time on this, but

15  before we get started talking about the project in some

16  detail, can you point out to the jury what tubes or what

17  section of the boiler is at issue in this project?

18  A    Yes, sir.  The tube section that we're replacing on this

19  one is this area -- whoops -- green goes to the right of where

20  you point, doesn't it?

21  Q    Everybody's had a little trouble with the screen,

22  Mr. Batdorf.

23  A    I got a little big larger area than I should, but it's the

24  vertical tubes there that are the pendant reheat.  And if you

25  look below that, you also have two sections of horizontal

BATDORF – DIRECT/HOPSON          Vol. 9–1333

1  reheat.  So we replaced the upper third section of that reheat

2  section, all of the vertical tubes.

3  Q    Did you replace the whole reheater?

4  A    No, sir.  We replaced the pendant which is, again, I'm

5  just to say a third, 33 percent, maybe more, maybe less.

6  Q    And it may be obvious to everyone by now but what do the

7  reheater tubes do?

8  A    The reheater tubes in the steam cycle just takes steam

9  after it goes through the high pressure section of the

10  turbine, it returns back to the boiler to be reheated back up.

11  It's sent back to the turbine again.

12  Q    And when you were in the process of thinking about this

13  project, planning it, evaluating it, were you aware of other

14  projects that involved replacement of all or a substantial

15  part of all of the reheater tubes in the Cinergy system?

16         MS. HIMMELHOCH:  Objection, Your Honor.  Gibson,

17  there is no issue of RMRR related to this project.

18         MR. HOPSON:  Well, your Honor, on all the projects,

19  we had hours of testimony about nature, extent, purpose, how

20  long it took, how much it cost.  I'm only going to ask three

21  or four questions about --

22         THE COURT:  All right.  You can do so.

23  BY MR. HOPSON::

24  Q    Do you remember the question, Mr. Batdorf?

25  A    Yes, sir.  In fact, the same pendant reheater section

BATDORF - DIRECT/HOPSON          Vol. 9-1334

1  that's in question in this case was also replaced on Unit

2  No. 1 in 1997.  If you look at the list of the projects in

3  question in this case -- and I'm going to go from recollection

4  from reviewing that document -- I believe there were five

5  reheater sections that were referenced in it as well; and I

6  would -- I could probably name another 10 reheat sections that

7  have been replaced on other units in our system.

8  Q    Let me ask you this.  In the course of planning this work

9  at Gibson, did you consider various contractors to perform

10 this work?

11 A    Yes, sir, we did.

12 Q    And how did you do that?  I mean, physically, how did you

13 think about which contractor you wanted to use and develop

14 that?

15 A    When we would assemble our bid packages where we would

16 send it out to different contractors, we call it a

17 solicitation for bid.  It's a proposal.  We always requested

18 that "Could you please provide an experience list showing

19 other work that you've done for other utilities doing tube

20 section replacement."  And they would provide that experience

21 list for us.  We would review that list and then factor that

22 into our decision of who to select to do that work for us.

23 Q    And what experience or credentials were you looking for

24 when you reviewed your responses to your bids?

25 A    There are several things you're looking at.  You

BATDORF – DIRECT/HOPSON          Vol. 9–1335

1  definitely want somebody that has done that kind of work

2  before.  They have the expertise, the knowledge, the know-how,

3  the tools and equipment, and again would have the workforce,

4  certified welders, in which you could complete that project.

5  Q   Were you able to find contractors with the type of

6  experience you wanted for this particular project?

7  A   Yes.  In fact, there were several that had the experience,

8  and we would then just use other factors to make that

9  decision.

10 Q   Were there any of the reheater tubes replaced at this

11 specific unit prior to the time you undertook the project here

12 in 2001?

13         MS. HIMMELHOCH:  Objection, Your Honor.  RMRR is not

14 an issue on this unit.

15         MR. HOPSON:  I don't disagree that RMRR is not an

16 issue, but talking about the size and scope of the project,

17 Your Honor, is not only an issue for RMRR.

18         THE COURT:  He can answer.

19 A   Yes.  We've had tube repairs in those sections.  That's

20 what led us to select that project to do.

21 Q   What, if anything, made the 2001 reheater front pendant

22 replacement different from what you had done in the past?

23 A   The only difference is the number of tubes replaced at any

24 one time.

25 Q   Did the number of tubes that you replaced in this

BATDORF - DIRECT/HOPSON          Vol. 9-1336

1  particular project we're looking at in 2001 have an effect on

2  how much you expected the unit as a whole to be available in

3  the two years after the repair?

4  A   No, sir, not at all.  Regardless of what my expectations

5  are with us trying to address availability, generation was

6  always driven by other factors.  It was driven by the

7  placement of that unit in the stacking order and customer

8  demand.

9  Q   Moving to another point, were the tubes that you put in in

10 the reheater front pendant the same as the tubes you took out?

11 A   No, sir.  We did make a material change, but that material

12 change was solely for the purposes of withstanding the harsh

13 atmospheric conditions that's in there.  That same molecule of

14 steam that went through those old tubes went through the new

15 tubes, no difference.  Just it's a better grade material to

16 hold up to the temperatures, the ash conditions, the corrosion

17 that's present.

18 Q   And focusing solely -- and continuing to focus solely on

19 this Gibson reheater project, did you have any expectation

20 that you or Cinergy would use the unit differently after this

21 tube replacement?

22 A   No, sir, we did not.

23 Q   And did you predict that the replacement of this component

24 at Gibson Unit 2 would result in an increase in emissions?

25 A   No, sir, we did not.  It's strictly tubes out, tubes in.

BATDORF - DIRECT/HOPSON          Vol. 9-1337

1  Q   Did you instruct anyone to seek a New Source Review permit

2  before going forward to replace the reheater front pendant

3  tubes at this Gibson Unit 2?

4  A   No, sir, I did not.

5  Q   Why not?

6  A   It was tubes out, tubes in.  It was emissions neutral.

7  The fact that we did a component replacement -- component

8  replacement does not equal unit availability.  Unit

9  availability does not equal generation.  They're all driven by

10 separate factors.

11 Q   Did you do any mathematical calculations that reflect what

12 you've just told us about your prediction relating to this

13 tube replacement project?

14 A   No, sir, I did not.

15 Q   Did you write a memo to the file reflecting the

16 predictions that you made with respect to this tube

17 replacement project?

18 A   No, sir, I did not.

19 Q   Did you understand at any time prior to this tube

20 replacement project that there was a requirement of any kind

21 that you put something in writing or do a mathematical

22 calculation?

23 A   No, sir, I knew of no such requirement.

24 Q   Going back to the list, if we can for a second, I just

25 want to ask you, we've identified the Indiana projects on this

1  chart; and we've agreed that for purposes of Indiana, we're

2  not going to talk about the pulverizer replacements, but

3  focusing on the other Indiana projects on this chart, tell us

4  to what extent, if any, there's a difference between what you

5  just described as the Gibson 2 project and the rest of the

6  projects on this list in Indiana?

7  A    There's no difference.  Each of the projects were tubes

8  in, tubes out.  The exception is five of the six projects were

9  with respect to the boiler.  The other project at Gallagher

10 was a condenser replacement.  It's a totally separate piece of

11 equipment, but it's tubes in, tubes out.  The tubes were just

12 a smaller diameter.  They're a thinner gauge material.

13 Q    Since you say that the component is a little bit different

14 with respect to condenser tubes, could you just take a minute

15 and tell the ladies and gentlemen of the jury how condenser

16 tubes are different in terms of their location and function?

17 A    Yes, sir.  The condenser itself -- and I don't know what

18 you've seen before; but in our steam cycle, after the steam

19 passes through the boiler, it's heated, the water turns to

20 steam, comes over the turbine, there's a condenser.  The steam

21 will actually go down into the condenser.

22         There's actually river water that passes through the

23 condenser tubes that causes steam to condense, and you've got

24 a closed cycle loop that way; but the two pieces of equipment

25 are totally separate, totally isolated, two different purposes

BATDORF - DIRECT/HOPSON          Vol. 9-1339

1   as part of a unit.

2   Q   Do you recall the series of questions I asked you a few

3   moments ago about your understandings, expectations and

4   predictions as they related specifically to the Gibson 2 unit?

5   A   Yes, sir, I do.

6   Q   If I asked you the same series of questions about the

7   Wabash River projects, would your answers be the same or

8   different?

9   A   They would be the same.

10  Q   Can you tell us, again, to be clear, if the Gallagher

11  condenser project here also was a tube replacement?

12  A   Yes, sir, it was.

13  Q   And again, if I focus your attention on that same series

14  of questions relating to your expectations, understanding and

15  the predictions you made with respect to Gibson, and I asked

16  you those questions about the Gallagher condenser tube

17  replacement, would your answers be the same or would they be

18  different?

19  A   They would be the same.

20  Q   If you had understood or believed that any of these

21  projects at Wabash River or Gibson or Gallagher would cause an

22  emissions increase, what would you have done?

23  A   First, we wouldn't have proceeded with the project.  I

24  would have gotten with our environmental department and

25  consulted with them to see if, in fact, a NSR permit was

BATDORF - DIRECT/HOPSON          Vol. 9-1340

1  required, much like what we did for Wabash River 1, much like

2  we did for the Cayuga CTs.

3          MR. HOPSON:  Your Honor, at this point, I'd like to

4  put up what we previously displayed as Defendants' Exhibit

5  2157.

6          MS. HIMMELHOCH:  No objection, Your Honor.

7          THE COURT:  You may do so.

8          MR. HOPSON:  If I may, Your Honor, I'm just going to

9  hand a copy to Mr. Batdorf so that if he has trouble reading

10 the screen, he has a paper copy.

11         THE WITNESS:  Thank you, sir.

12 BY MR. HOPSON:

13 Q   Now, again, I'm going to represent to you that this chart

14 was prepared from GADS data and purports to reflect an average

15 of availability of generation in the years before the projects

16 at issue, okay?

17 A   Yes, sir.

18 Q   Again, this is not a memory test for you, Mr. Batdorf; but

19 I just want to start by asking you if based upon your

20 experience in running and being the station manager at the

21 units in question, is this consistent with your recollection

22 of the levels of availability and generation in general that

23 were available for those units at that point in time?

24 A   I can't be specific as to which year because there's

25 multiple years covered here; but yes, I would say that

BATDORF - DIRECT/HOPSON          Vol. 9-1341

1  reflects my general knowledge or recollection of what they

2  were for the various stations, units.

3  Q   Did availability, sir, stay level from year to year?  Was

4  it going up or going down?  For example, we can focus on a

5  time frame if you want to.  We can look at Wabash River 2.

6  Let's look at Gibson.  We've talked about Gibson before.

7        During the period of time when the Gibson 2 unit was

8  having its reheater tube section replaced in 2001, in the

9  years prior to that, was availability going up, was it going

10  down or was it remaining exactly level?

11  A   The availability on any unit across a period of time will

12  vary.  It'll go up.  It'll maybe stay steady for a period of

13  time.  It'll drop.  It will go up again.  It'll reflect like a

14  saw tooth pattern over a period of time, much like because I

15  go back to our availability degrader list.  You fix one

16  problem and another one comes along.  So it gets better, gets

17  worse, gets better, gets worse.  It'll be a saw tooth pattern

18  over a period of time.

19  Q   Let me ask you just five quick questions here based on

20  your own experience.  Based on your own experience, could

21  Wabash River 2 have generated an additional 12,000-megawatt

22  hours in the year before the 1989 front wall radiant

23  superheater project?

24  A   Yes, sir.  12,000-megawatt hours off of Wabash River 2

25  would be approximately six, maybe seven days of generation.

BATDORF - DIRECT/HOPSON          Vol. 9-1342

1  Q   Next question:  Based upon your experience, could Wabash

2  River 3 have generated an additional 46,000-megawatt hours in

3  the year before the 1989 superheater and upper reheater

4  project?

5  A   What was the total again, sir?

6  Q   46,000?

7  A   Yes, sir.  That would be approximately 23 days of

8  generation off the unit.

9  Q   Was that available at that unit?

10 A   Yes.  In fact, if you look at the Wabash River 3 -- if you

11 come across to capacity factor, it's showing a 27.9 percent

12 capacity factor.  If the speed limit is 60 miles an hour and

13 then you're going down the highway 27.9 percent of that, even

14 if you would round it off to a third of that, you're driving

15 20 miles an hour.  So there's plenty of ample room in which to

16 produce that additional generation.

17 Q   And, sir, based upon your experience, could the Wabash

18 River 5 unit have generated an additional 16,000-megawatt

19 hours in the year before the 1990 project involving the

20 economizer?

21 A   Yes, sir.  That would be -- what was the number again,

22 please?

23 Q   Sorry.  Maybe I'm going a little too fast.  16,000.

24 A   16,000.  That would be approximately seven days of

25 generation off of that unit; and again, with the capacity

BATDORF – DIRECT/HOPSON          Vol. 9-1343

1  factor of only 23.2 percent, plenty of room to produce that

2  generation.

3  Q    Second to last question on this:  Based upon your

4  experience, could Wabash River 2 have generated an additional

5  12,000-megawatt hours in generation in the year before the

6  1992 finishing superheater and upper reheater project?

7  A    Yes, sir.  That's only six days of generation off the

8  unit.

9  Q    And based upon your own experience with the unit, could

10 Gallagher 2 have generated an additional 4,000-megawatt hours

11 in the year before the 1990 condenser project?

12 A    Yes, sir.  Again, based on the capability of that unit, it

13 would have only been a day, day and a half generation.

14 Q    Finally, based upon your experience, could Gibson Unit 2

15 have generated an additional 55,000-megawatt hours in the year

16 before the 2001 reheater project?

17 A    Yes, sir.  That would have been about three and a half

18 days of generation off that unit.

19 Q    At this time, I'd like to show you, Mr. Batdorf, what's

20 already been admitted by the Plaintiffs as Plaintiffs'

21 Exhibit 1319.

22         MR. HOPSON:  May I approach, Your Honor?

23         THE COURT:  Yes.

24 A    Thank you, sir.

25

BATDORF - DIRECT/HOPSON          Vol. 9-1344

1  BY MR. HOPSON:

2  Q   Let's put 1319 up on the screen, the first page of it.

3  Can you just tell us if you're familiar with this document,

4  Mr. Batdorf?

5  A   Yes, sir.  I've seen this document before.

6  Q   What is it?

7  A   It's a plant life assessment and evaluation that was

8  completed for the Wabash River generating station by Gilbert

9  Commonwealth.

10  Q   Let me ask you, based on your own experience, were all the

11  projects identified, recommended and discussed in Plaintiffs'

12  Exhibit 1319 actually done?

13  A   No, sir, they were not.

14  Q   The first thing I'm going to ask you to do is turn to page

15  1-2 of that document.

16  A   Yes, sir, I have that page.

17  Q   On page 1-2, there is a summary, if you will, of the

18  Wabash River station; is that correct?

19  A   Yes, sir.

20  Q   I want to ask you if you can see a statement in the

21  columns there about current life expectancy.  Do you see that?

22  A   Yes, I do.

23  Q   Before that there's a date of commercial operation.  What

24  does "date of commercial operation" refer to?

25  A   Date of commercial operation refers to a period in time

BATDORF – DIRECT/HOPSON          Vol. 9–1345

1  after start-up where the unit was determined to be stable

2  enough and it was basically declared commercial for producing

3  energy to our system.

4  Q   Is that basically when it went online?

5  A   No, sir.  It may have gone online.  You worked some bugs

6  out and at some point you say it's now declared commercial.

7  Q   Let me ask you this question.  As the station manager at

8  Wabash River or at any other time during your employment with

9  Cinergy back to 1971, did you have an expectation that the

10 Wabash River 1 unit would be shut down, that its life would be

11 over in 1993?

12 A   No, sir, we did not.

13 Q   To your knowledge, did anybody at Cinergy have that

14 expectation?

15 A   Not to my knowledge, no, sir.

16 Q   Then can you explain to us why Gilbert Commonwealth

17 prepared a document or what this document means when it says

18 "current life expectancy"?

19 A   Current life expectancy on there is just a function of

20 once we declare it commercial -- and I know we're not supposed

21 to talk about rates, so I'm careful with my language; but it's

22 a point in time then where we start recovering the money from

23 our customers for that investment.

24 Q   Let me ask you this.  Turn to the next page which has 1-3

25 down at the bottom?

BATDORF - DIRECT/HOPSON          Vol. 9-1346

1  A   Yes, sir.

2          MR. HOPSON:  Can you get the full page up?  That's

3  fine.

4  BY MR. HOPSON:

5  Q   Let me direct you to the section on that page that's

6  labeled 1.2.1, "Program Objectives."  Are you familiar with

7  these Program Objectives, sir?

8  A   Yes, sir.

9  Q   Can you read the language about the purposes of this Life

10  Extension project?

11  A   Yes, sir, I will.  It says "The specific program

12  objectives of the mechanics program are:  to develop a

13  comprehensive program for determining the refurbishment and

14  equipment replacements required to extend the economic life of

15  Unit 2 up to 15 years beyond 1993;

16          To conduct economic evaluations of refurbishment and

17  equipment replacement projects using criteria similar to those

18  suggested in EPRI Report EA3890, Volume 2, economic evaluation

19  of plant upgrading investments;

20          And the third objective, to rank and recommend all

21  identified plant life extension and upgrade projects in order

22  of importance to the Life Extension program and economic

23  attractiveness.

24  Q   Did you understand this document -- to what extent did you

25  understand this document to be a document involved in economic

BATDORF - DIRECT/HOPSON          Vol. 9-1347

1  ranking of projects?

2  A    That's exactly what it is.  That's all of what it's

3  intended to do.  That's the purpose.

4  Q    To your knowledge, based on your familiarity and use of

5  this document, was it prepared for any other reason?

6  A    No, sir, it was not.

7  Q    Let's turn to the page marked 2-1-151.  Can we call out

8  the relevant section of that page, please?  Just tell me when

9  you've got to the page, Mr. Batdorf.  I'm sorry.

10  A    Yes, sir, I have the page.

11  Q    It's the page that has the so-called Bates number of WR768

12  at the bottom.  Do you have it?

13  A    Yes, sir, I do.

14  Q    Just start by telling us what are we seeing on that page.

15  A    What we're seeing on that page is a cost/benefit analysis

16  for replacement of the radiant wall superheat section on a

17  unit at Wabash River.  I believe it's unit No. 2 at Wabash

18  River.  It just goes through an economic evaluation trying to

19  put in perspective common terms because as we're doing these

20  reviews and assessments, we're coming up with different

21  component -- different repair and replacement components.

22         You're trying to compare a radiant superheat tube to a

23  condenser to an air ejector, to an ID fan, to air heaters.

24  And the only way you can do that is to do the economic

25  evaluation, come up with a cost/benefit analysis so you're

BATDORF - DIRECT/HOPSON          Vol. 9-1348

1  comparing them all on the same common terms which is dollars,

2  net present value, internal rate of return and other economic

3  factors.

4  Q   Let me ask you, sir, if you see the word "benefits" of the

5  project on that page, do you see it?

6  A   Yes, I do.

7  Q   Can you read the first thing that's on this page under the

8  words "benefits"?

9  A   Yes, sir.  Little "i, "availability gain due to

10 improvement of MTBF, which means meantime between failures,

11 from current value of 1,367 hours to 12,000 hours for the next

12 eight years.  Present value equals $6,241,000."

13 Q   Now, let me ask you what kind of analysis, is that an

14 operational analysis or an economic analysis being reflected

15 on that page?

16 A   It's strictly an economic analysis.

17 Q   To what extent at all is that a prediction about the

18 future performance of this unit?

19 A   It's no prediction at all about the future performance of

20 the unit.  It's a reflection of the past using certain

21 assumptions to try to put a cost benefit to that solely for

22 the purposes of being able to compare to other projects to

23 make an informed decision as to which projects to move forward

24 with.

25 Q   When you're doing the cost/benefit analysis during this

BATDORF - DIRECT/HOPSON        Vol. 9-1349

1  point in time, were you guys able to do a pretty good

2  assessment of what you thought it would cost to do these

3  projects?

4  A   Yes, sir.  That's the whole purpose of doing assessments

5  like that is to try to come up with a relatively good,

6  accurate estimate.

7  Q   If you had an accurate estimate of what it would cost, why

8  didn't you just use that as a way of ranking the projects?

9  A   Well, we could have ranked them in alphabetical order.  We

10 could have ranked them low cost to high cost, but when you

11 make decisions based on that, you're going to make wrong

12 decisions.  You have to put them in common terms so you can

13 select the projects that are going to produce the best

14 perceived benefit, knowing full well that you're not

15 predicting the future.  You're just doing it to reflect past

16 historical data to make that decision.

17 Q   I don't want to put a lot of documents up on the screen

18 for you; but have you seen similar types of documents and

19 analysis during your 31 years at Cinergy?

20 A   Yes.  As you can see, Gilbert Commonwealth, other outside

21 firms use that, and we have our own internal economic

22 evaluation process we use as well.  It's a common practice

23 throughout the utility industry.

24 Q   Were similar documents created for most or all of the

25 projects that we're talking about in this case?

1  A   Yes, sir.  All the projects in this case are economic

2  projects that fell into our ranking system, and the economic

3  evaluations would have been completed on each of those.

4  Q   Who uses these cost/benefit or project evaluation

5  documents?  Who looks at them?

6  A   Documents like this and those that we create internally

7  would be used by engineers and managers, and those people who

8  knew what the sole purpose of the evaluation was for.

9  Q   Does the dispatch department -- did you, as a station

10 manager, send a copy of these documents to the dispatch

11 department so they would know what your predictions were on

12 availability?

13 A   No, sir.  The dispatch would not receive this, nor would

14 they even know what projects we were or were not doing.

15 Q   At this time -- let me take that away from you,

16 Mr. Batdorf.

17 A   Yes, sir.

18 Q   At this time, I'd like to direct your attention to another

19 document, which is another document already in evidence as

20 Plaintiffs' Exhibit 1278.

21        MR. HOPSON:  May I, Your Honor?

22        THE COURT:  You may.

23 A   I appreciate that.  That screen's hard to read.

24        MR. HOPSON:  Maybe we should get a large screen for

25 the witness, Your Honor.

BATDORF - DIRECT/HOPSON          Vol. 9-1351

1          THE WITNESS:  Hard copy is fine.

2          MR. HOPSON:  I'll forget that suggestion.

3          THE COURT:  Forget that suggestion.

4  BY MR. HOPSON:

5  Q    Do you recognize what I've shown to you as Plaintiffs'

6  Exhibit 1278?

7  A    Yes, sir, I do.

8  Q    Can you tell us what it is?

9  A    Yes.  This is a work order authorization form that is

10 used.  The project evaluation at this point has already been

11 completed.  This is an internal document that is used then to

12 start the approval process for the expenditure of dollars

13 associated with that project.

