1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF INDIANA
2                       INDIANAPOLIS DIVISION

3
     UNITED STATES OF AMERICA,        )
4          Plaintiff,                 )
                                      )
5    STATE OF NEW YORK, STATE OF      )1:99-cv-1693-LJM-JMS
     NEW JERSEY, STATE OF CONNECTICUT,)
6    HOOSIER ENVIRONMENTAL COUNCIL    )
     and OHIO ENVIRONMENTAL           )
7    COUNCIL,                         )
           Plaintiff-Intervenors,     )Indianapolis, Indiana
8                                     )May 21, 2008
             -vs-                     )8:00 a.m.
9    CINERGY CORP., PSI ENERGY, INC., )Volume 10
     and THE CINCINNATI GAS &         )
10   ELECTRIC COMPANY,                )
           Defendants.                )

11

12

13

14                          **BEFORE THE**
                   **HONORABLE LARRY J. McKINNEY**

15

16            OFFICIAL REPORTER'S TRANSCRIPT OF

17                   TRIAL PROCEEDINGS

18

19

20   Court Reporter:      Cathy Easley Jones, RPR, FCRR
                          Official Court Reporter
21                        46 East Ohio Street, Room 291
                          Indianapolis, IN  46204

22

23

24
              PROCEEDINGS TAKEN BY MACHINE SHORTHAND
25               COMPUTER-AIDED TRANSCRIPTION

Vol. 10-1489

1                      **A P P E A R A N C E S**

2

3    FOR THE PLAINTIFF:           Mr. Thomas Andrew Benson
                                  Mr. James A. Lofton
4                                 Ms. Sarah Dale Himmelhoch
                                  Mr. Phillip Brooks
5                                 Mr. Ignacio Arrazola
                                  Ms. Danielle Rosengarten
6                                 U.S. DEPARTMENT OF JUSTICE
                                  P.O. Box 7611
7                                 Ben Franklin Station
                                  Washington, DC  20044
8

9    FOR PLAINTIFF-              Mr. R. Keith Guthrie
     INTERVENORS:                ATTORNEY AT LAW
10                               13242 South 600 East
                                 Elizabethtown, IN  47232
11

12   FOR THE DEFENDANTS:         Mr. Mark D. Hopson
                                 Mr. Thomas Charles Green
13                               Ms. Kathryn B. Thomson
                                 Ms. Meghan Delaney
14                               Mr. Samuel B. Boxerman
                                 Mr. Frank Volpe
15                               SIDLEY AUSTIN LLP
                                 1501 K Street, NW
16                               Washington, DC  20005

17

18

19

20

21

22

23

24

25

Vol. 10-1490

1                              **INDEX**
                                            **PAGE**
2
Plaintiffs' Closing Argument ................1492
3   Defendants' Closing Argument ................1525
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 10-1491

1                          *(In open court)*

2      *(Jury out.)*

3            THE COURT:  Good morning.  I think we're done with

4   all of our morning glitches.  All the jury is here, and they

5   seem to be healthy enough to proceed; and the question is

6   you're all healthy enough to proceed?

7            MS. HIMMELHOCH:  We are, Your Honor.

8            MS. THOMSON:  Just one moment, Your Honor.

9            MR. HOPSON:  There is just a question about whether

10  one of the exhibits is in evidence.

11           MS. HIMMELHOCH:  I won't use the document.

12           THE COURT:  Any other questions?  Going once.  Going

13  twice.  Let's get the jury.

14     *(Jury in.)*

15           THE COURT:  You may be seated.  Good morning, ladies

16  and gentlemen.  I am pleased to announce this morning that it

17  is not June the 3rd.

18           We will now hear the final arguments of counsel, as I

19  mentioned to you yesterday, and then I'll read you these final

20  instructions.  You'll have a copy of the instructions to read

21  along with.

22           Those of you who have taken notes, I would encourage

23  you to continue to take your notes throughout the arguments.

24           So with that, I think we're ready to proceed.

25  Ms. Himmelhoch.

Vol. 10-1492

1          **PLAINTIFFS' CLOSING ARGUMENT**

2          MS. HIMMELHOCH:  Thank you, sir.  Good morning,

3   ladies and gentlemen.

4          Before I get into the depth of my presentation, I

5   want to again thank you very much for your time and your

6   thought and your commitment of effort in this case.  I know

7   for some of you this morning getting here was a challenge and

8   we appreciate your having done that every day while we

9   presented our evidence and we appreciate the commitment you're

10  going to bring to the deliberations.

11         Finally, the time has come for you to answer the

12  ultimate question in this case and that is whether Cinergy

13  violated the law by modifying its plants without coming in for

14  permits and without installing emissions control equipment.

15  The answer to this question we submit on the evidence is

16  undeniably yes; Cinergy violated the law.  The evidence

17  overwhelmingly shows that a reasonable owner or operator of a

18  power plant should have predicted that these projects would

19  result in a 40-ton increase of sulfur dioxide or nitrogen

20  oxides.

21         Now, what is the law we're talking about here?  The

22  law we're talking about is what Judge McKinney instructed you

23  about on the first day of trial, the New Source Review

24  program.  And as Judge McKinney instructed you at the

25  beginning of the trial and as the statute itself says -- if we

Vol. 10-1493

1  could have the first image, please -- I will proceed without

2  the image.

3          The New Source Review program was passed by Congress

4  to protect public health and welfare from any actual or

5  potential adverse effects of air emissions.

6          His Honor will instruct you further after the lawyers

7  are done talking, but I ask you to remember that in his

8  preliminary instructions he told you that to determine whether

9  or not Cinergy violated the law, you have to answer two

10 questions.  In front of you is the statement of purpose by

11 Congress that I was referring to and in that first paragraph.

12          As you see in the highlighted text, Congress's first

13 purpose was to protect public health and welfare from any

14 actual or potential adverse effect.  And to determine whether

15 Cinergy violated the law that implements this goal, you have

16 to answer two questions:  Was there a physical change at the

17 generating -- for some of these projects?  And for all of the

18 projects, should a reasonable power plant operator or owner

19 have expected these projects to result in a 40-ton increase of

20 either sulfur dioxide or nitrogen oxides?

21          Is it possible to switch over to the ELMO?

22          This will be the first page of the verdict slip that

23 you will be asked to analyze.  The first question that

24 addresses that physical change question:  Did Defendants prove

25 by a preponderance of the evidence that the project qualified

Vol. 10-1494

1  as RMRR activity?  And you will recall that RMRR is an

2  abbreviation for routine maintenance, routine repair or

3  routine replacement; and you only have to answer this for

4  certain projects.

5        You'll see on the next page of the verdict form the

6  next question you have to answer, and these are questions

7  you're going to have to answer for all of the projects; and

8  that's, should Cinergy have expected an increase in air

9  emissions of either sulfur dioxide or nitrogen oxide in excess

10 of 40 tons?  And did Cinergy show you that increased emissions

11 would be the result solely of demand rather than both the

12 projects and demand?

13        I will begin by walking you through the evidence that

14 relates to the questions you're going to have to answer for

15 every project because that's the fundamental question in this

16 case.

17        And I will begin by reminding you of the evidence

18 that you have heard, that the electricity generating industry

19 has long believed that projects such as the ones you've heard

20 about could result in increases in availability of the unit

21 and that those increases in availability would generate

22 increases in generation and, therefore, emissions.  I will

23 remind you of the evidence that the industry has been proven

24 right over and over in this expectation.

25        I will also remind you of the evidence that industry

Vol. 10-1495

1  in general and Cinergy in particular should have and did

2  expect not only to create additional availability, but to use

3  that availability to generate electricity.  And I will review

4  the evidence that if you generate more electricity, you

5  generally need to burn more coal.  And I will remind you of

6  the evidence that you heard that if you burn more coal and you

7  don't take any steps to prevent it, you will emit more sulfur

8  dioxide or more nitrogen oxides.

9          Before I get into the details though, I think there

10 are a couple of points that we need to make sure you

11 understand we're not asking you to decide.  You will recall I

12 told you during my opening statement that we don't ask you to

13 find that there's something wrong with generating electricity.

14 Modern America depends on electricity like it depends on

15 airplanes and cars and roads and hospitals.  There's nothing

16 wrong with generating electricity and providing a vital

17 service to the community.  And there's nothing wrong with

18 doing that in a way that provides a profit to the company.

19 We're not saying either of those things are bad or unAmerican

20 in any way.

21          What we are saying is that it is wrong to generate

22 electricity in a manner that violates the law.  It is our

23 contention, and we believe the evidence has shown, that

24 Cinergy has violated the law in how it was supposed to

25 generate electricity.

Vol. 10-1496

1          Judge McKinney instructed you in the preliminary

2     instructions that Congress passed a statute that made the

3     balance between this vital service of electricity and the

4     protection of our air.  And Congress struck that balance and

5     had as its purpose to ensure that economic growth will occur,

6     but in a manner consistent with the preservation of clean air.

7     Congress struck that balance in this particular program by

8     giving older plants a break.

9          Cinergy's plants that we have been talking about were

10    all in existence in 1977 when the law came into effect, and

11    Congress gave those plants a break.  It said you don't need to

12    install pollution controls immediately because it's -- you're

13    already operating.  But if you make a change that will

14    increase the emissions of sulfur dioxide or nitrogen oxide in

15    the two years following the project, you must install

16    pollution controls and get a permit at the same time that you

17    do the project.  That is the law.

18         In other words, Cinergy did not get a free pass to

19    operate without the state of the art pollution controls

20    forever.  Congress and the regulations specifically designed

21    when Cinergy should have to install pollution controls and

22    play by the same rules as everyone else.

23         We have shown you that Cinergy did not play by those

24    rules.  We have shown you from Cinergy's own documents that it

25    expected to increase generation at levels high enough to cross

Vol. 10-1497

1   that 40-ton health-based limit that EPA has set.

2          One other point I want to emphasize.  The question we

3   are asking you to design is not whether Mr. Stanley or

4   Mr. Batdorf or Mr. Pulskamp or Mr. Swez were at fault for any

5   of these violations.  These individuals are not the company.

6   The Duke companies that are the Defendants in this case have

7   thousands of employees from North Carolina to Ohio to Indiana,

8   and these individuals have and had at the time of these

9   projects numerous skills and specialties.

10          The law requires that all of the company make this

11  decision, all parts of the company:  the planning department,

12  the dispatch center, the engineers, the Environmental

13  Department and management all must ensure that they consider

14  the activities being undertaken, and using all of that

15  experience and all of that information available to the entire

16  company to consider whether they expected to run the units

17  more as a result of these projects.

18          Finally, of the things you're not being asked to

19  decide, Judge McKinney will instruct you that you are not

20  being asked to decide whether Cinergy meant to violate the

21  law.  The only question is using the methodology established

22  by the regulations:  Should a reasonable power plant operator

23  have expected that the projects would result in a net increase

24  of sulfur dioxide or nitrogen oxide in excess of that 40-ton

25  health-based limits?

Vol. 10-1498

1          So let's go through the evidence relating to this

2     question.  Our proof has been based on a common-sense chain of

3     logic.  If you replaces a component that has been causing a

4     large number of outage hours -- and you will recall "outage

5     hours" means that the unit isn't available.  It either can't

6     operate at all or it only can operate at a limited level.  It

7     can't reach full production.  If you go in and you take out

8     the component that's causing those outages and costing the

9     company availability and you put in a brand new component,

10    maybe the same component, maybe an improved component, maybe a

11    better designed component, you're going to have fewer problems

12    with the unit.  Why else would you spend millions of dollars

13    doing these projects?

14          And if you have fewer problems at the unit, you can

15    generate more electricity from the unit.  And if you keep the

16    unit in the same basic order of dispatch, you don't move it up

17    or down in this stacking order that you heard about, it will

18    be called upon roughly in the same way that it was before.  So

19    if on average it was called upon 50 percent of the time, it

20    will be called upon 50 percent of the time after the project.

21    But this time it will be able to answer that call.  It will

22    not have the forced outage that prevents it from meeting the

23    demand for electricity.

24          In other words, our logic is if you create more

25    availability you will have more generation; and if you have

1   more generation and you take no steps to prevent it, you're

2   going to burn more coal and you're going to emit more sulfur

3   dioxide and nitrogen oxide into the air we all breathe.

4        Now, in this trial Cinergy's offered you a very

5   different perspective.  They have said that none of these

6   projects could have resulted in an increase in emissions

7   because they could not result in an increase in availability.

8   And in the end, you're going to have to choose between these

9   positions.  You're going to have to choose:  Do you believe

10  the words contained in Cinergy's documents written at the time

11  these projects were undertaken and used in the testimony of an

12  engineer who for 30 years was hired by utilities to project

13  the effect of component replacements on unit availability and

14  reported to utility after utility, to public utility

15  commission after public utility commission, that you could

16  expect and, in fact, did experience increases in availability

17  and generation as a result of component replacement projects?

18  Or, do you believe the testimony of the high level company

19  executives who came here during this trial and offered not a

20  single supporting document to support their world view?

21       As I said, Plaintiffs' chain of logic rests largely on

22  Cinergy's own documents and testimony.  And if you may recall,

23  at the beginning of this trial, I gave you a list of the

24  evidence that I was going to offer; and if we could call that

25  up.

Vol. 10-1500

1          And the first thing I told you we were going to hear

2  about was the testimony of Cinergy's employees.  And we read

3  into the record the depositions of over a dozen Cinergy

4  employees who said that Cinergy expected that some component

5  replacement projects could result in increased availability.

6  For instance, we read you the testimony of Mr. Bott who was

7  Cinergy's manager of betterment programs at the time of these

8  projects; and what Mr. Bott was asked was, "What is your

9  understanding of the term 'economic justification'?  Do you

10  have an understanding of that term?"

