IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. IP99-1693 C-M/S |
| | ) | |
| CINERGY CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION
TO CINERGY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.      Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.     Effects Of Cinergy's Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    III.    Elements Of Relief Sought . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF MATERIAL FACTS IN DISPUTE . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.      The Court's Broad Equitable Authority Includes The Power To Redress Cinergy's Illegal Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.     The Court Has Broad Equitable Authority . . . . . . . . . . . . . . . . . . . . 8

        B.     The Clean Air Act Supports Broad Equitable Authority . . . . . . . . . . . 10

            1.     The statute affirms the Court's broad equitable authority . . . . . . 10

            2.     Prior decisions under federal environmental law . . . . . . . . . . . . 13

            3.     Decisions interpreting non-environmental federal statutes . . . . . 18

        C.     Cinergy Fails To Show Congressional Intent To Restrict Court's Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            1.     The statutory language does not limit equitable authority . . . . . . 21

            2.     The legislative history fails to support Cinergy's argument . . . . . 24

            3.     Cinergy's reference to other statutes is unavailing . . . . . . . . . . 25

        D.     Cinergy Has Argued Elsewhere That Courts Can Order Clean Air Act Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    II.     There Is No Reason To Preclude Mitigation At This Stage Of the Litigation . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

i

## ATTACHMENTS

Attachment A    Appellants' Brief and Required Short Appendix Filed by Cinergy in Seventh Circuit

Attachment B    *United States v. Carter*, Nos. 81-981-Civ-JWK, 81-982-Civ-JWK, 1982 U.S. Dist. Lexis 18092 (S.D. Fla. Dec. 21, 1982)

Attachment C    *United States v. American Electric Power*, 99-cv-1182, slip op. (S.D. Ohio June 30, 2006)

Attachment D    *United States v. American Electric Power*, 99-cv-1182, aff'd slip op. (S.D. Ohio Oct. 12, 2006)

Attachment E    *Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, No. 32A01-0605-CV-218, 2007 WL 4349705 at *3 (Ind. App. Nov. 13, 2007)

## EXHIBITS

Exhibit 1    Declaration of Dr. Phyllis Fox in Support of Plaintiffs' Opposition to Cinergy's Motion for Partial Summary Judgment on the Remaining Claims

Exhibit 2    Declaration of Lyle Chinkin in Support of Plaintiffs' Opposition to Cinergy's Motion for Partial Summary Judgment on the Remaining Claims

Exhibit 3    Direct Testimony of James E. Benning Before Public Service Commission of Indiana, Cause No. 37414 (PX 1664)(PSI-016697-166757)

Exhibit 4    Declaration of Dr. Joel Schwartz in Support of Plaintiffs' Opposition to Cinergy's Motion for Partial Summary Judgment on the Remaining Claims

Exhibit 5    Declaration of Dr. Charles T. Driscoll, Jr. in Support of Plaintiffs' Opposition to Cinergy's Motion for Partial Summary Judgment on the Remaining Claims

Exhibit 6    Declaration of Justin A. Savage in Support of the Plaintiffs' Opposition to Cinergy's Motion for Partial Summary Judgment

Exhibit 7    Supplemental Declaration of Justin A. Savage in Support of the Plaintiffs' Opposition to Cinergy's Motion for Partial Summary Judgment (FILED UNDER SEAL)

Exhibit 8              June 5, 1989 Letter from Henry Nickel, Hunton & Williams, to Polly
                       Gault, DOE (UARG1000090-100)

After eight days of trial and two days of deliberations, the jury in this case found that Cinergy violated the New Source Review provisions of the Clean Air Act for four construction projects at the Wabash River plant in West Terre Haute, Indiana.  Cinergy now argues that this Court lacks the power to do anything to redress the harm from the hundreds of thousands of tons of illegal pollution Cinergy emitted since the modifications.  That claim is wrong on the law, premature on the facts, and offensive to the Clean Air Act, the traditions of equity, and common sense.  As the Ninth Circuit found in a similar enforcement case under the Clean Water Act, once an action is brought in federal court, there is more for the court to do than simply tell the defendant to follow the law in the future: "We do not agree that a district court's equitable authority is so cramped. The authority to 'enforce' an existing requirement is more than the authority to declare that the requirement exists and repeat that it must be followed."  *Natural Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000).  Under the Clean Air Act, this Court is invested with the full scope of its equitable authority and may order what measures it deems necessary to bring Cinergy into compliance with the law and ameliorate the harm caused by its violations.  "Such action is within the recognized power and within the highest tradition of a court of equity."  *Wehner v. Syntex Corp.*, 682 F. Supp. 39, 40 (N.D. Cal. 1987) (citing *Porter v. Warner Co.*, 328 U.S. 395, 402 (1946)).

Cinergy makes two arguments in support of its motion for partial summary judgment. First, it argues that it is beyond the power of this Court to grant any relief aimed at redressing the harm from its prior violations of law.  Second, it argues that even if such power exists, it should not be exercised here.  The first argument flies in the face of centuries of equity jurisprudence, the language and purpose of the Clear Air Act, and Cinergy's own briefing in a related state case.

The second is both premature and procedurally infirm: it is inherently a fact-based question, and
Cinergy has provided no statement of undisputed facts.

Plaintiffs are still developing the elements of relief we believe will be necessary to bring
Cinergy back into compliance with the law and make up for nearly two decades of illegal
emissions.[1] The question before the Court at this time is simply whether it should preclude the
*possibility* of any redress of past emissions. Plaintiffs show below that the Court has broad
equitable authority to order actions to remediate the effects of Cinergy's pollution, and we
believe that our presentation at trial will demonstrate that such actions should be taken.
Cinergy's motion should be denied.

## BACKGROUND

### I.    Statute

The Clean Air Act passed in 1970 was intended in part to "speed up, expand, and
intensify the war against air pollution in the United States with a view to assuring that the air we
breathe throughout the Nation is wholesome once again." H.R. Rep. No. 91-1146, at 1 (1970),
*reprinted in* 1970 U.S.C.C.A.N. 5356, 5356; *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901,
909 (7th Cir. 1990) (quoting legislative history). Not satisfied with the results achieved under
the 1970 statute, Congress added the New Source Review ("NSR") program to the Act in 1977
to ensure that emissions from new or modified sources would not interfere with an area's ability
to meet or maintain air quality standards. *See* 42 U.S.C. § 7470 (congressional declaration of
purpose "*to protect public health and welfare from any actual or potential adverse effect* in
which the Administrator's judgment may reasonably be anticipate [sic] . . . *notwithstanding
attainment and maintenance of all national ambient air quality standards*.") (emphasis added);

---

[1] Plaintiffs are mindful that equitable remedies must have a nexus to proven violations and be
roughly proportional to the harm caused. Our proof will meet those standards.

*New York v. EPA*, 413 F.3d 3, 10 (D.C. Cir. 2005) ("In 1977, Congress amended the Clean Air Act . . . to strengthen the safeguards that protect the nation's air quality."). The Prevention of Significant Deterioration ("PSD") component of NSR – which applies to areas in attainment with air quality standards (or where attainment is unclassifiable) – was "aimed at giving added protection to air quality" while fostering economic growth in a manner consistent with preservation of existing clean air resources. *Environmental Defense v. Duke Energy Corp.*, 127 S. Ct. 1423, 1429 (2007). Under the NSR program, no major source can be built or modified unless various requirements are met, including obtaining a preconstruction permit setting forth emission limitations and applying state-of-the-art pollution controls. 42 U.S.C. §§ 7475(a), 7479(3), 7502(c)(5), 7503.

