IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | 1:99-cv-01693-LJM-JMS |
| CINERGY CORP., et al., | ) | |
| | ) | **FILED UNDER SEAL** |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR NEW TRIAL DUE
TO PARTY MISCONDUCT, OR IN THE ALTERNATIVE, FOR EXPEDITED
DISCOVERY AND AN EVIDENTIARY HEARING**

# TABLE OF CONTENTS

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      Mr. Batdorf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     The Batdorf Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    The Failure to Produce the Batdorf Agreement in the Liability Phase . . . . . . . . . . . . . . 6

IV.     The Liability Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V.      Discovery of the Batdorf Agreement in the Remedy Phase . . . . . . . . . . . . . . . . . . . . 10

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.      There Should be a New Trial Because Cinergy Misled the Jury . . . . . . . . . . . . . . . . . . 16

        A.      Mr. Batdorf Testified "Falsely" Within the Meaning of Rule 59 . . . . . . . . . . . . 16

        B.      Cinergy Created a False Impression with the Jury that it Relied
                Only on Unpaid Fact Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.     There Should be a New Trial Because of the Contract to Pay Mr. Batdorf
        $200 Per Hour for "Live Testimony" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.    The Failure to Produce the Batdorf Agreement During the
        Liability Phase Justifies a New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.     In the Alternative, Expedited Discovery and an Evidentiary
        Hearing Should be Held to the Extent that Cinergy Disputes the
        Material Circumstances Relating to the Batdorf Agreement . . . . . . . . . . . . . . . . . . . 27

        CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

***Federal Cases***

*Abrahamsen v. Trans-State Express, Inc.*, 92 F.3d 425 (6th Cir. 1996) . . . . . . . . . . . . . . . . . 26

*Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537 (7th Cir. 1993) . . . . . . . . . . . . . . 16

*Arnold v. Sullivan*, 131 F.R.D. 129 (N.D. Ind. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Arreolo v. Choundry*, 533 F.3d 601 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Budoff v. Holiday Inns, Inc.*, 735 F.2d 1523 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Davis by Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129 (6th Cir. 1990) . . . . . . . . . . . . . . . 16

*Dunn v. Truck World, Inc.*, 929 F.2d 311 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fortino v. Quasar Co.*, 950 F.2d 389 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Griffin v. Foley*, 542 F. 3d 209 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 28

*Hamilton v. General Motors Corp.*, 490 F.2d 223 (7th Cir. 1973) . . . . . . . . . . . . . . . . . 2,19-22

*Hewlett v. Davis*, 844 F.2d 109 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Jones v. Lincoln Elec. Co.*, 188 F.3d 709 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Juneau Square Corp. v. First Wisc. Nat'l Bank*, 624 F.2d 798 (7th Cir. 1980) . . . . . . . . . . . . 15

*Lawson v. Trowbridge*, 153 F.3d 368 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lonsdorf v. Seefeldt*, 47 F.3d 893 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 26

*Mataya v. Kingston*, 371 F.3d 353 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 24

*NLRB v. Thermon Heat Tracking Services*, 143 F.3d 181 (5th Cir. 1998) . . . . . . . . . . . . . . . 21

*Romo v. Gulf Stream Coach, Inc.*, 250 F.3d 1119 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 15

*Ty, Inc. v. Softbelly's, Inc.*, 353 F.3d 528 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 3, 22, 26-27

*Ty, Inc. v. Softbelly's, Inc.*, 517 F.3d 494 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22

*United States v. Balzack*, 349 F.3d 881 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Condon*, 170 F.3d 687 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Dawson*, 425 F.3d 389 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Vikase Corp. v. Am. Nat'l Can Co.*, 970 F. Supp. 697 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . 28

*Weiss v. Chrysler Motors Corp.*, 515 F.2d 449 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Wiedeman v. Galiano*, 722 F.2d 335 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

### Unreported Cases

*Huynh v. J.P. Morgan Chase & Co.*, No. CW06-001-PHX-RCB, Slip Copy,
    2008 WL 2789532 (D. Ariz. July 17, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Johnson v. Verisign, Inc.*, No. Civ.A.01-765-A, 2002 WL 1887527 (E.D. Va.
    Aug. 15, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

### Federal Statutes

18 U.S.C. § 201(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

18 U.S.C. § 201(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

### Federal Rules of Civil Procedure

F.R.C.P. 26(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

F.R.C.P. 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15

F.R.C.P. 59(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

F.R.C.P. 59(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

F.R.C.P. 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

F.R.C.P. 60(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

F.R.C.P. 60(b)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

Pursuant to Federal Rule of Civil Procedure 59, Plaintiffs move for a new liability trial due to newly discovered evidence of Cinergy's misconduct. Cinergy promised to pay its central *fact* witness, Mr. Robert Batdorf, $200 an hour for his testimony at the liability trial. About a month before trial, Mr. Batdorf signed a confidential agreement with Cinergy. The agreement expressly provides that Duke Energy Corporation ("Duke Energy"), "*will*" pay Mr. Batdorf "$200 per hour" for his "*live testimony* in th[is] litigation." Letter from D. Moesser to R. Batdorf, at 1, 3 (Apr. 3, 2008) (Ex. 1) [hereinafter "Batdorf Agreement" or "Agreement"] (emphasis added). Mr. Batdorf performed his end of the bargain: he took the stand in this Court and testified as a fact witness. Plaintiffs only learned of the Agreement on October 2, when Cinergy produced it in the remedy phase after much resistance.

There should be a new trial because Cinergy misled the jury and the Court, unfairly prejudicing Plaintiffs. The Batdorf Agreement unravels one of Cinergy's key trial themes: that the jury should trust and believe Cinergy's case because it turns on unpaid fact testimony, not the paid opinions of experts. In its Opening Statement, Cinergy suggested that its case was more credible because it did not rely on "hired experts." Cinergy Trial Tr. at 67:6-11 (May 6, 2008) (Relevant Excerpts to Trial Transcripts at Ex. 3). Cinergy then cross examined the government's expert witnesses extensively on their compensation, and Cinergy declined to call any of its four experts at trial. Cinergy, instead, called only fact witnesses – Mr. Batdorf and three others. Despite being expressly hired for $200 per hour, Mr. Batdorf testified on direct examination that he was not "currently employed," but instead "retired." *Id.* at 1291:16-25 (May 19, 2008) (Ex. 3). After Mr. Batdorf's testimony, Cinergy told this Court – in full hearing of the jury – that Mr.

Batdorf wished to watch the remaining proceedings "because he's retired . . . ."  *Id.* at 1423 (May 20, 2008) (Ex. 3).

In closing argument, Cinergy drove home this "expert versus unpaid witness" inference as the central theme of the defense:

> *The case really does come down to two different versions of the world*. . . . The Government's view of the world is one that is built on after the fact, artificial formulas, *expert testimony paid for and brought to you in this courtroom. We didn't rely on experts. We brought you the men who made these decisions in real time* to sit in this witness stand and to tell you the process they followed and what they thought.

Trial Tr. at 1525:12-21 (May 21, 2003) (Ex. 3) (emphasis added).

