UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| STATE OF NEW YORK, STATE OF NEW | ) | |
| JERSEY, STATE OF CONNECTICUT, | ) | |
| HOOSIER ENVIRONMENTAL COUNCIL, | ) | |
| and OHIO ENVIRONMENTAL COUNCIL, | ) | |
| | ) | Civil Action No. I:99-cv-1693-LJM-JMS |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | **FILED UNDER SEAL** |
| | ) | |
| CINERGY CORP., CINERGY SERVICES, | ) | |
| INC., PSI ENERGY, INC., and THE | ) | |
| CINCINNATI GAS & ELECTRIC | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**CINERGY'S OPPOSITION TO PLAINTIFFS' MOTION FOR NEW TRIAL
DUE TO PARTY MISCONDUCT, OR IN THE ALTERNATIVE,
FOR EXPEDITED DISCOVERY AND AN EVIDENTIARY HEARING**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ........................................................................................................................ 4

STANDARD OF REVIEW ....................................................................................................... 7

ARGUMENT ........................................................................................................................... 10

I.      COMPENSATING A FACT WITNESS FOR TIME AND EXPENSES IS NOT
ILLEGAL OR IMPROPER. ..................................................................................... 10

     A.    Federal and State Authorities Expressly Permit Reasonable Compensation of a Fact
Witness for Expenses and Lost Time.......................................................................... 10

     B.    Notwithstanding His Retirement, Mr. Batdorf May Receive Compensation For
Expenses and Lost Time. ............................................................................................ 17

     C.    The Compensation Mr. Batdorf Received Was Reasonable Under the Circumstances. ..
.................................................................................................................................... 19

II.    PLAINTIFFS' ARGUMENTS HINGE ON COUNTERFACTUAL ASSERTIONS
THAT DO NOT PROVIDE A BASIS FOR A NEW TRIAL. ................................... 21

     A.    Plaintiffs Never Requested Information About Mr. Batdorf's Compensation, And They
Alone Are Responsible For Any Strategic Decision Not To Challenge His Credibility
Based Upon Bias........................................................................................................ 22

     B.    Plaintiffs' Contention That Mr. Batdorf Was Not Retired Is Baseless........................ 24

     C.    Plaintiffs' Suggestion That They Would Have Mounted Further Credibility Challenges
To Mr. Batdorf Is Inconsistent With Their Trial Strategy. ......................................... 26

     D.    Mr. Batdorf's Consulting Agreement Was Irrelevant To Plaintiffs' Response To
Cinergy's Trial Strategy............................................................................................. 28

III.   PLAINTIFFS CANNOT MAKE THE SHOWING OF PREJUDICE REQUIRED FOR
A NEW TRIAL.......................................................................................................... 29

IV.  POST-TRIAL DISCOVERY AND AN EVIDENTIARY HEARING ARE
UNNECESSARY AND WOULD BE DISTRACTIONS FROM PREPARATIONS FOR
THE UPCOMING REMEDY TRIAL........................................................................ 33

CONCLUSION ........................................................................................................................ 35

## <u>TABLE OF AUTHORITIES</u>

### CASES

*American Library Association v. Odom*,
818 F.2d 81 (D.C. Cir. 1987) ...........................................................................................25

*Berberena v. Pesquino*, Civil No. 03-557-CJP,
2007 WL 2778635 (S.D. Ill. Sept. 19, 2007) ...................................................................30

*Bruggeman v. Blagojevich*,
219 F.R.D. 430 (N.D. Ill. 2004) .......................................................................................30

*Crawford Fitting Co. v. International Woodworkers of America*,
482 U.S. 437 (1987) ...........................................................................................................13

*Davis by Davis v. Jellico Community Hospital, Inc.*,
912 F.2d 129 (6th Cir. 1990) ..............................................................................................9

*Ellen v. Teledyne Industrial*, Civil No. 586-654,
1988 U.S. Dist. LEXIS 19364 (N.D. Ind. May 19, 1988) ................................................30

*Environmental Barrier Co. v. Slurry System, Inc.*,
540 F.3d 598 (7th Cir. 2008) ............................................................................8, 9, 31, 34

*Falk v. Paluch*,
163 F.R.D. 8 (N.D. Ill. 1995) ...........................................................................8, 31, 33

*Gordon v. United States*,
178 F.2d 896 (6th Cir. 1949) ..............................................................................................9

*Griffin v. Foley*,
542 F.3d 209 (7th Cir. 2008) ..........................................................................4, 8, 33, 35

*Hamilton v. General Motors Corp.*,
490 F.2d 223 (7th Cir. 1973) ..........................................................................2, 13, 14, 16

*Honeywell International, Inc. v. United States*,
70 Fed. Cl. 424 (2006) ......................................................................................................25

*Irons v. Karceski*,
74 F.3d 1262 (D.C. Cir. 1995) ..........................................................................................13

*Jones v. Aero/Chemical Corp.*,
921 F.2d 875 (9th Cir. 1990) ............................................................................................10

*Larrison v. United States*,
24 F.2d 82 (7th Cir 1928) .................................................................................................9

*Lonsdorf v. Seefeldt*,
47 F.3d 893 (7th Cir. 1995) .............................................................................................9

*Mataya v. Kingston*,
371 F.3d 354 (7th Cir. 2004) .........................................................................................14

*McNab v. General Motors Corp.*,
987 F. Supp. 1115 (S.D. Ind. 1997) ..............................................................................25

*Mumford v. Bowen*,
814 F.2d 328 (7th Cir. 1986) .........................................................................................30

*NLRB v. Thermon Heat Tracking Services, Inc.*,
143 F.3d 181 (5th Cir. 1998) .........................................................................................14

*Ortho Pharm. Corp. v. America Hospital Supply Corp.*,
534 F.2d 89 (7th Cir. 1976) .......................................................................................8, 31

*Parsons v. Jefferson-Pilot Corp.*,
141 F.R.D. 408 (M.D.N.C. 1992) ..................................................................................30

*Peacock v. Board of School Comm'rs*,
721 F.2d 210 (7th Cir. 1983) ...................................................................................10, 30

*Perry v. Larson*,
794 F.2d 279 (7th Cir. 1986) .............................................................................8, 31, 33

*Riggin v. Rea Riggin & Sons, Inc.*,
738 N.E.2d 292 (Ind. Ct. App. 2000) ............................................................................15

*Romo v. Gulf Steam Coach, Inc.*,
250 F.3d 1119 (7th Cir. 2001) .......................................................................................10

*Sarkes Tarzian, Inc. v. U.S. Trust Co. of Fla. Sav. Bank*,
168 F. App'x. 108, 110 (7th Cir. 2006) ...........................................................................9

*Smith v. Allen*,
212 F. Supp. 713 (E.D. Va. 1962) .................................................................................31

*Ty Inc. v. Softbelly's Inc.*,
353 F.3d 528 (7th Cir. 2003) ...................................................................................15, 34

*United States v. Dawson*,
425 F.3d 389 (7th Cir. 2005) ........................................................................11, 13, 14, 15

*United States v. Mitrione*,
357 F.3d 712 (7th Cir. 2004),
    *vacated on other grounds by* 543 U.S. 1097 (2005) ..........................................9, 28, 32

*United States v. Ogle*,
425 F.3d 471 (7th Cir. 2005) .........................................................................................9

*United States v. Walus*,
616 F.2d 283 (7th Cir. 1980) .......................................................................................30

*Vikase Corp. v. America National Can Co.*,
261 F.3d 1316 (Fed. Cir. 2001)....................................................................................34

*Vikase Corp. v. America National Can Co.*,
979 F. Supp. 697 (N.D. Ill. 1997), *affirmed by* 261 F.3d 1316 (Fed. Cir. 2001)..............34

*Wiedemann v. Galiano*,
722 F.2d 335 (7th Cir. 1983) .........................................................................................7

*Wroblewski v. Exch. Insurance Associate*,
273 F.2d 158 (7th Cir. 1959) ....................................................................................8, 31

## STATUTES

18 U.S.C. § 201....................................................................................................11, 13, 14

28 U.S.C. § 1821........................................................................................................13

## OTHER AUTHORITIES

Fed. R. Civ. P. 34.......................................................................................................30

Fed. R. Civ. P. 59.....................................................................................................7, 9

Fed. R. Civ. P. 60.........................................................................................................9

Fed. R. Civ. P. 61........................................................................................7, 8, 31, 33

Alaska Eth. Op. 93-2, 1993 WL 849637 (Sept. 11, 1993)...........................................19, 20

Ariz. Eth. Op. 97-07 (Oct. 31, 1997) ................................................................................16

Cal. Eth. Op. 1997-149, 1997 WL 197243 (1997) ...............................................18, 19, 24

N.Y. State Eth. Op. 547, 1982 WL 31701 (Nov. 29, 1982)................................................18

N.Y. State Eth. Op. 668, 1994 WL 593255 (June 3, 1994) ...............................................19

N.Y. State Eth. Op. 714, 1999 WL 221878 (Feb. 5, 1999) ...............................................19

Pa. Eth. Op. 95-126A, 1995 WL 935696 (Sept. 26, 1995)................................................24

S.C. Ethics Adv. Op. 97-42, 1997 WL 861959 (Dec. 1997) .............................................16

Va. L. Eth. Op. 587 (June 14, 1984)..............................................................................16, 18

Ill. State Bar Ass'n Adv. Op. on Prof. Conduct No. 87-5, 1988 WL 525079 (Jan. 29, 1988) ................................................................................................................16, 18

Mass. State Bar Ass'n. Comm. on Prof. Ethics, Op. No. 1991-3 (1991) ....................16, 20

Wash. State Bar Ass'n. Inf. Eth. Op. 1908 (2000) ...........................................................16

Wis. State Bar Ass'n. Comm. on Prof. Ethics, Op. No. E-89-17 (1989) ....................16, 18

Model Rule of Professional Conduct 3.4 ...........................................................................14

Indiana Rule of Professional Conduct 3.4 .........................................................................15

S.D. Ind. Local R. 83.5 ......................................................................................................16

<u>**INTRODUCTION**</u>

Last May, Plaintiffs argued before a jury that Cinergy had violated New Source Review ("NSR") requirements on 14 projects.  As this Court is aware, Plaintiffs sought to prove their case by convincing the jury to accept their experts' approach to predicting increases in emissions and by attacking the NSR approach used by current and former employees who took the stand for Cinergy.  Plaintiffs presented no serious argument that Cinergy's witnesses had presented false or biased testimony.  In the end, the jury returned a mixed verdict:  Plaintiffs prevailed on four projects but lost on the remaining ten.

