UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | )<br>)<br>) | |
| STATE OF NEW YORK, STATE OF NEW JERSEY, STATE OF CONNECTICUT, HOOSIER ENVIRONMENTAL COUNCIL, and OHIO ENVIRONMENTAL COUNCIL,<br>Plaintiff-Intervenors, | )<br>)<br>)<br>)<br>)<br>) | |
| vs. | ) | 1:99-cv-1693-LJM-JMS |
| CINERGY CORP., PSI ENERGY, INC., and THE CINCINNATI GAS & ELECTRIC COMPANY,<br>Defendants. | )<br>)<br>)<br>)<br>) | |

## **ORDER ON MOTIONS *IN LIMINE***

This cause is before the Court on: plaintiff's, the United States of America ("USA"), and plaintiff-intervenors', the State of New York, the State of New Jersey, the State of Connecticut, the Hoosier Environmental Council, and the Ohio Environmental Council (all plaintiffs, collectively, "Plaintiffs"), Motion *in Limine* to Exclude Portions of Mr. Rarick's ("Rarick's") Expert Testimony (Docket No. 1469) and Plaintiffs' Motion *in Limine* for Ruling that Facts Previously Found by this Court Relating to Particulate Matter Emissions Violations at the W.C. Beckjord Plant ("Beckjord") are Established for Purposes of the Remedy Trial (Docket No. 1472); and on defendants', Cinergy Corp., PSI Energy, Inc., and The Cincinnati Gas & Electric Company (collectively, "Cinergy"), Motion *in Limine* to Exclude Untimely and Impromptu Risk Assessment Offered by Plaintiffs' Expert Dr. Joel Schwartz ("Dr. Schwartz") (Docket No. 1475).

For the reasons stated herein, the Court **GRANTS** Plaintiffs' motion regarding Rarick's testimony, **GRANTS in part and DENIES in part** Plaintiffs' motion regarding Beckjord facts, and **GRANTS** Cinergy's motion regarding Dr. Schwartz's opinions.

### I. PLAINTIFFS' MOTION TO EXCLUDE PORTIONS OF RARICK'S TESTIMONY

Plaintiffs seek to exclude the testimony by Rarick about the NSR program and/or the purpose of the New Source Review ("NSR") or other Clean Air Act ("CAA") provisions. Rarick, a former employee at the Environmental Protection Agency ("EPA") Region 9, in San Francisco, California, and a former employee of the Indiana Department of Environmental Management ("IDEM"), is now a private consultant. Pls.' Rarick Ex. 1. Rarick testified that he will offer an opinion in this case about the objectives of the Non-attainment New Source Review ("NNSR") and Prevention of Significant Deterioration ("PSD") programs. Rarick Dep. at 51-52. Rarick was not involved with passage of the NNSR. *Id.* at 45-46. He also was unsure of whether he had read the statutory provisions concerning NSR. *Id.* at 52. Plaintiffs' argue that, to the extent Cinergy offers Rarick's testimony on legal matters, Rarick's testimony is neither helpful nor reliable; therefore, it should be excluded.

Cinergy contends that it is not offering Rarick's testimony on the legal interpretation of the relevant regulations. Moreover, Cinergy asserts that Rarick is qualified to lay the foundation for his opinions with his understanding of the relevant statutes and regulations. Cinergy avers that Rarick's reference to his understanding of the objectives of the NSR and PSD programs merely provides background and context for his broader opinions. Cinergy

evidences that Rarick himself testified that he does not intend to offer a legal opinion. *Id.* at 52.

The Court agrees with Plaintiffs that Rarick's testimony about the purpose of the NSR and PSD regulations is improper legal opinion and should be excluded. This Court has stated in the past that interpretation of environmental statutes and EPA regulations rests with the Court, not with experts provided by the parties. *United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/S, 2002 WL 31427523, at *8 (S.D. Ind. Oct. 24, 2002). The Court is not persuaded by Cinergy's argument that Rarick's understanding of the regulations is necessary foundation for his opinions on the proper remedy in this case. For these reasons, Plaintiffs' Motion *in Limine* to Exclude Portions of Mr. Rarick's ("Rarick's") Expert Testimony (Docket No. 1469), should be **GRANTED**.

