IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:99-cv-01693-LJM-JMS |
| | ) | |
| CINERGY CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' TRIAL BRIEF**

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………...1

BACKGROUND..…………………………………………………………………….....2

LEGAL STANDARD FOR INJUNCTION..……………………….…………………….3

OVERVIEW OF PLAINTIFFS' EVIDENCE..…………………………………………5

   I.  Wabash River Violations……………………………………………………5

      A. Emissions And Pollution Controls……………………………………...6

      B. Air Quality Impacts Of Cinergy's Illegal $SO_2$ And $NO_x$ Emissions……………...7

      C. Harm To Human Health And The Environment…………………..…………..8

      D. Public Interest And Existing Air Programs…………………….…………...10

   II.  Beckjord Violations……………………………….……..………………….11

PLAINTIFFS' PROPOSED REMEDY……………………………………………….12

   I.  Compliance With The Clean Air Act…………………………...……………….....13

   II. Mitigation Of Cinergy's Historic, Illegal Emissions…………..……………………14

   III. Remedy For The Beckjord Violations………………………………….….……18

      A. Emissions Monitoring……………………………………………….……18

      B. Penalty…………………………………………………………….............19

CINERGY'S PROPOSED REMEDY………………………………………….....21

   I.  Cinergy's Proposed Remedy For The Wabash River Violations……………………21

      A. Cinergy's Proposed Remedy Is Contrary To Law………………….……...22

      B. Cinergy's Proposed Remedy Lacks Factual Support…………………….…...24

         1. Cinergy's Electrical Reliability Argument Lacks Factual

           Support And Need Not Be Decided Here……..…….……………....24

         2. Cinergy Cannot Use Ratepayer Concerns To Shield

           Itself From The Clean Air Act…………………….……….............27

   II.  Cinergy's Proposed Remedy For The Beckjord Violations…………………….………29

CONCLUSION…………………………………….……….……………….........30

# TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987)…………………………….....….3

*Atchison, T. & S.F. Ry. v. Lennen*, 640 F.2d 255 (10th Cir. 1981)………..……………………3

*Burlington N. R.R. Co. v. Bair*, 957 F.2d 599 (8th Cir. 1992)……………..………………....3

*Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, No. 32A01-0605-CV-218,
2007 WL 4349705 (Ind. App. Nov. 13, 2007) ………………………….......………………...15

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)…......………….……..…………………3

*Environmental Def. Fund, Inc. v. Lamphier*, 714 F.2d 331 (4th Cir. 1983)………………………4

*Fuhr v. School Dist. of Hazel Park*, 364 F.3d 753 (6th Cir. 2004)……………………………....18

*Georgia v. Tenn. Copper Co.*, 206 U.S. 230 (1907) (Holmes, J.)……..……………………...…..4

*In re District of Columbia Pub. Serv. Comm'n*, Order No. 202-05-3,
No. EO-05-01 (Dec. 20, 2005) (Attachment 1)...…………..……......…………………..……26

*In re District of Columbia Pub. Serv. Comm'n*, 114 FERC P 61017,
2006 WL 41787 (Jan. 9, 2006)……………………………….......………..……….............26

*Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277 (1st Cir. 2006)……………….....5

*New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650
(W.D.N.Y. 2003) ………………………………….......………..…………….…...…..16

*North Carolina v. E.P.A.*, 531 F.3d 896 (D.C. Cir. 2008)……………………………………10

*North Carolina v. E.P.A.*, 2008 WL 5335481 (D.C. Cir. Dec. 23, 2008)………………………10

*North Shore Gas Co. v. EPA* 930 F.2d 1239 (7th Cir. 1991) (Posner, J.)………………..…27, 28

*Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*, No. 91-13-FR,
1992 WL 252123 (D. Or. Sept. 24, 1992)………………………………………............16, 22

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)…………………………………...18, 23

*SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215 (D.C. Cir. 1989)……………………………15

*Sierra Club v. Franklin County Power of Illinois, LLC*,
546 F.3d 918 (7th Cir. 2008)………………………………….......………..……………..6

*United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010 (N.D. Cal. 2002)...........................12

*United States v. Bethlehem Steel Corp.*, 38 F.3d 862 (7th Cir. 1994)...........................4, 24

*United States v. Cinergy Corp.*, No. 06-1224, 2006 WL 951826
(7th Cir. 2006)..............................................................................................14

*United States v. Cinergy Corp.*, No. 99-1693, 2007 WL 2914540
(S.D. Ind. Sept. 28, 2007)....................................................................2, 20

*United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055 (S.D. Ind. 2008)...............14, 16, 23, 24

*United States v. City of New York*, 198 F.3d 360 (2d Cir. 1999).........................27, 28

*United States v. Cumberland Farms of Conn., Inc.*,
826 F.2d 1151 (1st Cir. 1987)...................................................................15

*United States v. Halper*, 490 U.S. 435 (1989)..................................................15

*United States v. Metro. St. Louis Sewer Dist.*, No. 4:07-CV-1120 CEJ,
2008 WL 4279605 (E.D. Mo. Sept. 12, 2008)..............................................29

*United States v. Louisiana-Pac. Corp.*, 682 F. Supp. 1141 (D. Colo. 1988).................23

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996).................4

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001).................23

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003).................22

*United States v. Prod. Plated Plastics, Inc.*,
762 F. Supp. 722 (W.D. Mich. 1991)....................................................3, 4, 23

*United States v. Telluride*, 146 F.3d 1241 (10th Cir. 1998) ....................................15

*United States v. West Penn Power Co.*, 460 F. Supp. 1305 (W.D. Pa. 1978).................17

*U.S. E.P.A. v. Envtl. Waste Control, Inc.*, 917 F.2d 327 (7th Cir. 1990).................4

*Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*,
224 F.R.D. 694 (N.D. Ga. 2004)..............................................................28

*Wehner v. Syntex Corp.*, 682 F. Supp. 39 (N.D. Cal. 1987).................................12

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)..................................13, 23

FEDERAL STATUTES

16 U.S.C. § 824f……………………………………....……………..….….…………………26

16 U.S.C. § 824o…………………………………....……………..….…………………26

16 U.S.C. § 824o(e)(3)…………………………………....……………..….….………… 26

42 U.S.C. § 7401……………………………....……..………..….………………....14, 24

42 U.S.C. § 7413(b)…………………………………....………..….…………...….19

42 U.S.C. § 7413(e)(1)…………………………………....……………..….…………20

42 U.S.C. § 7413(e)(2)…………………………………....……………..….…………19

42 U.S.C. § 7470(4)…………………………………....……………..….…………28

42 U.S.C. § 7475(a)…………………………………....……………..….…………22

42 U.S.C. § 7479(2)(C)…………………………………....……………..….………..22

FEDERAL REGULATIONS

40 C.F.R. § 52.12(c)…………………………………....……………..….………………..19

## INTRODUCTION

The question posed to the Court by this trial is how to resolve Cinergy's longstanding violations of the Clean Air Act. The organizing principles of the remedy Plaintiffs seek are that Cinergy must be brought into compliance with the Clean Air Act and that the harms caused by its illegal air pollution must be redressed. For the Wabash River plant violations, Plaintiffs seek a remedy that requires Cinergy to come into prompt compliance with the Clean Air Act and redress the hundreds of thousands of tons of pollution that have been illegally emitted since the modifications. For the Beckjord plant violations, Plaintiffs seek a remedy requiring the installation of continuous emissions monitors that will enable a real-time determination of whether the units are complying with the law and a significant civil penalty.

