IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:99-cv-01693-LJM-JMS |
| ) | |
| CINERGY CORP., et al., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFFS' TRIAL BRIEF**

# Attachment 1

**(U.S. Department of Energy Order 202-05-3, Dec. 20, 2005)**

United States of America
Department of Energy

District of Columbia Public Service Commission   )        Docket No. EO-05-01

Order No. 202-05-3

## I. Summary

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA), 16 U.S.C. § 824a(c), and section 301(b) of the Department of Energy Organization Act, 42 U.S.C. § 7151(b), and for the reasons set forth below, I hereby determine that an emergency exists due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, a shortage of facilities for the transmission of electric energy and other causes, and that issuance of this order will meet the emergency and serve the public interest. Therefore, Mirant Corporation and its wholly owned subsidiary, Mirant Potomac River, LLC (collectively referred to herein as Mirant), are hereby ordered to generate electricity at their Potomac River Generating Station (the "Plant") pursuant to the terms of this order.

## II. Procedural History

On August 19, 2005, Mirant submitted to the Virginia Department of Environmental Quality (DEQ) a computerized emissions modeling study Mirant had conducted of its Plant that indicated that emissions from the Plant caused or contributed to significant localized exceedances of the National Ambient Air Quality Standards (NAAQS).[1] Also on August 19, 2005, DEQ issued a letter to Mirant which requested "that Mirant *immediately* undertake such action as is necessary to ensure protection of human health and the environment, in the area surrounding the Potomac River Generating Station, including the potential reduction of levels of operation, or potential shut down of the facility." (emphasis in original). The letter asked Mirant to provide DEQ with a summary of the actions taken and the progress toward eliminating NAAQS exceedances by August 24, 2005. At midnight on August 21, 2005, Mirant reduced production of all units at the Plant to their minimum load, and at midnight on August 24, 2005, Mirant shut down all five of the generating units at the Plant.

On August 24, 2005, the District of Columbia Public Service Commission (DCPSC) filed an *Emergency Petition and Complaint* with both the United States Department of Energy (DOE or Department) and the Federal Energy Regulatory Commission (FERC or Commission) pursuant to the FPA. The DCPSC requested the Secretary of Energy to find that an emergency exists under section 202(c) of the FPA and to issue an order directing Mirant to continue

---

[1] The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, authorizes the United States Environmental Protection Agency (EPA) to establish NAAQS, 42 U.S.C. §§ 7408-7409, and states that it is the responsibility of the states and local governments for assuring that they are attained, 42 U.S.C. §§ 7401(a)(3) and 7416.

operation of the Plant. The basis for the petition was that the shutdown of the Plant "...will have a drastic and potentially immediate effect on the electric reliability in the greater Washington, D.C., area and could expose hundreds of thousands of consumers, agencies of the Federal Government and critical federal infrastructure to curtailments of electric service, load shedding and, potentially, blackouts." The DCPSC requested that the Commission issue a similar order under sections 207 and 309 of the FPA. Numerous parties filed interventions and comments in response to DCPSC's emergency petition, as well as subsequent comments and responses.[2] Further, both FERC and DOE issued information requests to Mirant, the Potomac Electric Power Company (PEPCO), the company responsible for supplying electricity to retail customers in the District of Columbia, and PJM Interconnection, LLC (PJM), the grid operator responsible for the administration of the bulk power grid and electricity market in the region.[3] In addition to the DCPSC petition proceedings, DOE has hosted and participated in numerous conference calls and meetings to gather information on the shutdown of the Plant and its effect on the reliability of D.C.'s electricity system.[4]

### III. Background

The coal-fired Mirant Plant, which began operation in 1949, is located in Alexandria, Virginia, and is capable of producing 482 megawatts of electricity primarily for delivery to Washington, D.C. The Plant consists of five generating units, two of which are cycling units that range in output from 35 MW to 88 MW, and three of which are baseload units that range in output from 35 MW to 102 MW. It is one of only three sources of electricity that serve the central business district of the District of Columbia, many federal institutions, the Georgetown area in D.C., as well as other portions of Northwest, D.C., and the District of Columbia Water and Sewer Authority's Blue Plains Advanced Water Treatment Plant, the largest wastewater

---

[2] Several of these filings were only made in the FERC docket and not in DOE's docket. Even though a number of filers did not submit their comments in the DOE docket, the Department has, in the interest of rendering an appropriate and fully informed determination, reviewed all the filings in the FERC docket for any pertinent facts that will assist the Department in making its decision. Also, to the extent the filings contained analysis or legal arguments pertaining to the Department's 202(c) authority, they have been considered in the Department's decision making process.

