IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| STATE OF NEW YORK, STATE OF NEW | ) | |
| JERSEY, STATE OF CONNECTICUT, | ) | |
| HOOSIER ENVIRONMENTAL COUNCIL, | ) | |
| and  OHIO ENVIRONMENTAL COUNCIL, | ) | |
| | ) | Civil Action No. 1:99-cv-1693-LJM-JMS |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CINERGY CORP., PSI ENERGY, INC., and | ) | |
| THE CINCINNATI GAS and ELECTRIC | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**CINERGY'S REMEDY PHASE TRIAL BRIEF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

GLOSSARY ...................................................................................................... viii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 5

I.     Plaintiffs' Claims Against Cinergy. .......................................................... 5

II.    Plaintiffs' Delay In Bringing Suit. ........................................................... 6

III.   Preclusion Of Any Penalties For NSR Violations. ................................... 7

IV.   Liability-Phase Trial On Remaining Claims. ........................................... 8

ARGUMENT .................................................................................................... 10

I.     Cinergy's Proposal Is The Appropriate Remedy For the Violations Found At Wabash River Units 2, 3, and 5. ........................................... 10

      A.    This Court Has Broad Discretion To Order The Appropriate Injunctive Relief After Consideration Of All Pertinent Factors Bearing On That Remedy. ................................................................................. 10

      B.    Cinergy's Proposal To Reduce Operations Of And Then Shut Down Units 2, 3, and 5 Is the Appropriate Remedy. ......................... 12

            1.   Cinergy's remedy proposal. ........................................ 13

                 a. Environmental benefits of Cinergy's proposal. .................. 13

                 b. Cinergy's proposal satisfies its obligations as a public utility. ............. 13

                      i. Cinergy's statutory and regulatory duty to provide reliable service. ........................................................... 14

                      ii. Cinergy's proposal meets its reliability obligations and avoids the possibility of blackouts. ............................. 16

                      iii. Cinergy's proposal satisfies its duty to provide cost-effective service. ............................................... 17

            2.   Plaintiffs' proposed remedy. ...................................... 18

a. Plaintiffs' proposal to install controls at the Wabash River station by 2013 or later fails properly to balance equitable considerations. ............................................................ 20

b. Plaintiffs' immediate shutdown scenario also fails equitable scrutiny. ...................................................................... 22

C.   Plaintiffs' Request For Control Of Units 4 and 6 And For Allowance Surrender Are Inappropriate And Beyond The Bounds of Equity. ..................... 23

1.   Plaintiffs' proposed "remediation" is inconsistent with this Court's orders and the CAA. ................................................. 24

a. Remediation for "excess emissions" conflicts with this Court's orders. ............................................................... 24

b. Remediation for "excess emissions" is inconsistent with the CAA. ...................................................................... 24

2.   Plaintiffs cannot establish the prerequisite for any remedial injunction — irreparable harm directly linked to Cinergy's violations or a probability of future irreparable injury — making remediation inappropriate. ............................................... 28

3.   The remedial relief Plaintiffs request is inequitable. ................ 33

a. Any excess emissions do not justify controlling Units 4 and 6 or forcing the surrender of emission allowances. .............. 33

b. Cinergy has diligently met and exceeded its environmental obligations. ......................................................... 36

c. Remediation is inappropriate given Plaintiffs' delay in formulating the applicable NSR standards and in bringing suit. ................................................................. 36

4.   Plaintiffs' request for surrender of Cinergy's emission allowances under CAA cap-and-trade programs is not an available remedy for unrelated construction NSR violations. ............................. 38

II.   Cinergy's Proposal Is The Appropriate Remedy For The Beckjord Violations. ............. 41

A.   Background Relevant To The Beckjord Particulate Matter Remedy. ............. 41

B.   The Court Should Adopt Cinergy's Balanced Remedy Proposal, Rather Than Plaintiffs' Unsupported And Unduly Punitive Proposal. ............. 44

CONCLUSION ............................................................................... 49

# TABLE OF AUTHORITIES

## CASES

*Arthur Lipper Corp. v. SEC*,
    547 F.2d 171 (2d Cir. 1977)................................................................................12

*Bowles v. Lentin*,
    151 F.2d 615 (7th Cir. 1945) ............................................................................12

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)..........................................................................................35

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
    467 U.S. 838 (1984) .........................................................................................36

*City of Evansville v. S. Ind. Gas & Elec. Co.*,
    339 N.E.2d 562 (Ind. Ct. App. 1975)...............................................................17

*City of L.A. v. Lyons*,
    461 U.S. 95 (1983)............................................................................................32

*Conservation Law Found., Inc. v. Busey*,
    79 F.3d 1250 (1st Cir. 1996)......................................................................37, 38

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006).....................................................................................11, 22

*Freeman v. Pitts*,
    503 U.S. 467 (1992).....................................................................................11, 39

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002).....................................................................................28, 39

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944)..........................................................................................21

*Holmberg v. Armbrecht*,
    327 U.S. 392 (1946).....................................................................................11, 37

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977)..........................................................................................10

*Lemon v. Kurtzman*,
    411 U.S. 192 (1973).....................................................................................11, 37

*Lewis v. Casey*,
    518 U.S. 343 (1996).......................................................................11, 30, 34, 35

*Midwest ISO Transmission Owners v. FERC*,
    373 F.3d 1361 (D.C. Cir. 2004) ............................................................15

*Missouri v. Jenkins*,
    515 U.S. 70 (1995) .................................................................. *passim*

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008) ..............................................................40

*PepsiCo, Inc. v. Redmond*,
    54 F.3d 1262 (7th Cir. 1995) ................................................................35

*SEC v. Lipson*,
    278 F.3d 656 (7th Cir. 2002) ................................................................29

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
    402 U.S. 1 (1971) ...........................................................................10, 39

*Swift & Co. v. United States*,
    276 U.S. 311 (1928) ..............................................................................12

*U.S. Gypsum, Inc. v. Ind. Gas Co., Inc.*,
    735 N.E.2d 790 (Ind. 2000) .................................................................17

*U.S. Pub. Interest Research Group v. Atl. Salmon of Me., LLC*,
    339 F.3d 23 (1st Cir. 2003) ...................................................................32

*United States v. Alcoa Inc.*,
    98 F. Supp. 2d 1031 (N.D. Ind. 2000) ....................................11, 30, 32

*United States v. Am. Tobacco Co.*,
    221 U.S. 106 (1911) ..............................................................................37

*United States v. Cinergy Corp.*,
    397 F. Supp. 2d 1025 (S.D. Ind. 2005) .............................8, 24, 26, 37

*United States v. Holtzman*,
    762 F.2d 720 (9th Cir. 1985) ................................................................32

*United States v. Ohio Edison Co.*,
    276 F. Supp. 2d 829 (S.D. Ohio 2003) ...............................................37

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953)...................................................................11, 12, 32

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)........................................................................11, 29

*Wilk v. Am. Med. Ass'n,*
    895 F.2d 352 (7th Cir. 1990) ................................................................32

*Williams Elecs. Games, Inc. v. Garrity,*
    366 F.3d 569 (7th Cir. 2004) ................................................................28

*Winter v. NRDC,*
    129 S. Ct. 365 (2008) ..........................................................................11

*Wisconsin v. Weinberger,*
    745 F.2d 412 (7th Cir. 1984) ................................................................37

## STATUTES

16 U.S.C. § 824d(a) ....................................................................................17

       § 824*o* .............................................................................................14

28 U.S.C. § 2462 ..........................................................................................8

42 U.S.C. § 7407 ........................................................................................31

       § 7409(b) .......................................................................................29

       § 7412(b) .......................................................................................31

       § 7413(b) ................................................................................6, 24, 26

       § 7413(e) .......................................................................................47

       § 7502(a) .......................................................................................25

       § 7651 *et seq.* ..............................................................................19, 26

       § 7651a(3) .....................................................................................27

       § 7651b(a) .....................................................................................26

       § 7651b(b) .....................................................................................27

       § 7651b(f) .....................................................................................40

       § 7651j ..........................................................................................25

       § 7661 *et seq* ..................................................................................8

Ind. Code § 8-1-2-4 ....................................................................................17

§ 8-1-2-48(c) ..............................................................................................14

170 Ind. Admin. Code 4-6-9 ..............................................................................19

      4-6-10 ..............................................................................................19

      4-7-4 ..............................................................................................14

      4-7-6(d) ..............................................................................................14

Ohio Admin. Code 3745-17-10 ..............................................................................41

## REGULATIONS

40 C.F.R. pt. 60 ..............................................................................................44

40 C.F.R. § 50.121(b) ..............................................................................................27

      § 60.48Da(p) ..............................................................................................41, 45

      § 60.49Da ..............................................................................................45

      § 73 ..............................................................................................27

      § 81.315 ..............................................................................................29

      § 96.2 ..............................................................................................27

      § 96.54 ..............................................................................................25

45 Fed. Reg. 52,676 (Aug. 7, 1980) ..............................................................................31

53 Fed. Reg. 6845 (Mar. 3, 1988) ..............................................................................30

61 Fed. Reg. 58,482 (Nov. 15, 1996) ..............................................................................30

63 Fed. Reg. 57,356 (Oct. 27, 1998) ..............................................................................19, 27

66 Fed. Reg. 54,453 (Oct. 29, 2001) ..............................................................................27

## ADMINISTRATIVE DECISIONS

*In re Cinergy Corp.*,
    Order No. EPA-5-98-113(a)-OH-1 (Feb. 25, 1998) .......................................41, 43

*In re the Cincinnati Gas & Elec. Co.*
(Ohio Envtl. Prot. Agency Dec. 27, 2005),
http://www.epa.state.oh.us/dapc/enforcement/year_2005/ ....................................................44

*In re Tondu Energy Co.*,
9 E.A.D. 710 (Envtl. Prot. Agency Mar. 28, 2001), *available at* 2001 WL 312458 ..............31

*Midwest Indep. Transmission Sys. Operator, Inc.*,
97 F.E.R.C. ¶ 61,326 (Dec. 20, 2001) ....................................................................................15

*Midwest Indep. Transmission Sys. Operator, Inc.*,
122 F.E.R.C. ¶ 61,283 (Mar. 26, 2008) ..................................................................................15

## RULES

Fed. R. Civ. P. 26 ....................................................................................................................47

Fed. R. Civ. P. 37 ....................................................................................................................47

## SCHOLARLY AUTHORITY

Hon. Henry A. Waxman, *The Clean Air Act Amendments of 1990: A Symposium Over-
view and Critique*, 21 Envtl. L. 1721 (1991) ........................................................................40

## GLOSSARY

**AOC:**          Administrative Order on Consent

**BACT:**         Best Available Control Technology

**CAA:**          Clean Air Act

**CEM:**          Continuous Emissions Monitor

**EPA:**          United States Environmental Protection Agency

**ESP:**          Electrostatic Precipitator

**FERC:**         Federal Energy Regulatory Commission

**FGD:**          Flue Gas Desulfurization

**IGCC:**         Integrated Gasification Combined Cycle

**IURC:**         Indiana Utilities Regulatory Commission

**LAER:**         Lowest Achievable Emission Rate

**MISO:**         Midwest Independent Transmission System Operator

**NAAQS:**        National Ambient Air Quality Standards

**$NO_x$:**        Nitrogen Oxide

**NSR:**          New Source Review

**PM:**           Particulate Matter

**PSD:**          Prevention of Significant Deterioration of Air Quality

**RTO:**          Regional Transmission Organization

**SCR:**          Selective Catalytic Reduction

**SIP:**          State Implementation Plan

**$SO_2$:**        Sulfur Dioxide

## INTRODUCTION

At the liability trial in May 2008, the jury found that four unit modifications at the Wabash River plant violated the Clean Air Act's ("CAA") New Source Review ("NSR") provisions. This Court previously had granted summary judgment against PSI Energy, Inc. and the Cincinnati Gas and Electric Company (collectively "Cinergy") for four particulate matter ("PM") exceedances at the Beckjord power plant. The issue now before the Court is what relief strikes the proper equitable balance for the specific violations found.

**Wabash River Violations**

1.  Remedy Proposals. Cinergy's goal in fashioning its proposals is a remedy that properly balances energy-system reliability, environmental responsibility, and cost (to Cinergy and Indiana ratepayers). With respect to the NSR violations at Wabash River Units 2, 3, and 5, Cinergy proposes to shut down completely those Units by September 1, 2012 — the earliest possible date by which the Units can be closed without jeopardizing the reliability of energy service or incurring unreasonable costs, which would adversely affect electricity rates. In the interim, Cinergy would reduce operations of these Units in order to limit emissions to the "baseline" levels (as calculated by Plaintiffs' expert, Dr. Rosen) that prevailed before Cinergy undertook the respective projects deemed to have violated the NSR provisions. This proposal would cause Cinergy to incur significant costs for securing replacement power and generating capacity, but the environmental benefits from this approach are manifest: emissions would be dramatically cut immediately, followed by *the complete elimination of all emissions* from these three Units after 2012. In fact, the Units would be shut down completely even before all of the pollution controls Plaintiffs seek could be installed.

Plaintiffs' proposal fails by comparison. They seek an order requiring Cinergy to install prohibitively expensive pollution controls at these three small, older Units. Neither the public

1

interest nor the potential environmental benefits justify this proposal.  The controls Plaintiffs propose will take approximately four years to install completely and would result in reduced — but ongoing — emissions from these Units.  Moreover, Plaintiffs' own experts estimate that installation of these controls would cost approximately a quarter of a billion dollars in capital expenditures (Cinergy estimates the cost actually to be $400 million), plus an additional $26.2 million in annual operating costs.  By contrast, Cinergy's proposal would require replacement energy costs of up to $88 million between 2009 and 2012, and replacement energy and capacity costs of $34 to $39 million annually after 2012, all while completely eliminating emissions from the three Units.  The public interest strongly weighs against Plaintiffs' expensive proposal because costs associated with environmental compliance are part of the operating costs that go into Cinergy's rate base and are, therefore, borne by Indiana ratepayers.

