1                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF INDIANA
2                   INDIANAPOLIS DIVISION

3

UNITED STATES OF AMERICA,     )
4      Plaintiff,        )
                      )
5  STATE OF NEW YORK, STATE OF    )1:99-cv-1693-LJM-JMS
    NEW JERSEY, STATE OF CONNECTICUT,)
6  HOOSIER ENVIRONMENTAL COUNCIL   )
    and OHIO ENVIRONMENTAL        )
7  COUNCIL,                  )
       Plaintiff-Intervenors,   )Indianapolis, Indiana
8                      )February 3, 2009
        -vs-            )8:00 a.m.
9  CINERGY CORP., PSI ENERGY, INC., )
    and THE CINCINNATI GAS &      )Volume 2
10  ELECTRIC COMPANY,          )
       Defendants.         )

11

12

13

14                    **BEFORE THE**
            **HONORABLE LARRY J. McKINNEY**

15

16        OFFICIAL REPORTER'S TRANSCRIPT OF

17            TRIAL PROCEEDINGS

18

19

20  Court Reporter:     Cathy Easley Jones, RPR, FCRR
                   Official Court Reporter
21                   46 East Ohio Street, Room 291
                   Indianapolis, IN  46204
22

23

24

25       PROCEEDINGS TAKEN BY MACHINE SHORTHAND
         COMPUTER-AIDED TRANSCRIPTION

Vol. 2-219

1                    **A P P E A R A N C E S**

2

3    FOR THE PLAINTIFF:          Mr. Justin A. Savage
                                 Mr. Phillip Brooks
4                                Mr. Jason A. Dunn
                                 Ms. Jennifer A. Lukas-Jackson
5                                Mr. Myles E. Flint, II
                                 Mr. Thomas A. Benson
6                                Mr. Brent Marable
                                 U.S. DEPARTMENT OF JUSTICE
7                                P.O. Box 7611
                                 Ben Franklin Station
8                                Washington, DC  20530

9
     FOR THE DEFENDANTS:         Mr. Mark D. Hopson
10                               Mr. Frank R. Volpe
                                 Mr. Samuel B. Boxerman
11                               Ms. Kathryn B. Thomson
                                 Ms. Meghan Delaney Berroya
12                               Mr. Kosta S. Stojilkovic
                                 SIDLEY AUSTIN LLP
13                               1501 K Street, NW
                                 Washington, DC  20005

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 2-220

1          I N D E X   O F   W I T N E S S E S

2                                              PAGE

For Plaintiffs:

3

4   JOHN PAUL
    Direct Examination by MR. DUNN ................224
5   Cross-examination by Mr. Volpe ...............253
    Redirect examination by Mr. Dunn .............259
6
    CHARLES DRISCOLL
7   Direct Examination by LUKAS-JACKSON ..........260
    Cross-examination by Ms. Thomson .............299
8
    PHYLLIS FOX
9   Direct Examination by Mr. Benson .............302
    Cross-examination by Mr. Boxerman ............356
10  Redirect examination by Mr. Benson ...........391
    Recross-examination by Mr. Boxerman ..........401
11  Further Redirect examination by Mr. Benson ...407

12  KEVIN VUILLEUMIER
    Direct Examination by Mr. Flint ..............409
13  Cross-examination by MMr. Stojilkovic ........425

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 2-221

1            I N D E X   O F   E X H I B I T S

2                                              PAGE
Plaintiff's Exhibit No.:
3
1904 .........................................262
4 1907 .........................................235
1912 .........................................351
5 1913 .........................................296
1930 .........................................303
6 1939 .........................................334
1955 .........................................316
7 2066 .........................................236
2080 .........................................335
8 2138 .........................................338
9

10

11

12

13

14 Defendant's Exhibit No.

15 333 .......................................416

16

17

18

19

20

21

22

23

24

25

Vol. 2-222

1    *(In open court)*

2         THE COURT:  Good morning.  We have some housekeeping

3    matters to take up first.

4         MR. SAVAGE:  Your Honor, may I approach?

5         THE COURT:  Is that a black shirt you've got on this

6    morning?  Did someone tell you that was good trial attire?

7         MR. VOLPE:  It's my Cousin Vinny.

8         THE COURT:  That's what I thought.

9         MR. SAVAGE:  Your Honor, my wife has tried to warn

10   me before but I hadn't listened.

11        THE COURT:  Somehow I think I'd like your wife.

12        MR. SAVAGE:  Your Honor, one issue.  During

13   Mr. Chinkin's testimony there was a demonstrative --

14        THE COURT:  Several.

15        MR. SAVAGE:  And one was Demonstrative 24, which was

16   a compact disk of what we call the CAMx animation and movie.

17   It was at the trial transcript from page 15511 to 1659.  To

18   the extent it would be helpful to the trier of fact, we went

19   ahead and had it marked, and would ask that it be admitted

20   into the record as Plaintiffs' Exhibit 2139.  In fairness to

21   Cinergy, this is not in our exhibit list, but it was disclosed

22   during discovery.

23        THE COURT:  So do you have any problem admitting

24   that as an exhibit?

25        MR. VOLPE:  No. that's fine, Judge.

Vol. 2-223

1          THE COURT:  All right.  2139 then is admitted.

2          MR. SAVAGE:  Your Honor, there's one other issue.

3  We have some exhibits on both sides, I think not a terrible

4  amount of them that have been stipulated to as nonhearsay and

5  as authentic, and we'd just simply ask to move them into

6  evidence.  We have a few today we could go ahead and do

7  en masse as your preference.

8          THE COURT:  Let's do it now.

9          MR. SAVAGE:  All right.  Well, for today.  We have

10  two.  One is Plaintiffs' Exhibit 2133 which are photos of the

11  plant.  Those were to be admitted pursuant to the parties'

12  agreement that they would come in as authenticated by the

13  deposition of Mr. Cary Secrest, an EPA employee.

14          The second was Plaintiffs' Exhibit 1959.  That was

15  the testimony by Mr. Barnes and Mr. Raley that was discussed

16  in opening.  It's been stipulated to as nonhearsay and

17  authentic as it was testimony before the Indiana Utility

18  Regulatory Commission.

19          MR. VOLPE:  That's fine, Judge.

20          THE COURT:  All right.  Those will be admitted.

21          MR. SAVAGE:  Your Honor.  With that, we will call

22  our first witness.

23          THE COURT:  There was one other thing I wondered.

24  As I looked at the witness list today and the Defendants'

25  order of witnesses, I don't know how you're going to get done

Vol. 2-224

1  today.

2          MR. SAVAGE:  With the admission of Plaintiffs'

3  Exhibit 2139, we've cut one witness and we are going to be

4  very efficient with the others.

5          THE COURT:  I was going to suggest we could go all

6  day if we needed to do that.

7          MR. HOPSON:  We'd like to do that.  I've talked to

8  Mr. Brooks this morning.  If that will help so that Plaintiffs

9  are done midday tomorrow, I'm sure we can put ours on in two

10  and a half days.

11          THE COURT:  Okay.  That's what we'll do.

12          MR. SAVAGE:  Thank you, Your Honor.

13          THE COURT:  Sure.

14          MR. SAVAGE:  And with that, Plaintiffs call their

15  first witness, Mr. Paul.

16          **JOHN PAUL, PLAINTIFF'S WITNESS, SWORN**

17              **DIRECT EXAMINATION**

18          MR. DUNN:  Your Honor, Jason Dunn for the United

19  States.  As has been the practice, I'm just going to give a

20  brief overview of Mr. Paul's expected testimony.

21          Mr. Paul is the administrator of the Ohio Regional

22  Air Pollution Control Agency, or RAPCA, R-A-P-C-A, in Dayton,

23  Ohio.  RAPCA is a local air pollution control agency that

24  administers the Clean Air Act in the six-county Dayton, Ohio

25  metropolitan area.  RAPCA is responsible for air quality

JOHN PAUL - DIRECT/DUNN          Vol. 2-225

1  monitoring in the Dayton metro area, including monitoring of

2  PM2.5 and ozone.

3          Mr. Paul is also a leader in the National

4  Association of Clean Air Agencies or NACAA, N-A-C-A-A, which

5  is a nationwide association of state and local air pollution

6  control agencies.  Mr. Paul's experience dealing with ambient

7  air quality attainment issues is typical of similar air

8  regulatory agencies across the country.

9  Q    Good morning.  Please tell us your full name.

10 A    Good morning.  It's John Arnold Paul, P-A-U-L.

11 Q    And where are you currently employed?

12 A    I'm currently employed with the Regional Air Pollution

13 Control Agency centered in Dayton, Ohio.

14 Q    And that is known as RAPCA?

15 A    Yes, it is.

16 Q    What is RAPCA?

17 A    RAPCA is one of nine local agencies in the State of Ohio,

18 one every 165 local agencies across the United States.

19 Q    Generally, what is RAPCA responsible for?

20 A    In general, the Clean Air Act specifies that the control

21 of air pollution at its source is the primary responsibility

22 of states and localities.  So we are a local agency that

23 accepts that responsibility, that works with Ohio EPA and U.S.

24 EPA and basically serves as a full functioning local air

25 pollution control agency.

JOHN PAUL - DIRECT/DUNN          Vol. 2-226

1  Q   When you say a "full functioning local air pollution

2  control agency," just give the Court a little background about

3  what you mean by that.

4  A   Well, we're an agency which under various delegated

5  authorities does inspections.  We do enforcement cases.  We

6  write permits that are sent to the state and issued by the

7  state.  We investigate complaints, and we run an extensive

8  monitoring network.

9  Q   What is your current position at RAPCA?

10 A   My current position is classified as the administrator of

11 the agency or the supervisor of the agency.

12 Q   Is that the head of the agency?

13 A   Yes, it is.

14 Q   How long have you been employed at RAPCA?

15 A   I was originally employed at RAPCA in the summer of 1972

16 as an intern and then returned to full-time employment

17 beginning in December of 1973 to the present.

18 Q   How long have you been administrator?

19 A   I've been the administrator since 1985.

20 Q   What counties are encompassed by RAPCA?

21 A   RAPCA is a regional agency.  So we have six counties.

22 Starting at the Indiana line, we have Preble County and Darke

23 County, and then moving eastward, Miami county, Montgomery

24 County, Greene County and Clark County; six counties.

25 Q   Okay.  During your more than 35 years at RAPCA, has your

1  agency had responsibility for implementing and applying the

2  federal Clean Air Act?

3  A    Yes, we have.

4  Q    Mr. Paul, you've been involved with the National

5  Association of Clean Air Agencies or its predecessors for many

6  years; is that correct?

7  A    That's correct.

8  Q    And that organization is known by the acronym NACAA,

9  N-A-C-A-A?

10 A    Yes, the National Association of Clean Air Agencies.

11 Q    Has it been known by any previous names?

12 A    Yes.  It was previously known as STAPPA ALAPCO.  It's

13 S-T-A-P-P-A,  A-L-A-P-C-O, which basically stands for State

14 and Territories and Local Air Pollution Control Agencies.

15 Q    Now when you say it's a national association, who belongs

16 to NACAA?

17 A    The members of NACAA include 53 states and territories,

18 and approximately 165 local agencies.

19 Q    And what generally does NACAA do?

20 A    The primary job of our national association is to

21 coordinate the activities of the state and local agencies, to

22 provide communication among ourselves, to also provide

23 communication with various stakeholders, including U.S. EPA,

24 environmental groups, industry groups.

25          Primarily what we're trying to do is, on a regular

JOHN PAUL - DIRECT/DUNN          Vol. 2-228

1  basis, under specific subjects, discuss the problems of air

2  pollution control across the country.

3  Q   How long have you participated in NACAA?

4  A   I've participated in NACAA since the late 1970s.

5  Q   Okay.  Does NACAA have committees that address specific

6  issues with respect to the Clean Air Act?

7  A   Yes, we do.  One of the primary ways that we communicate

8  among ourselves is through various committees.  So we -- we'll

9  have a committee, and it will take subjects such as monitoring

10 or enforcement or New Source Review or criteria pollutants,

11 toxics.

12       For each of these committees, we'll have a co-chair;

13 one co-chair representing states, one representing local

14 agencies.  We'll have a staff person that's assigned at the

15 NACAA headquarters in Washington; and we'll have various

16 contacts with primarily U.S. EPA.  And so we will on a monthly

17 basis, we will discuss proposed regulations, non-attainment

18 problems, monitoring data, various subjects, just so that

19 we're all on the same page and working together.

20 Q   Okay.  And just briefly, what committees have you

21 participated in?

22 A   I've co-chaired the New Source Review committee since its

23 inception.  I also co-chaired the Criteria Pollutants

24 committee for approximately 15 years.  Then I've also

25 co-chaired various ad hoc committees.  We had an energy

JOHN PAUL – DIRECT/DUNN          Vol. 2–229

1  committee for a period of time.  We currently have a committee

2  which looks at mercury emissions from electric generating

3  units; and I co-chair that.

4  Q    What other positions have you held at NACAA or its

5  predecessor?

6  A    With NACAA, we have –– both on the state side and on the

7  local side, we have officers and various directors.  We have a

8  board of directors, which is made up of the officers from the

9  states and the officers from the locals; and within those

10  officers, we have a treasurer, vice president, president and

11  immediate past president; and I have served in those offices

12  two separate times.

13          So back in the 1980s, I went through the chain and

14  then once again fairly recently I went through the chain of

15  officers in NACAA.

16  Q    Through your work at RAPCA and NACAA, are you familiar

17  with how state and regional authorities show whether they're

18  in compliance with the National Ambient Air Quality Standards?

19  A    Yes, I am.

20  Q    And your responsibilities as administrators of RAPCA

21  include overseeing your agencies' implementation of its

22  ambient air quality monitoring program?

23  A    Yes, they do.

24  Q    How, as a practical matter, is ambient monitoring data

25  used to determine compliance with the National Ambient Air

JOHN PAUL - DIRECT/DUNN          Vol. 2-230

1  Quality Standards or NAAQS, N-A-A-Q-S?

2  A   Previously under the Clean Air Act, EPA has responsibility

3  for setting National Ambient Air Quality Standards.  I believe

4  it was beginning in 1979, they established regulations which

5  would establish very clearly what the monitoring method was

6  and how you site the monitors, how you run them, quality

7  assure them, how you submit the data.

8          So the standards are set.  Then the state and local

9  agencies following these criteria for monitoring, we buy the

10 monitors, site the monitors, collect the data, quality assure

11 it, send that in to U.S. EPA.

12         So the way that you determine whether or not you

13 attain the standard is based on monitoring, which is done in

14 accordance with the federal reference methods.

15 Q   What pollutants does RAPCA monitor for?

16 A   There are six National Ambient Air Quality Standards; and

17 we've monitored for all of those at some time in the past.

18 Currently, we monitor for carbon monoxide, sulfur dioxide,

19 ozone and particulate matter.

20 Q   And how many monitors does RAPCA operate?

21 A   It monitors at a number of sites.  With regard to the

22 federal reference method monitors, we operate 15 monitors at

23 12 sites.

24 Q   And Mr. Paul, do you have a demonstrative exhibit that

25 would help you explain where those monitors are located?

JOHN PAUL – DIRECT/DUNN          Vol. 2-231

1  A   Yes, I do.

2          MR. DUNN:  Could I have image 1, please?

3          For the record, Your Honor, this is Plaintiff's JP

4  Demonstrative 1.

5  BY MR. DUNN:

6  Q   Mr. Paul, what does this show?

7  A   This is actually a page from our website, our public

8  website.  What it shows is our six counties, and the location

9  and identification of the monitors across our six counties.

10 Q   And I notice that the monitors are spread out.  Why is

11 that?

12 A   Well, they're spread out because of a number of reasons.

13 Primarily, what we're trying to do is measure the air quality

14 as it enters our region, and the air quality as most of our

15 citizens and major population, what they're exposed to and

16 what they breathe.  And then the air quality as it leaves the

17 region.

18         So you'll see the site over there in Preble County,

19 it's 615.  At that location, we measure for PM2.5 and ozone,

20 which are the pollutants that we're going to be most concerned

21 with with regard to transport.  Then downtown, you'll see a

22 number of monitors.  That's because that's where most of our

23 population is.

24         And then once again, you see the monitors on the

25 outskirts up in Miami County, and then in Clark County we're

JOHN PAUL – DIRECT/DUNN          Vol. 2–232

1  measuring the air quality as it leaves our region.

2  Q    You mentioned PM2.5 and the ozone.  Are you generally as a

3  regulator familiar with how those pollutants form?

4  A    Yes, I am.  They can be ––PM2.5 can be emitted directly

5  but primarily we're concerned especially with regard to

6  transport of the –– the transport of precursors, NOX and SO2,

7  which form –– NOX contributes to the formation of ozone.  NOX

8  and SO2 contribute to the formation of fine particulates.

9           MR. DUNN:  Could I have image 3, please?

10          Your Honor, Cinergy has stipulated to the

11  authenticity and admissibility of this document, which is

12  marked as Plaintiffs' Exhibit 1907.  And so we'd move it into

13  evidence at this time.

14          MR. VOLPE:  Well, we may have stipulated it's not

15  hearsay, but we've not stipulated that this witness can offer

16  this exhibit.  They still need to lay a foundation for his

17  personal knowledge or information about the exhibit.

18          THE COURT:  All right.

19          MR. VOLPE:  One other thing.  I'm not sure the

20  relevancy of a Cinergy document that is commenting on proposed

21  rule making.  I'm certainly not sure of the relevancy of this

22  witness talking about that.

23          MR. DUNN:  I could ask just two questions to lay the

24  foundation.

25

JOHN PAUL - DIRECT/DUNN          Vol. 2-233

1          THE COURT:  All right.

2    BY MR. DUNN:

3    Q    First, let me ask you, Mr. Paul, are you familiar with the

4    EPA's air docket for filing comments?

5    A    Yes.

6    Q    And can you just identify for the record what this

7    document is?

8    A    Well, just reading from it, comments of Cinergy

9    Corporation on EPA's proposed rule to reduce interstate

10   transport of fine particulate matter and ozone.  And then

11   under that, it identifies the docket number which if one

12   wanted to, which I frequently do, you go to the

13   regulations.gov web page.  You enter the docket number and you

14   can look at the entire docket on a particular rule.

15         MR. DUNN:  Your Honor, if I could, Cinergy has

16   stipulated again that this document is authentic and

17   admissible.  I have a question about a particular page to ask

18   this witness if it's consistent with what he just said

19   essentially.

20         MR. VOLPE:  I'm sorry, consistent with what he just

21   said about the docket?

22         MR. DUNN:  No, what he said about PM and NOX.

23         MR. VOLPE:  Judge, again, Mr. Paul —

24         THE COURT:  You said he stipulated to its

25   admissibility.  Is that just not true?

JOHN PAUL - DIRECT/DUNN          Vol. 2-234

1          MR. DUNN:  I don't know what his objection is, Your

2   Honor.

3          MR. VOLPE:  My objection is whether Mr. Paul knows

4   anything about this document.  He's not an expert witness.  He

5   can't just be reading from documents regardless of whether

6   they're in the record.

7          THE COURT:  For what is it you want to use this

8   document?

9          MR. DUNN:  Well, your Honor, this document, as I

10   said, it's been stipulated to.  It's party admission.  If I

11   could get to image 4, I could explain.

12          THE COURT:  All right.  Go ahead.

13          MR. DUNN:  Image 4 please.

14   BY MR. DUNN:

15   Q   Mr. Paul, could you please read the highlighted text into

16   the record?

17   A   Reading the highlighted text from this document, it says

18   "NOX is a precursor to ozone, and NOX and SO2 are precursors

19   to PM2.5.  Thus, SO2 control addresses one environmental

20   problem, PM, whereas NOX control addresses two (ozone and

21   PM2.5.

22   Q   Mr. Paul, is that consistent with your understanding as a

23   regulator of the relationship between NOX, SO2, ozone and

24   particulate matter?

25   A   Yes, it is.

JOHN PAUL – DIRECT/DUNN        Vol. 2-235

1           THE COURT:  Do you have a problem with that?

2           MR. VOLPE:  No.  I'll let this one go.

3           MR. DUNN:  Your Honor, we'd move to admit Plaintiff'

4  Exhibit 1907.

5           THE COURT:  This highlighted matter?

6           MR. DUNN:  Well, your Honor, the entire document has

7  been stipulated to.

8           THE COURT:  Well, I'll allow it to show that Cinergy

9  and this witness have the same concerns about NO2 and SO2.

10          MR. VOLPE:  Thank you, Judge.

11          THE COURT:  Go ahead.

12     *(Plaintiffs' Exhibit 1907 was received in evidence.)*

13  Q   Mr. Paul, let's turn back to RAPCA's monitoring

14  responsibilities.  Why does RAPCA perform ambient monitoring?

15  A   There are a number of reasons.  First of all, we're going

16  to monitor the air quality because we want to know what it is

17  and be able to inform our citizens as to whether or not the

18  air quality meets the national ambient air quality standards.

19          Second of all, it's required under our contract and

20  under our grant to monitor for air quality.  In order to run

21  an air pollution control agency, you really need to collect

22  the air quality data so you can see how good a job you're

23  doing.

24  Q   Now, I think we've established there's six counties in

25  RAPCA's jurisdiction.  Are those counties in attainment with

JOHN PAUL - DIRECT/DUNN          Vol. 2-236

1  the National Ambient Air Quality Standards for PM2.5 and

2  ozone?

3  A   We are currently designated as non-attainment in three of

4  our counties for PM2.5.  We are currently designated as

5  attainment in all of our counties for ozone; but we do not

6  meet the proposed ozone standard in three of our counties.

7          MR. DUNN:  Could I have image 6, please?

8  BY MR. DUNN:

9  Q   Mr. Paul, I'm showing you what's been marked as

10 Plaintiffs' Exhibit 2066.  Do you recognize this document?

11 A   Yes, I do.

12 Q   What is it?

13 A   This is a document that was prepared to simply demonstrate

14 what our PM 2.5 monitored data are.

15 Q   And are the data set forth in this document reported from

16 the ambient air quality monitors that are operated by RAPCA?

17 A   Yes, they are.

18         MR. DUNN:  Your Honor, Cinergy has stipulated to the

19 authenticity and admissibility of this document, so we move it

20 into evidence at this time as Plaintiffs' Exhibit 2066.

21         MR. VOLPE:  No objection, Judge.

22         THE COURT:  The exhibit is admitted.

23    (Plaintiffs' Exhibit 2066 was received in evidence.)

24 BY MR. DUNN:

25 Q   Now, Plaintiffs' Exhibit 2066 is entitled 2007 PM2.5

JOHN PAUL - DIRECT/DUNN          Vol. 2-237

1  FRM—Monitor Summary Data.  Mr. Paul, do you have a

2  demonstrative that would help you explain what this exhibit is

3  showing?

4  A    Yes, I do.

5  Q    Image 7, please.  For the record, this is Plaintiff's JP

6  Demonstrative 4.  Can you please explain for the Court what JP

7  Demonstrative 4 shows?

8  A    Yes, I can.  This is the 2005 to 2007 PM2.5 federal

9  reference method monitor summary data.  These are in

10  micrograms per cubic meter.

11        What this shows is the columns go across the site

12  identification, the three-year average of the 24-hour

13  readings, the three-year average, the annual, and then the

14  county where the monitor is located.  So the real concern that

15  I have with our data as demonstrated by this chart, what we're

16  looking for in that second column to the right is 35,

17  35-micrograms per cubic meters, the 24-hour standard for

18  PM2.5.

19        So we're looking at trying to see values that are

20  below 35.  What we see at the Dayton library is 37.4.  So

21  2.4-micrograms per cubic meter on a 24-hour average above the

22  standard.

23        Site 15, New Paris, the air quality coming into our

24  region reads 33.9-micrograms per cubic meter.  Once again,

25  compared to 35, that's just under the standard.  It's

1    attainment, but it's just barely attainment.

2          The Springfield site shows 36.43.  Once again,

3    compared to the standard of 35, it's 1.43 micrograms per cubic

4    meter above the standard.  Then the Yellow Springs site in

5    Greene County, 33.03, once again, compared to 35, it's

6    attainment but it's just under it.

7          The significance here, to me as a regulator, and

8    specifically as a regulator of RAPCA is how close we are to

9    the standard, both when we exceed it and when we meet it.

10         The same holds true for the annual standard, which is

11   the next column over.  There we're looking for 15.0, and there

12   we see at the Dayton library, the annual standard 15.54.  So

13   this is non-attainment.  It's .54-micrograms per cubic meter

14   above attainment.

15         The others in the list there, once again, New Paris,

16   the air quality coming in, 13.88, just under the standard;

17   Springfield site, 14.78, really just under the standard; and

18   then Yellow Springs, 13.56.

19   Q   Just for the record, is the three-year average PM 2.5 data

20   in JP Demonstrative 4 the same data as set forth in

21   Plaintiffs' Exhibit 2066 except that the geographic locations

22   of the monitors have been added?

23   A   Yes, it is.

24   Q   Just practically speaking, how important would it be to

25   you as a regulator to achieve a reduction in ambient air

JOHN PAUL - DIRECT/DUNN          Vol. 2-239

1  quality levels of something on the order of a tenth of a

2  microgram per cubic meter?

3          MR. VOLPE:  Objection, Your Honor.  He's asking for

4  an opinion from this witness.  The witness has not been

5  designated as an expert.

6          THE COURT:  The question was how important is it to

7  you?

8          MR. DUNN:  Yes, Your Honor.  How important as a

9  practical matter given his responsibilities to comply with --

10         THE COURT:  I'll let him answer that.  Go ahead.

11 A   Well, it's very important to us.  If you take .15 or .1 --

12 let's take .15-micrograms per cubic meter on the annual

13 average, and you look at the non-attainment site, Dayton

14 Library, 15.54, obviously .15 -- I mean, our objective is to

15 get to 15, to get under 15.

16         So in order to do that, we have to reduce the ambient

17 air quality level by .54-micrograms per cubic meter.  So if

18 you told me that there was a strategy out there that could get

19 us .15, which is nearly one-third of the way there toward

20 attainment, I would consider that very important.

21 Q   Let's turn to ozone.  Do you have a slide that would help

22 you explain how close to the attainment levels your counties

23 are for ozone?

24 A   Yes, I do.

25         MR. DUNN:  Could I have Image 8, please.  For the

JOHN PAUL — DIRECT/DUNN          Vol. 2-240

1  record, this is JP Demonstrative 5.

2  BY MR. DUNN:

3  Q    What does this slide show?

4  A    What this shows is the 2005 to 2007 ozone summary data,

5  and whereas the standard -- the old standard was 84 and we are

6  attainment for that, here is how close we are to the new

7  standard.  The new standard is 75 parts per billion; and

8  you'll see data which are similar to what we saw with PM 2.5,

9  the closeness to the standard.

10         So we operate six federal reference methods for ozone.

11  The first column shows where those are cited.  The second

12  column shows the three-year average, what we're measuring.

13         Once again, we're trying -- we're looking for 75 or

14  below here; and once again, we're very close.  Our downtown

15  site, 76.  So it's just one part per billion above the

16  standard.  Xenia 80, 5 parts per billion above the standard.

17  Enon, 78, 3 parts per billion under the standard.  New Paris

18  or Preble County, the air quality coming into the area is at

19  75.  So it's right at the standard.

20         Springfield, 80, 5 parts per billion above the

21  standard and then Casstown, site No. 619, 75, and Miami

22  County, right at the standard.

23  Q    Based on your nationwide experience at NACAA, are those

24  slim margins for PM2.5 and ozone typical of what you've seen

25  in other jurisdictions nationally?

JOHN PAUL – DIRECT/DUNN          Vol. 2-241

1          MR. VOLPE:  Objection, Your Honor.

2          THE COURT:  He can answer that from his experience.

3  Go ahead.

4  A   Yes, they are.  As a practical matter, both as in my job

5  at RAPCA and in my national positions, and through our

6  pollutant committees where we talk a lot, I've looked at

7  specifically the data for Ohio.  I've looked at the data for

8  the region -- throughout Region 5.  I've looked at the data

9  nationally.

10          We've discussed these data in our committee calls.

11  These are typical pretty much across the eastern half of the

12  United States.  There are a number of regions which have

13  similar monitoring data, which is either just above the

14  standard or possibly just below the standard.)

15  Q   What does that slim margin tell you as a regulator?

16  A   Well, it tells me a number of things.  It certainly tells

17  me that we're close to the standard.  It also tells me that if

18  we can find effective control measures that make an impact,

19  that those are measures that we want to see fully implemented

20  so that we can meet the standard and provide air that meets

21  the National Ambient Air Quality Standards across the country.

22  Q   Again, based on your experience with NACAA, is that true

23  nationally as well?

24  A   Based on my experience with NACAA, yes, that's true.

25  Q   As a factual matter, does all PM 2.5 and ozone measured by

JOHN PAUL - DIRECT/DUNN          Vol. 2-242

1 your monitors originate from sources within your jurisdiction?

2 A   As a practical matter, no, it doesn't.

3 Q   What as a regularity in Ohio can you do about out-of-state

4 sources?

5 A   Well, especially as a local regulator, it's very difficult

6 for us to effect controls outside of our region and especially

7 outside of our state.  So that's one of the reasons why our

8 agency is so involved in the national association because we

9 need to make sure that the national measures are effective and

10 are implemented and are enforced across the nation.

11 Q   Are you familiar with the term "emissions inventory"?

12 A   Yes.  Emissions inventory is basically that.  It's the

13 inventory of the emissions in a particular area.

14 Q   And so are you familiar with the point source inventory

15 for the RAPCA area?

16 A   Yes, I am.

17 Q   What is a typical year's number for a total SO2 emissions

18 in your jurisdiction in terms of tons per year?

19 A   In terms of tons per year, typically for SO2 from all the

20 point sources in all of our six counties is around 10,000,

21 11,000-tons per year SO2 from all of our point sources.

22 Q   I'd like to shift to another topic.  Are you familiar with

23 EPA's air quality index?

24 A   Yes, I am.

25 Q   Do you have a demonstrative exhibit that would help you

JOHN PAUL - DIRECT/DUNN          Vol. 2-243

1  explain what the air quality index is?

2  A   Yes, I do.

3         MR. DUNN:  Could I have image 9, please.  Could you

4  call out the bottom half of that perhaps.

5         For the record, this is JP Demonstrative 6.

6  BY MR. DUNN:

7  Q   Could you explain for us what this is showing?

8  A   This is from EPA's website.  It shows the air quality

9  index.  The air quality index is a uniform method of

10 communicating with the public with regard to the air quality

11 that we're experiencing.

12        You'll see it ranges from good all the way to

13 hazardous.  You'll see both the description and the colors,

14 and you'll see numerical values and then meaning.  So this is

15 the uniform method of communicating to the public with regard

16 to air quality.

17 Q   Okay.  Is there a practical or numerical relationship

18 between these AQI numerical values and the National Ambient

19 Air Quality Standards?

20 A   Yes, there is.  Generally, the national ambient air

21 quality standard is equivalent to 100 on the air quality

22 index.

23 Q   Okay.  What does 100 mean with respect to the description

24 of the air quality index?

25 A   Well, it would be moderate air quality, and then I can

JOHN PAUL - DIRECT/DUNN          Vol. 2-244

1  just read the meaning straightforward.  "Air quality is

2  acceptable; however, for some pollutants, there may be a

3  moderate health concern for a very small number of people who

4  are unusually sensitive to air pollution."

5          So that means that when we are reporting an air

6  quality index of between 51 and 100, there are people that

7  should be paying attention to that and should be adjusting

8  their behaviors in accordance with that because they may

9  experience health effects at those levels.

10 Q   And those levels are set at levels that meet the National

11 Ambient Air Quality Standards?

12 A   In general, yes.

13 Q   How does your agency use the air quality index?

14 A   Well --

15 Q   Let me just ask you this:  Do you use it to forecast air

16 quality conditions?

17 A   Yes, we do.

18 Q   Do you have a demonstrative exhibit that would help you

19 explain an example of such a forecast?

20 A   Yes, I do.

21          MR. DUNN:  Image 2, please.

22          For the record, this is JP Demonstrate 7.

23 BY MR. DUNN:

24 Q   What is this?

25 A   This is from the Airnow website, which is where all of the

JOHN PAUL - DIRECT/DUNN          Vol. 2-245

1  forecasts and air quality index numbers are accumulated.  So

2  this is run by EPA.  If I were going to New York City

3  tomorrow, I could look at this, see what the air quality is

4  today and what it's forecasted for in the future.

5        This particular page was captured on Saturday, and

6  you'll notice this is for Dayton.  You'll notice that the

7  current air quality is listed there as moderate.  We had on

8  Friday forecast air quality for over the weekend; and so

9  you'll see that we had forecast moderate air quality for

10 Saturday; and we had forecast moderate air quality for

11 yesterday.

