1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF INDIANA
2              INDIANAPOLIS DIVISION

3

     UNITED STATES OF AMERICA,        )
4          Plaintiff,                 )
                                      )
5    STATE OF NEW YORK, STATE OF      )1:99-cv-1693-LJM-JMS
     NEW JERSEY, STATE OF CONNECTICUT,)
6    HOOSIER ENVIRONMENTAL COUNCIL    )
     and OHIO ENVIRONMENTAL           )
7    COUNCIL,                         )
           Plaintiff-Intervenors,     )Indianapolis, Indiana
8                                     )February 4, 2009
              -vs-                    )8:00 a.m.
9    CINERGY CORP., PSI ENERGY, INC., )
     and THE CINCINNATI GAS &         )Volume 3
10   ELECTRIC COMPANY,                )
           Defendants.                )

11

12

13

14                  **BEFORE THE**
           **HONORABLE LARRY J. McKINNEY**

15

16       OFFICIAL REPORTER'S TRANSCRIPT OF

17           TRIAL PROCEEDINGS

18

19

20   Court Reporter:    Cathy Easley Jones, RPR, FCRR
                        Official Court Reporter
21                      46 East Ohio Street, Room 291
                        Indianapolis, IN  46204

22

23

24

25       PROCEEDINGS TAKEN BY MACHINE SHORTHAND
            COMPUTER-AIDED TRANSCRIPTION

Vol. 3–438

1                           **A P P E A R A N C E S**

2

3      FOR THE PLAINTIFF:              Mr. Justin A. Savage
                                      Mr. Phillip Brooks
4                                     Mr. Jason A. Dunn
                                      Ms. Jennifer A. Lukas-Jackson
5                                     Mr. Myles E. Flint, II
                                      Mr. Thomas A. Benson
6                                     Mr. Brent Marable
                                      U.S. DEPARTMENT OF JUSTICE
7                                     P.O. Box 7611
                                      Ben Franklin Station
8                                     Washington, DC  20530

9
       FOR THE DEFENDANTS:            Mr. Mark D. Hopson
10                                    Mr. Frank R. Volpe
                                      Mr. Samuel B. Boxerman
11                                    Ms. Kathryn B. Thomson
                                      Ms. Meghan Delaney Berroya
12                                    Mr. Kosta S. Stojilkovic
                                      SIDLEY AUSTIN LLP
13                                    1501 K Street, NW
                                      Washington, DC  20005

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 3-439

1    **I N D E X   O F   W I T N E S S E S**

2                                              PAGE
     For Plaintiff:
3

4    MATTHEW KAHAL
     Direct Examination by Ms. Lukas-Jackson .......440
5    Cross-examination by Mr. Hopson ...............490
     Redirect examination by Ms. Lukas-Jackson .....537
6    Cross-examination by Mr. Hopson ...............547

7    WILLIAM DEPRIEST
     Direct Examination by Mr. Boxerman ...........551
8    Cross-examination by Mr. Benson ...............583

9    STANLEY HAYES
     Direct Examination by Mr. Boxerman ...........600
10   Cross-examination by Mr. Savage ...............632

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 3-440

1                I N D E X   O F   E X H I B I T S
                                                        PAGE
2  Plaintiffs' Exhibit No.:

3  1993 .........................................441
   1977 .........................................460
4  1978 .........................................460
   1990 .........................................460
5  2016 .........................................481

6

7

8

9

10 Defendant's Exhibit No:

11 DR212 .......................................602
   DR256 .......................................552
12 DR267 .......................................567
   DR321 .......................................486

13

14

15

16

17

18

19

20

21

22

23

24

25                    *(In open court)*

Vol. 3-441

1           THE COURT:  Are we ready to proceed, yes?

2           MR. SAVAGE:  Yes, Your Honor.

3           THE COURT:  You didn't have to buy that white shirt

4   last night, did you?

5           MR. SAVAGE:  Your Honor, there's a TJ Maxx near us.

6           THE COURT:  At least you have some sense of the

7   economy of the day.

8           MS. LUKAS-JACKSON:  Good morning, Your Honor.

9           THE COURT:  Good morning.  Your next witness.

10          MS. LUKAS-JACKSON:  Jennifer Lukas-Jackson for the

11  United States; and our next witness is Matthew Kahal.

12          **MATTHEW KAHAL,  PLAINTIFF'S WITNESS, SWORN**

13                  **DIRECT EXAMINATION**

14          THE COURT:  You may inquire.

15          MS. LUKAS-JACKSON:  Your Honor, Matthew Kahal is a

16  utility economist.  He has spent the last 30 years advising

17  state regulatory agencies, state consumer advocate agencies

18  and federal agencies on public utility regulatory and

19  financial issues.  Mr. Kahal will testify about the historic

20  incentives that the Defendants had to avoid installing

21  pollution controls at the time of the projects that have been

22  determined to have triggered New Source Review.

23          He will also provide his analysis of the Defendants'

24  financial strength and ability to pay for the Plaintiffs'

25  proposed remedy, including the shutdown or installation of

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-442

1  controls at Wabash River, surrender of allowances, and payment

2  of a civil penalty for the violations at Beckjord.

3  BY MS. LUKAS-JACKSON:

4  Q   Mr. Kahal, please state your full name for the record.

5  A   Matthew I. Kahal; K-a-h-a-l.

6       MS. LUKAS-JACKSON:  If we could have image 1.  This

7  is Plaintiffs' Exhibit 1993.  This is the curriculum vitae of

8  Mr. Kahal.  I believe it's been fully stipulated and at this

9  time I move it into evidence as Plaintiffs' Exhibit 1993?

10       THE COURT:  Exhibit's admitted?

11       MR. VOLPE:  Yes, sir.

12       THE COURT:  Yes.  I got the no, which I thought

13  meant no objection.  Go ahead.

14   *(Plaintiffs' Exhibit 1993 was received in evidence.)*

15  BY MS. LUKAS-JACKSON:

16  Q   Mr. Kahal, please describe your educational background.

17  A   I hold a BA and MA degrees from the University of Maryland

18  in economics.  I have completed all course work and

19  examination requirements for the Ph.D. in economics from that

20  same institution.

21  Q   What's your current employment?

22  A   I'm currently employed as an independent consulting

23  economist.

24  Q   How long have you been consulting?

25  A   I've been consulting since 1977, so it's been slightly

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-443

1  over 30 years.

2  Q   Prior to being an independent consultant, where were you

3  employed?

4  A   Prior to being an independent consultant, which began in

5  2001, I was with a consulting firm, Exeter Associates.  I

6  helped found that firm in 1981 and served as president and

7  vice president of the firm in 1981 till 2001, so about 20

8  years.

9  Q   What's your areas of expertise?

10 A   My areas of expertise include public utility regulation,

11 financial economics, anti-trust.

12 Q   Who are your clients?

13 A   My clients consist of -- principally of federal agencies,

14 in addition to the Department of Justice.  They have included

15 the U.S. Department of Energy, the U.S. Department of the Air

16 Force, the Federal Energy Regulatory Commission.

17      I also am consultant to a number of state public

18 utility commissions and state consumer advocacy offices and

19 state energy offices.

20 Q   Specific to Indiana, have you ever worked for the Office

21 of Utility Consumer Counselor in Indiana?

22 A   I have, yes.

23 Q   When was that?

24 A   The work I did for that office was from the late 1980s

25 through the late 1990s.  So roughly over that decade, a number

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-444

1  of assignments for that office.

2  Q    In your work, do you evaluate financial issues related to

3  electric utilities?

4  A    Yes.

5  Q    What types of financial parameters do you consider?

6  A    The work I do on the financial side would be to determine

7  a utilities cost of capital, evaluate their financing plans,

8  evaluate the financial needs of the utility.  For example, the

9  financial need for special rate-making treatment and that sort

10 of thing.

11 Q    What types of sources do you consult to gather your

12 information?

13 A    Normally, I use -- it can range from publicly available

14 sources, such as filings with the SEC, credit rating reports

15 that are issued for utilities, security analyst reports.  This

16 is typically public information.

17        Very often, confidential information on the financial

18 position of a company is also made available in cases that I'm

19 involved in.

20 Q    How often have you analyzed whether utility can finance

21 the cost of major capital projects like installing pollution

22 controls?

23 A    That the work is typically ongoing.  I do it with a great

24 deal of frequency.  I'm in several cases now where I'm

25 involved in doing that at the state level.

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-445

1  Q   In total in your work, can you give a ballpark number?

2  A   Oh, certainly, probably somewhere between 20 and 50 cases

3  that I've been involved in that's required that kind of

4  analysis.

5  Q   Does your work also involve evaluating the impacts of

6  capital projects on utility's ratepayers?

7  A   Yes.

8  Q   How often do you think you've done that?

9  A   Many dozens of times.  Every time it's a generation -- an

10 electric generation project, for example, that's proposed,

11 it's necessary to evaluate the impact that has on customers.

12 Q   Was part of your assignment for Plaintiffs to analyze the

13 impact of surrendering SO2 and NOX pollution credits known as

14 allowances?

15 A   Yes, that was part of it.

16 Q   Let's discuss broadly some background on your experience

17 with allowance issues.

18      Can you describe for the Court how the SO2 allowance

19 market works?

20 A   Sure.  In broad terms, the SO2 allowance market was really

21 set up by the 1990 Clean Air Act amendments.  It's a framework

22 that's generally been referred to as cap and trade.  Under

23 that system, the Environmental Protection Agency or EPA

24 assigns, using an approved formula, what's known as allowances

25 to the various electric generating units that emit pollutants

1  such as SO2.  The utility is required to have and surrender

2  these so-called allowances when they emit SO2 pollutants.  It

3  requires one allowance for each ton of SO2 emitted.

4       The utility then can comply in that fashion utilizing

5  the allowances that have been allocated to it free of charge

6  by EPA.  To the extent that those allowances are not

7  sufficient to meet the amount of pollution from its generating

8  units, it can go into the so-called cap and trade market and

9  then purchase allowances.

10       On the other hand, if it has more allowances than it

11  needs to match its SO2 emissions, it then can sell those

12  allowances.

13       In addition, EPA holds allowance auctions to sell

14  allowances to buyers that would be interested in buying them

15  as part of their compliance.

16  Q    Can you describe the -- how the NOX allowance market

17  works?

18  A    The NOX allowance market works in a similar fashion

19  conceptually.  There are differences in the details.  For

20  example, the SO2 market actually began in 1995.  The NOX

21  market began in 2004 for the eastern part of the United

22  States.  So there was a timing difference.

23       In addition, the NOX market that was established in

24  2004 was for what's called the ozone season; that is, the

25  summer months, May through September, whereas the SO2 is year

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-447

1  round.

2          Other than those differences in details, the concept

3  of cap and trade is the same for SO2 and for NOX.

4  Q    How does a utility come to hold a SO2 or NOX allowance?

5  A    In the first instance, it's allocated these allowances

6  free of charge by EPA.

7          In addition to that, it can purchase allowances to the

8  extent it needs to from the -- this cap and trade market.

9  Q    If one needs to purchase an allowance, where does one do

10 that?

11 A    There are a couple of different ways of purchasing

12 allowances.  One can participate in the periodic EPA auctions

13 where these allowances are sold.  One can purchase these

14 allowances just through a commercial broker; and relatively

15 recently organized exchanges such as the Chicago Climate

16 Exchange have been set up for that purpose for buyers and

17 sellers to participate in the market.

18 Q    While this may be obvious, practically speaking, once a

19 utility owns an allowance credit, what does it do with it?

20 A    It uses the allowance credit for compliance purposes.

21 That is, it surrenders the allowance credit when it emits

22 pollutants.  However, if the holder of the allowance finds

23 that these allowances are surplus to its compliance needs, it

24 can then sell them into this market as I just described.

25 Q    You touched a little bit on this earlier, but what is an

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-448

1  EPA allocated allowance?

2  A    The EPA allocated allowance is essentially a permit that

3  allows the emissions of 1 ton of the pollutant.  For example,

4  one SO2 allowance would allow the holder to emit 1 ton of SO2.

5  So that allowance then would be surrendered as the emission

6  takes place or at the end of the year.

7  Q    And this is an annual allocation to the source?

8  A    That's correct.  It's an annual allocation.

9  Q    Do you deal with issues related to allowances in your

10  work?

11  A    Yes, I do.  Allowances are simply part of the economic

12  environment in which utilities operate.  They -- the utilities

13  need to take the allowance market into account as part of

14  their planning process and as part of the evaluation of

15  decisions on generation resources.

16  Q    Mr. Kahal, do you deal with transmission services issues

17  in your work?

18  A    Yes, I do.

19  Q    How do transmission service issues relate to what you do?

20  A    A lot of the work that I do deals with electric system

21  planning, planning for new generation resources or the

22  acquisition of purchase power contracts and those types of

23  resources.

24        In order to plan for generation, capacity additions or

25  to engage in the acquisition of purchase power contracts, it's

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-449

1  normally necessary to obtain transmission service in order to
2  do that.  So, therefore, the transmission issues really can't
3  be completely separated from the generation issues.  When you
4  plan for generation, you also have to plan for transmission;
5  and you also have to secure transmission service along with
6  the generation resources.
7  Q    So in your work on transmission planning issues, do you
8  review transmission planning studies?
9  A    I routinely review such studies.  I'm involved both in
10  transmission planning and also in the procuring of
11  transmission for generation resources.
12  Q    And how do transmission issues relate to utility
13  economics, your field of expertise?
14  A    It deals with it in that it's all part of the efficient
15  planning of electric systems.  That is, utilities -- that is,
16  regulated utilities generally plan their systems in order to
17  try to obtain what's called least cost results.  That involves
18  both looking at the transmission side as well as the planning
19  side.
20        There are also obviously reliability aspects to
21  transmission.  That is, utilities try to plan their systems in
22  order to provide for reliability and that means appropriate
23  planning of the transmission side as well as on the generation
24  side.  It's really hard to separate transmission and
25  generation.

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-450

1  Q   Can you give a recent example of your work that related to

2  transmission issues?

3  A   Sure.  In fact, this work is ongoing now.  I was recently

4  asked by a state commission to evaluate a 200 million-dollar

5  transmission upgrade project.  That project involved the

6  construction of several new 230 kilovolt lines and

7  substations.  I was asked to evaluate it to ensure that it met

8  the reliability needs of the region, and it also provided

9  economic benefits commensurate with its costs.  I submitted

10 expert testimony on that project a few weeks ago.

11 Q   How many projects would you say you've submitted expert

12 testimony on in your career?

13 A   Excuse me, on what?

14 Q   On how many occasions have you submitted expert testimony

15 in your career?

16 A   Something over 300 times.

17        MS. LUKAS-JACKSON:  Your Honor, at this time I

18 tender Mr. Kahal as an expert in public utility economics and

19 public utility finance.

20        THE COURT:  All right.  That's fine.

21 BY MS. LUKAS-JACKSON:

22 Q   The first issue I would like to talk to you about,

23 Mr. Kahal, is the Defendants' historical financial health in

24 the 1980s when the projects that have been found to have

25 triggered New Source Review was formed.

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-451

1  A   Yes?

2  Q   Do you have an opinion on whether PSI, the predecessor to

3  Duke Indiana, had financial incentives to avoid installing

4  pollution controls at the time of the projects?

5  A   Yes.  I reviewed the financial history during the late

6  1980s for that period; and I concluded that the Defendants, in

7  particular PSI Energy, had an incentive to minimize its

8  capital expenditures during that time period because of a

9  financial crisis that it was facing.  It wasn't specifically

10 environmental controls; but it was just all capital projects

11 in general.

12 Q   What was this financial crisis related to?

13 A   The financial crisis arose in 1984 as a result of the

14 abandonment of the Marble Hill nuclear plant, a multi-billion

15 dollar project.  At the time that occurred the abandonment of

16 that project meant that the utility company was forced to take

17 an enormous equity write-down.  It was something like

18 1.5 billion.  That write-down that it was forced to take

19 virtually destroyed its balance sheet and created a true

20 financial crisis for the company.

21 Q   Did -- what did PSI do to recover from the problem?

22 A   PSI engaged in a fairly aggressive financial recovery

23 program to restore its financial health, and that involved a

24 couple of fairly drastic steps that it took at that time.  At

25 the time it was paying out -- that is, in 1984 it was paying

1  out a substantial dividend to its shareholders.  Because of

2  the financial crisis, it cut that dividend and it eliminated

3  the dividend.  It needed to do that in order to use the cash

4  flow that would normally accompany that dividend to reduce its

5  debt balance.  It had far too much –– it was carrying far too

6  much debt because it incurred all of this debt because of its

7  investment in the nuclear plant.

8          In addition to that, it's clear that the company

9  engaged in a very, very modest capital spending program

10 because it needed the cash that it would otherwise spend on

11 major capital projects also to engage in this de–leveraging

12 process.  It needed to reduce its debt balance.

13         It also got some help from the state regularity, the

14 Indiana Utility Regulatory Commission, which granted emergency

15 rate increases during that time period to help with the

16 financial emergency as well.  This went on throughout the late

17 1980s.

18 Q   Mr. Kahal, do you consider undertaking installation of

19 pollution controls, like scrubbers and catalytic reduction, to

20 be major capital investments?

21 A   They are certainly major capital investments.  They

22 involve very large dollars.

23 Q   Considering the steps that PSI was taking to recover

24 financially that you just described, what effect would

25 investing in pollution controls related to the projects have

1  had on PSI's business plan?

2  A   Undertaking major capital spending at that time in the

3  late 1980s when it was trying to recover from this financial

4  disaster that it faced and trying to restore its financial

5  health, it would have worked with -- it cross-purposes with

6  that plan.

7       During this time period the company shrunk its asset

8  base.  It was undertaking really very, very modest levels of

9  capital spending.  So large capital spending would certainly

10 have slowed down its financial recovery.

11 Q   At or around the time these projects were being performed

12 in the late 1980s, 1990 time frame, did PSI have a rate

13 proceeding before the Indiana Utility Regulatory Commission?

14 A   Yes.  It submitted a rate filing in 1989.  By that time,

15 it had achieved some financial recovery, although the

16 financial recovery was not complete.

17      The petition that it submitted to the commission at

18 the time, it was asking for this emergency rates that had

19 previously been granted to make those rates permanent.  They

20 requested a rate freeze to extend over three years, and they

21 also requested the ability during this three-year rate freeze

22 period -- they requested three exceptions to the rate freeze.

23      The exceptions were for conservation program

24 expenditures, environmental costs and what they called force

25 majeure, which might be something like an ice storm or

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-454

1  something like that.

2        The Indiana commission denied this request and

3  instead, it cut the company's rates in that proceeding.

4  Q   Mr. Kahal, what was your original assignment for the

5  Plaintiffs in this case?

6  A   My original assignment was to evaluate the capability of

7  the Defendant to finance controls and the Plaintiffs' remedy.

8  Also, to evaluate the impact that that would have on the

9  customers of the utility and also to examine the historical

10  incentives faced by the company.

11  Q   So we've first covered your last issue that you've

12  mentioned.

13  A   That's right.

14  Q   Let's turn to the overview of the relationship between

15  Duke Energy Indiana, Duke Energy in Ohio and Duke Energy

16  Corporation.

17        Could you broadly describe the relationship between

18  these three companies?

19  A   Yes.  Duke Energy Corporation is a holding company.  It's

20  a holding company that owns several subsidiaries, and those

21  subsidiaries would include its Carolina utility operation

22  called Duke Carolina.  It would include Duke Ohio, and it

23  would include Duke Indiana.  So these three utility companies

24  are wholly owned by Duke Energy Corporation.

25  Q   How is Cinergy related to these companies?

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-455

1  A   Cinergy is also a holding company that was formed -- I

2  believe it was in the early 1990s.  It was the merger between

3  Cincinnati Gas and Electric, which is now called Duke Ohio,

4  and PSI Energy, which is now called Duke Indiana.  So Cinergy

5  then was a holding company that owned those two utility

6  companies.

7         In 2006, Cinergy was acquired by Duke Energy

8  Corporation.  So Cinergy still exists.  It's a direct

9  subsidiary of Duke Energy corporation.  Duke Energy Ohio and

10 Duke Energy Indiana continue to be subsidiaries of Cinergy

11 Corporation.  That makes Duke Energy Ohio and Duke Energy

12 Indiana what I would call second-tier subsidiaries of Duke

13 Energy Corporation.

14 Q   Does Duke Energy Corporation have holdings that operate in

15 other states besides Ohio and Indiana?  I think you said the

16 Carolinas?

17 A   Yes.  They have utility operations in the Carolinas.  They

18 also have some nonregulated operations, which comprise

19 approximately 25 percent of total Duke Energy Corporation.

20 Q   Are you familiar with the phrase "financial integration"

21 as it relates to companies?

22 A   Yes.

23 Q   What does that mean, to be financially integrated?

24 A   The financial integration refers to the relationship

25 between the holding company and the operating utilities.  In

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-456

1  this example that we're dealing with, the holding company, of

2  course, is Duke Energy Corporation, and the operating

3  utilities at issue are Duke Ohio and Duke Indiana.

4      Duke Ohio and Duke Indiana are financially integrated

5  with Duke Energy Corporation.  They are part of the

6  consolidated Duke Energy Corporation; and Duke Energy

7  Corporation to a large extent controls the cash flows of its

8  wholly-owned utility subsidiaries.

9  Q   It sounds like you're touching on my next question, which

10 is:  Why is it important to understand the extent to which

11 Duke Energy Corporation and Duke Energy Indiana and Duke

12 Energy Ohio are financially integrated?

13 A   Well, in this case, one of the things I was asked to look

14 at is the ability of Duke Energy Indiana, for example, to be

15 able to finance a major capital investment in environmental

16 controls.

17      Duke Energy Indiana's relationship with its ultimate

18 parent, Duke Energy Corporation, has more effects on its

19 financial capability.

20      Probably the most important relationship is that Duke

21 Energy Corporation is the source of and controls the common

22 equity of Duke Energy Indiana.

23      In addition, the relationship between the subsidiary

24 and the parent company can have important implications for

25 credit ratings.

KAHAL – DIRECT/LUKAS-JACKSON          Vol. 3-457

1  Q   All right.  Let's discuss briefly the financial resources

2  of Duke Energy Corp., Duke Energy Indiana and Duke Energy

3  Ohio.

4       If I could have image 2, please.

5       This is MK Demonstrative 1, the title of which is 2007

6  Financial Measures for Duke Energy Corp., Duke Energy Ohio and

7  Duke Energy Indiana.

8       Mr. Kahal, can you give us an overview, kind of a

9  bird's eye view of what this chart depicts?

10 A   Yes.  This is some summary financial measures that I

11 selected and extracted from the SEC form 10K, which is the

12 annual filing with the Securities and Exchange Commission for

13 these companies.  This is basic financial information that I

14 think gives a good picture of the financial position of these

15 companies, the scale of these companies and their

16 profitability.

17 Q   Okay.  Let's take a look at these financial measures in

18 turn.

19      How does this chart show what the financial measures

20 are of these three companies?

21 A   Well, if you look at a measure such as total assets, this

22 tells you the financial scale of these companies and the

23 financial resources.  For example, Duke Energy Corporation --

24 and this is the consolidated Duke Energy Corporation -- they

25 have assets of about $50 billion.  So this is obviously a huge

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-458

1  company.  Even though Duke Ohio and Duke Indiana are

2  subsidiaries, their total assets are on the order of 11

3  billion and $7 billion each.  So they have vast financial

4  resources.

5  Q   What is the second item in the first column, "total

6  capitalization"?

7  A   Total capitalization refers to the permanent financing of

8  the companies.  It's the sum of their long-term debt,

9  preferred stock and common equity.  This is what finances

10 their asset base.

11 Q   If you can, describe the other key measures that are

12 indicated in that first column.

13 A   Sure.  Common equity ratio refers to the common equity on

14 their balance sheet as a percentage of their total

15 capitalization.  These numbers are quite strong.  The

16 64 percent, for example, for Duke Energy Corporation, this

17 indicates that this is a company with a very strong balance

18 sheet.

19        Net income, that's just the profits of the company,

20 the after-tax profit.  For example, it's $1.5 billion for Duke

21 Energy Corporation in that year and 2- to 300 million for the

22 two utilities each.

23        Cash flow, that's a measure of the revenue of the

24 company minus its cash expenses.  That's important because

25 obviously these numbers are quite large, about 2.6 billion for

KAHAL – DIRECT/LUKAS-JACKSON          Vol. 3-459

1  Duke Energy Corporation and 6- to 700 million for the two

2  utilities.  That's important because the cash flow is the

3  source of funds that's used for investment purposes.

4        The return on equity is simply the profit of the

5  company divided over its equity balance.

6  Q    What source of information did you consult to find these

7  numbers?

8  A    I obtained all of this from their public filings with the

9  Securities and Exchange Commission, what's called the 10K

10  report or the year ending December 31st, 2007.  So this is the

11  most recent calendar year information.

12  Q    Looking at -- you mentioned the net income for Duke Ohio;

13  and the number there is 264 million.

14        That's their net income you indicated?

15  A    Net after-tax income.

16  Q    Where does that money go?

17  A    The net income of a subsidiary really belongs to the

18  parent, in essence.  So management of the company then decides

19  what to do with the net income.  Some of it's paid out in

20  dividends, and some of it's just reinvested in the company.

21  Those decisions are made by management.

22  Q    Similarly, the net income for Duke Indiana of

23  $232 million?

24  A    Yes.  These pay dividends to the parent, Duke Energy

25  Corporation.  The net income was also used for investment

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-460

1  purposes in the company.

2  Q   Similarly, looking at the net income for Duke Energy Corp.

3  and for year ending 2007, it was 1.5 billion?

4  A   That's correct.

5  Q   Is that all paid out to shareholders or is that, in part,

6  reinvested?

7  A   Again it's both.  In 2007 Duke Energy Corporation paid out

8  1.15 billion to its shareholders.  So the remainder, I guess

9  it's about a quarter of the total, was available for

10 reinvestment.

11 Q   Do you know what the dividends to shareholders were out of

12 Duke Corporation for 2008?

13 A   I don't have the exact numbers.  The year just ended, but

14 I believe it's slightly higher.  I believe that in 2008 Duke

15 Energy Corporation slightly raised its per share dividend

16 payout.  There's a small increase in the dividend payout in

17 2008 over 2007.

18         MS. LUKAS-JACKSON:  At this time, Your Honor,

19 Plaintiffs move to enter stipulated Exhibits 1977, 1978 and

20 1990 into evidence.  These are the Duke Corporation, Duke

21 Energy Indiana and Duke Energy Ohio 2007 10Ks.

22         MR. HOPSON:  No objection to the 10Ks, Your Honor.

23         THE COURT:  The exhibits are admitted.

24    *(Plaintiffs' Exhibit 1977, 1978 and 1990 were received in*

25 *evidence.)*

KAHAL – DIRECT/LUKAS–JACKSON        Vol. 3–461

1  BY MS. LUKAS–JACKSON:

2  Q    So in sum, Mr. Kahal, what do these financial parameters

3  demonstrate about these companies?

4  A    It demonstrates these companies are very large in scale,

5  have extensive financial resources.  It demonstrates, I think,

6  that they are highly profitable, and it demonstrates that they

7  are financially strong.  That is, they have strong balance

8  sheets, strong cash flows, all of which is good for what they

9  do.

10  Q    Considering your analysis of Duke Ohio that you just

11  described, is there any question that Duke Ohio can pay a

12  $1.32 million civil penalty that Plaintiffs are seeking for

13  the violations at the Beckjord facility in Ohio?

14  A    There's absolutely no problem at all in terms of that

15  causing any material problem for the company.  1.3 million is

16  very –– obviously is very small compared to annual earnings of

17  264 million or cash flow of 677 million.  So a penalty of that

18  magnitude would not be viewed as a materially adverse event

19  for the company.

20  Q    Does that take into consideration whether any rate

21  recovery would be applicable to that?

22  A    I'm making that statement under the assumption that Duke

23  Ohio cannot pass on a penalty to its ratepayers, that Duke

24  Ohio would have to absorb that 1.3 million.  That's my

25  assumption.

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-462

1  Q   Let's now discuss the sources of capital available to Duke

2  Indiana to pay for the Plaintiffs' proposed remedy with regard

3  to the Wabash River units.

4         You mentioned earlier that you consider installation

5  of pollution controls like scrubbers and SCR to be large

6  capital investments, right?

7  A   Yes, they are.

8  Q   In your opinion, what are the sources of financing

9  available to Duke Indiana to finance a large capital spending

10 program?

11 A   There are four conventional sources that a utility like

12 Duke Indiana normally would use.  It would issue long-term

13 debt.  That is, it would go out into the securities markets

14 and sell long-term debt to the investing public, and then it

15 would receive proceeds from that sale of long-term debt.

16 That's certainly something that Duke Indiana does from time to

17 time.

18         It would have available and it would use its cash

19 flow, its internally-generated cash.  The internally generated

20 cash being the revenue that it receives minus what it pays out

21 in expenses.  That's available to finance investment.

22         To the extent that it's needed, it can also obtain

23 equity capital from the parent company.  That is, the parent

24 company, Duke Energy Corporation, can infuse equity funds into

25 the subsidiary if it's judged that that's needed.  It also has

KAHAL – DIRECT/LUKAS-JACKSON          Vol. 3–463

1  access to short-term debt.  That is, the Duke Energy

2  Corporation system operates what's known as a money pool.

3  Duke Energy Corporation can obtain short-term debt for the

4  market, make that available through its money pool.

5         Also, operating subsidiaries that have surplus cash

6  can make that available to the money pool; and a company like

7  Duke Indiana that needs to finance an investment and can

8  borrow on a short-term basis from the money pool.  Those loans

9  from the money pool have to be paid back within one year.

10  That's a source of financing as well.  Those are really the

11  four principal sources of financing available to Duke Indiana.

12  Q   What role does Duke Indiana's credit rating have in its

13  ability to finance a large capital spending program?

14  A   The credit rating I view as a pivotal importance for Duke

15  Indiana or really any major utility company.  Fortunately for

16  Duke Indiana, they have a very strong credit rating.  They're

17  rated low single A, high triple B.  That's a very favorable

18  rating.

19         That strong credit rating is what allows Duke Indiana

20  to go into the markets and issue long-term debt and to issue

21  it at favorable interest rates.

22         In this regard, equity plays a key role as well

23  because maintaining a strong balance sheet is certainly one of

24  the keys to maintaining the strong credit rating and,

25  therefore, being able to finance a large construction program.