14 Q    And to be clear, is this document created before or after

15 we've gone through the project evaluation cost/benefit

16 process?

17 A    Again.  This is afterwards.

18 Q    What's the purpose of this document relative to the

19 funding of these projects?

20 A    That's the whole purpose of it is to say we've already

21 gone through the economic evaluation.  It's already been

22 ranked.  It's been forwarded to corporate and they've said

23 yes, it's a go project.  This then is the form that's used to

24 start the release of those dollars to make that happen.

25 Q    Can you read for us, Mr. Batdorf, what's been written

BATDORF - DIRECT/HOPSON          Vol. 9-1352

1  under "Necessity of the project"?

2  A   Yes, sir, I can.  It says "Increasing tube leaks resulting

3  in loss of availability.  Refer to the attached economic

4  justification highlighting a six-year payback and a benefit to

5  cost ratio every 1.3 for ten years."

6  Q   What was your understanding of that statement?

7  A   The statement saying we've --

8       COURT REPORTER:  Please repeat your answer.

9  A   I'm sorry.  It means that we've been having tube leaks in

10  these various sections and they've caused an impact on

11  availability, and please refer to the attached economic

12  evaluation relative to that project.

13  Q   Now I want to show you the document that was attached

14  which is a unfortunately difficult to read computer printout

15  that's already been moved into evidence as Plaintiffs'

16  Exhibit 1279.

17  A   Thank you, sir.

18  Q   Again, are you familiar with what this document is,

19  Mr. Batdorf?

20  A   Yes, sir, I am.

21  Q   Have you seen similar documents during your 34 years at

22  Cinergy?

23  A   Yes, sir, I have.

24  Q   What is it?  Give us your description and your own words

25  of what we're looking at.

BATDORF - DIRECT/HOPSON          Vol. 9-1353

1  A    This is an economic evaluation with respect to the No. 3

2  project in question in this case.  It's an engineering

3  analysis looking at that project, looking at the historical

4  impact that that has; and basically making certain

5  assumptions, going through a calculation just to come up with

6  a value -- an economic value which I believe is on the last

7  page, a benefit to cost ratio.

8         The reason we do that is, again, to compare unlike

9  projects, putting them all in the same terminology so we can

10 make an informed decision.

11 Q    And when this economic analysis is done, sir, and you're

12 doing calculations of availability or generation, is that

13 availability or generation attributable to the whole unit or

14 simply to the component that's being replaced?

15 A    It's attributed solely to the impact that that component

16 had.

17 Q    Can we zoom in on the top left corner there, and I just

18 want to ask you a couple quick questions.  Can you tell us

19 what it says under "Replacement Power Cost"?

20 A    Yes, sir.  It reflects under the superheat section,

21 15,604-megawatt hours, and then under the reheat section,

22 12,727-megawatt hours for a total of 28,331.

23 Q    Can you tell us in your own words what you just read,

24 "replacement power cost in megawatt hours" means?

25 A    Yes, sir.  That's just a reflection of the past, looking

BATDORF - DIRECT/HOPSON          Vol. 9-1354

1  at what's happened in that area, what tube leaks have we had,

2  what has that component caused.  Then they try to use the

3  economic evaluation, certain assumptions, to put dollar values

4  to that to come up with a cost benefit ratio.

5  Q  So what extent does what we see on the screen here reflect

6  what you were telling us a few minutes ago about cost benefit

7  or project evaluation analysis?

8  A  That's exactly what it is.  That's all it is.  It's

9  strictly looking at the past using economic evaluations.  It

10  has nothing to do with prediction -- anything of the use of

11  that unit in the future.

12  Q  To what extent is this a standardized way of looking at

13  these component replacement costs, or frankly, any other

14  capital costs?

15  A  It's a very standardized process because when we looked at

16  the other document from Gilbert Commonwealth, they used the

17  same methodology as what we used internally.

18  Q  I want to show you another document that's been marked for

19  identification as Defendants' Exhibit 1989.

20  A  Thank you, sir.

21  Q  Before we do anything to display this document, I just

22  want to ask you if you're familiar with this?

23  A  Yes, sir, I am.

24  Q  And you recognize that document?

25  A  Yes, sir, I do.

BATDORF - DIRECT/HOPSON          Vol. 9-1355

1  Q   Is that document made in the ordinary course of Cinergy's

2  business?

3  A   Yes, sir, it is.

4  Q   Is it part of the ordinary course of Cinergy's business to

5  make and maintain such documents?

6  A   Yes, sir, it is.

7  Q   Did you rely upon the document in your ordinary course of

8  your work at Cinergy?

9  A   Yes, sir, we did.

10         MR. HOPSON:  It's 1989, Your Honor.

11         THE COURT:  I've got it.

12         MR. HOPSON:  I move the admission of Defendants' 1989

13  at this time.

14         MS. HIMMELHOCH:  Your Honor, I believe this is

15  post-project for any of the projects that were on this list.

16  I just need a moment to check that.

17         MR. HOPSON:  Your Honor, it's not going to be used

18  for specific project information.  It's just an example of the

19  way projects were addressed, ranked.

20         MS. HIMMELHOCH:  We were not permitted to use

21  post-project documents to demonstrate the thinking of the

22  company; and by the same turn, Cinergy should not be allowed

23  to do that.

24         MR. HOPSON:  Again, Your Honor, it's not being used

25  for an irrelevant purpose.  It's just being used to illustrate

BATDORF - DIRECT/HOPSON          Vol. 9-1356

1  the process that's being followed.

2          THE COURT:  Have we had testimony that this is the

3  same process that was used during the course of the

4  development of these other projects?

5          MR. HOPSON:  I believe we have, but we can review it

6  if you want me to, sir.

7          THE COURT:  Let's review it.

8          MS. HIMMELHOCH:  We withdraw our objection, Your

9  Honor.

10          THE COURT:  All right.  You may proceed.

11          MR. HOPSON:  Can we see Defendants' 1989, please?

12  BY MR. HOPSON:

13  Q   What's the purpose of the document we're looking at on the

14  screen, Defendants' 1989?

15  A   Yes, sir.  The purpose of this document is for each

16  station -- in this case it's Wabash River generating station.

17  This is a wish list.  This is their Christmas list.

18          What they're doing through this project is identifying

19  those Excedrin headaches, those problems they have at that

20  plant, and identifying the respective year that they would

21  like to consider doing those projects.

22  Q   Who would prepare at the stations from 1985 to 2001 when

23  these types of documents were prepared -- who would prepare

24  them?

25  A   It was a cooperative effort, if you will.  You would have

BATDORF - DIRECT/HOPSON          Vol. 9-1357

1  engineers.  You would have supervisors.  You would have

2  superintendent.  You would have the station manager all

3  collectively working to identify those respective projects.

4  Very often the engineer was given the lead role to pull the

5  document together and assemble that.

6  Q   Does this document relate in any way to the capital budget

7  process, the cost benefit analysis that you were describing a

8  few moments ago?

9  A   Yes, sir.  This is just the first of several steps because

10 not only do you have a document like this for Wabash River.

11 You would have one for each of the generating stations.  Then

12 each other's station would have their list, and later on they

13 would be folded together into one common list for the whole

14 company.

15 Q   And how is this document that we're looking at on the

16 screen used in that capital budget process that you just

17 described?

18 A   Once these projects are identified, an engineer is then

19 assigned to do the economic evaluation of that project.  They

20 would then be combined into a common list for the company with

21 those economic rankings, and a single list would be formed for

22 the company.

23 Q   Is this part of what you talked about at the station

24 manager meetings that we discussed at the beginning of your

25 testimony?

BATDORF – DIRECT/HOPSON          Vol. 9–1358

1  A   Yes, sir.  It was one of several items that we discussed

2  during those meetings, yes, sir.

3  Q   You referenced earlier an annual station manager budgeting

4  process.  Does this document relate to that budgeting process

5  you discussed earlier?

6  A   Yes, sir.  This is the first step that leads to that

7  meeting.

8  Q   Can you tell us, if you can, what's the whole purpose of

9  these meetings and these budget documents and these

10  cost/benefit analyses?

11  A   The whole purpose of these meetings, the cost/benefit

12  analysis, is a methodology to compare, again, unlike projects

13  and try to put them in common terms so that we can make an

14  informed decision has to how best to spend our money.

15        I think we have a responsibility and an obligation to

16  our customers, we have an obligation to our shareholders and

17  we have an obligation to our employees to do that.

18  Q   Did all the station managers develop a separate ranking of

19  the projects?

20  A   Yes, sir, we did.

21  Q   What happened next in the process?

22  A   Again, next in the process, they were combined into a

23  common list internal to the company.  Here you just see a wish

24  list.  That list then is formulated with priorities.  They are

25  ranked in descending order.

BATDORF - DIRECT/HOPSON          Vol. 9-1359

1          MR. HOPSON:  At this time, Your Honor, I want to make

2     sure I've moved the admission of Defendants' 1989.

3          MS. HIMMELHOCH:  No objection, Your Honor.

4          THE COURT:  It's admitted.

5      (Defendants' Exhibit 1989 was received in evidence.)

6     BY MR. HOPSON:

7     Q    I'm now going to, Mr. Batdorf, show you what's been marked

8     as Defendants' 1981, and I may be mistaken, but I believe

9     there's no objection to this document.

10         MS. HIMMELHOCH:  I'm sorry.  I missed the exhibit

11    number.

12         MR. HOPSON:  It's 1981.

13         MS. HIMMELHOCH:  No objection, Your Honor.

14         THE COURT:  It's admitted.

15     (Defendants' Exhibit 1981 was received in evidence.)

16         MR. HOPSON:  Could you display 1981, please?  Could

17    we blow that up a little bit to see the top?  Let me put it on

18    the ELMO then because it will be a little easier to see.

19    BY MR. HOPSON:

20    Q    Let's just start, if you will, Mr. Batdorf, by telling us

21    what this is that we're seeing.

22    A    Yes.  This is the internal document that will result from

23    each station developing their own wish list.  The economic

24    evaluations would have been performed and then those projects

25    would be identified on this internal document for the company

BATDORF - DIRECT/HOPSON        Vol. 9-1360

1  with all of these station projects identified and listed for

2  that respective year.

3        In this case, it's 1999.  Then they're categorized

4  into different categories.  Then when you get into the

5  economic ones, you'll see a ranking process there based on the

6  economic analysis.

7  Q   Now, is this all the capital budget projects that are

8  being done in the company?

9  A   No.  These are just those internal to the generation side

10 of the business.  The transmission, the distribution side of

11 the business would develop similar such lists.

12 Q   Is this part of what you reviewed and recommended to upper

13 management during your capital budget meetings with the other

14 station managers?

15 A   Yes, sir.  As we said, we would meet collectively, review,

16 discuss, challenge and come up with a final ranking, final

17 recommendation that we would then forward to upper management

18 for final review, approval, maybe even further analysis.

19 Q   Let me show you a particular heading I want to talk about

20 here, and that is a heading for economic projects.  Can you

21 describe for the ladies and gentlemen of the jury what

22 "economic projects" are?

23 A   Yes.  We have several categories on here.  Economic

24 projects are those that after we do the mandatory

25 environmental projects, after we do other mandatory projects

BATDORF - DIRECT/HOPSON          Vol. 9-1361

1  which might be safety related, it's the dollars that are left
2  over to look at those other remaining projects so they could
3  compare and compete for the dollars that are left.
4  Q   Are all the Indiana projects, as we've referred to them
5  previously, economic projects?
6  A   Yes, sir, they are.
7  Q   Can you tell us by looking at that document what is the
8  total capital budget for the year we're looking at here, 1999?
9  A   The total 1999 capital budget reflects $238,489,498.
10 Q   Is that for the whole company or just on the generation
11 side?
12 A   No.  That again is just the generation side.
13 Q   This may be obvious at this point, but I need to ask the
14 question to connect it up.  How were the economic projects
15 ranked?
16 A   In this case, if you look at the ranking order -- if I can
17 get the correct page there -- these are ranked in order by
18 IRR.
19 Q   What does "IRR" stand for?
20 A   "IRR" is a economic term meaning internal rate of return.
21 Q   There are a couple other acronyms on the heading here.
22 What's NPV?
23 A   They're all economic terms.  NPV is net present value.
24 Q   What is B/C ratio?
25 A   That's a benefit to cost ratio.

BATDORF - DIRECT/HOPSON          Vol. 9-1362

1  Q    Can you tell us, based on your own personal experience, if

2  this kind of ranking of economic projects was done on a

3  regular basis, an annual basis, at Cinergy?

4  A    Yes, sir, it most certainly was.

5  Q    Did Cinergy have any internal guidelines or guidance that

6  governed or controlled the way we did this, the way you did

7  this ranking process?

8  A    Yes, sir, we did.

9  Q    Let me show you, if I may, Your Honor, Defendants' -- I'm

10 sorry, Plaintiffs' Exhibit 1592 which is already in evidence.

11         MR. HOPSON:  May I display that, sir?

12         THE COURT:  Yes.

13         MR. HOPSON:  May I approach, Your Honor, to provide a

14 paper copy?

15         THE COURT:  Yes.

16         THE WITNESS:  Thank you, sir.

17 BY MR. HOPSON:

18 Q    What are we looking at here, Plaintiffs' Exhibit 1592?

19 A    This is the internal document that the engineers would

20 utilize to perform their evaluations.  It's a guide.  It's a

21 instruction manual telling them how to go about that process.

22 Q    Is that the process of cost/benefit analysis we've been

23 talking about?

24 A    Yes, sir.

25 Q    I want to turn --

BATDORF – DIRECT/HOPSON          Vol. 9–1363

1          MR. HOPSON:  I would like to do this on the ELMO.

2   BY MR. HOPSON:

3   Q    I want to turn to the purposes of the guide and just ask

4   you briefly if you understood in your use and work with these

5   type of cost/benefit and project evaluation documents, is that

6   statement of purposes consistent or inconsistent with your

7   understanding?

8   A    It's consistent.  It identifies the sole purpose being to

9   do the economic evaluation.

10          THE COURT:  And the page of the exhibit?

11          MR. HOPSON:  Oh, I'm sorry, sir.  It's 1–1.

12          THE COURT:  Thank you.

13  BY MR. HOPSON:

14  Q    Why don't you go ahead and just read us the purposes of

15  the cost/benefit analysis?

16  A    Yes, sir.  It says "The purpose of this guide is

17  to:  introduce the new Proval model, which is the preferred

18  tool for project justification studies at PSI Energy;

19          Document and review economic methods that can be used

20  for performing project justification studies;

21          Document the generally accepted criteria used by PSI

22  in evaluating construction budget projects; and.

23          Provide a convenient source of data for evaluating

24  project economics that can be updated annually."

25  Q    I want to go back to the first page, sir, to the first

BATDORF – DIRECT/HOPSON          Vol. 9–1364

1  page of Plaintiffs' Exhibit 1591 and ask you if this was a

2  particular addition or annual version of this document.

3  A    1591?

4  Q    I'm sorry, sir, not the page.  Just look at what's on the

5  screen.  What year was this particular project evaluation

6  guide prepared?

7  A    This was prepared March 1st of 1991.

8  Q    Are there other versions of this for other years?

9  A    Yes, sir.  It's updated and revised every year to reflect

10 the more appropriate economics.

11 Q    If we walked through this guide and looked page by page,

12 would we find anything relating to using these project

13 evaluation tools to predict or plan unit operations for future

14 generation?

15 A    No, sir.  It would be using the guide for purposes other

16 than what it was intended.  It was strictly to do the economic

17 evaluation, nothing to do with future predictions.

18 Q    And to what extent, if any, do the cost/benefit analysis

19 or project evaluations done with this guide fold into the

20 rankings we just saw?

21 A    That's what leads to that ranking process.

22 Q    I want to ask you a series of questions that are focused

23 on the four Wabash River projects, if we could, okay?

24 A    Yes, sir.

25 Q    Let's focus in particular on one which we can use as an

1  example which is the replacement of the superheater and

2  reheater tubes at Wabash River 3.  Are you familiar with that

3  project?

4  A   Yes, sir, I am.

5  Q   Is that type of project common at Cinergy?

6  A   Yes, sir, it is.

7  Q   I don't want to test your memory unduly, but can you give

8  us a sense of how many similar size, scope reheater

9  replacements were done during your time at Cinergy?

10 A   I would say during my 34 years with Cinergy, it would be

11 well over 15 just on those sections alone; and you've got

12 economizers and waterwalls and other sections as well.  Those

13 would be in the hundreds.  Reheaters, well over 15.

14 Q   And when you were doing a project -- not doing it but

15 planning a project such as this, did you seek out information

16 about other reheater replacements?

17 A   Yes, sir, we did.

18 Q   Why did you want that information, Mr. Batdorf?

19 A   Again, part of that, seeking that information was again

20 with our solicitation for bids.  Not only did we ask

21 contractors did they have experience replacing these sections,

22 when we went out for bids for the materials, we asked the

23 supplier also who had manufactured these tube sections before.

24         I know that I've reviewed experience lists just from a

25 single vendor and it said it was partial, that they had

BATDORF - DIRECT/HOPSON          Vol. 9-1366

1  identified over 64 different tube sections they had

2  manufactured.

3  Q   Based upon your experience and your work on these issues,

4  is replacing an entire component the size of the reheater and

5  superheater tubes we're talking about a rare occurrence?

6  A   No, sir, they're not.  They're relatively common.

7  Q   And referring to Wabash 3 as an example, at the time you

8  did this project, did you expect that you would go back and --

9  you or Cinergy would have to go back and replace the reheater

10  and superheater components again?

11  A   Well, there were certain tube sections that I thought that

12  we may not develop leaks in, and there's definitely other

13  sections that I fully expected that they would be replaced

14  again.

15  Q   Is it common, based on your experience in the industry, to

16  do component replacement projects that are only done once in

17  the life of the unit?

18  A   I would say that is common.  I mean, there are some

19  sections, again depending on location in the boiler,

20  temperatures, pressures, there would be some sections that may

21  only be one time.  Other sections will be more, but it doesn't

22  make a difference whether it's routine or not.

23       I mean, we all drive vehicles.  You'll do maintenance

24  on that vehicle.  You'll change tires.  You'll put brakes on;

25  and maybe once you might have to change the timing chain.

BATDORF - DIRECT/HOPSON          Vol. 9-1367

1  That's a very expensive change.  It's still routine

2  maintenance on that vehicle.  So that doesn't make a

3  difference.  It doesn't say, well, it's not routine because

4  you only do it once.

5  Q    I want to focus again on the Wabash River 2 1989

6  replacement of the front wall radiant superheater tubes.  Was

7  that the only time in the history of this unit that that

8  particular component replacement was done?

9  A    No, sir, it was not.  In fact, it was just replaced

10 recently.

11 Q    So it was replaced in 1989 and again recently?

12 A    Yes, sir, that is correct.  It was done in 2006.

13 Q    Looking at Wabash River 2 1992 upper reheater tube

14 component replacement, was that the only time that component

15 replacement was done?

16 A    No, sir, it was not.  Again, it was replaced recently.

17 Q    How about the Wabash River 3 project involving the 1989

18 radiant superheater tube component replacement, was that the

19 only time that component replacement was done at that

20 particular unit?

21 A    It's the only time it was done but that job is in the

22 planning stage.  The tubes are on location.  They're on site

23 to be replaced in the near future.

24 Q    Were all these projects, the Indiana projects at Wabash

25 River, treated as a capital cost as opposed to a current year

BATDORF - DIRECT/HOPSON          Vol. 9-1368

1  expense?

2  A   Yes, sir.  They were treated as a capitalized maintenance

3  cost; again, solely to identify in accordance with FERC

4  regulations how they were to be handled.

5  Q   Does that accounting treatment affect in any way the views

6  that you've expressed that these were common type component

7  replacements?

8  A   No, sir.  That has nothing to do with whether they were

9  common or not.  It's strictly how they recover our costs.

10 Q   We've had testimony that I believe the budgeted cost for

11 the reheater and superheater replacement at Wabash River 3 was

12 about $2.8 million.  What I want to ask you is based on your

13 own knowledge and understanding, how would that compare to the

14 cost of replacing the unit?

15 A   For that time period, replacement of a unit would be

16 anywhere between 1,000 to $2,000 per installed capacity per

17 KW.  So that would be about a million or $2 million per

18 megawatt hour.  To replace a unit like that at Wabash River,

19 it would put the cost then in the neighborhood of 90 to

20 $180 million.

21 Q   And based upon your own experience and your work with the

22 company on planning issues, are there obstacles other than

23 cost to rebuilding these units?

24 A   Yes.  As far as -- there's numerous factors you encounter

25 as you're trying to rebuild due to routine maintenance, repair

1  and replacement at the stations.  If you're trying to (Mark)

2  find a site location, nobody wants a power plant in their

3  backyard, myself included.  (Mark).  You then have to find a

4  location that has adequate source of water.  You have to find

5  a location that has readily access to transmission lines and

6  then you have other permit issues that you have to deal with.

7  Q   Let me ask you this.  Did outside contractors work on the

8  four Wabash River projects?

9  A   Yes, sir, they did.

10  Q   And how common is it for Cinergy to use outside

11  contractors on large or small component replacement projects?

12  A   Yes, sir.  It's a very common practice.  When we're into a

13  planned outage, we have our own skilled workforce that is tied

14  up doing other maintenance on that unit.  So we will

15  supplement our workforce to do projects like this and other

16  maintenance needs on the station.  That way when the repairs

17  are done, they're gone.  They're off the payroll.

18  Q   Are you looking for something else besides just man-hours?

19  Are you looking for expertise?

20  A   Yes.  As I shared earlier, when we were looking for the

21  experience list, we were looking for somebody that isn't a

22  newcomer to the business.  It's not the first time they've

23  done it.  We want somebody that has that experience, has done

24  it before, has the knowledge, has the tools and equipment to

25  make that happen.

BATDORF − DIRECT/HOPSON          Vol. 9−1370

1  Q   If I went through all of the Wabash River projects, all

2  four of them, and asked you the same questions that I

3  specifically asked you about Wabash River 3, would your

4  answers be the same or would they be different?

5  A   They would be the same.

6         MR. HOPSON:  Your Honor, at this time, I have no

7  further questions for Mr. Batdorf.  Thank you.

8         THE COURT:  Cross-examine.

9         MS. HIMMELHOCH:  Thank you, Your Honor.

10                     **CROSS−EXAMINATION**

11  BY MS. HIMMELHOCH:

12  Q   Good to see you again, Mr. Batdorf.  Good to see you,

13  ladies and gentlemen.

14         You just indicated that your answer would be the same

15  for all of the Indiana projects.  I want to break those down

16  just a little bit.  With respect to the Wabash River 5 unit,

17  the economizer and superheater tube replacements, has that

18  been done more than once in the lifetime of that unit?

19  A   Not to my knowledge, no.

20  Q   Are you aware of any unit anywhere in the country that has

21  done that project more than once in the lifetime of its unit?