11          And Mr. Bott asked, "As applied to generating

12  projects?"  And was told yes.

13          Mr. Bott said, "Generally, the cost of the project

14  will be repaid by better unit operation or some other aspect."

15          He was asked, "How was it generally repaid?"  And

16  Mr. Bott said, "I don't know the calculation.  I'm sorry."

17          He was asked, "Well, what do you mean by 'better unit

18  operation'?"

19          And Mr. Bott responded, "Could be availability, could

20  be something else."

21          And Mr. Bott was asked, "How does availability add to

22  a payback?"

23          "If the unit is repaired," he says, "and it's needed,

24  and it runs, and the savings is actually there and remains in

25  place, it may justify the cost of the repair."

Vol. 10-1501

1          In other words, Mr. Bott said a component replacement

2     project could result in increases of availability.

3          Similarly, you heard the testimony of Mr. Messmer in

4     his deposition who was a plant manager -- I'm sorry -- manager

5     of plant improvements for PSI between 1990 and 1994.  He was

6     asked, "What is the generalization that you're saying is

7     correct?  What is the statement you are agreeing with?"

8          And he answered, "The generalization is that between

9     -- well, over an outage interval that availability declines;

10    and as you spend dollars, invest dollars, both capital and

11    O&M, that availability is restored to some previous level."

12    Again, he's saying that investments in capital projects can

13    restore availability.

14         As one of Cinergy's plant managers testified in his

15    deposition, the connection between projects like those at

16    issue and increasing availabilities at these plants is, in his

17    words, "intuitively obvious."

18         The testimony of those involved in the projects shows

19    in those deposition excerpts we read you that they expected

20    these projects would result in availability improvements, and

21    this testimony was bolstered by documents Cinergy wrote at the

22    time the projects were undertaken.  Time and time again,

23    Cinergy prepared documents that said projects like those at

24    issue in this case could result in increased availability;

25    and, in fact, would result in increased availability.

Vol. 10-1502

1          Now, the good news is that you're going to be able to
2   look at these documents and read them for yourselves and come
3   to your own conclusions.  So I won't go through all of them,
4   but I do want to highlight some of them for you.

5          Let's begin by looking at Exhibit 537 if we could.
6   You'll recall testimony about this.  This is a five-year
7   business plan for the Gallagher station.  You'll recall that
8   the projects at the Gallagher station included the replacement
9   of two sets of pulverizer systems.  This is the business plan
10  for years leading up to that project.

11         If you look at the next image, this is a page from
12  that document; and if you highlight the middle of the page,
13  exactly there, you see that in this document Cinergy stated,
14  "Gallagher's unsurpassed availability record should improve
15  through the next five years."

16         Then it goes on to say, "Such projects as replacement
17  of condenser tubes on units 3 and 4 and the radiant
18  superheat tube replacement on 1 and 2, with the planned
19  improvement indicated in the construction and maintenance
20  projects, will lead to our five year goal of a 1 percent
21  forced outage rate."

22         Now, you'll remember that Mr. Batdorf and others
23  testified that if you decreased forced outage rate, you
24  increase availability.  In other words, forced outage rate is
25  a measure of how unavailable the unit is.  And what Cinergy is

Vol. 10-1503

1  saying in this document is that, if you do projects like

2  retubing a condenser or replacing a radiant superheat, you

3  will see a decrease in the forced outage rate; and if you see

4  a decrease in the forced outage rate, you see an increase in

5  availability.

6       I also commend to your reading, when you go back to

7  the jury room, Exhibit 1666 which contains a similar

8  statement.  But we don't have just general statements by

9  Cinergy.  You also saw and heard documents written by Cinergy

10 front line engineers at the time the projects were being

11 planned; and each of these documents state that these projects

12 would improve availability on the units.

13      Now, again, I'm not going to walk you through every

14 single one of these, I'm limited to an hour; but I will

15 highlight a couple of them for you.

16      With respect to the Life Extension project at Beckjord

17 Unit 1, we showed you Exhibit 362.  You'll recall Mr. Pulskamp

18 indicated this was a document he wrote about that project

19 while he was working on it.  He described the expectations of

20 the company as a result of these projects, and he explained

21 the company's thinking at a time before they had been sued for

22 violations of the law.

23      If we turn to the next image, in this document he

24 said -- and if you could bring up the top part of the

25 document, please?  That the Unit 1 Life Extension project

Vol. 10-1504

1  would bring this 30-year old unit to near new condition.  You

2  can see that in the paragraph that begins, "our preliminary

3  evaluations."  He used the phrase "near new condition" with

4  respect to a 30-year old unit.

5          Mr. Pulskamp also acknowledged that this document

6  indicates that at the time that they made this statement about

7  increasing the operation of this unit to like new condition,

8  they had been contemplating whether they needed to retire this

9  unit.  The question they were analyzing was:  Do we retire

10 this unit?  Or, do we invest 15 to 18 million dollars to

11 restore it to near new condition?

12         We saw with respect to Beckjord Unit 2 -- and if we

13 could call up Exhibit 9, please -- this is the annual report

14 that CG&E issued to its shareholders and the public.

15         If we turn to the next image, this is page 22687 of

16 that document.  This states, "Cinergy told the public and its

17 shareholders that the purpose of the Unit 2 Life Extension

18 project was 'to return the unit to its original capacity

19 rating and efficiency, increasing its availability to the

20 system'."  But these were not the only projects where Cinergy

21 indicated it expected these projects to increase the

22 availability of the units.

23         With respect to Beckjord Unit 6, Exhibit 319, please,

24 and if we could highlight that first paragraph -- the first

25 paragraph.  I'm sorry.

Vol. 10-1505

1        Cinergy's project engineer stated at the time of the

2   project, before this lawsuit was filed, that "the existing

3   W.C. Beckjord Unit 6 condenser tubes have reached the end of

4   their useful life."  And they went on to say that, "the

5   reliability of the unit will be compromised if the tubes are

6   not replaced."

7        Now, Mr. Koppe testified that reliability is another

8   indication of availability.  It's not mathematically precisely

9   the same, but it's a measure of the same concept.  This again

10  is a statement by Cinergy that this component could affect the

11  availability of the unit and, therefore, that replacement was

12  necessary.

13       With respect to the Gallagher condenser, Cinergy's

14  engineers again indicated and expected an increase in

15  availability.

16       But let's focus now on the Wabash River projects

17  because you've heard a lot about those; and if we could go to

18  image 15, Exhibit 1319, please?

19       This is a large document, as you saw.  It's probably

20  about that thick, 3 or 4 inches thick.  You'll have an

21  opportunity to spend as much time or as little time as you

22  want with that document; but I do ask you to look at this

23  document.

24       This is the Life Extension Study that was performed

25  for Cinergy for Wabash River Unit 2; and you heard testimony

Vol. 10-1506

1  that this Life Extension Study was used as part of the

2  justification for the projects at Wabash River Unit 2.  This

3  study was prepared years before the lawsuit was brought and

4  states Cinergy's expectations with regard to these projects.

5          And if we could turn to image 16, please, which is the

6  page with the Bates number ending 2279.

7          The Life Extension Study classified the 1989

8  replacement of the radiant superheater as the project that

9  was -- and if we could highlight just the top part of that --

10  no, above.  Right there.  "Type:  Rehabilitation-operational."

11          And if we could go to the next image, please.

12          Now, what does that mean -- I'm sorry, not the next

13  image.  The page number ending 2158.

14          So what did the study say "rehabilitation-operational"

15  meant?

16          That was the correct page, whether I was right or not.

17  I probably have the Bates number wrong.  This was 2159.

18          If you look and highlight paragraph No. 2:

19  "Rehabilitation-operational projects are projects relating to

20  equipment restoration in regard to availability, reliability

21  and capacity factors at or near design status by repair or

22  replacement of kind."

23          In other words, as you heard, capacity factor is a

24  measure of generation.  These projects were projects that

25  would address availability, reliability and capacity factors

Vol. 10-1507

1  to bring those units back to near original design status.

2         At the time these projects were undertaken, the unit

3  was already 20 years old.  So they're talking about taking an

4  over 20-year old unit back to design status.

5         And you'll see that with respect to the 1992 project,

6  the other project that happened at Wabash River Unit 2, the

7  study also identified the type of these projects; and on the

8  page number -- exactly right -- at the very top there you'll

9  see this discusses the finishing superheater; and it states

10 it's a modernization-operational project.

11        And if we could go back to the other image, please.

12 It seems like a mysterious word, but they defined it.  This is

13 now the fourth paragraph.  That document states that, "A

14 modernization operational project is a project that's related

15 to equipment restoration in regard to availability,

16 reliability and capacity factors at or near design status by

17 using the current available state of the art component

18 design."

19        So again, Cinergy's own documents show that these

20 projects were targeted at increasing availability and

21 generation.

22        Let's look at the Wabash River Unit 3 project,

23 Exhibit 1265, image 19, please.  It must be image 20.  I'm

24 sorry.

25        Well, I'll just tell you what the document said.  You

Vol. 10-1508

1  heard it, and you can look at it yourself.  What the Cinergy

2  engineer stated about this project was that it will mean the

3  difference between a unit that will operate hour after hour,

4  or one that will be down at a rate of one forced outage every

5  week because of tube failures.  He's clearly stating that this

6  project will impact the availability of the unit.

7         Let's turn to one more example of these statements by

8  Cinergy, and you'll see many more of them in the documents you

9  reviewed, and that's the pulverizer study which relates to the

10 two pulverizer projects at Gallagher Units 1 and 3.  If we

11 could call up image 22 -- oh, I'm sorry.  That's not the

12 image.

13        The pulverizer study was conducted to review what the

14 benefits to the company would be of the project; and there's

15 the front cover.  You remember seeing this, I think, in

16 several witnesses' testimony.  They made several conclusions

17 about the benefits of this project.

18        If we could have the next image, please, and the next

19 image.

20        Here is the model assumptions that they used in

21 running their economic benefit calculations for this project.

22 And if we could highlight paragraph D you'll see there that

23 they said that, "The current pulverizer system experiences

24 significant derates --" and you'll remember that "derates" are

25 simply a decrease in the amount of electricity that can be

Vol. 10-1509

1  generated from that unit.  "A review of the past 15 years of

2  GADS data indicates an average loss of 1.8 percent EFOR."

3  You'll remember that you heard EFOR is a measure of the forced

4  outage rate that includes not only outages, but also derates.

5        "The new pulverizer system is projected to add only

6  1.5 percent to the EFOR and, therefore, a reduction of

7  1.3 percent in the equivalent forced outage rate can

8  reasonably be expected."  In other words, they're going to be

9  decreasing the forced outage rate, which increases the

10  availability of the unit.

11        For analysis purposes, only a decrease of 1 percent

12  was used.  So Cinergy conservatively estimated that at least

13  1 percent availability would be gained; but that wasn't the

14  only benefit that Cinergy expected from these projects.

15  Cinergy also expected to obtain a 7-megawatt increase in the

16  capability of the unit.  In fact, you heard during Mr. Koppe's

17  testimony that in planning the Unit 3 project, Cinergy looked

18  at what they had achieved in the Unit 1 project; and they

19  achieved in the Unit 1 project that increase in 7 megawatts

20  and as a result they expected to achieve the same thing with

21  the Unit 3 project, which was, as Mr. Koppe testified, a

22  nearly identical project.  But again, that's not the only

23  benefit that Cinergy saw from this project.

24        If we could go to the next image, please.

25        It was the one that kept coming up.

Vol. 10-1510

1      Okay, well, again, you will have the opportunity to
2 look at this, and you were able to study this during both
3 Mr. Hekking's and Mr. Koppe's testimony, or I believe at least
4 Mr. Koppe's testimony.

5      What that page in the document, which is GAL 014429, I
6 commend that to you when you go back to the room -- Cinergy
7 concluded that there would be an increase in the efficiency of
8 the unit; and while that means that each individual megawatt
9 produced required less coal, Cinergy projected that because it
10 was a more efficient unit; it would be used more because it
11 was cheaper to get electricity out of that unit; and because
12 it was going to be used more, the increase in efficiency would
13 actually result in enough extra generation that they needed to
14 think about whether or not they needed a PSD permit.  That's
15 the word they use in the document, "a PSD permit."

16      Now, PSD stands for "prevention of significant
17 deterioration."  And if you remember from the statutory
18 language I put up there, prevention of significant
19 deterioration is another name for part of the legal program
20 that's being implemented here.  It's part of the New Source
21 Review program.  So Cinergy actually thought about, hmm, we're
22 going to increase operations enough that we might trigger PSD;
23 but they never did a calculation to determine how much that
24 increase would be.

25      There are more documents -- and I know this is very

Vol. 10–1511

1  dry what I just went through, but I wanted to focus you on the

2  language of the documents because that's what they were

3  thinking at the time of these projects; and that's what you

4  have to conclude is:  What would a reasonable company

5  experienced in the electricity industry, who knew how these

6  systems operated and who knew all the environmental issues

7  because they have an Environmental Department, and all of the

8  projected future generation because they have a planning

9  department dedicated to that, and all of the information they

10  have on projected demand, what would a reasonable power

11  company that had all that information think?

12        And what better evidence do you have than Cinergy's

13  own statements at the time that they were undertaking these

14  projects.  But you also had other evidence.  And if we could

15  have that list of evidence back up again, please.

16        You heard from several witnesses on behalf of the

17  Plaintiffs, live witnesses.  The first was Mr. Joe Bradley.

18  And you'll remember Mr. Joe Bradley was a boilermaker who had

19  spent decades working on welding and repairing boilers.