## II.    Effects Of Cinergy's Violations

It is possible to state what controls *would have been required* if Cinergy had obtained NSR permits at the time of the projects. Cinergy itself has admitted in briefing to the Seventh Circuit that if projects "triggered NSR, then Cinergy was required to obtain a preconstruction permit before starting each project and to retrofit each power plant with state-of-the-art controls during the maintenance work." *United States v. Cinergy*, Cinergy Opening Brief to Seventh Circuit at 2 (Attachment A). By comparing the removal efficiencies – the percentage of emissions removed by a given pollution control technology – that would have been achieved with such controls to what Cinergy actually emitted, it is fairly straightforward to estimate the additional tons of pollution that Cinergy emitted due to its failure to comply with the NSR program. Plaintiffs' NSR expert Dr. Phyllis Fox has made a preliminary calculation and determined that the failure to obtain permits and install controls at Wabash River units 2, 3, and 5 resulted in an additional 340,000 tons of sulfur dioxide ("$SO_2$") (along with lesser amounts of

oxides of nitrogen ("$NO_X$") and mercury) emitted from the plant from the date of the modifications through the end of 2007. Ex. 1, Declaration of Phyllis Fox at ¶¶5-11. A typical year's worth of $SO_2$ emissions from Wabash River units 2, 3, and 5 is equivalent to the emissions from 324,000 heavy-duty diesel trucks – as many trucks as are registered in Indiana, Kentucky, and Ohio combined. Ex. 2, Declaration of Lyle Chinkin ("Chinkin Dec.") at ¶7. Cinergy itself studied installing flue gas desulfurization ("FGD") systems for controlling $SO_2$ at the Wabash River plant as early as 1985, and concluded that such installation was possible. *See, e.g.*, Ex. 3, Testimony of James E. Benning before Public Service Commission of Indiana (Feb. 11, 1985). The company believed that its planned refurbishment projects might trigger pollution control requirements and concluded that refurbishing the plants *and* adding FGD would be less expensive than replacing the plants with new units. *Id* at 17. The company estimated that installing FGD at Wabash River units 1 through 6 would cost approximately $160 million in 1984 dollars and approximately $294 million in actual dollars with construction costs incurred from 1990 to 1995. *Id.* at V-7, V-8. Of course, Cinergy later opted not to install controls, and the jury has found that the failure to follow the NSR process violated the law. Therefore, *any* emissions of pollutants from the affected units are illegal because the units were not authorized to operate without obtaining NSR permits.

Plaintiffs expect to present evidence showing the illegal emissions from the Wabash River plant have harmed and are continuing to harm specific downwind areas, such as Indianapolis. The pollutants at issue in this case, $SO_2$ and $NO_X$, form particulate matter ("PM") and ozone in the air after being emitted from power plants and other sources. Chinkin Dec. at ¶8; Ex. 4, Declaration of Joel Schwartz ("Schwartz Dec.") at ¶3. A particular subset of PM, PM2.5, refers to particulate matter with a diameter of less than 2.5 micrometers (a micrometer is

equal to one millionth of a meter). Chinkin Dec. at ¶8. PM2.5 has been well-studied and is known to cause premature mortality in human beings, increase the rate of heart attacks and artherosclerosis, reduce lung function in children and adults, and increase respiratory symptoms in children. Schwartz Dec. at ¶3. PM2.5 also increases the rates of hospitalization for pneumonia and heart failure. *Id*. There is no known threshold below which PM2.5 has no effects. *Id*. Ozone also affects human health by increasing rates of premature mortality, and respiratory hospital admissions. *Id*. Mercury from power plants enters the food chain for fish and mammals, resulting in exposure and neurological effects for humans and wildlife. Ex. 5, Declaration of Charles Driscoll at ¶3c.

In addition to harming human health, $SO_2$, $NO_X$, and mercury create acidic deposition, known as acid rain, which harms the environment. *Id*. at ¶3. Acidic deposition affects soils, harming the habitat for plants and delaying ecosystem recovery. *Id*. at ¶3a. Acid deposition has also impaired, and continues to impair, the water quality of lakes and streams, reducing the growth of aquatic life and having sometimes lethal effects on species of aquatic life in acid-sensitive regions. *Id*. at ¶3b.

## III.    Elements Of Relief Sought

While the precise contours of Plaintiffs' proposed relief await further discovery and development of expert opinions, there are two broad elements of relief Plaintiffs seek in this case: prospective and retrospective relief. The former will likely consist of installing state-of-the-art pollution controls and obtaining permits for Wabash River units 2, 3, and 5 (assuming Cinergy opts to continue running the units). We expect that the latter will focus on additional measures designed to further reduce the pollution from the Wabash River plant in order to make

up for the nearly two decades of illegal pollution.[2]  The crafting of such remedies is "an area in which the courts have settled authority and competence."  *U.S. Public Interest Research Group v. Atlantic Salmon of Maine, LLC*, 339 F.3d 23, 31 (1st Cir. 2003) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)).  To the extent that Cinergy predicts that Plaintiffs will seek certain types of "ad hoc and retroactive mitigation projects" described on page 2 of Cinergy's brief, Cinergy is simply wrong.  (Plaintiffs note that Cinergy cited excerpts of two briefs written by the *defendants* in prior NSR cases to support its supposition about what Plaintiffs will ask for here.  Without cluttering the record with Plaintiffs' response briefs in this cases, we simply ask that Cinergy not be allowed to use these excerpted briefs to present additional argument through its exhibits.)  Plaintiffs plan to seek the redress of illegal emissions from the Wabash River plant through specific measures to reduce pollution at Wabash River beyond what is required for prospective compliance, thus benefitting the very people that were harmed by the Cinergy's illegal emissions.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

Cinergy did not include a statement of material facts not in dispute in its brief, as required by Local Rule 56.1(a), so there are no facts for Plaintiffs to dispute.  Instead, Plaintiffs have described generally in the Background section above – and plan to further detail at trial – the facts that support equitable relief.

---

[2] Plaintiffs will also seek similar types of relief for the PM violations at Beckjord units 1 and 2.  *See United States v. Cinergy Corp.*, No. 99-1693, 2007 WL 2914540 (S.D. Ind. Sept. 28, 2007) (granting Plaintiffs' motion for summary judgment).

## ARGUMENT

When a court sits in equity, it has at its disposal the full panoply of equitable remedies – crafted, tested, and refined by literally centuries of jurisprudence – unless Congress explicitly restricts its reach. Nothing in the language or the purpose of the Clean Air Act suggests that Congress intended to curtail this traditional authority. To the contrary, both the broad language Congress used – "court shall have jurisdiction to . . . award any other appropriate relief" – and the goals Congress set for the Clean Air Act establish that courts have their full equitable authority in enforcing the law. The facts of this case support the use of the full range of those equitable powers in order to remediate the harm to human health and the environment caused by Cinergy's failure to obey the law. In any event, there is no reason to preclude such evidence and argument at this early stage of the remedy litigation.

## I.    The Court's Broad Equitable Authority Includes The Power To Redress Cinergy's Illegal Emissions

Part of the foundation of the equitable tradition is that a court sitting in equity has the discretion to employ any or all of the equitable remedies necessary to achieve complete justice. This fundamental principle came from the English common law tradition and has been part of American legal doctrine since the founding of the republic. A court's equitable authority is only curtailed by a clear signal from Congress, and Congress imposed no such restraint here.