Nor was the issue as to which the Court and jury were misled a small matter.  To the contrary, the Seventh Circuit has indicated that contracts to pay fact witnesses for their testimony at trial are improper and forbidden in civil trials under these circumstances.  The Seventh Circuit in *Hamilton v. General Motors Corp.*, 490 F.2d 223, 225-29 (7th Cir. 1973), rejected a similar contract to pay a former highly experienced employee for his *fact* testimony.  Such an agreement "leans toward the procurement of perjury; toward the raising up of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit; toward the perversion of justice; and toward corruption in our courts."  *Id.* at 228 (citation and internal quotation marks omitted).  Thus, even had Cinergy said nothing about this issue at trial (much less featured it), a new trial would be warranted.

The failure to produce the Batdorf Agreement in discovery also supports a new trial.  The Agreement was responsive to two pending document requests served by Plaintiff, the United States of America ("United States"), in the liability phase.  Although Cinergy entered into the

Agreement a month before trial, and well after the discovery cut off, it had an ongoing duty to supplement its discovery responses under Federal Rule of Civil Procedure 26(e), particularly on an issue central to its defense.

To the extent that Cinergy disputes any of the relevant circumstances giving rising to this motion, expedited discovery should be ordered and an evidentiary hearing should be held. *Ty, Inc. v. Softbelly's, Inc.*, 353 F.3d 528, 537 (7th Cir. 2003). Although Cinergy's trial counsel has threatened sanctions against Plaintiffs if they request this Court's assistance in compelling discovery related to the Batdorf Agreement, Email from F. Volpe to J. Savage (Oct. 15, 2008) (Ex. 4), this is an important matter and well within the Court's authority to order discovery, should Cinergy dispute the material facts relating to the Batdorf Agreement. *Griffin v. Foley*, 542 F.3d 209, 223 (7th Cir. 2008).

Plaintiffs are preparing for the February remedy trial and only bring this matter to the Court's attention now because of its seriousness and to avoid any suggestion that relief should be denied due to delay. Should the Court order a new trial -- or an evidentiary hearing on this matter -- Plaintiffs respectfully request to be heard on the scope of the re-trial, including whether the remedy trial should go forward.

Finally, this motion is filed under seal because Cinergy has marked the Batdorf Agreement as "confidential business information" (*i.e.*, "CBI") under the Protective Order, purportedly to protect Mr. Batdorf's "right to privacy." Email from K. Thomson to J. Savage (Oct. 16, 2008) (Ex. 25). Although Plaintiffs have redacted the only private information in the Agreement - Mr. Batdorf's address - Plaintiffs are not now moving to unseal, although they may file such a motion later, as appropriate.

## **BACKGROUND**

### I.       **Mr. Batdorf**

Robert Batdorf was employed by Cinergy and its predecessor companies for thirty-four

years.  Mr. Batdorf eventually became station manager at the Wabash River, Cayuga, and Gibson

power plants.  Trial Tr. at 1291-96 (May 19, 2008) (Ex. 3).  By 2005, Mr. Batdorf had retired.

Batdorf Depo. at 6:10-16 (July 6, 2005) (Relevant Excerpts from Batdorf depositions at Ex. 5).

Cinergy has *never* disclosed or offered Mr. Batdorf as an expert witness in any phase of this case.

*See, e.g.*, Relevant Excerpts from Expert Reports (Ex. 6); Cinergy's First Amended Final Witness

List, Doc # 1257 (April 14, 2008) (listing Mr. Batdorf as a fact witness, not expert witness).

### II.      **The Batdorf Agreement**

After the discovery cut off in the liability phase – and only about a month before the

liability trial – Cinergy entered into a consulting agreement with Mr. Batdorf.  *See, e.g.*, Batdorf

Agreement (Ex. 1); Order Setting Out Case Schedule, Doc # 421 (May 26, 2005).  The

Agreement was signed by Mr. Batdorf and Mr. Dean Moesser, the Associate General Counsel for

Duke Energy.  *See.* Ex. 1, at 3.

The subject of the Agreement was "Consulting Services re: USA v. Cinergy (NSR)."

*Id.* at 1.  The scope and purpose of the Agreement is apparent on its face.  The Agreement

expressly states that because of Mr. Batdorf's "knowledge and expertise" regarding "issues that

are relevant to" this case, "Cinergy Corp. ("Cinergy") would like to engage you as an independent

consultant in the above-referenced litigation."  *Id.*

-4-

The Batdorf Agreement states that Mr. Batdorf: "*will* be required to provide advice and *live testimony* in [the liability phase trial]."  Batdorf Agreement, at 1 (Ex. 1) (emphasis added).  No other consulting "Services" for Mr. Batdorf are specified in the Agreement, nor is any distinction made between expert and fact services.  *Id.*  The compensation clause of the Batdorf Agreement provides that Mr. Batdorf: "*will be paid $200 per hour* for time spent in performance of the Services contemplated herein."  *Id.* (emphasis added).  Mr. Batdorf was required to submit quarterly invoices to Duke Energy.  *Id.* at 2, 3.  Those invoices were to specify "the number of hours you have provided Services" and "reimbursable reasonable expenses" such as hotel, meals, business travel, and the like.  *Id.* at 2. The Agreement deems Mr. Batdorf to be Cinergy's "independent contractor."  *Id.*  Cinergy specifically requires Mr. Batdorf –  not Cinergy – to pay "income tax, social security tax, and unemployment insurance tax that might be due" because of Mr. Batdorf's "activities under this Agreement."  *Id.*

In performing these services, Mr. Batdorf was contractually obligated to receive assignments only from (1) Dean Moesser, in house counsel at Duke Energy, (2) Julie Ezell, in house counsel at Duke Energy Indiana, and (3) "their designees, which shall include outside counsel at the Sidley & Austin law firm in Washington D.C."  *Id.* at 1.  All three are counsel of record in this matter for Cinergy, although the United States does not have evidence that Ms. Ezell or outside counsel, including trial counsel, knew of the Agreement.

The overarching issue in the impending trial for which Mr. Batdorf was retained to advise and testify was whether certain construction projects at various coal-fired power plants constituted "major modifications" under the NSR program.  *See, e.g.*, Final Jury Instructions, Doc. # 1335 (May 21, 2008), Instructions Nos. 16 & 17.  The specific subsidiary issues in the

case, and the ones addressed by Mr. Batdorf at trial, were whether the projects at issue were "routine maintenance, repair, or replacement" and whether a reasonable power plant operator would have expected these projects to result in "significant net increases" in certain emissions. *See, e.g., id.*, Instructions Nos. 18 - 23; Trial Tr. at 1335:25-1336:8; 1336:18-25; 1337:1-10; 1337:24-1338:12 (May 20, 2008) (Ex. 3).