Dissatisfied with this result, Plaintiffs now ask this Court to take the extraordinary step of overturning the jury's verdict and ordering a new trial because, they say, witness bias and credibility attacks should have been the linchpin of their trial strategy.  At trial, Plaintiffs knew that three of Cinergy's witnesses were current employees drawing salaries, but made no issue of it.  They also knew Cinergy's fourth witness, Robert Batdorf, was a former employee who held Cinergy stock and drew a pension, but they likewise did not allege bias on his part.  Now, however, Plaintiffs contend that, had they known Mr. Batdorf was also receiving reasonable compensation for some of the time he had lost to this litigation, everything would have been different.  That contention is belied by the fact that Plaintiffs never even asked Mr. Batdorf whether he was receiving such compensation, and indeed, never asked any other Cinergy witness a single question about compensation.  Plaintiffs' decision not to seek such information during the extensive trial and pre-trial proceedings forecloses any claim now that Cinergy engaged in misconduct by not providing Mr. Batdorf's consulting agreement or that Plaintiffs would have fundamentally changed their trail strategy had they had it.

In support of their motion, Plaintiffs' disparage the reputations of two good men.  They allege false statements by Mr. Batdorf, a man who has dedicated most of his retirement to

1

volunteering and working on church projects and who takes very seriously an oath to tell the truth.  *See* Batdorf Aff. ¶¶ 13, 15 (Ex. A).  And they allege attorney misconduct by an attorney for Duke Energy whose only apparent offense was to draft a standard consulting agreement to compensate a retired employee with an hourly rate (fairly calculated on the basis of his pre-retirement compensation) for time spent preparing to participate meaningfully in this case, which kept him away from his family and avocations.  *See* Moesser Aff. ¶ 12-13 (Ex. B).

Plaintiffs' assertions are not grounded in reality.  On both the law and the facts, their motion is riddled with errors.

<u>First</u>, Plaintiffs rely upon a fundamentally incorrect reading of the applicable law in contending that Cinergy could not compensate Mr. Batdorf for the value of his time spent on this litigation.  They ignore language in their key case, *Hamilton v. General Motors Corp.*, 490 F.2d 223 (7th Cir. 1973), that expressly permits a retiree fact witness to be compensated for the "reasonable value of lost time in attendance" at trial.  This rule fully accords with federal statutes and modern ethics law, which recognize that in complex litigation it is often the case that former employees are called upon to invest substantial time and energy in preparation for providing well-informed testimony helpful to the trier of fact, and that it is only appropriate to compensate such individuals for the value of their lost time.  Relying upon a retiree's pre-retirement compensation, as occurred here, is an established way of calculating a fair hourly rate of compensation, and raises no concerns of improper influence or altered testimony.  And Indiana law, too, expressly permits compensation of fact witnesses.  There is nothing untoward about compensating Mr. Batdorf as a retiree for the hours he spent on this litigation; if he had still been employed, he would have earned the same compensation while spending the very same time preparing for this case.

Second, Plaintiffs' arguments rely upon a counterfactual view of this case. Plaintiffs claim that they asked for Mr. Batdorf's compensation arrangements in two discovery requests (Pls.' Mem. at 24-25), but no fair reading of those requests — which seek documents about technical regulations and permits — can encompass the consulting agreement in question. Simply put, Plaintiffs *never* requested this information, either through discovery or by questioning him on the stand, and Cinergy and Mr. Batdorf cannot be faulted for not providing information that Plaintiffs did not seek. Similarly, Plaintiffs challenge the veracity of Mr. Batdorf's statement on the witness stand that he was retired, even though he *is* retired. The fact that, like so many other retirees, he has occasionally worked during retirement, and that he was compensated for his time lost as a result of this case, does not mean that he was not "retired."

Plaintiffs also mischaracterize their own trial strategy and place misleading emphasis on defense observations that Plaintiffs' case was based upon the testimony of paid experts. As the Court is aware, Cinergy never suggested that Plaintiffs' experts should not be believed because they were paid. Rather, the key argument was that Plaintiffs' experts' methodology should not be credited because it was created in "brainstorming" sessions many years after the fact.

Third, even assuming *arguendo* that there had been the improprieties Plaintiffs allege, Plaintiffs have failed to show that their substantial rights were affected. Under Seventh Circuit law, new evidence that only provides a basis for challenging witness credibility is not a ground for ordering a new trial, even if (unlike here) the evidence was deliberately concealed. And false testimony does not warrant a new trial unless the falsehood was material and probably led the jury to a different result than it otherwise would have reached. Here, even crediting Plaintiffs' allegations, there is no chance that failure to disclose a consulting agreement covering one of four Cinergy fact witnesses was the determining factor in the outcome of the liability trial. That

is particularly true given that Plaintiffs prevailed on the majority of units on which Mr. Batdorf testified.  Accordingly, Plaintiffs have utterly failed to make the required showing of prejudice.

Finally, post-liability trial discovery and an evidentiary hearing on this matter are entirely unnecessary and unwarranted.  With the filing of this response and the affidavits and exhibits thereto, all the relevant facts and documents are now before the Court, and this issue can be decided upon the papers.  Moreover, additional discovery is not appropriate unless it would reveal material information, and, as stated, the exceedingly narrow credibility challenge Plaintiffs now claim they would have pursued — against only Mr. Batdorf and no other witness, and based solely on his consulting agreement and not the other financial interests he had in Cinergy that were already known to them — simply would not have been material to the outcome of the liability trial.  "[T]he place to challenge" Mr. Batdorf's credibility was "during cross-examination, not after trial."  *Griffin v. Foley*, 542 F.3d 209, 223 (7th Cir. 2008).

Plaintiffs' motion should be seen for what it is:  an attempt to undo a liability trial outcome with which Plaintiffs are dissatisfied.  That is not a valid basis for a motion for a new trial.  It is also not an acceptable justification for unfounded *ad hominem* attacks on Mr. Batdorf and Mr. Moesser.  Plaintiffs' motion should be summarily denied, so that this matter will not needlessly consume any more of the Court's time, and so that the parties can go about the real matter at hand, namely preparing for the upcoming remedy phase trial.

## **BACKGROUND**[1]

Robert Batdorf was an employee of Cinergy and its predecessors for 34 years.  5/19/08 Liability Trial Tr. at II-1292, *attached as* Ex. C1.  On June 30, 2005, he retired.  Batdorf Aff. ¶ 2,

---

[1] For the convenience of the Court, key facts are summarized here.  Additional details are provided in the attached Affidavits of Robert Batdorf (Ex. A) and Dean Moesser (Ex. B).  All "C#" exhibits cited herein are attachments to the Affidavit of Kathryn Thomson (Ex. C).

*attached as* Ex. A.  During that time, he worked his way up in the company, ultimately serving as station manager of the company's plants at Gibson, Cayuga, and Wabash River.  *Id.* ¶ 3; 5/19/08 Liability Trial Tr. at II-1292-96 (Ex. C1).  He supervised capital projects "essential to maintaining these stations as safe, reliable, efficient, and clean sources of energy."  Batdorf Aff. ¶ 3.  Some of those projects formed the basis for Plaintiffs' claims in this lawsuit, and therefore Mr. Batdorf, notwithstanding his retirement which commenced during the course of these proceedings, spent substantial time on this litigation.

At the time Mr. Batdorf retired in 2005, he entered into a consulting agreement with Cinergy to compensate him at the rate of $88/hour for his ongoing assistance on projects he had been involved with prior to retirement.  *See* July 1, 2005 Consulting Services Agreement §§ 1, 3, *attached as* Moesser Aff. Ex. B2 ("The services requested may include, but are not necessarily limited to, assisting with the NSR proceedings, the FGD restructuring, and the WRS/WVPA contract.").  That hourly rate roughly corresponded to Mr. Batdorf's base salary (i.e., excluding short- and long-term bonuses and incentives) shortly before his retirement, divided by 2000 hours.  *See* Moesser Aff. ¶ 9.  The agreement commenced on July 1, 2005 and ended on July 1, 2006, but it included a renewal clause.  *See* Moesser Aff. Ex. B2, § 2.  Pursuant to that agreement, Mr. Batdorf submitted two invoices, which covered work on this litigation as well as on unrelated matters, such as management issues linked to his pre-retirement responsibilities; he was compensated a total of $3,346 for his time, and reimbursed $355.04 in expenses.  *See* 9/05 and 12/5/05 invoices, *attached as* Moesser Aff. Ex. B3.  He last billed under this agreement for work performed on November 7, 2005, which was about four months after his retirement date. *See id*.  Although Mr. Batdorf testified on a total of seven occasions before and shortly after his

retirement, both in his personal capacity and as a Rule 30(b)(6) deponent, he did not bill Cinergy for the time he spent testistying at any deposition after his retirement.  *Id.* ¶ 7.

For most of 2006 and 2007, Mr. Batdorf heard little about this case.  Batdorf Aff. ¶ 9. Then, as trial approached, the matter began to consume substantial amounts of Mr. Batdorf's time as he was increasingly called upon to answer questions and review documents to refamiliarize himself with decades-old projects and the thousands of pages of his deposition testimony.  *See id.*  Although Mr. Batdorf informed Dean Moesser, an attorney with Duke Energy, that he did not want to be compensated, Mr. Moesser explained to Mr. Batdorf that the case likely would require substantial amounts of his time, for which he should receive a reasonable hourly fee.  Mr. Moesser drafted a consulting agreement between Duke Energy and Mr. Batdorf, setting Mr. Batdorf's fee at $200 per hour, which roughly corresponded to his total annualized compensation at the time of his retirement, divided by 2000 hours.  Moesser Aff. ¶ 12-13; *see also* Batdorf Aff. ¶ 9.  The agreement dealt with all of the mechanics of Mr. Batdorf's work as a consultant on this matter, including such details as the requirement that Mr. Batdorf maintain adequate insurance on his car in order to attend meetings, that he pay all taxes on his own, and that he not disclose the company's trade secrets.  *See* Moesser Aff. ¶ 13; *see also id.* Ex. B4.[2]

Pursuant to the 2008 agreement, Mr. Batdorf spent fewer than two hundred hours between March and May 2008 preparing for and attending trial, and was compensated $34,800 for that time.  He also was reimbursed $500.97 for out-of-pocket expenses.  *Id.* ¶ 11.