## II. PLAINTIFFS' MOTION REGARDING ESTABLISHMENT OF BECKJORD FACTS

Plaintiffs' second motion *in limine* seeks to prevent Cinergy from arguing that the test results underlying the facts found by the Court with respect to particulate matter emissions violations at Beckjord, in the Court's Order on Plaintiffs' Motion for Partial Summary Judgment on Particulate Matter Violations at Beckjord ("Beckjord Order"), Docket No. 984, are suspect. Plaintiffs assert that Cinergy admitted to the violations as presented by Plaintiffs' in their pleadings. *See* Docket No. 643, at 2; USA's Am. Compl. ¶¶ 194-96. As a result, Plaintiffs' argue, Cinergy has made a classic judicial admission that precludes it from producing contrary evidence now. Pls.' Beckjord Reply, at 2 (citing *United States v. Cunningham*, 405 F.3d 497, 503-04 (7th Cir. 2005)).

Cinergy contends that it does not seek to challenge the Court's finding in the Beckjord Order that it violated the Ohio State Implementation Plan ("SIP") or the Administrative Consent Order ("AOC") on the relevant dates. Rather, Cinergy seeks to admit evidence to call into question the values underlying at least one of those violations to rebut Plaintiffs' allegations that the only proper remedy for the Beckjord violations is continuous monitoring. Cinergy claims that the compliance margins or the variability of the underlying test results were not established pursuant to the Beckjord Order because they were not specified in the Court's decision. Cinergy's Beckjord Resp. at 5 (citing Fed. R. Civ. P. 56(d)(1)).

> According to Federal Rule of Civil Procedure 56(d)(1) ("Rule 56(d)(1)"):
>
> If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue. The facts so specified must be treated as established in the action.

Therefore, the Court must look to the Beckjord Order, exhibits cited therein, and the pleadings referenced in the Beckjord Order to determine what facts have been established.

> The Beckjord Orders states, in relevant part:
>
> [V]iolations occurred on the following dates: October 12, 1999; October 21-22, 1999; May 4, 2000; and May 26, 2000. After each of these occurrences, Cinergy notified the [Environmental Protection Agency, ("EPA")] that the [particulate matter ("PM")] emissions had exceeded allowable limits. *See* Pls.' Exs. 10-11, 20-23. Cinergy concedes in its response in opposition to the instant motion that the PM emissions exceeded the allowable limits.

Plaintiffs' Exhibits 10 and 11 refer to the PM emissions for Beckjord Unit 1 on October 12, 1999, stating that the test result for that date was 0.49 lb/mmBtu. Docket No. 564, Exs.

10-11. Plaintiffs' Exhibit 11 appears to be the actual test report. *Id.* Ex. 11. Plaintiffs' Exhibits 20 through 23 refer to the PM emissions for Beckjord Unit 1 on May 4, 2000, and May 26, 2000. *Id.* Exs. 20-23.

In its response to Plaintiffs' motion for partial summary judgment on the Beckjord PM issue, Cinergy cites to Plaintiffs' Complaints for the allegations of when it exceeded the SIP emissions limitations. Docket No. 653, at 2 & ns. 2-5. Cinergy then states: "Cinergy concedes that the four PM exceedences [sic] listed in Plaintiffs' Complaints occurred as alleged. Cinergy admitted the exceedences [sic] when they occurred and admits them now." *Id.* at 2. The allegations in the Plaintiffs' Complaints set forth: (1) that on October 12, 1999, Cinegy performed a stack test for particulate matter at Beckjord Unit1 and found that the particulate emissions were 0.49 lb/mm BTU, Docket No. 129-2, ¶ 190; Docket No. 129-4, ¶ 200; (2) that on May 4, 2000, stack tests performed on Beckjord Unit 1 found that particulate emissions were 0.13 lb/mm BTU, Docket No. 129-2, ¶ 191; Docket No. 129-4, ¶ 201; (3) that on May 26, 2000, stack tests performed on Beckjord Unit 1 found that particulate emissions were 0.16 lb/mm BTU, Docket No. 129-2, ¶ 191; Docket No. 129-4, ¶ 201;(4) that on or about October 21-22, 1999, Cinergy conducted a stack test on Beckjord Unit 2 and found that the particulate emissions were 0.39 lb/mm BTU, Docket No. 129-2, ¶ 195; Docket No. 129-4, ¶ 205; and (5) that on or about October 21-22, 1999, Cinergy conducted a stack test on Beckjord Unit 1 and found that the particulate emissions were 0.49 lb/mm BTU, Docket No. 129-2, ¶ 194; Docket No. 129-4, ¶ 205.