Based on Cinergy's sworn discovery responses and pleadings before the Court, there are three principal issues remaining to be decided by this remedy trial: (1) When Cinergy will be required to shut down Wabash River units 2, 3, and 5 (since Cinergy has indicated it prefers to shut these units down rather than obtain the requisite permits and install pollution controls); (2) What Cinergy will do to mitigate the illegal emissions from the violations at the Wabash River units, which persist unabated; and (3) The amount of the civil penalty for the Beckjord violations, which continued even after the filing of this enforcement action and are illustrative of Cinergy's pattern of violations of the Clean Air Act.

Plaintiffs' evidence will demonstrate that the emissions from the violating units, in particular from Wabash River, result in serious harm to human health and the environment. Cinergy's illegal emissions contribute to premature death, heart attacks, and hospitalizations and exacerbate conditions like asthma. While Cinergy has proposed an alternative remedy of continued illegal operation until 2012 (or beyond), that remedy is unconnected to any compelling public interest and would instead allow continued harm to public health and the environment.

The time has come to make Cinergy comply with the Clean Air Act at the Wabash River and Beckjord stations and redress the harm from its violations.

## BACKGROUND

The trial for the remedy phase of this case has been set for five days beginning February 2, 2009. There are two sets of violations for which Plaintiffs seek a remedy. First, the jury found that the projects at Wabash River units 2, 3, and 5 were modifications under the Clean Air Act for sulfur dioxide ("SO$_2$") and oxides of nitrogen ("NO$_X$"), and thus that Cinergy violated the New Source Review ("NSR") program of the statute by failing to obtain a permit and install pollution controls. Doc. ## 1338, 1339. The bulk of Plaintiffs' proof will address the Wabash River violations. Second, the Court granted Plaintiffs' motion for summary judgment related to violations of particulate matter ("PM") emissions limits set by the Ohio State Implementation Plan ("SIP") and an administrative settlement with EPA at Beckjord units 1 and 2. *United States v. Cinergy Corp.*, No. 99-1693, 2007 WL 2914540 (S.D. Ind. Sept. 28, 2007).

This brief is designed to give the Court an overview of Plaintiffs' case at trial. After setting forth the legal standard for injunctions that is applicable to this case, Plaintiffs describe in general terms the evidence we expect to present and how our primary witnesses fit within that framework. The brief then describes the remedy Plaintiffs will seek, and sketches the justification for each element of Plaintiffs' proposed remedy. Finally, the brief outlines the elements of the proposed remedy Defendants have identified, and sets forth why that remedy is contrary to the applicable law and unsupported by the relevant facts.

## LEGAL STANDARD FOR INJUNCTION

The traditional standard for an injunction requires the plaintiff to show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Plaintiffs' proof will be sufficient to compel an injunction under the traditional weighing analysis. However, this is not the typical case for injunctive relief for at least three reasons, which make an injunction even more compelling. First, this case involves environmental harm, an area that, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."[1] *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987); *see also United States v. Prod. Plated Plastics, Inc.*, 762 F. Supp. 722, 729 (W.D. Mich. 1991) ("an injunction is normally the proper remedy for violations of an environmental statute."). Therefore, if the injury is sufficiently likely, the "balance of harms will usually favor the issuance of an injunction to protect the environment." *Village of Gambell*, 480 U.S. at 545.

Second, Congress "has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits." *Burlington N. R.R. Co. v. Bair*, 957 F.2d 599, 601-02 (8th Cir. 1992) (citing *Atchison, T. & S.F. Ry. v. Lennen*, 640 F.2d 255, 259, 261 (10th Cir. 1981)).

---

[1] By proposing to shut down the violating Wabash River units and install pollution monitors at Beckjord as part of the remedy in this case, Cinergy implicitly concedes that injunctive relief is appropriate in this matter.

Finally, Plaintiffs here are acting on behalf of the public, further tilting the traditional analysis toward granting an injunction.  "[W]hen the plaintiff is a governmental entity, or private attorney general, and the activity may endanger public health, injunctive relief is proper without undertaking a balancing of the equities." *Prod. Plated Plastics*, 762 F. Supp. at 728 (citing *Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 337-38 (4th Cir. 1983)).  The Supreme Court has made clear that sovereigns are "somewhat more certainly entitled to specific relief than a private party might be." *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907) (Holmes, J.).  "[W]hen the United States or a sovereign state sues in its capacity as protector of the public interest, a court may rest an injunction entirely upon a determination that the activity at issue *constitutes a risk of danger to the public*." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996) (emphasis added) (referring to the idea as a "traditional principle of equity" and citing cases).

In this case, the factors outlined above apply:  the case involves environmental harm, and Plaintiffs, including the United States, are acting to protect the public in an area where Congress has established priorities.  Thus, after hearing the proof and deciding that these factors are present, the Court could order an injunction without resorting to the traditional equitable balancing *at all*.  The Seventh Circuit has stated that, "Where the plaintiff is a sovereign and where the activity may endanger the public health, 'injunctive relief is proper, without resort to balancing.'" *U.S. E.P.A. v. Environmental Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990) (citing *Environmental Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 337-38 (4th Cir. 1983)) (additional internal citations omitted); *see also United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867-68 (7th Cir. 1994) (in environmental case with United States as plaintiff, it was "not improper for the district court to have awarded injunctive relief . . . without conducting an equitable balancing.").  If the Court decides that the traditional equitable framework is

appropriate here, the fact that this case involves sovereigns acting on behalf of the public interest to enforce a federal statute designed to protect human health means that the analysis is weighted heavily in favor of injunctive relief. *See Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006) (finding trial court should consider balance of harms in case under environmental statute, but adding, *"We caution, however, that the operation of that framework is inevitably colored by the nature of the case and the purposes of the underlying environmental statute"*).

**OVERVIEW OF PLAINTIFFS' EVIDENCE**

In this section, Plaintiffs describe the principal witnesses we expect to call at trial and the testimony they may provide, although Plaintiffs have not made final decisions on our witnesses or the precise contours of their testimony. *See also* Doc. # 1519 (witness list). The section is divided between the Wabash River and Beckjord violations, though, as Plaintiffs explain in discussing our proposed Beckjord remedy, the Beckjord violations may be susceptible to resolution on the papers or through a separate hearing.

**I.      Wabash River Violations**

Plaintiffs' presentation of evidence will describe the harm from Cinergy's emissions and support our proposed remedy. Plaintiffs' evidence will detail how pollution is generated from the operation of the Wabash River plant, what happens to those pollutants once they are sent out the smokestack, and how they affect human health and the environment in downwind areas. In general terms, the evidence and witnesses can be grouped into four categories: the emissions and available controls for the pollutants at issue; the air quality impacts of those emissions; the harm to human health and the environment resulting from the emissions; and the remedy's consistency with the public interest and the existing air pollution programs.

This evidence is relevant to each of the traditional equitable factors, particularly the irreparable injury and public interest factors, and is sufficient to compel injunctive relief. *See, e.g.*, *Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918, 936-37 (7th Cir. 2008) (finding that injunction ordering facility to obtain NSR permit before commencing operation "would likely result in decreased emissions and improved public health, which would further a stated goal of the Clean Air Act" and that it therefore was supported by the public interest element of the traditional equitable balancing).

### A.    Emissions And Pollution Controls

Burning coal at the Wabash River power plant results in the release of emissions including $SO_2$, $NO_X$, and mercury. Plaintiffs will present Dr. Phyllis Fox – who earned a Ph.D. in environmental engineering and has worked on air permitting and pollution controls for three decades – to testify about Cinergy's emissions and the potential controls available.