[3] The data submitted contained Critical Energy Infrastructure Information and was submitted in both confidential and redacted versions, as defined in FERC's rules at 18 C.F.R. § 388.13. All information contained in this order is from public filings in the DOE and FERC dockets.

[4] The Administrative Procedure Act's prohibitions on ex parte communications in an adjudicatory proceeding, 5 U.S.C. § 557(d)(1), do not apply to DOE's 202(c) proceedings, because section 202(c) explicitly authorizes the Department to issue a 202(c) order "either upon its own motion or upon complaint, with or without notice, hearing, or report. . ." 16 U.S.C. § 824a(c).

treatment plant in the world.[5] The other two sources are two 230 kV lines that deliver electricity from other generating sources in the regional electric grid operated by PJM. Although there are other generating units in close physical proximity to the Central D.C. area, (e.g., the Benning Road and Buzzard Point generating facilities, which are dual-fueled oil and natural gas generating power plants, owned by PEPCO) there are no transmission lines that would allow delivery of power from these other units to reach the Central D.C. area. With regard to the sources of power that serve the Central D.C. area, PEPCO owns and operates the transmission lines, and PJM determines electricity demand.

Although Mirant shut down all of the Plant's generating units on August 24, 2005, it has since restarted unit number one which, the Department understands, is currently operating. Mirant is operating the unit on an 8/8/8 basis --- that is, in any given twenty-four hour period, the unit runs for eight hours at its maximum level of 88 MW, eight hours at its minimum level of 35 MW, and has eight hours when it does not run. DOE has been informed that both EPA and DEQ acknowledge that the operation of this unit in this manner does not result in any NAAQS exceedances. In addition, DOE understands that Mirant is taking other steps to increase production at the Plant in a manner which will be acceptable to DEQ and EPA.

PEPCO has applied to the DCPSC to construct two new 230 kV lines that would supply electricity to the Central D.C. area. In the same application, PEPCO has proposed building two new 69kV lines to supply the Blue Plains wastewater treatment plant. PEPCO proposes having the two 69 kV lines installed by the summer 2006 peak season, and the two 230 kV lines installed in 18 to 24 months. The two existing 230 kV lines that supply the Central D.C. area would need to be temporarily taken out of service sequentially in order to connect the new lines to the Central D.C. area. Once completed, these lines apparently would provide a high level of electric reliability in the Central D.C. area, even in the absence of production from the Plant.

## IV. Discussion

### A. Reliability Issues

The Department has conducted an independent analysis of the electricity reliability situation in the Central D.C. area and has analyzed the Plant's role in ensuring a sufficiently reliable supply of electricity to that area. DOE's analysis was conducted by the Department's Oak Ridge National Laboratory. Under North American Electric Reliability Council standards, at a minimum, the power system must carry at least enough contingency reserves of electricity to cover the most severe single contingency. The standards require that an area's system always be operated with sufficient reserves to compensate for the sudden failure of the area's most important single generator or transmission line.

---

[5] For purposes of this order, the area supplied with electricity by these three sources will be referred to as the "Central D.C. area," and the retail customers in this area will be referred to as the "Central D.C. area customers."

Based on the fact that the Central D.C. area has only three sources of supply, the Plant and the two 230 kV transmission lines, the Department's analysis concludes that in order to maintain a minimally reliable electric power system, the Plant must be available to run when one of the 230 kV lines is out of service, because if the remaining line failed there would be no other source of electricity to serve the Central D.C. area load. In addition, the analysis concludes that if one of the 230 kV lines failed unexpectedly, enough generation must be started as rapidly as possible so as to be able to serve all of the Central D.C. area load as a contingency reserve in the event the other line were to fail. The analysis also indicates that the Plant should be operated in such a way as to minimize the amount of time needed to bring it into production.