Plaintiffs' alternative suggestion of an immediate shutdown for the three Wabash River Units places too little weight on Cinergy's obligation to maintain a stable and reliable energy system for the delivery of electricity.  An immediate shutdown of Units 2, 3, and 5 poses a risk that Cinergy may not be able to reliably meet electricity demand in the Terre Haute region.  By 2012, a new state-of-the-art 630 megawatt plant will open near Edwardsport.  Once the Edwardsport plant and related transmission upgrades are online, the system will be able to supply reliable power to the Terre Haute region, even under times of system stress, without Wabash River Units 2, 3, and 5.  Because Cinergy's proposal better balances reliability, environmental, and cost obligations, the Court should adopt it as the appropriate remedy.

2. Remediation.  Additionally, Plaintiffs' proposal is flawed because it also seeks to "remediate" the "excess emissions" supposedly resulting from Cinergy's violations by trying to control Wabash River Units 4 and 6, at which no violations have been found, and to force

Cinergy to surrender emissions allowances from unrelated environmental programs under separate provisions of the CAA.  These requests should be rejected.

First, Plaintiffs' "excess emissions" theory is fundamentally inconsistent with this Court's orders and the statutory structure and practical operation of the CAA's cap-and-trade programs.  The theory runs headlong into this Court's explicit recognition that the violations here were one-time preconstruction permit violations that are not ongoing.  Moreover, since the implementation of the CAA's cap-and-trade programs, total sulfur dioxide ("$SO_2$") and nitrogen oxide ("$NO_x$") emissions from the Cinergy system have been capped.  Once these caps were put in place, there could be no "excess emissions" from the Cinergy system.  During this period, the NSR violations here at most simply shifted the allocation of Cinergy emissions from some other plant to Wabash River Units 2, 3, and 5, all while the Cinergy system stayed within the overall regional statutory cap.  In other words, regardless of whether Units 2, 3, and 5 emitted more than they would have "but for" the NSR violations, the Cinergy system as a whole never exceeded the system caps.  Thus, from the onset of these programs, there have been no "excess" emissions for Cinergy to remediate.

Second, Plaintiffs cannot establish the necessary prerequisite for an injunction to remediate "excess emissions":  Plaintiffs cannot prove that any excess emissions from Wabash River Units 2, 3, and 5 actually have caused or are likely to cause irreparable injury.  EPA's regulatory standards and prevailing science show that none of the pollutants at issue (or even mercury) would have caused or would have been expected to cause adverse health effects at the levels calculated by Plaintiffs.  This is true for both the area surrounding the plant and any downwind areas.  Indeed, EPA's own reports on emissions trends show steady declines since 1990 of $SO_2$ and $NO_x$ emissions throughout the principal areas Plaintiffs claim have been affected by Wabash

River emissions.  Further, because under Cinergy's proposal emissions from Units 2, 3, and 5 would be dramatically scaled back and would soon be reduced to zero, there would be no danger of any future excess emissions and, therefore, no basis for further remedial injunctive relief. Plaintiffs simply cannot establish the basic prerequisites for the extraordinary relief they seek.

Third, the remedial relief Plaintiffs seek is simply inequitable.  To the extent "excess emissions" is a viable theory, the relatively small amount of those emissions does not justify the additional and extraordinary remedy Plaintiffs' request.  Plaintiffs' experts estimate that the additional cost to control Units 4 and 6 will result in a total cost of $614 million in capital expenditures (Cinergy estimates the cost to be almost $800 million), plus an additional $45.5 million in annual operating costs.  This, they say, is necessary to control *annually* nearly *25 times* the annual emissions Plaintiffs said at trial resulted from the Wabash River projects and *six-times* the amount of any reasonable estimate of yearly "excess emissions."  The demanded relief is grossly disproportionate to the claimed emissions.  Further, as the Court is aware, Plaintiffs waited almost a decade after the projects in question before developing the "recovered availability" theory articulated by Dr. Rosen and Mr. Koppe and thereafter filing this lawsuit.  That delay should also weigh against any remediation in this case — both because Cinergy could not have known at the time of the projects the particular mathematical theorem that Plaintiffs would apply, and because Plaintiffs' delay in bringing suit substantially and unreasonably extended the period by which to calculate any "excess emissions" that allegedly must be remedied.

**Beckjord Violations**

Plaintiffs' proposed remedy as to the Beckjord exceedances also is unreasonable and unduly punitive.  Plaintiffs are asking for the installation of continuous emissions monitoring devices that have an unacceptable margin of error, and they insist that if those unreliable devices

register multiple violations, Cinergy should ultimately shut down the unit in question or else install prohibitively expensive controls that have not been studied or endorsed by any of Plaintiffs' experts in this case. Cinergy, on the other hand, proposes to install the same monitoring devices but to use them only as rough gauges to determine when further, more accurate testing should be conducted. Thus, while Cinergy agrees that continuous monitoring devices should be installed, it proposes to continue to assess compliance through much more reliable and well-established stack-test methodologies that have long been endorsed by EPA. Plaintiffs' demand for monetary penalties is also inequitable as it outstrips *by a factor of one hundred* other penalties assessed for violations like those here and fails to take into account mitigating factors and relevant facts regarding the operation of the Units.

## BACKGROUND

### I.    Plaintiffs' Claims Against Cinergy.

In 1999, Plaintiffs sued Cinergy under the NSR provisions of the CAA, alleging that component-replacement projects at Cinergy-owned coal-fired generating units throughout Indiana and Ohio violated the NSR provisions and implementing federal and state regulations. Plaintiffs claimed that these projects were "major modifications" for which Cinergy did not first obtain necessary preconstruction permits or install corresponding pollution controls. *See, e.g.*, Third Am. Compl. ¶¶ 106, 127, 145, 163, 172, 203. The operative complaint challenged 36 projects undertaken at six different power plants in Indiana and Ohio. *See id.* ¶¶ 35-68. Among these were projects completed at Units 2 through 6 at the Wabash River Plant in West Terre Haute, Vigo County, Indiana, and Units 1 through 6 at the Beckjord Plant in New Richmond, Clermont County, Ohio. *See id.* ¶¶ 144-61, 171-201.

As to the Wabash River plant, the complaint alleged that eight replacement projects undertaken at Units 2-6 starting as early as 1987 were major modifications that resulted in signifi-

cant net emission increases of $NO_x$, $SO_2$, or PM.  Third Am. Compl. ¶¶ 145, 150, 155.  Plaintiffs claimed that Cinergy was required to obtain preconstruction permits and install Best Available Control Technology ("BACT"), and that its failure to do so constituted violations of the Prevention of Significant Deterioration of Air Quality ("PSD") and nonattainment NSR provisions of the CAA and implementing regulations.  *Id.* ¶¶ 144-53.  They also alleged that these modifications and resulting emissions violated the Indiana State Implementation Plan ("SIP").  *Id.* ¶¶ 154-57.  Plaintiffs alleged similar NSR claims for supposed violations at the Beckjord plant, *see id.* ¶ 172-75, as well as claims alleging that PM emissions from Beckjord Units 1 and 2 exceeded limits set by, and therefore violated, the Ohio SIP and an Administrative Consent Order previously entered into between EPA and Cinergy under which Cinergy agreed to limit its PM emissions to specified levels under a three-year compliance plan.  *Id.* ¶¶ 186-92.

For all their claims against Cinergy, Plaintiffs sought "injunctive relief and civil penalties" under the pertinent provisions of the CAA.  *See, e.g.*, Third Am. Compl. ¶¶ 148, 153, 157, 161, 175, 180, 185; *see also* CAA § 113(b), 42 U.S.C. § 7413(b).

## II.    Plaintiffs' Delay In Bringing Suit.

Even though most of the Cinergy projects challenged by Plaintiffs occurred in the late 1980s and early 1990s, Plaintiffs did not file suit until 1999.  As revealed during the liability trial, the delay occurred because the specific methodology used to calculate a "significant net emission increase" that was used in this case (and others like it) was not created until 1999.  As the Court instructed the jury, the standard for determining whether a power plant project has resulted in a "significant net emission increase" is the actual-to-projected-actual test.  *See* Final Jury Instruction No. 23 (Dkt. No. 1335).  This test requires one to "compare the [actual] emissions per year" from a power plant unit "before a project began to the emissions predicted to result from the project."  *Id.*  To give this standard content, EPA developed a very detailed theo-

rem, referred to at trial as the "five-step formula," to predict whether a particular project will re-sult in a significant net emission increase.  Trial Tr. Vol. VII (May 13, 2008) at 1007-08, 1013, 1016 (testimony of Dr. Rosen) ("Rosen Tr.").  This formula is EPA's specific interpretation of the NSR regulations concerning the actual-to-projected-actual standard that EPA has adopted to enforce the NSR program.  *Id.* at 1008 (calling it "the mathematical interpretation" of the regula-tions).

The parties do not dispute that utilities must make a prediction whether a project will cause an emission increase before undertaking a plant modification.  Final Jury Instruction No. 23 (Dkt. No. 1335).  However, EPA has admitted that no one, including Cinergy, had notice of this "mathematical interpretation" until Plaintiffs filed suit in 1999.  *See* Rosen Tr. at 1006, 1008-09, 1013-16 (explaining that when he entered the litigation he had the role of coming up with this interpretation because it did not exist previously).  Even to this day, this particular in-terpretation of the NSR regulations cannot be found anywhere in the Federal Register, EPA's rules, or in any EPA policy documents.  Moreover, Plaintiffs' expert acknowledged that without this "mathematical interpretation" the actual-to-projected-actual standard would not sufficiently indicate that a project would violate NSR provisions.  Rosen Tr. at 1008 (agreeing that the "NSR rules didn't require any particular methodology or formula to make a prediction or to analyze whether emissions will increase" and explaining that he was the one to "come up with the mathematical interpretation").

## III.    Preclusion Of Any Penalties For NSR Violations.

Despite EPA's delay in developing its specific interpretation of the standard for determin-ing the applicability of the NSR provisions at issue, Plaintiffs pursued their complaint against Cinergy, alleging that Cinergy had failed to abide by this *ex post facto* interpretation.  However, because of Plaintiffs' delay, this Court held that the standard five-year federal statute of limita-

tions, *see* 28 U.S.C. § 2462, barred Plaintiffs' request for penalties to remedy any NSR viola-

tions, leaving only their request for injunctive relief.  *United States v. Cinergy Corp.*, 397 F.

Supp. 2d 1025, 1030 (S.D. Ind. 2005).  The Court specifically rejected Plaintiffs' contention that

the violations alleged in this case are "ongoing."  *Id.*  The Court reasoned that "'[t]he distinction

between preconstruction permit violations and operation permit violations is crucial.  It is gener-

ally recognized that failure to obtain an operations permit is a continuing violation for each day

of operation without the permit. . . .   In contrast, failure to obtain a preconstruction permit is a

discrete violation that occurs at the time of construction.'"  *Id.* (omission in original) (quoting

*United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692, 2002 WL 1760752, at *4 (S.D. Ind.

July 26, 2002) ("*SIGECO*")).  This reasoning applies to all applicable permits, both PSD and

nonattainment:  put simply, Cinergy "cannot be liable for failing to operate according to a non-

existent preconstruction permit."  *Id.* (citing *SIGECO*, 2002 WL 1760752, at *5 n.3).

    After this ruling, Plaintiffs attempted to add claims for operation permit violations at all

Cinergy plants by amending their complaint to include violations of Title V of the CAA, CAA

§ 501 *et seq.*, 42 U.S.C. § 7661, *et seq.*  For instance, they claimed that Cinergy "failed to obtain

proper or adequate Title V operating permits for Wabash River Units 2 through 6 that contained

emissions limitations for $NO_x$, $SO_2$ and/or PM [and] thereafter operated Wabash River Units 2

through 6 without meeting such limitations."  Third Am. Compl. ¶ 160.  The Court dismissed

these claims on the ground that they were procedurally defective and that "the Court lacks juris-

diction to hear" them.  Order on Defs.' Mot. for Summ. J. at 6 (Apr. 10, 2006) (Dkt. No. 909).

## IV.    Liability-Phase Trial On Remaining Claims.

    Plaintiffs' NSR claims have dwindled over the course of this case.  For example, in June

and August 2005, Plaintiffs voluntarily dismissed their claims based on projects at Beckjord

Units 4 and 5 and Wabash River Unit 6.  *See* Stipulation of Dismissal of Certain Claims (Jun. 21,

2005) (Dkt. No. 460); Stipulation of Dismissal of Certain Claims (Aug. 18, 2005) (Dkt. No. 537).  At trial, Plaintiffs chose to pursue only fourteen projects at five plants, rather than the 36 projects alleged in their Third Amended Complaint.  *Compare* Final Jury Instruction No. 16 (Dkt. No. 1335), *with* Third Am. Compl. ¶¶ 106, 127, 145, 163, 172, 203.  Indeed, during trial, Plaintiffs dropped their claim based on Wabash River Unit 4, *see* Trial Tr. Vol. II (May 6, 2008) at 61, and, at the same time, informed the Court that they would not present evidence on six other claims as well.