12        MR. DUNN:  Could you just call up the top half?  I'm

13 having a hard time reading it.  Thanks.

14 BY MR. DUNN:

15 Q   So I think you just said -- I apologize if I missed it.  I

16 think you said the forecast for Saturday -- this was Friday.

17 The forecast for Saturday was moderate.  What does moderate

18 mean?

19 A   Once again, reading from this, and since this is with

20 particulate matter, there is a health message with PM 2.5 at

21 the moderate level which states that unusually sensitive

22 people should consider reducing prolonged or heavy exertion.

23        MR. DUNN:  Next image, please, image 11.  For the

24 record, this is JP Demonstrative 8, and it was also identified

25 as Chinkin Demonstrative Exhibit 2.

JOHN PAUL – DIRECT/DUNN          Vol. 2–246

 1  BY MR. DUNN:

 2  Q    Could you explain for the Court what this shows?

 3  A    Once again, this is from EPA's website, Airnow.  And what

 4  it shows is just how the air is forecast across the nation.

 5  Much like a weather map, this is an air quality forecast map.

 6  Q    What do the yellow areas on the map represent?

 7  A    The yellow areas represent moderate air quality as

 8  forecast for those areas.

 9  Q    Why do you forecast moderate air quality?

10  A    Well, we're forecasting air quality so that people can

11  plan their activities.  And especially with regard to the PM

12  2.5 and the importance of moderate, there are people that

13  experience health effects at these levels.

14  Q    Mr. Paul, you're aware that the remedy that Cinergy has

15  proposed in this case is to shut down Wabash River Units 2, 3

16  and 5 in September 2012?

17  A    In general, yes --

18          MR. VOLPE:  Objection, Your Honor.  Again, he's not

19  an expert witness.  He's a fact witness.

20          THE COURT:  So where are we going here?

21          MR. DUNN:  Your Honor, I'd ask for Mr. Paul's

22  experience as a practical matter concerning whether or not he

23  has any practical concerns about Cinergy's proposed remedy

24  that are important to a regulator like himself.

25          MR. VOLPE:  Judge, you can call it a practical

JOHN PAUL - DIRECT/DUNN          Vol. 2-247

1  experience all you want, but it's still expert opinion.  He's

2  offering an opinion about what's --

3          THE COURT:  It's really -- expert opinion is

4  something that is designed to be of assistance to the Court or

5  to the fact-finder that they might not otherwise have some

6  view about or have to have explained.  It doesn't seem to me

7  that the testimony of a regulator, that he's going to be

8  concerned about rising air quality problems as a particular

9  matter for expert testimony.

10          MR. VOLPE:  I understand that, Judge.  We've got

11  that testimony.

12          THE COURT:  We do.  Let me finish.

13          MR. VOLPE:  Okay.

14          THE COURT:  So what we end up with is a witness who

15  is, with his testimony, pretty much saying the same thing that

16  a lawyer could say in the argument, which is exactly what you

17  want to do.  What you're going to testify is this is a

18  regulator, and any regulator worth his salt would be worried

19  about this.  That's a part of your argument.  So we really

20  don't need the testimony on the one hand; but it's not expert

21  testimony on the other hand.

22          MR. VOLPE:  No, it's opinion testimony.  It is

23  opinion testimony.

24          THE COURT:  What I've done is agree with you, you

25  see.

JOHN PAUL - DIRECT/DUNN          Vol. 2-248

1          MR. VOLPE:  I'm sitting down then.

2          THE COURT:  It's a good time to sit down.

3          But the important notion is, and it happens all the

4 time, not just in this case, witnesses who have particular

5 backgrounds are then asked about -- to answer a question that

6 the lawyer has written up for his final statement.  So we can

7 always refer to that; but you don't really need to do that.

8          You've got what you need to make the argument that

9 you want to make in this case.  We don't have to have him go

10 through and agree with your argument.  I know he's going to

11 agree with your argument.

12          MR. DUNN:  I'll move on, Your Honor.

13          THE COURT:  Okay.

14          MR. VOLPE:  Thanks, Judge.

15 BY MR. DUNN:

16 Q   Mr. Paul, as the administrator of RAPCA, are you familiar

17 with the consequences of having a county designated as

18 non-attainment?

19 A   Yes, I am.

20 Q   And is that true from a national perspective as well based

21 on your experience at NACAA?

22 A   Yes, it is.

23 Q   What are some of the practical consequences that you see

24 from having a county designated as non-attainment?

25 A   The biggest consequence is -- it's obvious that this is

JOHN PAUL - DIRECT/DUNN          Vol. 2-249

1  air that is not meeting National Ambient Air Quality

2  Standards.  So I'm concerned with that.

3          Second of all, when we have air which does not meet

4  the National Ambient Air Quality Standard, we work with the

5  state and prepare a plan to meet the standard.

6          So we have air quality.  We have emissions.  We have

7  to improve air quality.  We have to reduce emissions.  So that

8  means that existing industry in the area is going to have to

9  put on further controls.  So there's going to be an economic

10 impact.  It's going to cost them money to put on those

11 controls.

12         They also, if they wanted to expand or build a new

13 source, there's more stringent New Source Review requirements

14 for a non-attainment area.  So it may be that industry will

15 leave.  It may be that industry will be precluded from

16 expanding.  It may be that certain industries won't even

17 consider coming into the area because it's non-attainment and

18 they would have to meet more stringent standards.

19 Q   You mentioned adverse economic impacts in addition to the

20 adverse health impacts.

21         Do you know whether Duke agrees about the adverse

22 economic impacts of a non-attainment designation?

23             COURT REPORTER:  You'll have to repeat that.

24             MR. VOLPE:  Objection.

25 Q   Do you know whether Duke agrees about the adverse economic

JOHN PAUL - DIRECT/DUNN          Vol. 2-250

1  impacts of a non-attainment designation?

2  A   It's my understanding that they do.

3  Q   Can I have image 12, please.

4       Mr. Paul, we're showing you what's been marked as

5  Plaintiffs' Exhibit 2067.  I asked you this previously but

6  I'll ask it again.  Are you familiar with EPA's air docket for

7  submitting comments on proposed regulations?

8  A   Yes, I am.

9  Q   And does this docket indicate that it was submitted to the

10 air docket --

11          COURT REPORTER:  I'm sorry, please slow down.

12          THE COURT:  Maybe you ought to turn around three

13 times.

14          MR. DUNN:  I feel like it.

15 BY MR. DUNN:

16 Q   Let's see.  I think I asked you this but I'm just going to

17 back up.  Are you familiar with EPA's air docket for

18 submitting comments on proposed regulations?

19 A   Yes, I am.

20 Q   Does this document which has been marked as Plaintiffs'

21 Exhibit 2067 indicate that it was submitted to the air docket

22 for EPA's proposed particulate matter standards?

23 A   Yes, it does.  In the Attention line, it says "Docket ID

24 No. EPA-HQ-OAR-2001-0017," which it then identifies under that

25 as the National Ambient Air Quality Standards for Particulate

1  Matter Proposed Rule.

2          MR. DUNN:  Your Honor, this exhibit was the subject

3  of an exchange between the parties trying to resolve

4  objections.  I believe Cinergy objected to a prior version of

5  this document which was originally produced by Cinergy in an

6  unsigned form.

7          However, I believe that Cinergy has agreed to

8  stipulate if we provided a signed copy from the EPA air

9  docket, which we did, and that we have previously provided to

10  Cinergy; so I would move to enter Plaintiffs' Exhibit 2067 as

11  a party admission.

12          MR. VOLPE:  Again, Judge, this witness has, simply

13  by looking at the EPA docket, he wants to now testify about

14  what's in this document.  It's not his document.  It doesn't

15  matter that we've stipulated that the authentic.  It doesn't

16  matter that we've stipulated it's not hearsay.  He's not the

17  proper witness to bring this document in.  He is not an expert

18  witness in this case.  He is simply reading from a document.

19          MR. DUNN:  Your Honor, I think this actually

20  highlights a problem with -- what Cinergy is saying, it

21  highlights a problem.  They've stipulated to the authenticity

22  and admissibility of a number of documents that are clearly

23  party admissions.  I don't think it makes a lot of sense for

24  us to have to go through a foundation --

25          THE COURT:  Why do you need this witness to read a

JOHN PAUL - DIRECT/DUNN          Vol. 2-252

1  document?  What is it about this witness that makes this

2  important?

3          MR. DUNN:  Your Honor, it's following up on his last

4  answer about the economic consequences of non-attainment.

5          THE COURT:  And so your idea is then you bring this

6  page up and have him read it, and say, see, they agree with

7  this?

8          MR. DUNN:  Yes, Your Honor.

9          THE COURT:  And there are other ways you can do that

10 without having this witness do it.  I don't think it's -- I

11 think generally this is an authentic document.  You don't need

12 the witness to go through the matters of authentication.  I

13 think it's within the discretion of the Court to say yes or no

14 on this kind of technique.  I'm going to let you do it with

15 this one.  There are other ways to do it that are more --

16 well, that are just -- that brush the Rules of Evidence less

17 closely.

18         MR. VOLPE:  Okay.

19         THE COURT:  I'm going to let you do this.

20         MR. DUNN:  If Your Honor would prefer, I would just

21 be happy to move this document into evidence just now.

22         THE COURT:  You think that would make me happy, do

23 you?

24         MR. DUNN:  We could be more efficient that way.

25         THE COURT:  I'm going to let him answer the

JOHN PAUL – DIRECT/DUNN          Vol. 2–253

1  question.  Go ahead and answer the question.

2          MR. VOLPE:  I'm sorry, just for the record, we'll

3  object to the relevance of this document.

4          THE COURT:  Okay, and I'll overrule that.  You may

5  answer.

6  BY MR. DUNN:

7  Q   Image 13, please.  Could you read the highlighted portion

8  into the record, Mr. Paul.

9  A   Yes, I will.  "A non-attainment designation discourages

10 new industry from locating within such areas, and may prevent

11 existing industries from expanding, both of which have

12 significant impacts on jobs and local economies.  The

13 additional requirement imposed on industrial sources within

14 these areas may cause some facilities to shut down and

15 relocate leading to an erosion of jobs.  Lost jobs, wages and

16 increased costs for energy and consumer products create an

17 adverse real-world impact."

18 Q   Thank you, Mr. Paul.  No further questions.

19         THE COURT:  Cross-examine?

20         MR. VOLPE:  Thank you, Your Honor.

21                    **CROSS EXAMINATION**

22 BY MR. VOLPE:

23 Q   Good morning, Mr. Paul.  I'm Frank Volpe, counsel for

24 Cinergy.

25 A   Good morning.

*PAUL – CROSS/VOLPE*              Vol. 2-254

1  Q   I would like to mark a demonstrative here.

2        While this is warming up, I'll ask you a few

3  questions.  Mr. Paul, I take it from your long and successful

4  tenure at the Regional Air Pollution Control Agency, that

5  you've never worked as an EPA employee; is that true?

6  A   That's correct.

7  Q   And you've never worked for the Indiana Department of

8  Environmental Management; is that true?

9  A   That is true.

10  Q   And I understand your agency has certain delegated

11  authority from the Ohio EPA; is that right?

12  A   Yes, we do.

13  Q   But you've never been an Ohio EPA employee; is that true?

14  A   That is true.

15  Q   I just wanted to -- this is a very bad copy.  Does it look

16  as bad on your screen as it does on mine?

17  A   It does, but I think -- I can recognize it, I think.

18  Q   This is the -- what we've marked as Defendants'

19  Demonstrative Exhibit 49, and this is a printout from the

20  Quality of Air Means Quality of Life web page that you

21  referenced in your direct testimony.  Do you remember that?

22  A   Yes, I do.

23  Q   All right.  And you'll see that the current air quality --

24  and you'll see that Dayton is marked there, right?

25  A   Yes, I do.

*PAUL - CROSS/VOLPE*                    Vol. 2-255

1  Q   And you see the current air qualities in Dayton are green,

2  G, good, right?

3  A   That's correct.

4  Q   And today's forecast is G for good?

5  A   Actually, I think that's -- yes, for Tuesday, yes.

6  Q   For Tuesday.  I'm sorry, right.

7       Then tomorrow's forecast is green, G for good, right?

8  A   Correct.

9  Q   So I think it's fair to say, Mr. Paul, that the air

10 quality changes in Dayton, Ohio; is that true?

11 A   It changes across the nation, yes.

12 Q   Okay.  So you didn't mean to imply by that other

13 demonstrative, the one that the Plaintiff showed you, that the

14 air quality in Dayton is always in the moderate level, did

15 you?

16 A   I meant to imply that the air quality was moderate at the

17 time that we downloaded that.

18 Q   I take it, Mr. Paul, that if we looked at that weather map

19 that you looked at on direct, and we looked at it for today,

20 we would not see those yellow blotches sitting over the top of

21 Dayton; is that correct?

22 A   I would have to look at it to comment on that.

23 Q   You know, I only had a black and white copy of that.  So

24 if I represented to you that I looked at the map this morning

25 and there were no yellow blotches over the city of Dayton,

*PAUL - CROSS/VOLPE*                    Vol. 2-256

1  would you agree with me?  Would you trust me on that?

2  A    I'd rather look at it myself.  I mean, it's not that I

3  don't trust you.

4  Q    All right.

5            THE COURT:  The question is would you have any

6  reason to dispute my notion.  See, that makes it easier.

7            MR. VOLPE:  Thanks, Judge.

8  BY MR. VOLPE:

9  Q    All right.  Now, you mentioned that one of the reasons you

10 don't -- you want to be in attainment is because it has

11 economic repercussions, correct?

12 A    That's one of the reasons, yes.

13 Q    So it's important to not have your area designated as

14 non-attainment, right?

15 A    As a local regulator, I'm concerned because I live in the

16 area, because I -- the plant manager of a plant may be my

17 neighbor.  So I'm concerned about the air quality primarily in

18 my job, but I'm also concerned about the economic condition of

19 the area also.

20 Q    And let me ask you, do -- does -- do the motor vehicles in

21 Dayton, Ohio, contribute to the non-attainment status of the

22 area?

23 A    Which non-attainment?

24 Q    The PM 2.5?

25 A    They contribute, yes.

*PAUL - CROSS/VOLPE*                  Vol. 2-257

1  Q   Have you measured that contribution?

2  A   We have done the emissions inventory, and so we look at

3  that, yes.

4  Q   Can you quantify that for us?

5  A   Not specifically right now, but I can say that motor

6  vehicles do contribute to the non-attainment problem.

7  Q   They contribute significantly, don't they?

8  A   Well, you asked specifically about PM2.5.  And I cannot

9  say the significance of the motor vehicle impact on the PM2.5

10 non-attainment problem.

11 Q   I wanted to ask you one other question.  This is

12 Plaintiffs' Demonstrative Exhibit -- I'm not sure what number

13 it was.

14        MR. DUNN:  I think it's JP1.

15 Q   As I understand this exhibit, Mr. Paul, Preble is the

16 western-most county of your area?

17 A   Yes.  We pronounce it Preble.

18 Q   Preble?

19 A   Correct.

20 Q   And so I understood that the importance of having a

21 monitor at Preble is to determine the air that's coming into

22 your area; is that right?

23 A   That's correct.

24 Q   I wanted to ask you about this demonstrative here.  It's

25 the New Paris --

*PAUL – CROSS/VOLPE*                    Vol. 2-258

1    THE COURT:  Can we identify that for the record?

2    MR. VOLPE:  I'm sorry, this is Plaintiff's

3 Demonstrative, which is entitled 2005-2007 PM2.5 FRM-Monitor

4 Summary Data.

5    What was the number again?

6    MR. DUNN:  4.

7    MR. VOLPE:  Plaintiff's Demonstrative 4.

8 BY MR. VOLPE:

9 Q   So New Paris would be the monitor that sits on the

10 western-most part of your region, correct?

11 A   That's correct.

12 Q   That's the monitor that's monitoring the air coming in?

13 A   When the wind is from the southwest, which is the

14 predominant direction of the wind, yes.

15 Q   So when the wind is from the southwest, which is the

16 predominant direction, it's the New Paris monitor that's

17 monitoring the air coming into the area, right?

18 A   That's correct.

19 Q   As I understood what you said before, the three-year

20 average of the 98 percentiles is 33.9, which is below the max

21 level, correct?

22 A   That is correct.

23 Q   And then the three-year average of annual averages is

24 13.88; is that right?

25 A   That's correct.

*PAUL — CROSS/VOLPE*                    Vol. 2-259

1  Q    And that's below the max standard as well?

2  A    It's below the current max standard, yes.

3  Q    So the first monitor in your region that reads the air

4  coming into your jurisdiction shows that the max levels --

5  that the emissions levels are below the max standards; is that

6  correct?

7  A    That's correct.  They're below, but they're very close to

8  the standard.

9         MR. VOLPE:  I don't have any further questions,

10 Judge.

11        THE COURT:  Thank you.

12        Redirect?

13        MR. DUNN:  Briefly.

14                    **REDIRECT EXAMINATION**

15 BY MR. DUNN:

16 Q    Mr. Paul, as a local regulator, can any single source of

17 sulfur dioxide be responsible for non-attainment of PM 2.5

18 standards?

19 A    Theoretically, that's possible, yes, because if you're

20 very close to the standard and you have a definite

21 contribution from a source, then that source can make the

22 difference between attainment or non-attainment.

23 Q    And is that -- for the same question, is that true in your

24 national experience as well?

25 A    Yes, it is.

PAUL – REDIRECT/DUNN                    Vol. 2–260

1          MR. DUNN:  No further questions.

2          THE COURT:  Anything else?

3          MR. VOLPE:  Nothing, Judge.

4          THE COURT:  You may step down.

5     (Witness excused.)

6          MR. DUNN:  Your Honor, may I leave the well with the

7    witness?

8          THE COURT:  Yes.

9          Your next witness?

10         MS. LUKAS-JACKSON:  Your Honor, we call Dr. Charles

11   Driscoll, please.

12    (Witness sworn.)

13         THE COURT:  You may inquire.

14        **CHARLES DRISCOLL, PLAINTIFF'S WITNESS, SWORN**

15                   **DIRECT EXAMINATION**

16         MS. LUKAS-JACKSON:  Thank you, Your Honor.  I'm

17   Jennifer Lukas-Jackson with the United States.  In keeping

18   with our practice, I'll give you a brief statement about

19   Dr. Driscoll and what he's going to provide testimony on.

20         Dr. Driscoll is a distinguished professor of

21   environmental engineering at Syracuse University, and for more

22   than 30 years he has been studying, analyzing and writing

23   about the adverse effects of air pollutants like sulfates,

24   nitrates and mercury on the health of soil, water, trees and

25   fish.

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-261

1  BY MS. LUKAS-JACKSON:

2  Q   Dr. Driscoll, could you state your full name for the

3  record, please?

4  A   Charles Thurston Driscoll, Jr.

5  Q   Dr. Driscoll, you work at Syracuse University; is that

6  right?

7  A   That's correct, yes.

8  Q   What's your area of expertise?

9  A   I'm an environmental engineer and the focus of my work is

10 on air pollution effects on ecosystems.

11 Q   In broad terms, what was your assignment in this case for

12 Plaintiffs?

13 A   I was asked to evaluate effects of sulfur dioxide, NOX and

14 mercury on ecosystems in the study region.  And I broadly

15 define the study region as the upper Midwest and eastern U.S.,

16 and I was specifically asked to look at the emission patterns

17 from the Wabash River facility relative to those sensitive

18 areas with respect to air pollutant impacts.

19 Q   Excuse me, do you have the microphone on?

20         THE COURT:  Is that light on?

21         THE WITNESS:  It is, the green light, yes.  Am I not

22 speaking loud enough?

23         THE COURT:  Put it up higher on your tie.  That's

24 better.

25         MS. LUKAS-JACKSON:  If we could have image 1.  This

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-262

1  is Plaintiffs' Exhibit 1904.  This is the curriculum vitae of

2  Dr. Driscoll.  And this has been stipulated to as nonhearsay

3  and authentic, and I move it into evidence as Plaintiffs'

4  Exhibit 1904.

5          MS. THOMSON:  No objection, Your Honor.

6          THE COURT:  It's admitted.

7      (Plaintiffs' Exhibit 1904 was received in evidence.)

8  BY MS. LUKAS-JACKSON:

9  Q   Could you describe your educational background,

10 Dr. Driscoll?

11 A   Yes.  I received my bachelor's degree in civil engineering

12 from the University of Maine, and I received my master's and

13 Ph.D. in environmental engineering from Cornell University.

14 Q   What's your current title at Syracuse?

15 A   I'm a professor in the Department of Civil and

16 Environmental Engineering at Syracuse.

17 Q   Do you serve in other departments other than the civil and

18 environmental engineering department?

19 A   Yes, I have joint appointments in the departments of

20 biology, earth science and chemistry.

21 Q   What courses do you typically teach?

22 A   I teach an undergraduate course in Introductory

23 Environmental Engineering.  I teach a course in Chemical

24 Modeling.  I teach a course in a subject called

25 biogeochemistry which refers to the transformation and cycling

DRISCOLL – DIRECT/LUKAS-JACKSON        Vol. 2-263

1  of elements globally and locally, and I teach some seminar

2  courses as well.

3  Q   Do the courses you teach -- you mentioned briefly -- do

4  they involve air quality modeling and interpretation of air

5  quality modeling results?

6  A   Yes.

7  Q   Describe briefly those courses.

8  A   We talk about the nature of models, actually some of the

9  materials that were discussed yesterday in terms of the

10 various types, plume models and grid models, how they work,

11 what the output are, how one would interpret the results of

12 those calculations, yes.

13 Q   And do you teach courses that involve or touch on the

14 human health impacts for mercury deposition?

15 A   Yes.  Actually in the undergraduate class and the graduate

16 biogeochemistry class, we have sections on mercury.  We talk

17 about mercury as a pollutant including effects on human health

18 and wildlife.

19 Q   In looking at your CV, it's very extensive so we'll just

20 touch on some highlights.  You have funded research indicated

21 in your CV; is that right?

22 A   That's correct.

23 Q   And how is your research funded?

24 A   It's primarily funded from federal sources, competitive

25 grant programs, primarily through groups like the National

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-264

1  Science Foundation, Environmental Protection Agency.  I do

2  have -- I have had some industrial funding before.  I

3  currently have a project with Honeywell.  I've been previously

4  supported by the Electric Power Research Institute, and I do

5  have some state funding through the New York Energy Research

6  and Development Authority.

7  Q   Can you characterize your areas of research?

8  A   Yes.  So I do mostly field-based research and we also do

9  some modeling studies.  We examine effects and transformations

10  of acidic deposition on forest and aquatic systems.  We also

11  do studies looking at mercury inputs, transformations and

12  effects on plants and animals.

13  Q   Which of your research projects are particularly relevant

14  to your work that you did for this case?

15  A   I have a lot of projects on acid rain and mercury, and so

16  there are a large number of projects that are relevant to this

17  case.  So I've been working on this problem for a long time.

18  Q   If you had to give it a percentage, what percent would you

19  say of your work is related to this work in this case?

20  A   I would say maybe two-thirds to three-quarters of my work

21  is on air pollution effects on ecosystems.

22  Q   In several places in your CV, you cite to work conducted

23  at the Hubbard Brook Experimental Forest.  For example, on

24  page 108, you indicated that the National Science Foundation

25  funded research on long-term ecological effects and research

DRISCOLL — DIRECT/LUKAS-JACKSON        Vol. 2-265

1  regarding those effects at the experimental forest.

2        Could you describe the nature of your work at the

3  Hubbard Brook Experimental Forest?

4  A    Yeah, the Hubbard Brook Experimental Forest is run by the

5  USDA Forest Service.  It's a long-running ecological study.

6  It's been operated since the mid fifties.  It involves

7  approximately 75 researchers —— senior researchers down to

8  students maybe from 20 institutions.  So it's really an

9  ecosystem study.  And we focus on looking at effects of

10 disturbance such as clear-cutting climate change as well as

11 air pollution.

12       As part of that operation, we set up a friends group a

13 few years ago called the Hubbard Brooks Research Foundation,

14 and that group, as part of its activity, does outreach work.

15 We've done outreach projects on acid rain, nitrogen pollution

16 and mercury, and given briefings to Congress and various

17 agencies about these problems.

18 Q    Are you on the board of the Hubbard Brook Science

19 Foundation?

20 A    Yes.

21 Q    Do you have a particular title with respect to the

22 research conducted at the experimental forest?

23 A    Well, I am the principal investigator of the long-term

24 ecological research study, which is sort of the flagship study

25 at the site.

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-266

1  Q    Could you provide some detail about the scope of the

2  science link mercury project in particular?

3          COURT REPORTER:  I'm sorry, could you repeat that?

4  Q    Sure.  Could you provide some detail about the scope of

5  the science link mercury project?

6  A    As I mentioned, this is an outreach activity, and what is

7  involved is a synthesis of information on the particular

8  problem; in this case, mercury.  So this was done a few years

9  ago.  Our reports were released in 2007.  And we work as a

10 team involving people who are -- who have expertise in

11 emissions, atmospheric transformations, watershed ecosystem

12 effects, effects on wildlife --

13         COURT REPORTER:  Excuse me?  "Watershed" --

14 A    Watershed processes, effects on wildlife and human health

15 effects.  And we provided a synthesis of the mercury pollution

16 problem.

17         And then as part of our outreach activities, we gave

18 briefings to Congress, various agencies -- federal agencies,

19 state agencies, state health groups -- to try to inform these

20 individuals about the nature of mercury problem as there was a

21 lot of discussion going on about how to regulate mercury in

22 electric utilities.

23 Q    Has your research involved analyzing air pollution in the

24 Midwest in particular?

25 A    Yes.  We've had several projects over the years looking at

1  air pollution effects in the Midwest.  We've done a number of

2  projects looking at effects of acid rain on lakes in the

3  Midwest; and we're currently involved in a large project

4  funded through the EPA called the Glad Program, Great Lakes

5  Atmospheric Deposition program, to do a synthesis for the

6  Great Lake states, including Indiana, much like we did through

7  the Hubbard Brook Research Foundation which was largely

8  focused on the eastern U.S.

9  Q   How is the data from the Great Lakes Atmospheric

10 Deposition project used by health departments and resource

11 managers?

12 A   Well, our plan again is to provide a synthesis of the

13 status of mercury contamination in the Great Lakes region and

14 to take that information and provide it to resource managers

15 so that they can better make decisions and inform the public

16 about the nature of the contamination.

17 Q   Your publications are listed in your CV on pages 79

18 through 103; is that right?

19 A   That's correct.

20 Q   And how many papers have you written that have been

21 published in peer review journals or books?

22 A   Some -- over 300.

23 Q   The Institute for Scientific Information considers you a

24 highly-cited researcher.  What does that mean?

25 A   Within various disciplines, individuals when their papers

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-268

1  are cited a lot are given this designation.  So I was given

2  this in two areas, environmental science as well as

3  engineering.

4  Q    The national committees you've served on are listed on

5  pages 105 through 107 of your CV, correct?

6  A    Yes.

7  Q    Could you describe for us your relevant work for national

8  committees on which you currently serve?

9  A    Yes.  I'm currently on a multi-agency committee that's

10 working to develop a national mercury monitoring program.  I

11 am also on the CASAC committee, which is the Clean Air Science

12 Advisory Committee similar to Dr. Schwartz discussed that

13 yesterday.

14         I'm also on the clean air compliance committee, again,

15 from the EPA.  So I'm involved -- I'm on a state committee to

16 review the status of mercury contamination in New York.  So

17 I'm on a few national and state committees.

18 Q    And what awards or honors have you received for your work?

19 A    I've gotten a few awards.  I've been fortunate enough to

20 be on some national research council committees.  You

21 mentioned earlier the Institute for Scientific Information

22 designation.  Early in my career, I was designated as a

23 presidential young investigator, and a couple years ago, I was

24 inducted in the National Academy of Engineering.

25 Q    Now, earlier you mentioned related to the Hubbard Brook

DRISCOLL – DIRECT/LUKAS-JACKSON        Vol. 2-269

1  Experimental Forest Science Link program that you had provided

2  testimony to Congress; is that right?

3  A    That's correct.

4  Q    And what did that testimony involve specifically?

5  A    Well, I've testified to Congress a few times; but for that

6  time in particular, we gave briefings for staff on the mercury

7  analysis that we had conducted both on the House and Senate

8  side.

9        There was follow-up.  I was asked to testify in a

10 Transportation Committee meeting about mercury contamination

11 in surface waters in the U.S.  So there was some follow-up

12 committee testimony as well.

13 Q    Did the testimony that you provided regarding the effects

14 of mercury contamination involve both effects to bio and

15 wildlife as well as human effects?

16 A    That's correct.

17 Q    Have you been accepted as an expert in court previously?

18 A    I have.

19 Q    On how many occasions?

20 A    Twice.  I was involved in a case a number of years ago,

21 about 20 years ago, a state case in the state of Minnesota,

22 again, an air pollution case.  Then recently this past summer,

23 I was involved in the Tennessee Valley Authority-North

24 Carolina case in Asheville.

25 Q    Thank you, Dr. Driscoll.

DRISCOLL - DIRECT/LUKAS-JACKSON      Vol. 2-270

1          MS. LUKAS-JACKSON:  Your Honor, at this time, I

2  tender Dr. Driscoll as an expert in environmental engineering,

3  particularly in the effects of air pollution on ecosystems

4  including wildlife and human.

5          THE COURT:  I guess, this will be No. 3.

6          MS. LUKAS-JACKSON:  I'm sorry?

7          THE COURT:  This will be No. 3.  He's been accepted

8  twice.  This will be No. 3.

9  BY MS. LUKAS-JACKSON:

10 Q   All right.  Before we begin talking about your opinions in

11 this case, Dr. Driscoll, let's briefly cover some background.

12         We've already heard from Mr. Chinkin that SO2 is a

13 precursor to sulfates and NOX is a precursor to nitrates.  How

14 does sulfate and nitrate contribute to acid rain?

15 A   Well, sulfate in the form of sulfuric acid, and nitrate in

16 the form of nitric acid are the major components of acid rain.

17 Q   And simply stated, what is acid rain or what I think we'll

18 refer to in your testimony today as acidic deposition?

19 A   So the sort of the general common term is acid rain as you

20 indicate, but acidic deposition actually refers to three ways

21 in which materials from the atmosphere can be deposited to

22 land surface.

23         It can become incorporated in precipitation or it can

24 fall directly as gases and particles.  That's what we commonly

25 refer to as dry deposition.  Then finally, in the high

1 elevation areas or in coastal areas, it can occur as cloud or

2 fog deposition.

3 Q   Can you state again what the geographic area was that you

4 studied for your opinions on acidic deposition for this case?

5 A   Yes.  I studied the area-included information in the area

6 from the upper Midwest ranging from Minnesota eastward,

7 central Appalachia Mountain area, as well as the northeastern

8 U.S.

9 Q   The study area includes the state of Indiana; is that

10 right?

11 A   Yes, that's correct.

12 Q   Did you conduct any analysis of the emissions and

13 transport of SO2 and NOX from the Wabash River Units 2, 3 and

14 5?

15 A   I did.  I used the information that was presented

16 yesterday, developed by Sonoma Technologies by Mr. Chinkin and

17 Wheeler on the emission patterns for sulfur dioxide and

18 nitrogen oxide, and looked at the transport pattern of these

19 materials relative to sensitive areas that I examined in my

20 report.

21 Q   You used the term "sensitive" areas.  What is a sensitive

22 area?

23 A   Sensitive areas with respect to acidic deposition are

24 generally at high elevations.  They're generally forested

25 areas, and specifically for the purposes of this study, they

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-272

1  include areas of northern Minnesota, Michigan, Wisconsin,

2  areas into New York and New England, the Appalachian Mountain

3  areas.  Actually, there's been some recent analysis to suggest

4  that the area of southern Indiana is fairly sensitive as well.

5  So I included those broad areas, included scientific

6  information from the literature pertaining to impacts of

7  acidic deposition in those areas.

8  Q   Now, you seem to indicate that acidic deposition is what

9  you analyzed for sensitive areas, but does acidic deposition

10 also affect nonsensitive areas?

11 A   It does.  There will be -- there can be fairly subtle

12 effects on areas that are considered to be insensitive.  I

13 didn't focus on that for my analysis.  I really focused on the

14 areas that were severely impacted by acidic deposition where

15 there was very clear effects, you know, that have been

16 published in the scientific literature on effects of acidic

17 deposition, on soils, trees, surface waters.

18 Q   Let's turn back to what you did do for this case.  Did you

19 attempt to trace emissions from Wabash River 2, 3 and 5 and

20 measure or calculate the effects on particular areas?