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-464

1  Q   Is state utility regulatory treatment of Duke Indiana a
2  factor in determining its credit rating?
3  A   Very much so.
4  Q   Can you explain how that is?
5  A   Yes.  Regulatory treatment is certainly one of the key
6  items that credit rating agencies focus on.  Duke Indiana is
7  fortunate to have in Indiana several regulatory features which
8  help to maintain its strong financial position.
9        For example, Duke Indiana has available to it what are
10 known as rate riders or trackers that enable it to on a very
11 timely basis pass through costs for approved environmental
12 expenditures.
13        It similarly has a favorable rate recovery mechanism
14 for its largest capital project, which is the Edwardsport
15 integrated gasification combined cycle project.  These
16 regulatory mechanisms, these rate recovery mechanisms both
17 provide very timely recovery of costs associated with these
18 projects, including costs incurred during construction; and it
19 also provides a great deal of certainty about cost recovery.
20        So the strong cash flow that it obtains through these
21 rate-making mechanisms, along with the certainty of cost
22 recovery, give the credit rating agencies a great deal of
23 confidence in Duke Indiana.  So it plays a major role in its
24 credit rating.
25 Q   In your opinion, is this process of using the IURC's rate

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-465

1  riders important to enhancing the company's ability to finance

2  pollution controls?

3  A   Absolutely, both in providing it with cash flow from these

4  investments during the construction period as well as helping

5  to maintain the solid credit ratings.  It's very much a key to

6  its financial ability to undertake a large capital spending

7  program.

8  Q   How long have these types of rate riders been employed by

9  the IURC?

10  A   My understanding is that the environmental cost recovery

11  trackers or riders, that's been available since the mid-1990s.

12  Q   Does the IURC have rate riders for the cost of purchasing

13  emission allowances similar to the riders that exist for

14  recovery of pollution control investments?

15  A   Yes.  It has a rider that allows for the recovery of the

16  net expenses associated with emission allowances, the net

17  expenses being what the company must pay for emission

18  allowances minus the revenues it receives from sales of

19  emission allowances.

20       That mechanism allows for timely and complete recovery

21  of those costs, or at least the retail portion of those costs.

22  Q   What percent of Duke Indiana's jurisdiction is retail?

23  A   Its retail operations are approximately 92 percent of the

24  total.  The other roughly 8 percent are its wholesale

25  operations.  That is, its sales to other utilities.

KAHAL — DIRECT/LUKAS-JACKSON          Vol. 3-466

1  Q   How does the rate rider process differ from a standard
2  rate case in Indiana?
3  A   It's quite different.  The way the process works for
4  environmental expenditures is that Duke Indiana would first go
5  to its state commission and request that the state commission
6  pre-approve its plan for environmental compliance.
7       For example, if we're talking about investments and
8  controls, it would ask the Indiana commission to pre-approve
9  those investments.  Then once it obtained the commission's
10 pre-approval, then the next step, obviously, is to start with
11 construction.
12      The rate riders that it has available allows the
13 company to recover the carrying charges during construction,
14 the return on investment once it enters service, and then the
15 ongoing expenses —— O&M expenses associated with those
16 controls, as well as the depreciation expense, depreciation
17 expense essentially being the recovery of the principal in
18 your investment.
19      So these riders provide for a timely recovery.  That's
20 quite different than what might be referred to as the standard
21 rate case treatment.
22 Q   Let's turn now to your opinions on the rate impacts of
23 Plaintiffs' remedy.
24      Can you refresh our recollection briefly about what
25 the Plaintiffs originally asked you to analyze?

KAHAL – DIRECT/LUKAS-JACKSON         Vol. 3-467

1  A   Yes.  The original analysis I performed last summer.  At

2  that time I was asked to assume that the Plaintiffs would

3  install controls, that is, selective catalytic reduction and

4  scrubbers at Units 2 through 6 of the Wabash River plant, so

5  all the units that are owned by the company.

6       In addition, I was also asked to assume that there

7  would be the surrender of the SO2 and NOX emissions

8  allowances.  At that time the amount of the surrender I was

9  asked to assume was the amount of emissions that would take

10 place in an uncontrolled plant; that is, if these pollution

11 controls did not take place.

12      For example, at the present time or for the most

13 recent year, those six units emit about 60,000 tons per year.

14 So I was simply asked to assume that that level of allowances

15 each year then would be surrendered over the assumed life of

16 the controls, which I assume to be 20 years.

17 Q   Dr. Fox testified yesterday that she estimated the cost of

18 pollution controls for Wabash River 2 through 6, and

19 Plaintiffs' counsel provided you with those numbers for your

20 original analysis; isn't that right?

21 A   I was provided with preliminary estimates of what those

22 controls would cost.

23 Q   Do you recall what those preliminary estimates were?

24 A   I was given a range.  The range that I was given was

25 380 million to 690 million.  That's for both the SCR and the

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-468

1  scrubbers combined.

2       I was also asked to assume that the annual operating

3  costs for the controls would be $31 million per year.

4  Q   Once you obtained the capital and the operation and

5  maintenance costs for the pollution controls, what did you

6  determine the impact on Duke Indiana's electric customers'

7  rates would be?

8  A   I'm sorry.  Can you give me that again?

9  Q   Sure.  Once you obtained the capital and operation and

10 maintenance costs --

11 A   Yes?

12 Q   -- what did you determine would be the rate impact for

13 Duke Indiana's customers?

14 A   The magnitude?

15 Q   Yes.

16 A   I determined that it would -- that the effect on the

17 retail ratepayers of Duke Indiana would be approximately a

18 $1.82 to $2.72 per megawatt hour.  That range of figures is,

19 in essence, a 20-year average over an assumed 20-year cost

20 recovery period.

21 Q   Does that translate to a percentage increase?

22 A   Yes.  In percentage terms, I simply compared that to the

23 current rates; that is, the rates that were in effect in 2007

24 for the company.  That translated into a range of rate

25 increases of 2.9 percent to 4.4 percent.  I think just to be

1 clear, the meaning of that is that with this remedy that I was

2 asked to assume, that means that the cost to customers would

3 be 2.9 to 4.4 percent higher than the rates otherwise would be

4 absent this remedy.

5        MS. LUKAS-JACKSON:  If we could have image 6,

6 please.  And if you could expand that view, please.

7 BY MS. LUKAS-JACKSON:

8 Q   This is MK Demonstrative 2.  The title of this is "Retail

9 Rates Comparison for 2007 In Cents Per Kilowatt Hour."  What's

10 this chart tell us, Mr, Kahal?

11 A   This is a rates comparison for the most recent year of

12 data that I had.  What this tells me is that Duke Energy

13 Indiana in relative terms has very attractive retail rates.

14 The Duke Indiana rates are below the Indiana State average,

15 but Indiana is a very low-cost state.

16        Just looking at this comparison, I also included the

17 East-North Central region.  That's basically the upper Midwest

18 in which the state of Indiana is included.  And this shows

19 that the -- that Duke Energy Indiana's rates are about

20 25 percent below this regional average.

21        I also include the United States average, and Duke

22 Indiana's rates are about 40 percent lower than the US

23 average.  So in relative terms, Duke Indiana's rates are very

24 attractive.

25 Q   What does your analysis assume about rate recovery?

KAHAL – DIRECT/LUKAS-JACKSON        Vol. 3–470

1  A   I've assumed that the costs associated with Plaintiffs'

2  remedy are flowed through to customers and recovered in rates.

3  I assume that they would be included in rates, at least

4  eventually.

5  Q   Now, originally, this included controls at Units 2 through

6  6; is that right?

7  A   That's correct.

8  Q   And also surrender of allowances?

9  A   Yes, a very large allowance surrender.

10 Q   Does the cost increase that you just described include the

11 entire remedy that you were asked to analyze?

12 A   Yes, it does.  It includes both the cost of controls and

13 the cost of allowance surrender.

14 Q   Now, explain how your analysis included the cost of the

15 proposed allowance surrender?

16 A   Yes.  I think that that's most easily explained by

17 comparing it to a conventional analysis of the cost of

18 controls that one would do in the normal course of planning.

19      If we were not in a case that involved an allowance

20 surrender, if Duke Energy Indiana, for example, was just

21 simply evaluating the cost impact of controls with no

22 allowance surrender issue, they would probably calculate the

23 impact of those controls in the manner similar to what I did.

24 That is, they would have the capital costs.  They would take

25 the O&M costs.  They would add them together.  It would obtain

KAHAL – DIRECT/LUKAS-JACKSON        Vol. 3-471

1  what's known as an annual revenue requirement or annual cost

2  for the controls.

3        Then after doing that, they would realize that what

4  these controls do is they enable the company to sharply

5  eliminate its emissions, in fact, also completely eliminate

6  its emissions.  In doing that, they realize, well, that

7  provides a large cost savings.  Now, with the controls, the

8  company doesn't have to go out and purchase the allowance.  So

9  that's a cost savings.

10        So the next step in that analysis would be to subtract

11  out the value of these allowances, of either not having to

12  purchase the allowances or even selling the surplus EPA

13  allowances.  That's a large cost offset, and that would

14  sharply reduce or even possibly eliminate the cost of the

15  controls.

16        In my analysis, what I did –– since I'm assuming

17  allowance surrender, what I did was I simply did not include

18  that offset.  In other words, I calculated the cost of

19  controls; but I gave no credit in there for allowance savings

20  because I assumed that there would be no allowance savings

21  because the company would simply continue to surrender the

22  allowances just as it does now with an uncontrolled plan.

23  Q   So turning back to your conclusion of the 2.9 to

24  4.4 percent range increase in Duke Indiana's customers, how

25  does this comparison of rates relate to your analysis of the

1  rate impact of Plaintiffs' remedy?

2  A   Obtaining a result of a 2.9 to 4.4 percent increase, that

3  can be superimposed on these rates for Duke Indiana that are

4  shown on this screen.  If you were to increase these rates by

5  that range of 2.9 to 4.4 percent, that would bring Duke

6  Indiana probably pretty close to the Indiana statewide

7  average; but it would do very, very little really to reduce

8  this large gap that exists between Duke Indiana's very

9  attractive rates and the Midwest average, just looking at that

10  7.83 versus the 9.78 for the residential customers.

11        Similarly, a 2.9 to 4.4 percent is not going to do

12  very much to reduce the relative attractiveness of Duke

13  Indiana's rates compared to the U.S. average.  In other words,

14  even with a rate increase of that magnitude, Duke Indiana's

15  rates are still going to be sharply below the regional and

16  national averages.  Duke Indiana will continue to have very

17  attractive rates, even with that 2.9 to 4.4 percent rate

18  increase.

19  Q   In your opinion, does environmental compliance in the way

20  Plaintiffs have proposed have an effect on the operation of

21  these coal plants?

22  A   I'm sorry.  Can you give me that question again?  I missed

23  it.

24  Q   Sure.  Does environmental compliance as defined by –- or

25  as the Plaintiffs consider their remedy to be complying with

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-473

1  New Source Review affect the attractiveness of operating these

2  coal plants -- this coal plant, Wabash River in particular?

3  A   Well, the company believes so because it's proposing -- my

4  understanding is that the company is proposing to retire three

5  of the units.  What I was testifying to is that I believe that

6  these rates, even though they will go up under the remedy,

7  will continue to remain very attractive; and the company has

8  very attractive rates because virtually all of the electricity

9  that it supplies comes from low-cost, older coal plants.

10          There are some environmental consequences associated

11  with operating those coal plants, and there's some

12  environmental costs associated with environmental compliance

13  when your power is supplied from low-cost, older coal plants.

14  Q   To your knowledge, are Plaintiffs now proposing a modified

15  remedy that you were asked to assume back in August 2008?

16  A   Yes.  I understand that Plaintiffs' proposed remedy today

17  is different than the one I looked at last summer.

18  Q   How is it different?

19  A   My understanding is that the current remedy would allow

20  for the retirement of Units 2, 3 and 5.  It would have

21  controls on Units 4 and 6 instead of controls on Unit 2

22  through 6 as I have assumed; and the allowance surrender being

23  proposed by Plaintiff is substantially less than what I

24  assumed last summer.  In fact, it's probably -- what I assumed

25  is probably two to three times higher than what was assumed

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-474

1  last summer.

2  Q    I'm sorry.  Did you misspeak?  The emissions allowance

3  surrender proposal is higher or lower than it was before?

4  A    What I meant to say, the allowance surrender that I

5  assumed was substantially higher than the current proposed

6  remedy.  What I assumed was probably two to three times

7  greater than what's currently being proposed.

8  Q    Does the current proposed Plaintiffs' remedy compared to

9  the remedy that you originally analyzed cause you -- excuse

10  me -- cause your calculated rate impacts to increase?

11  A    No, not at all.

12  Q    Why not?

13  A    It's -- there are reasons for believing that the current

14  remedy is -- would be a less costly remedy I evaluated.  The

15  reason being is that the company -- and the Plaintiffs agree

16  with this -- prefer to shut down Units 2, 3 and 5 instead of

17  controlling them.  It's reasonable to believe that the reason

18  that they're proposing that is they believe that that's a less

19  costly way to go than controlling Unit 2, 3 and 5 as I had

20  assumed.

21       In addition, the allowance surrender is an important

22  cost in the analysis; and it's substantially less under the

23  current remedy than the remedy I assumed when I did my rate

24  impact analysis.

25       For that reason, I certainly don't believe that the

KAHAL – DIRECT/LUKAS-JACKSON          Vol. 3-475

1  2.9 to 4.4 percent range understates rate impact of the

2  current remedy; and, if anything, it suggests that range of

3  rate impacts, if anything, is conservatively high compared to

4  the current remedy.

5  Q    Defendants' counsel, Mr. Hopson, said in his opening

6  statement that it would cost $400 million to surrender the

7  400,000 SO2 allowances that Plaintiffs seek; is that right?

8  A    To me, I find that misleading based upon my understanding

9  of the remedy.  My understanding is that he obtained the

10 400 million-dollar figure -- is that the figure that you cited

11 me, counsel, 400 million?

12 Q    Yes.

13 A    He obtained that 400 million by taking the 400,000

14 allowance surrender estimate and assuming that the cost of the

15 SO2 allowances would be about $1,000 per allowance.

16         In fact, my understanding is that the remedy permits

17 the surrender of those allowances, not immediately but over a

18 20-year period.  So that would be -- that would suggest 20,000

19 allowances per year being surrendered.

20         In addition, and as I documented in my expert report,

21 EPA has allocated approximately 12,000 allowances to the

22 Wabash River plant free of charge.  By and large under the

23 Plaintiffs' remedy, those free allowances allocated by EPA,

24 the 12,000, really wouldn't be needed for compliance.

25 Q    And why is that?

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-476

1   A   Because Units 2, 3 and 5 will be retired.  So they won't

2   be emitting any SO2 once they're retired, but those allowances

3   will still be there.

4   Q   How about the allowances for Units 4 and 6?

5   A   Well, for 4 and 6 here we're assuming under the

6   Plaintiffs' remedy that those units are going to be

7   controlled, for example, scrubbing at 99 percent.  So almost

8   none of the EPA allowances for those 2 units are needed for

9   compliance.

10          So the company now finds itself with the EPA-allocated

11  allowances, approximately the 12,000 per year, that it doesn't

12  need for compliance.  Those 12,000 allowances now can be used

13  as part of the surrender.

14  Q   Just again, these 12,000 allowances are at no cost to Duke

15  Indiana; is that right?

16  A   No charge.  They're given to Duke Indiana free of charge.

17  Q   Annually?

18  A   Each year.  That's correct.  That's its annual allocation.

19  Q   So Duke surrenders approximately 12,000 EPA allocated

20  allowances annually.

21          How does Duke Indiana surrender the remaining 8,000

22  allowances?

23  A   It would then go out and buy -- it could then go out into

24  the market and buy the other 8,000.

25  Q   How would you determine how much that would cost?

KAHAL – DIRECT/LUKAS-JACKSON          Vol. 3–477

1  A   You pay the market price.  Over a period of time, of

2  course, that's uncertain.  This gentleman assumed $1,000.

3  There certainly are estimates of that amount out there.  In my

4  report I suggested using a range of 200 to 1,000, 200 being

5  closer to the current marketplace.

6       So if one were to use the purchase of the 8,000

7  allowances not covered by the EPA free allowances, then that

8  would suggest an annual cost –– using the range of 200 to a

9  thousand –– of about 1.6 million to $8 million per year.  This

10  would be over a 20–year period.

11  Q   So if Duke Indiana were to opt to surrender allowances in

12  the manner that you just described, would this cost Duke

13  Indiana ratepayers $400 million as Mr. Hopson represents?

14  A   No.  I think for the reason that I said, it would

15  certainly be less than that.  You can't minimize the fact that

16  paying for something over a 20–year period is a whole lot

17  different than having to write a check for it today.  There's

18  time value to money.

19  Q   Mr. Kahal, we also discussed earlier how the allowance

20  markets function.

21       If Duke is required to surrender allowances equal to

22  400,000 tons of SO2 and about 50,000 tons of NOX, what would

23  the effect be on the allowance markets?

24  A   I don't think it would have any material effect on the

25  allowance market.

KAHAL – DIRECT/LUKAS-JACKSON        Vol. 3-478

1  Q    Why would that be?

2  A    Under the remedy, there would be a necessity for the

3  company to go out and purchase some allowances as we've just

4  described, purchase those allowances and then surrender those

5  allowances to EPA.  But on the other hand, that's really what

6  the company is doing now.  The company's business as usual

7  case, that is, what the company would propose doing if this

8  case never existed, if there had been no NSR violation, what

9  the company then would be doing would be not controlling the

10 plant, not installing the pollution control; and it would be

11 emitting pollutants presumably at something similar to the

12 historic level.  It would then have to go out into the market,

13 purchase allowances and then surrender them.

14         So under the status quo or business as usual, you have

15 allowance purchase and surrender.  You have the same thing

16 under Plaintiffs' remedy.  So I don't see where there's any

17 problem or disruption to the cap and trade system or allowance

18 markets.

19 Q    Turning to another issue, you're aware that both

20 Plaintiffs' and Defendants' remedies include the potential

21 shutdown of Wabash River's Units 2, 3 and 5, right?

22 A    Yes.

23 Q    With respect to shutting down these units, are you aware

24 that Defendants claim that there is a reserve margin

25 deficiency for the Duke Indiana system?

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-479

1  A    Yes.

2  Q    So let's start out and define some terms.

3         What's a reserve margin?

4  A    The reserve margin that you're referring to is known as

5  the capacity reserve margin.  The capacity reserve margin

6  refers to the capacity that the utility either owns or obtains

7  through contract over and above its annual peak demand.

8  Q    What is a reserve margin deficiency?

9  A    Utilities such as Duke Indiana are required to maintain --

10 to ensure reliability for their own customers and the

11 region -- they are required to maintain a minimum reserve

12 margin target.  For Duke Indiana -- and this is a pretty

13 standard industry practice -- it's about 14.5 percent; and

14 what that means is that they are required to maintain on an

15 annual basis capacity reserves that are at least 14.5 percent

16 over and above its annual peak.

17 Q    So how does this issue relate to the Wabash River plants?

18 A    Well, at the present time, Duke Indiana does not have

19 sufficient owned capacity to meet that 14.5 percent standard.

20 In fact, in recent years and in its plan, it makes up this gap

21 between the capacity it owns and the capacity it's supposed to

22 maintain by going out into the market and making capacity

23 purchases.

24         If you retire Wabash Units 2, 3 and 6, the that's 265

25 megawatts.  So that simply makes the existing deficits 265

KAHAL – DIRECT/LUKAS-JACKSON          Vol. 3–480

1  megawatts larger than it otherwise would be.

2  Q    How does a utility resolve a reserve margin deficiency?

3  A    It goes out and acquires capacity.  In the short run, the

4  obvious solution is to simply purchase that capacity in the

5  wholesale market.  Duke operates within the framework of the

6  very large Midwest market.

7  Q    How does one know if capacity is available to be

8  purchased?

9  A    In the first instance, there's simply published data on

10  it.  I, myself, determined this by simply looking at the data

11  on -- from the summer reliability assessment for 2008 from the

12  Midwest Indiana system operator.  That indicated in the region

13  that there's a surplus of capacity over and above this

14  required reserve margin of about 5,000 megawatts.  So that

15  tells you that there's capacity out there to buy.

16        Beyond that, there are other more specific ways of

17  identifying the sources available for sale.  You can

18  contract -- you can contact with brokers, that is, people that

19  are in the business of selling capacity.  You can conduct an

20  RFP for the purchase of capacity.  There are many different

21  ways of doing it.

22  Q    Is there capacity available to be purchased on the market

23  for 2009?

24  A    Yes.

25  Q    How about 2010?

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-481

1  A    Yes.

2  Q    How about 2011?

3  A    Yes.

4  Q    How do you know that?

5  A    I know that by a couple of things.  One is this

6  5,000 megawatts of surplus that I identified, that's a

7  sufficient surplus to be around for several years, though I'm

8  not suggesting it will be around forever.

9         In addition to that, during the deposition I believe

10  it's of the company's witness, Diane Jenner, information was

11  provided on broker quotes for capacity purchases.

12  Q    If we could have image 12, please.  And if you could

13  enlarge the top two-thirds, please.  This is Plaintiffs'

14  Exhibit 2016 and I believe it's been fully stipulated to.

15         MR. HOPSON:  Yes.

16         MS. LUKAS-JACKSON:  I move this into evidence as

17  Plaintiffs' Exhibit 2016.

18         THE COURT:  It's now admitted.

19    (Plaintiffs' Exhibit 2016 was received in evidence.)

20  BY MS. LUKAS-JACKSON:

21  Q    Mr. Kahal, can you describe what this e-mail is?

22  A    This is an e-mail from somebody within the Duke Indiana

23  organization who simply went out and acquired broker quotes on

24  what's called ICAP.  That's an acronym that refers to

25  installed capacity.

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-482

1        What he cites are the prices he obtained from brokers

2   for the purchase of capacity for various years, going out to

3   calendar 2011.  This shows what the prices are.  It appears

4   that over time, the prices are increasing.  So this is an

5   indication to me that capacity is available through this

6   broker or one wouldn't be able to get quotes.  That is, the

7   broker would come back and say I can't find any capacity to

8   sell to you.  That's not what this e-mail says to you.

9   Q    This is dated October 17th, 2008, from ICAP to Duke?

10  A    Well, it's from a gentleman named Michael Chen to Diane

11  Jenner.

12  Q    Right below that?

13  A    Oh, below that.  It's from a gentleman who I assume is a

14  broker.  I'm not familiar with the e-mail address, but it

15  appears to be from a broker to an employee of Duke Indiana.

16  Q    I guess what I'm just pointing out is that this is an

17  October 2008 --

18  A    October 2008, yes.

19  Q    What's the significance of obtaining a broker quote to

20  purchase capacity?

21  A    Those quotes tell you something about what's available in

22  the market.  The fact that Mr. Chen was able to readily obtain

23  these quotes is an indication that capacity is available for

24  purchase in the market.  The -- this also shows a pattern of

25  prices going up, which I interpret as meaning that over time

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-483

1  the market will tighten.

2  Q    So in your opinion would it be a problem for Duke Indiana

3  to purchase capacity to meet its reserve margin deficiency?

4  A    In the near term, no.  In the long term, I wouldn't rely

5  on the wholesale market.  In the long term they should be

6  looking for long-term capacity resources such as it might

7  involve, for example, building a peaking unit to replace

8  something that's retired.  In the short run, you can obtain it

9  from the wholesale market.

10 Q   So now that we've gone through all of these issues related

11 to Plaintiffs' proposed remedy, in your opinion is it feasible

12 for the Defendants to finance the proposed remedy?

13 A   Yes.  The proposed remedy is entirely feasible.  Duke

14 Indiana certainly has the financial resources to be able to

15 comply with that remedy.

16 Q   Let's turn to one last issue.

17      Are you aware that Cinergy has raised a local

18 reliability issue if Wabash River units 2, 3 and 5 are shut

19 down prior to September 2012, right?

20 A   Yes.  I'm aware that's been discussed.

21 Q   Are you familiar with the -- excuse me.

22      In what context are you familiar with this issue?

23 A   Well, the issue came up and it first came to my attention

24 in the deposition of an employee with the -- what's called

25 MISO, which is the Midwest Independent System Operator.  This

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-484

1  individual with MISO indicated that he thought that the

2  immediate shutdown of the plant may create a local reliability

3  problem, or what I would call a local reliability criteria

4  violation in the local area near where the plant is sited.

5  Q   Are you aware of a report that -- subsequent to Mr. Harszy

6  of MISO, his deposition -- are you aware of a subsequent

7  report that MISO has put out on this issue?

8  A   Yes.  That was a report I believe that may have been

9  issued two or three weeks ago.

10 Q   Have you read that January 19th, 2009 report?

11 A   I have .

12 Q   Let's back up a minute.

13      You mentioned that this report identifies a

14 reliability criteria violation, a potential one?

15 A   Yes.

16 Q   What is a reliability criteria violation?

17 A   There are certain rules that are set on reliability that

18 transmission providers such as MISO must follow.  These are

19 rules that are established by the North American Electric

20 Reliability Corporation.

21      These are rules associated with how a bulk power

22 system operates and the amount of redundancy that needs to be

23 built into the system in order to achieve a certain desired

24 level of reliability.

25      For example, the industry generally follows what's

KAHAL – DIRECT/LUKAS-JACKSON        Vol. 3-485

1  known as a one day and 10-year rule, meaning that there's an

2  expectation of inadequacy once every 10 years.

3           MS. LUKAS-JACKSON:  If I could have image 7, please.

4  This is Defendants' Exhibit 321.

5  BY MS. LUKAS-JACKSON:

6  Q   You've seen this report before, Mr. Kahal?

7  A   I have.

8  Q   What is the specific issue identified by MISO in this

9  report?

10 A   What this report attempts to address is what would happen

11 if there was an immediate shutdown of Units 2, 3 and 5.  What

12 the report discusses is that really under certain scenarios,

13 there could be overloads on certain critical facilities that

14 would require the shedding of load.

15 Q   Does it identify that particular critical facility as you

16 call it?

17 A   Yes.  It mentions one transmission line that would be

18 overloaded and also a major substation known as the Dresser

19 substation.  The scenario in question that's discussed in this

20 report is really a combination of things happening.  It

21 includes an outage at critical facilities, including losing

22 one of the two transformers that currently exist at that time

23 the Dresser substation and weather conditions where –– peak

24 day weather conditions where the temperatures are higher than

25 90 degrees.

1        So under those types of situations where you have the

2   outages of other facilities, then the shutdown of the units,

3   the report discusses the possibility of overload which would

4   have to be dealt with through some degree of load shedding

5   during those hours.

6   Q   And the load shed, is there a particular geographic region

7   that's identified in the report?

8   A   Yes.  It's known -- it's a region that's known as the

9   Terre Haute load pocket.  I believe the report identifies the

10  total load in that region being around 350 megawatts.

11  Q   Let's take a look at the fifth page of this report.  I'll

12  note the report actually itself is not numbered.

13        MR. HOPSON:  Should we move it into evidence if

14  you're going to read from it?

15        MS. LUKAS-JACKSON:  If you would choose to do that

16  at your discretion, you may.  I'm not choosing to do that at

17  this time.

18        MR. HOPSON:  Then I don't want it read from.

19        THE COURT:  It needs to be in evidence if we're

20  going to read from it.

21        MS. LUKAS-JACKSON:  Okay.  We'll stipulate to move

22  it into evidence.

23        THE COURT:  You've made a different choice?

24        MS. LUKAS-JACKSON:  Yeah, that's fine.  I'd like it

25  read.

1          THE COURT:  All right.  Let's give it a number.

2          COURT CLERK:  It's DR321.

3          THE COURT:  All right.

4      *(Defendants' Exhibit DR321 was received in evidence.)*

5  BY MS. LUKAS-JACKSON:

6  Q   So let's take a look at the fifth page of this report.

7  And if you could enlarge the yellow highlighted area, please.

8          Mr. Kahal, what is the -- what does the first

9  paragraph on this page say?

10 A   Do you want me to read the paragraph out loud?

11 Q   Sure.

12 A   The heading is "Disclaimers.  The reference is prepared

13 for discussion and information purposes and provided 'as is'

14 without representation or warranty of any kind, including

15 without limitation, accuracy, completeness or appropriateness

16 for any particular purpose.  The Midwest ISO assumes no

17 responsibility for the consequences of any errors or

18 omissions.  Midwest ISO may revise or withdraw this reference

19 at any time at its discretion without notice.  Even though

20 every effort will be made by the Midwest ISO to update these

21 references and inform its membership of changes, it is the

22 user's responsibility to ensure you are using the most recent

23 edition."

24 Q   Mr. Kahal, earlier in your testimony you mentioned that

25 you routinely review planning transmission studies; is that

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-488

1  correct?

2  A    Yes.

3  Q    Is it typical in a transmission study to have a disclaimer

4  as the one contained in the MISO report?

5          MR. HOPSON:  He wasn't proffered as an expert on

6  what transmission reports looks like.  He didn't mention

7  transmission reports in his report.

8          THE COURT:  So you don't think he ought to be able

9  to answer whether this disclaimer is typical?

10         MR. HOPSON:  Yes.

11         THE COURT:  I think that's probably right, although

12  it looks typical of my car warranty and my insurance policy.

13         Go ahead.

14         MS. LUKAS-JACKSON:  Your Honor, I just would say

15  that Mr. Kahal frequently deals with transmission planning

16  studies --

17         THE COURT:  He may, but we're trying to keep him to

18  what we've planned for.  Go ahead.

19  BY MS. LUKAS-JACKSON:

20  Q    Let's look at the eighth page of this report.

21         MS. LUKAS-JACKSON:  And if you could enlarge the

22  yellow highlighted part.

23  BY MS. LUKAS-JACKSON:

24  Q    Mr. Kahal, could you please read the highlighted section?

25  A    Yes.  The highlighted sentence states:  "This document is

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-489

1  not an Attachment Y study and is an operational and planning

2  analysis for informational use only."

3  Q    What's an "Attachment Y study"?

4  A    My understanding is that Attachment Y is a reference to a

5  portion of the MISO tariff.  That is, MISO is a transmission

6  provider and it operates under a FERC-approved tariff.

7          Attachment Y is a reference to a study that is

8  required in the event that a -- that a generation -- that a

9  generation owner within the MISO footprint must request from

10 MISO at the time that the generation owner wants to shut down

11 or retire a generating unit -- this case might be an example

12 of that.

13          For example, if Duke Indiana wants to shut down Wabash

14 River's 2, 3 and 5 it then must go through the Attachment Y

15 study process before the shutdown is approved by MISO.

16 Q    Do you have any response to this report?

17          MR. HOPSON:  Objection, Your Honor.  It's beyond the

18 scope now.  I'm not contesting he has some knowledge, but this

19 is not in his report.

20          THE COURT:  He can answer yes or no.

21 BY MS. LUKAS-JACKSON:

22 Q    Do you have a response to this report?

23 A    Yes, I do.  This report --

24          THE COURT:  Wait.  You're going to have to wait for

25 the next question.

KAHAL - DIRECT/LUKAS-JACKSON        Vol. 3-490

1          MR. HOPSON:  I'll let it go, Your Honor.  That's

2    fine.

3          THE COURT:  All right.  Go ahead.

4    BY MS. LUKAS-JACKSON:

5    Q   I'm sorry.  Mr. Hopson is he saying he'll allow further

6    explanation of your opinions.

7    A   Yes.  Based upon what I've reviewed of his report,

8    including his disclaimer, and I think including this very

9    important statement, that this report is not intended to

10   comply with the Attachment Y protocols that MISO follows, this

11   really helps put the report in context.