22  A   Economizer?

23  Q   Economizer and superheater at the same time.

24  A   They did not replace the superheater at the same time.

25  Q   The crossover tubes?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1371

1  A   Yes, I am.

2  Q   How many?

3  A   Well, I know of one specifically because I attended an

4  EEEI conference.  The utility that gave that presentation was

5  on their second replacement.

6  Q   What was the cause of the failures in that instance?

7  A   Erosion.

8  Q   What was the cause of the failure at Wabash River?

9  A   It was a combination of things.  The primary thing was the

10 support mechanism of the header had failed.  As hard as Riley

11 Stoker tried --

12       COURT REPORTER:  Could you slow down.

13 A   I'm sorry.  As hard as Riley Stoker tried, and I remember

14 reading reports, and I know from those reports that there was

15 a material problem that they used carbon steel for some of

16 these hanger rods, and due to the temperature they were

17 seeing, it did not hold up to that; and as a result, the

18 header started dropping, caused the tubes to drop and that's

19 why that project had to continue; and there was an upgrade in

20 material with that.

21 Q   And so the purpose of the other project and the -- strike

22 that.

23       With respect to the Wabash River Unit 5 project, how

24 does the cost of that project compare to the overall annual

25 maintenance budget for the Wabash River plant?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1372

1  A   Can you tell me what the cost of that project was?  I

2  don't think I have any documents that --

3  Q   Would you agree that it cost approximately $2.3 million?

4  A   That sounds reasonable.

5  Q   What was the -- in comparison to that $2.3 million, was

6  that overall annual maintenance budget for the Wabash River

7  plan in the year that project was done (Mark)?

8  A   That was 1990?

9  Q   I believe so, yes?

10  A   I don't know.  I wasn't there at that point.  I worked at

11  the station after that.  Again, if you have documents I could

12  review, I would be more than happy to identify that.

13  Q   I don't need you to speculate on that.  I'll move on.

14        With respect to the Wabash River Unit 3 project, can

15  you -- well, let me step back.  When you were discussing the

16  Gibson reheater project, you indicated it was similar to the

17  Wabash River project, correct?

18  A   I didn't say similar.  I was asked a question had other

19  reheater sections been replaced, and I said yes.

20  Q   In comparison to the Gibson reheater project, which is not

21  at issue for RMRR, how big is the Wabash River Unit 3 project?

22  A   How big is it compared to?

23  Q   Well, let's look at the Gibson project.

24  A   Okay.

25  Q   How many tubes were replaced in the Gibson project?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1373

1  A   Again, Ms. Himmelhoch, I reviewed that for my depositions.

2  I did not do that for here.  I don't recall the exact numbers.

3  Q   You indicated about a third of the reheater was replaced

4  at Gibson, correct?

5  A   Yes, that is correct.

6  Q   And at Wabash River Unit 3, a portion of the reheater was

7  replaced, correct?

8  A   Yes.  If I go from recollection on that, I believe it was

9  about a third also because it was just the finishing or the

10  convection section if I recall correctly.  You still have the

11  horizontal reheater in that unit as well.

12  Q   But that wasn't all that was replaced during that project;

13  isn't that correct?

14  A   It wasn't all that was replaced but it was all that was

15  replaced with respect to the reheater, and that's what we're

16  talking about.

17  Q   But the Wabash River 3 heater also included complete

18  replacement of three sections of the superheater, did it not?

19  A   Not -- well, it included replacements of sections of the

20  superheater but not the complete superheater, yes.

21  Q   But three sections of the superheater, plus a partial

22  replacement of the reheater?

23  A   Yes, ma'am, that is correct.

24  Q   And at Gibson, all that was replaced was a third of the

25  reheater?

BATDORF– CROSS/ HIMMELHOCH    Vol. 9-1374

1  A   Yes, that is correct.

2  Q   And at Wabash River Unit 2, what was replaced was both

3  portions of the reheater and portions of the superheater,

4  correct?

5  A   Could I get a copy of the document that lists the six

6  Indiana projects so I can continue to refer to that?

7      MS. HIMMELHOCH:  Do you have a copy for the witness?

8      MR. HOPSON:  Sure.

9  *(A discussion was held off the record.)*

10     MS. HIMMELHOCH:  May I approach the witness, Your

11 Honor?

12     THE COURT:  Yes.

13     THE WITNESS:  Thank you, ma'am.

14 BY MS. HIMMELHOCH:

15 Q   In the 1992 Wabash River project, both sections of the

16 reheater and sections of the superheater were replaced?

17 A   Yes, just portions of each section, that is correct.

18 Q   And that was a project that was bigger in scope than the

19 Gibson project, correct?

20 A   Well, when you say "bigger in scope," it does include

21 other sections that Gibson did not, but again, because of the

22 size of the Gibson, if you're trying to draw some comparisons,

23 it's very possible that the reheat section at Gibson that was

24 replaced would include more tubes than what was replaced in

25 this project.

BATDORF- CROSS/ HIMMELHOCH       Vol. 9-1375

1  Q    But you don't know that?

2  A    No, I don't know that.

3  Q    Back early in your testimony -- I'm trying to find a place

4  where this will be out of the way (indicating).  Back earlier

5  in your testimony, you talked about Exhibit -- Defendants'

6  Exhibit 2115.  Do you recall that?

7  A    I remember talking about several.  I don't know which

8  one --

9  Q    It's the September availability degrader report.

10 A    Yes, ma'am, I do.

11 Q    If you could turn to that for a moment and if we could

12 call it up, please.

13 A    Yes, I have that document.

14 Q    Okay.  Now, you indicated that the second and third page

15 of this document were the report of overall highest

16 availability degraders for the PSI system, correct?

17 A    Yes, I did.

18 Q    I would like to just take a look at a couple of entries

19 here.  Line No. 4 on page 2, if we could turn to page 2?

20 A    It's page 2 but it says "3" at the top, yes.

21 Q    Yes, I'm sorry.  Why don't I clarify.  It's Bates number

22 ending 6812.

23 A    Yes, ma'am.

24 Q    Okay.  If you look at line 4, it says "opacity."  Do you

25 see that?

*BATDORF- CROSS/ HIMMELHOCH*        Vol. 9-1376

1  A    Yes, ma'am, I do.

2  Q    And it says for Gallagher, there were 882 hours lost,

3  correct?

4  A    Yes, it does.

5  Q    Is it fair to say that some of those hours were due to

6  pulverizer problems?

7  A    I would have to look at the detailed list.  When you look

8  at this, these are strictly summarized and grouped.  There

9  are -- there might be 125 hits that cause that.  You would

10  have to go back and look at that specific cause.

11  Q    Right.  But in this time period, the pulverizers were

12  causing loss of ignition that required derates of the units

13  for opacity reasons; isn't that correct?

14  A    Yes, they were.

15  Q    And if we look at line 12, for pulverizer feeders again

16  under Gallagher, it lists 56,835 hours of lost availability,

17  correct?

18  A    Yes, it does.

19  Q    And if you look on the next page, line 16?

20  A    Yes, ma'am.

21  Q    It shows 736 hours lost to pulverizer mills at Gallagher,

22  correct?

23  A    Yes, along with 48,000 at Wabash River.

24  Q    Let's turn now to the numbered page 7 and the Bates number

25  is 6816.  It's about four or five pages in.

BATDORF- CROSS/ HIMMELHOCH       Vol. 9-1377

1  A    Yes, ma'am.  I have that page.

2  Q    The Gallagher station report, the No. 1 degrader listed is

3  the pulverizer feeders; isn't that correct?

4  A    Yes, it is.

5  Q    And if we turn to Gibson station, the No. 1 degrader is

6  reheater leaks, correct?

7  A    As soon as I get to Gibson --

8  Q    It should be the page right after the one we were on?

9  A    It's not in mine.  It's on page 20.

10  Q    I'm looking at page 8.  Can you turn back to page 8?

11  A    Yes.  I apologize.  I'm on page 8 and yes, it does

12  indicate the first reheater tube leaks is the No. 1 cause for

13  the derates or outages at Gibson.

14  Q    Okay.  And if we can turn to Wabash River, which should be

15  two pages down at page 10.

16  A    Okay.  I have that page.

17  Q    The eighth cause -- top cause of availability loss is the

18  second superheater tube leak; isn't that correct?

19  A    Yes, that's correct.

20  Q    That caused a lost availability of 7.6 percent; is that

21  correct?

22  A    Yes, that's correct.  (Mark).

23  Q    Thank you.  Now, I understand -- I think I saw you on your

24  last day of work for PSI.  So you're a retired Cinergy

25  employee; is that right?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1378

1  A    Well, you saw me more than my last day.  I think I worked
2  several days past that.
3  Q    And you're now receiving a pension from Cinergy, isn't
4  that correct?
5  A    Yes, I am.
6  Q    Do you hold any stock in Cinergy?
7  A    No.  I hold it in Duke.
8  Q    And Duke is now the successor of Cinergy, isn't that
9  correct?
10 A    Yes, that is correct.  Good investment.
11 Q    Now, I believe you testified that we -- and I think you
12 were referring to Cinergy, don't expect replacement of a
13 component to increase availability.  Do you recall testifying
14 to that?
15 A    I certainly did, yes.
16 Q    Do you know who Mr. Elkins is or was in -- my apologies.
17 I thought I was organized.
18        In 1996, do you know what position Mr. Elkins held?
19 A    In 1996, yes.  At least for part of that time period.
20 Q    He was president -- he was station manager at Wabash
21 River; isn't that correct?
22 A    Yes, that is correct.
23 Q    And Mr. Elkins stated in 1992 --
24        MR. HOPSON:  Objection, Your Honor.  She's reading
25 from the same document you sustained an objection to

BATDORF- CROSS/ HIMMELHOCH     Vol. 9-1379

1  yesterday, I believe.

2       MS. HIMMELHOCH:  This is not a document I offered

3  yesterday.  I did offer it previously.  The witness has now

4  testified that the company does not believe a component

5  replacement can increase availability.  This goes directly to

6  impeach that statement.

7       MR. HOPSON:  Can we come to the bench, Your Honor.

8       THE COURT:  All right, although I doubt this is a

9  mystery to anybody on the jury.

10     (A bench conference was held on the record.)

11      MR. HOPSON:  I just didn't want to talk about

12 impeachment in front of a jury.  You can't impeach a witness

13 by confronting him with somebody else's testimony.  It's just

14 a bright-line rule.  You just don't say Mr. Elkins says this

15 or you're lying."  That's not fair impeachment.

16      MS. HIMMELHOCH:  He has testified that was the belief

17 of the company.  I'm entitled to inquire --

18      THE COURT:  I thought he said that's what he thought.

19      MS. HIMMELHOCH:  He said "we."  I said, "Are you

20 just -- are you referring to Cinergy?"  He said, "Yes."

21      THE COURT:  That's what you just asked him.  And so?

22      MS. HIMMELHOCH:  I want to ask him if everyone in

23 Cinergy held that belief.

24      THE COURT:  If you ask him if everyone held that

25 belief and he says "I don't know," then what are you going to

*BATDORF— CROSS/ HIMMELHOCH*        Vol. 9–1380

1  do?

2          MS. HIMMELHOCH:  I think I'm entitled to explore

3  whether or not other individuals at the company —

4          THE COURT:  I don't think you can, not without

5  bringing those people in —

6          MR. HOPSON:  Right.

7          THE COURT:  — and taking care of that.

8          MR. HOPSON:  In part because it's hearsay, in part

9  because it's improper impeachment, and also he testified he

10 was the one making the predictions, not Mr. Elkins or whoever

11 the heck he was talking about.

12         MS. HIMMELHOCH:  The point is —

13         THE COURT:  The point is I'm not going to let you do

14 it.

15         MS. HIMMELHOCH:  Your Honor, I have other statements

16 by the company.

17         THE COURT:  Each statement may be different.  Does he

18 know of these people, who these people are?

19         MS. HIMMELHOCH:  He just testified — may I attempt

20 to lay the foundation and then we'll go from there?

21         THE COURT:  You can try and lay a better foundation

22 than you've got, and then we'll come back here and do what we

23 need to do.

24         MS. HIMMELHOCH:  Okay, thank you.

25     *(End of bench conference.)*

*BATDORF– CROSS/ HIMMELHOCH*    Vol. 9–1381

1    *(In open court)*

2  Q    So, Mr. Batdorf, you testified that the station managers

3  met regularly each year to discuss capital improvement

4  projects, correct?

5  A    I said we met regularly, sometimes monthly, bimonthly and

6  yes, annually as well.

7  Q    And during the course of those discussions, you discussed

8  the benefits to be expected from particular capital

9  improvement projects, correct?

10 A    Among other things, yes, ma'am.

11 Q    After the merger with Cinergy, there was some discussion

12 about what plants should be given priority in maintenance

13 dollars; isn't that correct?

14 A    Discussions about which plants would be given priority

15 with respect to maintenance dollars?

16 Q    Well, let me ask it a different way.  Are you familiar

17 with the asset rationalization model that was developed in the

18 post-merger period?

19 A    I've heard of the model but I think it was short lived.  I

20 don't recall ever utilizing it for anything.

21 Q    Do you recall discussing it at meetings with other station

22 managers?

23 A    I really don't recall.  I apologize.  I do not recall

24 discussing that at any of the meetings.

25 Q    When you said that we don't expect a component replacement

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1382

1  to result in increases in availability, is that your

2  understanding of the belief that everyone at Cinergy held?

3  A   I don't know what belief they had, but it was a common

4  understanding that the fact that you do component

5  replacement -- repair and replacement does not translate into

6  availability of the unit, and that does not translate to

7  generation.

8  Q   Okay.  Well, let's start with the last point, the question

9  of generation.  You testified regarding Plaintiffs' Exhibit

10  1592, did you not?  That's the project -- construction project

11  evaluation guide?

12  A   Yes, ma'am, I did.

13  Q   And if we could -- and you also testified that you did not

14  expect these projects to change the dispatch order of the

15  unit, correct?

16  A   I didn't say I didn't expect it to.  I said that's what --

17  if you did a project, the only way you would have any impact

18  on generation would be to change a dispatch order, yes, ma'am.

19  Q   Well, did you have any expectation that any of the Indiana

20  projects would result in making it less likely that the unit

21  would be dispatched?

22  A   No, not at all.

23  Q   In fact, you expected them to retain their current

24  standing in the dispatch ranking -- in the stacking order I

25  think was what you said?

BATDORF- CROSS/ HIMMELHOCH      Vol. 9-1383

1  A   Solely with respect to these projects, that's absolutely

2  right, but there's other things that change such as fuel costs

3  that would move a unit, a dispatch order, not these projects.

4  Q   Let me then go project by project.  With respect to the

5  Gibson project, was there any expectation in the years leading

6  up to the project -- and let's focus on the five years leading

7  up to the project.  Was there any expectation that the fuel

8  costs at the Gibson unit would change?

9  A   Without reviewing documents, I couldn't say whether there

10  was expectations or not.  I can say, Sarah, we have fuel

11  contracts that do change over time.  In my 25 years as station

12  manager, I recall sitting in meetings there with the coal

13  suppliers, and fuel prices did change.

14  Q   But you don't know specifically about the Gibson project,

15  correct?

16  A   Not without reviewing documents.  I'd be happy to review

17  those and identify whether, in fact, it does reflect a fuel

18  change.

19  Q   But you don't know of any fuel change?

20  A   Not without reviewing documents, no, ma'am, I do not.

21  Q   And you didn't bring any documents here today that would

22  help you answer that?

23        MR. HOPSON:  Objection, Your Honor.  This is

24  argumentative whether he brought documents about fuel changes.

25        THE COURT:  Well, he didn't.  Let's go on.

*BATDORF- CROSS/ HIMMELHOCH*    Vol. 9-1384

1       MS. HIMMELHOCH:  I'll move on.

2   BY MS. HIMMELHOCH:

3   Q   Now, Mr. Batdorf, you understand that the regulations

4   require a determination of whether there will be a significant

5   net emissions increase, isn't that correct?

6   A   Yes.  I understand that the regulations require that if we

7   do a project that would cause a change or change in

8   operations, that it, by itself, would cause an increase in

9   emissions; that, yes, we would have to apply for an NSR

10  permit.

11  Q   Let's focus on a couple elements of that.  In doing that

12  projection, do you understand you need to select a baseline

13  period?

14  A   First of all, you have to get to the point of doing that

15  prediction or calculation.  And the projects in this question

16  are tubes out, tubes in.  They're emissions neutral.  They're

17  not going to affect how that unit is going to be utilized.

18  Q   Let me step back and ask you to answer my question which

19  is do the regulations require a comparison between a baseline

20  period and the two years following the project?

21  A   Yes, the regulations require that.

22  Q   And there are no documents showing that Cinergy did a

23  comparison of operations in a baseline period to the two years

24  immediately following the project; isn't that correct?

25  A   I believe as I testified in my direct testimony that there

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1385

1  was no requirement to do such.

2  Q   And there were no documents?

3  A   There's no need to have those documents, that is correct.

4  We did do the mental evaluation.  We did review.  We did

5  consider.

6  Q   Did --

7  A   There was no need to put pen to pencil.

8  Q   I'm sorry.  You know from our prior encounters that I

9  sometimes don't hear that you're still talking.

10         Now, you indicated that you did not believe these

11  projects would result in an increase in emissions because they

12  didn't change the function.  They didn't change the capability

13  and they didn't change the stacking order of the unit; isn't

14  that correct?

15  A   Yes, ma'am.  That's correct.

16  Q   Okay.  Now, if you don't change the function of a unit but

17  you replace a large section of tubes that reduces the number

18  of forced outages, and nothing else goes wrong, just assume

19  that for a moment, you will run that unit more hours; isn't

20  that correct?

21  A   No, that is incorrect.

22  Q   Why is that incorrect?

23  A   Because you're making the assumption that the mere fact

24  that you did a component replacement is going to directly

25  relate to that unit operating.  That's not what drives whether

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1386

1  a unit runs or not.  We have economic dispatch.  The location

2  of that unit and the dispatch order, what its costs are, what

3  the customer demand is, that determines whether that unit runs

4  or not.

5  Q   All right.

6  A   Let me finish, please.

7  Q   Oh, I'm sorry.

8  A   When I worked at Wabash River, we had similar tube

9  replacement sections that we replaced.  We got phone calls

10 during the week that says "We want you to shut Unit 2 and 3

11 down after the peak tonight and take 4 down tomorrow" all

12 because of customer demand.

13 Q   As a result of those -- in the years following those

14 projects, was the average use of that unit the same as the

15 average use in the two years before the project?

16 A   I really don't know, Sarah.  I didn't review documents to

17 see whether it was.  Even if it was, you've got to look at all

18 of those other factors I talked about on that availability

19 degrader list.  There are other problems that continue to

20 plague that unit.  There are going to be new problems that

21 arise, and that availability is going to be up and down, and

22 what drives generation is customer demand and the placement of

23 that unit in the dispatch order, not the fact that you do a

24 project.

25 Q   I understand, and I appreciate your point of view, but I

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1387

1  would like to ask you to confine your answer to the question

2  I'm going to ask you.

3  A   I apologize but I'm trying to -- I'm trying to answer your

4  question.

5  Q   Let's turn to 1592, if we could.  And if we could call up

6  page 3-20, which is the document Bates number ending 2012?

7  A   What page, please?

8  Q   3-20 or if you want to use the Bates numbers, 2012.

9       Mr. Batdorf, this is the discussion of how you perform

10  the economic evaluation, is it not?

11  A   This is a page in one of the factors and one of the

12  assumptions that you make, yes.

13  Q   This is discussing the term "utilization factor," correct?

14  A   Yes, it is.

15  Q   Utilization factor is a measure of how much availability

16  of the unit is actually used, is it not?

17  A   It's a measure of how that unit is utilized, yes.

18  Q   And the company has established a formula for calculating

19  UF, has it not?

20  A   They have a formula for calculating UF, yes, they do.

21  Q   And that formula is --

22       MS. HIMMELHOCH:  And, Your Honor, may I just write

23  down so we can follow the math -- I'm not going to ask to

24  admit this.  I just want to be able to visually follow this.

25       THE COURT:  Yes.

BATDORF- CROSS/ HIMMELHOCH       Vol. 9-1388

1  BY MS. HIMMELHOCH::

2  Q   The formula is UF equals CF over EAF, correct?

3  A   I'd have to go back and do some recollection.  I don't

4  have formulas memorized, I'm sorry.

5  Q   If you look down on the middle of the page there?

6  A   Yes.

7  Q   There's a formula; do you see that?

8  A   Yes, I do.

9  Q   Did I accurately read that formula?

10 A   Yes, you did.

11 Q   Do you have any reason to dispute that was the formula the

12 company was using at this time?

13 A   No, I do not but you need to understand, it's being

14 utilized for economic evaluation, not to predict how that unit

15 is going to be used in the future.

16 Q   That's not my question.  My question is is this the

17 formula they used for utilization factor?

18 A   That's the formula that's in here for economic evaluation,

19 yes, ma'am.

20 Q   UF is utilization factor?

21 A   Yes, that is correct.

22 Q   And CF is capacity factor, correct?

23 A   Yes, ma'am.

24 Q   That's a measure of generation, is it not?

25 A   Yes, it is.

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1389

1  Q   And EAF is equivalent availability factor, isn't it?

2  A   Yes, it is.

3  Q   It's a measure of the availability of the unit, correct?

4  A   Equivalent, yes.

5  Q   And equivalent simply means you're taking into account

6  both derates and outages, correct?

7  A   Yes, that's correct.

8  Q   So both times when it's not running at all and times when

9  it's not running at full power?

10  A   Correct, past performance, not future.

11  Q   As a simple matter of math and I hate to use the word

12  "simple" because math is never simple to me; but if UF equals

13  CF over EAF -- in other words, if utilization factor is

14  capacity factor divided by EAF, then capacity factor is EAF

15  times UF; isn't that correct?

16  A   Yes, that is correct.

17  Q   So if we could switch to the ELMO for a moment.  That's

18  the formula, correct, CF equals UF times EAF?

19  A   Yes, that's correct.

20  Q   In other words, the generation is a factor of utilization

21  and availability?

22  A   Yes, according to the formula, that's correct.

23  Q   If utilization stays constant and availability increases,

24  by definition the capacity factor increases, does it not?

25  A   Again, you're making certain assumptions eliminating one

1  key thing and that's demand.

2  Q    I'm just asking for how the formula works?

3  A    That's how the formula works.

4  Q    Under the formula, if utilization stays the same and

5  availability goes up, the capacity factor goes up?

6  A    Yes, according to the formula.

7  Q    And you don't know or are not testifying regarding the

8  utilization factors of these units before or after these

9  projects, correct?

10  A    No, I am not.  I reviewed the document that was presented

11  today that reflected the capacity factor on the units.

12  Q    Now, Cinergy did use this project evaluation to estimate

13  improvements -- the effect of improvements in availability on

14  generation, did it not, for purposes of economic evaluations?