20  Mr. Bradley came here on his own time to explain that

21  companies such as Cinergy do these projects for only one

22  reason.  They expect to use the unit more in the future.

23        He fully understood the connection between fixing a

24  recurring problem at a unit and increased availability.

25  Cinergy should have and did have that same understanding.

Vol. 10-1512

1    You also heard from Mr. Hekking, who worked for over

2    20 years in the maintenance of boilers at the Tennessee Valley

3    Authority.  He testified that he had done similar projects

4    when he was with TVA.  In fact, he testified that TVA had been

5    sued over those projects.  And he testified that these

6    projects, like the ones at issue in this case, were done

7    precisely to obtain additional generation.

8    You also heard from Mr. Larkin.  Mr. Larkin is an

9    accountant who had decades of experience looking at the way

10   electric utilities report how they spend their money; and he

11   told you that accounting is the way that companies explain to

12   regulators, to shareholders, to the public how and why they

13   are spending their money.  Mr. Larkin told you that every

14   single one of these projects was capitalized.

15   In other words, Cinergy considered the expenditures to

16   be ones that extended the life of the unit or improved the

17   unit's service.  These were not projects that simply

18   maintained the status quo.

19   You heard from Mr. Larkin that Cinergy, by

20   capitalizing these projects, told stockholders and regulators

21   that these projects improved the value of the unit.  For an

22   electricity generating unit, what is the most important way

23   for a utility to improve the value of that unit?

24   You heard from Mr. Batdorf; you heard from

25   Mr. Pulskamp; you heard from Mr. Hekking; and you heard from

Vol. 10-1513

1  Mr. Koppe that availability is a critical, important value of

2  a generating unit.  If you don't have availability, you don't

3  have generation.

4        So if they're improving the value of their units,

5  common sense tells you they probably expect these units to

6  result in increased generation.

7        You also heard from Mr. Koppe, who was the principal

8  architect of the generation availability data system, which

9  I'm sure by now you know is called GADS.  GADS is a system

10 developed to help utilities track what's causing outages at

11 their units and identify ways to prevent those outages in the

12 future.  That was the purpose behind developing the GADS

13 system.

14       The testimony of Cinergy's engineers in this case, in

15 the deposition transcripts we read to you, referred to GADS as

16 the data they used to perform this analysis.  Like 90 percent

17 of the utilities in this country, Cinergy reports data into

18 GADS and uses that data to track what's been happening at the

19 unit in the past in the hopes of being able to address the

20 major degraders.  You heard that term from some of Cinergy's

21 documents.  They also use this GADS data to calculate the lost

22 generation and the expected payback in additional generation

23 after the projects.

24       Now, Mr. Koppe told you this was not unique to

25 Cinergy.  This was the way the utility industry approached

1  this question; that he had been hired by utility after utility

2  to do just this kind of analysis; to look at the historical

3  performance of the unit and project what would be the effect

4  of a change at the unit; if you had a problem and you made

5  this change, what would the effect of that be?  That was what

6  utilities hired Mr. Koppe to do for nearly 30 years; and he

7  did it over and over.  And when did it over and over, he did

8  go back and look at, was he generally right?  Did he generally

9  get it right?  And his experience is that he and industry were

10 proven right time and time again; that if you undertake the

11 replacement of a component that's shutting that unit down all

12 the time, and you replace it with something that's going to

13 have very few or no outages due to that component, you're

14 going to see an improvement in the availability of the unit.

15 It's just common sense.

16         If this component can cause losses in availability,

17 replacing it should cause increases in availability.  In other

18 words, Mr. Koppe's testimony is fully consistent with the

19 experience of the industry and more important with the plain

20 language of Cinergy's own documents.

21         Now, Cinergy has spent some time in this trial arguing

22 that Mr. Koppe failed to consider everything else that was

23 going on at the unit; and if you thought about everything else

24 that was going on at the unit, well, you wouldn't expect an

25 increase in availability.

Vol. 10-1515

1          If we could go to image 24, please?

2          But I ask you to remember two of the demonstratives

3  you saw.  The first is this graph, Koppe image 11, titled

4  "Wabash River Unit 5 Outage Hours in the Five Years Before the

5  Project."  Mr. Koppe testified that he prepared this graph

6  from GADS data.

7          What this shows you is Mr. Koppe absolutely did

8  consider everything else that was going on at the unit, and he

9  looked at:  Was there a trend up or down in everything else

10 that was going on in the unit?  And he looked at the relative

11 proportion of outages caused by the component that was being

12 replaced and everything else -- and this is one of the most

13 dramatic cases -- and it shows you that these were big

14 problems for these units.  And it shows you that it was almost

15 comparable to everything else at the unit and that Mr. Koppe

16 analyzed that and came to the conclusion that you could be

17 safe that you weren't overestimating increased availability.

18         If you simply assumed that all the other problems

19 continued, there was no indication, no document saying that

20 they expected another component to show up and cause these

21 level of outages in the year -- the two years following the

22 project.  So Mr. Koppe did look at all the other data.  And in

23 case you have any concern about whether or not he did, let's

24 look at one of Cinergy's exhibits.

25         If you could turn to that, please?

Vol. 10-1516

1        And there is Cinergy's Exhibit 2135.  This is the

2   compilation of GADS data that Mr. Green went through with

3   Mr. Koppe and has shown up a couple of other times.  What this

4   is is a list of all of the availability events that happened

5   in the Gallagher pulverizer -- or in Gallagher Unit 3 in the

6   years preceding the project.  You will remember that Mr. Koppe

7   is the individual who compiled this data, who went into the

8   GADS data system and pulled this data out.  He looked at this

9   data.

10       Now, Cinergy has suggested -- well, after you heard

11  from Mr. Koppe, you heard from one more witness for the

12  Plaintiffs, and that was Dr. Rosen.  Dr. Rosen was the only

13  generation planner you heard from in this trial.  Dr. Rosen

14  has over 30 years of experience in generation planning.

15       Dr. Rosen showed you that Cinergy should have expected

16  that these increases in availability that Mr. Koppe concluded

17  would occur as a result of these projects would, in fact,

18  result in increases of more than 40 tons of sulfur dioxide or

19  nitrogen oxides at each of these units in the two years

20  following the project.  You've heard that the formula that

21  Dr. Rosen used was actually the same formula that Cinergy

22  used; and you'll see -- I'll just call up the cover page so

23  you can be reminded what the document is.

24       Image 26.

25       This was the construction project evaluation guide,

Vol. 10-1517

1  and you saw several witnesses talk about this.  We walked you

2  through the formula contained in that guide, and we showed you

3  that what's represented in this construction project

4  evaluation guide is mathematically equivalent to the formula

5  used by Dr. Rosen to convert availability into generation.

6       Now, you will remember that Cinergy's own witnesses

7  took great pains to point out that these projects should not

8  have changed the ranking of these units in the stacking order

9  for dispatch.  By testifying to that, what they were saying is

10 that the percentage of availability that would be used in

11 these projects -- at these units, would be roughly the same

12 before the project and after the project.

13      For people like me who are a little slow about math,

14 at first you might think well, that means that generation is

15 going to be the same before and after; but think about this as

16 a pie.  There's a pie in front of you.  Half of that pie has

17 been eaten and half of the pie is still there.  Then put next

18 to that pie a bigger pie.  Again, we're going to use the same

19 percentage.  Instead of a 9-inch pan, we've got a 10-inch pan.

20 So the pie is bigger.  There's more fruit.  There's more

21 crust.  Everything good is more.

22      Again, you eat half of it.  You use the same

23 percentage of that pie, but you've eaten more pie.  You have

24 to do more sit-ups as a result of eating that pie than you did

25 by eating half of the other pie.  That's the point that

Vol. 10-1518

1  Dr. Rosen has made for you is they were going to use the same
2  percentage of availability before the project and after the
3  project, but availability went up.  There was more pie and
4  when the unit was called on, it could respond more often than
5  it could before the project.

6         Dr. Rosen is the only individual who testified about
7  particular numbers of increases.  He crunched the numbers.  He
8  used Cinergy's data to come up with estimates of increased
9  generation in the same way that Cinergy came up with estimates
10 of increased generation.  The difference was at the end of
11 that, when he found increased generation, he multiplied it by
12 a pollution factor.  Cinergy multiplied it by dollars.

13        If you call up image 28, you'll see this is the
14 numbers that Cinergy gave.  And I believe I saw all of you
15 writing these down before; but just take a moment and look at
16 these because, unfortunately, you won't get to take this chart
17 back with you.  The important point here is look at each of
18 these projects; and you'll see that for the projects that
19 are -- you were asked about on the verdict form, each of them
20 shows an increase greater than 40 tons and in many cases it's
21 substantially greater than 40 tons.

22        Cinergy has instead argued that Dr. Rosen's
23 calculations were unnecessary because these projects were just
24 tubes in, tubes out; and, therefore, they didn't need to do a
25 calculation.  That's a catchy phrase: "tubes in, tubes out."

Vol. 10-1519

1  Sounds simple.  Sounds straightforward, but it's not

2  consistent with the law.  The rules are specific.  You have to

3  look at the generation in a two-year period before the project

4  and compare that to a two-year period after the project; and

5  the regulations tell you what those two-year periods should

6  be.  For the baseline period, that pre-project period, you

7  have to look at a defined period of time.  Cinergy's witnesses

8  testified they didn't look at that defined period of time.

9        For the post-project period you have to look at the

10  two years following the project.  That's what the rules

11  require you to do.  Cinergy testified they didn't examine

12  those two years.  The longest forecast you heard about from

13  Cinergy was a seven-day forecast; but you also heard that

14  Cinergy has whole departments dedicated to looking at what

15  happens over a year, two years, five years to generation at

16  these units.

17        Cinergy has to generate electricity.  It has to meet

18  its commitment to the grid.  It has to order coal.  It has to

19  know it's going to meet its commitments to its customers.  It

20  has to meet the demand it expects to rise.  To do that it has

21  to think ahead.  It has to project, what are these units going

22  to do in a year, in two years?  That information was never

23  presented to you in this trial by Cinergy.

24        Cinergy will argue to you that the reason they didn't

25  have to do that was because there's this thing called "the

Vol. 10-1520

1  demand growth exclusion."  The demand growth exclusion is a

2  defense that Cinergy must prove to you.  What they have to

3  prove, among other things, is that the generation that is

4  expected to occur after the project is unrelated to the

5  project, not that the project isn't the sole cause.  We don't

6  have to show you that the project is the sole cause.  If we

7  show you that the project resulted in increased generation

8  alone or in combination with other factors, then Cinergy has

9  to come back and say that if you take out the generation that

10 was a result of only demand growth and had nothing to do with

11 the project, you're not above the threshold.

12        Cinergy didn't do that analysis.  Cinergy said to you,

13 "Well, demand was growing.  So we would have increased

14 generation because of demand.  So we meet the demand growth

15 exclusion."

16        That's not what the law says you have to do.  The law

17 says you have to show that you could have met that demand

18 without these projects at this unit, and Cinergy did not show

19 you that.

20        Moreover, we showed you why our calculations

21 specifically excluded the hours that were related only to the

22 projects and not to demand growth.  And I'll ask you to look

23 at image 29.

24        Again, this is a demonstrative you won't be able to

25 take back, but you'll recall Mr. Koppe explained this to you,

Vol. 10-1521

1  and there are three colors on this graph.  The first color is

2  yellow, and that's generation that happened regardless of

3  whether or not the project occurred because the unit was

4  called on.  It could meet that demand and it did in the

5  pre-project period and post-project period.

6       The red on this graph is the day that it was called on

7  in the pre-project period, but it couldn't generate because it

8  was unavailable due to a forced outage.

9       Post-project, because you fixed the thing that caused

10 that forced outage, if it's called on, it's going to run that

11 day; and it's going to run just like the other days of the

12 week.  That's that red.  That's the red that happens because

13 the project happened.

14       Then there's demand growth they're going to generate

15 more overall from this unit, and that's the green; and you

16 heard both Mr. Koppe an Dr. Rosen explain to you that they

17 excluded that green from their calculations.

18       All in all, the final emission analysis really reveals

19 the gaps in Cinergy's arguments.  Cinergy offered no witnesses

20 from its Generation Planning Department.  We heard nothing

21 from Cinergy about how it planned to meet future generating

22 needs.  Cinergy provided no testimony from its Environmental

23 Department explaining the steps it had taken to understand the

24 regulations, or showing that anyone from the Environmental

25 Department familiar with the regulations had reviewed the

Vol. 10-1522

1 projects to see if a New Source Review permit was required.

2          Wouldn't you expect a company that had so carefully

3 documented every aspect of the economic decision to have

4 documented that it also considered the environmental issues?

5          We ask you to carefully consider the statement Cinergy

6 made before this lawsuit was filed, the experience of the

7 industry as it has been presented to you; and when you look

8 closely at this evidence, exercise your common sense and ask

9 yourself:  Would you have spent $5 million, $15 million,

10 $18 million on projects and not expected to use that unit and

11 to use the availability created by that project?

12          Cinergy will also talk to you about routine

13 maintenance, repair or replacement; but you're going to hear

14 them probably refer to it as RMRR, and that's because they

15 don't want you to focus on the key question in this defense.

16 Cinergy has to prove to you that this repair, maintenance or

17 replacement was routine.  Was it not a big deal?

18          The reason the routine maintenance, repair and

19 replacement exclusion exists is because the definition of

20 physical change is very broad.  The definition of physical

21 change includes fixing a leaky pipe.  It includes putting in a

22 Dutchman.  The regulations provide the exclusion, this narrow

23 exclusion for routine maintenance to say, if all you're doing

24 is going in and maintaining the status quo, fixing the leak so

25 you can bring the unit back up, that does not require an

Vol. 10-1523

1   emissions analysis.