Cinergy entirely inverts this system by arguing that Congress must explicitly allow a given remedy for courts to employ it. Cinergy simply ignores the fundamental premise that, unless restricted, courts have at their disposal a complete set of equitable remedies. In addition, Cinergy relies on a strained interpretation of the statutory language to conclude that the phrase "any other appropriate relief" in the Clean Air Act enforcement provision means – in fact – no additional relief. Cinergy's reading cannot withstand scrutiny.

Congress has done nothing to curtail the authority of district courts in actions under the Clean Air Act. In fact, the language of the enforcement provision, as interpreted by the courts, confirms that this Court has all the traditional remedies of equity at its disposal.

## A.    The Court Has Broad Equitable Authority

The Court's equitable authority in this case does not come from the Clean Air Act, but is inherent in the Court's equitable jurisdiction itself. "For several hundred years, courts of equity have enjoyed sound discretion to consider the necessities of the public interest when fashioning injunctive relief." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001) (internal citations and quotation marks omitted). This tradition can be traced throughout American history back to English common law. *Franklin v. Gwinnett County Pub. Schools*, 503 U.S. 60, 66-67 (1992). Unless specifically curtailed by Congress, "all the inherent equitable powers of the District Court are available for the proper and complete exercise of [its equitable] jurisdiction." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (quoted in, *inter alia*, *Town of Munster, Ind. v. Sherwin-Williams Co., Inc.*, 27 F.3d 1268, 1271 (7th Cir. 1994)). Indeed, "the court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice." *Porter*, 328 U.S. at 398. The traditional equitable authority lodged in the district court includes the power to enjoin otherwise lawful conduct as necessary to mitigate past harm from violations of law. *See, e.g.*, *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 961 (10th Cir. 2002) ("'A federal court's equity jurisdiction affords it the power to enjoin otherwise lawful activity when necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct.'") (quoting *United States v. Holtzman*, 762 F.2d 720, 724-25

(9th Cir. 1985)) (further citations omitted).  By allowing courts to "grant additional injunctive relief . . . remedying harm caused by [defendants'] past violations," equity "gives meaning to the statute's grant of enforcement authority."  *Atlantic Salmon*, 339 F.3d at 31.

The traditional equitable discretion vested in the district court can only be abrogated by

> a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. *The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.*

*Porter*, 328 U.S. at 398 (internal citations and quotation marks omitted) (emphasis added); *see also Romero-Barcelo*, 456 U.S. at 313; *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 496; *Town of Munster*, 27 F.3d at 1271 ("Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but the Supreme Court has taught that we should not lightly assume that Congress has intended to depart from established principles.") (internal citations and quotation marks omitted).

A district court's equitable authority is at its apex when the public interest is involved.  In such cases, a district court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake."  *Porter*, 328 U.S. at 398 (citing *Virginian Ry. Co. v. System Federation No. 40*, 300 U.S. 515, 552 (1937)); *see also United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 231 (3d Cir. 2005) (quoting *Porter*); *United States v. Miami Univ.*, 294 F.3d 797, 819 (6th Cir. 2002) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.") (quoting *Virginian Railway*, 300 U.S. at 552).  Statutes like the Clean Air Act that are devoted to, among other goals, protecting

public health provide a compelling justification for expansive injunctive relief. Once a violation has been found, "[T]he Court has the responsibility in this case of crafting a remedy that is protective of public health, *and this responsibility necessarily takes preeminence over all other considerations.*" *United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1027 (N.D. Cal. 2002) (Safe Drinking Water Act case) (emphasis added).

### B.    The Clean Air Act Supports Broad Equitable Authority

Despite Cinergy's best efforts, addressed specifically in Section C below, nothing in the language or purpose of the Clean Air Act provides any clue – to say nothing of the "necessary and inescapable inference" required – that Congress intended to curtail the Court's injunctive authority. To the contrary, the statute confirms that the full array of remedies is to be considered – as Cinergy itself has argued in another setting.[3] Moreover, while no court has definitively addressed the precise question at issue, numerous courts have considered similar provisions and concluded that their equitable authority remained comprehensive.

### 1.    The statute itself affirms the Court's broad equitable authority

The Clean Air Act enforcement provision applicable to this case is facially broad and must be given an expansive interpretation to ensure that the purposes of the statute are fulfilled. Section 113(b) states that the applicable district court

> shall have jurisdiction to restrain such violation, to require compliance, to assess such civil penalty, to collect any fees owed the United States under this chapter (other than subchapter II of this chapter) and any noncompliance assessment and nonpayment penalty owed under section 7420 of this title, *and to award any other appropriate relief*.

42 U.S.C. § 7413(b) (emphasis added). On its face, the phrase "award any other appropriate relief" is clear and matches the Court's inherent equitable discretion. The use of the word "award" further supports the idea that "any other appropriate relief" includes more than ordering

---

[3] *See* Section D below.

compliance and penalties.  The word "award" implies a benefit to the plaintiff and/or the environment rather than merely an order against the defendant.  Courts do not speak of "awarding" an injunction, rather courts traditionally speak of "awarding" things like damages, restitution, compensation, costs, fees, etc.  Here the relief Plaintiffs seek is akin to restitution – measured not in money but in tons of pollution emitted and now reduced.

Moreover, the phrase "award any other appropriate relief" should be interpreted broadly for at least two reasons.  First, the Supreme Court has instructed that statutes are to be construed "'in favor of that interpretation which affords a full opportunity for equity courts to treat enforcement proceedings . . . in accordance with their traditional practices, as conditioned by the necessities of the public interest which Congress has sought to protect.'"  *Romero-Barcelo*, 456 at 320 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944)).  Second, Congress intended to give EPA broad enforcement authority through Section 113, and the language of the provision should be read with that purpose in mind.  *United States v. Marine Shale Processors*, 81 F.3d 1329, 1354 (5th Cir. 1996).

The purpose of the Clean Air Act (and in particular the PSD program) supports a broad enforcement provision that is tailored to protecting human health and the environment.  As described above, Congress enacted the PSD program to "add[] protection to air quality," *Duke Energy*, 127 S. Ct. at 1429, and "to protect public health and welfare from any actual or potential adverse effect in which the Administrator's judgment may reasonably be anticipate[d]."  42 U.S.C. § 7470.  The means Congress selected to achieve this goal was the PSD permitting program, which required that, *inter alia*, each source install top-of-the-line pollution controls when first built or modified.  A critical element of the statutory formula is the pre-construction permit requirement:  the permit must be obtained *before* the construction or modification begins

11

so that the permitting authority can ensure that air quality and public health will not deteriorate as a result of the project. 42 U.S.C. § 7475. The pre-construction emphasis of PSD is also reflected in Section 167, 42 U.S.C. § 7477, which allows EPA or states to issue orders or seek injunctions preventing the commencement of construction or modification without complying with the PSD rules.

Given that Cinergy has long since violated the statute by failing to obtain pre-modification permits, the only way to redeem the statutory purpose is through the exercise of this Court's equitable authority. The Supreme Court "long ago recognized, there is inherent in the Courts of Equity a jurisdiction to . . . give effect to the policy of the legislature." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960) (internal citations and quotation marks omitted); *see also United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 225 (3d Cir. 2005) (same); *New York v. Niagra Mohawk Power Corp.*, 263 F. Supp. 2d 650, 663 (W.D.N.Y. 2003) (defendant's "initial failure to comply with the requirements of the Clean Air Act cannot now inure to its benefit."). In crafting the proper remedy in equity "courts must act primarily to effectuate the policy of the [act] and to protect the public interest while giving necessary respect to the private interests involved." *Porter*, 328 U.S. at 400.