**III.     The Failure to Produce the Batdorf Agreement in the Liability Phase**

Although signed only a month before the liability trial, the Batdorf Agreement was responsive to two prior document requests the United States served earlier in the case, which asked for "all" documents "relating to" Cinergy's communications with its consultants regarding New Source Review ("NSR").  Plaintiff United States' First Request for Production of Documents, Document Request, Request No. 17 at p.13 (served June 5, 2000) (Ex. 28); Plaintiff United States' Second Supplemental Request for Production of Documents, Request No. 6 at pp. 16-17 (served Dec. 24, 2002) (Ex. 29).  Despite these document requests, the Batdorf Agreement was not produced.  *See also* Argument, Section III *infra* at pp. 23-26 (discussing this issue). Although Mr. Batdorf was deposed in the liability phase, s*ee* Ex. 2, at 1, those depositions all took place *years* before the Batdorf Agreement was signed in April 2008.  When the trial began about a month later, Plaintiffs were unaware of the Agreement.

**IV.     The Liability Trial**

During the eight day trial in May 2008, Cinergy pressed a consistent theme:  its case was more trustworthy and believable because it relied on ordinary working men whom Cinergy called to the stand, not paid testimony from Plaintiffs' experts.  In opening, Cinergy introduced its paid versus unpaid dichotomy by telling the jury:

> During the years covered by this case, the people
> that were making the prediction for Cinergy were its
> engineers, *not hired experts*; and they were our engineers
> because they were the people most familiar with the company's
> generation units and the repair projects that were about to
> take place.

Trial Tr. at 67:6-11 (May 6, 2008) (Ex. 3) (emphasis added).

In cross-examination, Plaintiffs' key witnesses were questioned about their compensation in this case.  Mr. Mike Hekking was asked about the fact that his only paying work over the last 10 years had been working for the Department of Justice and EPA in cases like this.  Trial Tr. at 375-6 (May 7, 2008) (Ex. 3).  The cross examination on that topic picked up again the next day:

> Q  Now, sir, I need to ask you this.  I presume that you've
>    been compensated for your efforts, have you not?
> A  Yes.
> Q  Can you tell us the total amount of the compensation
>    you've received since the time you went to work for the
>    Government in this endeavor up and through today?
> A  No.
> Q  Well, can you give me an estimate?
>         . . .
> A  I would say on the order of $250,000.  No more than that.

Trial Tr. at 427-28 (May 8, 2008) (Ex. 3).

With both Mr. Robert Koppe, Plaintiffs' expert in engineering who testified on the effects of major component replacements on unit availability, and Dr. Richard Rosen, an expert in utility generation planning, Defendants conducted cross-examination to associate their opinions with remuneration.  First, Mr. Koppe was asked:  "So your methodology for predicting an increase in availability now linked with what we're going to hear from Dr. Rosen, an increase in emissions, that's never been done before, before you came to work for the Government, right?"  Trial Tr. at 738 (May 9, 2008) (Ex. 3) (emphasis added).  Next, when Dr. Rosen testified, he was asked:

-7-

"Well, when you were first hired in this case to give your opinion, you discovered that the NSR rules didn't require any particular methodology or formula to make a prediction or to analyze whether emissions will increase; isn't that correct?"  Trial Tr. at 1008 (May 13, 2008) (Ex. 3). Dr. Rosen was also asked: "Before you were hired in this case, you had never given any opinion on the applicability of NSR or any other environmental regulation to a utility; isn't that correct?" *Id*. at 1010 (emphasis added).

At the conclusion of Dr. Rosen's cross examination, Cinergy returned a third time to the topic of his compensation:

> Q     And can you confirm for us that the total amount of payment you
>       or the Tellus Institute has received for your participation in the
>       NSR cases is about $500,000?
> A     I would say that's roughly correct, yes.
> Q     Could it be more than $500,000?
> A     It could be more by now because there are other cases that I haven't
>       appeared in yet that I'm starting to work on.  So it could be more,
>       yes.
> Q     Could it be $600,000?
> A     It is a possibility.  I really haven't made an estimate.
> Q     Could it be $700,000?
> A     I don't think it's that much yet, no.

*Id*. at 1079.

Consistent with its opening and the cross examinations of Plaintiffs' experts, Cinergy declined to call any of its four experts at trial.  *See* Relevant Excerpts from Expert Reports (Ex. 6).  Cinergy only called Mr. Batdorf and three current Cinergy employees.  *See* Trial Tr. at 1110:1-13; 1141:14-1142:3; 1291:10-25 (May 19, 2008); Trial Tr. at 1423:23-1424:12 (May 20, 2008) (Ex. 3).

-8-

When Cinergy called Mr. Batdorf, the examination began with an inquiry into his current employment status:

Q      Are you currently employed, Mr. Batdorf?
A      No, sir, I am currently retired.
Q.     Where did you work before you retired?
A.     Immediately prior to my retirement, I worked for the Cinergy Company.

Trial Tr. at 1291:16-25 (May 19, 2008) (Ex. 3).  This examination was followed by an exploration of Mr. Batdorf's work history up until retirement from Cinergy, but not after.  *Id*. at 1291-96.

As Mr. Batdorf left the stand, in full hearing of the jury, counsel inquired of the Court: "Mr. Batdorf, I assume because he's retired, would like to know if he could sit in the courtroom and observe the proceedings going forward?" Trial Tr. at 1423 (May 20, 2008) (Ex. 3).  Mr. Batdorf then sat in the audience for the rest of the trial.

In Closing Argument, the defense returned to the paid versus unpaid testimony theme:

> *The case really does come down to two different versions of the world.*  It could not be clearer, and it could not have been clearer in Ms. Himmelhoch's opening statement. *The Government's view of the world is one that is built on after the fact, artificial formulas, expert testimony paid for and brought to you in this courtroom. We didn't rely on experts.  We brought you the men who made these decisions in real time* to sit in this witness stand and to tell you the process they followed and what they thought.

Trial Tr. at 1525 (May 21, 2008) (Ex. 3) (emphasis added).  *See also id.* at 1529 (government's emissions methodology "never been recommended ... by anybody who wasn't a paid Government expert").

The defense closing also emphasized the importance of Mr. Batdorf's testimony and

contrasted it with the government's expert testimony:

> *Let's talk about the real world for a minute.  Let's talk about Bob Batdorf and Barry Pulskamp*.  The longest witnesses we put on the stand which I hope were not too long by comparison were Bob Batdorf and Barry Pulskamp.  They didn't come to you with advanced degrees in physics.  They didn't come to you with presentation graphics that had 6-foot high boilermakers.  They didn't come to you with formulas.  *All they did is come to the stand and tell you, look you in the eye and tell you what they thought, what they expected and what they believed and what they predicted at the time they did these projects*.  They told you what they understood and what they believed based on their reasonable, common-sense engineering judgment.  And contrary to what you've heard from the Government this morning, they told you there was a process in place.  No one was ignoring the law.  No one was pretending to be above the law.  They were making good-faith judgments.  And Mr. Batdorf told you if he had a question, he called the environmental engineers.  If he had a question, he called the state of Indiana.

*Id.* at 1551:20 - 1552:14 (emphasis added).

On May 22, 2008, the jury returned a split verdict.  It found Cinergy liable on four of the fourteen alleged NSR violations at the Wabash River plant, but not liable on the ten remaining claims at Cinergy's other coal-fired power plants.  *See* Verdict Form, Doc # 1339 (May 22, 2008).  Judgment was not entered on any portion of the verdict.