---

[2] Mr. Batdorf believed that his prior agreement had lapsed, since he had not submitted an invoice under it for several years and since Cinergy, the entity with which he had signed the agreement, had been taken over by Duke Energy.  Batdorf Aff. ¶ 10.  Nor did Mr. Moesser understand there to be an existing agreement governing the relationship.  Moesser Aff. ¶ 14.

Mr. Moesser confirms that, "I never suggested to Mr. Batdorf—and certainly never believed—that his pay would, in any respect, be contingent upon the content of his testimony or the outcome of the litigation.  The entry of the agreement was, from my perspective, entirely innocuous and simply a matter of logistics."  Moesser Aff. ¶ 15.  Mr. Batdorf states in his affidavit: "At trial, as at all other times during my involvement in this case, I testified truthfully. My testimony was not in any way influenced by the fact that Duke Energy undertook to compensate me for my time.  Every time I testified, I took an oath to tell the truth, and I believe that swearing an oath is a very serious matter."  Batdorf Aff. ¶ 12.  He further confirms that if he had been asked a question at the liability trial about compensation for his time, he would, of course, have testified truthfully and fully in response.  Batdorf Aff. ¶ 14.

Although Mr. Batdorf was contacted early on about participating as a witness in the remedy phase proceedings, Cinergy ultimately dropped him from its remedy phase witness list after he suggested others more qualified to address technical details of the environmental control upgrades being proposed for the Wabash River Station.  *See* Batdorf Aff. ¶ 16.  Mr. Batdorf has not done any work on the remedy phase of this case, and accordingly has not billed or been paid for any such work.  *Id.*

## **STANDARD OF REVIEW**

Cinergy disputes the standard of review set forth in Plaintiffs' memorandum, which misstates the governing law of this circuit.  Pursuant to Federal Rule of Civil Procedure 59, and as Plaintiffs initially concede, a party is not entitled to a new trial unless that party was actually prejudiced by the trial defect identified.  *Wiedemann v. Galiano*, 722 F.2d 335, 337 (7th Cir. 1983); Pls.' Mem. 15.  Plaintiffs, however, fail to note that Federal Rule of Civil Procedure 61 governs the determination of prejudice:  "Unless justice requires otherwise, no error . . . by the

court or a party . . . is ground for granting a new trial . . . .  At every stage of the proceeding, the

court *must disregard* all errors and defects that do not affect any party's *substantial rights*."  Fed.

R. Civ. P. 61 (emphasis added).  Thus, to receive a new trial, a party "must show that the error

was substantial enough to deny him a fair trial." *Perry v. Larson*, 794 F.2d 279, 285 (7th Cir.

1986) (citing Fed. R. Civ. P. 61); *see also Griffin*, 542 F.3d at 219 (requiring a party's

"substantial rights" be affected for a new trial to be granted).  In other words, "any wrongdoing

is merely harmless error" unless it "affects the party's 'substantial rights.'" *Falk v. Paluch*, 163

F.R.D. 8, 9 (N.D. Ill. 1995) (citation omitted).

Where a party seeks Rule 59 relief based on newly discovered evidence, a five-part test

applies:  "To succeed on a motion under Rule 59, a party must show that: (1) it has evidence that

was discovered post-trial; (2) it had exercised due diligence to discover the new evidence; (3) the

evidence is *not merely cumulative or impeaching*; (4) the evidence is *material*; and (5) the

evidence is such that *a new trial would probably produce a new result*." *Envtl. Barrier Co. v.

Slurry Sys., Inc.*, 540 F.3d 598, 608 (7th Cir. 2008) (denying post-trial relief under Rule 59(e) on

the basis of "newly discovered evidence" that the opposing party had concealed an affidavit

contradicting the testimony of its sole witness) (emphases added).  As these factors make clear,

regardless of why the evidence was not presented at trial, the grant of a new trial generally is

inappropriate where, as here, a party seeks to overturn the jury's verdict based on evidence that

would only serve to impeach a witness.  *See id.*; *Ortho Pharm. Corp. v. Am. Hosp. Supply Corp.*,

534 F.2d 89, 95 (7th Cir. 1976) (a trial court's erroneous exclusion of evidence cannot be

grounds for a new trial when such evidence is strictly impeaching in nature); *Wroblewski v.

Exch. Ins. Assoc.*, 273 F.2d 158, 162 (7th Cir. 1959) ("It is well settled law generally that newly

discovered evidence which is strictly impeaching in nature, cannot be the basis for a new trial.").

*Cf.* Pls.' Mem. 1 (explaining that "Plaintiffs move for a new liability trial due to *newly discovered evidence* of Cinergy's misconduct" (emphasis added)).

Even where a party seeks a new trial based on allegedly false testimony, a new trial is inappropriate unless the moving party can point to false testimony that "(1) came to [its] knowledge only after trial; (2) could not have been discovered sooner with due diligence; (3) was material; and (4) would *probably* have led to [a different outcome] had it not been heard by the jury." *United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004) (emphasis added), *vacated on other grounds by* 543 U.S. 1097 (2005); *see also United States v. Ogle*, 425 F.3d 471, 475-76 (7th Cir. 2005). The *Mitrione* court specifically overruled the more lax standard that a new trial may be granted so long as a party can show that a jury "*might* have reached a different verdict" absent the false or perjured testimony. *Id.* at 717-18 (emphasis in original). *Cf.* Pls.' Mem. 16 (urging application of the rejected "might have" test). That *Mitrione* was a criminal case does not affect the applicability of the reasonable probability test in a civil case, *cf. Envtl. Barrier*, 540 F.3d at 608 (applying reasonable probability test where party had concealed evidence).[3]

Plaintiffs also incorrectly state that they must only prove relevant facts by a preponderance of the evidence. Pls.' Mem. at 15. In fact, parties that move for a new trial "must prove that they are entitled to a new trial by clear and convincing evidence." *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995) (applying Fed. R. Civ. P. 60(b)). Moreover, and despite Plaintiffs' argument to the contrary, the same standard of proof applies regardless of whether a party brings its motion pursuant to Rule 59 or Rule 60(b). *Sarkes Tarzian, Inc. v. U.S.*

---

[3] Indeed, the Sixth Circuit "might have" test that Plaintiffs urge upon this Court was derived from a criminal case out of the Seventh Circuit. *See Davis by Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129, 134 (6th Cir. 1990) (quoting *Gordon v. United States*, 178 F.2d 896, 900 (6th Cir. 1949) (citing, as sole authority, *Larrison v. United States*, 24 F.2d 82 (7th Cir 1928))). But *Larrison* is the very case that the Seventh Circuit overruled in *Mitrione*. 357 F.3d at 718 ("Today, we overrule *Larrison* and adopt the reasonable probability test.").

*Trust Co. of Fla. Sav. Bank*, 168 F. App'x. 108, 110 (7th Cir. 2006) (holding that district court, in deciding a motion for a new trial under Rule 59, "very reasonably synthesized its analyses of [the moving party's] burdens under Rules 59(a) and 60(b)(2), applying our precedent regarding Rule 60(b) motions for a new trial on the basis of newly discovered evidence."); *Peacock v. Board of School Comm'rs*, 721 F.2d 210, 213-14 (7th Cir. 1983) (holding that "the same criteria apply in evaluating 'new evidence' offered under" Rules 59(b) and 60(b)); *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990) ("The test to be applied when discovery misconduct is alleged in a Rule 59 motion must be borrowed from cases interpreting Rule 60(b)(3), just as the test applied to a Rule 59 motion alleging newly discovered evidence is borrowed from Rule 60(b)(2)."). Indeed, the case from which Plaintiffs mistakenly draw their preponderance standard held that a party seeking relief under Rule 59 must "*clearly* establish a manifest error of law or an intervening change in the controlling law or present newly discovered evidence." *Romo v. Gulf Steam Coach, Inc.*, 250 F.3d 1119, 1121 n.3 (7th Cir. 2001) (emphasis added).

## <u>ARGUMENT</u>

I.   **COMPENSATING A FACT WITNESS FOR TIME AND EXPENSES IS NOT ILLEGAL OR IMPROPER.**

 A.   **Federal and State Authorities Expressly Permit Reasonable Compensation of a Fact Witness for Expenses and Lost Time.**

As a matter of both legal ethics and the law, Plaintiffs are simply incorrect that it "was improper under the circumstances of this case," Pls.' Mem. at 19, for Cinergy to reimburse Mr. Batdorf for the reasonable value of the time he devoted to serving as a fact witness in this litigation. Plaintiffs base their argument on an archaic common-law principle that a fact witness can receive no compensation for fear that such compensation would induce the witness to commit perjury. Pls.' Mem. at 21. Like the similarly outdated common-law rule that a party may not take the stand to support his or her own case for fear that the incentives for perjury

would be too great, this principle has been largely rejected.  *See United States v. Dawson*, 425 F.3d 389, 394 (7th Cir. 2005) (Posner, J.) ("Any *general* policy . . . against giving a witness inducements to testify, rather than relying entirely on his love of truth or the terrors of the oath, would require reinstating the old rule . . . that the party to a case may not testify at all because he has an interest, pecuniary or otherwise, in the outcome and is therefore not a disinterested witness").  Overwhelming authority, including recent Indiana caselaw, supports the proposition that the compensation of fact witnesses for their expenses and time lost is a common and permissible feature of modern complex litigation.

Indeed, the very authorities Plaintiffs cite draw a clear distinction between payment for the content of testimony, which is rightly prohibited, and reasonable compensation of a fact witness for expenses and the value of time lost, which is permitted and even protected.  First and foremost, the federal bribery statute, 18 U.S.C. § 201, cited by Plaintiffs, Pls.' Mem. at 19-20, 21, specifically provides for payment to individuals for "the reasonable value of time lost" due to their service as witnesses.  18 U.S.C. § 201(d).[4]  Plaintiffs, however, virtually ignore section 201(d) — they cite it only in passing, in a footnote, Pls.' Mem. at 20 n.2 — even though this section materially qualifies the sections of the statute on which they so heavily rely.  When *all* the relevant portions of the bribery statute are considered, it is clear that section 201 does not embody any prohibition against compensating a fact witness for the substantial time he or she

---

[4] 18 U.S.C. § 201(d) provides that "paragraphs (2) and (3) …of subsection (c) [prohibiting the exchange of a thing of value for testimony] shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying."

devotes to testimony.  Indeed, contrary to Plaintiffs' apparent misreading of the statute, section 201 provides a specific safe harbor for the sort of compensation at issue here.