Based on the facts as set forth above, the Court can only conclude that Cinergy has admitted that the stack test data for particulate emissions on the dates and at the units set forth above were as a matter of fact those that were stated in Plaintiffs' Complaints.

Therefore, Cinergy may not call into question the numerical result it reported for the subject dates and units. In other words, Cinergy cannot have an expert opine that the results "are basically impossible considering the available evidence." Defs.' Ex. 3, Richard D. McRanie Expert Report, Sept. 29, 2008, at 7 n.13. Nor may Cinergy's expert otherwise opine that the result should have been anything but what Cinergy reported it to be. However, Cinergy may, if appropriate to address an allegation made by Plaintiffs, call into question the reliability of using the results for those particular days to justify continuous monitoring as a potential remedy. To the extent that Plaintiffs' seek to limit Cinergy's expert from opining that those few high results cannot justify continuous monitoring, Plaintiffs' motion must be **DENIED**. Otherwise it must be **GRANTED**.

In summary, Plaintiffs' Motion *in Limine* for Ruling that Facts Previously Found by this Court Relating to Particulate Matter Emissions Violations at the W.C. Beckjord Plant are Established for Purposes of the Remedy Trial (Docket No. 1472) is **GRANTED in part and DENIED in part**.

### III.  CINERGY'S MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. SCHWARTZ

Cinergy contends that the Court should exclude at trial testimony from Plaintiffs' environmental health effects expert, Dr. Schwartz, that gives a ballpark estimate of the number of deaths attributable to pollution from Cinergy's Wabash River Station ("Wabash"). Cinergy claims that Dr. Schwartz had never made such a disclosure before, that such a failure violates Federal Rule of Civil Procedure 26(a) ("Rule 26(a)"), and that it would be prejudiced if the Court did not exclude the testimony pursuant to Rule 37(c)(1). Cinergy asserts that despite knowing that Cinergy took issue with Dr. Schwartz's initial

report because it made no quantifiable estimate of the health effects of emissions from Wabash, Dr. Schwartz failed to offer a quantitative assessment in his rebuttal report. Rather, all of Dr. Schwartz's opinions were generic, not specific, in nature. Cinergy claims that Dr. Schwartz's deposition ballpark estimate was "smuggled in at the last moment" and, therefore, was prejudicial. Cinergy Reply, at 5.

Plaintiffs assert that Dr. Schwartz's ballpark estimate is not a new opinion; rather, Plaintiffs argue that his ballpark estimate is merely an elaboration of and consistent with the opinions he expressed in both his initial report and his rebuttal report. Specifically, Plaintiffs contend that Dr. Schwartz consistently opined that increases in the particle concentrations in air that result from a utilities failure to install pollution controls has a substantial effect on human health, and result in early deaths. Cinergy Mot. in Limine, Ex. 2, at 2, 7, 42-43. Furthermore, Plaintiffs aver that the data to back up these opinions is referenced and discussed in Dr. Schwartz's report. Moreover, Plaintiffs assert that Dr. Schwartz listed the outside sources, namely other Plaintiffs' experts' reports, he relied upon in addition to those he relied upon in his report when he made the ballpark estimate. Even if the Court concludes that Dr. Schwartz's ballpark estimate is not merely an elaboration of his prior opinions, Cinergy was not prejudiced by the non-disclosure because Dr. Schwartz's opinion was consistent with all the opinions in his reports, and because Cinergy asked the question that elicited the estimate and it failed to object to Dr. Schwartz's testimony and declined the opportunity to question Dr. Schwartz further about his opinion.

The context of Dr. Schwartz's testimony is relevant here. Dr. Schwartz was asked if he considered the Chinkin or Wheeler draft reports in preparing his report, and Dr. Schwartz replied, "No, that didn't have anything to do with my task." Schwartz Dep. at 20.

7

Likewise, Dr. Schwartz testified that he did not consider the Grandjean draft to prepare his opinions. *Id.* at 20-21. In addition, Dr. Schwartz testified to the purpose of his report:

> Well, what I was asked to do was to produce a report that talks about what are the effects of particles in the air, irrespective of, you know, how they got there, you know, what plant they came from.
>
> So the opinions in my report are sort of generic. They're not about the health effects of particles if they came from the Wabash River plant or if they came from a plant somewhere in Chicago or anything else. It's this is what particles seem to do to health.