Dr. Fox calculated the amount of illegal air pollution resulting from the violations. She calculated that Wabash River units 2, 3, and 5 collectively generated 378,000 tons of $SO_2$ and 49,000 tons of $NO_X$ since completing the modifications through the end of 2007. As we explain below, because the units have operated without the necessary NSR permits since the modifications, each of these tons is illegal. The illegal emissions continue to grow as Cinergy continues to operate the units. Dr. Fox also estimated that the units emitted more than 1,000 pounds of mercury since the modifications. The mercury emissions are relevant because, as Dr. Fox will explain, the pollution controls that should have been installed at the time of the projects and that could be installed today to control $SO_2$ and $NO_X$ also significantly reduce mercury emissions.

Dr. Fox will also describe the air pollution controls available to control $SO_2$, and $NO_X$ including the cost of such controls and their performance capabilities. This discussion is relevant

to what mitigation of emissions is possible through reductions at Wabash River units 4 and 6

(and to what would be required if Cinergy opted to obtain NSR permits for units 2, 3, and 5).  In

particular, Dr. Fox will describe flue gas desulfurization ("FGD") technology, also known as

scrubbers, which can remove as much as 99 percent of the $SO_2$ from a unit's emissions, and

selective catalytic reduction ("SCR") technology, which can remove 90 percent or more of the

$NO_X$ from a unit's emissions.  Dr. Fox can explain what controls would have been required at the

time of the modifications, had Cinergy complied with the law and obtained NSR permits and

installed the requisite pollution controls.  She can describe what controls would be required

today if Cinergy opts to comply with the law by obtaining permits now.

　　　While Dr. Fox prepared a joint expert report with Mr. Hal Taylor, an experienced

pollution control engineer, Plaintiffs may only call Dr. Fox to further judicial economy,

particularly because the trial is limited to five days (a schedule that Cinergy urged upon the

Court).

### B.　　　Air Quality Impacts Of Cinergy's Illegal $SO_2$ And $NO_x$ Emissions

　　　Plaintiffs will present testimony from expert witnesses Lyle Chinkin and, possibly, Neil

Wheeler on the substantial air quality impacts of the $SO_2$ and $NO_X$ emitted from the Wabash

River smokestack.  (Although Mr. Chinkin and Mr. Wheeler prepared a joint expert report,

Plaintiffs may only call Mr. Chinkin due to the trial schedule in the interest of judicial economy).

Mr. Chinkin is a recognized expert on air quality issues; for example, he has been appointed to a

National Academy of Sciences panel.

　　　Mr. Chinkin will explain that the $SO_2$ and $NO_X$ emitted from the Wabash River

smokestack are transformed by chemical reactions in the atmosphere into other air pollutants.

Specifically, $SO_2$ and $NO_X$ form fine particulate matter, known as $PM_{2.5}$ (which stands for

particles smaller than 2.5 microns, or smaller than a grain of beach sand).  In addition, $NO_X$ contributes to ground-level ozone (*i.e.*, smog).

It is well settled in the field of atmospheric science that ozone and $PM_{2.5}$ can have both local and long-range impacts on air quality.  Mr. Chinkin will testify that the $SO_2$ and $NO_X$ emissions from the Wabash River plant contribute to poor air quality in Indiana and in downwind areas in other states such as Dayton, Ohio and Louisville, Kentucky.  Many of the downwind communities that bear the brunt of Cinergy's illegal emissions – such as Indianapolis – already fail to meet federal air quality standards for PM2.5 and/or ozone (so-called "National Ambient Air Quality Standards" ("NAAQS")).  Mr. Chinkin will provide context on the magnitude of the illegal emissions from Wabash River.  For example, the illegal $SO_2$ emissions generally exceed 20,000 tons *every year*, which is equivalent to the $SO_2$ emitted by the 324,000 heavy-duty diesel trucks registered in Indiana, Kentucky, and Ohio.  In reaching his conclusions, Mr. Chinkin relied on, among other things, generally accepted techniques in the field of air quality analysis and peer-reviewed, state-of-the science air quality models.

**C.    Harm To Human Health And The Environment**

Plaintiffs will present testimony from expert witness(es) describing the health impacts of $PM_{2.5}$ and ozone.  Dr. Joel Schwartz is a professor and researcher at the Harvard School of Public Health who has extensively studied the human health impacts of particulate matter and ozone air pollution.  Dr. Schwartz will describe the scientific evidence that demonstrates that the fine particulate matter and ozone that form from the emissions of coal-fired power plants contribute to human health problems including premature mortality, heart attacks, asthma, and others.  He will explain that increases in the levels of these pollutants are linked to harm to human health while decreases provide health benefits.

Dr. Robert Daly is a physician specializing in pulmonology with an active practice in the Indianapolis area.  He also serves on the Indianapolis Air Pollution Control Board.  Dr. Daly may testify to the effects of particulate air pollution that he has seen in his patients, including increased respiratory ailments, asthma exacerbation, worsening of chronic obstructive lung disease, increased hospital visits, and increased heart attacks.

Plaintiffs may also present testimony from Dr. Charles Driscoll, a university professor at Syracuse University who teaches environmental engineering with a focus on air pollution effects on ecosystems.  He could testify regarding the adverse ecological effects of atmospheric deposition of sulfur, nitrogen, and mercury (all of which originate from Wabash River units 2, 3, and 5) on sensitive resources, including forest and freshwater ecosystems, located in the Midwestern and Eastern United States.  Dr. Driscoll will testify regarding his analysis of the transport patterns of the emissions from Wabash River units 2, 3, and 5 in relation to these sensitive areas.  Dr. Driscoll can also describe how mercury emitted from power plants accumulates in fish (and other animals) and thus is ingested by people.

Finally, Plaintiffs may present testimony from Dr. Indra Frank and/or Dr. Philippe Grandjean concerning the health impacts of ingesting mercury.  Dr. Grandjean is a researcher who has studied the impacts of mercury on human health; Dr. Frank is a medical doctor who has worked on mercury issues in Indiana, including a study group commissioned by the state board tasked to write rules on mercury emissions.  Drs. Frank and/or Grandjean will describe how even small amounts of mercury can permanently impair brain development, particularly when children are exposed in utero, and may also impact heart function.  They can also describe the impacts in Indiana, including the scope of mercury warnings for those who eat fish from local waters.

### D.        Public Interest And Existing Air Programs

Although Cinergy carries the burden of proving at trial that equitable considerations favor an alternative to Plaintiffs' proposed remedy, Plaintiffs may also present witnesses to testify about the lack of adverse consequences from Plaintiffs' proposed remedy and the practical effects of the existing regulatory program.

Plaintiffs will call Matthew Kahal, a utility economist with more than 25 years of experience.  Mr. Kahal will give a brief economic overview of the allowance trading programs for the emissions of $SO_2$ and $NO_X$ from sources like Wabash River.  As Mr. Kahal will explain, the Wabash River units are covered by the Clean Air Interstate Rule,[2] a set of federal rules that sets a cap on $SO_2$ and $NO_X$ emissions from power plants and creates a market to trade the rights to emit tons of pollution.  Under CAIR and two similar programs that pre-date it,[3] utilities are required to surrender permits known as allowances for each ton of $SO_2$ and $NO_X$ they emit.  The allowances are distributed to utilities by EPA and/or individual states and can then be traded from one source to another, so that if one source reduces emissions below its allocated level of allowances, it can sell any unneeded allowances to other sources.  Mr. Kahal will provide background regarding the workings of the allowance markets and the implications of this program for the remedy sought by Plaintiffs.  Mr. Kahal can also explain that Cinergy is able to finance the remedy sought by Plaintiffs without undue hardship on itself or its ratepayers.  *See infra*, Cinergy's Proposed Remedy, Section I.B.2 (discussing this ratepaying issue).  Mr. Kahal

---

[2] The D.C. Circuit vacated CAIR on July 11, 2008, but later adjusted its order so that CAIR will continue to apply until replaced by EPA.  *North Carolina v. E.P.A.*, 531 F.3d 896 (D.C. Cir. 2008); *North Carolina v. E.P.A.*, --- F.3d ----, 2008 WL 5335481 (D.C. Cir. Dec. 23, 2008).