PEPCO has asserted that:

> Absent the generating capacity of the Plant, if the two 230 kV transmission circuits into the [Central D.C. area] fail, there will be a blackout in much of the District of Columbia until the circuits are repaired or the Plant's generators are restarted and can operate at a level that matches load. All electric customers in Georgetown, Foggy Bottom and major portions of downtown Washington will be affected. The affected customers will also include Blue Plains wastewater treatment plant. It is PEPCO's understanding that within 24 hours of the loss of electric supply, Blue Plains will have no option but to release untreated sewage directly into the Potomac River, which would result in a significant adverse impact to human health, aquatic wildlife and other environmental resources. Affected customers will also include numerous hospitals, schools, universities, commercial buildings, and residential customers. Importantly, numerous federal facilities will lose power, including those critical to the security, safety, and welfare of the whole country, such as the FBI, the Justice Department, the State Department, the Federal Emergency Management Agency, the Department of the Interior, and the Department of Energy to name but a few.[6]

No commenter has disputed these statements by PEPCO, and they have been generally corroborated by DOE's own independent analysis; therefore, DOE will accept them as correct statements of fact. Further, the 230 kV lines do go out of service on occasion; since 2000, there have been 34 one-line outages for maintenance, and seven occasions where one of the lines has tripped unexpectedly. DOE has been informed that, prior to 2000, there were two occasions when both of the lines failed simultaneously.

### B. Environmental Issues

Some commenters have asserted that the renewed operation of the Plant would result in NAAQS exceedances and a violation of the Clean Air Act, and that DOE could not issue a 202(c) order which would contravene the Clean Air Act (42 U.S.C. §§ 7401-7626). In response to this assertion, DCPSC, PEPCO and PJM contend that there were no actual monitored

---

[6] *See* Potomac Electric Power Company's Leave to Answer and Answer to Comments, FERC Docket No. EL05-145-000 at pages 2 & 3 (September 9, 2005).

4

exceedances of the NAAQS at the Plant during operation, and that operation of the plant at full power does not exceed the emissions limits contained in the Plant's operating permit and therefore the operation of the Plant pursuant to a DOE order would not violate the Clean Air Act. EPA has shared information with DOE regarding NAAQS modeled results and other environmental issues at the Plant. In response to the environmental concerns raised, this order seeks to minimize, to the extent reasonable, any adverse environmental impacts. Should EPA issue a compliance order directed to operation of the Plant, DOE will consider whether and how this order should conformed to such order.

Another assertion raised is that DOE cannot issue an order without complying with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*. Responders to that assertion stated that NEPA review requirements do not apply because any order would merely require the Plant to operate in the manner and at the level it has historically operated, and thus is not a "major federal action" triggering NEPA. In addition, responders assert that "...the emergency nature of the relief sought in this case permits the [the Secretary] to act without conducting a NEPA analysis, even if it were required."[7] DOE has determined that the emergency circumstances here make it necessary to take action without performing a NEPA analysis. Indeed, in order for an order under FPA section 202(c) to be issued at all, the Secretary of Energy must determine that an emergency exists, and I have made that determination here. DOE has consulted with CEQ about alternative arrangements pursuant to 40 C.F.R. § 1506.11.

### C. Other Issues

Commenters opposed to the issuance of a FPA section 202(c) order cited *Richmond Power & Light v. FERC*, 574 F. 2d 610 (D.C. Cir. 1978) as imposing a limit on the Secretary's authority to make an emergency finding under section 202(c). In *Richmond*, the New England Power Pool (NEPOOL) petitioned the Federal Power Commission (the Secretary's predecessor in exercising section 202(c) authority) for an order pursuant to FPA section 202(c) to have utilities east of the Mississippi River with excess electric generating capacity supply NEPOOL with that excess capacity. The request was based on fears of an oil shortage due to the 1973 Arab oil embargo. The Commission responded by holding a conference and a series of meetings which resulted in an agreement among the purchasing, transmitting and supplying utilities and participating state regulatory commissions. As a result of the agreement, NEPOOL moved to withdraw its petition, which the Commission allowed. Richmond Power & Light Company challenged the decision to allow the withdrawal and the court found that the Commission did not abuse its discretion in declining to issue an order under section 202(c), but rather settling on the temporary-voluntary agreement program reached by the interested parties. Instead of limiting its