After a nine-day trial, the jury returned a non-liability finding on ten of the fourteen projects Plaintiffs pursued, finding Cinergy liable for only four projects completed before 1992 at Wabash River Units 2, 3, and 5.  *See* Verdict Form (Dkt No. 1339).  Specifically, the jury found as follows:

| Unit | Project | SO$_2$ | NO$_x$ |
|------|---------|--------|--------|
| Unit 2 | 1989 front wall radiant superheater project | Liable | Not liable |
| Unit 2 | 1992 high temperature finishing superheater tubes and upper reheater tubing assemblies | Liable | Not liable |
| Unit 3 | 1989 Finishing, intermediate, and radiant superheater tubes and upper reheat tube bundles | Liable | Liable |
| Unit 5 | 1990 Boiler pass and heat recovery | Liable | Liable |

With respect to the Beckjord claims, the Court granted summary judgment in favor of Plaintiffs on their claims that on four occasions PM emissions from Beckjord Units 1 and 2 exceeded limits established in the Ohio SIP and in the Administrative Order on Consent entered into between Cinergy and EPA.  Order on Pls.' Mot. for Partial Summ. J. (Sept. 28, 2007) (Dkt. No. 984) ("Beckjord Summ. J. Order").  Specifically, the Court cited three failed PM tests at Beckjord Unit 1 in 1999 and 2000, as well as one failed test at Beckjord Unit 2 in 1999, as evidence of Cinergy's violation of the Ohio SIP.  *Id.* at 2.  The Court also accepted Plaintiffs' contention that the three failed tests at Beckjord Unit 1 constituted violations of the Administrative

Order on Consent.  *Id.* at 4-5.  The Court declined, however, to accept Plaintiffs' claim for an additional SIP violation stemming from a 2003 failure at Beckjord Unit 1 that had never been identified in any of Plaintiffs' complaints.

Thus, despite the broad range of claims raised in the course of this case, the specific issues currently before the Court are limited to the appropriate remedies for the liability determinations ultimately established:  (1) the four preconstruction NSR permitting violations for projects at Wabash River Units 2, 3, and 5, and (2) the four PM exceedances at Beckjord.

## ARGUMENT

I.     **Cinergy's Proposal Is The Appropriate Remedy For the Violations Found At Wabash River Units 2, 3, and 5.**

A.     **This Court Has Broad Discretion To Order The Appropriate Injunctive Relief After Consideration Of All Pertinent Factors Bearing On That Remedy.**

An equitable remedy is a "'special blend of what is necessary, what is fair, and what is workable.'"  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 375 (1977) (quoting *Lemon v. Kurtzman*, 411 U.S. 192, 200-01 (1973) (plurality opinion)).  As this Court has recognized, it retains the full scope of its inherent equitable authority to determine the appropriate remedy for the violations found in this case, including the authority to deny *any* equitable remedy.  *See* Order on Defs.' Mot. for Partial Summ. J. at 18 (Oct. 14, 2008) (Dkt. No. 1440) ("Partial Summ. J. Order") (retaining jurisdiction to "determine[e] whether to grant injunctive or other equitable relief at all").

Although a court has broad equitable discretion, a particular equitable remedy is justifiable only insofar as it shares an adequate nexus with the particular violation being remedied.  In "any equity case, the nature of the violation determines the scope of the remedy."  *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971).  This "'means simply that federal-court decrees must directly address and relate to the . . . violation itself.'"  *Missouri v. Jenkins*,

10

515 U.S. 70, 88 (1995) (quoting *Milliken v. Bradley*, 433 U.S. 267, 281-82 (1977)); *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996).  Thus, "[a] remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial . . . violation."  *Freeman v. Pitts*, 503 U.S. 467, 489 (1992).

Moreover, in deciding the appropriate relief, a court should consider the full range of factors that bear on any remedy.  For instance, among the many factors generally coloring "what is fair" are whether the defendant knew specifically of the applicable standard and whether the plaintiff acted diligently.  *See Lemon v. Kurtzman*, 411 U.S. 192, 205-06 & n.7 (1973) (plurality opinion); *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946) ("'There must be conscience, good faith, and reasonable diligence, to call into action the powers of the court.'" (quoting *McKnight v. Taylor*, 42 U.S. (1 How.) 161, 168 (1843))).

Because "[a]n injunction is a matter of equitable discretion[,] it does not follow from success on the merits as a matter of course."  *Winter v. NRDC*, 129 S. Ct. 365, 381 (2008); *accord Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law").  Rather, traditional equitable principles require a plaintiff seeking an injunction to establish at a minimum: "(1) that it has suffered an irreparable injury" caused by the defendant; "(2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiffs and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *United States v. Alcoa Inc.*, 98 F. Supp. 2d 1031, 1039 (N.D. Ind. 2000) (mem.).

11

Moreover, for an injunction to issue, the "necessary determination is that there exists some cognizable danger of *recurrent* violation, something more than the mere possibility which serves to keep the case alive." *W.T. Grant*, 345 U.S. at 633 (emphasis added).  The traditional and principal "purpose of an injunction is to prevent *future* violations," *id.* (emphasis added); it "deals primarily, not with past violations, but with threatened future ones," *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928); *Bowles v. Lentin*, 151 F.2d 615, 620 (7th Cir. 1945) ("the injunction is not to be used to punish past offenses"); *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 181 n.6 (2d Cir. 1977) ("These actions share with damage suits the quality of visiting serious consequences on past conduct, even though they also have a remedial effect.  They thus differ from injunctive proceedings, the objective of which is solely to prevent threatened future harm.").

### B.  Cinergy's Proposal To Reduce Operations Of And Then Shut Down Units 2, 3, and 5 Is the Appropriate Remedy.

Plaintiffs bear the burden to prove that injunctive relief is warranted in this case.  *See W.T. Grant*, 345 U.S. at 633 ("the moving party must satisfy the court that relief is needed"). Plaintiffs have proposed installing state-of-the-art environmental controls that will take at least four years to install completely and cost hundreds of millions of dollars.  Alternatively, Plaintiffs request immediate shutdown of Units 2, 3, and 5.  They further argue that, to remediate past "excess" emissions, Cinergy should be required to place pollution controls on Units 4 and 6, at which no violations were found, and surrender statutory and regulatory emissions allowances provided for by environmental programs wholly distinct from NSR.  Such relief is not supported by applicable law or by the facts of this case and will impose extraordinary hardships on Cinergy and its Indiana customers.  By contrast, Cinergy's suggested remedy — retiring Units 2, 3, and 5 by September 1, 2012, preceded by curtailed operations of those Units — will protect the envi-

ronment more substantially and more quickly than Plaintiffs' proposal to control Units 2, 3, and 5, will save ratepayers hundreds of millions of dollars, and will simultaneously safeguard the availability of a reliable electricity supply to customers in the Terre Haute area and, indeed, throughout the Midwest.  In short, unlike Plaintiffs' proposed remedy which disserves in important respects the public interest and fails even to attempt to achieve a proper equitable balance, Cinergy's proposal serves the ends of equity, protects the environment, safeguards Cinergy's ratepayers, and furthers the goals of the NSR program.

1.      **Cinergy's remedy proposal.**

*a.  Environmental benefits of Cinergy's proposal.*

Cinergy's proposal will achieve significant overall annual emissions reductions by eliminating *completely* $NO_x$, $SO_2$, or any other pollutant after Units 2, 3, and 5 are shut down in 2012. By 2018, this would eliminate $SO_2$ emissions by approximately 148,000 tons and $NO_x$ emissions by 21,000 tons.  And until then, these Units would not emit any more than the low pre-project baseline levels that were calculated by Plaintiffs' expert.  This would promptly reduce $SO_2$ emissions by approximately 40,000 tons and $NO_x$ emissions by approximately 4000 tons over the next four years.  Thus, over the next ten years alone, Cinergy's proposal would reduce $SO_2$ emissions by 188,000 tons and $NO_x$ emissions by 25,000 tons.

*b.  Cinergy's proposal satisfies its obligations as a public utility.*

Cinergy's proposal also satisfies its numerous obligations as a public utility to federal and state regulators and to its customers.  Principal among Cinergy's obligations are to provide reliable service to its customers and to do so in a cost-effective manner.  Cinergy's proposal avoids the risk of regional or localized blackouts that could result from the premature closure of Units 2, 3, and 5 and provides a cost-effective remedy that ultimately benefits Indiana ratepayers.

13

i. <u>Cinergy's statutory and regulatory duty to provide reliable service.</u>

Cinergy must provide service to its customers reliably.  This means, among other things, that Cinergy must assist in ensuring that energy can be and is delivered to customers without contributing to loss of service (blackouts) or otherwise adversely affecting the Midwest Independent Transmission System Operator ("MISO") energy grid.  This obligation derives from both state and federal law.  Indiana specifically invests the Indiana Utilities Regulatory Commission ("IURC") with authority to inquire into an electric utility's "system reliability."  Ind. Code § 8-1-2-48(c).  Utilities in turn must report on the reliability of their transmission, distribution, and generation systems, 170 Ind. Admin. Code 4-7-4(13) to (15) (resource plan requirements), and justify before the IURC that their future planning accounts for the reliability of their system, 170 Ind. Admin. Code 4-7-6(d) ("A utility shall identify transmission and distribution facilities required to meet, in an economical and reliable manner, future electric service requirements.").

Cinergy also must deliver electricity in compliance with federally enforceable reliability standards.  *See* 16 U.S.C. § 824*o*(b).  After the Northeast Blackout in 2003, which left much of the northeastern United States and parts of Canada without power, Congress passed the Electricity Modernization Act of 2005, which created a standards setting body to adopt and enforce reliability standards.  *Id.* § 824*o*(b), (d), (e).  These standards are also directly enforceable by the Federal Energy Regulatory Commission ("FERC").  *Id.* § 824*o*(e)(3).  Cinergy must comply with the standards, which, among other things, attempt to prevent cascading power losses throughout energy grids, such as occurred in the 2003 blackout, when a series of small problems propagated through the energy grid, causing one failure after another and ultimately widespread blackouts.

Further, Cinergy has federal reliability obligations by virtue of its participation in MISO.  MISO is the FERC-approved regional transmission organization ("RTO") that links various utility-owned transmission lines to create a single-interconnected energy grid, "stretching across the

northern border of the U.S. from Michigan to eastern Montana, and reaching as far south as Kansas City, Missouri and Louisville, Kentucky." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1365 (D.C. Cir. 2004); *see also Midwest Indep. Transmission Sys. Operator, Inc.*, 97 F.E.R.C. ¶ 61,326 (Dec. 20, 2001) (approving MISO as an RTO). In order to ensure the reliable delivery of energy and to enhance competition in the energy market, FERC strongly encouraged Cinergy and other Midwestern utilities to join MISO. *See Midwest ISO Transmission Owners*, 373 F.3d at 1364-65. Upon joining MISO, Cinergy "surrender[ed] operational control of its transmission facilities," meaning that "any transmissions across those facilities were subject to the control of" MISO. *Id.* While Cinergy "retain[s] ownership of and physically operate[s] and maintain[s] [its] transmission facilities," it does so "subject to MISO's instructions," as MISO has "functional control of the transmission system" and serves as the "system security coordinator." *Id.* Thus, Cinergy must operate in accordance with and obey MISO directives to ensure the stability and integrity of the MISO grid.

Also, in order to ensure reliability, Cinergy, like other utilities within the MISO grid, must maintain a reserve margin of generating capability over and above what is required to meet its customer demand. *See Midwest Indep. Transmission Sys. Operator, Inc.*, 122 F.E.R.C. ¶ 61,283, ¶ 11 (Mar. 26, 2008). This obligation is imposed by the MISO tariff, as well as federally enforceable standards, to guarantee that there is sufficient generating capacity on the energy grid in cases of emergency. Utilities within MISO may satisfy these requirements by designating their own generators or by purchasing generating capability from other utilities. *Id.* ¶ 12. Currently, even with Wabash River Units 2, 3, and 5, Cinergy does not have enough generating capability to meet its 14.3% reserve margin requirements and so must purchase additional capacity in the marketplace. With the shutdown of those three Units, Cinergy would be required to pur-

chase even more capacity on the open market, at a likely additional cost of $11 million a year beginning in 2012.

ii.  <u>Cinergy's proposal meets its reliability obligations and avoids the possibility of blackouts.</u>

Cinergy's proposal to phase out Wabash River Units 2, 3, and 5 over the next four years avoids the serious reliability problem that would be caused by completely shutting down the Units immediately.  As a MISO representative in a deposition in this case has indicated, immediate shutdown could cause blackouts to customers in Terre Haute, Indiana, during peak summer conditions.  Terre Haute resides in a "load pocket," which is an area that has few electricity transmission lines that can deliver needed energy.  Currently, that area is serviced by two primary sources of energy — the Wabash River station and electricity delivered from a high-voltage 345kV line (which is the predominant connection to the MISO grid) to a lower-voltage 138kV line, which in turn services Terre Haute. The high voltage power on the 345kV line is converted into a useable lower voltage at the Dresser substation.  If Wabash River Units 2, 3, and 5 were immediately shut down, Terre Haute would be forced to rely mainly on the 345kV line. This means that any problem at the Dresser station, such as the loss of an electricity transformer during peak summer conditions, could compel Cinergy to "shed load" (*i.e.*, black out) segments of Terre Haute to relieve the problem.  Such targeted blackouts are necessary to prevent cascading blackouts throughout the MISO energy grid and are compelled by federally-enforced reliability standards.  In short, to avoid the unattractive potential of a series of targeted blackouts, Units 2, 3, and 5 presently are required to ensure reliability in the region.