21 A   No.

22 Q   Why didn't you do this?

23 A   I didn't do this for a few reasons.  First of all, there

24 was limited time; but probably more importantly, the patterns

25 that were shown yesterday and that I discussed in my expert

DRISCOLL – DIRECT/LUKAS–JACKSON        Vol. 2–273

1  report in terms of the overall emission patterns are very

2  similar to what has been done in other studies in modeling

3  efforts and trajectory analysis using a variety of approaches.

4  So I think it's fairly well established.  Those general

5  transport patterns of materials are fairly well established in

6  the scientific literature.

7          Then also, as we talked about briefly, I've been

8  involved in a few cases and I've done similar exercises

9  looking at the specific contributions of facilities.  What you

10 find is depending on the proximity of the source to the

11 receptor, the sensitive areas, you see some contribution from

12 that facility.

13         And most importantly, I focused on those areas that

14 are already clearly impacted by acidic deposition, so that any

15 inputs would make the problem worse or any reductions would

16 make the problem better because these areas have already been

17 clearly identified as having severe impacts.

18 Q   I guess this ties into my next question, but what

19 conclusions did you draw from your review and analysis of the

20 Chinkin and Wheeler modeling of Wabash River's emissions?

21 A   Yes.  So as I said, I examined the general trajectory

22 pattern.  It's similar to what we've done in other studies and

23 other people have reported that there's a general transport of

24 these materials in a northerly direction and an easterly

25 direction; and they are transported over, you know, many

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-274

1  hundreds of miles.  So they're certainly capable of long-range

2  transport and subsequent deposition.

3  Q   So now let's turn to your opinions on the effects of

4  acidic deposition on forest ecosystems and freshwater aquatic

5  ecosystems.  If we could have Image 2, please.  For the

6  record, this is CD Demonstrative 1, and the caption is

7  "Emissions, Deposition and Effects."

8        In general terms, Dr. Driscoll, in what ways does the

9  deposition affect the health of forest and freshwater aquatic

10 ecosystems of the Midwest and eastern United States?

11 A   Well, this diagram illustrates the process of acidic

12 deposition and its effects.  So the materials are emitted to

13 the atmosphere.  They undergo a number of transformations that

14 was discussed yesterday, and eventually they're deposited.  A

15 few minutes ago we talked about the mechanisms of deposition.

16       They will impact soils and they will affect those

17 soils, modifying their chemical characteristics, and those

18 effects will have implications to the trees and plants that

19 are growing on those soils.

20       As they affect the soil, they also affect the soil

21 water.  So therefore, they impact the surface waters that

22 drain from these watersheds and will have subsequent effects

23 on aquatic organisms.

24 Q   Let's take each of those in turn.  We'll focus on forest

25 ecosystems first, and get into a little more detail.  In what

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-275

1  way is the health of soil important to a healthy forest?

2  A   Well, soil is critical.  That's where the plants obtain

3  their nutrients and their water.  That's really the foundation

4  for the ecosystem.  So it's actually fundamental to the health

5  of ecosystems.

6  Q   How does soil function in environments where acidic

7  deposition is low?

8  A   Well, an important aspect of soil and its role in

9  regulating the acid-based status of ecosystems is the

10 breakdown of minerals that are native to the soil.  So these

11 minerals, as they break down or weather, they release

12 materials like calcium or magnesium which are retained in

13 soil.

14      So soil provides a mechanism to buffer or to hold

15 these materials.  Then they can be drawn up by plants for use

16 as nutrients.  Calcium and magnesium are both important plant

17 nutrients.

18 Q   What happens to soil once inputs of acidic deposition are

19 increased?

20 A   Well, when acidic deposition enters a forest system, there

21 are really three broad impacts.  First of all, the sulfur

22 nitrogen that enter the system, some of that is retained

23 within the soil.

24      The second effect is that these materials, sulfate and

25 nitrate, are acids and they have the ability to leach or

DRISCOLL – DIRECT/LUKAS–JACKSON          Vol. 2–276

1  mobilize calcium and magnesium from soil.  So they leach the

2  calcium from soil; and as the systems are typically sensitive,

3  they have low reserves –– naturally low reserves of calcium

4  magnesium.  So the acidic deposition accelerates the leaching

5  of these materials.

6        And then third, the soil matter itself, the backbone

7  of soil is really aluminum and aluminum oxides.  In the

8  presence of acids, this aluminum can dissolve and start to

9  unravel, if you will.  And the release of aluminum is

10  significant because aluminum is toxic to plants and it's also

11  toxic to aquatic organisms as well.

12  Q   Can soil reach a point where it can't handle additional

13  inputs of acids?

14  A   Yes, that's clearly the case.  When the basis in soil,

15  calcium magnesium, have been leached, to a large extent the

16  soil has the inability to neutralize the acidity.  Then the

17  soil is compromised, and it shows low concentrations of

18  calcium magnesium and high concentrations of aluminum, and the

19  acidity will be leached to adjacent surface waters.

20  Q   Has this been observed anywhere to your knowledge?

21  A   Yes.  It's been observed in the areas I've discussed, the

22  sensitive areas, the upper Midwest and the Northeast and the

23  central Appalachian areas.  All those areas show these sorts

24  of symptoms.

25  Q   If the inputs of acidic deposition were reduced, what

1   would happen to the damaged soils?

2   A   Well, sort of a critical issue with respect to recovery is

3   that acidic deposition has cumulative long-term effects.  So

4   the inputs of acidic deposition have been occurring for

5   decades.

6         So these materials, which are inherently sensitive,

7   have been leached by these acids for a long time, and they

8   accumulate, as we discussed, some sulfur and nitrogen.  They

9   also show this leaching of calcium.  So reductions in acidic

10  deposition are good.  It reduces the problem to some extent;

11  but recovery is very slow because the sulfur and nitrogen that

12  had previously accumulated with soil under low inputs, that

13  starts to bleed out and that will delay the recovery.

14        Then finally, the calcium and magnesium that have been

15  leached from soil, recovery is -- only really occurs when

16  those materials are allowed to go back; and that requires the

17  native breakdown of these rocks and minerals which is

18  extremely slow in these sensitive areas.

19  Q   And does it matter when reductions in acidic deposition

20  occur, for example, one year from now or four years from now?

21  A   Well, these systems have already been impacted, and there

22  are clear effects.  So with respect to ecosystem recovery, the

23  greater the extent of reductions, and the sooner, the faster

24  the reductions, the faster recovery.  So there are advantages

25  in terms of reducing emissions and doing it as soon as

DRISCOLL – DIRECT/LUKAS–JACKSON        Vol. 2–278

1  possible.

2  Q   And turning to another aspect of the health of forest

3  ecosystems, how does a tree normally interact with soil?

4  A   The trees take up a lot of their nutrients through roots

5  and a lot of their water through roots.  So their interactions

6  with the soil are critical to their survival.

7  Q   Once soil damage from acidic deposition occurs, how does

8  this affect the vegetation like trees?

9  A   Well, first of all, there is a depletion of available

10  calcium and magnesium to these sites.  So they have a

11  restricted pool of calcium and magnesium from soil that they

12  are unable to take up.

13      The other problem is associated with aluminum.  The

14  aluminum will associate with the roots.  It will be taken up

15  directly.  It's a toxic substance, but it will also impede the

16  uptake of nutrients, specifically calcium magnesium and also

17  water.  So it represents a stress to the plant.  So those two

18  conditions can impair tree health.

19  Q   Could we have Image 3, please.  This is CD

20  Demonstrative 2.

21      Dr. Driscoll, how does this photo relate to what you

22  just described?

23  A   Okay.  So this is a photo.  It's actually from the

24  Allegheny National Forest in Pennsylvania.  It's a stand of

25  sugar maple.  And this is an area –– this particular stand is

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-279

1  in a site where the soils are very low in calcium.  And there

2  are -- we are fortunate that there is some historical

3  information on soil calcium.  So it's fairly well documented

4  that over the last -- since the '30s, there's been very marked

5  decreases in soil available calcium magnesium and increases in

6  soil aluminum.

7        This has resulted in low concentrations of calcium

8  magnesium from the soil to the plant, and then the tree

9  becomes more susceptible to drought stress and insect stress.

10  This is a stand of sugar maple that's doing very poorly and

11  it's largely because of insect infestation.

12        Also, I should add that low calcium concentrations

13  restricts regeneration of sugar maple.  So if a stand like

14  this is on low calcium soils, it will not regenerate.  Once

15  the overstory trees die out, sugar maple won't come back.

16        MS. LUKAS-JACKSON:  Let's have Image 4, please.

17  This is CD Demonstrative 3.

18  BY MS. LUKAS-JACKSON:

19  Q   Does this photo also demonstrate what you were describing

20  with respect to the effects of acidic deposition on sugar

21  maples?

22  A   Well, partially.  This is a slide of red spruce.  You can

23  see sort of the yellowing or oranging at the tips of the

24  needles.  That represents needle damage.  That needle damage

25  is associated with low calcium conditions, low calcium uptake.

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-280

1      Part of that is because of the depletion of calcium
2  from soil like we talked about occurs in sugar maple, but in
3  the case of red spruce, red spruce is found in very high
4  elevations, along the ridge tops of mountains.  It receives
5  very high inputs of acidic deposition, and particularly cloud
6  deposition, which directly leaches the calcium from the
7  foliage from the needles.
8      The mechanism here is that the calcium maintains the
9  integrity of membranes within the needles; and the loss of
10  this membrane-bound calcium, particularly in younger age
11  classes of needles will cause problems for the tree under very
12  cold conditions.
13      So this particular photograph was taken after a very
14  cold winter and there was reduced cold tolerance from the red
15  spruce, and then needle damage, and under extreme conditions,
16  mortality to the trees.
17  Q   And you just mentioned "mortality."  I take it trees can
18  actually die off from these conditions?
19  A   They can.
20  Q   And they can fail to continue to reproduce; is that right?
21  A   Yes.
22  Q   So it sounds like trees are affected both from the damaged
23  soil through their roots and also from above from acidic
24  deposition through rain and sleet and snow?
25  A   That's correct.

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-281

1  Q    And are each of these cumulative effects?

2  A    These are cumulative effects which are really manifested

3  through these processes in soil.  The long-term leeching and

4  depletion of stocks of calcium and magnesium from soil as well

5  as the accumulation of sulfur and nitrogen that occurs in

6  soils.

7  Q    All right.  Let's turn to your opinions on the effects of

8  acidic deposition on fresh water aquatic ecosystems.  First,

9  if you could say in layman's terms what's a freshwater aquatic

10  ecosystem?

11  A    Lake, stream, river.

12  Q    And in general terms, in what ways does acidic deposition

13  affect lakes and streams in the Midwest and in the eastern

14  United States?

15  A    Well, there are really two aspects of it.  There is an

16  increase in acidity and an increase in concentrations of

17  aluminum.  So organisms that are present in lakes and streams,

18  they are sensitive to those conditions.

19        The acidity, one way of quantifying it is through a

20  measurement which is called pH.  PH is a measurement of the

21  acidity.  It's a little bit confusing term.  It's a

22  logarithmic quantity.  So a normal, you know, natural stream

23  unimpacted by acidic deposition might have a pH around 7 or

24  6.5.  So that is what we call neutral pH.

25        As the acidity increases, the pH decreases.  I'll give

DRISCOLL - DIRECT/LUKAS-JACKSON      Vol. 2-282

1  you a couple of examples to put this in context.  If you

2  measured the pH of precipitation in this region, it would be

3  somewhere on the order of 4 to 4.5, something like that.  So

4  that is many orders of magnitude more acidic than 7.  We think

5  natural precipitation has a pH of about 5.5.  So 4.5 would be

6  10 times more acidic than background or precipitation that's

7  unimpacted by acidic deposition.

8        In some of the streams and lakes that we study in the

9  most impacted areas, those will show pH values of around 5 or

10 even below 5.  So a pH of 5 would be 100 times higher in

11 hydrogen than a pH of 7.  So it's a logarithmic scale.  It

12 increases exponentially as you get lower and lower.

13 Q   How does acidification effect the health of biota living

14 in these lakes and streams?

15 A   There's really three ways acidification can effect

16 organisms.  It can effect individual organisms.  The organism

17 that's exposed -- like fish that's exposed to low pH and high

18 aluminum conditions, that results in an energetic cost to

19 these organisms.  So the growth rate will be reduced.

20       In fact, there have been studies done on individual

21 fish that have shown physiological responses to acidification

22 stress where there's an accelerated loss of electrolytes.  So

23 there's impacts on the individual organism.

24       There's also population level impacts.  So there have

25 been studies done in the laboratory, in the field doing what

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-283

1  we call cage trial experiments where we put organisms within a

2  restricted environment in cages and we watch their response to

3  certain conditions.  So certain types of organisms will be

4  impacted as well, certain species of organisms.

5          The third way is really sort of a community or

6  ecosystem response, where a whole group of organisms like fish

7  or a whole ecosystems like aquatic ecosystems could be

8  impacted.

9  Q   So let's give an overview of each one of those.  It sounds

10 like acidification you said affects an individual fish?

11 A   That's correct.

12 Q   And if it needs -- or excuse me, if energy is expended --

13 excess energy is expended to grow because of acidification, it

14 stunts its growth; is that right?

15 A   Yes.  Its growth is curtailed.  Fish that are impacted by

16 acidic deposition tend to be skinnier.  It's something we call

17 a condition factor.  It's the light to weight ratio.  So their

18 growth is impaired.

19 Q   What is one of the effects from acidification on the

20 population of a species particularly related to reproductive

21 growth?

22 A   Well, the organisms, the life history stages, at least

23 with respect to fish that are most sensitive are the youngest

24 life history stages, the eggs and the fry.  So those life

25 history stages are impacted first; and usually the fish are

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-284

1  basically eliminated from the population at young life history

2  stages.  So that results in a recruitment failure.

3  Eventually, the older fish die out and then the population is

4  eliminated.

5  Q   How does acidification affect communities in lakes and

6  streams?  You touched on this briefly.

7         If we could have Image 5, please.  This is CD

8  Demonstrative No. 4.

9  A   Yes.  So this is a table figure which tried to illustrate

10  the sensitivity of different types of organisms to different

11  pH conditions.  So I have sort of a pH range in the corner

12  where impacts start to occur.

13        At pH 6 to 6.5, that's where the impacts are first

14  realized, and only the most sensitive species, such as this

15  fathead minnow here, would be impacted by these conditions.

16        Then if we move down to the next range of pH where you

17  start to get below 6, again, very sensitive individuals start

18  to be impacted.  So this is a figure of a Mayfly.  Mayflies

19  are very sensitive as are caddisflies.  Again, certain species

20  of fish are quite sensitive.  Then they would start to -- they

21  would fall out of the community.

22  Q   And if I could just stop you, May fly are important food

23  to other organisms, particularly fish; is that right?

24  A   Yes, they're part of the food chain --

25             MS. THOMSON:  Objection.

DRISCOLL – DIRECT/LUKAS-JACKSON        Vol. 2–285

1          THE COURT:  Because it was a leading question?

2   Well, it certainly was.

3   A   Mayflies are important for the community but they're also

4   part of the food chain.  And fish like May flies.

5   Q   Please continue.  You can discuss the next --

6   A   So then if we start to get in the range of 5.5 to 5, then

7   you start to see impacts on fairly sensitive species of fish

8   and to less sensitive species of fish.

9          So let me give you an example.  Lake trout is a fairly

10  sensitive species of fish.  They will eventually be eliminated

11  when the pH starts to get down to about 5.5.  Brook trout on

12  the other hand is a very tough fish, and it's very tolerant to

13  acidic conditions, but once the pH gets down to around 5, even

14  a very tolerant fish like Brook trout can't survive.

15         So you get down below pH 5 and there are very few

16  organisms that can survive.  In fact, when you get down to

17  those conditions, the chemical conditions in lakes in the most

18  highly-impacted regions are fishless.  They don't have the

19  chemical conditions that would allow for a fishery to be

20  supported.

21  Q   Do you observe these extreme conditions anywhere?

22  A   Yes, in some of these study sites, we've seen these

23  extreme conditions, yes.

24  Q   Do the adverse effects of acidic deposition on soils have

25  a cumulative effect on lakes and streams?

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-286

1  A    They do because the emissions of sulfur dioxide have

2  actually peaked in 1973, and since that time, we've seen

3  long-term, slow decreases in emissions of sulfur dioxide,

4  decreases in sulfate in precipitation, decreases in sulfate in

5  surface waters all throughout the study region that I've been

6  talking about, upper Midwest, extending on to Maine.  But the

7  recovery of surface waters, we do see very slow recoveries,

8  but they're extremely slow.

9        The reason for this delay in recovery is because of

10 these processes we discussed previously, the stripping of

11 calcium and magnesium from soil which previously served the

12 role of neutralizing the acidity.  That has been basically

13 washed and eliminated from the soil.  So the neutralization

14 mechanisms have been lost.  And also there's a long-term

15 accumulation of sulfur and nitrogen that under lower

16 deposition starts to bleed out of the soil and also delays the

17 recovery process.

18 Q    So if acidic deposition inputs were reduced, would it

19 reduce the harm to lakes, streams and therefore things living

20 in them, like fish?

21 A    It does, but it occurs very, very slowly.  We're starting

22 to see some recovery of surface waters, but it's not as fast

23 as people, I think, had anticipated with the Title 4 that we

24 talked about last time.  So it is going on, but it's a very,

25 very slow process.

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-287

1  Q   And again, similar to soils but in turn with respect to

2  lakes and streams, does it matter when reductions in acidic

3  deposition occur?

4  A   Yes.  Again, as I said, the systems have already been

5  impacted.  So the greater the reductions and the sooner the

6  reductions, the faster and greater the recovery.

7  Q   And are your opinions on the adverse effects of acidic

8  deposition within the consensus of other researchers in the

9  scientific community?

10  A   Yes.  I think that there's complete consensus in the

11  scientific community about the things that we've talked about

12  today which are really sort of mainstream research.

13       There have been over the last 15, 20 years any number

14  of state of the science documents which say the same thing and

15  talk about these processes.  So there's clear consensus about

16  these phenomena in the -- among the scientific community.

17  Q   So in other words, if you tried to apply with a grant to

18  study this issue, do you think your grant would be accepted?

19  A   Not a chance.  Not a chance.  The science is too well

20  developed.

21  Q   All right.  Dr. Driscoll, do you have an opinion about the

22  effect of mercury deposition on ecosystems in the Midwest and

23  the upper eastern United States?

24  A   Yes.

25  Q   What's that opinion?

DRISCOLL – DIRECT/LUKAS-JACKSON        Vol. 2-288

1  A   The opinion is that the ecosystems of the upper Midwest

2  are receiving its mercury input overwhelmingly through

3  atmospheric deposition, and that there are widespread

4  contamination of mercury in fish.  That's of interest because

5  our exposure to mercury is largely overwhelmingly through the

6  consumption of fish.

7  Q   Mercury is a naturally-occurring element, is it not?

8  A   That's correct.

9  Q   Could we have Image 6, please?  This is CD

10  Demonstrative 5.  It's labeled Quicksilver Clouds.

11      What does this figure show, Dr. Driscoll?

12  A   So this conceptual diagram illustrates, much like the acid

13  rain figure that we saw a few moments ago, the nature of

14  mercury transport and transformations in the environment.

15      So mercury is released from a variety of sources.  We

16  talked about natural sources, so things like volcanos.  There

17  are naturally mercury rich soils that are released to the

18  atmosphere.  There are human processes that release mercury

19  such as coal-fired power plants, other industrial processes;

20  and then finally, mercury that had been previously released

21  from human activities can then be deposited on the soil and

22  converted by a photochemical reaction back to a gaseous

23  mercury and go back up into the atmosphere.

24      So those three mechanisms are the major form by which

25  mercury is supplied to the atmosphere.

1  Q   You touched on this just partially in your response just

2  now, but what are the different forms of mercury -- or excuse

3  me.  What are the different forms that mercury can take as

4  it's emitted into the atmosphere?

5  A   Yes.  Mercury -- there are three major forms of mercury.

6  The first is elemental mercury.  Elemental mercury is like the

7  mercury you'd have in a thermometer.  When I was a school boy,

8  our teachers used to give us beads of mercury and we would

9  amalgamate dimes.  So that's elemental mercury and that has a

10  relatively long resonance time in the atmosphere.  That can be

11  transported globally, although there are mechanisms by which

12  it can be deposited locally.

13        The other two forms are forms of oxidized mercury,

14  either in a gaseous or particulate form.  These materials are

15  deposited generally close to the source on the order of hours

16  to days; and they are transported on the order of 200,

17  250 miles from the source -- 0 to 250 miles.  So those are

18  more local to regional sources.

19  Q   Do the different forms of mercury have characteristics

20  that influence how it's transported in the air from the

21  source?  You mentioned that elemental mercury has a longer

22  resonance time?

23  A   Yes, right.  So elemental mercury has a longer resonance

24  time.  It's considered to be a global pollutant, but it can

25  also be deposited locally or regionally; and oxidized mercury,

DRISCOLL - DIRECT/LUKAS-JACKSON      Vol. 2-290

1  either particulate or gaseous mercury has characteristics

2  which will allow it to fall out relatively close to the source

3  on the order of hours to days.  So that tends to be

4  transported locally to regionally.  So 0 to maybe 250 miles

5  from where it was emitted.

6  Q   As stated in your expert report, you looked at the Wabash

7  River mercury emissions from Fox and Taylor; is that right?

8  A   That's correct.

9  Q   Describe your review of their information.

10 A   So Fox and Taylor -- I think the thing that I took away

11 from their report was that the mercury emissions were largely

12 in the oxidized form.  So therefore, I would anticipate that

13 they would be deposited relatively close to the source because

14 of the nature of oxidized mercury.  So within, as I said

15 before, maybe 0 to 250 miles.

16 Q   Based on your review, did you draw any conclusions from

17 that data?

18 A   So the -- there would be clear benefits if those emissions

19 were eliminated, there would be clear benefits to Indiana and

20 adjacent states because they wouldn't be receiving these

21 levels of emissions.

22 Q   So if Wabash River mercury emissions were reduced or

23 eliminated, where do you think you would find the benefits?

24 A   Largely locally to Indiana and maybe adjacent states like

25 Illinois and Ohio and north and south, yeah.

DRISCOLL – DIRECT/LUKAS-JACKSON        Vol. 2-291

1  Q   What's the fate of mercury once it's deposited on the

2  earth's surface?

3  A   Once mercury is deposited on the earth's surface, there

4  are three potential pathways.  It can be retained in soil and

5  then maybe bleed out at a later date.  That's something we

6  don't know a lot about but that's been hypothesized.

7       I mentioned it also can be converted by a photo

8  chemical reaction to elemental mercury and be reemitted back

9  to the atmosphere.

10       Then finally, it can be transported with water --

11 drainage water to downstream wetlands and lakes and streams.

12 So those are the three pathways.

13 Q   So what transformations occur to mercury once it is in the

14 soil before it enters the lakes and streams?

15 A   Well, one of the critical processes is something that we

16 refer to as methylation.  Within wetlands and lake sediments,

17 there are certain bacteria that occur in those types of

18 environments that we call sulfate-reducing bacteria.

19       So these bacteria take sulfate from a source and as

20 part of their processing of that sulfur, they convert

21 inorganic mercury, the mercury that comes in from the

22 atmosphere, to a new form which is called methylmercury.

23 Methylmercury is important because that's the form that

24 biocumulates in food chains and that's the form that's found

25 in fish.

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-292

1  Q   So it sounds like -- is there a link between the sulfates

2  found in acidic deposition and mercury?

3  A   Yes.  There have been a number of studies -- actually,

4  most of the studies done in this region where people have

5  looked at the linkage between the formation of methylmercury,

6  even the formation of mercury in fish and inputs of sulfur.

7       What they found is that additional inputs of sulfate

8  enhance the formation of methylmercury; and when sulfate is

9  decreased, that process is decreased and even they've linked

10 that to reductions in fish mercury.  So sulfur is very

11 important in transformations of mercury, as well as mercury

12 itself.

13       MS. LUKAS-JACKSON:  If I could have Image 7, please.

14 This is CD Demonstrative 6, and it's captioned Mercury in

15 Fish.

16 BY MS. LUKAS-JACKSON:

17 Q   Dr. Driscoll, what does this chart tell us about mercury

18 levels in fish?

19 A   So these are data from this large survey that I discussed

20 earlier when we were doing the introductory material, part of

21 this Science Links program.  What we did for this is we worked

22 with state agencies, and we compiled a lot of state

23 information.  And I should add a provincial -- the provinces

24 of Quebec and Ontario were included in this as well.  So we

25 compiled a lot of information on mercury in fish, different

DRISCOLL - DIRECT/LUKAS-JACKSON      Vol. 2-293

1  types of fish.  There were over 20,000 observations.  This is

2  for the eastern states as well as Ontario and Quebec.

3  Q    If I can just stop you.  You say 20 observations but what

4  really in this context -- excuse me -- 20,000 observations,

5  but what are these 20,000 observations?

6  A    These are fish mercury concentrations.

7  Q    Are these actual tissue samples?

8  A    Correct, yes.

9  Q    Go ahead.

10  A    So these are ordered in terms -- of those samples, these

11  represent the 13 most abundant fish where we had the most

12  samples for.  Each one of these represents several hundred

13  observations.  And they're ranked from the lowest, which is

14  brown bullhead at the top of the page, to walleye, which is at

15  the bottom of the page.  What this shows is their average

16  mercury concentration.  For a point of reference, I drew a red

17  line through there -- vertically through the page at .3 parts

18  per million.

19  Q    What's the significance of the .3 parts per million?

20  A    That's the advisory value that EPA recommends to states to

21  use for their consumption advisories.  So what this analysis

22  shows is that of the 13 most abundant fish, 10 have average

23  values above the .3 part per million advisory criterion.  Some

24  species are well in excess such as walleye, lake trout,

25  Northern Pike, well in excess of those values.

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-294

1  Q   What does this say in a nutshell about the extent of
2  mercury contamination in fish?
3  A   It says it's very high.  I think it's important to point
4  out that really the mercury that gets into fish occurs through
5  the aquatic food chain.  So we talked about methyl mercury
6  being produced.  And that methyl mercury is taken up once it
7  enters lakes and streams by algae and bacteria.
8        Then if insects consume that, there will be an
9  increase in their methyl mercury content, maybe by a factor of
10 10,000.  Then when small fish, prey fish eat the insects, it
11 will maybe go up to a factor of 100,000.  Then when larger
12 fish, such as trout or bass, then consume these prey fish, the
13 concentration of methyl mercury will go up by a factor of
14 maybe a million to ten million.
15       That's how relatively low concentrations in water can
16 be translated to relatively high concentrations in fish, and
17 that why our exposure to mercury is overwhelmingly through
18 consumption of fish.
19 Q   How does methyl mercury affect fish and animals?
20 A   Methyl mercury is a neurotoxin, and so it has -- it
21 affects neurological function in all animals.  So with respect
22 to fish, it alters their behavior, and it alters their
23 reproductive success.
24       In other animals, like birds that consume fish, like
25 eagles and mergansers and loons and maybe otter and mink, it

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-295

1  will have behavioral affects.  It will affect their -- in the

2  case of birds, their nesting success and their reproductive

3  success.  So it's a neurotoxin and it's manifested through

4  those types of occurrences.

5  Q   Is this a cumulative effect?

6  A   This is a cumulative effect, yes.

7  Q   And is it reversible to your knowledge?

8  A   It is reversible.  So we have done studies actually in

9  southern New Hampshire.  We were very fortunate.  There was a

10 large effort to reduce mercury emissions from a number of

11 large sources in southern New Hampshire.  And we showed -- we

12 found remarkable decreases over a very short period of time of

13 mercury in fish and in loons.

14 Q   Are there mercury fish consumption advisories?

15 A   Yes.

16 Q   And how pervasive are they across the United States?

17 A   Every state has a mercury -- at least one mercury

18 consumption advisory, including Indiana, including all the

19 states in the study reason.

20 Q   Why are there fish consumption advisories?

21 A   Because as we talked about previously, exposure to mercury

22 occurs through consumption of fish.

23 Q   What happens to humans if they're exposed to mercury?

24 A   Well, mercury is a neurotoxin and it will affect

25 cognitive -- people's cognitive function, sensory function.

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-296

1  Individuals who are most sensitive are young children and

2  women of childbearing age.  Actually, there's been recent

3  concern about linkages to cardiovascular disease.

4  Q   Are your opinions on the adverse effects of mercury

5  deposition consistent with the consensus of other researchers

6  in the scientific community?

7  A   Yes, there have been -- since the mercury report to

8  Congress, there have been numerous synthesis critical reviews

9  of mercury much like acid rain, and there is a lot of

10  consensus among the scientific community about the mechanisms

11  of mercury transfer and exposure.

12          There's more uncertainty with respect to mercury than

13  acidic deposition, but it's a very widespread problem.

14          MS. LUKAS-JACKSON:  If I could have Image 8, please.

15  This is Plaintiffs' Exhibit 1913.  It's a USGS chart, and I

16  believe it has been stipulated as authentic and nonhearsay;

17  and at this time I move to admit it into evidence as

18  Plaintiffs' Exhibit 1913.

19          MS. THOMSON:  We have no objection, Your Honor.

20          THE COURT:  The exhibit's admitted.

21    (Plaintiffs' Exhibit 1913 was received in evidence.)

22  BY MS. LUKAS-JACKSON:

23  Q   Dr. Driscoll, if we could focus in on the bottom half of

24  the document, please.  What's the status of mercury -- well,

25  first of all, what is this document?

DRISCOLL - DIRECT/LUKAS-JACKSON        Vol. 2-297

1  A    This document is a recently released report by the U.S.

2  geological survey about mercury in Indiana.  In fact, there

3  was an article in yesterday's paper -- front page of the paper

4  about dealing with some of these issues, which I think was a

5  result of this report.

6  Q    As noted on this document, what's the status of mercury

7  advisories in Indiana according to U.S. geological survey?

8  A    So can I paraphrase?

9  Q    Certainly.

10 A    Okay.  So what this report says is that as of 2006, there

11 are about 3,000 miles of streams, about 40,000 acres of lakes,

12 and about 60 miles of Great Lakes shoreline in Indiana for

13 which there are mercury consumption advisories.

14        So to try to put that in significance, the author has

15 indicated that there are in excess of a million people in the

16 state that fish.  So that includes older individuals greater

17 than 16 years old, as well as young folks.  They spend, every

18 year, 15.5 million days fishing and spend $470 million on

19 their fishing.

20        So it's very widespread.  People in Indiana like to

21 fish.  So that translates to one out of every six individuals

22 in Indiana potentially being impacted by these fish

23 consumption advisories.

24 Q    What would be the benefit, Dr. Driscoll, of reducing

25 mercury emissions from Wabash River in your opinion?

1  A   Well, my understanding from the Taylor and Fox analysis is

2  that over the period, if there were controls that would be put

3  in, they estimated that there would be about a thousand pounds

4  of mercury over that period that would not have been released.

5        So as we talked about previously, that mercury is

6  thought to have been largely in the oxidized form of mercury.

7  So that means that that mercury falls out close to the source.

8  By close, I mean, say, within zero to 250 miles; so nearby.

9  So that means that there would be less mercury deposition to

10 Indiana and the adjacent states.

11       And the state has clearly problems with respect to

12 mercury.  The article in the paper talked about high

13 concentrations in streams.  There are a number of

14 advisories -- fish consumption advisories that we talked about

15 here.  So that reduction -- the source of that mercury is

16 largely -- in fish, is largely from atmospheric deposition.

17 So reductions in the loading from the Wabash River facility

18 would go to improve this situation of mercury contamination in

19 the state and adjacent states.

20       MS. LUKAS-JACKSON:  Thank you, Dr. Driscoll.

21       I have no further questions, Your Honor.

22       THE COURT:  How long do you suppose you would take

23 here?

24       MS. THOMSON:  Very brief.

25       THE COURT:  Go ahead.

1              **CROSS EXAMINATION**

2  BY MS. THOMSON:

3  Q    Good morning, Dr. Driscoll.  I'm Katie Thomson.  I'm one

4  of the attorneys for the Cinergy Companies.  You and I have

5  had the opportunity to meet on a couple of prior occasions; is

6  that right?

7  A    That's correct, yes.

8  Q    If I understand correctly the testimony that you're

9  offering in court today concerns the impacts of air pollutants

10 on a variety of ecosystems.  Is that a correct statement?

11 A    Ecosystem types, yes.

12 Q    The pollutants specifically on which you've testified are

13 SO2 and chemicals formed from SO2; is that correct?

14 A    That's correct.

15 Q    And nitrogen oxides and chemicals formed from nitrogen

16 oxides; is that correct?

17 A    Correct.

18 Q    And mercury and chemicals formed from mercury; is that

19 correct?

20 A    That's correct.

21 Q    I believe you testified that you teach courses involving

22 the application and interpretation of air quality modeling; is

23 that correct, or a fair characterization of your testimony?