12          The report is -- should be properly interpreted as an

13   indication that MISO thinks that there may be a reliability

14   issue associated with the immediate shutdown of the plant, but

15   this is not the full study.  And because it makes this

16   statement, that this is not an Attachment Y study, to me this

17   is an indication that really no determination has been made

18   with regard to how to resolve any potential reliability issues

19   associated with shutdown.

20          In other words, I view the study as really being a

21   starting point for addressing the issue.

22   Q   Mr. Kahal, you're aware that this report is dated

23   January 19th, 2009?

24   A   Yes.

25   Q   If you had had this report back in August or at some time

KAHAL - DIRECT/LUKAS-JACKSON          Vol. 3-491

1  before the discovery cutoff in November of 2008, would you

2  have included your opinions on this report in your report?

3  A   Oh, I certainly would have cited it, absolutely.  And

4  probably attempted to explore it further to get even more

5  information than what's contained in this report.

6  Q   Thank you, Mr. Kahal.?

7         MS. LUKAS-JACKSON:  I have no further questions,

8  Your Honor.

9         THE COURT:  Cross-examine?

10        MR. HOPSON:  Yes, sir.

11                   **CROSS EXAMINATION**

12  BY MR. HOPSON:

13  Q   Are you a little cold in here?

14  A   I'm doing just fine, thanks.

15  Q   Must be me.  It got warmer in the courtroom yesterday,

16  Your Honor.

17        THE COURT:  One of the great advantages of these old

18  courtrooms is you always know what the temperature is outside.

19        MR. HOPSON:  I've had some houses like that.

20        THE WITNESS:  I would rather have it cold than too

21  hot.

22  BY MR. HOPSON:

23  Q   Good morning, Mr. Kahal.  My name is Mark Hopson, and I

24  represent Cinergy or Duke Energy in this case.

25         Before we get into some of the calculations and so

KAHAL – CROSS/HOPSON          Vol. 3-492

1  forth, I just want to see if we can agree on some general

2  principles.

3        In forming your opinion on costs or the financial

4  viability of the remedy, you took into account that Cinergy or

5  Duke Indiana is a public utility, right?

6  A   I certainly did.

7  Q   That means that its rates are regulated by the Indiana

8  Utility Regulatory Commission, correct?

9  A   Yes.

10 Q   The reason it's regulated has to do with the notion that

11 Duke Energy, like other utilities, is a monopoly, right?

12 A   That's correct.

13 Q   That means that customers have to pay these regulated

14 rates because they don't have a competitive choice, correct?

15 A   Generally speaking.  There's -- I don't want to quarrel

16 too much, but there's some limited scope for competition but

17 it's quite limited.  I think it is fair to say that Duke

18 Indiana has monopoly power and the purpose of regulation is to

19 prevent the exercise of the monopoly power.

20 Q   In exchange, Cinergy -- I'm going to say Cinergy because I

21 can't quite get my mouth around Duke Indiana.

22        Cinergy has an obligation to provide electric service

23 to its customers at the least cost; is that correct?

24 A   No.  That's not correct.

25 Q   Okay.  Provide -- give me your paraphrase of that

KAHAL - CROSS/HOPSON                    Vol. 3-493

1  statement.

2  A    Sure.  Because this is something that I often have to

3  articulate.  Duke -- I'll stick with Cinergy.  Cinergy has a

4  public utility responsibility to provide reliable service at

5  lowest reasonable cost in compliance with the relevant laws

6  and regulations.

7  Q    Can we refer to that as we go forward as least cost since

8  it's not such a mouthful, but I'll understand when I say that,

9  that that's your definition?

10 A    Right.  The reason I was saying that is you could have

11 least cost without being reliable, and that would be

12 unacceptable.

13 Q    And you could have least cost without being in compliance

14 with the law; and that would be unacceptable too, right?

15 A    Exactly.  That's why I had to give you the full story.

16 Q    In the course of your testimony here today, you told the

17 Court that you didn't do a different calculation for shutdown

18 rather than controls because you assumed that if my client

19 chooses a shutdown rather than controls, that's a lower cost

20 option; is that correct?

21 A    I'm assuming that the company believes that, that they

22 wouldn't have selected shutdown unless they believed it was

23 less costly.

24 Q    You also understand from your 30 years of experience that

25 utilities as a general matter don't invest large sums of money

*KAHAL - CROSS/HOPSON*                Vol. 3-494

1  to control older, smaller units; isn't that correct, too?

2  A   Sometimes they do.  Sometimes they don't.

3  Q   But you understand in this case when you make the

4  assumption that shutdown is less expensive that that's exactly

5  what's going on here, right?

6  A   I'm assuming that that's the company's rationale for doing

7  that.

8  Q   And back to the general concepts that you understand so

9  well, part of the IURC's job is to set rates that provide

10  sufficient revenue to Cinergy to cover the cost of providing

11  electric service, right?

12  A   To cover the prudently-incurred costs of providing utility

13  service, yes.

14  Q   I don't mind you correcting me, Mr. Kahal.  I appreciate

15  it.

16       And that cost recovery includes a fair return on

17  capital; isn't that right?

18  A   Yes, it does.

19  Q   Because if a utility, for whatever reason, does not

20  recover those costs, including a fair return on capital, over

21  the time, that's going to affect its costs of capital in the

22  future, right?

23  A   It's cost of capital will be affected by how it does

24  financially, yes.  I don't want to go so far as to say unless

25  it recovers every single dollar that its cost of capital will

KAHAL – CROSS/HOPSON                Vol. 3–495

1   increase.

2   Q   Well, you told us at one point in your testimony about a

3   failure to recover costs for investment in nuclear power at

4   Marble Hill.

5       Do I have that right?

6   A   That's correct.

7   Q   Isn't that exactly what happened there; that the failure

8   to recover those costs in that nuclear plant is what damaged

9   Cinergy's financial standing at that point in time?

10  A   Absolutely.

11  Q   And you also hold the opinion, sir, that a utility such as

12  my client should maintain and manage its operations in a

13  manner that ensures that they maintain an investment grade

14  rating; is that correct?

15  A   That's correct.

16  Q   Because again, you understand and I think we all

17  understand it's going to have costs when that utility goes out

18  to try to access the capital markets, right?

19  A   That's part of it.  The other part is, if a utility does

20  not maintain an investment grade, it may find itself not

21  having sufficient access.

22      In other words, it's not only the costs but whether it

23  can get the capital that it needs at all.

24  Q   That could be disastrous, right?

25  A   That would be –– let's just stay problematic, yes.

1  Q   I want to go to the last bit of your testimony about

2  reliability; and let me just put up here Defendants' Exhibit

3  321.

4        MR. HOPSON:  Your Honor, I have to raise a

5  housekeeping point.  I apologize.  It just popped into my

6  mind.

7        MISO's counsel made a request of me that if this

8  document came into evidence, that it be filed under seal; and

9  I would just -- I'm sorry, Mr. Kahal.  I would direct your

10 attention -- this is not my request.  This is MISO's request.

11       Apparently, there is some issue about the extent to

12 which these kind of documents that address the reliability of

13 our energy grid have some national security implications or

14 are otherwise confidential.

15       THE COURT:  So we need to know who's in the

16 audience?

17       MR. HOPSON:  We can talk about it.  They didn't

18 object to us talking about it or putting it into evidence.

19 They just wanted the document under seal in the Court's

20 records.

21       THE COURT:  Does the Government have any problem

22 with that?

23       MR. BROOKS:  No problem, Your Honor.

24       MR. HOPSON:  I'm sorry, Your Honor.  I owed that to

25 MISO to do that.

KAHAL – CROSS/HOPSON          Vol. 3-497

1  BY MR. HOPSON:

2  Q    You talked a little bit about reliability issues, right,

3  Mr. Kahal?

4  A    Yes.

5  Q    And you told us that -- I believe you said reliable

6  service by a utility such as Cinergy means service in

7  compliance with reliability standards?

8  A    Yes.

9  Q    And one of those sources of reliability standards is NERC;

10 isn't that correct?

11 A    That's correct.

12 Q    NERC sets these federal standards pursuant to federal law,

13 correct?

14 A    Yes.

15 Q    And NERC, just to define who they are, is a

16 self-regulatory organization; and they're subject to oversight

17 by FERC, correct?

18 A    That's correct.

19 Q    And NERC develops and enforces these reliability standards

20 you're talking about under the authority delegated by FERC?

21 A    Yes, it does.

22 Q    And, in fact, as of 2007 FERC delegated to NERC legal

23 authority to enforce these reliability standards with all U.S.

24 users, owners and operators of the bulk power system, right?

25 A    I'll accept that.  I'm not sure what the law is on that.

KAHAL — CROSS/HOPSON             Vol. 3-498

 1  Q   Let me ask a simpler question.

 2      You understand that these NERC standards are not just

 3  a suggestion to the utility industry?  You understand that

 4  they are mandatory and enforceable, correct?

 5  A   As far as I know, they've always been treated as

 6  mandatory, to be followed by transmission providers.

 7  Q   What's MISO?

 8  A   MISO is a transmission provider.

 9  Q   Tell me what it means when you say it's a "transmission

10  provider"?

11  A   What that means is that it's assigned certain

12  responsibilities associated with transmission service.  For

13  example, if a transmission customer seeks transmission

14  service, they request that transmission service through MISO.

15  That transmission service could be a wheeling service, that

16  is, a transmission path.  They could go to MISO to request the

17  interconnection with the grid.  There are various services

18  that the provider provides to customers.

19  Q   It gets a little complicated?

20  A   It really does.

21  Q   But MISO actually operates a transmission grid here in the

22  Midwest, correct?

23  A   Now, that's a very complicated question.  To some degree,

24  they do.  To some degree, there is some operational

25  responsibilities of the transmission owners as well.  I think

KAHAL – CROSS/HOPSON              Vol. 3-499

1  of it as the transmission owners and MISO really jointly

2  operating the transmission grid.

3  Q    Put aside operation for a second.

4        You would agree that one of MISO's responsibilities is

5  to apply these NERC reliability standards in the course of

6  fulfilling their obligation, which is to maintain the

7  integrity and the reliability of the transmission grid we're

8  talking about here in the Midwest?

9  A    I agree with that.

10 Q    And you understand, I guess we should say on the record,

11 Duke Energy Indiana is a member of MISO?

12 A    Correct.

13 Q    Most of the major if not all of the major utilities in the

14 Midwest are members of MISO?

15 A    It's a mixed bag.  Probably most are.  I'm not sure what

16 your definition of the Midwest is.  Some company that is –– we

17 think of as being in the Midwest are actually members of the

18 PJM regional transmission organization, not MISO.

19 Q    I'm not going to get into the geographic boundaries.  It

20 gets a little complicated?

21 A    More than a little.

22 Q    You would agree that MISO is the entity charged when

23 there's going to be a local area reliability problem in Terre

24 Haute, right?

25 A    At the transmission level, they are charged with that.

KAHAL – CROSS/HOPSON              Vol. 3-500

1  The only distinction I want to make is that they don't have

2  that responsibility at the distribution level.

3  Q   Let's define terms then, sir.

4       Tell the Judge, what's the difference between

5  transmission and distribution?

6  A   Transmission –– and I'm not going to give you precise

7  definitions because I don't know what the precise definition

8  is; but transmission refers to the high voltage system that

9  connects generating units to load centers.  Distribution is ––

10 are the facilities, the wires and substations and what not in

11 local neighborhoods.

12 Q   Is it sufficient for our purposes to say transmission is

13 the higher voltage, longer distance; and distribution is lower

14 voltage, shorter distance?

15 A   Yes.  Some systems use a dividing line, something like 69

16 kilovolts, but it differs a little from one system to another,

17 something like that.

18 Q   Subject to that definition and qualification, you would

19 agree with me that MISO is the entity charged with determining

20 whether there would be a local area reliability problem with

21 transmission in the Terre Haute region, correct?

22 A   I believe that is their assigned responsibility to make

23 that determination.

24 Q   Under federal law?

25 A   I don't know under federal law.  It's what's been approved

KAHAL - CROSS/HOPSON          Vol. 3-501

1  by the FERC.

2  Q    FERC's a federal agency, right?

3  A    Yes.  MISO operates under a FERC-approved tariff.  The

4  NERC-approved tariff defines what MISO's abilities are.

5  Q    Do you understand that MISO rather than Cinergy is the

6  last word on making these reliability determinations that you

7  described in your expert testimony here today?

8  A    I believe that MISO has their responsibility -- has the

9  responsibility for making that determination.  I'm not

10 suggesting that Cinergy can't have input.  I think that the

11 local transmission owners normally do, but I think that the

12 determination is supposed to be made by MISO.

13 Q    MISO has the last word, right, Mr. Kahal?

14 A    They make the determination.  If that's what you mean by

15 "last word," then yes.

16 Q    Let me tell you what I mean.  If Duke Energy Indiana had

17 gone out in the wake of the jury verdict in May and done four

18 extensive studies that you thought were terrifically done,

19 very detailed and precise and perfect, and those studies

20 showed that there was no reliability in transmission in the

21 Terre Haute region, if MISO reached a contrary conclusion,

22 MISO has the last word, correct?

23 A    I believe that MISO's determination rather than Cinergy's

24 determination would be controlling.  I think as a practical

25 matter, generally, the transmission owners and the

1 transmission provider, MISO in this case, tend to cooperate.

2 There's a lot of cooperation between transmission owners and

3 the transmission provider.

4 Q   You don't -- you, personally, Mr. Kahal would defer to

5 MISO on issues of local area reliability?

6 A   I would.  I wouldn't be making these reliability

7 determinations myself.  I'm not the transmission provider.

8 Q   So any of your testimony about reliability shouldn't be

9 relied upon or heard by us to be second guessing MISO, right?

10 A   I'm not second guessing MISO.  I think that what I said in

11 my testimony was simply that the report that they produced was

12 informational.  It was a starting point for the reasons that I

13 gave.  I didn't construe this as a final conclusion or a

14 definitive study that was reached by MISO.

15        As this report itself says, this is informational.

16 It's an indication by MISO that they think there is a problem

17 that needs to be addressed.

18 Q   I got it; but you also suggested to us, I think, correct

19 me if I'm wrong, that this whole problem could be resolved by

20 Duke Energy going out and purchasing capacity to ensure

21 reliability.  Didn't you suggest that, Mr. Kahal?

22 A   We're talking about two different things.  That discussion

23 about capacity referred to the obligation that Duke -- we're

24 going to call it Cinergy?

25 Q   We can call it both.

1  A   That discussion referred to the obligation that Cinergy

2  has to maintain its minimum installed capacity reserve margin,

3  that figure of roughly 14.5 percent.  That's an aspect of

4  reliability.  There are different aspects of reliability.

5  Q   You weren't meaning to suggest that the purchase of

6  capacity could solve any problem from the shutdown of Wabash

7  River 2, 3 and 5?

8  A   Well, I think specifically, what I was not saying was that

9  the purchase of capacity from the wholesale market addresses a

10  local reliability problem that's caused by a transmission

11  constraint.  It simply goes to having a total amount of

12  installed capacity that's adequate and meeting that

13  obligation.  It's unrelated to this local issue, whatever this

14  local issue is.

15  Q   Well, you understand though, sir, just to make sure we're

16  seeing this the same way, MISO believes that the shutdown --

17  immediate shutdown of Wabash River 2, 3 and 5 exacerbates the

18  reliability risk in transmission, correct?

19  A   I don't recall the report saying anything about

20  exacerbating.  What they said in this report is that the

21  shutdown of these units in combination with other things

22  happening, including an outage at one of the major

23  transformers at the Dresser substation and under conditions

24  where the temperature was above 90 degrees, that that had the

25  potential to cause an overload on critical facilities.  They

KAHAL - CROSS/HOPSON          Vol. 3-504

1  didn't say anything about exacerbating anything.

2          THE COURT:  Excuse me just a second.  This has to do

3  with the delivery of electricity through -- to the ultimate

4  user?

5          MR. HOPSON:  I'm going to put up a map, Your Honor,

6  and see if Mr. Kahal and I can describe it.

7          Can we have that map?

8  BY MR. HOPSON:

9  Q   You referenced the Attachment Y study.

10         Where's the phrase "Attachment Y" come from?

11 A   It's in the MISO tariff.  It's a big, big thick document.

12 Q   I tried to look at it, Mr. Kahal.  I know it's a big thick

13 document.

14         Aren't you aware, Mr. Kahal -- maybe you aren't, maybe

15 you are -- but you know that getting an Attachment Y study out

16 of MISO takes six to nine months?

17 A   I recall six-months.  They request a lead time of

18 six-months.  The nine months doesn't ring a bell.

19 Q   Fair enough.  Your opinion controls.  Let's just look at

20 this for a minute.  I'm not going to dwell on this, but I'm

21 going to see if we can understand what we're talking about

22 here when we refer to this reliability issue.

23 A   Yes.

24 Q   Let me ask you an open ended question, first.  There are

25 two ways that you can get electricity into any area.

KAHAL - CROSS/HOPSON          Vol. 3-505

1        You can do it through local generation or you can

2    transmit it over this high voltage grid that we have in this

3    country, right?

4    A    Yes.  We'll call that remote generation.

5    Q    And on this map, I would just like to direct your

6    attention to the line of substations, Terre Haute, Fruitridge

7    Market, Allendale and Water Street -- those are substations in

8    the Terre Haute region, right?

9    A    Yes.

10   Q    There are two ways to get power to those substations in

11   the Terre Haute region, right?  Maybe more than two, but there

12   are two obvious ways to this map, right, Mr. Kahal?

13            COURT CLERK:  Excuse me, counsel.  Could you

14   identify what you're referring to for the record?

15            MR. HOPSON:  Thank you very much.  I am referring to

16   Exhibit marked as DR Demonstrative 65.

17   A    If you're referring to supplying the generation locally or

18   importing it remotely, if that's what you mean, then I agree

19   with that.

20   BY MR. HOPSON:

21   Q    Right.  So one way on this map that you can get generation

22   into what is called the load pocket of Terre Haute is you can

23   get that generation in directly from the Wabash River station,

24   correct?

25            MS. LUKAS-JACKSON:  Your Honor, if I could

KAHAL - CROSS/HOPSON                    Vol. 3-506

1 interrupt, Mr. Kahal may not have seen this before and we

2 would -- we object that Mr. Kahal has not had an opportunity

3 to see this before and we object on that.

4           MR. HOPSON:  First, Mr. Kahal doesn't seem to be

5 struggling too much --

6           THE COURT:  I think we can use this as a

7 demonstrative exhibit, and he can tell us if it's confusing

8 him.

9 BY MR. HOPSON:

10 Q   The obvious way in this simplified transmission map is you

11 can bring the power in from the high power lines through the

12 Dresser station, right?

13 A   Yes.

14 Q   And the Dresser station has transformers which step down

15 that generation from 230,000 volts or 345,000 volts to

16 138,000 volts, correct?

17 A   Yes.  At some point it gets stepped down further than

18 that.

19 Q   It gets stepped down further at these other substations,

20 right?

21 A   Yes, distribution substations; and at some point you get

22 the power into the distribution system.

23 Q   This may be too simple a way to characterize it, but is it

24 fair that MISO's concern is that Dresser is a bit of a

25 bottleneck going into the Terre Haute load pocket?

1  A   I think it views the Dresser substation under certain

2  conditions as being a constraint.  That's not to say it's

3  always a bottleneck; but under certain conditions, it could

4  be.

5  Q   And MISO says that if one of the two transformers were to

6  go down at that Dresser station and all the generation from

7  Wabash River were not available, that that could overload the

8  system.  Is that the reading of the report?

9  A   Not quite.

10  Q   Correct me.

11  A   It was a little unclear on that.  I think it's probably a

12  more accurate reading to say at least some of the generation

13  from Unit 2, 3 and 5.  That was really the focus, 2, 3 and 5,

14  not necessarily all 265 megawatts, but certainly some of it.

15  Q   That's a good correction.  Thank you.

16       What they're really saying is that if 2, 3 and 5 are

17  shut down and there's a problem at Dresser, that they may have

18  to shed load to the Terre Haute region, correct?

19  A   Under certain conditions.  Those conditions being again --

20  and I think that you included in your question, if one of the

21  two transformers goes out.  And if we're dealing with a

22  situation where the temperature is over 90 degrees, so it's a

23  summer hot day, that there could be an overload that would

24  require curing the overload by shedding load for a short

25  period of time?

KAHAL - CROSS/HOPSON                Vol. 3-508

1          THE COURT:  "Shedding load" means?

2          THE WITNESS:  Means cutting off power to the end

3    users.

4    BY MR. HOPSON:

5    Q    It means blackouts and brownouts, right, Mr. Kahal?

6    A    It doesn't necessarily mean a massive blackout.  It means

7    that there may have to be some cuts somewhere.  It's not -- I

8    think it's overly dramatic to suggest that the whole region

9    goes black.  It means there would be some cuts for a few hours

10   or something like that.

11   Q    I don't want to be overly dramatic, but did you in the

12   course of reading the MISO report see what the impact of the

13   load shedding would be?

14   A    I'm not sure we're talking about the same thing.  What the

15   report had was information on the customer base of the Terre

16   Haute load pocket.

17   Q    Does it estimate the impact on the customer base?

18   A    There is an estimate of the number of megawatts of

19   potential load shedding, but I would have to get back into the

20   report to tell you what that number is.

21   Q    We'll save that.

22          The shedding of load in Terre Haute is not the only

23   reliability risk that MISO identifies in its report, right,

24   sir?

25   A    In this report?

KAHAL − CROSS/HOPSON                Vol. 3-509

1  Q   Yes.

2  A   No.  I think that was the −− my recollection −− I would

3  have to go back and review the report.  I think that's what

4  they were talking about, that there was the potential under

5  certain scenarios, as we've just discussed, for causing an

6  overload on facilities and to prevent the thermal overload on

7  a facility there would be some cutting of load.  That was the

8  essence of the report.

9  Q   Again, to make sure we're all clear here, cutting of load

10 means turning down other generating stations on the high

11 voltage grid, right?

12 A   Right.  Now, I remember what you were referring to.  It

13 was the potential effects on other generators.

14 Q   Right.  And what were those potential effects?

15 A   That it could affect the operation of these other

16 generators, although, to me, that part of the report was

17 unclear, whether that would −− whether that was a potential

18 risk or not.

19 Q   It says, if you recall, approximately 1,143 megawatts of

20 generation resources could be impacted; is that right?

21 A   I would have to go back and look at the report.  I don't

22 have it in front of me.

23 Q   And that means in English that you might have to turn down

24 generation from Cayuga, Vermillion, Marion and these other

25 generating stations shown on the map, right?

KAHAL - CROSS/HOPSON          Vol. 3-510

1  A    That's what they were suggesting.

2  Q    And you would have to turn that down in summer peak

3  conditions when you need it the most?

4  A    I don't know whether that would happen or not.  They were

5  simply identifying that as a potential concern.  I don't think

6  that was a prediction that was going to happen.  At least I

7  didn't read the report that way.

8  Q    Didn't you just clarify for me earlier that this whole

9  problem is about summer peak?

10  A    That's the scenario that they were -- under which they

11  were suggesting a potential problem could occur when

12  temperatures were over 90 degrees.

13  Q    Okay.  Let's get off of that.

14       Let's talk a little bit about the generation impact

15  testimony you provided, okay, Mr. Kahal?

16  A    Sure.

17  Q    In making your opinion for the Court today and offering

18  your opinion about the affordability or the ability to finance

19  this remedy, whatever the remedy is, you said that you assumed

20  full rate recovery for the costs of any shutdown, pollution

21  controls or allowances that are surrendered; is that correct?

22  A    Yes.

23  Q    And you said and I believe that the implication of that is

24  that any remedy ordered by the Court is going to affect the

25  retail rates that Duke Energy charges its customer over some

*KAHAL – CROSS/HOPSON*          Vol. 3-511

1  period of time, correct?

2  A    Yes.  I assume that the remedy –– that the costs

3  associated with the remedy were recoverable from customers.

4       Let me just slightly modify that.  That would be for

5  the retail jurisdictional portion, which as I indicated was

6  about 92 percent.

7  Q    That's a good correction.

8       Let's just say that unless we say otherwise, you and I

9  are talking about that 92 percent.

10 A    That's correct.

11 Q    You told us that you had evaluated the ability to get

12 financing for any type of –– and I'm just going to say any

13 remedy; is that correct?

14 A    Well, for the remedy that I was asked to look at.

15 Q    And you identified four sources of financing?

16 A    That's correct.

17 Q    And it's safe to stay that the credit markets and equity

18 markets have taken a little bit of a down turn since you

19 prepared your report in August 2008; is that correct?

20 A    They have.

21 Q    You're still comfortable that Duke Energy can issue bonds?

22 A    Oh, yes.  They can and they have been during this time

23 period.  The Duke system –– Duke Energy Corporation

24 subsidiaries have been out there issuing debt.  They have been

25 operating successfully within this current economic

1  environment.

2  Q    And I'm just confirming that we're not relying on some

3  report that's become stale because it was filed in

4  August 2008.

5        Your report you're giving us from the stand here is

6  current, right, sir?

7  A    Oh, yes.

8  Q    Any of those costs, though, are eventually going to be

9  recovered?  I'm talking about the cost of financing of course,

10 right?

11 A    They're recovered using the standard rate-making the

12 procedures authorized by the Indiana commission, yes.

13 Q    And you characterized those, sir, in your direct testimony

14 as very favorable; and I heard you to mean that they're

15 favorable to Duke; is that correct?

16 A    That's correct.

17 Q    And they're favorable to Duke in the sense that the IURC

18 allows you to get preapproval of environmental costs and

19 immediately begin recovering those costs in the rate base; is

20 that correct?

21 A    They -- as soon as the investment is undertaken in the

22 capital project, they are allowed to recover carrying charges

23 associated with that investment.

24 Q    Okay.

25 A    They obviously don't get to recover the principal on their

1  investment until it actually enters commercial service.

2  Q    So what you're really allowed to recover up front is

3  essentially the carrying costs while you're getting the

4  pollution control online?

5  A    While you're getting it built.

6  Q    I'm going to show you what doesn't have an exhibit number,

7  so I'm going to put it on it.

8       I'm going to show you what was referred to in your

9  direct testimony as Exhibit 2; and we're going to call this,

10 for the record, DR Demonstrative 76.

11      This is a document I believe you prepared; isn't that

12 right, Mr. Kahal?

13 A    Correct.

14 Q    And you were comparing in this document the residential,

15 commercial and industrial rates of Duke Energy to other

16 utilities, or averages that you think are comparable, right?

17 A    These are what I consider to be relevant comparisons.

18 Q    Didn't think you would make a chart with irrelevant

19 comparisons, sir?

20      So you said that, by looking at this chart, it

21 corroborated your opinion that Duke Energy's rates are very

22 attractive?

23 A    Yes.

24 Q    And you also used the word, I believe, competitive; is

25 that correct?

KAHAL – CROSS/HOPSON          Vol. 3-514

1  A   I don't recall using that term.

2  Q   Well, let me just ask you the open-ended question:  If

3  we're dealing with a regulated monopoly, why does Duke Energy

4  care if its rates are high or low compared to these other

5  utilities?

6  A   I have to be a little bit cautious in saying what

7  management cares about and what management doesn't care about.

8       But with that in mind, there is a limited scope of

9  competition among even what are known as regulated monopoly

10 companies.  In fact, I've seen company documents that talk

11 about this.  They talk about price elasticity effects, and

12 they have to be concerned that even though they are

13 monopolists, raising prices can have at least a limited effect

14 on the sales volume; and that affects their earnings.

15      You drive up the price.  Consumers consume less.  At

16 least for a period of time that could have some effect on

17 their earnings.

18      In addition to that, they have concerns about

19 maintaining, for example, industrial load because some

20 industrial load is footloose.  It can relocate to other parts

21 of the country.

22      So it's true they are monopolists.  They have monopoly

23 power.  It doesn't mean the competition is zero.  It doesn't

24 mean there's no response at all to changes in price.  They

25 have to be mindful about that.

KAHAL - CROSS/HOPSON          Vol. 3-515

1  Q   Let me explore that for a minute.  Your reference to

2  competitive advantage then has more to do on the industrial or

3  commercial side than it does on the residential side, right?

4  A   You mean in that last answer?

5  Q   Yes.

6  A   I think that that's probably true, that the scope of

7  competition is greater on the commercial and industrial side,

8  particularly industrial than residential; but there may even

9  be some on the residential side.

10         For example, the -- a customer can decide what type of

11 heating system that they want for their house.  There is now

12 fuel competition.  It's limited, but there's some.

13 Q   And the reason that you referred to businesses being

14 footloose -- and I love that term -- is that because for these

15 big commercial and industrial users, electricity is a major

16 cost of doing business, right?

17 A   For some it is.

18 Q   Well --

19         THE COURT:  Let's take 15.

20         MR. HOPSON:  Sure.

21         COURT CLERK:  All rise.

22         Court will recess for 15 minutes.

23     (A recess was taken.)

24         THE COURT:  You may continue, sir.

25

*KAHAL - CROSS/HOPSON*          Vol. 3-516

1  BY MR. HOPSON:

2  Q    Before we took the break we were talking about this notion

3  that the idea of competitiveness has more to do on the

4  industrial and commercial side than it does on the residential

5  side, right?

6  A    Yes.  And I think more on the industrial side than the

7  commercial side.

8  Q    And you've said that this issue of competitive utility

9  rates can have all kinds of economic impacts, including

10 impacts on local jobs and businesses.

11 A    When did I say that?

12 Q    At your deposition.

13        MS. LUKAS-JACKSON:  Objection, Your Honor, this is

14 improper impeachment.

15 A    Honestly, I don't recall.

16        MR. HOPSON:  I'll ask an open ended question.

17 BY MR. HOPSON:

18 Q    Don't you understand that this competitive advantage of

19 local utility rates can have all kinds of economic impacts,

20 including impacts on local jobs and businesses?

21 A    The relative attractiveness of electric rates can have

22 local economic effects, yes.

23 Q    And that issue of competitiveness of rates is one of the

24 reasons why, despite the rate recovery system you've

25 described, a utility does have an incentive to control cost,

KAHAL - CROSS/HOPSON          Vol. 3-517

1  right?

2  A    I think it has some incentive to control costs, yes.  Not

3  as much as a company operating in a competitive market, but it

4  has some.

5  Q    And that desire to control costs, to seek least cost

6  alternatives, is consistent with its obligation to act in the

7  public interest, correct?

8  A    No.

9  Q    No?

10 A    Not necessarily.  I think you're getting into a very

11 complicated issue with that question.  I think that there

12 are -- there are balances of all kinds of considerations.

13 Q    Reliability considerations, cost considerations,

14 environmental considerations, correct?