15  A    We utilized that for purposes of economic evaluation; but

16  when you look at that formula, Mrs. Himmelhoch -- and please

17  bear with me -- that can only be utilized for past.  How can

18  you determine what that's going to be for the next year, two

19  years out when you don't know what the demand is going to be.

20  Q    How far in advance do you order your coal?

21  A    We have coal contracts that are multiple years, and we

22  have some that's spot market.

23  Q    And you do have to make projections for the PUC regarding

24  how much reliable power you can produce, do you not?

25  A    I don't but we have at the company -- somebody does that,

*BATDORF- CROSS/ HIMMELHOCH*        Vol. 9-1391

1  yes.

2  Q    In fact, there's a whole division devoted to that, is

3  there not, a generation planning group?

4  A    Yes, that is correct.

5  Q    And they analyze on a regular basis how much electricity

6  the plants can generate?

7        MR. HOPSON:  Your Honor, I am going to object this is

8  beyond the scope.  He didn't testify to generation planning

9  subjects.

10        MS. HIMMELHOCH:  He testified regarding the company's

11  expectations regarding the outcome of these projects.  I'm

12  entitled to explore the limitations of his knowledge regarding

13  that fact.

14        THE COURT:  I think you are.  He may answer.

15  A    So repeat the question, please?

16  Q    The generation planning group looks at what each unit is

17  going to do in the future, does it not?

18  A    I don't know what the generation planning group does.

19  Q    And to your knowledge, the generation planning group was

20  not consulted or asked to do any analysis before these

21  projects were undertaken?

22  A    I don't know.  I don't know why they would be consulted.

23  Q    But to your knowledge, they were not?

24  A    I don't know.

25  Q    So the crux of your testimony then with respect to the

1  emissions is that -- let me step back and ask one more

2  question regarding the future projections.  In addition to

3  regularly projecting electricity for the PUC, the company also

4  regularly analyzes demand, does it not?

5  A    Somebody in the company is looking at factors.  My

6  responsibility at the station was to try to make the units

7  available and reliable.  I don't know what was taking place

8  elsewhere.

9  Q    So you don't know whether someone else in the company was

10  analyzing demand and could have indicated what was happening

11  to demand in the expected -- the two years following the

12  project?

13  A    I had enough Excedrin headaches to handle myself.  I

14  didn't worry about that.

15  Q    Do you know who Mr. Messick was in the mid '90s?

16  A    Yes, I do.

17  Q    Who was he?

18  A    Mr. Joe Messick at one point in time was my supervisor.

19  Q    Did you ever discuss with him whether or not a component

20  replacement could result in increased availability?

21  A    As far as specifically with him, I can't say; but we had

22  discussions and a common understanding amongst all managers

23  that when we're looking at some of these repair and

24  replacement projects, tubes in, tubes out.

25  Q    And you're indicating that Mr. Messick held that common

BATDORF- CROSS/ HIMMELHOCH       Vol. 9-1393

1  understanding?

2  A   Mr. Messick was my boss and we would occasionally review

3  with him these projects, and being the fact that he approved

4  to proceed without questioning them, yes, I would say he had

5  that same understanding.

6  Q   If Mr. Messick stated "At our Wabash River generating

7  station, we have found that some sections of the tubes in the

8  boilers needed to be replaced.  We have completed some of

9  these projects and have others scheduled in the future.  These

10 tube replacements are performed in order to improve the

11 operating availability of the "units," would that be

12 consistent --

13       MR. HOPSON:  Objection, Your Honor.  I think for the

14 reasons we stated at the bench that this is improper use of

15 another person's testimony to confront a witness on the stand.

16 It's just improper.  It doesn't matter whether he talked to

17 the gentleman or didn't talk to the gentleman or whether he

18 knows the gentleman's views.  It's just improper impeachment,

19 I believe.

20       MS. HIMMELHOCH:  He testified that Mr. Messick

21 approved these projects with a common understanding.  I'm

22 entitled to establish that it was not a common understanding.

23       THE COURT:  Well, in order to do that we have to have

24 specific conversations between one witness and another, and

25 you don't have that, and I sustain this objection.

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1394

1  BY MS. HIMMELHOCH:

2  Q   Now, just because a unit has the capability to burn a

3  particular kind of coal does not mean that that unit will, in

4  fact, burn that kind of coal; isn't that correct?

5  A   I apologize, repeat?

6  Q   I'm sorry, I need to lean into the podium to get closer to

7  the microphone.

8       You were station manager at Gallagher for some period

9  of time, were you not?

10 A   No, ma'am, I was not.

11 Q   You worked at Gallagher, though, did you not?

12 A   Yes, I did.

13 Q   Are you familiar with the kinds of coal that Gallagher

14 could burn prior to 1999?

15 A   I was a maintenance supervisor.  The yard supervisor and

16 others would be people more knowledgeable.  I was directing a

17 crew of our people to maintain equipment.

18 Q   Let me ask you a different question.  You were station

19 manager at several other stations, were you not?

20 A   Yes, ma'am, I was.

21 Q   Did, for instance, Wabash River have the ability to burn

22 more than one kind of coal?

23 A   Yes.  Each station had the ability to burn coal from

24 different suppliers.

25 Q   And the choice of what coal to burn was governed by a

BATDORF– CROSS/ HIMMELHOCH        Vol. 9-1395

1  number of factors, was it not?

2  A    Yes, it was.

3  Q    Including cost?

4  A    Including cost, yes.

5  Q    And there tended to be long-term coal contracts, correct?

6  A    As I said earlier, we had both long-term coal contracts

7  and where we purchased coal on the spot market.

8  Q    Let me move on to another question.  In justifying the

9  Gallagher condenser project, the Cinergy engineers calculated

10  lost generation as a result of outages; is that not correct?

11  A    They did an economic evaluation where they reflected the

12  past historical impact that had on the component on the unit,

13  yes.

14  Q    And they concluded that Units 1 and 2 together had

15  suffered nearly 100,000 megawatts of lost availability due to

16  condenser leaks, did they not?

17  A    I remember reading reports, Ms. Himmelhoch, but I don't

18  recall the exact number.

19  Q    And Cinergy anticipated that the condenser leaks would

20  decrease or be eliminated in the two years immediately

21  following the project, did it not?

22  A    They fully expected by doing that project that the tube

23  leaks in the condenser would be reduced, but we were looking

24  more at a long period of time, not strictly a one year, two

25  year period.

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1396

1  Q    So you weren't looking at the two years immediately

2  following the project?

3  A    Any time we do any repair and replacement projects, we're

4  looking at maintaining the availability over a long period of

5  time, not a short window.

6  Q    And you did not evaluate what the historical availability

7  losses had been due to the condensers in the two years

8  immediately preceding the project?

9  A    Did I personally?  No, I did not.

10  Q    Are you aware of anyone at Cinergy doing so?

11  A    Part of the economic evaluation was to look at the

12  historical data and use that into the calculation to come up

13  with the cost/benefit ratio.

14  Q    And do you know what time period was evaluated in that

15  historical evaluation?

16  A    Not without reviewing that economic evaluation, no, I do

17  not.

18  Q    Just to make sure I understand, Cinergy did not do a

19  comparison between any historical period and the two years

20  immediately following the project for purposes of determining

21  emissions changes?

22  A    There was no need to.  It was tubes out, tubes in.  The

23  project in and of itself was not going to cause the change or

24  change in operations that would cause an emissions increase.

25  Q    Did you do any analysis to determine whether or not

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1397

1  regardless of the cause there would be more hours of operation

2  at the Gibson unit in the two years following the project

3  compared to two years before the project?

4  A    The project in and of itself, Sarah -- I apologize,

5  Ms. Himmelhoch -- would not be the cause of any increased

6  generation.  Component availability does not equal unit

7  availability, does not equal generation.  Generation is driven

8  by other factors.

9  Q    And I appreciate that, and please feel free to call me

10 Sarah.  With a last name like mine, anything is acceptable.

11       But I want to focus on the question that I asked and I

12 understand your point; but Cinergy did not evaluate whether

13 for whatever reason the Gibson unit would run more in the two

14 years following the project than in the two years preceding

15 the project?

16       MR. HOPSON:  Objection, asked and answered.

17       THE COURT:  He can answer.

18 A    Now, we jumped from condenser back to Gibson.  Are we on

19 Gibson?

20 Q    I'm sorry.  I did jump, did I not?  I apologize for that.

21 Let's go with the question I asked because I actually got it

22 out in an understandable form.

23 A    We did not put pen to pencil.  We did the mental

24 calculation.  We did the evaluation.  We did the litmus test,

25 and there was no need to put pen to pencil because there was

BATDORF- CROSS/ HIMMELHOCH      Vol. 9-1398

1  not going to be an increase in emissions solely because of

2  that project.

3  Q   When you say demand would have been the cause of the

4  increases, is that what you're saying?

5  A   I'm saying any increase in generation from a unit comes

6  because the customer demand is there and the unit's placed in

7  the stacking order, that is correct.  The project does not

8  drive generation.

9  Q   Generation -- in order to meet demand -- or for an

10 increase in generation, you have to have both the demand and

11 the generation available, correct?

12 A   Yes, you do.

13 Q   And if the demand is there but the availability isn't

14 there, you have to go to other sources to find that

15 generation, correct?

16 A   Yes, you do.

17 Q   Did you analyze -- let me ask you another question.

18 Electricity can't be stored; isn't that correct?

19 A   That is correct.

20 Q   And so it has to be distributed at the time it's

21 generated, correct?

22 A   Yes, it does.

23 Q   So if a unit has excess capacity because it runs at full

24 power during the day and then at half power in the evening, if

25 you have an outage at 10 a.m., the fact that you could have

BATDORF- CROSS/ HIMMELHOCH     Vol. 9-1399

1  produced more electricity at midnight won't help you to have
2  met the demand at 10 a.m.; isn't that correct?
3  A   I don't see the correlation, but if a unit's off and it's
4  unavailable, it can't produce energy no matter what time of
5  the day it happened.
6  Q   Right.  And the fact that you could have produced
7  electricity at a different time of day doesn't answer the
8  question whether if the forced outage hadn't happened, you
9  would have run the unit at that time of day?
10 A   If you're making the assumption where that unit sat in the
11 stacking order, it may have been dropped, decreased on load
12 because at night when customers are going to bed, businesses
13 are shutting down, that demand may drop.  It may drop because
14 of that as well.
15 Q   I understand, but by definition, a forced outage happens
16 when Cinergy is trying to run the unit, correct?
17 A   Forced outages are random, unexpected events, yes.
18 Q   And they occur while the unit is being run?
19 A   Well --
20 Q   Or trying to run?
21 A   As soon as it occurs, the unit's no longer running.
22 Q   Right.  But, but for the problem, the unit would more
23 probably than not have continued to run; isn't that correct?
24 A   Just for that specific day but you can't correlate that to
25 days and weeks in the future.

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1400

1  Q   But on average, if the forced outages are happening when

2  the unit is used and in the future there are no forced outages

3  during those equivalent time periods, the fact that in the

4  pre-project period, they could have produced at a different

5  time of day doesn't answer the question of whether they would

6  be operating at 10 a.m. post-project or where they couldn't

7  pre-project?

8  A   I'm not so sure I'm following you.  I apologize.

9  Q   Let me see if I can formulate that question better, and

10 we'll get to some other points.

11        Now, the Gilbert Commonwealth Life Extension Study at

12 Wabash River was done not just by Gilbert Commonwealth but a

13 number of contractors; is that correct?

14 A   I think they had other subcontractors that worked for

15 them, yes.

16 Q   And they performed a thorough inspection of Wabash River

17 Unit 2, did they not?

18 A   Yes, they did.

19 Q   And as a result, they identified major concerns with the

20 boiler; isn't that correct?

21 A   I don't know that I would use "major" concerns.  They

22 identified issues where continued maintenance would be

23 required, yes.

24 Q   And they identified places where they recommended focusing

25 initial prioritization in the boiler, did they not?

BATDORF- CROSS/ HIMMELHOCH      Vol. 9-1401

1  A   Yes.  They had numerous projects and they used the

2  economic evaluation to come up with the recommendation, yes.

3  Q   If we could have 1319, page 1-9, which is ending in -- I

4  don't know which Bates -- oh, you have the same Bates numbers.

5  It's CINWA002129.  It's the big, thick one.

6  A   I don't have that.

7  Q   Let me turn to that page then.

8       THE COURT:  Let's take a break and we'll take a look

9  at that when we get back.

10      COURT CLERK:  All rise.

11      This court stands aside in brief recess.

12  (Jury out.)

13  (A recess was taken.)

14  (Jury in.)

15                  (Open court.)

16      THE COURT:  You may continue.

17  Q   Before the break, we had established that you didn't have

18  a copy of 1319.  I've now handed you a copy; is that correct?

19  A   Yes, ma'am.

20  Q   Can you turn to page 1-9, which CINWA002129.

21  A   Yes, ma'am.  I have that page.

22  Q   In the middle of the page, there is a paragraph that

23  begins "The major concerns"?

24  A   Yes, ma'am.

25  Q   And it identifies five major concerns regarding the boiler

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1402

1  and its auxiliaries; is that correct?

2  A   Yes, it does.

3  Q   And among the five major concerns are the radiant

4  superheater; is that correct?

5  A   Yes, ma'am.

6  Q   And that was replaced in the 1989 project, correct?

7  A   In the 1989 project as well as again just recently, yes.

8  Q   But the 1989 project was in response to the study,

9  correct?

10  A   Yes, I believe it was.

11  Q   And they also identify as a major concern the finishing

12  superheater; is that correct?

13  A   Yes, ma'am.

14  Q   And that was replaced in the 1992 project; isn't that

15  correct?

16  A   Yes, ma'am.

17  Q   And they identify as an area of concern the reheater upper

18  bank; isn't that correct?

19  A   Yes, they did.

20  Q   And that was replaced in the 1992 project, correct?

21  A   Yes, ma'am, it was.

22  Q   Now, let's go a little bit deeper into this document.  If

23  you go to page 2.0-2, which bears the number CINWA002158,

24  starting at the very bottom of this page, the last paragraph

25  states "Once the outage inspections were completed,

BATDORF- CROSS/ HIMMELHOCH       Vol. 9-1403

1  engineering evaluation by G/C" -- which means Gilbert

2  Commonwealth, correct?

3  A   Yes, ma'am.

4  Q   "Combustion Engineering and Westinghouse started.  At the

5  completion of evaluation, all recommended projects were

6  developed.  These projects were classified into the following

7  five groups."  And if we could continue on to the next page?

8  A   Yes, ma'am.

9  Q   I just want to focus on two groups.  Item No. 2,

10  "Rehabilitation operational.  Projects relating to equipment

11  restoration in regard to availability, reliability and

12  capacity factors at or near original design status by repair

13  or replacement of kind."  Do you see that?

14  A   Yes, ma'am.

15  Q   Then category 4 is "Modernization operational.  Projects

16  relating to equipment restoration in regard to availability,

17  reliability and capacity factors at or near original design

18  status by using the current available state-of-the-art

19  component design."  Do you see that?

20  A   Yes, I do.

21  Q   Now, we need to go a little deeper into the document.  If

22  you go to 2.1-148, which is Bates No. CINWA002279; if you

23  could highlight the top portion of the page, please.

24        This is the section of the radiant superheater project

25  description, is it not?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1404

1  A    Yes, it is.

2  Q    And that's the project that was carried out in 1989,

3  correct?

4  A    Yes, ma'am.

5  Q    How is it classified in this grouping of projects?

6  A    Well, the firm that did this classified it as

7  rehabilitation-operational.

8  Q    And the economic justification, a little bit further down

9  the page, states that "The replacement will increase the

10  meantime between failures from the present value of 1,367

11  hours to 12,000 hours for approximately eight years."  Do you

12  see that?

13  A    Yes, I do.

14  Q    And in my layman's terms, that means that they expect

15  failures due to this component to be far less common in the

16  post-project period than the pre-project period; isn't that

17  correct?

18  A    For that component, yes.

19  Q    And that's for the eight years following the project?

20  A    That's what it reflects, yes, ma'am.

21  Q    If we could now turn to page 2.1-157.  This discusses the

22  finishing superheater; is that correct?

23  A    Yes, ma'am, it does.

24  Q    And that's part of what was done in the 1992 project as

25  part of the Wabash River Unit 2 project; isn't that correct?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1405

1  A   Yes, ma'am, it was.

2  Q   The document classifies this project as

3  modernization-operational; isn't that correct?

4  A   Yes, it does.

5  Q   And it states that the -- at the very bottom of the page,

6  it states "The meantime between failures would increase from

7  the present value of 1,094 hours to a minimum of 18,000 hours

8  for approximately ten years."  Do you see that?

9  A   Yes, I do.

10  Q   And that's a statement that in layman's terms again means

11  that they expect outages due to this component to be far less

12  frequent in the post-project period for at least ten years;

13  isn't that correct?

14  A   Yes, it does.

15  Q   Let's turn now to page 2.1.1 -- or -167, Bates

16  No. CINWA002298.

17  A   Yes, ma'am, I have that page.

18  Q   And this project, too, was designated as

19  modernization-operational in this document, was it not?

20  A   Yes, ma'am.

21  Q   And they conclude on the next page "The meantime between

22  failures would increase from the present value of 3,978 hours

23  to 18,000 hours for approximately ten years."  Do you see

24  that?

25  A   That's what they were projecting, yes.

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1406

1   Q   That again is a statement that they expected the number of

2   failures in this component to be greatly reduced in the ten

3   years following this project, correct?

4   A   They expected it to be reduced, yes.

5   Q   Now, the project -- the discussion -- the purpose of this

6   document, as Mr. Hopson asked you to read it, if you could

7   turn back to that page in the document.

8         MS. HIMMELHOCH:  May I approach the witness to assist

9   him in finding it?

10        THE COURT:  Yes.

11  BY MS. HIMMELHOCH:

12  Q   Mr. Batdorf, if you could read the Bates number beginning

13  with CINWA, for the record, please?

14  A   Yes, ma'am.  It's CINWA002123.

15  Q   Okay.  On that page, one of the purposes mentions EPRI.

16  Do you see that?

17  A   Yes, I do.

18  Q   Could you please read that purpose in again?

19  A   Yes.  "To conduct economic evaluations of refurbishment

20  and equipment replacement projects using criteria similar to

21  those suggested in EPRI report EA3890 Volume 2, economic

22  evaluation of plant upgrading investments."

23        MS. HIMMELHOCH:  May I approach the witness, Your

24  Honor?

25        THE COURT:  You may.

BATDORF- CROSS/ HIMMELHOCH       Vol. 9-1407

1  BY MS. HIMMELHOCH:

2  Q   Mr. Batdorf, I've handed you a document that's been marked

3  Plaintiffs' Exhibit 1522 for identification.  Do you recognize

4  this document?

5  A   No. I've not seen this document before.

6  Q   What is the title of the document?

7  A   It says "Economic Evaluation of Plant Upgrading

8  Investments, Volume 2 Case Studies."

9  Q   What is the EPRI report number in the upper left-hand

10 corner?

11 A   You mean upper right-hand corner?

12 Q   I'm sorry, yes, upper right-hand corner.

13 A   It's EPRI EA3890.

14 Q   Is this the document that was referred to in 1319?

15 A   Yes, ma'am, it was.

16      MS. HIMMELHOCH:  I move for the admission of this

17 document at this time.

18      MR. HOPSON:  Objection, Your Honor.  It's hearsay.

19 It's not a Cinergy document.  It's not prepared by or used by

20 the particular witness.  It's just hearsay.

21      MS. HIMMELHOCH:  It's a business record of EPRI.

22 It's also a document that they indicated they relied upon and

23 that their methodology was consistent with. I'm entitled to

24 explore what their methodology was.

25      THE COURT:  I don't think so.  Sustain the objection.

BATDORF- CROSS/ HIMMELHOCH      Vol. 9-1408

1  BY MS. HIMMELHOCH:

2  Q   The replacement at the Wabash River Unit 2 in 1989

3  involved the replacement of 244 tubes; is that correct?

4  A   Again, I do not recall the totals, Ms. Himmelhoch.

5  Q   They estimated that the contract labor would involve

6  330,000 hours; is that correct?

7  A   I guess if that's what the documents reflect.  I don't

8  have any documents before me that reflects that.

9  Q   If we could now turn to Exhibit 1439.

10        MS. HIMMELHOCH:  Your Honor, this has previously been

11  admitted.  It's a single page.  I don't have a copy for the

12  witness.  May I publish on the screen so he can read it there?

13        THE COURT:  Yes, you may.

14        MS. HIMMELHOCH:  Thank you.

15  BY MS. HIMMELHOCH:

16  Q   1439, please.

17        Mr. Batdorf, this is a memo concerning the radiant

18  superheater project that occurred in 1989, is it not?

19  A   Yes.  The document is dated June 9th, 1988, but it does

20  link to the Unit 2 radiant superheat front wall tube

21  replacement, yes.

22  Q   Who was Leonard Baughman at that time?

23  A   Leonard Baughman at that time, I believe, was a

24  supervising engineer at Wabash River.

25  Q   Was he the project engineer for this project?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1409

1  A    I don't know.

2  Q    In this memorandum, he's recommending approval of the

3  project, is he not?  If you could focus on the second to last

4  paragraph, last sentence.  He states "Based upon-- I'm sorry?

5  A    I apologize.

6  Q    He states "Based upon the lost generation and the need to

7  alleviate the stresses at the header, I recommend we proceed

8  with this project."  Is that what he stated?

9  A    Yes, he does.

10  Q    Now -- I lost my place in my outline.  I apologize.

11        The cost of this project -- you don't know the cost of

12  this project, correct?

13  A    Not offhand, no, ma'am.

14  Q    The 1990 -- I'm sorry.  All of the costs at the 1989

15  project were charged to account 312, correct?

16  A    Yes.  There were accounts that they were charged to, yes.

17  Q    And that's a capital account?

18  A    It's a capitalized maintenance account.

19  Q    Now, in the 1992 project at Wabash River Unit 2, that

20  involved the replacement of finishing superheater and upper

21  reheater assemblies, correct?

22  A    Yes, ma'am, it does.

23  Q    And that was done based on the recommendations contained

24  in the Life Extension, correct, the Life Extension Study,

25  correct?

*BATDORF- CROSS/ HIMMELHOCH*       Vol. 9-1410

1  A    That was one of the considerations, that is correct.

2  Q    And Cinergy used -- estimated that the project would take

3  about 400,000 hours of contract labor?

4  A    Again, I would have to review the detailed sheet off the

5  work order to reflect what that estimate was, but offhand, I

6  don't know.

7         MS. HIMMELHOCH:  Your Honor, may I approach the

8  witness?