2        But that's not what these projects were.  You heard

3   from witness after witness that these projects were large

4   projects designed to improve the availability of the units,

5   that were undertaken after long planning by outside

6   contractors after high level approval and review.  These

7   projects were a big deal.

8        Now, Cinergy will ask you to focus on one factor.

9   They'll ask you to focus on the fact that many other companies

10  have done the same kinds of projects.  By their reasoning, if

11  every utility in the country does it once, it's routine.  But

12  think about the implication of that statement.  If that's the

13  standard, then building a power plant is routine because every

14  electric generating utility has built a power plant.  By

15  definition, if you're an electric generating utility, you've

16  built a power plant or you've purchased somebody else's.

17       Cinergy's standard would turn a narrow exception

18  designed to take those small maintaining the status quo

19  projects into an exception that would say building a power

20  plant is routine.  That cannot be a narrow exception, and

21  Cinergy's argument just simply fails on that fact.

22       You heard the testimony of Mr. Bradley and

23  Mr. Hekking, as confirmed by the testimony that we read you

24  from the depositions, that there is normal upkeep.  There are

25  day-to-day, week-to-week and month-to-month steps that you

Vol. 10-1524

1  take for the normal upkeep of the unit; and you heard them say

2  these were not those kinds of projects.  Mr. Bradley said this

3  was not normal upkeep of a boiler.  This was a major

4  undertaking in referring to the Wabash River Unit 2 project.

5       In the end, the question is now yours to decide.  You

6  have the power to come to the conclusion of whether or not

7  Cinergy violated the law.

8       I thank you for your close attention during the trial,

9  and I thank you for your close attention during my statement

10  today.

11       The case is in your hands, and you will have to decide

12  whether to believe the statements and the documents and the

13  plain language that Cinergy used when it was planning and

14  undertaking these projects, or are you going to believe

15  testimony offered by high level executives in this trial

16  without a single supporting document to suggest that that's

17  what they thought at the time the projects were undertaken?

18       We ask that you return a verdict in favor of the

19  Plaintiffs on each and every one of these projects so that

20  Judge McKinney can decide what steps to be taken to assist us

21  in meeting Congress' goal to protect the air we breathe.

22       THE COURT:  Thank you.  Is the defense ready?

23       MR. HOPSON:  We are, Your Honor.

24       THE COURT:  Mr. Hopson.

25

Vol. 10-1525

**DEFENDANTS' CLOSING ARGUMENT**

1

2        MR. HOPSON:  Good morning, Your Honor.

3        Good morning, ladies and gentlemen.  I also want to

4   thank you very much for the time and attention and focus you

5   brought to this case through testimony and evidence that I

6   know was not always particularly scintillating or fascinating;

7   but every time I looked over you folks were following along

8   and taking notes and trying to keep up with the sometimes

9   clumsy maneuvers of the lawyers -- and I include myself

10  particularly in that remark -- as we tried to present this

11  case in the courtroom.

12       The case really does come down to two different

13  versions of the world.  It could not be clearer, and it could

14  not have been clearer in Ms. Himmelhoch's opening statement.

15  The Government's view of the world is one that is built on

16  after the fact, artificial formulas, expert testimony paid for

17  and brought to you in this courtroom.

18       We didn't rely on experts.  We brought you the men

19  who made these decisions in real time to sit in this witness

20  stand and to tell you the process they followed and what they

21  thought.

22       And it's certainly true that there are two issues.

23  One issue involves predictions of emissions increases.  The

24  other involves routine.  I'm going to focus on the emissions

25  increase first, save my remarks about routine until the end.

Vol. 10-1526

1 Some of the issues overlap, but I don't think you'll have any

2 trouble following; but as you listen to the evidence, both in

3 the closing arguments and when you go back to deliberate, I

4 want you to keep in mind that Judge McKinney is going to give

5 you an instruction of law; and that instruction of law is

6 going to say you should use your common sense in weighing the

7 evidence and consider the evidence in light of your own

8 observations in life.  I think that's an important

9 observation, an important instruction; and you should keep

10 that in mind, as I say, not only in closing but in

11 deliberations.

12         Now, I do want to review the evidence; but before I

13 do, I want to take a minute to look at the legal standard

14 because we heard from Ms. Himmelhoch some arguments this

15 morning about what the law is and what the law requires; and

16 we heard Dr. Rosen tell us that his formula is based on his

17 own interpretation of the law.

18         And I might not be certain about a lot of things, but

19 one of the things that I'm certain about is there's only one

20 expert on the law in federal court, and that is the Judge.

21 And here is what he is going to tell you what the law is:

22 "The law requires an owner or operator to make an assessment

23 or prediction on that question before the project begins."

24 Nothing in there about whether the assessment has to be in

25 writing, whether it has to be a formula or whether you have to

Vol. 10-1527

1  do a memo on the file.  You have to do an assessment.

2      Then the question is:  Did they look to the

3  information available to the Defendants at the time before

4  they began the project?  And you have to decide, your question

5  in these instructions, is whether a reasonable owner or

6  operator should have predicted that the project would cause an

7  increase of 40 or more tons of emissions.  That's the law.

8  That's where we start.

9      Another way to rephrase what you see there as the law

10  in the case is to ask yourself whether Bob Batdorf and Barry

11  Pulskamp were reasonable in their belief that taking out a

12  section of tubes and putting in a new section of tubes doesn't

13  cause an emissions increase.

14      Now, as we talk about the evidence here, I want to

15  begin talking about the year 1999 because that was a very

16  important year.  That was the year that Dr. Richard Rosen and

17  Dr. Bob Koppe became an inseparable team or, as Mr. Green

18  referred to them, "a tag team."  And they really are a tag

19  team because you have take their evidence and their testimony

20  together to get where the Government wants you to go in this

21  case.

22      Dr. Rosen and Mr. Koppe clearly are the founding

23  fathers of the formula that is the heart of the Government's

24  case.  Ms. Himmelhoch says the question is whether Cinergy has

25  to play by the same rules as everybody else?  That's not the

Vol. 10-1528

1  question.  The question is whether Cinergy should have played

2  by the rules made up by Dr. Rosen and Mr. Koppe?

3          Here's what we know about Dr. Rosen and Mr. Koppe.

4  And by the way, it's remarkable that the Government doesn't

5  show you Dr. Rosen's formula.  They show you these numbers,

6  but the only way you get these numbers is by using the

7  formula.  So where does the formula come from?  Well, we heard

8  in argument it was "a methodology established by the

9  regulations."  That's a quote.  But what we know from the

10  evidence, from the witness stand, is that the formula comes

11  from brainstorming for six months and thinking about the right

12  way to do emissions calculations.

13          We know the brainstorming had an assist from the

14  Government's lawyers and from Mr. Hekking and over a period of

15  time, as they looked at and rejected various different

16  formulas, including 10 different kinds of emissions

17  calculations formulas, they came up with the formula that

18  they're using in this case.

19          All right.  Let's go back to the ELMO.

20          They came up with the formula that they're using in

21  this case.  Again, you don't get anywhere with the

22  Government's world of calculations and projections and

23  predictions unless you buy into this formula.  And we heard --

24  even though we didn't see the formula, we heard that it was

25  industry standard, that it was simple, that it was obvious,

Vol. 10-1529

1 although it remains unclear what industry it's standard in

2 because the evidence is nobody used this formula to predict

3 emissions increases from tube replacements prior to 1999.

4          If the formula really is as simple and obvious and

5 identical to Cinergy's cost/benefit documents, that's really

6 true, you might have been treated to some explanation about

7 why it took a whole bunch of smart people six months to think

8 it up back in 1999.

9          The other thing you might want to consider is, if

10 it's really obvious, if this formula is really self-evident

11 and identical to what Cinergy and the entire utility industry

12 has been doing forever, why did no one use this formula?  Why

13 did it not exist prior to 1999?

14          Here are a few other things we know about this

15 formula besides the history of its creation.  We know it's

16 never been used outside this and similar lawsuits.  We know

17 it's never been recommended or supported by anybody who wasn't

18 a paid Government expert.  We know it's heads you win; tails I

19 lose.  As long as you plug in some hours of availability up

20 here in the top right-hand corner, it's going to spit out an

21 increase in emissions, of course, as long as you hold

22 everything constant.

23          But the evidence was -- and I'm going to review it

24 with you -- Dr. Rosen held everything constant or made changes

25 that were unfavorable to Cinergy in every case except two of

Vol. 10-1530

1  his calculations.  And I'll review that with you.  That gets

2  into issues of heat rate and other aspects.

3         But before we get into the specific numbers and the

4  way they were plugged into this formula, I want to talk about

5  the assumptions that underlie this formula.

6         Can we get an assist so that we can get this ...

7         While they're working on the technology, which I've

8  always told them I don't trust, let me just tell you there are

9  four assumptions underlying the formula.

10        Maybe we should do this.  Rather than scramble

11  around, why don't you just give me the ELMO and I'll do it

12  that way?

13        This is Dr. Rosen's demonstrative, which I borrowed

14  because I want to show you something.  He characterized this

15  demonstrative as reflecting the heart of his testimony or the

16  way his formula or his way of looking at how these projects

17  really worked, and there are four embedded assumptions.  The

18  first embedded assumption is -- and you heard about this in

19  the Government's closing -- is that if you improve

20  availability, if you add up the GADS hours as shown in that

21  little piece of blue up there, all those hours caused by that

22  component that's being replaced are going to be recovered.

23        The second assumption which is shown by the red right

24  here is that everything else, everything that impacts

25  availability at these complex units will remain constant.

Vol. 10-1531

1          The third assumption, which Dr. Rosen calls his

2  assumption of constant utilization factor, is just a fancy way

3  of saying that this red here remains constant; that all of the

4  hours of availability get translated into generation; and, of

5  course, Dr. Koppe's contribution up here in blue gets

6  translated into additional generation.

7          Once you've gone that far, you're through the first

8  line of his formula.  After that, all that's going on in steps

9  2 through 5 is translating that increase in generation based

10  on three assumptions, based on further assumptions into

11  emissions.

12          The point about this is that despite all this

13  reference to Cinergy's documents, the proof in this case is

14  not based on Cinergy's documents.  It's based on this formula;

15  and this formula piles assumption on assumption on assumption.

16  It is nothing more than a house of cards or, as Dr. Rosen

17  agreed when I asked him, garbage in and garbage out.

18          Let me go to the first assumption.  And I'm told

19  things are now working, so we'll give it one more chance.

20          The first two assumptions, if you put them together,

21  the assumption of improved availability from the component

22  replacement and the assumption of constant availability with

23  everything else in the unit, is just a fancy way of saying

24  that the way we're going to prove this -- says the

25  Government -- is we're going to assume an increase in

Vol. 10-1532

1   availability.

2         Now, in the first half of the Government's case when

3   they were talking about Life Extension, they told you over and

4   over again -- and some of you will remember the famous graph

5   from that learned treatise "*Steam*" that shows as these units

6   get older, the outage rate gets worse and worse; and

7   availability falls off.  You may remember that testimony.

8         But then, when the dynamic duo Dr. Rosen and

9   Mr. Koppe take the stand, the assumptions change.  Then the

10  testimony becomes, well, actually what's happening is outage

11  rates are getting better and availability is increasing.

12        And Mr. Green asked Mr. Koppe:  How can that be?  If

13  the Government's position is that problems always gets worse

14  as the unit gets older, how in the world can you predict an

15  increase in availability from a single component replacement?

16        And there on the screen is what Mr. Koppe says.  He

17  says, "I think overall the unit is going to get better.  Many

18  of these problems are things that are going to happen once

19  every two years or five years.  So some will go up and some

20  will go down.  Overall, I think the overall outage rate will

21  get better."

22        Maybe the Government will explain to you which of

23  these two assumptions is at work in this courtroom.  Are we

24  assuming that these older units get worse or are we assuming

25  the older units get better?  Or, maybe the third option is

Vol. 10-1533

1  that you do a single component replacement like you change out

2  the radiant superheater tubes at Wabash River 2 and it's a

3  turning point.  It's miraculous.  The unit goes from being in

4  decline to suddenly being an improvement.  Or, maybe the more

5  sensible answer is the one given by Bob Batdorf and Barry

6  Pulskamp which is, in the real world, availability doesn't do

7  dramatic dips and dives.  It has a sawtooth, up and down, year

8  to year.  You can't predict it.  A single component

9  replacement doesn't change it.

10        Let me talk a little bit more about the evidence and

11  Mr. Koppe's role in the first step in this formula.

12        If you're going to accept the output of this formula,

13  you have to conclude that Mr. Koppe was correct in adding up

14  all the hours of outage associated with a single component and

15  ignoring everything else.

16        Can we see the GADS data?  This is just an example.

17  Mr. Green spent some time going through this.  I'm not going

18  to dwell on it because I think you'll recall it; but you will

19  know that the blue are the hours that Mr. Koppe added up of

20  losses in availability over here in the third column from the

21  right.

22        The yellow and the orange-like color are everything

23  else that's going on at that unit.

24        Now, Mr. Koppe is a smart man, and he doesn't say

25  that that stuff wasn't happening.  He doesn't say that it was

Vol. 10-1534

1  irrelevant to thinking about how these units are really going

2  to operate in the real world.  What he does say is that he

3  made a judgment call to ignore everything else.

4        Ms. Himmelhoch showed you this morning a graph, but I

5  would rather show you Mr. Koppe's testimony:

6        "So you didn't look at the GADS data for that

7  information?"  Referencing what we just saw.

8        "Answer:  That's correct.

9        "Question:  It would be available information, but

10 you didn't consider it?

11        "Answer:  That is correct.

12        "Was that a judgment call you made not to consider

13 the other availability degraders in the unit -- I'm sorry --

14 going on at the unit in the GADS data?