Cinergy's narrow construction of the Court's equitable authority would limit the remedies available to penalties and prospective relief. This does nothing to redress the harm from the additional pollution already emitted that would have been avoided had Cinergy followed the law. Such a limited remedy does not "give effect" to the clearly stated statutory policy of controlling emissions as of the time of modification.

## 2.    Prior decisions under federal environmental law

Many courts have found that similar – or arguably *narrower* – language in other environmental provisions does not curtail equitable authority.  As the First Circuit has explained in the context of a Clean Water Act enforcement case, "Injunctive remedies for past harm commonly dictate future conduct *so as to mitigate past harm*."  *Atlantic Salmon*, 339 F.3d at 33 (emphasis added).

The Ninth Circuit has already determined that the Clean Air Act incorporates the courts' traditional equitable authority in motor vehicle enforcement cases.  The Clean Air Act has separate sets of provisions for stationary sources, like power plants, and mobile sources, like cars.  In a case interpreting the Clean Air Act enforcement provision for vehicles, the Ninth Circuit found that a statutory grant of authority solely to "restrain violations" did not narrow the district court's equitable authority.  *Holtzman*, 762 F.2d at 724-725.  In *Holtzman*, the defendant argued that where the statute authorized district courts to "restrain violations" it precluded them from "enjoining *lawful* activity."  *Id*. at 724.  The Ninth Circuit disagreed, finding that district courts have the inherent equitable authority to "enjoin otherwise lawful activity when necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct," and that the "restrain violations" language of the statute did nothing to curtail the courts' equitable powers.  *Id.* at 724-725.  Notably, the statutory provision analyzed in *Holtzman* is, if anything, narrower than that at issue here: Section 204(a) of the Clean Air Act explicitly mentions *only* the power to "restrain violations" while Section 113(b) *also* sets forth the power to require compliance, assess civil penalties, collect fees, and "award any other appropriate relief."  *Compare* 42 U.S.C. § 7523(a) *with* 42 U.S.C. § 7413(b).  Moreover, there is no reason to believe

that Congress intended courts to have a broader array of available remedies in enforcement actions related to motor vehicles than those related to stationary sources like power plants.

Courts have also held that they have the authority to order remediation for violations of the Clean Water Act.  The Clean Water Act states that the United States may seek "appropriate relief" and explicitly confers jurisdiction for courts to "restrain such violation and to require compliance."  33 U.S.C. § 1319(b).  In a case where the defendants failed to obtain a permit before a citizen suit was filed, the First Circuit held that the district court could remediate the prior violations by entering an injunction that was more stringent than permit requirements.  *See generally Atlantic Salmon*, 339 F.3d 23.  Defendants obtained a general permit from the state during the course of the litigation, and then argued to the First Circuit that the district court could not impose injunctive relief that went beyond that required in the state permit.  *Id.* at 27, 30-31. The First Circuit held that

> the court may grant additional injunctive relief governing the post-permit operations of the companies insofar as the court is remedying harm caused by their past violations. . .  Conventionally, a court's equitable power to enforce a statute includes the power to provide remedies for past violations-an area in which the courts have settled authority and competence.

*Id.* at 31 (citing *Romero-Barcelo*, 456 U.S. at 313; *Porter*, 328 U.S. 398).  Courts have also noted that Clean Water Act injunctions could require defendants to pay money into a remedial fund designed to address the harm from their pollution.  *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 82 (3d Cir. 1990).

Similarly, numerous courts have ordered the restoration of wetlands under the Clean Water Act.  Courts have repeatedly found that they have the authority to order defendants responsible for destroying wetlands to take steps necessary to return the terrain to its natural state

and thus undo the harm from their violations.  For instance, the First Circuit upheld an injunction that required the defendant to: 1. reestablish the prior topography; 2. raise the water table to prior levels; and 3. spread strips of vegetation from neighboring wetlands to aid in regenerating species diversity.  *United States v. Cumberland Farms of Connecticut*, 826 F.2d 1151, 1164-65 (1st Cir. 1987).  Once its equitable jurisdiction is invoked, the court need not simply order compliance with the law, but should evaluate whether the proposed remedy "(1) . . . would confer maximum environmental benefits, (2) . . . is "achievable as a practical matter," and (3) . . . bears an equitable relationship to the degree and kind of wrong it is intended to remedy."  *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003) (internal citations and quotation marks omitted).  The *Deaton* court upheld an injunction that required more than defendants would have had to do if they had simply obtained a permit before the violations.  *Deaton*, 332 F.3d at 713-14.

The foundational issue of the courts' authority has rarely been controversial in wetlands cases:  "There can be no doubt that this court has the power under the Clean Water Act to order the restoration proposed by the Government."  *United States v. Ciampitti*, 615 F. Supp. 116, 122 (D.N.J. 1984); *see also Cumberland Farms*, 826 F.2d at 1164 (court has "authority to issue such restorative orders so as to effectuate the stated goals of the Clean Water Act to maintain the chemical, physical, and biological integrity of the Nation's waters") (internal quotation marks omitted); *United States v. Van Leuzen*, 816 F. Supp. 1171, 1180 (S.D. Tex. 1993) ("the duty to restore an intentionally filled wetland is mandatory, absent equities"); *Leslie Salt Co. v. United States*, 820 F. Supp. 478, 484 (N.D. Cal. 1992) ("[t]he United States is entitled to injunctive relief which restores the property at the points of violation to essentially their pre-existing condition") (internal quotation marks omitted), *aff'd*, 55 F.3d 1388 (9th Cir. 1995); *United States v. Banks*, 115 F.3d 916, 918 (11th Cir. 1997) (defendant ordered "to restore the wetlands to their

15

undisturbed condition before such unlawful discharges by removing the fill and otherwise implementing a restoration plan."); *United States v. Larkins*, 657 F. Supp. 76, 86 & n.25 (W.D. Ky. 1987), *aff'd*, 852 F.2d 189 (6th Cir. 1988) (United States was "entitled to restoration" of site and noting "numerous precedents for restoration.").

Judge Sharp reached the same conclusion in a different type of Clean Water Act case. In *United States v. Alcoa, Inc.,* the defendant regularly emitted pollution in excess of its permit limits into a nearby ditch that eventually flowed into the Wabash River. 98 F. Supp. 2d 1031, 1032 (N.D. Ind. 2000). The United States sought penalties and an injunction for future compliance along with an order requiring the defendant to develop and carry out a plan to remediate the contamination in the affected waters. *Id.* at 1033. In denying a motion to dismiss the remediation claim, Judge Sharp found that the "require compliance" language in the enforcement provision was "broad enough to include the mandated clean up of contaminated sediments where the sediments are contaminated as a direct result of NPDES Permit violations." *Id.* at 1039; *see also United States v. Outboard Marine Corp.*, 549 F. Supp. 1036, 1039 (N.D. Ill. 1982) (finding court had authority to order cleanup of past pollution under Clean Water Act). Notably, in *Alcoa* the parties did not dispute that the phrase "appropriate relief" left undisturbed "the full range of traditional injunctive relief." 98 F. Supp. 2d at 1036.