## V.    Discovery of the Batdorf Agreement in the Remedy Phase

As the remedy phase began, this Court and Plaintiffs did not know about the Batdorf Agreement.  It is not likely the Agreement would have ever been discovered, except that Cinergy initially wanted the option to call Mr. Batdorf back to this Court again as a "fact witness" at the remedy trial.  On its initial witness list in the remedy phase, Cinergy listed Mr. Batdorf as a former employee and potential fact witness.  When Plaintiffs requested his contact information, Cinergy's counsel informed them that Mr. Batdorf was a Cinergy consultant who could only be contacted through counsel.  After Plaintiffs began pressing discovery on this consulting arrangement,

-10-

Cinergy:  (1) abruptly removed Mr. Batdorf from all of its witness lists; (2) refused to make him available for deposition; (3) only belatedly produced the Batdorf Agreement, after initially resisting; and (4) still refuses to produce the billing records and other documents relating to the Agreement.

From August through September 2008, Cinergy listed Mr. Batdorf on four separate fact witness lists for the remedy trial, which were periodically updated pursuant to this Court's Orders. *See* Order, Doc # 1409 (Sept. 15, 2008); Preliminary List of Fact Witnesses for Remedy Phase of Case, Doc # 1391 (Aug. 15, 2008), at 2; Letter from K. Thomson to Plaintiffs' Counsel (Sept. 8, 2008) at 1 (Ex. 7 ) [hereinafter "Thomson September 8 Letter"]; Cinergy's Revised Preliminary List of Fact Witnesses for Remedy Phase of Case (Sept. 10, 2008), at 2 (Ex. 8 ); Cinergy's Revised List of Fact Witnesses for Remedy Phase of Case (Sept. 25, 2008), at 3 (Ex. 9).

Because of the size of Cinergy's fact witness lists (typically in excess of 70 witnesses listed), this Court ordered the parties to serve a list of "Top 10" fact witnesses that the parties would each be most likely to call at the remedy trial.  *See* Order, Doc # 1404 (Sept. 2, 2008). Cinergy listed Mr. Batdorf as a "Top 10" witness.  *See* Thomson September 8 Letter, at 1. Cinergy also offered dates for Mr. Batdorf's deposition, as it did for other Top 10 witnesses.  *See* Letter from K. Thomson to T. Benson & J. Savage (Sept. 18, 2008) (Ex. 10).

 In the remedy phase, Plaintiffs served document requests seeking all documents relating to "compensation" of former employees who were on Cinergy's witness lists, including consulting contracts, billing records, and invoices relating to payment of such witnesses.  Plaintiffs also requested all documents sent to, or received from, former employees, regardless of whether they are witnesses in this matter.  *See* Plaintiffs' Second Set of Requests for Production of Documents

-11-

in Remedy Phase of Case, Requests No. 1 & 9, 10, 12 (served Aug. 15, 2008) (Ex. 11).  In its

September 18 response to this discovery, Cinergy stated:

> Subject to and without waiving any of these objections, Cinergy responds that, *to date,* no witnesses other than expert witnesses are being compensated for testimony *related to the remedy phase of this case.*

Defendants' Objections and Responses to Plaintiffs' Second Set of Requests for Production of

Documents in Remedy Phase of Case, at 11 (served Sept. 18, 2008) (Ex. 12) (emphasis added).

Meanwhile, Cinergy was refusing to produce to Plaintiffs the contact information for Mr.

Batdorf, claiming that he was under contract with Cinergy, as a consultant, and therefore had to

be contacted through Cinergy's counsel.  As a result, Plaintiffs followed up and requested Mr.

Batdorf's consulting agreement(s).  *See* Email from K. Thomson to T. Benson (Sept. 10, 2008)

(Ex. 13); Letter from J. Savage to K. Thomson (Sept. 20, 2008) (Ex.14).  In response, Cinergy's

counsel initially agreed, in writing, to produce Mr. Batdorf's consulting contract.  *See* Letter from

K. Thomson to J. Savage (Sept. 22, 2008) (Ex. 15).  But instead of producing the contract (and

related documents), on September 30, Cinergy's counsel informed Plaintiffs on a phone call that

Cinergy was withdrawing Mr. Batdorf from all witness lists and therefore any further discovery

relating to him would be irrelevant.  *See* Letter from J. Savage to K. Thomson at 2 (Oct. 2, 2008)

(Ex. 16) (discussing this chronology) [hereinafter "Savage October 2 Letter"].

On October 2, a week before the Court deadline for updated witness lists, Plaintiffs

received a revised witness list from Cinergy that removed Mr. Batdorf as a Cinergy witness.  *See*

Cinergy's October 2, 2008 Revised List of Fact Witnesses for Remedy Phase of Case (Ex. 17 ).

That afternoon, the United States wrote Cinergy a letter explaining why the discovery of Mr.

Batdorf remained relevant.  *See* Savage October 2 Letter (Ex.16).  Cinergy replied: "In light of

-12-

the revisions to our witness list (served earlier today), Cinergy has no responsive documents to produce." Email from K. Thomson to Plaintiffs' Counsel (Oct. 2, 2008, 4:59 pm) (Ex. 18).  When the United States immediately requested a briefing schedule for a motion to compel, Cinergy produced the Batdorf Agreement.  *See* Email from J. Savage to K. Thomson (Oct. 2, 2008, 5:17 pm) (Ex. 19); Email from K. Thomson to J. Savage (Oct. 2, 2008, 5:44 pm) (Ex. 20).

That evening, after receiving the agreement, the United States immediately requested "the invoices, billing records, and any other documents relating to the payment of Mr. Batdorf under this consulting agreement."  Email from J. Savage to K. Thomson (Oct. 2, 2008, 6:45 pm) (Ex. 21).  Cinergy's counsel initially replied that she needed to confer with her client.  Email from K. Thomson to J. Savage (Oct. 2, 2008, 6:51 pm) (Ex. 20).  Later that night, Cinergy's counsel wrote: "after further conferring with the client, I can tell you that Cinergy will be able to produce the additional information you seek on or before Monday, October 6."  Email from K. Thomson to J. Savage (Oct. 2, 2008, 8:11 pm) (Ex. 22).  When that deadline came, however, Cinergy instead sent the United States a letter.  Letter from K. Thomson to J. Savage (Oct. 6, 2008) (Ex. 23).  In relevant part, the letter provided:

> After careful consideration of your request for the production of Batdorf compensation documents and further consultation with the client, Cinergy has determined that it will not produce any additional documents concerning Mr. Batdorf's compensation, nor will it produce Mr. Batdorf for a deposition in this case.

*Id.*

On October 14, Plaintiffs wrote Cinergy's counsel to inform Cinergy that it had completed its review and analysis of the Batdorf Agreement, and that in Plaintiffs' judgment, the Agreement raised substantial questions regarding the fairness and integrity of the liability trial.  *See* Letter

-13-

from J. Savage to K. Thomson (Oct. 14, 2008) (Ex. 24).  Plaintiffs therefore requested all

documents relating to the Batdorf Agreement, or it would seek judicial relief compelling such

disclosure.  On October 15, Cinergy again refused.  Instead, Cinergy stated, in part, "there is

nothing controversial about a consulting agreement for a highly trained former employee like Mr.