Section 201(d) envisions that a fact witness may receive compensation in two forms. First, in allowing for the payment of "witness fees provided by law," Congress made clear that parties were permitted to pay witnesses the fees and allowances required under statutes such as 28 U.S.C. § 1821.  *See Dawson*, 425 F.3d at 394 (noting that 18 U.S.C. § 201(c)(2) does not prohibit a party from paying the amounts required under 28 U.S.C. § 1821).  Section 1821 sets the maximum amounts that a federal court *may order* a party to pay a fact or expert witness, *see Crawford Fitting Co. v. Int'l Woodworkers of Am.*, 482 U.S. 437, 439 (1987), but it does not limit the amounts that a party *may voluntarily choose* to pay a witness.  *See id.*; *Irons v. Karceski*, 74 F.3d 1262, 1263 (D.C. Cir. 1995) (noting that an order to pay the statutory fees provided under section 1821 "leaves the parties free to make out a private arrangement for payment in excess of the statutory amount").  Thus, the second part of 18 U.S.C. § 201(d) makes allowance for a party to compensate a fact witness for reasonable costs and the reasonable value of time lost, separate and in addition to the amounts set for court-imposed costs.

The chief case on which Plaintiffs rely, *Hamilton v. General Motors Corp.*, 490 F.2d 223 (7th Cir. 1973), recognizes this safe harbor and, in fact, embraces it.  *Id.* at 227, 229.  *Hamilton* involved a fact witness — a retired employee of the party for whom he testified — whose estate brought suit against that same party, claiming that he and the party had entered into an implied contract to compensate him for his service as a witness.  *Id.* at 224-25.  The court refused to find an implied contract to pay a fact witness, explaining that such a policy would enable witnesses to extort unreasonable fees for their testimony after the fact.  *Id.* at 228-29.  In doing so, however, the court explained that "the law could imply [a contract] . . . for reasonable cost of travel and

subsistence incurred and the reasonable value of lost time in attendance." *Id.* at 229 (internal quotation marks omitted) (citing the federal bribery statute's safe harbor provision). The court explained that "[t]hese reimbursable items could only accrue as expended," and that it would be inappropriate to find an implied agreement for a "lump-sum payment at the end of the litigation." *Id.* The witness was "on notice that reimbursements were being made from time to time," and thus, "[i]f he had any additional claims (for lost time, for example), he had an opportunity to make them as the time was expended." *Id.* In sum, contrary to Plaintiffs' suggestion otherwise, the *Hamilton* court plainly found *permissible* the compensation of a retired employee serving as a fact witness "for lost time" during the course of litigation. It rejected such compensation only because it had not been billed as the time accrued.

Similarly, the Fifth Circuit dissent Plaintiffs cite expressly notes the permissibility of compensating a fact witness for reasonable expenses and lost time. *See NLRB v. Thermon Heat Tracking Servs., Inc.*, 143 F.3d 181, 190-191 (5th Cir. 1998) (Garza, J., dissenting) (cited at Pls.' Mem. at 21). Although Judge Garza explained that a fact witness who is compensated for his or her testimony is "presumptively incompetent to testify," *id.* at 190-91, he was careful to point out that "'[c]ompensation' has usually been defined so as to exclude: (1) reasonable expenses that a witness incurs in attending or testifying at a legal proceeding; (2) reasonable compensation for losses due to a witness's attendance or testimony at a legal proceeding; or (3) reasonable payments to an expert witness." *Id.* at 190 n.4.

Further, the more recent Seventh Circuit cases Plaintiffs cite offer little more than passing statements that 18 U.S.C. § 201(c)(2) prohibits a party from giving anything of value to any person in exchange for testimony. *Mataya v. Kingston*, 371 F.3d 354, 359 (7th Cir. 2004) (citing 18 U.S.C. § 201(c)(2)); *Dawson*, 425 F.3d at 394 (same). The opinions in these cases do not cite

or analyze section 201(d), and their language taking note of the prohibition contained in section 201(c)(2) casts no doubt on the continued relevance of the safe harbor contained in section 201(d).  Indeed, the government witness at issue in *Dawson* had an agreement to receive a "bounty" in the form of 20 percent of the proceeds the government obtained through his assistance, 425 F.3d at 393; this compensation arrangement provided the witness with a direct stake in the content of his testimony, a far cry from reasonable compensation for time lost.  Thus, as the safe harbor of section 201(d) provides, the compensation of a fact witness for expenses and time lost remains permissible in the Seventh Circuit.

Finally, in citing an opinion on "witness tampering," Plaintiffs implicitly concede that it is the effort to influence the *content* of a witness's testimony, and not the effort to compensate a witness for expenses and lost time, that is prohibited.  *See Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 534-36 (7th Cir. 2003) (cited at Pls.' Mem. at 22).  *Ty* involved a party that used the prospect of a business deal to dissuade a witness from testifying because it was afraid of what the witness might say.  *Id.* at 534-35.  This is the quintessential case of an effort to pay off a witness and thereby affect the *content* of his testimony.  By then arguing that compensating a fact witness for lost time is the "more compelling" case of misconduct, Pls.' Mem. at 22, Plaintiffs reveal their deep misunderstanding of the law.

Plaintiffs likewise thoroughly misconstrue the applicable standards of legal ethics, and fail to cite *any* Indiana authority precluding fact witness compensation.  Although Plaintiffs are correct to note that Comment 3 to Model Rule of Professional Conduct 3.4(b) provides that the common law in most jurisdictions prohibited the compensation of fact witnesses, *see* Pls.' Mem. at 21, Plaintiffs wholly ignore guidance from the American Bar Association ("ABA") — the entity that promulgated the Model Rules — explaining that compensation for lost time is *not*

*improper*.  The ABA specifically opined that "[a] lawyer, acting on her client's behalf, may compensate a non-expert witness for time spent in attending a deposition or trial or in meeting with the lawyer preparatory to such testimony, provided that the payment is not conditioned on the content of the testimony and provided further that the payment does not violate the law of the jurisdiction."  ABA Formal Opinion 96-402 (Aug. 2, 1996).  Additionally, the ABA Ethics Committee provided that a fact witness who is retired or unemployed — such as Mr. Batdorf — may nonetheless be compensated for the "reasonable value of the witness's time based on all relevant circumstances."  *Id.*

Although the Indiana Bar Association does not appear expressly to have addressed this topic, a recent Indiana Court of Appeals decision held that it was proper to compensate a witness for the reasonable value of his lost time spent preparing documents and testifying at a deposition (in addition to the minimal statutory fees permitted for lay witnesses), even if he was questioned "only as a fact witness and not as an expert."  *Riggin v. Rea Riggin & Sons, Inc.*, 738 N.E.2d 292, 308-10 (Ind. Ct. App. 2000).  The court rejected any categorical bar on such fact witness compensation, reasoning that a more restrictive approach could impose an "*undue burden or expense*" on the fact witness.  *Id.* at 309 (quoting Trial Rule 26(C)).  Instead, the court *affirmed* a trial court ruling requiring compensation of the fact witness, who was a professional (a CPA), based on the value of his time.  *Id.* at 308-09.  Similarly, Indiana Rule of Professional Conduct 3.4 — stating that a lawyer shall not "offer an inducement to a witness that is prohibited by law" — mirrors the ABA Model Rule and Comment, which the ABA interpreted in Formal Opinion 96-402 as *permitting* compensation for the reasonable value of the time a retiree spends as a fact witness.  ABA Formal Op. 96-402. Because in this Court it is Indiana state law that governs

15

ethics questions, *see* S.D. Ind. Local R. 83.5(g), this Court should adhere to the approach upheld in *Riggin* and the interpretation of Rule 3.4 by the ABA, which created the rule Indiana adopted.[5]

The ethics committees of numerous other state bar associations have reached similar conclusions.  For instance, in Illinois it is permissible to pay "compensation to a witness for loss of time in attending or testifying," as well as "reasonable compensation to a witness for time spent in being interviewed," so long as such compensation is not "in fact for the purpose of influencing testimony, rendering a prospective witness 'sympathetic' to one's cause, or suborning perjury."  Ill. State Bar Ass'n Adv. Op. on Prof. Conduct No. 87-5, 1988 WL 525079 (Jan. 29, 1988).  Likewise, in Wisconsin, it is "proper to *reasonably* compensate the witness for his or her loss of time, unless, of course, such compensation is prohibited by law."  Wis. State Bar Ass'n. Comm. on Prof. Ethics, Op. No. E-89-17 (1989) (emphasis in original), *available at* http://www.wisbar.org/AM/Template.cfm?Section=Wisconsin_ethics_opinions&TEMPLATE=/ CM/ContentDisplay.cfm&CONTENTID=52848, *attached as* Ex. C4.[6]

---

[5] Similarly, in *Hamilton*, the Seventh Circuit looked to Illinois law (the forum of the District Court there at issue) to determine the validity of a contract to compensate a fact witness.  490 F.2d at 229.  Finding no law directly on point, the court predicted "that if the courts of Illinois were confronted with this question they would hold as the district judge held in this case."  *Id.*  In the 35 years since *Hamilton* was written, the Illinois State Bar Association has advised that, in Illinois, it is permissible to pay "compensation to a witness for loss of time in attending or testifying," as well as "reasonable compensation to a witness for time spent in being interviewed," so long as such compensation is not "in fact for the purpose of influencing testimony, rendering a prospective witness 'sympathetic' to one's cause, or suborning perjury." Ill. State Bar Ass'n Adv. Op. on Prof. Conduct No. 87-5.  To the extent that *Hamilton* was a prediction of how witness compensation questions would be treated in Illinois, this more recent state authority provides more definitive guidance.

[6] Numerous additional states similarly expressly permit fact witness compensation based on the value of the witness's time.  *See, e.g.*, Ariz. Eth. Op. 97-07 (Oct. 31, 1997) ("[A] reasonable fee may be paid to a fact witness for time spent preparing for testimony, being interviewed and/or testifying at deposition or trial."), *attached as* Ex. C5; Cal. Eth. Op. 1997-149, 1997 WL 197243 (1997) ("An attorney may pay a non-expert witness for the time spent preparing for a deposition or a trial."); Mass. State Bar Ass'n. Comm. on Prof. Ethics, Op. No. 1991-3 (1991) ("[W]e find it difficult to believe that the Supreme Judicial Court would conclude that it was a violation of

Accordingly, there is no applicable legal rule precluding the hourly compensation of Mr. Batdorf for the substantial time he spent preparing for and participating in the liability trial. Indeed, any such rule would disregard the realities of modern complex litigation, which often creates substantial time demands on former employees, who deserve to be paid for the value of their lost time just as current employees would expect to remain on the payroll as they prepare for a trial in which they will testify on behalf of their employer.