*Id.* at 32. Dr. Schwartz also testified that he did not do a health impact assessment or a risk assessment, but he might have some, if not all, of the information available to him to do such an assessment if he had been asked to take the time to do one. *Id.* at 36-37, 52-54. The information he had available that he would have looked at included the "Chinkin and Wheeler report," which included the CALPUFF model. *Id.* at 50-53.

> Dr. Schwartz then testified:
>
> Q . . . Before we took the break, we were talking about quantitative risk assessments; is that right?
>
> A That's right. So I think I could do a quantitative risk assessment. I mean, I would want to read through that report in a lot more detail to be sure, but having briefly looked through it, I think I could do a quantitative risk assessment in this case if someone wanted me to.
>
> Q Okay. Fair enough. And if you were to do that, would that tell us what Wabash River's contribution is to health impacts as opposed to other sources of air pollution?
>
> A Yes, it would.

*Id.* at 55-56.

And, Dr. Schwartz testified:

> Q Dr. Schwartz, can you tell me – well, earlier today we talked about quantitative risk assessment.

8

Do you recall that discussion?

A   Yes.

Q   Are there multiple sources that contribute to the formation of ozone in the ambient air?

A   Yes.

Q   Are there multiple sources that contribute to the formation of PM2.5 in the ambient area?

A   Yes.

Q   Can you tell me, relative to all sources, how the Wabash River excess emissions compare?

MS. VANDERHOOK:  Objection; vague and ambiguous.  Are you asking with regard to PM –

MS. THOMPSON:  Let's take ozone first.

THE WITNESS:  Actually, I don't even remember what the NOx numbers were.  So I can't even tell you that.

BY MS. THOMSON:

Q   Okay.  Let's take the example of particulate matter.

A   Right.  So you mean relative to all emissions in the country or relative to –

Q   Let's focus on, I guess, the affected area.  So let's take roughly east of Indiana.  I'm sorry.  Let's say east of Illinois to capture Indiana.

A   Right.  So what the effects of the emissions from that facility are.  Well, so looking at the modeling that was done, it looked like there was an area of about six states where the annual average – there was a bunch of stuff done with various days.  The annual average was only done with the CALPUFF model, which they didn't have enough time to do the CMAQ, and they got numbers of about – on annual average of about 0.01 micrograms per cubic meter in that six-state area, and there's this much larger area where there was some impact but the numbers were much smaller than that.

So you know, in terms of a health impact assessment, so then you'd want to say if I multiply that by some coefficient and do some calculations, what

would you get? So obviously, I can't do that standing – a detailed one, but you can actually do a ballpark estimate. Right? So if you look at these mortality cohort studies, and so the Laden study was like, you know, 1.3 percent per microgram per cubic meter in terms of increases in mortality and the ACS study was lower and things like that.

So if you round if off and pick a round number because that's all I'm going to do standing here, let's call it 1 percent. So if mortality goes up by 1 percent per microgram and you have 0.01 micrograms, then you got 0.01 percent.

Now, those six states have a lot of people in them. So let's say that those states are responsible for a sixth or seventh or something of the deaths in the United States. So there were 2.4 million deaths in the United States. So a sixth of that is 400,000. So 0.01 percent of 400,000 is 40. So obviously, you know, I would do more than that if I was doing a real – but just to get a sort of idea of the ballpark, it suggests that the number of excess deaths per year are in the 10s.

Q Okay. But again, you didn't do any quantitative risk assessment in your expert reports in this case?

A No.

MS. THOMPSON: I think that concludes the deposition for today. I do want to reserve whatever time I have . . . .

*Id.* at 264-67.

The Court concludes that it should exclude Dr. Schwartz's ballpark estimate testimony because it was not disclosed in his two reports, it was not a mere elaboration of the opinions in his reports, and it is unreliable in the context in which it was given. Pursuant to Rule 37(c)(1), "[i]f a party fails to provide information . . . as required by Rule 26(a) . . ., the party is not allowed to use that information . . . at trial, unless the failure was substantially justified or is harmless." Generally, the exclusion is automatic absent a showing of justification or harmlessness. *See Salgado by Salgado v. Gen'l Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). Rule 26(a)(2)(B)(i) and (ii) require an expert's written

report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them; [and] the data or other information considered by the witness in forming them . . . ." Here, Dr. Schwartz testified that he had not been asked to do a quantitative risk assessment and that he had not included such an assessment in his report. Moreover, he testified that he had some, if not all, of the data he needed to perform such an assessment, but to do so would take more time. His ballpark estimate was nothing more than that: a quick guess of what a quantitative analysis would show. This is not the stuff of his report, which he testified was a more of a generic view of what these types of particles in the air can do to health.