[3] The Wabash River units are also subject to the Acid Rain program of Title IV of the Clean Air Act and a regulatory $NO_X$ emissions trading program known as the $NO_X$ Budget Trading Program.

may be called as a rebuttal witness concerning Cinergy's ability to pay for a remedy, depending on evidence presented by Cinergy.

Plaintiffs may call John Paul.  Mr. Paul is the administrator of the air quality agency for the area surrounding Dayton, Ohio and a leader in the National Association of Clean Air Agencies.  Mr. Paul may testify about, *inter alia*, the practical effects of failing to meet the $PM_{2.5}$ and ozone federal air quality standards.

Plaintiffs may call Roger Harszy.  *See infra*, Cinergy's Proposed Remedy, Section I.B.1 (discussing electric reliability issues).  Mr. Harszy is the vice-president of real-time operations at the Midwest Independent System Operator ("MISO") and served as the entity's representative at a Rule 30(b)(6) deposition of MISO taken by Plaintiffs.  MISO is funded by electric utilities to exercise functional control over the electrical grid in the area that includes Indiana, subject to oversight by appropriate federal agencies such as the Federal Energy Regulatory Commission ("FERC").  As a matter of law, it is Cinergy's obligation to demonstrate any equitable factors that counsel against Plaintiffs' proposed remedy.  Nonetheless, Plaintiffs issued a trial subpoena to Mr. Harszy and requested an analysis of the effect of closing the violating Wabash River units on electrical reliability in the Terre Haute area during summer peak demand conditions, which Mr. Harszy has indicated was a potential concern at his deposition.  Plaintiffs understand that MISO intends to provide further information to the Parties before the beginning of trial.  Plaintiffs may also call Mr. Harszy, either in our case-in-chief or in rebuttal, if Cinergy continues to argue that reliability issues as compel delaying the shutdown of the violating units.

## II.     Beckjord Violations

The Ohio SIP, as approved by U.S. EPA, limits Beckjord units 1 and 2 to emitting PM at no more than 0.1 lbs/mmbtu.  Compliance is assessed through stack tests generally performed once a year.  The violating Beckjord units have regularly violated the emissions limit during

these periodic stack tests.  EPA and Cinergy reached an administrative settlement (known as an Administrative Order on Consent or "AOC") in 1998 that, *inter alia*, resolved violations at Beckjord unit 1 and called for Cinergy to comply with the Ohio SIP PM limits and perform semi-annual stack tests during the years 1998 through 2000.  Cinergy continued to violate the PM limits during that period and last violated the standard as recently as 2006.

In addition to the testimony described above in the Wabash River section, which is generally relevant to the emissions from Beckjord, Plaintiffs expect to call EPA Region 5 engineer Kevin Vuilleumier and/or Mr. Taylor to describe the units' compliance history and testing program.  Messrs. Vuilleumier or Taylor will also testify that continuous monitors known as PM CEMs are available and could provide real-time tracking of Cinergy's emissions in order to provide continuous data on compliance.  Mr. Vuilleumier will also testify about Plaintiffs' proposed penalty, which he calculated.

**PLAINTIFFS' PROPOSED REMEDY**

Plaintiffs' proof will show that pollution from the Wabash River and Beckjord units has harmed and is continuing to harm human health and the environment in Indiana, Ohio, and other communities downwind of the power plants.  Plaintiffs' proposed remedy is crafted to bring Cinergy into compliance with the law as quickly as possible and redress the harm from the historic continuing illegal emissions.  An order redressing the harm to the public caused by Cinergy's violations "is within the recognized power and within the highest tradition of a court of equity." *Wehner v. Syntex Corp.*, 682 F. Supp. 39, 40 (N.D. Cal. 1987); *see also United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1027 (N.D. Cal. 2002) (Safe Drinking Water Act decision in which "Court has the responsibility . . . of crafting a remedy that is protective of public health, and this responsibility necessarily takes preeminence over all other considerations.").

As described further below, Plaintiffs seek a remedy with four elements:

    1. Prompt compliance with the Clean Air Act at Wabash River units 2, 3, and 5;

    2. Mitigation of the historic, illegal pollution at Wabash River units 2, 3, and 5;

    3. Installation of pollution monitors at Beckjord units 1 and 2; and

    4. Payment of a civil penalty for the Beckjord violations.

The details and justification for each of these elements are sketched below.

## I.    Compliance With The Clean Air Act

The first element of Plaintiffs' remedy is simply stated:  Cinergy must comply with the law.  As the Supreme Court made clear in *Romero-Barcelo*, when faced with a violation of a statute, a district court has discretion, but must exercise that discretion to order the "relief it considers necessary to secure prompt compliance with the Act."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

There are two avenues for Cinergy to comply with the law: obtaining New Source Review permits or shutting down the units.  Cinergy has stated in interrogatory responses and briefing that the appropriate remedy in this case is to shut the units down rather than obtain the necessary permits and install the required controls.  Ex. A (Pl. Remedy Trial Ex. 2080), Defendants' Objections and Responses to Plaintiffs' Second Set of Interrogatories ("Cin. Resp. to Pl. 2d Interr.") No. 3 at 17; Doc. # 1456 at 9.  Based on Cinergy's representations, Plaintiffs discuss here and are preparing for trial assuming that Cinergy has opted for unit shutdown as its compliance method.

Given Cinergy's choice, Plaintiffs seek an order requiring the shutdown of Wabash River units 2, 3, and 5 within 30 days.  There is no dispute that Cinergy is out of compliance with the law, and the violation must be cured.  Moreover, the evidence of harm caused by Cinergy's emissions sketched above compels bringing the units into compliance as soon as possible.

## II.      Mitigation Of Cinergy's Historic, Illegal Emissions

As a result of its continuing failure to comply with the law, Cinergy has emitted hundreds of thousands of tons of $SO_2$ and $NO_X$ in violation of the Clean Air Act.  As described above, those illegal emissions harm human health and the environment.  To redress the harm from Cinergy's past illegal emissions, Cinergy must undertake pollution reductions *in addition* to those required to come into prospective compliance at the Wabash River Station.  As this Court has already explained, "an order requiring Defendants to take actions that remedy, mitigate, and offset harms caused to the public and the environment by their past CAA violations would seem to give effect to the CAA's purpose 'to protect and *enhance* the quality of the Nation's air resources so as to promote the public health and welfare.'"  *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1061-62 (S.D. Ind. 2008) (quoting 42 U.S.C. § 7401).

Cinergy itself has admitted in briefing to the Seventh Circuit that if its projects "triggered NSR, then Cinergy was required to obtain a preconstruction permit before starting each project and to retrofit each power plant with state-of-the-art controls during the maintenance work." *United States v. Cinergy*, 2006 WL 951826 (7th Cir. 2006) (Cinergy Appellate Brief) at 2.  The jury has found that four Wabash River projects did trigger NSR, so, by its own terms, Cinergy failed to meet the requirements of the law.  As described above, Plaintiffs' expert Dr. Fox calculated that units 2, 3, and 5 collectively emitted 378,000 unpermitted tons of $SO_2$ and 49,000 unpermitted tons of $NO_X$ after the modifications through 2007.  In addition, Cinergy continues to run these units and generate pollution.  Because Cinergy has no NSR permit for the units, these emissions are illegal.