---

[7] District of Columbia Public Service Commission Answer to Motion of the Virginia Department of Environmental Quality at page 24 (October 26, 2005), FERC Docket No. EL05-145-000. *See also* Answer of Potomac Electric Power Company and PJM Interconnection, LLC at page 18, (October 13, 2005), FERC Docket No. EL01-145-000.

reach, *Richmond* underscores the discretionary nature of the Secretary's authority under section 202(c).[8]

Another case asserted to limit the Secretary's authority to issue an order under section 202(c) was *National Fuel Gas Supply v. FERC*, 909 F2d 1519 (D.C. Cir. 1990). In that case, National Fuel applied under section 7 of the Natural Gas Act (NGA), 15 U.S.C. § 717 *et seq.*, for a certificate of public convenience and necessity to allow it to make interruptible sales of natural gas. The Commission imposed a condition that National Fuel accept a blanket transportation certificate to provide open access transportation. The court ruled that the Commission was improperly using a NGA section 7 certificate condition in place of an individual or generic proceeding under section 5 of the NGA. The Department does not see the relevance of *National Fuel* here. I am using section 202(c) of the FPA for precisely the type of situation contemplated by section 202(c) of the FPA.

## V. Decision

Section 202(c) of the FPA vests in the Secretary of Energy the authority to issue an order when "an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of the fuel or water for generating facilities, or other causes...." 16 U.S.C. § 824a(c). DOE's regulations acknowledge that "[e]xtended periods of insufficient power supply as a result of inadequate planning or the failure to construct necessary facilities can result in an emergency as contemplated by these regulations." 10 C.F.R. § 205.371.

I find that in the circumstances presented here, an emergency exists that justifies the issuance of a section 202(c) order. My determination is not based on any single factor, but on the combination of all relevant facts and circumstances. In particular, I find that an emergency exists because of the reasonable possibility an outage will occur that would cause a blackout, the number and importance of facilities and operations in our Nation's Capital that would be potentially affected by such a blackout, the extended number of hours of any blackout that might in fact occur, and the fact that the current situation violates applicable reliability standards.

---

[8] The facts in *Richmond* and in the current situation are very different. *Richmond* dealt with a wide regional or even national energy shortage situation, while we are considering electricity reliability in a discrete geographic area. The facts here more closely resemble those considered by the Federal Power Commission in *City of Cleveland, Ohio v. Cleveland Electric Illuminating Company*, 47 FPC 747 (1972). In that case, the City of Cleveland petitioned the Commission pursuant to section 202(c) to order an interconnection with Cleveland Electric Illuminating Company to provide services during shortages caused by outages of the City of Cleveland's generating facilities, or delays getting generation on line. The Commission found that the City of Cleveland had an emergency due to periodic shortages of generating facilities caused by outages and ordered the establishment of a 69kV temporary emergency interconnection between the electric systems of the City and Cleveland Electric Illuminating. Similarly, here DOE is ordering the Plant to provide electricity in certain limited situations.

More specifically, if the Mirant plant is not available to generate electricity and one of the two transmission lines serving the Central D.C. area goes out of service, the Central D.C. area would be served by only one transmission line. Should that remaining line fail for any reason, a blackout would occur in the Central D.C. area, potentially for an extended period of time. In fact, if one or both of the transmission lines could not be brought back into service immediately and the only source of energy for the Central D.C. area was the Mirant Plant, in the absence of today's order it would take several hours at a minimum to bring the Plant into full operation.