Cinergy's continued operation of these three Units, albeit at substantially reduced capacity, will be sufficient to ensure reliable service.  This approach for 2009-12 will keep these Units available during the peak summer months when the demand for energy is at its highest.  In 2012,

16

the construction of Cinergy's new, state-of-the-art IGCC plant near Edwardsport and related up-grades to the Dresser substation and the energy grid near Terre Haute will be complete.  These upgrades will resolve the reliability issue that has been identified by MISO and that is associated with the shutdown of the Wabash River Units.  Even though the preliminary work is underway, these upgrades cannot be completed sooner than 2012.

        iii.  <u>Cinergy's proposal satisfies its duty to provide cost-effective service</u>.

Cinergy also has an obligation to provide its customers electricity in the most cost-effective manner possible.  *E.g.*, 16 U.S.C. § 824d(a); Ind. Code § 8-1-2-4.  Cinergy is subject to "regulation by the state to ensure that it is prudently investing its revenues in order to provide the best and most efficient service possible to the consumer."  *U.S. Gypsum, Inc. v. Ind. Gas Co., Inc.*, 735 N.E.2d 790, 797-98 (Ind. 2000).  Generally, this means that Cinergy cannot engage in unnecessary capital expenditures and must make cost-effective decisions on behalf of its custom-ers.  *See City of Evansville v. S. Ind. Gas & Elec. Co.*, 339 N.E.2d 562, 568-69 (Ind. Ct. App. 1975) (no "excessive or imprudent expenditures").

Shutting down Units 2, 3, and 5 in 2012, and reducing their emissions levels from 2009-2012, will impose significant costs on Cinergy and its ratepayers, largely because it will require Cinergy to purchase replacement energy to serve customers and replacement generation capacity to satisfy federal reserve margin requirements.  But those measures, while expensive, would nonetheless be the most cost-effective means for remedying the violations found at the Units.  For the period between 2009 and 2012, the cost of the replacement energy Cinergy would need to purchase as a result of the emissions reductions would fall between $70.9 million and $88.3 million (depending on the fluctuating cost of energy).  Once the Units are closed in 2012, the Edwardsport IGCC plant will be available to generate half or more of the necessary replacement energy, and the cost of generating or purchasing energy to replace Wabash River Units 2, 3, and

17

5 would be reduced to $34 million to $39 million annually.  By contrast, if those Units were closed immediately and Cinergy were required to purchase all of the replacement energy and capacity from the marketplace in the absence of an operational Edwardsport facility, the cost from 2009-2012 would range from $200 million to $240 million.  And, as explained below, if Cinergy were instead required to install the expensive pollution controls Plaintiffs seek, the cost would be several times higher.

Even though Cinergy and its ratepayers would face substantial economic burdens from reducing operations at, and then fully retiring, Units 2, 3, and 5, Cinergy submits that this remedy would achieve both immediate and permanent environmental benefits while at the same time meeting Cinergy's regulatory and statutory obligations in the most cost-effective manner.

### 2.    Plaintiffs' proposed remedy.

Plaintiffs' proposal reduces fewer emissions from Wabash River Units 2, 3, and 5 at far higher cost to Cinergy and Indiana ratepayers.  Plaintiffs contend that the Court should order Cinergy to install current BACT to reduce emissions of $NO_x$ and $SO_2$.  Additionally, they ask the Court to order the same level of pollution controls to be installed on Wabash River Units 4 and 6.

Plaintiffs contend that BACT requires installation of wet flue gas desulfurization ("FGD") technology with an $SO_2$ removal efficiency of 99% and selective catalytic reduction ("SCR") technology with a $NO_x$ removal efficiency of 90%.[1]  Plaintiffs' experts estimate the capital cost to install such a wet FGD and SCR for Units 2 through 6 at the Wabash River station to be approximately $614 million in initial capital expenditures, plus an additional $45.5 million annually to operate and maintain these controls.  Cinergy's expert estimates that the cost will be closer to $793 million in capital expenditures to install these controls and $36.8 million in annual

---

[1] Cinergy contends that BACT for $SO_2$ at Units 2, 3, and 5 actually consists of a wet FGD with an $SO_2$ removal efficiency of not more than 95% and that BACT for $NO_x$ at Units 3 and 5 consists of currently installed advanced low $NO_x$ burner technology.

operation and maintenance costs.  Under Indiana law, these expenses will be subject to cost re-covery as approved environmental compliance expenditures.  *E.g.*, 170 Ind. Admin. Code 4-6-9; *id.* 4-6-10.  Plaintiffs' expert agrees that these costs would be recoverable and concludes that, under Plaintiffs' cost estimates, Indiana ratepayers could expect a 4.3% to 6.9% rate increase in 2014 and an average 2.9% to 4.4% rate increase over the life of Plaintiffs' proposed controls.

Even if Cinergy were just to place these environmental controls on Wabash River Units 2, 3, and 5, Plaintiffs estimate the cost to Cinergy to be $251 million in capital expenditures to install these controls and an additional $26.2 million annually to operate them.  Cinergy's expert calculates $392.5 million in capital expenditures and $13.9 million in annual operation and main-tenance costs.  The controls could not be completely installed and operational at the Wabash River plant until 2013 or 2014.[2]

Plaintiffs' alternative proposal is to shut down Units 2, 3, and 5 immediately and then place environmental controls on Units 4 and 6.  Under either alternative, Plaintiffs also submit that Cinergy should be forced to surrender system-wide emissions allowances available to it un-der current environmental programs (*i.e.*, the cap-and-trade programs under the Acid Rain Pro-gram, CAA § 401 *et seq.*, 42 U.S.C. § 7651 *et seq.*, and the "$NO_x$ SIP Call," 63 Fed. Reg. 57,356 (Oct. 27, 1998) (codified at 40 C.F.R. pts. 51, 72, 75, 96)), as well as any future, applicable al-lowance programs.

Plaintiffs' proposals reflect no effort to balance the competing concerns for system reli-ability, cost, and environmental benefit.  Nor do Plaintiffs attempt to justify their proposals as a matter of public interest or of the governing principles of law and equity.  Their proposal to re-quire the installation of expensive controls would impose extraordinary and unnecessary costs on

---

[2] An SCR could be installed in approximately two and a half to three years, but installation of an FGD would take at least four years.

19

Cinergy's ratepayers (*see infra* Section I.B(2)(a)); their alternative proposal to immediately shutter Units 2, 3, and 5 would endanger the reliability of the system (*see infra* Section I.B(2)(b)); and their effort to reach into other Units at which no violations were found and environmental programs that have nothing to do with NSR is unsupported by either the facts or the law (*see infra* Section C).

> *a. Plaintiffs' proposal to install controls at the Wabash River station by 2013 or later fails properly to balance equitable considerations.*

As to Units 2, 3, and 5, Cinergy's proposal achieves a superior environmental benefit while avoiding the installation of expensive controls at smaller, older units at which such an expense cannot be justified.  Although Plaintiffs' capital installation cost estimates are too low, even accepting those figures, installing controls at all of Cinergy's Wabash River Units would cost over half a billion dollars and an additional $45.5 million annually to operate them.  Installing controls only on the Units for which Cinergy was found liable is no better — according to Plaintiffs, it would cost more than a quarter of a billion dollars in capital expenditures plus an additional $26 million annually to control three small, older generating units.  The comparison to Cinergy's proposal is stark:

| Cost Comparison Cost of Cinergy Proposal to Control Scenarios | | | |
|---|---|---|---|
| | Proposal | Cost 2009-2012 | Annual Cost After 2012 |
| Cinergy | Reduce operations between 2009-2012 and retire in September 2012 | $70.9 – $88.3 million | $34-39 million (until new capacity built) |
| vs. | | | |
| Plaintiffs | Install controls at Units 2-6 | $614 - $793 million | $36.8 - $45.5 million |
| | Install controls at Units 2, 3, 5 | $251 - $392.5 million | $13.9 - $26 million |

Cinergy's proposal of limiting emissions from Units 2, 3, and 5 to pre-project baseline levels, followed by complete shutdown, achieves immediate environmental benefits without wasting resources.  In fact, Cinergy's less burdensome proposal more substantially and more immediately benefits the environment as compared to Plaintiffs' proposal to control Units 2, 3, and 5.  Defendants' proposal will lead to immediate emissions reductions, and, after September 1, 2012, there will be *no further emissions whatsoever* from these Units.  Cinergy's remedy also avoids an enormously complex, labor- and materials-intensive construction project.  Historically, it has taken at least four years to install completely all of the controls sought; Plaintiffs call only for these controls to be installed  "as expeditiously as possible," Pls.' Second Suppl. Resps. at 9 (served Nov. 14, 2008), which likely means they could not be completed any earlier than 2013 or 2014.  Cinergy's proposal will permanently eliminate emissions from Units 2, 3, and 5 before Plaintiffs' proposed controls (which only reduce, not eliminate, emissions) could even become completely operational, and thus it is the solution that most appropriately reconciles "the public interest and private needs" in a "practical[]" manner.  *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944).

In addition to being more cost effective, to being more expeditious, and to reducing more substantially emissions than Plaintiffs' proposal, Cinergy's proposal further benefits the public interest by *avoiding* collateral environmental harm associated with *Plaintiffs'* requested relief. An FGD would generate (conservatively) approximately 80,000 tons of solid waste and would consume 125 million gallons of water every year, a portion of which would have to be treated and then discharged back into the Wabash River.  Similarly, an SCR would require Cinergy to store 50-75,000 gallons (or more) of hazardous anhydrous ammonia, which presents a general risk to the public.  An SCR further poses the danger of a "blue plume" (like the one American

Electric Power experienced at its Gavin plant, and for which it had to purchase a town), which is $SO_3$-laden flue gas that can negatively affect air quality in the immediate vicinity of the plant. Moreover, Cinergy would need to dispose of the catalyst used in the SCR, material likely containing substances such as arsenic, alkalis, and phosphorus.[3]

> *b. Plaintiffs' immediate shutdown scenario also fails equitable scrutiny.*

Plaintiffs' alternative proposal that Cinergy immediately shut down Wabash River Units 2, 3, and 5 also fails to achieve an equitable result. Indeed, the "public interest would . . . be disserved by" this alternative remedy. *eBay*, 547 U.S. at 391. As Plaintiffs appear to recognize, public interest considerations weigh heavily against this proposal. *See* Pls.' Second Suppl. Resps. at 9 (Nov. 14, 2008) (acknowledging implications for "ensur[ing] reliable electric service in any areas affected by the shutdown, including Terre Haute"). Immediate shutdown would unnecessarily harm Cinergy, its customers, and other electricity consumers throughout Indiana and the Midwest without generating a suitable benefit to the public interest.

The most substantial risk from premature shutdown of the Wabash River Units would be the risk that reliable service to the Terre Haute area could be undermined. As a MISO representative has indicated, the Wabash River Units are needed to ensure the reliable delivery of electricity to Terre Haute and, more broadly, to ensure the integrity of the MISO energy grid, until 2012, when upgrades associated with the Edwardsport IGCC plant will be complete.

Cinergy's proposal also furthers the public interest in maintaining fair and reasonable electricity rates. Separate from potential problems with delivering sufficient amounts of electricity (which cannot be remedied by purchasing energy) to Terre Haute, if Wabash River Units 2, 3,

---

[3] In contrast, Cinergy's proposal has the additional benefit of meeting electricity demand in large part through the state of the art Edwardsport IGCC facility. This new plant will burn Indiana coal much more cleanly by gasifying it first and thereby producing less $SO_2$, $NO_x$ or other emissions. Cinergy is also developing the plant in a way that will facilitate the capture of carbon dioxide generated by the plant, once such capture technology is available, and is studying ways to capture and store such emissions.

and 5 were shuttered immediately, Cinergy would be required to purchase replacement energy and reserve margin capacity on the open market or to operate more expensive generating stations.  As a result, Cinergy — and ultimately its customers, the citizens of Indiana — would be forced to shoulder roughly an additional quarter of a billion dollars.

| Comparison of Shutdown Cost Scenarios | | |
|---|---|---|
| | Proposal | Cost from 2009 to 2012 |
| Cinergy | Reduce operations between 2009-2012 and retire in September 2012 | $70.9 – $88.3 million |
| Plaintiffs | Immediate shutdown | $200-240 million |

Although Cinergy's proposal will result in more emissions than Plaintiffs' immediate shutdown alternative, running the Units at "baseline" levels will achieve an immediate reduction in emissions.  Indeed, such reduced operations from 2009 until 2012 will reduce $SO_2$ emissions by approximately 40,000 tons and $NO_x$ emissions by almost 4000 tons.  In short, Cinergy's proposal, unlike Plaintiffs', strikes the proper equitable balance by achieving very real emissions reductions, while also safeguarding reliable and affordable electrical service.

### C.    Plaintiffs' Request For Control Of Units 4 and 6 And For Allowance Surrender Are Inappropriate And Beyond The Bounds of Equity.

Plaintiffs seek an order requiring Cinergy to install controls on Units 4 and 6 and to surrender its emissions allowances under current and future (as yet undetermined) cap-and-trade programs in order to remedy so-called past "excess emissions."  Such relief would be inconsistent with this Court's orders and with the CAA, and Plaintiffs cannot establish the necessary prerequisites for the issuance of such relief.