24 A    Yes.

25 Q    Also from your CV and testimony today, you indicated one

DRISCOLL – CROSS/THOMSON          Vol. 2-300

1  of your areas of research is also air quality or environmental

2  quality modeling; is that correct?

3  A    That's correct.

4  Q    But again, you testified today that you didn't do any

5  modeling to quantify the impacts of Wabash River emissions on

6  ecosystems.  That's correct, too?

7  A    That's correct.

8  Q    And I believe you said the reason for that is because you

9  didn't have time?

10 A    Well, actually, I gave three reasons.  That was one of

11 them.

12 Q    What were your other two, just to be clear?

13 A    My other two were that for other cases, I have done

14 analysis looking at the specific contributions from those

15 facilities to specific receptor areas -- sensitive areas to

16 try to estimate the contribution of that particular source or

17 cluster of sources to total deposition or to the total

18 concentration of sulfate in drainage water.

19       From those previous analyses, I found a certain

20 fraction of the total from that source, and the values

21 generally seemed reasonable given the proximity to the source

22 and the magnitude of the source.  So I would anticipate a

23 similar type of analysis in this case.

24       The third reason that I gave was because I focused on

25 areas that I felt had clear, demonstrated impacts of either

DRISCOLL - CROSS/THOMSON          Vol. 2-301

1  acidic deposition or mercury where there really wasn't any

2  scientific debate that these systems were not already clearly

3  impacted.  So that any increases in emissions and associated

4  deposition would have adverse impacts on those systems, and by

5  extension, any reductions would have some benefits on those

6  systems.

7  Q   I appreciate your response.  That's helpful.

8       Did the Plaintiffs tell you not to do any modeling in

9  this case?

10 A   No.

11 Q   Did you decide on your own not to do any modeling of the

12 Wabash River emissions in this case?

13 A   I think for the reasons I gave, I came to the conclusion

14 that it was -- it would be difficult to do, and I didn't

15 really see any reason for doing it.  So I didn't do it.  It

16 didn't seem to me to be -- I didn't really even contemplate it

17 much because I just went forward and did what I did because it

18 seemed like a straightforward path.

19 Q   I appreciate that.  Just one final question.  You also

20 didn't do anything to quantify in dollars and cents the

21 ecological harm that you contend was caused by emissions from

22 Wabash River; isn't that correct?

23 A   That is correct.

24          MS. THOMSON:  No further questions, Your Honor.

25          THE COURT:  Thank you.  Any redirect?

DRISCOLL — CROSS/THOMSON          Vol. 2-302

1          MS. LUKAS-JACKSON:  No thank you, Your Honor.

2          THE COURT:  You may step down, sir.  Don't forget

3  the microphone.

4          All right.  We'll take about 15 minutes.

5          COURT CLERK:  All rise.

6          THE COURT:  If we're going to go ahead today and go

7  beyond the usual hour, we might as well have a lunch hour

8  then.  Okay.  That's what we'll do.  We'll come back and work

9  till noon and then we'll take an hour.

10          COURT CLERK:  All rise.  Court will recess for 15

11  minutes.

12      (A recess was taken.)

13          THE COURT:  So let us have our next witness.

14          MR. BENSON:  Good morning, Your Honor.  The United

15  States calls Dr. Phyllis Fox.

16          THE COURT:  Would you raise your right hand, please.

17          **PHYLLIS FOX, PLAINTIFF'S WITNESS, SWORN**

18                  **DIRECT EXAMINATION**

19          MR. BENSON:  Just a brief overview while Dr. Fox

20  gets situated and gets her microphone on, Phyllis Fox holds a

21  doctorate in environmental and civil engineering, and has

22  worked as an environmental engineer for more than 35 years.

23  She is an independent environmental consultant with a

24  specialty in air pollution controls and air permitting issues.

25          Dr. Fox will testify today about the magnitude of

FOX - DIRECT/BENSON                Vol. 2-303

1  the SO2 and NOX emissions from Wabash River Units 2, 3 and 5

2  dating back to the modifications found by the jury.  She will

3  also describe the pollution controls that are available for

4  SO2 and NOX emissions and how the use of pollution controls at

5  Wabash River Units 4 and 6 going forward could redress the

6  illegal emissions from Units 2, 3 and 5.

7  BY MR. BENSON:

8  Q    Dr. Fox, can you introduce yourself to the Court?

9  A    Hi.  My name is Phyllis Fox.  My address is 745 White Pine

10 Avenue, Rock Ledge, Florida, 32955.

11     *(A discussion was held off the record.)*

12          MR. BENSON:  Thank you, Dr. Fox.  If we could have

13 Image 1, please.  This will be Plaintiffs' Exhibit 1930, and

14 it's a copy of Dr. Fox's resumé, and consistently as we've

15 done with the other witnesses, we would move it into evidence

16 at this time.

17          MR. BOXERMAN:  No objection, Your Honor.

18          THE COURT:  It's admitted.

19     *(Plaintiffs' Exhibit 1930 was received in evidence.)*

20 Q    Now that we have the resumé in evidence, we won't go

21 through in detail all your experience.  We'll just quickly go

22 through some of the highlights.

23          Dr. Fox, could you describe your educational

24 background?

25 A    Yes.  I have a Ph.D. in environmental and civil

FOX - DIRECT/BENSON                    Vol. 2-304

1  engineering from the University of California at Berkeley.  I

2  have a bachelor's degree in the same subjects from the same

3  university; and I have a bachelor's of science degree in

4  physics with high honors from the University of Florida.

5  Q   Can you describe your work history for us?

6  A   My work history started in the early 1970s at Bechtel,

7  which is one of the largest engineering and construction

8  companies.

9        I worked there from roughly 1971 to 1976 as an

10 engineer, and there I have experience with and responsibility

11 for design and analysis of coal-fired and other types of power

12 plants and refineries, as well as cost estimating.

13 Q   What did you do after your time at Bechtel?

14 A   After Bechtel, I was a principal investigator at the

15 Lawrence Berkeley National Lab where I was the program manager

16 of a large synthetic fuels program that looked at shale oil,

17 integrated combined cycle coal gasification, coal slurry

18 transport and coal mining.

19 Q   What did you do after leaving the Berkeley laboratory, the

20 national laboratory?

21 A   After leaving the Berkeley laboratory, I set up my own

22 consulting engineering practice in 1981, and since that time,

23 I have been working as an independent consultant.

24        COURT CLERK:  Ma'am, you're going to have to speak

25 right into the microphone because we cannot hear you.

FOX - DIRECT/BENSON                Vol. 2-305

1      *(A discussion was held off the record.)*

2   BY MR. BENSON:

3   Q   Dr. Fox, you had just stated that you -- in 1981, you went

4   and started your own environmental consulting business.  Can

5   you describe in broad terms the work that you have done since

6   then as an environmental consultant?

7   A   Yes.  As an environmental engineer, I have worked in the

8   range of environmental engineering all the way from water

9   supply and wastewater disposal to risk assessments to air

10  permitting to environmental impact reports, risk assessments

11  and other similar activities with a heavy emphasis on air

12  pollution control.

13  Q   Have you done any work related to New Source Review under

14  the Clean Air Act?

15  A   Yes, I have.

16  Q   Can you describe that in general terms?

17  A   In general terms, I have done permitting for both

18  applicants and for those who choose to a challenge permits

19  that have been issued for hundreds of different projects.

20  Q   And through that work, are you familiar with the air

21  pollution controls that are on the market?

22  A   Yes, I am.

23  Q   How have you developed your knowledge of air pollution

24  control technology?

25  A   Through working with vendors and developing control

FOX - DIRECT/BENSON                Vol. 2-306

1  technology options for various projects, through comprehensive

2  literature reviews, through attendance at meetings that are

3  specific to individual industries and through course work.

4  Q    Have you ever designed any -- I'm sorry -- are we still

5  having --

6        Have you ever designed any air pollution controls

7  yourself?

8  A    Yes, I have.

9  Q    Can you describe that?

10 A    I have designed a number of SCRs for server farms.

11 Q    Can you describe in general terms what an SCR is?

12 A    SCR is a control technology that follows a combustion

13 source.  Its purpose is to remove nitrogen oxides from the

14 field gas stream, and it does that by injecting ammonia in the

15 field gas stream.  The ammonia reacts with the NOX over a

16 catalyst converting it into elemental mercury and water.

17 Q    Dr. Fox, have you done work related to air pollution

18 controls for coal-fired utilities?

19 A    I have done permitting work for coal-fired utilities, yes.

20 Q    Have you ever designed or installed pollution controls at

21 a coal-fired utility?

22 A    No, I haven't.

23 Q    What's your typical role in working with sources like

24 coal-fired utilities?

25 A    My typical work is performing BACT and LAER analyses for

FOX - DIRECT/BENSON                Vol. 2-307

1  coal-fired power plants for various parties who have an
2  interest in the project.  In that work, I do comprehensive
3  reviews of the technology that's available working with
4  vendors and reviewing the literature from around the world.
5  Q    You mentioned the terms BACT and LAER.  We'll talk about
6  that a little bit more as we go, but can you describe what
7  those are?
8  A    BACT is a type of technology that is required when the air
9  quality in a given area complies with ambient air quality
10  standards.  It stands for Best Available Control Technology.
11  LAER is a type of technology that applies in areas that don't
12  meet ambient air quality standards, and it stands for Lowest
13  Achievable Emission Rate.
14  Q    Have you worked on industry side or government side or
15  both?
16  A    The majority of my work has been on industry side.
17  Q    And is it part of your job as a consultant to review the
18  available pollution controls for particular sources?
19  A    Yes.
20  Q    And does that include developing costs for pollution
21  controls?
22  A    Yes.  It does involve developing costs.
23  Q    Are you familiar with the pollution emissions data that
24  coal-fired utilities are required to report to EPA under
25  what's known as the acid rain program?

FOX - DIRECT/BENSON          Vol. 2-308

1  A   Yes, I am.  Under the acid rain program, subject

2  facilities report on a quarterly basis continuous emission

3  monitoring data for NOX and SO2 to the U.S. EPA.  That data is

4  posted on EPA's website and is available for anyone.  I

5  routinely download it and analyze it.

6  Q   Dr. Fox, do you hold any licenses or certifications as an

7  engineer?

8  A   Yes.  I am a licensed professional engineer in five

9  states.  I am certified in air pollution control by the

10 American Academy of Environmental Engineers.  I am a qualified

11 environmental professional, and I have several other

12 California-specific certifications.

13        MR. BENSON:  Your Honor, at this time, we move to

14 qualify Dr. Fox as an expert in air pollution controls in the

15 New Source Review permitting process.

16        THE COURT:  That's fine.

17 BY MR. BENSON:

18 Q   Dr. Fox, we'll start today by discussing the pollution

19 that Cinergy has emitted from Wabash River Units 2, 3 and 5 as

20 a result of failing to follow the New Source Review law.  As

21 an initial matter, did you tally up the total actual emissions

22 from these Wabash River units since the time of the projects?

23 A   Yes, I did.

24 Q   Can you describe how you did that?

25 A   Yes.  In the course of this litigation, Cinergy stipulated

FOX - DIRECT/BENSON                    Vol. 2-309

1   to certain emissions for each of their units.  My starting

2   point for my analysis was the SO2 and NOX that was stipulated

3   to by Cinergy.

4   Q    What time period did you calculate those emissions?

5   A    From 1989 to 2007 for Units 2, 3 and 5.

6   Q    Did you do a calculation of Units 2, 3 and 5 for NOX as

7   well?

8   A    No.  For NOX, my calculation was for Units 3 and 5.

9   Q    How much -- and if we could have Image 2 which is PF

10  Demonstrative 1.

11        Dr. Fox, can you describe what this is?

12  A    This is a summary of some of my calculations for Wabash

13  River Units 2, 3 and 5.  These are the total emissions

14  post-modifications for SO2 and NOX.

15        For SO2, between the time of the modification and

16  December 31st, 2007, Units 2, 3 and 5 emitted about 370 tons

17  of SO2.  Over the same time period, from Units 3 and 5, about

18  49,000 tons of NOX were emitted.

19  Q    Are these units continuing to emit SO2 and NOX?

20  A    Yes, they are.

21  Q    I believe you mentioned a moment ago, is Duke one of the

22  utilities that's required to report these emissions to EPA as

23  part of the acid rain program?

24  A    That's correct.

25  Q    And with that reported data, would it be possible, once

FOX – DIRECT/BENSON              Vol. 2-310

1  the units were shut down, to go back and calculate exactly how

2  many tons were emitted from the time of the modifications to

3  the date of shutdown?

4  A    Yes, it would.

5  Q    Does this chart reflect a sort of estimation of that

6  calculation?

7         MR. BOXERMAN:  Your Honor, I would just object to

8  the leading form of the question.

9         THE COURT:  Well, you need to be a little more

10  careful.  I know you're not leading her into her answers

11  because the answers are right there, but --

12         MR. BENSON:  I'll try, Your Honor.

13         THE COURT:  All right.

14  BY MR. BENSON:

15  Q    Dr. Fox, can you describe what the rest of this chart

16  reflects?

17  A    The rest of the chart, starting with the column labeled

18  Monthly Average Total Based on the year 2000, gives you a

19  metric that you can use to extrapolate the total for 1989 to

20  2007 to any other point in the future; say, the units are shut

21  down in May 31st, 2009, and you want to extrapolate the

22  estimate through December 31st, 2007, you simply count up the

23  number of months between December 31st, 2007 and the date of

24  interest in this case, May 31st, 2009, and multiply it by the

25  monthly average tons based on 2007 to get the future

FOX - DIRECT/BENSON            Vol. 2-311

1  emissions.

2  Q    Could you maybe hold the microphone a little bit farther

3  away.  We're getting sort of variable volume here.  Try that.

4        Did you calculate what the projected tons would be if

5  these units operated through May 31st, 2009?

6  A    Using that calculation, using the 2007 annual emissions

7  for SO2 and NOX, in the case of SO2, the total through 2007

8  was 378,000 tons.  Extrapolating based on the monthly 2007

9  number through May 31st, 2009, you would get 416,000 tons of

10  SO2 over that period.

11        For NOX, the total tons through December 2007 is

12  49,000.  The monthly average in 2007 is 157 tons.  Multiplying

13  that 157 by the elapsed months gives you 52,000 tons through

14  May 31st, 2009.

15  Q    Now, these are the actual emissions we've been talking

16  about.  Let's compare that to what Cinergy would have emitted

17  if it had installed state-of-the-art pollution controls at the

18  time of the project.

19        Dr. Fox, can you give us a general outline of the New

20  Source Review permitting project that a source is supposed to

21  follow?

22  A    Under the New Source Review permitting process, which is a

23  preconstruction process, there are two routes that you can go

24  down.  If the area your plant is located in complies with

25  ambient air quality standards, you do what's known as

FOX - DIRECT/BENSON                 Vol. 2-312

1  prevention of significant deterioration or PSD review.

2        If the area where your plant is located is in an area

3  where ambient air quality exceeds ambient air quality

4  standards, you go down a branch known as non-attainment New

5  Source Review.

6        At the time of these modifications, the area around

7  the Wabash plant was in non-attainment for SO2, which means

8  non-attainment NSR review was required.

9        At the time of these modifications, the units were

10 located in an area where NOX was in compliance with ambient

11 air quality standards, which means that the PSD or prevention

12 of significant deterioration review would have been required.

13 Q   Did you say for SO2, what would be required?

14 A   Non-attainment New Source Review.

15 Q   Now, in this case, obviously the jury has already found

16 that these were modifications, and Cinergy has admitted in

17 prior briefing in this case what it means when a source is

18 found to trigger NSR.

19        And if we could have Image No. 3, which we have

20 labeled PF Demonstrative 11.  This is Cinergy's brief to the

21 7th Circuit when this case was up on appeal.

22        MR. BOXERMAN:  Your Honor, this sounds like legal

23 argument by counsel in the middle of a question.

24        THE COURT:  It's an odd thing to see a brief as a

25 demonstrative piece of evidence.

1          MR. BENSON:  It's sort of like the discussion we

2   were having earlier.  It's a Cinergy statement that's

3   essentially endorsing exactly what Dr. Fox is talking about in

4   this context.  Obviously it's a brief filed in this case so

5   it's a judicial admission.

6          MR. BOXERMAN:  It sounds like legal argument and if

7   she is going to be offering opinion about legality or --

8          THE COURT:  I think it is argument.  It's argument

9   you can make when you get to it.  I'll sustain this objection.

10  Go ahead.

11  BY MR. BENSON:

12  Q   Dr. Fox, you've described a little bit about the two

13  standards, BACT and LAER.  Can you describe the process that

14  is used to select what the top technology is under a BACT or a

15  LAER process?

16  A   Under the BACT process, the purpose is to determine the

17  best available control technology.  That's what the letters

18  "BACT" mean.

19          Under the LAER process, the purpose is to determine

20  the technology that satisfies the lowest emission rate that is

21  achievable.

22  Q   Let's turn to your analysis of what controls would have

23  been required at the time of the projects.  We'll start with

24  SO2.

25          Did you reach a conclusion as to what the likely New

FOX – DIRECT/BENSON                Vol. 2–314

1  Source Review permit requirement would be at the time of these

2  projects for SO2?

3  A   Yes.  At the time of these projects, LAER would have been

4  required.  My conclusion after doing a comprehensive analysis

5  was that LAER in 1989 would have been a wet scrubber capable

6  of removing 95 percent of the SO2 from the flue gas.

7  Q   Can you describe for us what a wet scrubber is?

8  A   A wet scrubber is similar to the dishwasher that you find

9  in your home.  At the top of it, it has a series of nozzles

10 that spray out a liquid which is mixed with limestone.  The

11 limestone is important because the limestone solution reacts

12 with sulfur dioxide and pulls it out of the stack gas.  That

13 solution from the nozzle flows downward.

14      The flue gas with the SO2, which you want to remove,

15 moves up through the bottom of the absorber.  So the flue gas

16 and the limestone solution from the nozzles meet.  They

17 interact.  The SO2 is transferred from the limestone slurry

18 being sprayed out of the nozzles at the top of the

19 dishwasher–like device into the limestone solution, and it

20 falls down the scrubber, which is a vessel, to the bottom and

21 is collected at the bottom of the vessel.

22      The gases, less the SO2, move up through the absorber

23 and exit the top minus the SO2.  And this is the most common

24 SO2 removal technology in the marketplace today and has been

25 for decades.

FOX - DIRECT/BENSON                Vol. 2-315

1  Q   Now, Dr. Fox, is there any dispute that the scrubber was

2  the best available SO2 technology in the 1980s?

3  A   No.

4  Q   And is there any dispute among the parties that a scrubber

5  was possible as a technical matter at the Wabash River units

6  in the 1980s?

7  A   Not that I'm aware of.

8          MR. BOXERMAN:  Your Honor, I'm going to object to

9  the continuous leading of the witness.

10         THE COURT:  I don't think the last one was a leading

11 question.  She's answered it.  Go ahead.

12 BY MR. BENSON:

13 Q   Dr. Fox, are you aware of whether Cinergy itself

14 considered installing a scrubber at Wabash River during the

15 1980s?

16 A   They did install it -- consider installing a scrubber in

17 the early 1980s.

18 Q   And if we could have Image 4, which is Plaintiffs'

19 Exhibit 1955.

20         Dr. Fox, this is testimony to the IURC by certain PSI,

21 which is predecessor witnesses.  Have you reviewed the

22 testimony of Mr. Benning?

23 A   Yes, I have.

24 Q   Can you tell us who Mr. Benning is?

25 A   Mr. Benning was the executive director of fossil power

FOX - DIRECT/BENSON                Vol. 2-316

1  operation support at the time for Duke's predecessor company.

2        MR. BENSON:  Your Honor, at this time, this

3  document, Plaintiffs' 1955, has been fully stipulated and we

4  would move it into evidence.

5        MR. BOXERMAN:  That's right, Your Honor.  No

6  objection.

7        THE COURT:  It's admitted.

8     (Plaintiffs' Exhibit 1955 was received in evidence.)

9  BY MR. BENSON:

10  Q   Dr. Fox, can you explain in general terms what Mr. Benning

11  was talking about in his testimony to the IURC in 1985?

12  A   The purpose of the testimony was to describe Cinergy's

13  then proposed plan for refurbishing the units at the Wabash

14  station.

15  Q   Did Mr. Benning discuss -- I'm sorry.

16        If we could turn to page 23 in this document.  Did

17  Mr. Benning investigate and describe in his testimony the

18  possibility for FGD at the station?

19  A   Yes, he did.  He did an evaluation in which he concluded

20  that the cost of refurbishing the units and installing a

21  scrubber was more economic than shutting down the unit.

22  Q   We'll get to that point in a moment.  First, if you could

23  look at the highlighted portion on the screen here.  Does this

24  reflect he's describing the calculations that he's did?

25        MR. BOXERMAN:  Your Honor, I'm sorry to object again

FOX - DIRECT/BENSON                 Vol. 2-317

1  but I'm concerned that the Plaintiffs are offering an exhibit

2  through a witness.  This is not her expertise to read

3  testimony of the company.  I don't understand what they're

4  doing.

5          THE COURT:  I'll let her testify.  Go ahead.

6  Overruled.

7  BY MR. BENSON:

8  Q   Dr. Fox, can you read the highlighted portion into the

9  record?

10 A   Sure.

11      The question asked "Would you please identify

12 Petitioner's Exhibit No. V-7.

13      And the answer of Mr. Benning was:  "Petitioner's

14 Exhibit V-7 (JEB-7) contains my calculations for the costs of

15 FGD systems to be retrofitted at Units 1 through 4 of the

16 Gibson generating station, Units 1 and 2 of the Cayuga

17 generating station, all four units of the Gallagher generating

18 station, and all six units at the Wabash River station."

19 Q   I believe you alluded to a moment ago -- and we can turn

20 to page 17 of this report -- that Mr. Benning also evaluated

21 whether pollution controls would make these projects

22 noneconomic?

23 A   He did.

24 Q   And if you could point to us what on that page supports

25 that.

FOX - DIRECT/BENSON                Vol. 2-318

1  A    You have highlighted it in yellow, and it states "The
2  company currently projects that it will be able to both
3  refurbish the units and modify them to meet the currently
4  proposed environmental regulations, and that the costs of
5  doing both will be less than the costs of retiring units and
6  replacing them with new units."
7  Q    Based on your understanding of this document, the
8  reference to "meet currently proposed environmental
9  regulations," what controls did that include?
10 A    FGD or a scrubber.
11 Q    When you say "FGD," are "FGD" and "scrubber" synonymous?
12 A    Yes.
13 Q    Let's turn to the removal efficiency for SO2 that you
14 concluded would be required at the time of the modifications.
15 What's your conclusion about the appropriate removal
16 efficiency?
17 A    I concluded a removal efficiency of 95 percent would have
18 satisfied LAER.
19 Q    What was the basis for that conclusion?
20 A    Several.  First, in the 1980s, starting in 1982, a unit in
21 Pennsylvania, known as Mitchell Unit 3, installed a scrubber
22 under a consent decree designed for 95 percent removal; and
23 they ran that scrubber for roughly a decade.
24        I made an effort to get the CEMs data, the continuous
25 emission monitoring data from that unit from the state of

1  Pennsylvania.  That was a long time ago.  Pennsylvania had

2  some of the records measured by continuous emission monitors

3  for a handful of months which I analyzed; and that data showed

4  that that unit was needing 99 percent.

5       In addition, Pennsylvania had to file a number of

6  reports with various agencies stating what the removal

7  efficiency of that unit was, and it reported 99 percent

8  through the decades.  The inventor of that technology applied

9  for a patent on that process based on 99 percent control.

10       The now vendor of that system states that that system

11  operated at 99 percent, and it would be easy to build another

12  such system to operate at 99 percent.

13  Q   Other than the experience at Mitchell plant, is there

14  anything else that supports your opinion?

15  A   At that time, I was aware of one permit that had been

16  issued requiring a 95 percent removal to the Harry Allen plant

17  in Nevada.  That plant was never built, but the permit was

18  issued.

19       In addition, prior to 1999, there were a number of

20  papers that were presented at a symposia held in San Francisco

21  and a number of other spots around the country reporting on

22  the experience in Germany and in Austria and Japan and other

23  countries in the world as well as the performance of scrubbers

24  that had been installed in the United States.  That work

25  showed that in the United States in particular, there were

FOX – DIRECT/BENSON                Vol. 2-320

1  scrubbers running at that time that were achieving 95 to

2  96 percent SO2 control.

3  Q    A couple minutes ago, you referred to the distinction or

4  that there's two different standards, BACT and LAER, depending

5  on whether a source is in attainment.  Would your conclusion

6  in this case about the SO2 removal efficiency be the same

7  whether BACT or LAER applied here?

8  A    Yes, it would.

9  Q    Now, if you compare Cinergy's actual SO2 emissions that

10 you discussed a few moments ago to what the plant would have

11 emitted with New Source Review pollution controls, what are

12 the additional SO2 emissions that resulted from Cinergy's

13 failure to comply with New Source Review?

14        And if we could have Image 5.  This is labeled PF

15 Demonstrative 2.

16        Can you describe what this is, Dr. Fox?

17 A    Yes.

18 Q    Please go ahead.

19 A    This demonstrative shows in the first blue bar the total

20 emissions from Units 2, 3 and 5 for SO2 from the time of the

21 modification through the end of 2007.  The first bar is the

22 total emissions from those three units from 1989 to 2007, and

23 the number is 378,000 tons.

24 Q    What does the second bar reflect?

25 A    The second bar is my calculation of what the excess

FOX – DIRECT/BENSON                    Vol. 2–321

1  emissions would have been had Cinergy installed at the time of

2  the modifications a scrubber removing 95 percent of the SO2.

3  And that number is 359,000 tons.  In other words, roughly, if

4  you had installed a scrubber, this facility would have emitted

5  only about 20,000 tons of SO2.

6  Q    Over that entire time period?

7  A    Over that entire time period.  But instead, because it did

8  not install a scrubber, it emitted 359,000 excess tons.

9  Q    In calculating the excess emissions that you just

10 described, did you do calculations for each year?

11 A    Yes.  I calculated it for each year and summed.

12 Q    Can you describe what the excess emissions would be for

13 SO2 in a typical recent year like 2002?

14 A    In 2002, for SO2, the excess emissions would have been

15 23,200 tons.

16 Q    Are you familiar with the expert report of Cinergy's

17 expert, William DePriest in this case?

18 A    Yes.  I am.

19 Q    Are you familiar with the top removal efficiency that he

20 had suggested was available for scrubbers at the time of these

21 projects?

22 A    Yes, he assumed 90 percent.

23 Q    If a 90 percent scrubber was the best available at the

24 time of these projects, how would that change the excess

25 emission calculation?

FOX - DIRECT/BENSON                Vol. 2-322

1          And if we could have Image 6, please?

2  A    It would be a very small change.  At 95 percent, my

3  calculations show excess of 359,000 tons.  Using the same

4  calculation procedure in calculating excess emissions assuming

5  Mr. DePriest's 90 percent, the excess emissions would have

6  been 340,000.

7  Q    Just for the record, this is PF Demonstrative 3.

8          Now, Dr. Fox, did Cinergy offer another theory of SO2

9  excess emissions through a different expert witness during

10 discovery?

11 A    Yes.

12 Q    Can you briefly describe what that theory was?

13 A    Yes, I can.  For SO2 or NOX?

14 Q    For SO2, I'm sorry.

15 A    For SO2, Cinergy's expert, Mr. Rarick, assumed that at the

16 time of the modifications, Cinergy could have taken a cap on

17 its emissions and avoided New Source Review.

18 Q    In practical terms, how does -- what does it mean to "take

19 a cap on your emissions"?

20 A    You take your baseline emissions in the preceding two

21 years, for example, and you add to that 39 tons per year,

22 which is just below the significance threshold of 40.

23 Q    Does that require getting a permit?

24 A    It does require getting a permit.

25 Q    After the projects were performed, did Cinergy, in fact,

FOX – DIRECT/BENSON            Vol. 2-323

1  stay within the hypothetical pollution caps that Mr. Rarick

2  has described?

3  A   Pardon?

4  Q   I'm sorry, after the projects were performed, did Cinergy,

5  in fact, stay within the hypothetical pollution caps that

6  Mr. Rarick described?

7  A   They certainly did not.  Their emissions increased

8  substantially beyond the cap.

9  Q   If we could have Image 7, please.  This is marked as PF

10  Demonstrative 4.

11      Dr. Fox, can you describe the new bar that we've added

12  here?

13  A   Yes.  There's a new bar added at the very bottom captioned

14  "Excess Emissions Synthetic Minor Case (adjusted)."  These are

15  the emissions that you would get if you did a correct

16  calculation based on a cap.

17  Q   When you say a "correct calculation," why do you add that?

18  A   Mr. Rarick's calculation of cap had a -- what I would call

19  a fatal flaw in it.

20  Q   What was that?

21  A   Well, he took credit for those instances in which the

22  emissions were less than the cap.  In other words, if you have

23  a permit limit, there's a permit limit and it's not to be

24  exceeded, period.  What he did is if a level of emissions was

25  less than the cap, instead of treating it as a zero, which he

FOX - DIRECT/BENSON                Vol. 2-324

1  should do because you have to meet the cap no matter what, he

2  calculated a negative number.  And then he used that negative

3  number to offset other numbers that were positive.

4       It's sort of like a speed limit.  If you drive to work

5  one day and you speed -- say the speed limit is 50 and you're

6  caught going 50, this would be like you saying to the cop,

7  "Well, cop," Your Honor, "I don't think I should get a ticket

8  because yesterday I only drove 50."  Needless to say, the cop

9  would not be persuaded by that argument.

10 Q   Dr. Fox, what did you calculate as the excess emission

11 tons compared to the cap on emissions that Mr. Rarick

12 described?

13 A   I did it the standard way.  I -- when Cinergy met or had

14 emissions that were less than the cap, I set that equal to

15 zero.  In other words, they get no credit for emissions less

16 than zero to set off previous or prior emissions that might be

17 larger because the cap is a cap.  Thou shalt not exceed the

18 cap.

19 Q   And what was your result when you did that calculation?

20 A   My result as shown on this figure is 120,000 tons per

21 year.

22 Q   How did that compare to the number that Mr. Rarick came up

23 with?

24 A   I don't recall Mr. Rarick's number, but it was

25 significantly smaller.

FOX – DIRECT/BENSON              Vol. 2–325

1  Q   Do you want to refer to your expert report?

2  A   Sure.

3  Q   I think if you look at the rebuttal report on page 33?

4  A   Thank you.

5      Using Mr. Rarick's calculation, assuming negative

6  values credited against exceedances, was 114,000 roughly

7  compared to my 120,000.

8  Q   I'll let you put that aside.  We've been talking about

9  SO2.  Let's move over to nitrogen oxides for a minute.  Did

10 you reach a conclusion as to what the likely BACT technology

11 would be at the time of the projects?

12 A   Yes, I did.  I concluded that historic BACT would have

13 been low NOX burners plus selective catalytic reduction or

14 SCR.

15 Q   Could you describe what an SCR is?

16 A   It's a device which is located downstream of the boiler in

17 the flue gas duct, and it works by injecting ammonia into the

18 flue gas.  The ammonia reacts with the NOX that you want to

19 remove over a catalyst which accelerates the reaction; and it

20 converts the NOX into ammonia gas, which is part of the air

21 and water.

22 Q   Did you say ammonia gas?

23 A   Nitrogen gas.  Thank you.

24 Q   I was going to say, my chemistry is not as good as yours

25 but I wasn't sure that was right.

FOX - DIRECT/BENSON                Vol. 2-326

1          Why do you conclude that SCR would have been required
2   in a BACT analysis as of the time of the projects?
3   A    The time was ripe.  There was a very large experience
4   using SCR in other countries.  Germany, Austria, and many
5   other European countries, plus Japan, had in excess of 200
6   SCRs in operation on the range of coals.  And in this country,
7   SCR had widespread use on gas and oil.  So the time was ripe
8   to require SCR on coal-fired source.
9   Q    Under a BACT determination, what's the standard for
10  determining what control technology is required?
11  A    It has to be available and applicable.
12  Q    Why do you believe -- do you believe that was met here?
13  A    Well, it was available because there were vendors in the
14  marketplace in the United States willing to sell SCRs for
15  coal-fired boilers; and it was applicable based on the very
16  large experience in Europe and in Japan.  Six separate nations
17  had used it, and also, based on the experience in this country
18  on oil and gas.
19  Q    Now, just to be clear, was SCR actually operating on any
20  U.S. coal-fired units at the time of the projects?
21  A    No, they weren't.
22  Q    When was the first U.S. coal-fired application permitted?
23  A    It was permitted in October of 1989.
24  Q    And has Cinergy's expert --
25  A    I misspoke.  It was permitted in late 1990.  The

FOX – DIRECT/BENSON                    Vol. 2-327

1  application was filed in October 1989.