15 A    I can explain -- I can give you an example --

16 Q    Go ahead.

17 A    I think, based upon some of the questions that you've

18 asked, if it is true that the scope of competition on the

19 industrial side, let's say, is greater than on the residential

20 side, then if the utility then was seeking to sort of maximize

21 its competitive advantage, then what that would suggest is

22 that the utility then would try to keep industrial rates as

23 low as possible and shift the revenue on to residential rates;

24 and I'm sorry, I don't consider that to be in the public

25 interests.  I think there are a lot of complicated issues.

KAHAL - CROSS/HOPSON                Vol. 3-518

1  Q    I didn't consider that, but the IURC would prevent that?

2  A    It would be an issue that would be presented for the IURC

3  and they would have to resolve it.  That is why you have

4  regulation.

5  Q    When you offer the opinion that the cost of the remedy as

6  you calculate it would not materially impair these rates, were

7  you talking about all three categories of rates?

8  A    Yes.  I think that applies to all three rates; and what I

9  was saying in my testimony is it does not impair the relative

10 attractiveness of these rates to a significant degree compared

11 to, say, the Midwest regional average or in comparison to the

12 U.S. average.

13 Q    In forming that opinion, you took into account, Mr. Kahal,

14 that there are other rate increases coming for Duke Energy

15 Indiana, right?

16 A    Yes and no.  What I assumed in my study was that Duke

17 Indiana's rates would increase over time at that rate of

18 inflation.  I chose that because that was a neutral

19 assumption.

20      In point of fact, the information I have is that

21 Duke's rates are going to be increasing at least for the

22 foreseeable future substantially more than the rate of

23 inflation.  One of the main drivers of that is going to be the

24 Edwardsport IGGC plant.  What that means, the import of that

25 relative to my assumption about rates going up at the rate of

KAHAL — CROSS/HOPSON            Vol. 3-519

1  inflation, means that the 2.9 to 4.4 percent rate impact that

2  I calculated is overstated because if, in fact, Duke Indiana's

3  rates rise higher -- more than that, that means the percentage

4  increase is going to be lower.

5  Q   That's just math?

6  A   That's just math.  That's right.

7  Q   You mentioned Edwardsport, and you understand that

8  Edwardsport is expected to increase rates by 18 percent when

9  it comes on line in 2012, right?

10 A   That's correct.

11 Q   On your chart, 18 percent increase on residential rates

12 would be about a buck 40?

13 A   I'm sorry.  Which were you comparing it to, the

14 residential --

15 Q   Forget it.  You don't need to do the math.  Strike the

16 question.

17      You talked about the cap and trade system, didn't you?

18 A   I did.

19 Q   You described it to us?

20 A   Yes.  In broad terms, yes.

21 Q   Before we get into specifics, let me just confirm that

22 your opinions that Cinergy will obtain full rate recovery for

23 the costs of any allowances that had to be surrendered as part

24 of a remedy in this case; is that correct?

25 A   That's the working assumption I've made.  It's really up

KAHAL - CROSS/HOPSON          Vol. 3-520

1  to the IURC.  It's not up to me.

2  Q    But we can only talk to you right now and that's what

3  underlies your opinion and analysis, correct?

4  A    Yes.  I'm making the assumption that they get to recover

5  the allowance costs they incurred because that has been the

6  historical practice.  I'm not trying to preempt the IURC.

7  Q    In making this prediction and calculation of value, you've

8  given the Court a general understanding of the way this

9  allowance system works; isn't that correct?

10 A    That's right.

11 Q    So you can tell us that the purchase and surrender of one

12 allowance or 10 allowances or 100 allowances won't necessarily

13 have any impact on the amount of emissions here in Indiana,

14 correct?

15 A    The purchase of allowances by itself, if that's the only

16 thing that happens, no, that doesn't affect the amount of

17 pollution.  What affects the amount of pollution are physical

18 decisions such as whether to control or shut down units.  It's

19 those physical decisions that govern the emissions.

20 Q    Let's talk about the basic regulatory framework.

21        You told us on direct that SO2 and NOX allowances were

22 not created or allocated pursuant to the New Source Review

23 program; is that correct?

24 A    They were -- they came out of the 1990 Clean Air Act

25 amendments, the cap and trade system.

KAHAL – CROSS/HOPSON                    Vol. 3-521

1  Q    Not out of the New Source Review program?

2  A    That's right.

3  Q    I think you told us that the original allocation of SO2

4  allowances to utilities were based on 1985 to 1987 emissions

5  levels; is that correct?

6  A    I believe that's correct.  I don't think I testified to

7  that, but to my knowledge, a base period in the late 1980s was

8  used.

9  Q    And NOX allowances were created somewhat later?

10 A    Yes.

11 Q    And you agree that there are more recent rules and

12 regulations that impact the way this cap and trade system

13 works than the 1990 amendments to the Clean Air Act, right?

14 A    Yes.  I think you're probably referring to the Clean Air

15 Interstate Rule.

16 Q    Yes.  Tell His Honor what the Clean Air Interstate Rule

17 is?

18 A    The Clean Air Interstate Rule is a rule that was issued by

19 EPA in 2005.  It doesn't change the basic logic of the cap and

20 trade, but it changes some rather important details associated

21 with the cap and trade system.  In particular, the purpose of

22 it was –– is to achieve nationwide reductions in emissions of

23 SO2 and NOX compared to the current level of emissions.

24 Q    Push the national cap down is the way I think of it.

25       Is that fair?

*KAHAL – CROSS/HOPSON*              Vol. 3-522

1   A    That's right.  I can't remember the exact numbers, but I

2   think it's -- over time it's eventually to lead to something

3   like a 60 percent reduction eventually.

4   Q    That rule was originally promulgated in 2005; is that

5   correct?

6   A    That's right.

7   Q    And it was set to go into effect this year, 2009?

8   A    Well, it's supposed to go into effect in 2009 or actually,

9   I believe, it has gone into effect in 2009 for NOX.

10          On the SO2 side, it kicks in 2010.

11  Q    While the rule is going into effect temporarily, the rule

12  has been struck down as unlawful by the United States Court of

13  Appeals for the District of Columbia circuit, correct?

14  A    That's correct.  It was vacated.  It was vacated in 2008

15  by the DC circuit court, but -- it's been allowed to continue

16  in effect, but in effect remanded back to the EPA to deal with

17  some of the issues the Court found with it.

18  Q    So in a simple sense, the EPA's going to come up at some

19  point with a new rule?

20  A    Either EPA or Congress.

21  Q    Then maybe that rule will be approved by the DC circuit

22  and maybe it won't?

23  A    It could be subject to more litigation at the DC circuit.

24  Q    Let me ask you this.  I bring that up, sir, because I

25  hope -- just want to confirm that when you and I talk about

1  predictions of allowance cost, there's some uncertainty in

2  valuing five years or 10 years or 20 years down the road what

3  these allowances are going to be worth; isn't that right?

4  A   No question about it.  There's a lot of uncertainty and

5  that's why I cited a very wide range in my report.

6  Q   Fair enough.  And it's because of the absence of care that

7  we really can't know what the rules are going to look like in

8  the future and, so, you've given us a range rather than a

9  specific number, correct?

10  A   Yes.  I'm not sure what you mean by the absence of care.

11  My understanding is it's in effect, subject to change I

12  suppose.

13  Q   If –– we don't know what's going to be in effect when that

14  new rule comes out from the EPA, right?

15  A   I don't.  You may, but I don't.

16  Q   I don't.  I don't think anybody in the courtroom does, but

17  at least the two of us don't know what that new rule is going

18  to look like.

19  A   That's fair.

20  Q   Another basic principle that you talked about in the

21  course of this cap and trade is that the cap and trade

22  allowances can be acquired by Cinergy one or two ways.

23      They can be allocated to Cinergy in that original

24  allocation, or Cinergy can go out and buy them in the

25  marketplace; is that right?

KAHAL - CROSS/HOPSON                Vol. 3-524

1   A    That's correct.

2   Q    And if Cinergy sells allowances, is there a benefit to

3   ratepayers from that if it's a net seller?

4   A    Let me put it this way:  It can earn revenue from selling

5   allowances and I believe that the rate making process

6   incorporates that as a credit back to ratepayers either as an

7   offset to other costs or is an outright revenue credit.

8          I have a little problem when you say "is there a

9   benefit" because that's assuming that selling the allowances

10  is the right thing to do.

11  Q    Fair enough.  But if there's a financial cash in-flow from

12  the sale of the allowances, in general, that would have an

13  impact on rates?

14  A    Yes, in the manner I just described.

15  Q    The allowances sound to me a lot like currency in a way?

16  A    I think of allowances being more like -- to me it's more

17  like a commodity.  You can think of it as a financial product

18  since an allowance is not really something physical.

19  Q    And again, a financial product is just something that's

20  bought or sold on the market.

21          Is that what you mean by financial product?

22  A    Yes.  An allowance is not actually a physical entity.

23  It's a -- it's a representation of something.

24  Q    Let me ask you this question based upon the understanding

25  of the cap and trade system that you've shared with us today.

KAHAL - CROSS/HOPSON                    Vol. 3-525

1          Wholly apart from this lawsuit, if Cinergy had decided

2     for some operational reason to control these units back in

3     1989 to 1992, you would agree with me that, again, absent a

4     lawsuit, they would not have surrendered any allowances

5     associated with those units?

6     A    Right.  Absent a finding of violation and absent this type

7     of lawsuit, then they would retain their allowances.  They

8     wouldn't be required to surrender.

9          What they would be required to surrender would be

10    allowances equal to whatever emissions did come out of the

11    plant; but presumably, they would be a lot less.

12    Q    If Cinergy, for whatever operational planning reason, had

13    shut down Wabash River units 2, 3 and 5 in 1989 to 1992 and,

14    further, assuming it has nothing to do with litigation or this

15    case, they would not have surrendered the allowances allocated

16    to those units, correct?

17    A    With the same caveats as in my previous answer, that is,

18    no violation found and no NSR issue, but they just simply

19    decided it was the time to retire the plant -- for whatever

20    reason -- that would not trigger a surrender of allowances.

21    Q    You, on direct examination, gave us one way of calculating

22    or predicting is a better way -- predicting, not calculating,

23    the value of the allowance surrendered in this case; is that

24    correct?

25    A    Yes.

KAHAL - CROSS/HOPSON              Vol. 3-526

1  Q   Did I understand you correctly that you were following the

2  analysis that's laid out in your report, Dr. Kahal?

3  A   I'm sorry.  In which report?

4  Q   I'm sorry.  Were you articulating in the courtroom the

5  analysis that was laid out in your expert report of

6  August 22nd, 2008?

7  A   Yes.  I described the analysis that was in my expert

8  report.

9  Q   You're not taking the position that that is the only

10 possible way of predicting the financial impact of the

11 allowance surrender being sought by the Plaintiffs, are you?

12 A   I'm not sure what we're talking about here because what

13 was in my report was a very different allowance surrendered

14 than the current remedy.

15      Are you referring to the current remedy or the one

16 that was in my report which was a different remedy?

17 Q   You know what, that is such a good question, I'm going to

18 stop.  Go backwards.  Let's talk about the current remedy.

19 A   And the current remedy was not discussed in my report.

20 That's what I was trying to say.

21 Q   It was a very confusing question, for which I apologize.

22 Let's move back and start from the beginning.

23      I'm showing you just for purposes of reference what

24 has been marked as Defendants' DR324.  I'm not moving this

25 into evidence.  I just want to see if you've seen it because

KAHAL – CROSS/HOPSON          Vol. 3-527

1  on page 17 it states, very succinctly I think, what the

2  current remedy approach is; and I just want to ask you if you

3  understand that Plaintiffs who's briefed this is -- are

4  requesting that Cinergy should be required to mitigate

5  approximately 412,000 tons of SO2?

6  A   Yes.

7  Q   And do you also understand that -- bear with me a second

8  here -- they take the position to provide an environmental

9  benefit, that Cinergy should be required to surrender SO2 and

10 NOX emission allowances in amounts matching the reduction.

11        Do you understand that?

12 A   Yes.

13        MS. LUKAS-JACKSON:  Your Honor, at this time I would

14 object.  This is beyond the scope of my examination of

15 Mr. Kahal.

16        MR. HOPSON:  Mr. Kahal's already testified to one

17 way of calculating emissions.

18        THE COURT:  I'm going to let him testify.  Go ahead.

19 BY MR. HOPSON:

20 Q   In your report, sir -- and I want to tell you right up

21 front, subject to all the uncertainties we discussed -- one of

22 the numbers that you offered up was the estimate of a thousand

23 dollars per ton on SO2 allowances; isn't that correct?

24 A   Yes.  That was the upper end of the range that I cited.

25 Q   Did you take that number from some other study or some

1  other place?

2  A    Yes.  That estimate came from, I believe it was the 2008

3  Energy Information Administration Annual Energy Outlook.  That

4  was their forecast of what allowance prices might be under

5  CAIR.  What they specifically said is that over time, they

6  thought that the allowance prices under CAIR -- and that's

7  Clean Air Interstate Rule -- would ramp up from current levels

8  up to a thousand dollars per ton in the year 2020 and then

9  decline after that.  That was their forecast.  So, I simply

10 took the thousand dollars as being the upper end of the range.

11 Q    And you're telling me here today that, as far as we're

12 concerned and subject to the uncertainties, that's a

13 reasonable number to use?

14 A    That's one potential plausible view where the market might

15 go.

16 Q    Well, just to keep this simple for a minute, putting aside

17 whatever Cinergy does in its business, if Cinergy purchases

18 and surrenders 412,000 SO2 allowances for the next 20 years

19 and those allowances are worth a thousand dollars each, that

20 is a 412 million-dollar cost over the 20 year period, right?

21 A    Yes.  Spread over 20 years without taking into account the

22 time value of money.  However, what I was trying to say in my

23 earlier testimony is that it's not necessary for the company

24 to purchase that volume of allowances because they're

25 allocated approximately 12,000 allowances per year right now

*KAHAL - CROSS/HOPSON*          Vol. 3-529

1  that the company is not going to need for compliance.  So

2  those 12,000 allowances, those can be used for the allowance

3  surrender remedy.

4  Q  You don't know what Cinergy's going to need for compliance

5  next year or five years or 10 years down the road, do you,

6  Mr. Kahal?

7  A  I'm referring to compliance at the Wabash River plant in

8  the event that the Plaintiffs' remedy is followed.  The

9  Plaintiffs' remedy involves the shutdown of units 2, 3 and 5.

10  By definition, zero allowances will be needed for units 2, 3

11  and 5.  Four and 6, under Plaintiffs' remedy, would be

12  controlled.  Emissions wouldn't drop the zero, but they would

13  drop to very close to zero.  So only minimum amount of

14  allowances would be needed for units 4 and 6.

15  Q  Sir, would you agree with me that the cap and trade system

16  is a national system?

17  A  More or less.  It covers most of the country.  It's a

18  national market.  The NOX is for the eastern part of the

19  United States.

20  Q  Would you agree with me that NSR is a local rule?

21  A  Yes.  It involves -- determination of local sources.

22  Q  Once those SO2 allowances were allocated to Cinergy back

23  in 1985 and 1987, Cinergy could do whatever it wanted with

24  them, right?

25  A  They have the ability to use them either for compliance or

KAHAL - CROSS/HOPSON          Vol. 3-530

1  to sell them, yes.

2  Q   They can do what they want with them on their system,

3  right?

4  A   They can allocate them to other units to their system,

5  yes.

6  Q   And as you've already agreed with me today, there's only

7  two places Cinergy can look to for the allowances to operate

8  its system.  It can use the allowances that are allocated to

9  its system or it can purchase allowances, correct?

10  A   That's correct.

11  Q   And Cinergy is going to make decisions consistent with its

12  obligations as a regulated utility on how to operate its

13  system as we go forward in the years, right?

14  A   They're going to do what they're going to do.

15  Q   They're going to do what they're going to do.  That's even

16  better.

17        They're going to do what they're going to do to

18  operate the system, and if they're a net buyer of allowances

19  or a net seller of allowances, you and I don't know, right?

20  A   Right.

21  Q   But if they purchase and surrender 412,000 SO2 allowances,

22  my client and its ratepayers are out $412 million regardless

23  of what they do in operating the system or what they do at

24  Wabash River, right?

25  A   Well, wait a minute.  First of all, the $412,000 is over

KAHAL - CROSS/HOPSON           Vol. 3-531

1  20 years.  It's approximately 20,000 allowances per year.

2  Secondly, that number is based upon the thousand dollar figure

3  and that's one figure you can use.  I'm not saying that you

4  can't.  I'm simply saying that's a great deal higher than

5  where the market is today.

6        Furthermore, what I'm saying is, if you want to, you

7  can go out and you can meet this remedy if you want to, if

8  that's what you choose to do.  You can go out and purchase

9  412,000 allowances if you want to.  I'm simply saying you

10 don't have to because you have 12,000 allowances per year,

11 which over 20 years is approximately 240,000 allowances that

12 are given to you by EPA for free.  So if your question is, can

13 we comply by going out and buying 412,000 allowances?  Yes,

14 you can do that, if that's what you choose to do.

15 Q   Your answer just said that Cinergy doesn't have to go out

16 and buy those allowances, right?

17 A   That's right.

18 Q   Whether or not Cinergy has to go out and buy allowances

19 depends on how many allowances it needs to operate the system

20 and provide the electricity that it's obligated to provide to

21 its customers, right, Mr. Kahal?

22 A   I would agree with that as well.

23 Q   All right.  Let's turn to NOX.  I've shown you an exhibit

24 that's just -- a demonstrative exhibit just to help a little,

25 I hope, with the math.  It's marked as DR demonstrative 5.

KAHAL - CROSS/HOPSON                Vol. 3-532

1          You understand that, in addition to the 412,000 SO2

2    allowances, Plaintiffs are also seeking the purchase and

3    surrender of 55,000 NOX allowances.

4          Is that your understanding, sir?

5    A    In round numbers, yes.

6    Q    You provided some range of estimates for NOX allowances as

7    well, correct, sir?

8    A    Yes.  I believe I might have used a range of a thousand to

9    $3,000.

10   Q    Well, let me pull out your report?

11   A    This is from memory.

12   Q    I don't want to make this a memory test, sir.  Let me ask

13   you to look at page 38 of your report, which I'm handing to

14   you.

15          MR. HOPSON:  May I approach, Your Honor?

16          THE COURT:  Yes.

17   BY MR. HOPSON:

18   Q    Just tell us the range of estimates you used for NOX.

19   It's on page 38.

20   A    Yes.

21   Q    It's at the end of the second paragraph, sir.

22   A    I think I refer to an EIA projection of 2500 to 3400.  I'm

23   trying to find my actual calculation.

24   Q    Will you indulge me just for a moment --

25   A    I think it's just on a different page.

KAHAL – CROSS/HOPSON                    Vol. 3-533

1   Q    Let's use the 2500 number for illustrative purposes.

2        That's the low number on the EIA estimate, right, as

3   reported by you?

4   A    Right.

5   Q    So of the cost --

6   A    By the way, I think these may be referring to different

7   points in time.  That's why there's a range.

8   Q    But we all know this is subject to great uncertainty

9   anyhow, right?

10  A    Yes.

11  Q    The cost of surrendering 55,000 allowances over 20

12  years -- over 20 years, using that low number estimate, is

13  about $137 million, right?

14  A    Did you want me to do a calculation?

15  Q    Would you accept my representation that I've done the

16  calculation using a calculator and that is approximately the

17  number I got?

18  A    I'll -- normally I like to check my own calculations, but

19  I'll cut you some slack and accept the 137 million.  I assume

20  that's based on the 2500.

21  Q    Yes, sir.  Somebody else can check the calculations for

22  both of us, sir.

23       All right.  Last thing -- or almost last thing.

24  Shutting down Unit 2, 3 and 5 will have some costs; isn't that

25  correct?

1  A   It'll have some costs and it'll save some costs.

2  Q   But there will be costs of replacement energy and

3  replacement capacity, right?

4  A   Yes.

5  Q   And those costs are going to go into rates, if the IURC

6  says so?

7  A   Subject to the IURC approval process, yes.

8  Q   And if there were an order seeking the installation of a

9  scrubber or an SCR, that would have some costs, and those

10 costs would go into rates subject to the caveat you just gave

11 us, right?

12 A   Yes, they would; and there would also be some cost

13 offsets.

14 Q   You talked a little during your direct examination about

15 financial incentives.

16      Do you recall that?

17 A   I do.

18 Q   And I believe -- I'm relying on my notes here -- you said

19 that Cinergy had a financial incentive in the late earlies and

20 early '90s not to install pollution controls; is that a fair

21 paraphrase?

22 A   Yes.  I was addressing it a little more generally than

23 that.  They had incentive at that time not to engage in a

24 large capital spending program.  That could include

25 environmental controls.  I wasn't trying to single that out.

KAHAL – CROSS/HOPSON                Vol. 3-535

1  Q    You said that there was a dividend cut in 1984; is that

2  correct?

3  A    Yes.

4  Q    Can you confirm for us that in general terms, paying that

5  dividend is something that's very important to a utility?

6  A    Absolutely.

7  Q    You said –– again, if my notes are correct –– that the

8  financial problems or financial incentives you're referring to

9  affected capital spending, right?

10  A    Yes.

11  Q    But you also –– I'm sure you know that some capital

12  spending is discretionary and some capital spending is not,

13  correct?

14  A    That's correct.  There's some capital spending that one

15  might have to do in order to, for example, hook up new

16  customers.  There's some capital spending that one might have

17  to do in order to meet reliability standards and so forth; and

18  then there are others that are essentially management

19  decisions.

20  Q    One form of nondiscretionary capital spending would be

21  spending for environmental controls that are required by law,

22  correct?

23  A    That's correct.

24  Q    You're not suggesting to this court that Cinergy didn't

25  spend any capital in the late '80s or early '90s on

1   environmental costs, are you?

2   A    No.  What I am suggesting is that during that time period

3   in the late 1980s, there was a very reduced level of capital

4   spending.  In fact, the level of capital spending during that

5   time period was so low that it didn't even meet the company's

6   annual depreciation expense, which means the company was

7   liquidating.  It was shrinking its asset base.

8   Q   Don't disagree.  But you also wouldn't disagree that

9   Cinergy installed low NOX burners on Unit 2 at Wabash River in

10  1992 and Unit 3 in 1993 and Unit 5 in 1990, right?

11  A   I'm not disputing that some capital spending on a variety

12  of things, including pollution controls, took place.  I'm not

13  disputing that.

14  Q   And you're not disputing that, if Cinergy had believed

15  that environmental control costs of some kind were required by

16  law, they would have done that, put it into the rate recovery

17  process and got recovery for it as well as their costs of

18  capital, right?

19  A   I'm not saying that one way or the other.  I am not trying

20  to testify to what the company knew, what the company didn't

21  know, what the company believed, what the company wanted to

22  do.  I'm simply telling you what the financial incentives were

23  that existed back then.  I am telling you what the business

24  plan was back then.

25  Q   I appreciate that, sir, because everybody knows that one

*KAHAL − CROSS/HOPSON*                    Vol. 3-537

1  of the reasons −− one of the reasons why Cinergy might not

2  have installed controls on these units in the time period was

3  because they didn't think NSR applied to those projects,

4  right?

5  A    I can't offer an opinion on that.

6  Q    That could be true as far as you know?

7  A    And I think what I said in my deposition is that that's

8  not mutually inconsistent with the analysis that I performed

9  on their financial environment.  I'm simply testifying to what

10 the financial incentives were at that time period and what the

11 company's business plan was at that time.  I'm not testifying

12 to what the company knew and what they believed.

13 Q    And you're not telling the Judge that, if controls of any

14 kind had been installed on those units pursuant to NSR, that

15 the IURC wouldn't have approved those costs, right?

16 A    You mean approved for cost recovery?

17 Q    Yes.

18 A    No.  I am not suggesting and I never have suggested that

19 the IURC would have out and out denied recovery.

20       I am saying that during that time period, that the

21 company may not have gotten the type of cost recovery it

22 wanted or the mechanism for cost recovery it wanted or the

23 timing for cost recovery that it wanted.  I think that was

24 problematic during that time period, but I'm not suggesting

25 they would have been flat turned down.

KAHAL – CROSS/HOPSON                Vol. 3-538

1  Q   And you're not testifying that Cinergy had a motive to

2  intentionally violate the law, right?

3  A   I'm testifying to what their financial incentives were,

4  which included this capital minimization.  I am not saying

5  that the company intentionally violated the law.  I'm not

6  saying one way or the other on that.

7          MR. HOPSON:  Thank you, sir.  I appreciate it.

8          THE COURT:  Redirect?

9          MS. LUKAS-JACKSON:  Yes, Your Honor, thank you.

10                  **REDIRECT EXAMINATION**

11 BY MS. LUKAS-JACKSON:

12 Q   Mr. Kahal, absent this litigation, are you aware of any

13 plans by Duke to control units at Wabash River 2 through 6?

14 A   No.  I am not aware that the company has any plans to add

15 controls at any of the units at Wabash River.

16 Q   So isn't it your testimony that they haven't already

17 planned to purchase -- they have already -- excuse me --

18 planned to purchase allowances in order to continue operating

19 Wabash River units 2 through 6?

20 A   Absolutely.  The company's compliance plan would require

21 substantial purchases of allowances above and beyond the

22 EPA -- free allowances that are allocated because those EPA

23 free allowances only cover a small percentage of the emissions

24 that would take place on the uncontrolled plants.

25 Q   So what Plaintiffs are proposing in their remedy is simply

KAHAL − REDIRECT/LUKAS−JACKSON      Vol. 3-539

1  to continue with business as usual with respect to the

2  purchase and surrender of emissions allowances for Wabash

3  River?

4           MR. HOPSON:  Objection, leading.

5           THE COURT:  Sustained.

6  BY MS. LUKAS−JACKSON:

7  Q   How, if at all, is the Plaintiffs' proposed remedy

8  different from what Duke is already doing with respect to its

9  emissions allowance plan at Wabash River?

10 A   And I assume you're asking me absent what −− what they

11 would do absent this litigation?

12 Q   That's right.

13 A   My understanding is the plan, if this litigation didn't

14 exist, which I've sometimes referred to as the business as

15 usual case, is the company would continue to operate units 2

16 through 6.  They would not invest in new controls at units 2

17 through 6, which means that they would then be emitting

18 approximately the same level of emissions that they emit now.

19      For example, for SO2, that's about 60,000-tons per

20 year.  The EPA allowances would cover about 12,000 of that

21 60,000.  That means that the company would have to purchase

22 48,000 allowances per year or ton equivalent allowances per

23 year in order to reach compliance.

24      Plaintiffs' remedy involves the surrender of about

25 20,000 allowances per year.  So the Plaintiffs' remedy

KAHAL – REDIRECT/LUKAS–JACKSON        Vol. 3–540

1  actually involves a much smaller level of allowance surrender

2  that would take place under the business as usual case.

3  Q   And if Duke –– absent this litigation, if Duke decided to

4  shut down Wabash River, it would still maintain the EPA

5  allocated allowances ––

6        MR. HOPSON:  Objection, leading.

7        THE COURT:  Sustained.

8  BY MS. LUKAS–JACKSON:

9  Q   If Duke opted to shut down the Wabash River units, would

10 the EPA allocated allowances still be allocated to the Wabash

11 River plant?

12 A   Yes, they would.  I can't give you the exact number, but

13 whatever those allowance allocations are, they would continue

14 even if the units were retired.

15 Q   What's the current market price for an SO2 allowance?

16 A   The current market today is closer to that $200 allowance

17 figure that I cited in my expert report.  The –– it bounces

18 around from day to day, but it's around $200.

19 Q   And you mentioned earlier there is a projection for SO2

20 allowances; is that right?

21 A   Yes.  I consulted a projection from the DOE Energy

22 Information Administration.

23 Q   And what date by year did your analysis show that the

24 1,000-dollar per SO2 allowance would meet?

25 A   Well, I was citing from the Energy Information

*KAHAL – REDIRECT/LUKAS–JACKSON*        Vol. 3–541

1  Administration report, but that report projected that

2  allowance prices would rise over time and reach a thousand

3  dollars by the year 2020; and then it would go down after

4  that.  So the one thousand was kind of a maximum.

5  Q   If allowances aren't surrendered as part of the Court's

6  ordered remedy in this case, but Wabash River units 2, 3 and 5

7  are shut down and units 4 and 6 are controlled, what happens

8  to the allowances allocated to those units?

9  A   There would be some substantial surplus allowances at the

10  Wabash River plant.  The company would need much less than the

11  12,000 per year that they're allocated at that plant by EPA.

12  The company then could sell those allowances if they wish to

13  or they can allocate them for compliance to another Cinergy

14  generating unit.

15  Q   Could those allowances be sold to any utility?

16  A   As far as I know, they could be sold to any utility or

17  nonutility generator for that matter.

18  Q   With respect to financing options that you and I have

19  discussed and also you discussed with Mr. Hopson, are you

20  aware of any public statements by a high-ranking Duke official

21  regarding Duke's financial strength?

22  A   Yes, I am.

23  Q   What is that statement?

24  A   I believe it was last week I saw an interview with

25  Mr. James Rogers, who is the CEO of Duke Energy Corporation,

1  on CNBC; and he was being queried about Duke's financial

2  position and how it was operating in the current economic

3  environment of distress and financial panic.

4       In that interview, he indicated that Duke Energy was

5  operating rather successfully.  He cited to Duke having one of

6  the strongest balance sheets in the industry.  He indicated

7  that Duke Energy corporation –– and I assume that was a

8  reference to the subsidiaries of Duke –– had been successful

9  in being able to issue long–term debt on reasonable terms.

10      He indicated in this interview that Duke was not

11 backing off its very large capital spending program.

12 Q   I'm going to turn to the first issue that Mr. Hopson and

13 you discussed and that's the MISO transmission report.

14      Do you consider the MISO report to be a transmission

15 study?

16 A   Yes, it's a transmission study.  As the report itself

17 indicates, it's informational.  It provides some information.

18 Q   How is it different, if at all, from other transmission

19 studies that you've seen?

20 A   It's quite different than other transmission studies that

21 I've seen.  Transmission studies are typically issued by

22 transmission providers for a –– for a specific request, such

23 as a request by a transmission examiner for transmission

24 service.  These are often called system impact studies.  The

25 system impact studies are technical studies in which the

KAHAL – REDIRECT/LUKAS–JACKSON        Vol. 3-543

1  modeling is described in great detail, the inputs to the

2  model.  The affected facilities are then identified in the

3  study.  The constraints are described, and it's a pretty cut

4  and dry engineering–type study.  That's quite a bit different

5  than this MISO study that I saw.

6  Q    What other specific ways, if you can articulate, is it

7  different?

8  A    For one thing the disclaimers in this report are very

9  unusual.  Transmission studies do sometimes have caveats.

10        For example, they might indicate that costs of

11  upgrades are estimates or something like that.  But

12  transmission studies generally don't have the type of really

13  sweeping disclaimers that this one had.

14        In addition, transmission studies normally don't have

15  information on end use customers.  This study identified the

16  end use customers and talked about the end use customers, even

17  gave information on employment at the end use customers.  I've

18  never seen anything like that in a transmission report.  I

19  routinely review these transmission reports as part of the

20  work I do.