9         THE COURT:  You may.

10         MS. HIMMELHOCH:  And the bench?

11         THE COURT:  Sure.

12  BY MS. HIMMELHOCH:

13  Q   Mr. Batdorf, I've handed you what's been marked for

14  identification as Plaintiffs' Exhibit 1072.

15         MS. HIMMELHOCH:  Cinergy has stipulated that this

16  document is authentic and nonhearsay, and I move its admission

17  at this time.

18         MR. HOPSON:  No objection, Your Honor.

19         THE COURT:  The exhibit is admitted.

20    *(Plaintiffs' Exhibit 1072 was received in evidence.)*

21  BY MS. HIMMELHOCH:

22  Q   Mr. Batdorf, this is the work order authorization for the

23  1992 project; isn't that correct?

24  A    It's dated 1991, but it does identify the finishing

25  superheat and upper reheat for Unit 2.  It may have been an

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1411

1  early submittal.

2  Q   Well, it's signed by approval officials, is it not?

3  A   Pardon me?

4  Q   It's signed by the approval officials, is it not?

5  A   Signed by the?

6  Q   Approving officials?

7  A   Yes, it is.

8  Q   Among the approving officials were the executive

9  direceter/vice president of the company; isn't that correct?

10 A   Yes, that is correct.

11 Q   And Cinergy capitalized the cost of this project, correct?

12 A   Yes, we did.

13 Q   It estimated the work would cost at least –– or

14 approximately $1.59 million, correct?

15 A   Yes, that is correct.

16 Q   And if you turn to the next page, which is CINWA00329,

17 it's a little bit cut off, but there's an estimate there for

18 the number of contractor hours.  Do you see that?

19 A   I'm scanning down the document.  Yes, I do.

20 Q   Is it fair to read that as 445,000 hours?

21 A   No, I think I would read that as $445,000, not hours.

22 Q   Well, let's add up the hours under Contractor.  4,000 and

23 4,000 is 8,000, plus two is 10,000.  So over 10,000 hours of

24 contractor hours?

25 A   Yes.

*BATDORF- CROSS/ HIMMELHOCH*        Vol. 9-1412

1   Q    At the Wabash River Unit 3 project, that involved the

2   replacement of the finishing, intermediate and radiant

3   superheat tubes, and the upper reheat bundles; isn't that

4   correct?

5   A    Yes, ma'am.

6   Q    And there were 162 assemblies replaced; is that correct?

7   A    Again, I know I spoke specifically to that in the

8   depositions, but I don't recall the numbers right now.

9   Q    Okay.  Well, let me turn to another exhibit.

10         I'll ask you to turn now to Exhibit 1307, which has

11  been previously been admitted into evidence.

12            MS. HIMMELHOCH:  May I approach the witness?

13            THE COURT:  You may.

14            THE WITNESS:  Thank you, ma'am.

15            MS. HIMMELHOCH:  Do you want another copy, Your

16  Honor?

17            THE COURT:  If you have one available.

18  BY MS. HIMMELHOCH:

19  Q    Mr. Batdorf, this is -- 1307 is the work order

20  authorization for the Unit 3 project; is that correct?

21  A    Yes, ma'am, it is.

22  Q    And it states that the costs were charged to the account

23  312, which is a capital account, correct?

24  A    Yes.  It's a capital maintenance account, yes, ma'am.

25  Q    And the work was estimated to cost $1.558 million,

BATDORF- CROSS/ HIMMELHOCH    Vol. 9-1413

1  correct?

2  A    Yes, that's correct.

3  Q    And the authorization was signed by the president of the

4  company, correct?

5  A    Yes, ma'am, it was.

6  Q    And the necessity of the project states "Increasing number

7  of tube leaks in the above-mentioned areas resulting in

8  unavailability.  The attached economic justification has a

9  benefit/cost ratio of .33 for five years to 1.79 for ten

10 years."  Do you see that?

11 A    Yes, ma'am.

12 Q    Did I read it correctly?

13 A    Yes, you did.

14 Q    And if we go to the next page of the document, it

15 states -- it lists the number of assemblies and tubes being

16 replaced.  Do you see that?

17 A    Yes, ma'am.

18 Q    And in the finishing superheat, 162 assemblies were

19 replaced, correct?

20 A    Yes.

21 Q    In the radiant superheat, 240 tubes were replaced,

22 correct?

23 A    Yes.

24 Q    In the intermediate upper loop, 122 assemblies were

25 replaced, correct?

BATDORF- CROSS/ HIMMELHOCH          Vol. 9-1414

1  A   Yes.

2  Q   And in the reheat upper assembly, 162 assemblies were

3  replaced, correct?

4  A   Yes, ma'am.

5  Q   And the total contract labor cost was estimated to be at

6  least -- estimated to be $326,000; correct?

7  A   Yes, that is correct.

8  Q   Cinergy expected the outages due to these components to

9  decrease in the two years following the project, did they not?

10 A   Again, you're referencing two years following.  We fully

11 expected by replacing those components that the failures in

12 those sections would decrease over a extended period of time,

13 yes.

14 Q   Now, if we could please turn to Exhibit 1277 -- don't call

15 it up yet -- which has previously been admitted into evidence,

16 so if we could please call that up.

17       MS. HIMMELHOCH:  May I approach the bench and the

18 witness, Your Honor?

19       THE COURT:  You may.

20 BY MS. HIMMELHOCH:

21 Q   Mr. Batdorf, this memorandum discusses the work order for

22 the Wabash River Unit 3 project, does it not?

23 A   Yes, ma'am, it does.

24 Q   And it indicates that a revised work order is being

25 prepared for an increased cost; isn't that correct?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1415

1  A   Yes, that is correct.

2  Q   And the increased cost was up to $2.392 million; is not

3  that correct?

4  A   Yes, from the 1.55 million previously.

5  Q   And if you turn to the next page, the document states that

6  "The following justification is based on available GADS data

7  for tube failures and lost generation.  The 1989 economic

8  evaluation guide was used for replacement power costs,

9  escalation rates, discount rates and levelized fixed charge

10  rates;" is that correct?

11  A   Yes, it does.

12  Q   And the Wabash River Unit 5 project, that was the

13  replacement of the upper economizer, boiler tube hangars and

14  hanger rods; is that correct?

15  A   Yes, ma'am, that is correct.

16  Q   And it involved repairing boiler structural work and

17  realigning steam headers; correct?

18  A   Yes, that is correct.

19  Q   And Cinergy expected that this project would reduce the

20  number of forced outages attributable to the economizer at

21  Unit 5; isn't that correct, in the two years immediately

22  following the project?

23  A   Again, we didn't look at a two-year period, Sarah.  We

24  looked over an extended period of time; and yes, by replacing

25  those components, we expected fewer problems, fewer leaks in

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1416

1  that area of the boiler.

2  Q    I would like to turn now to a document that has been

3  marked for identification as Exhibit 1256.

4        MS. HIMMELHOCH:  May I approach the witness and the

5  bench?

6        THE COURT:  Yes.

7        THE WITNESS:  Thank you, ma'am.

8        MS. HIMMELHOCH:  Cinergy has admitted to the

9  authenticity and nonhearsay status of this document, and I

10  request its admission at this time.

11        MR. HOPSON:  I don't object, Your Honor.

12        THE COURT:  Exhibit's admitted.

13    *(Plaintiffs' Exhibit 1256 was received in evidence.)*

14  Q    Mr. Batdorf, this is the work order authorization for the

15  Wabash River Unit 5 project, is it not?

16  A    Yes.

17  Q    And it was signed by the president of the company, was it

18  not?

19  A    Yes, ma'am.

20  Q    And it was charged to the capital account, was it not?

21  A    It was charged to the capitalized maintenance account,

22  yes.

23  Q    And it states in the "necessity of project, existing

24  boiler back pass areas are deteriorating rapidly;" isn't that

25  correct?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1417

1  A   Yes, that's correct.

2  Q   And it estimated $97,200 of contract labor; isn't that

3  correct?  If you'll look on the first page in the Summary of

4  Estimated Costs, line 3.

5  A   Yes.  That's $97,200 of contract labor costs, yes.

6  Q   And, in fact, the scope of the project increased after

7  this work order authorization was approved, did it not?

8  A   Again, I haven't seen any documents that would reflect

9  that, but if it would, it would be much like the one we just

10  reviewed.

11  Q   I would like to turn now to a document marked for

12  identification as Plaintiffs' Exhibit 1210.

13       MS. HIMMELHOCH:  May I approach the bench and

14  witness?

15       THE COURT:  You may.

16       THE WITNESS:  Thank you, ma'am.

17       MS. HIMMELHOCH:  Cinergy has stipulated to the

18  authenticity and nonhearsay status of this document, and I

19  request that it be admitted at this time.

20       MR. HOPSON:  Your Honor, I don't have an objection to

21  the document, but I do want to lodge an objection that the

22  whole line of questioning is cumulative.  This ground has been

23  plowed and many of the documents were read into evidence at

24  great length by Plaintiffs' experts on this.

25       MS. HIMMELHOCH:  This is the last document of this

*BATDORF- CROSS/ HIMMELHOCH*       Vol. 9-1418

1 type I will be using, Your Honor.

2          THE COURT:  The exhibit is admitted.

3    *(Plaintiffs' Exhibit 1210 was received in evidence.)*

4 BY MS. HIMMELHOCH:

5 Q   Mr. Batdorf, this document discusses the Wabash River

6 Unit 5 project, does it not?

7 A   Yes, ma'am, it does.

8 Q   And it indicates that additional work was identified after

9 the work order authorization was approved; isn't that correct?

10 A   Yes.  As I read it, that's what it does.

11 Q   Okay.  As station manager, you were not responsible -- oh,

12 sorry.  We already did that.

13          You indicated that environmental compliance was one of

14 your duties as station manager; isn't that correct?

15 A   Yes, ma'am, that is correct.

16 Q   And you understood that if Cinergy undertook a physical

17 change at the plant that resulted in a significant net

18 emissions increase as calculated under the regulations, it was

19 required to obtain a permit, correct?

20 A   Yes, and when it was, we did.

21 Q   If Cinergy was unsure of whether it needed a permit, it

22 could, and has in the past, requested guidance, has it not?

23 A   Yes, we did.

24 Q   Whose obligation is it to perform an emissions projection

25 in the first instance, the company's or EPA's?

BATDORF- CROSS/ HIMMELHOCH        Vol. 9-1419

1  A   If you look at the regulations, if we saw a project that

2  by itself would cause an increase in those emissions, that

3  calculation would be done internally by the company.

4  Q   And Cinergy has a separate environmental department, does

5  it not?

6  A   Yes, ma'am, we do.

7  Q   And while you were station manager, you had responsibility

8  for compliance with existing permits, but the decision as to

9  whether new permits was required was handled by the

10  environmental department, isn't that correct?

11  A   It was a combined joint effort because, like I said, when

12  I was manager at Cayuga station and we were installing CTs, I

13  worked with environmental to make sure that we did have the

14  new necessary permits for that.

15  Q   Do you remember being deposed in September of 2004?

16  A   How well.

17  Q   That was the first occasion on which we met, is it not?

18  A   Pardon me?

19  Q   That was the first occasion on which we met, was it not?

20  A   Yes, it was.

21  Q   And in that deposition, I asked you about what your

22  responsibilities were with respect to permits; do you recall

23  that?

24  A   We had numerous conversations in those six days, yes,

25  ma'am.

*BATDORF- CROSS/ HIMMELHOCH*        Vol. 9-1420

1        MS. HIMMELHOCH:  Counsel, do you have this

2   deposition?

3        MR. HOPSON:  We're trying to figure that out right

4   now.

5        MS. HIMMELHOCH:  September -- Your Honor, may I

6   confer with counsel?

7        THE COURT:  You may.

8     *(A discussion was held off the record.)*

9        MS. HIMMELHOCH:  Your Honor, may I approach the

10  witness?

11       THE COURT:  You may.

12       THE WITNESS:  Thank you.

13  BY MS. HIMMELHOCH:

14  Q   I've handed you the record of that deposition.  If you

15  could please turn to page 58.

16       MS. HIMMELHOCH:  Would Your Honor like a copy.

17  A   Yes, I have page 58.

18  Q   And I asked you in that deposition:

19       "Did you have any understanding with respect to

20  your responsibility related to determining whether a

21  construction permit or permit to install was necessary.

22       And after counsel's objection you answered, "As a

23  station manager, my responsibilities were more for compliance

24  with existing operating permits that as projects were

25  submitted for subsequent years, they were reviewed higher in

1  the organization on those kind of assessments."

2      Did I ask you that question and did you give that

3  answer?

4  A   Yes, ma'am, I did.

5  Q   Now, PSI and then Cinergy had very specific guidelines for

6  performing its cost benefit analyses, did it not?

7  A   Pardon me?

8  Q   PSI, and then Cinergy, had very specific guidelines for

9  performing its economic benefit analyses, did it not?

10  A   Yes, we did.

11  Q   And those involved detailed analyses of estimated

12  increases in generation; isn't that correct?

13  A   They involved looking at historical information and doing

14  economic evaluations and calculations on that, yes.  It did

15  not predict the future.

16  Q   But essentially what they did to determine the cost

17  benefit –– the benefit of the project was to calculate a

18  generation figure and multiply that by a replacement cost

19  number; isn't that correct?

20  A   Yes, that is correct.

21  Q   That cost –– replacement power is the cost the company

22  wouldn't have to spend to buy power is the assumption behind

23  that calculation, correct?

24  A   Not necessarily buy.  It could be replaced internal to the

25  system, and it would look at those increments and make that

BATDORF- CROSS/ HIMMELHOCH       Vol. 9-1422

1  determination.

2  Q   And these economic analyses were carefully documented and

3  provided to management with the approval documents, were they

4  not?

5  A   Yes, they are.

6  Q   And the economic concerns of the company were therefore

7  carefully documented and analyzed before the project was

8  undertaken; isn't that correct?

9  A   Yes.

10 Q   And as a company, you have an obligation to provide low

11 cost electricity; isn't that correct?

12 A   Yes, ma'am, we do.

13 Q   But that obligation also comes with an obligation to

14 comply with the law; isn't that correct?

15 A   Yes, it does.

16 Q   And it comes with the obligation to comply with

17 environmental laws, does it not?

18 A   Yes.

19 Q   And there are no written documents analyzing the question

20 on whether a permit was required for any of the projects

21 you've discussed today, are there?

22 A   No, there are not.

23        MS. HIMMELHOCH:  Thank you.  Nothing further.

24        THE COURT:  Redirect?

25        MS. HIMMELHOCH:  Once I get out of his way.

*BATDORF- CROSS/ HIMMELHOCH*      Vol. 9-1423

1        MR. HOPSON:  I have no further questions for

2   Mr. Batdorf, Your Honor.  Thank you, sir.

3        THE COURT:  Thank you.  You may step down.

4        THE WITNESS:  Yes, sir.

5        THE COURT:  You may call your next witness.

6        MR. HOPSON:  We are, Your Honor; but may I ask you a

7   question first?  Mr. Batdorf, I assume because he's retired,

8   would like to know if he could sit in the courtroom and

9   observe the proceedings going forward?

10       MS. HIMMELHOCH:  We have no objection.

11       THE COURT:  No problem.

12       MR. HOPSON:  Thank you.

13       THE COURT:  Have a seat.

14       MR. VOLPE:  We're going to call John Swez, Your

15  Honor.

16       MS. HIMMELHOCH:  Your Honor, may I just pick up the

17  notebook I left?

18       THE COURT:  Yes.

19       This is the witness stand up here, sir.  If you'll

20  come up here, I'll swear you in.

21       MR. GREEN:  May we get those documents?

22       THE COURT:  Would you raise your right hand, please.

23       **JOHN SWEZ, DEFENDANT'S WITNESS, SWORN**

24              **DIRECT EXAMINATION**

25

SWEZ – DIRECT/VOLPE          Vol. 9–1424

1  BY MR. VOLPE:

2  Q   Good morning, ladies and gentlemen.  Good morning,

3  Mr. Swez.

4  A   Good morning.

5  Q   Would you please tell the ladies and gentlemen of the jury

6  your name?

7  A   My name is John Swez.

8  Q   Mr. Swez, where are you currently employed?

9  A   I'm employed at Cinergy, or now known as Duke Energy.

10 Q   What is your current job title?

11 A   I am direcer of generation dispatch and bulk power

12 marketing.

13 Q   All right.  I want to back up just a little bit and ask

14 where you attended college?

15 A   I attended college at Purdue University graduating in 1992

16 with a Bachelor's of Science in mechanical engineering.

17 Q   What did you do after graduation from Purdue?

18 A   After graduation, I was hired by PSI Energy.

19 Q   PSI Energy is the former company to Cinergy; is that

20 right?

21 A   Yes.

22 Q   All right.  So if I refer to Cinergy for the rest of my

23 questions, you'll know what I'm talking about?

24 A   Yes.

25 Q   All right.  Now, did you work for PSI prior to your first

SWEZ – DIRECT/VOLPE              Vol. 9–1425

1  full-time employment?

2  A    I did.  I actually started in 1988 as a cooperative

3  education student.

4  Q    What is a co-op student?

5  A    Well, a co-op student basically, we apply on-the-job

6  training -- I'm sorry -- on the job -- we apply education

7  learned in a classroom on the job.

8  Q    I think what you meant to say is you do on-the-job

9  training; is that right?

10  A    Yes.

11  Q    How long did you work for Cinergy has a co-op student?

12  A    Four years until I started full-time in 1992.

13  Q    When you started at Cinergy in 1992, what was your first

14  full-time position?

15  A    I was called a performance engineer.

16  Q    What does a performance engineer do?

17  A    A performance engineer run a variety of testing,

18  mechanical testing and analysis at the power plants, at the

19  generating stations, to ensure that the plants are operating

20  as efficiently and reliably as possible.

21  Q    Now, did you go back to school while you were working at

22  Cinergy?

23  A    I did.  I attended the University of Indianapolis and

24  graduated in 1995 with a Master's of business administration.

25  Q    How long did you work as a performance engineer?

SWEZ – DIRECT/VOLPE            Vol. 9–1426

1  A   About four years.

2  Q   Did you take a new job after that?

3  A   I did.

4  Q   What was that job?

5  A   In 1996, I was employed as an investment engineer.

6  Q   How long did you work as an investment engineer?

7  A   About three years.

8  Q   After working as an investment engineer, what did you do

9  next?

10 A   I started in my current group, which is called Power

11 Services.

12 Q   All right.  So for the rest of the questioning, I'm going

13 to ask you about your work as a power services engineer.  What

14 does power services do?

15 A   Power services is responsible for the real–time

16 generation, dispatch and commitment of the generating units.

17 Q   Is it the power services group that controls Cinergy's

18 generating system?

19 A   That's correct.  We actually move the units around.

20 Q   Do you decide when to turn the units on and when to turn

21 them off?

22 A   That's correct.  We decide when to turn plants on, when to

23 turn plants off.

24 Q   Mr. Swez, did I ask you to take some pictures of the room

25 from which you control the Cinergy system?

SWEZ – DIRECT/VOLPE                    Vol. 9–1427

1   A    We do.  It's called the Generation Dispatch Control

2   Center.

3   Q    Did you take some pictures of that room?

4   A    I had some pictures taken for me.

5   Q    Have you looked at those pictures?

6   A    I have.

7   Q    Do those pictures fairly and accurately represent the

8   Cinergy dispatch control room?

9   A    They do.

10        MR. VOLPE:  Judge, I'd like to approach the witness,

11   please.

12        THE COURT:  You may.

13        MR. BROOKS:  No objection, Your Honor.

14   BY MR. VOLPE:

15   Q    Did I hand you, Mr. Swez, the photographs that you had

16   taken of the Cinergy control dispatch room?

17   A    Yes.

18        MR. VOLPE:  Judge, I'd like to offer D1979 and D1979J

19   into evidence.

20        THE COURT:  I think he said no objection.

21        MR. BROOKS:  No objection.

22        MR. VOLPE:  Thank you.

23        THE COURT:  Those are admitted.

24        MR. VOLPE:  May I display?

25

SWEZ – DIRECT/VOLPE                Vol. 9–1428

1    *(Defendants' Exhibits D1979 and D1979J were received in*
2  *evidence.)*
3              MR. VOLPE:  May I display?
4              THE COURT:  You may.
5  BY MR. VOLPE:
6  Q    Mr. Swez, what are we looking at here in this photograph?
7  A    That's a picture of the generation dispatch control
8  center.
9  Q    Where is this control room located?
10  A    It's physically located in Cincinnati, Ohio.
11  Q    And what part of the Cinergy system does this control?
12  A    We are controlling the Indiana generating units from that
13  control room.
14  Q    Do you know why the dispatch control room for the Indiana
15  side is located in Cincinnati, Ohio?
16  A    Yes.  As a result of the merger between PSI and CG&E, we
17  basically consolidated the functions, and it just ended up in
18  Cincinnati, Ohio.  It could actually be done from anywhere.
19  Q    Is there a similar location for controlling the Ohio side?
20  A    There is.  It's in the same building, as a matter of fact.
21  Q    Is the control room essentially identical?
22  A    It's an identical control room, yes.
23  Q    Now, Mr. Swez, can you describe for the jury what we're
24  actually looking at here as far as the monitors and the
25  gentleman sitting at the table?

SWEZ – DIRECT/VOLPE                Vol. 9–1429

1  A    The gentleman is the generation dispatcher; and he has a

2  series of screens, basically two rows of screens in front of

3  him.

4  Q    All right.  Let's focus on the back row of screens.

5  What's going on there?

6  A    Can I touch this (indicating)?

7  Q    I think so.

8         Yes, there you go.

9  A    The first screen -- again, these are five screens in a row

10 here on the top row.  The first screen is showing information.

11 These are all trends.  So basically these are all two-hour

12 trends showing information as it changes every few seconds.

13 That first screen is information that shows the generation

14 that is being generated as well as -- the difference between

15 the generation being generated and the customer demand.

16        On that same screen, you also have what's called the

17 eastern interconnection frequency, but basically it's issues

18 related to grid stability.

19 Q    What about the second monitor there?

20 A    The second monitor shows a trend of our load, our actual

21 customer usage as it changes over time.  There also, on that

22 second screen, you have, the bottom of the second screen, you

23 have some still customers that are actually bouncing up and

24 down.

25 Q    Now moving to the -- what are we on the third screen now?

SWEZ – DIRECT/VOLPE          Vol. 9-1430

1  A    Yes.  On the third screen, you've got some of the same

2  information but now it's displayed in actual numerical format.

3  Again, the information related to how much generation we're

4  actually supplying, how much usage, how much customer demand

5  usage we have, information related to how many generating

6  units we have on reserve, just different information like

7  that.

8  Q    All right. let's talk about the fourth screen in with the

9  squiggly lines.

10  A    That screen right there, that is a trend of the last seven

11  days of our load, customer demand or customer usage.

12  Basically, you have a different line for every day of load.

13  Q    Why do you care what the last seven days has -- why do you

14  care what generation has occurred in the last seven days?