15        "Answer:  Yes."

16        You've heard testimony from the mouth of Government

17 witnesses and defense witnesses that there are thousands of

18 components at this unit, and I'm not suggesting to you that

19 they're all as big as the radiant superheater tubes; but all

20 of those thousands of components contribute to questions about

21 how that unit operates, when it's available and when it's

22 derated.  And the Government's expert makes a judgment call to

23 exclude all that and simply assume that it remains constant.

24        And while we're talking about availability, let me

25 show you the list of availability degraders.  I'm sure you

Vol. 10-1535

1  recall since it was relatively recent Mr. Batdorf's testimony

2  about how the people, the men and women who are in charge of

3  running these units, in charge of doing the maintenance, in

4  charge of operating these units make real-world decisions and

5  track real world data about what's going on.

6      At this particular point in time -- and we didn't

7  dump 20 of these into evidence.  We gave you one example.  The

8  biggest single cause of loss of availability at Wabash River

9  was thermal discharge limits.  The river's too hot.  If the

10 water in the river is too hot, you can't discharge from the

11 plant anymore.  That means you either got to turn the units

12 off or turn them down.  You cannot predict, ladies and

13 gentlemen, what the weather's going to be next year or the

14 year after.  You can assume it, but you can't predict it.

15     In fact, Dr. Rosen acknowledged that to some degree

16 when he admitted that predicting future outages is random.  He

17 also said that predicting whether outage rate goes up or

18 outage rate goes down is like a coin toss.  Liability under

19 federal law should not be based on a coin toss.

20     Let's talk about the third assumption.  The third

21 assumption, as you might recall, is where the utilization

22 factor comes in.  And again, I'm not going to belabor the

23 point, this is based on assumptions.

24     Can we see Mr. Koppe's testimony?

25     Mr. Koppe told us in calculating the utilization

Vol. 10-1536

1  factor, which is the way you translate availability into your

2  predicted or hypothetical generation, you have to make some

3  assumptions.  Again, assumptions aren't evidence.  Assumptions

4  aren't proof.  The whole formula is packing one assumption on

5  top of another.

6         So to try to address this assumption we called John

7  Swez.  John Swez is actually the head of the dispatch

8  department at Cinergy, and you saw his interesting photographs

9  about the control room.  Looks a little bit like the bridge of

10 the Starship Enterprise and all very serious and scientific

11 stuff going on there, but what's not going on there is what

12 Ms. Himmelhoch says.  She says "dispatch" means use the same

13 percentage of availability year after year after year.  That's

14 a good assumption.

15        Mr. Swez said no.  The first thing he says is his

16 dispatch group doesn't even know about availability issues.

17 They don't know about these component replacements.  They

18 don't know about the projects in this case.

19        From Mr. Swez's perspective, trying to get the

20 electricity to all the homes and businesses around the region,

21 it's an on-off, black-white situation.  Either the unit is

22 there and he can call on it, or it's not and he can't call on

23 it.

24        He also told you that his dispatch model or dispatch

25 formula doesn't have any calculation of unit availability

Vol. 10-1537

1  because again, it's not relevant to dispatch.  The unit's

2  there.  He can use it.  If it's not there, he can't use it.

3          Mr. Swez's testimony makes clear that there's no

4  connection.  The hypothetical connection that ties

5  availability to generation is just a figment of the experts'

6  imagination.

7          He also told you about his dispatch model.  And we

8  heard about the dispatch model or the stacking order during

9  the Government's closing.  But what he told you was, what the

10  evidence in this case is is that the dispatch model is simply

11  a starting point.  There are all kinds of issues that go into

12  how these units are dispatched by the minute, by the hour or

13  by the day.  He talked to you about grid stability and the

14  obligation to generate and deliver power.  He told you about

15  buying and selling off the grid; he told you about contractual

16  commitments; and he told you about transmissions issues.  And

17  how did Dr. Rosen and Mr. Koppe address that?  They don't.

18  They simply assumed it away.

19          We heard -- finally, one last word about this

20  assumption -- we heard from Ms. Himmelhoch this morning that

21  Cinergy does a lot of planning and a lot of modeling; and

22  that's absolutely right.  They do it short term.  They do it

23  long term.  They do it for all kinds of reasons.  You heard

24  testimony about a little of it from Mr. Stanley.  You heard a

25  little bit more about it from Mr. Pulskamp, and the company

Vol. 10-1538

1  makes very important decisions based on that planning.  It

2  makes decisions about how it's going to deliver electricity in

3  the next week, in the next month, 10 years, 20 years down the

4  road.

5          In all those models, the evidence is they don't

6  predict future availability.  They use historical

7  backward-looking measures of availability.  Why?  Because

8  historical data is real data.  It's reliable data.

9          Of course, if you plugged a five-year historical

10 average into Dr. Rosen's formula, it would show zero increase.

11 So he can't rely on historical real data that the company

12 relies on when it's making serious decisions.

13         He did say on the witness stand words to the effect

14 of, well, you could -- you could use Cinergy's generation

15 planning models and you could change the assumptions, and you

16 could plug in an increase in availability, and it would show

17 an increase in emissions.  Well, I guess that's probably

18 right.  It's a computer program.  You can plug anything you

19 want into it.  You can tell the computer to assume that it's

20 always sunny and 100 degrees in Indianapolis from May 1st to

21 October 1st, but that doesn't prove anything.  That will just

22 prove that you can put in right assumptions and you can put in

23 wrong assumptions.  And the assumption that the company uses

24 when it's making important and serious decisions is an

25 assumption that historical availability is the best measure of

Vol. 10–1539

1 availability.

2        Now, the fourth assumption is how Dr. Rosen gets from

3 generation to emissions.  And the amazing thing about this

4 assumption is even though -- as we've already talked about --

5 the formula is loaded completely in the Government's favor,

6 what you saw on the witness stand is that Dr. Rosen and

7 Mr. Koppe continue to shave the dice.  They make all kinds of

8 changes -- I'm not going to talk about all of them.  I'm only

9 going to show you two examples, but they're always making

10 changes to change the outcome of the formula.  They're

11 changing definitions.  They're changing the way the formula

12 applies.  None of those changes are conservative and none of

13 those changes favored Cinergy and I want to review just a

14 couple of them.

15        Can we put up page 20 of the report?

16        MS. HIMMELHOCH:  Objection, Your Honor, this document

17 is not in evidence.

18        MR. HOPSON:  I'm only using it as a demonstrative.

19 The Government talked about a half a dozen documents.

20        THE COURT:  Have we talked about it before today?

21        MR. HOPSON:  We showed it to Dr. Rosen and used it

22 during his cross-examination.

23        MS. HIMMELHOCH:  I withdraw my objection.

24        THE COURT:  Go ahead.

25        MR. HOPSON:  Projects like tube replacement, as odd

1    as it may sound to our lay people, sometimes have an effect on

2    efficiency.  Now, I guess that's not crazy because if you

3    drive a car, as most of us do, you know that if you get a

4    tune-up, or even if you inflate the air in the tires properly,

5    you might get a little improvement in efficiency or mileage;

6    and those small improvements in efficiency are in the scheme

7    of things not that great.

8         But because the formula, the formula is relying on

9    changes in availability and generation that are minute, the

10   heat rate changes that result from these projects are very,

11   very important; and they can cancel out the increases in

12   availability and emissions that Dr. Rosen and Mr. Koppe

13   calculated.

14        Now, Mr. Koppe found only four heat rate

15   improvements, even though in all the documents that the

16   Government rattles off in this case, including Plaintiffs'

17   1277, there are references to other assumptions of heat rate

18   improvement and other things going on at these units; but

19   Mr. Koppe as an expert found four; and he gave four to

20   Dr. Rosen.

21        But Dr. Rosen decided, for a variety of reasons that

22   you heard him testify to, he wasn't going to include two of

23   the heat rate changes in his calculation.  He would only

24   include the ones at Beckjord 1 and 2 and ignore the ones at

25   Gallagher 1 and 3.  What he wrote in his report was that he

1  didn't include the heat rate changes at Gallagher 1 and 3

2  because he assumed that increased unit dispatch would cancel

3  out the benefits of those heat rate improvements.

4          In other words, he says, "Well, I understand that

5  heat rate makes things more efficient and if it's more

6  efficient, obviously, it's going to move up in the stacking

7  order and Cinergy's going to run it more."

8          Even though he admitted on cross-examination that he

9  generally ignored unit dispatch, he makes an exception to

10 create an assumption to argue away the evidence for these two

11 units.  The question becomes:  Is that a good assumption?  No.

12         As Ms. Himmelhoch told you the evidence in the case,

13 as opposed to the assumptions in the case, is that none of

14 these projects have any impact on unit dispatch.

15         Let me turn to another issue involving assumptions.

16 You were told this morning, as you were treated to another

17 review of Cinergy's cost/benefit documents, that there are

18 certain industry standard definitions.  We heard that again

19 and again in the testimony.  We heard it in closing.

20         The whole basis of the Government's argument in a

21 nutshell is this is so industry standard, any company that

22 uses the cost/benefit project evaluation tools that Cinergy

23 uses should have known, should have thought up this formula,

24 and should have used this formula to predict emissions; and

25 what they're really saying is, if Cinergy didn't do that, if

1  they didn't dream up this formula, they weren't behaving

2  reasonably.

3          But the truth is, despite the claims about industry

4  standard definitions, Dr. Rosen and Mr. Koppe don't use

5  industry standard definitions when it gets the wrong result.

6  That happened at Beckjord Units 1 and 3 and Miami Fort 5.

7  They were all units with very high generation and very low --

8  I'm sorry -- very high availability and very low generation;

9  and you'll see them down there towards the bottom of the list

10 where I filled in availability and generation with Dr. Rosen.

11          I'm not going to get into the mathematics of this

12 except to remind you that I asked Dr. Rosen if he made an

13 exception and used a modified utilization factor for some of

14 his calculations.  This is what that goes to, that modified

15 utilization factor.  And he said yes, and he said he thought

16 it was a good idea.  And he checked with Mr. Koppe, and they

17 thought that was great.

18          But I also asked him:  "Well, how did you come to

19 make this change to a modified utilization factor?"  And you

20 may recall, when Dr. Rosen was on the stand, he claimed that

21 he didn't even know if calculations had been done using a

22 standard utilization factor.

23          I asked him:  "Do you show an increase in emissions

24 if you use a standard utilization factor for these four

25 units?"

Vol. 10-1543

1          "Gee, I don't know.  I don't know if that was ever

2     done."

3          Well, Mr. Koppe could recall it.  Mr. Koppe recalled

4     that after they ran the data and didn't show the 40-ton

5     increase that they needed to prove their case, they got

6     together on the phone; and Mr. Koppe, under examination from

7     Mr. Green, remembers that he said that's impossible.  But they

8     got together again, and they brainstormed some more, and they

9     had a call, and they came up with a modified utilization

10    factor that they used for these four units.

11          Again, it's not the industry standard definition.

12    How do we know that?  Because I showed Dr. Rosen the industry

13    standard definition.  And I said, Dr. Rosen, isn't it true

14    that what you're doing in your modified utilization factor is

15    taking the reserve shutdown hours out of availability?  And he

16    agreed.  That's what he did.

17          And I said but -- well, what I actually said is:

18    Have you looked at this GADS definition?  And I don't recall

19    exactly what he said, but he did agree that this is the GADS

20    definition written by Mr. Koppe and that reserve shutdown is

21    time when the unit's available; and the only reason it's not

22    being used is lack of demand.

23          The final thing I want to say about this is that

24    Mr. Green also asked Mr. Koppe about this issue of using the

25    modified utilization factor of capacity factor over service

1  factor.  Let me show you what that testimony was.

2          Mr. Green at this point had showed him Defendants'

3  Exhibit 123, which was the "eureka" memo, you may remember;

4  and he walked him through what Mr. Koppe said about method

5  No. 2.  And the question was:  "Can you tell me what you meant

6  by that?"

7          And Mr. Koppe said:  "Doing the calculation this way

8  would result in projected generation that would be too high.

9  It would be higher than what you would really expect and

10 that's not the right way to do it."

11         Now, my point here is not to argue with Mr. Koppe and

12 Dr. Rosen.  Maybe it's okay to use a modified utilization

13 factor.  But the fundamental point here is that this formula

14 does not just spring from the earth.  It's not written on

15 stone tablets.  And when the Government says to you, in

16 essence, that Cinergy should have dreamed up this formula back

17 in 1985 to 2001 when these projects were being done, they're

18 also suggesting to you if you want to rely on their evidence

19 of what the outcome is, you also have to believe that Cinergy

20 should have dreamed up all of the exceptions and all of the

21 exclusions and all of the changes in assumptions; and Cinergy

22 should have understood when to put heat rate in and when to

23 leave it out and when to assume things away.  That is not a

24 reasonable approach to the issue in this case.

25         One final thing about reasonableness and I will move

Vol. 10-1545

1  on.  We heard very little, almost nothing from the EPA in this

2  case, except from one witness.  We heard a snippet of

3  testimony from a gentleman named David Schulz.

4       Ms. Himmelhoch told you, and she spent some time

5  emphasizing the Beckjord Life Extension projects.  She is

6  clearly right.  Those were big projects.  There were multiple

7  tubed components being replaced at the same time back in the

8  mid '80s.

9       And we also know from that snippet of testimony that

10  Mr. Dave Schulz who was an EPA inspector was present at the

11  Beckjord units during the Life Extension.  We didn't play you

12  a lot of the testimony.  We did tell you that Mr. Schulz was

13  the -- or had the title of Combustion Process National

14  Oracle."

15       I'm not exactly sure -- I've never encountered

16  anybody before who had a business card who had the word

17  "oracle" on it, but I think it means he knows something about

18  combustion and coal-fired boilers.