The Clean Water Act precedent is particularly relevant to the instant case for two interrelated reasons. First, the Clean Water Act is closely related in language, structure, and purpose to the Clean Air Act. *See, e.g.*, *Southern Ohio Coal Co. v. Office of Surface Min., Reclamation & Enforcement*, 20 F.3d 1418, 1426 (6th Cir. 1994) ("The enforcement provisions of the CWA were modeled after the enforcement provisions of the Clean Air Act.") (citing *Southern Pines Assocs. v. United States*, 912 F.2d 713, 716 (4th Cir. 1990) (citing S.Rep. No. 92-

16

414 at 63 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3730)).  Given the relationship between the statutes, it is simply illogical to conclude that Congress intended a narrower range of equitable remedies under the Clean Air Act than under the Clean Water Act.  Second, much of the Clean Water Act precedent finding judicial authority to order remediation was issued *before* Congress amended the Clean Air Act in 1990 to make more explicit the broad equitable enforcement authority possessed by district courts.  *See United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1301 (5th Cir. 1976); *United States v. Weisman*, 489 F. Supp. 1331, 1343 (M.D. Fla. 1980), *aff'd*, 632 F.2d 891 (5th Cir. 1980); *Outboard Marine*, 549 F. Supp. 1036 (1982 case); *United States v. Bradshaw*, 541 F. Supp. 884, 886 (D. Md. 1982); *United States v. Carter*, Nos. 81-981-Civ-JWK, 81-982-Civ-JWK, 1982 U.S. Dist. Lexis 18092, at *9-10 (S.D. Fla. Dec. 21, 1982) (Attachment B); *Ciampitti*, 615 F. Supp. at 122 (1984: "There can be no doubt that this court has the power under the Clean Water Act to order the restoration proposed by the Government."); *Larkins*, 657 F. Supp. at 86 & n. 25 (1987 decision noting "numerous precedents for restoration"); *Cumberland Farms*, 826 F.2d 1151 (1987).  With cases going all the way back to 1976, it is reasonable to presume that Congress was aware of this line of precedent in passing the 1990 Clean Air Act amendments.  *See, e.g.*, *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) ("it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with [our] precedents ... and that it expect[s] its enactment[s] to be interpreted in conformity with them.") (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 699 (1979)); *United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir.1991) ("Congress is, of course, presumed to know existing law pertinent to any new legislation it enacts.").  Had Congress objected to the interpretation of the Clean Water Act enforcement provision, it surely would not have amended the Clean Air Act language in 1990 to make it even *broader*.

Courts have also found broad equitable authority under the Safe Drinking Water Act. The Ninth Circuit upheld a district court's order requiring divestiture of certain defendant water providers. *United States v. Alisal Water Corp.,* 431 F.3d 643 (9th Cir. 2005). The court found no statutory language limiting the court's authority, and so concluded that the statute "incorporate[d] the full panoply of the court's equitable powers." *Id.* at 654; *see also United States v. Massachusetts Water Res. Auth.*, 48 F. Supp. 2d 65, 71-72 (D. Mass. 1999) (similar).

There is ample authority in federal environmental law for an order requiring Cinergy to take actions to redress the harmful effects of its illegal pollution.

### 3.    Decisions interpreting non-environmental federal statutes

There are also numerous cases outside the environmental arena in which courts have interpreted similar or arguably narrower enforcement language to be consistent with traditional equitable authority. Without attempting to catalog all such cases, Plaintiffs highlight a few lines of precedent below.

In *Porter*, the Supreme Court interpreted a statute with language similar to that at issue here, and found that the Emergency Price Controls Act ("EPCA") did not curtail courts' equitable authority. The EPCA was a World War II era measure designed to combat inflation, and the government was seeking restitution of rent collected above maximum levels. *Porter*, 328 U.S. at 396-97. The statute stated that courts could order a "permanent or temporary injunction, restraining order, or other order." *Id.* at 397. The Court found that restitution was appropriate because it "restor[ed] the status quo [by] ordering the return of that which rightfully belongs to the purchaser or tenant." *Id.* at 402. The Court continued that such a remedy "is within the recognized power and within the highest tradition of a court of equity." *Id.* The statutory language under the EPCA is very similar to the corresponding Clean Air Act passage, and in

18

both cases a remedy that removes additional profits or pollutants directly serves the goals of the law.

Courts have also found that the Food, Drug, and Cosmetic Act ("FDCA") invokes the full equitable authority of district courts. The FDCA has more limited language than the Clean Air Act: it explicitly authorizes courts to "restrain violations." 21 U.S.C. § 332(a). That authority is sufficient to "invoke[] courts' general equity jurisdiction." *United States v. Rx Depot*, 438 F.3d 1052, 1061 (10th Cir. 2006); *see also United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 220 (3d Cir. 2005) (holding FDCA supports retrospective remedy); *United States v. Universal Mgmt. Srvs., Inc., Corp.*, 191 F.3d 750, 761-62 (6th Cir. 1999) (similar). Notably, Congress harked to the FDCA in passing the Clean Air Act, so this precedent is particularly relevant. *See* H. Rep. No. 95-294 at 70-71, *reprinted in* 1977 U.S.C.C.A.N. 1148-49 ("Like the Food, Drug, and Cosmetic Act on which the Clean Air Act is patterned in many respects, the Clean Air Act is intended to deal with activities which touch phases of the lives and health of people."). The Supreme Court similarly held that the power to "restrain violations" in the Fair Labor Standards Act did not curtail courts' equitable authority. *Mitchell*, 361 U.S. at 289, 296.

Another line of cases has found that disgorgement and restitution are available under various statutes with enforcement language similar or less expansive than that of the Clean Air Act. The Security Exchange Act explicitly referenced authority to issue orders for compliance; that invocation of equitable authority sufficed to make disgorgement available. *S.E.C. v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989) ("Disgorgement, then, is available simply because the relevant provisions of the Securities Exchange Act of 1934. . . vest jurisdiction in the federal courts."); *see also FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468-70 (11th Cir. 1996) (holding restitution available as remedy under Federal Trade Commission Act);

*ICC v. B & T Transp. Co.*, 613 F.2d 1182, 1183-86 (1st Cir. 1980) (holding restitution available as remedy under Motor Carrier Act); *CFTC v. Hunt*, 591 F.2d 1211, 1221-23 (7th Cir. 1979) (holding disgorgement available as remedy under Commodity Exchange Act).

The fact that no court has yet extended this conclusion to Section 113(b) is hardly surprising given that – as the United States informed the Court at the liability trial in this case – no similar New Source Review enforcement case has yet proceeded to a remedy trial. Instead, the prior litigated cases have settled, and every NSR power plant settlement reached with the United States to date has included a mitigation component. While the settlements do not represent judicial precedent, they do suggest that the parties believe mitigation is available under the statute. *See Alcoa*, 98 F. Supp. 2d at 1034 (taking note of settlements of similar claims).

### C.     Cinergy Fails To Show Congressional Intent To Restrict Court's Authority

Cinergy makes three distinct attempts to argue that Congress implicitly restricted the traditional equitable authority of district courts. Each of these arguments, however, is based on the unstated and fundamentally flawed premise that Congress must articulate a remedy for the Court to order that type of relief. In reality, as discussed above, the opposite is true: district courts *have* their traditional equitable authority unless Congress restricts that power "in so many words, or by a necessary and inescapable inference." *Porter*, 328 U.S. at 398; *see also Rx Depot*, 438 F.3d at 1059 ("Defendants and amicus fail to recognize that by granting courts general equity jurisdiction, Congress authorized all traditional equitable remedies."). At best, all Cinergy has to offer are the "light inferences [and] doubtful construction" that cannot be allowed to preclude the equitable pursuit of "complete justice." *Porter*, 328 U.S. at 398.