Batdorf . . . ."  Letter from K. Thomson to J. Savage, at 1 (Oct. 15, 2008) (Ex. 2).  Cinergy also

refuses to allow Plaintiffs to contact Mr. Batdorf, except through counsel, yet Cinergy counsel

will not accept service of his subpoena without a Court order.  *See* Email from K. Thomson to J.

Savage and Cinergy counsel (Oct. 16, 2008) (Ex. 25); Email from J. Savage to K. Thomson and

Cinergy counsel (Oct. 16, 2008) (Ex. 26); Email from K. Thomson to T. Benson (Sept. 10, 2008)

(Ex. 13); Email from J. Savage to Cinergy service list (Oct. 14, 2008) (Ex. 27).  Finally, Cinergy's

trial counsel, commenting on Plaintiffs' intention to compel production of these records,

subsequently wrote Plaintiffs to provide "notice under Rule 11 and Rule 26(g) that any such

unsupported pleading [seeking further discovery on the Batdorf Agreement] will be met with a

request for sanctions."  Email from F. Volpe to J. Savage, at 1 (Oct. 15, 2008) (Ex. 4).

* * * *

This matter is ripe for the Court's consideration.  The only reasonable conclusion to draw

from the circumstances is that Mr. Batdorf, a fact witness, testified pursuant to a confidential

agreement to be paid $200 per hour at trial.  He performed his end of the bargain.  The available

facts suggest Duke Energy performed its end, too:  Cinergy's counsel has admitted there are

billing records, but it refuses to produce them or make Mr. Batdorf available for deposition.  The

record supports an order for a new trial, and Cinergy's refusal to provide further information on

the scope of its conduct should not delay this Court.  Alternatively, to the extent Cinergy now

-14-

wishes to dispute the relevant circumstances (despite having multiple opportunities to do so before this filing), this Court should order expedited discovery and an evidentiary hearing.

## **STANDARD OF REVIEW**

Motions for new trials are permitted where, as here, there has been no entry of judgment. *Dunn v. Truck World, Inc.*, 929 F.2d 311, 313 (7th Cir. 1991).  Federal Rule of Civil Procedure 59(a) provides, in relevant part, that the "Court may, on motion, grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ."  Fed. R. Civ. P. 59(a)(1)(A).  Thus, "[t]rial courts have wide discretion in deciding a motion for a new trial."  *Arreolo v. Choudry*, 533 F.3d 601, 605 (7th Cir. 2008).  "Rule 59 gives the trial judge ample power to prevent what he considers to be a miscarriage of justice." *Juneau Square Corp. v. First Wisc. Nat'l Bank*, 624 F.2d 798, 806 n.11 (7th Cir. 1980) (internal quotation marks and citation omitted).

"The misconduct of . . . a party justifies a new trial where that misconduct prejudiced the adverse party."  *Wiedeman v. Galiano*, 722 F.2d 335, 337 (7th Cir. 1983).  Although motions for new trial may be made for party misconduct under both Rules 59 and 60, a Rule 59 motion need only be proven by a preponderance of the evidence.  *See Romo v. Gulf Stream Coach, Inc.*, 250 F.3d 1119, 1121 n.3 (7th Cir. 2001) ("Although both Rules 59(e) and 60(b) have similar goals of erasing the finality of a judgment and permitting further proceedings, Rule 59(e) generally requires a lower threshold of proof than does Rule 60(b)."); *Ty, Inc. v. Softbelly's Inc.*, 517 F.3d 494, 498 (7th Cir. 2008) (Posner, J.) (expressing doubt that a heightened standard of proof applies to any Federal Rules of Civil Procedure beyond Rule 60(b)(3)) ([hereinafter *Ty II*].

Regardless, the Batdorf Agreement, when viewed in light of the other relevant circumstances, shows clearly and convincingly party misconduct by Cinergy.

## ARGUMENT

**I.    There Should be a New Trial Because Cinergy Misled the Jury.**

Cinergy created a false impression with the jury by offering Mr. Batdorf as fully retired and not currently employed and by presenting its case as though the company had no paid witnesses. Plaintiffs were unfairly prejudiced, and the integrity of the proceedings was subverted. This warrants a new trial.

      A.    Mr. Batdorf Testified "Falsely" Within the Meaning of Rule 59.

Cinergy misled the jury about Mr. Batdorf's employment status. "If a verdict is based on false testimony, the district judge has the discretion under Rule 59 to grant the injured party a new trial." *Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993). In *Antevski*, the Seventh Circuit favorably cited the Sixth Circuit's opinion in *Davis by Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129, 133 (6th Cir. 1990). The Sixth Circuit in *Davis* established the following standard for a new trial based on false testimony:

> A new trial should be granted where the court is reasonably well satisfied that [1] the testimony given by a material witness is false; [2] that, without it, a jury *might* have reached a different conclusion; [and] [3] that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial.

912 F.2d at 134 (emphasis added).

-16-

Based on the newly discovered Batdorf Agreement, Mr. Batdorf's testimony is reasonably viewed as false.   At the beginning of his direct, Mr. Batdorf testified:

Q.  Are you currently employed Mr. Badorf?
A.  No sir, I am currently retired.

Trial Tr. 1291:16-25 (May 19, 2008) (Ex. 3).  Cinergy's counsel reinforced the impression that Mr. Batdorf was simply a retiree by stating at the end of his testimony, in full hearing of the jury: "Mr. Batdorf, I assume because he's retired, would like to know if he could sit in the courtroom and observe the proceedings going forward."  Trial Tr. at 1423 (May 20, 2008) (Ex. 3).  Mr. Batdorf then sat in the audience for the remainder of the trial.

But the Agreement dispels any notion that Mr. Batdorf was only a retiree:  he was under contract for his live testimony and advice at a rate of $200 per hour.  Batdorf Agreement, at 1 (Ex. 1).  The Agreement specifies that Mr. Batdorf was Cinergy's "independent contractor," and, anticipating the complications of his self-employment as a consultant, the Agreement requires Mr. Batdorf to pay his own "income tax, social security tax, and unemployment insurance tax . . ."  *Id.* at 2.  Mr. Batdorf's testimony – in conflict with his written Agreement – misled the jury and justifies a new trial, particularly in light of the significance Cinergy attached to the compensation of witnesses in its defense.  *See, e.g.*, *Arnold v. Sullivan*, 131 F.R.D. 129, 132-133 (N.D. Ind. 1990) (vacating judgment based on party's material "misstatements" at hearing regarding "her true employment activities" and when "she last worked").

Moreover, the "jury might have reached a different conclusion without the false testimony."  *Johnson v. Verisign, Inc.*, No. Civ.A.01-765-A, 2002 WL 1887527, at *15 (E.D.

Va. Aug. 15, 2002).  After all, "[t]he jury was presented with two starkly different stories."  *Id.*

As Cinergy framed it in the closing argument:

> *The case really does come down to two different*
> *versions of the world.* . . .The Government's view of
> the world is one that is built on after the fact,
> artificial formulas, expert testimony paid for and
> brought to you in this courtroom. We didn't rely on
> experts.  We brought you the men who made these
> decisions in real time . . .