### B.   Notwithstanding His Retirement, Mr. Batdorf May Receive Compensation For Expenses and Lost Time.

The Batdorf agreement is exactly the type of agreement that the Seventh Circuit has described as permissible — an agreement to reimburse a retired employee for time and expenses as they accrued.  *See supra* at 12-13. Mr. Batdorf submitted invoices for his costs and his time spent, and received payment on a regular basis to compensate him for the time and cost of assisting Cinergy in litigation.  Batdorf Aff. ¶ 11.  Mr. Batdorf did not request that he be compensated, and it was never suggested to him that the compensation was contingent on the

---

[state ethics rules] for a law firm to pay for the time of an employee or former employee taken in testifying and preparing to testify about a matter relating to his or her employment."), *available at* http://www.massbar.org/for-attorneys/publications/ethics-opinions/1990-1999/1991/opinion-no-91-3, *attached as* Ex. C6; N.Y. State Eth. Op. 668, 1994 WL 593255 (June 3, 1994) ("An individual testifying at trial may receive a reasonable rate, determined by the fair market value for the time, regardless of whether the individual suffered actual financial loss."); S.C. Ethics Adv. Op. 97-42, 1997 WL 861959 (Dec. 1997) (finding permissible reasonable payments to a fact witness to cover expenses and time lost appearing at trial); Va. L. Eth. Op. 587 (June 14, 1984) ("It is not improper for an attorney to compensate a witness for the reasonable value of time expended in the preparation for, and rendering of, testimony in litigation"); Wash. State Bar Ass'n. Inf. Eth. Op. 1908 (2000) ("[I]t is not unethical for a lawyer to pay . . . a fact witness[] the reasonable expenses incurred by the witness in connection with testifying and the reasonable value of the witness's time in connection with testifying."), *available at* http://pro.wsba.org/IO/print.aspx?ID=1102, *attached as* Ex. C7.  Indeed, the modern trend is so strong that at least one countervailing opinion, which allowed for compensation of lay witnesses but limited it to out-of-pocket expenses, has been withdrawn.  *See* Co. Eth. Op. 44 (Feb. 14, 1970), *withdrawn* Dec. 1998, *available at* http://www.cobar.org/index.cfm/ID/386/subID/1763/CETH/Ethics-Opinion-44:-Withdrawn-12/98-(Lay-Witness-Fees,-02/14/70)/, *attached as* Ex. C8.

content of his testimony.  *Id.* at ¶ 12; Moesser Aff. ¶ 15.  The attorney who drafted the compensation agreement did so not because he sought to obtain any particular testimony from Mr. Batdorf, but because he believed that, out of fairness, Cinergy should be reimbursing Mr. Batdorf for the time he was devoting to this case out of his own retirement.  Moesser Aff. ¶ 12.

Like the *Hamilton* court, numerous state ethics authorities have held that a retired or unemployed witness is entitled to be compensated for the fair value of his or her time, even though he does not forfeit hourly income.  Where, as here, a retired employee serves as a fact witness, the witness does not lose time that would have been spent earning income, but the witness does sacrifice free time, and authorities have held that such a sacrifice can and should be compensated.  *See, e.g.*, Ill. State Bar Ass'n Adv. Op. on Prof. Conduct No. 87-5 ("Nor are [the Illinois ethics rules] limited to permitting compensation only for time lost from a job or profession."); Wis. State Bar Ass'n. Comm. on Prof. Ethics, Op. Nos. E-89-17 ("Although unemployed or retired persons would, by definition, not lose 'wages' as a result of being a witness, they obviously are deprived of time that would otherwise be devoted to other endeavors."); Cal. Eth. Op. 1997-149 (explaining that the rule permitting compensation of fact witnesses "applies whether the witness is currently employed, unemployed, retired, suspended or in any other employment status."); N.Y. State Eth. Op. 547, 1982 WL 31701 (Nov. 29, 1982) ("[E]ven recreation time is susceptible to valuation.  Attorneys are frequently called upon to elicit proof of unliquidated damages, and should not feel at a loss in coping with the vagaries of the situation."); Va. L. Eth. Op. No. 587 ("The amount of the compensation should be a fair value of time expended calculated by a usual hourly charge or by some other method which determines the reasonable value of time spent.").

Accordingly, Plaintiffs' assertion that Mr. Batdorf was not entitled to compensation because he did not "miss[] a day of work," Pls.' Mem. at 23, is beside the point.  Indeed, there is no reason to distinguish between a retired individual who testifies without "missing a day of work," and a salaried employee who misses a day of work to testify but does not lose any income as a result.  What Mr. Batdorf sacrificed was not income, but time — and the authority is clear that Mr. Batdorf's time has value.

> C.      **The Compensation Mr. Batdorf Received Was Reasonable Under the Circumstances.**

Both modern case law and ethics opinions make clear that compensation of a fact witness for expenses and lost time must be reasonable under the circumstances.  The reasonableness of a particular amount of compensation "depends for the most part on the witness's occupation and/or trade," and "[i]f the lay witness is an engineer or other professional, . . . their 'financial loss' could be a [sic] substantial and reimbursement of that loss by the attorney would be ethical." Alaska Eth. Op. 93-2, 1993 WL 849637 (Sept. 11, 1993).  Using a similar standard, the New York State Bar Association Committee on Professional Ethics has stated explicitly that a lay witness may be compensated $150 per hour if his time is so valued and such a rate is reasonable under the circumstances.  *See* N.Y. State Eth. Op. 714, 1999 WL 221878 (Feb. 5, 1999).

Clear and helpful guidance is available on what constitutes "reasonable" compensation for a retired individual who, like Mr. Batdorf, devotes significant time out of his retirement to serve as a fact witness:  "Possible objective bases upon which to determine reasonable compensation might include the witness' rate of pay if currently employed, *what the witness last earned if currently unemployed*, or what others earn for comparable activity." Cal. Eth. Op. 1997-149 (emphasis added).  The ultimate goal is to compensate a witness for "the fair market value for the time, regardless of whether the individual suffered actual financial loss."  N.Y.

State Eth. Op. 668.  This valuation may be informed by a witness's earning potential, and not just current earnings.  *See* Alaska Eth. Op. 93-2 ("[A] highly skilled and educated engineer may be content in his or her twilight years to earn a relatively nominal wage working in a greenhouse. Yet, that person could probably command a fee worth many times his or her hourly wage.").

Indeed, the Massachusetts Bar Association Committee on Professional Ethics has provided guidance in a situation remarkably similar to the one at issue here.  The Committee found that it was permissible for a party to compensate a fact witness who was a former employee, where that witness "had to spend a fair amount of time reviewing documents and generally refreshing his recollection of the events involved in the case for his testimony to have any value."  Mass. Eth. Op. No. 1991-3.  The Committee explained:

> This situation will not often present itself with the ordinary fact witness but it will often be the case with a former employee of a party.  Indeed, it may often be the case with a busy employee of a party who will have to work overtime nights and weekends to prepare for testimony in a case.  Since the employee and the former employee have such close ties to the employer-party already, paying them for their time (but only for their time) does not seem to present a substantial additional threat to the integrity of their testimony.

*Id.*

In this case, Mr. Batdorf was a highly skilled manager and engineer whose compensation at the time he retired, including bonuses and incentives, was approximately $200 per hour. Moesser Aff. ¶ 12.  This figure provides a reasonable and non-arbitrary valuation for Mr. Batdorf's time, and this approach for compensating a retiree or former employee fully accords with the approach illustrated by ethics opinions from California, New York, and Alaska.  In sum, there was nothing improper about paying Mr. Batdorf, as a retiree fact witness, for his participation in this complex case by using an hourly fee based upon his total compensation at the time he retired a few years earlier during the course of this litigation.

## II.   PLAINTIFFS' ARGUMENTS HINGE ON COUNTERFACTUAL ASSERTIONS THAT DO NOT PROVIDE A BASIS FOR A NEW TRIAL.

Like Plaintiffs' misconstruction of the governing law, Plaintiffs' memorandum also relies upon an imaginative recasting of the facts in this case.  They seek now to blame Cinergy because Plaintiffs failed to seek discovery — or ask relevant questions — related to compensation.  They malign Mr. Batdorf and Cinergy's attorneys for allegedly lying when stating that Mr. Batdorf is retired, even though Mr. Batdorf indisputably is retired.  Despite the fact that he has received reasonable compensation under a consulting agreement — just as countless other retirees do — Plaintiffs further claim that, if only they had known that Mr. Batdorf was being compensated for his time, they would have fundamentally changed their trial strategy to focus their cross examinations and trial arguments on the credibility of Cinergy's witnesses.  But Plaintiffs were well aware that Cinergy's three other witnesses were highly compensated executives and managers, and Plaintiffs did not ask a single question regarding their compensation or make any argument alleging bias.

Finally, Plaintiffs mischaracterize Cinergy's arguments at trial, which contrasted, on the one hand, the views of the men who over the course of decades had made the actual decisions at issue, with, on the other, the views of experts who developed their "methodology" with litigation in mind.  As this Court is well aware, this case did not turn on the credibility of individual witnesses:  instead, both sides relied upon competing approaches on methods of making emissions predictions.  All of the evidence and argument in this case focused on attempts to convince the jury that each side's approach to their predictions was more "reasonable."

A.   **Plaintiffs Never Requested Information About Mr. Batdorf's Compensation, And They Alone Are Responsible For Any Strategic Decision Not To Challenge His Credibility Based Upon Bias.**

Plaintiffs never requested information about Mr. Batdorf's compensation.  Not producing unrequested information does not constitute misconduct by Cinergy, nor can such undiscovered new evidence provide a basis for a new trial.  Plaintiffs contend that two document requests should be interpreted to call for production of Mr. Batdorf's consulting agreement.  *See* Pls.' Mem. at 24.  Both requests sought technical "information pertaining to the Cinergy Plants" and the Clean Air Act and its implementing regulations.  *See*  Plaintiff United States' First Request for Production of Documents ("First Request"), Request No. 17, at 13, *attached as* Ex. 28 to Pls.' Mem.; *see also* Plaintiff United States' Second Supplemental Request for Production of Documents ("Second Request"), Request No. 6, at 16-17, *attached as* Ex. 29 to Pls.' Mem.  The First Request asked Cinergy to:

> 17.   Produce all documents that relate in any way to Defendants' communications with any person, including any of Defendants' employees or consultants, *regarding the following information pertaining to the Cinergy Plants*:
>
> a.   whether Defendants should obtain, or had to obtain, a PSD or Nonattainment NSR permit;
>
> b.   whether Defendants should obtain, or had to obtain a construction permit pursuant to either Indiana Air Pollution Code (APC) Regulation 19 or 326 Indiana Administrative Code (IAC) 2-1, and whether Defendants would register a modification pursuant to either of these provisions;
>
> c.   whether Defendants should obtain, or had to obtain, a permit to install, or construction permit, pursuant to Ohio Administrative Code (OAC) Chapters 3745-31-01 through 3745-31-08; and
>
> d.   whether NSPS was applicable to any of its boiler units.