Furthermore, Dr. Schwartz had the opportunity to do a more detailed quantitative analysis in rebuttal because Cinergy's expert had pointed out the deficiencies of Dr. Schwartz's initial report with respect to such quantitative opinions. *See* Pls.' Ex. B, Valberg Rep., at 81-82. But, Dr. Schwartz never did so. Moreover, Dr. Schwartz testified that such quantitative analysis was not within the scope of what he was hired to do and would have taken a much longer time to complete. Schwartz Dep. at 32, 36-37, 52-54. Clearly Dr. Schwartz's ballpark estimate was a new opinion because he had never done it for Plaintiffs and had never been asked by Plaintiffs to do it in preparation for his testimony in this case.

Finally, Dr. Schwartz's "back of the envelope" analysis is devoid of pertinent references to scientific data. He does reference several studies and reports in his discussion, however, it is unclear whether any of them other than the apparent reference to Chinkin and Wheeler's CALPUFF analysis, are part of Dr. Schwartz's prior reports, available in the public domain, or otherwise already in evidence. In addition, Dr. Schwartz's off-the-cuff analysis uses too many assumptions and "round off to pick a round

11

number" references to pass the reliability standard of Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

For all of these reasons, the Court concludes that Cinergy's Motion *in Limine* to Exclude Untimely and Impromptu Risk Assessment Offered by Plaintiffs' Expert Dr. Joel Schwartz (Docket No. 1475) must be **GRANTED**.

### IV. **CONCLUSION**

For the reasons stated herein, the Court **GRANTS** plaintiff's, the United States of America, and plaintiff-intervenors', the State of New York, the State of New Jersey, the State of Connecticut, the Hoosier Environmental Council, and the Ohio Environmental Council (all plaintiffs, collectively, "Plaintiffs"), Motion *in Limine* to Exclude Portions of Mr. Rarick's Expert Testimony (Docket No. 1469); **GRANTS in part and DENIES in part** Plaintiffs' Motion *in Limine* for Ruling that Facts Previously Found by this Court Relating to Particulate Matter Emissions Violations at the W.C. Beckjord Plant are Established for Purposes of the Remedy Trial (Docket No. 1472); and **GRANTS** defendants', Cinergy Corp., PSI Energy, Inc., and The Cincinnati Gas & Electric Company, Motion *in Limine* to Exclude Untimely and Impromptu Risk Assessment Offered by Plaintiffs' Expert Dr. Joel Schwartz (Docket No. 1475).

IT IS SO ORDERED this 9th day of January, 2009.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distributed electronically to:

Scott R. Alexander
TAFT STETTINIUS & HOLLISTER LLP
salexander@taftlaw.com

Kevin P. Auerbacher
STATE OF NEW JERSEY,
DEPT. OF LAW & PUBLIC SAFETY
auerbkev@law.dol.lps.state.nj.us

Christopher D. Ball
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
christopher.ball@dol.lps.state.nj.us

Deborah Nicole Behles
U. S. DEPARTMENT OF JUSTICE
deborah.behles@usdoj.gov

Thomas Andrew Benson
U. S. DEPARTMENT OF JUSTICE,
ENVIRONMENTAL ENFORCEMENT
thomas.benson@usdoj.gov

Samuel B. Boxerman
SIDLEY AUSTIN LLP
sboxerman@sidley.com

Phillip Brooks
U. S. DEPARTMENT OF JUSTICE
phillip.brooks@usdoj.gov

Jayna Morse Cacioppo
TAFT STETTINIUS & HOLLISTER LLP
jcacioppo@taftlaw.com

Robert R. Clark
TAFT STETTINIUS & HOLLISTER LLP
rclark@taftlaw.com

Larry Martin Corcoran
ENVIRONMENTAL AND NATURAL RESOURCES DIVISION
larry.corcoran@usdoj.gov

Carol Lynn DeMarco
NEW JERSEY ATTORNEY GENERAL'S OFFICE
carol.demarco@dol.lps.state.nj.us