It is impossible to scrub from the environment the pollution Cinergy has already emitted or bring back the good health of those harmed by these illegal emissions.  Under the circumstances, Plaintiffs submit that the best possible method for the Court to redress the illegal

emissions in this case is to order future pollution reductions from the same plant.  Such a mitigation order is analogous to the traditional remedy of disgorgement of ill-gotten gains.  *See, e.g.*, *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215 (D.C. Cir. 1989) (discussing disgorgement).  The benefit from these additional reductions in pollution from the Wabash River plant will flow to the same areas harmed by the prior, illegal emissions, providing a benefit to the downwind communities roughly proportionate to the additional harm they have suffered over the past two decades.  This nexus between the prior harm and the benefit of the Court's mitigation more than satisfies the requirements of the law.  *See United States v. Telluride*, 146 F.3d 1241, 1247 (10th Cir. 1998) (acknowledging lack of precise symmetry between injury and cost of compliance in upholding injunction and finding it not a penalty) (citing *United States v. Halper*, 490 U.S. 435, 446 (1989) ("the Government is entitled to rough remedial justice . . . it may demand compensation according to somewhat imprecise formulas").  This theory of mitigation has been ordered in prior environmental cases.  For instance, the First Circuit upheld an order in a Clean Water Act case requiring the defendant to not merely stop violating the statute until obtaining a permit, but to also restore the wetland at issue to its pre-violation condition.  *United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1155-56, 1162-65 (1st Cir. 1987).  Cinergy itself has predicted just such a result in this action in briefing before the Indiana Court of Appeals.  *See Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, No. 32A01-0605-CV-218, 2007 WL 4349705 at *3 (Ind. App. Nov. 13, 2007) ("'Any other appropriate relief' . . . includes environmental projects that mitigate past harm").

Without such mitigation, Cinergy will have succeeded in obtaining a free pass from the requirements of the Clean Air Act for the Wabash River units.  As demonstrated in the liability trial of this case, Cinergy performed the modifications at issue at the violating Wabash River units because the work was necessary to keep the units operating.  For instance, Cinergy

commissioned a comprehensive assessment of Wabash River unit 2 that "define[d] the actions recommended for extending the economic service life . . . up to 15 years beyond its current life expectancy of 1993." Pl. Liability Trial Exhibit 1319 at 1-1. Cinergy embarked on the projects giving rise to the jury's verdict beginning in June 1989. The 15 years Cinergy expected to reap from the modifications have already been achieved. If Cinergy shuts down these units without mitigating the tons of illegal pollution, it will merely be doing what it expected to have to do anyway, while entirely avoiding the expense of complying with a law that this Court has found is designed to protect public health and the environment. *See, e.g.*, *Cinergy*, 582 F. Supp. 2d at 1061-62. Such a result harms the environment and human health, as Plaintiffs' evidence will show, while also undercutting the entire regulatory program by suggesting that companies can benefit by flouting the rules. *See New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 663 (W.D.N.Y. 2003) (utility's "initial failure to comply with the requirements of the Clean Air Act cannot now inure to its benefit."); *see also Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*, No. 91-13-FR, 1992 WL 252123, at *23 (D. Or. Sept. 24, 1992) (rejecting "windfall" for "modified sources that disregarded the SIP-mandated requirements").

Currently, none of Cinergy's units at the Wabash River plant have top-of-the-line pollution controls, and Cinergy has no $SO_2$ controls at all at its Wabash units. Because of the lack of controls, Cinergy could achieve significant reductions at units 4 and/or 6 in order to redress the illegal emissions from units 2, 3, and 5.

Plaintiffs seek an order that Cinergy make emissions reductions from Wabash River equaling the amount of illegal emissions from units 2, 3, and 5 within 20 years of the Court's order. Assuming that Cinergy shuts down the units in the middle of 2009, the company should

be required to mitigate approximately 412,000 tons of $SO_2$ and 55,000 tons of $NO_X$.[4]  Plaintiffs do not ask this Court to dictate by what method Cinergy achieves the necessary emissions reductions.  Dr. Fox will demonstrate at trial that it is possible to achieve the necessary reductions at units 4 and 6 through the installation of a scrubber and SCR, which even Cinergy admits would reduce $SO_2$ emissions by 95 percent and could reduce $NO_X$ emissions by 90 percent.  *Cf. United States v. West Penn Power Co.*, 460 F. Supp. 1305 (W.D. Pa. 1978) (ordering coal-fired power plant to build scrubber within three years to come into compliance with Clean Air Act).

To provide an environmental benefit, and thus be true mitigation, the emission reductions must be reductions that are not otherwise required by law and must not serve any other compliance purposes.  Therefore, Cinergy should be required to surrender $SO_2$ and $NO_X$ emission allowances to U.S. EPA in amounts matching the reduction.  Without such a requirement, Cinergy's reductions would simply make it easier for the company to comply with its obligations under CAIR.  In fact, by selling the allowances it no longer needs once Wabash River emissions are reduced, Cinergy could reap an unwarranted windfall while transferring to other communities the harm that has been suffered by those downwind of the Wabash River station.  *See* Cin. Resp. to Pl. 2d Interr. No. 24 at 124-126 (noting that Cinergy has considered installing a scrubber at Wabash River units 2-6 or unit 6 alone "in order to generate SO2 emissions allowances that Cinergy could use itself or sell on the allowance market.").  Because of such concerns, allowance surrender has been a standard term in Consent Decrees entered to resolve similar NSR violations.  *See, e.g.*, *United States v. American Electric Power Service*

---

[4] This assumes that Cinergy emits $SO_2$ and $NO_X$ in the same amount in 2008 and the first half of 2009 as it did in 2007, and is meant solely to give Cinergy and the Court a sense of what reductions will be necessary.  Plaintiffs propose that the reductions be tied to the actual emissions until the closure of units 2, 3, and 5.  These emissions are already continuously monitored and reported by Cinergy to EPA on a quarterly basis.

*Corp*. Consent Decree (available at

epa.gov/compliance/resources/decrees/civil/caa/americanelectricpower-cd.pdf) at ¶¶ 70-84, 91-

99.

An order requiring Cinergy to fully mitigate the illegal emissions from units 2, 3, and 5 is

necessary to fulfill the Court's duty to implement the injunctive relief that provides "the most

complete relief possible."  *Fuhr v. School Dist. of Hazel Park*, 364 F.3d 753, 760 (6th Cir. 2004)

(internal citation omitted); *see also Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (to

ensure complete relief "court may go beyond the matters immediately underlying its equitable

jurisdiction and decide whatever other issues and give whatever other relief may be necessary

under the circumstances. Only in that way can equity do complete rather than truncated

justice.").  Such an order will also ensure that the jury's verdict is given meaning, and that

Cinergy is not simply allowed to shut down the offending units, after exhausting the economic

benefit of its violations, without redressing the harm caused by the illegal operation.

## III.     Remedy For The Beckjord Violations

There is little dispute between the Parties on the elements of the appropriate Beckjord

remedy.  Plaintiffs seek the installation of PM CEMs at Beckjord units 1 and 2 and a significant

civil penalty for the violations found by the Court.  Cinergy does not object to installing PM

CEMs, subject to certain conditions, and believes a minimal penalty is appropriate.  These issues

are discussed further below.  Plaintiffs submit that the differences between the Parties' proposed

Beckjord remedies need not take up trial time and could be more efficiently resolved through

post-trial pleadings and, if necessary, a penalty hearing.