The outage of one of these two lines is not merely a theortetical possibility. On Friday, December 16, 2005, PJM informed DOE that on the previous night, "one of the two circuits critical to providing service to the District tripped. Continued [electric] service to certain load within the District was at that time entirely dependent on the remaining circuit." As a result, PJM requested dispatch of a second generating unit at the Plant, but Mirant refused to do so. PJM informed DOE that "service was not interrupted because load was low and the remaining circuit performed without incident." Fortunately, full service to the line that had tripped was restored by the morning of December 16. Nonetheless, there can be no assurance that the Central D.C. area will be so lucky next time, either with respect to the timing of the event, the operation of the second transmission line, or the ability to bring the first transmission line back into service.

Furthermore, it is periodically necessary for an outage to occur on one of the transmission lines because of the need to perform maintenance. In fact, maintenance is scheduled on one of the lines in the next few weeks. Thus, as occurred on the night of December 15, 2005 and as will certainly occur again in the future, if the Mirant Plant is not made operational Central D.C. will find itself relying solely on one transmission line. The duration of an outage can range from up to several days (for maintenance) or even longer (up to weeks) if the outage of a line is due to a major equipment failure. Throughout such a period, if the Plant is not fully operational a blackout in Central D.C. is only one step away, i.e., if an event should occur that causes the second line to fail. Such a blackout could last for hours or days.

I recognize that, if past experience is any guide, the simultaneous failure or outage of both transmission lines serving the Central D.C. area is not a high probability. While this event has occurred in the past, it has not happened often. Moreover, the recent tripping of one circuit does not in itself dictate the existence of an emergency justifying issuance of a 202(c) order.

The facilities and functions that would be adversely affected by an extended blackout in this instance, however, is an important consideration. The Central D.C. area includes offices, facilities and operations involved in all three branches of government, and that are critically important to the Nation's national security, law enforcement and regulatory functions. The Central D.C. area also includes hundreds of thousands of residents and workers, and all manner of public safety and protection facilities, including hospitals, police, and fire facilities. Moreover, DOE has been informed that within 24 hours of a blackout in the Central D.C. area, untreated sewage from the Blue Plains Wastewater Treatment plant would be discharged into the Potomac River.

Finally, it is noteworthy that a blackout in the Central D.C. area not only would affect critically important facilities and operations, it could last for an extended period. Depending on the reason for the outage of the transmission lines, the lack of service on those lines accompanied by the lack of generation by the Plant could result in a large portion of the District of Columbia being without electricity for a period that could last hours or days. At the very least, if the two transmission lines were made unavailable with no advance notice and the only source of electricity for the Central D.C. area was the Mirant plant, in the absence of today's order DOE understands it would take at least 28 hours, and likely longer, to bring the Plant into full operation, during which time all or a substantial part of the Central D.C. area would be without electric power. The results would be hardship and physical risk to hundreds of thousands of persons from loss of heat, elevator outages, medical equipment failure and numerous other causes. In addition, critical portions of the nation's government would also be severely impacted, with resulting adverse effects on a national scale.

Of course, the fact that the Department did not act immediately on the DCPCS petition does not argue against my finding that an emergency currently exists. After the petition was filed, DOE took several weeks to gather the relevant information, consider the facts, talk with environmental regulatory authorities, and develop an order that balanced the appropriate considerations. As explained in the text of this order, the current facts fully justify my finding that an emergency exists and that this order will meet that emergency. There certainly is nothing in the Federal Power Act that requires me to wait until a blackout actually has occurred, lives are put in jeopardy, and a significant disruption of National government functions already has happened before exercising my section 202(c) authority.

Accordingly, and based on all of the facts and circumstances, I find that an emergency exists justifying the issuance of this order under Federal Power Act section 202(c).

After finding the existence of an emergency, DOE has the authority, "either upon its own motion or upon complaint, with or without notice, hearing, or report, to order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c). The statute gives the Secretary of Energy broad discretion to fashion the terms of an order that will, in the Secretary's judgment, "best meet the emergency and serve the public interest." Based on the circumstances described above in this order, I hereby direct Mirant to generate electricity at the Plant pursuant to the terms of this order.