1.   **Plaintiffs' proposed "remediation" is inconsistent with this Court's orders and the CAA.**

*a. Remediation for "excess emissions" conflicts with this Court's orders.*

The remedial remedy Plaintiffs seek conflicts with this Court's prior rulings.[4]  In holding that the statute of limitations bars Plaintiffs from obtaining any penalties, this Court found that the violations here were "'discrete violation[s] that occur[ed] at the time of construction'" and, unlike violations of operating permits, are not "'continuing violation[s].'"  *Cinergy Corp.*, 397 F. Supp. 2d at 1030 (quoting *SIGECO*, 2002 WL 1760752, at *4).  Indeed, the Court explicitly held that "Cinergy . . . cannot be liable for failing to operate according to a non-existent preconstruction permit."  *Id.*  Yet, Plaintiffs' argument for controlling Wabash River Units 4 and 6 rests on the theory that "excess emissions" were generated by the ongoing *operation* of Units 2, 3 and 5. That theory simply cannot be squared with this Court's holding that the violations here were one-time violations and that Cinergy cannot be held "liable for failing to operate according to a non-existent preconstruction permit."  *Id.*

*b. Remediation for "excess emissions" is inconsistent with the CAA.*

Plaintiffs' request for a remedial injunction to mitigate so-called "excess emissions" is also fundamentally at odds with NSR and the CAA.  There is no recognized concept of "excess emissions" within the NSR program.  Rather, this theory is, according to Plaintiffs' own expert, a concept that was created entirely for litigation.  However, under wholly separate provisions, the CAA establishes cap-and-trade programs, under which total, coal-fired utility emissions of $NO_x$ and $SO_2$ are capped, and utilities may emit such pollutants only to the extent that they have "emissions allowances" permitting them to do so.  These cap-and-trade programs specifically

---

[4] While this Court concluded that section 113(b), 42 U.S.C. § 7413(b), does not preclude it from "order[ing] Defendants to take actions to remedy, mitigate, and offset the harm to public health and the environment caused by the established CAA violations," Partial Summ. J. Order at 3 (Dkt. No. 1440), it did not pre-judge whether remediation is indeed appropriate under the circumstances here or whether Plaintiffs qualify for such relief under traditional principles of equity.

provide remedies for "excess emissions," but only for exceedances of *specified* limits that can be precisely quantified, for example, by emitting $SO_2$ or $NO_x$ in excess of emissions allowances actually held. *See* CAA § 411, 42 U.S.C. § 7651j; 40 C.F.R. § 96.54. This concept is wholly inapposite for the violations at issue, because a preconstruction permit violation does not lead a party to exceed any pre-specified limits.

Plaintiffs nonetheless attempt to shoehorn the concept of "excess emissions" into the NSR context by hypothesizing the level of emissions at Wabash River Units 2, 3, and 5 in the absence of the NSR violations. According to Plaintiffs, if Cinergy had complied with the NSR program, it would have had to install BACT (or "LAER")[5] that was available at the time of the projects in question to reduce emissions from Units 2, 3, and 5. However, installing environmental controls on these Units was *not* Cinergy's only compliance option. To the contrary, it is indisputable that the far more common approach for sources facing NSR review was *not* to install costly controls but to obtain a "synthetic minor" permit. This type of permit would have enabled Cinergy to undertake the very same construction projects without installing pollution controls, as long as Cinergy agreed to limit its emissions at the affected Units to specified "pre-project" or "baseline" levels (plus 39 tons).[6] Indeed, because installing pollution control technology would have been extremely costly given the small size of the Units in question, obtaining a synthetic minor permit would have been Cinergy's most logical and likely compliance alterna-

---

[5] In those areas that are not in attainment, *see infra* note 7 and accompanying text, companies going through NSR review would need to meet the Lowest Achievable Emission Rate or "LAER." CAA § 173(a)(2), 42 U.S.C. § 7502(a)(2). Although the actual air quality in Vigo County attained NAAQS levels for $SO_2$ at the time of the projects, EPA did not designate Vigo County in attainment until 1996. Accordingly, if Cinergy had gone through NSR review, then the $SO_2$ emissions limitations would have had to meet LAER. For $NO_x$, Vigo County has been unclassified or in attainment since EPA first set NAAQS levels and so the $NO_x$ limit would have had to satisfy BACT, if Cinergy had gone through NSR review.

[6] Plaintiffs grossly overestimate the extent of any alleged excess emissions in numerous ways. For example, Plaintiffs base their calculation of excess $NO_x$ on an SCR technology that had not been retrofitted on any similar coal-fired plant in the United States at the time of the projects in 1989 and 1990.

25

tive.  Or, Cinergy may have chosen not to undertake the modifications at all in light of the potential costs.

This uncertainty about what course Cinergy would have followed in Plaintiffs' hypothetical world makes an "excess emissions" theory wholly inconsistent with the CAA.  There is no clear baseline against which to judge any "excess."   Hence, unlike in the cap-and-trade programs, Congress reasonably chose not to include an "excess emissions" remedy under the NSR program for permit violations like those established here.   Rather, the appropriate means for remedying historic violations of preconstruction requirements is a monetary civil penalty, as specifically contemplated by section 113 of the CAA.  42 U.S.C. § 7413(b).  Plaintiffs here are foreclosed by this Court's decision, however, from pursuing any monetary remediation by virtue of their own delay in bringing suit.  *Cinergy Corp.*, 397 F. Supp. 2d at 1030-31.  Plaintiffs should not be allowed to seek the equivalent of a penalty by the unprecedented application of an "excess emissions" theory.

More fundamentally, there have been no "excess emissions" generated by Cinergy since the implementation of the CAA's cap-and-trade programs.  Under these programs — the Acid Rain Program and the $NO_x$ SIP Call — the region's overall emissions of $NO_x$ and $SO_2$, of which Cinergy's emissions are a part, are capped.  Under the Acid Rain Program, CAA § 401 *et seq.*, 42 U.S.C. § 7651 *et seq.*, which was part of the 1990 amendments to the CAA, total annual $SO_2$ emissions from certain coal-fired electric generating units located in the eastern United States have been capped at 8.9 million tons since 1995, meaning that annual emissions from all covered sources in a given year cannot exceed this amount.  CAA § 403(a)(1), 42 U.S.C. § 7651b(a)(1).  Within this cap, EPA allocates annually, on a per-unit basis, $SO_2$ allowances to specified utilities, with each allowance constituting authorization to emit one ton of $SO_2$ for the specified year.  *Id.*;

CAA § 402(3), 42 U.S.C. § 7651a(3).  These allowances are tradable, meaning they can be real-located among plants or bought and sold.  CAA § 403(b), 42 U.S.C. § 7651b(b); 40 C.F.R. § 73.

Promulgated after the Acid Rain Program, the $NO_x$ cap-and-trade program — established through the EPA's "$NO_x$ SIP Call," *see* 63 Fed. Reg. 57,356 — takes a similar approach.  This rule sets specific emissions budgets for states, and states are obligated to impose certain controls on utilities within them to meet the particular budget.  40 C.F.R. § 50.121(b)(1).  Indiana met its obligations under the rule by adopting EPA's model cap-and-trade program.  66 Fed. Reg. 54,453, 54,456 (Oct. 29, 2001) (codified at 14 C.F.R. pt. 39).  As in the Acid Rain Program, EPA allocates emissions allowances to utilities, with one allowance authorizing a unit to emit up to one ton of $NO_x$ in the applicable period.  40 C.F.R. § 96.2.  These allowances too may be traded or sold on the market.

The central purpose of these cap-and-trade programs is to establish a market-based system to achieve overall emissions reductions.  Because overall emissions are capped, any increase or decrease in emissions at a particular unit in a system will have a corresponding decrease or increase at another unit.  Utilities may allocate allowances among their own units in any manner they choose and may purchase or sell allowances on the market.  This approach allows the market to dictate which units to control.  63 Fed. Reg. at 57,460.

If it is economically efficient to place controls at a particular unit rather than purchase extra allowances, a company will do so.  If a company reduces emissions levels below the number of allowances allocated, it may then redistribute those excess allowances to another unit or sell them to another utility.  Accordingly, for every increase in emissions there is always a corresponding decrease.  This principle holds true regardless of the reason for the emissions increase or decrease (that is, whether the resulting emissions derive from compliance or non-compliance

with the NSR program).  In sum, the fact that a single unit within a system has higher (or lower) emissions affects only *how* total emissions allowances are allocated within the system, but it does not change the total number of emissions from the system.

Because Cinergy never exceeded the caps set by EPA and Congress, there have been no "excess emissions" since the implementation of these programs.  Instead, the only effect of the NSR violations in this case was to reallocate emissions of $NO_x$ and $SO_2$ within the Cinergy system.  Put differently, if emissions at Wabash River Units 2, 3, and 5 had been lower (because of controls), emissions from another Cinergy unit would likely have increased by a corresponding amount.  The total amount of $SO_2$ and $NO_x$ emitted remained constant; the only change was the source that emitted them.

> **2.    Plaintiffs cannot establish the prerequisite for any remedial injunction — irreparable harm directly linked to Cinergy's violations or a probability of future irreparable injury — making remediation inappropriate.**

Plaintiffs are not entitled to the injunctive remediation they seek for the additional reason that they have neither established any past harm directly linked to Cinergy's violations nor shown a probability of future irreparable injury caused by the alleged past excess emissions. Plaintiffs seek a specific form of equitable relief — an injunction requiring Cinergy to install pollution controls on Units 4 and 6 and an injunction forcing Cinergy to surrender emissions allowances under current and future CAA cap-and-trade programs.  Indeed, even though Plaintiffs have analogized to restitution and disgorgement remedies, they plainly do not seek such remedies, nor do they qualify for such remedies in equity.  *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212-14, 218 (2002) (equitable restitution must "seek not to impose personal liability on the defendant, but to restore to the plaintiff *particular* funds or property *in the defendant's possession*."); *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 577 (7th Cir.

2004); *SEC v. Lipson*, 278 F.3d 656, 663 (7th Cir. 2002) ("Disgorgement is a form of restitution."). Yet, an essential criterion "for injunctive relief in the federal courts has always been irreparable injury," *Romero-Barcelo*, 456 U.S. at 312, and Plaintiffs fail to show that Cinergy's excess emissions from Wabash River Units 2, 3, and 5 will cause such irreparable injury; they cannot even show that any *past* emissions from these Units have caused *any* specific harm justifying remediation.

Plaintiffs cannot show that any "excess" emissions from Units 2, 3, and 5 led to or will cause injury to the public health or welfare in Vigo County, where the Units are located. The CAA required the EPA to set National Ambient Air Quality Standards ("NAAQS") for $SO_2$ and $NO_x$ establishing the emissions levels that, "allowing an adequate margin of safety," must be attained and maintained in order to "protect the public health," CAA § 109(b)(1), 42 U.S.C. § 7409(b)(1), and "protect the public welfare." CAA § 109(b)(2), 42 U.S.C. § 7409(b)(2).[7] Wabash River is located in an area that, since EPA first set NAAQS standards, has been classified as either in attainment or unclassified for $NO_x$. This means that even under Plaintiffs' "excess emissions" theory, EPA, in its regulatory capacity, has already independently determined that total $NO_x$ emissions in this area do not pose a risk to the public health or welfare. Similarly, the actual air quality in the Wabash River area has been well below the NAAQS standard for $SO_2$ since at least 1985 and officially reached attainment status in 1996. 40 C.F.R. § 81.315. Hence, as with $NO_x$, any "excess" $SO_2$ emissions from Units 2, 3, and 5 in this area cannot have injured the public health or welfare in Vigo County. Indeed, in 1988 and again in 1996, EPA noted that the air quality in Vigo County would meet "the SO2 NAAQS, even when PSI—Wabash River Station is *operating at its maximum design rate*." Approval and Promulgation of Implementation

---

[7] Areas are considered in "attainment" if they meet the "primary" or "secondary" NAAQS for the pollutant, CAA § 107(d)(1)(A)(ii), 42 U.S.C. § 7407(d)(1)(A)(ii), and "nonattainment" if they do not, CAA § 107(d)(1)(A)(i), 42 U.S.C. § 7407(d)(1)(A)(i).

Plans Designation of Areas for Air Quality Purposes; Indiana, 53 Fed. Reg. 6845, 6851 (Mar. 3, 1988) (emphasis added); *see also* Designation of Areas for Air Quality Planning Purposes; Indiana, 61 Fed. Reg. 58,482, 58,483 (Nov. 15, 1996) (codified at 40 C.F.R. pts. 52, 81).

Nor will Plaintiffs be able to show that Cinergy's emissions impaired air quality in areas outside Vigo County or had any adverse health or ecological impact. The mere fact that $NO_x$ or $SO_2$ have been emitted (or, as Plaintiffs will assert, that they can form PM or ozone) does not in and of itself establish demonstrable harm. Chemicals like those here only become harmful or hazardous based upon the level of human or ecological exposure. But Plaintiffs cannot show that the specific "excess emissions" from Units 2, 3, and 5 in fact caused any harm to human health or the environment. Indeed, they have done nothing to show a causal connection between any excess emissions and any actual or anticipated harm. They discuss generalized notions of harm from certain concentrations of $SO_2$ or $NO_x$ but present no evidence to suggest that excessive emissions of such pollutants *from the Wabash River Units* in fact caused that harm, much less that they were the *sole cause* of any adverse effect. *See Alcoa*, 98 F. Supp. 2d at 1039 (explaining that a remedial injunction would issue, only if plaintiff could show, among other things, that the defendant was the "only source" of the contaminant at issue); *see Lewis*, 518 U.S. at 360 n.7 ("Courts have no power to presume and remediate harm that has not been established."); *see also* Order on Mots. *In Limine* at 7-11 (Jan. 9, 2009) (Dkt. No. 1525). More importantly, even assuming Plaintiffs' estimates are correct, exposure to such levels could not and would not result in harm.