2  Q    Given that, why did you conclude that SCR was appropriate

3  as a BACT technology if it had never been done in the U.S. on

4  coal before?

5  A    There's no requirement that a technology be done on a

6  specific fuel in the United States.  It has long been EPA's

7  policy that technologies that have been demonstrated outside

8  of the United States are fair game to make BACT and other

9  technology determinations.

10  Q    We talked about Mr. DePriest, Cinergy's expert, a moment

11  ago.  Has he identified any potential problems with installing

12  SCR at Wabash River in the late 1980s?

13  A    Yes, he did.

14  Q    Have you -- what problems did he identify?

15  A    He identified an increase in emissions from increased

16  power demand to run the FGD and the SCR.

17  Q    And just specific to SCR at the time of the projects, did

18  Mr. DePriest identify any issues that would prevent

19  installation of installing SCR in the 1980s?

20  A    Not that would prevent it, yes.

21  Q    What issues did Mr. DePriest raise about SCR installation

22  in the 1980s?

23  A    He argued that high sulfur coals would -- there was very

24  little experience on high sulfur coals and that that could

25  create a problem.

FOX - DIRECT/BENSON                    Vol. 2-328

1  Q   Did you consider that issue?

2  A   I did.

3  Q   What did you conclude?

4  A   I concluded that there were solutions for that problem.

5  It had been encountered in other countries and solutions had

6  been found for it.

7  Q   Now, let's compare the actual emissions again that you

8  calculated to the excess emissions based on installing SCR.

9  If we could have Image 8, which we've marked as PF

10 Demonstrative No. 5.

11       Dr. Fox, can you describe this chart for us?

12 A   This chart summarizes Wabash River 3 and 5 NOX tons since

13 the modifications through 2007.  The first bar is the total

14 emissions, which are 49,000 tons.

15       The second bar calculates my excess emissions, which

16 are 30,000 tons.

17 Q   Based on your calculations, what would the excess NOX

18 emissions be compared to BACT for a typical recent year like

19 2002?

20 A   About 2,200 tons.

21 Q   Now, again we mentioned Cinergy's expert, Tom Rarick.  Did

22 he also make an excess NOX emissions calculation?

23 A   Yes, he did.

24 Q   In that calculation, did he use a synthetic minor

25 comparison like he did for SO2 that you described earlier?

FOX - DIRECT/BENSON                Vol. 2-329

1  A   He relied on a calculation in which he assumed that NOX

2  BACT at the time would have been low NOX burners, meaning

3  0.6 pounds per MMBTU.

4  Q   And do you agree with Mr. Rarick's method for calculating

5  excess emissions?

6  A   No.

7  Q   Why not?

8  A   Well, it has the same problem I discussed previously; and

9  that is when there were negative numbers, he offset positive

10 numbers with them, which goes to the speeding example.  You

11 don't get to not get a ticket just because you went slower the

12 day before, the same sort of thing.

13 Q   So is that true of BACT, that you have to comply?

14 A   Yes.  If you accept an emission cap, that means you have

15 to comply each and every day.  You don't get any credit for

16 days in which your emissions are less than the limit.

17 Q   Now, let's turn our attention to the present.  Dr. Fox,

18 did you reach a conclusion on what technologies would likely

19 be required if Cinergy were to have obtained New Source Review

20 permits for Units 2, 3 and 5 at Wabash River in the present

21 day?

22 A   Yes.

23 Q   Can you briefly describe your conclusions?

24 A   For both pollutants?

25 Q   We can take them one at a time if you prefer.  Let's try

FOX - DIRECT/BENSON               Vol. 2-330

1  SO2.

2  A   For SO2 for present day, a wet scrubber again, but this

3  time achieving 99 percent SO2 control.

4  Q   And how about for NOX?

5  A   For NOX, NSCR, achieving 90 percent SO2 control.

6  Q   Now, has the Court has already heard, Cinergy has said

7  that it intends to shut these units down, so we're not going

8  to dwell further on what would be required to get New Source

9  Review permits going forward for those three units, but we

10 wanted to get that in the record.

11      Dr. Fox, let's turn to what Cinergy could do to make

12 up for the hundreds of thousands of tons of excess pollution

13 it emitted as a result of the modifications at Units 2 and 3

14 described earlier today.  And if we could have Image 9,

15 please.

16      The Court has obviously already heard evidence about

17 the Wabash River station.  We're just going to briefly review.

18 This has been marked as PF Demonstrative 6.

19      Dr. Fox, can you briefly describe the units at the

20 Wabash River plant?

21 A   Yeah.  There's six units.  Units 1, 2 and 3 are

22 90-megawatt units that were built in the 1950s.

23 Q   I'm sorry, let me interrupt you.  Did you say Unit 1?

24 A   Units 2, 3 and 4 are 90-megawatt gross units that were

25 built in 1953, '54 and '55, respectively.

FOX - DIRECT/BENSON                Vol. 2-331

1        Unit 5 is a slightly larger unit, 103 megawatts gross.

2  And Unit 6 is a much larger unit, a 342-megawatt unit that was

3  built in 1968.  The five units vent through a common stack

4  which you see on the right-hand side.

5  Q    Just roughly, how much coal do Units 2 through 6 burn in a

6  typical year?

7  A    Typically, 2 million tons.

8  Q    How do Units 2 through 5 that you just described compare

9  in size to what's typical for the U.S. coal-fired utility

10 fleet?

11 A    There's roughly a thousand plus boilers in the United

12 States -- utility boilers; and of those thousand plus, roughly

13 half are in the 10 to 200-megawatt range.  So they would be

14 similar to 2, 3, 4 and 5.

15 Q    Is it unusual for units that are the size of those at

16 Wabash River to have scrubbers or SCRs?

17 A    No.

18 Q    Are there pollution controls available today that would

19 allow Cinergy to reduce emissions at Wabash River Units 4 and

20 6?

21 A    Yes.

22 Q    We won't try to canvas all the possibilities but we'll

23 just highlight a couple of the most common technologies, and

24 they are things you've referred to already.

25        Let's begin by looking at SO2 emissions.  Based on

FOX - DIRECT/BENSON                Vol. 2-332

1  your experience, Dr. Fox, what's the most effective SO2

2  removal technology for coal-fired units like those at Wabash

3  River?

4  A    Wet scrubber.

5  Q    And is a wet scrubber feasible at the Wabash River

6  station?

7  A    Yes, it is.

8  Q    Has anyone at Cinergy disputed that?

9  A    No.

10  Q    Let's talk about how much SO2 scrubbers can remove.  What

11  remove efficiency do you believe a wet scrubber could achieve

12  at a coal plant like Wabash River?

13  A    I believe one could achieve 99 percent.

14  Q    Why do you conclude that 99 percent removal is achievable?

15  A    First, in the 1980s, a wet scrubber operated for a decade

16  at 99 percent.  So we know it's done.

17  Q    That's the Mitchell plant you discussed earlier?

18  A    That's the Mitchell plant.

19        There are quite a few wet scrubbers outside of the

20  United States that had operated at 99 percent.  I have seen

21  and evaluated the CEMs data for those plants.  There are many

22  vendors who are willing to guarantee 99 percent removal; and,

23  in fact, Duke has 99 percent removal on some of their units in

24  North Carolina.

25  Q    Let's talk about a couple of those points in a little more

FOX – DIRECT/BENSON                Vol. 2-333

1  detail.  You mentioned that many vendors are willing to

2  guarantee 99 percent removal.  Can you give us examples of

3  any?

4  A   Advatech, Babcock & Wilcox, Babcock Power, Alston.

5  Q   Are those major scrubber vendors that operate in the U.S.?

6  A   Those are the big dogs.

7  Q   And you alluded to Duke Energy itself installing

8  99 percent removal efficiency scrubbers.  Can you describe

9  where those are going in?

10  A   They're going in Allen; Belews Creek, Belews,

11  B-E-L-L-E-W-S, Belews Creek; Cliffside, Marshal.  There's one

12  more that I've forgotten.

13  Q   Are you aware of any unit where Cinergy is installing a

14  99 percent scrubber as a retrofit on an existing coal-fired

15  unit?

16  A   Yes.  Many of them are retrofits.

17  Q   Now, let's turn to what plans Cinergy has considered for a

18  scrubber at the Wabash River plant.

19        MR. BENSON:  If we could have image 12, which is

20  Plaintiffs' Exhibit 1939.  This has been fully stipulated and

21  we would move it into evidence at this time.

22        MR. BOXERMAN:  We have no objection.  There was some

23  question about whether the copies included an additional

24  document at the tail end of the copy.  I see that there was an

25  annual report, I think, that was still appended to the copy.

FOX - DIRECT/BENSON          Vol. 2-334

1  I don't know if it was provided to the Court as well.

2          MR. BENSON:  We can double-check that and make sure

3  it is not.

4          MR. BOXERMAN:  Provided that additional document is

5  not appended, we have no objection to the IRP itself.

6          THE COURT:  It's accepted with that condition.

7    *(Plaintiffs' Exhibit 1939 was received in evidence.)*

8  BY MR. BENSON:

9  Q   If we could have the next page of that exhibit.  Dr. Fox,

10 can you describe in general terms what the Integrated Resource

11 Plan is?

12 A   The Integrated Resource Plan is a plan that Cinergy

13 submits to the Indiana Utility Regulatory Commission; and

14 among other things, it lays out options that it is considering

15 to install for environmental compliance purposes.

16 Q   If we look at the page that's been highlighted here, what

17 are some of the options Cinergy considered in its 2007

18 Integrated Resource Plan?

19 A   They considered the use of low sulfur coal with SO3

20 injection and precipitator upgrades.

21 Q   You can just look at the highlighted portion if you

22 prefer.

23 A   The highlighted portions, they considered switching to

24 high sulfur coal with a single wet FGD or scrubber for Unit 6.

25          They considered switching to high sulfur coal with a

FOX - DIRECT/BENSON          Vol. 2-335

1  common single module wet FGD on Units 2 through 6, and the

2  possible retirements of Unit 2 through 5.

3  Q   You may have said this already and I missed it.  What does

4  Cinergy do with the Integrated Resource Plan?

5  A   Submits it to the Indiana Utility Regulatory Commission.

6          MR. BENSON:  If we could move on to Image 13, which

7  is Plaintiffs' Exhibit 2080.  This has also been fully

8  stipulated to by the parties.  We would move it into evidence

9  at this time.

10          MR. BOXERMAN:  Yes, Your Honor.

11          THE COURT:  It's admitted.

12      (Plaintiffs' Exhibit 2080 was received in evidence.)

13  BY MR. BENSON:

14  Q   Dr. Fox, are you familiar with this document?

15  A   I can't read it.

16  Q   Can we call out just the heading?

17  A   I can't read anything on the page.

18          Ah.

19  Q   Is that a little better?

20  A   Okay.  It's Defendants' Objections and Responses to

21  Plaintiffs' Second Set of Interrogatories and Third Set of

22  Document Production Requests in Remedy Phase of case.

23  Q   If we could turn to page 125 of this document, which I

24  think is the third page.  I should say it's the third page in

25  our software.  If we could call out the highlighted section.

FOX - DIRECT/BENSON            Vol. 2-336

1        Dr. Fox, does this provide an explanation as to why

2   Cinergy was considering installing a scrubber at Wabash River?

3   A   Yes.

4   Q   Could you read the highlighted portion into the record?

5   A   "Cinergy has considered installing a wet FGD at Wabash

6   River Units 2 through 6 and at Unit 6 in order to generate SO2

7   emissions allowances that Cinergy could use itself or sell on

8   the allowance market.  Cinergy also considered installing a

9   wet FGD as part of Cinergy's overall planning for future

10  environmental regulations."

11  Q   Are you familiar with the work that Cinergy has done to

12  investigate the possibility of FGD at the Wabash River

13  station?

14  A   Yes, I am.

15  Q   Can you describe briefly what they've done?

16  A   In early 2006, Cinergy engineers identified the

17  possibility of installing wet FGD at Units 2 through 6, and

18  did some preliminary calculations and investigations to see

19  what would be involved, and put together some preliminary

20  costs.  They then retained Sargent & Lundy and Babcock &

21  Wilcox to develop a conceptual level estimate which was done

22  in late September 2006.

23       Around May 2007, Babcock & Wilcox, after a bunch of

24  iterations back and forth with Cinergy, put together a cost

25  estimate to retrofit FGD to Unit 2 through 6.

FOX - DIRECT/BENSON                Vol. 2-337

1          MR. BENSON:  If we could turn to image 14, which is

2   Plaintiffs' Exhibit 2138.  And there is an objection to this,

3   Your Honor.  I don't know if Cinergy wants to raise that now

4   or --

5          MR. BOXERMAN:  To this document?  I'm sorry.  I was

6   listening to my colleague.  Yes, we do have an objection to

7   this document.

8          MR. BENSON:  It's been stipulated as authentic.

9          MR. BOXERMAN:  It's not a business record.  It's an

10  exchange of e-mails.  It's an e-mail exchange.  There are many

11  people on it.  The Plaintiffs had the opportunity to depose

12  the people and inquire about this particular document.

13         It's just a routine e-mail.  It's not a business

14  record of the type that would be appropriate for admission and

15  exception to the hearsay rule.

16         MR. BENSON:  Your Honor, we're not arguing that it's

17  a business record, but it is a party admission under Rule

18  801(d) 2A.  This is a -- it's an e-mail from one Cinergy

19  engineer to another to several other Cinergy employees,

20  including Bob Moreland, who is a senior vice president for

21  analytical investment engineering; and it's setting forth the

22  total cost that they came up with --

23         THE COURT:  Anything else?

24         MR. BOXERMAN:  It's reporting on an outside

25  statement by the consultants that were retained.  So it's not

FOX – DIRECT/BENSON          Vol. 2–338

1  like they're making their own statement.  They're reporting on

2  a third party out-of-court statement.

3          THE COURT:  The objection is overruled.  The exhibit

4  is admitted.

5      *(Plaintiffs' Exhibit 2138 was received in evidence.)*

6  BY MR. BENSON:

7  Q   If we could just call out the top of this e-mail.

8  Dr. Fox, does this reflect what Cinergy concluded as a result

9  of this process would be the cost of installing this type of

10  FGD or scrubber at the Wabash River station?

11  A   Yes.

12  Q   What did they conclude?

13  A   Their conclusion was that the total cost was 286,315,000

14  roughly.

15  Q   And let's get a sense now of what a scrubber would cost at

16  Wabash River Units 4 and 6.  First, Dr. Fox, let me ask you,

17  are control costs -- pollution control costs commonly

18  expressed in dollars per kilowatt?

19  A   Yes.

20  Q   And why is that a useful metric?

21  A   It's a way to normalize the cost to a common basis.

22  Q   When we say "dollars per kilowatt," we're referring to --

23  what is the kilowatt aspect of it?

24  A   The kilowatt aspect of it is generally expressed as the

25  gross output in megawatts, and you convert it to kilowatts.

FOX - DIRECT/BENSON                Vol. 2-339

1  Q    It means essentially the size of the plant?

2  A    The size of the plant.  The design basis of pollution

3  control equipment is generally the flow gas corresponding to

4  the gross output of the plant because you can anticipate that

5  the plant will operate at its max some part of the time.

6  Q    Have experts for both sides in this case estimated the

7  cost of scrubbing Wabash River units?

8  A    Yes, they have.

9  Q    Let's look at what those estimates would be once adjusted

10 based on the size of Unit 4 and 6; and if we could have image

11 15, please.  This has been marked PF Demonstrative 8.

12          Dr. Fox, can you describe what's reflected here?

13 A    I'm having trouble reading it.

14 Q    Can we just call out -- is it the colors or the size?

15 A    It's washed out in white here.  It doesn't look like the

16 other screen.

17 Q    It doesn't look like when you saw it last?

18          MR. BENSON:  May I approach, Your Honor?

19          THE COURT:  Yes.

20          MR. BENSON:  Can I give her the slide that's coming

21 up shortly after?

22 BY MR. BENSON:

23 Q    Okay, Dr. Fox, if we look at the first one that refers to

24 capital cost estimates for scrubber, and it has the label PF

25 Demonstrative 8; do you see that?

FOX - DIRECT/BENSON                Vol. 2-340

1  A   Yes.

2  Q   Can you describe what that is?

3  A   This is a slide that summarizes the cost of installing a

4  scrubber at Units 4 and 6 as estimated by three parties.

5       The first estimate is the Babcock & Wilcox estimate.

6  What we did is Babcock & Wilcox estimated costs for Units 2

7  through 6.

8  Q   That's what culminated in the e-mail that we just put into

9  evidence?

10 A   That's correct.  Here we're talking about Unit 4 and 6

11 only, not 2 through 6.  So we adjusted the cost of Unit 2

12 through 6 to only Units 4 and 6 by using a simple arithmetic

13 calculation based on dollars per kilowatt.

14      The dollars per kilowatt were used and are in

15 parentheses on the label on the left-hand side.  In the case

16 of Babcock & Wilcox, their estimate was $414 per kilowatt.

17      Units 4 and 6 total 432-megawatts gross.  If you go

18 through the arithmetic, 414-kilowatts times 432-megawatts and

19 do the unit conversions, you come up with a cost of

20 179 million for Units 4 through 6.

21 Q   Dr. Fox, I think we understand what you're saying but just

22 so the record is clear, can you describe the multiplication

23 you did again?  It's $414 per kilowatt times the number of

24 megawatts for the unit?

25 A   That's correct.

FOX - DIRECT/BENSON                Vol. 2-341

1  Q   And you've described the Babcock & Wilcox estimate.  Can

2  you describe the second bar on this chart?

3  A   The second bar on that chart is the same sort of

4  calculation for our cost in our expert report.  We did the

5  cost for Units 2 through 6.  We converted that cost to dollars

6  per kilowatt.  What you see here was 575-kilowatts.  You

7  multiply that number times the gross megawatts for Units 4

8  through 6, which is 432.  You multiply the two numbers

9  together and do the unit conversion.  You get $248 million for

10 Units 4 and 6.

11 Q   And if you could just briefly describe what the last bar

12 reflects.  I think we get the process but just what the

13 numbers are there?

14 A   The last bar, same calculation for Mr. DePriest's

15 calculation:  $660 per kilowatt, 432-megawatts gross.  Do the

16 arithmetic and you get $287 million to retrofit Units 4 and 6

17 with a scrubber.

18       So the cost range that we're talking about here ranges

19 from 179 million to 287 million to retrofit Units 4 and 6 with

20 a wet scrubber.

21 Q   I think you may have misspoke in the dollars per kilowatt

22 on the estimate that Mr. DePriest put in his expert report.

23 Can you just state what that is?

24 A   665.

25 Q   Now, in their opening statement, Cinergy suggested that

FOX - DIRECT/BENSON                    Vol. 2-342

1  they may actually close down Unit 4.  If we were just looking

2  at Unit 6, how would you adjust the costs of these estimates?

3  A   You would adjust them by the ratio of Unit 6, which is 342

4  megawatts to Unit 4 plus 6, which is 432 megawatts.  That

5  works out to about 80, .8.  So the costs shown in this chart

6  would be reduced by 80 percent.

7  Q   Would they be reduced by 80 percent or they would be --

8  A   They would be 80 percent.  They would be reduced by

9  20 percent.

10 Q   Are there annual operating costs associated with running a

11 scrubber?

12 A   Yes.

13 Q   Briefly, or very roughly, describe what those would be for

14 the Wabash River units.

15 A   Mr. DePriest made an estimate of operating costs for

16 Units 2 through 6, and those costs were about $20 million.

17       If you extrapolate those costs to Unit 4 and 6 or Unit

18 6, they would clearly be less.  So $20 million would be the

19 upper bound.

20 Q   And we've been talking about potential SO2 technologies.

21 Let's turn to potential NOX control technologies.  What's the

22 most effective potential NOX control for the Wabash River

23 units?

24 A   Selected catalytic reduction or SCR.

25 Q   You've scribbled before today what that is.  As a

FOX – DIRECT/BENSON            Vol. 2–343

1  technical matter, is SCR feasible at Wabash River Units 4 and

2  6?

3  A   Yes, it is.

4  Q   Has anyone from Cinergy disputed that conclusion?

5  A   Not that I'm aware of.

6  Q   What NOX removal efficiency is possible with SCR?

7  A   90 plus percent.

8  Q   Let's turn to the costs of SCR.  Have experts for the

9  parties again estimated the costs of SCR?

10 A   Yes, they have.

11 Q   If we could look at Image 16, which we've marked as

12 Plaintiff -- I'm sorry, PF Demonstrative 9, can you describe

13 what this is, Dr. Fox?  You have it in front of you.

14 A   This is a summary of capital cost estimates for an SCR at

15 Units 4 and 6.

16 Q   Was it prepared in the same way that you described before?

17 A   Yes, it was.

18 Q   Can you walk through the different estimates that we have

19 here?

20 A   Sure.  There are four estimates here.  The first is a

21 compilation of reported SCR costs which come from my expert

22 report.  There were four different studies that looked at a

23 range of SCR costs.

24     Those studies show the cost range when adjusted to

25 $2,008 of 37– to $130 million.

FOX - DIRECT/BENSON              Vol. 2-344

1        Oak Creek Units 5 through 8 is a power station in

2   Wisconsin which consists of a number of smaller units similar

3   to the unit we're talking about here.  They recently filed a

4   proposal with the Wisconsin Public Service Commission to

5   install SCR on those units.  The SCR was to be installed in

6   what's known as the low dust position.

7        SCR can be installed in a number of locations in the

8   power plant immediately at the boiler outlet after the

9   electrostatic precipitator or at the tail end of the plant

10  after the scrubber.  The further down the plant you go, the

11  more expensive it gets.

12       The Oak Creek costs were for an SCR that was installed

13  after the electrostatic precipitator.  In that case, Wisconsin

14  Electric did a detailed cost estimate that included all in.  I

15  participated in that case and in particular reviewed the

16  costs.  Those costs were all in costs.  They included all the

17  costs that the owner would bare.

18       Wisconsin Public Services Utility certified those

19  costs in July of 2008.  I took those costs on a dollar per

20  kilowatt basis, and through arithmetic, multiplied by 432

21  megawatts, which is Units 4 and 6, to come up with a cost for

22  a similar SCR at Wabash of 89 million.

23  Q   If you could just briefly go through the last two bars

24  here, how you got the values?

25  A   The next bar, the third value, is our estimate.  We

FOX - DIRECT/BENSON               Vol. 2-345

1  estimated the cost of installing a similar SCR using the

2  dollar per kilowatt method and multiplying by the size as

3  we've described before of 136 million; and Mr. DePriest did

4  his own estimate in which he came up with 178 million.

5        Again, that's extrapolated from 2 to 6 using the

6  method I described previously.  So here we're talking about a

7  range for SCR at Wabash Unit 4 of 37 million to 178 million.

8  Q   And the range you just described would be for Units 4

9  and 6?

10 A   Yes, units 4 and 6.

11 Q   Before, you testified the cost for 6 alone would be about

12 80 percent of the total shown here.  Is that true for the SCR

13 as well?

14 A   That's correct.  If you take 4 off the table, the cost of

15 6 alone would be about 80 percent of the shown numbers.

16 Q   And Dr. Fox, are there annual operating costs for SCR?

17 A   Yes.  They're about 15 million as calculated by

18 Mr. DePriest for Units 2 through 6.  So that would be an upper

19 bound clearly if you just retrofit 4 and 6, or 6 only, those

20 costs would be a lot lower.

21 Q   Dr. Fox, in its trial brief, Cinergy raised a handful of

22 potential environmental impacts from the installation and

23 operation of scrubbers or SCR.  Are you familiar with those --

24 what they raised?

25 A   Yes.

FOX – DIRECT/BENSON              Vol. 2-346

1  Q   What are they?

2  A   For FGD, they raised two issues.  They raised the fact

3  that a scrubber would generate 80,000 -- roughly 80,000 tons

4  of solid waste that would have to be disposed.  That solid

5  waste is gypsum and gypsum is marketable.

6       Many, many coal-fired power plants sell their gypsum.

7  Here, Cinergy hasn't done a market study, so they don't know

8  yet whether it's marketable, but there's a chance that that

9  material could be sold rather than disposed.

10      The other FGD issue that Cinergy raised was water use.

11 Wet scrubbers use water.  Cinergy estimated that a wet FGD on

12 this plant would use 125 million gallons a year.  What they

13 didn't say is that only about 10 percent of that water would

14 be fresh water.  The balance of it could be dirty water like

15 different blow-down streams or plant service water which would

16 otherwise be treated and disposed.

17      As to SCR, the issues they raised were three.  First,

18 they argued that an SCR requires the use of a hazardous

19 substance, namely, anhydrous ammonia.  Well, that's not true.

20 You don't have to use anhydrous ammonia in an SCR.  You can

21 use aqueous ammonia which has a low percent ammonia.  28 is a

22 typical number, or what is done by many coal-fired power

23 plants to get rid of ammonia as a liquid altogether, and use

24 pellets which are known as urea.

25      In fact, all of the AEP plants, American Electric

FOX - DIRECT/BENSON                    Vol. 2-347

1   Power, uses urea pellets instead of ammonia to avoid the

2   hazard.  So there are solutions.

3        And the final issue that Cinergy raised with SCRs is

4   that it generates a catalyst that has to be disposed.  Well,

5   that's not quite a whole story.

6        The catalyst has a lifetime; and when its lifetime is

7   reached, the catalyst is pulled out and replaced by a new

8   catalyst.  However, that catalyst is not disposed.

9        One of two things happens to it.  It either goes to a

10  catalyst rejuvenation facility where they clean the catalyst

11  and rejuvenate it and return it to the plant; or if it's no

12  longer able to be cleaned, it goes back to the vendor who then

13  recycles it or disposes of it itself.  The burden is not on

14  the applicant to dispose of the catalyst.

15  Q   Has Cinergy also identified the problem that's commonly

16  known as a blue plume?

17  A   Ah.  The third issue Cinergy raised was blue plume.  Under

18  some circumstances, and those circumstances are if sulfur in

19  the coal is high enough, 0and in my experience high enough

20  means 7 pounds of SO2 per MMBTU or more; in other words, high

21  sulfur coal -- the catalyst will convert some of the SO2 into

22  SO3.  SO3 is a chemical which when emitted refracts light in

23  such a way that the plume takes on a blue haze.

24       The Wabash station does not burn high sulfur coal.  It

25  burns a medium sulfur coal.  And in my experience, I have not

FOX - DIRECT/BENSON                Vol. 2-348

1  run into a blue plume problem with a coal with a medium sulfur

2  coal such as that burned at the Wabash station.  This is

3  largely a problem of very high sulfur coals.

4        And even if there were a blue plume problem, solutions

5  have long since been found for the problem.  There are two, at

6  least two.  The first one is to select a catalyst that does

7  not convert very much of the SO2 to SO3, which is the bad

8  actor.  You can now buy, for a competitive price, a catalyst

9  that only converts less than .1 percent of the SO2 into SO3.

10       Alternatively, you can install an absorbent injection

11 system.  You can inject a chemical like trona or calcium oxide

12 or magnesium oxide into the duct and remove the offending SO3.

13       Then finally, I recall there was a comment about the

14 blue plume causing AEP to purchase the town of Cheshire, Ohio.

15 It is true that AEP purchased --

16 Q   Dr. Fox, we don't have to get into that right now.  We can

17 do that later if they want.

18       Dr. Fox, are you aware whether Duke Energy, including

19 Cinergy, has any SCR or FGD installed at its coal-fired unit?

20 A   They have several SCRs and FGDs installed at existing

21 facilities.

22 Q   So has Duke Energy already addressed these problems to the

23 extent that they exist at those units?

24 A   Yes.  These problems are well known and they have been

25 long since solved and routinely addressed.

FOX - DIRECT/BENSON                Vol. 2-349

1  Q   Let's shift gears for a minute here.  We've been talking

2  about SO2 and NOX technologies.  Do those control technologies

3  that you described have any effect on other pollutants?

4  A   Yes.

5  Q   What other pollutants?

6  A   One of the well-known co-benefits of SCR and scrubbers is

7  the simultaneous removal of mercury.

8  Q   First off, let's just talk about what types of mercury are

9  created by coal combustion.

10 A   There are three types of mercury created by coal

11 combustion.  First, elemental mercury.  Second, oxidized

12 mercury.  Third, particulate mercury.

13 Q   And would those three types be present in a stack -- are

14 those three types all emitted from the Wabash River stack?

15 A   Yes.

16 Q   Does the Wabash River plant currently have any pollution

17 controls that effect mercury emissions?

18 A   The Wabash River plant currently has an electrostatic

19 precipitator which would remove some of the mercury.

20 Q   Can you describe how the installation of SCR and/or FGD

21 would affect mercury emissions?

22 A   Sure.

23      To understand the story, you have to understand that

24 elemental mercury is not soluble; and it is hard to get out.

25 It doesn't, for example, dissolve in the scrubber solution.

FOX – DIRECT/BENSON              Vol. 2-350

1  So the way these two projects work in tandem is SCR converts

2  some of the elemental mercury into oxidized forms; and once

3  the mercury is in oxidized form, it is then soluble and it is

4  removed in the scrubber.

5  Q   Now, if there was a scrubber but no SCR, would there still

6  be mercury removal?

7  A   Yes.  That portion of the mercury that is present in the

8  oxidized form, regardless of the presence of an SCR, would be

9  removed anyway.

10 Q   Did you calculate how much less mercury Cinergy would have

11 emitted since the time of the projects if it had installed

12 scrubbers and –– I'm sorry –– scrubbers and SCRs as you stated

13 would have been appropriate at that time?

14 A   Yes.  I calculated the excess mercury, assuming that the

15 SCR and scrubber had been installed at the appropriate time,

16 and concluded that the excess emissions over the period of

17 1989 through 2007 would be about a thousand pounds.

18 Q   Now, has Duke itself stated that it expects to achieve

19 substantial mercury reductions through SCR and scrubbers?

20 A   Yes.  I looked at Duke's website; and they have a little

21 piece up there that says that they expect to achieve ––

22 Q   Let me cut you off and we'll put it up just so everyone

23 can see what we're talking about.  This is Image 18 and it is

24 Plaintiffs' Exhibit 1912.  And this has been, I believe, fully

25 stipulated.  We would move it in at this time.

FOX - DIRECT/BENSON                Vol. 2-351

1          MR. BOXERMAN:  Yes.

2          THE COURT:  It's admitted.

3     *(Plaintiffs' Exhibit 1912 was received in evidence.)*

4    BY MR. BENSON:

5    Q   Dr. Fox, can you read the highlighted portion into the

6    record?

7    A   "The SO2 and NOX controls (scrubbers and selective

8    catalytic reduction) we are installing have the co-benefit of

9    removing a significant amount of mercury.  While estimate" --

10   Q   I think you skipped a line there.

11   A   "While we're still in the process of understanding how

12   much mercury will be removed on a consistent basis, we

13   currently estimate that it could be between 70 percent an

14   80 percent."

15   Q   Has Duke admitted in the litigations in this case to

16   roughly how much mercury is emitted from the plant in a

17   typical year?

18   A   About 1,400 pounds for the record.

19   Q   I'm sorry.  In a typical year, has Duke admitted how much

20   mercury it emits for Units 2 through 6?

21   A   Duke in its filings stipulated that the mercury emissions

22   in 2007 would be about 170 pounds in the entire plant.

23   Q   We'll turn back for one final topic.  If we could go back

24   to the total emissions generated by Cinergy since the

25   modifications.

FOX - DIRECT/BENSON                Vol. 2-352

1        And this is Image 2.  It's been labeled as PF

2   Demonstrative 1.

3        Dr. Fox, you've already testified to this.  Can you

4   just remind us what the total projected emissions are if we

5   assume that the plant shuts down on May 1st, 2009?

6   A    The last column, the blue column, is the total tons

7   projected to be emitted through May 31st, 2009.  In the cases

8   of SO2, 416,000.  In the case of NOX, 52,000.

9   Q    Given the available options that you've testified about

10  already, let's look at how long it would take for pollution

11  reductions at Wabash River to make up for those emissions.

12        And if we could have Image 20, please.  This has been

13  marked PF Demonstrative 10.

14        MR. BOXERMAN:  I would just object to this witness

15  being shown and asked to testify to something with regard to

16  the level of emissions.  It's really going to a legal issue

17  that she's not qualified to testify to.

18        MR. BENSON:  Well, I guess this is what we described

19  the emissions as being total legal emissions.

20        THE COURT:  Those are your terms, not hers?

21        MR. BENSON:  Yes.  She won't be testifying whether

22  they're legal or not.