21  Q    You stated in response to a question from Mr. Hopson that

22  you don't believe that this study constitutes a determination

23  of a reliability problem; is that right?

24  A    That's correct.

25  Q    Is MISO a Government agency?

KAHAL – REDIRECT/LUKAS–JACKSON        Vol. 3–544

1  A    No.  It's not for profit, but it's not government.

2  Q    Are they regulated?

3  A    Yes.

4  Q    Who regulates MISO?

5  A    They're regulated by the Federal Energy Regulatory

6  Commission.  They operate under a FERC–approved tariff.

7  Q    What's a tariff?

8  A    A tariff is a document that the regulated entity –– and

9  MISO is a regulated entity –– submits to its regulators that

10 provides the authorization for the utility services that it

11 provides.  So MISO really should be viewed as a utility.

12 Q    If MISO makes a determination that a reliability issue

13 exists, does FERC play any role in what happens next?

14 A    In most cases, it doesn't.  That is, this is a

15 responsibility that's assigned under the tariff to MISO and in

16 the routine, everyday course of business, the regularity

17 doesn't get involved or need to get involved.

18        However, I believe anything that MISO does can always

19 be appealed to FERC.  That is, somebody can file what's known

20 as a Section 206 complaint.  That's Section 206 under the

21 Federal Power Act.

22        A customer has a right to file a complaint with the

23 FERC if they think that MISO is doing something wrong or if

24 they believe that a tariff change is needed or anything like

25 that.

1  Q   Absent a 206 filing, are there circumstances under which

2  FERC would be involved in a MISO finding of a reliability

3  issue?

4  A   Only -- to my knowledge, only if somebody raises the issue

5  and goes before FERC.  I think that the legal process is a 206

6  complaint.  Whether there are others and he was at FERC for

7  doing that, I don't know.

8        As a practical matter, there tends to be a great deal

9  of cooperation.  There is a tendency to work these things out

10 cooperatively if there are disagreements.

11 Q   Turning back specifically to the study, have you seen the

12 load forecasts in the MISO study?

13 A   Well, load forecasts were used, I believe.  I don't recall

14 whether they were specifically identified.  That is --

15 Q   I'm sorry.  In your work, do you typically review load

16 forecasts?

17 A   I review and prepare load forecasts.

18 Q   Are you familiar with whether, in general, utilities are

19 generally adjusting their load forecasts to account for the

20 current economic downturn?

21 A   Yes, they are.  Generally -- not all utilities have

22 actually gotten around to it; but the ones who have, they have

23 been reducing their load forecasts due to the economic

24 downturn.

25 Q   So based on your experience of dealing with load forecasts

KAHAL – REDIRECT/LUKAS–JACKSON        Vol. 3-546

1  and the current considerations for economic downturns, would

2  it be of interest to you to see in depth the load forecast

3  included in the MISO study?

4  A    If I was assigned the job of reviewing the study to

5  determine whether it was a technically accurate study, then

6  the realism of the loads that were used in the study would be

7  an issue that would be looked at.

8  Q    Who owns the transmission equipment discussed in the MISO

9  study?

10  A    It's owned by Duke Indiana.

11  Q    Does Duke, or as Mr. Hopson was referring to Cinergy, have

12  the tools to evaluate the reliability impact of closing its

13  generation units?

14  A    I don't know whether they have those tools or not.  I

15  believe that they should.  That is, I know that Duke Indiana

16  employs transmission engineers.  I would think that that would

17  be the kind of issue that transmission engineers at Duke

18  Indiana would certainly look at.

19        I can't tell you exactly what analytical tools they

20  have in-house at Duke Indiana.

21  Q    To your knowledge, could Cinergy request MISO -- let me

22  lay a foundational question.

23        Does -- certainly, based on this study MISO has the

24  ability to generate reports on reliability?

25  A    That's what they do, yes.

KAHAL – REDIRECT/LUKAS–JACKSON       Vol. 3-547

1  Q   Is Cinergy able to request that MISO conduct reliability

2  studies?

3  A   They absolutely can request it, and I would go further

4  than that, I think that they're required to.  That is, if

5  they're proposing the shutdown of a generating unit, I believe

6  under that appendix Y they are required to make that request

7  of MISO.

8  Q   If a full attachment Y study that you just referred to had

9  been requested when the jury returned its verdict back in May

10 of 2008, would you expect that we would have that study today?

11 A   I would have expected we would have had it several months

12 ago, yes.  If they had requested it in May, then it would have

13 been available I suppose in the fall of 2008.

14 Q   Based upon your experience, would you expect a full

15 reliability study, this attachment Y study, would identify

16 alternative solutions to the reliability problems identified?

17 A   I would think so because when MISO identifies a

18 reliability problem, it's not as if there's only one solution

19 to it.  There can be many solutions to it.  The realistic and

20 relevant solutions to it that can accommodate, let's say

21 something like a unit shutdown, should be studied and

22 evaluated as part of this process.  That's something where

23 Cinergy can have some input.  They can ask MISO to study

24 different options that they would have in order to accommodate

25 a shutdown.

*KAHAL − REDIRECT/LUKAS−JACKSON*      Vol. 3−548

1        MS. LUKAS-JACKSON:  Thank you, Mr. Kahal.

2        Your Honor, I have no further questions.

3        THE COURT:  Thank you.

4        Mr. Hopson?

5                    **CROSS EXAMINATION**

6   BY MR. HOPSON:

7   Q    Just curious.  You referenced this Section 206 complaint

8   before FERC?

9   A    Yes.

10  Q    Have you ever been involved in one of those?

11  A    Yes.

12  Q    How many years do those take to resolve?

13  A    Depends on whether they're settled.

14  Q    If they're not settled?

15  A    If they're not settled, a Section 206 complaint sometimes

16  can take years, sometimes can be resolved in a few months.

17  I've seen some Section 206 complaints that go on for many

18  years.

19  Q    In the course of your observations about the MISO report,

20  did you come to learn why the MISO report was prepared or who

21  requested it?

22  A    My understanding is that the Plaintiffs requested the MISO

23  report.

24  Q    Did you look at the letter in which the Plaintiffs laid

25  out in detail the questions they wanted MISO to address in the

KAHAL - CROSS/HOPSON          Vol. 3-549

1  report?

2  A    I did not.

3  Q    So you can't tell us whether or not MISO's report fairly

4  addresses the questions framed up by the Plaintiffs in this

5  case?

6  A    I'm sorry.  I'm not really following.  Which questions are

7  you talking about?

8  Q    You did not look at the letter --

9  A    I did not look at the letter.  I do not know specifically

10 what was requested.  I just have a general understanding there

11 was a request.

12         MR. HOPSON:  Thank you.

13         THE COURT:  Anything else of this witness?

14         MS. LUKAS-JACKSON:  We're finished with our witness.

15 Thank you.

16         THE COURT:  You may step down.

17    (Witness excused.)

18         THE COURT:  Government's next witness.

19         MR. SAVAGE:  Your Honor, may I approach, first --

20         MS. LUKAS-JACKSON:  Your Honor, may I have

21 permission to exit the well with the witness?

22         THE COURT:  Sure.

23         MR. SAVAGE:  Your Honor, before we close proof, we

24 just have a small housekeeping matter.  We have about 30 or so

25 exhibits that haven't been entered into the record.  About 30

Vol. 3-550

1  of those are stipulated and three are contested.

2         We think it would be more efficient to confer with

3  Cinergy to try to cut back on some of those and just do a

4  consolidated filing of that.

5         THE COURT:  That's fine.  We'll leave you open

6  contingent on that list.

7         MR. HOPSON:  That's fine, Judge.

8         THE COURT:  Is the defense ready to proceed?

9         MR. VOPEL:  Can we take a quick break, Judge, while

10 we collect ourselves and switch our lawyers?

11        THE COURT:  We'll take a few.

12        COURT CLERK:  All rise.

13        We will take a short recess.

14    (A recess was taken.)

15        THE COURT:  Are we ready to proceed for the defense?

16        MR. BOXERMAN:  We are, Your Honor, but the

17 Plaintiffs have one additional item.

18        MR. SAVAGE:  There are a few deposition designations

19 that Your Honor had not ruled on the objections yet and we

20 just wanted to make sure that those were still pending before

21 we closed proofs.

22        THE COURT:  So you're still offering those same

23 things?  We may have to have a little argument about some of

24 those actually.

25        MR. SAVAGE:  Yes, Your Honor.  I don't want to

Vol. 3-551

1  interrupt Mr. Boxerman.  I just wanted to raise it.

2           THE COURT:  That's fine.  Your next witness, sir?

3           MR. BOXERMAN:  Your Honor, the Defendants called

4  William DePriest.

5           THE COURT:  Mr. DePriest.

6           MR. BOXERMAN:  Mr. DePriest is the senior vice

7  president of the international firm of Sergeant and Lundy.  He

8  has 35 years of experience dedicated to the design and

9  application of emissions control technology in the electric

10 utility industry.  He is going to be testifying regarding the

11 availability of SCR at the time of the projects, the cost of

12 controls at the time -- I'm sorry -- the cost of the controls

13 currently, as well as the ability to achieve certain removal

14 efficiencies at this time.

15          THE COURT:  All right, sir.

16          MR. BOXERMAN:  Thank you, Your Honor.

17          **WILLIAM DEPRIEST, DEFENDANT'S WITNESS, SWORN**

18                    **DIRECT EXAMINATION**

19 BY MR. BOXERMAN:

20 Q    Please state your name.

21 A    William DePriest.

22 Q    Where are you employed?

23 A    Sargent & Lundy.

24 Q    What does Sargent and Lundy do?

25 A    Sargent & Lundy is an engineering firm that supplies

Vol. 3-552

1  engineering services and consulting services to the electric

2  utility industry worldwide.

3  Q    Mr. DePriest, what are your current responsibilities for

4  Sargent & Lundy?

5  A    At Sargent & Lundy, I manage a group of engineers and

6  professionals in what is known as the environmental controls

7  division in our fossil power group.

8  Q    Does that include responsibilities associated with a

9  scrubber and SCR technology?

10 A    Yes, scrubbers and SCR technologies are part of what we

11 do.

12        MR. BOXERMAN:  Your Honor, may I approach the

13 witness?

14        THE COURT:  Yes.

15 BY MR. BOXERMAN:

16 Q    I'll hand you what's been marked for identification as

17 DR256.

18      Do you recognize that, sir?

19 A    Yes.  This is my resumé.

20        MR. BOXERMAN:  I ask that it be admitted, Your

21 Honor, pursuant to the parties' stipulation.

22        MR. BENSON:  No objection.

23        THE COURT:  Exhibit is admitted.

24    (Defendants' Exhibit DR256 was received in evidence.)

25 BY MR. BOXERMAN:

Vol. 3-553

1   Q    Mr. DePriest, where did you attend university?

2   A    Michigan Technological University.

3   Q    What degree did you receive?

4   A    BS in chemical engineer.

5   Q    What year?

6   A    1972.

7   Q    After graduation where did you go to work?

8   A    I went to work for the company Babcock & Wilcox Company.

9   Q    What is Babcock & Wilcox?

10  A    Babcock & Wilcox is a service provider to the electric

11  utility industry, boilers, scrubbers, environmental control

12  equipment and the like.

13  Q    How long were you employed by Babcock & Wilcox or B & W?

14  A    I was there for 13 years.

15  Q    Let's briefly discuss your work there.

16        Can you sort of summarize your career track?

17  A    I started in a fairly typical fashion.  I started in the

18  field service group for them.  My focus was the start up and

19  commissioning of environmental control systems, principally at

20  that time FGD systems, and worked in the field for three

21  years.

22        After that they brought me back to the main office

23  where I progressed through the organization to the point of my

24  departure.  Thirteen years later I was manager of their

25  functional engineering group.

Vol. 3-554

1  Q   What is functional engineering?

2  A   In the sense of my position there, it was a functional

3  engineering group of the environmental controls division.  So

4  we had responsibility for equipment sizing and design of all

5  the environmental product lines that Babcock & Wilcox supplied

6  at that time.  And most notably, I think in this case, I think

7  the flue gas desulfurization system.

8  Q   So I don't distract you, you can set that to one side.  We

9  heard a little bit yesterday about how a scrubber functions.

10         Can you give us some sense of maybe the major

11  component and the magnitude of this particular technology?

12  A   To kind of put it in perspective, if you think about the

13  unit that we're talking about, Unit 6 at the Wabash River

14  station which is a 342-megawatt nominally sized boiler, the

15  scrubber for such a system would be comprised of a number of

16  components.  I think most notably the biggest one and the most

17  expensive piece would be the absorber, which is where the flue

18  gas is contacted with the scrubbing liquor which contains an

19  alkali material to remove the sulfur dioxide from the gas

20  stream.

21         The size of that, just for perspective and interest,

22  on a sized unit like that, that absorber might be 50 feet in

23  diameter, 120 feet tall, made out of a very highly corrosion

24  resistent material, typically a high alloy of some nature, and

25  by far is the most expensive component that makes up the

Vol. 3-555

1  scrubber.

2  Q    Did your work at B & W include engineering of SCR

3  technology?

4  A    No, it did not.

5  Q    Why not?

6  A    At that particular point in time, from my start-up

7  experience in '72 through 1985, '86 time frame when I left,

8  SCRs were not part of the product line that B & W had

9  supplying the electric utility industry.  They bring that in

10 later on in the late '90s when SCR became a big part of a --

11 fossil power plants in the U.S.

12 Q    So you joined Sergeant and Lundy in 1985, '86?

13 A    That's right.

14 Q    Generally, what was your work experience there?

15 A    At Sargent & Lundy they hired me away from B & W to be the

16 company's consultant on flue gas desulfurization systems.

17 They recognized the industry would be moving in that direction

18 in the near future and they felt such an individual would be

19 important in the organization.  So that's where I began.

20 Q    Give us a sense of the scope of your experience with FGD

21 systems, both while you were at B & W and since then at

22 Sergeant and Lundy?

23 A    I think you mentioned 35 years in the industry.  So if you

24 look at 35 years, which is really kind of the life span of FGD

25 systems in the electric utility system.  They really came into

Vol. 3-556

1  vogue in about the early 1970s.  So I was with FGD from the

2  very beginning.

3           During that period of time.  From then until now, the

4  industry has installed approximately 250 FGD systems in this

5  country.  I worked on -- latest count -- 90 of those systems.

6  So a fairly large portion of the scrubbers that are put in in

7  the U.S. I had some involvement with.

8  Q   Now, since coming to Sargent & Lundy, tell us about your

9  experience with the range of NOX emission controls?

10 A   Since coming to Sargent & Lundy, when I first came in,

11 like the 1985 time frame, the industry was moving through

12 original equipment, low NOX burners and what I call the first

13 generation low NOX burners.  They continued to modify those

14 burners, I would say the second generation and third

15 generation burners as we moved into the 1990s.

16          During that period of time over fire air systems

17 became an important NOX reduction system on certain boilers

18 that it made sense on.  So they started becoming part of the

19 NOX control, I guess suite of technologies that might be

20 available.

21          In the mid '90s to the late '90s SCR technology became

22 an important part and really started moving, I would say,

23 probably 1998 in earnest and continues on till today.

24 Q   As with the scrubber, can you give us a sense of the scope

25 of your experience with the application of that technology at

Vol. 3-557

1  coal-fired plants?

2  A    A similar type of analysis.  Beginning in the mid '90s

3  when SCRs became part of the technologies used for coal fired

4  power plants, there's been about 150 to 170 of them installed

5  in the U.S.  Most of them coming after the year 2000.  Of

6  those, Sargent & Lundy was involved -- and myself

7  personally -- in 54 of them; 40 of them on coal fired power

8  plants.  So a fairly large percentage.

9  Q    Has your work involved development of cost estimates?

10  A    Yes, it has.

11  Q    Explain how that has been a part of your work?

12  A    Well, I guess, just to step back a second here, Sam, our

13  work that we do -- at least in my group of the 30 or so

14  professionals that constitute my area of expertise -- we help

15  our clients out from both -- starting at the strategic

16  planning stage when regulatory changes are coming to the

17  utility industry.  We help our clients figure out what their

18  most appropriate technologies are and where they might be

19  installed in their system to be compliant with the

20  regulations.

21       So cost estimating is a huge part of that activity and

22  understanding what the cost of different technologies are and

23  how those technologies might perform in applications in the

24  industry.  So it's a big part of that activity, in that our

25  clients are making strategic decisions that typically involve

Vol. 3-558

1  large capital investments to implement in their system that

2  they might run for another 30 or 40 years.  So it's important

3  at the beginning.

4        Then when we move into actually selecting the

5  technologies and now securing financing and budgeting

6  activities, we then -- I shouldn't say modify, but refine

7  those cost estimates as we move through and do more

8  engineering work to give them a firm basis for budgeting the

9  process as it moves forward.

10 Q   Do you have any professional certifications?

11 A   I'm a professional engineer -- certified professional

12 engineer in the state of Wisconsin.

13       MR. BOXERMAN:  Your Honor, I would offer

14 Mr. DePriest as an expert in air pollution control technology,

15 including the application of SO2 and NOX admission controls to

16 coal fired power plants.

17       THE COURT:  All right.  You may proceed.

18 BY MR. BOXERMAN:

19 Q   Let's talk first, Mr. DePriest, about the controls that

20 were available at the time of the projects at Wabash River

21 Units 3 and 5.

22       And are you aware that Plaintiffs' expert, Dr. Fox,

23 has claimed that the company should have installed SCR at the

24 time of those projects?

25 A   Yes, I am.

Vol. 3-559

1  Q    Do you agree with that opinion?

2  A    No, I do not.

3  Q    What is your view?

4  A    My view is that that technology, selective catalytic

5  reduction, was not a viable or commercially available

6  technology for application to U.S. coal plants, especially the

7  Wabash River facility.

8  Q    I would like you to walk us through the reasons for your

9  opinion.

10       Can you give us the first reason?

11 A    Well, the first reason is that there were none in

12 operation in the U.S. at that particular point in time on

13 pulverized coal fired power plants which would have given us

14 the basis for drawing a design for one at the Wabash River

15 station.

16 Q    Do you have a demonstrative exhibit to further explain

17 this?

18 A    I do.

19 Q    Can you show us demonstrative 29?  There it is.

20       Can you explain the "Time Frame of Projects"

21 demonstrative and what it illustrates?

22 A    This first slide shows the date of the modifications, June

23 of 1989 on Unit 3, and May of 1990 in Unit 5.

24 Q    So you've got the timeline on the bottom?

25 A    Yes.  There's years on the bottom '80 through '96.

Vol. 3-560

1  Q    Let's put some more details on this.

2         Can you show us the next demonstrative No. 30?

3         What does this first row that's added to your

4  demonstrative No. 30 show?

5  A    To help try to explain what this slide is all about, what

6  I've shown here is the permitting requirement in a form of a

7  timeline, showing 18 to 24 months of permitting activities

8  that would be necessary to select a technology for application

9  to those two units in the time frame of the modification.  So

10 there's two different time lines, one for Unit 3 and one for

11 Unit 5 that offset what appear to be about nine months.

12 Q    What are the years where you estimate the permit process

13 would be for Unit 3?

14 A    For Unit 3, it would have been appropriate to start that

15 permitting process in 1985 and hopefully finish it in 1986.

16 Q    What about for Unit 5?

17 A    And Unit 5 in September of '85 finishing in August of '87.

18 Q    Let's add the next row to the slide.

19         What does this addition to the timeline illustrate?

20 A    This shows at what point during that permitting process

21 that you would have selected a technology for application to

22 those particular units in the coming years as part of the

23 modification.

24 Q    What years have you indicated in demonstrative No. 30?

25 A    For Unit 3, that technology selection would have been made

Vol. 3-561

1  at the end of the permitting process in 1986; and for Unit 5,

2  in the end of its permitting process, in 1987.

3  Q    And I believe there's one more row.

4  A    Right.

5  Q    What does this add to the timeline, the typical SCR

6  installation schedule?

7  A    This shows what it would take to implement the selected

8  technology and, for example purposes here, I have shown that

9  if an SCR was picked as the appropriate technology for the

10 modification, it would have taken two and a half years to

11 implement that.

12       So for Unit 3, having selected the technology at the

13 end of 1986, we would have started the project in 1987,

14 January, finished it in June of '89, just in time for the

15 completion of the modifications, similar to the time frame for

16 Unit 5.

17 Q    Let's go to your next slide, please.

18       What does this slide, demonstrative No. 31 illustrate?

19 A    What I attempted to show here would be some recent example

20 of back determinations made just after the time of the

21 modifications.  I've listed the unit there.  You can read

22 those.  This shows the date at which that particular BACT

23 determination was issued and what the technology selection

24 was.

25 Q    What was the technology that was being selected in the

Vol. 3-562

1  1999, 1991 time frame that you've identified on demonstrative

2  31?

3  A    Low NOX burners -- this is the BACT determination for NOX

4  controls.  It would be low NOX burners for all four of the

5  units, and then three of the units with the added feature --

6  as I discussed earlier -- of an over fire air system, which

7  has some benefits in some cases for reduction of NOX.

8  Q    What is a low NOX burner?

9  A    A low NOX burner, I guess in simple terms it's a mechanism

10  for staging combustion of the fuel in the furnace, and it is

11  essentially meant to extend the combustion process to allow it

12  to reduce NOX.

13  Q    So it's part of the actual combustion process, rather than

14  a technology that's added to control emissions at the end?

15  A    In an ideal situation like on these units, you would be

16  designing the boiler for that particular combustion process.

17         In a retrofit application it's a little different, in

18  that the boiler is already sized and you're trying to put a

19  low NOX burner in it.  So there's some limitations that would

20  not exist on new units.

21  Q    Let's go to the next exhibit.  This is DR demonstrative

22  32.

23         What does this illustrate in support of your opinion

24  regarding SCR?

25  A    This shows the actual start of SCR application to

Vol. 3-563

1  pulverized coal plants in the U.S.  I've shown six of them

2  that range from March of '94 through November of 1996 on six

3  different coal fired power plants in the U.S.

4        The point I'm making here is, if you go over to the

5  middle of the page there, it shows at what point in time we

6  would have been deciding what technology to use for Wabash

7  River Units 3 and 5 and the fact that that was happening eight

8  to 10 years before any SCRs were running in the U.S.

9        In other words, it would be a very difficult decision

10 to actually pick SCR, considering those facts.

11 Q   You can take that slide down.

12       Now, are there other reasons, Mr. DePriest, why you

13 believe SCR would not have been considered commercially

14 available feasible technology at the time of these projects?

15 A   Fundamentally, the reason why SCR was pushed out or

16 happened when it did happen in the U.S. is at the time of us

17 making the decision and the BACT analysis in the mid, '80s or

18 even at the time of the projects, there were a number of

19 unresolved questions concerning the application SCR

20 technologies to U.S. coals.

21 Q   What were those --

22 A   Principally the sulfur in the fuel was a big question for

23 design engineers at that point in time.

24 Q   Explain exactly why the sulfur in the fuel was a concern

25 for design engineers?

Vol. 3-564

1  A   An SCR catalyst which is used to reduce NOX in the

2  presence of ammonia, also has a -- I guess they would call it

3  an undesirable side reaction, in that it also oxidizes SO2 to

4  SO3.

5        In the mid '80s, if you were considering SCR

6  technology, the catalysts that were available had a relatively

7  high degree of SO2 to SO3 oxidation and could cause secondary

8  problems with the application of that technology on coal fired

9  power plants.

10 Q   I've heard the term "blinding the catalyst."

11       What does that mean?

12 A   Well, there's a number of different mechanisms for

13 blinding.  The SO2 converted to SO3 could react with the

14 ammonia in the SCR catalyst, if the temperature range was

15 correct for that, and end up kind of coating the catalyst or

16 blinding the catalyst, and causing the catalyst essentially to

17 become deactivated and not useful for the purpose of reducing

18 NOX.

19       The other mechanism is the SO3 that could be formed by

20 the oxidation of SO2 could react with alkali metals in the ash

21 from the coal and actually get into the pores of the catalyst

22 and plug them, and prevent the NOX and ammonia from entering

23 and reaching the catalytic surfaces.

24 Q   Can you describe generally, briefly -- you sort of gave us

25 the brief description of a scrubber -- an SCR?

Vol. 3-565

1          What kind of structure and framework are we talking
2   about?
3   A   The type of SCR that we're talking about for Unit 6 would
4   be called the high dust SCR.  That would be located at the
5   economizer outlet -- between the economizer outlet and air
6   heat inlet.
7   Q   So that's inside --
8   A   It's very much on the inside of the power block of the
9   unit.  So on a retrofit it could be very difficult to achieve.
10          The reactor in this particular case would probably be
11  somewhere, 40 feet by 50 feet square box, very large, maybe
12  60 feet tall.  It would have to find a location for that at
13  that point in the center of the power block.
14  Q   Were there other unknowns if he associated with the coal
15  characteristics as well back at the time of the projects such
16  as the, you know, components of the flyash?
17  A   Yes.  As I mentioned, there could be alkali in the flyash
18  that could react with the SO3 that's formed by the undesirable
19  reaction in the catalyst itself; but there could also be
20  poisons, arsenic, phosphorus, other elements that are in the
21  flyash that are known poisons.  Understanding how they
22  reacted -- how a catalyst would react to the U.S. based coals
23  in that regard was not understood at that time and I think
24  fairly well recognized by the industry that it was not
25  understood.

Vol. 3-566

1  Q    Was there research actually ongoing at the time of the

2  projects?

3  A    There was quite a bit of research going on that continued

4  all from that time frame all the way into the '90s as we

5  continued to learn about the application of this technology

6  for U.S. coals.  Those researches were being conducted by the

7  normal usual suspects.  The utilities were doing it.  Electric

8  Power Research Institute was doing it.  The Environmental

9  Protection Agency was doing research in that area.

10 Q    Are there other reasons that you believe SCR was not

11 feasible at the time?

12 A    There were -- I guess there's some secondary environmental

13 concerns.

14 Q    What are those?

15 A    Well, most notably it again stems back to the issue of the

16 SO2 to SO3 conversion.  If that SO3 were not to react with

17 ammonia, let's say in the catalyst and blind the catalyst, or

18 react with the ammonia and potentially plug the air heater, it

19 could be an emission that proceeds through the system and out

20 the chimney and form sulfuric acid aerosols, which create what

21 is known as a visible plume and a -- possible implications on

22 ground impact.

23 Q    Is that what we heard testimony about yesterday relating

24 to the Gavin plant?

25 A    Yes.  I was here yesterday and I did hear that testimony.

Vol. 3-567

1  Q   What does this tell you about the viability of SCR that

2  there was this problem at the Gavin plant in 2003?

3       What does that tell you about the viability of SCR in

4  1989 and 1990?

5  A   It just tells me -- what I recognized at the time was that

6  there was a lot to be learned about the application of this

7  technology.  Even though I heard yesterday that there were

8  catalysts that were able to achieve -- and I know this -- to

9  achieve low oxidation rates, those did not become available

10 until after we had figured out these issues into the 1990s,

11 and actually into the year 2000 before we really had low

12 oxidation catalysts to help control this particular

13 phenomenon.

14 Q   Mr. DePriest, is there a fourth reason for your opinion?

15 A   I think there's support in the industry for my position at

16 that particular time, and I think that support goes across the

17 spectrum.  I think the Environmental Protection Agency at that

18 time also had an opinion that is very similar to mine.

19          MR. BOXERMAN:  Your Honor, may I approach?

20          THE COURT:  Yes.

21 BY MR. BOXERMAN:

22 Q   Mr. DePriest, I hand you what's been marked for

23 identification as DR267.

24       Do you recognize this document, sir?

25 A   Yes, I do.

Vol. 3-568

1  Q    Can you identify it for the record?

2  A    The title is "SO2 and NOX Control Technology Research

3  Development and Demonstration."

4  Q    Who is the author of this particular document?

5  A    Three gentlemen from the Environmental Protection Agency.

6  Q    Which office of the EPA?

7  A    This is out of their research Triangle Park, the EPA

8  Office of Research and Development, Air, Energy Research

9  Laboratory.

10         MR. BOXERMAN:  Your Honor, I believe this document

11  has been stipulated to and I've asked that it be admitted.

12         MR. BENSON:  That's fair.

13         THE COURT:  Exhibit's admitted.

14    (Defendants' Exhibit DR267 was received in evidence.)

15  BY MR. BOXERMAN:

16  Q    Mr. DePriest, I ask you to turn to page 11 of this

17  exhibit, and I believe there's a portion of this that you had

18  cited in your report and that you're relying on.  If you could

19  identify and read that for us.

20  A    Okay.  I'm going to not read the whole thing, but I'll

21  just read what I think is important.

22         Middle of the page, starting with "EPA is concerned

23  that fundamental knowledge of SCR, particularly with respect

24  to high sulfur coal applications, is necessary to ensure

25  successful commercialization in the U.S.  EPA has recently

Vol. 3-569

1  begun construction of a bench scale SCR system in order to

2  evaluate many concerns, including bullet point coal and flue

3  gas constituents which affect catalyst performance, erosion,

4  aging, poisoning, overall loss of performance.  Second bullet,

5  secondary impacts, ammonia, NO2 emissions."

6  Q    I don't know if we made it clear on the record.

7        What's the date of this particular document?

8  A    1989.

9  Q    What, if anything, does this contribute to your opinion?

10 A    It shows that there was a thought that -- my opinion -- to

11 be fairly universal support for the technical viability of SCR

12 support at that time.

13 Q    We heard testimony from Dr. Fox yesterday about experience

14 with SCR overseas, in Japan and in Europe.

15       In your opinion, why wasn't that sufficient to support

16 SCR in the United States at the time of the project?

17 A    I certainly don't want to belittle that experience.  We,

18 as design engineers, tapped into it.  We visited Japan,

19 Germany during the time frame of the early '90s and mid '90s

20 leading up to the SCR application in the late '90s; and even

21 at that point in time we recognized that that particular

22 experience base taught us a lot of things; left a number of

23 significant voids in design knowledge that would be necessary

24 for us to design viable SCR technology application for the

25 U.S. marketplace.

Vol. 3-570

1  Q   You can set that exhibit aside there.  Mr. DePriest, let's

2  turn to the present day.

3       Have you evaluated the cost to control SO2 and NOX

4  emissions at Wabash River Station Unit 6?

5  A   Yes, I have.

6  Q   Do we have a chart that summarizes your estimates for us?

7  A   Yes, we do.

8  Q   I think it's No. 33, if I'm not mistaken, DR Demonstrative

9  33.

10      Can you just list for us what is illustrated, the

11 estimates that you've prepared of the cost of FGD or scrubber

12 and SCR technology?

13 A   What this exhibit shows is a summary level of the work

14 that we did.  The first line, of course, are the technologies

15 on the left side of the graphic here.  But in the middle,

16 capital costs for the FGD system, $290 million, for the SCR

17 system, 123 million.

18 Q   What about the annual operating costs?

19 A   The annual operating costs of 11 million for the scrubber

20 per year and 2.7 million for the SCR system.