15  A    Customer demand over the last seven days is important for

16  forecast and demand over the next, say, seven days.

17  Q    We've got one more monitor on that row.

18  A    That fifth screen on the right shows information that is

19  related to the stability of the electric grid.

20  Q    Now, let's look at the front row of monitors.  What's

21  going on in the foreground?  What are we seeing there?

22  A    These two screens right here, the kind of black background

23  screens, that is the energy management system, or you can

24  shorten it to say it's the EMS.

25  Q    Now, you have a photograph of the EMS screens in front of

SWEZ – DIRECT/VOLPE          Vol. 9–1431

1  you?

2  A  I do.

3  Q  Does that fairly and accurately represent what the EMS

4  screens look like?

5  A  It does, yes.

6        MR. VOLPE:  Judge, I'd like to offer D1979J into

7  evidence.

8        THE COURT:  I think we already have.

9        MR. VOLPE:  All right.  Can I display that to the

10  jury, Your Honor, please?

11        THE COURT:  Yes.

12  BY MR. VOLPE:

13  Q  All right.  What are we looking at here, Mr. Swez?

14  A  This is a closeup of those two screens called the EMS.

15  Each line on those three different screens, there's actually

16  three different -- one, two, three -- each line represents a

17  generating unit.

18        The dispatcher in the last -- in the last picture, you

19  saw the dispatcher had his hand on the mouse.  The dispatcher

20  is actually able to physically control the generating units

21  from these screens.  In addition, we have information related

22  to the real-time customer demand on these screens.

23  Q  So can you describe -- just give us an example of what

24  actually happens when the dispatcher clicks the mouse?

25  A  Yes.  The dispatcher would take his mouse and click

SWEZ – DIRECT/VOLPE          Vol. 9–1432

1  actually on one of the names of the generating units.  By

2  doing so, it actually sends an electronic signal to that

3  generating unit that he clicked on.

4       That signal is received by that generating unit.  The

5  generating unit sees that signal and tells the govern –– the

6  valve that is opening, allowing steam to the turbine, that

7  steam flows into the turbine and produces more electricity.

8       At the same time, the boiler on this particular unit

9  see that the valve opened up allowing more steam to flow into

10 the generator –– I'm sorry, into the turbine –– and the boiler

11 sees that and puts more coal into the boiler.  It all happens

12 automatically.

13 Q   Now, is that how it works at all the Cinergy plants?

14 A   No.  Some of the units are –– I guess they're

15 old-fashioned, but we actually have to do it –– we actually

16 have to pick up a phone or we have a radio system where we

17 actually pick up a phone and issue a verbal command to that

18 generating unit.  We might say, you know, generate

19 10 megawatts more or generate 10 megawatts less.

20 Q   But once you issue the command, is the process behind the

21 scenes approximately the same?

22 A   Yes.  The generation dispatcher would now see on his

23 screen that unit where he issued the command.  He would

24 actually see it raise up and down.

25 Q   Mr. Swez, how do you staff the generation dispatch center?

SWEZ - DIRECT/VOLPE          Vol. 9-1433

1  A    It's staffed by two individuals 24 hours a day, seven days

2  a week.

3  Q    Do the power services operators or dispatchers have

4  complete discretion over which units to run?

5  A    I wouldn't say they have complete discretion.  There are a

6  lot of factors that we have to basically be aware of.

7  Q    What are some of those factors?

8  A    Well, there are times, for instance, when we have

9  transmission distribution issues that we're instructed to run

10  certain units or not run certain units.  There could be issues

11  with -- to do with fuel constraints, fuel contracts.

12        There are issues related to the grid stability and

13  maintaining certain amounts of generating reserves.  There's

14  just a host of a lot of factors both at support levels where

15  we have to do certain things because of a voltage problem or

16  issue.

17  Q    All right.  We'll come back to some of those parameters.

18  I'll take this down.

19        I want to ask you is demand on the Cinergy system

20  relatively constant?

21  A    No.  Actually I would characterize it probably the

22  opposite.  It's constantly changing as customers use more

23  electricity, the electricity we're using right now, the time

24  of the day, the customers change behaviors.  So demand is

25  always changing.

SWEZ – DIRECT/VOLPE                Vol. 9–1434

1  Q    Now, in performing your function as a dispatcher, do you

2  have to plan ahead?

3  A    Yes, we're always planning ahead.

4  Q    What sort of planning do you do?

5  A    Planning ahead out the next minute, the next five minute

6  period, the rest of this hour, the rest of today, maybe

7  tomorrow, the rest of this week.

8        We're constantly planning ahead to make sure that we

9  have the right number of units online, the right amount of

10 generating units online to serve our customer load; and also

11 making sure that we have the correct units online to do it in

12 the most cost effective manner.

13 Q    Mr. Swez, do statistical or historical measures of unit

14 availability impact how you plan to dispatch the units?

15 A    No.  It has nothing to do with the dispatch and commitment

16 of those units.

17 Q    Is dispatch planning ever used to predict the impact of

18 replacing one component --

19        COURT REPORTER:  Could you repeat that?

20 Q    I'm sorry, was I going fast?

21        MR. BROOKS:  Object, Your Honor.  The objection is

22 this is a matter now moving into expert testimony.  They have

23 experts they've chosen not to call and now you want to bring

24 it out through a witness.

25        THE COURT:  He works in this place.  He can tell us

SWEZ – DIRECT/VOLPE            Vol. 9–1435

1  what he knows.  Go ahead.

2  BY MR. VOLPE:

3  Q   Mr. Swez, is dispatch planning ever used to predict the

4  impact of replacing one component on one generating unit?

5  A   No, it is not.

6  Q   And why isn't it used?

7  A   It's not relevant to determining which units to turn off,

8  which units to turn off or what units to actually move around

9  and dispatch.

10  Q   Do you tend to look at the Cinergy system as a whole?

11  A   Yes, we do.  We look at the summation of all the

12  generators and all the load.

13  Q   Let's talk about the process you use to determine which

14  units to turn on.  Is there a name for that?

15  A   The process which we use to turn on –– to decide which

16  units to turn on and turn off is called unit commitment.

17  Q   Is there a separate process that you use to determine what

18  level you're going to run the units at?

19  A   Yes, that process is called generation dispatch.

20  Q   Can you give us a little more detail on the unit

21  commitment and generation dispatch?

22  A   Yeah.  Unit commitment is the process by which we have to

23  figure out what units to turn on.  That involves a host of

24  factors, for instance, the cost of the unit, the efficiency of

25  the unit.  There's also the physical parameters of the unit;

1  for instance, how long the unit must remain online; if you

2  turn it online, how much it costs to turn online, how long the

3  unit must remain offline once you turn it offline, just a lot

4  of different physical parameters like that.

5  Q   And is that the same as what you do for generation

6  dispatch?

7  A   No.  Generation dispatch is once you've determined which

8  units you're going to turn online, now you've got to decide

9  where to actually move those units around.

10       So generation dispatch is the process by which you're

11  moving those units around to ensure that you're serving your

12  load in the most cost effective manner.

13  Q   Can you always dispatch units within the Cinergy system in

14  accordance with some economic model?

15  A   No.  Unfortunately, there are always things happening that

16  you can't always follow perfect economic dispatch.

17  Q   What are some of those things that impact how you

18  dispatch?

19  A   Well, there could be a variety of issues like voltage

20  support issues, transmission distribution issues, maintaining

21  reserves, just a host of other issues that force us to do

22  certain things in a certain way.

23  Q   Now, you keep saying "voltage" issues.  What does that

24  mean?  What are voltage issues?

25  A   A voltage issue would be like if you had a problem at a

SWEZ - DIRECT/VOLPE            Vol. 9-1437

1  certain area and you had to -- you were forced basically to

2  run a power plant in that area to correct that problem.

3  Q    Are there also reserve issues that you have to pay

4  attention to?

5  A    Yes, there are.  We have to maintain a certain amount of

6  spinning reserves or generation reserves for the stability of

7  the grid.

8  Q    We'll talk about the grid in a little bit.  I wanted to

9  ask you, though, when you dispatch units, do you wait until

10 one unit is at 100 percent before you dispatch the next unit?

11 A    No, that's not the way it works.

12 Q    All right.  Can you describe generally how it works?

13 A    Sure.  In the Cinergy Indiana system, we generally have,

14 say, at least a dozen units on at any given point in time.  Of

15 those dozen units, you're typically dispatching or actually

16 moving up and down the output of those generators up and down,

17 roughly about half those units at any given point in time.

18 Q    Once you turn on a unit, Mr. Swez, can you always count on

19 that unit to run the remainder of the time that you need it?

20 A    No, unfortunately, most commonly, it could be forced off

21 due to like a tube leak or something like that.

22 Q    Do fuel costs affect the dispatch order?

23 A    Yes.  Fuel costs are a large part of the dispatch of the

24 cost of the unit.

25 Q    And are there -- I think you've said this.  Are there

SWEZ - DIRECT/VOLPE                Vol. 9-1438

1  local dispatch issues that affect the dispatch order?

2  A   Yes, there are.  Those grid stability issues I mentioned,

3  yes.

4  Q   Are there geographical or physical considerations that you

5  take into account when you decide which units to dispatch?

6  A   Yes, there are.  You just can't take off a lot of power

7  plants in a small, centralized location.

8  Q   Can you give an example of what you're referring to?

9  A   Sure.  Actually, the city of Cincinnati, Ohio, is a good

10 example of that.  If you were to take off too many power

11 plants too close to the city, you actually run out of

12 transmission capability to bring power into that city.  So you

13 basically always have to keep on a certain number of units.

14 You just don't have enough transmission to serve that load,

15 serve that customer demand.

16 Q   Does the fact that there has been a component replacement

17 dictate how you're going to run a unit?

18 A   No, it has nothing to do with it.

19 Q   What about the replacement of a superheater or reheater or

20 the retubing of a condenser, can the replacement of those type

21 of components change the economics of running the unit so that

22 you will dispatch it more?

23 A   No, it doesn't have anything to do with the dispatch or

24 commitment of the unit.

25 Q   What about if at one time I change several of those

SWEZ – DIRECT/VOLPE          Vol. 9–1439

1  components.  Does that change how you dispatch the unit?

2  A   Again, it doesn't affect the actual dispatch and

3  commitment of that unit.

4  Q   Is there a type of project -- or what kind of project

5  could change the economics of running the unit such that it

6  would change the dispatch of that unit?

7  A   Like a large project that changed the entire makeup of the

8  unit.

9  Q   Do you have an example of that?

10  A   Actually, just north of here at Noblesville, Indiana, we

11  converted an old coal-fired unit to burn natural gas.  The

12  efficiency of the unit changed from about 13,000 BTUs per

13  kilowatt hour down to about 8,000 BTUs per kilowatt hour.

14  Q   I'll take your word for it that that's more efficient, but

15  does having the unit more efficient also mean that it's the

16  most economical unit to run?

17  A   Not necessarily.  In the case of Noblesville, the unit

18  actually was converted from natural gas to coal.  In the last

19  few years, natural gas has actually increased quite a bit, so

20  the price of the fuel is a large driver as well.

21  Q   I'll ask you to slow down just a little bit.  The court

22  reporter's machine is smoking over here.

23  A   Sorry.

24  Q   Is there a document you use to plan unit commitment and

25  unit dispatch?

SWEZ – DIRECT/VOLPE                Vol. 9–1440

1   A    There is, yes.

2   Q    What's that document called?

3   A    The document is called the Energy Cost Manual.

4   Q    Is that the official manual of generation dispatch?

5   A    Yes, it is.

6   Q    Has it always been the official manual of generation

7   dispatch at Cinergy?

8   A    Yes, it's always been that way.

9   Q    What kind of information is contained in that energy cost

10  manual?

11  A    Basically everything I need to do my job, which is for

12  each generating unit, the size of the unit, how many megawatts

13  that unit can produce, what cost the unit is, the cost of the

14  unit, the fuel cost of the unit, emissions cost of the unit,

15  physical parameters related to that unit.

16  Q    What are some of the physical parameters of the unit?

17  A    Just everything to do with what makes up the unit; for

18  instance, the start-up cost of the unit or the start-up time,

19  how long it takes to actually turn a unit online, parameters

20  like once you turn a unit on, how long do you have to leave it

21  online; once you turn it off, you know, how long do you have

22  to leave it offline; just everything that describes that

23  individual power generating unit.

24  Q    Does the energy cost manual contain information on the

25  capacity factor of the unit?

SWEZ – DIRECT/VOLPE                    Vol. 9–1441

1  A    No, it does not.

2  Q    What about the equivalent availability factor of the unit,

3  is that contained in the energy cost manual?

4  A    No, it's not in there.

5  Q    What about the utilization factor of the unit, is that in

6  the energy cost manual?

7  A    No, it's not in the cost manual.

8  Q    Why isn't that information in there?

9  A    That information is not needed for me to do my job, which

10 is generation dispatch and unit commitment.

11 Q    Now, you testified earlier that one of the considerations

12 you take into account is -- I think you called it grid

13 stability.  What is the grid?

14 A    The grid is a series of transmission lines that connect

15 generating units to load -- or to customer usage centers

16 across North America.

17 Q    All right.  Do you have a demonstrative that would help

18 explain the grid to the ladies and gentlemen of the jury?

19 A    I do.

20        MR. VOLPE:  Judge, I'd like to display the

21 demonstrative, please.

22        THE COURT:  Do you have the number?

23        MR. VOLPE:  Yes, it's D2160.

24        THE COURT:  Thank you.

25

SWEZ - DIRECT/VOLPE                Vol. 9-1442

1   BY MR. VOLPE:

2   Q   All right, Mr. Swez, what are we looking at here?

3   A   This is a picture of a portion of the eastern

4   interconnection.  And what you see, all the different colored

5   lines are transmission lines.  They're just different voltage

6   levels.  Some are blue, some are red, some are green.

7   Q   Can you see units on here as well?

8   A   You can.  The little -- it's kind of hard to see, but the

9   little dots, they could be actually squares or triangles if

10  you got close enough, those are actually the generating units.

11  There's actually little circles that are actually the customer

12  loads center, or points where customers are using electricity.

13  Q   You said this is a portion of the eastern interconnection.

14  What is the total area of the eastern interconnection?

15  A   The eastern interconnection of North America is the grid

16  that stretches from the geographic area of the Rocky Mountains

17  to the west, all the way in the east to basically the Atlantic

18  seaboard.  In the north, it starts up in Canada and goes all

19  the way down to Florida, and ends at the border of Texas.

20  Q   Now, is the eastern interconnection connected to other

21  grids?

22  A   Yes, in North America, there are three other grids, and

23  they're connected through high voltage transmission lines.

24  Q   Does Cinergy have obligations to the grid?

25  A   Yes, we do.  We have grid stability obligations to the

SWEZ – DIRECT/VOLPE                Vol. 9–1443

1  grid.

2  Q    What does that mean?

3  A    Well, I mean, every few seconds, we have to make sure that

4  our generation being generated is equal to the customer

5  demand.  Like I said, what we're using right now is being

6  generated right this very second.

7        We also have to make sure that we hold back generation

8  in reserve, generation that is not being generated on, just

9  held back in reserve in case of an emergency.

10  Q    An emergency on the grid?

11  A    Yes.

12  Q    All right.  What happens if the grid becomes unstable?

13  A    If the grid becomes unstable, it's possible that you would

14  have a failure of the grid.

15  Q    What do we commonly understand a failure of the grid to

16  be?

17  A    A failure of the grid would mean to people at their homes,

18  basically a blackout.

19  Q    Why can't you store electricity to use in emergencies?

20  A    Physically, electricity cannot be stored in any large

21  quantity.

22  Q    Aren't batteries stored electricity?

23  A    They are, small quantities of electricity, but it's

24  nothing that's -- it's very, very small quantities.

25  Q    Can Cinergy decide one day that it's had enough of the

SWEZ - DIRECT/VOLPE          Vol. 9-1444

1  grid and it wants to get off?

2  A    No, that's not really possible.

3  Q    Does your obligation to maintain grid stability impact how

4  you dispatch units?

5  A    Yes, it does.

6  Q    Can you again tell us how it does impact such dispatch?

7  A    Sure.  There are times when we have to hold back

8  generation to meet possible emergencies.  There are also times

9  when we have to take the generation that's currently being

10  generated and constantly follow that real-time customer

11  demand.  Those kinds of things force us not to be able to

12  dispatch our units perfectly.

13  Q    By "perfectly," do you mean most economically?

14  A    Yes, I'm sorry.  Most economically.

15  Q    Now, between economic considerations of running Cinergy's

16  units to meet its customer demand and maintaining grid

17  reliability or stability, is there a priority?

18  A    Yes.  Grid stability always takes precedence.

19  Q    How does your obligation, Mr. Swez, to maintain grid

20  stability or reliability impact how you will run a unit, say,

21  after a Cinergy unit is forced suddenly offline?

22  A    Well, if we were to have a sudden loss of a generating

23  unit, it would mean we would do two things.  We would, one,

24  start up typically a pretty expensive unit but one that could

25  be started up very quickly to replace that power.  At the same

SWEZ – DIRECT/VOLPE          Vol. 9–1445

1  time, we would have the units that we were keeping in

2  reserve –– we would have those generators actually ramp up and

3  produce more power.  We have 10 minutes to do this.  So

4  basically that unit that comes off line suddenly, we need to

5  replace that loss within 10 minutes.

6  Q    Do other utilities pitch in?

7  A    Actually they do.  We buy emergency power from those other

8  utilities, yes.

9  Q    What about if another utility had a sudden forced outage,

10 would you help that utility out?

11 A    We do the same thing.  We would send them that emergency

12 power.

13 Q    All right.  Let me change the subject just a little bit.

14 Over the years from the 1980s to 2001, has the way Cinergy

15 responded to customer demand changed?

16 A    Yes.  In the 1980s, we were primarily focused with using

17 our own units to serve our own customer demand.  Then

18 gradually throughout the '90s, utilities started to buy and

19 sell power from one another, and that kind of created a

20 gradual transition, a wholesale electric market per se.

21 Q    What are the implications of the wholesale market to

22 Cinergy's generation?

23 A    What it means is there are times when we can actually buy

24 electricity from the market cheaper than we can generate it

25 ourselves.

SWEZ – DIRECT/VOLPE          Vol. 9–1446

1  Q   How can that be so, Mr. Swez?

2  A   There are different power plants owned by different

3  locations, by different utilities.  There's also different

4  loads, different weather.  The weather here may be 80 degrees

5  or something, and it could be 90 in Nashville, Tennessee, or

6  somewhere else.

7          So there's just different fuels that go into different

8  power plants.  There's different weather in different

9  locations that make the price of power different no matter

10 where you're at.

11 Q   Is that a fairly typical scenario?

12 A   Yes, it is; quite a bit, yes.

13 Q   During the 1990s, how often would you say Cinergy bought

14 power from or sold power to the grid?

15 A   All the time.

16 Q   Would you say that Cinergy bought power more often than it

17 sold power?

18 A   Yes.  We are essentially more of a buyer than a seller,

19 yes.

20 Q   When Cinergy sells power, do they sell it for a profit?

21 A   Yes.  We make a profit, yes.

22 Q   What happens to those profits that you get from selling

23 energy to the grid?

24 A   The profits --

25          MR. BROOKS:  I'll object, Your Honor, we're getting

SWEZ – DIRECT/VOLPE          Vol. 9–1447

1  off into things you've already ruled we shouldn't.

2          THE COURT:  Yes, we don't need to go any further.

3          MR. VOLPE:  I don't have any further questions,

4  Judge.

5          THE COURT:  Cross-examine.

6          MR. BROOKS:  Yes, Your Honor.

7                    **CROSS-EXAMINATION**

8  BY MR. BROOKS:

9  Q    Good morning, Mr. Swez.

10 A    Good morning.

11 Q    My name is Phillip Brooks.  I'm with the Department of

12 Justice and I've got a few questions for you here.

13         Let me just ask you first:  On this grid that you

14 showed the jury, that means that you can sell electricity

15 basically anywhere within that grid; isn't that right?

16 A    It's not practical to sell to far off distances, no.

17 Q    But you can put it onto the grid and that can be brokered

18 to other places; isn't that right?

19 A    You can sell electricity if it's economic.

20 Q    And those economic forces change day to day, don't they?

21 A    They change hour to hour, minute to minute.

22 Q    In fact, that's your focus, isn't it, sort of the hour to

23 hour, day to day changes in demand; isn't that right?

24 A    Yes.  Generally we plan 7 days and in, yes.

25 Q    But dispatchers can't get electricity from a unit that's

1 | not available, can they?

2 | A    If a generator is not available, we cannot run that unit.

3 | Q    You'll agree with me that the total amount of generation

4 | that's theoretically possible from a unit is defined by the

5 | unit's capacity in megawatts, its availability and the number

6 | of hours you have to run it; is that right?

7 | A    Could you repeat the question?

8 | Q    Sure.  I'm just talking general conceptual theory, okay?

9 | So if we want to know what the total amount of generation we

10 | can get from a unit is, you'd have to know a couple of things,

11 | right?  You'd have to know its rating, its megawatt rating?

12 | A    That's correct, yes.

13 | Q    And you'd have to know how available it is, wouldn't you?

14 | A    No. I need to know if I can turn on or if I can't turn on.

15 | That's all I need to know.

16 | Q    I'm talking about what it's theoretically capable of

17 | giving you, you need to know whether or not isn't available,

18 | don't you?

19 | A    I need to know, yes, if I can turn it on or if I can't

20 | turn it on.

21 | Q    That's an instantaneous kind of question for a dispatcher,

22 | isn't it?  You need to know today?

23 | A    In dispatch, we need to know what units we can turn on or

24 | can't turn on generally speaking 7 days and in.

25 | Q    That's generally your focus, that week right in front of

SWEZ- CROSS/ BROOKS          Vol. 9-1449

1  you, right?

2  A    That's correct.

3  Q    Now, you would agree with me that there are also people

4  within the Cinergy Corporation that look beyond next week;

5  isn't that right?

6          MR. HOPSON:  Objection, Your Honor, it's beyond the

7  scope.

8          MR. BROOKS:  Oh, I don't think so, Your Honor.

9          THE COURT:  I think he can answer that if he knows.

10  BY MR. BROOKS:

11  Q    There are people who look beyond just one week, aren't

12  there?

13  A    Yes, there is.

14  Q    There's even a department that does generation planning,

15  though, isn't there?

16  A    I believe so, yes.

17  Q    Those folks look at what the demand is expected to be next

18  year, the next five years, don't they?

19  A    Yes.

20  Q    And they do something called the demand forecast, don't

21  they?

22  A    Demand forecast being the expected customer demand.

23  Q    Yes.  You've heard that term before, "demand forecast"?

24  A    I have.

25  Q    And that means that the company takes a look at what it

SWEZ– CROSS/ BROOKS            Vol. 9–1450

1   expects to happen with the demographics and the demand over

2   the next year, the next five years, maybe the next ten years;

3   isn't that right?