19       And he writes in his inspection report, which was

20  moved into evidence as Defendants' Exhibit 31, that there was

21  a 15 million -- I'm sorry -- 13 week Life Extension, major

22  overhaul, estimated to cost 15 million going on while he was

23  there.

24       Now, if we believe the Government's evidence about

25  what the Life Extension looks like, it must have been clear to

Vol. 10-1546

1  anybody in that there were a lot of tubes being replaced.  I

2  mean, a lot of tubes being replaced.  We don't know, and it's

3  probably not relevant to know what Mr. Schulz particularly

4  thought about it.

5          But when you're thinking about whether the

6  Government's approach to this case is reasonable, one thing

7  you can infer from this evidence is that Mr. Schulz did not

8  think it was reasonable to whip out his calculator and start

9  adding up GADS hours based on the forced outage rate of the

10  components that were being replaced.

11          I'm not criticizing Dave Schulz.  I'm not suggesting

12  he was asleep at the wheel, but neither were Mr. Batdorf and

13  Mr. Pulskamp.  The approach of adding up hours and multiplying

14  by assumption after assumption was not an approach that was

15  used because it was not reasonable.

16          And, finally, if you come through all four

17  assumptions, and you come through the playing around and the

18  changing of definitions and assuming heat rate away and

19  assuming capacity changes in, there is still one more question

20  that has to be considered before you can rely on the numbers

21  that the Government is giving you in their demonstrative about

22  increases in emission; and that is the question of causation,

23  because the jury instruction in this case -- if I can find

24  it -- says, "Plaintiffs have a burden of proving by a

25  preponderance of the evidence that the project was a major

Vol. 10-1547

1 modification.

2          And in considering whether a project is a major

3 modification," Judge McKinney goes on, "you can answer two

4 questions."  And the second question is:  "Should a reasonable

5 power plant owner or operator have expected the physical

6 change to result in a significant emissions increase?"

7          As part of our exploration of these issues, I asked

8 Dr. Rosen at the time he was on the stand to walk me through

9 and tell me how many -- what percentage of the time in the

10 year was the unit available to run before the projects in

11 question.  And I asked him to fill in also what percentage of

12 the time did the unit actually run.

13          Now, I'm not talking about demand growth exclusions

14 or anything complicated here.  I'm talking about a simple

15 common sense approach to this issue of whether tubes in, tubes

16 out causes an emissions increase.

17          You might recall that I walked Dr. Rosen through one

18 example at Gibson 2.  Didn't walk him through all 14.  I

19 walked him through one.  Together we agreed that the change

20 that he was predicting or forecasting or hypothesizing at

21 Gibson 2 would result in an additional 88 hours of generation.

22 That's what the formula spits out.

23          But before the project was even done, the Gibson 2

24 unit was available and not generating electricity 2,348 hours.

25 I don't care if the hours are at 10:00 a.m. or at midnight.

Vol. 10-1548

1  The units were available to generate the projected increases

2  in electricity before the projects.  The projects did not

3  cause the increase in emissions.

4       Let me take this down and let me ask you to turn to

5  the project evaluation documents because that really was the

6  majority of the Government's closing presentation so far.  And

7  the gist of what the Government is telling you is that those

8  cost/benefit or project evaluation documents were just like

9  the formula that Dr. Rosen and Mr. Koppe came up with.

10       And they said to you during the close of the trial

11  it's common sense, it's derived from common industry

12  definitions and standards, and it should have been obvious.

13  And that's why every one of our witnesses, frankly, was

14  confronted with all these project evaluation documents.

15  That's the reason that the Government spent days in the well

16  of this courtroom going through project evaluation guides, and

17  going through Wabash River assessments and Gallagher

18  assessments, and this assessment and that assessment.

19       So let's answer the question:  To what extent is what

20  Cinergy's doing in its cost/benefit analysis or its project

21  evaluation, like what the Government's doing here with

22  emissions, and in what ways is it unlike it?

23       Now, we don't dispute that when the company is doing

24  cost/benefit analysis it's using the same definitions of

25  availability, capacity factor and utilization factor.  No

Vol. 10–1549

 1  question about it.  Those definitions have been around forever

 2  in this industry.  They're industry-standard definitions.  But

 3  that's really where the similarities stop.

 4          The purpose -- as you heard from Bob Batdorf and from

 5  Barry Pulskamp, the purpose of the project evaluation

 6  documents is economic ranking.  It is not predicting.  There

 7  is a tool that is used to measure the differences in the

 8  potential projected benefits of different projects.

 9          Can we see that?  Actually, let me put this on the

10  ELMO.  It's a little easier to read.

11          You will probably remember this document marked as

12  Defendants 1981.  I went through this with Mr. Batdorf at some

13  length because at the end of the day, this document shows you

14  in a page the whole purpose of the cost/benefit and project

15  evaluation process that Cinergy goes through.  No one in the

16  real world used any of the documents that Ms. Himmelhoch

17  showed you this morning to make predictions.  They used it to

18  make economic rankings.

19          You'll recall Mr. Batdorf's testimony that all of the

20  projects in this case are economic projects.  They even call

21  them economic projects when they do their capital budget

22  because they're based upon doing an economic cost/benefit

23  analysis.

24          And yes, that cost/benefit analysis does include

25  assumptions.  It has to, because how else are you going to

Vol. 10-1550

1  assign a dollar value to a radiant front superheater?  How

2  else are you going to assign a dollar value to a new

3  transmission line?  You have to make assumptions.  And the

4  truth is the cost/benefit project evaluation documents that

5  Cinergy uses are a very good tool for making those

6  projections; and the reason is threefold:

7          First, you're making these assumptions and you're

8  making this analysis and you're using these project evaluation

9  tools among an audience of engineers and utility experts and

10 generation experts, including public utility commissions.

11 Everybody understands the assumptions in the formula.  They're

12 laid out in those 1991 and 1994 project evaluation guides that

13 the Government keeps showing you.  The assumptions are laid

14 out in there for everybody to understand.  And everybody

15 understands that if you're valuing competing projects like a

16 air heater soot blower regulator or the -- something DC HTR

17 safety relief valves -- everybody understands that you're

18 focusing on that component and you're excluding everything

19 else.  Everybody understands that assumption.  And most

20 important, everybody who's using these project evaluation

21 tools and all the documents Ms. Himmelhoch showed you this

22 morning understands that, if they evaluate all of the projects

23 using similar tools, similar guidelines and similar

24 assumptions, that you then get a very reasonable ranking.  You

25 can rank the projects.

Vol. 10-1551

1          Now, the bottom line on this is the very things that

2    make these good tools for project evaluation and ranking make

3    them very bad tools for predicting the future; and the reason

4    that they're bad tools for predicting the future is that

5    they're based upon assumptions and they're not based upon real

6    world data.  That's why Cinergy doesn't make important

7    decisions with formulas and models and conceptual approaches

8    that are based on assumptions.  They base it on real world

9    data.

10          The second problem with using these tools to make

11    predictions of the future is they hold everything constant,

12    which is the opposite of what's happening in the real world.

13          And there's a reason that these tools were never used

14    to make predictions about emissions before 1989.  They simply

15    don't work.  In contrast to everything I have said -- and I

16    apologize if I have dwelled on the formula; but it is, at the

17    end of the day, the heart and soul of the Government's whole

18    case.  If the formula falls, the predictions they have on this

19    piece of paper or anyplace else are completely meaningless.

20          Let's talk about the real world for a minute.  Let's

21    talk about Bob Batdorf and Barry Pulskamp.  The longest

22    witnesses we put on the stand which I hope were not too long

23    by comparison were Bob Batdorf and Barry Pulskamp.  They

24    didn't come to you with advanced degrees in physics.  They

25    didn't come to you with presentation graphics that had 6-foot

Vol. 10-1552

1  high boilermakers.  They didn't come to you with formulas.

2          All they did is come to the stand and tell you, look

3  you in the eye and tell you what they thought, what they

4  expected and what they believed and what they predicted at the

5  time they did these projects.

6          They told you what they understood and what they

7  believed based on their reasonable, common-sense engineering

8  judgment.  And contrary to what you've heard from the

9  Government this morning, they told you there was a process in

10 place.  No one was ignoring the law.  No one was pretending to

11 be above the law.  They were making good-faith judgments.  And

12 Mr. Batdorf told you if he had a question, he called the

13 environmental engineers.  If he had a question, he called the

14 state of Indiana.

15         That is not a bad-faith approach.  That is a

16 reasonable, common-sense, good-faith approach to this issue.

17 They admitted to you they didn't write it down.  He admitted

18 to you he didn't do a memo to the file.  If the Government had

19 a rule that said do a memo to the file, you can be assured Bob

20 Batdorf would have done a memo to the file.  So would Barry

21 Pulskamp.

22         They told you about some cases where they thought

23 there might be an emissions increase where they got an NSR

24 permit because they looked at a project that was proposed and

25 they said, "Wait a minute.  That might change capacity.  It

Vol. 10-1553

1  might change functionality.  It might change how the unit will

2  be operated in the future.  We better get some people involved

3  here.  We better actually do a calculation and take a closer

4  look."

5        And when there was a reasonable view that a project

6  would result in an increase in emissions, they got an NSR

7  permit.  Where there wasn't, they didn't do formulas.  They

8  didn't do calculations.  They proceeded under their process

9  and under their reasonable judgment.

10       Reasonable is the byword here.  If you're not

11  changing anything about unit operations, if you're not

12  changing the capacity of the boiler, it's tubes in, tubes out.

13  You can mock that phrase if you want to; but it reflects a

14  common-sense, real-world judgment that whether the front

15  reheater tubes are old or whether the front reheater tubes are

16  new and shiny doesn't cause emissions from the unit.

17       You also heard the following things from Mr. Batdorf

18  and Mr. Pulskamp:  They told you that based on their long

19  experience and their real-world view, you cannot predict and

20  that they didn't predict that changes to a single component

21  would impact the availability of the unit.

22       I already showed you the availability degraders.  You

23  heard Mr. Batdorf talk about Excedrin Headache 57 or 58 or 59

24  or whatever one it was.  That was a reasonable way of

25  approaching these predictions.

Vol. 10-1554

1    They also told you that they didn't predict, couldn't

2  predict and wouldn't predict that changes in availability if

3  they did occur would translate into changes in generation.

4  That's what John Swez said too.

5    So Mr. Green and I asked them.  Well, if all that's

6  true, why are you spending so much money doing these projects?

7  And the answer was uniform:  Because if you don't do projects,

8  over the long term the availability of these units will fall

9  off in the curves like the curves that you saw in the

10  Government's graphs.  If you don't take the time to inspect

11  the units, if you don't take the time to think about what

12  needs to be replaced and what doesn't need to be replaced, you

13  will over the long term suffer a decline in availability which

14  affects the reliability of the units and their ability to

15  generate.

16    But it's big jump, ladies and gentlemen, from saying

17  that Cinergy understood that if they didn't do projects like

18  these over the course of a decade or more, these units would

19  decline to saying that if you do a single component

20  replacement, you'll see a measurable, reliable increase in

21  availability in the next two years.

22    That is not a sensible or reasonable way of looking

23  at these units as Mr. Batdorf and Mr. Pulskamp told you.

24    Finally, I want to turn to RMRR.  And I suppose I

25  should start by talking for a minute about the definition of

Vol. 10-1555

1   the word routine.  I thought I heard Ms. Himmelhoch say that

2   in her view, routine means not a big deal.  I don't find that

3   anywhere in the instructions that the Judge gives us.  He

4   tells you to use the word routine.  He tells us what factors

5   to look at.  He tells you what factors to look at in defining

6   what routine is, but you can use your own common-sense

7   definition of what's routine.

8          If you think about it for a minute, an appendectomy

9   is a routine medical procedure.  I haven't had one, and I hope

10  I don't; but if I have that routine procedure, I hope to only

11  have it once, okay.  And I hope to only have it once in this

12  unit that I'm walking around in.  So I don't know how we get

13  from the notion that the word routine means once in the unit.

14  I don't know how we get to the world in which routine means

15  not a big deal.

16         I would ask you to apply the word "routine" when you

17  look at the Judge's jury instructions and your common sense

18  understanding.

19         While I'm at it, the routine argument we're making

20  would not excuse building a new unit.  The routine exclusion

21  is for routine maintenance, repair and replacement.  So when

22  Ms. Himmelhoch stands in front of you an hour ago and says,

23  "Oh, if you buy their view of routine, they'll just go build

24  new units and call it routine," that is not right.  This is an

25  exclusion for maintenance, repair and replacement.

Vol. 10-1556

1          Now, let's look at the evidence that came in about

2     this issue.  We heard about Mr. Bradley, the Government's

3     first witness.  He seemed like an interesting man.  I'm sure

4     he has some colorful stories and I'm not exactly sure why he

5     was called other than the fact that the Government didn't want

6     me to stand up here and say that their entire case was built

7     on expert testimony.  So we had Mr. Bradley, and he told us a

8     little bit about the life of a boiler maker and he did have

9     one interesting piece of testimony, if we could see that,

10    please.

11         I asked him, "Mr. Bradley, given your long life in

12    the industry and this work that you've done all around Indiana

13    and all around the country, can you estimate for me how many

14    finishing superheaters you've worked on during the course of

15    your career?"  And he didn't want to be wrong.  So I told him

16    he could estimate.  And he said rough guess was 25 and maybe

17    as many as 40.

18         And I asked him the same question about reheaters or

19    one of the other components at issue in this case, and he said

20    the same thing.  And it's an interesting place to start

21    thinking about routine; that one man who works on these units

22    could have worked on 25 to 40 of the type of component

23    replacements we're talking about in this case.