### 1.    The statutory language does not limit equitable authority

Cinergy argues that the language of Section 113(b) cannot be squared with redressing the past harm from Cinergy's illegal emissions. As a preliminary matter, this inverts the inquiry by suggesting that the Court's authority must be specified in the statute rather than simply not precluded. Even on its own merits, however, Cinergy's reading of the statutory language is unpersuasive.

There are three potential sources of authority in Section 113(b) for a court to order mitigation: it could be described as restraining a violation, requiring compliance, or qualifying as any other appropriate relief. *Cf.* Doc. # 1365 ("Cin. Br.") at 3. The relief sought here by Plaintiffs fits comfortably within "any other appropriate relief" (or requiring compliance or restraining violations, as described above with *Alcoa, Mitchell*, and the FDCA cases). Cinergy states that interpreting the phrase "any other appropriate relief" requires looking at the "overall language, structure and purpose of the statute." Cin. Br. at 3. However, Cinergy fails to even discuss the "overall language, structure and purpose of the statute" choosing instead to focus on a handful of provisions without any discussion of the purpose of the law.

Cinergy's interpretation of its selected statutory provisions is not compelling, beginning with its reading of Section 113(b). Its reliance on a pair of canons of statutory construction proves too much: if – as Cinergy would have it – the phrase "any appropriate relief" simply authorizes "orders effectuating whatever 'restraint[s],' 'compliance,' or 'penalt[ies]' a Court chooses to impose," then the other appropriate relief language is unnecessary. *See* Cin. Br. at 4. This would, of course, violate another rule of statutory interpretation: the "deep reluctance to interpret a statutory provision so as to render superfluous other provisions." *See, e.g., Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 562 (1990) (cited in Cin. Br.

at 4). Canons of construction are only useful to the extent they serve "to help judges determine the Legislature's intent as embodied in particular statutory language" and it is hardly unusual for canons to be contradicted by others "pointing in a different direction." *Chickasaw Nation v. United States*, 122 S. Ct. 528, 535 (2001).

Cinergy's argument must fail because it contradicts the plain meaning of the phrase *any other appropriate relief*. The Supreme Court reached the same conclusion in evaluating the phrase "any other final action" in another provision of the Clean Air Act related to review of EPA decisions. There, the Court rejected the *ejusdem generis* concept that Cinergy relies on, finding that by saying "*any* other final action" Congress did not intend to limit the term by the specific items listed. *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 589 (1980). The Court's reasoning is equally applicable to this situation:

> [The] expansive language offers no indication whatever that Congress intended
> [a] limiting construction . . . Rather, we agree with the petitioners that the phrase,
> 'any other final action,' in the absence of legislative history to the contrary, must
> be construed to mean exactly what it says, namely, any other final action.

*Id.*

Cinergy next attempts to use a statutory limit on mitigation for citizen suits as a tacit limitation on mitigation sought by the government. *See* Cin. Br. at 5. Instead, the citizen suit provision, which explicitly authorizes limited mitigation from funds that would otherwise go to the U.S. Treasury as penalty, simply illuminates the flaws in Cinergy's argument in at least two interrelated ways. *See* 42 U.S.C. § 7604(g)(2), The fact that Congress found it necessary to limit the citizen suit mitigation implies that without an explicit limit the courts' traditional authority is intact. This is particularly true in light of the role Congress assigned to EPA and citizens, respectively. Given that Congress intended for EPA to have primary enforcement duties and citizens to have only a supplementary role, it would be nonsensical for citizens to have the right

22

to obtain mitigation while EPA lacked that authority. *See Alaska Dept. of Envt'l Conservation v. E.P.A.*, 540 U.S. 461, 490 (2004) ("Congress, however, vested EPA with explicit and sweeping authority to enforce CAA 'requirements' relating to the construction and modification of sources under the PSD program, including BACT."); *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 475 (6th Cir. 2004) ("Congress has authorized citizen suits only when environmental officials 'fail to exercise their enforcement responsibility' and has provided an 'interstitial' role for private parties in enforcing the statute.") (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60-61 (1987)).

Finally, Cinergy attempts to suggest that the Clean Air Act creates a "comprehensive and reticulated" remedial scheme such that it implicitly foreclosed the use of traditional equitable remedies. Cin. Br. at 5-6 (quoting *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005)). In *Philip Morris*, the sole case Cinergy relies upon for this point, the court found that the Racketeer Influenced and Corrupt Organizations Act ("RICO") provided a "comprehensive and reticulated remedial scheme" by allowing for (i) criminal remedies including fines, imprisonment, and forfeiture of illegal proceeds and (ii) treble damages to make plaintiffs whole and punish violators. *Philip Morris*, 396 F.3d at 1200. The court noted that if disgorgement was also permitted, it would lead to "issues of duplicative recovery." *Id.* at 1201 (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 269 (1992)). Under the Clean Air Act, by contrast, there are no other means outside Section 113(b) to remedy the harm caused by years of illegal pollution. Thus there is no "comprehensive and reticulated" remedial scheme to provide the "inescapable inference" that Congress intended to restrict the courts' equitable authority. *Id.* at 1197 (citing *Porter*, 328 U.S. at 398). Moreover, the Philip Morris court noted that the remedies explicitly granted in the provision at issue were "all directed

23

toward future conduct," making a retrospective remedy suspect. *Philip Morris*, 396 F.3d at 1200. The Clean Air Act explicitly includes *both* prospective and retrospective relief (such as penalties and fees), making the *Philip Morris* conclusion inapplicable. *See RX Depot*, 438 F.3d at 1059 (noting *Philip Morris* relied on fact that specified statutory remedies were forward-looking).

### 2.    The legislative history fails to support Cinergy's argument

Faced with a presumption that full equitable powers remain and plain statutory language that allows *any* appropriate relief, Cinergy resorts to a selective reading of the legislative history of the statute. Looking to the legislative history is not necessary here, where the statute and the underlying equitable tradition are clear. *See, e.g.*, *Newsom v. Friedman*, 76 F.3d 813, 816 (7th Cir. 1996). Even if the legislative history is considered, it says nothing to contradict the Court's equitable authority as affirmed by the clear statutory language.

The Senate Report Cinergy relies upon devotes a single sentence to the any other appropriate relief clause of the statute. Cinergy argues that the construction of the report's sentence – which states that courts are authorized to award any other appropriate relief "when considering" whether to order other injunctive relief or penalties – implies that the authority is related only to penalties, restraining violations, or requiring compliance. S. Rep. No. 101-228 at 359 (Dec. 20, 1989). Cinergy's reading is hardly compelled by the language; a more reasonable interpretation would be that the intent was simply that the Court would decide all penalty and injunctive relief issues at the same time. In any event, there is no clear meaning to the Senate report statement that could overcome the equitable background and unambiguous statutory language discussed above. *See, e.g.*, *Peare v. McFarland*, 778 F.2d 354, 357 (7th Cir. 1985)

("[T]he plainer the [statutory] language, the more convincing contrary legislative history must be.") (quoting *United States v. United States Steel Corp.*, 482 F.2d 439, 444 (7th Cir. 1973)).