Trial Tr. at 1525 (May 21, 2008) (Ex. 3) (emphasis added).  If the Batdorf Agreement had been

disclosed to the jury, Cinergy's fundamental defense theme would have been fatally undermined.

Finally, Plaintiffs did not know of the falsity of Mr. Batdorf's testimony at trial.  The

Batdorf Agreement was only produced on October 2.   Although it was signed one month before

trial in the liability phase, it should have been produced in response to Plaintiffs' liability discovery

that Cinergy had an obligation to supplement under Federal Rule of Civil Procedure 26(e).  *See*

*also* Part III *infra* at pp. 23-26.

       B.   <u>Cinergy Created a False Impression with the Jury that it Relied Only on Unpaid
Fact Testimony</u>.

There should be a new trial because Cinergy "should not have . . . le[ft] the jury with the

wrong impression."  *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998) (ordering new

trial where defendants' direct and closing left the jury with an erroneous impression).  From

opening through closing, Cinergy stressed a central trial theme:   that its case was more

trustworthy and believable because it relied on fact testimony, not the paid testimony of experts

offered by Plaintiffs.  Cinergy's entire presentation of Mr. Batdorf as fully retired, as opposed to a

witness who was being compensated, was false.

-18-

The Court need not determine whether Cinergy's trial theme, including closing argument, resulted from "intentional" or "unintentional" misrepresentations:  the Court has the authority to order a new trial regardless in order to protect "the fairness of the proceedings."  *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995) (ordering new jury trial under Rule 60(b)(3)).  Nor does the Court need to find that the Batdorf Agreement would have "altered the outcome of the trial."  *Id.*  "It is sufficient that prejudice has occurred."  *Id.*  It did.

## II.      There Should be a New Trial Because of the Contract to Pay Mr. Batdorf $200 Per Hour for "Live Testimony."

Regardless of whether the Agreement shows that Cinergy misled the jury, the Agreement itself was improper under the circumstances of this case, justifying a new trial.  The Seventh Circuit decided thirty-five years ago in *Hamilton v. General Motors Corp.* that contracts for fact witness testimony offend fundamental public policy and should be rejected.  490 F.2d 223-25, 229 (7th Cir. 1973).  Citing a criminal statute prohibiting such agreements,[1] the Seventh Circuit

---

[1] Section 201(c)(2) and (c)(3) of Title 18 of the United States Code provide, in relevant part:

(c) Whoever—

* * *

(2) directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;

(3) directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon any such trial, hearing, or other proceeding, or for or because of such person's absence therefrom;

shall be fined under this title or imprisoned for not more than two years, or both.

-19-

rejected on public policy grounds a similar contract between General Motors and Hamilton, a highly experienced former employee, to pay for his deposition testimony and the preparation for his deposition and trial testimony as a fact witness.  *Id.*

> *Hamilton* reasoned that:
>
> The federal policy regarding federal witnesses is so positive that it provides (18 U.S.C. § 201(i)):
> Whoever, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of the testimony under oath or affirmation upon any such trial, hearing, or other proceeding, or for or because of the absence therefrom –
> Shall be fined not more than $10,000 or imprisoned for not more than two years or both.

*Hamilton*, 490 F.2d at 227.[2/]

_____

18 U.S.C. § 201(c)(2) - (c)(3).

[2/]  The criminal prohibition on payment of a fact witness in 18 U.S.C. § 201 has withstood constitutional challenge under the First and Fifth Amendments including claims that the statute  is an impermissible content-based infringement of speech and that it fails to provide Fair Notice of prohibited conduct.  *U.S. v Balzack*, 349 F.3d 881 (6th Cir. 2003).  Dispensing with the First Amendment Challenge, the court in *Balzack* noted:  "Section 201(c)(3), on the other hand, does nothing to prevent a witness from testifying; it simply prohibits a witness from accepting *payment* in exchange for that testimony.  Section 201(c)(3) criminalizes compensation 'for or because of' testimony, regardless of its content, and, therefore, does not implicate the First Amendment."  *Id.* at 885 (emphasis in original).  In rejecting the Fair Notice claim, the court held:  "Section 201(c)(3) clearly prohibits demanding or accepting anything of value in exchange for testimony. Its meaning should be clear to a person of common intelligence because it is neither overly technical nor obscure."  *Id.* at 887.  Sections 201(c)(2) and Section 201(c)(3) are "companion" subsections, one applying to the demander or recipient of payment and the other to the one offering or paying for the testimony.  *Id.* at 886.  Thus, the law is positive on both sides of the equation:  payment for factual testimony is generally prohibited.  *See also* 18 U.S.C. §201(d) (creating exceptions to 18 U.S.C. § 201(c) for "the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying.").

The Seventh Circuit observed that "[t]he policy expressed in 18 U.S.C. § 201 is also a common law policy." *Hamilton*, 490 F.2d at 227-228.  "The common law rule in civil cases in most jurisdictions prohibited the compensation of fact witnesses. *See* 14 Williston on Contracts § 1716 (3ʳᵈ ed.) Model Rules of Professional Conduct Rule 3.4(b) cmt. 3 (1983)." *NLRB v. Thermon Heat Tracking Services*, 143 F.3d 181, 190-191 (5th Cir. 1998) (Garza, J., dissenting because issue not addressed in majority opinion) (citations omitted).  The common law abhors contracts for fact testimony because it "leans toward the procurement of perjury; toward the raising up of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit; toward the perversion of justice; and toward corruption in our courts." *Hamilton*, 490 F.2d  at 228 (citation and internal quotation marks omitted).

Although not involving motions for new trials, *Hamilton* and the Seventh Circuit's more recent case law leave little doubt where the Circuit stands on paying fact witnesses in civil trials. "To pay a witness, other than an expert witness, for this testimony is irregular and in fact is unlawful in federal trials." *Mataya v. Kingston*, 371 F.3d 353, 354 (7th Cir. 2004) (Posner, J.) (citing 18 U.S.C. § 201(c)(2); *United States v. Condon*, 170 F.3d 687, 689 (7th Cir. 1999)). "[P]aying witnesses (other than experts) for their testimony (beyond the tiny fees permitted in the case of federal trials, by the Judicial Code, 28 U.S.C. § 1821) is forbidden." *United States v. Dawson*, 425 F.3d 389, 394 (7th Cir. 2005) (Posner, J.) (citing 18 U.S.C. § 201(c)(2)).

The Batdorf Agreement is clear and unequivocal:   Duke Energy promised to pay Mr. Batdorf $200 per hour for his "live testimony" in this matter. Ex. 1, at 1-2. Mr. Batdorf testified and then watched the remaining proceedings.  Cinergy has never suggested that somehow the contract was terminated or did not apply; on the contrary, it simply refuses to provide billing

-21-

records that would indicate, *inter alia*, the date and times Mr. Batdorf billed for his services, the nature and description of services actually compensated, and the total amount of Mr. Batdorf's compensation for his $200 per hour services.  Rather than disavowing the Agreement, Cinergy has said that there is "nothing controversial" about it because Mr. Batdorf is a "highly trained former employee."   Thomson Oct. 15 Letter, at 1 (Ex. 2).  "Unfortunately for . . . [Cinergy], however, . . . [Mr. Batdorf] was not an expert witness and that fact brings into play a host of countervailing public polic[ies]."  *Hamilton*, 490 F.2d at 227.