First Request at 13 (emphasis added).  Similarly, the Second Request asked Cinergy to:

> 6.   Produce all Documents relating to communications (oral or written) between Defendants and their Contractors, Subcontractors, Consultants, agents or attorneys *relating to the meaning and application of*:

(a) the routine maintenance, repair, and replacement provision of the PSD regulations (40 C.F.R. § 52.21 (2)(b)(iii)(*a*)) or of the Nonattainment NSR regulations (40 C.F.R. § 52.24 (f)(5)(iii)(*a*));

(b) the routine maintenance, repair, and replacement provision of the NSPS regulations (40 C.F.R. § 60.14 (e)(1));

(c) the method by which emissions calculations must be performed under Nonattainment NSR (40 C.F.R. § 52.24 (f)(6)) or PSD (40 C.F.R. § 52.21 (b)(3)) regulations for determining whether there has been a "net emission increase" associated with a construction project;

(d) the method by which emission calculations must be performed under NSPS for determining whether there has been "an increase in the emission rate to the atmosphere of any pollutant to which a standard applies . . ." (40 C.F.R. § 60.14 (a)); or

(e) the definitions of "modification" under the NSPS regulations and "major modification" under the Nonattainment NSR or PSD regulations.

Second Request at 16-17 (emphasis added).

Neither request makes any demand for information regarding consulting agreements with (or compensation of) witnesses. Mr. Batdorf's consulting agreement is not "information pertaining to the Cinergy Plants" about obtaining a PSD permit or an APC, IAC, or OAC construction permit. It likewise has nothing to do with "whether NSPS was applicable to any of its boiler units" or any of the other technical details mentioned in the above requests. *See* Batdorf 2008 Agreement, *attached as* Ex. B4 to Moesser Aff.

Indeed, Plaintiffs' requests for such documents at other phases of this litigation, including prior to the liability trial, make clear that they know how to request compensation information for witnesses, and these other requests plainly indicate that the First and Second Requests do *not* encompass Mr. Batdorf's consulting agreement. For instance, Plaintiffs specifically requested *expert* compensation arrangements in 2005. Pls.' First Request for Production of *Expert* Documents (emphasis added), at Exp.18 ("Separately for each Witness, produce all documents discussing or reflecting the remuneration in any form the Witness received for services performed in connection with this Litigation or the Utility Enforcement Initiative); *id.* at Definition 14 ("'Witness' means a witness designated to testify as an *expert* on behalf of

23

Cinergy, and all affiliates, associates, independent contractors, consultants, employees, and anyone who worked with or for, or who assisted any such witness in preparation of the Report" (emphasis added)), *attached as* Ex. C9.  And after the liability phase trial, during remedy phase discovery, they likewise knew how to frame a clear request for employee consulting agreements. *See* Second Set of Plaintiffs' Requests for Production, Remedy Phase, dated August 15, 2008, at 10, attached to Pls.' Mem. as Ex. 11 (requesting "[a]ll documents relating to Your Compensation of any of Your Witnesses, including, but not limited to, Employee Witnesses").

Plaintiffs obviously also had an opportunity at trial to ask Mr. Batdorf whether he was being compensated, and he would have testified fully and truthfully about his compensation if asked.  Batdorf Aff. ¶ 14.  *See also* Pa. Eth. Op. 95-126A, 1995 WL 935696 (Sept. 26, 1995) (explaining that a compensated fact witness "must be instructed that, *if asked on cross examination*, he is to be candid about the nature and amount of the compensation he has been paid." (emphasis added)).  Cinergy likewise would have disclosed Mr. Batdorf's compensation arrangements if Plaintiffs had made an applicable discovery request before the liability trial.  *See* Cal. Eth. Op. 1997-149 ("the amount and nature of [compensation] is discover*able* and admiss*ible* at trial" (emphasis added)).  Plaintiffs simply did not do so.

In sum, Plaintiffs could have requested compensation information for Cinergy's liability phase, but chose not to do so.  Their own failure to exercise adequate diligence does not open the door for a "do over."

### B.   Plaintiffs' Contention That Mr. Batdorf Was Not Retired Is Baseless.

Plaintiffs' accusation that Mr. Batdorf made false statements by claiming he was retired and that Cinergy's counsel improperly bolstered that statement is groundless.  *See* Pls.' Mem. at 17.  Plaintiffs' counsel had deposed Mr. Batdorf on the first day of his retirement, as she acknowledged in the record.  *See* Rule 30(b)(6) deposition of R. Batdorf, July 1, 2005, at 103,

*attached as* Ex. C3 (statement of Ms. Himmelhoch) ("I'm sorry you had to spend your first day of retirement this way"); *see also* 5/20/08 Liability Trial Tr. at 9-1377-78, (Ex. C1).  As such, Plaintiffs were well aware that Mr. Batdorf had ceased full-time employment with Cinergy in 2005.  Plaintiffs' contention that anyone who does any work or receives any compensation ceases to be "retired" does not accord with the experience of millions of American retirees. Countless courts have recognized that retired employees, including those of the United States government, occasionally consult for former employers and others while remaining "retired." *See, e.g.*, *McNab v. Gen. Motors Corp.*, 987 F. Supp. 1115, 1122 (S.D. Ind. 1997) (executives retired, but "continue[d] to work as consultants on the transition team"); *Am. Library Ass'n v. Odom*, 818 F.2d 81, 82 (D.C. Cir. 1987) ("Friedman retired [from the government] in 1955 but continued thereafter to work for NSA as a consultant"); *Honeywell Int'l, Inc. v. United States*, 70 Fed. Cl. 424, 437 n.7 (2006) ("Dr. Task retired from the United States Air Force, but has continued technical work as a consultant").

Indeed, one of Plaintiffs' own witnesses in this trial noted that he was retired, but still did consulting work.  *See* 5/6/08 Liability Trial Tr. at II-164-65 (Ex. C1) (Plaintiffs' counsel asking expert witness Hekking: "[Y]ou said you retired.  Are you doing any other consulting work[?]" Witness answer: "[T]his is the only paid work that I do, yes.").  Mr. Batdorf similarly testified (truthfully) that he was "retired" and not "employed," based upon his understanding of those words.  *See* Batdorf Aff. ¶ 15.  If Mr. Batdorf falsely testified by stating that he was "retired," then Mr. Hekking did as well.  But, in fact, neither witness falsely testified or said anything that was even close to misleading.  Plaintiffs' argument that Mr. Batdorf testified falsely in stating that he was "retired" is insulting to Mr. Batdorf and lacks any merit whatsoever, and plaintiffs certainly have not provided clear and convincing evidence of any false statements.

C.   **Plaintiffs' Suggestion That They Would Have Mounted Further Credibility Challenges To Mr. Batdorf Is Inconsistent With Their Trial Strategy.**

Plaintiffs maintain that they would have challenged Mr. Batdorf's credibility if they had known of his consulting agreement with Cinergy, and that these challenges might have affected the outcome of the liability trial.[7]  *See* Pls.' Mem. at 17-18.  As this Court is aware, Plaintiffs' trial strategy focused on contrasting the competing approaches to "predicting" future emissions, and not on credibility challenges.  *See, e.g.,* 5/21/08 Liability Trial Tr. at 10-1492-1524, *attached as* Ex. C2.  Plaintiffs do not suggest that there were inconsistencies between Mr. Batdorf's testimony during his seven deposition appearances (for which he was not compensated apart from his normal salary), and the testimony given at trial.  As Mr. Batdorf attests in his affidavit, *see* ¶ 12, the fact that he was compensated for his time had no effect upon his trial testimony.  Put simply, there is no basis in the record to suggest that, even if Plaintiffs had known of Mr. Batdorf's consulting agreement, they would have changed their trial strategy by vigorously questioning Mr. Batdorf in order to lay the basis for a credibility challenge, or that such a strategy would have altered the verdict in this case.

Plaintiffs already had laid the basis for a (likely unsuccessful) challenge to Mr. Batdorf's credibility, yet they reasonably chose not to stress witness credibility issues to the jury.  Plaintiffs questioned Mr. Batdorf about whether he received a pension from Cinergy and whether he owned stock in its successor, thereby opening the door to arguing that Mr. Batdorf had an

---

[7] It is unclear whether Plaintiffs are suggesting that knowing about Mr. Batdorf's compensation agreement would have led them to alter their approach to cross-examining Mr. Batdorf alone, or whether they contend that they then also would have altered their approach to cross-examining Cinergy's other fact witnesses, all of whom (as Plaintiffs knew) were being compensated by Cinergy at the time.  The latter suggestion would be nonsense, of course, because Plaintiffs' strategy for those witnesses would not have depended on anything relating to Mr. Batdorf.  The former suggestion, for different reasons, is just as implausible, *see infra* at 26-29, and, to the extent that is Plaintiffs' position, it merely underscores that Plaintiffs suffered no prejudice from the very limited and narrow difference in strategy they claim they would have pursued.

interest in the outcome of this case, yet Plaintiffs never pursued this line of argument.  *See* 5/20/08 Liability Trial Tr. at 9-1378 (Ex. C1).  Mr. Batdorf's positive feelings towards Cinergy were likewise no mystery to either the government or the jury, for he stated that Duke Energy stock was a "[g]ood investment," and he noted, for instance, that he had "had the good fortune at each of the plants that [he] managed to work with a good group of employees."  5/19/08 Liability Trial Tr. at 8-1296 (Ex. C1).  The jury was well aware that Mr. Batdorf had worked for Cinergy and its predecessors for over three decades.  5/19/08 Liability Trial Tr. at 8-1292 (Ex. C1). Against this background, the fact that Mr. Batdorf was being paid a reasonable hourly fee for his time preparing for and testifying in this case would have simply been cumulative evidence in support of a credibility challenge that Plaintiffs prudently chose not to pursue.