Meghan Colleen Delaney
SIDLEY AUSTIN LLP
mberroya@sidley.com

Michael E. DiRienzo
KAHN DEES DONOVAN & KAHN
miked@k2d2.com

Jason A. Dunn
UNITED STATES DEPARTMENT OF JUSTICE
jason.dunn@usdoj.gov

Steven David Ellis
ENVIRONMENTAL & NATURAL RESOURCES
steven.ellis@usdoj.gov

Julie L. Ezell
DUKE ENERGY LEGAL DEPARTMENT
julie.ezell@duke-energy.com

Cynthia Marie Ferguson
U. S. DEPARTMENT OF JUSTICE,
ENVIRONMENT & NATURAL RESOURCES
cynthia.ferguson@usdoj.gov

Myles E. Flint II
U. S. DEPT OF JUSTICE
myles.flint@usdoj.gov

Richard Mark Gladstein
U. S. DEPARTMENT OF JUSTICE
richard.gladstein@usdoj.gov

Thomas Charles Green
SIDLEY AUSTIN LLP
tcgreen@sidley.com

Maurice A. Griffin
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
maurice.griffin@dol.lps.state.nj.us

R. Keith Guthrie
ATTORNEY AT LAW
kgmail@comcast.net

Eugene J. Kelly Jr.
NEW YORK STATE ATTORNEY GENERAL
eugene.kelly@oag.state.ny.us

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

James A. King
PORTER WRIGHT MORRIS & ARTHUR LLP
jking@porterwright.com

Joseph M. Kowalczyk
NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
joseph.kowalczyk@oag.state.ny.us

Christine F. Lewis
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
christopher.ball@dol.lps.state.nj.us

Jonathan F. Lewis
CLEAN AIR TASK FORCE
jlewis@catf.us

Jennifer Anne Lukas-Jackson
UNITED STATES DEPARTMENT OF JUSTICE
jennifer.lukas-jackson@usdoj.gov

Larry A. Mackey
BARNES & THORNBURG LLP
larry.mackey@btlaw.com

John R. Maley
BARNES & THORNBURG
jmaley@btlaw.com

Jon C. Martin
STATE OF NEW JERSEY
martijon@law.dol.lps.state.nj.us

Kimberly P. Massicotte
OFFICE OF THE ATTORNEY GENERAL
kimberly.massicotte@po.state.ct.us

Dean M. Moesser
DUKE ENERGY CORPORATION
dmmoesser@duke-energy.com

Carmel Alicia Motherway
CONNECTICUT ATTORNEY GENERAL
carmel.motherway@po.state.ct.us

Michael Joseph Myers
NEW YORK STATE DEPARTMENT OF LAW
michael.myers@oag.state.ny.us

John D. Papageorge
TAFT STETTINIUS & HOLLISTER LLP
jpapageorge@taftlaw.com

Crissy Lyn Pellegrin
ENVIRONMENTAL PROTECTION AGENCY
pellegrin.crissy@epa.gov

Jean Patrice Reilly
STATE OF NEW JERSEY
martijon@law.dol.lps.state.nj.us

Danielle Brody Rosengarten
U. S. DEPT OF JUSTICE
danielle.rosengarten@usdoj.gov

Robert T. Rosenthal
NEW YORK ATTORNEY GENERAL'S OFFICE
robert.rosenthal@oag.state.ny.us

Jeffrey K. Sands
UNITED STATES DEPT. OF JUSTICE
jeffrey.sands@usdoj.gov

Justin Aaron Savage
UNITED STATES DEPARTMENT OF JUSTICE
justin.savage@usdoj.gov

J. Jared Snyder
OFFICE OF THE ATTORNEY GENERAL
jared.snyder@oag.state.ny.us

Kosta S. Stojilkovic
SIDLEY AUSTIN LLP
kstojilkovic@sidley.com

Kathryn B. Thomson
SIDLEY AUSTIN LLP
kthomson@sidley.com

Katherine Lynn Vanderhook
UNITED STATES DEPARTMENT OF JUSTICE
katherine.vanderhook@usdoj.gov

Gaylene Vasaturo
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
vasaturo.gaylene@epa.gov

Frank R. Volpe
SIDLEY AUSTIN LLP
fvolpe@sidley.com

Distributed via U.S. Postal Service to:

Stefanie A. Brand
R J HUGHES JUSTICE COMPLEX
25 Market Street
P O Box 093
Trenton, NJ 08625

Mary E. Costigan
R J HUGHES JUSTICE COMPLEX
25 Market Street
P O Box 093
Trenton, NJ 08625

James A. Murphy
R J HUGHES JUSTICE COMPLEX
25 Market Street
P O Box 093
Trenton, NJ 08625