### A.     Emissions Monitoring

As Plaintiffs' witnesses will describe at trial, Cinergy repeatedly violated the Ohio SIP at

Beckjord units 1 and 2, including four violations *during* the effective period of the AOC (1998-

2000), which was itself a response to earlier violations.  The most recent stack test violation at Beckjord unit 1 occurred in 2003, while the most recent violation at unit 2 occurred in 2006.  All the violations were discovered through periodic stack testing.  Because of the infrequent testing and history of non-compliance, there is a significant risk of undetected deviation from the statutory requirements.

In order to determine whether the units are consistently in compliance, Plaintiffs seek an order requiring the installation of PM CEMs.  Cinergy does not object to the installation of PM CEMs so long as (i) the device is of the type proposed by its expert witness Richard McRanie and (ii) the results are used only for performance enhancement rather than to determine compliance with the law.  Cin. Resp. to Pl. 2d Interr. No. 4 at 19-21.  Plaintiffs have no objection to the first condition.  Plaintiffs believe that the PM CEMs results should be used to demonstrate compliance – or lack thereof – with the PM standards, but believe this is essentially a legal question and need not be addressed by testimony at trial.  Under EPA regulations and the Ohio SIP, "*any* credible evidence or information" is relevant to whether a source is violating the applicable standard.  *See, e.g.*, 40 C.F.R. § 52.12(c).

## B.    Civil Penalty

Plaintiffs seek the statutory maximum civil penalty ($3.465 million) for the violations addressed in the Court's summary judgment decision.  The statute (as adjusted for inflation) allows penalties of up to $27,500 per day for each violation.  *See* 42 U.S.C. § 7413(b).  Plaintiffs calculated the number of days the offending unit operated following each violation until Cinergy demonstrated compliance through a subsequent stack test.  *See* 42 U.S.C. § 7413(e)(2) (once plaintiffs make prima facie case that violations will continue, burden shifts to source to demonstrate compliance).  For the violations at unit 1, Plaintiffs' calculation includes an assessment against both (i) Cinergy Corporation (for violation of the AOC) and (ii) Cinergy

Services, Inc. and the Cincinnati Gas & Electric Co. (for violation of the Ohio SIP), as

contemplated by the Court's summary judgment decision. *United States v. Cinergy Corp.*, No.

99-1693, 2007 WL 2914540, at *2 (S.D. Ind. Sept. 28, 2007).

Under the statute, the Court is charged to consider the following factors, along with

"other factors as justice may require" in determining the appropriate penalty amount:

> the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation.

U.S.C. § 7413(e)(1). A penalty of $3,465,000 is appropriate in this matter. The evidence shows

a continuing saga of non-compliance by Cinergy. Cinergy relies on electrostatic precipitators

("ESPs") for PM control at Beckjord units 1 and 2. Plaintiffs' evidence will show that the ESPs

were known to be undersized from the moment they were installed in the 1970s. Despite this

knowledge and the litany of failed PM stack tests, Cinergy systematically failed to address the

true cause of the test failures – the undersized nature of the ESPs. Cinergy continued to ignore

the underlying issue even when the terms of the AOC required them to hire consulting engineers

to perform inspections of the boiler and pollution control equipment and to make

recommendations following a failed stack test. Cinergy's non-compliance stretched years past

the filing of this case, with the last failed stack test in 2006. And, the company's "full

compliance history" indicates numerous recent violations of the Clean Air Act at its coal-fired

power plants. As Plaintiffs will show at trial, each of the statutory penalty factors compel a very

significant penalty for these violations, and the statutory maximum penalty of $3,465,000 is

warranted.

**CINERGY'S PROPOSED REMEDY**

**I.     Cinergy's Proposed Remedy For The Wabash River Violations**

Plaintiffs asked Cinergy in discovery what it contends is the appropriate remedy for the Wabash River violations in this case.  Cinergy's response stated that "retiring Wabash River Units 2, 3, and 5 by September 1, 2012 is the most appropriate remedy for the violations found by the jury."  Cin. Resp. to Pl. 2d Interr. No. 3 at 17.  Cinergy went on to state that under its proposed remedy, until the units' retirement, it would "target total annual emissions of those three units to the baseline annual emissions (as calculated by Dr. Rosen)."  *Id*. at 18.  This so-called targeting – which suggests a goal rather than a hard "cap" – would have the effect of reducing the amount of time the units operate, compared to recent years, and returning to the pollution levels emitted before the modifications.  Cinergy also stated that both the eventual closure of the units and reducing generation prior to retirement "would be subject to Cinergy's obligations (including regulatory obligations) to provide reliable, uninterrupted generating capacity and electricity to the citizens of Indiana and appropriate oversight by regulatory authorities, including the Indiana Utility Regulatory Commission and the Midwest ISO."  *Id*. at 18.  In other words, September 2012 is not a deadline for shutting down the violating Wabash River units, but rather another "goal" subject to caveats.

Plaintiffs' interrogatory also asked Cinergy for "any . . . legal or factual bases for" its proposed remedy.  Cinergy identified three principal reasons supporting the delay of closure of the units until 2012.  First, Cinergy stated that retiring units 2, 3, and 5 before the Edwardsport Integrated Gas Combined Cycle plant and associated transmission equipment are expected to come online in 2012 "could cause loss of power during peak conditions . . . in the Terre Haute area."  *Id*. at 17.  Second, Cinergy argued that its remedy would benefit its ratepayers because Cinergy would attempt to pass the compliance costs onto consumers by filing a petition with the

Indiana Utility Regulatory Commission ("IURC" or "Commission").  Third, Cinergy stated that delaying the shutdown would allow a period of time for the company to find new jobs for Wabash River workers, including jobs at the new Edwardsport facility.  *Id.*

Rather than obtain the necessary permits and install state of the art pollution controls, Cinergy has indicated it prefers to close the violating Wabash River units to comply with the Clean Air Act.  However, Cinergy's articulated remedy delays any shutdown until September 2012 *and* apparently would allow the units to continue operating after 2012 if Cinergy determines that operation is necessary.  The company's proposal also includes no component to address the units' illegal emissions.  This delayed and caveat-laden proposed remedy is contrary to law and unsupported by the facts uncovered during discovery.

### A.      Cinergy's Proposed Remedy Is Contrary To Law

In seeking a remedy that delays compliance with the law until at least September 2012, Cinergy is asking this Court for a license to pollute for the next four years.  Such a remedy is antithetical to the Clean Air Act, while putting companies that complied with the law at a competitive disadvantage, and thus should not be part of a proper order from this Court.

The New Source Review program applies *before* construction or modification of a source.  *See, e.g.*, 42 U.S.C. §§ 7475(a) (describing requirements before new source can operate); 7479(2)(C) (defining "construction" to include modifications).  "The requirements of the program have been met only upon *receipt* of PSD permits . . . after agency review and determination of BACT."  *United States v. Louisiana-Pac. Corp.*, 682 F. Supp. 1141, 1166 (D. Colo. 1988); *see also United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 850 (S.D. Ohio 2003) (a "modification triggers permitting requirements under the CAA as well as the duty to install pollution controls."); *Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*, No. 91-13-FR, 1992 WL 252123, at *23, (D. Or. Sept. 24, 1992) (applicable NSR rules require "without

exception" that all major modifications, even those already constructed, are subject to control retrofit and other NSR requirements).  Under the statute, there is no room for operation without a permit, as Cinergy suggests here.  For instance, the facility in *Louisiana-Pacific* had installed state-of-the-art controls and applied for the relevant permits, but was still found liable because it operated without an issued permit.  682 F. Supp. at 1166.  Not only is there is no provision in the statute for granting permission to a modified source to operate without a permit – to say nothing of operating for four years – such a remedy is contrary to the fundamental structure of NSR.