While I am issuing this order to help ensure a reliable supply of electric energy to the Central D.C. area, I am cognizant of the concerns that have been expressed concerning the potential adverse environmental consequences of operating the Plant, and of the national interest in attainment of the NAAQS that have been established under the Clean Air Act. Ordering action that may result in even local exceedances of the NAAQS is not a step to be taken lightly. However, it would not be reasonable for the Department of Energy to stand by and take no positive action on the DCPSC petition, even though the Central D.C. area is in danger of an extended blackout and the Department and private parties have available to them the legal and operational tools to prevent such a blackout from occurring. In this order, I have sought to harmonize those interests to the extent reasonable and feasible by ordering Mirant to operate in a

manner that provides reasonable electric reliability, but that also minimizes any adverse environmental consequences from operation of the Plant.

DOE expects that the DCPSC, having sought an emergency order, will take such actions as are within its authority to provide adequate and reliable electric service for the Central D.C. area including, for example, expediting approval of PEPCO transmission system upgrades and instituting demand response programs.[9] Indeed, DOE views this order not as a permanent solution to the Central D.C. area's reliability issues, but rather as a bridge between the current untenable situation and a more permanent solution that must be crafted by appropriate parties, including the DCPCS, FERC, environmental regulatory authorities, and relevant private sector parties. This permanent solution may include the installation of the new transmission lines discussed above, the installation of new pollution control equipment at the Mirant Plant, or other means.

As explained above, in the event that one of the two transmission lines that serve the Central D.C. area is out of service (due either to a necessary planned outage or to unforeseen events) and sufficient electricity from the Mirant power plant were not available, then the Central D.C. area would experience an immediate blackout should the one remaining source of electricity fail. This situation must be avoided, and ordering paragraph A of this order ensures that this situation will be avoided. When an outage is planned, Mirant is to be given advance notice and is required to supply necessary generation throughout the period of the outage.[10] In the event of an unexpected outage, Mirant must provide such generation as soon as possible. In the very unlikely eventuality of both transmission lines failing at the same time, Mirant is required to provide sufficient generation to supply the electrical demands of the affected area as soon as possible.

It is essential to determine the level of operation and other steps that will enable Mirant to rapidly respond to an unplanned transmission line outage. Some commenters have urged the Department to order the Plant to run continuously, even if doing so causes ongoing exceedances of the NAAQS. This would assure a high level of reliability of the electricity supply, but of course would not be tailored to particular circumstances in which operation of the Plant would be most necessary to provide needed reliability for the Central D.C. area and might also cause local air quality concerns. Other commenters have urged the Department to do nothing.

---

[9] Demand response programs prompt electricity customers to reduce demand, especially during periods of short supply.

[10] In making certain portions of this order effective only upon notice to Mirant by PEPCO of a planned or unplanned outage of one or both of the 230 kV lines, it is similar to the FPA section 202(c) orders issued during the 2000/2001 California energy crisis. In those, DOE ordered certain entities to generate, deliver, interchange and transmit electricity to the California Independent System Operator (California ISO), but the entities were not required to deliver energy or services unless the California ISO had filed with DOE a certificate that it had been unable to acquire adequate supplies of electricity in the market.  *See* Order pursuant to Section 202(c) of the Federal Power Act (December 14, 2000); Order Pursuant to Section 202(c) of the Federal Power Act (January 11, 2001).

9

The Department is not prepared to order actions that could cause more localized NAAQS exceedances than are necessary in order to assure adequate electric reliability for the Central D.C. area. At the same time, the Department should address the risks that delays in responding to an unplanned transmission line outage would present if measures are available to mitigate that risk. In my judgment, the appropriate balance is struck by (1) requiring Mirant to keep as many units in operation, and take all other measures to reduce the start-up time of units not in operation, for the purpose of providing electrical reliability, as feasible (as further defined in the ordering paragraphs below). Thus, Mirant must take actions to reduce the time it takes to respond to an unplanned outage. This will serve to reduce the risk of a blackout but not at the price of unnecessary exceedances of health-based NAAQS. As Mirant improves its environmental performance, in cooperation with environmental regulators, its ability to react to an unforeseen outage also will improve. Environmental regulators and Mirant can work together, with the Department, to reduce, and perhaps eliminate, any conflict between environmental goals and electric reliability.

This order is effective immediately and will terminate at 12:01 a.m. October 1, 2006. This order may be modified or extended at any time upon order of the Secretary of Energy.