Moreover, Plaintiffs cannot justify their claims of "excess emissions" by pointing to the harmful effects of other emissions such as mercury, because the liability in this case is based solely on emissions of $SO_2$ and $NO_x$. Equity does not permit relief for conduct without an ade-

quate nexus to the acts for which liability was established, and so the jury's findings as to $SO_2$ and $NO_x$ do not open the door to the unbounded relief Plaintiffs demand.  *See Jenkins*, 515 U.S. at 88.  Indeed, mercury is a particularly inappropriate basis for Plaintiffs' request because the PSD program expressly excludes consideration of mercury.   Section 112(b)(6), 42 U.S.C. § 7412(b)(6), states that the PSD provisions "shall not apply to pollutants listed under this section," of which mercury is one such pollutant, CAA § 112(b)(1), 42 U.S.C. § 7412(b)(1).  The Environmental Appeals Board has recognized that mercury is "expressly excluded from direct consideration under the PSD program."  *In re Tondu Energy Co.*, 9 E.A.D. 710, 722 n.17 (Envtl. Prot. Agency Mar. 28, 2001), *available at* 2001 WL 312458.[8]   The same holds true for nonattainment NSR, which only applies to criteria pollutants for which NAAQS have been established, and no such standard has been set for mercury.  *See* CAA §§ 171-73, 42 U.S.C. § 7501-03; *see also* CAA § 107(d), 42 U.S.C. § 7407(d).  Mercury therefore cannot be said to "directly address and relate to the [NSR] violation[s]" in this case.  *Jenkins*, 515 U.S. at 88.  In all events, as with $SO_2$ and $NO_x$, Plaintiffs have disclosed no evidence that draws any credible nexus between the level of mercury emissions from the Wabash River Units and any demonstrable injury of any kind to any person or the environment.

Given the lack of *past* harm from any excess emissions, there is plainly no foundation for concluding that there will be *future* irreparable injury from such past emissions.  The absence of any basis for finding a likelihood of future irreparable injury should independently be dispositive here.  While an injunction may issue if "necessary and appropriate in the public interest to cor-

---

[8] The Environmental Appeals Board has recognized a very narrow exception, which is that a permitting authority, in making a BACT determination, may consider whether a particular control technology will have collateral environmental effects on mercury.  *In re Tondu*, 9 E.A.D. at 722 n.16.  The controls Plaintiffs request for Units 4 and 6, however, are not based on a BACT determination, nor do Plaintiffs contend that they are.  Indeed, they cannot, as BACT is a unit specific determination, and there is no violation at Units 4 or 6 requiring such a determination.  *See* 45 Fed. Reg. 52,676, 52,681 (Aug. 7, 1980) (codified at 40 C.F.R. pts. 50, 52, 124) ("BACT applies only to the units actually modified.").

rect or dissipate the evil effects of past unlawful conduct, *this power is not often necessary or appropriate*, and it is therefore *infrequently exercised*."  *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985) (emphasis added).  This power is considered "extraordinary," *id.*, in large part because "[t]he purpose of an injunction is to prevent *future* violations," *W.T. Grant*, 345 U.S. at 633 (emphasis added), and because an injunction "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983).  That is, the "necessary determination is that there exists some cognizable danger of *recurrent* violation." *W.T. Grant*, 345 U.S. at 633 (emphasis added); *accord Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 367 (7th Cir. 1990) (quoting *W.T. Grant*, 345 U.S. at 633).

Accordingly, a court should issue a remedial injunction for environmental violations only when it finds a risk that the direct and lingering effects of a past violation will continue to cause harm in the future and the injunction will prevent or mitigate that harm.  *See, e.g.*, *U.S. Pub. Interest Research Group v. Atl. Salmon of Me., LLC*, 339 F.3d 23, 32 (1st Cir. 2003) (injunction appropriate to remedy past violations that caused "*ongoing* harm to the ocean and the native fish population" (emphasis added)); *Alcoa, Inc.*, 98 F. Supp. 2d. at 1039 (allowing plaintiffs to seek injunction requiring sediment remediation where the hazardous substance "will continue to be released into the waters"); *see also Wilk*, 895 F.2d at 369-70 (upholding injunction eliminating continuing economic and reputational harm directly caused by past unlawful boycott).

If this Court orders Units 2, 3, and 5 to be reduced in operations and closed, as Cinergy proposes, the threat of any future violation will be completely eliminated.  Any additional relief, such as an injunction requiring that Units 4 and 6 be controlled or emissions allowances be surrendered, would be purely backward-looking.  Nor can Plaintiffs show that the remedial injunc-

tion they seek would mitigate any continuing harm to the environment that resulted solely from Cinergy's "excess emissions."  As explained, any excess emissions from Wabash River Units 2, 3, and 5 cannot have harmed the public health or welfare in Vigo Country, and Plaintiffs have not shown that any excess emissions caused any other particular irreparable harm.

### 3.      The remedial relief Plaintiffs request is inequitable.

Further,  installation of pollution controls on Units 4 and 6 and surrender of emissions allowances would be inequitable remedies because the amount of any "excess emissions" simply cannot justify such relief, and because Cinergy's proactive approach to environmental compliance and Plaintiffs' failure to notify Cinergy of the governing interpretation of the standard in this case weigh against any additional remedies.

> *a. Any excess emissions do not justify controlling Units 4 and 6 or forcing the surrender of emission allowances.*

Compelled installation of pollution controls on Units 4 and 6 and surrender of emissions allowances are inordinate remedies unjustified by any actual retrospective estimate of "excess emissions."  To the extent that there were excess emissions resulting from Cinergy's permit violations, Plaintiffs miscalculate the amount by hypothesizing that Cinergy would have complied with the NSR program by installing extraordinarily stringent and novel controls at the time of the projects.  In point of fact, for $SO_2$, Cinergy most likely would have complied with any NSR obligations for the projects in question by obtaining a synthetic minor permit, which would have limited any emissions from these Units to pre-project emissions levels plus 39 tons.  As a result, Plaintiffs estimate "excess" $SO_2$ emissions at levels three times greater than any reasonable calculation of such emissions.

With regard to $NO_x$ emissions, Plaintiffs likewise wholly miscalculate any so-called "excess."  Plaintiffs' theory rests on the incorrect assumption that Cinergy would have taken the ex-

traordinary step of being the first pulverized-coal-plant operator anywhere in the United States to install SCR technology, a technology EPA then recognized was still under development. Further, Plaintiffs' estimate ignores the fact that Cinergy installed then-state-of-the-art, special "low $NO_x$ burners" to reduce $NO_x$ emissions *at the time of the project at Unit 5 in 1990*. Further, Cinergy installed the same low $NO_x$ burner technology at Unit 3 shortly thereafter and then upgraded the low $NO_x$ burners at all of the Cinergy-owned Wabash River units between 2003 and 2007. As a result, rather than produce "excess" emissions, Cinergy actually emitted less $NO_x$ than would have been permitted had it gone through NSR review. Thus, the actual "excess" emissions — to the extent they exist — are far lower than Plaintiffs estimate and simply cannot justify the added burden Plaintiffs seek.

Cinergy's proposed remedy — shutdown of Units 2, 3, and 5 in 2012 preceded by a reduction to baseline emissions levels — ensures not only full prospective compliance, but also achieves significant remediation of any so-called "excess emissions." Under this proposal, emissions will be *below* the levels required for compliance with the NSR program. Because Cinergy will eliminate more emissions than the NSR program requires, such excess reductions would achieve significant remediation.

Given the lower levels of any actual "excess emissions" and the remediation built into Cinergy's proposal, no further relief is required to mitigate any effects of Cinergy's violations. *Cf. Lewis*, 518 U.S. at 357 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). More fundamentally, the requested relief is patently disproportionate to the "excess emissions" Plaintiffs claim must be "remedied."

For example, on average over the last 18 years, proper estimates reveal that at most Cinergy emitted approximately 6300 tons of $SO_2$ a year more than it would have if it had ob-

tained a synthetic minor permit for $SO_2$ and no excess $NO_x$ emissions. Nonetheless, Plaintiffs seek controls on non-infringing Units 4 and 6 to remove approximately 38,000 tons of $SO_2$ and 4700 tons of $NO_x$ *annually* at an additional cost of more than a third of a billion dollars. Such disproportionate relief of *six times* the annual "excess emissions" is plainly beyond the bounds of equity. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("the scope of injunctive relief is dictated by the extent of the violation established"); *see also Lewis*, 518 U.S. at 357; *Jenkins*, 515 U.S. at 88, 89; *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) ("[A] court abuses its discretion where the scope of the injunctive relief 'exceeds the extent of the plaintiff's protectible rights.'" (quoting *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1094 (7th Cir. 1988))).[9] Plaintiffs' request is particularly disproportionate given that using his "mathematical interpretation" of the NSR rules, Plaintiffs' expert (Dr. Rosen) estimated at trial that the projects at Wabash River Units 2, 3, and 5 would cause a total increase of $SO_2$ emissions of only 1477 tons a year. In other words, Plaintiffs now seek annual reductions of $SO_2$ emissions *25 times greater* than the annual violation proven at the liability trial. Such reductions are grossly outside any reasonable scope of appropriate mitigation.

Further, Plaintiffs' "excess emissions" claims must be put into context. While it is important to reduce emissions of pollutants such as $NO_x$ and $SO_2$, the costs of the reductions must be weighed against the reductions to be achieved, because such pollutants are part of our industrial society and cannot be entirely eliminated. Indeed, the NSR program specifically contemplates the need to balance environmental concerns and economic interests. *Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 838, 851-52 & n.25 (1984). Since 1990, EPA estimates that in the

---

[9] Even accepting Plaintiffs' claim that Cinergy emitted 19,900 excess tons of $SO_2$ and 1700 excess tons of $NO_x$ annually over the last eighteen years, Plaintiffs' request is still disproportionate. They ask that Cinergy spend exorbitant sums of money to control annually *twice* the level of $SO_2$ and *nearly three times* the level of $NO_x$ that Cinergy supposedly emitted in excess of allowable limits.

United States there were 320,682,000 tons of $SO_2$ emitted and 406,869,000 tons of $NO_x$. Thus, the "excess" emissions on which Plaintiffs' case for mitigation rests amount to about 0.1% of the total $SO_2$ emissions and 0.007% of the total $NO_x$ during that time. Viewed in context, even Plaintiffs' estimates of "excess emissions" do not warrant the additional hundreds of millions of dollars that will be borne by Indiana citizens. Plaintiffs' inequitable request should be rejected.

### b. Cinergy has diligently met and exceeded its environmental obligations.

Plaintiffs' request for remediation is further unjustified because, during the period in which Plaintiffs attribute the "excess emissions," Cinergy undertook numerous environmentally beneficial projects that substantially *reduced* its emissions from coal-fired plants, both companywide and at the Units in question. Cinergy has invested billions of dollars in controls in Indiana alone, installing pollution controls on every coal-fired generator in the state. For example, Cinergy has spent approximately $1.8 billion since 1990 installing state-of-the-art pollution controls on its largest generators, controlling an estimated 4162 megawatts of generating capacity. At Wabash River alone, the company has taken numerous steps to reduce $NO_x$ emissions, including, as noted, installing low-$NO_x$ burners at Unit 5 at the time of the project in question and at Unit 3 shortly thereafter. It also installed such burners at each of the other Cinergy-owned Wabash River Units. Moreover, it upgraded those burners again between 2003 and 2007, after the $NO_x$ SIP Call, to reduce further its $NO_x$ emissions. Cinergy has taken its environmental obligations seriously, and the steps it has taken counsel against imposing the added burdens Plaintiffs request.

### c. Remediation is inappropriate given Plaintiffs' delay in formulating the applicable NSR standards and in bringing suit.

This Court also should decline to order remediation in its equitable discretion due to Plaintiffs' delay both in formulating the "mathematical interpretation" announced in 1999 to

judge a significant net emission increase from projects occurring in 1992 and earlier, and in bringing suit against Cinergy to enforce the NSR provisions of the CAA.  Important factors coloring whether a remedy is fair and equitable are whether the defendant knew of the applicable standard by which it would be judged and whether the plaintiff acted diligently.  *See Lemon*, 411 U.S. at 205-06 & n.7 (concluding that equity favored defendants because there was no "clear warning" that they were "treading on unconstitutional ground").  Indeed, whether a violation was "blatant" or done knowingly or with intent has long factored into the appropriateness of an injunction.  *See Wisconsin v. Weinberger*, 745 F.2d 412, 427 (7th Cir. 1984) (overturning injunction for which violation "could not have been characterized as . . . blatant"); *see also United States v. Am. Tobacco Co.*, 221 U.S. 106, 185 (1911) (considering in crafting a remedy the absence of "any guilty knowledge or intent").

Moreover, a plaintiff must display "'reasonable diligence[] to call into action the powers of the court.'"  *Holmberg*, 327 U.S. at 396 (quoting *McKnight v. Taylor*, 42 U.S. (1 How.) 161, 168 (1843)).  Injunctive relief is particularly inappropriate when the plaintiff has delayed bringing suit because, in such cases, the harm complained of "largely [may have] been done . . . by plaintiffs' failure to timely seek" relief.  *Conservation Law Found., Inc. v. Busey*, 79 F.3d 1250, 1272 (1st Cir. 1996).  Indeed, this Court has repeatedly observed that "a significant delay between a violation and the USA's filing suit may be relevant in determining whether to grant injunctive or other equitable relief at all.  Such a delay may also be relevant in determining the extent of such relief to be awarded."  Partial Summ. J. Order at 18 (Dkt. No. 1440); *see also Cinergy Corp.*, 397 F. Supp. 2d at 1031 n.2; *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 832-34 (S.D. Ohio 2003) (noting that any remedy should consider the "abysmal breakdown in the administrative process" and EPA's inconsistent enforcement of the CAA).