23        THE COURT:  Okay.

24  BY MR. BENSON:

25  Q    Dr. Fox, can you describe what this demonstrative shows?

FOX - DIRECT/BENSON                Vol. 2-353

1  A   This demonstrative is a calculation of the number of years

2  that a scrubber and an SCR would have to operate to offset the

3  total NOX and SO2 emissions in the previous slide.

4  Q   Can you walk us through the calculation that you did for

5  SO2?

6  A   Sure.  The second column labeled 2007 tons for Unit 4 and

7  6 is the number of tons emitted from Units 4 and 6 in 2007,

8  and that is 37,500.  If you assume a 97 percent scrubber --

9  Q   I'm sorry.  Did you say how efficient scrubber -- can you

10  say it again?

11  A   If you assume a 99 percent efficient scrubber, the tons

12  that would be removed by that scrubber would be 37,000 tons.

13        If you take the 37,000 tons that would be removed and

14  you divide it into the total tons through May 31st, 2009, from

15  the previous demonstrative, you will find that it takes about

16  11 years to offset the total emissions from this project which

17  were illegal as of the date of the installation of

18  modifications without a permit.

19  Q   When you say --

20        MR. BOXERMAN:  Your Honor, I'm going to move to

21  strike that last response.  He already said they're not going

22  to be testifying as to whether or not they're legal or

23  illegal.

24        THE COURT:  All right.  We'll do that.

25        MR. BENSON:  That's fine.

FOX – DIRECT/BENSON                Vol. 2-354

1  BY MR. BENSON:

2  Q   Dr. Fox, when you say the 37,000 tons, that would be

3  removed each year just in rough terms?

4  A   That would be removed each year in rough terms from a

5  scrubber designed to remove 99 percent of the SO2.

6  Q   And the 11 years you referenced, when do those 11 years

7  start?

8  A   They start from the start-up of the scrubber.

9  Q   So it wouldn't start today.  It would be once the scrubber

10 gets rolling?

11 A   In the future, yeah.

12 Q   Now, you did a calculation here based on a 99 percent

13 removal scrubber.  Are there other possible SO2 control

14 technologies that Cinergy could use at the Wabash River

15 station?

16 A   You could use a less efficient scrubber.  Cinergy has

17 designed 97 percent scrubbers at other units in its fleet; and

18 in the case of the Wabash station, Cinergy designed a

19 97 percent scrubber based on the design at other facilities

20 which would lengthen the amount of time to mitigate.

21        You could also use a 95 percent scrubber or even a

22 90 percent scrubber.  The less efficient the scrubber, the

23 longer it will take to mitigate the emissions.

24 Q   Just as an example, if Cinergy installed a scrubber that

25 removed about 95 percent of the SO2, roughly how long would it

FOX - DIRECT/BENSON                Vol. 2-355

1  take to mitigate the 416,000 tons of SO2 emissions that we've

2  projected?

3  A    About 11.7 years.

4  Q    And let's just run through the NOX numbers quickly.

5  A    Same sort of calculation.  The NOX emissions from Units 4

6  and 6 in 2007 was 4,760 tons.  If you assume 90 percent SCR is

7  installed, the amount of NOX that you would remove each year

8  would be 4,300 tons.  If you divide that into the total tons

9  of SO2 from 1989 to March 31st, 2009 from the previous

10 demonstrative, you get 12 years to mitigate the total

11 emissions from the project.

12 Q    I assume, as you testified before, if you had a less

13 effective NOX removal technology, it would take longer?

14 A    Yeah.  If you had a less effective NOX removal technology,

15 one that removes less than 90 percent, it would simply take

16 longer.

17         MR. BENSON:  We have no further questions, Your

18 Honor.

19         THE COURT:  Thank you.  Have you got a lengthy

20 cross-examine?

21         MR. BOXERMAN:  Yes, Your Honor.

22         THE COURT:  We'll break for lunch and reconvene at

23 one o'clock.

24    *(A luncheon recess was taken.)*

25

FOX – DIRECT/BENSON                Vol. 2–356

1          **A F T E R N O O N   S E S S I O N**

2                   <u>**CROSS EXAMINATION**</u>

3          THE COURT:  Let us proceed with cross-examination,

4 Mr. Boxerman.

5          MR. BOXERMAN:  Thank you, Your Honor.  Hopefully

6 I've made good use of the lunch and focused my questioning.

7 BY MR. BOXERMAN:

8 Q   Dr. Fox, good afternoon.

9 A   Good afternoon.

10 Q   I'd like to start a little bit with your experience.  It's

11 true, isn't it, that you've never been employed by EPA; is

12 that right?

13 A   That's correct.

14          I'm having trouble hearing you.

15 Q   I'll speak up as well.  I'm usually loud but I don't want

16 to be too loud.

17          You've never worked for EPA; is that right?

18 A   That's correct.

19 Q   You're not an employee of IDEM, the Indiana Department of

20 Environmental Management, right?

21 A   Right.

22 Q   You've never worked for them, right?

23 A   What do you mean by "worked"?

24 Q   You've never been an employee?

25 A   I've never been an employee of IDEM or EPA.

FOX – CROSS/BOXERMAN                    Vol. 2–357

1   Q    You've never drafted an air quality permit yourself, a

2   permit?

3   A    No.  I have not drafted an air quality permit.

4   Q    And you've never been a regulator or been required to make

5   a BACT determination, correct?

6   A    As a regulator, I have never been required to make a BACT

7   determination.

8   Q    And you have never assisted an applicant in submitting an

9   NSR permit application for a pulverized coal-fired power

10  plant, correct?

11  A    As stated, correct.

12  Q    And you've never done the detail design engineering for

13  any pollution control such as a scrubber for a coal-fired

14  power plant?

15  A    Correct.

16  Q    And likewise for an SCR for a coal-fired power plant?

17  A    Correct.

18  Q    And you've never designed a low NOX burner; isn't that

19  right?

20  A    Correct.

21  Q    And never been responsible for buying or writing

22  specifications for the installation of a low NOX burner?

23  A    Correct.

24            COURT REPORTER:  Low NOX burner?

25            MR. BOXERMAN:  Low NOX burner.  We use these terms

FOX – CROSS/BOXERMAN                Vol. 2–358

1  loosely, I know.

2  Q   You've never managed the installation of a low NOX burner,

3  correct?

4  A   Correct.

5  Q   Never managed the operation of a low NOX burner?

6  A   Correct.

7  Q   Never designed –– I'm sorry.  Strike that one.

8        You've never been responsible for purchasing an SCR

9  for a coal-fired power plant?

10  A   Correct.

11  Q   Never written detailed engineering specifications for the

12  installation of an SCR at a coal-fired power plant?

13  A   Correct.

14  Q   Never managed the installation or operation of an SCR at a

15  coal-fired plant?

16  A   Correct.

17  Q   You've never designed a wet fluidized gas desulfurization

18  unit or a scrubber for a coal-fired power plant?

19  A   Correct.

20  Q   Never been responsible for purchasing a wet FGD for a

21  coal-fired plant?

22  A   Correct.

23  Q   Never managed the installation or operation of a wet FGD?

24  A   Correct.

25  Q   Isn't it true also, Dr. Fox, that you have not ever been

*FOX – CROSS/BOXERMAN*                    Vol. 2–359

1  to or seen a scrubber on a coal-fired plant until you visited

2  the Stanton facility in early 2006?

3  A    I believe that's correct.

4  Q    You're not sure?

5  A    I believe you asked me that question in my deposition, and

6  that's what I said; but, you know, I've been working in this

7  field a long time and I could have forgotten something.

8  Q    But you were under oath at that time and you gave your

9  best recollection, correct?

10  A    My best recollection at that time was, yes, Stanton.

11  Q    A list of your publications are found on your resumé that

12  was provided today; is that right?

13  A    Correct.

14  Q    Correct me if I'm wrong, but as I read your list of

15  publicattions and presentations, I don't see any that relate

16  to the operation of an SCR at a coal-fired power plant; is

17  that right?

18  A    Right.

19  Q    Likewise, you don't have any publications relating to the

20  costs or the estimates of the costs of an SCR at a coal-fired

21  plant, right?

22  A    Correct.

23  Q    And none relate to the removal efficiency of an SCR at any

24  coal-fired plant, correct?

25  A    Correct.

FOX - CROSS/BOXERMAN                Vol. 2-360

1  Q   And likewise, none of the publications or presentations on

2  that long list relate to the operation of a scrubber at a

3  coal-fired power plant, correct?

4  A   Correct.

5  Q   And none relate to the cost, the estimated estimate or the

6  removal efficiency of a scrubber either at a coal-fired power

7  plant, right?

8  A   Correct.

9  Q   Now, you've testified, Dr. Fox, about excess emissions,

10  and I would like to start by reviewing how you developed the

11  process that you followed in this case.

12        It's true, isn't it, Dr. Fox, that the Government's

13  lawyers were the ones that first told you to follow the

14  process that you explained to us in this case; isn't that

15  right?

16  A   Correct.

17  Q   And you followed those instructions first in another piece

18  of litigation involving American Electric Power and then again

19  in this case, right?

20  A   Not completely.  I did not personally do the excess

21  emissions in the AEP case.  I reviewed them.

22  Q   So this was the first time that you actually made the

23  calculations in this case, correct?

24  A   Correct.

25  Q   And to your knowledge, Dr. Fox, this process of excess

*FOX – CROSS/BOXERMAN*                Vol. 2-361

1  emissions, that's not described or defined anywhere in the

2  Clean Air Act, right?

3  A    Right.

4  Q    And to your knowledge, it's not found in any EPA NSR

5  regulations that you've discussed for us today, right?

6  A    Right.

7  Q    This is not a process that's set out in any Indiana State

8  regulations as well, right?

9  A    To my knowledge, no.

10  Q    To your knowledge, it's not found in any EPA guidance or

11  any guidance of the Indiana Department of Environmental

12  Management, right?

13  A    I believe you asked me that in my deposition, and I

14  believe since I found the memo that does mention the concept

15  of --

16           COURT REPORTER:  I'm sorry, ma'am, could you repeat

17  that?

18  A    I said no, but that caused me to go look, and I believe

19  that since then, I have found at least one EPA guidance memo

20  that does mention the concept of excess emissions.

21  Q    There's a reference to it in an EPA memo?

22  A    Yes.

23  Q    And it's in the context of New Source Review?

24  A    Yes.

25  Q    Do you have it with you?

FOX - CROSS/BOXERMAN                Vol. 2-362

1  A   No.

2  Q   Do you know its name?

3  A   No.

4  Q   Do you know when it was published?

5  A   I don't recall.

6  Q   Do you know who the author is?

7  A   No.

8  Q   I take it, Dr. Fox, that you are not telling us that this

9  is the only official methodology, the one that you followed --

10 the only official methodology for determining excess

11 emissions, right?

12 A   It is one method of determining excess emissions.

13 Q   You're saying this is what you believe would have occurred

14 had the company complied with NSR before the projects, right?

15 A   Right.

16 Q   They would have installed, in your opinion, a scrubber and

17 an SCR plus low NOX burners at that time, right?

18 A   Correct.

19 Q   But they could have -- there could have been other

20 outcomes that the company could have chosen at that time that

21 would have satisfied their obligations; isn't that right?

22 A   Correct.

23 Q   And you're familiar, Dr. Fox, with the term "synthetic

24 minor source permit," right?

25 A   Synthetic minor defined how?

FOX − CROSS/BOXERMAN               Vol. 2-363

1  Q   You're familiar with the term "synthetic minor permit,"

2  right?

3  A   Yes.  Synthetic minor generally means taking a cap to keep

4  your emissions below the major source threshold, which is

5  100 tons for listed sources and 200 for unlisted sources.

6  Q   But you can also obtain a synthetic minor, as you

7  described in your direct, by capping it at a baseline plus

8  whatever applicable threshold there might be under the New

9  Source Review rules, right?

10 A   Right.  It has a slightly different term.  We're talking

11 about definitions here, but yeah.

12 Q   In concept, it's the same thing, right?

13 A   Right.  In concept, you can do that.

14 Q   And you have, in fact -- and it doesn't matter whether

15 it's an attainment area or non-attainment area.  This process

16 which you described in your direct is the same for the

17 synthetic minor we'll call it, right?

18 A   Right.

19 Q   You've, in fact, advised clients to do just that, to take

20 a cap on their emissions rather than make the decision to

21 install pollution controls; isn't that right?

22 A   Could you repeat that?

23 Q   Sure.  If I'm going too fast, tell me.

24      You have, in fact, advised clients to do just that, to

25 take a cap on their emissions rather than make the decision to

*FOX − CROSS/BOXERMAN*                  Vol. 2-364

1  install pollution controls?

2  A    I have advised some clients, yes.

3  Q    And you have had clients that were adding equipment; and

4  the client chose not to trigger the New Source Review

5  requirements, and so you advised them you can take a cap

6  instead, right?

7  A    That's correct.

8  Q    In fact, you would agree that it's a very common practice

9  for sources to do that, right?

10  A    It's a very common practice for some types of sources to

11  do it.  It is not a common practice for base−loaded electric

12  generation facilities.

13  Q    You do recall testifying at your deposition.  Tell me if

14  you still agree with this statement, that it's very common

15  across industry, whether it is utilities or otherwise, to use

16  a synthetic minor permit to comply with the law rather than

17  install controls; isn't that right?

18        MR. BENSON:  Objection, Your Honor, this is improper

19  impeachment.

20        THE COURT:  She's entitled to take a look at it if

21  you've got it there.

22  Q    I'll just ask the direct question first and then if we

23  need to impeach you with your testimony, we will.

24        You would agree, wouldn't you, Dr. Fox, that it's very

25  common across industry, whether it is utilities or otherwise,

FOX - CROSS/BOXERMAN                    Vol. 2-365

1  to use a synthetic minor permit to comply with the law rather

2  than install or comply with New Source Review by installing

3  controls; isn't that right?

4  A    That's correct, and you asked me that in my deposition and

5  it gave me pause for thought.  So I went and did some

6  investigation; and what I discovered in my subsequent

7  investigations is that it is a common practice in some

8  industries.

9        For example, in the petroleum refining industry and

10  the ethanol production industry and manufacturing industries;

11  but it's not a common practice in the utility industry where

12  the generator is a base-loaded coal-fired power plant.  It's

13  quite uncommon in that.

14  Q    But I'm correct that you did make that statement at your

15  deposition, correct?

16  A    That's correct.  I made that statement.  You caused me to

17  think about it, and I went back and I looked at the permitting

18  record and, in fact, I found no cases similar to what we're

19  dealing with here where a cap would have been taken for a

20  modification of a major source which is a base-loaded electric

21  generation facility.

22  Q    But you agree with me that it was an option that was

23  available at the time?

24  A    I agree that it's an available technique, but --

25  Q    And there were other technologies that were available

1  other than a 95 percent scrubber when combined with a cap that

2  would have satisfied the requirements; isn't that right?

3  A    Yes.

4  Q    Now, your testimony was -- one part of your testimony

5  focused on the application of SCR, right?

6  A    Correct.

7  Q    And I think you explained that BACT, or Best Available

8  Control Technology, requires the technology to be available,

9  right?

10 A    Correct.

11 Q    And if a technology is not technically feasible, then it's

12 not considered to be available, right?

13 A    Correct.

14 Q    And if it's not commercially available for a particular

15 application, then it's also not considered to be available,

16 right?

17 A    Correct.

18 Q    And if it's only in a pilot project stage, it's likewise

19 not considered to be available, right?

20 A    If it's only --

21 Q    In a pilot project stage, then it's not considered to be

22 commercially available.  It's still being tested.  It's in the

23 pilot project stage, correct?

24 A    Correct.

25 Q    If it's still being researched to develop whether or not

1  it's capable of being applied to a particular type of

2  application, that, too, would not be considered available and

3  would not be considered as feasible for purposes of BACT;

4  isn't that right?

5  A    Correct.

6  Q    Now, in the case of the projects in question for the NOX

7  emissions, we have the two projects, one on Unit 3 in 1989 and

8  the second on Unit 5 in 1990, right?

9  A    Right.

10 Q    And the latter of the two was done in February --

11 approximately February of 1990, correct?

12 A    Correct.

13 Q    And that would have been the time when they actually took

14 the unit down and made the changes that resulted in the

15 finding of the modification, right?

16 A    Correct.

17 Q    Now, to have installed an SCR during that particular

18 outage, you would agree with me that the company would have

19 had to make some plans before that outage in order to

20 accomplish that; isn't that right?

21 A    That's correct.

22 Q    And they would have had to consider the technologies, make

23 an application, and receive a permit, right?

24 A    That's correct.

25 Q    And once they have the permit, then they would have a

FOX - CROSS/BOXERMAN                Vol. 2-368

1  certain period of time after that to construct the pollution

2  control and make the change to the plant so that they could

3  have it up and running at the time of the outage in February

4  of 1990, right?

5  A    Right.

6  Q    So all of that planning would have had to have been done

7  some years before the time of the outage in February of 1990,

8  right?

9  A    The planning would have had to have been done, but the

10 BACT determination would have been made at the date of issue

11 of the permit.

12 Q    At the date of issuing of the permit, right?

13 A    Right.

14 Q    The permit, though, would be issued some years before

15 because you can't start constructing an SCR until you have a

16 permit to do so, right?

17 A    But it's feasible to plan on installing low NOX burners.

18 You could plan on that.  By the time you get to the end of

19 your planning period, another technology is BACT and you have

20 to start over.

21 Q    Are you suggesting that a company like PSI in 1985 would

22 make its plans, get its permit, and then on January 1 after

23 investing a lot of time and money and effort to get everything

24 going, if there was a change in the BACT determination

25 somewhere in the United States, they would have to drop

1  everything and start over?

2  A   It wouldn't be dropping everything because NOX would have

3  been low NOX burners plus SCR.

4  Q   I see.  But you're saying it was BACT.  SCR was BACT,

5  right?  That's your testimony?

6  A   Low NOX burners plus SCR was BACT.

7  Q   I apologize.  Low NOX burners plus SCR.  But that would

8  have been required for them to undertake the physical change

9  at the plant, right?

10  A   They would have had to have done some additional planning

11  for the SCR.

12  Q   To plan and install an SCR, that's going to take two or

13  three years at a minimum, even in today's era, right?

14         I'll take your time period.  About two years?

15  A   You asked me this in my deposition.  I said I was going to

16  rely on EPA's numbers.  As I recall, the EPA number was 21

17  months but you caused me to think about it.  So I went and

18  researched how long it would actually take, and the Institute

19  of Clean Air Companies, which is a collection of vendors of

20  equipment like SCR and FGD have published a report on the time

21  it takes to install an SCR.  And the time range is a little

22  less to a little more than one year.

23  Q   So I'll take your word for that, whether I agree or

24  disagree; but let's assume it is a year.  You would agree that

25  there would need to be some time of planning, purchasing,

1  permitting, and all that has to take place in advance of the

2  outage of February of 1990, right?

3  A    Right.

4  Q    Now, to be clear, you would agree that there were no

5  full-scale applications of SCR in a pulverized coal-fired

6  power plant in the United States as of June 1989, the first

7  project?

8  A    That's correct.  There were none, but the time was ripe

9  for one.

10 Q    I understand that's your opinion.  I just want to confirm

11 that you agree that there were no full-scale applications on a

12 coal-fired power plant in June of 1989?

13 A    That's correct.

14 Q    And likewise, there were no full-scale applications of SCR

15 operating on any coal-fired utility in the United States --

16 pulverized coal-fired utility in the United States as of

17 February of 1990, correct?

18 A    There were none operating, but a permit application had

19 been submitted for one in the prior year.

20 Q    That was your testimony on direct.  I heard that, but you

21 agree with me that even as of February of 1990, there were no

22 full-scale applications on any pulverized coal plant like the

23 Wabash River station at the time of the project at Unit 5?

24 A    Correct.

25 Q    So you would agree with me that in the scenario that you

FOX – CROSS/BOXERMAN                    Vol. 2–371

1  are hypothesizing in this case, the retrofit of SCR on these

2  units would have been the first retrofit on a pulverized coal

3  plant anywhere in the United States?

4  A    That's right.  Someone has to be first.  The time was ripe

5  and it could have been Wabash.

6  Q    But you agree it would have been the first?

7  A    It would have been the first.

8  Q    And it likewise would have been the first retrofit ever of

9  an SCR and a scrubber together on a pulverized coal–fired

10 power plant, right?

11 A    In the United States?

12 Q    In the United States.

13 A    Yes.

14 Q    Now, as I hear your testimony, you said that there were

15 vendors who were willing to sell catalysts or SCR at this

16 point in time, and that's one of the reasons that you believe

17 it was available, right?

18 A    Correct.

19 Q    Now, in my experience, and it's not necessarily the SCR

20 purchasing, but you're often deluged with salesmen who are

21 willing to say "I can sell you.  I'm willing to supply you

22 something."  But the devil's always in the details.

23        My question for you is do you have any evidence for us

24 that suggests that the vendors were willing to supply a

25 catalyst for a pulverized coal–fired power plant with the

1  removal efficiency that you are suggesting in this case?

2  A    I believe in my expert report.  I cited two such

3  instances.  And in addition, around that time period, I was

4  involved in the use of SCR on gas and oil-fired sources in

5  California.

6        In conjunction with that work, I looked rather broadly

7  at the experience with SCR in Japan and Europe as well as what

8  was going on in the United States; and I talked to vendors at

9  that time, and I collected literature from them.  So in my

10 files, I have vendor literature selling or attempting to sell

11 SCR catalysts for coal fired and other sources in the United

12 States.

13 Q    But none had been purchased at that point, correct?

14 A    None had been purchased at that point.

15 Q    Now, you're aware, aren't you, Dr. Fox, that around this

16 time, EPA was considering a proposal to adopt a presumptive

17 BACT for coal-fired power plants; isn't that right?

18 A    That's correct.

19 Q    And they were proposing a presumptive BACT for nitrogen

20 oxide emissions to be low nitrogen oxide burners; isn't that

21 right?

22 A    They were proposing to adopt presumptive BACT to align the

23 requirements in Title 1 and Title 4 of the Clean Air Act.

24 Q    Well, you would agree with me that in June of 1991, EPA

25 proposed a presumptive BACT for all coal-fired power plants

FOX – CROSS/BOXERMAN              Vol. 2-373

1  and their proposal was that it would be low NOX burners,

2  right?

3  A   Well, that proposal that you're referring to, which you

4  haven't showed me yet, but I remember it from my deposition,

5  was only a proposal.  It was a draft.  If you look at the

6  final, you'll see a very different conclusion.

7  Q   But certainly EPA was well aware of the presence of SCR,

8  but they nonetheless proposed low nitrogen oxide burners;

9  isn't that right?

10 A   It was a draft proposal.  The final does not contain a

11 proposal for presumptive BACT for low NOX burners.  In fact,

12 if you look at the final, you'll see a discussion of the use

13 of SCR on, I believe, 200 units in seven nations and EPA

14 declined to set a presumptive BACT.  You've only been showing

15 me the draft.

16 Q   Now, you mentioned later in your direct that there -- that

17 the issues associated with the blue plume and the other

18 technical issues associated with SCR were resolved currently,

19 right?

20 A   Correct.

21 Q   I don't think there's much debate currently about whether

22 or not SCR is available or not.  But the catalyst issues were

23 a real issue at the time of these projects; isn't that right?

24 A   At the time of these projects, there had been experience

25 in Germany using medium to high sulfur coals if they had

FOX – CROSS/BOXERMAN          Vol. 2-374

1  encountered the problem.  The Germans had encountered the blue

2  plume problem, and they had developed solutions for it.

3  Q    But you agree there were issues at that time applying the

4  technology to coal comparable to that in use at the Wabash

5  River station, right?

6  A    No.  The problems that I'm aware of with the sulfur

7  content of the coal were on high sulfur coals.

8  Q    But you would agree with me, Dr. Fox, that generally,

9  sulfur content of coal in Japan and Germany is 1 percent or

10 less, right?

11 A    Most of the coal burned in Japan is around 1 percent or

12 less.  However, not all; and there were one or two units in

13 Japan that were burning higher sulfur coal, 2.5 percent sulfur

14 coal, which is somewhat higher than what was proposed, or then

15 used for Wabash.

16 Q    So are you saying that one or two examples would be

17 sufficient to transfer that technology to the United States?

18 Is that what you were saying?

19 A    There was also similar experience in Europe.  And that

20 historical experience with SCR was specifically relied on EPA

21 retrospectively to revise the New Source Performance Standards

22 in 1997 to 1998.

23 Q    Now, there were issues though –– and when we're talking

24 about issues, we're talking about the blue plume, which is a

25 formation of acid, which can then –– or acid mist that can go

FOX - CROSS/BOXERMAN                Vol. 2-375

1  onto ground level, right?

2  A    Right.

3  Q    That was where your counsel -- Mr. Benson was asking you

4  about the purchase of a town, right?  That arose in the

5  context of an AEP plant, the Gavin plant, right, in the United

6  States in 2003, right?

7  A    But --

8  Q    Is that correct?

9  A    Your statement has portions that are correct and portions

10 that are not.

11 Q    Okay.  Let me take it in small bites.  You agree there was

12 an SCR installed on AEP's Gavin station, right?

13 A    Correct.

14 Q    One of the outcomes of that installation was the formation

15 of a blue plume or this acid mist that reached ground level,

16 right?

17 A    Yes.

18 Q    And it was a problem that impacted a neighboring town, the

19 town of Cheshire, correct?

20 A    Well, there's two problems rolled in together there.  The

21 SCR created the blue plume.  There was a separate problem at

22 Gavin that had nothing to do with the SCR.  There had been a

23 long history at Gavin of what is called "plume touchdown."

24 The plume would come up the stack and roll down the side of

25 the stack and come down into the town.  That is separate from

FOX - CROSS/BOXERMAN                Vol. 2-376

1   the blue plume problem.

2        AEP bought the town of Gavin because of the plume

3   touchdown issues.  That didn't solve the blue plume problem

4   which continued.  AEP ultimately solved it by injecting trona

5   into the duct.

6   Q   And this issue with the SCR and the injection, that was

7   resolved in 2003 thereabouts?

8   A   Thereabouts; but that problem arose because the Gavin

9   station burned very high sulfur coal.  Its fuel contained

10  7.5 pounds of SO2 per MMBTU.

11       Wabash, on the other hand, is a medium sulfur coal

12  which burned 2.8 to 2.5 pounds of SO2.  And I'm not aware of

13  plants that burn low sulfur coal that have blue plume problems

14  such as Gavin experienced.

15  Q   Now, you also testified about the calculation of excess

16  emissions that Mr. Rarick prepared, right?

17  A   Correct.

18  Q   I think you used the speed limit analogy in criticizing

19  his --

20  A   Yes.

21  Q   Overall, the difference between your calculations and his

22  calculations, assuming that there was a cap, if I'm not

23  mistaken, was approximately 7,000 tons over the 20 years?

24  A   I would have to look.

25  Q   I think your number was 120,000, and his was approximately

FOX – CROSS/BOXERMAN                 Vol. 2-377

1  113.  Does that sound about right?

2  A   Sounds about right.

3  Q   Now, your analogy was to the speed limit, and if you go

4  below the speed limit, you don't get credit for that, right?

5  That was your analogy?

6  A   Right.

7  Q   If we instead analogize the emissions to the number of

8  miles that you travel, you would get credit if you drove less,

9  right, in a sense by emitting fewer emissions over the course

10  of the last 20 years, right?

11  A   You wouldn't get credit for --

12  Q   I'll skip that.  It's probably too complicated anyway.  I

13  apologize.

14       You talked about the number of SCR that are on smaller

15  units; do you remember that?

16  A   Yes.

17  Q   I think you said there are a thousand plus units and about

18  half of them are in the 10 to 200-megawatt range; is that

19  right?  Does that sound right?

20  A   That sounds right.

21  Q   Have you quantified how many plants that are smaller than

22  100 megawatts have an SCR?

23  A   No, I haven't.

24  Q   Have you quantified how many less than 100 megawatts have

25  an SCR and a scrubber?

1  A    I have not.

2  Q    Now, you mentioned at one point your understanding of, I

3  think it was -- you referred to it has the acid rain database.

4  You understand the Clean Air Act subjects utilities like

5  Cinergy to a cap on their emissions of SO2, right?

6  A    Could you say that again?

7  Q    You understand that the Clean Air Act subjects utilities

8  like Cinergy to a cap on their emissions of SO2?

9  A    Are you referring to Title 4?

10 Q    Yes.

11 A    Yes.

12 Q    That's known as a -- part of a cap and trade program?

13 A    Correct.

14 Q    And allowances are assigned to utilities on a system-wide

15 basis?

16 A    Generally, yes.

17 Q    And that allows a utility like Cinergy to allocate those

18 allowances within its system?

19 A    I'm not really an expert on allowances; and I have no

20 opinion on allowances.

21 Q    I would like to shift gears then for a second.  Do you

22 remember being shown an excerpt from the testimony of

23 Mr. Benning --

24 A    Yes.

25 Q    -- by your counsel?

FOX – CROSS/BOXERMAN               Vol. 2-379

1        Did you read the entire submission?  It's a fairly

2   lengthy document.  You read the entire submission?

3   A   I assume I did.  I read Mr. Benning's testimony.  I didn't

4   read what came before and after it.

5   Q   It's not your view, Dr. Fox, that this was a BACT analysis

6   or a BACT issue that you were testifying to, was it?

7   A   No, it wasn't a BACT analysis.

8   Q   You know that this analysis that was represented has

9   nothing to do with NSR, right?

10  A   My understanding of that analysis was to present to the

11  Indiana Utility Regulatory Commission Cinergy's program to

12  refurbish its unit.  So no, it was not a BACT analysis.

13  Q   In fact, the company was discussing with the Indiana

14  regulatory agencies the proposed environmental regulations

15  such as, at this point in 1989, the expectation that there

16  might be new legislation, the Clean Air Act legislation, the

17  Clean Air Act of 1990; isn't that right?

18  A   Yes.  Well, I don't know what legislation they were

19  discussing, but they were discussing some anticipated

20  regulation.

21  Q   You understand that this testimony is all based on the

22  predictions of what that legislation may or may not

23  contemplate, right?

24  A   I don't recall that.

25  Q   You don't recall that?

FOX - CROSS/BOXERMAN                Vol. 2-380

 1  A    No.

 2  Q    There was the excerpt -- this was the excerpt that your

 3  counsel shared with us.  Doesn't it say that the company will

 4  have to evaluate whether the cost of refurbishing the unit and

 5  making the necessary modifications or additions to meet the

 6  proposed environmental regulations, right?

 7  A    Right.

 8  Q    So that's what it's referring to.  And it's actually

 9  referring to proposed regulations in legislation in the Clean

10  Air Act, right?

11  A    Well, I did not see a specific reference to what proposed

12  regulations were being discussed.  I read that paragraph and

13  remember it, but I don't recall that this testimony identified

14  the proposed regulations that was the subject of this

15  testimony.

16  Q    Did you read the rest of the testimony that's included in

17  Plaintiffs' Exhibit 1955?

18  A    I didn't read other individuals' testimony.  I just read

19  Benning's.

20  Q    You just read Mr. Benning's testimony?

21  A    That's correct.

22  Q    You're not aware that this was part of a complete package

23  of submissions that were made by the company at that time?

24  A    I was aware it was part of a complete package, but I did

25  not read the entire package.

FOX - CROSS/BOXERMAN              Vol. 2-381

1  Q   This is from the testimony of Mr. Quarles, also submitted

2  at the same time, Dr. Fox.  In here, it references that the

3  company was making these evaluations in the context of one of

4  the bills requiring utilities to install controls of this

5  type.  Isn't that what it says?

6        MR. BENSON:  Objection, excuse me.  The witness has

7  just said she's never seen these documents before.  She only

8  looked at the Benning testimony.

9        THE COURT:  I think she can answer this question.

10       COURT CLERK:  Mr. Boxerman, could you repeat the

11 question, please.

12       MR. BOXERMAN:  Could you read it back?

13   *(The pending question was read back by the reporter.)*

14 A   Okay.

15 Q   Is that what it says?

16 A   What's the question?

17 Q   Am I properly representing what Mr. Quarles testified to?

18 A   Well, Mr. Quarles testified to the fact that they were

19 evaluating the cost of installing controls on the units and

20 refurbishing then.

21 Q   He was doing so in the context of potential legislation;

22 isn't that right?

23 A   I don't have the whole document.  So I don't know -- my

24 understanding was the context here was the refurbishment of

25 the units; and they're also evaluating the effect of the

*FOX – CROSS/BOXERMAN*                    Vol. 2-382

1  proposed regulations on the refurbishment of the units.

2          Mr. Benning's conclusion was that installing the

3  controls that might be required by this legislation and

4  refurbishing the units would be more cost effective than

5  shutting them down.

6  Q   But certainly the overriding reason, as Mr. Quarles goes

7  on to say, was because of the potential legislation; isn't

8  that right?