21 Q   So what is the estimate you've prepared for Unit 6 for the

22 total cost of the two technologies?

23 A   That represents $413 million total capital requirement and

24 $13.8 million as a yearly operating expense.

25 Q   Before we get to the details of your estimate, you

Vol. 3-571

1   mentioned already the length of time that you would estimate

2   to install an SCR.

3          What about for a wet FGD or a scrubber?

4   A    A typical installation schedule from the point of awarding

5   the contract to the FGD's OEM or system supplier to commercial

6   operation, depending on the conditions of the market at the

7   time, would range from 36 months to 42 months.

8   Q    Is there sort of a pre-award process that would precede

9   that generally?

10  A    Leading up to that, the actual selection of that

11  particular OEM, depending on the client involved, would be

12  somewhere in the neighborhood of six to eight months, six to

13  10 months maybe.

14  Q    Let's take these one at a time, going back to your

15  estimates.

16         How did you prepare your cost estimate for the

17  scrubber or FGD?

18  A    For the scrubber project, this $290 million you're looking

19  at on the graphic, we used a project that we had ongoing

20  in-house for an FGD system that was being installed on a

21  multiple unit site that was actually in progress at the time

22  that the request came to me to look at the Wabash River

23  station.  So we took that estimate and we adjusted it to the

24  conditions of the Wabash River site.  So there were

25  adjustments that were required due to the size of the unit,

Vol. 3-572

1  due to the sulfur level in the fuel, due to the flue gas

2  volume, somewhat due to the reagent availability and location

3  and issues like that.  So we adjusted that cost from a known

4  project that was in-house working through our system at the

5  time of, I believe it was July of 2008 when we did that; and

6  that's how we came up with the $290 million.

7  Q    What about for SCR, did you use the same approach or a

8  different approach?

9  A    SCR we used a little bit different approach in that, in

10 1998 we had done some conceptual design work for Cinergy at a

11 number of their units throughout the system, including a

12 conceptual design at the Wabash River site, Unit 6.  So we

13 took that site as a base -- that conceptual design as a basis,

14 and then based on the fact that we had built eight SCRs for

15 Cinergy from those estimates that we had developed in 1998, we

16 had actually constructed them.  We knew exactly what the

17 actual material requirements were, structural requirements and

18 had a good handle on the difference between our conceptual

19 design that we did in 1998 and what we actually built.

20      So we took our conceptual design for Wabash River.  We

21 modified it to represent the lessons learned from the projects

22 that we had actually built to come up with new quantities for

23 the conceptual design for Wabash 6.  Then we used a market

24 unit pricing from our cost estimating group to actually

25 calculate the costs for the new SCR at unit No. 6.

Vol. 3-573

1  Q   Now, we saw yesterday a number of cost estimates during

2  Dr. Fox's testimony.

3       Why are your estimates different from the fox-Taylor

4  estimates that Dr. Fox presented?

5  A   Well, there's a number of fundamental reasons.  I think a

6  good, firm handle on the market conditions at the time of our

7  estimate and at the current date is something that we built

8  into our estimates that wasn't apparent from my viewing the

9  Fox work was in their estimates and so that's one piece.

10 Q   What's the second piece?

11 A   The second piece is there were some cost components that

12 are important and are real costs for a project like this that

13 were left out of the Fox-Taylor work.

14 Q   Can we have demonstrative 34, please?

15      Is this part of the work you did in connection with

16 your expert report in this case?

17 A   Yes.  This represents kind of a summary of what I just

18 spoke of.

19 Q   Can you explain what each of these additional components

20 are starting with AFUDC?

21 A   That's Allowance for Funds Used During Construction and

22 essentially represents the financing costs for handling a

23 capital project like there.

24 Q   So this is a typical component of an estimate that you

25 prepared in the course of your usual practice?

Vol. 3-574

1   A    Absolutely.

2   Q    Then what's the next item?

3   A    Escalation.

4   Q    What does that reflect?

5   A    This reflects the cost -- the anticipated escalation in

6   the market place from the time of the estimate to the time of

7   commercial operation.  So for a scrubber, that would be five

8   years worth of escalation approximately.  For an SCR it would

9   be approximately three years.

10  Q    And there's an item listed "owner's."  I think it's

11  "owner's costs."

12         What is that?

13  A    That's typical costs that a client or owner would incur

14  for a large capital project like this.  It would be whatever

15  capital carrying charges the client has in his accounting

16  system as well as any sort of, I guess, invoicing and bill

17  paying activities and -- as well as any of his staff that

18  would be working on the project, which might be engineering

19  all the way through administrative and managerial.

20  Q    Then you've also included a contingency in your estimate.

21         Why is that?

22  A    Contingencies are normal and typical for a project like

23  this.  Considering the fact that this project of these

24  estimates that we put together contained very little

25  engineering work on our part.  I mean, we did this in a very

Vol. 3-575

1  short period of time.  So the engineering certainly was less

2  than 5 percent.  So a -- what appears to be a contingency here

3  of about 15 percent on the direct capital would be typical,

4  absolutely typical.

5  Q    Thank you, Mr. DePriest.  We can take that slide down now.

6        I would like to address one further topic.  Dr. Fox

7  testified about the ability of controls to achieve certain

8  removal efficiencies, such as we heard testimony about a

9  scrubber running at 99 percent removal.

10        What is your response to that type of analysis?

11  A    Well, I don't think it tells the whole story, but I do

12  agree that you can buy a design at 99 percent removal.

13  Q    What are the technical issues associated with the full

14  story, if you were going to paint a full picture?

15  A    The full story, when you purchase a scrubber -- and we do

16  this all the time -- you set up a set of design criteria that

17  you're going to use to purchase that scrubber and to get a

18  meaningful guarantee from the system supplier.  But those

19  conditions are specified, and the system supplier will come

20  back and say under those specified conditions I will guarantee

21  whatever it is, in this case, 99 percent.

22        Then you proceed into operation of the plant; and the

23  specified conditions become a little, I guess, fuzzy on the

24  edges, to use a technical term, but you find yourself in a

25  situation where you're strained from those conditions under

Vol. 3-576

1  normal operation.

2      So the anticipation is that that system is never going

3  to operate as well as it does under the specified conditions

4  under normal operating conditions.

5  Q   Sort of like when I buy my car, it operates well in the

6  first day?

7  A   Yes.

8  Q   What are some of the common issues of technical concern

9  about meeting that design criteria over time for an FGD

10 system?

11 A   Well, the performance -- if we're going to -- speaking of

12 a scrubber, the performance of a scrubber is highly dependent

13 on the fuel that's being burned, the reagent that's being

14 used, the water that's part of the makeup to the system.

15 Then, of course, the operation of the boiler, load swings, et

16 cetera.  So anything that strays from the actual design

17 conditions would be considered an out, from a guarantee

18 standpoint, and we would expect the performance to suffer more

19 so in some situations than in others; but certainly not to be

20 able to maintain 99 percent day in and day out.

21 Q   What do those kinds of technical issues mean for being

22 able to meet the design efficiency on a consistent basis?

23 A   What it means to me, and I think what we advise our

24 clients, is that from a -- if we're speaking of, say, a

25 permitting or regulatory basis, if you're going to agree to a

Vol. 3-577

1  particular regulatory level of performance, that you need to

2  buy some margin in your design in order to accommodate for

3  operating issues that will normally occur during the operation

4  of the unit.

5  Q   Can you give us sort of a practical example of what you

6  mean?

7  A   Well, a practical example might be if you're thinking

8  about a system that's designed at 99 percent removal and it's

9  designed to operate on a specific reagent -- in most cases

10 it's limestone, so it's coming from a quarry.  We all know

11 that quarried limestone will vary in some cases more

12 significantly than others, but it will certainly vary in its

13 quality; but the quality that the 99 percent guarantee is

14 based on is a specific quality from that limestone quarry.

15      So let's suppose -- take you're running along on your

16 scrubber at 99 percent and you've got the right limestone, and

17 then you get a train load of stuff in that's maybe a little

18 bit off spec.  You've still got to deal with it.  You've got

19 to process it.  Maybe your performance on your scrubber drops

20 to 97 percent during the time that you're dealing with that

21 off spec limestone.  Not unusual at all in the business.

22      If I've got a 99 percent regulatory requirement and I

23 run like that, let's say for two weeks on a 30 day roll with

24 the wrong limestone, then the next two weeks I've got to run

25 at 101 percent removal in order to make up for the 97 to get

Vol. 3-578

1  the average of 99.  Obviously, that's impractical and not

2  achievable.  So, therefore, it's not unusual.  And I think

3  most regulatory agencies, if not all, will recognize that a

4  margin is required between the design point and the permit

5  point on a typical unit.

6  Q   Now, we also heard discussion yesterday on the SCR about

7  90 percent removal.

8       Is that really the right question to be asking in

9  connection with an SCR?

10 A   Probably not, even though it's a bit of a complicated

11 question.  An SCR is really working to an outlet loading.

12 Q   What do you mean by that?

13 A   The amount of NOX leaving the system that has not been

14 reduced.  So the 90 percent removal is really -- it's not that

15 important.

16 Q   So what is sort of the right metric or measurement that

17 you would focus on in evaluating the ability of a certain

18 system?

19 A   The right metric is the outlet loading.

20 Q   How is that expressed?

21 A   Typically in -- well, from a technical standpoint it's

22 really expressed in PPM because that's how the system works.

23 But in the way that we deal with it, is pounds per million

24 BTU.

25       In this case we looked at a number of different

Vol. 3-579

1  designs ranging from .05 to .07.

2  Q    .05 to .07...

3  A    Pounds per million BTU.

4  Q    I believe you said there were economic issues that needed

5  to be considered in this analysis.

6       Are there economic differences between designing, in

7  the case of a scrubber, designing and operating a scrubber at

8  99 percent removal as opposed to 95 percent?

9  A    Yes.

10  Q    Can you show us what you mean by that?

11       I believe we have a chart.

12  A    Do we have an exhibit?

13  Q    Demonstrative 35.

14       Is this a chart based on something that you prepared

15  for your report?

16  A    Yes, I did.

17  Q    Can you explain what this SO2 technology analysis 2008

18  Unit 6 depicts?

19  A    Okay.  What I've done here is, if you look across the top,

20  I have looked at scrubbers that were designed for 90, 95 and

21  99 percent removal, three different designs, plant life of 20

22  years in each case.  The capital costs on the third line down

23  represents the capital requirements for a project like that.

24       If you look over to the right to the $290 million for

25  the 99 percent removal is from that earlier chart.  You would

Vol. 3-580

1  expect to spend less from a capital standpoint for a scrubber

2  design for 95 and less more down to a 90 percent scrubber.

3  The capital difference represents the design to

4  achieve different levels of performance.

5  Q   What would be the capital requirement for 95 percent?

6  A   $260 million.

7  Q   For 90 percent?

8  A   246 million.

9  Q   What about the operating expenses?

10  A   As you might expect, as you increase the performance

11  requirements of the scrubber, the operating costs will go up.

12  Those will be across the board reagent, waste disposal, water,

13  et cetera.  But the most important one in this analysis is the

14  auxiliary power requirements.  That's why I've listed those

15  there.

16  Q   If you could explain what you mean by "auxiliary power"

17  and why it's important?

18  A   It's auxiliary power is the power required to run the

19  scrubber.  The two principal consumptions are the pumping

20  power that is pumping the liquor up to interface with the flue

21  gas.  Then the other principal part of consumption is the fan

22  required to push the flue gas through the scrubber.

23  Q   Then you've got a line item listed in yellow "incremental"

24  and then "dollars per ton."

25          Can you explain how that relates to your opinion?

Vol. 3-581

1  A    The incremental dollars per ton represents a -- an

2  analysis of both the capital and operating costs required to

3  capture a ton of SO2.  So, if you look under the 90 percent

4  case, it's $1,464 a ton to get from no scrubbing to 90 percent

5  scrubbing.  Then to go from 90 percent scrubbing to 95 percent

6  scrubbing and the tons you catch in that -- between those two

7  numbers represents an additional $1,518 per ton for the tons

8  that you've captured between 90 and 95.  Then again from 95 to

9  99, the dollars per ton goes up from $1,518 a ton

10 incrementally to close to $5,000 a ton.

11 Q    Let's just complete the chart.  You have a line item

12 "incremental CO2 (tons/-ton SO2)."

13       What is that illustrating for us?

14 A    This is to represent what I call a secondary environmental

15 concern, in that a scrubber operating at 90 percent removal

16 will emit 2 tons of CO2 and that's represented by the aux

17 power requirements.  Two tons of CO2 for every ton of SO2

18 captured.

19       When you moved to 95 percent, the tons of CO2 per tons

20 of SO2 captured jumps up to 3.4 tons on an incremental basis.

21 Then when you go to 99 percent removal, it jumps way up to

22 12.9, close to 13 tons of CO2 or SO2.

23 Q    By CO2, of course, we mean carbon dioxide?

24 A    Yes.

25 Q    Do you have a similar economic analysis table doing this

Vol. 3-582

1  kind of comparison for an SCR?

2  A   Yes, I do.

3  Q   Can we pull up the next demonstrative?  It's No. 36.

4      Does this suggest -- let's start from the top.  I see

5  it's NOX technology analysis 2008; and your first row is the

6  NOX emission rate.

7      Is that what you were referring to a moment ago?

8  A   Yes.  This is important in that I think a NOX technology

9  looks more at the outlet loading.  So that's the way I

10 structured this particular analysis.

11 Q   Could you walk through the comparison of the capital cost

12 for us?

13 A   Okay.  The capital cost -- if you remember from the

14 earlier slide, 123 million was the SCR that was on the

15 original slide I showed, which represents an emission rate of

16 .05 pounds per million BTU.  Then if you go to .06, the

17 capital drops to $115 million.  When you -- a SCR design for

18 .07 outlet drops to $109 million.

19 Q   Let's skip to the incremental cost per ton.

20      Do you see a similar relationship as you did for the

21 scrubber?

22 A   Very similar.  It's $4,380 a ton at .07, jumping to 5216

23 at .06, and then $9,623 at .05.  So there's a significant

24 uptick as you move past .06 to the .05 level.

25 Q   So for each additional ton removed to go from .06 down to

Vol. 3-583

1  .05 pounds per million BTU, it costs an additional $9,623?

2  A    That's correct.

3  Q    Do you see a similar relationship for the incremental

4  carbon dioxide as you did for the scrubber?

5  A    Yes.  It's a little different arrangement, but essentially

6  the same of 4.3-tons of CO2 at the .07 rate.  It moves up to

7  7.1 tons of CO2 at the point .06 rate on an incremental basis,

8  and then up to 12.1 when a system is designed for .05 pounds

9  per million.

10 Q    Based on these overall concerns and the cost analyses

11 you've done, if one were to install a scrubber at Unit 6

12 overall, in your opinion, what is the most cost effective

13 operating range for Wabash River Unit 6?

14 A    I think, for my analysis and it's my opinion, that the

15 scrubbers most economic to operate from a cost effectiveness

16 standpoint and a secondary environmental standpoint, it's

17 somewhere around 95 percent removal for this particular fuel.

18 Q    The same question, what about with regard to an SCR?

19 A    Same analysis on an SCR would probably put you in the

20 range -- you can see it's not quite as clear -- but probably

21 in the range of .06, .07.

22         MR. BOXERMAN:  Thank you, Mr. DePriest.

23         THE COURT:  Cross-examine?

24         MR. BENSON:  Yes, Your Honor.

25

Vol. 3-584

1                     CROSS-EXAMINATION

2  BY MR. BENSON:

3  Q   Good afternoon, Mr. DePriest.  My name is Tom Benson with

4  the Department of Justice on behalf of the Plaintiffs.  Let's

5  start with a few areas where I think you and Plaintiffs'

6  experts are in agreement.

7        First, you would agree that today SCR can be installed

8  at the Wabash River units that we've been talking about?

9  A   Yes.

10 Q   And you looked at that exact possibility for this case,

11 right?

12 A   That's correct.

13 Q   And you don't have any doubt that SCR can be installed?

14 A   Correct.

15 Q   Second area of agreement.  You agree that a scrubber is

16 feasible to control some or all of the units at the Wabash

17 River plant today?

18 A   Yes.

19 Q   And you agree -- you just testified on direct that you

20 could design and install a scrubber that's designed to remove

21 99 percent of the SO2?

22 A   The key word being designed, yes.

23 Q   And scrubbers are available for boilers from 100 megawatts

24 all the way up to a thousand megawatts; isn't that right?

25 A   Yes.

Vol. 3-585

1  Q    And somewhere in the 400 to 500-megawatt range is a common

2  size for scrubbers; is that right?

3  A    Yeah, sure.

4  Q    You would agree that every scrubber vendor has experience

5  with that size?

6  A    I think if you're talking about wet scrubbers, that's

7  true.

8  Q    Wet scrubbers.  Thank you.  Together, Wabash River units 4

9  and 6 are about 430 gross megawatts?

10       So they would be right in that sort of sweet spot; is

11  that right?

12  A    Sweet spot, maybe.  Yes.

13  Q    And you're aware, aren't you, that Duke Energy currently

14  is installing 99 percent removal efficiency scrubbers at units

15  in North Carolina?

16  A    Designed, yes.

17  Q    The 99 percent design basis?

18  A    Yes.  It's a little more complicated than just that but,

19  yes.  It's a dibasic acid enhanced system that takes it from

20  97 to 99.

21  Q    But 99 percent removal is the design level for those

22  units?

23  A    That's what I understand, yes.

24  Q    I believe Sargent & Lundy has been involved in a study

25  looking at the Beckjord plant, which is another Cinergy plant,

Vol. 3-586

1  and the design removal efficiency there is about 98 1/2

2  percent; is that right?

3  A    I think you're correct on that.  It's about 98 plus.

4  Q    Both Sargent & Lundy and Babcock & Wilcox, your current

5  employer, your former employer, were both involved in a study

6  looking at 97 percent removal efficiency scrubbers for the

7  Wabash River unit; isn't that right?

8  A    Design for that, yes.

9  Q    You talked a little bit about this on direct.

10         A scrubber is designed for a certain range of

11  operating conditions, right?

12  A    A certain set of specified conditions, yes.

13  Q    And that's when you talked about the limestone.  Sometimes

14  you're not getting the right limestone, so you're outside

15  those conditions.

16         That's one example?

17  A    That is one example, yes.

18  Q    And a scrubber needs some maintenance over time, right,

19  just like any other equipment?

20  A    Correct.

21  Q    And if a source does the necessary maintenance and stays

22  within the operating parameters set by the design, you would

23  expect that over time the scrubber would continue to operate

24  at its design removal efficiency, correct?

25  A    I think, as I tried to explain and maybe didn't do a very

1   good job was that yes, the components of a system do wear out.

2   There's moving parts, pumps, mixers, nozzles, instrumentation

3   that are always in need of some stage of repair and

4   maintenance.  So the utility is always struggling with keeping

5   those things up to optimum performance with the expectation

6   that everything will be at its top level of performance.  A

7   100 percent of the time is unrealistic in a normal maintenance

8   type of scheme.

9   Q    Sure, and that wasn't quite what I was asking.

10        What I was asking is:  Assuming you perform the

11  necessary maintenance, you would expect going forward that a

12  scrubber would continue to operate at its design level?

13  A    With the limitation that the expectation that perform the

14  maintenance means that I'm sequencing my maintenance

15  activities, trying to stay on top of it, so the system isn't

16  at its optimum operating point all the time.  The expectation

17  that that could occur is probably not a good one.

18  Q    And you talked a little bit about what a regulatory

19  requirement would mean and what you would need to do to deal

20  with that; and you were here for Dr. Fox's testimony

21  yesterday.

22        Plaintiffs aren't asking for a regulatory requirement

23  of 99 percent removal, are they?

24  A    I'm not aware of what they're asking for.

25  Q    One last -- at least one more area of agreement I think.

Vol. 3-588

1  Let's take a look at scrubbers at the time of the projects.

2  You didn't testify about this on direct, but I know it's in

3  your expert report.

4        You would agree that a scrubber could have been

5  installed at Wabash River at the time of the projects, right?

6  A   Correct.

7  Q   And looking at that time period, you expected that a

8  scrubber could be designed to remove at least 90 percent of

9  the flue gas, right?

10  A   Yes.

11  Q   In fact, you're aware, aren't you, of at least one

12  scrubber that was designed to remove at least 95 percent?

13  A   Yes, I am.

14  Q   And that's the Mitchell Unit 3 -- I'm sorry -- Mitchell

15  Unit 33 scrubber that Dr. Fox talked about yesterday?

16  A   Yes.

17  Q   You understand, don't you, that that scrubber actually did

18  achieve a 99 percent removal, correct?

19  A   I understand that there's some data that says that, yes.

20  Q   And you believe that data, right?

21  A   I have no reason not to believe it.  I think the issue is,

22  you know, was it a one-day test?  Was it a test here and

23  there?  I think Dr. Fox talked about that.

24        It was unclear to me whether that was a continuous

25  testing of the program.  At that point in time, if you look

Vol. 3-589

1  back to 1998, 1999, there were no continuous emissions

2  monitoring requirements required by the EPA, and I questioned

3  whether or not there was such an instrument installed on that

4  unit at that time.

5  Q   I believe that Dr. Fox described in her expert report she

6  had several months of data at a time, and you saw that

7  reference in her expert report, correct?

8  A   Yes, I did.

9  Q   And you have no reason to doubt that data, right?

10 A   I did not review that data in depth to know whether or not

11 it was valid or collected in an appropriate way.  I didn't

12 really take time to look at it.

13 Q   And you're not aware of any technical or physical reasons

14 that would have precluded installing a similar scrubber -- a

15 scrubber similar to that at Mitchell to the Wabash River units

16 at the time of the projects, are you?

17 A   The scrubber I think -- which wasn't brought out

18 yesterday -- it's somewhat of a unique scrubber, the scrubber

19 that was put in at the Mitchell station, in that it was a lime

20 based magnesium promoted using a specific lime from a single

21 source at the time.  Certainly from an economic standpoint, it

22 wouldn't have been the best choice; but from their perspective

23 at that time, whatever it might have been, they picked that

24 technology, yes.

25 Q   I understand what you're saying, but let me just make sure

Vol. 3-590

1  that we're clear that you -- there's nothing that you can say,

2  sitting here today, that would preclude installing that type

3  of scrubber, at least on a technical basis, at the Wabash

4  River plant?

5  A    That's probably true.

6  Q    And you didn't do any analysis of what the cost would be

7  at the Wabash River plant?

8  A    I'm not sure what you mean.

9  Q    I'm sorry.  You didn't do any analysis of what the cost

10  would be to install the Mitchell 33 type of scrubber at the

11  Wabash River plants at the time of the project?

12  A    No, no, I did not.

13  Q    Let's turn to what you talked about for awhile on your

14  direct examination and that's the historic SCR -- whether or

15  not an SCR could have been installed at the Wabash River units

16  at the time of the project.  You mentioned I think once, but

17  you didn't really testify about what BACT is.

18         Are you offering any opinions about BACT?

19  A    No.

20  Q    That's outside your expertise, right?

21  A    Yes.

22  Q    So you can't say whether an SCR would have been required

23  as part of a BACT determination at the time of the project?

24  A    No.  I think my opinion, at that point in time in my

25  expert report which you're referring to and in my testimony,

Vol. 3-591

1  was -- my opinion was it was technically viable and

2  commercially available and my opinion was no.

3  Q    Your opinion is it was not?

4  A    It was not.

5  Q    But you don't know how that fits into a BACT analysis?

6  A    Well, not to stray too far from why I'm here today, but I

7  do know if it's not technically available or commercially

8  feasible, then it would not be part of a BACT analysis.

9  Q    Now, you mentioned on your direct that the principal issue

10  that had been raised was SO2 to SO3 conversion across the

11  catalyst, correct?

12  A    That was a reason, yes.

13  Q    Are you familiar with unit where that has been a problem

14  over time?

15  A    Yes.

16  Q    And the plants where SO3 -- SO2 to SO3 conversion has been

17  a problem have all been burning high sulfur coal; is that

18  correct?

19  A    I think you're on a bit of a continuum there.  I mean, the

20  effect that this SO2 to SO3 conversion has is least at, let's

21  say low sulfur coals, and progressively gets worse as it gets

22  to "high sulfur coals."  Where it stops becoming a problem is

23  probably where the debate is.

24  Q    That's not something you've looked at?

25  A    Yes, yes, it is.  We think that the 4-pound coal that

Vol. 3-592

1  we're talking about for Wabash River would have been an issue

2  at that time with the application of SCR technology at Wabash

3  River.

4  Q   Let's talk about the one unit that you did mention, that

5  you identified a problem, and that's the Gavin unit.

6         Do you know what type of coal they were burning at

7  Gavin when these problems occurred?

8  A   Not specifically.  I probably shouldn't speculate.

9  Q   It was a lot higher than 4-pound coal, wasn't it?

10 A   I don't know.

11 Q   Have you identified any plant burning coal similar to that

12 that was being burned at Wabash River that ran into these type

13 of significant SO2 to SO3 conversion problems?

14 A   Well, specifically the 4 point plus pound coal that Wabash

15 River is designed for --

16 Q   Let me take a step back.

17        What's your understanding of what sulfur content coal

18 Wabash River was burning at the time of these projects?

19 A   I think it's in my report.  At the time of the projects,

20 I'm thinking it was somewhere around 3-pound coal with a

21 design for 4.

22 Q   So somewhere between 3 and 4 pound coal?

23 A   You need to recognize that when we're doing a design on a

24 project we look at the sulfur range that could be burned.  So,

25 even though they might have been burning 3-pound coal during

Vol. 3-593

1  the time of the projects, they had every expectation that they

2  would burn higher sulfur coal at some point in time.  We would

3  be designing the SCR system for the highest sulfur coal that

4  was in the specification for what might be burned.

5  Q   Now, you're aware, aren't you, that SCRs were widely used

6  in Europe and Japan at the time of the projects?

7  A   Yes.  I don't know if "widely" is the right word, but

8  there was some experience to be drawn on from both of those

9  locations, yes.

10 Q   That experience included coal fired generation, right?

11 A   Yes.

12 Q   At the time of the projects, there was U.S. SCR experience

13 on oil and gas applications?

14 A   That's correct.

15 Q   In terms of overseas coal application, are you aware

16 whether there's any plants overseas with SCR operating burning

17 coal similar to that at Wabash River, 3 or 4-pound coal?

18 A   No, nothing similar to that.

19 Q   Not that you're aware of?

20 A   Not that I'm aware of, no.

21      Having said that, just to shift that a bit, I do know

22 that there were some projects that were supposedly specified

23 to burn that level fuel; but in the actual experience, if you

24 look at how they actually were run, they never did see coal

25 that high.  So even burning the coal sulfur level they were

Vol. 3-594

1   burning it at, they still -- which was less than what might

2   have been the specified level, they were still experiencing

3   problems of the nature that I've discussed here today prior to

4   even getting to that level.

5   Q   Now, I assume it's fair to say that your testimony here

6   today is based on your experience in the field, the pollution

7   control field?

8   A   That's correct.

9   Q   When did you first begin working on SCR technology?

10  A   Oh, in earnest -- well, I guess there's two different ways

11  of working on it.  One would be studying it, looking at how

12  the industry was -- the applications of this technology to

13  coal-fired units in the U.S.; and that would have to go back

14  to the -- certainly the 1990 time frame.  When we designed our

15  first SCR was 1998, the beginning of that.

16  Q   And you can't point, can you, to any statement by a

17  permitting authority saying that SCR was not available for

18  installation in the 1980s on coal fired U.S. units?

19  A   Where they specifically said it's not available?

20  Q   Right.

21  A   I didn't look for such a thing, no.  I can't point out

22  one, no.

23  Q   So at the end of the day, you're just not sure whether SCR

24  could have been installed at the Wabash River units at the

25  time of the projects?

Vol. 3-595

1  A   Oh, I'm quite sure it could have been installed.  The

2  question is would it be successful in its operation.  My

3  opinion is clear on that, that I think there were unresolved

4  technical issues at that point in time -- and that's not to

5  say they haven't been resolved now, and I think for the most

6  part they have been.  But at that point in time we did not

7  have the answers we needed to successfully design an SCR for

8  that application.

9  Q   You think it couldn't be done at the time?

10 A   I don't know what you mean by "couldn't be."  I mean, you

11 could do it and do it wrong, absolutely.

12         I think you're right.  At that point in time, I didn't

13 have the information and the knowledge to do it right.

14 Q   So you weren't sure whether it could be done at the time

15 or not?

16 A   Well, I think I said I'm pretty sure.  Yeah, I'm sure.  I

17 would not certainly have recommended that my client install an

18 SCR for the purpose of reducing NOX at that point in time

19 without significant testing work, which I think the industry

20 then embarked on and continued on into the 1990s, to the point

21 where at least we thought we had them all solved in the late

22 '90s and we've learned a few things since then.

23 Q   Mr. DePriest, you remember that I took your deposition in

24 this case back in October?

25 A   Yes.

Vol. 3-596

1  Q   And you testified accurate at that time?

2  A   I hope so.

3  Q   And all your answers were taken down by a court reporter?

4  A   Yes.

5  Q   And you had a chance to review those answers?

6            MR. BOXERMAN:  Your Honor, if this is something he's

7  impeaching him on, he needs to --

8            THE COURT:  I assume that's where he's going.

9            MR. BENSON:  It certainly is.

10           THE COURT:  Go ahead.

11           MR. BENSON:  You can put it up at the same time that

12  we do this?

13           THE COURT:  You were doing that all right.

14  BY MR. BENSON:

15  Q   You had a chance to review the transcript and make any

16  corrections you needed to make?

17  A   I have to confess that I read about half of it.  There

18  were no significant corrections in the half that I read.

19  Q   Well, you certainly had the opportunity to read it?

20  A   I certainly had the opportunity.  I do not deny that.

21           MR. BENSON:  May I approach, Your Honor?

22           THE COURT:  Yes.

23  BY MR. BENSON:

24  Q   Mr. DePriest, this is a copy of your deposition.  If you

25  can turn to page 264.

Vol. 3-597

1  A    I didn't get that far.

2  Q    I believe I said it wrong, 262.

3  A    Okay.

4  Q    If we could call out lines 4 through the middle of the

5  page.

6        The question on that day was: "If a unit had been

7  ordered to install an SCR -- you know, if the Wabash River

8  units had been ordered to install SCR in 1989, would they have

9  been able to contract with a vendor and get equipment

10 installed on the units?"

11       Your answer was:  "I really don't know.  I couldn't

12 answer that question."

13       Did I read that correctly?

14 A    Yes.

15       MR. BOXERMAN:  Your Honor, I object.  I don't see

16 how that's different than his testimony today.  It's just a

17 different answer.

18       THE COURT:  You may be right, but it's still in the

19 evidence today.

20 A    It goes on to say there were no viable vendors in the U.S.

21 for that technology at the time, if that helps clarify my

22 position.

23 BY MR. BENSON:

24 Q    Let's turn to the costs that you testified about.

25       You talked today about your estimates for FGD and SCR

Vol. 3-598

1  costs at the Wabash River units 4 and 6 only?