4   A    That's correct.

5   Q    And there's a whole group of people within the corporation

6   who study that, isn't there?

7          MR. VOLPE:  Judge, excuse me, this is well beyond the

8   scope of direct.

9          THE COURT:  I'll let him answer that question.

10  A    Can you repeat the question?

11  Q    Sure.  You've got a whole group of people who spend their

12  time working on these demand forecasts out in the future,

13  don't you?

14  A    Again, I don't work in that area.  I know it exists.  I

15  know there's a group that does that, yes.

16  Q    And there's also a group that then plans to meet that

17  demand called generation planning, isn't there?

18  A    Again, I don't do that, but I believe there is, yes.

19  Q    Do you know Diane Jenner?

20  A    I do know of Diane Jenner, yes.

21  Q    In fact, she's high up in the generation planning group,

22  isn't she?

23          MR. VOLPE:  Judge, I object.  I don't know the

24  scope --

25          THE COURT:  I don't know where we're going with this.

*SWEZ— CROSS/ BROOKS*        Vol. 9–1451

1          MR. BROOKS:  Your Honor, where we're going with this

2    is the witness has testified about what the company would

3    expect as a result of projects on these units; and he's

4    looking at a one—week time frame, week to week, minute to

5    minute, hour to hour.  And I want to establish that —— put

6    that view in context for the jury, that, in fact, this company

7    looks at long—term demand, looks at long—term generation, and

8    I believe that it's relevant to put his testimony in context

9    because he's testified to core issues in this case.

10          THE COURT:  The objection is sustained.  Let's have

11    the next question.

12    BY MR. BROOKS:

13    Q   Well, you testified about availability here a little while

14    ago, didn't up?

15    A   I testified about whether a unit was available or not for

16    me to turn on the unit.

17    Q   Well, you indicated that availability was of no concern to

18    you, is that right, other than whether it is or isn't

19    available?

20    A   Again, historical availability is meaningless for my job,

21    for my decisions to make generation dispatch or unit

22    commitment decisions.  I just need to know whether a unit is

23    available or not available.

24    Q   So you don't have any idea?  As you sit here today, you

25    can't tell this jury, can you, about what Cinergy expected to

SWEZ— CROSS/ BROOKS                Vol. 9–1452

1  happen for any two-year period after any of the projects in

2  this case; isn't that right?

3        MR. VOLPE:  Object as argumentative.

4        MR. BROOKS:  Your Honor, I think it's a totally fair

5  question.

6        THE COURT:  Well, I'll let him answer the question,

7  but it is pretty close to the kind of argument that I would

8  sustain an objection to, but you can answer this.

9  A   Can you repeat it again, I'm sorry?

10 Q   Sure.  I'll try to be less argumentative.

11       You don't have any information today about what the

12 company -- and I'm talking about Cinergy, PSI Cincinnati Gas &

13 Electric -- you don't have any information for this jury, do

14 you, about what the company expected in terms of the annual

15 demand on the units for the two years following any of the

16 projects in this case; isn't that right?

17       MR. VOLPE:  Judge --

18       THE COURT:  I'll let him answer that.  Go ahead.

19 A   Could you repeat one more time.  I'm sorry.

20 Q   All right.

21       MR. BROOKS:  Would you like to read it back?

22   (The pending question was read back by the reporter.)

23 A   Well, I don't have any information specific to the -- to

24 those two-year periods, no.  I just can bring my expertise in

25 terms of generation dispatch and unit commitment.

*SWEZ- CROSS/ BROOKS*                Vol. 9-1453

1  Q   Okay.  And, sir, you don't disagree with me that if a

2  major degrader of availability is repaired, that the unit

3  itself becomes more available?

4  A   Well, again -- well, not "again," but I would say that

5  availability tends to remain constant over time.  If a unit is

6  more available, now I can -- again, it's one of my units.  I

7  can either turn on or turn off.  Just because something was

8  available, again, to me it just means it's now part of my

9  decision-making process.

10 Q   So it's now available to be dispatched, right?

11 A   I can now make the decision to bring that unit on or not

12 bring it on.

13 Q   And you agree with me that for any given unit, if you've

14 got some component that's been degrading availability over

15 time and you fix that, then over the course of a year, you can

16 expect that the overall availability of that unit has

17 improved, do you not?  Do you agree with that?

18 A   No, I do not.

19        MR. BROOKS:  Your Honor, I'd like to offer

20 Plaintiffs' Exhibit 1084, and ask the witness if he could

21 identify that.

22        May I approach the witness, Your Honor?

23        THE COURT:  Yes.

24        MR. BROOKS:  And you as well.

25        THE COURT:  Me, too.

*SWEZ– CROSS/ BROOKS*          Vol. 9-1454

1          MR. VOLPE:  Judge, I object to questioning about this

2  document.  It is well beyond the scope of direct examination.

3          MR. BROOKS:  Your Honor, I believe that the inference

4  is --

5          THE COURT:  Let me look at the document here just a

6  second.

7          MR. BROOKS:  In particular, Your Honor, I would

8  direct the Court's attention to the next to the last page, the

9  first two paragraphs.  This is a document under his e-mail and

10  it is directly contrary to what he just said.

11          MR. VOLPE:  Judge, can we approach?

12          THE COURT:  Sure.

13     *(A bench conference was held on the record.)*

14          MR. VOLPE:  There's many objections to this --

15          THE COURT:  Excuse me just a second.  The record

16  should reflect that this is a conversation on the offer of

17  Plaintiffs' Exhibit 1084.  Go ahead.

18          MR. VOLPE:  First of all, this document is

19  post-project information about the projects at issue in this

20  case.

21          Second of all, while -- the second thing is this is a

22  submission for ratemaking.

23          The third thing is, there's been no foundation

24  established that Mr. Swez wrote the document.  Just because it

25  came under his e-mail doesn't mean it's his document, and I

*SWEZ- CROSS/ BROOKS*          Vol. 9-1455

1  guess that's several objections.

2          THE COURT:  I would like a little foundation.  Did he

3  write this?  Any other reason you want to object to it?

4          MR. GREEN:  Well, it's just that, you know, it's

5  right into these areas that you've ruled out of their case.

6  I's rate making.  It's a public utility rate making.

7          THE COURT:  But you can't say one thing to one group

8  and say something else to somebody else.  If this is a

9  statement that he's made to a group to which he has

10 responsibility, that's different than the one he just made to

11 this jury.  It would be relevant if that's what this is.

12         MR. GREEN:  We don't know what this is actually.

13         THE COURT:  If that's not what this is, I'm not

14 interested in it, all right?

15         MR. BROOKS:  Okay.

16    *(End of bench conference.)*

17                        *(In open court)*

18 BY MR. BROOKS:

19 Q   Mr. Swez, let's take a look at that cover page of

20 Plaintiffs' Exhibit 1084.  Is this an e-mail that you sent?

21 A   I don't believe so.

22 Q   It says "From John Swez."  Is that you, sir?

23 A   Yes.  This is actually sent from me to John Bloomer.

24 Q   So you sent this e-mail to Mr. Bloomer; is that correct?

25 A   Yes.

*SWEZ— CROSS/ BROOKS*          Vol. 9-1456

1  Q   And the attachments to this document, let's look behind

2  here.  Do you see these pages?

3  A   I do.

4  Q   Those were attached to your e-mail, were they not, sir?

5  A   Let's see.  I believe so.

6  Q   And you wrote those, did you not, sir?

7  A   This attachment?

8  Q   Yes.

9  A   No, I did not.

10 Q   Who wrote it?

11 A   Well, it appears the attachment was written by -- it says

12 "Response, Brian Meister, engineer, Wabash River station."

13 Q   Did you see anything in this document that you disagreed

14 with before you passed it on?

15       MR. VOLPE:  Objection, Your Honor.  There's no

16 foundation to ask him questions about this document.

17       THE COURT:  He can ask him if he read this document.

18 BY MR. BROOKS:

19 Q   Did you read this document before you passed it on?

20 A   It's been 11 years since this document was sent.

21 Q   Would that be your normal pattern and practice to read

22 documents before submitting them up the chain, sir?

23       MR. VOLPE:  Objection, Your Honor.

24 A   I get a lot of e-mails.

25 Q   You get a lot of e-mails?  Do you usually attach documents

SWEZ– CROSS/ BROOKS          Vol. 9–1457

1  and send them forward?

2       Mr. Bloomer was above you in the chain, was he not?

3  A   I believe so at the time, yes.

4  Q   Do you usually send your boss stuff that you haven't

5  looked at?

6  A   Well, he was not my boss.  He's never been my boss.

7  Q   He's higher in the chain, isn't he?

8  A   I said I believe he was.  We've changed jobs over the

9  years.

10 Q   Is it customary for you, sir, to review materials that you

11 forward to superiors within the corporation?

12 A   I wouldn't call him my superior.  He's basically a

13 co-worker of mine.  Is it customary for me to review e-mails?

14 Yes, but there's sometimes when I get hundreds upon hundreds a

15 day.  I do not remember whether I read this or not at the

16 time.

17 Q   Well, let me ask you:  Do you think that your views about

18 availability within the corporation relative to what the

19 impact of a component replacement project could be on

20 availability are widely shared?  Is this a universal opinion?

21       MR. VOLPE:  Objection, this is argumentative.

22       THE COURT:  Sustained.  Are you going to offer this

23 or have you gone as far as you want to go?

24       MR. BROOKS:  Well, at this time, I would offer 1084,

25 Your Honor.

*SWEZ– CROSS/ BROOKS*          Vol. 9–1458

1    THE COURT:  Your objection is the same as I heard up

2  here?

3    MR. VOLPE:  Yes.

4    THE COURT:  Sustained.

5  BY MR. BROOKS:

6  Q   Let's talk a little bit about dispatch then.  First, I'd

7  like to make sure that we're talking about the same terms.

8  You can't dispatch a unit that's on a forced outage, can you?

9  A   That's correct.

10  Q   And when a unit is forced offline, another unit has to

11  pick up that load; is that right?

12  A   Not necessarily.

13  Q   You could purchase?

14  A   You could purchase.

15  Q   Or you have to use another unit; is that right?

16  A   I believe those are the only two options.

17  Q   Equivalent availability means what, sir?

18  A   The definition is 100 minus planned outage factor, minus

19  planned derate, minus unplanned outages and unplanned derates.

20  Basically, it's the –– go ahead.

21  Q   And the lower –– I'm sorry.  The more hours of forced

22  outage, then the lower your equivalent availability factor,

23  right?

24  A   The more forced outage –– the higher the forced outage

25  rate, the lower the EAF with all other things being equal.

1  Q    And the converse is also true, right?  If forced outages

2  are reduced, then the equivalent availability factor goes up;

3  isn't that right?

4  A    That's correct.

5  Q    Now, the capacity factor, what does that mean?

6            MR. VOLPE:  Judge, I object.  It's beyond the scope.

7            THE COURT:  He can answer if he knows.

8  A    Capacity factor is the –– just in the course of a given

9  time period –– the amount of generation that's produced

10  divided by the total amount of possible generation that could

11  be produced.

12  Q    And the term "utilization factor," what's your

13  understanding of that?

14  A    I'm less familiar with the term "utilization factor."

15  Q    Do you understand that it is essentially a measure of the

16  amount of the availability that's used?  Have you ever heard

17  that?

18  A    I've heard the term "utilization factor," but again, I'm

19  not very familiar with it.

20  Q    Well, the dispatch center is actually responsible for the

21  utilization of units, right?  The dispatch center uses what

22  availability is there, don't they?

23  A    We make decisions to turn on units or turn off units based

24  on whether they're available or not.

25  Q    And isn't it true, sir, that if I look at the dispatch of

*SWEZ– CROSS/ BROOKS*          Vol. 9–1460

1  any particular unit, let's say, over a two-year period, I can

2  look in there and I can see on average how much of the

3  availability has been used, can't I?

4  A    No.  Generation dispatch is based on a whole host of

5  factors.

6  Q    I'm asking about the past.  It's already happened, sir.

7  Are you telling me that it's impossible to figure out the rate

8  at which a unit has been dispatched in the past?

9  A    Well, no.  You can go back and look and see how much the

10 unit generated each hour.

11 Q    And you can look over an entire year, can't you?

12 A    You could do that, sure.

13 Q    You could get an average for a year, couldn't you?

14 A    You could do that.

15 Q    You could get an average for two years, couldn't you?

16 A    You could do that.

17 Q    For any number of years?  And you could talk about the

18 average use of that unit, couldn't you?

19 A    If you got those statistics, you could talk about it,

20 sure.

21 Q    That's really a reflection, is it not, of where that unit

22 was in your dispatch stacking, isn't it?

23 A    It's a reflection of all the different factors that go

24 into that dispatch and commitment of that unit; so again,

25 costs; some of the parameters I talked about, voltage issues,

*SWEZ- CROSS/ BROOKS*          Vol. 9-1461

1  spinning reserves, maintaining grid reliability, all those

2  things go into determining where to actually run that unit at.

3  Q   And at the end of a couple of years, we could take a look

4  and we could talk about -- let's pick a unit, Wabash 2.  We

5  could talk about what the capacity factor was over that two

6  years on average, couldn't we?

7  A   Sure.

8  Q   And that capacity factor would be the average from all

9  those fluctuations up and down over the course of a year or

10  two years, right?

11  A   That's correct.

12  Q   And the same way with availability.  We could look at

13  availability minute to minute, hour to hour, day to day, week

14  to week, or we could take the average over time to describe

15  what happened to that unit over the year, two year period;

16  isn't that right?

17  A   You could look at the availability over a two-year period,

18  yes.

19  Q   We can also look over how often it was dispatched, how

20  heavy it was loaded, essentially how much that unit was used,

21  right?

22  A   Yes.

23  Q   And again, we could do it minute to minute or we could

24  look at a couple of years and get an average, couldn't we?

25  A   You could do that.

*SWEZ— CROSS/ BROOKS*           Vol. 9–1462

1  Q   I wanted to make sure that in your testimony I didn't miss

2  something.  You didn't tell this jury anything about whether

3  Cinergy expected a change in the dispatch order or the

4  stacking -- help me with the right words when you answer the

5  question.

6       You didn't tell them anything about what Cinergy

7  expected about the relative ranking in the dispatch stack for

8  each of these units, right?

9  A   For each of the units?

10 Q   Well, let me help you with the question because it was

11 lousy, okay?  I'll just acknowledge that and try and fix it.

12      Let's take one example, Wabash River 2, and there was

13 a project in 1989.  Are you familiar with that?

14 A   No, not really.

15 Q   I'll just ask you to assume it then, okay?

16 A   Okay.

17 Q   I just want to make sure that you don't have any

18 information that says that Cinergy -- I guess it was PSI at

19 the time -- expected that before it engaged in this project, a

20 superheater replacement, that it expected after that project

21 to somehow use the unit differently?  You don't have any

22 information about that, do you?

23 A   No, but I mean a tube leak repair just maintains the

24 unit's availability to some constant level.  It doesn't change

25 the economic parameters of the union, it doesn't make it more

*SWEZ– CROSS/ BROOKS*            Vol. 9–1463

1  efficient, it doesn't change its order in the dispatch order.

2  Q    So you would use it the same way you did before the

3  project.  Is that what you're saying?

4  A    No.  We use that unit depending on all the factors at any

5  given point in time.  We use that unit based on the current

6  demand, all the different things I talked about, voltage

7  issues, spinning reserves, any of the other parameters that

8  come into play.

9  Q    Let's talk about stacking order, though.  The relative

10 position of this unit you're saying wouldn't change; is that

11 right?

12 A    The position of the unit in the stacking chart would not

13 change, taking a tube out and putting a tube in.

14 Q    So as we sit here today, as far as you know, Cinergy

15 expected to use each of these units in about the same relative

16 degree that it did before any of these projects, right?

17           MR. VOLPE:  Judge, asked and answered.

18           THE COURT:  Sustained.

19 BY MR. BROOKS:

20 Q    Let me make sure that you don't have any objection to the

21 utilization factors that were calculated by Dr. Rosen in this

22 case.  You haven't looked at those, have you?

23           MR. VOLPE:  Objection, Judge, that is well beyond the

24 scope.

25           THE COURT:  Well, it is.  It is beyond the scope of

*SWEZ– CROSS/ BROOKS*          Vol. 9-1464

1  the direct examination.

2          MR. BROOKS:  I'm never going to argue with the Court.

3  If it's beyond the scope, it's beyond the scope.

4          Based on that ruling, Your Honor, I need to cut back

5  on the scope of what I was going to ask.

6  BY MR. BROOKS:

7  Q   All right.  Let me just talk a little bit about your

8  planning -- your week ahead planning.  Do you use any sort of

9  models that help you understand what the week ahead's going to

10 look like?

11 A   We use models to forecast our customer demand.

12 Q   For the next week; is that right?

13 A   The next seven days, yes.

14 Q   Have you ever heard of a dispatch program -- dispatch

15 model called PROMOD?

16 A   I've heard of it, yes.  Not in the term dispatch.  I've

17 heard of that in terms of the long-term planning.

18 Q   Well, I don't mean for operating dispatch, sir.  I mean in

19 terms of simulating dispatch.  Have you heard of it in that

20 context?

21 A   I've heard of it in the long-term context.

22 Q   For forecasting what?  You just don't know?

23 A   Planning.  Yeah.

24 Q   Planning?  Like planning for generation needs, things like

25 that?

*SWEZ– CROSS/ BROOKS*          Vol. 9–1465

1  A   Yes.  I would agree with that.

2          MR. BROOKS:  Well, if you don't know anything about

3  PROMOD, I will conclude, Your Honor.  Let me just check with

4  my colleagues to see if there's something that needs to be

5  covered.

6          THE COURT:  Certainly.

7          MR. BROOKS:  That is all, Your Honor.

8          THE COURT:  Redirect?

9          MR. VOLPE:  Thank you, Mr. Swez.  I have no further

10  questions.  Thank you, Your Honor.

11          THE COURT:  You may step down, sir.

12          MR. GREEN:  Your Honor, indulge me one moment?

13          THE COURT:  Yes.

14    *(A discussion was held off the record.)*

15          MR. GREEN:  Your Honor, the Cinergy Company rests

16  their case.

17          THE COURT:  All right.  Let's take our noon break at

18  this time, ladies and gentlemen.  I'm going to sit right here

19  while I watch you go out.

20          COURT CLERK:  All rise.

21    *(Jury out.)*

22          THE COURT:  You may be seated.  With the Plaintiff

23  having rested their case in chief and the Defendant having

24  rested, does the Plaintiff have any rebuttal?

25          MR. BROOKS:  Yes, Your Honor.

*SWEZ— CROSS/ BROOKS*          Vol. 9-1466

1        THE COURT:  And what would be the nature of that

2   rebuttal?

3        MR. BROOKS:  The rebuttal witness, Your Honor, is

4   Mr. Myron Adams who was generation planner at American

5   Electric Power for 40 years.  Mr. Adams is being offered to

6   rebut the testimony that we have heard here that, number one,

7   that the replacement of a component cannot improve the

8   availability of a generating unit.  The testimony here has

9   been generally that that is accepted within the industry.

10  Mr. Myron Adams will say no, it is not.

11        In addition, proof from the last few witnesses has

12  been to the effect that there is some enormous gulf between

13  the economic analyses that were done by Cinergy and the type

14  of analysis that would be done to determine what the impact on

15  generation and emissions would be from a project such as

16  these.  Mr. Adams has the knowledge and experience to come in

17  and say that that's simply not so.

18        THE COURT:  All right.

19        Mr. Green?

20        MR. GREEN:  Yes.  Thank you, Your Honor.

21        A number of points, if I may, sir.  We filed a short

22  motion in memorandum to exclude Mr. Adams' testimony.  I don't

23  know whether Your Honor has had a chance to see that.  There

24  are both procedural and substantive reasons why this rebuttal

25  is improper.

*SWEZ- CROSS/ BROOKS*          Vol. 9-1467

1         Mr. Adams was identified as a rebuttal witness to

2    Mr. Slater.  Explicitly in his opinion, he indicates that he

3    has been retained to review Mr. Slater's expert report and the

4    affidavit of Diane Lee Jenner, neither of whom testified.

5         He has not read any of the depositions of the Cinergy

6    witnesses.  He has not reviewed any of the project evaluation

7    documents that were admitted into evidence.

8         To call him now violates the provisions of Rule 26

9    with respect to notice and the content of his opinion because

10   nothing in his report or his opinion alludes to rebutting fact

11   testimony offered in this courtroom by Cinergy witnesses.

12        Beyond all of the problems associated with Rule 26

13   and the failure to abide by the provisions of that rule, what

14   we had in this courtroom -- and I presume that counsel is

15   making reference principally to the testimony of Mr. Pulskamp

16   and Mr. Batdorf -- was essentially eye-and-ear witness

17   testimony as to how they went about undertaking to make the

18   prediction that's required by the New Source Review

19   regulations.

20        Now, if it were proffered that Mr. Adams could come

21   into this courtroom and testify that while at the time that

22   Messrs. Pulskamp and Batdorf said they were making predictions

23   Mr. Adams saw them on the beach of the Royal Hawaiian Hotel,

24   you know, sipping Pina Coladas, that might be rebuttal

25   testimony with respect to their eye-and-ear elaboration of

*SWEZ– CROSS/ BROOKS*          Vol. 9–1468

1  what they did and what they thought.

2         For Mr. Adams to come in and talk about the gulf

3  between project evaluation documents and predictions for New

4  Source Review, that's what Mr. Koppe did.  When I grew up,

5  Yogi Berra was one of my favorite men in sports and it was

6  deja vu all over again.  And Adams is just Koppe all over

7  again.  Mr. Koppe said that ad nauseum in this courtroom.

8         So I won't belabor there, sir, but I don't think

9  there's any proper rebuttal here in the form of Myron Adams to

10  anything that occurred in the Cinergy case.

11         THE COURT:  Okay.

12         MR. BROOKS:  Brief response, Your Honor?

13         THE COURT:  Sure.

14         MR. BROOKS:  First of all, the Rule 26 issue has been

15  resolved by the Court when it was determined that, in fact,

16  Mr. Adams could be a rebuttal witness.  It is true that the

17  witnesses that were first offered to give these opinions about

18  the connection between component replacements and

19  availability, and availability improvements and generation

20  were first in the form of expert witnesses.

21         In fact, they have withdrawn those witnesses; but the

22  law of rebuttal focuses on the subject matter, and Mr. Adams

23  is here to talk about that subject matter.  It doesn't matter

24  who the mouthpiece was.  Defendants still put that same idea

25  across and it would be unfair for us not to now offer the

1  rebuttal that was prepared for that.