24         Mr. Bradley also told us that there was a whole

25    industry of companies that did nothing but make the tubes and

Vol. 10-1557

1  provide the labor to do these component replacements, and he

2  told us also that there were thousands of components in a

3  boiler that could cause an outage.

4       The Government's main expert on the RMRR issue was

5  Mr. Michael Hekking, who you will recall worked at TVA.

6  Mr. Hekking did testify for quite a long time and walked us

7  through the little animations with the little guys in there

8  swinging from their ladders or on their scaffolds and so

9  forth.  It was pretty interesting stuff.  What I took away

10 from it and I think what you took away from it is that these

11 projects were big; big, big projects.  They take a lot of

12 time.  They cost some money, and there's a lot of labor

13 involved.

14       And all that's true.  And Judge McKinney is going to

15 tell you when you think about routine, you should look at the

16 nature, extent, purpose, cost and frequency of these projects.

17       He will also tell you to look at the frequency in the

18 industry, and his instruction also says to look at the

19 circumstances as a whole.

20       Now, again, when you look at this issue, you do not

21 have to put aside your common sense and rely on Mr. Michael

22 Hekking.  You can think about the fact that it is true that if

23 anybody in this courtroom today I think talked about spending

24 a half a million dollars or a million dollars on something,

25 that would be an enormous amount of money.

Vol. 10-1558

1        But you can also use your common sense to think about

2   spending a million dollars to replace a component in a boiler

3   that might cost 90 or 200 million or a billion dollars to

4   replace, and you can put it in context.  In the context I mean

5   of the boilers.

6        The fact is that all these projects as the evidence

7   came in from that witness stand, all these projects range from

8   less than 1 half of 1 percent to 1 or 2 percent of the

9   replacement cost of the boilers.

10       And Mr. Hekking even testified that component

11  projects such as these were plentiful in the industry.  He

12  didn't want to use the R word, but he was willing to say

13  plentiful.  One of the more interesting things about

14  Mr. Hekking came up in his cross-examination when Mr. Green

15  asked him to review this document; and Mr. Hekking told us

16  that he had signed about 20 of these documents while he was

17  employed at TVA.

18       And I won't bore you with the details of this project

19  except to note Mr. Hekking agreed that the cost of this

20  component replacement at this TVA unit was about two and a

21  half times the largest of the projects that we're talking

22  about with respect to the RMRR exception.  It was about an

23  8 million-dollar project.  Mr. Hekking signed the form saying

24  that this was a routine improvement of existing TVA

25  facilities.

1          Now, I know, you will recall there was a bunch of

2   wrestling around about whether this is a different statute or

3   whether the word "routine" is an adjective as it's used here;

4   but at the end of the day, Mr. Hekking does not deny that he

5   understands the meaning of the word routine.

6          Mr. Green's question, "It would be your testimony on

7   each and every occasion the 20 times you signed this form you

8   had no understanding of the word -- specifically no

9   understanding of what the word 'routine' meant; is that

10  right?"

11         He says he didn't recall ever studying the phrase,

12  but he knew what it meant.

13         Now, maybe it does mean something else at TVA; but

14  words have some meaning in this case, and there should be some

15  application of common sense.

16         Let me talk a little bit about common sense with

17  respect to Mr. Hugh Larkin.  Seemed like a nice man.  His

18  testimony was very well presented in this courtroom.  And what

19  he basically told us, that these were all capital projects;

20  and he told us that FERC accounting rules meant that they had

21  to be characterized as capital projects.  He also said under

22  FERC accounting rules they're different rules for repair and

23  maintenance, to which one might say, "So what?"

24         The Government proved that Cinergy follows FERC

25  accounting rules.  Cinergy doesn't have an option to decide

Vol. 10-1560

1  what's capitalized and what's not.  It's an accounting rule.

2       As Mr. Larkin himself conceded, to his knowledge, the

3  FERC accounting rules don't have anything at all to do with

4  the environmental rules that are at issue in this case and

5  which frame up the decision that you, as the jury, must make.

6       So as we talked about "routine," I would ask you to

7  remember that the evidence shows that the projects are

8  routinely performed both in the Cinergy system and in the

9  industry as a whole, including, of course, at TVA.  Projects

10  much bigger than the ones at issue for your decision for RMRR

11  have been routinely performed in this industry for a long

12  time.

13       I would ask you to remember Bob Batdorf and Barry

14  Pulskamp's testimony that when it comes to the nature or the

15  purpose of these tube replacements, they're no different in

16  nature or purpose whether you're replacing one tube or three

17  tubes or an entire component.

18       You may recall the Government kept using this room,

19  which is a beautiful courtroom, to say over and over again:

20  How high is the superheater?  Is it bigger than a bread box?

21  Is it wider than this wall?  Is it taller than the windows?

22       And I thought that was very effective because you did

23  get the sense that the components that were being replaced

24  were very, very large; but we made a little demonstrative

25  which I hope puts this in context.

Vol. 10-1561

1    Can we see the first page?  Here is the federal

2 courthouse in which we are all spending this time together

3 this morning.  We went to the historian -- because there is a

4 historian of this courthouse -- and got the dimensions, the

5 exterior dimensions of the courthouse; and we turned that into

6 a little model.  There's the model.  That's what the

7 courthouse looks like in three dimensions, using the

8 dimensions we were given by the courthouse historian.

9    What we did is we moved it over to Gibson station.

10 And when you think about this room that we're in, in the tiny

11 little corner of that courthouse, and you think about a

12 component being as tall as this or as wide as that, I would

13 ask you to put it in context and think about what that means

14 in the context of these boilers.

15    In fact, one last thing I would ask you to think

16 about is while the Government told you that these were once in

17 a lifetime projects at these generating units, we heard from

18 Mr. Batdorf that at least three of the once in a lifetime

19 projects have now been done again, which shows, I think, the

20 projects are routine.

21    In conclusion, all I want to ask you to do is to

22 think about which project was reasonable.  On all 14 of the

23 projects, on the issue of emissions increases, you have been

24 present two different predictions.

25    As I told you at the beginning of my comments about

Vol. 10-1562

1  an hour ago, there were two different views of the world; and

2  we talked about the two different views of the world.  We

3  talked about the views of the world held by the men and women

4  who work with Cinergy who were out there every day planning

5  these projects, understanding their impact and making their

6  reasonable predictions based on the process they always

7  followed.

8       The other view of the world comes from the

9  Government's experts who pick things out of documents and

10 7 megawatts here and heat rate there and they plug it into a

11 formula.

12      Judge McKinney is going to give you another

13 instruction.  He's going to tell you that you, as the jury,

14 are the sole judges of credibility.  What that means is that

15 not every word that comes out of somebody's mouth in a

16 courtroom has to be accepted at gospel value by you.  You can

17 judge the credibility of the witnesses.  You can take into

18 account how they behaved on that witness stand.  You can think

19 about how they talked on direct and how they talked on cross

20 and how they answered questions.

21      You can think about who seemed honest and forthright,

22 and you can think who seemed argumentative and evasive; and

23 you take that into account as you weigh the competing views of

24 the world.

25      As you deliberate, and as you think about the case as

1   a whole, I want you to remember that the Government's world

2   and their presentation in this courtroom, despite this

3   selective use of Cinergy's capital expenditure documents, is

4   really a world in which all things are held constant.

5          They showed you again this morning -- I'm not going

6   to dig it out -- their idealized model.  It's actually called

7   by the Government an idealized model on how demand interacts

8   with outages.  Everything in the Government's case that's

9   important to your verdict is color-coded.  It's in a graph.

10  It's in a chart.  It's in a demonstrative.  It's all very

11  clean and neat, and it's built by piling assumptions on top of

12  assumptions and selectively cherry-picking here and there from

13  our -- from Cinergy Company's capital documents.

14         But Mr. Batdorf and Mr. Pulskamp and Mr. Stanley, and

15  Mr. Swez told you they don't live in an idealized world.  They

16  live in a world in which there are lots of moving parts and

17  everything changes.

18         They told you that these units are in a constant

19  state of repair and disrepair and maintenance.  They told you

20  that these units come online and come offline every day.

21         They told you that demand is constantly shifting:

22  Winter, summer, spring, fall.  During the day, is the steel

23  mill online?  Is the steel mill not online?

24         They told you how the dispatch department responds to

25  that, moment by moment; not with projections of two years in

1 the future, but moment by moment.

2      So when these men and women at Cinergy moved forward

3 to do these tube replacement projects, they did it based on

4 their understanding of the law, as the Judge explained it to

5 you and is going to explain it to you; and they based it on

6 their real world views of how these units work and how they

7 don't work.  And they based it on their real-world view that

8 changing the tubes in a boiler does not cause emissions.

9      Now, if you think that Mr. Batdorf or Mr. Pulskamp

10 should have or could have done more, I want you to remember

11 one last thing.  From 1985 to 1989 there is no evidence that

12 anyone ever heard of the formula the Government's relying on

13 in this case.  Nobody used this formula.  Nobody told

14 Mr. Batdorf and Mr. Pulskamp to use this formula, and nobody

15 criticized their approach to this case.

16      I know that I'm speaking for Mr. Green and for

17 Mr. Volpe, and all the rest of the people that helped us put

18 this case on, in telling you that it has been an honor, really

19 an honor to be able to speak on behalf of Cinergy and on

20 behalf of the men and women throughout this company who we're

21 called upon to represent in this courtroom today.

22      We tried to do our speaking, to the best of our

23 ability, in a clear and complete and common sense way; and I

24 probably made some mistakes in that regard.  I'm sure I did.

25 I'm sure I got lost in the weeds, and I've said some things

Vol. 10-1565

1  that weren't clear; and I've said some things in the course of

2  this well of this courtroom.  I got Bob Batdorf's tenure with

3  the company wrong.  It was 34 years rather than 31 years.

4  I've made mistakes.  But we've done our best; and it really

5  doesn't matter anymore because from this moment forward, the

6  case is in your hands.

7          So what I want to ask you to do, as you proceed from

8  here and you proceed to listen to the Judge's instructions on

9  the law, is to look carefully at the evidence that we

10 presented to you.  Listen carefully to Judge McKinney's

11 instructions about what the law is, and use your common sense

12 and your good judgment to return a verdict for Cinergy.

13         Thank you very much.

14         THE COURT:  Thank you, Mr. Hopson.  We'll take about

15 10 minutes at this point.

16         COURT CLERK:  All rise.

17         This court stands aside in brief recess.

18     *(Jury out.)*

19     (A recess was taken.)

20     *(Jury in.)*

21         THE COURT:  You may be seated.  We'll now hear

22 rebuttal from the Government.

23         MS. HIMMELHOCH:  Thank you, Your Honor.

24         Thank you, ladies and gentlemen, again.

25         As I said to you in my closing argument at the

Vol. 10-1566

1  outset, you have heard two opposing world views, but you have

2  heard Mr. Hopson and I agree on two things.  We both have

3  asked you to apply your common sense, and we both have asked

4  you to look closely at Cinergy's own documents.

5        We have built a case based upon expectations that

6  industry stated in documents, expressed by hiring Mr. Koppe to

7  analyze over and over again what the effects of this project

8  would be on availability, expressed in Cinergy's own

9  documents.

10        Mr. Hopson has tried to minimize the evidence that we

11  have presented to you by calling much of what our experts

12  testified to assumptions.  But think carefully back to the

13  testimony that Dr. Rosen and Mr. Koppe provided.  Mr. Koppe

14  did not assume availability would increase.  He analyzed what

15  was going on at the units.  He looked at the data.

16        And based on having answered this question:  What the

17  effect of a project would be on unit availability for 34 years

18  for dozens of different utilities and dozens of different

19  states, having all that experience, and having looked at what

20  actually happens at unit after unit, Mr. Koppe said the data

21  show you that these projects should have been expected to

22  result in an increase in availability.

23        And Dr. Rosen, based on 34 years of looking at how

24  power companies dispatch their units in the long term, over

25  long-term averages, that availability should be converted into

1  generation and should have been expected to be converted into

2  generation.

3          Those are not assumptions that these gentlemen made.

4  Those are conclusions based on long experience, careful

5  analysis and review of the specific documents that Cinergy has

6  produced.

7          Mr. Hopson has also tried to minimize the evidence of

8  Cinergy's own statements by telling you that these were just

9  comparative analyses; that these were not actual projections

10  of availability increases.  These were not actually expected

11  benefits of these projects.

12          Use your common sense.  These projects cost anywhere

13  between a million dollars and $20 million, $18 million.  These

14  projects required the units to be down for a long time in

15  order to be completed.  They required the dedication of

16  substantial engineering resources within the company.  They

17  required the hiring of outside contractors.

18          All of that effort went into the development of these

19  projects, and all of that effort was documented in carefully

20  calculated economic benefit analyses in which a dollar figure

21  was produced and presented to management and said, based on

22  the recovery of generation, this project is going to have a

23  benefit to the company; and high level officials signed

24  approval documents relying on those statements.

25          Use your common sense.  Did they really only think

Vol. 10-1568

1   that that was a theoretical benefit?  Did they really spend

2   their money on something that was only a theoretical benefit?

3           Mr. Hopson has asked you to infer from the fact that

4   EPA was at the facility at the end of the last of the Life

5   Extension projects at Beckjord, and to infer from the fact

6   that we used experts rather than fact witnesses, that somehow

7   this question of how you predict emissions increases was not

8   reasonable to expect the companies to project these emissions

9   increases.

10          But think about it for a minute.  Who's going to be

11  the expert in how to analyze increases in availability?  It is

12  the people who are writing the documents justifying these

13  projects.  These are the people who spent months looking at

14  these projects, determining whether doing these replacements

15  would result in increases in availability; and they wrote

16  documents that they submitted to their management that said we

17  expect these increases; and Cinergy repeated those statements.