Cinergy's other legislative history argument fails to withstand scrutiny. The committee report language Cinergy attempts to rely on, *see* Cin. Br. at 7, referred solely to a provision broadening the violations for which enforcement could be sought, not what remedies would be available. S. Rep. No. 101-228 at 361 (Dec. 20, 1989). Thus the other statutes Cinergy cites are immaterial to the interpretation of "any other appropriate relief."

### 3. Cinergy's reference to other statutes is unavailing

Cinergy attempts to argue that the language of other federal environmental statutes implies that Congress implicitly restricted the remedies available under the Clean Air Act. *See* Cin. Br. at 8-9. This flies in the face of the precedent cited above requiring either an explicit statement or "a necessary and inescapable inference" to restrict the courts' authority, *Porter*, 328 U.S. at 398, and the numerous cases cited above in which courts have found *no* such restriction.

Moreover, Cinergy relies on a misreading of the Clean Water Act to conclude that the statute has an explicit mitigation authorization provision. The provision Cinergy cites is applicable *only* to discharges of oil and hazardous substances, not to the entire set of pollutants regulated by the Clean Water Act. *See* Cin Br. at 8 (citing 33 U.S.C. § 1321(b)(9)); *see also* 33 U.S.C. §§ 1321(b) (setting special restrictions for oil and hazardous substances), 1362(6) (defining "pollutants"). Cinergy's confusion renders its entire argument infirm: it cannot explain why the Clean Water Act supports mitigation beyond discharges of oil and hazardous substances – as described in numerous cases above – but the Clean Air Act should not.

If anything, the Clean Air Act enforcement provision is arguably *broader* than that under the Clean Water Act, though Plaintiffs believed they should be interpreted to have coextensive

scope.  Unlike the Clear Air Act, the applicable Clean Water Act enforcement provision is

broken into two sentences, the first granting the authority to seek "all other appropriate relief,"

and the second granting the courts jurisdiction to "restrain such violation and to require

compliance."  *Compare* 42 U.S.C. § 7413(b) *with* 33 U.S.C. § 1319(b).  In a passage cited by

Cinergy, the *Alcoa* court indicated that the second sentence limited the first.  98 F. Supp. 2d at

1036 (cited in Cin. Br. at 4).  Of course, Cinergy failed to report the holding of *Alcoa*, described

above.  And the *Alcoa* language Cinergy does cite is based on an element of the Clean Water Act

without parallel in the Clean Air Act.

      Finally, the cases Cinergy cites for the proposition that Congress's failure to enumerate a

given remedy precludes the court from using it are simply not applicable.  *See* Cin Br. at 9.

*Medellin v. Texas,* 128 S. Ct. 1346 (2008), is particularly far afield: it does not involve the

courts' equitable authority at all, but instead the effect of a judgment from the International Court

of Justice.  The other two cases Cinergy cited involved the available remedies for private citizens

under federal environmental statutes; citizen suits are authorized separately and without broad

"any other appropriate relief" style language, and so are not relevant to the interpretation of the

provisions at issue in this case.  In the *American Electric Power* NSR enforcement case*,*

Magistrate Judge Kemp found that *Middlesex County* was "simply inapposite" to the scope of

equitable relief available.  *United States v. American Electric Power*, 99-cv-1182, slip op. at 6

(S.D. Ohio June 30, 2006) (Attachment C); *aff'd* slip op. at 7 (S.D. Ohio Oct. 12, 2006)

(Attachment D).  Similarly, the *Meghrig* decision was based on the language and purpose of the

Resource Conservation and Recovery Act ("RCRA") and its relationship to other environmental

statutes providing complementary relief, so *Meghrig* did not alter the "general rule" established

by *Porter.  Rx Depot*, 438 F.3d at 1057 (detailing foundations for *Meghrig* holding and

concluding "rather than overruling or limiting *Porter*'s and *Mitchell*'s *general rule* that a grant of equity jurisdiction enables courts to order any form of equitable relief, *Meghrig* merely demonstrates that a statute's particular characteristics may preclude application of the rule.") (emphasis added).

### D.    Cinergy Has Argued Elsewhere that Courts Can Order Clean Air Act Mitigation

In state insurance litigation related to coverage for costs associated with *this case*, Cinergy has taken a position diametrically opposed to its motion before this Court. There, Cinergy recently argued that the Clean Air Act *does* grant courts authority to order mitigation of past environmental harms and that it anticipates such a result in this case. In a brief filed with the Court of Appeals of Indiana in November 2007, Cinergy argued that, "'Any other appropriate relief' is not an equipment injunction 'to require compliance.' *It includes environmental projects that mitigate past harm* and even payment of money damages." *Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, No. 32A01-0605-CV-218, 2007 WL 4349705 at *3 (Ind. App. Nov. 13, 2007) (emphasis added) (Attachment E). Cinergy went on to describe mitigation projects required in the AEP settlement and state that they were the "'other appropriate' compensatory relief allowed by the CAA." *Id.* In trying to secure insurance compensation for its defense costs in this case, Cinergy urged the Indiana courts to adopt Plaintiffs' reading of the Clean Air Act. Given their own insurance litigation briefing, Defendants must concede that Plaintiffs' reading of the statute is reasonable. If our reading is reasonable, Congress did not provide the "clear and valid legislative command" required to abrogate the courts' equitable authority. *See Porter*, 328 U.S. at 398.

## II.    There Is No Reason To Preclude Mitigation At This Stage Of The Litigation

Cinergy argues that even if the Court has the authority to redress the harm from Cinergy's violations, it should deny mitigation without hearing any testimony or seeing any relevant evidence. While Cinergy offers several different arguments for this audacious proposition, it is both premature and without a valid basis.

Summary judgment on whether to award mitigation is unripe at this point, as relevant discovery has not been completed and the question involves many issues of disputed facts. *See*, Ex. 6, Declaration of Justin Savage; Ex. 7, Supplemental Sealed Declaration of Justin Savage (collectively "Savage Decs."). In order to make the issue of mitigation ripe for summary judgment, Cinergy would have to present undisputed evidence showing either that it emitted no more $SO_2$ or $NO_X$ after the projects than before, or that its emissions caused no harm to human health or the environment. Cinergy has presented *no* evidence in support of its motion, however. Furthermore, the jury has already determined that the projects resulted in increased emissions, and Plaintiffs have filed with this brief and will continue to develop evidence that Cinergy's emissions harmed human health and the environment. *See* Savage Decs.; Background section above. Cinergy essentially asks the Court to ignore any harm resulting from its illegal activity and decide on a limited remedy without hearing the facts.

At issue is whether the Court should hear evidence regarding the harm from Cinergy's illegal emissions. Cinergy argues that the Court should preclude mitigation of that harm without hearing the evidence – and that such a decision would avoid much discovery. *See* Cin. Br. at 10. Cinergy is incorrect. Harm would be relevant regardless of whether mitigation were at issue. *See, e.g.*, *United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996) (finding a traditional principle of equity that "when the United States or a sovereign state sues in its

capacity as protector of the public interest, a court may rest an injunction entirely upon a determination that the activity at issue *constitutes a risk of danger to the public*.") (emphasis added); *EPA v. Environmental Waste Control*, 917 F.2d 327, 332 (7th Cir.1990). The proof Plaintiffs intend to present would be similar regardless of the issue of mitigation, and will show that Cinergy has harmed both human health and the environment through its illegal activity.