 *Ty, Inc. v. Softbelly's, Inc.*, 353 F.3d 528 (7th Cir. 2003), similarly supports a new trial. There, the Seventh Circuit ordered a judgment vacated under Rule 60(b)(3) based on disputed evidence of whether Plaintiff dissuaded a third-party witness from testifying at trial.  *Id.* at 536-37.  Before the trial, the Plaintiff's CEO had called the witness, with whom he had previously "discussed the possibility of doing business," and mentioned that the witnesses' testimony could cause "a lot of problems."  *Id.* at 534.  The Seventh Circuit vacated the judgment and ordered a hearing on the CEO's actions because dissuading a witness from testifying was "misconduct" and potentially "witness tampering."   *Id.* at 536.  This case is more compelling than *Ty*:   unambiguous evidence shows that Duke Energy agreed to pay Cinergy's central fact witness, Mr. Batdorf, $200 per hour for his testimony.  No meaningful distinction exists between financial dissuasion of fact testimony  – as in *Ty* - and financial inducements for testimony.  Both are equally improper.  *See, e.g., Ty II*, 517 F.3d at 498 ("Trying improperly to influence a witness is fraud on the court and on the opposing party . . . ").

 As this appears to be a case of first impression in this Court, Plaintiffs wish to make clear what this motion is *not* about.  This is not a case where a party simply offered to pay reasonable

travel and lodging expenses of the witness.  *See* Batdorf Agreement, Ex. 1, at 1-2 (payment for testimony *and* expenses for "business travel," lodging, and the like).  Nor did Cinergy reimburse a fact witness for missing a day of work:  Mr. Batdorf testified he was "currently retired."  Trial Tr. 1291:16-25 (May 19, 2008) (Ex. 3).  This motion does not involve a disclosed, proffered expert witness who also happens to provide fact testimony.  *See, e.g.*, Cinergy's First Amended Final Witness List, Doc # 1257 (April 14, 2008) (listing Mr. Batdorf as a fact witness, not expert witness).  Indeed, Cinergy successfully moved to exclude Plaintiffs' rebuttal expert, Mr. Myron Adams, based, in part, on the assertion that Mr. Batdorf was a "fact witness" who offered "factual testimony."  *See* Motion and Memorandum to Exclude the Proposed Rebuttal Testimony of Myron D. Adams, Doc # 1330, at 2, 4 (May 19, 2008); Trial Tr. at 1465:22-1469:21 (May 20, 2008) (Ex. 3).  Nor is this even a case where an effort was made to distinguish in the agreement between a "fact" and "expert" role:  instead, Mr. Batdorf was simply promised $200 per hour for his "live testimony."  Moreover, the $200 per hour undifferentiated payment that Mr. Batdorf was promised for his live testimony exceeds the hourly rate paid to several testifying experts in this case.  *Compare* Batdorf Agreement, at 1 (Ex. 1), *with* Excerpts from Expert Reports (Ex. 6) (providing hourly rates of several of the parties' experts).

## III.   The Failure to Produce the Batdorf Agreement During the Liability Phase Justifies a New Trial.

Federal Rule of Civil Procedure 26(e) provides, in relevant part, that:  "A party who has . . . responded to . . . [a] request for production . . . must supplement . . . its . . . response . . . in a timely manner if the party learns in some material respect the . . . response is incomplete."  "Under Rule 26(e), a party is under a continuing obligation to supplement its discovery responses."

-23-

*Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 156 (3rd Cir. 1995).  This duty extends past the discovery cut off and through trial.  *See, e.g.*, *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449, 457 (2d Cir. 1975) ("Similar considerations lead us to reject Chrysler's arguments that its duty to respond to the interrogatories concerning the expert testimony ended when the trial began . . . . Chrysler's obligation to supplement its response . . . was a continuing obligation."); *Huynh v. J.P. Morgan Chase & Co.*, No. CW06-0001-PHX-RCB, Slip Copy, 2008 WL 2789532, at *25 (D. Ariz. July 17, 2008) ("Plaintiff cannot be allowed to circumvent the liberal discovery rules by conveniently waiting until two weeks after the close of discovery to request a supporting affidavit from a potential witness - a witness she identified, albeit inaccurately, at the outset of discovery.").

Here, the Batdorf Agreement – although executed after the discovery cut off and only month before trial – should have been produced pursuant to Cinergy's ongoing duty to supplement prior material responses to Plaintiffs' prior discovery requests.  In the liability phase, the United States had two pending document requests for (1) "all documents" (2) "relating to" communications between Cinergy and its consultants regarding (3) whether NSR applied to Cinergy's plants and the meaning and application of NSR generally.  *See* Plaintiff United States' First Request for Production of Documents, Document Request, Request No. 17 at p.13 (served June 5, 2000) (Ex. 28) ("all documents that relate in any way to Defendants' communications with any person, including any of Defendants' employees or consultants regarding the following information pertaining to the Cinergy plants:  a.  whether Defendants should obtain, or had to obtain, a PSD or Nonattainment NSR permit ...."); Plaintiff United States' Second Supplemental Request for Production of Documents, Request No. 6 at pp. 16-17 (served Dec. 24, 2002) (Ex.

-24-

29) ("all Documents relating to communications (oral or written) between Defendants and their . . . Consultants . . . relating to the meaning and application of . . . the routine maintenance, repair, and replacement provision of the PSD regulations ... the method by which emissions calculations must be performed under ... NSR or PSD ... the definitions of 'major modification' under the Nonattainment NSR or PSD regulations.").

The Batdorf Agreement was responsive to this discovery.  It relates to communications between Cinergy and Mr. Batdorf regarding NSR.  It is incontrovertible that there were communications between Cinergy and Mr. Batdorf, the company's consultant, regarding NSR specifically as it applied to Cinergy's plants and NSR generally.  That was the heart of Mr. Batdorf's testimony at trial:  In the words of Cinergy's counsel, Mr. Batdorf "was essentially eye-and-ear witness testimony as to how they [Cinergy] went about undertaking to make the predictions that's required by the New Source Review [NSR]" program.  Trial Tr. at 1467:15-19 (May 20, 2008) (Ex. 3).  The Batdorf Agreement was a document relating to these communications; indeed it was the contract pursuant to which Mr. Batdorf appeared at trial. Cinergy should not be heard to dispute that the Batdorf Agreement, which by its express terms is a "consulting services" agreement for live testimony in this NSR case, *see* Ex. 1, at 1, reasonably falls within the scope of two requests for documents relating to Cinergy's consultants and NSR. Cinergy's obligation to supplement its responses to these requests did not cease.  There cannot be a discovery-free zone in the interstitial period between the close of liability discovery and the liability trial, especially as to facts that show the witness testified misleadingly and that counsel chose to feature throughout Cinergy's defense.