Any argument about the reasonableness of Mr. Batdorf's hourly compensation also would have gotten nowhere.  Mr. Batdorf's fee corresponds, on an hourly basis, to his pre-retirement compensation.  *See* Moesser Aff. ¶ 12.  That compensation was an appropriate one for an executive of his stature; indeed, the other executives and managers who testified for Cinergy continue to earn similar or greater compensation.  *See id.* at ¶¶ 4-6 (detailing compensation packages of other Cinergy witnesses, all of which approximate or exceed Mr. Batdorf's).

Arguments about the amount of time spent likewise would have fared poorly.  Substantial preparation time was required for Mr. Batdorf to refamiliarize himself with the events at issue in large part because decades passed between the time of the projects and the time of trial, *see id.* at ¶¶ 7, 9.  Moreover, Mr. Batdorf did not even charge for much of his time spent preparing to participating in the liability trial.  *Id.* at ¶ 11.  Even if Plaintiffs had strongly pressed the issue of Mr. Batdorf's bias or credibility, the additional evidence would not likely have influenced the trial outcome.  Both sides focused on which approach to NSR was more "reasonable" — not on

27

hover

which side was telling the "truth" — and there is no basis to believe that an additional question or two about Mr. Batdorf's compensation would have led to a different result. *See Mitrione*, 357 F.3d at 718 (but for alleged false statement, jury must "*probably*" have reached a different verdict).  Thus, even if there had been a misstatement about Mr. Batdorf's compensation or retirement status, there is no basis for concluding that such misstatement was material to this case, *see id.*, in light of the Plaintiffs' merits-based strategy and utter disinterest in credibility challenges.

> **D.     Mr. Batdorf's Consulting Agreement Was Irrelevant To Plaintiffs' Response To Cinergy's Trial Strategy.**

Plaintiffs' contention that Cinergy's trial strategy focused on compensation is likewise baseless.  They mischaracterize Cinergy's arguments at trial as focusing on a distinction between compensated and uncompensated witnesses.  *See* Pls.' Mem. at 6-7, 18.  Indeed, Cinergy could not have made that argument because, putting aside Mr. Batdorf, it was indisputable that its other three witnesses (Messrs. Stanley, Pulskamp and Swez) were all well compensated.

As the Court is well aware, Cinergy's essential point was *not* that Plaintiffs' expert witnesses were less credible because they had been compensated, but rather was that the approach taken by Cinergy's witnesses was reasonable because it was an approach informed by practical experience at the units in question and was the approach used to make "these decisions in real time," 5/21/08 Liability Trial Tr. at 10-1525 (Ex. C1).  In contrast, Cinergy argued that the approach of Plaintiffs' experts was less reasonable because the entire "recovered availability" approach was "made for litigation" years after the projects in question had been completed.  *See id.* at 10-1544 (Ex. C1) ("the Government says to you, in essence, that Cinergy should have dreamed up this formula back in 1985 to 2001 when these projects were being done").  Cinergy highlighted the "years and years of hands-on historical experience" of its witnesses with the units

in question, who made their predictions "based on the information available" at the time, 5/6/08 Liability Trial Tr. at II-68, (Ex. C1), as opposed to the formulas and methodologies that the Plaintiffs' lawyers and experts had spent months "trying out" long after the fact. *Id.* at II-73, (Ex. C1).

To be clear, Cinergy never stated that its own witnesses were not being paid. Indeed, the three Cinergy witnesses who remain active employees earn substantial compensation. *See* Moesser Aff. ¶¶ 4-6. Plaintiffs made a *strategic choice* not to cross-examine those witnesses about compensation. And — contrary to Plaintiffs' characterization — Cinergy did not attempt to draw a stark distinction between "unpaid" or "disinterested" witnesses and paid witnesses.

Thus, when Cinergy's arguments are accurately characterized, instead of distorted, Plaintiffs' complaint that they were unable to meet Cinergy's arguments because they did not know of Mr. Batdorf's consulting agreement rings hollow. Plaintiffs reasonably chose not to argue that *any of the four Cinergy witnesses* was biased by compensation or loyalty or self-interest. Plaintiffs' actual conduct at trial — as opposed to the rhetoric of their motion — demonstrates that even if they had known of Mr. Batdorf's compensation for his time, they would have proceeded just as they did — to argue that their approach was the only "reasonable" one. Accordingly, because Plaintiffs have failed to make any showing that knowledge of Mr. Batdorf's consulting agreement would have changed their trial strategy — let alone the outcome — their motion should be denied.

## III. PLAINTIFFS CANNOT MAKE THE SHOWING OF PREJUDICE REQUIRED FOR A NEW TRIAL.

Because Mr. Batdorf's compensation agreement was not improper, and because Plaintiffs failed to request any information regarding Mr. Batdorf's compensation, this Court need not reach the question whether Plaintiffs suffered prejudice due to their newly discovered evidence

of that compensation.  Nonetheless, even if this Court were to determine that Cinergy acted improperly in this case, a new trial would not be appropriate because Plaintiffs were not prejudiced by Cinergy's conduct.

Most fundamentally, because Plaintiffs *never asked* about such compensation, any "failure" to discover such information is attributable either to the fact that it was not important to their strategy, or to their own lack of diligence, and they have therefore not made an adequate showing of prejudice attributable to Cinergy.  As the Seventh Circuit held, a movant must show "due diligence on the part of the movant to discover the new evidence."  *See United States v. Walus*, 616 F.2d 283, 287 (7th Cir. 1980) (applying Rule 60(b)); *see also Peacock*, 721 F.2d at 213-14 (same criteria apply for evaluating new evidence under Rules 59(b) and 60(b)).  Here, no reasonable reading of the First and Second Requests can support the conclusion that Plaintiffs have, with "reasonable particularity," Fed. R. Civ. P. 34(b)(1)(A), sought disclosure of the agreements at issue.  *Mumford v. Bowen*, 814 F.2d 328, 330-31 (7th Cir. 1986) (applying Rule 60(b)) ("lack of knowledge is not enough; the plaintiff must show that her lack of knowledge was not due to her lack of diligence") (citing *Valmont Indus., Inc. v. Enresco, Inc.*, 446 F.2d 1193, 1194 (10th Cir. 1971)).  Plaintiffs had a duty to provide "'sufficient information to enable [the party to whom the request is directed] to identify responsive documents.'"  *Bruggeman v. Blagojevich*, 219 F.R.D. 430, 436 (N.D. Ill. 2004) (quoting *Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408, 412 (M.D.N.C. 1992)); *see also, e.g.*, *Berberena v. Pesquino*, Civil No. 03-557-CJP, 2007 WL 2778635, at *2 (S.D. Ill. Sept. 19, 2007) (denying motion for new trial based upon alleged failure to disclose relevant information responsive to a discovery request, where interrogatory did not "squarely ask" for the material in question and "it [wa]s a far stretch to interpret [the] interrogatory" in the manner proposed by movant); *see also Ellen v. Teledyne*

*Indus.*, Civil No. 586-654, 1988 U.S. Dist. LEXIS 19364, at *5-6 (N.D. Ind. May 19, 1988) (requests such as those propounded by plaintiffs are "simply too general to apprise the defendant and the court of what documents or specific categories of documents are included.").

Even if Cinergy had been called upon to produce Mr. Batdorf's consulting agreement, a new trial still would not be warranted.  Newly discovered or excluded evidence cannot serve as the basis for a new trial if it is relevant only to the credibility of a witness, as the consulting agreement would have been.  *See Ortho Pharm.*, 534 F.2d at 95; *Wroblewski*, 273 F.2d at 162. This is true even where (unlike here) the reason the impeachment evidence did not surface at trial is because the opposing party *inappropriately concealed it.  Envtl. Barrier*, 540 F.3d at 608. Plaintiffs therefore fare no better by claiming that the newly discovered evidence about Mr. Batdorf's compensation goes to "party misconduct," Pls.' Mem. at 1.  Any wrongdoing by a party is harmless error unless the opposing party can show that it affected its "substantial rights." Fed. R. Civ. P. 61; *Perry*, 794 F.2d at 285; *Falk*, 163 F.R.D. at 9.  Thus, even if Plaintiffs could show that they would have launched a serious credibility challenge had they known Mr. Batdorf was being compensated for his time, the governing law is clear that their inability to impeach a witness cannot support a finding of prejudice.

Even in a case applying the old common law rule forbidding witness compensation, a federal district court found that a new trial was not warranted where a party failed to disclose that it was compensating its fact witness.  In *Smith v. Allen*, one of the defendant's fact witnesses, an independent plumbing contractor, had lost a day of work in order to testify; the defendant promised to reimburse the witness for his time, and, indeed, sent him a check for the amount he would have earned that day.  212 F. Supp. 713, 713 (E.D. Va. 1962).  In contravention of the then-applicable rule, the defendant did not disclose this arrangement to the plaintiff, but the court

explained that even if the plaintiff had known and had asked the witness about it on cross-examination, "it would go merely to the credibility of the witness," and therefore "the subsequent discovery of the fact would not justify a new trial."  *Id* at 714.  Quite simply, if all Plaintiffs can show is that they lost a chance to impeach a witness, then they cannot demonstrate prejudice.

Further, even if there were some truth to Plaintiffs' allegation of false testimony, which there is not, Plaintiffs cannot show that such a false statement "could not have been discovered sooner with due diligence," *Mitrione*, 357 F.3d at 718, since they managed to request witness compensation information for experts during liability phase discovery and for all company witnesses during remedy phase discovery.  And they similarly cannot make the showings required for a new trial by demonstrating that any misstatement about Mr. Batdorf's retirement or employment status was material to the subject of his testimony or that such alleged falsehood "*probably*" led the jury to a different result than it otherwise would have reached.  *Id.*  Any questioning about his retirement status would have been nothing more than an aside, and plaintiffs have not shown by clear and convincing evidence that it would have had any probable bearing on the jury's verdict.  In sum, under any applicable standard, Mr. Batdorf's statement about being retired cannot warrant a new trial.