The Supreme Court has made clear that while courts enjoy great discretion in equity, they may not "reject the balance that Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001).  The requirements of the statute set the floor for any injunctive relief.  *See United States v. Production Plated Plastics, Inc.*, 762 F. Supp. 722, 731 n.9 (W.D. Mich. 1991) ("The Court cannot order the defendants to do less than RCRA minimally requires.").  While Cinergy might prefer to forestall shuttering the units for four *or more* years, there is no basis under the law for the Court to legitimize that option under the circumstances, as Plaintiffs intend to prove at trial.

The Court's role in this phase of the case is to "secure prompt compliance with the Act," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982), while best "giv[ing] effect to the CAA's purpose 'to protect and *enhance* the quality of the Nation's air resources so as to promote the public health and welfare.'" *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1061-62 (S.D. Ind. 2008) (quoting 42 U.S.C. § 7401); *see also Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (obligation to "do complete rather than truncated justice.").  Cinergy's remedy delays compliance and utterly ignores its illegal emissions that have harmed the health and environment of downwind communities for two decades.  Cinergy's remedy fails to give effect to the purposes of the Clean Air Act – indeed by tacitly endorsing the historic, illegal emissions,

23

Cinergy's proposed remedy is decidedly at odds with the Clean Air Act purpose "to protect and enhance the quality of the Nation's air resources."  *See Cinergy*, 582 F. Supp. 2d 1055, 1061-62; 42 U.S.C. § 7401.  Such a remedy cannot stand.

**B.      Cinergy's Proposed Remedy Lacks Factual Support**

We discuss below two of justifications Cinergy has offered for its remedy:  electrical reliability and the potential impact on Cinergy's ratepayers.  In addition, to the extent that Cinergy argues that either potential reliability or job loss concerns support its delayed compliance remedy, any negative effects could be avoided altogether by continuing to run the units after installing pollution controls and obtaining NSR permits.  Cinergy should not be allowed to choose closure as its compliance method and then claim that the consequences of that decision compel continued operation – and continued pollution.  *See United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867 (7th Cir. 1994) ("'a facility cannot, by its own actions, make itself [unable to meet RCRA's requirements] and then claim 'impossibility' as a defense to liability under RCRA § 3005(e).'") (internal citation omitted).

**1.      Cinergy's Electrical Reliability Argument Lacks Factual Support and Need not Be Decided Here**

Cinergy asserts that retiring units 2, 3, and 5 "before 2012 could cause loss of power during peak conditions . . . in the Terre Haute area."  Cin. Resp. to Pl. 2d Interr. No. 3 at 17. However, as Plaintiffs probed this possibility during discovery it became evident that Cinergy had done little to support or even investigate its claim.  Cinergy should not be allowed to use the specter of potential outages to elude compliance with the law, particularly where Plaintiffs will demonstrate the gravity of the harm caused by Cinergy's emissions and where Cinergy controls the analytical tools necessary to attempt to substantiate its argument, but has not even tried to do so.

Cinergy's own statements make clear that retiring the violating Wabash River units will not "cause" power loss in Terre Haute.  Plaintiffs took a Rule 30(b)(6) deposition of the company on the effects on retiring units 2, 3, and 5 before 2012.  In that deposition, the company witness explained that if units 2, 3, and 5 were shut down, and if the electrical transmission substation near Terre Haute suffered a "major loss" of capacity, there was a "chance" of shedding customer load during periods of peak and near-peak demand.  Ex. B (SEALED), Deposition of Anthony Geswein ("Geswein Dep.") at 95:1-96:7; *see also* Ex. C, Rule 30(b)(6) Deposition of Roger Harszy ("Harszy Dep.") at 34:20-24, 37:8-16 (noting "risk" of power loss in Terre Haute area "during summer peak conditions" if units 2, 3, and 5 were closed and defining summer peak as temperatures above 90 degrees).  However, Cinergy's corporate representative testified that the company did not know how likely any potential loss of power would be, or what level of generation would be needed from the violating Wabash River units to avoid this amorphous "risk."  Geswein Dep. at 112:25-114:8, 135:23-136:17.  Cinergy has had the modeling tools available to evaluate the likelihood of power loss after Wabash River closures, but had not done so.  Geswein Dep. at 90:16-92:2.  Cinergy's available evidence comes up well short of demonstrating that a four-year pass from statutory compliance is warranted.

Moreover, even if *some* level of continued operation from units 2, 3, and 5 is necessary in limited circumstances, Cinergy's proposed remedy is not linked to that level of generation from the violation Wabash River units.  As described above, Cinergy proposes to target emissions to baseline levels.  The baseline tons emitted in the two years before the modifications have no relationship to what generation might be necessary to protect the power supply today.

In any case, the Court need not decide any potential grid reliability issue based on the limited evidence at this juncture.  Existing administrative schemes empower expert federal agencies to address the issue, to the extent Cinergy decides to marshal any evidence to support

its litigation position.  For instance, the Federal Energy Regulatory Commission ("FERC") has authority to address reliability issues through certain procedures under the Federal Power Act ("FPA").  Cinergy or others could seek a declaratory order from the Commission that, under a specified set of facts, the lack of generation at Wabash River station risks violating reliability standards approved and enforceable under FPA Section 215, 16 U.S.C. § 824o, or otherwise threatens the reliability of the bulk power system.  Alternatively, FPA Section 215(e)(3) authorizes the Commission, on its own motion or upon complaint (*e.g.*, a complaint by MISO against Cinergy), to "order compliance with a reliability standard . . . if the Commission finds, after notice and opportunity for a hearing, that the user or owner of operator of the bulk power system has engaged or is about to engage in any acts or practices that constitute or will constitute a violation of a reliability standard."  16 U.S.C. § 824o(e)(3).   In addition, Section 207 of the FPA, 16 U.S.C. § 824f, would allow the Commission, upon complaint of a State commission, to order Cinergy and MISO to remedy any "inadequate or insufficient" service caused by the closure of the Wabash River units.  *Cf. In re District of Columbia Pub. Serv. Comm'n*, 114 FERC P 61017, 2006 WL 41787 (Jan. 9, 2006) (FERC order addressing effect of utility plant shutdown on reliability of electricity grid); *In re District of Columbia Pub. Serv. Comm'n*, Order No. 202-05-3, Docket No. EO-05-01 (Dec. 20, 2005) (Attachment 1) (DOE order issued under parallel FPA authority, and in conjunction with U.S. EPA order, allowing limited operation for a limited period of time of power plant which had shut down due to Clean Air Act concerns in order to avoid risk of blackout of downtown Washington D.C.).  The Court's order to shut down the Wabash River units would not prevent Cinergy (or a third-party) from filing a petition under the FPA to obtain an administrative order specifying the nature and extent of a genuine reliability risk posed by the inability to operate Wabash River units 2, 3 and 5, and identifying the specific actions necessary to ensure reliability.  If such administrative procedure concludes that the only

feasible way to reduce the reliability risk to acceptable levels is through operation of these units for some specified period, then Cinergy may move this Court for limited relief from the injunction, and Plaintiffs may respond.

### 2.     Cinergy Cannot Use Ratepayer Concerns to Shield Itself from the Clean Air Act

In written discovery and in an appearance before the Honorable Magistrate Judge, Cinergy has also argued that its remedy best serves the Indiana ratepayer.  Specifically, Cinergy has argued that it will pass on any cost of compliance to the Indiana consumer, and that therefore it should be allowed to pursue what it deems to be the cheapest compliance option:  years of continued operation of the Wabash River units, subject only to so-called "targets" on emissions that the company hopes to achieve.  Cin. Resp. to Pl. 2d Interr. No. 3 at 17.