## VI. Ordering Paragraphs

For the reasons set forth above, pursuant to section 202(c) of the Federal Power Act, it is hereby ordered that:

A. During any period in which one or both of the 230kV lines serving the Central D.C. area is out of service, whether planned or unplanned, Mirant will operate the Potomac River Generating Plant to produce the amount of power (up to its full capacity) needed to meet demand in the Central D.C. area as specified by PJM for the duration of the outage.

In the event of a planned outage, Potomac River units will generate that amount of electricity specified by PJM to meet demand.

In the event of an unplanned 230 kV line outage, Potomac River units will generate that amount of electricity specified by PJM to meet demand as soon as possible.

When producing electricity pursuant to this paragraph, Mirant shall utilize pollution control equipment and measures to the maximum extent possible to minimize the magnitude and duration of any exceedance of the NAAQS.

B. Mirant shall keep as many units in operation, and shall take all other measures to reduce the start-up time of units not in operation, for the purpose of providing electricity reliability, as "feasible." For purposes of this paragraph, "feasible" means as determined by the Department of Energy, after consideration of the plan submitted by Mirant pursuant to paragraph D of this order and after consultation with the Environmental Protection Agency, without regard to cost and without causing or significantly contributing to any exceedance of the NAAQS.

C. Notice

In instances of scheduled outages of one of the 230kV lines, PEPCO will give advance notice of the planned outage and the estimated duration of such outage to Mirant, PJM, DOE, FERC, EPA, and DEQ. The notice must be sufficiently in advance of the outage to allow Mirant to bring the required amount of generation needed for reliability purposes on line by the time the outage is scheduled. PEPCO will ensure that only those planned outages needed to maintain or enhance the reliability of the 230 kV lines (or to install new lines) are scheduled and that such outages are scheduled to minimize the environmental effects of the operation of the Plant.

PEPCO will notify DOE, PJM, FERC, EPA, and DEQ of any unplanned outage of one or both of the 230 kV lines as soon as possible, but in no event later than two hours after informing Mirant.

In the event of either a planned or unplanned outage, PJM will specify the amount of electricity that Mirant must provide in order to meet demand.

D. Mirant shall submit a plan to DOE, within 10 days of the date of this order, detailing the steps it will take to ensure compliance with this order. This compliance plan shall include, at minimum, information regarding adequate staffing, materials, and supplies; emissions controls; and length of time necessary to start-up the Plant's generating units in the event of an unplanned or planned outage. DOE will review the compliance plan and order additional requirements if necessary.

E. Pursuant to the terms of FPA section 202(c) and DOE regulations at 10 C.F.R. § 205.376, Mirant and its customers should agree to mutually satisfactory terms for any costs incurred by Mirant under this order. If no agreement can be reached, just and reasonable terms shall be established by a supplemental order.

F. DOE expects that the DCPSC will take all reasonable actions to augment electrical reliability and to reduce electricity demand in the Central D.C. area.

G. DOE will periodically reexamine the need for this order with particular emphasis on: (1) Mirant's progress, working with environmental regulators, in reducing emissions and/or the impact of emissions; and (2) whether the DCPSC is taking all reasonable actions available to it to support electricity reliability in the Central D.C. area.

H. Pursuant to section 313 of the Federal Power Act (16 U.S.C. § 8251), any person, State, municipality, or State commission that is a party to this proceeding and is aggrieved by this order may apply for a rehearing within thirty days. Requests for rehearing may be submitted by mail, facsimile, or electronic mail to the following: (1) mail should be directed to Lawrence Mansueti of the Permitting, Siting, and Analysis Division of the Office of Electricity Delivery and Energy Reliability at the United States Department of Energy, Routing Symbol OE-20, 1000

Independence Avenue, S.W., Washington, D.C. 20585; (2) facsimiles may be submitted to 202-586-5860; (3) e-mail may be submitted to Lawrence.Mansueti@hq.doe.gov.

Issued in Washington, D.C. at __1:45 PM__ this 20th day of December, 2005.

*Samuel W. Bodman*
*Secretary of Energy*