Here, Plaintiffs did not formulate its interpretation of the actual-to-projected-actual stan-dard used to establish the NSR violations in this case until they held a series of "brainstorming" sessions almost a decade after the projects were undertaken.  Indeed, Plaintiffs did not derive this "mathematical interpretation" of the standard until 1999, directly before bringing suit against Cinergy, and long after the projects at issue were completed in 1989, 1990, and 1992.  Plaintiffs' delay weighs heavily against imposing excessive burdens on Cinergy, particularly as to units for which there was no liability finding.  Plainly Cinergy did not — and could not — anticipate the standard that would ultimately be used to judge whether these modifications would result in sig-nificant net emission increases.  Nor can Cinergy be said to have violated the NSR provisions knowingly, intentionally, or blatantly.  Cinergy proposes a balanced and fair remedy for the vio-lations found by the jury at Wabash River Units 2, 3, and 5.  Any harsher remedy should be re-jected as a matter of equity because of Plaintiffs' delay.

Moreover, had Plaintiffs not delayed in formulating the applicable theorem or in bringing suit, Plaintiffs would not even be able to contend that they should be able to seek remediation for "excess emissions."  Plaintiffs' theory hinges on the notion that Cinergy operated the Units in excess of specific emissions limits for an extended time.  Given Plaintiffs' delays, however, any "excess emissions" are at least as much a product of those delays as they are of Cinergy's viola-tions, since Plaintiffs' own delay extended dramatically the time between the occurrence of con-struction projects and the determination that they were major modifications.  *See Conservation Law Found., Inc.*, 79 F.3d at 1272.

### 4.    Plaintiffs' request for surrender of Cinergy's emission allowances un-der CAA cap-and-trade programs is not an available remedy for un-related construction NSR violations.

Finally, Plaintiffs' specific request for surrender of Cinergy's emissions allowances under current and future cap-and-trade programs should be rejected as inherently inequitable.  Such a

38

remedy is so far afield from Cinergy's construction violations under the NSR program that the requisite nexus between remedy and violation does not exist.  *See Swann*, 402 U.S. at 16 ("As with any equity case, the nature of the violation determines the scope of the remedy."); Partial Summ. J. Order at 17 (Dkt. No. 1440) (noting that anything beyond "additional measures designed to further reduce pollution from the Wabash River plant . . . would be too far afield from that which would be appropriate").  Here, the allowance surrender Plaintiffs seek does not relate to a violation or flow directly from one and so extends beyond the authority of a court sitting in equity.  *See Jenkins*, 515 U.S. at 98.  Cinergy has never violated any existing cap-and-trade program (much less any future one).  Nor would allowance surrender resolve a condition flowing from the violations established here.  As explained, a violation of the NSR provisions does not affect the cap-and-trade programs other than to change how a static number of allowances are allocated among generating units.  Such a remedy might be appropriate if the violations caused the breach of an emissions cap.  But that is simply not the case.  Stated plainly, the management of system-wide emissions is wholly unrelated to oversight of construction undertaken at individual units, and so allowance surrender is not a justifiable remedy for the violations at Units 2, 3, and 5.  *Cf. Freeman*, 503 U.S. at 489.[10]

Moreover, this request is simply a monetary penalty in the guise of an equitable remedy. *See Great-West Life*, 534 U.S. at 211 n.1 ("[A]ny claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction.").  Emissions allowances have a monetary value as commodities that are traded and purchased in the EPA administered allowance markets. Plaintiffs' own expert has estimated that the loss of the surrendered allowances would impose a monetary cost — *i.e.*, a penalty — of $2.2 million to $3.5 million *every year*.  Moreover, Plain-

---

[10] Indeed, because allowances under the Acid Rain Program were allocated based on reductions from 1980s levels, CAA § 401(b), 42 U.S.C. § 7651(b), Cinergy would have received the same number of allowances as it actually did if it had not violated NSR.

tiffs seek this penalty *without limitation on time*.  Indeed, Plaintiffs ask the Court to magnify this penalty even further by an unknown amount in seeking the surrender of allowances for *programs that have not even been enacted*.  Asking Cinergy to surrender any allowances is simply another form of asking Cinergy to pay a penalty.  This Court has already ruled that a penalty is time-barred, and Plaintiffs should not be permitted an end run around that ruling.

Not only is allowance surrender insufficiently related to Cinergy's permit violations, but it is also unauthorized by Title I of the CAA, of which the NSR provisions are a part.  Recently, the D.C. Circuit flatly held that the EPA lacks authority to remove allowances from the Acid Rain Program as a means of effectuating a program under Title I of the CAA.  *North Carolina v. EPA*, 531 F.3d 896, 921-22 (D.C. Cir. 2008).  The D.C. Circuit explained that "[a]lthough it may be reasonable for EPA, in structuring a program under section 110(a)(2)(D)(i)(I), to consider the impact on the [Acid Rain Program] market, it does not follow that EPA has the authority to remove allowances from that market."  *Id.* at 922.   The court found "nothing in section 110(a)(2)(D)(i)(I) granting EPA authority to remove [$SO_2$] allowances from circulation in the . . . market."  *Id.*[11]

Further, forcing Cinergy to surrender allowances for NSR violations would disrupt a highly complex and independent statutory scheme.  Undoubtedly, the Acid Rain Program and $NO_x$ SIP Call are some of the most detailed legislative and regulatory schemes pertaining to air quality in the United States.  *See* Hon. Henry A. Waxman, *The Clean Air Act Amendments of 1990: A Symposium Overview and Critique*, 21 Envtl. L. 1721, 1742-43 (1991).  Given the meticulous level of detail governing the allocation — and occasional surrender — of allowances under these detailed programs, the Court should not disrupt this carefully crafted scheme by forc-

---

[11] The D.C. Circuit also noted that, although Title IV provides that "[n]othing . . . in any . . . provision of law shall be construed to limit the authority of the United States to terminate or limit" a party's authorization to emit, 42 U.S.C. § 7651b(f), this provision does not by itself grant any such authority.  *North Carolina*, 531 F.3d at 921.

ing the surrender of allowances as a remedy for violations of a separate program that does not even limit system-wide emissions.  Indeed, if EPA could seek allowance surrender as a remedy for NSR violations, section 113(b) would become a backdoor by which EPA could eat away at the overall supply of allowances, thereby changing the structure of and pricing within the allowance market for all utilities.

## II.   Cinergy's Proposal Is The Appropriate Remedy For The Beckjord Violations.

### A.   Background Relevant To The Beckjord Particulate Matter Remedy.

In the State of Ohio, PM emissions from coal-fired electric generating units are regulated under the federally-approved Ohio SIP.  The Ohio SIP establishes a bright line limit, expressed in pounds of PM per million BTU of energy, that a coal-fired generating unit may legally emit.  *See* Ohio Admin. Code 3745-17-10.  Permits issued by the state of Ohio require periodic testing of the smoke stack for PM emissions pursuant to methodologies set forth in state and federal regulations.  Continuous testing for PM emissions is not required under either state or federal law.  *See* 40 C.F.R. § 60.48Da(p); Ohio Admin. Code 3745-17-10.

In the early 1990s, two coal-fired units at the Walter C. Beckjord station in New Richmond, Ohio failed to meet the applicable PM limit during several stack tests.  As a result of these failures, Cinergy paid a $63,000 penalty to U.S. EPA.  In addition, Cinergy entered into an Administrative Order on Consent ("AOC") with EPA.  *See In re Cinergy Corp.*, Order No. EPA-5-98-113(a)-OH-1 (Feb. 25, 1998).  In the AOC, Cinergy was ordered to achieve, demonstrate, and maintain continuous compliance with the Ohio SIP PM limit at the Beckjord Units that had previously failed stack tests.  *Id.* at 3.  The AOC also required Cinergy, *inter alia*, to increase the frequency of PM testing at these Units and spelled out stringent conditions for such tests, including mandating the use of "worst case coal quality" (*i.e.*, coal that is most likely to result in high PM emissions) for all tests and prohibiting the company from relying on tests taken within four

41

weeks of control equipment cleaning or rehabilitation.  *Id.* at 3 & Attach. A.  Moreover, the AOC instituted a series of procedures in the event of any future failed PM stack test, including shutting the unit down within 15 days of a failed test report, engaging a "qualified consulting engineer" to inspect the unit and control equipment, restarting the unit only upon the completion of corrective measures recommended by the qualified consulting engineer, and re-testing the unit within 45 days following restart.  *Id.* at 3-4.  By its terms, the AOC testing protocols were applicable from the date of entry through the end of 2000.  *Id.* at 3.

Beckjord Unit 1 was one of the units governed by the AOC.  The Unit was tested for PM eleven times between 1998 and 2000, passing eight times and failing three.  The first failure occurred on October 12, 1999.  Upon learning of the failed test, Cinergy immediately shut the Unit down and engaged a qualified engineering consultant to inspect it.  The consultant attributed the failure to a malfunction in the $SO_3$ conditioning system, which affects the efficiency of the Electrostatic Precipitator ("ESP") — the control equipment that removes PM from the gas exiting the boiler.  In accordance with the AOC, Cinergy implemented all repair measures recommended by the consultant, restarted the Unit, and passed a PM stack test on November 5, 1999.

The second and third failures at Beckjord Unit 1 occurred on May 4 and 26 of 2000.  Immediately upon learning of the May 4 failure, Cinergy shut the Unit down and engaged *three* outside consultants to inspect it.  All three consultants attributed the failure to dysfunctional rappers — equipment that periodically bang the top of the ESP, thereby causing trapped PM to fall into collecting plates and freeing up the ESP to trap more PM.  Per the consultants' recommendation, Cinergy replaced the rapper circuit board and implemented additional repairs.  The Unit was restarted on May 26 and failed again.  Then Cinergy took drastic action, including derating the Unit to a maximum capacity of 90MW — a reduced level of operation at which the Unit has

42

always shown ample compliance with the applicable PM limit — and speeding up the implementation of a series of costly upgrades to the ESP controls.  After the May 26 failure and corrective measures, the Unit was retested four times prior to the end of 2000 and passed every time.

Unlike Unit 1, Beckjord Unit 2 had never failed a PM test prior to 1998 and was not subject to the AOC.  Nonetheless, Cinergy conducted six full stack tests of Unit 2 between 1998 and 2000.  The Unit passed five times and failed once.  The lone failure occurred on October 21-22, 1999, under very unique circumstances:  On those dates, Cinergy, with the approval of Ohio EPA, conducted a test burn of an alternative coal/paper pellet fuel mixture.  Upon learning of the failure, Cinergy immediately discontinued use or experimentation with the alternative fuel mixture at any of the Beckjord units.  Cinergy also shut Unit 2 down and engaged a qualified consultant to identify any necessary repairs, which were promptly carried out.  Beckjord Unit 2 was retested on December 14, 1999 and passed.

Since 2000, Beckjord Units 1 and 2 have improved their performance in controlling PM emissions.  Unit 1 has passed 11 of 12 PM tests, including the 10 most recent tests dating back to November of 2003.  Unit 2 has passed 5 of 6 PM tests, including the 5 most recent tests dating back to May of 2006.  The performance of the Units is attributable to significant expenditures incurred by Cinergy to upgrade and reinforce PM controls at these Units.  The expenditures include over $3.2 million in capital costs for the two Units, plus hundreds of thousands more in operating and maintenance costs.  The highlight of these expenditures is the installation, after extensive study, of a system of gas flow modifications that have dramatically improved PM collection rates for the ESPs at Beckjord Units 1 and 2.  *Neither Unit has failed a PM test since the installation of the gas flow modifications*, done in 2004 for Unit 1 and 2007 for Unit 2.

Cinergy has resolved the sole PM violation at Beckjord Unit 1 since 2000 with the Ohio EPA through the payment of a $28,000 penalty.  *In re the Cincinnati Gas & Elec. Co.* (Ohio Envtl. Prot. Agency Dec. 27, 2005), http://www.epa.state.oh.us/dapc/enforcement/year_2005/cin122705.pdf (final findings and orders).

### B.   The Court Should Adopt Cinergy's Balanced Remedy Proposal, Rather Than Plaintiffs' Unsupported And Unduly Punitive Proposal.

Plaintiffs are seeking both injunctive relief and penalties for the Beckjord PM violations. With respect to injunctive relief, Plaintiffs are seeking "the installation of continuous PM monitoring devices ("PM CEMs") for compliance monitoring" at Units 1 and 2.  Plfs.' Second Supplemental Resps. at 15.  If the PM CEMs or any other test method indicates an exceedance of the Ohio SIP, Plaintiffs ask that Cinergy be required to shut down the Unit, notify EPA and Ohio, and bring in an outside consultant to recommend remediation.  *Id.*  "If a repeat violation occurs at the same unit, Cinergy should either install a baghouse or shut down the unit permanently." *Id.*  With respect to penalties, Plaintiffs seeks the sum of $3,465,000.  *Id.* at 16.