9  A   The overriding reason for installing the controls would

10 have been the proposed legislation.

11 Q   So the point is this isn't really an environmental plan at

12 all, is it?  This testimony to the Public Utility Commission,

13 right?  You wouldn't consider this an environmental compliance

14 plan, right?

15 A   No, I wouldn't.

16 Q   This was the utility advising the utility commission of

17 potential legislation and potential activity that might occur

18 if that legislation is enacted, right?

19 A   That's one thing that was discussed.

20 Q   But you would agree with me this has nothing to do with

21 BACT standards or NSR, right?

22 A   I don't know what the proposed legislation is.  So I can't

23 answer that.

24 Q   So you don't know one way or another?

25 A   I don't know.

FOX - CROSS/BOXERMAN                    Vol. 2-383

1  Q    Now, you provided some testimony about guarantees; is that

2  right?  I think you mentioned 99 percent guarantees from some

3  vendors?

4  A    Correct.

5  Q    For SO2 removal; is that right?

6  A    Correct.

7  Q    And that would translate -- are you suggesting that that

8  should be the permit limit in some future permit or are you

9  simply saying that's something that could be accomplished?

10 A    I'm saying that's something that could be accomplished,

11 and it would not be unreasonable to require it in a permit;

12 and it, in fact, has been required in a permit.

13 Q    But that would be the lowest permit in any operating unit

14 in the United States, right?

15 A    That I'm aware of, correct.

16 Q    Now, when sources get guarantees, that's just a promise

17 from the vendor, right?  It's not a -- it's not like the

18 vendor is going to be there to operate the scrubber, right?

19 A    No.  The owner operates the scrubber.  It's a promise from

20 the vendor to make sure the scrubber operates the way it was

21 guaranteed and designed.

22 Q    But those guarantees are limited in time, right?

23 A    Some are.  Some aren't.

24 Q    And in the examples that you gave in North Carolina,

25 that's a state where the company is subject to a removal

FOX - CROSS/BOXERMAN                    Vol. 2-384

1  efficiency rate of 95 percent, right?

2  A    That's correct.

3  Q    So the additional guarantee that's provided is really a

4  cushion to the company in order to meet a more lenient

5  compliance point; isn't that right?

6  A    Well, my understanding of the Duke guarantees in North

7  Carolina to comply with the North Carolina Clean Air Act is

8  the following:  Duke is required to meet 95 percent burning

9  its typical coal, which has 2.8 pounds of SO2 per MMBTU.

10         However, Duke sometimes gets higher sulfur coals, and

11 to assure that it can meet the regulations burning any coal

12 that may come in the door, including a higher sulfur coal,

13 they want the ability to ramp up their scrubbers to

14 99 percent, which in most of the cases they elect to do by

15 installing a dibasic acid system.

16 Q    Now, there's no then expectation that it would be operated

17 at that higher level consistently over time, right?

18 A    That's correct, because Duke has no regulatory requirement

19 to do that.  They're only required to operate at 95 percent to

20 comply with the North Carolina Clean Air Act.

21 Q    Let's talk a little bit about cost.  One question I

22 have -- I should probably have a clean copy, but maybe you

23 have it in front of you anyway; what's been marked, for

24 example, as PF No. 9.  It's the SCR cost estimate.  Do you

25 have that in front of you?

FOX - CROSS/BOXERMAN                Vol. 2-385

1   A   Yes, I do.

2   Q   You've got four different numbers here.  Is it your

3   testimony that the -- your estimate, the Fox Wabash River

4   estimate is the estimate that you're standing behind as an

5   expert as the estimate of the cost for an SCR at Wabash

6   River 4 and 6?

7   A   No.  I view my role as laying out some of the options that

8   could be used as remedy in this case.  The judge will decide

9   what remedy it is.

10  Q   Of course.  Maybe I misled you with my question.  I'm not

11  asking you to say this is what I think the remedy is.

12      I'm saying assuming that the remedy were considered to

13  control 4 and 6, is it your testimony that you, as an expert,

14  believe that the cost will be -- you know, this is an

15  estimate -- $136 million?

16  A   No.  My testimony is the cost of installing a scrubber at

17  Units 4 and 6 will range --

18  Q   An SCR?

19  A   SCR at Units 4 and 6 will range between 37- and

20  $178 million.  Somewhere in that range is what an SCR cost

21  will be.

22  Q   You seriously believe, Dr. Fox, that an SCR can be built

23  today at Wabash River station for $37 million?

24  A   That's what has been experienced at other facilities.

25  Q   What year was the $37 million number?

FOX - CROSS/BOXERMAN                Vol. 2-386

1  A    It's in my expert report.  I can --

2  Q    If you can find that or if you know generally.  Is it in

3  the last two years?

4  A    No. I think it's probably 2001 data, which I escalated

5  using engineering cost estimates.  I think the most accurate

6  estimate actually is the second one, the Oak Creek SCR because

7  that cost was done very recently.  It's an all in cost.  It

8  included owners' costs, ASDC, contingencies, and that cost was

9  comprehensively vetted by the Wisconsin Public Services

10 committee and intervenors and staff, and certified by --

11            COURT REPORTER:  Ma'am, "intervenors and --

12 Q    I think she said "staff."

13 A    Staff, sorry.  It's the same kind of SCR at Units 5, 6 and

14 8 which are about the same size as the Wabash units; and it is

15 a cold side SCR which is located between the electrostatic

16 precipitators and the wet FGD.  So it would be in roughly the

17 same position, and it's a very space-constrained site.

18            So in my opinion, the Oak Creek estimate would be the

19 closest to what would be experienced here; but I concede that

20 the cost could range all the way up to Mr. DePriest estimate

21 of $178 million.

22 Q    Now, with respect to the scrubber, which is Plaintiff --

23 I'm sorry -- PF No. 8, is it your testimony that the -- your

24 own estimate of $248 million is the estimate that you believe

25 is the best estimate?

FOX – CROSS/BOXERMAN            Vol. 2-387

1   A   Again, I believe that a scrubber at Units 4 and 6 will

2   cost somewhere between Babcock & Wilcox's estimates for

3   Cinergy of 179 million and Mr. DePriest's estimate of

4   287 million.

5   Q   Now, the Babcock & Wilcox estimate, that was not for a

6   99 percent removal efficiency, was it?

7   A   No, it wasn't.  It was --

8   Q   And there would be additional capital and O & M

9   associated --

10          MR. BENSON:  Excuse me.  She wasn't finished with

11  her answer.

12          THE COURT:  She was not.

13          MR. BOXERMAN:  I apologize.  I'm sorry.  Sometimes I

14  do that and I don't mean to be discourteous.  Please complete

15  your answer.

16          THE WITNESS:  What was I saying?

17      (The previous answer was read back by the reporter.)

18  A   No, it wasn't.  The Babcock & Wilcox was for a 97 percent

19  efficient scrubber.  My estimate was for a 99 percent

20  scrubber, and I believe Mr. DePriest estimated a 98.5 percent

21  scrubber.  So they're somewhat different, but the cost -- the

22  actual costs will fall somewhere in this range.

23  Q   The Babcock & Wilcox estimate was also more of a

24  stripped-down model; isn't that right?

25  A   Yes.  It was a stripped-down model without spares.  So it

1  would definitely be on the lower end.

2          Mr. DePriest's estimate, on the other hand, was on the

3  high end, I think excessively high, because he made

4  assumptions about AFUDC and contingencies that I think were

5  unrealistically high, which is why, I believe, the true cost

6  lies somewhere between the two means -- the two ends of the

7  range.

8  Q    So perhaps your estimate -- your testimony would be your

9  estimate would be somewhere in the middle?

10 A    Somewhere in the middle, right.

11 Q    Now, your estimate is based on a -- as I recall, it's

12 based on using a software, an EPA software, as adjusted by you

13 and Mr. Taylor, right?

14 A    Correct.

15 Q    So you didn't actually go out into the marketplace to

16 evaluate what it cost today to actually bid a contract and

17 build a scrubber; isn't that right?

18 A    I believe Mr. Taylor did go out into the marketplace and

19 get industry numbers.  We did not use the entire CUECost

20 software.  We only used it to do the mass balance modeling

21 portion in the front end.

22 Q    But the bulk of the inputs for your cost estimate were the

23 standard default numbers included in that software, right?

24 A    For the mass balance front end, to calculate the flow rate

25 and the amount of limestone you need, yes; but as far as

1 costing the module and the equipment, Mr. Taylor went out into

2 the market.

3 Q   But the overall estimate was not a full soup to nuts

4 evaluation based on an actual construction of a scrubber in

5 the marketplace, right?

6 A   It was what's called a study estimate, an error of plus or

7 minus 30 percent.

8 Q   Dr. Fox, you also provided testimony on mercury emissions?

9 A   Yes.

10 Q   I think you gave us a total number of about a thousand

11 pounds over the last 20 years?

12 A   A thousand pounds excess, correct.

13 Q   And have you divided the thousand pounds among the

14 categories of -- let me put it this way.  I didn't see

15 anywhere where you divided it between elemental, oxidized and

16 particulate; is that right?

17 A   The only place I did that was in my expert report where I

18 said roughly 20 percent would be elemental and 80 percent

19 oxidized at the stack.

20 Q   Now, you further assumed as part of your analysis that

21 there was a certain percentage removal of the existing

22 electrostatic precipitator at the Wabash River station, right?

23 A   Correct.

24 Q   That's part of your analysis?

25 A   That's correct.

1  Q    And you assumed 28 percent; is that right?

2  A    That's right.

3  Q    And you're aware, aren't you, that the company has

4  information from a study that indicates the electrostatic

5  precipitator at Wabash River was achieving a removal

6  efficiency of higher than that; isn't that right?

7  A    The company actually has information indicating that the

8  precipitators achieved both the higher and the lower removal

9  efficiency.

10  Q    Now, your calculations assume that both an SCR and a

11  scrubber are installed at Wabash River, right?

12  A    Right.

13  Q    And if, in fact, it were the case that an SCR was not

14  installed, then you would have less mercury oxidized, right?

15  A    That's correct.

16  Q    And so the actual amount of mercury that you would be

17  calculating would be reduced, right?

18  A    That's correct.

19  Q    And just if the company had only installed low NOX burners

20  in your hypothetical analysis, that would not contribute to

21  the oxidizing of the mercury, right?

22  A    That's correct.

23  Q    Now, I think you testified that if the company were to

24  install a less efficient 95 percent removal scrubber, that it

25  will take 11.7 years to offset the excess emissions; is that

FOX — CROSS/BOXERMAN                Vol. 2–391

1  right?

2  A    It will take 11.7 years to offset the total emissions.

3  Q    So —— okay.  Thank you.

4          THE COURT:  Redirect?

5          MR. BENSON:  Yes, Your Honor.

6                  **REDIRECT EXAMINATION**

7  BY MR. BENSON:

8  Q    Dr. Fox, Mr. Boxerman was just asking you a few questions

9  about your mercury calculations.  First of all, if we could

10 clarify, he asked did your calculations assume SCR and

11 scrubber.  Was that true for each of Units 2, 3 and 5?

12 A    No.  Unit 2 did not have a NOX claim.  So there was no SCR

13 on that unit.

14 Q    If —— and Mr. Boxerman also asked you questions about if

15 there was no SCR installed, just an FGD.  How would that

16 affect the mercury removal efficiency that you calculated?

17 A    The mercury removal efficiency from the scrubber alone

18 would range between 40 and 60 percent.

19 Q    What's your basis for that conclusion?

20 A    Published studies that have been done.

21 Q    Mr. Boxerman asked you a few questions about the Benning

22 testimony that we saw in your direct exam.  In your

23 experience, is it reasonable to rely on that type of analysis

24 in doing a BACT determination?

25 A    Which type of analysis?

1  Q    I'm sorry, the type of analysis that Mr. Benning described

2  in his testimony.  Is it reasonable to rely on statements that

3  a company makes to the IURC in performing a BACT analysis?

4  A    No.  That's not a BACT analysis.

5  Q    Is that a reasonable thing for someone to rely on in

6  performing a BACT analysis?

7  A    It's reasonable only in that it demonstrates that Cinergy

8  considered FGD to be feasible at the Wabash station in, I

9  believe, 1983.  So it establishes what technology was

10 achievable at that point in time.

11 Q    Then Mr. Boxerman also asked you some questions about the

12 testimony of Mr. Quarles, which you hadn't seen before, and he

13 was talking about what the applicable environmental

14 regulations were.

15        Is there any reason to believe that the actual

16 regulations that applied would affect what the cost of a

17 scrubber was?

18 A    Yes.

19 Q    Why is that?

20 A    Well, regulations commonly specify the control that is

21 required to meet them, like the Title 4 program in phase one

22 specified that low NOX burners were the method to be used.

23        New Source Performance Standards, for example, which

24 could have been one of the things that was being referred to

25 at that point in time, specify what emission level has to be

FOX – REDIRECT/BENSON          Vol. 2-393

1  met using best demonstrated technology, which at that point in

2  time would have been a wet FGD achieving 90 percent removal or

3  an emission rate of 1.2 pounds of SO2 per MMBTU or SO2.

4  Q   Is there anything in the testimony that you saw from

5  Mr. Quarles about what the applicable regulations might be

6  that would affect your decision to look at the Benning

7  testimony in its description of the company's looking at

8  scrubbers?

9  A   No.

10  Q   Now, Mr. Boxerman asked you some questions about whether

11  there were any plants that are less than 100 megawatts that

12  have either SCR or FGD.  Do you remember that question?

13  A   Yes.

14  Q   How many megawatts is the Wabash River plant?

15  A   The entire plant gross megawatts is 715.

16  Q   And it's the units that we're talking about that are about

17  100 megawatts; is that right?

18  A   Units 2, 3 and 5 have 90 megawatts gross.  Unit 4 has

19  104 megawatts gross.

20  Q   Is it uncommon to install SCR or scrubbers on plants that

21  have a series of units that are around 100 megawatts?

22  A   No, it's not uncommon.  When you have a series of smaller

23  units, what you do is you duct them together and you install

24  one scrubber or one SCR that treats the flue gas from the

25  collection.

1          MR. BENSON:  At this time, we'd like to offer

2    Plaintiffs' Exhibit 2090.  I'm going to try to do it on the

3    ELMO if I can.

4          MR. BOXERMAN:  There is an objection.

5          MR. BENSON:  There is an objection.  I was getting

6    to that.  It's been stipulated as authentic, and I'll let

7    Mr. Boxerman express his objection.

8          THE COURT:  Can you tell me what it is?

9          MR. BENSON:  This is a document created by Babcock &

10   Wilcox.  It was sent to Cinergy in advance of a meeting that

11   Babcock & Wilcox and Cinergy had in October of 2006.

12         THE COURT:  It's being offered because?

13         MR. BENSON:  It's being offered because it describes

14   a −− it actually goes to the Babcock & Wilcox scrubber design

15   that Dr. Fox talked about earlier at Wabash River, and it

16   describes in more general terms the possibilities for putting

17   pollution controls on multiple relatively small units.

18         MR. BOXERMAN:  Your Honor, this is like a

19   presentation or sales pitch by Babcock & Wilcox explaining and

20   selling their wares.  It's hearsay.  If they wanted to

21   introduce it, Babcock & Wilcox needs to be responsible for it.

22   It's not a Cinergy record.

23         MR. BENSON:  If I could, Your Honor, we would say it

24   is a party admission.  It is something Cinergy expressed −− I

25   shouldn't say expressed reliance on.  It's an entity hired by

*FOX – REDIRECT/BENSON*              Vol. 2-395

1  Cinergy to do a study of FGD at Wabash River, and this is part

2  of that work.

3         MR. BOXERMAN:  There is no evidence it's part of

4  that work, and --

5         THE COURT:  It doesn't trouble you that this is a

6  sales pitch?

7         MR. BENSON:  I wouldn't agree with that

8  characterization.

9         THE COURT:  What would you call it?

10        MR. BENSON:  I can ask the witness about it.  I

11 believe this is an initial PowerPoint presentation that

12 Babcock & Wilcox presented, and they went on to do additional

13 work in terms of designing the 97 percent scrubber that we've

14 talked about at Wabash River.

15        THE COURT:  I'm going to sustain this objection at

16 this time.

17 BY MR. BENSON:

18 Q   Now, Dr. Fox, Mr. Boxerman asked you some questions

19 about -- when you and he were talking about historic SCR

20 installations, and he asked you some questions about the

21 experience overseas.  Do you recall that?

22 A   Yes.

23 Q   Are you aware of any instances where EPA or other entities

24 have used overseas experience in determining what control

25 technologies would be appropriate in the U.S.?

1  A    Yes.  I am aware of other experiences.  And A good example

2  would be the 1998 revision to the New Source performance

3  standards for NOX for electric generating units.

4          In conjunction with that revision, EPA in the early to

5  mid '90s conducted an extensive review of the experience with

6  SCR and other NOX control technologies in use in Japan and

7  Europe.  They made a field trip.  They collected continuous

8  emission monitoring and fact test data.  They wrote up two

9  detailed reports describing that experience, and they then

10 used that experience to set a much lower NSPS for electric

11 generating units.

12         They basically lowered the standard from .60 pounds

13 per MMBTU, which you achieve with a low NOX burner, all the

14 way down to .15 pounds per MMBTU which you can only achieve

15 with an SCR.  They made that determination based largely on

16 foreign experience.

17 Q    If we could have Image 22, please.  This has been marked

18 for identification as PS Demonstrative 13.

19         Dr. Fox, can you describe what this document is?

20 A    I can't read it.

21 Q    Okay.  Can we call out the description at the top where it

22 has the date and the little title?

23 A    I actually can't see anything except the --

24 Q    Will that work?

25 A    Okay, I can read it now.  This is the proposed revision of

1 standards of performance for nitrogen oxide emission from new

2 fossil fuel fired steam generating units; proposed revisions

3 to reporting requirements for standards of performance for new

4 fossil fuel fired steam generating units, July 9th, 1997.

5 Q   And is this the proposed rule that you were referring to

6 earlier?

7 A   That's correct.

8 Q   If we could turn to page 6 in this document.  If we could

9 call out the last full paragraph there.  Dr. Fox, does this

10 illustrate what you were referring to before?

11 A   Yes, it does.  Would you like me to read it?

12 Q   Can you read the applicable portion into the record?

13 A   "Application of flue gas treatment technologies on

14 coal-fired boilers in the United States has grown considerably

15 during the past two years.  However, both SNCR and SCR

16 technologies have been applied widely to commercial-scale gas

17 and oil-fired steam generating units.  Both technologies have

18 been applied to coal-fired steam generating units outside the

19 United States.  The SCR technology has been implemented on

20 coal-fired steam generating units in Germany and Japan over

21 the past 15 years, and has achieved substantially reduced NOX

22 emission levels.  A recent EPA report notes that there are 72

23 coal-fired plants (137 units) in Germany, 28 coal-fired plants

24 (40 units) in Japan, 9 coal-fired plants (29 units) in Italy,

25 and 8 coal-fired plants (10 units) in other European countries

FOX - REDIRECT/BENSON            Vol. 2-398

1  using SCR."

2  Q   I'll cut you off there, and state for the record this is

3  62 Federal Register 36948 at page 36950.

4        Dr. Fox, Mr. Boxerman asked you a few questions about

5  a proposed presumptive BACT level.  Do you remember those

6  questions?

7  A   Yes.

8  Q   I believe he was -- he was referring to the proposal and

9  you said there was a very different story in the final?

10 A   That's correct.

11 Q   If we could turn to Image 21, please, again if we could

12 call out the top.  For the record, this is PF Demonstrative

13 12.

14       Dr. Fox, do you recognize this document?

15 A   Yes, I do.

16 Q   Just briefly, what is it?

17 A   This is the final of the 1991 proposal that Mr. Boxerman

18 asked me about.

19 Q   If we turn to the page labeled 47, and if we call out that

20 first paragraph that has the highlights in it.

21       Dr. Fox, does this reflect what EPA knew at the time

22 in terms of SCR technology in use overseas?

23 A   Yes.

24 Q   I could direct you to the sentence that begins "Commenters

25 noted.

1  A   "Comments generally opposing the EPA proposal, and the EPA

2  proposal was presumptive BACT.  Concluding that the

3  presumption is unwarranted, misguided and possibly illegal,

4  several opponents of them noted that it forecloses

5  consideration of other NOX control technologies and ignores

6  the demonstrated track record and cost effectiveness of other

7  technologies such as selective catalytic reduction or

8  selective noncatalytic reduction.  Commenters noted that SCR

9  technology is in use in more than 200 power plants in six

10 nations and can achieve twice the NOX reduction achievable by

11 low NOX burners."

12 Q   I'm going to jump to a different subject.  You were asked

13 some questions from Mr. Boxerman about when you needed to make

14 a determination as far as what the BACT level technology was

15 and how that affected the installation.  When a company avoids

16 BACT and then later has to go back and get a permit, do they

17 have to −− are they required to install BACT as of the time

18 when they actually get the permit?

19 A   BACT applies as of the date of issue of the permit.

20 Q   So if Cinergy had come after the violations in 1989 and

21 gotten a permit in 1999, what type of control technology would

22 have been required for NOX, say?

23 A   In 1999, unquestionably SCR and FGD.

24 Q   Mr. Boxerman also asked you some questions about capping

25 emissions as a way to avoid having to get a New Source Review

1  permit.  Do you believe that would be a likely option for

2  Cinergy in this case at the time of the projects?

3  A    An unlikely option because the purpose of the projects

4  that we're talking about here was to extend the life of the

5  units and allow them to operate more hours.

6        Placing a cap on the emissions means that you're going

7  to have to limit the heat input or the hours of operation, and

8  that is contrary to the purpose of the project in the first

9  place.  So it would not be a particularly attractive option.

10        And furthermore, if you were going to consider doing

11  that, you would want to look at the economic implications

12  because any capping of emissions would reduce the electricity

13  that you could then sell, which would have a significant

14  economic impact that I'm sure Cinergy would want to look at.

15  Q    Just a couple final questions on your experience with

16  BACT.  Have you ever testified before either an administrative

17  setting or a judicial setting regarding BACT analyses?

18  A    Yes.

19  Q    Can you give us a sense of how many times?

20  A    Separate cases?

21  Q    Separate cases, yes.

22  A    Ten.

23  Q    Give us an example of some of the bodies you've testified

24  before on BACT issues?

25  A    On BACT issues, I've testified before the Wisconsin Public

FOX − REDIRECT/BENSON          Vol. 2−401

1  Services Commission, the California Utilities Commission, the

2  Bay Area Air Quality Management District, the South Coast Air

3  Quality Management District, the Kentucky Office of

4  Administrative Hearings, the hearing board in Missouri which

5  has had a recent name change and I don't know the current

6  name.  I've testified before the hearing board in Connecticut.

7  Q   We'll stop you there.  That's good enough.

8  A   That's what I remember off the top of my head.

9  Q   And to your knowledge, did the boards or the hearing

10 officers in those cases rely on your BACT testimony?

11 A   Yes.

12         MR. BENSON:  Nothing further, Your Honor.

13         THE COURT:  Recross?

14         MR. BOXERMAN:  Yes, Your Honor.  Thank you.

15                   **RECROSS−EXAMINATION**

16 BY MR. BOXERMAN:

17 Q   Could you call up again the 1997 document for us, please,

18 the page you were looking at.  You had a particular part that

19 was highlighted.

20         MR. BENSON:  Page 6, I believe that's what you want.

21         MR. BOXERMAN:  What's the reference to there?  PF −−

22         MR. BENSON:  PF Demonstrative 13.

23 BY MR. BOXERMAN:

24 Q   You remember looking at this during the examination by

25 Mr. Benson?

*FOX - RECROSS/BOXERMAN*                    Vol. 2-402

1  A    Yes.

2  Q    And what this is referring to is a 1997 EPA Federal

3  Register Notice?

4  A    That's correct.

5  Q    So it's six years after the proposal that we were

6  discussing?

7  A    That's correct.

8  Q    And the quote that Mr. Benson had you read refers to the

9  statements by commenters to EPA, not statements by EPA, right?

10 A    No, not this document.  I disagree with that.  These are

11 EPA's responses to comments.

12 Q    I think there's a part that we were looking at before

13 that's a little bit higher up.  Can you just include the part

14 where it says "Response to comments," I believe and summarize

15 the comments?

16       So this one is the 1997 final rule on the low NOX

17 burner issue?

18 A    This is the 1997 draft rule.

19 Q    And even six years later, there's no discussion of any

20 significant number of SCR in the United States; isn't that

21 right?

22 A    That's incorrect.  Elsewhere in this document, there's a

23 table that shows all of the SCRs that were then in operation

24 on coal-fired power plants in the United States, and it

25 includes three that went into operation in 1994.

*FOX − RECROSS/BOXERMAN*          Vol. 2−403

1  Q    So those were the first three in 1994?  That's your

2  testimony?

3  A    Correct.

4  Q    Now, you also testified about foreign EPA −− EPA

5  considering foreign examples.  I think that was the document

6  that you were referencing for that proposition, correct?

7  A    Foreign experience.

8  Q    That was the 1997 final rule.  It's true that EPA wasn't

9  relying on foreign experience in 1989 and 1990 for any BACT

10  determinations; isn't that right?

11  A    I have not done any investigations to determine whether

12  EPA had looked at foreign experience at that point in time.

13  Q    So you're unaware of any EPA BACT determination as of

14  1989, 1990 in which EPA relied on foreign experience to apply

15  technology and find that it was BACT, correct?

16  A    I'm aware of a guidance letter that was written by EPA

17  around that time that said thou shalt consider foreign

18  experience; but I'm not aware of any specific EPA BACT

19  determination in 1989.  I know that other agencies working

20  under EPA's guidance had specific ones.

21  Q    Likewise, the Indiana Department of Environmental

22  Management as of 1989, 1990, they were relying on foreign

23  experience to find the technology was available, right?

24  A    I have not investigated that question, so I know of none.

25  Q    And it's true, isn't it, that EPA was undertaking pilot

FOX – RECROSS/BOXERMAN                Vol. 2–404

1  projects and research on SCR in 1989 and 1990, isn't that

2  right?

3  A    A number of parties were undertaking pilot experiments in

4  the United States because the issue had been raised that U.S.

5  coals might be different from European coals and Japanese

6  coals, even though the U.S. imported coals from both Europe

7  and Japan.

8            MR. BOXERMAN:  Can we call up the 1992 document?  I

9  believe -- I'm sorry, I don't have the PF number.  These were

10  not included in the demonstratives you gave us.

11            MR. BENSON:  It's 12.

12            MR. BOXERMAN:  Can you call up PF No. 12?  Can you

13  go to the same spot that you were at during your redirect?

14  BY MR. BOXERMAN:

15  Q    Here, you remember reading from this document, Dr. Fox?

16  A    Yes, I do.

17  Q    This is the 1992 Federal Register Notice, right?

18  A    Correct.

19  Q    This is where EPA is reporting on what commenters -- the

20  statements of commenters, right?  These are not statements of

21  EPA; isn't that right?

22  A    These are EPA's summaries of comments that they received

23  on the draft 1991 documents.

24  Q    Right.  The statement that is "commenters noted" and then

25  it goes on, right?

*FOX – RECROSS/BOXERMAN*                Vol. 2-405

1  A   Yes.

2          MR. BOXERMAN:  May I approach, Your Honor?

3          THE COURT:  Yes.

4  BY MR. BOXERMAN:

5  Q   I'm going to hand you what's been marked as DR117.  If we

6  can switch back to the ELMO.

7          Can you turn to page 27638 of this June 14th, 1991

8  Federal Register Notice 56 --

9  A   57 --

10 Q   Federal Register.  I'm sorry.

11         This is where in 1991, EPA makes the statement that

12 SCR is not available in this country; isn't that right?

13 A   Show me where you're reading?

14 Q   It's on the screen where it says "SNR," which I believe is

15 a typo from just above:  "SCR and NCR not in use in this

16 country as retrofit technologies; isn't that right?

17 A   I'm still not seeing it.

18 Q   You don't see it on the ELMO there?

19 A   No, I don't.  Could you show me?

20         MR. BOXERMAN:  May I approach?

21         THE COURT:  Yes.

22 A   Okay.

23 Q   Doesn't it say there that these include "SNR and SNCR are

24 not in use in this country as retrofit technologies for

25 coal-fired boilers."  Isn't that what it says?

*FOX — RECROSS/BOXERMAN*          Vol. 2-406

1   A   It says "Other NOX control technologies are being

2   developed for retrofitted use on at least some coal-fired

3   electric utility units, and thus can provide a much greater

4   degree of emissions reductions.  Those --

5   Q   Those technologies have not yet been demonstrated, right?

6           MR. BENSON:  Please, Your Honor, she wasn't finished

7   with her answer.

8           THE COURT:  Let's let her finish.  Go ahead.

9   A   Let me read the whole thing.

10          What it says in the paragraph that you pointed out to

11  me, which is on page 27638 in the right-hand column, is that

12  "SCR and other technologies are being developed for retrofit

13  coal-fired use in the United States."

14          And it goes on to say, however, S -- and this is a

15  typo.  It says "SNR."  It should say "SCR and SNCR are not in

16  use in this country as retrofit technologies for coal-fired

17  boilers."  And I agree with that.  That's correct.  At the

18  time that this was written, SCR was not in use on coal-fired

19  boilers as a retrofit technology, but it was widely used

20  outside of the United States.

21  Q   Thank you, Dr. Fox.

22          Now, you also, on redirect, you were asked again about

23  the testimony of Mr. Benning.  Do you remember that?

24  A   Yes.

25  Q   Now, you told us on cross-examination that you don't know

*FOX − RECROSS/BOXERMAN*          Vol. 2-407

1  what laws or regulations were being evaluated at that time;

2  isn't that right?

3  A    I don't know.  I can speculate, but I don't know.

4  Q    And you don't know what became of those proposed rules or

5  whether any of them became law; isn't that right?

6  A    That's correct.

7           MR. BOXERMAN:  Thank you.

8           MR. BENSON:  Very briefly, Your Honor.

9           If we could have Image 21 again, please, and page 47

10  again.

11          If we could highlight the paragraph under the

12  heading 4, the EPA analysis.

13              **FURTHER REDIRECT EXAMINATION**

14  BY MR. BENSON:

15  Q    Dr. Fox, Mr. Boxerman asked you a couple questions

16  pointing out that what we had read before was a description of

17  what the commenters said.  Based on this language, did EPA

18  agree with that analysis or adopt that analysis?

19  A    EPA, based on the comments it received, rejected the

20  notion of presumptive BACT.  Do you want me to read it?

21  Q    If you want to just read the first sentence there, the

22  first part of it?

23  A    "Based upon a consideration of the comments received and a

24  reexamination of the relative facts and statutory provisions,

25  EPA has determined not to promulgate the presumption regarding

1  BACT for NOX.  The EPA is concerned that this presumption

2  would suggest preemption of the exercise of state discretion

3  in case by case decision-making which Congress envisioned as

4  fundamental to the BACT process."

5          MR. BENSON:  That's all, Your Honor.  I did have one

6  housekeeping matter if I could raise that at this time.

7          THE COURT:  Yes.

8          MR. BENSON:  I believe I neglected to move into

9  evidence Plaintiffs' Exhibit 2080, which we went through in

10  her direct exam.  If that's the case, I would like to

11  officially move it in now.  And I believe that was the

12  interrogatory responses.

13          COURT CLERK:  I actually show that submitted without

14  objection.

15          MR. BENSON:  Okay, then I will withdraw the request.

16          COURT CLERK:  What document was she just reading

17  from then?

18          MR. BENSON:  I'm sorry, it's PF Demonstrative 12,

19  and the cite in the Federal Register is 57 Federal Register

20  32314 at page 32332.

21          THE COURT:  Anything else?

22          MR. BOXERMAN:  Nothing else, Your Honor.

23          THE COURT:  All right.  You may step down.

24          Your next witness?

25          MR. FLINT:  Good afternoon, Your Honor.  At this

1  point, the Plaintiffs would like to call Kevin Vuilleumier to

2  the stand.

3          THE COURT:  Would you raise your right hand, sir?

4      *(Witness sworn.)*

5          MR. FLINT:  Your Honor, consistent with the prior

6  practice, Mr. Vuilleumier is here to testify at this point as

7  we start talking about the penalties sought for the AOC and

8  Ohio SIP violations at Unit 1 and Unit 2 of the WC Beckjord

9  plant.

10         The factors the Court is to consider in determining

11  the amount of any penalty is set forth at 42 U.S.C. Section

12  7413(e)(1) of the Clean Air Act.  Mr. Vuilleumier is here to

13  testify about the history of noncompliance at Units 1 and 2,

14  the duration of the violations, and the United States penalty

15  demand.