2  A   Yes.

3  Q   And you're familiar in general terms with installation of

4  controls for units similar in size to Wabash River units 2

5  through 6, right?

6  A   I think so.

7  Q   And there's actually a project X that you used as the

8  basis for your FGD costs; do you recall that?

9  A   That's the project I referred to earlier.

10  Q   I believe you testified that is a multiple unit FGD

11  project as well?

12  A   Two units, yes.

13  Q   And I believe it's about 660 megawatts, project X?

14  A   That's correct.

15  Q   So it's two smaller units sort of being ducted in

16  together?

17  A   A 440 and a 220.

18  Q   And you're familiar with the use of the cost metric

19  dollars per kilowatt?

20  A   Yes.

21  Q   That's something that's commonly used in industry as a way

22  to scale costs to different sized units?

23  A   Yes.

24  Q   And your testimony in this case, your expert report in

25  this case, you came up with an estimate of $678 per kilowatt

Vol. 3-599

1  for SCR at units 3 and 5 in the present day.

2        Do you recall that?

3  A   Yes.

4  Q   You're not aware of any SCR that have cost that much on a

5  dollars per kilowatt basis, are you?

6  A   I can't think of any.

7  Q   You're not aware of anything close, are you?

8  A   Well, I don't believe so.  I mean, I'm not sure what you

9  mean by "close."  You know -- as you know, the prices for all

10 the components that are part of an SCR were escalating very

11 rapidly during that period of time.  So, therefore, the

12 SCRs -- the bulk of the SCRs that were installed were

13 installed prior to that runup in pricing.  So there's very

14 little to draw on experience wise to say yeah, there's another

15 one like it somewhere.

16 Q   But you're not aware of anything like that, are you?

17 A   No.

18 Q   And the same question for FGD.

19       You're not aware of any recent FGD or scrubber

20 installations that are similar to the dollars per kilowatt

21 that you estimated for Wabash River?

22 A   It's funny that you bring that up.  I was just reading in

23 a trade journal last week about a project in November that

24 Sargent & Lundy was the engineer on for the conceptual design

25 phase, and then it was turned over to another engineer who's

Vol. 3-600

1  proceeding with the implementation.  They bought all the

2  equipment for that particular project.  It's going on right

3  now.  The published number for the millions of dollars is

4  500 -- I'm sorry -- $457 million for a -- it's a multiple unit

5  station too, two small units into a single unit.

6  490 megawatts total.  So 490 megawatts, $456 million.  We're

7  talking 930, approximately, dollars per kilowatt for that

8  particular scrubber which is going in right now in the State

9  of New Hampshire.  I think that that supports pretty well the

10 estimate that we came up with.  In fact, that estimate is even

11 higher than the one that we're using.

12 Q   That wasn't something you were aware of at the time of

13 your expert report though, was it?

14 A   I just read it the other day.

15 Q   Now, you estimated costs or the costs that you testified

16 about today for FGD and SCR.  For FGD it was for a 99 percent

17 scrubber; is that right?

18 A   Yes, approximately.

19 Q   And for SCR it was for a SCR design to get the outlet out

20 the stack to a .05 pounds per MMBTU level?

21 A   Correct.

22 Q   In both of those cases the control technology would be

23 cheaper if you had a less efficient control technology,

24 correct?

25 A   That's correct.

Vol. 3-601

1          MR. BENSON:  No further questions, Your Honor.

2          THE COURT:  Redirect?

3          MR. BOXERMAN:  No, Your Honor.

4          THE COURT:  You may step down.

5     (Witness excused.)

6          THE COURT:  Your next witness.

7          MR. BOXERMAN:  We call Stanley Hayes.

8          **STANLEY HAYES, DEFENDANT'S WITNESS, SWORN**

9                    **DIRECT EXAMINATION**

10         THE COURT:  You may inquire.

11         MR. BOXERMAN:  If I may have one second, I handed

12    Mr. Hayes my copy of his slides.

13         THE COURT:  They're actually --

14         MR. SAVAGE:  There are a number of new

15    demonstratives.  We're fine with that, but there is an

16    animation, DR Demonstrative 48 that was not disclosed in

17    discovery and took the CAMx modeling results that we had for

18    PM2.5, converted them to what's called parts per million.  The

19    standard metric for PM2.5 is parts per million.  Ozone is in

20    parts per million.  They did this conversion.  We released our

21    experts.  I have no way to know how the two compare,

22    micrograms per cubic meter and parts per million.

23         We object to this animation.  I don't mean to cut

24    you off, Mr. Hayes, before you begin, but I just don't want

25    Defendants demonstrative 48 to get started and we haven't had

Vol. 3-602

1  an opportunity to review it.

2          MR. BOXERMAN:  If I may, Your Honor, it does say

3  parts per million.  I'm told by Mr. Hayes and his colleagues

4  that that is supposed to say micrograms per liter.  That was a

5  typographical error in the animation and it is an animation

6  that is based on the CAMx modeling.

7          My understanding is we had not seen the CAMx

8  modeling that -- until after the expert disclosures of your

9  witnesses.

10          MR. SAVAGE:  Your Honor, the CAMx animation that is

11  in the record as our last exhibit was produced to the

12  Defendants.  They deposed Mr. Chinkin on it for quite awhile.

13  I called Mr. Chinkin late at night in California last night

14  and talked to him about this and he basically said I don't

15  know what to tell you.  I haven't seen it.  And at 75

16  megabytes, at least I can't work the computer enough to figure

17  out how to e-mail it to him because it's so big.

18          MR. BOXERMAN:  It's for demonstrative purposes, Your

19  Honor.

20          THE COURT:  I think we'll do without it.

21          MR. BOXERMAN:  Very well.

22  BY MR. BOXERMAN:

23  Q   Can you introduce yourself please, sir?

24  A   Yes.  My name is Stanley R. Hayes.

25          MR. BOXERMAN:  Your Honor, may I approach the

Vol. 3-603

1  witness?

2            THE COURT:  You may.

3  BY MR. BOXERMAN:

4  Q   Mr. Hayes, I handed you what's been marked as DR212.

5            Is that your resumé?

6  A   Yes, it is.

7            MR. BOXERMAN:  Your Honor, I ask that DR212 be

8  admitted pursuant to stipulation.

9            THE COURT:  You don't have any objection?

10           MR. SAVAGE:  No objection, no.

11           THE COURT:  212's admitted.

12      *(Defendants' Exhibit DR212 was received in evidence.)*

13  BY MR. BOXERMAN:

14  Q   Who is your current employer, Mr. Hayes?

15  A   I work with Environ International Corporation.

16  Q   What is Environ?

17  A   Environ is a scientific consulting company that

18  specializes in environmental matters.

19  Q   What is your position with Environ?

20  A   Since 1990 I've been a principal with the company.

21  Q   You might need to move your mic up a little bit.

22           Are you an engineer?

23  A   I am an engineer, yes.

24  Q   What is the emphasis of your work?

25  A   Well, for more than 30 years, since 1976, I have done air

Vol. 3-604

1  related research consulting.  The primary part of the work

2  that I have done had been the assessment of the air-related

3  environmental impacts of industrial emissions from facilities

4  such as that are at issue in this case today.

5          Part of that work has entailed using engineering

6  principles to calculate atmosphere -- calculate what the air

7  concentrations would be that would result from those

8  emissions; analysis of the exposures that people might

9  experience as they breathe that air; and then, ultimately,

10 calculation of the health risk that would be posed by those

11 exposures.

12 Q   What kind of assessments have you done?

13 A   Well, I've done a variety of assessments.  Some have

14 involved compliance.  Some have involved permitting as an

15 aspect of compliance.  All of them have entailed the

16 comparison -- virtually all have entailed the comparison of

17 the air quality or the health risks impact as I calculate to a

18 range of bench marks of significance such as we're looking at

19 here today.

20 Q   Have you authored articles on air quality and health risks

21 and relate issues?

22 A   Yes.  I've published more than 60 scientific papers or

23 technical presentations during the course of my career.  I've

24 also published what, by this time, must be hundreds of

25 different technical reports, all on air related topics.

Vol. 3-605

1  Q   Where did you attend university?

2  A   I went to Stanford University.  I graduated with a degree

3  in mechanical engineering, a bachelor's degree in 1968 -- 1967

4  and then again with a master's in aeronautics and astronautics

5  in 1968 also from Stanford.

6  Q   Have you been qualified as an expert before, Mr. Hayes?

7  A   Yes, I have, both in court and before various regulatory

8  agencies.

9  Q   Which regulatory agencies have you been qualified before?

10 A   Well, I've given expert testimony before the U.S. Science

11 Advisory Boards, Clean Air Scientific Advisory Committee.

12 Q   That's the CASAC?

13 A   Yes.  The California Air Resources Board, also various

14 local air and regulatory agencies, the South Coast Air Quality

15 Management District.  That's the Los Angeles area.  The Bay

16 Area Air Quality Management District, in San Francisco.

17         I've also been asked to give -- invited briefings on

18 the state of science to members of the California legislature

19 and other political leaders around the U.S.

20 Q   Are you a member of any professional associations?

21 A   Yes, I am.  I'm a member of the Air and Waste Management

22 Association.  This is an 8,000 member organization that's a

23 scientific and technical association for professionals in my

24 business.

25 Q   And have you been active in that organization?

Vol. 3-606

1  A    I have.  Several years ago I was conferred fellow status

2  in recognition of my career, I guess.

3         I've also chaired national conferences or co-chaired

4  national conferences on climate change, on environmental

5  security in the context of homeland security.

6         I have been the chair of one of the major technical

7  subdivisions within the Air and Waste Management association.

8         I've chaired various technical sessions at annual

9  meetings.

10        I'm an elected board member of the Golden West section

11 of the Air and Waste Management Association, which is part of

12 the West Coast subdivision of the organization.

13 Q    Are you a member of any public advisory boards?

14 A    Yes, I am.  I am a member of the Advisory Counsel to the

15 Bay Area Air Quality Management District.  This is an

16 organization that's appointed by the governing board of the

17 district to provide advice and counsel on matters of air

18 pollution science and policy.

19 Q    Has a part of the emphasis of your work included an

20 evaluation of air quality impacts and air quality modeling?

21 A    Yes.

22 Q    Could you describe that generally?

23 A    Well, when -- in my work, when an assessment is made of

24 compliance with environmental regulations, or when a permit is

25 sought, it's necessary to take the results of the air modeling

1  analyses that I do and compare them against benchmarks of

2  significance.  Virtually every significant air permit that's

3  issued by any of the agencies charged with regulation about

4  air quality in the United States requires a mandatory finding

5  that the emissions from the facility will not cause or

6  significantly contribute to a violation of the ambient air

7  quality standards.  So, virtually every modeling study that

8  I've done in that context has required an assessment and

9  comparison with the ambient air quality standards.

10           MR. BOXERMAN:  Your Honor, I would offer Mr. Hayes

11  as an expert in air modeling in evaluating impacts of

12  emissions on air quality.

13  BY MR. BENSON:

14  Q   Mr. Hayes, have you formed an opinion on whether the

15  alleged excess emissions from Wabash River have had an impact

16  on air quality?

17  A   I have.

18  Q   What are they?

19  A   I believe they are small, for reasons that I think will

20  become evident from my testimony.

21  Q   What are the benchmarks you've used for your opinion?

22  A   I was asked to use and analyze the concentration

23  differences that Mr. Chinkin and Mr. Wheeler calculated with

24  the air modeling that they did.  What I was able to do, based

25  on that analysis, was to compare those concentration

Vol. 3-608

1 differences both -- in various ways with the National Ambient

2 Air Quality Standards, particularly the health protective

3 primary standards.  I was also able to compare them against

4 the air quality significant impact levels that are being

5 proposed for PM2.5 by the U.S. CPA.

6 Q   Did you calculate excess emissions yourself or conduct

7 your own modeling?

8 A   No.  I think for the purposes of my analysis, I think it

9 was appropriate to take the concentration differences that

10 were calculated by Mr. Chinkin and Mr. Wheeler.

11        Ultimately to that list, we also added the differences

12 that we back calculated from the results of modeling that EPA

13 did.

14        THE REPORTER:  I'm sorry. Please slow down and

15 repeat your answer again, please.

16 A   Sure.  Ultimately to add to the two sets of modeling

17 results that Mr. Chinkin and Mr. Wheeler generated, results

18 that we were able to derive from modeling done by the U.S.

19 EPA.

20 BY MR. BOXERMAN:

21 Q   What are the three -- just to remind us, we heard about

22 this the other day -- the three modelings that Mr. Chinkin and

23 Mr. Wheeler and then EPA used in connection with evaluating

24 emissions from Wabash River station?

25 A   Sure.  Mr. Chinkin and Mr. Wheeler used two different

Vol. 3-609

1   models.  They used the CALPUFF model, which they used to model

2   the year 2003.  They used the CMAQ model to model a single

3   month in 2002.  That's June.  A third model called CAMx was

4   used by the U.S. EPA in the modeling that they did; and that

5   model, which we've developed at Environ, it was used as the

6   third of the three models.

7   Q    What is your understanding of why EPA conducted the CAMx

8   modeling?

9   A    My understanding is it was done to better understand the

10  source receptor relationships between points of emission and

11  the destinations of those emissions as a way to support the

12  non-attainment evaluations that EPA did.

13        MR. SAVAGE:  Your Honor, we object on foundation.

14  He's not shown that Mr. Hayes, although he's here today, has

15  any familiarity or understanding of EPA's use of its modeling

16  process.

17        THE COURT:  You want to know how he was able to give

18  that last testimony?

19        MR. SAVAGE:  To 29 --

20        THE COURT:  You can ask him a question or two about

21  that, if you would.

22  BY MR. BOXERMAN:

23  Q    How is it that you know that was the reason that you

24  believe EPA conducted that modeling?

25  A    Well, there were two documents that accompanied the

Vol. 3-610

1  modeling results that we had and they described the purpose of

2  it.  I think I've done some other examination, investigation

3  to determine what the purpose of the modeling was.

4        It was modeling that was done I think a bit late in

5  the process and didn't arrive in time to really support the

6  attainment designations which were issued in December, but I

7  think ultimately that was the purpose of it.

8        THE COURT:  All right.

9  BY MR. BOXERMAN:

10 Q   Let's -- you've noted that you've reviewed the modeling in

11 connection with the relationship with the National Ambient Air

12 Quality Standards; is that correct?

13 A   That's correct.

14 Q   Which particular pollutants did you evaluate?

15 A   We compared PM2.5, both annual and daily maximum, 24 hour,

16 to the PM standards.

17 Q   What are the PM2.5 standards?

18        Let's start with the annual average.

19 A   The annual average is a standard that's set at

20 15 micrograms per cubic meter.

21 Q   What about the 24 hour or daily average for PM2.5?

22 A   That's set at 35 micrograms per cubic meter.

23 Q   Did you also consider the data related to ozone?

24 A   Yes, I did.

25 Q   What is the EPA NAAQS, or National Ambient Air Quality

Vol. 3-611

1   Standard, for ozone?

2   A    It is an eight hour standard that's set at 75PPB.

3   Q    Why did you use the NAAQS as a comparison point?

4   A    Well, the EPA under the Clean Air Act is charged with

5   setting national air ambient air quality standards to protect

6   the public health with an adequate margin of safety.  EPA has

7   interpreted that as meaning even the most sensitive population

8   groups.

9           MR. SAVAGE:  We object on foundation.  This is very

10  much legal testimony as to the law.

11          THE COURT:  I don't think so.  I think with his

12  background he can testify.

13          Go ahead.

14  A    I think there is a lengthy deliberative process that the

15  EPA engages in to, first of all, sift through the large volume

16  of research of health and welfare effects on pollutants.  Over

17  a period of time that information is distilled down by the

18  agency subject to public comment and stakeholder input,

19  ultimately to develop and propose what they believe to be

20  health protective standards and that's what they've done.

21  Q    Let's take a look at some of the work take you've done.

22          Have you compared the modeled contributions in the

23  data from the three models related to the Wabash River plant

24  to the National Ambient Air Quality Standard for PM2.5?

25  A    Yes, I have.

Vol. 3-612

1  Q    Can we bring up the first graphic, demonstrative 38?

2         This is a chart that you prepared with your

3  colleagues, Mr. Hayes?

4  A    Yes, it is.

5  Q    Can you sort of set the lay of the land so that we can

6  understand how this illustrates your testimony?

7  A    Yes.  Let me sort of try to lay out the basic features of

8  this plot.

9         This is a comparison really between the concentration

10  differences that are predicted by the three sets of modeling

11  that we have to the ambient air quality standard.  In this

12  case, this is the annual standard and it's set, as I said

13  earlier, at 15 micrograms per cubic meter.

14  Q    So the red line annual PM2.5 NAAQS, that reflects the

15  standard?

16  A    Yes, that's the concentration level of the health based

17  primary --

18  Q    The legend like a rectangular box, that has a legend, what

19  does that show?

20  A    Running along the vertical axis is the annual average

21  PM2.5 concentration in micrograms per cubic meter.

22  Q    Then that box in the middle that has CALPUFF, CMAQ, what

23  does that represent?

24  A    Those are the three sets of modeling results I think we

25  mentioned earlier.  Now, those correspond, each of those

Vol. 3-613

1  three, to sets of three bars that are shown at the bottom

2  along the horizontal axis.

3  Q   What do we see on the horizontal axis before we get to the

4  numbers?

5       What is listed on the very bottom?

6  A   There are 11 items that are mentioned here.  The first is

7  the maximum.  This is the maximum concentration difference.

8  It's calculated by each of these three sets of modeling

9  anywhere within the region that was modeled.

10 Q   Then there are 10 cities listed after that?

11 A   Yes.

12 Q   What are the 10 cities that are listed?

13 A   The 10 cities that are listed are Indianapolis,

14 Evansville, Louisville, Cincinnati, St. Louis, Chicago,

15 Dayton, Columbus, Cleveland and Detroit.

16       The choice of those 10 cities was because these were,

17 at the time this analysis was done, the closest non-attainment

18 areas to the Wabash River station.

19 Q   Now, what are the first two bars in each collection of

20 three bars?

21 A   It's easiest, I think, to see it for the maximum because

22 those are a little more visible.  So let's focus on those in

23 the lower left hand corner.

24       Those three bars -- the first two of those, the left

25 and the middle one, correspond to the two sets of modeling

Vol. 3-614

1  results that Mr. Chinkin and Mr. Wheeler developed.  The first

2  of those corresponds to the CALPUFF 2003 modeling.  That's the

3  .02.

4  Q   So that's the annual average that was modeled by the

5  CALPUFF modeling?

6  A   That's right.  That's right.

7  Q   And then what's the second bar above the maximum?

8  A   The second bar, the .10, is the CMAQ June 2002 PM average.

9  I recognize this is just a one month average.  It's not a true

10 annual average, but it's the best we have from the CMAQ

11 modeling, and we would expect this monthly average would be

12 somewhat higher than the annual average.  Typically, summer

13 months have higher sulfate levels and, therefore, the

14 reasoning here would be for including it would be that these

15 numbers are, if anything, a bit higher than what the annual

16 average would be, but I'm not asserting that.

17 Q   Is it the case that those first two bars represent the --

18 what's been described in this case as the excess emissions?

19 A   That's correct.

20 Q   What about the third bar in each of these groupings of

21 three?

22        Is that the EPA CAMx?

23 A   That's the EPA CAMx modeling.

24 Q   Have you adjusted those to reflect only the excess

25 emissions?

Vol. 3-615

1  A   We have.  The EPA CAMx modeling calculated the effect of

2  the entire Wabash River station's emissions.  What we're

3  interested in here, of course, are the excess emissions.  So

4  what we've done is to scale back the full station's impacts to

5  what we believe can be attributed to the excess emissions.

6  It's a simple proportionality adjustment based on the

7  estimates of excess emissions of SO2 and NOX that Dr. Fox

8  made.

9  Q   And how does the -- for example, the maximum for the CMAQ

10 data compare to the National Ambient Air Quality Standard for

11 the annual PM2.5 NAAQS?

12 A   It's a pretty simple math problem.  The .10 is about 150

13 times lower than the concentration level of the standard.

14 Q   Let's just look at one other one.

15      In Indianapolis, what are the data that are shown that

16 you found in the CALPUFF and CMAQ and derived from the CAMx

17 modeling for the City of Indianapolis annual PM2.5 NAAQS

18 attributable to excess emissions?

19 A   They're a little lower than the maximum by definition, of

20 course.  The CALPUFF difference is .01.  It's .05 for the June

21 2002 CMAQ modeling and it's .02 for the EPA modeling.

22      Just a bit of perspective, the .05 is the highest of

23 the three.  That's the June 2002 CMAQ average.  That's about

24 300 times lower than the standard.  The .02 from EPA is about

25 750 times lower.

Vol. 3-616

1  Q   Have you also prepared a map from the CMAQ, or maybe it's
2  the -- forgot which day data now.

3      Have you also prepared a map to show some of the
4  impact of excess emissions on annual average?

5  A   Yes, I did.  That's from the EPA modeling.

6  Q   So this is demonstrative No. 39.

7      We've seen these sorts of graphics earlier this week,
8  but could you describe this for us?

9  A   Sure.  This is something that's probably pretty similar to
10 what perhaps Mr. Chinkin might have shown on Monday.

11     What I've done here is to do a couple things.  First
12 off, this is showing a map of the geographic distribution of
13 the concentration differences as calculated by EPA's modeling;
14 and we have now represented here not the total impact of the
15 Wabash plant, but rather the excess emissions portion of it.

16     The scale is different than the one that Mr. Chinkin
17 used.  I've chosen the scale here, I think to be helpful in
18 sort of comparing this against the ambient standards because
19 that's what I was trying to do with this.  The scale starts at
20 the low end at .015.

21 Q   How does that compare to the standard?

22 A   That's a thousand times lower than the standard.  The
23 highest -- at the top of the scale, we have .15 micrograms per
24 cubic meter, which is exactly 100 times lower than the
25 concentration level of the standard.  And we have now used

Vol. 3-617

1   these to portray the distribution geographically of the

2   concentration differences and trying to do it in a way that

3   could be compared to the standards easily enough.

4           I might point out, and if you look at the bottom of

5   the figure, you'll see that there's something that says "max

6   equals 0.10."

7   Q   What does that represent?

8   A   That's the maximum concentration difference that's

9   predicted by EPA anyplace within the region that they model.

10          I think you can see, if you look carefully, that that

11  corresponds to the darkest blue.  That .1 is actually 150

12  times lower than the standard, and it looks to be in the near

13  proximity to the plant.

14  Q   And that was the maximum that we were looking at on the

15  bar graph?

16  A   It was.  I note, looking at my display here, that it's

17  very difficult to see the outermost boundary.  The .015 to

18  .03.  I think if you were --

19  Q   You might be able to zoom in on this?

20          Oh, high tech.

21  A   I'm not sure it's picking up the color clear.  I'll sort

22  of represent to you, and I think you can see it better in the

23  hard copy, that the outermost boundary extends almost to

24  Chicago.

25  Q   And what is the level at that point?

Vol. 3-618

1  A   Well, at the outermost boundary, the concentration would

2  be .015, which is a thousand times lower than the standard.

3       The next, and now the most visible darker portion of

4  the map, right at that boundary, the concentration would be

5  .03 micrograms per cubic meter, which is 500 times lower than

6  the standard.  And, successively, you can move in to the point

7  of the maximum .10, 100 times lower than the standard that's

8  located right at the plant.

9  Q   Let's move on to your next illustration to your review of

10 the data.

11      Do you have a graphic illustrating the 24 hour daily

12 PM2.5 values?

13 A   Yes, I do.

14 Q   Can I have demonstrative No. 40.

15      Can you describe this one, perhaps not quite in the

16 detail we did the first one?

17 A   I think we've gotten the lay of the land with the last

18 figure.  This is very similar to the last figure.  I won't go

19 through the details here.  It's the same thing.

20      In this case now, not the annual average PM2.5, but

21 rather the maximum 24 hour PM2.5.

22 Q   And that's the line -- the brownish line at the top next

23 to 35?

24 A   That's the standard.  Yes, that's the 24 hour standard.

25 Q   And again, you have on the bottom the maximum, and then

Vol. 3-619

1  the same 10 cities?

2  A    That's right.

3  Q    Can you describe what the data are showing, for example,

4  for Indianapolis again for us?

5  A    Sure.  The three sets of modeling results for Indianapolis

6  show that the maximum 24 hour PM2.5 difference is predicted to

7  be .4, .5 and .4 respectively.  The .5 is 750 -- what is that,

8  700 times lower?  Yeah.

9  Q    I'm sorry.

10  A    It's 70 times lower than the concentration level of the

11  standard.

12  Q    What generally does this side illustrate in support of

13  your opinion?

14  A    Well, I think this gives -- and I think fairly visually --

15  a similar message to the figure we looked at for annual

16  average.  What it shows is that the concentrations that are

17  predicted by all three of the modeling, at all 10 of the

18  cities and even at the maximum, are well below the

19  concentration level of the primary health based standard.

20  That's even true for the maximum.

21       If you look at the maximum level, the highest value is

22  predicted by the EPA modeling to be 1.9 micrograms per cubic

23  meter, which is almost 20 times lower than the standard.

24  Q    Mr. Hayes, have you also looked at data comparing the

25  24-hour average excess emissions contribution to the daily

Vol. 3-620

1  maximum 24 hour PM2.5 in Indianapolis?

2  A    Yes, I have.

3  Q    Can we see demonstrative 41, please?

4        So this demonstrative is labeled "Benchmarks of Air

5  Quality Impact 24 hour PM2.5 NAAQS."

6        Can you illuminate on what you're depicting in this

7  particular demonstrative?

8  A    Sure.  This is just another way to compare the

9  concentration differences to the standard.

10        What you see here, plotted once again on the vertical

11  axis, is the maximum 24 hour PM2.5 micrograms per cubic meter.

12  The -- sort of connect the dot solid line on top represents

13  the daily concentration during the month of June that's

14  calculated by the CMAQ modeling that Mr. Chinkin and

15  Mr. Wheeler did.

16        Along the horizontal axis on the bottom you see days

17  of the month, from the 1st to the 30th of June.  Each of the

18  dots that you see on the upper line represent a daily max

19  PM2.5 concentration for that particular day.

20  Q    I see that the connect the dots goes up and down.

21        Have you drawn any overall conclusion from the

22  variation in those PM2.5 values in Indianapolis and the

23  relatively constant level of model contribution of excess

24  emissions from the Wabash River station?

25  A    I have drawn a few conclusions about this.  I think the

Vol. 3-621

1  reasons for -- primary reason why you see the concentration

2  going up some days and down on other days is due to

3  fluctuations in the weather, speed of the wind, various other

4  factors that influence the concentrations on any particular

5  day.

6          Along the bottom, though, you see in what on my screen

7  looks to be kind of a pink color on exactly the same scale of

8  the daily concentrations in the upper line, the excess

9  emission differences that are calculated by Mr. Chinkin and

10  Mr. Wheeler.

11  Q    That's the line at the very bottom with the triangles?

12  A    Yes.

13  Q    That reflects each day from the model CMAQ for June of

14  2002?

15  A    Yes.

16  Q    What conclusion are you drawing from this comparison?

17  A    It seems evident to me that the concentration variations

18  that you -- or the variations you see in the daily mix of

19  PM2.5 do not seem to be very correlative, if at all, with the

20  excess emissions.  Most importantly, it looks to me the excess

21  emissions during that month are a very small contributor to

22  the daily maximum PM concentrations.  That suggests that there

23  are other sources that are more important to determining the

24  air concentrations in Indianapolis than the excess emissions.

25  Q    Let's turn to ozone.

Vol. 3-622

1          I think you said you also compared the model

2   contributions of excess emissions from the Wabash River plant

3   to the National Ambient Air Quality Standard for ozones?

4   A    Yes, I did.

5   Q    Is your opinion the same regarding the comparison with the

6   ozone standard?

7   A    Do we have a demonstrative on this?

8   Q    Yes.  Would you bring up demonstrative 42?

9          So this is a similar collection of -- I guess, why

10  don't you describe what we see?

11  A    Again, it's the same sort of figure we've been looking at.

12  In this case, on the vertical axis, instead of micrograms per

13  cubic meter of PM, we're looking at the maximum 8 hour ozone

14  concentration in parts per billion.

15  Q    What data do we see on the bottom?

16  A    For those same 10 cities is and the maximum,NAAQS anyplace

17  within the modeling region, the concentration difference that

18  was calculated by the CMAQ June 2002 modeling, I point out

19  that the EPA modeling which we showed previously did not

20  calculate -- or did not report ozone, at least in the material

21  that we saw, so we couldn't include that here.  The CALPUFF

22  modeling also did not calculate ozone for our purposes here.

23  Q    So again, just by way of comparison, how do you compare

24  the maximum, which I see listed as .8 parts per billion to the

25  eight hour ozone NAAQS?

Vol. 3-623

1  A    The eight hour ozone NAAQS is 75 parts per billion.  While

2  we show it to be .8, it happens to be exactly .75, which makes

3  the math really easy.  It's just a factor of 100 lower.

4  Q    What about for Indianapolis?

5  A    It's lower still.  In Indianapolis we're talking about a

6  difference of .1 parts per billion, which is 75 -- 750 times

7  lower than the standard.

8  Q    Okay.  Let's bring up Mr. Hayes next demonstrative,

9  No. 43.

10        Is this a similar comparison as the one we saw earlier

11  for the PM2.5?

12  A    Yes, it is.

13  Q    Can you describe what this -- what these data illustrate

14  to us in terms of your conclusions?

15  A    Sure.  These are daily maximum eight hour ozone

16  concentrations through the month of June 2002.

17        What we see in the upper figure is the daily max --

18  the total daily maximum ozone concentration that's calculated

19  by the modeling.

20  Q    So that's the blue line; connect the dots that goes up and

21  down?

22  A    It is.

23  Q    What are you comparing that to?

24  A    I'm comparing that to the excess emissions concentration

25  differences, which are shown again in pink along the bottom of

Vol. 3-624

1  this figure.

2  Q   So what conclusion do you draw from the variation in ozone

3  for Indianapolis and the modeled contribution from the Wabash

4  River excess emissions?

5  A   I draw essentially the same conclusions that I did for the

6  24 hour PM2.5.  These concentration differences for ozone are

7  very small.  And they're very small not just relative to the

8  standard, but to the daily maximum ozone concentrations, which

9  again suggests that the major contributors to those daily

10  maximum ozone concentrations are other sources than the excess

11  emissions.

12  Q   Let's move on to the second set of comparisons, Mr. Hayes.

13       I believe you said you compared the data to what's

14  known as EPA's significant impact levels?

15  A   Yes, I did.

16  Q   What are these levels or -- as they're abbreviated, SIL,

17  or SILs?

18  A   Under the PSD program, EPA for some time has tried to

19  specify some levels of air quality significance.  Recently, in

20  fact, in I think it was September of 2007, EPA proposed to

21  codify this policy that they have been informally applying for

22  a number of years into regulations and to promulgate, thereby,

23  specific significant impact levels, as well as other things

24  for the PM2.5.