2          THE COURT:  All right.  The situation is, first of

3  all, I would be happy to entertain a rebuttal witness on

4  anything on which the Defendant had the burden and that's not

5  what this man is being offered for.  There's no offer on the

6  two issues that the defense has the burden on.  It's an offer

7  to rebut the testimony of the Defendants on issues on which

8  the Plaintiff has the burden.

9          Now, I remember in our conferences when we talked

10  about Mr. Adams, and I was a little concerned about the timing

11  and some other Rule 26 issues, and I suggested that perhaps if

12  you're going to use him, you could use him to rebut the

13  Defendants' experts.  The Defendants experts are not here and

14  have not been offered so there's no rebuttal of that.

15          So you're left then with his offer of rebutting the

16  testimony about the replacement of components not being to

17  generate a gulf between the economics and the planning.

18          It is my view that that was a part of the Plaintiffs'

19  burden to begin with, and we just don't bring in somebody else

20  just to gainsay what has already been said by the Defendants.

21  So the motion is granted.  We will not hear from Mr. Adams.

22          MR. BROOKS:  Your Honor, could I have my statements

23  about what he would testify accepted as proffer?

24          THE COURT:  Yes, you sure can.  And your record is

25  made.  In fact, if you want to expand on that at some other

*SWEZ– CROSS/ BROOKS*          Vol. 9–1470

1  time, I would be happy to let you do that.

2          MR. GREEN:  I would like to renew my motion.

3          THE COURT:  Well, what I thought I would do is let

4  you renew your motion.

5          MS. HIMMELHOCH:  We also have a motion, Your Honor.

6          THE COURT:  I suspect you do.  I suspect you've got

7  more than one motion.  What I want do is I want to bring the

8  jury back down at their usual time and then send them home.

9  Then I thought I might just invite you folks to go have a

10  decent lunch for once, and then maybe about 1:30, you could

11  come back and make all of your motions.

12          In the meantime then, I'd like to give you a revised

13  set of instructions that I just have revised and a chance to

14  look at a new verdict form so that when you come back at 1:30,

15  relaxed and refreshed, then I could hear these motions and

16  then we could discuss the matters of the instructions.

17          Then you might be able to go home at a decent hour

18  today and get yourselves ready.  So if we could have the jury

19  back, please.  Even if they're in mid–sandwich, bring them

20  back.

21      *(Jury in.)*

22          THE COURT:  You may be seated.  Just when you thought

23  I couldn't engineer a 10–minute break if I saw one, you get a

24  10–minute break.  Well, I brought you back, ladies and

25  gentlemen, because you've heard now all the evidence you're

*SWEZ– CROSS/ BROOKS*          Vol. 9–1471

1  going to hear in this case, and there's no sense you waiting

2  around this afternoon.

3         So you will be excused to come back tomorrow morning

4  at eight o'clock.  We'll begin with the final statements of

5  counsel, and then I'll read the final instructions to you.

6  You'll be given a copy of those instructions to follow along

7  as I read them, and then I'll send you upstairs for your

8  deliberation on this matter.  With that in mind then, you're

9  excused for the day and I'll see you in the morning at eight

10 o'clock.

11        COURT CLERK:  All rise.

12    *(Jury out.)*

13        THE COURT:  You can be seated.  I don't mean to keep

14 you here any longer but just let me reiterate, when you come

15 back –– I should say iterate since I've only said it once ––

16 when you come back, I'll hear your motion and then I'll hear

17 your motion on the matters on which he has the burden, and

18 then I'll hear your motion on whether or not you think I ought

19 to just decide this case right now and leave this jury to stay

20 at home.

21        Then when that's over, then we'll take a look at the

22 instructions.  When that's over, then you can go.  All right.

23 I'll see you at 1:30.

24        COURT CLERK:  All rise.

25        This court stands in recess until 1:30 p.m.

*SWEZ– CROSS/ BROOKS*          Vol. 9–1472

1    (A recess was taken.)

2                    (Open court.)

3         THE COURT:  You can be seated.

4         Mr. Green?

5         MR. GREEN:  Sir, if Your Honor, please, as a

6    preliminary, I'm wondering if I could just get some guidance

7    from you as to how you do closings in your courtroom, as to --

8         THE COURT:  Sure.  The fact that that's premature is

9    all right with me.  I don't mind doing that.  I don't know if

10   I do it any differently than anybody else.  I give you a time

11   limit for your finals, and then I would assume that you and

12   Mr. Hopson might want to share final arguments or --

13        MR. GREEN:  Actually, Mr. Hopson is going to do the

14   closing.

15        THE COURT:  You don't want Mr. Stojilkovic to help

16   you with your final?

17        MR. GREEN:  Well, it's a possibility.

18        THE COURT:  I thought maybe you might.  I mean, after

19   all, he has played such a role here.

20        MR. GREEN:  Critical indeed.

21        THE COURT:  Critical role.  So he's going to do it

22   all?

23        MR. GREEN:  He will do it all.

24        THE COURT:  So what's the question?

25        MR. GREEN:  Well, is it normally the Government

SWEZ— CROSS/ BROOKS          Vol. 9–1473

1  first, then the Defendant?

2         THE COURT:  Yes.  The Plaintiff first and then you

3  regardless of the fact that you've got a burden of your own.

4  Plaintiff and then you and then the Plaintiff.

5         MR. GREEN:  I'm not sure I understand.  The Plaintiff

6  will go first?

7         THE COURT:  Plaintiff and then you and then the

8  Plaintiff.

9         MR. GREEN:  But now when the Plaintiff goes again, is

10 the Plaintiff just rebutting or responding to our burden?

11        THE COURT:  Well, generally sometimes that's what

12 they do.  Other times they don't.  I don't hold them to that,

13 no.  I will not hold them to that.  They'll have their 12

14 minutes and you'll have your 12 minutes.  Then they'll have 3

15 minutes and that's it.  No, I will not hold them to that.

16 They will say –– they will have their –– how much time did we

17 say we were going to have?

18        MS. HIMMELHOCH:  We actually have not set a time

19 limit for closing arguments.

20        THE COURT:  Let's set one now so that we can write

21 this down.

22        MS. HIMMELHOCH:  I think I can keep mine under an

23 hour easily.

24        THE COURT:  Is an hour good?

25        MR. GREEN:  Again, I'm standing in Mr. Hopson's

SWEZ- CROSS/ BROOKS          Vol. 9-1474

1  shoes.  I think he would like to aim for an hour, but if he

2  drifted another ten minutes --

3           THE COURT:  Well, a drift of ten minutes is a little

4  too much for me.  I can drift a couple minutes with you, but

5  not 10.  If you want an hour and 10 minutes, tell me now and

6  I'll give you an hour and whatever.  I don't want to quibble

7  with you on minutes.  Just tell me what you want and I'll give

8  you what you want.

9           MR. GREEN:  I was going to suggest that we have

10 available to use an hour and a quarter.

11          THE COURT:  That's fine with me, available to use.

12 If you use it, fine; if you don't, fine.  The only thing about

13 the Plaintiffs' argument is you can't argue in your opening

14 less time than you would in your rebuttal.

15          MS. HIMMELHOCH:  My rebuttal can't be longer than my

16 first closing?

17          THE COURT:  Sure.  Then, of course, you don't know

18 Mr. Green.  He's full of interesting techniques.  He's liable

19 to have Mr. Hopson stand up and say that "We think the facts

20 speak for themselves, we have no argument" in which case you

21 would have no rebuttal.

22          MS. HIMMELHOCH:  Understood.

23          MR. GREEN:  But the Government's opening round and

24 rebuttal round is limited to an hour and a quarter?

25          THE COURT:  Yes, that's right.  You have the same

SWEZ– CROSS/ BROOKS          Vol. 9–1475

1  amount of time.

2          MR. GREEN:  All right, sir.

3          Your Honor, I would first like to renew our motion

4  for judgment as a matter of law under Rule 50 now at the close

5  of all the evidence in the case.

6          With respect to RMRR, I'm not moving for judgment on

7  RMRR.  I believe that that should be resolved by the jury

8  and –– but with respect to the issue which in many respects

9  eclipse RMRR, I do move for judgment.

10          The basis for the motion is that a reasonable jury

11  could not conclude as a matter of law that the Plaintiffs have

12  proved by a preponderance of the evidence that Cinergy should

13  have predicted that each of the projects would cause a

14  significant net emissions increase.  I make the following four

15  or five points which I will state in reasonably summary

16  fashion.

17          It is my view, Your Honor, that the evidence clearly

18  demonstrates that a reasonable engineer –– power plant

19  engineer cannot predict an increase in availability of the

20  entire unit by isolating on only one component; that indeed,

21  the only proper way to assess availability is to assess the

22  condition of the entirety of the unit, something that

23  Mr. Koppe by his own admission conceded that he did not do.

24          I also believe that the evidence clearly demonstrates

25  that predicting no increase in availability from the specific

*SWEZ– CROSS/ BROOKS*          Vol. 9–1476

1  projects that were undertaken and that are at issue in this

2  case was reasonable under all circumstances.

3          I believe the evidence clearly indicates, and no

4  reasonable jury could conclude otherwise that no project –– no

5  one project changed the inherent economics of operating the

6  entirety of the unit; that is, the economics of operating any

7  generating unit so much and so that that unit moved in the

8  stacking order.  That is the indisputable evidence in this

9  case.  It stands uncontradicted.

10          I believe the evidence also demonstrates, and I

11  believe that no reasonable jury could conclude to the

12  contrary, that none of these projects caused the units to be

13  dispatched more as a result of the undertaking and completion

14  of the project because dispatch is totally unrelated to the

15  replacement of a component in a generating unit.  That

16  evidence stands undisputed, uncontradicted, and I think is

17  clearly compelling.

18          For all of those reasons, Your Honor, it is my view

19  that a reasonable jury could not conclude as a matter of law

20  that Cinergy should have predicted increased generation and

21  therefore increased emissions from any of these units, let

22  alone an increase in the threshold amount required under law.

23  For those reasons, I move for judgment as a matter of law,

24  sir.

25          THE COURT:  Thank you, Mr. Green.

1          You would like to make a statement on that?

2          MS. HIMMELHOCH:  I will make a short statement, Your

3     Honor.  In fact, the testimony regarding the relationship

4     between dispatch and availability is not uncontested.

5          Mr. Koppe and Dr. Rosen explained the methodology

6     that Cinergy itself used for calculating benefits of a

7     project; and those benefits were calculated as increased

8     generation times a dollar figure.

9          The plain language of those documents demonstrate

10    that Cinergy expected increased generation from those units,

11    that they used the same methodology to get to that generation

12    figure, but instead of multiplying it by a pollution factor,

13    they multiplied it by a dollar figure.  But it shows that our

14    experts used the same methodology that Cinergy did and that

15    they came to the conclusion that these projects would result

16    in a significant net emissions increase.

17          To the extent there is a dispute, it is a dispute

18    over the meaning of the documents, and that is something that

19    the jury can resolve.

20          THE COURT:  Thank you.  I'm going to give these

21    issues to the jury.  I don't believe -- I believe that

22    reasonable -- a reasonable jury could disagree on these

23    points.  I think that when we make an attempt in the Congress

24    to decide how to deal with the problem of increased need for

25    energy and increased concern about emissions, that we go to

1  the Congress and we argue policy, and we finally arrive at a

2  compromised bill that has particular language in it.  We send

3  it over to the executive for rules, and when we put it back

4  down into the real world, this is the place.  The jury is

5  whether we test whether that was successful or not on either

6  side, whether the lobbyist for the energy group got what they

7  needed or whether the folks who are concerned about emissions

8  got what they needed.

9        I think we're in the right place.  That's what this

10  system is about, to give the jury the decisions on those

11  issues, and we'll find out in this case.

12        I was just going to say we'll find out in this case

13  whose response was appropriate.

14        MS. HIMMELHOCH:  I would like to form -- make a

15  motion for a directed verdict myself.

16        THE COURT:  Yes.  I understand that.  I have that

17  down for next.

18        MS. HIMMELHOCH:  I'm sorry.  I was concerned that I

19  hadn't made it clear I still have more to say.

20        THE COURT:  You're fine.  You're not done.  Go ahead.

21        MS. HIMMELHOCH:  Okay.  As to emissions calculations,

22  I understand that Your Honor has just ruled it will go to the

23  jury.  I will note for the record that Cinergy produced no

24  evidence contradicting the baseline period selected by our

25  experts or providing any evidence of a calculation performed

*SWEZ- CROSS/ BROOKS*          Vol. 9-1479

1  in conformance with the requirements of the New Source Review

2  rules.  And for that reason, we believe our emissions

3  calculations are uncontested and provide for a decision as a

4  matter of law.

5          I make that statement for the record, recognizing

6  you've already ruled, Your Honor.

7          THE COURT:  And I -- the record will reflect your

8  argument on that issue.  As you noticed, I did anticipate that

9  and probably shouldn't have.  I should have waited for you but

10  I didn't.

11          MS. HIMMELHOCH:  With respect to the two issues on

12  which Cinergy bears the burden of proof, however, we do

13  believe that a decision as a matter of law is appropriate.

14          With respect to demand growth, you yourself have

15  instructed the jury already that Defendants bear the burden of

16  proof on this and that they must show two things.

17          They must show first that the unit was capable of

18  accommodating the generation; and more importantly, for this

19  motion, they must also show that the increase in generation

20  was unrelated to the project.  In other words, it is not the

21  burden of the Plaintiffs to show that the demand was -- that

22  the project was the sole cause of the increase.

23          For this reason, if you listened carefully to the

24  testimony of both Mr. Pulskamp and Mr. Batdorf, the testimony

25  was that demand was the cause but not the only cause of the

*SWEZ— CROSS/ BROOKS*          Vol. 9–1480

1   increases, and for that reason alone, we believe Cinergy has

2   failed to establish as a matter of law the demand growth

3   exclusion.

4         Further, with respect to the capable of

5   accommodating, they have simply turned the requirements of the

6   rules on their head and argued that if they did not operate

7   their plant 24 hours a day, 7 days a week, as authorized by

8   their operating permits, they were capable of accommodating

9   and that therefore they have shown that the unit was capable

10  of accommodating within the meaning of the demand growth rule.

11        We believe that given that you yourself have held

12  that the demand growth exception is a further enunciation of

13  the causation requirement, it is clear that it goes not to

14  whether there was in theory some capacity sometime during the

15  year to generate the megawatt hours, but the capable of

16  accommodating phrase is could it accommodate the demand at the

17  time it was made; and we have established that the hours that

18  we are saying resulted in the increase occurred when the unit

19  was being called on to operate; and therefore, we have only

20  focused on those hours that the unit was not capable of

21  accommodating in the baseline period.  And for that reason, we

22  believe we're entitled to judgment as a matter of law on the

23  demand growth.

24        With respect to routine maintenance, again, the

25  Defendants bear the burden on this issue.  For each of the

*SWEZ– CROSS/ BROOKS*                 Vol. 9–1481

1  projects at issue, if you examine the criteria that Your Honor

2  set forth in your opinion on the other routine maintenance

3  projects, and you apply them to these projects at issue here,

4  you will find that for the very same reasons you held the

5  other projects were not routine maintenance, repair or

6  replacement, these projects were not routine maintenance,

7  repair or replacement.

8        These were large projects.  They were done only once

9  or maybe twice in the lifetime of a unit.  While they may have

10 been done at 15 –– I think the testimony was some of them have

11 been done 15 times in the Cinergy system, 15 times is not

12 routine, particularly when it only occurs once or twice in the

13 life of the unit.

14       Moreover, frequency is not the only determining

15 factor.  The high level approval of these projects, the cost

16 of these projects, and the evidence we submitted that these

17 were intended to improve the unit, all go to demonstrate that

18 these projects were similar in scope, size, nature, extent,

19 purpose and frequency to those projects you have already found

20 as a matter of law were not routine maintenance, repair or

21 replacement.  And for that reason, we ask for a directed

22 verdict on that as well.

23       THE COURT:  Thank you.

24       Mr. Green?

25       MR. GREEN:  With respect to capable of accommodating,

1  Your Honor, the way that Plaintiffs or the Government would

2  read that provision, it would completely nullify and make it

3  totally unificatious (sic) and nonsensical because when the

4  unit is down for an outage, it can't operate; and the

5  regulation can't mean that it has to be capable of

6  accommodating emissions when it's not running.  It just

7  doesn't make any sense.

8      Each of the engineers who testified in this case were

9  asked specific questions about the capacity of these

10  generating units to generate all of the additional generation

11  that was predicted by the Plaintiffs' experts in this case,

12  and specifically indicated that if these units were run more,

13  they would be run more because of demand placed upon the units

14  by the customers whom Cinergy services.

15      I think we are right at the heart of the capable of

16  accommodating provision, well within the intendment of that

17  provision.  All of these units had significant unused

18  capacity.  There's clear and unequivocal testimony that they

19  were all in condition, suitable and satisfactory and

20  sufficient condition to run, to continue to run without the

21  replacement projects completed, and that they could have

22  accommodated all of the increased generation that the

23  Plaintiffs' experts, through their formula and theories and

24  assumptions, suggested would be related somehow to a single

25  component replacement.

1        On RMRR, I direct your recollection, sir, if you

2   will, back to the testimony of Mr. Hekking, who was the

3   Government's expert on RMRR, and somewhere in the course of

4   that interrogation, I confronted him with that document from

5   the Tennessee Valley Administration where he indicated that he

6   was one of the signatories on an $8 million project which I

7   note in passing is about two and a half times the amount of

8   money involved in any of these projects that are at issue.

9        He passed that project as a routine improvement,

10  acknowledged as such and further conceded and admitted on the

11  stand that it was indeed a capital project and so that being a

12  capital project was not a bar to a conclusion on his part that

13  it was nevertheless a routine improvement.

14       Now, the Plaintiffs have consistently bottomed their

15  case principally RMRR by counting up the times that it's done

16  on the same unit at the same power station.  They're, with all

17  due respect, somewhat fixated on that.  We went through the

18  cost.  The cost -- you know, there has to be some comparison

19  for cost, and comparing the cost to a replacement of the

20  generating station is sensible and it's under 1 percent,

21  sometimes typically under a half of 1 percent.

22       The function and purpose is to maintain availability.

23  Nothing extraordinary in the electrical utility generating

24  business, because that's the object of maintenance.  There's

25  nothing dramatic or unusual about the function or the purpose,

*SWEZ— CROSS/ BROOKS*          Vol. 9-1484

1  nothing unusual about the cost.  The frequency, well, yes,

2  there is a point to be made that at an individual unit, they

3  may not be made over and over again.  They are indeed made

4  over and over and over again throughout the industry; and I do

5  wish to remind the Court that I find it somewhat unusual that

6  when the Environmental Protection Agency issues a regulation

7  in the preamble, it tells the regulated community that it's

8  clarifying RMRR, and then proceeds to say in the next sentence

9  what its clarification is, and that is that RMRR must, must --

10 I don't have the language in front of me, but the adverb is

11 must -- must be assessed in the context of what's routine in

12 the industry.  The language translates into that.

13        Clearly, that defined the decision and confirmed as

14 Mr. Pulskamp stated his continuing belief of how RMRR is

15 determined; but I think that for all of these reasons,

16 Defendants have demonstrated that this is a issue that should

17 be resolved by the jury.  There's sufficient evidence on each

18 of these components that would lead a jury to conclude that

19 these projects qualify as RMRR, sir.

20        THE COURT:  Thank you.

21        Anything else?

22        MS. HIMMELHOCH:  I will just note our disagreement

23 with his characterization of the preamble language.  I do not

24 believe it translates as he describes.

25        THE COURT:  Well, I have looked at some of these

*SWEZ- CROSS/ BROOKS*          Vol. 9-1485

1  projects on summary judgment, and I don't even remember if I

2  was asked to do summary judgment on these.

3          MS. HIMMELHOCH:  You were not.

4          THE COURT:  But as I look at them, I listened to the

5  evidence in this case, and so much of it is the purpose of the

6  project when you look at these six things, the nature of the

7  project, the extent of the work performed, and the purpose and

8  frequency, that the project is performed at the facility, and

9  how frequently the type of project is performed within the

10  industry and other facilities and the cost of the project.

11          Any time we have a list of five or six factors to

12  look over, and then we make that statement that no single

13  factor is dispositive, it causes pause even in the summary

14  judgment area.

15          In this case, I think that it would be of value to

16  this controversy -- as it's not only here but it's other

17  places -- it would be of some value to have a jury listen to

18  the statements of the Defendant in this case on the purpose of

19  the project and how they stick to the idea that tubes in,

20  tubes out, and they stick to this notion that the purpose of

21  the project is just to keep it going the way it's always gone,

22  and that they listened to the idea that you have a maintenance

23  budget in your particular power plant and that you -- when you

24  have -- you spend this much money on a project and you put

25  this much time and energy on it and you hire as many labor

*SWEZ– CROSS/ BROOKS*          Vol. 9-1486

1  hours, and at the same time your own maintenance people are

2  doing other things, I think it would be valuable for us all to

3  hear what the jury had to say about that; not just for this

4  case, but I think it would be helpful for both sides of this

5  controversy as it runs around the United States to have

6  someplace where you can say "Well, the jury bought this" or

7  "The jury thought this was dumb" or whatever they thought.  I

8  think that would just be valuable in this case rather than

9  just have another judge opine one way or the other.  So I

10  think we'll leave this one with the jury, too.

11          On the issue of the demand exclusion, I think we'll

12  do the same thing to see what the jury has to say about that.

13          So are there any other motions at the close of the

14  case?  No?

15          MS. HIMMELHOCH:  No, Your Honor.  We're ready for

16  jury instructions.

17          THE COURT:  Now, I'll give you a choice.  We can go

18  back in my conference room and take a court reporter with us

19  and sit down and talk about it, or we can do it here if you

20  think that would be any better.

21          MR. GREEN:  Whatever your preference is, Your Honor.

22          THE COURT:  Well, my preference is to go back and

23  unloosen my tie and sit in the conference room and deal with

24  this.

25          MR. GREEN:  That would be great.

*SWEZ– CROSS/ BROOKS*          Vol. 9–1487

1          MS. HIMMELHOCH:  We can send a limited number of

2   counsel.  We do not have to bring in all counsel unless your

3   conference room can accommodate us all.

4          THE COURT:  I've got maybe 10 chairs in there.

5          MS. HIMMELHOCH:  So each side will take five.

6          THE COURT:  Yes, and then I'll stand.

7          MS. HIMMELHOCH:  Oh, I'm sorry.

8          THE COURT:  No, that's all right.

9          COURT CLERK:  All rise.

10          *(The proceedings concluded at 2:56 p.m.)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SWEZ– CROSS/ BROOKS*

1    <u>CERTIFICATE OF REPORTER</u>

2

3    I, Cathy Jones, certify that the foregoing is a true and

4    correct transcript of the proceedings in the above–entitled

5    matter.

6

7

8

9
                      _____
10                         CATHY JONES, RPR, FCRR
                           OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25