18          One of the statements I read to you this morning was

19  a statement by Cinergy to its shareholders in which it said

20  the Unit 2 Beckjord Life Extension project would result in

21  increasing availability to the system.  And you heard

22  Mr. Pulskamp say that they expected to run those Beckjord

23  units more; that they knew that in the two years following

24  these projects they were going to need these units more.  They

25  were absent an entire generating station that they had been

Vol. 10-1569

1  expecting to rely upon, and they were going to have to make up

2  for the absence of that generating station.

3           And Mr. Pulskamp told you that's why they did those

4  Life Extension projects, so that they could make up for the

5  fact that Zimmer wasn't going to be online for more than two

6  years after these projects.

7           On the smaller projects they made similar

8  predictions.  They very, very carefully, in a routinized way,

9  went through and analyzed how much the project was going to

10  cost; and they made a projection on how much benefit they were

11  going to get; and that benefit was increase in generation.

12  That increase in generation was multiplied by a dollar amount,

13  and that dollar amount was counted as the benefit; and that

14  dollar amount was good enough to justify the expenditure of a

15  million dollars, $3 million, $5 million, $15 million,

16  $18 million.  Why is that same analysis not good enough to

17  determine whether these projects should have been expected to

18  result in an increase in emissions?

19           Cinergy asks you to believe that they had no -- they

20  had a process for analyzing the question of whether these

21  projects resulted in a significant net emissions increase.

22  And they followed it, and they determined they didn't; but

23  they didn't give you a single document that mentioned this

24  analysis.  Not a single document.

25           There's only one document you have seen that

Vol. 10-1570

1 discusses the question of whether Cinergy thought about the

2 NSR program in relation to any of these projects.

3         Could we please call up image 22?

4         And that document is a page out of Cinergy's

5 pulverizer study.  We talked about this through a number of

6 witnesses.

7         At item 2, "Increasing boiler efficiency will likely

8 trigger PSD review due to potential increase in annual

9 emissions."

10        They thought that there was a potential this project

11 would increase annual emissions and that would require a

12 permit.

13        They also said, if you increase boiler capacity, will

14 likely trigger PSD and another regulatory requirement, due to

15 increase in potential in short-term and annual emissions.

16        The only document you have before you, that Cinergy

17 says anything about what it expected in terms of emissions

18 instead of in terms of dollars, is consistent with what we're

19 telling you and consistent with the natural, common-sense

20 conclusion from their economic analyses:  That you do these

21 multi-million dollar projects that total up to almost

22 $55 million -- if you look at all these different projects,

23 you do these projects to improve the value of the unit, and

24 the value of the unit is its ability to generate electricity.

25        In the end, what you heard Mr. Hopson say about all

Vol. 10-1571

1  of these Cinergy documents is very much like what the Wizard

2  of Oz said when Dorothy found him behind that curtain.  What

3  he said was, "Pay no attention to the man behind the curtain."

4  He asked Dorothy to shut her eyes and not see what she was

5  seeing before her.

6      Mr. Hopson is asking you to do the same thing.  He's

7  asking you to shut your eyes and not read the plain language

8  of their own statement to mean what they say.  He's asking you

9  to conclude that when Cinergy told its shareholders that they

10  would increase the availability of the unit from one of these

11  projects, it didn't really think that.

12      Think about that.  Ask yourself:  Would Cinergy had

13  undertaken these projects if the benefit that was expected was

14  only theoretical, was only done to compare one project to

15  another?

16      They have to spend their money wisely.  They have to

17  say, "This project is worth doing in and of its own self

18  regardless of whether it ranks with everything else."  If it

19  ranked at the top and it still wasn't worth doing, they still

20  wouldn't have done it.  That ranking means more than this one.

21  It means the ranking has value in and of itself.

22      With respect to routine maintenance, Mr. Hopson spent

23  virtually all of his argument on the point that many other

24  projects have been done in the industry.  But think about what

25  the routine maintenance, repair and replacement exclusion is

Vol. 10-1572

1  addressed at.  It's addressed at distinguishing between the

2  kind of day-to-day maintenance that is intended to simply keep

3  the unit in the status quo, to keep it running just as it had

4  been in the past; and projects that are designed to make the

5  situation better, that's the purpose of the routine

6  maintenance exclusion.

7       We have shown you through Cinergy's documents that

8  the intended purpose as stated in the company justifications,

9  as stated by the way they treated the costs that they incurred

10  in these projects, was to increase the value of the unit, not

11  to maintain the status quo.

12       That's not routine.  That's not going in and fixing a

13  pad weld.  That's not going in and replacing a foot of tube.

14  That's going in and replacing enough tubes -- and you heard

15  this in the depositions -- to drive from Cincinnati to Dayton.

16  That's replacing enough tubes to almost get from Muncie to

17  Indianapolis.  That's not routine maintenance.  That's not

18  something that's the day-to-day, week-to-week, monthly work

19  that is done to keep the unit running.  It's work done to make

20  things better.

21       And as I said, we're not asking you to say Cinergy

22  shouldn't make more electricity; and we're not asking you to

23  say Cinergy shouldn't improve its units.  What we are asking

24  you to say is that Cinergy, like every other company and

25  person in this country, must do even good things in a way that

Vol. 10-1573

1  is in compliance with the law.  And the law here says that if

2  you should have expected in the two years following the

3  project to emit 40 tons or more of sulfur dioxide or nitrogen

4  oxides, more than you would have without this project, you

5  must control those emissions.  That's what the law says.

6          Cinergy never did an analysis that compared that

7  baseline period to those two years, never wrote down anything

8  where they said they had thought about PSD or NSR requirements

9  except where they acknowledged that the project that they were

10  considering potentially would trigger the requirement to

11  obtain a permit and the requirement to install pollution

12  controls.

13          Cinergy never sought a permit and never installed the

14  pollution controls in conjunction with these projects.  Thank

15  you very much.

16          THE COURT:  Thank you, Ms. Himmelhoch.

17          Ms. McCord, would you pass out those instructions;

18  and I'll read them to the jury, and then we'll send them on

19  their way.

20      *(Jury instructions were given to the jury.)*

21          THE COURT:  And so, you'll take these forms to the

22  jury room; and when you've reached unanimous agreement on the

23  verdicts, your foreperson will fill in, date and sign the

24  forms and return the completed forms with you into open court.

25          As much as I would like to read to you for the next

Vol. 10-1574

1   hour and a half, you're finished.  So ladies and gentlemen,

2   you get this case now for your deliberation.  As soon as I

3   swear in the bailiff, we'll send you upstairs.

4          Would you raise your right hand, sir?

5      (The bailiff was sworn.)

6          THE COURT:  All right.  You may lead the jury out,

7   and we'll get the evidence together and send it up to you as

8   soon as we can.

9          COURT CLERK:  All rise.

10     *(Jury out.)*

11         THE COURT:  You may be seated.  Did we get all the

12  offers of proof in on the record or are there some that

13  remain.

14         MS. HIMMELHOCH:  We do have two.  One offer of proof

15  and clarification of an offer of proof.

16         THE COURT:  Okay.

17         MR. BROOKS:  Your Honor, prior to the commencement of

18  the trial, the Court ruled that we could introduce no

19  post-project data.  The claim for modification at Wabash 4

20  rested entirely on post-project data.

21         We had intended to have Dr. Rosen testify and he

22  would have testified that based on an analysis of the actual

23  emissions in the five years following the project, that the

24  project itself, in fact, caused an increase in emissions of

25  SO2 in the amount of 175 tons per year.

Vol. 10-1575

1          Those calculations are reflected in what we offered,

2    I believe, as Plaintiffs' Exhibit 1858.  So that would be our

3    proffer on that.

4          THE COURT:  Okay.

5          MR. BROOKS:  And further that had Mr. Adams been

6    called to testify, he would have testified that based on his

7    40 years of experience as a generation planner for American

8    Electric Power, that projects of the type presented here in

9    this trial would reasonably be -- could reasonably be expected

10   to result in increases of availability and that the

11   Plaintiffs' method for analyzing the effect of increases in

12   availability is reasonable and one that is used within the

13   industry.

14         He would have also testified that project

15   justification documents such as those that are introduced into

16   evidence in this case are, in fact, good indicators of what

17   the company actually expected the effect of the project to be.

18         I believe Ms. Himmelhoch has a couple of documents

19   that she would like to also proffer, and that brings us to the

20   end.

21         THE COURT:  Good.  I just changed my mind.  I think

22   we should bring that evidence back in.  No.

23         MS. HIMMELHOCH:  This is very short, Your Honor.

24   There were three documents that were offered in

25   cross-examination of Mr. Batdorf and Mr. Swez yesterday that

Vol. 10–1576

1  we simply ask to be recorded as a proffer.  Those are

2  Exhibits 1664, 1084 and 1582.

3         THE COURT:  That's fine.

4         All right, now, as I think I mentioned to you

5  yesterday, the jury already has their lunch I think upstairs

6  by now.  They will shortly.  I will let them deliberate the

7  rest of the afternoon, and we will check with them around

8  5:30, five o'clock or so, see if they would like to have

9  dinner.

10        And they'll -- we used to take them out to these

11 fancy restaurants, but we don't anymore.  We bring them all in

12 meatball subs and leave them on their own.

13        So I will check with them again sometime around

14 seven-thirty or eight o'clock and make sure that they're still

15 making progress.  They may meet a point any time from 6 to --

16 I don't know.  I won't have them go much further than nine

17 o'clock.  Sometime from 6 to 9 they may reach a point where

18 they would just like to take a break and go home and go to

19 bed, which is a reasonable thing for them to do.

20        I would certainly let them do that, and then we would

21 bring them back in the morning.  I may tell them that they

22 don't have to be here in the morning until nine o'clock so

23 they don't have to fight the usual traffic.  Then they'll sit

24 there tomorrow from nine o'clock until they hang.

25        MR. HOPSON:  God forbid.

Vol. 10-1577

1          THE COURT:  And so stay within about 15 minutes of us

2   if you would.  One of the judicial nightmares is the jury

3   might change their mind while the lawyers come back in.  We

4   can't have that.

5          All right.  Thank you very much.

6          COURT CLERK:  All rise.

7          This court stands in recess until the jury returns

8   its verdict.

9      (The proceedings were recessed for deliberation of the

10  jury.)

11                        *(In open court)*

12     *(Jury out.)*

13          THE COURT:  You can be seated.

14          I think the jury's question is in response to

15  something that I never tell them.  I'll read you their

16  question.

17          "If our vote on any count is not unanimous, even

18  after due deliberation, does the result lean to one side?

19  Example:  If the jury appears to be stuck on a vote of 7, yes,

20  and 3, no, on a count and cannot reach unanimity on it after

21  extensive deliberation, does our decision become no on said

22  count on the grounds that we can't achieve a unanimous yes?

23  (We ask this to clarify the commonly-used concept of a hung

24  jury --"

25          I must have spoken too loud.  You think I made this

Vol. 10-1578

1  up, don't you?  I wouldn't call you out of your lunch just to

2  laugh.

3          "-- so as to be able to recognize if we've arrived

4  there, whether we wish to or not.)  We are, thus, also

5  concerned about what happens if that's the case on any count."

6  Signed by the foreperson.

7          Here's my proposal.  The jury is to address each

8  project individually.  In order to arrive at a verdict on each

9  of the projects, your decision must be unanimous.  If you're

10  unable to reach a unanimous verdict on one or more of the

11  projects and more deliberation would not assist you in

12  arriving at a unanimous decisions, let us know.  In such a

13  case, there's simply no resolution of the dispute on that

14  project.

15          What do you think?  All right.

16          MR. GREEN:  Fine.

17          MS. HIMMELHOCH:  Fine.

18          The request is can we encourage them that it's not an

19  outcome that should be desired?

20          MR. HOPSON:  An Allen charge after 45 minutes.

21          THE COURT:  Not 35 minutes after noon.  They're

22  trying to get organized, and that's one thing I never want to

23  say to the jury, "Oh, and by the way before you go out, here's

24  what a hung jury is."

25          I don't want to do that.  So I'll send this back

Vol. 10-1579

1  upstairs.  Thank you very much.  Hope we didn't interrupt your

2  lunch too badly.

3        MR. HOPSON:  Hadn't ordered my cheeseburger yet.

4        THE COURT:  Okay.  Thanks for coming back so quickly.

5     (A recess was taken.)

6                        *(In open court)*

7     *(Jury in.)*

8        THE COURT:  You may be seated.  But don't get used to

9  it.

10       Ladies and gentlemen, as you can see, it's about 10

11 minutes till 9 at night.  You've been here all day.  It's time

12 for you to go home.  Get some rest.  Come back in the morning.

13 I think 9:30 is early enough for you to be here.  So get a

14 good night's sleep.  Sleep in a little bit.  Come in at 9:30,

15 and we'll assemble up in the jury room.  We'll bring you back

16 down here, and the lawyers will be here, and we'll tell you

17 it's time to have another go at it.

18       Thanks for your efforts today.  While you're out,

19 don't discuss the case among yourselves or anybody else; and

20 don't form or express an opinion on it until you're back in

21 the jury room.

22       With that in mind, we'll see you in the morning at

23 9:30.

24    *(Jury out.)*

25       *(The proceedings recessed at 8:51 p.m.)*

1                    CERTIFICATE OF REPORTER

2

3       I, Cathy Jones, certify that the foregoing is a true and

4   correct transcript of the proceedings in the above-entitled

5   matter.

6

7

8

9                       _____

10                      CATHY JONES, RPR, FCRR
                        OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25