Further, Cinergy is a $22.1 billion company that is a wholly owned subsidiary of a $49 billion company – yet it complains that providing evidence related to the harm from its illegal emissions would be too costly. *See* Cin. Br. at 10. Through June 21, 2005 along, Cinergy has elected to spend $24 million litigating this case. *See Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, 873 N.E.2d 105, 108 (Ind. Ct. App. 2007). Now Cinergy cries poor after it has been found to have illegally polluted from three of its units over the course of nearly two decades. The harm these illegal emissions have visited on the public and the environment is eminently worthy of the full judicial process that Cinergy seeks to avoid in its newfound frugality. Indeed, addressing the harm caused by Cinergy's violations is "within the highest tradition of a court of equity." *Wehner v. Syntex Corp.*, 682 F. Supp. 39, 40 (N.D. Cal. 1987) (citing *Porter v. Warner Co.*, 328 U.S. 395, 402 (1946)).

In seeking to prevent the Court from hearing about the harm it has caused through its illegal emissions, Cinergy steps through the looking glass and blames Plaintiffs for those emissions. *See* Cin. Br. at 10-11. Cinergy's argument amounts to, "If you had prosecuted us earlier, we would have stopped breaking the law earlier." Even if true, this would not prevent Plaintiffs from seeking injunctive relief and mitigation. First, the Court has already dismissed Cinergy's laches defense. Doc. # 412 (Order on the USA's Motion for Partial Judgment on the Pleadings) at 16. Moreover, as this Court has noted, "[t]here is significant doubt about whether

the doctrine of laches applies to actions initiated by the United States." *United States v. SIGECO*, No. IP 99-1692-C-M/F, 2003 WL 446280, at *3 (S.D. Ind. Feb. 18, 2005); *see also United States v. Tortes*, 142 F.3d 962, 966 (7th Cir. 1998) ("[i]t is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights."). The majority of courts that have examined this issue in the environmental context have dismissed laches claims against the government. *See Park County Resource Council, Inc. v. United States Dep't of Agric.*, 817 F.2d 609, 617 (10th Cir. 1987), *overruled on other grounds, Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992) ("Nearly every circuit . . . and numerous district courts have recognized the salutary principle that '[l]aches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage.'"). The rule that laches ought not to apply to the government when it acts in the public interest exists for good reason: the victims of overburdened government ought not be the citizens, and the spoils of overburdened government ought not accrue to those who break the law.

Cinergy then claims that if it had known that its conduct was illegal, it would not have released the illegal emissions that now require mitigation. *See* Cin. Br. at 11. Although Cinergy once again claims that it did not know that its conduct was illegal, this Court has already found that "Cinergy had fair notice of the standards for determining whether its projects would cause a significant emissions increase for purposes of NSR." Doc. # 940 (Order on Cross-Motions for Summary Judgment Regarding Fair Notice Defense) at 26. As this Court has noted, "had Cinergy made any inquiry it probably would not be facing the allegations at issue in this lawsuit." *Id.* at 25. Indeed, there is ample evidence that Cinergy had *actual* notice of the requirements of the law. As Plaintiffs have described in greater length in prior briefing, a trade

group representing Cinergy and other utilities complained to the Department of Energy in 1989 that, "A utility experiencing increased forced outages at its units due to equipment problems cannot undertake repairs … without applying for and receiving a PSD permit."  Ex. 8, Henry V. Nickel Letter to Polly Gault, June 5, 1989, at Attachment, p. 4.  The claim that Cinergy would have produced fewer illegal emissions had it known its conduct was illegal is also belied by the fact that Cinergy took no steps to install controls or reduce emissions after the case was filed in 1999.

Finally, Cinergy stresses the fact that no court in any NSR case has ever ordered the type of retroactive mitigation that Plaintiffs have sought in the utility initiative cases.  *See* Cin. Br. at 11.  Cinergy's seems to assert that because no court has ordered mitigation, this Court should decline to do so – without hearing any supporting evidence.  This argument is misleading, however, because all other defendants have settled prior to a remedy trial.  It is noteworthy that *all* NSR power plant settlements include some form of mitigation for past harm.

## CONCLUSION

There can be no dispute that Cinergy violated the Clean Air Act by performing modifications at the Wabash River plant in 1989 and 1990.  As a result of its failure to comply with the NSR program, Cinergy emitted vastly more pollution from the offending units then it would have in compliance with the law.  That pollution harmed human health and the environment, and this Court has ample authority to use its equitable powers to redress the harm from Cinergy's emissions.  To require only that Cinergy comply with the law going forward – as Cinergy argues – would essentially allow Cinergy an 18-year holiday from the Clean Air Act.  Cinergy should not be allowed to have its "initial failure to comply with the requirements of the Clean Air Act . . . inure to its benefit."  *New York v. Niagra Mohawk Power Corp.*, 263 F. Supp.

2d 650, 663 (W.D.N.Y. 2003).  Most importantly, in keeping with the purpose of the Clean Air

Act and the principles of equity, the people affected by Cinergy's pollution deserve a remedy

that redresses the illegal pollution that has impaired their health and the environment for the last

two decades.  Plaintiffs ask that the Court deny Cinergy's motion and, after hearing the evidence

at trial, exercise its authority to order relief redressing Cinergy's violations of the law.

                              Respectfully submitted,

Dated: August 4, 2008        RONALD J. TENPAS
                             Assistant Attorney General
                             Environment & Natural Resources Division

                              /s/ Thomas A. Benson
                             PHILLIP BROOKS
                             JUSTIN SAVAGE
                             KATHERINE VANDERHOOK
                             DANIELLE ROSENGARTEN
                             THOMAS A. BENSON
                             Environmental Enforcement Section
                             Environment & Natural Resources Division
                             U.S. Department of Justice
                             P.O. Box 7611
                             Washington, D.C. 20530
                             (202) 514-5261
                             thomas.benson@usdoj.gov

                             TIMOTHY M. MORRISON
                             United States Attorney
                             Southern District of Indiana

                             THOMAS E. KIEPER
                             Assistant United States Attorney
                             Southern District of Indiana
                             10 West Market Street, Suite 2100
                             Indianapolis, IN  46204-3048

                             ANDREW CUOMO
                             ATTORNEY GENERAL

OF THE STATE OF NEW YORK

MICHAEL MYERS
JOSEPH KOWALCZYK
Assistant Attorneys General
The Capitol
Albany, NY 12224
(518) 402-2594
ANNE MILGRAM
ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

MAURICE GRIFFIN
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-4503
(609) 984-2845

RICHARD BLUMENTHAL
ATTORNEY GENERAL
OF THE STATE OF CONNECTICUT
CARMEL MOTHERWAY
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120
(860) 808-5101

HOOSIER ENVIRONMENTAL COUNCIL
OHIO ENVIRONMENTAL COUNCIL

JONATHAN LEWIS
CLEAN AIR TASK FORCE
Staff Attorney and Climate Specialist
18 Tremont Street, Suite 530
Boston, MA 02108
 (617) 624-0234 x10

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing brief, attachments, and exhibits (aside from the Sealed Declaration of Justin Savage) were filed with the Court's ECF system on August 4, 2008 and will be emailed to counsel of record through the ECF system.  The Sealed Declaration of Justin Savage was filed with the Court under seal and will be emailed to counsel of record.

_/s/ Thomas A. Benson_
THOMAS A. BENSON