-25-

Ordering a new trial would be an appropriate remedy for failing to disclose the Batdorf Agreement before the liability trial. In *Fortino v. Quasar Co.*, 950 F.2d 389 (7th Cir. 1991) (Posner, J.), the Seventh Circuit ordered a new trial where the trial court admitted testimony by a third-party fact witness that was not previously disclosed in plaintiffs' response to defendant's interrogatory. There, plaintiffs had argued that no new trial was warranted because the third-party witness appeared on plaintiffs' witness list, and because defendants could have served additional discovery to ferret out the witnesses' testimony. *Id.* at 397-98. The Seventh Circuit, however, ordered a new trial. The witness should not have been permitted to testify about "something that should have been disclosed in a supplemental response to the original interrogatory," which led to unfair surprise at trial. *Id.* at 397. That rationale applies with equal force where, as here, Cinergy failed to disclose the Batdorf Agreement, a document that bears on a central witnesses' testimony and a key defense theme at trial. Accordingly, there should be a new trial. *See also Abrahamsen v. Trans-State Express, Inc.*, 92 F.3d 425, 428 (6th Cir. 1996) (holding that defendant's failure to turn over a statement by a third-party witness was misconduct that justified vacating a jury verdict under Rule 60(b)(3), despite Plaintiff's knowledge of witnesses identity through other discovery, because "[t]he rules of discovery, however, do not permit parties to withhold material simply because the opponent could discover it on his or her own.").[3/]

---

[3/] Regardless of whether the Batdorf Agreement was responsive to Plaintiffs' discovery, the rules of discovery provide no defense to party misconduct. *See, e.g.*, *Ty*, 353 F.3d 528 (rejecting plaintiff's argument that defendant's failure to discover evidence during deposition absolved plaintiff of allegation of witness tampering because "negligence is not a defense to fraud or other deliberate wrongdoing"); *Lonsdorf*, 47 F.3d at 893 (rejecting defendant's argument that plaintiff should have earlier discovered falsified document used in closing argument – even when the document was produced at a pretrial deposition – because "[a] litigant . . . should not be required

-26-

**IV.  In the Alternative, Expedited Discovery and an Evidentiary Hearing Should be Held to the Extent that Cinergy Disputes the Material Circumstances Relating to the Batdorf Agreement.**

This motion is ripe for decision, and, at a minimum, the strong appearance of impropriety on Cinergy's part justifies a new trial. *Budoff v. Holiday Inns, Inc.*, 732 F.2d 1523, 1525-26 (6th Cir. 1984) ("[T]here is a class of cases where some irregularity so taints the trial that the appearance of impropriety compels a new trial as a prophylactic rather than a remedial measure.").

To the extent, however, that Cinergy wishes belatedly to dispute the material facts relating to the Batdorf Agreement, Plaintiffs request expedited discovery on the issue and an evidentiary hearing. *See, e.g.*, *Ty, Inc.*, 353 F.3d at 537 (disputed issue of witness tampering in civil case required "further investigation by the judge" and a hearing); *Jones v. Lincoln Elect. Co.*, 188 F.3d 709, 734 (7th Cir. 1999) (affirming denial of Rule 60(b) motion where trial court "[c]onduct[ed] two hearings and review[ed] the substantial amount of evidence submitted by both parties on the veracity of Dr. Eager's trial testimony").

Were the Court to order an evidentiary hearing, expedited discovery should be ordered in advance of the hearing.  Due to the extraordinary circumstances, and the protracted and unusual history of this discovery dispute, *see* Background, *supra* Section IV, at pp. 6-10, Plaintiffs would respectfully request that the Court order the following:  (1) all documents in Cinergy's possession, custody or control relating to Mr. Batdorf's role at the liability trial (including payments for preparing for trial) be turned over to the Court and the parties for use at the hearing; (2) to the extent that Cinergy claims any document is privileged, that it file a privilege log with the Court

---

to assume that falsified documents are being produced by the opposing party").

-27-

and Plaintiffs; (3) any persons with knowledge of the Batdorf Agreement (or Mr. Batdorf's role at the liability trial) be identified in a sworn declaration submitted by a Cinergy corporate representative to the Court; and (4) any persons identified in the declaration be made available for deposition in advance of the hearing.  With respect to Mr. Batdorf, Plaintiffs should be permitted to serve him directly with a subpoena, despite Cinergy's position that he may only be contacted through Cinergy's counsel (unless Cinergy agrees to accept service within one day of the Court's Order).  *See* Exs. 13, 25-27.

As the record in the remedy phase shows, Cinergy initially claimed that it had "no responsive documents" relating to Mr. Batdorf's role in this case, only to turn over the Batdorf Agreement less than an hour later.  *See* Exs. 18-20.  The time for hiding the ball is over.  *See, e.g.*, *Griffin v. Foley*, 542 F.3d 209, 223 (7th Cir. 2008) (discovery after trial usually arises where "new information" has come to light); *Hewlett v. Davis*, 844 F.2d 109, 115 (3rd Cir. 1988) ("court has discretion to order discovery in post-trial matters"); *Vikase Corp. v. Am. Nat'l Can Co.*, 979 F. Supp. 697, 699-703 (N.D. Ill. 1997) (ordering post-trial discovery where there was evidence of false testimony at trial).

## CONCLUSION

The extraordinary circumstances of Cinergy's misconduct require a new trial in the interest of fairness, justice, and the integrity of this Court's proceedings.  To the extent Cinergy now tries to dispute any of the material facts, the Court should order expedited discovery and hold an evidentiary hearing to get to the bottom of this serious issue.

Dated: October 21, 2008

Respectfully submitted,
RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division


<u>/s/ Phillip Brooks   (w/ permission)   </u>
PHILLIP BROOKS
Special Counsel to the Chief
<u>/s/ Justin Savage                        </u>
JUSTIN SAVAGE
THOMAS A. BENSON
KATHERINE VANDERHOOK
MYLES FLINT, II
DANIELLE ROSENGARTEN
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20530
(202) 514-5293
justin.savage@usdoj.gov


TIMOTHY M. MORRISON
United States Attorney
Southern District of Indiana


THOMAS E. KIEPER
Assistant United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN  46204-3048


ANDREW CUOMO
ATTORNEY GENERAL
OF THE STATE OF NEW YORK

MICHAEL MYERS
JOSEPH KOWALCZYK
Assistant Attorneys General
The Capitol
Albany, NY 12224
(518) 402-2594
ANNE MILGRAM
ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

MAURICE GRIFFIN
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-4503
(609) 984-2845

RICHARD BLUMENTHAL
ATTORNEY GENERAL
OF THE STATE OF CONNECTICUT
CARMEL MOTHERWAY
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120
(860) 808-5101

HOOSIER ENVIRONMENTAL COUNCIL
OHIO ENVIRONMENTAL COUNCIL

JONATHAN LEWIS
CLEAN AIR TASK FORCE
Staff Attorney and Climate Specialist
18 Tremont Street, Suite 530
Boston, MA 02108
  (617) 624-0234 x10

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing motion, proposed order, brief and exhibits were filed with the Court's ECF system on October 21, 2008 and will be emailed to counsel of record through the ECF system.

 /s/ Justin Savage_____
JUSTIN SAVAGE