Finally, the jury verdict itself provides a powerful indication that the jury did not decide this case based upon credibility determinations, and therefore, as a factual matter, Plaintiffs can have suffered no prejudice.  Plaintiffs *prevailed* on the vast majority of their claims involving the units at which Mr. Batdorf had served as station manager:  the jury found for Cinergy on the Gibson unit (on which Mr. Batdorf testified) but found for the Plaintiffs on the four Wabash River units (on which Mr. Batdorf also testified).  *See* Jury Verdict Form (S.D. Ind. May 22, 2008), *attached as* Ex. C10; *see also* Batdorf. Aff. ¶ 3.  That outcome is inconsistent with

32

Plaintiffs' assertion that the jury might have reached a different conclusion had Plaintiffs impeached Mr. Batdorf with his compensation agreement.  *See* Pls.' Mem. at 17.  The jury decided this case based upon its view of the extent to which the NSR "prediction" was made in a meaningful way, based upon the record evidence.  Witness credibility simply was not, and could not have become, the driver of this verdict.

In sum, Plaintiffs' arguments about inappropriate compensation, missing evidence, and false testimony are groundless, both as a matter of law and as a matter of fact.  They cannot show that any error that might have occurred affected their "substantial rights," Fed. R. Civ. P. 61, by "deny[ing] them a fair trial."  *Perry*, 794 F.2d at 285.  Instead, any error was harmless, *see Falk*, 163 F.R.D. at 9.  Plaintiffs' motion reflects nothing more than a desire to second guess their trial strategy, and that is not a proper basis for a new trial motion.  *See Griffin*, 542 F.3d at 224 ("As we have said before, 'civil litigants are entitled to a fair trial, not a perfect one'").  Plaintiffs' motion should be denied.

## IV.   POST-TRIAL DISCOVERY AND AN EVIDENTIARY HEARING ARE UNNECESSARY AND WOULD BE DISTRACTIONS FROM PREPARATIONS FOR THE UPCOMING REMEDY TRIAL.

Plaintiffs move in the alternative for a new round of discovery and an evidentiary hearing, "[t]o the extent . . . that Cinergy wishes belatedly to dispute the material facts relating to the Batdorf Agreement."  Pls.' Mem. at 27.  Any reopening of discovery on liability is unwarranted.  As Plaintiffs acknowledge in making their "alternative" and conditional request, a motion for a new trial under Rule 59 does not automatically trigger a further evidentiary hearing.  Indeed, as Rule 59(c) ("Time to Serve Affidavits") indicates, the Rules already provide a different method for parties to present evidence supporting or opposing a Rule 59 motion.

Plaintiffs had ample opportunity during discovery and the trial itself to seek information about Mr. Batdorf's compensation; they chose not to do so.  *See supra* at 23-24.  Nonetheless, in

an effort to expedite resolution of this issue in advance of the upcoming remedy trial, Cinergy has made available, in the exhibits and affidavits opposing Plaintiffs' motion, all facts and documents relevant to Mr. Batdorf's compensation.  *See* Moesser Aff. ¶ 18 (declaring, under penalty of perjury, that all consulting agreements and resulting invoices involving Mr. Batdorf have been disclosed).  Consequently, there is no need for additional discovery in this matter.

In any event, as a matter of law, Plaintiffs are not entitled to the post-trial discovery they seek.  Post-trial discovery is "an unusual event, flowing from new information."  *Vikase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1324 (Fed. Cir. 2001).  In the cases Plaintiffs cite, post-trial discovery was granted only where the court lacked a sufficient basis to determine whether a new trial was warranted.  *See Vikase Corp. v. Am. Nat'l Can Co.*, 979 F. Supp. 697, 700 (N.D. Ill. 1997), *affirmed by* 261 F.3d 1316 (Fed. Cir. 2001) (allowing post-trial discovery where "the allegations of altered documents were serious enough" that the court "*could not determine without more information*" whether the misconduct affected the outcome of the case) (emphasis added); *Ty Inc.*, 353 F.3d at 537 (finding that an evidentiary hearing and further investigation were necessary to determine *whether witness tampering occurred*).  Here, by contrast, all the relevant facts are before this Court such that a ruling on the papers is appropriate.

Further, in a Rule 59 motion, the "materiality of the evidence is critical."  *Envtl. Barrier*, 540 F.3d at 608.  There is simply no need for post-trial discovery where the evidence sought could not supply the basis for a new trial.  Plaintiffs seek discovery of evidence that could be used to impeach a witness, but which does not offer any new material facts about the substance of this case.  New impeachment evidence generally is not a legal ground for a new trial, *see supra* at 31, particularly where, as here, Plaintiffs had similar impeachment evidence available to them at trial and nonetheless chose not to make impeachment arguments.  "[T]he place to

34

challenge" Mr. Batdorf's credibility was "during cross-examination, not after trial." *Griffin*, 542 F.3d at 223.  Moreover, because Mr. Batdorf will not be playing any role in the upcoming remedy trial, any information about his compensation is irrelevant on a going-forward basis.

Post-trial discovery would be expensive, time-consuming, potentially invasive into privileged matters, and unnecessary.  Plaintiffs do not allege any evidentiary confusion and cannot identify any relevant evidence that is not now before this Court.  Because Plaintiffs lack any good faith basis for seeking additional discovery, this Court should put an end to this unwarranted distraction from remedy phase preparations and deny Plaintiffs' motion in all respects, including their alternative argument seeking to reopen discovery for the liability phase.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a new trial and for expedited discovery and an evidentiary hearing should be denied.

DATED:  November 10, 2008

Respectfully Submitted,

PSI ENERGY, INC. AND THE CINCINNATI GAS & ELECTRIC COMPANY

By: /s/ Robert R. Clark

By: /s/ Kathryn B. Thomson

Attorneys for PSI Energy, Inc. and The Cincinnati Gas & Electric Company

THOMAS C. GREEN
MARK D. HOPSON
SAMUEL B. BOXERMAN
KATHRYN B. THOMSON
FRANK R. VOLPE
KOSTA S. STOJILKOVIC
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005

(202) 736-8131

SCOTT R. ALEXANDER
ROBERT R. CLARK
DEBRA MCVICKER LYNCH
JOHN D. PAPAGEORGE
Taft Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, IN  46204

JAMES A. KING
Porter Wright Morris & Arthur LLP
41 South High Street
Columbus, OH  43215

JULIE L. EZELL
Duke Energy Business Services LLC
1000 East Main Street
Plainfield, IN 46168-1782

DEAN M. MOESER
Duke Energy Corporation
5555 San Felipe St.
Houston, TX 77056

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2008, a copy of the foregoing was filed electronically under seal with the Court.  On that same date, the foregoing and all attachments and affidavits thereto are being sent via electronic mail to the following parties.

**FOR PLAINTIFF, UNITED STATES OF AMERICA:**

Jeffrey K. Sands
E-mail:  jeffrey.sands@usdoj.gov
Sarah Dale Himmelhoch
E-mail:  sarah.himmelhoch@usdoj.gov
Larry Martin Corcoran
E-mail:  larry.corcoran@usdoj.gov
James Lofton
E-mail:  jim.lofton@usdoj.gov
Katherine Vanderhook
E-mail:  katherine.vanderhook@usdoj.gov
Cynthia Ferguson
E-mail:  cynthia.ferguson@usdoj.gov
Deborah Behles
E-mail:  deborah.behles@usdoj.gov
Thomas Benson
E-mail:  thomas.benson@usdoj.gov
Danielle Rosengarten
E-mail:  danielle.rosengarten@usdoj.gov
Environmental and Natural Resources Division
United States Department of Justice

Gaylene Vasaturo
E-mail:  vasaturo.gaylene@epa.gov
Charles V. Mikalian
E-mail:  mikalian.charles@epa.gov
Ignacio L. Arrazola
E-mail:  arrazola.ignacio@epa.gov
Thomas Williams
E-mail:  williams.tom@epa.gov
United States Environmental Protection Agency

Thomas E. Kieper
E-mail:  tom.kieper@usdoj.gov
United States Attorney's Office

**FOR PLAINTIFF-INTERVENOR, THE STATE OF NEW YORK:**

Robert T. Rosenthal
E-mail:  robert.rosenthal@oag.state.ny.us
J. Jared Snyder
E-mail:  jared.snyder@oag.state.ny.us
Joseph M. Kowalczyk
E-mail:  joseph.kowalczyk@oag.state.ny.us
New York State Attorney General

**FOR PLAINTIFF-INTERVENOR, THE STATE OF CONNECTICUT:**

Carmel Alicia Motherway
E-mail:  carmel.motherway@po.state.ct.us
R. Keith Guthrie
E-mail:  kgmail@comcast.net
Connecticut Attorney General

**FOR PLAINTIFF-INTERVENOR, THE STATE OF NEW JERSEY:**

Kevin P. Auerbacher
E-mail: auerbkev@law.dol.lps.state.nj.us
Jean Patrice Reilly
E-mail: reilljea@law.dol.lps.state.nj.us
Jon C. Martin
E-mail: martijon@law.dol.lps.state.nj.us
State of New Jersey, Department of Law
  &amp; Public Safety
New Jersey Office of the Attorney General

Christine F. Lewis
Email: christine.lewis@dol.lps.state.nj.us
Christopher D. Ball
Email: christopher.ball@dol.lps.state.nj.us
Maurice A. Griffin
E-mail: maurice.griffin@dol.lps.state.nj.us
Carol DeMarco
E-mail: carol.demarco@dol.lps.state.nj.us

**FOR THE DEFENDANTS:**

Julie L. Ezell
E-mail: julie.ezell@cinergy.com
Cinergy Services, Inc.

James A. King
E-mail: jking@porterwright.com
Porter Wright Morris & Arthur, LLP

Scott R. Alexander
E-mail: salexander@taftlaw.com
Robert R. Clark
E-mail: rclark@taftlaw.com
John D. Papageorge
E-mail: jpapageorge@taftlaw.com
Taft Stettinius & Hollister LLP

Samuel B. Boxerman
E-mail: sboxerman@sidley.com
Kathryn B. Thomson
E-mail: kthomson@sidley.com
Thomas Charles Green
E-mail: tcgreen@sidley.com
Frank R. Volpe
E-mail: fvolpe@sidley.com
Mark D. Hopson
E-mail: mhopson@sidley.com
Kosta S. Stojilkovic
E-mail: kstojilkovic@sidley.com
Sidley Austin LLP

**FOR PLAINTIFFS-INTERVENORS, HOOSIER ENVIRONMENTAL COUNCIL AND OHIO ENVIRONMENTAL COUNCIL:**

Jonathan Lewis
jlewis@catf.us
Clean Air Task Force

By:  /s/ Kathryn B. Thomson
Attorney
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
kthomson@sidley.com

2