First, the possibility of state ratemaking proceedings is not an appropriate consideration in fashioning compliance with the Clean Air Act.  Although not addressing the precise issue, federal courts have repeatedly rejected the possibility of ratepayer impact as a factor in complying with federal environmental laws.  In *North Shore Gas Co. v. EPA*, the Seventh Circuit held that a public utility lacked standing to sue on behalf of its ratepayers to enjoin the remediation of harbor pollution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  930 F.2d 1239, 1243 (7th Cir. 1991) (Posner, J.).  While the remediation may have imposed costs on the public utility, the possibility that the utility could pass those costs onto its ratepayers was irrelevant:   federal environmental "laws are intended for the protection of the environment, not for the protection of persons deemed responsible for the consequences of having polluted the environment . . . ."  *Id.*

Similarly, the Second Circuit held in *United States v. City of New York* that ratepayers could not intervene to challenge a remedy at a local drinking water plant under the Safe Drinking Water Act because "the equitable power vested in the district court by the SDWA is more

27

circumscribed than intervenors propose; it is available to ensure compliance with the statute and the regulations promulgated thereunder, not to rework or reject these legislative and regulatory determinations."  *United States v. City of New York*, 198 F.3d 360, 366 (2d Cir. 1999); *accord Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 224 F.R.D. 694, 701 (N.D. Ga. 2004) (denying intervention to ratepayers in a Clean Water Act enforcement action because their concern that a consent decree would result in higher rates was not "an interest directly related to the environmental subject matter of the litigation").

The facts here are even more compelling for avoiding an environmental remedy based on unsupported concerns regarding a single state's utility rates.  While *North Shore* and *City of New York* involved pollution solely within a state's boundaries, the illegal emissions from Wabash River are carried by the winds to other states including Illinois, Ohio, and Kentucky.  The public health and economic costs of such interstate air pollution motivated Congress to create the NSR program.  *See, e.g.*, 42 U.S.C. 7470(4) (goal "to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State").  That federal objective should be given effect here.

Second, entertaining Cinergy's "ratepayer" equitable consideration would require the Court to speculate on the outcome of state ratemaking proceedings that have yet to be initiated. To pass compliance costs onto Indiana consumers, Cinergy would have to choose to file a petition with the Indiana Utility Regulatory Commission ("Commission"), and the Commission would have to rule on that petition.  Ex. D, Deposition of James Turner at 30:25-32:2, 235:4-14. Although Plaintiffs are prepared to present testimony from their expert, Mr. Kahal, on this subject, and Cinergy may present its own evidence, the airing of this inchoate dispute is premature and not ripe in light of the available state administrative remedies should Cinergy

decide to recover its costs.  *Cf. United States v. Metropolitan St. Louis Sewer Dist.*, No. 4:07-CV-1120 CEJ, 2008 WL 4279605, at *6 (E.D. Mo. Sept. 12, 2008) (denying motion of ratepayers to intervene in Clean Water Act enforcement action because the possibility of higher rates depended on a "sequence of events," including the utility's decision "to pass the cost of such penalties or projects to the ratepayers").

Finally, to the extent the Court wishes to hear the parties' views on the possible outcome of future Commission ratemaking proceedings, the proof favors Plaintiffs.  As an initial matter, Cinergy need not pass any of its costs onto the Indiana ratepayer:   Mr. Michael Callahan, a treasury official with Cinergy, testified that the company could afford Plaintiffs' remedy without rate recovery.  Ex. E, Deposition of Michael Callahan at 61:16-62:16.  To the extent Cinergy, a multi-billion dollar company, insisted on rate recovery, Plaintiffs' expert, Mr. Kahal would testify that such rate impacts would be minimal.

## II.    Cinergy's Proposed Remedy For The Beckjord Violations

As noted above, Cinergy does not object to the PM CEMs sought by Plaintiffs, but only raises the legal issue of how results from the monitors may be used.  Cinergy has not set forth a proposed penalty amount for the Beckjord violations, despite a specific request in Plaintiffs' interrogatories, but did state that $28,000 already paid to the state of Ohio was a "reasonable penalty amount."  Cin. Resp. to Pl. 2d Interr. No. 4 at 19-21.  Cinergy's response was based on the factually incorrect premise that the penalty paid to Ohio was for the same violations as found by this Court, a misapprehension that was later cleared up by testimony from Ohio EPA.  Ex. F, Deposition of James Orlemann at 4:11-16.  Thus the only significant difference between the parties for Beckjord is the amount of the penalty.  For the reasons discussed in describing our Beckjord remedy above, Plaintiffs believe the statutory penalty factors clearly compel a very significant penalty rather than the superficial figure suggested by Cinergy.

## CONCLUSION

The jury and this Court have found Cinergy violated the law at Wabash River units 2, 3, and 5 and Beckjord units 1 and 2.  Plaintiffs' evidence at trial will show that these violations harm the health and environmental quality of the communities downwind of the plants.  The harm from these illegal emissions will continue until the Court orders Cinergy to comply with the law.  Even then the harm already incurred as a result of Cinergy's violations will not be redressed without additional reductions from the same plant.

The evidence sketched above and to be detailed at trial will support the following remedy for the Wabash River and Beckjord violations:

1.   Closure of Wabash River units 2, 3, and 5, to the extent Cinergy opts to avoid installing pollution controls and obtaining the required permits, within 30 days of this Court's order;

2.   $SO_2$ and $NO_X$ reductions at Wabash River units 4 and/or 6 equal to the amount of illegal emissions from units 2, 3, and 5, along with the surrender of emissions allowances in the same amount, within 20 years of the order;

3.   Installation of PM CEMs at Beckjord units 1 and 2;  and

4.   A civil penalty of $3.465 million for the Beckjord violations.

Dated: January 9, 2009           Respectfully submitted,
                                 RONALD J. TENPAS
                                 Assistant Attorney General
                                 Environment & Natural Resources Division

                                 PHILLIP BROOKS
                                 Special Counsel to the Chief
                                 /s/ Thomas A. Benson
                                 JUSTIN SAVAGE
                                 KATHERINE VANDERHOOK
                                 MYLES FLINT, II
                                 JENNIFER A. LUKAS-JACKSON

JASON A. DUNN
THOMAS A. BENSON
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20530
(202) 514-5261
thomas.benson@usdoj.gov

TIMOTHY M. MORRISON
United States Attorney
Southern District of Indiana

THOMAS E. KIEPER
Assistant United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN  46204-3048

ANDREW CUOMO
ATTORNEY GENERAL
OF THE STATE OF NEW YORK

MICHAEL MYERS
JOSEPH KOWALCZYK
Assistant Attorneys General
The Capitol
Albany, NY 12224
(518) 402-2594
ANNE MILGRAM
ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

MAURICE GRIFFIN
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-4503
(609) 984-2845

RICHARD BLUMENTHAL
ATTORNEY GENERAL
OF THE STATE OF CONNECTICUT
CARMEL MOTHERWAY

Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120
(860) 808-5101

HOOSIER ENVIRONMENTAL COUNCIL
OHIO ENVIRONMENTAL COUNCIL

JONATHAN LEWIS
CLEAN AIR TASK FORCE
Staff Attorney and Climate Specialist
18 Tremont Street, Suite 530
Boston, MA 02108
    (617) 624-0234 x10

**CERTIFICATE OF SERVICE**

       I hereby certify that foregoing brief was filed with the Court's ECF system on January 9, 2009 and will be emailed to counsel of record through the ECF system.  The exhibit filed under seal with the Court will be separately emailed to counsel of record.

        /s/ Thomas A. Benson
       Thomas A. Benson