Cinergy is willing to install PM CEMs at Beckjord Units 1 and 2, but does not believe they should be used for compliance measurement purposes.  This is based on a simple and unassailable observation: *PM CEMs are far less precise than the periodic test method currently used at Beckjord*.  This is because PM CEMs, unlike periodic stack test methods, do not measure PM directly, but rather rely on indirect proxies for PM mass.  Therefore, PM CEMs must be calibrated by reference to stack tests.  Critically, EPA's own guidelines define adequate calibration as any set of PM CEMs results that is within 25% of the actual stack test results most of the time (and may be off by even more than 25% the rest of the time).  *See* 40 C.F.R. pt. 60, app. B, Performance Specification 11.  Even with this large error margin, some power plants have not been able to certify PM CEMs.  The error margin recognized by EPA and the difficulties experienced

by power plants seeking certification reflects current inability to make PM CEMs that faithfully parallel actual stack test results. Simply put, PM CEMs are like a radar gun that cannot distinguish between a car going 55 miles per hour, 42 m.p.h., or 68 m.p.h., or worse.

Plaintiffs likely will argue that a number of electric generating units around the country use PM CEMs for certain kinds of compliance measurement. The crucial distinction is that virtually all those units have wet scrubbers, which typically reduce PM readings to 1/100 or less of the legal limit. Companies with such units take no risk by installing PM CEMs technology — regardless of the 25% or more tolerance interval — and they benefit under a federal regulation that permits units with PM CEMs to dispense with the use of standard opacity monitors that tend to work poorly in wet-scrubbed units. *See* 40 C.F.R. § 60.49Da(u). The fact that electric companies have been willing to use PM CEMs for compliance under wholly different circumstances does not show that the technology is appropriate at Beckjord.

Plaintiffs may also quote language by U.S. EPA endorsing or supporting the use of PM CEMs. Regardless of what EPA has said, however, to date the agency has not had the confidence to actually mandate the use of PM CEMs. *See* 40 C.F.R. § 60.48Da(p) (providing only that PM CEMs may be installed *at the option of the company*). By contrast, EPA regulations mandate the use of other, more reliable continuous emissions monitors, including $SO_2$ CEMs, NOx CEMs, and $O_2/CO_2$ CEMs. *See* 40 C.F.R. § 60.49Da(b)-(d). The discrepancy in the regulatory treatment of PM CEMs and other continuous emissions monitors shows that even EPA harbors some doubt about the reliability and precision of PM CEMs.

Plaintiffs will further likely argue that, without PM CEMs, there is no way to ensure that Beckjord Units 1 and 2 are in compliance between stack tests. This argument is completely undercut by Cinergy's willingness to install PM CEMs as performance indicators. What Cinergy

45

proposes is to use PM CEMs as indicators of PM emissions between stack tests.  While the *absolute* value of any PM CEMs readout cannot be trusted, if Beckjord staff see a significant *relative* increase in the readouts, they will inspect the relevant control equipment to try to identify problems, and may consider temporarily derating the Unit.  These steps will provide ample assurance that the Units in question are not exceeding the Ohio SIP PM limit between periodic stack tests, without subjecting Cinergy to the very real possibility of false violations and needless and punitive litigation.

Plaintiffs have also failed to join issue with Cinergy on the topic of "averaging time" for any PM CEMs installed at Beckjord Units 1 and 2.  Cinergy's PM expert McRanie has noted that a fairly long averaging time is necessary to average out false positive readings and has endorsed a 30 day averaging period.  *See also* Dfs.' Objections and Suppl. Resps. to Plfs.' First and second Sets of Interrogs. in Remedy Phase of Case (Nov. 14, 2008) at 24 ("Cinergy will not object to the installation of PM CEMs as performance indicators at Beckjord Units 1 and 2, *provided that the PM CEMs are of the type and specifications endorsed by Mr. McRanie*") (emphasis added).  By contrast, Plaintiffs have not addressed the issue of averaging time, other than a note in one of their expert reports recognizing that some sort of averaging method should be used.  Because Cinergy's request for a prolonged averaging time has gone unrebutted in discovery and in the contention interrogatories, the Court should adopt Cinergy's proposal and should not permit Plaintiffs to seek a shorter averaging time at trial.

Further, Plaintiffs have not produced an iota of evidence or expert opinion in support of their demand that Cinergy install baghouses at Beckjord Units 1 and 2 or shut the Units down permanently in the event of more than one future PM exceedance at each Unit.  Baghouse technology is among the most expensive ways of controlling PM emissions, and without further

study it is impossible to determine whether installing baghouses would be practicable or cost-effective at the Beckjord Units.  As for the suggestion to shut down the Units permanently in the event of any future PM exceedances — rather than addressing any such exceedances through appropriate means such as state or federal administrative or judicial actions — Plaintiffs' position is grossly excessive and unduly punitive.  In any event, because Plaintiffs have produced no evidence or expert opinion on these proposed remedies, they are foreclosed from seeking them at trial.  *See* Fed. R. Civ. P. 26, 37; *see also* Letter from K. Stojilkovic to Plfs. (Sept. 16, 2008) (placing Plaintiffs on notice of their failure to disclose expert testimony in support of injunctive relief other than PM CEMs at Beckjord).

Finally, Plaintiffs' penalty demand for the Beckjord PM violations is excessive.  The almost $3.5 million sum dwarfs penalties that Cinergy has paid for similar violations, including settling four violations at Beckjord for a total sum of $63,000 (reduced from an initial EPA demand of $77,000) and settling a more recent violation at Beckjord for $28,000 (reduced from an initial Ohio agency demand of $56,000).  Even if one considers that the prior penalties were paid through settlement, the initial sums sought by the relevant agencies in those proceedings show that the sum sought here by Plaintiffs is well above an appropriate level.

There are three principal reasons why Plaintiffs' penalty demand should be reduced drastically by this Court.  First, while the applicable statute calls for the arbiter of the penalty to balance a variety of factors,[12] Plaintiffs have conceded that they are simply seeking the statutory maximum multiplied by the number of days of noncompliance estimated by their witnesses, *without consideration of any other factors called for by the statute*.  At a minimum, the Court

---

[12] *See* 42 U.S.C. § 7413(e)(1) ("the Administrator or the court, as appropriate, shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, . . . payment by the violator of penalties previously assessed for the same violation, the economic benefit of non-compliance, and the seriousness of the violation").

should reduce the penalty based on the good faith effort that Cinergy has expended over the past decade to improve PM emissions controls at the Units, including spending over $3.2 million in capital improvements to the PM controls at the Units at issue.

Second, Plaintiffs are seeking the statutory maximum per day of violation for *both* the SIP and AOC violations at issue for Beckjord Unit 1, thus essentially doubling the penalty amount applicable to the same nucleus of facts.  While Cinergy accepts this Court's ruling recognizing both SIP and AOC violations, that ruling expressly reserved penalty determinations to the remedy phase.  *See* Beckjord Summ. J. Order at 5 (Dkt. No. 984) ("the issue of the imposition of any penalties is not currently before the Court and need not be decided at this time").  Now that the Court has arrived at the remedy phase, it should take the reasonable step of discounting any AOC penalty in light of the penalty it will impose for the corresponding SIP violations.[13]

Third, while Plaintiffs have attempted to determine the duration of noncompliance for purposes of the penalty calculation, their determination is erroneous in several respects.  Most notably, Plaintiffs are not justified in assuming that Beckjord Unit 2 was out of compliance on every day of operation between October 21-22, 1999 (the dates of the failed PM test) and December 14, 1999 (the date of the first subsequent passed test).  This assumption is implausible in light of the fact that the Beckjord Unit 2 failure occurred during a test burn of an alternative fuel that was limited to October 21 and 22, and that Beckjord Unit 2 had never previously failed a PM test.  As Plaintiffs' own PM expert conceded, the Beckjord Unit 2 failure on October 21-22,

---

[13] Indeed, the Court should give Cinergy credit for complying in good faith with all the testing and inspection obligations under the AOC, as well as for voluntarily following some of those protocols since the expiration of the AOC in 2000.  Moreover, the Court should note the principal reason offered by Plaintiffs in support of the AOC claims at summary judgment — namely, that different corporate entities were responsible for the SIP and AOC penalties — has been mooted by a stipulation between the parties that the various named Defendants are jointly responsible for any and all Beckjord PM penalties ordered in the remedy proceeding.  *See* Joint Notice of Fact Stipulations for the Remedy Phase at 3 (Doc. 1499) (Dec. 10, 2008).

1999 was *sui generis*.  Plaintiffs' duration estimates with respect to the Beckjord Unit 1 violations are not as grossly unreasonable, but Cinergy will demonstrate at trial that Plaintiffs have not sufficiently discounted days when the Unit was shut down, derated, or fixed, and thus almost certainly operating below the applicable PM emissions limit.

## CONCLUSION

For the reasons stated, the Court should adopt Cinergy's proposed remedies.

DATED:  January 9, 2009

Respectfully Submitted,

PSI ENERGY, INC. AND THE CINCINNATI GAS & ELECTRIC COMPANY

By:  /s/ Kathryn B. Thomson

Attorneys for PSI Energy, Inc. and The Cincinnati Gas & Electric Company

THOMAS C. GREEN
MARK D. HOPSON
SAMUEL B. BOXERMAN
KATHRYN B. THOMSON
FRANK R. VOLPE
KOSTA S. STOJILKOVIC
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8131

JAMES A. KING
Porter Wright Morris & Arthur LLP
41 South High Street
Columbus, OH  43215

JULIE L. EZELL
Duke Energy Business Services LLC
1000 East Main Street
Plainfield, IN 46168-1782

DEAN M. MOESER
Duke Energy Corporation

5555 San Felipe St.
Houston, TX 77056

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2009, a copy of the foregoing was filed electronically under seal with the Court.  On that same date, the foregoing and all attachments and affidavits thereto are being sent via electronic mail to the following parties.

**FOR PLAINTIFF, UNITED STATES OF AMERICA:**

Jeffrey K. Sands
E-mail:  jeffrey.sands@usdoj.gov
Sarah Dale Himmelhoch
E-mail:  sarah.himmelhoch@usdoj.gov
Larry Martin Corcoran
E-mail:  larry.corcoran@usdoj.gov
James Lofton
E-mail:  jim.lofton@usdoj.gov
Katherine Vanderhook
E-mail:  katherine.vanderhook@usdoj.gov
Cynthia Ferguson
E-mail:  cynthia.ferguson@usdoj.gov
Deborah Behles
E-mail:  deborah.behles@usdoj.gov
Thomas Benson
E-mail:  thomas.benson@usdoj.gov
Danielle Rosengarten
E-mail:  danielle.rosengarten@usdoj.gov
Environmental and Natural Resources Division
United States Department of Justice

Gaylene Vasaturo
E-mail:  vasaturo.gaylene@epa.gov
Charles V. Mikalian
E-mail:  mikalian.charles@epa.gov
Ignacio L. Arrazola
E-mail:  arrazola.ignacio@epa.gov
Thomas Williams
E-mail:  williams.tom@epa.gov
United States Environmental Protection Agency


Thomas E. Kieper
E-mail:  tom.kieper@usdoj.gov
United States Attorney's Office

**FOR PLAINTIFF-INTERVENOR, THE STATE OF NEW YORK:**

Robert T. Rosenthal
E-mail:  robert.rosenthal@oag.state.ny.us
J. Jared Snyder
E-mail:  jared.snyder@oag.state.ny.us
Joseph M. Kowalczyk
E-mail:  joseph.kowalczyk@oag.state.ny.us
New York State Attorney General

**FOR PLAINTIFF-INTERVENOR, THE STATE OF CONNECTICUT:**

Carmel Alicia Motherway
E-mail:  carmel.motherway@po.state.ct.us
R. Keith Guthrie
E-mail:  kgmail@comcast.net
Connecticut Attorney General

**FOR PLAINTIFF-INTERVENOR, THE STATE OF NEW JERSEY:**

Kevin P. Auerbacher
E-mail: auerbkev@law.dol.lps.state.nj.us
Jean Patrice Reilly
E-mail: reilljea@law.dol.lps.state.nj.us
Jon C. Martin
E-mail: martijon@law.dol.lps.state.nj.us
State of New Jersey, Department of Law
  & Public Safety
New Jersey Office of the Attorney General

Christine F. Lewis
Email: christine.lewis@dol.lps.state.nj.us
Christopher D. Ball
Email: christopher.ball@dol.lps.state.nj.us
Maurice A. Griffin
E-mail: maurice.griffin@dol.lps.state.nj.us
Carol DeMarco
E-mail: carol.demarco@dol.lps.state.nj.us

**FOR THE DEFENDANTS:**

Julie L. Ezell
E-mail: julie.ezell@cinergy.com
Cinergy Services, Inc.

James A. King
E-mail: jking@porterwright.com
Porter Wright Morris & Arthur, LLP

Scott R. Alexander
E-mail: salexander@taftlaw.com
Robert R. Clark
E-mail: rclark@taftlaw.com
 John D. Papageorge
E-mail: jpapageorge@taftlaw.com
Taft Stettinius & Hollister LLP

Samuel B. Boxerman
E-mail: sboxerman@sidley.com
Kathryn B. Thomson
E-mail: kthomson@sidley.com
Thomas Charles Green
E-mail: tcgreen@sidley.com
Frank R. Volpe
E-mail: fvolpe@sidley.com
Mark D. Hopson
E-mail: mhopson@sidley.com
Kosta S. Stojilkovic
E-mail: kstojilkovic@sidley.com
Sidley Austin LLP

**FOR PLAINTIFFS-INTERVENORS, HOOSIER ENVIRONMENTAL COUNCIL AND OHIO ENVIRONMENTAL COUNCIL:**

Jonathan Lewis
jlewis@catf.us
Clean Air Task Force

By:   /s/ Kathryn B. Thomson
                 Attorney
          Sidley Austin LLP
          1501 K Street, NW
          Washington, DC 20005
          kthomson@sidley.com