16         Because Defendants have stipulated that they are

17  jointly responsible for any penalty imposed at the remedy

18  trial, we will not address the issue of which defendant is

19  responsible for any portion of the penalty that may be

20  assessed by the Court.

21          **KEVIN VUILLEUMIER, PLAINTIFF'S WITNESS, SWORN**

22                   **DIRECT EXAMINATION**

23  BY MR. FLINT:

24  Q   Mr. Vuilleumier, would you please state your full name?

25  A   Kevin Vuilleumier.

VUILLEUMIER - DIRECT/FLINT         Vol. 2-410

1  Q   And could you give us your educational background?

2  A   Yes.  I have a Bachelor of Science in environmental

3  sciences from Aurora University, and I have a Master of

4  Science in environmental engineering from the Illinois

5  Institute of Technology.

6  Q   Did you specialize in any particular area during your

7  master's studies?

8  A   I did.  I specialized in air.

9  Q   Are you currently employed?

10  A   Yes.

11  Q   Where are you employed?

12  A   I'm employed with the U.S. Environmental Protection

13  Agency, Region 5, in the air and radiation division.

14  Q   What is your job title?

15  A   I'm an environmental engineer.

16  Q   How long have you held that position?

17  A   I've been in that position since April 1997, so almost 12

18  years.

19  Q   And generally, what are some of your duties as an

20  environmental engineer?

21  A   We have multiple duties.  Several that I can identify is

22  evaluating compliance with the Clean Air Act and the

23  underlying regulations.  We also are involved with developing

24  and recommending enforcement actions as well as developing and

25  recommending penalties.

VUILLEUMIER - DIRECT/FLINT          Vol. 2-411

1  Q   One of the items that you mentioned was compliance

2  evaluations.  What does that involve?

3  A   Compliance evaluations can involve a multitude of steps.

4  What you initially start out with is reviewing the historical

5  files that we have at the agency to get -- to identify the

6  facility.  You also review various records within those files.

7  Q   What types of records would be within those files?

8  A   Again, they can range, but they include things like

9  emissions test reports, excess emission reports, it may

10  include permits, whether they be Title 5 or permits to

11  install.  They also include past enforcement actions.

12  Q   Why do facilities submit documents such as emission tests

13  to EPA?

14  A   Typically, they are submitted as a means to demonstrate

15  compliance with an applicable limit, whether it be in a permit

16  or another applicable recommendation.

17  Q   Do you ever review emission tests?

18  A   Yes, I do.

19  Q   Could we have Image 1, please; and for the record, this

20  document has been marked as KV Demo 1.

21      Mr. Vuilleumier, can you briefly review the Court's

22  summary judgment order and order on motions in limine?

23  A   Yes.  For the liability aspect, the Court had found

24  Cinergy Corporation liable for violating a 1998 Administrative

25  Order on Consent.  It also found Cinergy Gas & Electric

VUILLEUMIER – DIRECT/FLINT          Vol. 2-412

1  Company liable for exceeding particular matter emission limits

2  in the Ohio SIP at Unit 1 and Unit 2.  That would be at the

3  Beckjord facility.

4  Q    When you state Ohio SIP, what does "SIP" stand for?

5  A    It stands for the State Implementation Plan.

6  Q    Going through -- again, referring to KV Demo 1, could you

7  identify the dates of the emission tests that were at issue in

8  this case?

9  A    Yes.  There were three conducted at Unit 1.  The first was

10  October 12th, 1999.  The second was May 4th, 2000.  And the

11  third was May 26th, 2000.

12  Q    As part of your involvement in this case, did you review

13  the emissions tests the Defendant conducted at Beckjord

14  Units 1 and 2?

15  A    Yes, I did.

16  Q    Why did you look at those tests?

17  A    We looked at the tests to help evaluate compliance with

18  whether it be the administrative order, as well as the history

19  of noncompliance.

20  Q    Based upon that review, have you prepared a slide that

21  shows those emissions tests?

22  A    Yes.

23  Q    Could we have Image 2, please.  Can you explain what Image

24  2 is --

25  A    Yeah --

VUILLEUMIER - DIRECT/FLINT        Vol. 2-413

1  Q   I'm sorry to interrupt for a second.  This has been marked

2  as KV Demo 2.

3  A   Yes.  This is a summary of stack tests conducted at Unit 1

4  for particulate matter, and they range from April of 1990

5  through December of 2008.

6  Q   Can we turn to the second page of this KV Demo 2, please?

7  Could you identify what this is?

8  A   This is a list of stack tests, emission tests conducted at

9  Unit 2 for particulate matter.  And the dates range from

10 March 1992 through February of 2008.

11 Q   If we could please go back to the first page of this demo.

12 What does the highlighting on this represent?

13 A   The highlighting identifies various stack tests conducted

14 throughout these periods that the Unit 1 exceeded the

15 applicable emissions limit.

16 Q   If you could please call out the top portion of page 1.

17 Mr. Vuilleumier, what is it showing?

18 A   This is showing a list of the particulate matter emissions

19 tests that were conducted prior to the issuance of the

20 Administrative Order on Consent at Unit 1.

21 Q   And how many emissions tests are listed here?

22 A   There's 13.

23 Q   How many of these 13 tests were failures?

24 A   Four of the 13 failed.

25 Q   So is this representing that between 1991 and 1997, Unit 1

VUILLEUMIER – DIRECT/FLINT          Vol. 2–414

1  failed approximately a third of the tests?

2  A    Yes, about 31 percent failure.

3  Q    What are the dates of those test failures?

4  A    Again, there are four.  The first was October 9th, 1991.

5  The second was July 12th, 1994.  The third was August 12th,

6  1994.  The fourth was March 28th, 1997.

7  Q    Could we now go and call out the middle portion of that

8  document, please?  What is it showing?

9  A    This is showing a list of the particulate matter emissions

10  tests conducted at Unit 1 during the time frame covered by the

11  Administrative Order on Consent.

12  Q    Just to go back a little bit, do you know why the 1998 AOC

13  was issued?

14  A    The 1998 AOC was issued in response to an enforcement

15  action involving at least the stack test failed at Unit 1 in

16  1997.  It was also a separate unit that's not part of the

17  remedy phase, Unit 4.

18  Q    And going back to what's showing on the screen now, how

19  many emissions tests were conducted during the time period of

20  the 1998 AOC?

21  A    There were 11.

22  Q    How many of those were failures?

23  A    Three.

24  Q    So during that time period, Unit 1 failed -- I guess

25  Unit 1 failed a PM emissions test during the AOC for

VUILLEUMIER – DIRECT/FLINT          Vol. 2–415

1  approximately a third of the time?

2  A    Yes, about a 27 percent failure rate.

3  Q    And the dates of those tests are some of the tests issued

4  in this case, correct?

5  A    Yes, they are.

6  Q    Those are the October 12, 1999; May 4th, 2000; and

7  May 26th, 2000?

8  A    Yes.

9  Q    What is the emissions limit that is set in the Ohio SIP?

10 A    The emission limit that applies to Unit 1 is 0.100 pounds

11 of particulate matter per million BTU.

12 Q    Turning your attention to the results from the October 21,

13 1999 test, what were those results?

14 A    The October 12th, 1999 test was 0.494 pounds of

15 particulate matter per million BTU.

16 Q    And 0.494 is how much over the Ohio SIP limit?

17 A    It's nearly 400 percent.

18 Q    We can go back to the full version.

19       Thank you.

20       Now, down at the bottom of this -- I guess the third

21 section.  Can you call that out, please.

22       What is this showing?

23 A    This is showing a list of the particulate matter emissions

24 tests conducted after the Administrative Order on Consent had

25 expired.

VUILLEUMIER – DIRECT/FLINT        Vol. 2-416

1  Q    And were there any failures during that time period?

2  A    There was one on October 28th, 2003.

3  Q    Could we go to Image 3, please.

4         MR. FLINT:  Your Honor, this is Defendants'

5  Exhibit DR333.  We're willing to stipulate to the

6  admissibility of this document if you all are.

7         MR. STOJLIKOVIC:  That's fine.

8         THE COURT:  It's admitted.

9    *(Defendants' Exhibit 333 was received in evidence.)*

10 Q    Mr. Vuilleumier, what is this document?

11 A    There is the Defendants' reasonable estimate of

12 noncompliance for the Beckjord Unit 1 violations.

13 Q    I'm sorry.  Actually, I think there's actually two pages.

14 That's the first page.  Could we flip to the second page of

15 the document.  Then I guess could you make the -- identify

16 what the second page is?

17 A    Yes.  This is the Defendants' reasonable estimate of

18 noncompliance for the Beckjord Unit 2.

19 Q    Again, I apologize.  Can we flip back to the first page?

20        Looking at Defendants' Exhibit DR333, what is their

21 estimate of the days of noncompliance for the three violations

22 at Unit 1?

23 A    The Defendants' estimate is 23 days.

24 Q    To your knowledge, is that a change in the Defendants'

25 position?

VUILLEUMIER – DIRECT/FLINT          Vol. 2-417

1  A    Yes.

2  Q    What is EPA's response to that change in position?

3  A    We would be willing to stipulate the 23 days of

4  noncompliance.

5  Q    Given that position, what penalty is EPA now seeking from

6  Cinergy for the 23 days of noncompliance within 1998 AOC?

7  A    The penalty would be the statutory maximum.

8  Q    What is that?

9  A    At the time of these violations for Unit 1, the statutory

10  maximum was $27,500 per day per violation.

11  Q    So doing the math of 27,500 times 23 days, what does that

12  come out to?

13  A    About $632,500.

14  Q    Mr. Vuilleumier, why is EPA seeking the statutory maximum

15  for the 1998 AOC violations?

16  A    The purpose of the Administrative Order on Consent is an

17  agreement between the parties to bring a unit into compliance

18  in a very short time frame and maintain that compliance.

19         In this case, even after entering an Administrative

20  Order on Consent, Cinergy failed to comply with the

21  requirements of the Ohio SIP on at least three separate

22  occasions, including one where their emissions were measured

23  to be almost 400 percent above the allowable SIP limit.

24  Q    During Defendants' opening statement, Mr. Hopson made a

25  reference to a $63,000 penalty that Cinergy paid in the 1990s.

VUILLEUMIER – DIRECT/FLINT          Vol. 2-418

1  To your knowledge, was that penalty paid as a part of the

2  negotiated administrative settlement?

3  A    Yes, it was.

4  Q    To your knowledge, is there a financial cap placed on

5  administrative settlements?

6  A    Yes, there is.  At the time of these violations, the cap

7  that was placed by statute is $250,000 for an administrative

8  action.

9  Q    Turning back to Defendants' Exhibit DR333, for the same

10  time period that's shown here, was Unit 1 also in violation of

11  the Ohio SIP?

12  A    Yes, it was.

13  Q    What amount of penalty is EPA seeking for those Ohio SIP

14  violations?

15  A    It would be the statutory maximum.

16  Q    Again, what would that be for the Ohio SIP violations?

17  A    For the 23 days again, that 27,5 times 23, it would be

18  $632,500.

19  Q    Could we turn to the second page of this exhibit, please?

20        Again, I think you mentioned this earlier, but what is

21  this page showing?

22  A    This is the estimate of noncompliance for Beckjord Unit 2

23  for the failed stack tests.

24  Q    How many days is in this estimate?

25  A    Two days.

VUILLEUMIER - DIRECT/FLINT          Vol. 2-419

1  Q    And what is EPA's response to this?

2  A    We can stipulate again to the two days of violation for

3  Unit 2.

4  Q    To your knowledge, do you know what the result of that

5  Unit 2 test failure?

6  A    Yes, it was the result -- it was 0.393 pounds of

7  particulate matter per million BTU.

8  Q    And the 0.393 is how much over the Ohio SIP limit?

9  A    That's nearly 300 percent above the Ohio SIP limit.

10 Q    What is the amount of penalty EPA is seeking for these two

11 days of noncompliance with the Ohio SIP limit?

12 A    At the statutory maximum of 27,500, it would times two,

13 which is $55,000.

14 Q    Mr. Vuilleumier, to your knowledge, have any of the

15 Defendants paid a penalty to the EPA for the 1998 AOC

16 violations or the Ohio SIP violations at Beckjord Units 1 or

17 2?

18 A    No, they have not.

19 Q    What is the total penalty EPA is now seeking from the

20 Defendants for the 1998 AOC and the Ohio PM SIP violations?

21 A    The statutory maximum would total, I believe, $1,320,000.

22 Q    Why is EPA seeking the statutory maximum for these

23 violations?

24 A    There are several reasons as we discussed earlier.  One is

25 a repetitive history of noncompliance.  There were about eight

VUILLEUMIER - DIRECT/FLINT          Vol. 2-420

1  tests that were failed at Unit 1, as an example.  You also

2  have several tests that they were considerably higher than the

3  allowable emissions limit, around 300 percent and 400 percent,

4  which is not common.

5          We also have the facility itself.  To be very real

6  about it, it's a very large company.  One of the purposes of a

7  penalty is to deter noncompliance.

8  Q   Could we have Image 4, please.

9          MR. FLINT:  Your Honor, this exhibit has been marked

10 as Plaintiffs' Exhibit 2017.  I believe that the Defendants

11 have stipulated to everything except for relevance on this?

12         MR. STOJLIKOVIC:  I believe that's correct.

13         MR. FLINT:  You do or you don't?

14         MR. STOJLIKOVIC:  We stipulate to everything.

15         MR. FLINT:  Oh, you did?  Okay, I'm sorry, I guess

16 we had a misunderstanding.

17 BY MR. FLINT:

18 Q   So Mr. Vuilleumier, can you identify --

19         THE COURT:  So this is admitted then?  You've

20 offered this and you have no objection to it?

21         MR. FLINT:  I offer it now --

22         MR. STOJLIKOVIC:  I'm sorry.  My understanding is

23 that -- well, one moment, Your Honor.

24         Your Honor, we stipulate to the admissibility.  I'm

25 not sure what the relevance is.  I don't know where you're

VUILLEUMIER - DIRECT/FLINT          Vol. 2-421

1   going with it.

2          MR. FLINT:  With a few questions with the witness, I

3   think I can establish that.

4          THE COURT:  Okay.

5   BY MR. FLINT:

6   Q   Mr. Vuilleumier, can you identify what has been marked as

7   Plaintiffs' Exhibit 2017?

8   A   This would be a final decision on a Title 5 permit issued

9   to Duke Energy.  It looks like Patrick -- it's hard to read,

10  but I think it's Coughlin -- Patrick Coughlin, the Duke Energy

11  contact.

12  Q   Earlier on, you made reference to the types of documents

13  that are contained in EPA files.  Is this the type of document

14  that may be included in a facility file?

15  A   Yes, it would.  A Title 5 permit has many facets to it.

16  Among other things, it incorporates the applicable

17  regulations.  It also includes applicable permit requirements,

18  like underlying permits.  So they would have like emission

19  limits and things like that as well in it.  So it's very

20  common for these to be part of the file.

21  Q   Can we move to the second image of this document, please.

22  Can you call out the highlighted portion?

23          Mr. Vuilleumier, could you read the highlighted

24  portion there?

25  A   Yes.  The highlighted portion is in Section E2 discussing

1  Title 4 emissions allowances.  It indicates "The permittee may

2  not use allowances has a defense to noncompliance with any

3  other applicable requirement."

4          MR. FLINT:  Your Honor, at this point, we move the

5  admission of this exhibit.

6          MR. STOJLIKOVIC:  Your Honor, this witness is not

7  being called, at least not on anything disclosed to us

8  previously --

9          THE COURT:  I'm sorry, I can't hear you.

10          MR. STOJLIKOVIC:  This witness has never been

11  identified to us as a witness of Wabash River, only the

12  Beckjord aspects of the case.  This document relates to Wabash

13  River, and essentially counsel is going to get into issues

14  relevant to Wabash River.  So we object to this witness

15  testifying about this document.

16          MR. FLINT:  Well, Your Honor, as I was trying to

17  identify it through the questions I asked the witness, these

18  are the types of documents that this witness would review.  It

19  does relate to the Wabash River site.  I apologize.  I should

20  have pointed that out earlier.

21          But the reason this is relevant is because the

22  Defendants have -- are arguing that Title 4 and Title 5 are a

23  defense to the NSR provisions.  And the reason why we're

24  trying to admit this document is we think that the document

25  itself, which is their -- can I have the front page of the

VUILLEUMIER – DIRECT/FLINT          Vol. 2-423

1  document again --

2          MR. STOJLIKOVIC:  Your Honor, this --

3          THE COURT:  Just a second.  Your position is that

4  this note from IDEM precludes the Defendant from making the

5  argument about allowances in this case?  Is that --

6          MR. FLINT:  Well, this is from IDEM.  It's the final

7  decision with respect to the Title 5 permit given to the

8  defendants.  In the permit itself, it clearly states that the

9  defense that they are making is not a defense that's available

10 to them.  And so that's why we're trying to admit the

11 document.

12         THE COURT:  I'm not sure that's what that means.  I

13 haven't had time to look at it, and I don't know.  I'm going

14 to let it into evidence.  I'm going to let you make your

15 argument.  That doesn't mean that I think that this precludes

16 them from arguing allowances.  So go ahead.

17         COURT CLERK:  So, Judge, you're overruling the

18 objection?

19         THE COURT:  Yes, ma'am.

20         MR. FLINT:  Your Honor, this is a very similar

21 document.  We're trying to offer it for the exact same

22 purpose.

23         MR. STOJLIKOVIC:  Same objection.

24         THE COURT:  You have the same objection?  Okay, I'm

25 going to allow it with the same reservation.

VUILLEUMIER - DIRECT/FLINT          Vol. 2-424

1  BY MR. FLINT:

2  Q   Can we go to the second page of the image.  May I have the

3  witness read it in at this point, Your Honor or -- or do you

4  want me to identify the page?

5        THE COURT:  Be sure the record reflects what you

6  just put in and what page you're on and where in that page you

7  are.

8  BY MR. FLINT:

9  Q   Let's go back to the first page.

10       Mr. Vuilleumier, could you identify what has been

11  marked as Plaintiffs' Exhibit 2018?

12  A   Yes.  This would be a final decision on a permit issued

13  onto the acid rain provisions, which would be Title 4 of the

14  Clean Air Act.

15  Q   What plant does this refer to?

16  A   This also refers to the Wabash River.

17  Q   This is the type of document you would review or is

18  contained -- may be contained in EPA files?

19  A   Yes.  Compliance with the acid rain provisions are

20  portions of our typical duties.  As an environmental engineer,

21  that's part of my typical duties.

22  Q   Okay.  Can we now turn to the second page.  If you could

23  call out the highlighted text.

24       Mr. Vuilleumier, could you read that text?

25  A   It's No. 11, "Effect on other authorities.  No provision

VUILLEUMIER - DIRECT/FLINT          Vol. 2-425

1   of the acid rain program, an acid rain permit application, an

2   acid rain permit, an acid rain portion of an operation permit,

3   or a written exemption under 40 CFR 72.7 or 72.8 shall be

4   construed as:"

5         Then subparagraph (A) "except as expressly provided in

6   Title 4 of the Clean Air Act (42 U.S.C. 7651 to 76510),

7   exempting or excluding the permittee, and to the extent

8   applicable, the designated representative of Units 1, 2, 3, 4,

9   5 or 6 from compliance with any other provision of the Clean

10  Air Act, including the provisions of Title 1 of the Clean Air

11  Act relating to applicable national ambient air quality

12  standards or state implementation plans."

13        MR. FLINT:  Your Honor, the Plaintiffs would move

14  the admission of Plaintiffs' Exhibit 2018 subject to the same.

15        MR. STOJLIKOVIC:  Same objection.

16        THE COURT:  It's admitted with the same thought.  Go

17  ahead.

18        MR. FLINT:  That's all I have.  Thank you.

19        THE COURT:  Cross-examine, Mr. Stojilkovic.

20                    **CROSS EXAMINATION**

21  BY MR. STOJILKOVIC:

22  Q   Good afternoon, Mr. Vuilleumier.

23  A   Good afternoon.

24  Q   We've met before, but I'll just remind you.  My name is

25  Kosta Stojilkovic and I represent the Defendants in this case.

*VUILLEUMIER – CROSS/STOJILKOVIC*    Vol. 2-426

1  I'd just like to ask you a few questions about the testimony

2  you've just given.

3      Mr. Vuilleumier, do you recognize this document?

4  A   Yes.

5  Q   For the record, I'll just identify this document as DR

6  Dem 50.  Mr. Vuilleumier, this document represents Plaintiffs

7  original penalty demand in this case; is that right?

8  A   Yes, that is correct.

9  Q   Based on the testimony you've just given, I understand

10 that that demand has changed?

11 A   Yes.

12 Q   I just want to walk through with you how it has changed.

13     For Unit 1, Mr. Vuilleumier, I understand that you are

14 now accepting Defendants' estimate of 23 days of

15 noncompliance, right?

16     MR. FLINT:  Your Honor, given the stipulation we

17 made with respect to Defendants' Exhibit 333, I'm not sure if

18 this is even relevant anymore.

19     THE COURT:  What's the point?

20     MR. STOJILKOVIC:  All right.  I'll speed it up, Your

21 Honor.

22 BY MR. STOJILKOVIC:

23 Q   This chart, Mr. Vuilleumier, shows an estimate of days

24 times the statutory maximum; is that right?

25 A   Yes, that's correct.

VUILLEUMIER – CROSS/STOJILKOVIC       Vol. 2-427

1  Q   And that's still the approach the Plaintiffs are taking in
2  this case, right?
3  A   It would be the statutory maximum times the number of days
4  of the violation.
5  Q   And the number of days have changed based on the
6  stipulation, but the approach to take that number times the
7  statutory maximum has not for Plaintiffs' penalty demand; is
8  that right?
9  A   That would be correct.  To calculate a penalty based on
10 statutory maximum, the units are $27,500 per day per
11 violation.  So the mathematics are the same:  The number of
12 days times statutory maximum times the violation.
13 Q   And for Unit 1, you are seeking twice the statutory
14 maximum per day; isn't that correct?
15 A   I'm sorry?
16 Q   For the violations at Unit 1, if we look at the whole
17 demand, you are seeking twice the amount of the statutory
18 maximum per day of noncompliance; is that correct?
19 A   I don't know where you're coming from with twice the
20 number of days.
21 Q   Okay.  Well, you count violations of the Ohio SIP or State
22 Implementation Plan at Unit 1, right?
23 A   Correct.
24 Q   And you're seeking the statutory maximum for every day of
25 those violations, correct?

*VUILLEUMIER – CROSS/STOJILKOVIC*      Vol. 2-428

1  A    For the Ohio SIP, yes.

2  Q    And you're also seeking another statutory maximum for

3  every day of violation of the Administrative Order on Consent,

4  right?

5  A    That is correct.

6  Q    Can you confirm for me that the violation of the consent

7  order is just a violation of a promise by Cinergy not to

8  violate the Ohio SIP, right?

9          MR. FLINT:  Objection, Your Honor.  I think you've

10  issued a summary judgment order that clearly held that the

11  Defendants are liable for violation of both the AOC and the

12  Ohio SIP.  I'm not sure --

13          THE COURT:  I'm going to let him make his argument.

14  Go ahead.

15  BY MR. STOJILKOVIC:

16  Q    I'll repeat the question, Mr. Vuilleumier.  The violation

17  of the consent order that you're using to count up part of the

18  penalty is just the violation of a promise in that consent

19  order by Cinergy not to violate the Ohio SIP, right?

20  A    It is an agreement to not violate the Ohio SIP.  The

21  Administrative Order on Consent had three primary factors.  It

22  indicated they must attain, demonstrate and maintain

23  continuous compliance with the Ohio SIP.

24  Q    Mr. Vuilleumier, when you are counting days of violation

25  of the consent order at Unit 1, you used the same calendar

*VUILLEUMIER – CROSS/STOJILKOVIC*    Vol. 2-429

1  days as for the violation of the Ohio SIP at Unit 1; isn't

2  that right?

3  A   We used the same number of days identified as violations.

4  Q   The same calendar days?

5  A   Well, calendar days often refer to weekdays or something

6  like that.  We used 23 days for the Administrative Order on

7  Consent.  We used 23 days on the Ohio SIP.

8  Q   The same 23 days?

9  A   Correct.

10        MR. STOJILKOVIC:  May I approach, Your Honor?

11        THE COURT:  Yes.

12  BY MR. STOJILKOVIC:

13  Q   Mr. Vuilleumier, I would like to show you that document

14  that I showed you at your deposition on October 22nd; and this

15  document has been marked DR171.  Can you identify this

16  document for the record?

17  A   I believe -- it looks like a notice of filing.  It

18  indicates the complainant's prehearing exchange.

19  Q   Would it be fair to describe this as a notice of filing of

20  a complaint from the EPA to Cinergy Corporation, as well as

21  some attachments to that document?

22  A   Without having a clear title, I believe that's what it is.

23  Q   I would just ask you to turn to Tab G of the document.

24  This tab shows a penalty determination for Cinergy, Beckjord

25  Station, New Richmond, Ohio; is that correct?  And I'm just

1  reading the title there, the Subject line.

2  A   Yes, it does.

3  Q   And one of the people this document is from is a David

4  Schulz; is that correct?

5  A   Yes, it is.

6  Q   Do you know who Mr. Schulz is?

7  A   He is the regional power industry expert.

8  Q   He's an EPA employee?

9  A   Yes, he is.

10  Q   Do you know that his official title is combustion process

11  national oracle?

12  A   I believe he has many titles.

13  Q   Is that one of them?

14  A   It most likely is, yes.

15  Q   Would you say that Mr. Schulz is someone who has

16  experience with penalty calculations?

17  A   Yes.

18  Q   If I could have you turn to the second page, it looks like

19  what Mr. Schultz is doing here, it's coming up with a penalty

20  for two PM violations for 1997, correct?

21  A   Yes.

22  Q    And both --

23        MR. FLINT:  Excuse me a second.  Your Honor, I'm

24  going to object.  This is a document that relates to an

25  administrative penalty.  During Mr. Vuilleumier's direct

*VUILLEUMIER - CROSS/STOJILKOVIC*      Vol. 2-431

1  testimony, he indicated there's a cap on it.  With respect to

2  the deposition designations, you sustained a ruling that these

3  types of calculations are not relevant to the penalty at issue

4  in this case.

5          THE COURT:  I did.  And so?

6          MR. FLINT:  I'm asking -- I'm objecting on the same

7  basis here.

8          MR. STOJILKOVIC:  Your Honor, if you don't want to

9  go into the dollar amounts, that's fine, but the factors that

10 are applied are some of the same, and I just want to explore

11 briefly with the witness --

12         THE COURT:  It appears this way to me now as it

13 appeared when I looked at the objection.  That's not Judge

14 Dinglehoffer from Ohio making a determination of a penalty.

15         MR. STOJILKOVIC:  I completely agree, Your Honor.

16         THE COURT:  That's an administrative agency making

17 an administrative decision based on the responsibility they're

18 given under their statute, which is different than mine.  I'll

19 sustain this objection again.

20         MR. STOJILKOVIC:  Very well.

21 BY MR. STOJLIKOVIC:

22 Q   Mr. Vuilleumier, the Clean Air Act contains a number of

23 factors that are relevant to determination of a penalty for PM

24 violations like the ones at issue here, right?

25 A   Yes, it does.

*VUILLEUMIER – CROSS/STOJILKOVIC*     Vol. 2-432

1  Q    Those factors are relevant both in an administrative

2  proceeding and in a judicial proceeding; is that right?

3  A    I believe they would be.  I would want to read

4  specifically for the administrative record, but I believe it

5  is the same authorities.

6  Q    Mr. Vuilleumier, I've put the statute book in your hands,

7  and if you could turn to Section 42 U.S.C. 7413, also known as

8  Clean Air Act Section 113, and look at Subsection E1; and

9  perhaps it'll move it along quickly, as I'm sure everybody

10 wants to do at three o'clock.  I'm just going to ask you a

11 quick question about that section.

12        Clean Air Act Section 113(e)(1) lists the relevant

13 statutory factors for a penalty for the Beckjord penalty at

14 issue here, right?

15 A    It identifies multiple factors and has a parenthetical

16 that says "In addition to such other factors as justice may

17 require."  So it may be other factors outside of what is

18 included in E1.

19 Q    Mr. Vuilleumier, I'll identify this as DR Dem 12.  Can you

20 just confirm for me that I've listed all of the statutory

21 factors here, including, as you pointed out, "such other

22 factors as justice may require"?

23 A    Yes.  There is one portion that's missing where it

24 discusses credible evidence.  It says "including evidence

25 other than the applicable test method."

VUILLEUMIER - CROSS/STOJILKOVIC      Vol. 2-433

1  Q   And is that portion about "credible evidence" a duration

2  factor?

3  A   Yes.  "Duration of the violation as established by any

4  credible evidence (including evidence other than the

5  applicable test method)."  Sure.

6  Q   My only question for you, Mr. Vuilleumier, when you were

7  coming up with the penalty demand in this case, the only

8  factor you considered was duration, wasn't it?

9  A   Without -- you mean now or with the 23 days?  I don't know

10 which one you're referring to.

11 Q   Well, let's start with the original demand.  The original

12 demand, you just estimated a number of days and multiplied by

13 the statutory maximum, right?

14         THE COURT:  Let me just ask you something.  I don't

15 know what the answer to this is.  Does the EPA's demand have

16 some presumptive weight?

17         MR. STOJILKOVIC:  Your Honor, I don't believe that

18 it does.

19         THE COURT:  Well, then, what does it matter how he

20 arrived at this demand?

21         MR. STOJILKOVIC:  All I want to establish, Your

22 Honor --

23         THE COURT:  In the long run, I'll probably be glad

24 you put this in because when I get to this, I'll say where are

25 those damn factors, and they'll be right there, and I'll have

*VUILLEUMIER - CROSS/STOJILKOVIC*    Vol. 2-434

1  fussed at you for nothing.

2      MR. STOJILKOVIC:  The only reason I'm doing this is

3  Your Honor has to consider all of the factors.

4      THE COURT:  I understand that.  That's what the

5  statute says and that's what I'll do.

6      MR. FLINT:  Your Honor, if I may, I don't disagree

7  that you shouldn't consider all the factors.  Mr. Vuilleumier

8  is not the only witness that can address the factors that are

9  listed here.  For example, tomorrow, we'll have testimony from

10  Mr. Cahal.  Mr. Cahal's an economist.  He'll be able to

11  address some of the factors.

12  BY MR. STOJILKOVIC:

13  Q   Mr. Vuilleumier, can I just establish the factor you're

14  helping this Court out with, including subject to a revision

15  of your demand in light of our estimates, is the duration

16  factor?

17  A   That would be one factor that would be considered.

18  Q   And I'm just trying to figure out what part you're trying

19  to help with here.  That's the part that you're helping with?

20      MR. FLINT:  Your Honor, I think we identified that

21  when he was called to the stand.

22      THE COURT:  Well, even so, he can be cross-examined

23  on it.  Go ahead.

24      MR. STOJILKOVIC:  Nothing further, Your Honor.

25      *(Witness excused.)*

Vol. 2-435

1          THE COURT:  Well, thank you.  Anything else?

2          MR. FLINT:  No.

3          THE COURT:  You may step down.

4          How are we doing time-wise today?

5          MR. SAVAGE:  Your Honor, may I approach?

6          THE COURT:  Yes, you may, black shirt and all.

7          MR. SAVAGE:  I'm a little worried about walking up

8   here since I can clearly barely dress myself.

9          Your Honor, we very much appreciate you making your

10  time available this afternoon.  The Plaintiffs in directs and

11  crosses are back on track.  We have just one more witness.  We

12  anticipate he will take just a little over an hour, and we

13  would appreciate the opportunity to put him on 8 a.m. sharp

14  since he came in late last night and we had anticipated doing

15  that.  So we should be done with our case well within the two

16  and a half day break.

17          THE COURT:  Do you need to use this afternoon or

18  will we be done by Friday if we don't?

19          MR. HOPSON:  If Mr. Savage says he'll be done

20  halfway tomorrow, we'll get ours in in two and a half days,

21  Your Honor.

22          MR. SAVAGE:  There's one housekeeping matter.  We

23  had submitted deposition designations.  Your Honor had ruled.

24  We just wanted to confirm that those were part of the record

25  since you have both the designations and the depositions.

Vol. 2-436

1          THE COURT:  Same for you?

2          MS. THOMSON:  That's acceptable, Your Honor.

3          THE COURT:  All right.  That's what we'll do.  I'll

4  see you tomorrow morning at eight o'clock.

5          *(The proceedings were adjourned at 3:09 p.m.)*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3        I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct transcript from reported proceedings in the

5    above-entitled matter.

6

7

8      /s/ Cathy Jones                      February 3, 2009
     _____
9      CATHY JONES, RPR, FCRR
       Official Court Reporter
10     Southern District of Indiana
       Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25