25  Q   Can you show us some of EPA's language that you've

Vol. 3-625

1  referenced in your report?

2  A    Sure, I can.

3  Q    Can we have demonstrative 44?

4        And these are from a federal register notice of

5  September 2007?

6  A   Yes, they are.  I thought these were particularly helpful

7  in expressing what EPA's intent is with respect to the

8  definition of these SILs.

9        MR. SAVAGE:  Your Honor, may I interpose?  We'll

10  just register an objection to the extent they're talking about

11  what EPA has proposed, but -- if Mr. Hayes would like to talk

12  about it, we just want to get that on the record.

13        THE COURT:  All right.  Go ahead, sir.

14  BY MR. BOXERMAN:

15  Q    These are two quotes out of the federal register as to

16  EPA's description to the SILs?

17  A    Yes.  I think --

18  Q    Could you read the first one?

19  A    "EPA considers a source whose individual impact falls

20  below a SIL to have a de minimis impact on air quality

21  concentrations."

22  Q    What is your second quote?

23  A    I think it expands on that by saying, "If a source can

24  show that its emissions alone will not increase ambient

25  concentrations by more than the SILs, EPA considers this to be

Vol. 3-626

1  a sufficient demonstration that a source will not cause or

2  contribute to a violation of the NAAQS or PSD increment."

3  Q    I see we have a typo?

4  A    Yes.

5  Q    Now, have you compared the excess emissions of the Wabash

6  River plant to EPA's proposed SILs?

7  A    Yes, I have.

8  Q    Can we have the next demonstrative, please?

9        Can you describe for us what we are viewing and how it

10 illustrates your opinions?

11 A    Sure.  This is the same figure we looked at before with

12 the 24-hour comparison with the PM 2.5 24-hour NOX.  What

13 this now shows is the first of the three options EPA is

14 considering.

15       They're considering a definition of the SIL, that is a

16 de minimus level, concentrations below that EPA would consider

17 de minimus.  They're considering a 5-microgram per cubic meter

18 SIL.

19       Now, option one is interesting because it corresponds

20 to what it has been historic practice at EPA.  EPA, at least

21 as far back as 1990, and I think in all likelihood earlier,

22 has used first for TSP, total suspended particulates, for

23 PM10, and now as a place -- are proposing as their first

24 option for PM2.5, a 5-microgram per cubic meter significance

25 threshold.

Vol. 3-627

1  Q    Is there a second option?

2  A    There is.  In this case they would propose to set the SIL

3  at 4 micrograms per cubic meter.  This is based on the ratio

4  of PM2.5 to PM10 emissions nationally.

5  Q    Is there a third option?

6  A    Yes.  The third one they're considering is at

7  1.2 micrograms per cubic meter.  This is based on the ratio of

8  the PM2.5 standard to the PM 10 standard.

9  Q    In each of the cases that we've looked at, options 1, 2

10 and 3, with one exception, where do the data fall in relation

11 to the de minimus levels?

12 A    Well, a common use of the SIL is to see whether a source

13 located upwind has a significant impact on a non-attainment

14 area.  These are the 10 closest non-attainment areas at the

15 time this work was done, and you can see that all of the

16 cities have concentration differences that are less than even

17 the most stringent of the three SILs under consideration by

18 the EPA.

19 Q    That's the same 10 cities that you listed earlier in your

20 testimony?

21 A    Yes.

22 Q    Now, I do see that there's one data point on one day that

23 exceeds SIL option three.

24 A    Yes, that's the EPA CAMx modeling.

25 Q    And can you put that particular point in context for us?

Vol. 3-628

1  A    Well, sure.  First off, I think it's important to remember

2  that at 1.9 micrograms per cubic meter we're nearly 20 times

3  lower than the standard to begin with.

4           Secondly, the -- this is maximum 24 hour PM2.5, and in

5  examining the day by day variations within the EPA modeling,

6  if this is occurring -- this 1.9 would occur on I think a

7  single day and it would occur in the immediate proximity of

8  the plant.

9  Q    Have you also done a similar analysis for instead of the

10  24 hour PM2.5 de minimus or SILs level, but the annual

11  average?

12  A    Yes, I have.

13  Q    Can we see the next slide, please?  So this is

14  demonstrative -- DR demonstrate 46.

15           Can you please describe what we see?

16  A    Sure.  This is now for annual average of PM2.5.  The

17  standard is shown.  The bars are the same as the one we've

18  looked at previously, but now I've added SIL option 1, 1

19  microgram per cubic meter.  Once again, this corresponds to a

20  historical practice.

21           I might add that option 1 I think is, in fact, what's

22  in place until this rule is finalized.  So it's currently in

23  force.

24  Q    So the SILs, there are different de minimus levels set for

25  the 24-hour average and the annual average?

Vol. 3-629

1  A    Yes.

2  Q    And are there proposed options 2 and 3 as there were for

3  the 24-hour average?

4  A    Yes.  Here's SIL option 2.  This is set at .8 micrograms

5  per cubic meter.

6  Q    Is there a third option?

7  A    Yes.

8  Q    What is that?

9  A    This is set at .3 micrograms per cubic meter.

10 Q    How do all the data for both the maximum and the 10 cities

11 compare to even the most stringent proposed annual average de

12 minimus level proposed by EPA?

13 A    Here all of the cities and the maximum are below even the

14 most stringent of the annual SILs being considered.

15 Q    Mr. Hayes, are you familiar with Mr. Chinkin's comparison

16 of emissions from the Wabash River plant to emissions from

17 other sources, such as trucks or cars, as well as emissions in

18 Marion County?

19 A    Yes, I am.

20 Q    What is your reaction to Mr. Chinkin's sort of gross

21 comparison of tons of emissions from the plant to tons of

22 emissions from another source?

23 A    I think it's a flawed comparison and that's because, it

24 seems to me, that the comparison is best done based on the air

25 quality differences.  I think, when you look simply at

Vol. 3-630

1  emissions, you don't take into account whether the emissions

2  are upwind of you or downwind, whether they are -- how those

3  are affected by other sources.  There are a number of

4  important factors that need to be taken into account in order

5  to calculate what I think is the proper comparison, that is,

6  between air quality differences.  And that's why we need air

7  modeling.  That's why we have that modeling before us, the

8  results of which we have seen.

9  Q   Have you looked at additional modeling data to compare the

10  relative contribution to Indianapolis of the other sources in

11  Marion County when compared to the modeled contribution from

12  the Wabash River station's excess emissions?

13  A   Yes, I have.

14  Q   What did you look at?

15  A   I looked at the EPA modeling that was done.  I thought

16  that was a particularly useful way of trying to see what the

17  contribution of, first, the total emissions from the Wabash

18  station and extract it, as we have done the excess emission

19  portion, to its affect on air quality, for example, in a place

20  like Indianapolis.

21  Q   I think we have a slide from Mr. Hayes' demonstrative 47.

22       Can you explain for the record what data you have put

23  on this bar graph to illustrate your views to the Court?

24  A   Sure.  This is a representation of the contribution of

25  different sources to air quality in Indianapolis.

Vol. 3-631

1   Q    So what is the first -- let's set the parameters again.

2        In the left hand column, what are the -- what are we

3   measuring?

4   A    We're measuring the PM2.5 contribution.  This is the 24

5   hour PM10 as calculated by EPA --

6   Q    I'm sorry, PM?

7   A    2.5.  I'm sorry.

8   Q    In micrograms per cubic meter?

9   A    Yes.

10  Q    Then you have the first bar labeled as excess emissions.

11       What does that represent?

12  A    The EPA modeling calculated, I think it was .43 micrograms

13  per cubic meter, as the impact of all of the Wabash River

14  station's emissions on Marion County.  We used, in this case,

15  a rough one-third adjustment to calculate this .14.  We didn't

16  do it exactly the way we did for some of the earlier things we

17  showed because of some important differences between what EPA

18  did and what we did; but nonetheless, the .14 is what EPA's

19  modeling would suggest is the contribution of the excess

20  emissions to air quality in Marion County.

21  Q    Let's just explain these data a little bit more.

22       Are these a subset of the EPA modeled data in some

23  fashion?

24  A    The excess emissions are.

25  Q    Explain what you mean.

Vol. 3-632

1  A   Well, as I said, the air modeling that EPA did calculated

2  the impact of all of the emissions at the Wabash River station

3  in comparison to the county's air quality in a way that

4  employed proportionality based on the excess emission

5  estimates of Dr. Fox.  We calculated that about a third of

6  that .43 was associated with the excess emissions.

7  Q   Are these data in particular a top 5 percent compilation

8  of the CAMx data?

9  A   Yes, yes.

10  Q   Can you explain what that is?

11  A   Yes.  The contributions that are shown here are based on a

12  subset of the top 5 percent of days; that is, those days that

13  had the highest 5 percent of the PM -- the daily PM2.5

14  concentrations.

15  Q   And then the second bar is -- it says "Marion Co total."

16       Can you tell us what that is?

17  A   This is strictly as EPA calculated it with their CAMx

18  modeling.  They calculate that sources in Marion County

19  contribute to Marion County's air quality 13.09 micrograms per

20  cubic meter on average on the highest days.

21  Q   So that also is focused on the top 5 percent of the PM2.5

22  values in 2005?

23  A   Yes.

24  Q   So what is the import of this comparison that you've

25  outlined on this bar chart, demonstrative No. 47?

Vol. 3-633

1  A   Again, the math is pretty easy here.  What it is telling

2  us is that sources that are in Marion County are contributing

3  about 100 times more to the air quality in Marion County than

4  the excess emissions.

5           MR. BOXERMAN:  Thank you, Mr. Hayes.

6           THE COURT:  Cross-examine?

7           MR. SAVAGE:  Yes, Your Honor.

8                        **CROSS-EXAMINATION**

9  BY MR. SAVAGE:

10  Q   Good morning, Mr. Hayes.  Let's talk about a few areas

11  where we agree before we get into some respectful

12  disagreements.

13          If we could call up Defendants' demonstrative 39.

14          Mr. Hayes, this shows that you estimated the PM2.5

15  annual average impact from the Wabash River excess emissions,

16  correct?

17  A   That's correct.

18  Q   And --

19  A   Actually EPA did.  We simply calculated the excess

20  emissions fraction of it.

21  Q   EPA did that with the 2005 CAMx modeling?

22  A   Yes.

23  Q   And what was what Mr. Chinkin talked about too, right?

24  A   Yes.

25  Q   To do the estimate of the excess emissions predicted by

Vol. 3-634

1  the CAMx modeling, you scale it; I think that's what you

2  referred to it as?

3  A    Yes.

4  Q    You scale it by looking at the excess SO2 emissions,

5  correct?

6  A    Based on the total emissions.

7  Q    Based on the scaling, you concluded that there was a

8  maximum PM2.5 impact from the excess emissions on an annual

9  basis of a 10th of a microgram?

10  A    That's right.

11  Q    Mr. Chinkin concluded that there was an impact of a 15th

12  of a microgram annual PM2.5 from the Wabash River excess

13  emissions?

14  A    A 15th or .15?

15  Q    .15.

16  A    Yes.

17  Q    Let's go to Defendants' demonstrative 47, please.

18        I think you've already mentioned this, but this

19  shows -- according to the CAMx EPA modeling -- 0.14-microgram

20  impact on Marion County's 24 hour PM2.5 pollutants from the

21  Wabash River excess emissions?

22  A    On average over the 5 percent of worst days.

23  Q    Now, the areas that don't meet the NAAQS I think are

24  called non-attainment areas.

25        Do you agree with me?

Vol. 3-635

1  A    Yes.

2  Q    The non-attainment areas have to do with something called

3  an attainment demonstration?

4  A    That's correct.

5  Q    Emission measures will be sufficiently reliable to achieve

6  attainment of the standards?

7  A    Yes.

8  Q    States have to typically look at a collection of control

9  measures to demonstrate attainment?

10 A    Typically, yes.

11 Q    For example, a single truck by itself would never have a

12 0.1 microgram impact on an entire state's air quality?

13 A    No, but a concentration of an entire fleet of trucks might

14 be the object of a control measure which would have a greater

15 impact in that .14.

16 Q    To demonstrate attainment with the NAAQS, states have to

17 perform air quality modeling?

18 A    Yes.

19 Q    And the two most commonly used models for attainment

20 demonstrations for PM2.5, are those we've been talking about,

21 CMAQ and CAMX?

22 A    That's right.

23 Q    And CAMx can predict PM2.5 concentrations, I think to at

24 least a thousandth of a microgram; would you agree with that?

25 A    I think the computer will give you as many decimal points

Vol. 3-636

1  almost as you would wish, but that doesn't necessarily make it

2  correct.  It simply is a numerical value.

3  Q    CMAQ can do the same thing; it can give you a prediction

4  of a PM2.5 impact past even a thousandth of a microgram,

5  correct?

6  A    It will give you a numerical value, whether you believe it

7  to that level of significance depends upon the uncertainty in

8  the analysis that you're conducting.

9  Q    Can I just it again to make it clear.  The question is

10  not -- I appreciate you providing some additional information,

11  but the question is actually a lot simpler.

12        The question is this:  The CMAQ computer model can

13  predict PM2.5 concentrations down to at least a thousandth of

14  a microgram, whatever you do with that data?

15  A    And my answer was that the model will calculate a large

16  number of decimal places.  The extent to which you trust the

17  model's results, depends on the uncertainty that's present in

18  the modeling, which of course we all know --

19  Q    Actually -- I'm sorry.  Go ahead.  That actually brings up

20  a good point.

21        Regulators use CMAQ and CAMx to test whether or not

22  control measures will be sufficiently effective to reduce

23  PM2.5 to the NAAQS levels, right?

24  A    They look at large collections of control measures such as

25  the ones you were mentioning a few minutes ago.  There will be

Vol. 3-637

1  a large collection of emission controls.  The larger scale

2  changes in air quality that those would produce would be

3  analyzed with the CMAQ model.

4  Q   Right.  And the CMAQ model's used by the regulators to

5  test --

6         MR. BOXERMAN:  Mr. Savage, objection.  Can he allow

7  the witness to finish his answer?

8  BY MR. BOXERMAN:

9  Q   I'm sorry, your voice was trailing off a little bit at the

10  end, so --

11  A   I sat here yesterday through Dr. Fox's testimony and I was

12  surprised that I couldn't hear well in the back row, and now

13  that I'm up here I'm starting to feel a little embarrassed.  I

14  apologize to the Court.  I'll try to speak louder.

15  Q   Just so I understand, regulators use the CMAQ model to

16  test whether, as you said, a collection of control measures

17  will be sufficiently negative to reduce PM2.5 down to the

18  NAAQS level?

19  A   That's right.

20  Q   And Environ helps the states out with those attainment

21  demonstrations for PM2.5?

22         Let me just actually move right no.

23         You're not aware of any states that have excluded a

24  control measure or suite of control measures because of a

25  predicted PM2.5 impact on air quality was less than

Vol. 3-638

1  0.1 micrograms?

2  A    Well, actually I think the analyses that were done at the

3  CAIR program were done in a way that excluded a state from

4  further consideration if its contribution was less than; what,

5  1 or 2 percent of the standard as I recall.  So entire states

6  would be excluded with numbers like this.

7  Q    In this case, you understand it's not about an entire

8  state's emissions?

9  A    I understand.  You asked the question.  I'm just trying --

10  Q    Perhaps I wasn't clear.  I'll ask it again and I'll speak

11  slowly since we're talking technical terms and it's difficult

12  to hear in the courtroom.

13       You were not aware of any states that have excluded a

14  control measure or suite of control measures because predicted

15  PM2.5 impact in air quality was less than 0.1 micrograms?

16  A    And my answer I think is similar to what I just said.  It

17  seems to me that in the CAIR program a state's emissions were

18  considered to be de minimus if its contribution to a downwind

19  state was less than, I want to say less than two tenths of a

20  microgram per cubic meter.

21  Q    Sir, CAIR is not a state program, right?

22       That was issued by U.S. EPA?

23  A    That's correct.  You asked me about a suite of control

24  measures.  If you're asking me about a single source, fine.

25  But if you're asking about a suite of control measures, the

Vol. 3-639

1  concentration differences are almost invariably much larger

2  than the .1 we're talking about.

3  Q    And perhaps I'm not clear because I'm asking about the

4  states and I'm hearing about CAIR.  Let me try one more time

5  and we'll see if this makes any sense.

6       You're not aware of any states that have excluded a

7  control measure or suite of control measures for an attainment

8  demonstration because the predicted PM2.5 impact on air

9  quality was less than 0.1 micrograms?

10 A    No.  I've certainly not heard of anything like that.  I

11 would be surprised if such a thing happened but, no.

12 Q    Thank you for clarifying that.

13      If we could bring up Defendants' demonstrative

14 Exhibit 40.  Pardon me, 41.

15      Mr. Hayes, this slide purports to show 24 hour PM2.5

16 concentrations in Indianapolis, correct?

17 A    In the blue line, yes.

18 Q    In the blue line.

19      That blue line, however, represents the modeled

20 impact, correct?

21 A    It does.

22 Q    So you did not -- for purposes of your expert report, you

23 did not examine whether the model predicted air quality

24 impacts in Indianapolis on days where the air quality was

25 already above the PM2.5 NAAQS as shown by the monitoring data?

Vol. 3-640

1  A   Well, I'm not sure I understand exactly what you asked.

2  But it seemed to me that the more relevant comparison was

3  between -- was based on the modeling itself, the modeling that

4  Mr. Chinkin and Mr. Wheeler did.  They predicted an ambient

5  air concentration.  They predicted a concentration difference.

6  It seemed only fair and consistent to compare them on that

7  basis, model to model.

8  Q   I understand.  But just so we're clear, in your expert

9  report you did not go and look at air quality monitoring data

10 to see whether the model had predicted impacts on days where

11 the NAAQS was already exceeded, according to the monitoring

12 data?

13 A   No.  This is based on a comparison of the modeled results.

14 Q   Let's talk some more about your views of when emissions

15 are small.

16       You concluded that the Wabash excess emissions

17 represent excess emissions -- excess excisions for SO2

18 represent 2 percent of total emissions from all sources in

19 Indiana, right?

20 A   I discussed that in my expert report, but I think the

21 relevant comparison is -- I think I also said in my expert

22 report is on the basis of their effect on air quality.  So

23 that's why in my presentation today I'm talking about air

24 quality differences and not emission differences because, as I

25 said earlier, I think those can be misleading.

Vol. 3-641

1  Q   So just so we're clear though, the Wabash River excess

2  emissions for SO2 are equivalent to 2 percent of all SO2

3  emissions in the whole state of Indiana?

4  A   They are what I said in my report.

5  Q   Sources of SO2 in Indiana include highway vehicles?

6  A   Yes.

7  Q   Includes all power plants?

8  A   Yes.

9  Q   It includes all off highway vehicles like forklifts?

10 A   And passenger vehicles and trucks and the IPALCO Harding

11 Street station in Marion County, too.

12 Q   Let's talk about the significant impact levels that you

13 discussed in your testimony.

14        If we could have Defendants' demonstrative 44.

15        Just so we're clear, your opinion is that the excess

16 emissions are smaller than the significant impact levels

17 proposed by EPA in September 2007?

18 A   They're smaller -- for all three of the options, for

19 annual average PM10, they're smaller than the -- the SILs for

20 option 1 and 2 for 24 hour PM10, and it's only for one of the

21 modeling, perhaps two of the modeling results that we showed

22 for the maximum anywhere that they exceed option 3.  So --

23 Q   Okay.  And the SIL levels that you used, those apply only

24 to direct emissions of PM2.5?

25 A   Yes.

Vol. 3-642

1 Q   Direct emissions are those that are directly emitted out

2 of the stack?

3 A   That's right.  And we added -- we considered all of the

4 PM, not just the direct part but also the secondary formed.

5 So the number we compared is larger -- or the number that we

6 showed on those charts is larger than the direct emissions

7 and, therefore, I think is favorable to you.

8 Q   Well, sir, the PM2.5 impacts in this case are from

9 secondary PM2.5, correct?

10 A   And they're included in my bar chart.  That's correct.

11 Q   These proposed SILs only look at what actually comes out

12 of the stack in terms of PM2.5?

13 A   They allow you to compare your impact only with respect to

14 direct emissions and not to include the secondary emissions.

15 But we've conservatively added in those secondary emissions to

16 the direct emissions in reporting the impacts that we've shown

17 in the bar charts.  So we've overestimated the impacts

18 relative to direct emissions.

19 Q   I understand you think it's an overestimate.  Let's talk

20 about these SILs a bit more.

21        These proposed SILs only look at impacts within

22 50 kilometers of a source, correct?

23 A   No.  I think SILs are defined in that rule.  I think

24 conventionally to be the definition of de minimus, whether

25 it's de minimus next to the plant, 50 kilometers away or

Vol. 3-643

1 further.  It's still what EPA regards to be de minimus.

2 Q   I understand you're expressing your opinion about what you

3 think EPA says in the proposed rule, but I want to make the

4 record perfectly clear.

5         In this proposed SIL rule, EPA says this applies only

6 to -- measuring direct emissions within 50 kilometers of the

7 source?

8 A   I think you're misunderstanding.  The use of the SIL in

9 the context of the proposed rule is to determine whether you

10 qualify for a kind of off ramp in the rule.  The EPA says, for

11 a lot of reasons, resource conservation and all, that if

12 you -- if your emissions are de minimus, your impact is de

13 minimus I should say, that you don't need to go to the more

14 extensive analyses that otherwise would be required.

15 Q   I understand --

16 A   That's why they're saying 50 kilometers, if that's what

17 you're saying.

18 Q   I understand you're saying there's an off ramp.  I'm

19 trying to understand what the off ramp is.

20         You understand the off ramp to be looking at only

21 impacts from direct emissions of PM2.5 within 50 kilometers of

22 the source?

23         Yes, no, you don't know?

24 A   I don't recall if it says 50 kilometers, but if it says

25 that it makes sort of sense.  Because if when you're

Vol. 3-644

1  qualifying for the off ramp, you're basing that on an initial

2  screening level air quality assessment, which is invariably

3  done with a model whose maximum distance of validity is

4  50 kilometers.  So that's a perfectly logical thing for EPA to

5  do.

6         It doesn't change the fact that EPA considers impacts

7  less than the SIL wherever they occur, 50 kilometers or

8  100 kilometers or 500 kilometers to be de minimus.

9  Q   I understand you, as an expert, have an opinion about what

10 EPA thinks.  I was just focusing on the rule.

11        It's true that SO2 converts into PM2.5 at a rate of

12 about 2.5 percent an hour?

13 A   Roughly.

14 Q   You have a general understanding that the smoke stack at

15 the Wabash River exceeds a height of 300 feet?

16 A   Yes.

17 Q   Sir, the 50 kilometers, that equates to roughly 25 miles?

18 A   Could you repeat that?  I'm sorry.

19 Q   Fifty kilometers equates to roughly 25 miles?

20 A   Thirty miles.

21 Q   Thirty miles?

22        There are no non-attainment areas for PM2.5 within

23 30 miles of the Wabash River, correct?

24 A   No.  I mean, that is correct.

25 Q   Let's talk about another view you've taken on whether air

Vol. 3-645

1  quality impacts are small.

2       You were an expert witness for American Electric Power

3  in U.S. versus American Electric Power?

4  A   Yes, I was.

5  Q   That case was brought on behalf of the United States?

6  A   Yes.

7  Q   And it was brought against American Electric Power or AEP?

8  A   That's correct.

9  Q   And you were an expert for AEP?

10 A   I was.

11 Q   The United States contended there were excess emissions?

12 A   That's right.

13 Q   The United States contended the excess emissions were from

14 coal fired power plants?

15 A   Yes.

16 Q   Coal fired power plants were owned and operated by AEP?

17 A   Yes.

18 Q   The excess emissions were SO2?

19 A   Yes.

20 Q   The excess emissions were also NOX?

21 A   That's correct.

22 Q   Many of the issues you raised in this case are similar to

23 the ones you raised in the AEP case?

24 A   Sure.  And the concentration increments, the differences

25 that we're seeing in this case, are really a fraction of what

Vol. 3-646

1  we were seeing in the AEP case.

2  Q   Thank you for clarifying that.

3       In the AEP case, you reviewed an expert report offered

4  on behalf of the United States about air quality modeling of

5  AEP's excess emissions?

6  A   I don't know that I did about air modeling.  I think I

7  made my opinion largely based on health effect modeling that

8  your experts did, but it also included air modeling.

9  Q   So it's true to say you reviewed an expert report offered

10 on behalf of the United States about the air quality modeling

11 about AEP's excess emissions?

12 A   Yes.

13 Q   That model, as here, was called the CMAQ model?

14 A   Yes.

15 Q   The excess emissions modeled in the AEP case were

16 457,000 tons of SO2 and 75,000 tons of NOX, correct?

17 A   Spread over 26 units at nine different power plants all

18 over the central eastern United States, as I recall.

19 Q   And just so we're clear, those were the amounts of excess

20 emissions that were modeled in that case?

21 A   Yes.

22 Q   In the AEP case, as here, you concluded that the

23 concentration changes predicted by CMAQ for AEP's excess

24 emissions were small, correct?

25 A   For the reasons that I described there, yes.  I think they

Vol. 3-647

1 were below the benchmarks that I think I laid out in that

2 report.  And again, I think we have to be careful comparing

3 things on the basis of gross emissions.  The question isn't

4 the emissions.  The question is what is the effect of those

5 emissions on air quality, which I think was the basis for my

6 evaluation similar -- similar evaluation in the AEP case.

7 Q    Just so we're clear, in the AEP -- let's actually call up

8 Defendants' demonstrative 38.

9          Let's call up Defendants' demonstrative 47.

10          Now, Mr. Hayes, this demonstrative purports to show

11 the contribution of excess emissions to Indianapolis as

12 0.14 micrograms?

13 A    That's correct.

14 Q    And it shows the design value for Indianapolis at

15 40 micrograms?

16 A    That's correct.

17 Q    The design value is the official non-attainment level of

18 pollution in that area?

19 A    It is, and it's a bit of apples and oranges on this

20 figure.  I think I included it for reference because I thought

21 you wanted to see it.

22          It's based on the three year average of what's called

23 the 98th percentile concentration.  That's not the same thing

24 as what EPA assumed when they calculated the 13.09 or the .43

25 that we think equals .14 for the excess emissions.  It's an

Vol. 3-648

1  apples and oranges comparison, so you really can't compare the

2  two exactly but it's there for reference.

3  Q    So the design value is 40 and the NAAQS are set at 35 for

4  PM2.5, 24 hour?

5  A    That's right.

6  Q    So the difference -- the amount that Indianapolis is out

7  of attainment is 5 micrograms?

8  A    The overage, yes.

9  Q    The Marion County totals shown on slide 47 is 13.09

10 micrograms?

11 A    That's right.

12 Q    And that is based on an impact estimated for 2005?

13 A    Yes.

14 Q    And you're familiar with what's called the Harding Street

15 Station, correct?

16 A    I am.

17 Q    That's a power plant?

18 A    Yes.

19 Q    It's a coal fired power plant?

20 A    Yes.

21 Q    It's in Indianapolis?

22 A    Yes.

23 Q    In 2005 it didn't have controls for SO2?

24 A    That's right.

25 Q    And in 2005 it didn't have controls for NOX?

Vol. 3-649

1   A    That's right.

2   Q    Now the Harding Street Station now has what's called a

3   scrubber?

4   A    I understand that that's the case.  I've heard it stated

5   in these hearings, yes.

6   Q    And the Harding Street Station now has what's called a

7   selected catalytic reduction or SCR?

8   A    Okay.

9   Q    So the 13.09 predicted for Marion County on itself, that

10  would be lower today because Harding Street Station has been

11  controlled, correct?

12  A    Well, by some amount.  The Harding Street Station

13  contributed, according to EPA modeling, about a little over a

14  microgram per cubic meter.  So of that 13, about one of it's

15  from the Harding Street Station.  So it's somewhat less than

16  13 now, but not much.

17          MR. SAVAGE:  Thank you, Mr. Hayes.

18          THE COURT:  Redirect?

19          MR. BOXERMAN:  Your Honor, just two housekeeping

20  matters.  One is -- I apologize, I did not -- when we

21  presented the slide of the EPA rule, I did not provide the

22  full citation to that significant impact level -- de minimus

23  levels proposal.  It's from the Federal Register 72 Fed Reg

24  54112, September 21st, 2007.

25          I also ask that our demonstratives from Mr. Hayes'

Vol. 3-650

1    testimony be admitted.

2            MR. SAVAGE:  Your Honor, to the extent -- are you

3    trying to move that into evidence?

4            MR. HOPSON:  Just going to provide them to the

5    Court.

6            MR. SAVAGE:  It's a proposal.

7            THE COURT:  Thank you.  Nothing else of this

8    witness?

9            MR. BOXERMAN:  Nothing else.

10           THE COURT:  You may step down.

11       *(Witness excused.)*

12           MR. SAVAGE:  Your Honor, my understanding was they

13   just tried to provide the federal register.

14           MR. BOXERMAN:  I just gave the cite.

15           MR. SAVAGE:  Your Honor, I apologize --

16           THE COURT:  I can't take all these apologies at

17   once.  You can take yours back.  That about evens us up.

18           MR. BOXERMAN:  I was referring to the Federal

19   Register.  If I said something else --

20           MR. FLINT:  I thought you were talking about all

21   your demonstratives.

22           MR. BOXERMAN:  If I said that, that was a mistake.

23           THE COURT:  So these are the two that you scheduled

24   for today.

25           MR. BOXERMAN:  Yes, sir.

Vol. 3-651

1          THE COURT:  I think that ought to do it for today.

2          There are some proposed designations that we hadn't

3    dealt with, so let's deal with those sometime tomorrow.  And

4    before you, you can both take a look at those.

5          Tomorrow, I do have a matter for the noon hour, so

6    I'll have to -- from 12 to 1 I'll be otherwise engaged.  But

7    I'll be in a different courtroom, so you don't have to take

8    your things anywhere.

9          So time wise we're doing all right?

10         MR. HOPSON:  I think we're doing all right.  It's

11   our expectation that if you are absent from 12 to 1 we'll just

12   pick up the hour on the other end?

13         THE COURT:  Right.  We're not going home then.

14         MR. HOPSON:  We don't want that to happen.

15         THE COURT:  Yes.  As soon as I finish with that,

16   I'll be back.

17         All right.  Thank you.

18         COURT CLERK:  All rise.

19         (The proceedings were adjourned at 1:48 p.m.)

20

21

22

23

24

25

1                CERTIFICATE OF COURT REPORTER

2


3       I, Cathy Jones, hereby certify that the foregoing is a

4   true and correct transcript from reported proceedings in the

5   above-entitled matter.

6


7


8     /s/ Cathy Jones                        February 4, 2009
      _____
9     CATHY JONES, RPR, FCRR
      Official Court Reporter
10    Southern District of Indiana
      Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25