1     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF INDIANA
2      INDIANAPOLIS DIVISION

3
 UNITED STATES OF AMERICA,  )
4   Plaintiff,    )
           )
5 STATE OF NEW YORK, STATE OF  )1:99-cv-1693-LJM-JMS
 NEW JERSEY, STATE OF CONNECTICUT,)
6 HOOSIER ENVIRONMENTAL COUNCIL )
 and OHIO ENVIRONMENTAL   )
7 COUNCIL,       )
   Plaintiff-Intervenors,  )Indianapolis, Indiana
8          )February 5, 2009
    -vs-     )8:00 a.m.
9 CINERGY CORP., PSI ENERGY, INC., )
 and THE CINCINNATI GAS &   )Volume 4
10 ELECTRIC COMPANY,    )
   Defendants.     )

11

12

13

14        **BEFORE THE**
     **HONORABLE LARRY J. McKINNEY**

15

16   OFFICIAL REPORTER'S TRANSCRIPT OF

17     TRIAL PROCEEDINGS

18

19

20 Court Reporter:  Cathy Easley Jones, RPR, FCRR
        Official Court Reporter
21       46 East Ohio Street, Room 291
       Indianapolis, IN  46204
22

23

24

25   PROCEEDINGS TAKEN BY MACHINE SHORTHAND
    COMPUTER-AIDED TRANSCRIPTION

Vol. 4-653

1                    **A P P E A R A N C E S**

2

3    FOR THE PLAINTIFF:          Mr. Justin A. Savage
                                 Mr. Phillip Brooks
4                                Mr. Jason A. Dunn
                                 Ms. Jennifer A. Lukas-Jackson
5                                Mr. Myles E. Flint, II
                                 Mr. Thomas A. Benson
6                                Mr. Brent Marable
                                 U.S. DEPARTMENT OF JUSTICE
7                                P.O. Box 7611
                                 Ben Franklin Station
8                                Washington, DC  20530

9    FOR THE DEFENDANTS:         Mr. Mark D. Hopson
                                 Mr. Frank R. Volpe
10                               Mr. Samuel B. Boxerman
                                 Ms. Kathryn B. Thomson
11                               Ms. Meghan Delaney Berroya
                                 Mr. Kosta S. Stojilkovic
12                               SIDLEY AUSTIN LLP
                                 1501 K Street, NW
13                               Washington, DC  20005

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 4-654

1                 **I N D E X   O F   W I T N E S S E S**

2                                                       PAGE

JAMES L. TURNER
3  Direct Examination by Mr. Hopson ..............656
   Cross-examination by Mr. Brooks ...............706
4  Redirect Examination by Mr. Hopson ...........782
   Recross-examination by Mr. Brooks  ...........785

5


6  PETER VALBERG
   Direct Examination by Ms. Thomson .............787
7  Cross-examination by Mr. Brooks ...............839
   Redirect Examination by Ms. Thomson ..........868
8  Recross-examination by Mr. Brooks  ...........872

9

   THOMAS RARICK
10 Direct Examination by Mr. Volpe ...............878

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 4-655

1          I N D E X   O F   E X H I B I T S

2                                              PAGE
   Plaintiffs Exibit No.:
3
   2012 .........................................752
4  2134 .........................................716

5

6

7

8

9

10

11

12

13

14

15 Defendants Exhibit No.:

16 DR-062 .......................................787
   DR-142 .......................................896
17 DR-235 .......................................880
   DR-244 .......................................828
18 DR-025 .......................................836

19

20

21

22

23

24

25

Vol. 4-656

1                    (In open court.)

2          THE COURT:  Are we ready to proceed?

3          MR. HOPSON:  We are, Your Honor.  We call Mr. Jim

4  Turner.

5              **JAMES L. TURNER, DEFENDANT'S WITNESS, SWORN**

6                    **DIRECT EXAMINATION**

7  BY MR. HOPSON:

8  Q   Would you please state your name for the record?

9  A   Yes.  James L. Turner.

10 Q   Are you currently employed, Mr. Turner?

11 A   I am.

12 Q   What is your position?

13 A   I'm employed by Duke Energy Corporation as a group

14 executive, and I'm president and chief operating officer of

15 our franchised electric and gas business segment.

16 Q   Does the franchised electric and gas business include Duke

17 Cinergy of Indiana, or Cinergy as we referred to it in this

18 courtroom?

19 A   Yes, it does.

20 Q   Let's talk briefly about your background.

21          I understand you grew up originally around here?

22 A   I grew up in Muncie, Indiana.  Went to high school there.

23 Went to college there at Ball State and went to law school

24 here in Indianapolis at IU.

25 Q   When did you graduate?

Vol. 4-657

1  A    From law school in 1984.

2  Q    What did you do after law school graduation?

3  A    My first job out of law school was with a law firm then

4  called Bingham Summers Welsh and Spilman.  I think it's now

5  called Bingham McHale.

6  Q    How long have you been employed there?

7  A    I was employed there through the end of 1990, and then I

8  was asked by Governor Evan Bayh at that time to come run an

9  agency called the Utility Consumer Counselor.

10 Q    What does the Utility Consumer Counselor do?

11 A    The utility consumer counselor is the statutory agency in

12 Indiana that represents the interests of consumers of

13 electricity, natural gas, telephone, water and sewer services

14 here in the state.  It essentially serves as the consumer

15 advocate with the IURC, serving as sort of the judge, if you

16 will.

17 Q    And after that?

18 A    After that I went back into private practice with a small

19 firm called Lewis and Kappes.  Did that for about two and a

20 half, three years, representing the interests of large utility

21 consumers, manufacturing corporations primarily.

22 Q    When did you join Cinergy?

23 A    In 1995.

24 Q    What was the position you were hired into when you joined

25 Cinergy?

Vol. 4-658

1  A    I was senior counsel in charge of regulatory matters in

2  Ohio and Kentucky.

3  Q    I'm not going to walk through all your positions at

4  Cinergy, but could you just tell us when you moved to your

5  current position?

6  A    Yes.  I moved through a series of different positions with

7  Cinergy, and then in 2006 we merged Cinergy into Duke Energy

8  Corporation.  At that time I became a group executive, which

9  is essentially like an executive vice president with the

10 company, and I currently -- I moved into the job I have right

11 now in April of 2007.

12 Q    Were you involved, Mr. Turner, in the decision-making

13 process that led to developing Cinergy's proposed remedy as

14 it's laid out in our trial brief here today?

15 A    Yes, I was.

16 Q    Were you the -- is it fair to say that you're the decision

17 maker with regard to that position?

18 A    Yes, in essence.  I'm certainly helped by other members of

19 the management team and my boss, Jim Rogers; but yes, I was

20 the primary decision maker.

21 Q    The Court knows what Cinergy's proposed remedy is, but let

22 me ask you this:  Assuming that the Court will order shutdown

23 of Units 2, 3 and 5 at some point in time, have you made any

24 final decision about Unit 4?

25 A    We've not made a final decision.  But I think, in my own

Vol. 4-659

1  mind, I'm trending toward shutting down Unit 4 as well at some

2  point.  It may be within a couple years of shutting down Units

3  2, 3 and 5.  It may be sooner than that.

4  Q   What's the reason that you're trending towards that

5  decision?

6  A   When we think about the operation of Units 2, 3, 4 and 5,

7  they're smaller units at the Wabash River site that are sort

8  of separate from Unit 6.  So we think of the Units 2, 3, 4 and

9  5 as more of an integrated whole.

10        It may not make sense from an efficiency standpoint to

11 operate Unit 4 as a stand alone unit with Unit 6 once we

12 retire Units 2, 3 and 5.

13 Q   I want to, in your testimony today, walk through the facts

14 and the analysis that you relied upon in making the

15 recommendation or the proposed remedy to this Court, okay?

16 A   Yep.

17 Q   Before I do that, I would like to ask you if you could

18 just tell us the considerations you relied upon in making your

19 decision.

20 A   Well, the considerations I relied upon in making that

21 decision -- the decision in this case are the considerations I

22 rely upon as I think about our business all the time, which is

23 to balance the interests of our customers in the way that we

24 provide electricity; and when I say that, there are really

25 three drivers that we think about all the

Vol. 4-660

1  time:  affordability, reliability and clean.  Those are the

2  three broad -- and those are very broad concepts, but they're

3  the three broad things that we consider as we make decisions.

4        We have to make electricity that's affordable for our

5  customers.  We have to make electricity that is reliable for

6  our customers, and that may be even first among equals.  And

7  we have to make electricity that is clean in the sense that it

8  complies certainly as fully and compliant with environmental

9  laws and regulations.  But even beyond that, we've begun

10  looking at, I would -- I would say aggressively looking at

11  things like energy efficiency and conservation and renewable

12  energy resources as a way to help address our future

13  electricity needs.

14  Q   Let's go ahead then and walk through and define and

15  discuss each of those three concepts separately.

16        What do you mean when you talk about "environmental

17  concerns" or "clean energy"?

18        What are you referring to?

19  A   Well, I'm referring to, first and foremost, making sure

20  we're in compliance with all of our obligations under the law.

21  There are a lot of obligations obviously, both federal and

22  state, in the five states that we operate utilities in.  But

23  beyond that, as I mentioned earlier, we have begun to really

24  take a proactive look at what things we can do to help

25  mitigate and minimize our environmental footprint.

Vol. 4-661

1        I mentioned renewable energy resources.  We're buying

2  100 megawatts today from a wind farm in Benton County,

3  Indiana.  We didn't have to do that, no legal requirement to

4  do that, but we went before the Indiana utility commission and

5  proposed it.  They approved it.  We're purchasing that power

6  from the wind farm today.

7        We have a solar energy plan we filed.  We have a smart

8  grid plan we filed with the commission --

9            MR. BROOKS:  Your Honor, objection here.  This is

10  pretty far afield.  It's not relevant to the issues before the

11  Court.

12            MR. HOPSON:  I think that they've brought up issues

13  involving the whole Cinergy system, and Your Honor can hear

14  the full story about the Cinergy system.

15            THE COURT:  I don't know that they have actually,

16  but I'll let him do it.

17  A    I'll truncate.

18  BY MR. HOPSON:

19  Q    We can stop at that point.  Let me just ask you one point.

20  We've heard a little bit about Edwardsport.

21        Can you briefly describe what Edwardsport is?

22  A    Mr. Kahal mentioned Edwardsport yesterday.  Edwardsport --

23            MR. BROOKS:  I want to pose an objection, if I may.

24  The company representative Mr. Tony Geswein, who was put up to

25  answer questions about any reliabilities in this issue,

Vol. 4-662

1  specifically disclaimed any connection between the Edwardsport

2  IGCC and the reliability issues that Duke has raised.

3          If the Court would like, I can show that portion of

4  the transcript.

5          THE COURT:  I think I understand that.  I'm going to

6  let him give us this background.  We've got some issues here

7  on the remedy that have something to do with Edwardsport.

8  I'll let him go ahead and testify.

9  BY MR. HOPSON:

10 Q   Just tell us briefly what Edwardsport is so we understand.

11 A   Edwardsport is an integrated gasification and combined

12 cycle plant down in Edwardsport, Indiana, about 630 megawatts

13 that we are building today and we expect to have on line in

14 2012.  Essentially, it is a way of using coal to generate

15 electricity that is probably the cleanest coal technology at

16 that size of megawatts that will be installed in this country.

17 And it also gives us the opportunity to capture CO2 at the

18 site and possibly sequester it.  We're evaluating it right

19 now.

20 Q   Let me turn to talking about costs.  We've heard about

21 cost recovery.

22          How do you personally view the issue of costs when

23 you're engaging in long-term planning or operational decision

24 making?

25 A   You heard Mr. Kahal, and I think he said it well

Vol. 4-663

1  yesterday, that our obligation is to provide service in the

2  lowest cost reasonably possible.  The Indiana Utility

3  Regulatory Commission calls that essentially just and

4  reasonable rates, and that's what the statute in Indiana

5  requires that we provide our service at.  So we are heavily

6  and fully regulated by the IURC on every single component of

7  our cost.  So we try to meet that obligation to do it in the

8  lowest cost reasonably possible.

9  Q   When you say "every single component," is it the case that

10 environmental control costs and other costs are passed on into

11 rates as well?

12 A   Yes, they are.

13 Q   Is there any kind of particular or special rules with

14 regard to environmental control costs?

15 A   Yes, there are.  Beginning in the early '90s, Indiana

16 adopted a rule that allows -- and Mr. Kahal summarized it

17 yesterday -- but allows utilities who are installing

18 environmental compliance controls such as scrubbers to come

19 into the commission before they begin the capital investment.

20 So before they begin construction of these expensive and --

21 these expensive controls on their plants, they get the

22 commission to approve their environmental compliance plan up

23 front so that there's no risk later on that the commission

24 will say, well, you shouldn't have constructed that particular

25 environmental control.  You should have done something else.

Vol. 4-664

1  So they get preapproval of the projects up front.  And that's

2  a very complicated and long process with a lot of testimony

3  and all that sort of stuff.

4       But then once it's approved, you also have the

5  opportunity to begin recovering the financing costs associated

6  with that capital investment in rates immediately.  Normally

7  with rate making, you have to wait until the capital

8  investment is in service, used and useful for customers.

9  Q   Back to the IURC process for a moment.

10      Do the costs of replacement generation or replacement

11  capacity affect rates in any way?

12 A   Yes.  To the extent we have to purchase power in the

13 market to meet our customers' needs, we have the opportunity

14 to pass those costs along to customers as well.

15 Q   Does the use of SO2 or NOX allowances affect your analysis

16 of costs and the actual rates that are paid?

17 A   Yes.  Just like all other costs of environmental

18 compliance, SO2 and NOX allowances are passed through rates to

19 consumers.

20 Q   Just on the flip side of the coin, if you sold allowances,

21 were a net seller of allowances, would that impact rates?

22 A   Yes.  Customers get the benefit.  So if we -- if we're

23 buying allowances we pass the costs to the customers.  If

24 we're selling allowances, we pass the benefit to the

25 customers.

Vol. 4-665

1  Q    If Cinergy were to require this remedy phase to either

2  purchase or simply surrender allocated allowances, would that

3  have a cost passed on to ratepayers?

4  A    Absolutely.

5  Q    Is there a difference between allocated allowances and

6  allowances that are purchased in terms of the cost impact?

7  A    Not in the way we think about them.  They all have value

8  at whatever the market price of allowances is today.

9  Q    Let's put up an exhibit, and I just briefly want to walk

10  you through a cost comparison.

11       MR. BROOKS:  Your Honor, I'm going to object to

12  this.  I'm going to object to this because we specifically

13  served interrogatories asking for cost information.  They were

14  last updated in November 10th, and that's the first time that

15  we saw this information.  That was after the discovery cutoff.

16  We've had no opportunity to depose Duke witnesses about this

17  slide here.

18       I could tender it to the Court, but the supplemental

19  interrogatory is dated November 10, which was well after

20  discovery cutoff.

21       THE COURT:  Mr. Hopson?

22       MR. HOPSON:  Mr. Turner was deposed after this.  But

23  more importantly, Your Honor, we have been updating these

24  numbers all along through the remedy phase.  These numbers

25  were disclosed, albeit on November 10th; but that was two

Vol. 4-666

1  months ago.

2         THE COURT:  I'm going to let you do it.  Go ahead.

3  BY MR. HOPSON:

4  Q   Did you have a hand in preparing Defendants' Demonstrative

5  Exhibit 63?

6  A   Well, not physically, but I asked that a comparison be

7  prepared to demonstrate the -- this is just the shutdown part,

8  the difference in the shutdown timing of the remedies.

9  Q   What time period does this cover, sir?

10  A   This covers essentially the impact -- if you look at the

11  blue column there, it says "The Cinergy Plan."  That assumes

12  that we run the units at reduced operation and then shut them

13  down in -- reduced operation between now and 2012, and then

14  shut them down in 2012, Units 2, 3 and 5, and the Government's

15  plan shows shutdown immediately, essentially, in 2009.  We

16  ended the whole thing at 2018 because beyond 2018 I don't know

17  what happens to those units.

18         MR. BROOKS:  I do not mean to be a pest, but I'm

19  going to object on foundation.  According to the transcript,

20  when Mr. Turner was deposed --

21         MR. HOPSON:  Your Honor, if he wants to do

22  impeachment --

23         THE COURT:  Let him have his argument.  Don't

24  interrupt him.

25         MR. BROOKS:  I'm simply pointing out in his

Vol. 4-667

1  deposition, Mr. Turner stated that he really didn't know who

2  even produced the numbers about shutdown that he testified to

3  back then.  So I think we need a little foundation, if we

4  could, about what Mr. Turner knows about any underlying

5  numbers before he moves on to talk about conclusory numbers.

6          THE COURT:  Well, two things about that:  One, you

7  can cross-examine him about that.  Two, his credibility is

8  certainly on the line today anyway.  So go ahead.

9  BY MR. HOPSON:

10  Q   What is the basis of the underlying numbers, Mr. Turner?

11      Is it Cinergy specific data or is it market data?

12  A   Essentially, what this represents is, if we had to shut

13  the units down immediately, or if we shut the unit down in

14  2012, what does that cost our customers.  In very simple

15  terms, that's what this tries to show.  We've used the same

16  market price assumptions for buying replacement capacity and

17  energy for both sides of this calculation.

18  Q   "Replacement cost" and "capacity," will you define the

19  types of costs that go into this chart?

20  A   Yes.  It assumes essentially an all end product of both

21  capacity and energy.  Capacity is essentially reserving the

22  right in generating units on the system to be able to have

23  energy available when you need it; and energy is the actual

24  electrons flowing at the time you need them.

25  Q   Why would you purchase capacity as opposed to purchasing

Vol. 4-668

1   electricity when you need it?

2   A    Well, the risk that you run -- and I think even Mr. Kahal

3   alluded to it yesterday -- the risk that you run is the energy

4   won't be there -- if you wait until you have an event where

5   you need electricity immediately, in all likelihood the

6   electricity won't be available at the time that you need it,

7   so you have to buy capacity ahead of time to ensure that you

8   have adequate reserves.

9   Q    Is there a regulatory component to this notion of

10  capacity?

11  A    Yes, there is.

12  Q    Can you explain that to us?

13  A    Well, the Indiana Utility Commission, as we talk about

14  reserve margin, they would not consider spot energy purchases,

15  i.e., purchases you make in the moment that you might need

16  energy.  They would not consider that to count as capacity

17  against that reserve margin concept that I'm talking about,

18  nor would MISO, nor would NERC and others who regulate

19  reliability on the system.

20  Q    Does the notion of reserve capacity have any relationship

21  to peak demand seasons?

22  A    Oh, yeah, absolutely.

23  Q    Can you explain that a little bit?

24  A    Yeah.  The utility industry really plans for system peak.

25  In our business, we worry a lot about summer peak.  We worry a

Vol. 4-669

1   lot about winter peak.  We worry about electricity delivery

2   obviously 24-7, 365.

3          But in designing the system and designing reserve

4   capacity, reserve margins, as you heard Mr. Kahal discuss

5   yesterday, we're really planning for that moment when we hit a

6   system peak because that is when the system, both the

7   generating units, the transmission system and the like are the

8   most stressed.

9          So that's where you have to make sure you have your

10  cushion because if you lose a generating unit at that point,

11  if you lose a transmission circuit at that point, bad things

12  happen, and they happen instantaneously and generally

13  catastrophically.

14  Q   When you were framing up the remedy and considering the

15  various operational impacts, did you consider offering an

16  operational standard along the lines of we'll only use these

17  units when we need it, as opposed to promising a specific

18  reduction to a level?

19  A   Well, in calculating this -- the Cinergy plan essentially

20  assumes that we run at reduced operation.  The reduced

21  operation we used, as I understand how the numbers were

22  calculated, was the Government's numbers.  I'll refer to it as

23  the Rosen baseline because that's how I've heard it described.

24         The Rosen baseline, as I understand it, is what the

25  Government believes we would have had to run the units at back

Vol. 4-670

1  before the projects were done that are the subject of this

2  lawsuit.  We would have had to get down to that level in order

3  to meet our NSR compliance obligations back at that time.

4          So that's the number we used to assume how much we

5  would run the units between now and 2012 at the point we shut

6  them down.

7  Q   Is it possible that the Rosen baseline is more than you

8  might need next summer or the summer after to meet peak

9  demand?

10 A   Yes, it's possible that it's more.  It's possible it's not

11 enough.  But I've asked our guys can we live with the Rosen

12 baseline and I've been told we can.

13 Q   When is Cinergy's peak demand period?

14 A   In the summer, summer months, basically June through

15 September.

16 Q   And can you tell --

17 A   I should say, we don't know when in that period, actual

18 system peak will occur, but generally you would expect the

19 peak demand to occur in those summer months.

20 Q   Can you tell Your Honor what your reserve capacity

21 requirements -- what requirements you had to maintain capacity

22 over and above your full generation capability was last year?

23 A   Yes.  We have several ways of thinking about this.  MISO

24 has certain reserve capacity requirements, as does NERC and

25 ReliabilityFirst.  That's the first time I think that name's

Vol. 4-671

1  come up in the courtroom.

2        ReliabilityFirst is a regional reliability

3  coordinator, if you will, that essentially works as a regional

4  arm of NERC, the North American Electric Reliability Council,

5  to enforce reliability standards in the Midwest region.  I

6  think through MISO and NERC, there's about a 14 1/2 percent

7  reserve margin requirement.  We actually plan to a 15 to

8  17 percent reserve margin requirement in our documents with

9  the Indiana Utility Regulatory Commission that we filed.

10        I should say that 15 to 17 percent, as we think about

11  it, is a reserve margin requirement that includes, for

12  example, calling on customers to reduce demand at certain

13  times when we need them to reduce.  It includes purchases in

14  the marketplace.  So we already have built into our reserve

15  margin the assumption that we are purchasing a certain amount

16  of capacity, that we have customers getting off the system

17  when we ask them to get off within some very small period of

18  time, say, 10 to 30 minutes.

19  Q    Just to be clear on the basis of these calculations, is

20  there a market price for purchasing reserve capacity today?

21  A    Oh, yes.

22  Q    Is there a market price for purchasing generation today?

23  A    Yes.

24  Q    Were those market prices used in preparing the exhibit

25  that we're looking at?

Vol. 4-672

1  A   They were, and I made sure that the market price was the

2  same for both assumptions.  So, in other words, this is an

3  apples and apples comparison of market price.  It's simply the

4  effect of time of shutting the unit down now and not having

5  the generation available versus shutting the units down in

6  2012 after using them at a reduced level.

7  Q   Was there any adjustment for inflation or otherwise?

8  A   I don't think so.

9  Q   Let me ask you this:  Would it be possible for you, if you

10 were required to, to give projections similar to the ones that

11 are shown in this exhibit forward after 2012?

12 A   It becomes very speculative to do it after 2012 because we

13 really don't know what the price of electricity will be.  So

14 many things change between now and 2012, certainly after 2012,

15 fuel prices, what units are actually available in the

16 marketplace will affect the price.  Weather can change

17 obviously year to year, demand, load growth.  All those inputs

18 can change dramatically, which will have a significant impact

19 on the price of electricity when you get out into that time

20 period.

21      So it's very hard to quantify beyond 2012 what the

22 market price will look like.  You can make guesses, but it's

23 anybody's guess frankly.

24 Q   You did do planning documents though, that go beyond four

25 or 5 years, correct?

1  A    Yes.  We plan actually about 20 years out in our

2  integrated resource planning with the commission; but that

3  gets refreshed every two years, specifically because so many

4  things change in our industry that we need to make sure that

5  the documents stay fresh on a relatively regular basis.

6  Q    With respect to the absolute numbers in the chart, are

7  some of the same uncertainties that you just identified going

8  to impact the absolute numbers to this chart as well?

9  A    Oh, sure.  I mean, these are our best case -- our best

10 assumptions, best guess at this point as to what the impact

11 will be.  And while they may not be -- they're not precisely

12 right.  I can guarantee you those numbers are not precisely

13 right, but they're directionally right and proportionately

14 right, I believe.

15 Q    Let's focus on Wabash River Units 2, 3 and 5.

16      Let me just ask you this question:  Looking back on

17 2008 and 2007, were these units being run during that period

18 of time as peaking units?

19 A    I'm sorry, Units 2, 3 and 5?

20 Q    Yes.

21 A    No, they were not.

22 Q    How were they being run?

23 A    They were essentially running as base-load.  We're running

24 them at about a 70 to 80 percent capacity factor, which means

25 they're running almost all the time.

Vol. 4-674

1  Q   Let me ask you this:  Why did you, in formulating the

2  proposal that you brought to the Court this week, choose

3  September 1st, 2012 as a shutdown date?

4  A   We were syncing up the shutdown of these plants with the

5  Edwardsport IGCC generation online that I described earlier,

6  the 630 megawatts of new generation we will add.  The current

7  schedule is around September of 2012.

8  Q   Why is adding new generation relevant, in your mind, to

9  the shutdown date?

10 A   In my mind, it's relevant because I don't like taking

11 units off of our system and reducing the capacity we have

12 available until we have other capacity available on the

13 system.

14 Q   Is what you just said essentially the same thing or

15 different from the transmission issues or MISO issues that

16 we've heard about in the courtroom?

17 A   It's not the same thing, but it's probably two sides of

18 the same coin.  There's both -- the transmission issue we

19 discussed, or that was being discussed yesterday, is a

20 separate concern that was identified by the Midwest

21 Independent System Operator or MISO.  But the generation

22 concern is a separate concern that I have about having

23 adequate capacity available in our region to serve our

24 needs -- having that available before we retire these units.

25 Q   Are you suggesting, one way or the other, that Edwardsport

Vol. 4-675

1  is somehow a replacement for Wabash River 2, 3 and 5?

2  A    No.  I wouldn't say it that way.  Electrons are funny

3  things.  The system -- you can't tie electrons to specific

4  places.  Electrons go where they go.  That's the nature of

5  electricity.  It flows to the path of least resistance.

6       What I'm talking about is simply having an adequate

7  base of generation in our region that we can call on, physical

8  assets we can call on to make sure we have an adequate

9  reserve.  I have seen what happens when you don't have that.

10  I have seen companies get into trouble without adequate

11  reserves of generation and, so, we're trying to avoid -- I'm

12  trying to avoid being in that position by shutting these units

13  down.

14       The transmission issue that you just asked me about,

15  Mr. Hopson, was a separate issue that was brought to my

16  attention and to the company's attention by the MISO.

17  Q    To be clear, one last question on this:  Did the original

18  planning of Duke Energy, Duke Energy Indiana and Cinergy

19  involve running both Edwardsport and Wabash River Units 2, 3

20  and 5?

21  A    Oh, yes.  We had no plans to shut these units down.

22  Q    Let me ask you some questions about planning generally, in

23  a general sense.

24       First, Cinergy's processes or planning related to

25  cost, is there a process by which you analyze in the short,

1  medium or long term what generating resources, what units

2  should be created or shut down or modified?

3  A    Yes.  We -- your question had a second part in it that

4  I'll try to get to as well; but the basic process that we use

5  is the integrated resource planning process.  This is

6  something that is -- that we do with the Indiana Utility

7  Regulatory Commission.  All electric generating utilities do

8  it.

9         In essence, what we do is, in a very comprehensive

10  way, file a set of documents with the commission that is

11  iterative in nature that lays out our plan for meeting our

12  customers' needs, meeting our reliability obligations and our

13  customers' needs.  It's an incredibly complex document.  It

14  runs off a model that basically creates base cases and low

15  cases and high cases and sensitivity cases, but it models more

16  sensitivities than I can probably conceive using different

17  input assumptions.

18         What if the forced outage rate on this unit is this

19  and the forced outage rate on this unit is that?  What if

20  power prices are not X, but they're X plus some number?  What

21  happens if CO2 is regulated in the future?  What happens -- it

22  runs through a series of scenarios.  What if natural gas

23  prices are A, B or C level?

24         It models, again, more scenarios than I probably can

25  even describe in coming up with a plan that we think is robust

Vol. 4-677

1 under the most number of circumstances or potential

2 circumstances.

3      When I say "robust," I mean it's reliable.  And also,

4 going back to that cost component, it also reflects lowest

5 cost reasonably possible.

6      Now, there's an environmental component to it.  I

7 thought I heard something embedded in your question --

8      MR. HOPSON:  Let me hold off on that, and let me ask

9 if I can approach, Your Honor, to show the witness an exhibit?

10      THE COURT:  You may.

11 BY MR. HOPSON:

12 Q   Let me show you what's been marked as Plaintiffs'

13 Exhibit 1939.

14      Can you tell the Court what that exhibit is?

15 A   This appears to be Volume 1 --

16      MR. HOPSON:  I should have said too, Your Honor, I

17 believe this is already in evidence, 1939.

18      THE COURT:  Okay.

19 A   This appears to be Volume 1 of the November 1, 2007 Duke

20 Energy Indiana Integrated Resource Plan.

21 BY MR. HOPSON:

22 Q   Is that the final document that you were just describing a

23 moment ago?

24 A   It appears to be the final copy that was filed with the

25 commission.  I don't see a commission stamp, but I'm assuming

Vol. 4-678

1   that's the final.  Looks like it.

2   Q    In your integrated resource planning prior to May of last

3   year and the liability trial, were you telling the IURC that

4   you were going to shut down Wabash River 2, 3 and 5?

5   A    No.

6   Q    Let's turn to one other kind of planning.

7        And let me ask you:  Is there a separate process in

8   Indiana in which the IURC and you, Duke Energy, addressed

9   questions of environmental compliance costs?

10  A    I'm sorry.  Could I hear the question again?

11  Q    Is there a planning process for environmental compliance

12  costs?

13  A    Yes.  There's a separate planning process called the

14  Environmental Compliance Plan.  The reason I brought it up in

15  the context of the IRP is we do summarize the environmental

16  compliance planning process as part of our integrated resource

17  plan because the two are inextricably woven together.

18  Depending on what you do with the environment, clearly has an

19  impact on costs, and the reliability and all the other issues

20  that are in the IRP, the Integrated Resource Plan.

21       We have environmental compliance plans that we file

22  periodically with the commission that lay out what our

23  proposed environmental compliance strategy is at any given

24  point in time.  We have to go through a very laborious

25  regulatory progress with the commission involving lots of

1  parties, filing testimony and the like.  Then the commission

2  ultimately makes a determination as to the reasonableness of

3  that environmental compliance plan.  Essentially, if they

4  approve it, we implement it.

5  Q   In the course of the process you just described, has

6  Cinergy -- prior to the liability verdict in this case -- ever

7  gone through the process of evaluating whether it should

8  control or shut down the Wabash River Units 2, 3 and 5?

9  A   I think we've considered it.  The idea of controlling

10  Units 2, 3 and 5, to me, doesn't make sense.  You're talking

11  about three very small units that were all -- that all came on

12  line before I was born, so they're all pushing 60 years old or

13  they're over 60 years old.  Those are not the things we would

14  normally consider putting significant environmental controls

15  on like a scrubber.

16         They have smaller environmental equipment that we've

17  put on in the past, but we wouldn't put a scrubber on plants

18  like that.  So we've considered it, but we've not tried to

19  model it because we don't think that's an appropriate

20  conclusion.

21  Q   Turning -- and again, just focusing on long-term planning,

22  were you -- as the chief operating officer, did you really

23  have in mind that Units 2, 3 and 5 would continue to operate

24  in their current condition for an indefinite period of time?

25  A   No units that we have will run for an indefinite period of

Vol. 4-680

1  time, much as we might like to think they could.  These units

2  are no exception.  Since these units are 60 years old, I would

3  not expect that -- they're going to be some of the first units

4  off the system eventually.  But I would say that, in the

5  absence of this case, they certainly would not have been off

6  the system in 2012 knowing what I know today.

7  Q    Does your environmental planning which you just described

8  do anything to take into account the possibility of future

9  environmental regulation?

10 A    Oh, yes.  As I mentioned earlier, we've run sensitivity

11 around carbon dioxide regulation.

12      For example, CO2 is not regulated yet in Indiana or

13 federally; but we want to make sure we're being thoughtful

14 about what could happen to us in the future.  In essence, to a

15 very large degree, that's what the Edwardsport IGCC plant is

16 about because it creates an opportunity for us to evaluate

17 capturing CO2 from a coal unit and disposing of that CO2

18 somehow.

19 Q    Might future environmental regulations impact units like

20 2, 3 and 5?

21 A    Oh, yes.  My sense is that environmental regulations over

22 time have only gotten stricter, tighter, tougher; and what

23 that means is the units that are the most vulnerable to

24 environmental regulation, smaller units, less controls, older

25 units, are likely the ones that over time will be shut down.

Vol. 4-681

1  Q   You've talked about environmental and cost considerations.

2  So I just want to take you through the third consideration

3  that you mentioned, which is reliability, and just ask you to

4  describe for us generally why reliability is an important

5  consideration to you as the chief operating officer?

6  A   I mentioned three components earlier, cost, affordability,

7  reliability and clean.  Reliability, in essence, in my mind is

8  the first among peers.  All three components are very

9  important, but reliability is what we're about.  The service

10 we provide -- and I hope it's not hubris to say it,

11 Mr. Hopson -- but the service we provide, in my mind, is the

12 most important service in anyone's life because everything

13 starts with electricity.  That's been the case for some time.

14 And I think now, in the age that we live in, in the

15 computerized age that we live in with instantaneous

16 communication, it's become more critical than it's ever been

17 before.

18      We have manufacturing processes that expect and demand

19 what we call five 9s, reliability -- 99.999 percent

20 reliability from us.  And we've also seen what happens, you

21 know, things like the blackout that First Energy experienced

22 in 2003.  Those things are more consequential to utility

23 executives than you can imagine.  They strike fear into our

24 hearts.

25      I'm firmly convinced that Gray Davis is no longer

Vol. 4-682

1  governor of California today because of the blackouts that

2  happened in California in 2000 and 2001 and their failed

3  restructuring experiment out there.

4         So reliability to me is where we exist as a company,

5  and we have to make sure we're planning our system in a

6  reliable way, not just today, but to be able to meet customer

7  needs 10, 15, 20 years hence.

8  Q   Is your reliability --

9  A   In the face of, I would say, this increasing environmental

10 regulation that I was talking about.

11 Q   Let me ask you this, sir:  Is your reliability that you

12 just described, the issue of reliability, regulated in any

13 way?

14 A   Oh, yes.  The Indiana Utility Regulatory Commission has

15 one piece of that regulatory component.  They're mostly

16 looking at local distribution reliability, but they also are

17 very concerned about general reliability of the system.

18        The primary reliability regulators now are really the

19 federal level.  It starts with the federal FERC, the Federal

20 Energy Regulatory Commission.  Then FERC oversees NERC, which

21 is the North American Electric Reliability Council which

22 oversees regional reliability organizations.

23        Following the blackout of 2003 with First Energy,

24 significant steps were taken to beef up reliability

25 enforcement at the federal level, and both at FERC and NERC

Vol. 4-683

1  and their regional reliability organizations.  They monitor

2  reliability very carefully.

3         So, for example -- just to give one example of the

4  world that we live in, if we have vegetation in a transmission

5  right-of-way that grows to within -- we're supposed to keep 15

6  or he 20-foot clearances from vegetation.  We have to assume

7  that the transmission line could sag to a certain level on a

8  given day under certain operating conditions and still have

9  adequate clearance.

10        If we have not maintained that adequate clearance, we

11 can be fined significantly for that, even if we didn't know we

12 were within the range.  So reliability has become a very

13 strict concern at the federal level.

14        More locally, reliability is coordinated essentially

15 at the transmission level through MISO, the Midwest

16 Independent System Operator.

17 Q   Is MISO one of the regional transmission organizations

18 that you referenced in your answer?

19 A   Yes -- well, there's a regional reliability organization

20 that's called ReliabilityFirst.  It's under NERC.  MISO is a

21 separate entity that has a tariff.  It's essentially a

22 regulated transmission operator, if you will, that's regulated

23 by the FERC under a tariff.

24 Q   What role, if any, does MISO have in enforcing reliability

25 standards?

Vol. 4-684

1  A    The companies –– the transmission-owning companies such as

2  Duke Energy that have transmission in the MISO geographic

3  footprint, basically MISO operates the transmission system to

4  ensure system reliability, integrity and security.

5  Transmission owners like Duke manage the transmission assets.

6  It's –– I think you heard Mr. Kahal yesterday use the word

7  "complicated."  It is a complicated arrangement.

8         Essentially, MISO has the ability to oversee the large

9  transmission footprint in what we call MISO and ensure

10  reliability, integrity, system security of the integrated

11  grid; and we essentially manage the transmissions part of it

12  that we own.

13  Q    You mentioned a footprint.

14         May we see the next Demonstrative Exhibit, please?

15         I'm showing you, Mr. Turner, what's been marked as DC

16  Demonstrative DEM64.

17         Could you tell His Honor what that is?

18  A    That appears to be the MISO footprint that I was talking

19  about which includes, as you can see, Duke Energy, Indiana's

20  transmission assets.

21  Q    To be clear, do you, Duke Energy, still own the assets

22  used in transmission of high voltage energy within your

23  service territory here?

24  A    Yes, we do.

25  Q    So what does it mean when you say that MISO is a

Vol. 4-685

1  transmission operator?

2  A   There was a belief —— I don't know how detailed to get

3  into here.  I'll try to shorten it.  What it essentially means

4  is MISO —— MISO's headquartered in Carmel, Indiana.  If you go

5  to the MISO office, they have an enormous board in the room

6  that gives them visibility into the entire transmission

7  system —— interconnected transmission system in the eastern

8  part of MISO.  There's another MISO control room for the

9  western part of the footprint.  But essentially they're

10  coordinating the dispatch of generation, the moving up and

11  down of generation levels.  They're coordinating the

12  transmission system.  They're making sure that the system runs

13  in a —— in an integrated way that enhances reliability.  At

14  the same time, they plan for new transmission upgrades for the

15  system out into the future.

16  Q   Just focusing on today as an example, does MISO have any

17  say on what generating units you are dispatching within your

18  service territory and the levels at which you're dispatching

19  them?

20  A   Yes, they do.  MISO can order units on, order units off,

21  ask us to raise the level of a unit, ask us to take a unit

22  down.

23  Q   Does MISO have a role in setting Duke Energy —— Duke

24  Indiana's reserve capacity levels?

25  A   Yes.  MISO has an expectation.  We have a minimum reserve

Vol. 4-686

1  capacity margin or reserve margin of -- I think it's in the

2  14 percent range.  Again, we try to plan to a 15 to 17 percent

3  reserve margin to give ourselves a little more cushion.

4  Q   Let's talk specifically then about some reliability issues

5  as they affected your decision in this case.

6       Did Cinergy consider whether it would recommend or

7  acquiesce in an immediate shutdown of Wabash River Units 2, 3

8  and 5?

9  A   We considered it, but I did not believe it to be prudent.

10 Q   What were the -- you've referenced this already, but just

11 to be clear:  What were the competing considerations?

12 A   Again, my primary concern was generation, resource

13 adequacy, knowing that we're going to bring the Edwardsport

14 plant on line in 2012.  And again, our original plan would be

15 we would run Edwardsport and we would run the Wabash River

16 units.  I think the IRP, our Integrated Resource Plan,

17 supported that as an appropriate choice.

18      My belief was from a generation adequacy standpoint,

19 we would be better served by waiting until we got to 2012 when

20 we brought the Edwardsport capacity online to shut those units

21 down.

22      Recognizing the situation that we're in here with the

23 liability finding last year, and wanting to do something about

24 not just running the units at an 80 percent capacity factor or

25 70 percent capacity factor as we have been, we would run them

Vol. 4-687

1  at reduced levels.  So we know that they're there when we need

2  them between now and 2012.

3  Q    I'm going to ask you, Mr. Turner, to put aside the

4  generation side for a moment and focus on the transmission

5  side and ask you:  Have you become aware of any reliability

6  issue relating to the transmission side?

7  A    Yes, I have.  Actually in the course of this case.  I had

8  an opportunity to skim a deposition that was given by, I think

9  it was Mr. Harszy with MISO, where he identified a concern

10  relating to our substation at Dresser and to a load pocket in

11  the Terre Haute, Indiana area.

12        Since that time, as I understand I, I think the

13  Government requested a study from MISO, and Mr. Kahal

14  discussed it a little bit yesterday.

15  Q    Have you looked at the same MISO study Mr. Kahal talked

16  about yesterday?

17  A    I have.

18  Q    Do you understand the issue that's been identified by

19  MISO?

20  A    Yes.  I don't want to hold myself out as an electrical

21  engineering expert, but I have a general understanding of what

22  MISO's concern is.

23  Q    Can we see the next demonstrative exhibit, please?

24        I'm not going to challenge your abilities as a

25  transmission engineer.

Vol. 4-688

1   A    That's good.

2   Q    Could you tell His Honor in your understanding, as the

3   chief operating officer, what the reliability issue is as

4   identified on this map?

5   A    If you think about that -- I'm not sure what shape that

6   is, but the center of that geometric shape there is the Terre

7   Haute region, the Terre Haute, Indiana region.  Wabash River

8   is the big square on the left-hand side.  That's our

9   generating station.

10          Down to the south of there you see a mark called

11  "Dresser."  Dresser is a substation, an electrical substation

12  that we operate.  It's a transmission substation, which means

13  it's transforming high voltage energy from different power

14  lines down to a lower voltage energy for further distribution

15  around the City of Terre Haute in this region.  So we have at

16  that Dresser substation two transformers that step the voltage

17  down from, say 345,000 volts to 138,000 volts.

18          What the MISO report is concerned about is the

19  possibility of overloading of the Dresser substation during

20  peak times; and if that were to happen, we have the potential

21  to have essentially a rotating blackout.

22          You heard the term "load shedding" yesterday.  That

23  means we're dropping a large chunk of load.  We're dropping

24  customers off the system in order to keep the system stable in

25  this region so we don't lose other things.

Vol. 4-689

1          Again, not to be overly dramatic, but keeping the
2     system stable is a critically important thing.  Again, I
3     mentioned earlier that our business failure is instantaneous
4     and catastrophic.

5          If you look back at the history of the First Energy
6     situation in 2003, it was essentially a series of one off
7     smaller things that just cascaded on top of one another that
8     caused 50 million customers to be blacked out essentially
9     within about nine seconds.  I'm not saying that's a precursor
10    to that, but that's the kind of thing MISO is concerned about.
11    They don't want a transformer failure there to cascade into
12    much bigger events on the system, including the blacking out
13    of the Terre Haute region.

14         We have -- I'll stop there.
15    Q   Let me just ask you a simpler question.  We'll go back.
16    I'm not going to dwell on this.

17         Can you identify for us the other generating units
18    that are shown on this simplified transmission map?
19    A   Yeah.  If you look up to the north there's Cayuga.  That's
20    our unit.  Vermillion, not our unit.  Sugar Creek.  And then
21    down at the bottom you've got Merom.  These are other
22    generating stations in the region that I think the MISO report
23    also intimated could be impacted.

24         If we would have a transformer failure under certain
25    load conditions at Dresser, you would lose potentially the

Vol. 4-690

1  generation, or have to back down the generation from those

2  facilities as well so the system in this region didn't get

3  overloaded.

4  Q   To what extent, if any, does the electricity generated at

5  those units flow into the Dresser station?

6  A   I think the electricity in that entire area is sort of

7  interconnected with -- so all those generating stations and

8  all those transmission facilities are essentially

9  interconnected.

10 Q   Are they connected to Dresser?

11 A   Yes.

12 Q   How, if at all, will Edwardsport be connected to the Terre

13 Haute region?

14 A   Edwardsport is a different issue.  Edwardsport will

15 essentially come up and flow in -- the capacity will come out

16 of Edwardsport.  It will go in different directions, but some

17 of the capacity out of Edwardsport will flow up through the

18 Dresser substation.

19 Q   Let me just ask you the open-ended question:  Is there a

20 proposed solution to the contingency or issue that MISO has

21 identified?

22 A   There is, though it's not a solution that was proposed in

23 response to the MISO report.  Because of bringing the

24 Edwardsport on line, there's a significant amount of new

25 generating capacity, 630 megawatts coming up from the south

Vol. 4-691

1  out of Edwardsport.  We identified the Dresser substation as a

2  problem for that concern.  When you bring on that much extra

3  generation out in 2012, we wanted to make sure that Dresser

4  could handle it.  So we had been studying and evaluating the

5  upgrade of the Dresser substation in which we would add a

6  third transformer.  It has two transformers today, and we were

7  studying the addition of a third transformer.

8        We believe that that solution will also solve the

9  concern that's been identified by MISO.

10  Q   That proposal you just described for a transformer, was

11  that in place before you knew about MISO's issue?

12  A   The study -- we were certainly evaluating it before we

13  knew about MISO's issue.

14  Q   What's the significance, if you can tell us in simple

15  terms, of adding other transformer to the Dresser station?

16  A   Well, the significance -- the original significance that

17  we saw was it helped provide insurance that Dresser would not

18  be overloaded by the addition of the Edwardsport plant.  The

19  benefit -- I guess you could call it a co-benefit, but the

20  side benefits that we now understand -- given the MISO

21  report -- is that it helps alleviate MISO's concern about an

22  overloading of the station during system peak at the point

23  when we would eventually shut the Wabash River units down in

24  2012.

25  Q   How long will it take to do the upgrade that you just

Vol. 4-692

1 described at the Dresser station?

2 A    In part, because I knew I was going to be on the stand

3 this week, I checked with the team this week to make sure we

4 can get that done before we bring Edwardsport on line and get

5 it done in 2012; and the answer is yes, but it'll take

6 essentially until 2012 to get it done.

7 Q    What was the original time planned before we knew about

8 the MISO issue?

9 A    Well, we wanted Dresser done by the time we brought

10 Edwardsport on line.  We viewed Dresser completion as sort of

11 a gating item for bringing Edwardsport on.  The Edwardsport

12 schedule has slipped a little, but it's also been in the 2012

13 time frame.

14 Q    Can Cinergy accelerate the upgrade you just described at

15 the Dresser substation?

16 A    We might be able to move schedules slightly, Mr. Hopson;

17 but it is not a next week or next year or even two years.  It

18 takes a long time.

19        I know you're wondering why you can't speed up a

20 substation.  This substation is an enormous piece of

21 equipment --

22        MR. BROOKS:  Your Honor, we will object to lack of

23 foundation.  I think we ought to lay a little foundation that

24 this witness actually has the knowledge necessary to answer

25 this important question because I don't believe they plan to

Vol. 4-693

1  bring anybody here who actually has an engineering background

2  or involved in these products.

3        I object to having a mouthpiece basically recite

4  hearsay.  I think we should --

5        THE COURT:  I think it may be a little harsh to call

6  the boss a mouthpiece.  That may be just a little harsh.  I

7  think he can testify.  I know what his background is.  I know

8  what he does.  I know what his goals are.  I know what he

9  thinks about this.  I don't think this is a problem.

10        Go ahead.

11 BY MR. HOPSON:

12 Q   You understand, as the chief operating officer, what a

13 transformer is and what it does?

14 A   Not to an electrical engineering certainty, but I

15 certainly have a general understanding what a transformer is.

16 Q   Why can't we just take a transformer out of stock and plug

17 it into the Dresser station?

18 A   When you're talking about a transformer that changes

19 345,000 volts to 138,000 volts, you're talking about a very

20 large piece of equipment.  We don't have sitting in inventory

21 these massive pieces of equipment.

22        We do have one large spare transformer that we have to

23 redeploy this summer in the Cincinnati area to maintain

24 reliability at system peak there.  We have an urgent need to

25 replace a transformer that has failed.  So we don't have the

Vol. 4-694

1  luxury with that one spare transformer of adding a new

2  transformer to the Dresser substation.

3  Q    These transformers, are they stock items, or are they

4  generally made to specification?

5        I should say:  Is a new transformer generally made to

6  specification?

7  A    Generally, a new transformer is going to be made to

8  specification.  I would say again, it's not just a matter of

9  bringing in -- you have to fabricate this very large piece of

10 equipment and have it shipped here and then installed, but

11 there's a lot of planning that goes into that process.  You

12 don't just drop a new transformer in and make a two

13 transformer station a three transformer station without a

14 massive amount of planning that is iterative with the MISO.

15 Q    Is the project currently on time to be completed by

16 September 2012?

17 A    Yes, it is.

18 Q    Let me ask you, did you, yourself, or anyone at your

19 instruction ask MISO to conduct this formal study on the

20 impact of the Wabash River shutdown?

21 A    Can I hear the question again, Mr. Hopson?

22 Q    I'm sorry.  Did you ask MISO to conduct a study on the

23 potential impacts or reliability issues associated with the

24 Wabash River shutdown?

25 A    No, I didn't.

Vol. 4-695

1  Q    Why not?

2  A    Well, if -- basically what MISO requires is, if we plan to

3  take a unit out, we have to give them, I think it's six months

4  notice or something like that, to study it.  Our proposal was

5  that -- our proposal in this case was that we retire these

6  units in 2012.  So we did not ask MISO to study this; and

7  again, frankly, I was not aware of the Dresser issue as it

8  relates to Wabash River.  But we didn't ask MISO to study it.

9  I learned again about this issue for the first time in

10 skimming Mr. Harszy's deposition in this case.

11 Q    Is there one other update or upgrade that MISO wants in

12 addition to the new transformer?

13 A    I think the report alludes to a new 138KV circuit, which

14 is I think the dotted line that's represented on this diagram.

15 The dotted line that comes out of Dresser, goes up through

16 Allendale to Margaret.

17        Essentially, in addition to the new transformer at

18 Dresser, MISO is suggesting that we have to enhance that

19 transmission circuit.

20 Q    Had Cinergy considered doing that prior to hearing about

21 MISO's concern?

22 A    No, I don't believe we had.  Our focus was on Dresser, not

23 on the circuit; but we certainly are focused on the circuit

24 now.

25 Q    Can you get that circuit installed by 2012?

Vol. 4-696

1  A   Oh, yes.  I say oh, yes, but everything in our business is

2  complicated, assuming we get adequate rights of way and all

3  those sorts of things taken care of because we probably have

4  to go negotiate with landowners and the like, but I have every

5  confidence we can get it done by 2012.

6  Q   Let me ask you this:  Are there any other considerations,

7  large or small, that you took into account in recommending a

8  2012 shutdown?

9          I guess I should ask a better question.

10         Did you consider any resource issues, operational

11  issues, personnel issues in considering a 2012 shutdown?

12         MR. BROOKS:  I'll object to the leading.

13         THE COURT:  He can answer.  Go ahead.

14  A   Well, one of the things that we have long done as a

15  company is try to minimize impacts on our employees from the

16  decisions that we make.  We've tried to work for many, many

17  years not to lay people off, for example, not to do forced

18  layoffs.

19         Having time -- time is our friend, frankly, as a

20  utility business.  If we have adequate time, we can take the

21  employee resources that are in the Wabash River area and

22  either allow them to retire through natural attrition or

23  redeploy them to different places on our system, for example,

24  Cayuga or Edwardsport.  They would probably need to be trained

25  to do Edwardsport because it's a different type of generating

Vol. 4-697

1  facility.

2        Our hope is that we don't force anyone out of a job at

3  Wabash River, but we simply find another place for them on the

4  system.  Having till 2012 to do that gives us great

5  flexibility, I think, in making that happen.  Plus it's

6  getting communities ready.

7        These units employ people in the community who live in

8  the community and pay taxes in the community.  It's getting

9  communities ready for these kind of shutdown decisions.

10  Q   We've talked about, I think now, all the issues relating

11  to what your proposal is.  I want to talk briefly about your

12  response to the Plaintiffs' proposal and the decisions you

13  made there.

14        You do understand the Government is seeking emissions

15  reductions beyond the closure of Wabash River Units 2, 3 and

16  5, do you not?

17  A   Yes, I have heard that.

18  Q   In the course of your decision making and in evaluating

19  and deciding on Cinergy's position, did you consider whether

20  Cinergy should seek some emission reductions beyond the

21  closure of Wabash River 2, 3 and 5?

22  A   No, I didn't.

23  Q   Why not?

24  A   I don't think it's appropriate.  And I heard the

25  discussion with Mr. Kahal yesterday.  I don't think it's

Vol. 4-698

1 appropriate for us to surrender or give up emission allowances

2 to -- as a part of this remedy.

3 Q   Let me talk about emissions first and then emission

4 allowances.

5       Why wouldn't you, as part of an NSR remedy, offer the

6 Court some reduction in emissions?

7 A   Well, there are going to be reductions in emissions when

8 we shut down Units 2, 3 and 5 in 2012.

9 Q   How about -- you're familiar with the term excess as it's

10 been used in the courtroom?

11 A   I've heard the term.  I don't know what it means.

12 Q   But you understand the way Plaintiffs are using it?

13 A   Yes.

14 Q   Do you know their concept of excess emissions?

15 A   Generally, yes.

16 Q   What did you mean when you said a minute ago there are no

17 excess emissions?

18 A   In my thinking about this, we operate in a cap and trade

19 world.  In a cap and trade world, you operate to what

20 essentially the cap is on emissions from coal-fired power

21 plants.  We are within that cap.  We've always operated within

22 that cap.

23       The fact that repairs weren't made, or controls

24 weren't put on at Wabash River back 20 years ago doesn't mean

25 we're not fully in compliance with our cap and trade

 1  obligations and responsibilities; and essentially, had we

 2  controlled Wabash River back then, or had we shut the units

 3  down back then, or had we run them at a reduced level back

 4  then, we would have had more emissions available to our

 5  company to manage our cap and trade obligations going forward.

 6  We could have used those for compliance on another part of the

 7  system or we could have sold them into the market and likely

 8  would have.  That's how cap and trade works.

 9       Congress gave us all the flexibility to manage our

10  clean air compliance obligations in the most cost efficient

11  way that we can.  So the idea of excess emissions is not one

12  that I frankly understand.

13  Q   When you refer to the cap and trade system in your

14  question, is that a unit-specific regulation or a system

15  wide --

16  A   No, it's a system wide.  Cap and trade basically -- you

17  can think of it as Duke Energy system wide, but it's also

18  essentially most of the country systemwide, where Congress

19  basically set a limit that said you'll never go above this

20  level of emissions of SO2 again and eventually NOX again.

21  We'll let companies have flexibility to figure out what's the

22  best way to meet their compliance obligations with that system

23  wide cap.

24       In essence, Mr. Hopson, a lot of the IRP and

25  environmental compliance planning documents that we talked

1   about earlier, we went into great detail with the Indiana

2   utility commissions to that very issue.  We're thinking about

3   putting controls on here.  That frees up allowances for us to

4   do this and sell allowances and customers get the benefit.

5   Or, we're not going to control this unit, but we're going to

6   buy allowances to meet compliance obligations if we're short

7   the allowances we need.

8           So, essentially, you have two different ways of

9   thinking about it.  One is you put controls on and free up

10  allowances that you can sell or use in another part of your

11  system, or you can buy allowances to meet your obligations so

12  that your total system emissions don't go above the level

13  you're allowed to go above.

14  Q   I want to just take a very quick look and have you

15  describe in a little bit more detail what the company has done

16  to address environmental compliance generally; and I want to

17  start with again an open-ended question.

18          Given what we've heard over the last three days about

19  environmental impacts of burning coal, why do you use so many

20  coal-fired units in Duke Energy Indiana?

21  A   That's really a history question, Mr. Hopson.  We sit in

22  an area that doesn't have abundant hydro resources.  We don't

23  have cheap access to natural gas, as some places closer to the

24  Gulf of Mexico, for example.  So, historically, coal-fired

25  generation was a low cost efficient way to produce large

Vol. 4-701

1  amounts of electricity for customers in Indiana.

2       Again, many of these units were built a very long time

3  ago.  We think that's actually been a good thing for Indiana.

4  I know it has environmental implications, and more and more

5  we're addressing those environmental implications, but it's

6  been a good thing for Indiana from the standpoint of reliable,

7  low cost generation resources for many, many years.

8       I heard Mr. Kahal talk before competitive rates

9  yesterday.  The way I think about competitive rates is, if we

10  can keep our rates relatively low and our services reliable

11  and reduce our environmental footprint, we have an opportunity

12  to attract customers into our service territory.

13      Indiana is not blessed with a coastline.  It's not

14  blessed with a great climate.  This is the kind of stuff that

15  helps give Indiana a competitive advantage to bring in

16  jobs-producing companies.  They look at electricity rates.

17  Q   So given what you've just described regarding coal, has

18  Cinergy done anything, spent any money to address the

19  environmental considerations the Plaintiffs have been talking

20  about?

21  A   I've looked back, and I think it depends on what you count

22  and when you start counting; but the company has spent in the

23  last 18 years or so, last decade --

24      MR. BROOKS:  Objection, Your Honor.  I don't see how

25  it's relevant how they spent money on something that --

Vol. 4-702

1          MR. HOPSON:  I've heard my client's motives impugned
2   yesterday by an economist.
3          THE COURT:  So this will make you feel better then?
4          MR. HOPSON:  I think it's relatively relevant.
5          THE COURT:  This isn't a question about raising the
6   court's level of indignation or lowering it.
7          I'm not the Congress.  You're not lobbyists.
8          MR. HOPSON:  I recognize that.
9          THE COURT:  So I'm going to sustain this objection.
10  BY MR. HOPSON:
11  Q   What considerations go into your decisions about where to
12  install pollution control systems when you're working through
13  the IGCC or the environmental process that you talked about?
14  A   Again, we don't do our environmental compliance planning
15  in a vacuum.  We do it in conjunction with the IURC.  And the
16  IURC expects that the planning process will result in the best
17  environmental benefit for the lowest cost reasonably possible.
18  That's really what guides us in looking at where we're going
19  to install controls:
20          Number 1, we make sure we're in compliance with the
21  law.
22          Number 2, we're trying to get the best environmental
23  bang for the dollar that we're asking consumers to pay for.
24  Q   Let me go to the issue of allowances that I cut you off
25  before.  You mentioned that allowances and the existence of

Vol. 4-703

1  allowances influence decision making and I just want to
2  briefly review your understanding of how that works.
3        First, when was Cinergy's cap on SO2 emissions set?
4  Based on what baseline is what I mean?
5  A   As I understand, the cap was set in the early '90s with
6  the passage of the Clean Air Act amendments.  What I
7  understand happened is they looked back at the generating
8  levels in the '85 to '87 time frame and essentially used that
9  in the levels of emissions from plants at that point in
10 creating this sort of system wide cap.
11 Q   Has demand on the Duke Energy Indiana system increased
12 since 1985?
13 A   Oh, yes, significantly.
14 Q   So how do you, from an operational perspective, deal with
15 the fact that your cap was set based on limits that are over
16 20 years old?
17 A   We either put controls on or we purchase allowances.
18 Q   And as a mechanical matter, what drives -- or I should say
19 from an operational perspective, what drives your overall
20 decision making whether to be a net buyer or seller of these
21 emission allowances?
22 A   You know, essentially, again, the biggest driver is the
23 environmental compliance planning process that we do with the
24 commission in trying to get the best environmental benefit for
25 the lowest cost reasonably possible for our customers.  That's

Vol. 4-704

1    the driver.

2    Q    And do the planning documents that you've referenced take

3    the allowance costs into consideration?

4    A    Yes.

5    Q    When you make operational decisions and you do a cost

6    analysis on these allowances, do you treat allocated

7    allowances different than purchased allowances or market

8    allowances?

9    A    No.  Allowances are allowances.  They essentially sit in a

10   fungible bucket, if you will, of allowances.  All of the

11   planning that we do with the commission assumes that

12   allowances have value, and that there's a cost associated with

13   those allowances, and there's a price associated with them if

14   you sell them into the marketplace.  It's -- that assumption

15   is what's been driving our environmental compliance planning

16   for many years.

17   Q    Under this allowance system, has Cinergy ever emitted more

18   than it has allowances for?

19   A    No, not that I'm aware of.

20   Q    Has the approach that you've just described led to the

21   installation of SO2 controls on specific units outside the NSR

22   context?

23   A    Oh, yes.  We've put scrubbers -- sometimes called FGD.

24   We've put scrubbers on all five of our Gibson units.  We've

25   put scrubbers on our two Cayuga units.  We've put SCR for NOX

Vol. 4-705

1  control purposes on all five Gibson units.

2      MR. BROOKS:  I think this is the back door of the

3  same relevance issue.

4      THE COURT:  I think that's probably true, but I'm

5  not going to strike it.

6      Go ahead.

7  BY MR. HOPSON:

8  Q   If Duke Energy had controlled Wabash River 2, 3 and 5 from

9  1985 to 1992, would you have fewer allowances today?

10 A   No.  If we had controlled those units then, we would have

11 had basically freed up allowances, if you will.  We call it

12 head room.  We would have had head room with allowances that

13 we could have sold into the market or used in other system

14 compliance planning.

15 Q   Finally, if you are ordered to surrender allowances as

16 part of this remedy or part of some other environmental

17 demand, will that have any operational impact on how you meet

18 demand that's created by the customers of Duke Energy Indiana?

19 A   If we have to surrender allowances, it essentially has an

20 impact on our environmental compliance planning process

21 because we've assumed we have allowances available to meet our

22 compliance obligations.  If we have to surrender that

23 assumption goes out the window.

24      MR. HOPSON:  I have no further questions, Your

25 Honor.

Vol. 4-706

1          THE COURT:  Mr. Brooks?

2                    **CROSS-EXAMINATION**

3  Q   Good morning, Mr. Turner.  My name is Phillip Brooks, here

4  for the United States.

5          MR. BROOKS:  Your Honor, may I proceed?

6          THE COURT:  You may.

7  BY MR. BROOKS:

8  Q   Let me clear up a couple things that we just heard about.

9  You talked about allowance surrenders.

10          We're talking about the acid rain program, right?

11  A   Yes, generally speaking.  The Clean Air Act amendments I

12  think you would calculate the acid rain program.

13  Q   You're aware, are you not, that actual allowance surrender

14  for emissions didn't begin until 1995?

15  A   I said early '90s.  It may have been 1995.

16  Q   Until the allowance surrender requirements kicked in, of

17  course, there wouldn't have been any allowances freed up in

18  that earlier time period, right?

19  A   Well, no.  I'm not suggesting there were.  I'm simply

20  saying that had we controlled those units when the allocation

21  happened, the allocation would have been based on '85 to '87

22  generation levels.  So, in essence, if we're using that as the

23  generation level, we would have sort of had emissions

24  available to us to use in our system planning.

25  Q   Not to be hypertechnical but, of course, it wasn't based

1  on generation.  It was based on heat input, wasn't it?

2  A    Sure.  But it's looking back to a period of time when

3  those units were uncontrolled and we had a certain amount of

4  output from that generation.  We had allowances -- emission

5  allowances that would have been available to us based on a

6  historic allocation that no longer reflected the output of

7  those units that would have been controlled.  So we would have

8  had allowances for planning purposes had we put those controls

9  on.

10 Q    I understand that.  But had, let's say, the company

11 complied with the Clean Air Act, New Source Review provisions

12 in connection with its 1989 projects, there wouldn't have been

13 any allowance that had to be turned in in 1990, '91, '92, '93,

14 the '94; isn't that right?

15 A    Mr. Brooks, that's not what I was trying to suggest with

16 my answer.  What I was trying to suggest was -- I'm not

17 talking about '92, '93, '94.  What I'm saying is we would have

18 had head room essentially on our system when the allocation

19 process happened.  If it was the mid '90s, I'll accept that

20 representation.  We would have had allowance head room at that

21 time to use because it was based on historical heat input at

22 the Wabash River station, which was in an uncontrolled

23 environment.

24 Q    Thank you.  Let's see if we can answer my question.  My

25 question is fairly simple.

Vol. 4-708

1       Let's assume that you got allocated allowances based

2  on your '85 to 1987 heat input into your boilers.  But if you

3  had complied with the New Source Review provisions in 1989 by

4  controlling these units, then the very next year you still

5  wouldn't have had any allowances that you had to surrender,

6  right?

7  A    I don't think we had allowances then.

8  Q    That's right.  They didn't kick in until '95, right?

9  A    I think the law was passed in '90, but the allowance

10 process -- I said early '90s.  If you say mid '90s, I'll

11 accept that.

12      You used the word "surrender," Mr. Brooks.  I'm using

13 the term -- I think of it as, essentially, consuming the

14 allowance or using the allowance.

15 Q    You have a ticket for each ton and, so, for each ton

16 that's emitted, at the end of the year you turn that into EPA?

17 A    Yes.  I just didn't want to confuse that surrender term

18 with the one you all are proposing.

19 Q    It's an accounting concept?

20 A    That's a good way to say it.

21 Q    You said reliability is what you're about; isn't that

22 right?

23 A    Yes.

24 Q    It's first among equals?

25 A    I would say it is, yes.

Vol. 4-709

1  Q   We talked a little bit about -- you talked a little bit

2  about the blackouts First Energy caused, right?

3  A   Yes.

4  Q   And that's a major concern for Duke, isn't it?

5  A   Blackouts are a major concern; yes, they are.

6  Q   So reliability issues get first billet in review; is that

7  right?

8  A   Yes.

9  Q   Now, the Wabash generating station has a history of having

10 forced outages during the summer peak season; isn't that

11 right?

12 A   We certainly have had forced outages.  Generating units

13 have forced outages.  That's one of the reasons we have a

14 reserve margin.

15 Q   Well, it's even more than that at Wabash, isn't it?

16         Isn't it the case that Wabash River generating station

17 has a discharge permit called a National Pollution Elimination

18 Discharge Permit that basically controls the temperature of

19 the water that can be dumped into the Wabash River?

20 A   Well, it's not just the Wabash River station.  All of our

21 stations that are on rivers have NPEDS permits that limit the

22 water temperature coming out of our stations.

23 Q   And Wabash River is sort of a low flow river, isn't it?

24 A   It certainly has proven to be recently.

25 Q   In those conditions, you have to sometimes curtail the

Vol. 4-710

1  operation of Wabash River generating station to avoid

2  violating the water permit; isn't that right?

3  A    I'm struggling only because you used the term "forced

4  outage" earlier.  What you're talking about, generally

5  speaking, is what we would refer to as a thermal derate.  A

6  forced outage means the plant trips offline.  A thermal derate

7  means you take the units down to minimize the temperature

8  coming out of the river -- coming out of the plant into the

9  river.  So it's essentially fewer megawatts, not you lose the

10 unit.

11 Q    Now, you're aware that the NPEDS permit for Wabash River

12 actually has a specific provision that says that you, Duke,

13 understand that you may have to take units completely offline

14 to keep from avoiding the thermal limits; isn't that right?

15 A    Yes, we understand that.

16 Q    And that happens, doesn't it?

17 A    It has happened, yes.

18 Q    In fact, the most recent time was last year -- I'm sorry,

19 2007.  I'm losing track.

20          It happened in August, right?

21 A    Yes.  August we had a substantial heatwave in this country

22 where we -- in the eastern half of the country essentially,

23 and we did have to take a unit off at Wabash.  I don't recall

24 what unit.  I don't think it was every unit, but I do remember

25 we took down the capacity at Wabash.  I don't remember the

Vol. 4-711

1  specific details.

2  Q   You could check the records, but I believe you're going to

3  find that they all came off line.

4         They all came off line in October of 2007, didn't

5  they?

6  A   I don't think they all came off line in October 2007.  I

7  recall a thermal derate in 2007.

8  Q   Well, we could check the MISO report, if you like; and

9  that's Defendants' Exhibit 321.  We could bring that up.

10 Let's just make sure we understand we're talking about the

11 right thing.  Page 12.

12         Sir, I would direct your attention here to right above

13 where it says "generating capacity."

14 A   I'm having a little trouble reading mine.  Is it passible

15 to get it bigger?

16 Q   Can we make that a little larger where it says August 4

17 through 10 and pick up the portion that says October 5 and 8,

18 2007?

19         Can you read it now, sir?

20 A   Yes, I can see it now.

21 Q   In October 5 and 8, Wabash River units were forced offline

22 and held there due to high river temperatures?

23 A   Yes.  I don't know which units they're talking about

24 necessarily.  They do talk in the earlier one about 2, 3 and 5

25 are commonly online -- or called online due to limited

Vol. 4-712

1  available market redispatch or effective switching options.  I

2  don't know if this is saying all Wabash River units or if it's

3  referring to specific units.

4  Q    Did you read Mr. --

5  A    By the way, I'd just say too, October 5th and 8 is not in

6  a peak time.  It's what we would call a shoulder month.  A

7  shoulder month means that, generally speaking, the demand on

8  the system isn't that high, which is -- if we were to reduce

9  to the Rosen baseline, that would essentially deal with the

10  fact that there are going to be times in those shoulder months

11  where we don't need the generation.  We can bring it down.

12  Q    I think we'll get to that.  I want to stick here.

13        When we talk about peak, we're talking about the level

14  of generation, not the time of year, aren't we?

15  A    Well, sort of.  We certainly think of our peak demand --

16  we're a summer peaking company, which means we peak in the

17  summer; but peak certainly is reference to a specific level of

18  electricity demand that's happening.

19  Q    Did you happen to look through the deposition of Mr. Tony

20  Geswein who testified on behalf of Duke Energy under the

21  30(b)(6)?

22        You understand that to mean that he testified for the

23  company, right?

24  A    Yes, I understand that to mean that.  I did not look

25  through Tony's deposition.

Vol. 4-713

1  Q   If Mr. Geswein said that the units went out -- that all

2  the units went out in October, you wouldn't dispute that,

3  would you?

4         MR. HOPSON:  Your Honor, I would object.  If he

5  hasn't read the deposition, I don't think he should be

6  confronted with someone else's testimony.

7         THE COURT:  I think he can answer this question.

8  A   If Tony said all the units went out and they went

9  completely offline, I would believe Tony.

10 BY MR. BROOKS:

11 Q   I believe that testimony is designated, so I won't hunt

12 through here right now.  This problem is identified in a

13 permit.  We talked about that.

14        Isn't it the case that that provision, that the units

15 may have to be shut down due to thermal issues, that

16 provision's been in the permit for more than 15 years, hasn't

17 it?

18 A   I don't know the answer to that, Mr. Brooks.  I wouldn't

19 be surprised, but I don't know.

20 Q   Would you like to see one of the permits?

21 A   I'll take your word for it.

22 Q   Now, when the units were shut down in 2007 because of the

23 thermal problems, you don't have any question that that, in

24 fact, was during a peak demand period; isn't that right?

25 A   The August one would probably have been during a system

1  peak or a peak on our system.  Again, I don't know if you

2  mentioned that Tony said both of those events were all units

3  forced offline at Wabash River or one, or some, or which event

4  it was.

5  Q   You're aware that generally for these units, when we talk

6  about summer peak, we're talking about 90-degree days; isn't

7  that right?

8  A   Generally speaking, that's when you're going to see peaks

9  happen.

10 Q   Again, if that's what Mr. Geswein testified to, that it

11 was 90 degrees at the time, you wouldn't dispute that?

12 A   No, I wouldn't.

13 Q   Nobody lost any service in August of 2007 as a result of

14 the shutdowns at Wabash River; isn't that right?

15 A   That's correct.  But I remember being very concerned that

16 summer, frankly, both in the Midwest and in the Carolinas,

17 about our ability to continue meeting system needs.  We had

18 regular phone calls throughout that day as to how the rest of

19 the system was holding up.  We did not drop load.  We did not

20 shed load that day.

21 Q   Now, following the October 2007 outages, Duke actually

22 conducted a study in which it determined that adding a third

23 transformer to the Dresser station would provide protection

24 against substation overloads, didn't it?

25 A   Yes.  As I mentioned on my direct exam, we've been

Vol. 4-715

1  studying that for some time.

2         MR. BROOKS:  Can we see Plaintiffs' Exhibit 2134,

3  please?

4  BY MR. BROOKS:

5  Q   Sir, do you recognize what this is?

6  A   Yes, generally.

7  Q   What is it?

8  A   It appears to be a transmission assessment summary that

9  looks like we prepared.  Duke Energy Midwest would be

10 essentially our Midwest system.

11 Q   I don't know that we've talked about it so far, sir.

12         What is Duke Energy Midwest?

13 A   There is no actual corporate entity called Duke Energy

14 Midwest.  It's a generic way of referring to our transmission

15 system in the Midwest versus the Carolinas.

16 Q   But its focus is transmission, is it not?

17 A   Not really.  You can call our -- all of our assets in the

18 Midwest, all of our utility operations in the Midwest could be

19 generically referred to as Duke Energy Midwest.

20         MR. BROOKS:  If we could see page 5 of this?

21         MR. HOPSON:  Could I get a clarification whether

22 this is in evidence?

23         MR. BROOKS:  I would move it into evidence.

24         THE COURT:  I understand.  He just offered it.

25         MR. HOPSON:  I suppose it's a business record, so no

Vol. 4-716

1  objection.

2          THE COURT:  All right.  It's admitted.

3      (Plaintiffs' Exhibit 2134 was received in evidence.)

4          MR. BROOKS:  I apologize.

5  BY MR. BROOKS:

6  Q   Let's take a look at page 5 there, sir.  I'm going to

7  direct your attention here to project 1263.

8          Do you see that with the Edwardsport?

9  A   I think I need it to be a little bigger.

10 Q   I'm sorry?

11 A   I can't read it.

12         MR. BROOKS:  Can we make that a little bigger for

13 him?

14 A   Is it possible to move it a little bit to the left to make

15 sure I'm seeing everything?

16         MR. BROOKS:  If I may approach, I can give him a

17 hard copy.

18         THE COURT:  Yes.

19 BY MR. BROOKS:

20 Q   This is an identification, is it not, of the need for a

21 third transformer at Dresser?

22 A   Let me read it a minute.

23 Q   I'm sorry.  You've got to look down to the next one.

24         MR. HOPSON:  Can I get a copy of this?

25         MR. BROOKS:  Yes.

Vol. 4-717

1        MR. HOPSON:   Thanks.

2   BY MR. BROOKS:

3   Q   You see where I'm talking about?

4   A   Yeah.  I'm only hesitating, Mr. Brooks, because I don't

5   recognize the document.  I've read the first paragraph, which

6   is I guess page 3.  It says, "Transmission assessments

7   performed by Duke Energy Midwest, Midwest ISO and

8   ReliabilityFirst Corporation were reviewed to identify

9   potential near term and long term problems and verify

10  adherence to NERC standards."

11        I don't know if this is our document or our document

12  in conjunction with other entities.

13        I'm looking now at page 5, which is what you've

14  directed me to.  I do see "project 000, add a new 345/138KV

15  transformer project," and then the project description is

16  "Dresser overloads."

17  Q   It says here that "loss of Dresser BK1."

18        What is that?

19  A   I would assume that's the first transformer at Dresser.

20  Q   It overloads the second one and vice versa.  Isn't that

21  what it says?

22  A   Yes.

23  Q   There's identification there that with enough load, you

24  need a third transformer; isn't that right?

25  A   Yeah.  This is what we call contingency planning.  Our

1  business is all about contingency; and this is saying if you

2  had an event, you could have one overload the other and vice

3  versa.

4  Q    Then in November of 2007 -- and I believe you talked about

5  it a moment ago -- Cinergy filed an Integrated Resource Plan

6  with the IURC in which it identified the retirement of Units 2

7  through 5 as one of the compliance options; isn't that right?

8  A    Yes.  We mentioned it as something that may have to happen

9  depending on the outcome of the case, which we didn't know at

10 the time we filed that IRP.

11         MR. BROOKS:  Now, that was Plaintiffs' 1939.  I

12 don't believe it's been offered, so at this time because I

13 believe it has been stipulated to as authentic and nonhearsay

14 --

15         COURT CLERK:  It's already in.  It was put in on

16 Tuesday.

17         MR. BROOKS:  I stand corrected.

18 BY MR. BROOKS:

19 Q    About the same time in November, isn't it true that

20 lawyers in connection with this case requested an analysis of

21 the impact of unit retirement on the transmission grid?

22 A    I don't know the answer to that.

23 Q    Can we see the privilege log, please?  I believe that's

24 the cover letter transmitting it.

25         Can we blow that up, please?

Vol. 4-719

1  BY MR. BROOKS:

2  Q    Sir, do you know who Mr. J. Bloemer is?

3  A    I assume that's John Bloemer.

4  Q    Who is R. Snead?

5  A    Ron Snead -- that's probably Ron Snead.  That's who

6  R. Snead is.

7  Q    I'm sorry?

8  A    R. Snead is probably Ron Snead.

9  Q    Let me ask you, who is Mr. Bloemer?

10  A    John Bloemer works in Integrated Resource Planning for the

11  company.  I think he works in environmental compliance

12  planning and integrated resource planning.

13  Q    He also works with transmission planning, does he not?

14  A    I believe he does.

15  Q    Mr. Snead, what does he do?

16  A    Mr. Snead is the person in charge of transmission

17  planning.

18  Q    Is that R. Moreland?  Who is that?

19  A    That would be Bob Moreland who is -- I think we call him

20  environmental investment engineer.

21  Q    J. Ezell?

22  A    That's probably Julie Ezell.  She's an attorney.

23  Q    K. Pike?

24  A    Keith Pike is an engineer as well.  Kind of an

25  environmental technical expert.

Vol. 4-720

1  Q   What about R. McMurray?

2  A   I think McMurray works in integrated resource planning as

3  well.  I think that's Bobby McMurray.

4  Q   The description that we see here says, "E-mail regarding

5  potential effects of possible unit retirements on transmission

6  system prepared at request of counsel for purposes of NSR

7  litigation."

8        Do you see that?

9  A   Yes, I see what's written in there.

10 Q   Is it your testimony that you've never seen that analysis?

11        MR. HOPSON:  Objection.  This is our work product.

12 They're reading into evidence from a privilege log, Your

13 Honor, and it's a privilege log reflecting a document that was

14 done as my work product before the liability trial.  The

15 witness can't be asked about what he knows about counsel's

16 work product.

17        THE COURT:  I'm going to sustain that objection.

18 Let's have the next question.

19        MR. BROOKS:  Yes, Your Honor.

20 BY MR. BROOKS:

21 Q   Now, in May of 2008 you filed written testimony with the

22 IURC, did you not?

23 A   Yes.

24        MR. BROOKS:  Can we see Plaintiffs 1971, please?

25

Vol. 4-721

1  BY MR. BROOKS:

2  Q    Can you identify that for us, sir?

3  A    Yes.  Even in the unblown-up version that appears to be

4  the cover page of our -- what we call our case-in-chief, not

5  in this kind of litigation context but, in regulatory

6  litigation, we file our direct testimony in writing; and, so,

7  this would have included our testimony -- written testimony

8  and exhibits for our case-in-chief in the Edwardsport IGCC

9  docket.

10  Q    Sir, did you submit testimony as part of the that written

11  submission?

12  A    Yes, I did.

13  Q    Could we, please, turn to page -- I believe it's 15.

14  Let's see if it's there.

15          Can you pick up the highlighted portion?

16          Sir, this is part of your testimony, is it not?

17  A    Well, it appears to be.

18  Q    Would it make it easier for you to verify if I gave you

19  the whole document?

20  A    If you're representing this is my testimony, I'll take it.

21  It's just it's hard to see it out of context.  But I'll assume

22  this is it.

23  Q    Can you read the highlighted portion, please?

24  A    Read it out loud or to myself?

25  Q    Out loud.

Vol. 4-722

1  A   "In the IRP analysis performed by Ms. Jenner, one scenario

2  included the retirement of our Wabash River Units 2 through 5

3  in 2012, units with an average age of over 50 years.  The

4  company believes this is an important scenario to consider

5  given the high cost to retrofit these units with pollution

6  control equipment, especially if more stringent environmental

7  regulations are to be enacted.  These are the next oldest coal

8  units on Duke Energy Indiana system after the retirement of

9  the existing Edwardsport units, and with more stringent --"

10 Q   Can we have the next page, please?

11 A   "Environmental requirements, likely the next units to face

12 retirement."

13 Q   Okay.  Now, the jury returned a verdict in this case, I

14 believe it was on or about May 22nd; isn't that right?

15 A   I'll take your word for it.  I know it was in May.  I

16 can't remember the date.

17 Q   Now, at the time that you received the jury verdict, did

18 you contact MISO to tell them that there was a possibility

19 that you were going to have to take Units 2, 3 and 5 offline?

20 A   No, because our view was -- to the extent we would take

21 Units 2, 3 and 5 offline as part of the remedy phase -- it

22 would be done in conjunction with bringing Edwardsport online

23 in 2012.

24 Q   So you decided you would wait until 2012 and that would be

25 the convenient time to do it?

Vol. 4-723

1  A    No.  I decided that I wouldn't burden MISO with a request

2  to do something that doesn't help my decision making at that

3  point in time.

4  Q    Well, I'm really confused by that, sir.

5        Reliability is your number one concern, isn't it?

6  A    Yes, it is.  I said first among equals.  I stick by that

7  statement.

8  Q    And generation is certainly an element of reliability;

9  isn't it, sir?

10 A    Absolutely.

11 Q    And you had 265 megawatts on the line, didn't you?

12 A    Yes, with those three units that's about right.

13 Q    Isn't it true that all it takes is a phone call for Duke

14 to request MISO to run a reliability study?

15 A    I think I said, Mr. Brooks, that it was not in my mind at

16 that moment -- after the verdict came out -- that we would be

17 shutting the units down immediately.  My first thought was we

18 need to get the team together and sort of figure out what we

19 do here.

20       Frankly, I didn't know what the Government's position

21 would be at the time that the verdict came out.  I would not

22 have, frankly, expected that you would have asked that the

23 units be shut down immediately.  In fact, as I understand it,

24 one of your remedies was to put controls on the units rather

25 than shut them down immediately.  If we install controls on

1   the units, that's a multi year process in any event.

2           So, no, it was not in my mind at that moment that I

3   need to get a study from MISO right away and tell them to

4   evaluate what happens if those units are not there.

5   Q   Sir, are you aware that the United States filed a set of

6   interrogatories on Duke in, I believe, June of 2008 asking

7   whether there were any impediments to the immediate shutdown

8   of Units 2, 3 and 5?

9   A   I'm not aware of that.

10  Q   You're not?

11  A   I don't disagree that you did that.  I just am not aware

12  of them.

13  Q   Are you aware of what the company's response was in July

14  of that same year?

15  A   No, I'm not.

16  Q   Would you be surprised if the response was that MISO would

17  have to be given six months notice?

18          Would you like to see that?  Can we pull that up?

19          Well, that's all right.  We don't need to slow us down

20  anymore than that.

21          How about this, let's pull up Exhibit 2080 if we

22  could.  We'll just jump past the July time frame to October.

23          Can I have 2080?

24          Can I have it in hard copy?

25              MR. BROOKS:  I'm sorry, Your Honor.

Vol. 4-725

1          MR. HOPSON:  Could I get a copy, Mr. Brooks?

2          MR. BROOKS:  Yes, sir.

3    BY MR. BROOKS:

4    Q    Can you identify what you see there on the screen at

5    Plaintiffs' Exhibit 2080?

6    A    Not at this moment.

7          MR. BROOKS:  Can you give him a little definition

8    there?

9          MR. HOPSON:  I'll pose an objection, Your Honor.

10   The pleadings are not evidence.

11         MR. BROOKS:  In that case I would like to move it

12   into evidence.

13         MR. HOPSON:  Pleadings are lawyers arguments and

14   answers to discovery.

15         MR. BROOKS:  Actually the rules say it's the

16   client --

17         THE COURT:  Just a second.  These are Defendants'

18   objections and responses to Plaintiffs' interrogatories?

19         MR. BROOKS:  Yes, Your Honor.  They're verified by

20   the company.

21         THE COURT:  Interrogatories can be admitted in a

22   case.

23         Do you have a specific interrogatory you want

24   addressed?

25         MR. BROOKS:  Yes, I do, Your Honor.  If I could ask

Vol. 4-726

1   that we turn to page 19.

2           THE COURT:  You want to offer page 19, then?

3           MR. BROOKS:  I would like to offer all of them.

4           THE COURT:  I'm sure you would, but we don't need

5   all of them.

6           MR. BROOKS:  Then we would move page 19.  Let's

7   highlight that so Mr. Turner can read it.

8           Well, that's not going to do us any good.  What

9   would help -- I understand there's a problem with the screen.

10          Would it be possibility to give him a hard copy?

11  A   I've got a bigger one now.

12  BY MR. BROOKS:

13  Q   Page 16, and I'm talking about interrogatory 3.  If you

14  would like a hard copy --

15  A   That would be easiest.

16          MR. BROOKS:  I'll share my copy.  May I approach?

17          THE COURT:  Yes.

18  BY MR. BROOKS:

19  Q   Mr. Turner, can you read interrogatory No. 3 for us,

20  please?

21  A   You want me to read the whole interrogatory?

22  Q   Yes, let's get that into the record.

23  A   Okay.  This is interrogatory No. 3 from Defendants'

24  Objections and Responses To Plaintiffs' Second Set of

25  Interrogatories and Third Set of Document Requests In Remedy

Vol. 4-727

1  Phase of Case.

2       It says -- and I guess this is your question to us.

3  "What do you contend is the appropriate remedy for the

4  violations of the Clean Air Act found by the jury at Wabash

5  River Units 2, 3 and 5?  Please include in your answer:  the

6  pollutants being addressed; the type of emissions control

7  technology, if any; the emissions rate and/or removal

8  efficiency of any selected emissions control technology; the

9  cost of the technology; the anticipated reduction in

10 pollutants from your proposed remedy; describe whether your

11 emissions reductions are achieved by emissions control

12 technology or other measures; the federal, state or local

13 permits or permitting amendments required to implement your

14 proposed remedy (including amendments to the Title V operating

15 permit for Wabash River); any mitigation that you intend to

16 propose; any equitable factors that you contend support your

17 proposed remedy; and any remaining legal or factual bases for

18 the remedy (including identifying any documents relating to

19 your proposed remedy, identifying your witnesses on your

20 proposed remedy, and identifying any persons with knowledge of

21 your proposed remedy).

22       "If you do not --"

23 Q   We can stop there, unless counsel thinks it would be

24 incomplete.

25 A   There's only one more sentence now.  "If you do not intend

Vol. 4-728

1  to propose a remedy for the violations at Wabash River Units

2  2, 3 and 5, please so state; and no further response is

3  required; however, if your answer on that score is qualified

4  in any respect, please fully answer the interrogatory."

5  Q    You're familiar with how interrogatories work.

6        You're an attorney, right?

7  A    I'm not practicing now and probably haven't for probably a

8  decade, but I'm generally familiar with how they work.

9  Q    When we see the response there, the first thing that

10 happens is we get the lawyers' objections, right?

11 A    Yep.

12 Q    Those are from the lawyers.  They're not from the client,

13 right?

14       Do you remember the rules?  I won't quiz you on them.

15 A    I remember how it all works, yeah.

16 Q    Let's go to the next page on the screen, please.

17 A    Okay.

18            MR. BROOKS:  Page 17?

19 BY MR. BROOKS:

20 Q    Let's just look here on the paragraph that starts,

21 "Cinergy contends."

22       Can you read that first sentence?

23 A    "Cinergy contends that retiring Wabash River Units 2, 3

24 and 5 by September 1, 2012 is the most appropriate remedy for

25 the violations found by the jury."

Vol. 4-729

1  Q    If you would, sir, could I ask you to turn to the back of

2  that exhibit, Exhibit 2080, and see when those responses were

3  served?

4  A    It looks like October 8th, 2008.

5  Q    Now, on October 8, 2008, these responses were served.

6        Sir, at that time, did Duke contact MISO and request

7  any sort of reliability study connected to the closure of

8  Wabash River Units 2, 3 and 5?

9  A    No.  Again, MISO deals with thousands of requested

10  studies.  We would not have asked MISO in 2008 to conduct that

11  study for a 2012 shutdown.

12  Q    Because you decided 2012 was the right date for the

13  shutdown, right?

14  A    I decided it was the most appropriate remedy.

15  Q    Did you think that maybe the federal court --

16  A    I'm open to the possibility that others will have an

17  opinion about that.  I'm assuming you have an opinion about

18  that, and I assume His Honor eventually will have an opinion

19  about that; but that was certainly the assumption I was

20  operating under at that time.

21  Q    Well, my opinion doesn't count; but I'm just trying to

22  understand here your thought process because, of course,

23  reliability is first among equals and there was a possibility

24  that this would be interpreted as the company selecting

25  shutdown as opposed to control.

Vol. 4-730

1        Isn't that what this means?

2  A    Yes.  But, Mr. Brooks, your question presupposes that when

3  we filed this interrogatory answer that I'm going to go

4  suddenly tell MISO to do a study for something we think most

5  appropriately should happen four years hence.

6  Q    I'm just trying to understand the thought process here.

7  A    I just explained it.

8  Q    Let me make sure I understand though.

9        What you've ruled out is controlling the units; isn't

10 that right?

11 A    Yes.  Essentially, we've ruled out controlling the units,

12 those three units.

13 Q    Those three units.

14       You understand that compliance at this point has only

15 two ways to go:  You can either control the units or you can

16 shut them down.

17       Do you disagree with that?

18 A    No -- yes, I do disagree with it.  I would add a third

19 one, which is what we've also proposed, and that is to run the

20 units at a lower level between now and the time we shut them

21 down; running them about at an 80 percent more like base-load

22 capacity factor today.

23       What we were proposing, in addition to a 2012

24 shutdown, is that we run them at a much lower capacity factor,

25 reflecting basically more of an as-needed kind of commitment.

Vol. 4-731

1  Q    Sir, in the law, is there a name for the option that you

2  just described?

3              MR. HOPSON:  Objection to a question about the law.

4              THE COURT:  Sustained.

5  BY MR. BROOKS:

6  Q    I'm trying to understand here what it is you're telling us

7  when you say that you're not going to control.

8              You've ruled that out completely; yes?

9  A    Yes.  Essentially we've ruled out controlling those three

10 units.

11 Q    So the options now are between closure when you want and

12 closure at some other date, correct?

13 A    Well, in conjunction with the option of running them at a

14 reduced level between now and the time we shut them down.

15              We're trying to be thoughtful about our environmental

16 commitments here, Mr. Brooks.  The idea is, rather than saying

17 we're going to run the heck out of these units until 2012,

18 we're proposing we run them at a much reduced level until 2012

19 and then shut them down when we bring Edwardsport on line.

20 Q    In fact, as we stand here today, you haven't reduced your

21 operation of Wabash River Units 2, 3 and 5, correct?

22 A    In fact, I've instructed our team to operate those units

23 at a reduced level as if this thing that I mentioned earlier

24 called the Rosen baseline were in effect.  So they are under

25 an order from me to run them at a Rosen baseline level for

Vol. 4-732

1   2009 until they hear otherwise.

2   Q    When did that order go out, sir?

3   A    Late last year.

4   Q    That's interesting because we also asked another

5   interrogatory in which we asked what you had done to come into

6   compliance, and I believe you're going to find it in this same

7   set of interrogatories, but I am somewhat hindered by not

8   having it.

9            MR. BROOKS:  May I borrow your copy, sir?

10           MR. HOPSON:  If you give it back.

11  BY MR. BROOKS:

12  Q    Let me ask you to go to page 13, if I could.  Again, this

13  is in Plaintiffs' Exhibit 2080.

14           Would you call up the question there?

15  A    Interrogatory No. 1.  "What have you done since the jury

16  verdict in this matter to come into compliance with the Clean

17  Air Act at Wabash River Units 2, 3 and 5?

18           "Your answer should include, but not be limited to,

19  describing your steps to install pollution controls at those

20  units, reduce emissions at those units or obtain new or

21  amended permits.

22           "In your answer, please describe the facts in detail

23  (specific actions taken, why they were taken, when they were

24  taken, et cetera) identify the relevant documents, identify

25  your witnesses and identify any persons with knowledge of any

Vol. 4-733

1  of the facts responsive to this interrogatory."

2  Q   Can you go down there and look at the highlighted portion?

3        I ask you to read that.

4  A   "The Court has not yet determined what remedial relief

5  (i.e., specific measures to 'come into compliance') if any is

6  appropriate and warranted with respect to the New Source

7  Review violations established at Wabash River Units 2, 3 and 5

8  and the particulate matter State Implementation Plan (SIP)

9  violations established at Beckjord Units 1 and 2.  Moreover,

10 no final judgment has been entered in this case.  Accordingly,

11 Cinergy has no legal obligation at this time to 'come into

12 compliance' with Clean Air Act amendment requirements relevant

13 to the established violations."

14 Q   So let's be fair.  There's the word "nonetheless."  Let's

15 pull that up and see what that leads us to.

16 A   Do you want me to keep reading?

17 Q   If you would like.

18 A   Well, do you want me to keep reading?

19 Q   Please.

20 A   "Nonetheless, since the jury verdict in this matter and

21 the Court's September 28th, 2007 summary judgment concerning

22 Beckjord, Cinergy, at the direction of and in close

23 consultation with its attorneys, has been working diligently

24 to determine what relief, if any, is appropriate under Section

25 113 of the Clean Air Act, 42 U.S.C. Section 7413(b)."

Vol. 4-734

1          Keep going?

2    Q    Yes, please.

3    A    "This assessment has included but has not been limited to

4    an evaluation of:

5          "1, The Federal Court's and EPA's interpretation and

6    application of CAA Section 113 generally;

7          "2, The specific application of Section 113 in other

8    enforcement cases (including settlements) in which NSR and/or

9    PM violations have either been alleged or established;

10          "3, EPA and state guidance and practices regarding the

11    interpretation and application of NSR permitting and control

12    requirements and synthetic minor source permitting;

13          "4, The potential costs of 'coming into compliance' to

14    the company and its customers based on the specific relief

15    sought by Plaintiffs in this case;

16          "5, The technological feasibility and propriety of

17    installing certain types of controls or compliance measurement

18    devices;

19          "6, Regulatory and or legal obligations (for example,

20    requirements imposed by the Midwest Independent Transmission

21    System Operators and the Indiana Utility Regulatory

22    Commission);

23          "7, The reasonableness of and factual basis for

24    penalties sought by Plaintiffs for the Beckjord PM SIP

25    violations; and

Vol. 4-735

1     "8, The specific facts and arguments made by

2 Plaintiffs and their experts in support of the relief they

3 seek in this case.

4     "To date Cinergy's analysis has been hampered by

5 Plaintiffs' failure to fully respond to discovery requests

6 seeking to elicit the precise details of the relief Plaintiffs

7 seek in this case."

8 Q   Sir, my question is:  Anywhere in there this concept that

9 you are reducing emissions?

10 A   No.  Again, this -- I think we -- I think I mentioned this

11 was sent out, it looks like in October.  It was really late

12 last year, as I was getting my mind around this case following

13 my deposition, that I encouraged our folks to see about the

14 idea of starting the process of operating the units at a

15 reduced level for 2009.

16 Q   Now, that's a lot easier when it's not summer, isn't it?

17 A   I don't understand that question.

18 Q   Well, you like to run those units whenever you can.

19     Isn't that your testimony earlier today?

20 A   Well, we've been running them at about a 70 to 80 percent

21 capacity factor, which means they're running.  The baseline

22 idea that I talked about earlier gives us the flexibility to

23 run them at the times that we most need them.

24 Q   Let's just be clear about what that capacity factor means.

25     When you hit a 75 or 80 percent capacity factor,

Vol. 4-736

1  you're operating those units virtually every hour they're able

2  to be operated; isn't that true?

3  A    That's a way to think about it.  That's the right way to

4  think about it.

5  Q    And that's the way they were operated the summer after the

6  jury verdict, isn't it?

7  A    Yes.

8  Q    Now, I just want to make sure -- and I know we've been

9  over this -- but you understand that there's a possibility --

10  I can't put a number to it, but there's a possibility that

11  this court might order you to come into compliance sooner,

12  rather than later with the Clean Air Act; isn't that right?

13  A    I don't want to quarrel with the words, Mr. Brooks.  I

14  certainly understand the Court's ultimate remedy could be

15  different from the one we've proposed, if that's what you're

16  asking me.

17  Q    And even as an insurance policy though, you've decided not

18  to ask MISO to do a full reliability study; is that right?

19  A    We've been over this, Mr. Brooks.  We have the jury

20  verdict; but it didn't trigger in my mind, oh, my God, I've

21  got to get a study from MISO.

22  Q    You understand, do you not, sir, that a full Attachment Y

23  reliability study would identify not only the problem, but

24  potential solution; isn't that right?

25  A    MISO's Attachment Y reliability study is sort of a

Vol. 4-737

1  definitive word on reliability for our bulk transmission

2  system and the generation assets tie into that bulk

3  transmission system.  So, certainly before we would shut those

4  units down, we would ask MISO to do a formal Attachment Y

5  study.

6  Q   But that takes about six months, doesn't it?

7  A   Generally, yes.  I don't know if you can expedite with

8  MISO.  There may be some instances where you can expedite.

9        Generally speaking, a good and thorough Attachment Y

10 probably takes six months.

11 Q   So if you don't ask for an Attachment Y, you always have

12 at least six months, right?

13       You always have a reason why you can't shut down for

14 another six months?

15 A   Again, there may be times where you can ask MISO to

16 expedite.  I don't know what their flexibility is on that.

17 Q   You haven't asked if they can expedite on it, have you?

18 A   Again, I've not seen a reason to ask for that at this

19 point.

20 Q   You actually have people who work at MISO, right, on

21 committees?

22 A   Well, they don't work at MISO.

23 Q   Well, they work with MISO on committees, don't they?

24 A   Every major industry stakeholder that has a stake in

25 MISO -- MISO's a nonprofit independent system operator.  So

Vol. 4-738

1  that means that the board of directors, by charter of MISO and

2  by FERC order, is completely 100 percent independent of

3  participants, either market participants or

4  transmission-owning entities for whom MISO controls the

5  transmission system.

6         All of those entities, the many, many entities that

7  are in that large footprint that was put up earlier, all of

8  those entities participate in working committees at MISO.

9  Q   So you have a close working relationship with MISO,

10 correct?

11 A   I hope so.

12 Q   Just so I understand this operating constraint just a

13 little bit better, you would agree with me that MISO has

14 said -- let's look at --

15         THE COURT:  Let's take our break at this point.

16 Let's take 15.

17         COURT CLERK:  All rise.

18         The Court will recess until 10:20.

19     (A recess was taken.)

20         THE COURT:  You may continue.

21 BY MR. BROOKS:

22 Q   Mr. Turner, just as a little cleanup on where we were.

23         When did you say you first became aware that the

24 United States was insisting upon -- either the Plaintiffs were

25 insisting upon either control of the units or immediate

Vol. 4-739

1  shutdown?

2  A   I don't think I did say when I specifically became aware.

3  Honestly, I don't know the exact answer; but I would say it

4  would have been sometime leading up to my deposition in the

5  case would be my guess.  It may have been a little earlier

6  than that, but I don't remember the exact time frame.

7  Q   Maybe this will refresh your recollection, sir.

8        Can we see the video clip from the Turner deposition?

9  This would be from, I believe, page 195 in the transcript.

10       (An excerpt of the video deposition of Mr. Turner was

11  played in open court).

12  BY MR. BROOKS:

13  Q   Is that you, sir?

14       Does that refresh your recollection, sir?

15  A   It does.  I don't know what "not long after means," but it

16  would have been sometime between, call it June and November.

17       And I seemed to be struggling with it then just as I

18  am today.

19  Q   Well, when you testified in November, you think your

20  recollection was a little better?

21  A   I don't know.  I don't know when I specifically became

22  aware of it, Mr. Brooks.

23  Q   Well, if it was between June and November, and you

24  testified in November, if you had learned in November, you

25  wouldn't have had -- you wouldn't have used a reference that

Vol. 4-740

1  it was shortly after the jury verdict, would you?

2        MR. HOPSON:  Objection, argumentative.

3        THE COURT:  It is.

4        MR. BROOKS:  I'm sorry.

5  BY MR. BROOKS:

6  Q   Let's talk a little bit more about this proposal if Duke

7  continued to operate.

8        You understand that the issue that is addressed in the

9  MISO report, which is DR320; is that right?  321, I'm sorry.

10       You understand that the issue being addressed is a

11 summer peak issue, right?

12 A   Most of our reliability issues are summer peak issues.

13 So, yes, I think MISO is specifically talking about things

14 that can happen in the summer, but reserve margin is a summer

15 peak issue.

16 Q   Well, let's separate out, if we could, in our questions,

17 reserve margin and transmission constraint issues; is that

18 okay?

19 A   Sure.  You seem to be focused on summer peak; and

20 everything about our industry is a summer peak issue to some

21 extent.

22 Q   That's fair.  We'll specifically talk about reserve

23 capacity; but right now I want to focus on this issue that is

24 tied to the Dresser substation that you described, and that is

25 more described in DR321.  Let's look at page 7 of that

Vol. 4-741

1  exhibit.

2          MR. HOPSON:  Excuse me, Mr. Brooks, do you have an

3  extra copy?

4          Your Honor, just so we can move faster, if I can

5  just give him this copy and we'll work with both images and

6  hard copy.

7          THE COURT:  Thanks.  That'll be good because the

8  images are to replace the hard copies, so let's use both.

9          What kind of environmental standard is that,

10  Mr. Brooks?

11          MR. BROOKS:  A poor one, I admit.

12  BY MR. BROOKS:

13  Q   Can I ask you to look at page 7, please?

14  A   If there's pagination on here, I don't see it.

15  Q   It would be the 7th physical page.

16  A   Including the cover?

17  Q   Yes.

18  A   Okay.  It looks like it starts in the middle of a

19  sentence.

20  Q   Yes.  Let's look down there at that last sentence.

21          Could you read that into the record, please?

22  A   Yes.  It says, "Typically when ambient temperatures are

23  below 90 degrees Fahrenheit in the Terre Haute, Indiana

24  region, it is safe to shut down Wabash River units as system

25  conditions dictate."

Vol. 4-742

1  Q    So this is a reliability issue tied to temperature, isn't

2  it?

3  A    Well, that was the clarification I tried to make earlier.

4  Many of our reliability issues are tied to temperature, to

5  conditions on the system; and those conditions get most

6  stressed in high temperatures.

7  Q    But we're talking specifically -- if I understand your

8  prior testimony -- and please feel free to correct me -- that

9  one of the reasons that Duke believes it's appropriate to

10 allow these units to continue to operate until 2012 is because

11 there's a concern about reliability in the Terre Haute region,

12 correct?

13 A    Yes.

14 Q    In fact, that particular issue is addressed in this

15 informational report that's in evidence as DR321, right?

16 A    Well, part of the issue is.  When I was speaking earlier,

17 I talked about generation adequacy generally as a concern that

18 I had.  MISO then brought to our attention really -- at least

19 to my attention in Mr. Harszy's deposition, and later in the

20 report I'm holding in my hand -- that there was a transmission

21 issue as well, basically a load pocket issue in Terre Haute.

22 Q    And that's what the MISO study relates to, right?

23 A    Yes.

24 Q    That's not a full Attachment Y study as we've talked about

25 it here, right?

Vol. 4-743

1  A   I have to confess, I'm not intricately familiar with what

2  an Attachment Y looks like in detail; but this does not appear

3  to be the full blown study MISO would do if you were actually

4  asking them to do something to act now.

5  Q   Okay.  Let's focus here on the issue MISO is addressing.

6       Would you agree with me that the Dresser

7  transformer-related issue is tied to peak demand times when

8  the temperature is above -- is 90 degrees or higher?

9       Do you agree with that?

10 A   I don't know what the times part of that question was but,

11 generally speaking, the overload issue that MISO has

12 identified has to do with when the system is stressed.  And

13 you're going to see that happen when it gets up to around

14 90 degrees.  The system can get stressed below 90 degrees.

15 Don't get me wrong.  If units are out, or if there's some

16 other constraint on the system or congestion, the system can

17 certainly get stressed below 90.  But, generally, the concern

18 MISO has identified here is what happens when temperatures are

19 above 90 because that's when system problems are most likely

20 to happen.

21 Q   Mr. Turner, Duke Energy Midwest has several components

22 that deal with transmission issues; isn't that true?

23 A   Yes, both in our Midwest operations and in our Carolinas

24 operation we have transmission people.

25 Q   Well, you have a load forecasting group; isn't that right?

Vol. 4-744

1  A    Yes.

2  Q    I didn't mean to cut you off.

3  A    Go ahead.

4  Q    Their job is to forecast the load out into the future;

5  isn't that right?

6  A    Yes.

7  Q    In fact, that's how in some studies you identify load

8  problems out 5, 10, 15 years in the future, right?

9  A    That's correct.  It informs the Integrated Resource Plan.

10 Q    You also have a transmission and distribution section that

11 deals with making sure that the transmission system is

12 actually functioning, isn't that right?

13 A    Yes.  The split between what MISO does and what we do --

14 again, using Mr. Kahal's term -- is a little bit complicated;

15 but, in essence, we sort of manage the transmission assets.

16      We manage the people who would be in charge of, for

17 example, going to restore service on a transmission circuit;

18 but the responsibility for operating the grid, as it were,

19 sits MISO.

20 Q    Well, let's make sure that distinction is clear.

21      When you say "the assets," you're talking about things

22 like power lines, substations and transmission equipment, all

23 that have stuff, right?

24 A    Yes, and the people who would work on those things.

25 Q    They're all employees of Duke?

Vol. 4-745

1  A    Yes.  MISO wouldn't have people, for example, going to

2  work on a substation.

3  Q    And Duke Energy Midwest, about how many people work on

4  maintaining transmission?

5          Do you have a rough guess?

6  A    It would be a wild speculation, Mr. Brooks.  I'm sorry, I

7  don't know.  The number's lower than it used to be because of

8  MISO.  I don't remember the numbers.

9  Q    It still numbers over a hundred, doesn't it, sir?

10 A    If you've got something that says a hundred.  I just don't

11 remember.

12 Q    And those would be electrical engineers, right?

13 A    We do have folks who work in transmission system

14 planning -- Mr. Snead, whose name I saw earlier -- who are

15 electrical engineers.  But I'm -- the thing I'm hesitating on

16 is we have people who are also in the engineering distribution

17 system, which is very different from the transmission system.

18          The way I think about that organization is that it's a

19 power delivery organization, which includes both transmission

20 and distribution.  So I just don't remember the numbers.

21 Q    And you have a separate group that's called Asset

22 Management; isn't that right?

23 A    Yes, that's right.

24 Q    What do they do?

25 A    They basically take care of the assets.  They're the ones

1  responsible for maintaining the physical assets.

2  Q    Like substation transformers?

3  A    Yes.

4  Q    They would also be the folks involved in trying to order a

5  new transformer; isn't that right?

6  A    I think those work orders would come out of that group.

7  Q    Let me -- we talked just for a second about long-term

8  forecasting; but it's also true that, in planning for dispatch

9  of electrical generation, Duke's dispatch folks run models of

10 short-term demand trends; isn't that right?

11 A    Yes.  I think that's a fair statement.

12 Q    So they model a day ahead or a week ahead; isn't that

13 right?

14 A    Yes.

15 Q    And the idea there is to take into account current use

16 patterns and expected weather conditions; isn't that right?

17 A    Yes.

18 Q    Duke also monitors the hour-to-hour condition of important

19 transmission assets, doesn't it?

20 A    You're stretching the limits of what I understand between

21 what we do and what MISO does.  I'm certain we do monitor our

22 transmission system performance; and I think we do that

23 regularly from a transmission operations center; but again,

24 there's some overlap between what we do there and what MISO

25 does.

Vol. 4-747

1  Q   One of the things Duke does, for example, is it monitors

2  the temperature of important transformers, right?

3  A   Yes.  That's part of the managing the assets piece that I

4  talked about earlier.

5  Q   It monitors those temperatures because thermal overloads

6  are the most significant cause of failure of something like a

7  transformer; isn't that right?

8  A   I don't know if that's the most significant or the most

9  number of things.  We have gassing in our transformers that

10  occur.  There are all sorts of things that can happen in

11  transformers; but generally they're monitoring the assets to

12  try to make sure those things don't happen.

13  Q   Well, the problem that's identified in the MISO study is

14  that, if Wabash River 2, 3 and 5 are offline, and if one of

15  the two Dresser substations fails, then there's an operating

16  constraint; is that true?

17  A   There's only one Dresser substation.  There are two

18  transformers at Dresser.

19  Q   Did I misspeak?

20  A   I think the problem the report is speaking to is yes,

21  under certain conditions, we could have a catastrophic failure

22  if you were to lose a transformer at Dresser and the Wabash

23  River units were off at the same time.

24  Q   Sir, is there some statement in DR321 where they use that

25  term "catastrophic"?  Earlier you said "cascading."

Vol. 4-748

1  A   I consider losing all of Terre Haute catastrophic.  Maybe

2  we should readjust our terminology, but for me that would be a

3  catastrophic failure.  It wouldn't be as catastrophic as

4  50 million customers, but it would certainly be a bad day.

5  Q   Well, sir, does it say that that will happen; that all of

6  Terre Haute will go dark?

7       Is that really what the report says?

8  A   I don't remember what it says.  Let me look back.

9       It certainly talks about rotating -- shedding load.

10 The term "shedding load" is poison for me, so that gets my

11 attention.  I think they were describing most of the Terre

12 Haute load pocket, but you can maybe correct me if I'm wrong

13 here.

14       MR. HOPSON:  Is there a question pending, Your

15 Honor?

16       THE COURT:  They're looking for something.

17 BY MR. BROOKS:

18 Q   I just asked if the report indicates that all of Terre

19 Haute would be lost under any particular scenario.

20 A   It says that, "A portion of the approximately 350-megawatt

21 load of Terre Haute may have to be reduced at times when

22 available mitigation options are exhausted for the congestion

23 of the Dresser 345/138 transformers."

24       Then it says, "The risk to the Terre Haute and

25 vicinity 350-megawatt load pocket equates to approximately

Vol. 4-749

1  25 percent of the total 350 megawatts during the summer season

2  for approximately one to two hours of the peak each day."

3          So, in essence, what we do is we have plans to not

4  make everybody suffer the same -- not make one particular part

5  of the population suffer all of a blackout.  So what we

6  generally do -- you may have heard the term "rotating

7  blackouts --" there would probably be a rotation of the

8  blackouts.  So, at some point you're going to impact everybody

9  in a load pocket that would be constrained.

10 Q   Let me first ask you this:  In a scenario where Wabash

11 River 2, 3 and 5 are offline, and something happens to one of

12 the Dresser transformers, does that automatically mean a

13 blackout?

14 A   No, not necessarily.  It depends on the system conditions.

15 Q   And it depends on what mitigation can be taken by the

16 company at that time, right?

17 A   Well, yes; but what this is implying is that, if those two

18 things happen, the mitigation would have to be load shedding.

19 Q   Is that the way you read that?

20 A   That's the way I'm reading it.

21 Q   What page are you on?

22 A   Depending on the conditions.  Depending on the conditions.

23 Q   And this summer peak problem, this acute constraint lasts

24 one to two hours; is that right?

25 A   That's what the MISO report says.

Vol. 4-750

1  Q   Now, the load in the Terre Haute area, what is that load

2  in megawatts?

3  A   Well, it says here in the report that it's about

4  350 megawatts in the load pocket that they're referring to.

5  Q   You understand that to be a statement about what the peak

6  is?

7  A   I assume they're speaking about peak demand, but I don't

8  know.

9  Q   You don't know?

10 A   It doesn't say in this report.

11 Q   What's Duke's projection for the load in that pocket for

12 2009, peak load?

13 A   We don't project load by pocket.

14 Q   But you project load, do you not?

15 A   We forecast system demand for the entire system, but we're

16 not forecasting what's the Terre Haute -- we don't put

17 together Integrated Resource Plans that say here's the Terre

18 Haute load pocket, here's the Brazil load pocket, here's the

19 Johnson County load pocket.  We don't do that.

20 Q   I'm actually not talking about the Integrated Resource

21 Plan, sir.

22        Isn't it true that Duke maintains projections of load

23 for reasons other than the Integrated Resource Plan?

24 A   Most of the forecasting of load that we do is to inform

25 the Integrated Resource Plan.  Whether there are other

Vol. 4-751

1  projections of load that are load pocket by load pocket, I'm

2  not familiar with that.  There could be, but I'm not familiar

3  with them.

4  Q   Well, in order to have a system aggregate demand, you

5  would have to have the components of that demand, wouldn't

6  you?

7  A   We -- and I may be confusing generation load planning with

8  transmission load planning, but on the generation side we do

9  not pars it up into little tiny components.

10 Q   Not on a general basis, right?

11 A   I don't know that we do it at all from the standpoint of

12 planning generation.  Now, if you add generation or take

13 generation away from a particular place, that will not only

14 have system wide impacts, but it's going to have localized

15 impacts.

16        So, to the extent that there's a proposal to take away

17 or add generation in particular areas, we're probably going to

18 look at a more localized type of forecasting to your question.

19        The vast majority of the forecasting we do is a more

20 generalized forecasting of what resources we need and how

21 we're going to meet the demand.  What the loads goings to be

22 and how we're going to meet that load.

23        MR. BROOKS:  Could we have Plaintiffs' 2012, please?

24 BY MR. BROOKS:

25 Q   Mr. Turner, could you identify that for us?

Vol. 4-752

1    A    This appears to be a cover page of a FERC Form 715

2    document filed by Duke on April the 1st, 2008, called "Annual

3    Transmission Planning and Evaluation Report."

4             MR. BROOKS:  Your Honor, this has been stipulated to

5    as authentic and nonhearsay.  I move for its admission.

6             MR. HOPSON:  Correct, Your Honor.

7             THE COURT:  It's admitted.

8        *(Plaintiffs' Exhibit 2012 was received in evidence.)*

9    BY MR. BROOKS:

10   Q    What is the FERC Form 715?

11   A    Well, it looks like something we file with FERC to update

12   them on our transmission planning and evaluation; and it looks

13   like we do it annually.

14   Q    Well, if I could direct your attention to the fourth

15   physical page where it says ReliabilityFirst, sir.

16            What is ReliabilityFirst?  I think you talked about

17   that earlier.

18   A    I'm having trouble reading this page again.  If I could

19   get some help?

20            MR. HOPSON:  Your Honor, I object to impeaching the

21   witness if he hasn't seen the document before, if he hasn't

22   read it at least.

23            THE COURT:  I don't know if he's impeaching the

24   witness.

25            MR. BROOKS:  No intent to impeach.

Vol. 4-753

1  A    I can see part of that problem.

2  BY MR. BROOKS:

3  Q    This will help.  Part of the problem is the images are

4  made from later generation copies and it makes it hard to see.

5  A    I'm sorry.  What was the question?

6  Q    Well, you told us a little bit about ReliabilityFirst.

7         You see here, on page 4 of the exhibit, there's a

8  discussion about ReliabilityFirst?

9  A    Yes, I see it.

10  Q    Isn't it true that the ReliabilityFirst organization --

11  ReliabilityFirst Corporation assists, among others, Duke in

12  its power planning?

13  A    Yes, I think that's generally right.  I think of them more

14  as enforcement agency now under NERC.  It appears from this

15  that they do help with the power planning as well.

16  Q    You agree with me, do you not, that one of the major tools

17  of either ReliabilityFirst's operation, MISO or even at Duke,

18  is a model that's frequently referred to as power flow?

19         Are you familiar with that?

20  A    Yes.  But to say I'm intimately familiar would be an

21  overstatement.

22  Q    But power flow is one of those models that helps you

23  understand how the transmission grid will react to things like

24  contingencies, right?

25  A    Generally speaking, I think that's correct.

1  Q   In fact, it's true, isn't it, that there's a power flow

2  model that runs 247, both at Duke and MISO, that takes into

3  account today's conditions and tests those against various

4  contingencies to see what might happen if something goes

5  wrong; isn't that right?

6  A   Mr. Brooks, I'm generally familiar with that, but I can't

7  tell you that I'm intimately familiar with the power flow

8  simulations.

9  Q   But if Mr. Geswein -- in the designated testimony --

10 testified to that, you wouldn't quarrel with it, right?

11 A   If Mr. Geswein said it, I have no reason to doubt Tony on

12 that point.

13 Q   And these same basic models are what are used to do things

14 like identify the need for a new transformer.

15      Remember we looked at that study that Duke did and

16 projected that, somewhere out there in the future, it was

17 going to need a new transformer at Dresser?

18 A   Yes, particularly in conjunction with our addition of the

19 Edwardsport plant down in southwest Indiana.

20 Q   So these models are used all the time, aren't they?

21 A   I don't know how often they run.  You told me daily.  I

22 just don't know.  MISO does a lot of them as well.  That's why

23 I'm struggling with how much we do on a day-to-day basis.

24 Q   Let's look at page 7, if we could, of Exhibit 2012.  Let's

25 highlight the part that says "from current power flow cases

Vol. 4-755

1  down."  I'll just direct your attention down here.  You see a

2  number of cases.

3       You're familiar with how different scenarios are run

4  on models and they give them case names, right?

5  A   Not on the power flow model, but I'm generally familiar

6  with it in Integrated Resource Planning.

7  Q   You do see down here there was a summer 2009 peak case?

8       Do you see that?

9  A   I see the words.

10 Q   Well, here's my question, sir:  Based on your

11 understanding, is it correct that -- in order to know what the

12 summer peak for Duke Energy Indiana is -- you have to know

13 what all the discrete points of demand are?

14 A   You're testing the limits of my knowledge, Mr. Brooks.

15 Again, I think of this mostly as generation resource planning,

16 which is where we don't do discrete points of demand.  But I

17 think transmission planners probably get a little more

18 discrete, at least in trying to understand the flows of power

19 on the transmission system because they need to know what they

20 think is going to happen on power flows -- it's more

21 geographic, more location specific; but I can't answer your

22 question beyond that.

23 Q   Well, I'm curious.  Have you requested that any of your

24 transmission planning engineers develop a projection for the

25 summer peak load this summer in Terre Haute?

Vol. 4-756

1  A    I have not requested it, but I know we have -- I'm sure we

2  have forecasted summer peak loads for Terre Haute.

3  Q    But as far as you know, no one's going to come in here and

4  tell the court what that is, right?

5  A    It's in the Integrated Resource Plan.  At least that's one

6  forecast of the summer peak load that I looked at earlier.  I

7  think it's in evidence.

8  Q    Well, I'm going to let you look through it if you like,

9  but I might save you some time by telling you it's aggregate,

10  not Terre Haute specific.

11        Would you like to look at it?

12  A    I told you that it doesn't break it down.  That's what I

13  was telling you earlier.

14  Q    Are you telling me, or are you telling the court that Duke

15  Energy Midwest couldn't come up with a projection for the

16  summer peak load for this coming summer in Terre Haute?

17  A    I am assuming -- I could be assuming incorrectly -- that

18  MISO in coming up with 350 megawatts of load, either did its

19  own study or relied on Duke Energy forecasts for peak demand,

20  and assumed based on the number of customers in that region

21  that that was the peak demand.

22  Q    But you don't know how they did that?

23  A    I don't know.

24  Q    Do you know what --

25  A    I don't know how MISO came up with that number.  I assume

1  that number reflects numbers that we have somewhere in our

2  forecasting.

3  Q    Do you have any idea when the last load forecast for the

4  Terre Haute region was done?

5  A    Mr. Brooks, I am -- maybe I've miscommunicated to you.  I

6  don't know of specific things like here's the Terre Haute load

7  forecast; here's the Brazil load forecast; here's the Linton

8  forecast; here's the Kokomo forecast.  I'm not aware of

9  anything like that that we have on our system for peak demand.

10  Q    Let me ask you something that you probably do know then.

11  If a load forecast were done, let's say, year and a half ago

12  for Terre Haute, would you expect that the forecast for 2009

13  might be a little off as a result of the recession?

14  A    Yeah, we've seen load growth.  I think Mr. Kahal touched

15  on it yesterday.  We've seen load growth fall off a little

16  bit.

17       Normally we expect, and historically we've been

18  planning for, call it a percent to a percent and a half a year

19  of growth on the system.  Again, I'm talking system wide.  I'm

20  not talking Terre Haute and Kokomo and discrete communities.

21  I'm talking the total system of Duke Cinergy Indiana.  We're

22  planning for a 1 to 1 1/2 percent load growth.

23       The recession has clearly had an impact.  We're seeing

24  that growth sort of go down to zero; and even slightly south

25  of zero has been what we have been seeing over the last six

Vol. 4-758

1  months.

2  Q    Have you seen the projections from PJM, which is another

3  reliability organization that footprint actually intermingles

4  with MISO, that they're expecting load drop of between 1 1/2

5  and 5 percent in places like Ohio and Indiana?

6  A    I have not seen PJM's projections.  Five percent would be

7  high I think.  One percent is not inconceivable.  In fact,

8  that's more like what we're seeing for the next year.

9  Q    But you don't disagree with me that any study that seeks

10  to identify a contingency or a problem in a transmission

11  system absolutely relies upon or is driven by the load

12  forecast, right?

13  A    I'm not sure I understood your question.

14  Q    Well, you've looked at Exhibit DR321 you said.

15  A    I'm sorry.  What is that?

16  Q    That's the MISO study.  Let's look back at that in table

17  4, which is physically page 15.

18  A    Okay.

19  Q    Let's look at the top.  It says, "Table 4:  Planning

20  Analysis Thermal Violations."

21        What do you understand that to mean?

22  A    It appears to say that, if you had -- it kind of

23  identifies the contingency, identifies the potential limiting

24  impact, and then the percent that you would overload the

25  system essentially is how I'm reading it.  I didn't put this

Vol. 4-759

1  together, so I can't describe the table in detail.

2  Q    I'm just asking for your understanding, sir.

3  A    That's what it appears to be.

4  Q    Isn't it true, that what this table tells us is that at an

5  area load level of 358 megawatts with these various

6  contingencies, the things on the right, the percent overload,

7  that's what the model says will happen?

8  A    You'll have to ask the MISO witness if that's what --

9  Q    You don't know?

10  A    I don't know.

11  Q    So you don't know whether --

12  A    I understand generally what the MISO report says.  I don't

13  know specifically what this table is trying to tell us.

14  Q    Do you understand that there is a direct relationship

15  between the forecasted peak load and a model prediction of

16  percent overload of any particular transmission facility?

17  A    Absolutely.  It's all about peak load.

18  Q    So, if the load that they used in this model is wrong,

19  then the outcome is wrong; isn't that right?

20  A    But my understanding is they're modeling -- they were

21  modeling a current state problem, not what happens if the load

22  grows 5 percent problem.

23  Q    Well, that's interesting that you say that.  Let's look at

24  the top.  Look on the left side.  We're looking at table 4,

25  and just under the heading -- look to the left.  It says,

Vol. 4-760

1  "Model year 2013 summer peak."

2         Do you see that?

3  A    Yes, I do see that.

4  Q    This is a projection of 2013 load, isn't it, sir?

5  A    That's what the table says.  I don't remember if that's

6  what the rest of the report was talking about.

7  Q    But you agree with me that, if we don't have the load

8  right, we don't have the answer right?

9  A    Mr. Brooks, that is the nature of the business we're in.

10  We're making assumptions every day about what the loads will

11  be, what the weather conditions will be.

12         Let me just tell you that even if load stays

13  absolutely flat between now and 2013, if the summer

14  temperature in Terre Haute region is 95 degrees instead of 90,

15  it changes everything.  So the question that you're asking me

16  has no answer because there are so many contingencies that can

17  happen, which is why we build contingency in the way we do

18  with peak demand.

19  Q    Well, you do agree, don't you, that every effort ought to

20  be made to make the best projection one can make?

21  A    Mr. Brooks, I assume MISO tried to make good projections

22  when they put the report together, but you don't know whether

23  the temperature is going to be 90 degrees, or 95 the degrees,

24  or 98 degrees or even 100 degrees on any given day during the

25  summer of 2009, '10, '11, '12 or '13.  This is assuming

Vol. 4–761

1  90 degrees, so at 95 degrees the answer could be

2  extraordinarily different.

3  Q    How do you know it's assuming 90 degrees?

4  A    It talks about a contingency that happens at 90 degrees.

5  Q    Was that what the modeling was done at was 90 degrees?

6  A    Again, I didn't do this report; but I assume if they have

7  90 degrees in that report, that's what they were assuming.

8  Q    But you don't know what the basis of that load projection

9  was, do you?

10  A    I would encourage you to talk to the MISO person about it.

11  Q    Now, this constraint that's being discussed in this MISO

12  report is because there's too much load on one of the

13  transformers if the other one goes out, right?

14  A    Yes.

15  Q    But there are things that can be done to address that

16  problem, right?

17  A    I read the MISO report as suggesting that the options were

18  limited.

19  Q    If there were a fire at the Wabash River generating

20  station late this afternoon and everyone was out safely, but

21  Units 2, 3 and 5 were destroyed, are you telling me that Duke

22  has no idea what it would do to keep the transmission grid in

23  operation?

24  A    Well, I don't think we're at a system peak today.  So I'm

25  not as concerned about it this very moment; but if it were at

Vol. 4-762

1  a time of system peak, we would be very stressed, and there

2  would be things that we could do; but some of that, depending

3  on the conditions, could involve shedding load.

4  Q    Well, what would you do if it happened today and summer

5  peak is now five months away?

6  A    That is -- one, I haven't planned for the station burning

7  to the ground, but I'm certain that we would put a team

8  together very quickly and analyze what our options are.

9  Q    And that team would encompass the electrical engineers?

10 A    It would include folks from our generation planning group,

11 the analytical investment engineering group.  It would have a

12 lot of people involved in figuring out what to do.

13 Q    But you haven't tasked them, as we stand here today, with

14 identifying a plate of options that could be used in --

15          MR. HOPSON:  Objection, asked and answered.

16          MR. BROOKS:  I don't believe it has been, Your

17 Honor.

18          THE COURT:  Let me hear the full question.

19 BY MR. BROOKS:

20 Q    As we stand here today, you've not tasked the Duke Energy

21 Midwest folks with coming up with a contingency plan in the

22 event that this court decides that these units have to be shut

23 down in advance of this summer, have you?

24 A    We've certainly been giving it some thought.  I wouldn't

25 say that there is a full-blown plan that has been developed to

Vol. 4-763

1  figure that out.  It's on our minds because of this case, but

2  it's something I'm hopeful is not the direction we're going.

3  Q   You agree with me, sir, that the MISO concern about the

4  loss of a transformer at Dresser could be mitigated by

5  acquisition of a third transformer of the same basic size;

6  isn't that right?

7  A   For what use?

8  Q   At Dresser.

9  A   The issue with adding a transformer -- are you talking

10 about if a transformer failed?

11 Q   No, no.  I'm sorry, it was an unclear question.

12     You had testified earlier that you're already planning

13 to put a third transformer at Dresser, right?

14 A   Yes, that's correct.

15 Q   And you said that would go all the way or a long way to

16 resolving any reliability issue, right?

17 A   I believe it would because then, if you had one fail and

18 the second one fail, you would be in -- the chances of the

19 second one overloading would be minimized.

20 Q   Let's talk about that for a moment.

21     In terms of getting that new transformer, this isn't

22 the first transformer that Duke has purchased, is it?

23 A   When?

24 Q   Ever.

25 A   No.

Vol. 4-764

1  Q    In fact, you purchase a lot of them, don't you?

2  A    Not of this size.  I want to distinguish these kinds --

3  this kind of transformer that we're talking about from the

4  little one that you might see on the pole out behind your

5  house.  We have an inventory of the little one you might see

6  on the pole behind your house.  They're little.  They do fail

7  from time to time, and we want to be quick to put them back in

8  again.  We do not maintain an inventory of transformers of

9  this size.  These are massive things.

10        Again, we're not looking at Dresser as just a

11  replacement of a transformer.  We're looking at Dresser as an

12  upgrade of the substation.  We're adding a transformer, which

13  completely changes how you think about planning for what we're

14  doing.  It's not simply taking one out, putting one in, which

15  is of itself not simple, but it's certainly a simpler process

16  than adding more transformer and transmission capacity at a

17  station of that consequence.

18  Q    You're planning to put that in by 2012, right?

19  A    I think we've established that, yes.

20  Q    My question is:  You've got a lot of substations that are

21  this size when you look at the footprint of the entire Duke

22  system; isn't that true?

23  A    Yeah.  If you look -- you're talking about Midwest and

24  Carolinas?  We have quite a number of large substations.

25  Q    Sir, you have relationships with transformer vendors;

Vol. 4-765

1 isn't that right?

2 A    Yes, we have relationships with manufacturers who

3 fabricate various things for us and other utilities.  In fact,

4 Mr. Brooks, this is an issue that has come to EEI's radar

5 screen.  EEI is the Edison Electric Institute.

6       EEI, our trade industry organization, is quite

7 concerned about inventories of large transformers and sharing

8 of large transformers among utilities because of national

9 security issues; and one of the concerns that the industry has

10 is what our national security implications and people

11 targeting these kinds of assets.  But I don't want that to

12 suggest to you that we are all sitting around with a lot of

13 these in our garage waiting for incidents to happen because it

14 would be an extraordinarily expensive proposition for

15 customers if we tried to maintain an inventory of 345KV to

16 138KV transformers.

17 Q   We'll talk about inventories in just a minute; but in

18 terms of a new transformer, have you directed whoever it is

19 within Duke who's responsible for this to contact vendors to

20 see if they could expedite the fabrication and shipment of the

21 transformer for Dresser?

22 A    I have not personally contacted them.  My understanding

23 from the team is we're on a schedule where we can get these

24 things fabricated, delivered and installed in time for 2012.

25 Q    Sir, during a 30(b)(6) deposition, Mr. Geswein testified

1  for the company and he told me that it would take 18 to 24

2  months to get one of these transformers.

3          Do you disagree with that?

4  A   I don't know.  If he says 18 to 24 months to get one

5  delivered to us, that may be -- I have no idea whether that's

6  right or wrong.  But then you have to install it and you have

7  to plan the substation to take the additional transformer

8  capacity.

9  Q   Let's call up page 109 of Mr. Geswein.  I just want to

10  make sure we're not missing each other here.

11  A   Could we blow it up just a hair?

12  Q   Yes.  It's the lower portion.  Start with line 15, if you

13  would, please.

14          The question was:  "Has a replacement transformer been

15  ordered for the other failed transformer?"  There was prior

16  talk about another spare problem.

17          "How long will it take to replace it?

18          "Answer:  Lead times for that size transformer, as I

19  understand today, about two years.

20          "Can that be cut?

21          "I don't know that answer."

22          Has anybody explored the possibility of accelerating

23  installation of a third transformer at Dresser?

24  A   I satisfied myself that we could get it done by 2012.  My

25  understanding was we were being aggressive with the schedule

Vol. 4-767

1  as it is.  Whether we can accelerate it beyond 2012, I would

2  have to evaluate it.  I'm probably in the same place as Tony

3  is.

4       Again, I don't know if that's delivery of a

5  transformer or that includes all in, meaning engineering,

6  fabrication, delivery and installation of the additional

7  transformer at the substation.

8  Q   But you know that you can meet your business plan of 2012,

9  right?

10  A   I know we can have it on before we bring the Edwardsport

11  facility online, which is the thing initially I was most

12  concerned about.

13  Q   Now, let's talk about that issue of inventory or spares.

14       Have you directed an inventory throughout the Duke

15  system to determine whether there is a suitable spare

16  transformer for the Dresser substation?

17  A   My understanding is we do have a large spare; but the

18  large spare is being deployed in the Cincinnati area this

19  summer.  I can't remember exactly where it's being deployed.

20  I think the Pierce substation.  The issue there is we had a

21  failure of one of the transformers at that station, so the

22  criticality and the urgency of that is quite significant.

23       As I understand it, the models, the same kinds of

24  things we were talking about earlier from MISO, suggests that

25  we could lose significant amounts of load in Cincinnati if we

1  don't get that replaced before the summer.

2  Q   The Pierce transformer has actually been ordered and is

3  being fabricated, hasn't it?

4  A   That may be true.  I think we're deploying a spare

5  transformer, the one transformer we have that's of this size

6  at the Pierce substation.  That's my understanding.

7  Q   Now, the Pierce station system is part of the Duke Energy

8  Midwest, right?

9  A   Part of our Midwest operations, yes.

10 Q   What inquiry has been made of Duke Energy North Carolina

11 to see if they've got a spare?

12 A   I don't know, but I -- I'm not aware of a spare

13 transformer that could be used.  I could stand to be corrected

14 on that.  I don't know the answer.

15 Q   And ReliabilityFirst Corporation interacts with about

16 200,000 megawatts of generation in the United States; isn't

17 that right?

18 A   I don't know the number, Mr. Brooks.

19 Q   You wouldn't dispute that, would you?

20 A   I don't think so.  I don't think I'd dispute it.

21 Q   Any inquiry been made to ReliabilityFirst for assistance

22 in finding a spare in other utilities?

23 A   Again, it goes back to the EEI issue we discussed earlier.

24 Generally speaking, to the extent there are large spare

25 transformers like this, they're being used for system critical

Vol. 4-769

1  needs at times where they're worried about catastrophic

2  failures in this coming summer of 2009.  They're not being

3  deployed for substation upgrades.

4  Q   But you haven't looked for spares in other utilities, have

5  you?

6  A   That would have been a good question to ask Mr. Geswein.

7  I don't know.  I have not personally done that.  It may be

8  that Tony's gone out and checked.  I just don't know.

9  Q   But you haven't directed anyone to do that, have you?

10 A   No, I have not.

11 Q   Also, when we're talking about the load that affects

12 Dresser, that load -- part of it's an industrial load, isn't

13 it?

14 A   Yes.

15 Q   And what percentage of that industrial load is on what you

16 call interruptible service contract?

17 A   Are you talking about system wide or are you talking about

18 Terre Haute?

19 Q   Terre Haute.

20 A   I don't know.  We do have a number of industrial customers

21 or several industrial customers signed up on interruptible

22 tariffs, which means we can call them at some point during a

23 system issue and ask them to reduce their demand or reduce

24 load.  I just don't know how many manufacturers in Terre Haute

25 have that.

Vol. 4-770

1  Q   Have you directed any inquiry to determine whether there

2  are additional industrial customers that would be willing to

3  enter into interruptible load contracts in the Terre Haute

4  area?

5  A   We do this all the time.  We talk to our industrial

6  customers all the time about signing up for interruptible

7  tariffs.  Again, that all has to happen in conjunction with

8  the Indiana Utility Regulatory Commission.  That's not

9  something we can go out and unilaterally get somebody to agree

10 to interrupt.

11        We have to work with the commission, get a tariff

12 because there's a special price, a special rate that the

13 customer pays associated with that.

14        What we've found over time is there was a time in

15 history where industrial manufacturers essentially viewed

16 interruptible tariffs as a rate discount.  They got a nice

17 discount and they were rarely ever called on to give back

18 capacity.

19        Over time, we've called on them with some regularity

20 because we need the capacity and, so, customers are more cold

21 to the idea of signing up for interruptible service.

22 Q   But in connection with this reliability concern that

23 you've expressed, Duke hasn't made any outreach effort to the

24 industrial load in Terre Haute to see whether it can negotiate

25 any sort of interruptible load contracts, right?

Vol. 4-771

1  A    Since I learned of this issue in November, I'm not aware

2  of any effort we've made to go out and get people to sign up

3  for interruptible contracts in Terre Haute.

4  Q    And really when we're talking about interrupting load,

5  we're talking about interrupting load for a few hours during

6  that critical peak time; isn't that right?

7  A    I think the tariff specifies how many hours we can call

8  on.  It's generally, I want to say eight hours that we can

9  call on it once we call them.  And we have a certain number of

10 total hours then that we can interrupt the customers any given

11 summer.

12 Q    It's also true, isn't it, sir, that in order to address

13 this issue connected with Dresser, that another way to address

14 that is to install a combustion turbine somewhere in or near

15 the load pocket to compensate for the loss of Wabash 2, 3 and

16 5 in the event that you actually need it?

17 A    I think that would be helpful.  Certainly, if you have

18 capacity available, like from a combustion turbine, that might

19 be a possibility for a way to deal with a -- deal with the

20 constraint problem that MISO has identified.

21 Q    Are you familiar, sir, with a report called MTEP that's

22 put out by Midwest ISO?

23        Have you ever seen that before?

24 A    I have not seen it.  I don't know what it is.

25 Q    Would you disagree, if there was an indication in the

1  report that the Pierce transformer, the one that had to be

2  replaced, would be replaced in June of this year?

3          MR. HOPSON:  Your Honor, I object.  I don't know how

4  the witness can be asked if he agrees or disagrees to

5  statements in a report, or whether there are statements in a

6  report that he hasn't seen.

7          MR. BROOKS:  I can show you that.

8          THE COURT:  The issue here is when is the

9  transformer going to be put in at Pierce; is that right?  And

10 you think some report is different from what he said?

11         MR. BROOKS:  No, Your Honor.  I'm just making the

12 point that the witness said that the spare transformer that

13 could be used at Dresser is currently in use at the Pierce

14 substation and I'm asking --

15         THE WITNESS:  That's not what I said.

16         MR. BROOKS:  I'm sorry.

17         THE WITNESS:  I said we were going to put it to use

18 in the Pierce substation.

19         MR. BROOKS:  Then that's what the report reads.

20 Thank you.

21 BY MR. BROOKS:

22 Q   It's correct, is it not, Mr. Turner, that Duke has done no

23 modeling runs to address how it could operate this summer

24 without Wabash River Units 2, 3 and 5; is that right?

25         MR. HOPSON:  Objection, asked and answered.

1          THE COURT:  I think he's answered that.

2          MR. BROOKS:  All right.

3   BY MR. BROOKS:

4   Q   Let's talk a little bit about this idea of reserve margin.

5          That's separate and distinct from a question about

6   transmission reliability related to Dresser, right?

7   A   Yeah.  When I talk about reserve margin, I'm talking about

8   generation reserve margin, not transmission.

9   Q   Okay.  When we say reserve margin, that means that you

10  need to either have the generation capacity yourself or you

11  have to have contracts for generation capacity equal to some

12  amount greater than your projected peak load, right?

13  A   Yes, or you have the right -- we talked about

14  interruptible service earlier.  You have the right to call on

15  customers to -- and you have the physical ability to get them

16  off the system even if they would choose not to get off the

17  system.  So there are a lot of different things that the

18  commission will -- the Indiana Utility Regulatory Commission

19  will specifically count as capacity and FERC and others and

20  MISO and ReliabilityFirst and NERC will count as capacity.

21  But there are fairly specific definitions about what that

22  means.

23  Q   And Duke routinely enters into capacity contracts,

24  correct?

25  A   Yes.  Purchase power contracts we call them.

1  Q   In fact, as we stand here today, you couldn't meet this

2  summer's reserve capacity without capacity contracts, right?

3  A   That's correct.  We would not have an adequate reserve

4  margin in the absence of purchase power.

5  Q   And there's no reason to believe, is there, sir, that if

6  Wabash River Units 2, 3 and 5 are ordered offline as a result

7  of this litigation prior to the summer, that Duke will be able

8  to enter into capacity contracts in the amount of

9  265 megawatts; isn't that right?

10  A   I think it's -- I would think for the summer of 2009 we

11  would have the opportunity to purchase capacity to meet our

12  generation resource needs.  Again, that has nothing to do with

13  the transmission issue that the MISO report identifies.  So it

14  doesn't solve that problem at all.

15         I would think for 2009 we could find a adequate

16  generation resource to meet our reserve margin planning

17  requirements.

18  Q   That's true for 2010 and 2011 as well, isn't it?

19  A   Yes; but I have to say the farther out in time I get, the

20  more nervous I get about relying on purchase power.  I think

21  Mr. Kahal said the same thing on the stand yesterday.

22  Q   Isn't it true for every single year, for at least the last

23  15 years, Duke or its predecessor that owns Wabash has

24  submitted an annual certification to the Indiana Department of

25  Environmental Management in which they identify the reserve

Vol. 4-775

1 capacity available in the event that the Wabash River units

2 have to be shut down?

3 A   I don't know about IDEM.  We certainly tell the Indiana

4 Utility Commission -- Utility Regulatory Commission how we're

5 meeting our system needs.  I'm sorry, I don't know what has

6 been filed with IDEM on that point.

7 Q   Well, maybe you don't know who these folks are.  Let's

8 take a look at this document, and let's mark it as Turner

9 demonstrative 1 for a moment?

10        COURT CLERK:  Excuse me, sir.

11        MR. BROOKS:  PR1 -- why don't we just call it T demo

12 1, as in Turner.

13 BY MR. BROOKS:

14 Q   First of all, sir, is this on Duke letterhead?

15 A   Well, it appears to be.

16 Q   If we look down at the bottom, do you know who Debra

17 Nispel is?

18 A   Yeah, I know who Debbie is.  She works at EH & S, which is

19 Environmental Health and Safety.  I don't know her well; and I

20 couldn't describe her specific job duty for you, but I know

21 Debbie.

22 Q   Let me ask you to read that little paragraph under "Dear

23 Ms. Talon."

24        MR. HOPSON:  Objection.  Is this in evidence?  If

25 it's not in evidence, I object to it being read into the

Vol. 4-776

 1  record.

 2        MR. BROOKS:  Then I would move for its admission.

 3        THE COURT:  You move its admission as

 4  Exhibit Number...

 5        MR. BROOKS:  2140.

 6        MR. HOPSON:  It's not disclosed as an exhibit, Your

 7  Honor; and there's no foundation laid for it.  That's never

 8  been a document disclosed as an exhibit in this case.

 9        MR. BROOKS:  That's true.

10        THE COURT:  Sustain the objection.

11        MR. BROOKS:  All right.

12  BY MR. BROOKS:

13  Q   As we sit here today, sir, you don't have any studies from

14  your folks that indicate there isn't available capacity

15  through summer of 2011; is that right?

16  A   I think that's -- well, I think that's right.  There's no

17  study showing there's not available purchases you could make

18  between now and 2011.

19        Again, one summer ahead I feel okay about from a

20  generation adequacy standpoint.  I start getting a couple

21  summers out I start getting nervous about resources.

22        I would say, Mr. Brooks, it's because we already have

23  a fair amount of purchase power that we rely on that when you

24  start -- I hate to say doubling down because it's not

25  necessarily a doubling, but when you start increasing that

Vol. 4-777

1  reliance you're introducing more risk into the way you operate

2  your system when you don't have hard assets that you can call

3  on.

4          MR. BROOKS:  Your Honor, would it be possible to

5  take a few minutes so I can consolidate and finish?  Or, shall

6  I press on?

7          THE COURT:  I think that's probably a good idea.

8  I'll give you about 5 minutes.

9          COURT CLERK:  All rise.

10     (A recess was taken.)

11          THE COURT:  Mr. Brooks.

12          MR. BROOKS:  Thank you, Your Honor.  Hopefully I can

13  now get to a conclusion.

14  BY MR. BROOKS:

15  Q   Mr. Turner, we're at that point of the examination where

16  the it's potpourri and I apologize.  I just have a few things

17  to clean up.

18          THE COURT:  It's that point in the examination where

19  it's potpourri?  Is that what you said?

20          MR. BROOKS:  Yes, sir.

21          THE COURT:  I may have to write that down.

22          THE WITNESS:  Do I have to frame every answer with a

23  "what is"?

24          MR. BROOKS:  As soon as I get over being

25  embarrassed, I'll ...

Vol. 4-778

1  BY MR. BROOKS:

2  Q   Mr. Turner, you testified a little bit about costs of

3  various scenarios; but you didn't put those together yourself,

4  did you?

5  A   Oh, no.  I mentioned that I didn't put it together by

6  hand.  I asked that it be done working with the attorneys.

7  Q   You actually didn't do the calculations either, did you?

8  A   No.

9  Q   Somebody else did them?

10  A   Yes.

11  Q   And you did not explain on direct the methodology by which

12  all of the factors that went into that were done, did you?

13  A   No.  What I was just trying to do is give an overview of

14  what the slide -- what the chart represented.

15  Q   But you've done no investigation as to the validity of any

16  of the assumptions that went into that, right?

17  A   No.  The one thing I did ask is that the assumptions be

18  fair.  For example, with the Rosen baseline, that the

19  assumptions weren't aggressive on our side but represented

20  something that would seem reasonable for both sides, and that

21  the same assumptions go into making each chart.

22  Q   Now, Mr. Turner, the Friday before trial started, you

23  authorized folks to move forward with the acquisition of the

24  transformer for Dresser; is that right?

25  A   Yes.

Vol. 4-779

1  Q    And that still is targeted for, is it September 2012?

2  A    I thought it was June 2012 because what I wanted was to

3  make sure that we can get it -- it's critical we get that

4  done.  You never know in manufacturing processes how things

5  can get delayed, but it's critical we get it done and in and

6  before we bring the Edwardsport plant online.

7  Q    You've talked a little about Duke's proposed remedy.  I

8  want to talk about that proposed remedy as it relates to the

9  issue we've discussed at length here about the Dresser

10 substation.

11         There's been no analysis of exactly how little units

12 2, 3 and 5 could be utilized and still avoid the problem at

13 Dresser; isn't that right?

14 A    I'm not aware of a specific analysis, again in putting our

15 proposal together and in the bar chart that we talked about

16 earlier.  What we were trying to do is use a level that we

17 thought fairly represented, again a -- if you want to try to

18 go back in time the '80s and early '90s, it represents the

19 level that we would likely have had to get down to had we

20 known what the Government's position was going to be 10 years

21 later.

22 Q    Well, we might want to talk about that, too, but let me

23 just talk about this for a minute.

24         When you say that you're going to get there to this

25 Rosen baseline by virtue of reducing capacity factor, that

Vol. 4-780

1  means that you would dial these units back to somewhere

2  between what, 40, 50 percent capacity factor?

3  A    Yeah.  I don't know exactly what the Rosen baseline number

4  is, but it's certainly something way less than the capacity

5  factor we've been running them at.

6  Q    Well, let's take a 50 percent capacity factor.

7           Would it be fair to say that at least one of these

8  units would be operating at a 50 percent capacity factor under

9  your proposal?

10 A    I honestly, as we sit here today, can't remember the

11 capacity factor associated with the Rosen baseline.

12 Q    So you don't know how much exactly you're proposing to run

13 these units?

14 A    Again, I know it's the level -- what we trying to do -- I

15 don't think the Rosen baseline assumption that we used in the

16 cost estimate that you saw earlier was tied to what's the bare

17 minimum we can run them.  I think it was tied to, what's a

18 level that seems reasonable given where we've come from in

19 this case.

20 Q    If you operated at a 50 percent capacity factor, if you

21 operated at full power during that 50 percent of the --

22 50 percent of the hours of the year, that would be a

23 50 percent capacity factor, right?

24 A    Not really because capacity factor is how often the unit's

25 running when -- essentially, when it can run.  So there are

1  times of the year that it wouldn't be called upon anyway.  So

2  it's a much more complicated equation than just saying

3  50 percent of the year.

4  Q   Well, you told us that these units are basically run

5  whenever they're available, right?

6  A   Yes.  Current state, yes, that's correct.

7  Q   So availability of the unit defines the outer boundary of

8  its operation, right?

9  A   Yes, that's right.

10  Q   Then, you're going to then dial back in some way to use

11  less of that have availability than you have been; is that

12  right?

13  A   That was the proposal, yes, and then shut them down

14  completely.

15  Q   But you've done no analysis as to why that level of

16  generation has any relationship whatsoever to the transmission

17  reliability issue identified by MISO; isn't that the correct?

18          MR. HOPSON:  Asked and answered, objection.

19          THE COURT:  Yes.  I think he already said no.

20  BY MR. BROOKS:

21  Q   Isn't it true, Mr. Turner, that the transmission planners

22  and engineers at Duke Energy could devise a minimum operation

23  plan for these units to address solely the reliability issue

24  identified in MISO?

25          MR. HOPSON:  Objection, asked and answered.

Vol. 4-782

1          THE COURT:  I don't know that he said whether he

2     could or that he couldn't.

3          You can go ahead and answer that.

4     A   I would think it's possible to devise an operating plan

5     that addresses specifically the MISO concern that was

6     identified.  Again, the proposal that we put together has more

7     than that concern embedded in it.  It has that, plus

8     generation adequacy concern.

9          MR. BROOKS:  No further questions, Your Honor.

10          THE COURT:  Thank you.  Mr. Hopson?

11          MR. HOPSON:  Thank you, sir.

12                    **REDIRECT EXAMINATION**

13     BY MR. HOPSON:

14     Q   I'm just going to touch on a couple of the many things

15     that Mr. Brooks raised; and first, I just want to ask you

16     after all the conversation about the MISO study, did you have

17     reliability concerns wholly apart from the reliability

18     concerns raised by MISO?

19     A   I hope that came through in the discussion with

20     Mr. Brooks.  If it didn't, it was absolutely yes.

21          THE COURT:  So you object because it's asked and

22     answered?

23          MR. HOPSON:  These reformed lawyers, Your Honor,

24     they're hard to work with.

25          THE WITNESS:  If I wasn't very articulate, the

Vol. 4-783

1   answer is absolutely yes.

2           MR. HOPSON:  Sorry.  I lost my train of thought.

3           THE COURT:  I may have to write that down.

4   BY MR. HOPSON:

5   Q    Couple of questions about what you had done and thought

6   about in terms of "coming into compliance."

7           Do you remember those questions?

8   A    Yes.

9   Q    When you ordered people to start operating the Wabash

10  River units as if they had to be run at a lower level in '09,

11  what was your understanding about when the remedy order might

12  come into effect?

13  A    Well, originally, we thought the remedy case was going to

14  happen in the November or December time frame.  I can't

15  remember.  But it's -- obviously the time has moved, but I

16  wanted -- for 2009, I wanted to start operating under the

17  assumption that we may not have -- there may be a remedy that

18  looks like what we're talking about proposing.

19  Q    And there were a few questions, Mr. Turner, at the

20  beginning of your cross-examination about thermal derates.

21          Do you recall that?

22  A    Yes.

23  Q    Do you remember how many days of thermal derates were

24  shown in that document you looked at?

25  A    I don't.  I don't remember the number.

Vol. 4-784

1  Q   The document will speak for itself, but is it about 8?

2  A   Well, there were two separate periods, one in August and

3  one in October.  I'm sorry, Mr. Hopson, I can't remember.

4           MR. HOPSON:  Let me just take a second.

5           Can we call up Plaintiffs' -- the thermal derate

6  document that we looked at.  I think it was the very first

7  exhibit that we used in the cross-examination.  I'm not going

8  to challenge the tech people.  It's much ado about nothing.

9  BY MR. HOPSON:

10  Q   Let me show you the MISO report, which refers to the

11  thermal derate days.

12           Can you tell us how many thermal derate days are being

13  talked about in the MISO report?

14  A   Yes.  In August, it was August 4 through 10th of 2007, and

15  then -- which I guess is eight days, and then August 12th,

16  2007.

17           And then the October line says October 5th and 8th.

18  So two days in October.

19  Q   Whether the reliability planning is being done by you or

20  being done by MISO, is there a difference between eight or 10

21  days of loss of generation and 365 days of lost generation?

22  A   Oh, absolutely.

23           MR. HOPSON:  I have nothing further, Your Honor.

24           THE COURT:  Do you have anything else, Mr. Brooks?

25           MR. BROOKS:  Yes, Your Honor.

Vol. 4-785

1                    **RECROSS-EXAMINATION**

2    BY MR. BROOKS:

3    Q   Mr. Turner, summer peak doesn't occur 365 days a year,

4    does it?

5    A   No.

6              MR. BROOKS:  Thank you.  No further questions, Your

7    Honor.

8              THE COURT:  Anything else?

9              MR. HOPSON:  Nothing further.

10             THE COURT:  You may step down.

11        *(Witness excused.)*

12             THE COURT:  We're going to break at this point.

13   We'll reconvene at 1:00 o'clock.  We can go to maybe 3:30 this

14   afternoon.  Will that be all right?

15             MR. HOPSON:  Of course.

16             COURT CLERK:  All rise.

17             Court will recess until 1:00 o'clock.

18             (A lunch recess was taken.)

19

20

21

22

23

24

25

Vol. 4-786

1                    AFTERNOON SESSION

2     (In open court)

3          THE COURT:  You may be seated.  Sorry I'm late.  I

4  had a criminal matter I had to take care of over the noon hour

5  that lasted longer than I anticipated.  We will stay today

6  until we get through Mr. Rarick and Mr. Valberg, whatever that

7  takes.  You may call your next witness.

8          MS. THOMSON:  Katie Thomson for the Cinergy

9  Companies.  Your Honor.  We're going to begin this afternoon

10  with Dr. Valberg because he's in the process of losing his

11  voice, and we want to get him before he loses his voice

12  completely.

13          THE COURT:  Good thing I wasn't two hours late.

14          MS. THOMSON:  Exactly.  So I'll begin with his

15  summary and then ask Dr. Valberg to take the stand.

16          Cinergy offers Dr. Valberg as an expert in human

17  health effects of air pollutants and other chemicals.

18  Dr. Valberg has an undergraduate degree in physics from Taylor

19  University in Indiana, a Master's and a Ph.D. in physics from

20  Harvard University, and a Master's in human physiology in

21  inhalation toxicology from the Harvard School of Public

22  Health.

23          Dr. Valberg has been working on public health issues

24  for more than 30 years.  He spent 24 of those years at the

25  Harvard School of Public Health.  Since 2000 he's been

Vol. 4-787

1  principal at Gradient Corporation where he specializes in

2  inhalation toxicology and human health risk assessments.

3  Dr. Valberg will offer testimony on whether the Wabash River

4  emissions would be expected to cause adverse health effects at

5  the levels at issue in this case.

6         Dr. Valberg's qualifications are further set out in

7  his curriculum vitae which has been marked as DR062.  Pursuant

8  to the agreement of the parties, I would ask that the Court

9  admit Dr. Valberg's CV into evidence.

10         THE COURT:  It's admitted.

11     *(Defendant's Exhibit DR-062 was received in evidence.)*

12         MS. THOMSON:  The defense calls Dr. Peter Valberg to

13  the stand.

14         Your Honor, may I approach the witness?

15         THE COURT:  Sure.

16         MS. THOMSON:  I just handed Dr. Valberg a copy of

17  his expert report in case he chooses to take a look at it

18  during the course of his testimony today.

19         **PETER VALBERG, DEFENDANT'S WITNESS, SWORN**

20                  **DIRECT EXAMINATION**

21  BY MS. THOMSON:

22  Q    Please state your full name for the record.

23  A    Peter Valberg.

24  Q    Are you currently employed?

25  A    Yes.

1  Q    Who is your current employer?

2  A    Gradient Corporation in Cambridge, Massachusetts.

3  Q    What type of work does Gradient do?

4  A    Gradient is a human health risk assessment firm, and it

5  provides consulting services in the environmental transport

6  and human exposure to contaminants in the environment and the

7  potential health consequences.

8  Q    Do you have an area of specialization at Gradient?

9  A    Yes, I do; and that would be the inhalation toxicology.

10  Q    All told, how long have you worked in the public health

11  field?

12  A    For over 30 years.

13  Q    During your professional career, have you had the

14  opportunity to work with or on behalf of any governmental

15  organizations on public health matters?

16  A    Yes, I have.

17  Q    What governmental organizations have you worked with?

18  A    Those would include the National Institutes of Health, the

19  U.S. Environmental Protection Agency, the World Health

20  Organization, and the National Academy of Sciences.

21  Q    What type of work have you done for U.S. EPA?

22  A    U.S. EPA I've done a number of human health risk

23  assessments, because the Gradient Corporation, that is one of

24  the tasks that we do.  In addition, I've been asked by U.S.

25  EPA on a number of occasions to provide expertise on indoor

Vol. 4-789

1  air as well as provide expertise on reference concentrations

2  for inhalation health risk assessment.

3          MS. THOMSON:  Your Honor, I ask that Dr. Valberg be

4  qualified to testify as an expert on health effects in this

5  case.

6          THE COURT:  That's fine.

7  BY MS. THOMSON:

8  Q   Dr. Valberg, has Cinergy asked you to offer an expert

9  opinion in this case?

10 A   Yes.

11 Q   On what subject?

12 A   On the question of whether the airborne contaminants at

13 issue in this case at the levels that have been projected in

14 this case could potentially lead to human health effects in

15 downwind locations.

16 Q   Before we get into your opinions, what type of agencies

17 from the Wabash River plant did you consider in your

18 assessment?

19 A   My understanding is that the emissions at question here

20 involve sulfur dioxide, nitrogen oxides, and mercury.

21 Q   And those are sometimes referred to as primary pollutants;

22 is that correct?

23 A   That's correct.

24 Q   From there, any secondary pollutants also at issue in this

25 case?

1  A    Yes, there are.

2  Q    What are those?

3  A    In the case of sulfur dioxide, when that gas is emitted to

4  the environment, it can change at a slow rate to sulfate,

5  which is not a gas, which is a particulate type of

6  contaminant.  Likewise, in the case of nitrogen oxide, those

7  can react chemically in the air.  Sometimes they actually

8  reduce ozone, but a good fraction of the nitrogen oxides can

9  react in the atmosphere to increase ozone concentrations.

10 Q    Do sulfates have anything to do with particulate matter

11 which the Judge has heard a little bit about over the course

12 of the last several days?

13 A    Sulfates can be one component of particulate matter,

14 that's true.

15 Q    Is particulate matter a homogeneous mixture?

16 A    Not at all.  The particulate matter that we have in the

17 ambient environment derives from many sources, and as a

18 consequence, it has many chemical constituents and, in fact,

19 varies from location to location even on a local basis and

20 varies considerably across the country.

21 Q    Have you prepared a demonstrative that illustrates your

22 point?

23 A    Yes, I have.

24         MS. THOMSON:  May we see DR Dem 51?

25

Vol. 4-791

1  BY MS. THOMSON:

2  Q    Is this the demonstrative you were referring to?  For the

3  record, it's marked DR Dem 51?

4  A    Yes, it is.

5  Q    Can you explain what this demonstrative shows us?

6  A    Yes.  I would be glad to.  This essentially is a

7  demonstrative that was originally prepared by the United

8  States Environmental Protection Agency.  What you see across

9  the country are a series of pie charts.  These pie charts

10  refer to small particulate matter, sometimes called PM2.5 or

11  fine PM.

12      In each case the size of the pie -- overall size is

13  roughly proportional to the concentration of particulate as

14  you go across the country in these major reasons.  More

15  importantly for this case, the segments of the pie refer to

16  the composition of the particulate matter.  So you'll see here

17  in the industrial Midwest where we're located at the present

18  time, there is a good fraction of the pie that is designated a

19  sulfate; but then the remainder of the pie includes particles

20  that are nitrates, a component of crustal particles, and then

21  a fairly big component.  That's a white wedge of the pie is

22  elemental carbon.

23      By contrast in California -- southern California at

24  least has the highest particulate levels in the nation.  The

25  largest majority of the pie is now carbon, both elemental and

1  organic carbon.  The next largest wedge is nitrate.  So this

2  pie illustrates that the composition of particulate matter is

3  not homogeneous.  It's quite heterogeneous.

4        MS. THOMSON:  You can take that down if you would.

5  BY MS. THOMSON:

6  Q    Let's talk briefly about ozone.  What is ozone?

7  A    Ozone is a reactant that's produced from adding an

8  additional oxygen atom to atmospheric oxygen.

9  Q    Is ozone present only in the ambient air?

10 A    No.  Ozone can be created by a variety of sources.  Most

11 notably it is created by electrical discharges.  So in the

12 ambient air, we can smell ozone after a thunderstorm, but in

13 the indoor area, there are a variety of sources which use

14 electricity which also produce ozone.

15 Q    Changing subjects a bit, do you know whether Plaintiffs

16 quantified what they believed to be the emissions caused by

17 the violations at the Wabash River plant?

18 A    Yes, they did.

19 Q    And do you know whether Plaintiffs did any modeling to

20 calculate the estimated impact of those emissions on ambient

21 air concentrations?

22 A    Yes, they did.

23 Q    Did Plaintiffs do modeling for all of the pollutants at

24 issue in this case?

25 A    No.  My understanding is they did not do specific modeling

Vol. 4-793

1  for mercury.

2  Q    Did you use Plaintiffs' estimates of air impacts for

3  purposes of developing your opinions in this case?

4  A    Yes, I did.

5  Q    Why did you use Plaintiffs' estimates?

6  A    My assumption was that I would take what essentially could

7  be the worst case examples of ground level impacts and

8  basically work with those impacts to determine how they would

9  compare to levels that might be associated with human health

10 effects.

11 Q    Have you formed any opinion as to whether the emissions

12 from the Wabash River plant that are at issue in this case

13 would have caused any adverse health effects?

14 A    Yes.

15 Q    Would you please summarize your opinions for the court?

16 A    Well, my opinions are essentially that the impacts, as we

17 will demonstrate later on, are at sufficiently low levels that

18 the anticipation of human health effects does not arise; that

19 the key elements in all of these analyses is the actual amount

20 of material that people can be exposed to.  And in this

21 particular circumstance, the amount does not rise to the level

22 where you would expect a human -- an adverse human health

23 impact.

24 Q    If I understand correctly, you're saying that you found no

25 cause and effect relationship; is that correct?

Vol. 4-794

 1          MR. BROOKS:  Object to leading.

 2          THE COURT:  I'll sustain that.

 3          MS. THOMSON:  We'll go ahead.

 4   BY MS. THOMSON:

 5   Q   Did you reach your opinion -- or your finding with respect

 6   to the PM2.5 contribution from the Wabash River plant?

 7   A   Yes, I did.

 8   Q   Did you reach that opinion with respect to the sulfate

 9   contribution from the Wabash River plant?

10   A   Yes, I did.

11   Q   Did you reach that conclusion with respect to the ozone

12   contribution from the Wabash River plant?

13   A   Yes.

14   Q   Did you reach that conclusion with respect to the mercury

15   contribution from the Wabash River plant?

16   A   Yes.

17   Q   A moment ago again you were talking about the emissions at

18   issue in this case.  Did you consider the emissions at issue

19   in this case in isolation?

20   A   I considered them both in isolation and in combination

21   with existing levels of particulate and ozone.

22   Q   Does your opinion apply to the presence of the Wabash

23   River emissions in combination with the pollutants already

24   present in the ambient area?

25   A   Yes, it does.

Vol. 4-795

1  Q   What process, if any, did you follow in forming your

2  opinions in this case?

3  A   Well, I used what is a very well established discipline

4  called human health risk assessment; and human health risk

5  assessment essentially involves evaluating the potential, the

6  potential of the substances at issue to cause harm and then

7  combining that information with information on the dose that's

8  at issue in this particular case.

9       In the case of information on the substance, there is

10  a great deal of medical literature that helps explain what

11  human reactions to various chemical substances are, and in

12  terms of the dose, you also use that same literature to

13  develop a so-called dose response function to see whether the

14  dose that you're interested in here rises to the level that an

15  adverse health effect would be anticipated.

16  Q   Have you prepared a demonstrative that illustrates the

17  point you're trying to make about the dose response function?

18  A   Yes.

19       MS. THOMSON:  May we please see DR Dem 52?

20  BY MS. THOMSON:

21  Q   Is this the slide to which you were just referring?

22  A   Yes.

23  Q   Would you explain to us what we're seeing on this slide?

24  A   Yes.  The reason I included this slide was because of the

25  quotation that's at the very top of the slide which

Vol. 4-796

 1  essentially is the central organizing principle of human

 2  toxicology.  That central organizing principle is that the

 3  dose makes the poison.  Substances can be harmless or harmful,

 4  but it's not the substance itself that determines that.  It's

 5  the quantity.

 6         So here I illustrate a number of simple substances

 7  which you would normally think are being totally harmless and

 8  explain that at high enough levels that they can, in fact, be

 9  harmful and, in fact, life threatening.

10         The first example, street water.  We normally think of

11  water as not only harmless but a necessary component of life,

12  and your daily intake of water is about 1 1/2 quarts a day.

13         Now, you can exceed that and there would not be harm.

14  If you exceed it to a great deal, then harm can result.  I

15  believe some of us may remember from last year where a woman

16  participated in a radio contest where the goal was to see how

17  much water you could drink, and she actually died.  You notice

18  here that we can, therefore, develop what is called a lethal

19  dose, that even water, if ingested to excess, can lead to

20  life-threatening consequences.

21         The same thing is true of coffee.  Coffee contains

22  caffeine and other ingredients as well, which is fine at low

23  levels and can, in fact, be a stimulant.  But at sufficiently

24  high levels coffee can also be life threatening.  Similarly

25  for sugar, aspirin, and so the forth, I could put a whole host

Vol. 4-797

1  of common everyday substances on this list.  And what this

2  slide illustrates is that when you're talking about the

3  potential for human health effects, you need to think about

4  dose.

5        The one other thing that I should probably point out

6  about this slide, which is important in this case, is that --

7  I won't do the calculation here.  But if you look at the

8  difference between the normal dose or the beneficial dose

9  versus the lethal dose, you'll find that the ratio is about 40

10 or 50 fold.  That would mean if you increase something by 40

11 or 50 fold, you're then in a situation where you might cause

12 lethality.

13       What that would mean, for example, lethal doses are

14 often given in a parameter called LD50, which means that the

15 cause of normal human variation, if you were really to treat a

16 group of humans that way, about half of them would die as a

17 consequence of that overdose.

18       If, for example, you said, well, at this lethal dose

19 of coffee, 50 of 100 people died as a consequence, you might

20 say, well, does that mean that if I took a dose that was

21 normal; namely, just one-fiftieth of that and I applied it to

22 a larger population, would a proportionate amount of people

23 die as a consequence of the normal ordinary dose?  And the

24 answer is no, because these kinds of effects exhibit

25 thresholds.  So you cannot linearly extrapolate from a hazard

1  observed at high level to a proportionate hazard observed at

2  low levels.

3  Q    I want to make sure we're talking the same language here.

4  Is this same principle, the dose makes the poison, applicable

5  to each of the pollutants in this case?

6  A    Yes, it is.

7  Q    Did any of Plaintiffs' experts take into account the dose

8  of emissions in this case needed to cause adverse health

9  effects?

10  A    As far as I could tell, none of the Plaintiff experts

11  having to do with health effects literally look at the dose at

12  issue in this case.

13  Q    What, if anything, did Plaintiffs' experts do, if you

14  know?

15  A    Plaintiff experts made general statements about toxicology

16  of various substances; and as I said, it's true that any

17  substance at a sufficiently high level can be toxic.  So they

18  talked about potentially toxic effects of various substances,

19  but they did not apply any of that information to the specific

20  dose at issue in this case.

21  Q    Do you consider Plaintiffs' approach to be scientifically

22  reliable?

23  A    No, I do not.  I think the United States Environmental

24  Protection Agency and the National Academy of Sciences has

25  laid out a very specific approach that's quite useful in this

Vol. 4-799

1  case, and that approach is called the discipline of human

2  health risk assessment which involves components of

3  identifying the actual substance at issue as well as

4  identifying the dose, the kinds of exposure scenarios that

5  might take place and then using that information to calculate

6  either a risk or a probability of risk.

7  Q   Let's turn back to particulate matter and sulfates

8  specifically.  What, if anything, did Plaintiffs do to assess

9  whether sulfates from the Wabash River plant caused any harm

10  to human health?

11  A   The Plaintiffs did not use anything specific to these

12  doses.  What Dr. Schwartz reported in his expert report was

13  that there are associations -- epidemiologic associations that

14  have been reported for correlations between levels of ambient

15  particulate matter either as measured over space, over

16  distances, or as measured over time.  And then the appropriate

17  health statistics that you can get, let's say, for example,

18  from the National Center for Health Statistics.  So a wide

19  variety of these studies do exist that show statistical

20  correlations, and Dr. Schwartz focused on those statistical

21  correlations.

22  Q   Did Dr. Schwartz also opine on particulate matter as the

23  mass?

24  A   Yes.  The majority of his report was on generic -- if you

25  will, generic ambient particulate matter measured as mass.  So

Vol. 4-800

1 the majority of his report really referred to this

2 undifferentiated substance as a mass.

3 Q    In your opinion, is it appropriate to focus on PM as the

4 mass for purposes of determining health effects in this case?

5 A    In this case I don't believe it is at all appropriate,

6 because in this case you know very specifically what the

7 compound at issue is.  In other cases where you may have no

8 knowledge about the substance, there may be some benefit to

9 that analysis.

10 Q    You just mentioned the compound at issue.  What is the

11 compound at issue in this case in the context of PM2.5?

12 A    Well, the compound at issue that was, in fact, modeled in

13 the air modeling report of the Plaintiffs was in the case of

14 particulate sulfate.  Sulfate is a very well-known chemical.

15 Q    Are there any circumstances in which it's appropriate to

16 focus on the harm attributable to fine particulate matter as

17 the mass as opposed to any individual constituent?

18 A    In the case of the National Ambient Air Quality Standards,

19 the United States Environmental Protection Agency does focus

20 on mass, because that agency is trying to regulate the

21 emissions of a whole variety of sources that have widely

22 varying compositions.  Consequently, the National Ambient Air

23 Quality Standard has been developed for purposes of the

24 protective nature of the standards that the U.S. EPA wants to

25 impose.

1       That is to say, there is a precautionary element there

2   where you're applying your regulation to a whole variety of

3   sources, and you're trying to regulate against impact, against

4   the whole nationwide population.

5   Q   In your opinion is the precautionary approach the correct

6   approach to take in this particular case?

7   A   I don't believe so.  In this particular case, again, you

8   have very specific knowledge about the chemical at issue.

9   It's a very closely-focused case as opposed to a general

10  public health issue.

11  Q   Now, you mentioned Dr. Schwartz's opinions a moment ago.

12  Does Dr. Schwartz do anything to quantify the harm from PM2.5

13  exposures that he believes is attributable to the Wabash River

14  plant in this case?

15          MR. BROOKS:  I would pose an objection, Your Honor.

16  There's a motion in limine on this.  Unless we're opening the

17  door, I don't think he should be allowed to talk about the

18  quantification that was disallowed.

19          MS. THOMSON:  May I respond?

20          THE COURT:  Yes.

21          MS. THOMSON:  That was the entire point that in his

22  expert report and his rebuttal report, even though Dr. Valberg

23  pointed out that was a significant deficiency, Dr. Schwartz

24  didn't address it until the 11th hour of his deposition when

25  he tried to do what he called his ballpark estimate.  I think

1  it's significant that he didn't do any formal risk assessment

2  to quantify harm.

3          THE COURT:  That will clear the record up.  Thanks.

4  BY MS. THOMSON:

5  Q   Did Dr. Schwartz do anything to quantify the harm from

6  PM2.5 exposures that he believes is attributable to the Wabash

7  River plant in this case?

8  A   No, he did not.

9  Q   What then does Dr. Schwartz offer as support for his

10 opinion that PM2.5 causes adverse health effects?

11 A   Well, as I understand it, his overall argument is that any

12 amount of PM is harmful no matter what the existing level is,

13 no matter what the amount is; and, in fact, there is a strict

14 proportionality from even the tiniest amounts of particulate

15 matter created to larger amounts.  And the effect is going to

16 be 100 percent linear.  So that if you apply a small effect,

17 for example, of a large population, you might get a result.

18 So he emphasized again and again this concept of linearity

19 with no threshold.

20 Q   Did Dr. Schwartz rely on any particular type of study in

21 reaching his opinions, if you know?

22 A   Yes.  He relied very heavily on the statistical

23 correlations I mentioned earlier, which is called

24 observational epidemiology.  In observational epidemiology you

25 try to get a quantification of what you believe various

Vol. 4-803

1  metrics are for people's exposure, and you try to get numbers

2  for health statistics in those populations.

3       At those points you enter those two columns of numbers

4  into your mathematical model and do various adjustments and

5  fine tuning and so forth until you find whether that model

6  produces a correlation.  Often when you do that, the model

7  does produce a correlation.

8  Q   Is a correlation the same thing as causation?

9  A   No.  I think that's a very important consideration in that

10 in observational epidemiology, you don't have the ability to

11 do a controlled experiment.  You really go out into the

12 environment, and you observe the populations.  And you observe

13 some information about what the exposures might be.  So it's a

14 purely statistical kind of thing.

15      So there are many times that can give you the wrong

16 result.  Just to give you some obvious examples, on the basis

17 of the correlation between roosters crowing and the sunrise,

18 you might conclude that roosters caused the sun to rise.  Or

19 another example might be that in the summertime, the

20 consumption of ice cream goes up and also the admissions to

21 emergency rooms for heat exhaustion or heat stress also goes

22 up.

23      So you might come to the conclusion that increased

24 consumption of ice cream leads to people being admitted to the

25 hospital for heat stress.  So those are just kind of obvious

Vol. 4-804

1   examples where you know that they are not a causal

2   correlation, but it's a particular aspect of epidemiology that

3   you always have to be quite cautious about.

4   Q    Is there a way to determine through scientific data

5   whether a particular substance does have a cause and effect

6   relationship with adverse health effects?

7   A    Yes.  I think that involves looking at the totality of

8   the scientific evidence.  The example that I like to use

9   which, in fact, has been used by toxicologists a great deal is

10  that our knowledge about the toxicity of a substance is like

11  the surface of a three-legged stool.  That three-legged stool

12  is supported by three lines of evidence.

13         One of those lines of evidence is observational

14  epidemiology that we've been talking about right now, but then

15  there are two legs which are very important experimental legs.

16  One of the experimental legs has to do with actual

17  experimental exposures of either humans, volunteers, or

18  animals to very precise quantified levels of exposure where

19  you can allocate people to exposure and control groups.

20         Then the third leg is a mechanistic leg.  So that if

21  you took, for example, the ice cream example I gave, if you

22  were to do an experiment where you gave people ice cream, you

23  would find that that doesn't lead to heat stress.  So you

24  would say the experimental intervention leg of that particular

25  stool of dealing with the toxicity of ice cream is not right.

1          Thirdly, if you were to look at a mechanism -- and you

2     could ask yourself, can I think of any way that ingestion of

3     ice cream might lead to these symptoms of heat stress, you

4     would again strike out.

5          So in order to understand the toxicity of a substance,

6     you need to have support for that toxicity beyond the mere

7     statistic correlation that's provided by the environmental

8     epidemiology.

9     Q    Is any particular leg of the scientific data more reliable

10    than the others?

11    A    Not necessarily.  The epidemiology has its strengths and

12    weakness.  Its strength is that it deals with populations in

13    their actual natural environment.  Its weakness is a statistic

14    correlation can arise from other sources.  The real strength

15    of the experimental leg is that that's truly experimental

16    science where you can test hypotheses.

17         You can assign people or animals blindly to either

18    exposed groups and test the outcome either with sensitive

19    instrumentation or with exhaustive pathology in the case of

20    animals.  But then there are some issues in those studies of

21    how you extrapolate the results to people in the real

22    environment.  There are some shortcomings there.

23         Finally, the third leg having to do with mechanism,

24    that's where we've made the greatest progress in toxicology is

25    to understand how things actually interfere with the normal

Vol. 4-806

1  function of a body.  So consequently, in many cases, it turns

2  out to be a very strong leg that differentiates toxicity

3  between different types of substance.  But again,

4  extrapolating those two people in their natural environment

5  has some drawbacks.  So each leg has its strengths and

6  weaknesses, but you need to consider all of them.

7  Q   A moment ago you referred to observational epidemiology

8  studies.  Are you familiar with the body of observational

9  epidemiology studies that have evaluated the relationship

10  between PM2.5 exposure and adverse health effects over the

11  past decade or so?

12  A   Yes, I am.

13  Q   Have the findings in those studies been consistent?

14  A   They've actually been quite variable.  They haven't been

15  consistent.  I think one of the examples where the

16  epidemiologists struggled very hard to establish consistency

17  is the so called National Mortality and Morbidity Study of Air

18  Pollutants, NMMAPS, I believe, is the acronym.

19       What they did is took the 90 largest cities in the

20  United States so they could get the maximum population that

21  they could.  They took air levels monitored by U.S. EPA in

22  these cities, and they did this correlation between day-by-day

23  levels in pollution and day-by-day levels and mortality

24  counts.

25       Indeed, when they did all of the results together,

Vol. 4-807

1  they did find some positive results; but they also found some

2  cases, in fact, a fair number of cases, where the correlation

3  was negative.  That is to say, an increase in particulate led

4  to a decrease in mortality rates.

5       So even though that study was done as uniformly as one

6  can imagine, and even though that study was done over as large

7  a population as you could possibly get in the United States,

8  it showed quite inconsistent results.

9       In fact, the only two cities that had statistically

10  significant correlations were New York and Riverside.  So all

11  the other 90 fell somewhere in the middle.  Even the ones in

12  New York and Riverside were quite small, but they were

13  statistically significant.

14  Q   Let's continue to focus on particulate matter, and again,

15  specifically the role of sulfates.  In your professional

16  opinion, do you consider it important to identify which

17  constituents, if any, of the particulate mass may be

18  contributing to adverse health effects?

19  A   Yes, absolutely.  That would be very important.  If you

20  were to make the assumption that there was a causal basis for

21  these associations, then you would first of all want to know

22  right away which component of air pollution was important; and

23  then for particulate itself, it would be very important to

24  know whether it was this constituent or another constituent.

25  Because if you're going to have a public health benefit from,

Vol. 4-808

1  let's say regulating a source, you want to try to be as sure

2  as possible that you're regulating the correct source and not

3  one that might be producing a particle that is, in fact, less

4  harmful than others.

5  Q    Do any governmental bodies agree with you on this point?

6  A    I think the vast majority of them do.  The National

7  Academy of Sciences has called for again and again additional

8  analyses into which component of particulate matter is

9  important.

10         In fact, U.S. EPA in their final rule for particulate

11  matter said that this was an important matter that needed to

12  be addressed.  They didn't have sufficient information at the

13  present time to make a definitive determination, but they did

14  say that it was clear that different components of airborne

15  particulate matter would have different potential toxicities.

16  Q    In light of the current state of the science, do you

17  consider it appropriate for Dr. Schwartz to focus on PM as the

18  mass as opposed to sulfates, in particular, in this case?

19  A    Well, my conclusion would be that in this particular case,

20  it's not, because we're not dealing with PM in any kind of

21  generic sense.  We're dealing with a particular excess

22  emission that has been at issue, and that excess emission is

23  the sulfate particle that's produced from sulfur dioxide.

24  Q    In preparing your opinions in this case, did you evaluate

25  whether sulfates at the levels at issue here have harmful

Vol. 4-809

1  effects?

2  A   Yes, I did.

3  Q   Are sulfates present only in the ambient air?

4  A   Sulfates are a very common compound that are present in a

5  lot of substances.  In fact, they're naturally present in your

6  body.  For example, if you ate an egg this morning, the yolk

7  of an egg has a great deal of sulfur in it.  What the body

8  actually does is it changes that sulfur to sulfate in the

9  process of metabolizing it and excreting it.

10        So there are probably in each one of us as we sit

11  here, there are probably 3 grams of sulfate inside of our

12  bodies.  So it's a naturally occurring substance.  It occurs

13  in medications.  For example, asthma medications contain

14  Albuterol sulfate.  So the same kind of aerosols that

15  asthmatics breathe when they're having an attack that contain

16  the medicine which is going to mitigate the attack also

17  contain sulfate.

18  Q   Is there a level of exposure or dose, if you will, at

19  which sulfates begin to show adverse health effects?

20  A   Sulfates is one of those compounds that has been

21  extensively studied in the laboratory and, in fact, with human

22  exposures probably dating back to -- I mean, I would say 1970

23  or so.  A number of laboratories all around the country have

24  taken human volunteers, not only healthy volunteers but

25  volunteers with lung disease, volunteers with asthma, and have

Vol. 4-810

1  put them in chambers in a clinical setting.  And they've had

2  them breathe various concentrations of sulfate.

3        In fact, they've chosen for most of these experiments

4  a very potent form of sulfate; namely, sulfuric acid.  They

5  have had these concentrations inhaled by the individuals.

6  Then they do very sensitive respiratory function measurements.

7  In other words, they have laboratory instrumentation that can

8  determine whether or not your airways have narrowed a little

9  bit or whether your lung volumes have changed.

10        They test for pulmonary function in a very fine and

11  precise fashion.  These experiments have exposed human beings

12  to concentrations of sulfate into the thousands of micrograms

13  per cubic meter level.

14  Q   At what level do you begin to observe adverse health

15  effects?

16  A   If you look very carefully at lung function and airway

17  diameter in some individuals, you can see an effect at about

18  100 micrograms per cubic meter.  If you were to look at all

19  these studies and ask the investigators what would you

20  estimate to be the no adverse effect threshold, the answer

21  that comes up most of the time is 100 micrograms per cubic

22  meter.

23  Q   Did you compare that no adverse impacts threshold to the

24  sulfate levels modeled by Plaintiffs' experts in this case?

25  A   Yes, I did.

1  Q    What did you find?

2  A    The sulfate levels modeled by the Plaintiffs are indeed

3  quite small.  I think that has been brought out earlier in

4  this case.  Whereas I said that the no adverse effect

5  threshold is about 100, the maximum impact of this plant is in

6  the few tenths of a micrograms per cubic meter.  So it's far

7  below the kinds of levels that would be associated with even

8  the beginning of changes in your lung that you might judge as

9  adverse.

10  Q    If you add what Plaintiffs' model as the excess sulfate

11  levels, if you will, to the presence of sulfates already in

12  the ambient air, how does that compare to the 100 microgram

13  per cubic meter concentration threshold?

14  A    Even that remains much smaller than those concentrations.

15  Because if you, for example, take the -- suppose somebody were

16  at the national ambient air quality level for particulate

17  matter at 15.  Suppose they were all the way up there.

18  Suppose that that 15 was all sulfate, even though we know that

19  that is clearly not the case and there is some fraction of it

20  is something else.  So then you would be at 15.1 if you were

21  to add them directly, and that would still remain considerably

22  below the 100.

23  Q    A moment ago you said that the sulfate's concentration

24  level at which sulfates show adverse health effects is -- a

25  moment ago you mentioned that studies -- laboratory studies or

Vol. 4-812

1  human exposure studies determined that some adverse health

2  effects were observed at 100 micrograms per cubic meter.  My

3  question is have you had the opportunity to read the testimony

4  that Dr. Schwartz provided in this case earlier this week?

5  A   Yes.

6  Q   Are you aware that Dr. Schwartz testified that sulfates in

7  the environment are different from sulfates used in the

8  laboratory studies?

9  A   Yes.

10  Q   Do you agree with that testimony?

11  A   Basically, I don't agree with it because sulfate is a very

12  well-defined substance.  It's essentially S with four oxygens.

13  It is true that there are many other substances in the

14  environment as well, as my chart showed from the composition

15  of particulate matter around the United States.

16         However, I think that in terms of determining the

17  toxic effect of sulfate, that is really not relevant, because

18  if you're interested in the toxic effect of let's say zinc or

19  cadmium or chromium in the environment, then you're interested

20  in those compounds.  The sulfate that is added to those

21  compounds does not change their toxicity.

22  Q   We've been talking about sulfates for the last several

23  minutes.  Now I want to focus a little bit more on the PM

24  mass.  Have you formed an opinion as to whether the

25  particulate matter levels at issue in this case as the mass

Vol. 4-813

1  would have adverse health effects?

2  A    Due to the size that is involved, my conclusion is they

3  would not have adverse health effects.

4  Q    Did you look at the PM effects modeled by Plaintiffs in

5  isolation?

6  A    Both in isolation and combination with existing ambient

7  levels of particulate matter.

8  Q    Have you prepared any demonstratives to explain the basis

9  for your opinion?

10 A    Yes.

11 Q    May we see DR Dem 53?  We're showing you DR Dem 53.  Can

12 you explain to us what this demonstrative depicts?

13 A    Yes.  This demonstrative focuses on final particulate

14 matter here right in Indianapolis where we're sitting right

15 now.  The vertical scale is micrograms per cubic meter, and

16 the large bar underneath, which it says measured PM, is the

17 average of all the monitors -- the air monitors in

18 Indianapolis in 2003.

19       The reason I chose 2003 is because that is the year in

20 which the Plaintiffs did their air modeling.  You notice one

21 other thing on that big bar, and that is there is a little --

22 a smaller line with two flat edges on the top which is --

23 often looks like an error bar.  But what that particular bar

24 shows is the variation among particulate matter concentrations

25 just within Indianapolis.  These are annual averages.

1      So, for example, if you were living in one area of

2  Indianapolis, you might have a concentration that's at the

3  bottom of that small bar.  In another area you might have a

4  concentration that's at the top; but the mean for overall -- I

5  think there are seven monitors -- is the one that's shown by

6  the solid bar.

7      Then on the right-hand side you have the predicted

8  impact from Wabash excess emissions as modeled by the

9  Plaintiffs.  You probably can't even see the bar coming up

10  from 0, but it's the size of it in micrograms per meter is

11  0.012.  So if, for example, you were to take that increment

12  and add it up, you know, put it on top of the large bar, you

13  would, in fact, have an increment that was much smaller than

14  even the variation among monitors within the City of

15  Indianapolis.

16  Q   Why did you choose to depict Indianapolis here?

17  A   Because, in fact, Indianapolis is to the west of the

18  facility in question, the Wabash River plant.  And the

19  prevailing winds are from west to east.  So Indianapolis, in

20  fact, is the largest heavily populated area that would be, if

21  you will, downwind of the power plant in question.

22  Q   Did you look at any other areas in preparing your expert

23  report in this case?

24  A   Yes, I did.  In my expert report, there are numerous other

25  areas that are depicted; but as you get further away, let's

Vol. 4-815

1  say to Cleveland, Cincinnati, and so forth, the actual impact

2  decreases.  It gets less and less.  So the comparison here, in

3  fact, if you will, is the worst case comparison for a large

4  city.

5            MS. THOMSON:  May we please see DR Dem 54?

6  BY MS. THOMSON:

7  Q    Dr. Valberg, is this another demonstrative that you

8  prepared for purposes of your testimony today?

9  A    Yes, it is.

10  Q    What do we see on this demonstrative?

11  A    This is, again, the Plaintiffs' modeling now using the

12  CMAQ model.  They used the CMAQ model for one month in 2002.

13  This is the month of June in 2002.  You've seen this slide, a

14  similar slide a bit earlier in Stan Hayes's report.  What I

15  would like to point out here is that the jagged line that you

16  see is a day-to-day variation in particulate matter

17  concentrations for each day in June.

18        The bottom axis is numbered off in increments of 1, 2,

19  3, 4, 5, et cetera, which depict the dates in June 2002.  So

20  one thing you see right away is that the particulate matter

21  levels vary a lot because of conditions, changes in emissions,

22  changes in weather, and so forth.

23        The jagged line is actually composed of two lines.

24  There is a line very close to it.  In fact, you can't see the

25  differences between them.  There's a line there that

Vol. 4-816

1  represents the base case; that is to say, the situation with

2  the excess emissions in place.

3       Then there's another jagged line which is essentially

4  superimposed on it which is called the excess emissions

5  reduction case.

6       Then the yellow line at the very bottom, which is very

7  difficult to distinguish from zero, represents the difference

8  between the excess emissions being present and the excess

9  emissions being absent.

10      So you can't see them very well at all on a day-by-day

11 basis, but even if you took the average over the month of

12 June, I'll read you what it says in that tiny caption which

13 may be hard to read which is, "The base case average over the

14 whole month of June 2002 was 29.46 micrograms per cubic meter.

15 The excess emissions reduction case, the average is 29.41."

16 So it's the virtual proximity of those numbers that I think

17 indicates the size of the impact of the excess emissions in

18 Indianapolis.

19      MS. THOMSON:  May we please see DR Dem 55?

20 BY MS. THOMSON:

21 Q   Dr. Valberg, how, if at all, does this demonstrative

22 relate to what we've just been talking about?

23 A    In this demonstrative I tried to explain that particulate

24 matter is ubiquitous.  We don't only encounter particulate

25 matter in the outdoor air -- that's called ambient particulate

Vol. 4-817

1  matter.  And in terms of National Ambient Air Quality

2  Standards, that's the kind of particulate matter that's at

3  issue.  However, in terms of potential health effects, in

4  terms of personal exposures, there's particulate matter in all

5  of our environments.

6        So what I've tried to show on this slide was how these

7  increments that we're talking about here compare to other

8  everyday exposures.  And, in fact, the blue and orange bars

9  that I have there are common environments that have been

10  studied at the Harvard School of Public Health by a colleague

11  of Dr. Schwartz's, Dr. John Levy.

12        So, for example, you see along the bottom you see a

13  coffee shop with particulate matter levels in the 30 range, a

14  food court with particulate matters in the 200 micrograms per

15  meter range, a shopping mall, and then the orange bars

16  represent transportation environments.

17        When you and I go into the street and get into our

18  car, we're exposed to our own car emissions and those of other

19  cars.  So you see that the street emissions expose us to

20  concentrations of particulate matter that are in the range of

21  100 micrograms per cubic meter.

22        Finally, just to give some perspective I put on this

23  slide also the particulate matter levels that are measured in

24  Beijing, China.  You know, Beijing, China is where the

25  Olympics was last year.  For the Olympics they shut down

Vol. 4-818

1  factories so that this level was not there present at the time

2  of the Olympics.  But Beijing, China generally has an annual

3  average of about 100 micrograms per cubic meter of fine

4  particulate matter.

5         So this slide indicates we meet particulate matter in

6  a variety of places.  If we're going to claim that 0.012 is

7  going to have adverse health effects such as deaths and

8  hospitalizations, we have to confront that, that we should be

9  seeing deaths and hospitalizations in all these common

10 everyday environments.

11 Q   I just want to make sure we understand your point.  Up

12 here at the top under the label, it has "annual."  Are these

13 annual exposures or something else?

14 A   No.  These are short-term exposures, all except the very

15 last bar.  The far right-hand bar for Beijing, China, that is

16 the annual average level in Beijing, China.  So that is a high

17 level.  The personal activity bars are for approximately 12

18 hours of exposure.  So, you're right.  They don't correspond

19 to long-term annual exposure.

20        However, to the extent that we do these types of

21 activities many times a year, they would contribute

22 substantially to our personal annual average exposure.  Since

23 people spend most of their time in indoor environments, most

24 of our actual dose of particulate matter comes from indoor

25 exposures.

1        MS. THOMSON:  May we please see DR Dem 56.

2   BY MS. THOMSON:

3   Q   Now, Dr. Valberg, this looks similar to what we just saw.

4   Can you explain what you intend to show through this

5   demonstrative?

6   A   Yes.  This is very similar.  In fact, there are only two

7   points of difference, and I'll point that out.  On the far

8   left-hand side, we now have the Plaintiffs' modeled maximum

9   24-hour impact from the plant; and that's about half of a

10  microgram per cubic meter.  Again, this is in Indianapolis.

11        So if you were to take a whole year of data and ask,

12  you know, when in Indianapolis was there a maximum impact from

13  this plant, you would find one day, one day out of the 365

14  days when it came up to the level of about a half.

15        Again, the other bars are the same in terms of our

16  particulate exposure and normal everyday environments, except

17  now on the far right-hand side, I've given you the

18  corresponding figure for particulate matter in Beijing, China

19  just as a matter of perspective.  And you see that that

20  maximum 24-hour average exposure in a given year can go up as

21  high as 450 micrograms per cubic meter.

22        MS. THOMSON:  Would you please take that one down?

23  BY MS. THOMSON:

24  Q   Dr. Valberg, are there any other studies of people's

25  exposure to PM2.5 that you consider relevant to this case?

Vol. 4-820

1  A     Yes.  There are numerous studies.  Perhaps the one that

2  comes to mind that's quite relevant also is that we have a

3  long occupational history of people who have worked in

4  so-called dusty trades.  You know, you might be working in an

5  environment where you're mining coal or perhaps are using

6  underground diesel equipment or perhaps you're making the

7  substance called carbon black.

8          There are at lot of occupational environments that

9  have quite high levels of particulate matter and, in fact,

10 agencies like the Occupational Health and Safety Agency have

11 looked at these issues.  These dusty trades, in fact, have

12 standards of their own to limit particulate matter because

13 again, as any substance, those particular components of

14 particulate matter could be harmful at high enough levels.

15         However, I think the very important thing that's

16 relevant to this case is that the mortality records, the

17 hospitalization records, the illness records of those

18 occupational groups do not bear out the idea that tiny

19 increments of particulate matter are going to lead to death

20 and disease.

21         Since one of the emphases that Dr. Schwartz made time

22 and time again was this idea of linearity.  Everything is

23 linear with the concentration.  If you apply his same theory

24 to the occupational environment, you should have rates of

25 hospitalization and death that are truly overwhelming, I mean

1  that would not be missed in any way, shape, or form.  Of

2  course, in fact, the opposite is true.  The occupational

3  environment for dusty trades does not show anything of that

4  kind.

5  Q    Have you ever heard the term the "healthy worker

6  syndrome"?

7  A    Yes.

8  Q    What is that?

9  A    Well, one caution to what I just said is the fact that you

10  need to remember that the worker population is healthier than

11  the population in general.  In fact, statistics do show that

12  mortality rates, illness rates in the working population are

13  probably about 20 or 25 percent lower than the working rates

14  for the general population because the general population

15  includes a lot of people who may be ill, who may be in the

16  hospital, who are infirm.

17         However, the important thing to remember is that

18  you're talking about a difference in mortality and

19  hospitalization rates that's at most of the order of 10 to

20  20 percent; and yet, you're talking about differences in

21  particulate matter concentration that are orders of magnitude,

22  meaning, you know, many factors of 10.  So the "healthy worker

23  effect" cannot hide an effect that would be due to these

24  particulate matter levels if, in fact, it was a causal

25  relationship.

Vol. 4-822

1  Q    Let's turn next to ozone.  What opinion, if any, does

2  Dr. Schwartz offer on ozone?

3  A    Well, my understanding of his opinion is, in fact, it's

4  very similar for what he says for particulate, that any tiny

5  increment in ozone is going to lead to a corresponding

6  increment in hospitalizations, deaths, and so forth.

7        So he uses this same statistical linear no-threshold

8  model for ozone that he applied to particulate in this case.

9  Q    Do you agree with Dr. Schwartz's opinion on ozone?

10 A    I have the same problems with his opinion here, because he

11 is relying exclusively on statistical correlations,

12 observational epidemiology, which is -- has quite a bit of

13 heterogeneity in its own right.  But even beyond that, his

14 analysis, and particularly his analysis for what would be

15 applicable for this case, does not take into account volunteer

16 human exposures to ozone where again, similar things have been

17 done with ozone that have been done with particulate.

18        Experiments have been done with exposing animals to

19 ozone.  We know quite well from ozone what its mechanism of

20 toxicity is.  It is a reactive molecule.  So we have an idea

21 of what levels would be required to cause sufficient oxidative

22 damage to have a health effect.  So I do not agree with him

23 that these tiny increments of ozone are going to lead to

24 public health impacts.

25 Q    Let's delve into that a little bit more.  May we see DR

Vol. 4-823

1  Dem 58?  Dr. Valberg, can you explain to us what we're seeing

2  on there demonstrative?

3  A   These again are the CMAQ modeling done by the Plaintiffs

4  for the June of 2002 where they compared the base case, which

5  again is the jagged line which shows day-by-day variations in

6  ozone concentrations between June 1 and June 30.  Then they

7  also calculated the base case minus the excess emissions, and

8  that's called the excess emissions reduction case.

9        Then again, the difference between those two -- the

10  two curves are overlapping.  You cannot at the level of

11  resolution of this graph show, you know, which one is higher,

12  which one is lower.  But along the bottom axis in a yellow

13  line I've tried to show the difference which is very difficult

14  to distinguish from zero.

15       If you look at the small caption, it points out that

16  the base case with the excess emissions in place result in a

17  June average of 5 point -- 54.649 parts per billion and that

18  the excess emissions reduction case results in a June average

19  of 54.636 parts per billion.  So the difference there is very

20  small.

21       In fact, sometimes the difference is negative; that is

22  to say, nitrogen oxide emissions given different conditions

23  can actually act to reduce ambient ozone levels, and sometimes

24  they can react to increase ozone levels.  So in this case, not

25  only are the impacts small, sometimes they're actually

Vol. 4-824

1  negative.

2          MS. THOMSON:  May we see DR Dem 59?

3  BY MS. THOMSON:

4  Q    Does DR Dem 59 have any relationship to the prior slide

5  that we just saw?

6  A    Yes, it does.  I mean, this is, again, a demonstrative

7  take that tries to put into perspective the modeled ozone

8  impacts as modeled for the Wabash River excess emissions and

9  what their effect would be here in Indianapolis.

10         As you can see, it varies from a small negative value

11  up to 0.12 parts per billion.  But then if you look at the

12  scale of this graph, you'll notice that it is in parts per

13  billion, but it goes up to 200, 300, 400, so on.

14         The point of this graph is if we are in work

15  environments or even at home, there are pieces of -- there are

16  appliances and equipment that actually generate ozone by

17  virtue of electric sparks, electric discharges and so forth.

18  So the U.S. EPA and many other investigators have determined

19  what indoor ozone concentrations are from these devices, and

20  they are, in fact, considerably higher than these types of

21  impacts.

22         Again, the U.S. EPA is aware of the fact that if you

23  do happen to have a device such as a copier, an air cleaner,

24  perhaps even an ozone generator for the sense of fresh air

25  smell in your home, you're getting quite high ozone levels

Vol. 4-825

1   compared to ambient levels.  In fact, and, of course, much,

2   much larger than the ozone impacts that are depicted to this

3   graph.

4   Q   Now, this graph appears to depict only the incremental

5   emissions modeled by Chinkin & Wheeler; is that correct?

6   A   That's correct.

7   Q   Did you consider the incremental emissions in combination

8   with ozone already present in the ambient air to determine

9   whether there would be adverse health effects in this case?

10  A   Yes, I did.  In fact, if you recall what was on the

11  previous side, the average there was around 50 parts per

12  billion if you added them together.  Again, that's a level

13  that is small compared to what we expose people to in indoor

14  environments.

15       For example, the volunteer human exposures where you

16  take people -- most of them are healthy, but some of them have

17  asthma and lung disease.  And you put them in the laboratory,

18  you typically expose them to ozone levels of a hundred to 300

19  parts per billion.  You're looking for changes in respiratory

20  function.  Some of those higher levels do cause measurable

21  changes in respiratory function; but again, nothing like

22  hospitalizations or mortality.

23       So even these incremental levels, when added to the

24  others, give you levels that are quite small compared to those

25  that are measured in toxicology experiments.

Vol. 4-826

1           MS. THOMSON:  You may take this one down as well.

2    BY MS. THOMSON:

3    Q   We talked briefly about mercury when we first started our

4    discussion earlier.  Did Plaintiffs estimate emissions of

5    mercury that they contend resulted from the Wabash River

6    violations in this case?

7    A   I believe they did estimate them.

8    Q   Do you recall what the estimate was?

9    A   I believe the estimate was something like 77 to 200 pounds

10   per year.

11   Q   Do you have an opinion as to whether mercury emissions at

12   that level would be expected to have adverse health effects?

13   A   Yes, I do.

14   Q   What is your opinion?

15   A   The opinion is that those types of emissions at the

16   location and the stack height, et cetera, are not likely to

17   cause any effect.  The Plaintiffs didn't model the actual

18   mercury impacts.

19   Q   Did Plaintiffs do anything to quantify whether the mercury

20   emissions from Wabash River caused or contributed to any

21   adverse health effects?

22   A   No.

23   Q   What support do you have for your opinion?

24   A   Well, as I explained in my expert report, the impact of

25   coal-fired power plants in terms of emissions not only of

Vol. 4-827

1  mercury but other potentially hazardous air pollutants has

2  been determined in a number of studies.  One of the studies

3  was a United States Environmental Protection Agency study

4  which was reported to the U.S. Congress.  That report, in

5  fact, took emissions, including mercury for all coal-fired

6  power plants in the United States and examined whether those

7  emissions, when combined with an air dispersion model, could

8  lead to concentrations in the environment that would lead to

9  adverse health effects.

10          MS. THOMSON:  Your Honor, may I approach the

11 witness?

12          THE COURT:  Yes.

13 BY MS. THOMSON:

14 Q   I just handed the witness DR244, and Mr. Brooks, I believe

15 you have a copy of it as well.

16          MR. BROOKS:  I do have an objection as well.

17          THE COURT:  All right.

18          MR. BROOKS:  I assume the witness is now going to be

19 questioned about this document, Your Honor.  I'm going to

20 object to it on relevance grounds.  This is a study of air

21 pollutants and carcinogenic effects, and we didn't put on any

22 evidence about carcinogenic effects.  I'm not sure why we're

23 now going to delve into a study on that.

24          MS. THOMSON:  Your Honor, this was a comprehensive

25 study that Congress required of EPA to assess both the cancer

Vol. 4-828

1   and non-cancer effects of a variety of hazardous air

2   pollutants from coal-fired utilities.  I believe it's highly

3   relevant.  Dr. Valberg, in his report, cited it and explained

4   why it supported the basis for his opinions.

5               THE COURT:  Anything else?

6               MR. BROOKS:  If they can cite to something in here

7   that's non-cancer, I don't have an objection.

8               THE COURT:  The objection is overruled.  The exhibit

9   is admitted.

10       *(Defendant's Exhibit 244 was received in evidence.)*

11  BY MS. THOMSON:

12  Q   Dr. Valberg, have you had an opportunity to just flip

13  through this hefty document?

14  A   Yes.

15  Q   Is this the EPA study to which you were referring?

16  A   Yes.  In fact, this is the one I've used in my report.

17  The title is Study of Hazardous Air Pollutant Emissions From

18  Electric Utility Steam Generating Units, Final Report to

19  Congress.

20         And this report did include both carcinogenic and

21  non-carcinogenic effects.

22  Q   I believe you said a moment ago that you used this as

23  support for the opinions you reached in this case with respect

24  to mercury; is that correct?

25  A   That's correct.

Vol. 4-829

1        MS. THOMSON:  May we please see DR Dem 60?

2   BY MS. THOMSON:

3   Q   Dr. Valberg, what does DR Dem 60 depict?

4   A   This is a short summary of the size and conclusions of

5   this report.  As it shows in the first row, that all

6   coal-fired utilities were included, which numbered at that

7   time 426.

8        The base year for emissions' projections that they

9   used was 1990, and the number of different chemicals that they

10  included in their inhalation risk assessment was 67.  So it

11  wasn't just a few.  They tried very hard to determine which

12  chemicals might contribute to adverse health effects.

13       In addition to inhalation risk assessment, they

14  carried a number of them into what's called a "multi-pathway

15  risk assessment" where they allowed the material to deposit

16  out of the air, you know, perhaps be accumulating on the

17  ground or in the food chain.

18       The size of the population they included in this study

19  was nearly 200 million.  That is, the other strength of this

20  study, which I'd like to point out is that it did not study

21  each plant in isolation.  It studied all of them together.

22       So there were some results that were specific to

23  plants in terms of their local population, but then it also

24  included the impact on power plants all across the United

25  States.

Vol. 4-830

1

2         Now, I could have a lot of rows on there having to do

3    with cancer risks, because they did, in fact, look at cancer

4    risks for these plants as well.  Since that's not the focus of

5    this case, what I took out of this report for this particular

6    slide is their result for non-cancer risks.

7         For non-cancer risks, they expressed their result as

8    this number called hazard index, abbreviated HI.  What hazard

9    index is, is it essentially takes the maximum exposure that

10   could result from these power plants for any given substance,

11   and it divides that by what U.S. EPA has determined to be the

12   allowable continuous lifetime exposure of a particular

13   contaminant, which is determined to be without expectation of

14   adverse health effects.

15        So that gives you the hazard index.  What that means

16   is that if the hazard index is less than 1.0, it means that

17   the exposures that you're considering here are, in fact, below

18   this so-called reference dose or reference concentration which

19   is designated by EPA to be without expectation of adverse

20   health effects.

21        So for inhalation hazard risk, you see there they got

22   a HI of .1 to .2 at most for the maximally exposed individual.

23   So clearly those were less than a hazard index of 1.0.

24        Then in terms of mercury, where they carried into the

25   environment for a recreational angler, you know, the high-end

Vol. 4-831

1  recreational angler where the mercury had been changed into

2  methyl mercury, they calculated a hazard index of 0.7.  So

3  again, below a hazard index of 1.0.

4  Q    Just to be clear for the record, were the Wabash River

5  plants included in the EPA study?

6  A    Yes.  This includes everything.  Wabash River was included

7  in the study, along with everyone else.

8  Q    How did the mercury levels evaluated by EPA in its 1998

9  study compared to the mercury levels at issue in this case?

10  A    They were much higher, because they included not only

11  so-called excess emissions, they included total mercury

12  emissions from all plants.

13  Q    Dr. Valberg, in your opinion, are the findings of the 1998

14  report reliable today?

15  A    Yes, they are.  In fact, if anything, the assumptions they

16  made would -- were likely overly conservative.  They were

17  converting too much of their elemental mercury to methyl

18  mercury, but that's sort of a finer detail.  In terms of the

19  toxicity factors, the exposure scenarios, they were all very

20  conservative and tended to overestimate rather than

21  underestimate potential health risks.

22  Q    Do you have any support for your position that they were

23  overly conservative?

24  A    Yes.  There were a number of comments having to do with

25  the Clean Air Mercury Rule that went back and forth between

Vol. 4-832

1  the agency and public commenters and so forth.  In those

2  documents, in the CAMR document, EPA pointed out that they

3  felt that their own evaluation in this 1998 assessment was, in

4  fact, overly conservative.  That they, in fact, had higher

5  levels of mercury in the environment than were actually the

6  case.

7  Q    Do you have any other support for your conclusions about

8  mercury in this case?

9  A    There's an additional risk assessment that was done

10  specifically for this particular power plant.

11           MS. THOMSON:  May we take that down for a moment?

12           MR. BROOKS:  Before that comes down, I would like to

13  enter an objection if we're talking about PR61.

14           MS. THOMSON:  We've got DR25, but I think that is

15  the same.

16           MR. BROOKS:  Your Honor, I would object to any use

17  of the TERA risk assessment.  Certainly I object to its entry

18  into evidence as hearsay, but I have objections beyond that.

19  In particular, the document is incomplete as it stands,

20  because it refers to some sort of modeling work that was done

21  that's not included.  So those would be my objections.

22           THE COURT:  What is the exhibit?

23           MS. THOMSON:  The exhibit number is DR025.  I've got

24  a copy here if you would like to see it.

25           THE COURT:  Okay.  Thank you.

Vol. 4-833

1

2          MS. THOMSON:  And I'm prepared to respond.

3          THE COURT:  Go ahead.

4          MS. THOMSON:  The TERA report was prepared in 2002.

5   We believe it is complete.  It was intended to be a standalone

6   document.  The modeling data to which it refers is actually

7   modeling data from EPA's 1998 report to Congress.  It was

8   prepared at the request of the company to help the company

9   evaluate the risks associated with pollutants from its various

10  plants.  The company adopted it as its own.  It's been

11  published on behalf of the company to the public and used in

12  open houses where people were allowed to come in and review

13  the plants, review the report, ask questions.

14          We believe that it qualifies as a business record

15  and should be admitted into evidence.  I should also add, Your

16  Honor, the deposition designations that authenticate the

17  document and establish it as a business record are designated

18  either by Plaintiffs or counter-designated by us in the

19  deposition of Bob McElfresh.

20          MR. BROOKS:  Your Honor.

21          THE COURT:  Yes.

22          MR. BROOKS:  I haven't heard any foundation for it

23  being a business record, and as far as --

24          THE COURT:  You mean it's not contained in the

25  designations?

Vol. 4-834

1          MR. BROOKS:  I'm sorry, Your Honor?

2          THE COURT:  I think she said --

3          MR. BROOKS:  Yes.  I confess I don't know what she's

4  talking about.

5          MS. THOMSON:  Specifically, pages 23 to 24, 33 to

6  34, and 139 to 141.

7          MR. BROOKS:  Which deposition?  I'm sorry.

8          MS. THOMSON:  Bob McElfresh, Robert McElfresh.

9          MR. BROOKS:  I've got a note here that I should look

10  at this because I'm told that he says that it wasn't a Cinergy

11  business record; and as far as I know, Cinergy is not in the

12  business of doing risk assessments.  It's in the business of

13  being a utility.  I don't understand how the business record

14  exception --

15          MS. THOMSON:  Let's handle it this way.  I've only

16  got a few more questions for Dr. Valberg, and I think it's

17  appropriate for an expert to rely on this if it's something he

18  would typically rely on, and we can take up the admissibility

19  question later.  Does that make sense?

20          THE COURT:  Actually, we can do it now, but go ahead

21  and use that second approach.  As soon as we're done with

22  that, then we'll talk about admissibility, and I'll either say

23  yes or no.

24          MS. THOMSON:  Okay.

25          THE COURT:  So the issue now is, is this the kind of

Vol. 4-835

1   thing he would rely on?

2           MS. THOMSON:  Yes.

3   BY MS. THOMSON:

4   Q   Dr. Valberg, I've just handed you a copy of

5   Exhibit DR-025.  Would you take a moment and look at the

6   document?

7   A   Yes.  I have.

8   Q   Have you seen this document before?

9   A   Yes.  I used it in preparing my expert report, and it's a

10  title -- its title is Risk Assessment of Airborne Chemical

11  Emissions from Cinergy Electric Generating Station prepared by

12  Toxicology Excellence for Risk Assessment.

13  Q   Is this the type of document that you typically rely on in

14  the course of performing risk assessments in your day-to-day

15  work?

16  A   Yes, it is.

17          MS. THOMSON:  May I proceed?

18          THE COURT:  Yes.  It's interesting.  On the one

19  hand, Cinergy had a risk assessment made; and when they want

20  to the put it in, you say no, because it's not a business

21  record.

22          MS. THOMSON:  For this document?

23          THE COURT:  No, I'm talking to the gentleman behind

24  you.

25          MR. BROOKS:  I'm sorry?

Vol. 4-836

1          THE COURT:  Your objection to this again is?

2          MR. BROOKS:  That it's hearsay.  I realize an expert

3   can rely upon it, but that doesn't mean it comes in.  I don't

4   see it meets standard for a business record, because this

5   company is not in the business of doing risk assessments.

6   They may have one that someone did for them, but that doesn't

7   seem to me to meet the rule.

8          THE COURT:  I think that the record should reflect

9   that this exhibit is for at least this reason; and that is,

10  that Cinergy had a risk assessment done and was concerned

11  about those risks.  Then I think that if this is the kind of

12  thing that the witness relies on when he makes his --

13  expresses his opinions, I think it comes in for that reason.

14          I agree with you.  I don't think it's a business

15  record either, but in the context of this case, it comes in

16  for the reason I just described and also because this witness

17  uses this kind of thing to arrive at his opinions.

18          Still, it is what it is after that.  Go ahead.

19          MS. THOMSON:  Thank you, Your Honor.

20      (Defendants' Exhibit DR-025 was received in evidence.)

21  BY MS. THOMSON:

22  Q   Dr. Valberg, who conducted the 2002 -- what we call the

23  TERA risk assessment, if you know?

24  A   Yes.  It was the environmental consulting company called

25  TERA, T-E-R-A, and they had a number of toxicology

1  professionals who are listed in the rear of the document who

2  did this kind of an assessment according to standard risk

3  assessment protocol.

4          MS. THOMSON:  May we see DR Dem 61?

5  BY MS. THOMSON:

6  Q   Before we get to this particular demonstrative, why did

7  you choose to rely upon the TERA studies on your opinion in

8  this case?

9  A   The Plaintiffs themselves had not done any assessment of

10  mercury emissions.  And so this specimen, in fact, was very

11  relevant.  It had been done specifically for a whole variety

12  of plants that Cinergy owns, including the Wabash River plant

13  and, in fact, it addressed mercury.

14  Q   Now looking at DR Dem 61, what does this demonstrative

15  show us?

16  A   This demonstrative shows us the result of the risk

17  assessment for the Wabash River plant.  It shows two columns.

18  The first column is actually total non-cancer risk, and that

19  means that in terms of this hazard index parameter that I

20  describe earlier, it added up for the Wabash River plant

21  emissions of all hazardous air pollutants that they

22  considered.

23          You'll notice even for the worst case, MEI stands for

24  maximally exposed individual.  The hazard index is

25  considerably lower than 1.  So no health effects are expected.

Vol. 4-838

1  Then you just notice they also calculated a slightly different

2  exposure scenario which is called the reasonably exposed

3  individual, and that hazard index is, of course, lower.

4        The second column specifically addresses inhalation

5  health risks from mercury from Wabash River.  There the worst

6  case maximally exposed individual has a hazard index that's

7  quite low.  Both of these are far below the hazard index of 1;

8  and hence, the conclusion of this risk assessment with regard

9  to mercury is that no adverse health effects would be

10 anticipated via inhalation.

11 Q   How did the levels of mercury studied in the TERA risk

12 assessment compare to the levels of mercury estimated by

13 Plaintiffs' experts in this case?

14 A   In the TERA risk assessment they, of course, took total

15 mercury emissions.  So the TERA risk assessment was not

16 concerned about what we're dealing with in this case; namely,

17 the excess emissions.

18 Q   Do you know what protocols or methodology TERA used in

19 preparing this risk assessment?

20 A   Yes, I do.  They are standard health risk assessment

21 protocols where you identify the constituents of concern.  You

22 determine what the transport of those constituents is from the

23 source to potential human receptors, and you determine how

24 much those receptors take in.  Once you've determined how much

25 they take in, then you turn typically to U.S. EPA toxicity

Vol. 4-839

1 factors to see how that intake compares to what a intake would

2 be that EPA has determined on the basis of scientific

3 literature would be safe.  So that's the method that TERA used

4 in this particular document.

5 Q   One final question for you.  Are TERA's conclusions in the

6 2002 risk assessment consistent with U.S. EPA's findings in

7 its 1998 report to Congress?

8 A   Yes, they are.

9           MR. BROOKS:  Your Honor, may I be impertinent enough

10 to ask for five minutes?

11           THE COURT:  You can be that impertinent if you like.

12 We can take a quick break.

13           COURT CLERK:  All rise.  Court will take a short

14 recess.

15     (A recess was taken.)

16           THE COURT:  So cross-examine?

17           MR. BROOKS:  Yes, Your Honor.

18                      **CROSS-EXAMINATION**

19 BY MR. BROOKS:

20 Q   Good afternoon, Mr. Valberg.

21 A   Good afternoon.

22 Q   I'm sorry, it's Dr. Valberg, isn't it?

23 A   Yes.

24 Q   I'm sorry.  My name is Phillip Brooks, and I'm going to

25 ask you a few questions this afternoon.

Vol. 4-840

1          Dr. Valberg, Gradient is a -- did you say it was a

2   consulting firm?  Is that what you said?

3   A    Yes, a human health risk assessment consulting firm.

4   Q    You've been associated with Gradient since when?

5   A    Approximately 1990.

6   Q    In the last four years, I believe in your expert report

7   you've indicated that you've given testimony in 17 different

8   cases in litigation; is that right?

9   A    I would guess that's correct, whatever was listed there.

10  Q    In all of those but one you worked for the defense; is

11  that right?

12  A    Yes.

13          THE COURT:  Did you say defense or the feds?

14          MR. BROOKS:  Defense.  The feds didn't hire him.

15  BY MR. BROOKS:

16  Q    In each of those representations you were called upon to

17  offer an opinion about whether an exposure to a particular

18  substance or thing would create a health risk; isn't that

19  right?

20  A    I can't recall them one by one, but I believe in the

21  majority of them, that was the case.

22  Q    And you were able to discern in each one of those cases

23  that exposure to whatever it was that your client was alleged

24  to have put out into the environment caused no harm; isn't

25  that fair?

Vol. 4-841

1  A    That's fair.  By the time that you produce an expert

2  report, you've gone into the matter quite closely.

3  Q    Let me start by asking you a few questions about -- just

4  general questions.

5        Now, you talked a little bit about the dose makes the

6  poison, I believe?

7  A    Yes.

8  Q    How do you say that name?  Is that Paracelsus?

9  A    I'm sorry, Paracelsus.

10  Q    Paracelsus.  How long ago did Mr. Paracelsus make that

11  observation?

12  A    Quite some time.  I think it was the 1400s.

13  Q    Do I need to use --

14      *(A discussion was held off the record.)*

15        MR. BROOKS:  Can we call up DR Dem 52?

16  BY MR. BROOKS:

17  Q    That's what your point was with this slide, right, dose

18  makes the poison?

19  A    Yes.

20  Q    And the normal daily dose is just fine, isn't it?

21  A    For most.

22  Q    But now let's take the aspirin.  Start with that.  You're

23  not saying if you crush up two aspirins and inhale them into

24  your lungs that there are no problems, are you?

25  A    I have not looked at the issue of crushing up two aspirins

Vol. 4-842

1  and inhaling them in your lungs, but the dose makes the poison

2  would be a principle that applies to all the roots of entry.

3  Q   How about water?  If you put a quart and a half of water

4  if your lungs, any health risks?

5  A   It would interfere with air and gas exchange.  So

6  certainly inhaling it would not be a good idea.

7  Q   To some extent it matters also where that dose is

8  administered, doesn't it?

9  A   Yes.  In human health risk assessment, the root of

10 exposure is, of course, important.  But the principle remains

11 unchanged.

12 Q   You would agree with me, for example, that if an

13 individual were hypersensitive to aspirin or allergic to

14 aspirin, that the dose response would be different than set

15 out here, right?

16 A   Allergies are not limited to inhalation.  There are a lot

17 of people who are allergic to crab meat by ingestion.  So

18 there's nothing peculiar about inhalation that makes it

19 different from ingestion.

20 Q   But you agree with me that this dose response, also you

21 have to look at the individual who is responding, right?

22 A   There is some individual variability.

23 Q   Can we go to DR Dem 53, please?

24     You prepared this slide; is that right?

25 A   Yes.

Vol. 4-843

1  Q   I was just curious here.  You selected the -- for

2  comparison, the PM2.5 measurement, and I guess that's the --

3  what, that's the annual average in Indianapolis?

4  A   Yes, in 2003.

5  Q   You compared that to the increment added to that according

6  to the CALPUFF model; is that right?

7  A   Yes.  I should probably add that, in fact, the 0.12, of

8  course, is already in there because the plant was operating.

9  Q   But you're aware that Mr. Chinkin on the stand said that

10 he didn't really rely on the CALPUFF modeling; isn't that

11 right?

12 A   I was not here when he gave his testimony.

13 Q   And you didn't review that transcript?

14 A   No.

15 Q   Would you be surprised if what Mr. Chinkin said on the

16 stand in court was that actually, you should look at the CAMx

17 model?

18 A   I heard Mr. Hayes' testimony to that effect, yes.

19 Q   Do you know what the annual predicted concentration in

20 Indianapolis is from the CAMx model?

21 A   I believe if you look at the excess emissions from the

22 CAMx model, it is probably 0.02.  I think it's slightly higher

23 but not dramatically higher.

24 Q   I'll let the record speak for itself, but would you be

25 shocked if it was .15?

Vol. 4-844

1  A   I don't believe that's what Mr. Hayes' model showed for

2  Indianapolis, if we could bring those up.

3  Q   Let's look at DEM54 if we could, please.

4        Now, this is your slide in which you sought to compare

5  the base case of emissions versus what would have happened if

6  Wabash River Units 2, 3, and 5 had installed pollution

7  controls, right?

8  A   That's my understanding of what the excess emissions

9  reduction case amounts to.

10  Q   Well, my first curiosity is that you're aware that the

11  highest modeled daily impact in Indianapolis was

12  .5 micrograms, right?

13  A   Yes.  24-hour impact.

14  Q   I'm just curious why you picked this scale because it

15  seems like it would be pretty hard to see something like that,

16  wouldn't it, with a scale like this?

17  A   The purpose of this scale was to compare the size of the

18  increment to existing concentrations; and if you wanted to

19  illustrate .5, you would choose a different scale.  If I had

20  chosen a scale that would show .5, unfortunately, the other

21  lines would be so high, if you will, up in the air that they

22  wouldn't be plottable on this graph.

23  Q   You don't disagree with me, do you, that on the day

24  that -- on the model day showing a .5-microgram increase,

25  which was June 12th, 2003, that that would be on top of

Vol. 4-845

1  whatever PM concentration was occurring as a result of other

2  activities, right?

3  A   Yes.  That's correct.  In fact, you can see on this graph

4  that the PM from other activities was actually quite low on

5  that day.

6  Q   And you -- you agree with me that some days the wind blows

7  in a direction such that you really wouldn't expect much

8  contribution to Indianapolis air quality from Wabash River; is

9  that right?

10  A   That's correct.

11  Q   I look here, and I see that you've averaged -- if I look

12  up here, it says base case average equals 29.46 micrograms per

13  cubic meter, and you look at the excess emissions reduction

14  case and you say that the average is 29.41 micrograms per

15  cubic meter.

16         Sir, I'm curious, what's the metric under the NAAQS

17  that addresses a monthly average?  Is there one?

18  A   There's no metric under the NAAQS that addresses monthly

19  average.  The point is to look at that one month that

20  Mr. Chinkin modeled the PM impact and just average it for the

21  month, because you could say that if anything, that is

22  probably an overestimate of what the average for the full year

23  would be.  But there is no national ambient air quality

24  standard for monthly averages.

25  Q   Let's look at, if we could, DR Dem 55.  First of all, at

Vol. 4-846

1   the top, sir, I see it says annual, but that's not right, is

2   it?  These are not annual exposures that you've graphed?

3   A   No.  The annual refers to the Plaintiff-predicted PM

4   impacts from Wabash River, the annual increment.

5   Q   Again, you've selected the output from the CMAQ model --

6   I'm sorry, from the CALPUFF model; is that right?

7   A   That is CALPUFF.

8   Q   Let's take a look at this, because I can't quite

9   understand it.  First of all, we see that we've got a coffee

10  shop and a food court.  What's this exposure period over?

11  A   This is an exposure period over a week where this

12  represents a 12-hour average.  So it is, in fact, not an

13  annual average by any means, but this represents a exposure

14  that all of us are exposed to on a regular basis.

15  Q   So you're comparing a 12-hour average to an annual

16  average; is that right?

17  A   The purpose was to show that particulate matter exposure

18  occurs in a lot of environments, and the hourly averages that

19  you say, that is correct, it's comparing two different

20  averaging times.

21  Q   Didn't you tell us -- here, let's use the food court

22  example -- that that wasn't ambient particulates, right?

23  A   That wasn't ambient particulate, but it does refer to the

24  fact that I believe Dr. Schwartz, in his testimony, basically

25  says from his point of view, there's no differentiation.

Vol. 4-847

1  Particulate is particulate.

2  Q    You think that he said there was no difference between

3  ambient and non-ambient particles?

4  A    I don't believe there's anything in his testimony where he

5  draws a distinction.

6  Q    You just referred to Dr. Levy as your source for this

7  material, the non-ambient concentrations; is that right?

8  A    That's correct.

9  Q    Dr. Levy is also at the Harvard School of Public Health?

10  A    Yes.

11  Q    He's one of the leading advocates for reduction of ambient

12  PM2.5; is he not?

13  A    I'm sorry, I'm not understanding your question.

14  Q    Isn't it true that Dr. Levy is one of the leading national

15  advocates for lowering PM2.5 exposure, ambient PM2.5 exposure?

16  A    I believe that he may have said that, yes.  I think he, in

17  fact, has done analyses of power plants as well.

18  Q    And Dr. Levy has published a number of papers in which he

19  opines that based on his research, ambient PM2.5 at frequently

20  encountered levels are hazardous to human health; isn't that

21  true?

22  A    No.  That's not true.  He has published papers that

23  indicates that if he applies these same statistical models

24  that Dr. Schwartz applied, that he can apply that statistical

25  model to ambient concentrations and draw the conclusions that

Vol. 4-848

1  you mentioned.  However, he also makes these measurements for

2  indoor environments and demonstrates that indoor environments

3  are the major contributor for our particulate exposure.

4  Q    You're aware that Dr. Levy testified in North Carolina

5  against Duke Energy?

6  A    I had heard that.  I wasn't personally aware or heard that

7  testimony.

8  Q    He was called by the Plaintiffs, wasn't he?

9  A    I don't really know.

10 Q    Well, let's see.  Now, this bus, is this one hour behind

11 the bus or a year behind the bus?

12 A    I believe these are all 12-hour measurements.

13 Q    So if you drove right behind a bus for 12 hours, that

14 would be your exposure?

15 A    Well, our own exposure to traffic, bus, trucks, and so

16 forth is much more than 12 hours.  It's just that in these

17 experiments, the investigators had a limited amount of time in

18 which to do those measurements.  So those were essentially the

19 time durations that they reported in their article.  If you

20 wanted to then do a risk assessment where you calculated the

21 total amount of particulate exposure that contributes -- that

22 the bus contributes, you can do that.

23        The reason I plotted this is because these are the

24 data reported in the paper.

25 Q    Could we see DR Dem 56?  This was another comparison of

Vol. 4-849

1  particulates, and here I'm not sure what you're comparing.

2  Let's go back to the bus.  Is that an annual exposure to bus

3  exhaust?

4  A    No.  Remember, this is now a different slide.  If you look

5  at the caption in the slide, these are now daily averages.  So

6  you're comparing daily averages, but the bus, food court,

7  restaurant, those are the same as from the previous slide.  So

8  they're essentially half a day, if you will.

9  Q    They're a half-a-day exposure.  And you're comparing that

10  to the full day, 24 hour?

11  A    Yes.

12  Q    Dr. Valberg, you've never conducted a human study or had

13  one conducted at your direction; is that right?

14  A    My study was experimental toxicology.  I primarily used

15  animals.  So the answer is no, I did not experiment with

16  humans.

17  Q    Human chamber studies, they generally involve 10, 20

18  people; isn't that right?

19  A    Yes.

20  Q    Not hundreds?

21  A    No, but there are many of them.

22  Q    Human exposure studies that you cite in your report were

23  all done with laboratory-produced ammonium sulfate; isn't that

24  right?

25  A    They included more than just ammonium sulfate.  They

Vol. 4-850

1 included sulfuric acid, elemental carbon, and so forth.  They

2 were laboratory-generated aerosols.

3 Q    They didn't contain transition metals, right?

4 A    They didn't contain transition metals.  I don't believe

5 transition metals are an issue in this case.

6 Q    They didn't contain organic compounds?

7 A    I don't believe any contained organic compounds.

8 Q    None of the human subjects in these trials were exposed

9 for longer than a few hours at a time; isn't that right?

10 A    I believe the maximum were about four hours, but some of

11 them were repeated over several days.

12 Q    But none of the exposure tests went on for more than a few

13 weeks, right?

14 A    Yes.

15 Q    None of the human subjects had bronchitis at the time they

16 participated in the studies, right?

17 A    Some of them have chronic obstructive lung disease, so

18 they may have had bronchitis.  I don't know if chronic

19 bronchitis would have specifically fit their diagnosis, but

20 the investigators have tried to include people to the extent

21 they can to have preexisting lung disease.

22 Q    None of them had pneumonia?

23 A    I don't recall that any had pneumonia.

24 Q    Now, you've opined here that there's a problem in your

25 mind with the fact that sulfates have somehow been included in

Vol. 4-851

1  Mr. -- I'm sorry, in Dr. Schwartz's opinion.  You're taking

2  issue with that, that he lumped sulfates in with PM2.5?

3  A   I guess my main issue with Dr. Schwartz is that he didn't

4  do a risk assessment of the sulfate in this case.  Sulfates

5  are part of ambient particulate matter as well.

6  Q   And you're not aware of any U.S. EPA study that has

7  suggested that sulfates should be excluded from PM2.5

8  designations; is that right?

9  A   There are many studies that have found no association

10 between sulfates and these health end points, but EPA

11 continues to have a mass-based standard.

12 Q   And in the Midwest here, sulfates make up what, 35,

13 40 percent of the PM2.5?

14 A   I believe that's approximately right.

15 Q   And a large share of those sulfates come from power

16 plants, don't they?

17 A   I think a large share does but not all.

18 Q   You would agree with me that if Indianapolis, for example,

19 this area is in non-attainment for PM2.5, on an annual

20 standard that is, they are let's say less than a microgram

21 above that standard.  So somewhere between 15 and

22 16 micrograms per cubic meter, a healthy chunk of that has to

23 be sulfates, doesn't it?

24 A   If it's 1 microgram.  It could be that a third of that is

25 sulfate.

Vol. 4-852

1  Q    So something on the order of what, 5 plus micrograms in

2  this air would be sulfate based, right?

3  A    I think that's fair.

4  Q    You're aware, are you not, that there are enormous

5  economic consequences to an area being designated

6  non-attainment for PM2.5; isn't that right?

7  A    I'm not aware of what they are, but take your word for it.

8  Q    Are you aware where the State of Indiana has petitioned

9  the EPA to exclude the sulfates from the 2.5 calculation in

10 its attainment designation here in Indiana?

11 A    I'm not aware of that.

12 Q    Now, this isn't the first time that you've had a chance to

13 talk about your opinions about sulfates in PM2.5, is it?

14 A    No.  I have published papers on this and presented

15 material to the Clean Air Science Advisory Committee.

16 Q    And you were an expert witness retained in litigation

17 between United States and several states and American Electric

18 Power, right?

19 A    Yes.

20 Q    And you issued an expert report in that case, didn't you?

21 A    Yes.

22 Q    And you gave basically the same opinions that you've given

23 here; isn't that right?

24 A    I gave an opinion which is based on toxicology, and it

25 turns out in that case that it was similar.

Vol. 4-853

1  Q    And also in the case United States versus Westvaco, you
2  were also an expert in that case, right?
3  A    Yes.
4  Q    You even testified at trial, didn't you?
5  A    Yes.
6  Q    In that case, you also opined that sulfates are not a
7  problem; isn't that right?
8  A    Again, the issue of a problem is determined by dose, and
9  those doses were, in fact, again a small component of the
10 amount necessary to cause harmful effects.
11 Q    Well, even before your engagements in litigation relating
12 to PM2.5, you had occasion to make known to EPA your opinions
13 about the effect of sulfates on inhalation risks, didn't you?
14 A    Yes.
15 Q    In fact, if I can find my place in my notes, who was your
16 client when you submitted some comments in the rulemaking on
17 PM2.5?
18 A    I believe that was Engine Manufacturing Association.
19 Q    Specifically, the comment that you prepared for your
20 client addressed your concerns about the toxicology of
21 sulfates, right?
22 A    Well, that was one component, but engines don't usually
23 produce much sulfate.
24 Q    But that was one component, wasn't it?
25 A    Yes.

Vol. 4-854

1  Q   Those comments were considered by EPA in putting together

2  something called a criteria document, weren't they?

3  A   You provide these comments to the agency, and they take

4  them into account to the degree that they feel like they need

5  to.

6  Q   And the criteria document is the assessment by EPA of all

7  of the science out there on whatever topic EPA is reviewing;

8  isn't that right?

9  A   They attempt to do that kind of summary, yes.

10 Q   And they did that for PM2.5; did they not?

11 A   They have produced several criteria documents, yes.

12 Q   And those criteria documents, they're reviewed by an

13 organization called CASAC, aren't they?

14 A   Yes.

15 Q   What is CASAC?

16 A   It's the Clean Air Science Advisory Committee.

17 Q   You would agree with me, wouldn't you, that when EPA

18 appoints people to a specific CASAC, that it seeks out people

19 who are recognized in their fields; isn't that right?

20 A   I believe that's their aim, yes.

21 Q   And there was a particulate matter PM2.5 CASAC that

22 reviewed the 2004 criteria document, correct?

23 A   Yes.

24 Q   And that CASAC, in fact, endorsed the lowering of the

25 daily PM2.5 exposure from 65 micrograms per cubic meter to

Vol. 4-855

1  35 micrograms per cubic meter, didn't it?

2  A    Yes.

3  Q    And EPA followed that advice, didn't they?

4  A    Well, as I mentioned earlier, EPA is a precautionary

5  regulatory agency, and they felt that was the necessary thing

6  to do and they did.

7  Q    Well, that's interesting.  Is there someplace that you can

8  point me that EPA said we're going to regulate PM2.5 on a

9  precautionary principle just to be safe?

10 A    Their charge from the Clean Air Act says that the agency

11 is supposed to regulate particulate matter and other criteria

12 pollutants with an adequate margin of safety.

13 Q    Well, sir, in the course of the rulemaking -- you don't

14 disagree with me that they conducted quantitative risk

15 assessments, do you?

16 A    Yes.  They did conduct those assessments.

17 Q    In fact, they quantified the cost to the public from given

18 levels of PM2.5, didn't they?

19 A    I believe they did.  I didn't analyze their economics.

20 Q    To do that, they had to have a dose response relationship,

21 right?

22 A    Yes.

23 Q    And then they multiplied that times the population, right?

24 A    Yes.

25 Q    And they figured out what they felt the risk was, right?

Vol. 4-856

1  A    I believe so.

2  Q    And among the risks that EPA identified were premature

3  mortality, yes?

4  A    Yes.

5  Q    Aggravation of respiratory systems?

6  A    Yes.  They had several.

7  Q    Cardiovascular effects?

8  A    Yes.

9  Q    And EPA then tried to quantify the dollar cost of that to

10  society, didn't they?

11  A    I believe they did.

12  Q    You're aware also, are you not, that the CASAC that

13  reviewed the rule that was promulgated in 2006, the one that

14  we're currently living with, the CASAC thought the EPA should

15  actually have a lower annual standard, didn't it?

16  A    I'm aware of the letter that CASAC wrote, yes.

17  Q    You're aware that CASAC said that -- well, why don't we

18  pull it up.  Is that Exhibit 1911?

19         First of all, sir, I direct your attention to what has

20  been entered as Plaintiffs' Exhibit 1911.  Does that look

21  familiar to you?

22  A    I can't really see a thing.  I believe it's familiar.

23  Q    For some reason, I'm having troubles with all of these

24  today.

25             MR. BROOKS:  May I approach the witness, Your Honor?

1           THE COURT:  Yes, you may.

2  BY MR. BROOKS:

3  Q    Do you recognize that?

4  A    Yes, I do.

5  Q    I would first of all direct your attention to the third

6  full paragraph in the first sentence.  Do you see there where

7  it says the CASAC recommended changes in the annual fine

8  particle standard because there is clear and convincing

9  scientific evidence that significant adverse human health

10 effects occur in response to short-term and chronic

11 particulate matter exposure at and below the 15 micrograms per

12 cubic meter level?

13 A    Yes.  I think they're referring to the epidemiology

14 studies that we discussed earlier.

15 Q    Sir, let's turn to that last page.  On the last page, we

16 see seven names.  Those are all the members of the CASAC,

17 right?

18 A    Yes.

19 Q    Then they've got other people who support them; isn't that

20 right?

21 A    I believe that's right.

22 Q    And let's look up here at the top.  Dr. Rogene Henderson,

23 toxicologist, correct?

24 A    Yes.

25 Q    That's also true of Dr. James Crapo, he too is a

Vol. 4-858

1  toxicologist?

2  A    I believe he's a doctor of medicine.  He may know

3  toxicology as well.

4  Q    Dr. Frederick Miller, he too is a toxicologist?

5  A    I believe so.

6  Q    These folks had access to a number of other experts who

7  were toxicologists and medical doctors; isn't that right?

8  A    Yes.

9  Q    Let's look over here at the second page.  The first full

10  paragraph says "Significantly, we wish to point out that the

11  CASAC's recommendations were consistent with the mainstream

12  scientific advice that EPA received from virtually every major

13  medical association and public health organization that

14  provided their input to the agency, including the American

15  Medical Association, the American Thoracic Society, the

16  American Lung Association, the American Academy of Pediatrics,

17  the American College of Cardiology, the American Heart

18  Association, the American Cancer Society, the American Public

19  Health Association, and the National Association of Local

20  Boards of Health.  Indeed, to our knowledge, there is no

21  science, medical or public health group that disagrees with

22  this very important aspect of the CASAC's recommendations."

23  Do you see that?

24  A    Yes.  I see it.

25  Q    Then EPA's recent "Expert elicitation study (expanded

Vol. 4-859

1  expert judgment assessment of the concentration-response

2  relationship between PM2.5 exposure and mortality, the

3  September 21, 2006) only lends additional support to our

4  conclusions concerning the adverse human health effects of

5  PM2.5."

6        Sir, are you telling the Court that this statement is

7  based solely upon epidemiology?

8  A    The kinds of levels that they use for the human health

9  risk assessment were based exclusively on epidemiology.  I

10  think these statements reflect input of CASAC from these

11  organizations.  I think what you have to keep in mind -- and

12  Dr. Schwartz said this as well -- there are many organizations

13  that disagree with this because at the present time the U.S.

14  EPA, the National Institutes of Health, and other

15  organizations are pouring incredible amounts of money into

16  this area.  If it were indeed true that all scientific groups

17  believe there was no room for doubt here, then all of this

18  money is totally wasted.

19  Q    Well, it would be totally wasted to spend that money;

20  would it not, sir, if everybody concluded that there really

21  isn't a problem here too, right?  You could draw that same

22  conclusion?

23  A    I think if you believe there wasn't a problem, you could

24  draw that same conclusion.  However, as I said earlier, that

25  the issue of the components of PM and the causal factors is

Vol. 4-860

1  really a totally open question at this time.

2  Q    Totally open.  That would mean that you certainly couldn't

3  exclude sulfates, right?

4  A    It's totally open from the point of view of a public

5  regulatory standard, but toxicology has for many, many years

6  known about the fact that different chemicals have different

7  chemical potencies.

8  Q    But you're aware; are you not, sir, that again, no

9  affected state by the PM2.5 rule has petitioned EPA to exclude

10  sulfates which are such an obviously huge portion of the

11  PM2.5?

12  A    Well, other agencies have -- for example, the Netherlands

13  aerosol program has decided that in their aerosol review of

14  the Netherlands that they will, in fact, exclude sulfate.  So

15  there is certainly evidence there on the basis of some

16  regulatory agencies.  And, in fact, a fair amount of

17  literature that is being published even to this day that

18  indicates that sulfate is likely one of the lesser toxicity

19  components of particulate matter.

20  Q    You agree with me, don't you, that there are studies that

21  say the opposite?

22  A    I don't know of any recent study that says the opposite.

23  Q    You know, I'm curious.  In your expert report you cited to

24  the TERESA study which you thought was significant.  You said

25  that that study was the one that seeks to pull particles out

1  of the stacks of several different kinds of power plants and

2  then do toxicology studies, right?

3  A   Yes.

4  Q   But you didn't mention that in your direct.  Is that

5  because you read what Dr. Schwartz said about the kinds of

6  findings that they're making with the TERESA study?

7  A   No.  I think that was a question of time.

8  Q   Let's talk a little bit about -- just while I'm here,

9  you're aware you talked about these non-ambient particles in

10 the food court and whatnot.  You're aware that there are

11 studies that show that the non-ambient particles that are

12 found in places like food court and coffee shops really don't

13 show an association with adverse health effects once you

14 control for those?

15 A   There are a lot of us exposed to those particles in food

16 courts, and no one seems to be hospitalized or dropping dead.

17 So, in fact, I would assume they are not toxic, but I believe

18 Dr. Schwartz's assessment is that they do need to be

19 considered because they are, in fact, ambient -- they're not

20 ambient particulate but they are airborne particulate.

21 Q   Dr. Valberg, you were questioned about an EPA document.

22 It was Defendants' Exhibit DR244.  It was this big document;

23 do you remember that?

24 A   Yes.

25 Q   This was a study of -- relating to coal-fired power

Vol. 4-862

1  plants.

2  A    It included others as well, but it did include the

3  coal-fired power plants.

4  Q    EPA would have had this document when it came out with its

5  criteria of documents for PM2.5, wouldn't it?

6  A    I would assume so.

7  Q    Yet it's not cited in the criteria document, is it?

8  A    I can't answer that one way or the other.

9  Q    Okay.  Well, you're aware, are you not, sir, that Exhibit

10 244 is something called HAPS, H-A-P-S, Hazardous Air

11 Pollutants?

12 A    Yes.

13 Q    By definition, HAPS do not include secondary particles

14 like PM2.5, do they?

15 A    Some of the HAPS are particulate, so they are contained in

16 particulate matter, but they do not contain sulfate as a

17 component.

18 Q    Let's be a little more precise, sir.  Isn't it true that

19 HAPS do not include PM2.5 as a separate entity for evaluation?

20         MS. THOMSON:  Objection.  Asked and answered.

21         THE COURT:  He can answer.

22         THE WITNESS:  There two different categories.  PM2.5

23 is part of criteria pollutants.  HAPS are HAPS.  None of the

24 criteria pollutants are included in HAPS and vice versa.

25

Vol. 4-863

1  BY MR. BROOKS:

2  Q    So this study actually didn't look at PM2.5, did it?

3  A    As a generic entity, no, it did not.

4  Q    Let's talk for a moment about the TERA study.  I believe

5  that is DR025.  Do you remember talking about that?

6  A    Yes.

7  Q    Now first of all, my question is that study didn't look at

8  PM2.5 either, did it?

9  A    It was similar in design to the EPA study.  So it did not

10  look at PM2.5 as a generic quantity.

11  Q    And when they assessed the risks for mercury, that was for

12  inhaled mercury within 50 kilometers of the plant; isn't that

13  right?

14  A    Yes.

15  Q    So they didn't look at mercury deposition and its climb

16  through the food chain through fish, did they?

17  A    No, but the U.S. EPA report did.

18  Q    Would you agree with me, Dr. Valberg, that when you weight

19  a study, when you try to decide how much weight to give a

20  study, you look at how it was conducted and review sort of the

21  science behind it; isn't that right?

22  A    It would depend on what kind of study it is; but in a

23  general sense, I think that's probably fair.

24  Q    And would it trouble you at all if it turned out that a

25  citation in a study referred to something that no one could

Vol. 4-864

1   find?  Would that enter --

2            MS. THOMSON:  Objection, foundation.

3            MR. BROOKS:  Okay.  I'll give a foundation.

4            THE COURT:  All right.

5   BY MR. BROOKS:

6   Q    Dr. Valberg, if you're going to do a risk assessment, one

7   thing you have to know is the exposure; isn't that right?

8   A    Yes.

9   Q    And if you're talking about airborne pollution, you've got

10  to have an exposure model that somehow gets the pollution from

11  the stack to the receptors, right?

12  A    Yes.

13  Q    So the quality of that model could be very important,

14  couldn't it?

15  A    Possibly.

16  Q    You didn't review the modeling that underlies the TERA

17  report, did you?

18  A    I'm not an air extreme modeler, so I did not.

19  Q    I'm going to call up something called -- what we've marked

20  as Exhibit 1909.  I'm going to ask you if, as a professional

21  in the field --

22            MS. THOMSON:  Objection.  This is an out-of-court

23  statement.  It's not admissible in its own right.

24            MR. BROOKS:  I'm going to ask him if an expert would

25  rely on something like this for his opinions.

Vol. 4-865

1          THE COURT:  All right.

2   BY MR. BROOKS:

3   Q   Let's look at 1909.  This is a cover letter, sir.  I'll

4   just represent that a subpoena was sent to EPRI, the Electric

5   Power Research Institute.  The reason the subpoena was sent is

6   because in the TERA risk assessment -- and I'm happy to have

7   you look for it if you like -- but in the TERA risk

8   assessment, they say that the air modeling, if we look at

9   page -- I only have Bates numbers.  I can count them off for

10  you though.  I believe it's page 13.

11         It says -- there's a heading there that says "movement

12  of chemicals through the air," and you look down below, and

13  you see that it says "both EPA in the utility report and EPRI

14  conducted computer simulations for most coal, oil, and natural

15  gas fired power plants in the country.  Both groups used a

16  similar computer model called the industrial source complex

17  long-term version.  In C it says 2 (ISCL2) for estimating

18  dispersion of the plume"?  Do you see that?

19  A   Yes.

20  Q   Well, the letter that you see here as 1909 is a response

21  from EPRI a subpoena asking for that modeling.  Let's go to

22  the next page.

23         MS. THOMSON:  My objection stands.  It's an

24  out-of-court statement.  It hasn't established that would have

25  or did rely on it.

 1            MR. BROOKS:  I'm going to see if he did rely on it,

 2   Your Honor.

 3   BY MR. BROOKS:

 4   Q    I'm going to let you read that.

 5   A    I can't really see it.

 6   Q    You can't?  Well, maybe I'll give you my copy if you can't

 7   find it.  Here you are, sir.

 8            MR. BROOKS:  May I approach?

 9            THE COURT:  Yes.

10   BY MR. BROOKS:

11   Q    Look over that declaration if you would, sir, if you would

12   please.  Sir, is it fair to say that this declaration says

13   that EPRI doesn't have any record of ever doing any work for

14   TERA?

15            MS. THOMSON:  Objection.  It's asking him to

16   characterize a document he hasn't seen before.

17            THE COURT:  Well, are you going to use this one way

18   or another?  How are you going to do this?

19            MR. BROOKS:  Yes, Your Honor.  One more question if

20   I could be allowed.  I know I'm on thin ice here.

21   BY MR. BROOKS:

22   Q    Turn over here then two more pages in the TERA risk

23   assessment.  What were we on, 13?  That would make it 15.

24   I'll read it out to you.  It says, "However, the utility

25   report does not provide the results of each individual power

1  plant, so this assessment uses the EPRI computer stimulations

2  for each of the Cinergy stations;" do you see that?

3  A    Yes.

4  Q    My question, sir, is if you were trying to weight evidence

5  and you learned that you couldn't even get to the modeling

6  that underlies the report, would you feature it so prominently

7  in your decision making?

8  A    Well, the industrial source complex long-term model is a

9  standard EPA model.  I know that it's used regularly or had

10  been used regularly in this time period by a lot of people

11  doing air dispersion modeling.  It's not a terribly complex

12  model.

13        I don't know quite what to make of all of this.  I

14  mean, there seems to be a contradiction between the document

15  and the subpoena, but whether that has actual relevance to the

16  results, I am not sure.  It raises some questions.

17  Q    And you say that it is not a terribly complex modeling

18  part.  That model is not even capable of converting sulfates

19  and nitrates to PM2.5; isn't that true?

20  A    That's true.

21        MR. BROOKS:  May I have just one moment to confer?

22        THE COURT:  You may.

23    (A discussion was held off the record.)

24        MR. BROOKS:  I have no further questions, Your

25  Honor.

Vol. 4-868

1          THE COURT:  Thank you.  Redirect?

2          MS. THOMSON:  Yes, Your Honor.

3                    **REDIRECT EXAMINATION**

4   BY MS. THOMSON:

5   Q   Dr. Valberg, do you still have Plaintiffs' Exhibit 1911 in

6   front of you?  That's the CASAC September 29, 2006 letter to

7   the EPA administrator?  Do you have that in front of you?

8   A   Yes, I do.

9   Q   If I can direct your attention to the third paragraph of

10  that letter which I believe you were discussing a few moments

11  ago with Mr. Brooks; do you see that?

12  A   Yes.

13  Q   And you see the italicized language that appears in that

14  paragraph, correct?

15  A   This is at the bottom of the first page?

16  Q   The bottom of the first page.

17  A   Yes.

18  Q   Do you know whether EPA accepted CASAC's recommendation as

19  it set out in this letter?

20  A   To do it 13 to 14, the answer is no.

21  Q   Mr. Brooks also talked to you about the TERESA studies.

22  Briefly, what are the TERESA studies?

23  A   The TERESA studies are toxicology studies that take actual

24  emissions from coal-fired power plants and then treat them

25  chemically in a variety of ways to simulate their aging in the

Vol. 4-869

1  atmosphere.  Then the aerosols are delivered to animals at

2  high concentrations to determine if there are any toxic

3  effects.

4  Q   Have any of the TERESA studies been published in

5  peer-reviewed literature?

6  A   A portion of them have.

7  Q   Have those reported studies shown any relationship between

8  sulfates and adverse health effects?

9  A   The studies have not.

10  Q   Earlier you testified you had read Dr. Schwartz's

11  testimony in this case?

12  A   Yes.

13  Q   Do you recall reading the portion of the testimony where

14  he related a conversation he had had with some colleagues at

15  the Harvard School of Public Health about the TERESA study?

16  A   Yes.

17  Q   I believe he said that "his colleagues had informed him

18  that some of the more recent findings indicated some health

19  effects were being observed from sulfates."  Did you read that

20  in the testimony?

21  A   Yes, I recall reading that.

22  Q   In your professional opinion, do you consider information

23  you obtain orally from colleagues to be scientifically

24  reliable?

25  A   No, because it's so poorly described.  You have just the

Vol. 4-870

1  statement there with no backup information.

2  Q    Mr. Brooks also talked to you again about EPA's 1998 risk

3  assessment and whether it considered PM2.5 as the mass.  My

4  question is, can you tell the Court whether EPA's 1998 risk

5  assessment considered any of the individual constituents of

6  the PM2.5 mass?

7  A    Yes, it did, and that's what I tried to mention was that

8  hazardous air pollutants include chemicals that appear in

9  particulate form.  So they, in fact, are parts of ambient PM.

10  Q    You also spent a bit of time talking about the current

11  levels -- or excuse me, the process of EPA setting the NAAQS

12  standards.  Do you recall that conversation with Mr. Brooks?

13  A    Yes.

14  Q    Do you take issue at the current levels at which EPA has

15  set the NAAQS standards?

16  A    No, I don't take issue with the current levels.

17  Q    Why is that?

18  A    The EPA has to take into account all of the studies, and

19  to the extent the epidemiology studies are there and they show

20  these correlations that are just statistical correlations but

21  in integrating all of the evidence together they do, in fact,

22  give them some weight, and that's included in their standard

23  setting process.

24  Q    Why did you testify earlier that that's not the

25  appropriate approach to take in this particular case?

Vol. 4-871

1  A    In this particular case we know specifically what the

2  chemical involved is.  We know a lot of information about its

3  emission and transport and local concentrations.  So it only

4  makes sense to look at that specific compound.

5  Q    May we see DR Dem 38 which was from the Hayes --

6         Can you see this demonstrative, Dr. Valberg, DR Dem

7  38?

8  A    Yes, I can.

9  Q    Mr. Brooks was also asking you a number of questions about

10 the so-called excess emissions modeled by Mr. Chinkin and

11 Mr. Wheeler.  In particular he was talking to you about the

12 CAMx results; do you recall that conversation?

13 A    Yes.

14 Q    Can you see -- does this demonstrative depict any of the

15 CAMx results?

16 A    If I understand the legend correctly, it is showing the

17 sequence of results from CALPUFF, CMAQ, and CAMx for each of

18 the various cities along the bottom.  The results are shown

19 for Indianapolis.

20 Q    If you would, just take a look at the numbers that appear

21 across the bottom for I guess the maximum in each of the

22 cities, if you would.

23 A    Yes.  In Indianapolis, the maximum from CALPUFF is 0.01.

24 The maximum from CMAQ for Indianapolis is 0.05, and the

25 maximum from the EPA CAMx model is 0.02.

Vol. 4-872

1  Q   My question for you, sir, is do any of the numbers that

2  appear on this demonstrative change your opinions or

3  conclusions in this case?

4  A   No, they do not.

5          MS. THOMSON:  Nothing further, Your Honor.

6          THE COURT:  Thank you.  Mr. Brooks?

7          MR. BROOKS:  If I may.

8                     **RECROSS-EXAMINATION**

9  BY MR. BROOKS:

10 Q   Let's keep this up for just a second if I could, please.

11 This Exhibit DM38, those aren't the results take Mr. Chinkin

12 testified to, are they?

13 A   I was not here, so I do not know if this is --

14 Q   In fact, those were a transformation of data that were

15 offered by Mr. Hayes, weren't they?

16 A   If you would stipulate that, I have no reason to contest

17 it.

18 Q   Sir, you would agree; would you not, that if a dose

19 response relationship is linear, then any addition by

20 definition would have a health consequence to a population?

21         MS. THOMSON:  Objection.  Beyond the scope of the

22 redirect.

23         THE COURT:  I think he can answer that.

24         THE WITNESS:  Well, that's kind of a tautology.  If

25 you're saying it's linear, you're saying it's linear.  If you

1  making the assumption of linear, then it is linear.

2  BY MR. BROOKS:

3  Q    Well, you told us when you started that you had worked --

4  you had appeared on a National Academy of Science panel?

5  A    Yes.

6  Q    That actually resulted in the publication of a rather

7  lengthy document called Estimating the Public Health Benefits,

8  a Proposed Air Pollution Regulations; did it not?

9  A    Yes.

10 Q    And isn't it true that in that document your panel was

11 charged with reviewing, among other things, the PM2.5

12 regulation from 1998?

13 A    Yes.

14 Q    Isn't it true that this same panel considered all of the

15 evidence that EPA considered --

16         MS. THOMSON:  Objection, Your Honor.  Again, I'm

17 going to object as outside the scope of the redirect.

18         MR. BROOKS:  I think I can tie it up, and I can be

19 really brief.

20         THE COURT:  You're tieing up something she raised in

21 redirect?

22         MR. BROOKS:  I think I am.

23         THE COURT:  Okay.  Go ahead.

24 BY MR. BROOKS:

25 Q    You're making the point here about the size of these

Vol. 4-874

1  emissions.  You've agreed with me that if it's linear, a

2  linear dose-response relationship, that, in fact, any

3  additional increase would have health consequences, correct?

4  A    If you make the assumption of linear, you'll get linear.

5  Q    And the larger the population exposed, the larger the

6  effect?

7  A    If that's part of your hypothetical, yes.

8  Q    Well, it's just arithmetic, right?

9  A    Yes.

10  Q    Isn't it true, sir, that in this same report that you

11  yourself helped to author, we could see page 109 of the -- I

12  don't know what I'm supposed to call this?

13          MS. THOMSON:  Your Honor, I'm going to object once

14  again.  I didn't address this in my direct.  Mr. Brooks didn't

15  address it in his cross.  I didn't address it in my redirect.

16  It's coming up for the first time now.

17          MR. BROOKS:  I think it's fairly tied to tiny --

18  tiny point you were making to the last demonstrative.

19          THE COURT:  I don't know what that is.

20          MR. BROOKS:  What I'm asking him about is a paper

21  that was generated by the National Research Council when he

22  was one of the members.

23          THE COURT:  I think we're getting too far away from

24  where we were.

25          MR. BROOKS:  If I could just ask then one more

1  question?

2            MS. THOMSON:  May I have a copy, please?

3            MR. BROOKS:  Yes.

4            MS. THOMSON:  Can the witness also have a copy?

5            MR. BROOKS:  Yes.  May I approach?

6            THE COURT:  Sure.

7  BY MR. BROOKS:

8  Q    The document I've handed you, sir, that is the document

9  you helped author, isn't it?  If you want to check, you can

10 look at the very end of the document with the biographies.

11 A    Yes.  I believe this is the document.

12 Q    All right.  If we could look at page 109 together.

13           MS. THOMSON:  Objection, Your Honor.  We object to

14 reading the document which is not in evidence.

15           THE COURT:  You can have him look at it, but I don't

16 need to see it yet if it's not in evidence.

17           MR. BROOKS:  Your Honor, this is direct impeachment.

18           THE COURT:  As opposed to indirect impeachment?

19 You're going to impeach him on what point?

20           MR. BROOKS:  Well, he just said if one assumes that

21 there's a linear dose response, and I'm going to show him

22 that, in fact, that the paper he helped produce says that

23 there is.  I think that it's fair impeachment.

24           MS. THOMSON:  Your Honor, we didn't address the

25 linear dose-response function on redirect.  We did in the

Vol. 4-876

1  initial direct and Dr. Valberg responded and Mr. Brooks had

2  every opportunity to address it in his cross.

3           THE COURT:  I'm going to let him do it as an omitted

4  question.  Go ahead.

5           MR. BROOKS:  Thank you, Your Honor.

6  BY MR. BROOKS:

7  Q   Looking at page 109, does it not say here that "In

8  epidemiological studies, air pollution concentrations are

9  usually measured and modeled as continuous variables. Thus, it

10  may be feasible to test linearity and existence of thresholds

11  depending on the study design.  In time series studies with

12  the large number of repeated measurements, linearity and

13  thresholds have been formally addressed with reasonable

14  statistical power.  For pollutants such as PM10 and PM2.5

15  there is no evidence for any departure of linearity in the

16  observed range of exposure or any indication of a threshold."

17           Do you see that?

18  A   Yes.

19  Q   You were a member of this board; were you not?

20  A   Yes.

21  Q   And you did not issue any sort of minority report?

22  A   You've got to remember what this is talking about.  Notice

23  that it says here that these epidemiological associations have

24  been addressed with reasonable statistical power.  So what

25  they are saying is, if you look at the epidemiology evidence,

Vol. 4-877

1  the observational epidemiology, it is indeed very noisy; and

2  if you use all the statistical power you have available, you

3  cannot detect a departure from statistical linearity.  And so,

4  that particular statement about the statistics is a

5  statistical analysis.  That's, I think, what the

6  epidemiologists have reported.

7  Q   Isn't it true, sir, that this document goes on to endorse

8  EPA's conclusion of no threshold?

9  A   As a public health measure, yes, it does endorse it.

10  However, what you need to look at is that there is a section

11  in this document that very specifically says that because of

12  the uncertainty generated by these statistical associations, a

13  very key element has to do with determining the effect of

14  those uncertainties on the projected public health benefits.

15  That is to say not only you need to project the public health

16  benefit, you need to show the upper and lower bounds, how high

17  could it be, how low could it be.

18  Q   But you would agree with me that the overall conclusion of

19  the paper is that EPA's scientific approach to establishing

20  PM2.5 levels in the 1998 rule was sound?

21  A   I believe it gave a general endorsement.  I don't think it

22  said that the scientific toxicology evidence supports that.  I

23  think the statistical evidence is what they have, and that's

24  what they had to work with.

25          MR. BROOKS:  No further questions, Your Honor.

Vol. 4-878

1         THE COURT:  So you have overruled your associates on

2  another -- evidently you have because your time is up.

3  Anything else from --

4         MS. THOMSON:  No, Your Honor.

5         COURT CLERK:  Can we have an identifying number of

6  some kind for that last exhibit, please, the demonstrative?

7         MR. BROOKS:  What was my last in sequence?  Can we

8  use PR Demo 2?

9         THE COURT:  All right.  You can step down.  Thank

10 you.

11                    (Witness excused.)

12        MS. THOMSON:  Another witness?

13        MR. VOLPE:  The Defense calls Thomas Rarick.

14        **THOMAS RARICK, DEFENDANT'S WITNESS, SWORN**

15                    **DIRECT EXAMINATION**

16        MR. VOLPE:  Judge, I'm going to hand Mr. Rarick his

17 expert report and the demonstratives.

18        THE COURT:  All right, sir, you may proceed.

19        MR. VOLPE:  Thank you, Judge.  Before we proceed

20 with questioning, I'm going to read a summary of Mr. Rarick's

21 expertise and hope to speed up the Q and A.  Thomas Rarick

22 graduated from Purdue University in 1974 with a BS in

23 Environmental Engineering.  Since graduating from Purdue, he

24 has worked on environmental issues in Government and in the

25 private sector, including 11 years with the United States

Vol. 4-879

1  Environmental Protection Agency and almost six years with the

2  Indiana Department of Environmental Management.

3          At EPA after serving as a project and staff

4  engineer, Mr. Rarick became the Chief of the Air Operations

5  branch for EPA, Region 9, during 1985 to 1987.

6          While at IDEM, Mr. Rarick was the Assistant

7  Commissioner for the air programs where he directed the

8  development of the air pollution control regulations, oversaw

9  the review of all permit applications under the state's

10  construction and operating permit programs as well as under

11  the PSD and NNSR permit programs.

12          In 1989, Mr. Rarick was appointed Deputy

13  Commissioner of IDEM, and for four years he managed the four

14  major environmental programs which included the Offices of Air

15  Quality, Water Quality, Solid and Hazardous Waste and

16  Environmental Response.

17          Mr. Rarick left IDEM in 1993 and for the past 15

18  years has been in the private sector where he specializes in

19  Clean Air Act permitting and compliance matters.

20  Q   Mr. Rarick, please state your name for the record.

21  A   My name is Thomas Rarick.

22  Q   Where are you currently employed?

23  A   I'm currently employed with the firm of Environmental

24  Resources Manager as a partner.

25  Q   What does Environmental Resources Management do?

Vol. 4-880

1  A    Environmental Resources Management or ERM is a worldwide

2  environmental and consulting firm, and I'm located in its

3  Carmel, Indiana office.

4  Q    What kind of work does ERM do?

5  A    ERM again is, does environmental consulting work.  My role

6  there is heading up a practice dealing predominantly with air

7  compliance and permitting issues.  I supervise a staff of

8  environmental engineers and environmental specialists.

9  Q    Try to slow down a little bit, Mr. Rarick.

10           MR. VOLPE:  Can I see Exhibit 235?  Exhibit 235.

11  I'm going to approach the witness, Your Honor.  This is DR

12  Exhibit 235.

13  BY MR. VOLPE:

14  Q    Mr. Rarick, do you recognize this document?

15  A    Yes.  This is a copy of my curriculum vitae.

16           MR. VOLPE:  Pursuant to the agreement, Judge, we

17  offer this as evidence.

18           MR. BENSON:  No objection.

19           THE COURT:  Exhibit is admitted.

20      (Defendant's Exhibit DR-235 was received in evidence.)

21           MR. VOLPE:  Your Honor, we offer Mr. Thomas Rarick

22  as an expert -- as an environmental engineer with

23  specialization in air quality and permitting issues.

24           THE COURT:  All right.

25  BY MR. VOLPE:

Vol. 4-881

1  Q    All right, Mr. Rarick, I would like to start with the

2  concept of excess emissions that we have heard a bit about

3  during this trial.  First, let me ask you, are you familiar

4  with the concept of excess emissions within the context of

5  this case?

6  A    Yes.

7  Q    Within the context of this case, what do you understand

8  excess emissions to be?

9  A    Excess emissions calculations have been performed as part

10  of this case, are a look back, if you will, at the levels of

11  emissions that would have exceeded -- actual emissions that

12  would have exceeded levels of emissions that would have been

13  allowed had permits been issued at the time the modification

14  took place, looking back.

15  Q    Is this a historical view?

16  A    Yes, all the calculations have been calculations looking

17  at the historic record.

18  Q    During your time at EPA, Mr. Rarick, did you ever --

19  during your time at EPA, did you ever apply the concept of

20  historical excess emissions in an NSR enforcement or

21  permitting context?

22  A    No.  While I was at EPA and responsible for permitting and

23  enforcement issues, we never employed a look back at excess

24  emissions in this manner, no.

25  Q    What about during your time at IDEM?  Did you ever apply

Vol. 4-882

1  the concept of historical excess emissions in an NSR

2  enforcement or permitting action?

3  A    No.  Similar to my answer with EPA, I never did, no.

4  Q    Would your answer be the same for your time at the

5  environmental resource management?

6  A    Yes.  In fact, in other consulting roles, at no time in

7  consulting have I done similar types of calculations on behalf

8  of clients.

9  Q    Mr. Rarick, when did you first hear of the concept of

10 doing an historical excess emission calculation?

11 A    It was in the context of this case in a review of the

12 expert report by Dr. Fox.

13 Q    With regard to the calculation of excess emissions, can

14 you tell us what Dr. Fox did?

15 A    Yes.  Dr. Fox again looked historically at the difference

16 between actual emissions.  The actual emissions' baseline was

17 that which was provided by Duke Energy for the period of time

18 from the date of the projects through 2007 and compared that

19 against the level of emissions that she had presumed would be

20 allowed had permits been obtained at the time of the

21 modifications.

22 Q    Mr. Rarick, did you also calculate excess emissions?

23 A    Yes, I did.

24 Q    Why did you calculate them?

25 A    I calculated excess emissions in a basically similar

1  fashion, but I disagreed with the presumptions that Dr. Fox

2  had made regarding the level of controls that would have been

3  required.

4  Q   All right.  We'll come back to that.  Other than the

5  difference in the underlying presumptions, are the

6  calculations that you and Dr. Fox performed roughly the same?

7  A   Yes.  The math that was performed is roughly the same.  We

8  looked at the same period of time.  We used the same database

9  of actual emissions.

10 Q   So let's start with SO2.  In general, Mr. Rarick, how does

11 your analysis differ from Dr. Fox's?

12 A   For SO2, the difference in our calculations is based on

13 the presumption of what would have been required.  Dr. Fox

14 presumed that had a permit been obtained, that it would have

15 required the use of a wet flue gas desulfurization unit with

16 requirement for 95 percent control.  My presumption was is

17 they would have obtained a permit capping their emissions at

18 pre-project baseline levels.

19 Q   What about for NOX?  How do your calculations differ from

20 Dr. Fox's?

21 A   Again, the math is basically the same.  The principal

22 difference is what we determined to have been the requirement

23 at the time it would have been permitted.  Dr. Fox presumed

24 that low NOX burners or SCR would have been required.  My

25 presumption is that low NOX burners would have been required.

Vol. 4-884

1  Q    Mr. Rarick, have you prepared a chart summarizing your

2  analysis?

3  A    Yes, I have.

4  Q    This is Dem Exhibit 68, and it's entitled excess emissions

5  from date of projects through mid-2009.  Mr. Rarick, can you

6  tell us what's going on in this exhibit?

7  A    Yes.  Let me give you a rough orientation.  Each of the

8  bars in this chart represent total excess emissions during

9  that period of time from the date of the projects through

10 mid-2009.  There are two bars on the left which represent

11 calculations for SO2, and then the right half of the graph

12 represents calculations for NOX.

13        The blue bars, if you will, are calculations

14 performed -- are numbers based on calculations performed by

15 Dr. Fox, and the orange bar are calculations that I performed.

16 Q    What are the numbers for SO2?

17 A    For SO2, the calculations for Dr. Fox were 392,000 tons.

18 Mine were 127,000 tons.

19 Q    And for NOX?

20 A    For NOX, Dr. Fox's calculations were 32,000.  My

21 calculation was zero.  Maybe I can clarify one point if I

22 could so that there's some clarity going forward.

23 Q    Sure.

24 A    I just want to highlight that the calculations here go

25 from the date of the projects, which is similar to what

Vol. 4-885

1  Dr. Fox did through mid-2009.  So it does update some of the

2  figures that may have been presented by Dr. Fox using similar

3  methodology but projected through mid-2009.

4  Q    This chart is based on data from Unit 2, 3, and 5?

5  A    For the purposes of SO2, it represents data for Unit 2, 3

6  and 5.  For nitrogen oxides, it's for Units 3 and 5.

7  Q    Let's start with NOX.  Did you say, Mr. Rarick, that you

8  disagreed with Dr. Fox's assumption that SCRs would have been

9  BACT at the time of the project?

10  A    Yes.

11  Q    Why do you disagree?

12  A    I don't believe at the time these projects would have been

13  permitted in the late 1980s that the Indiana Department of

14  Environmental Management or IDEM would have determined that

15  SCRs was BACT for NOX at that time.

16  Q    What's the basis for your conclusions?

17  A    There are two things that I guess I would highlight that

18  would underpin those conclusions.  One was a review of similar

19  determinations that had been made for coal-fired power plant

20  units; and the second were statements and assessments that

21  were performed by the U.S. EPA.

22  Q    Let's start with the first one.

23        What are you referring to when you discuss the

24  database?

25  A    The database, the term is a RACT/BACT/LAER Clearinghouse.

Vol. 4-886

1   It is a database of decisions that are made -- technology

2   determinations that are made under the New Source Review

3   programs and form a database that we can look at what similar

4   decisions were made at the time.

5   Q    So the record is clear, what does RACT stand for?

6   A    RACT stands for Reasonably Available Control Technology.

7   Q    I think we know what BACT stands for.

8        What about LAER?

9   A    LAER is Lowest Achievable Emission Rate.

10  Q    Is the RACT/BACT/LAER clearinghouse a public database?

11  A    Yes, it is.  It is a database managed by EPA, state, local

12  agencies, EPA.  When decisions are made, BACT decisions or

13  LAER decisions, the data from those decisions are entered into

14  the database.

15  Q    When you were reviewing the RACT/BACT/LAER Clearinghouse,

16  did you focus on a specific time period?

17  A    Yes.  I looked at the time period several years prior to

18  and then up to the point of the date of the projects.

19  Q    Mr. Rarick, what did you learn from reviewing the

20  database?

21  A    The RACT/BACT/LAER Clearinghouse data for coal-fired --

22  pulverized coal-fired units up to and to the point of the

23  projects, did not show any determinations in the country

24  requiring selected catalytic reduction as BACT.

25  Q    Mr. Rarick, in Indiana, were there projects that required

Vol. 4-887

1  SCRs during the 1989 to 1990 period at coal-fired plants?

2  A    No.

3  Q    Were you at IDEM at the time?

4  A    Yes, I was.  I was in one of the positions that you

5  mentioned, either as the assistant commissioner for the Office

6  of Air Management or the deputy commissioner.

7  Q    Aside from the clearinghouse, what else are you relying on

8  for your opinion regarding the SCRs?

9  A    The other piece of information comes from a federal

10 register in which EPA is -- has commented on the state of

11 development of selected catalytic reduction.

12 Q    What was going on in the EPA document that you're

13 referring to?

14 A    The EPA document that I'm referring to is a proposed rule

15 making.  I believe it was June of 1991.  It is proposed rule

16 making that is proposing revisions to a number of regulations,

17 federal regulations, including the PSD or Prevention of

18 Significant Deterioration regulations.

19 Q    Mr. Rarick, do you have a demonstrative that you're

20 relying on for your opinions?

21 A    Yes, I do.

22 Q    Can I see DR Dem 69, please?

23      The cite to this is 56 Federal Register 27630,

24 pinpoint cite, 27638.

25      Is this the excerpt you're referring to, Mr. Rarick?

Vol. 4-888

1  A    Yes, it is.

2  Q    What does this show?

3  A    The highlighted portion -- I'll just read it.  It says,

4  "However, SNR --" and I would correct that.  I believe that's

5  referring to SCR "-- and SNCR are not in use in this country

6  as retrofit technologies for coal-fired boilers and the DOE,

7  or Department of Energy sponsored projects, have not yet been

8  demonstrated."

9  Q    Did EPA adopt this rule, Mr. Rarick?

10 A    To my understanding, no, it did not adopt this rule.

11 Q    Does the fact that EPA did not adopt this rule undermine

12 your opinions?

13 A    No, it did not.  The statements and the rule making I use

14 as evidence of EPA's assessment of the development of the

15 technology, not necessarily important in terms of whether they

16 adopted the regulations or not subsequently.

17 Q    As a regulator, would you rely on these type of statements

18 from the EPA in deciding what was BACT at the time?

19 A    Absolutely.  As a state regulator, it's very important to

20 be able to rely on a federal government that has the resources

21 to assess these kinds of things and provide this kind of

22 information.  I certainly would have relied on this type of a

23 statement from EPA in terms of the status of the development

24 technology.

25 Q    Let's move on, Mr. Rarick, to the second aspect of your

Vol. 4-889

1  opinion on NOX.

2        What do you believe BACT would have been for

3  controlling NOX in 1989 and 1990?

4  A    I believe BACT would have been determined to have been the

5  requirement for the use of a low-NOX burner, and a low-NOX

6  burner that would have met an emission limitation of

7  0.6 pounds per million BTUs.

8  Q    Did Cinergy, in fact, install such controls?

9  A    They did for Unit 5.  At the time of the modifications

10  they installed low NOX burners on Unit 5, and the record also

11  showed that they would have met a limit of 0.6 pounds per

12  million BTU.

13        They did not install the low NOX burners at the time

14  of the modifications on Unit 3, but did subsequently a few

15  years later install such equipment.

16  Q    Did your review of the RACT/BACT/LAER Clearinghouse

17  support your opinion that low-NOX burners were BACT at the

18  time of the projects?

19  A    Yes, they did.  There were a number of entries in the

20  clearinghouse identifying low-NOX burners as the required BACT

21  determinations for a number of coal-fired projects preceding

22  and up to the date of the modifications.

23  Q    Mr. Rarick, does your opinion regarding low-NOX burners

24  likewise have support in EPA statements?

25  A    Yes.  In statements that were found in the same Federal

Vol. 4-890

1   Register notice that we just discussed.

2   Q   Do you have a demonstrative highlighting the statement

3   you're referring to?

4   A   Yes, I do.

5   Q   Can I see DM71, please?

6       All right.  The citation for this again is 56 Federal

7   Register 27638.

8       Can you read for us, Mr. Rarick, what you're relying

9   upon?

10  A   Yes.  This is under a section of the preamble that is

11  discussing and is entitled "Utility BACT Presumption for NOX."

12      The highlighted section I would read says, "In

13  general, this will call for the use of combustion modification

14  and/or low-NOX burners."

15      So in this statement they're saying their presumption

16  for BACT would be the use of combustion modification or

17  low-NOX burners.

18  Q   Is this for retrofit coal-fired units?

19  A   Yes.  The discussion here is related to electric steam

20  generating units and to retrofits of those units.

21  Q   Mr. Rarick, is it your opinion that IDEM would have

22  required low-NOX burners as BACT at the time of the projects?

23  A   Yes.

24  Q   Let's take this back to the excess emissions we were

25  talking about.

Vol. 4-891

1          Did you find, Mr. Rarick, that there were excess

2     emissions for NOX?

3     A    No.

4     Q    Have you prepared a chart summarizing your calculations

5     for us?

6     A    Yes, I have.

7     Q    Can I see DM -- it's magic.  There's a lot going on in

8     this chart.  I'll read it.  It's Dem 72 and the title is

9     "Assessment of NOX Excess Emissions."

10          I think, Mr. Rarick, it's easiest if you describe

11    what's in the columns here.

12    A    Sure.  Let me walk you through, I guess, what the

13    different columns and different information are.

14          It has two different rows, one for Unit 3 and one for

15    Unit 5 and identifies project dates.  So that would be the

16    starting date.

17          The allowable emissions is the next column.  And

18    allowable emissions have been calculated from the date of the

19    project forward to mid 2009, and are based on the actual coal

20    consumption of, in this case Unit 3 during that period of

21    time, at an emission limit of .6 pounds per million BTU.  So

22    the 28,764 you see on there, that would be the total emissions

23    allowed during that period of time at a BACT limit of .6.

24          The next column calculates for the same period of

25    time.

Vol. 4-892

1   Q   Please slow down.  Let's go to the fourth column.  Let's

2   start that one over.

3           The fourth column.

4   A   The fourth column calculates over a similar period of time

5   the actual emissions that occurred.  That data is taken from,

6   again the data that was provided by Duke Energy of the actual

7   emissions from the unit.

8   Q   And finally, Mr. Rarick, what's going on in the last

9   column?

10  A   The last column is merely the difference between the total

11  allowable emissions and the total actual emissions calculated

12  for each of the units.

13  Q   And you have totals here; and can you read your totals for

14  allowable emissions?

15  A   The allowable emissions for Units 3 and 5 both were

16  approximately 29,000 each for a total of about 58,000.

17  Q   What about the actual emissions from 3 and 5?

18  A   Three and 5 actual emissions were around 28,000, 24,000,

19  for a total of about 52,000.

20  Q   And finally, for the excess emissions?

21  A   The excess emissions combined were a minus 5,900, roughly,

22  tons.

23  Q   Mr. Rarick, Dr. Fox testified here in court that she found

24  a fatal flaw in this analysis.

25          Were you here for that?

Vol. 4-893

1  A    Yes, I was.  I heard that testimony.

2  Q    Can you describe what she was referring to?

3  A    Yes, but it may be useful to step back a little bit in

4  terms of the fact that I think she said there was a fatal flaw

5  and if I had done it the normal way, I would have come up with

6  numbers more similar to what she did.  I don't know of a

7  normal way.  I think the point I was trying to make earlier

8  was I don't know of any guidance that tells me how one would

9  or would not calculate them.  I think I've gone through how I

10  did do the calculations.

11        Yes, the calculations do, in fact, recognize that

12  during much of this period of time, actual emissions were

13  below what would have been allowed under a BACT determination

14  for low-NOX burners.  The Unit 5, as I said, did put in a

15  low-NOX burner at the time of installation.  Unit 3, a few

16  years later, put in a low-NOX burner and, in fact, these units

17  both put in second generation low-NOX burners later on that

18  have been in operation for the last several years.

19        As such, the use of these technologies have, in fact,

20  resulted in emissions that are below what would have been

21  allowed.  So my calculations of excess emissions then take

22  that into account.

23  Q    Do you believe, Mr. Rarick, that's a fair way to calculate

24  this theoretical excess emissions?

25  A    Yes, I do.

Vol. 4-894

1  Q   All right.  Let's look at the SO2 analysis.

2        Mr. Rarick, is it your testimony that Dr. Fox

3  overstated the amount of excess SO2 emissions?

4  A   Yes, it is.

5  Q   How much do you believe Dr. Fox overstated those emissions

6  by?

7  A   I think that her calculations were in order of three times

8  the excess calculations that I calculated, so by a factor of

9  three.

10 Q   Can you tell us why your calculations diverge from the

11 ones performed by Dr. Fox?

12 A   Again, as I said earlier, Dr. Fox's calculations were

13 based on a presumption of the installation of a wet FGD,

14 meaning an emission limit or an emission reduction of

15 95 percent.

16        My calculations were based on an assumption that the

17 facility would have capped its emissions at roughly the

18 pre-project levels in order to satisfy the permitting

19 requirements.

20 Q   Mr. Rarick, why do you believe that that's the case, that

21 they would have capped their emissions?

22 A   I believe that an emissions cap would have afforded them a

23 number of advantages as a way of dealing with their permit

24 obligation in comparison with the requirement for a wet

25 scrubber.

Vol. 4-895

1  Q    In general terms, what are these type of permits called?

2  A    The permit I'm referring to is -- a term of art would be a

3  synthetic minor permit, typical terminology.

4  Q    Can you tell us what is a synthetic minor permit?

5  A    A synthetic minor permit, in order for a facility to be

6  determined that they would need to go through New Source

7  Review, they would have to have been determined to have been a

8  major modification.  If I take limits so that I'm below the

9  level that would have determined me to have been a major

10  modification, then I'm minor, if you will.  And taking those

11  restrictions then are referred to as a synthetic minor.

12  Q    Is this synthetic minor permit a common tool used by

13  sources to comply with NSR requirements?

14  A    Yes, in my experience both in regulatory agencies as well

15  as in private practice, it's a very common type of a permit.

16  Q    Do you have data on that point, Mr. Rarick, at least for

17  Indiana?

18  A    Yes, I do.

19            MR. VOLPE:  Approach, Your Honor?

20            THE COURT:  Yes.

21  BY MR. VOLPE:

22  Q    Can you identify this document for the record, Mr. Rarick?

23  A    Yes.  It's entitled "An Indiana Air Permitting Guide"

24  published by the Indiana Department of Environmental

25  Management.

Vol. 4-896

1  Q    It's Exhibit No. DR-142.

2          MR. VOLPE:   Judge, I offer this document into

3  evidence.

4          MR. BENSON:   No objection.

5          THE COURT:   It's admitted.

6      (Defendant's Exhibit DR-142 was received in evidence.)

7  BY MR. VOLPE:

8  Q   Mr. Rarick, is there a portion -- it's a big document.  Is

9  there a portion you're relying on for your opinions?

10 A   Yes, there's a portion of this document that speaks to

11 this point.  It's found I believe on page 59.

12 Q   Happily it's up on the screen already.

13          Can you read from the portion you're relying on?

14 A    Yes.  The highlighted portion, or the portion which is

15 pulled up here, is from a section entitled "Limiting Emissions

16 to Avoid PSD Requirements, which is the same thing we're

17 talking about.

18          It indicates that "The federal synthetic minor is a

19 frequently used option.  The OAM, or Office of Air Management,

20 reports that 40 percent of state construction permits have

21 some kind of limit on PTE or potential to emit, while only 2

22 to 3 percent are full-blown major sources."

23 Q   The implication of being a full-blown major source is

24 what, Mr. Rarick?

25 A   The reference here, I believe, is to the fact that a full

Vol. 4-897

1  blown major source would be required to go through the New
2  Source Review regulations.
3  Q    Can you describe, Mr. Rarick, how a synthetic minor permit
4  works in practice?
5  A    Yes.  In fact, it is a permit.  A permit is issued which
6  contains enforceable limitations.  Enforceable limitations
7  would include a restriction on the overall level of emissions
8  below what we've referred to as the major modification
9  threshold.  That limitation would be on a 12-month basis or
10 annual, if you will.  The permit would also be required to
11 have enforceable conditions so that one could measure and
12 report and ensure compliance with that.
13 Q    Just so I understand, Mr. Rarick, the threshold is
14 established how?
15 A    The threshold is established by looking at the level of
16 emissions that occurred prior to the change or the
17 modification.  Then you're allowed an increment above that.
18 In the case of sulfur dioxide, for example, and NOX, that
19 increment or threshold would be 40 tons.
20        Simply said, I would be allowed to emit 40 tons more
21 than I emitted prior to the projects and I could go forward
22 based on that cap on emissions.
23 Q    Mr. Rarick, you may have mentioned this, but what are some
24 of the advantages of taking a synthetic minor permit that make
25 them more common than NSR permits?

Vol. 4-898

1  A    I think the principal advantages would include -- I may

2  have to reduce emissions less.  It may, therefore, be less

3  costly.  I would have greater flexibility in being able to

4  meet a limit that was established over a 12-month period.  I

5  would have more ways that I could meet that limit than I would

6  otherwise.

7         Also, the nature or form of the permit conditions and

8  the permitting process may be more favorable.

9  Q    When you say "less costly," what are you referring to,

10  Mr. Rarick?

11  A    Well, as an example in this case, if I was able to reduce

12  emissions by only a third of what I would have to do

13  otherwise, I would very well be able to accomplish that at

14  less cost than I would be able to by having to apply in this

15  case a LAER standard.

16  Q    If Cinergy had chosen to obtain a synthetic minor permit

17  at the time of the projects, were you able to analyze the

18  impact of obtaining a cap on SO2 emissions?

19  A    Yes.  That goes back, I think, to an earlier chart where

20  we calculated what the emissions -- the excess emissions would

21  be.

22  Q    Do you have a demonstrative that walks through your

23  analysis related to SO2?

24  A    Yes, I do.

25  Q    Can I see demonstrative 74?  This is Exhibit DR Dem 74 and

1  it's entitled "Assessment of SO2 Excess Emissions Beyond the

2  Significant Net Emissions Threshold."

3          I suppose we should start with the title.  What are

4  you trying to convey in the title?

5  A   Again, this is my calculation of excess emissions, excess

6  emissions being those emissions -- the level of emissions that

7  we get from a historic record, the level of actual emissions

8  that would have been above what would have been allowed had

9  they gotten a synthetic minor or an emission cap at the time

10  of the modifications.

11  Q   Let's take a look at the body of the chart now and walk

12  through the various columns here, the first one being emission

13  unit and it's unit 2, 3 and 5?

14  A   That's correct.  I'll walk through these slowly and I'll

15  try to talk a little slower in the process.

16          The next column identifies the project date of the

17  projects associated with Unit 2, 3 and 5.

18          The next column is where the actual cap is calculated,

19  if you will.  So the cap is based on the average annual

20  emissions for the two years that preceded the date of the

21  project.  So that's an annualized number.

22          In the case of the first one for Unit 2, I've also

23  added up to an additional 40 tons for that first project.  So

24  that is what I've described before is that allowable increase

25  above the baseline that the rules provide for.

1        For Units 3 and 5, those are just the averages of the

2   two prior years.

3        The last column then is a calculation for each of the

4   units -- my calculation of the excess emissions.  Those

5   again -- in a similar fashion, they're the difference between

6   what would have been allowed over that same period of time had

7   I had an emission cap and the emissions -- and the emissions

8   that actually did occur based on the historic record.

9   Q    Mr. Rarick, did you bring this emissions in excess column

10  up into the future actually?

11  A    In order to be consistent with the calculations, this

12  calculation has been done up to mid 2009.

13  Q    Then what's the total here?

14  A    The total's approximately 127,000 tons.

15  Q    Can I see Dem 68, please?

16       Just so I'm clear, Mr. Rarick, is that 127,000 for SO2

17  showing up here in the orange column?

18  A    Yes, exactly.

19  Q    And likewise, when you did the NOX calculation, is this

20  number carried over onto this chart?

21       Would that number carry over onto this chart?

22  A    I did not carry it over as a negative number on this

23  chart.  We merely showed that there were no excess emissions.

24  We put a zero in rather than showing some negative value.

25  Q    In your experience as a regulator, Mr. Rarick, is there

Vol. 4-901

1   anything improper about employing a synthetic minor permit

2   instead of going through NSR review?

3   A    No, not at all.

4   Q    Let's shift gears and let's talk a little bit about the

5   local air quality in Vigo County.

6         Have you done any work to evaluate local air quality

7   in Vigo County since the projects in question?

8   A    Yes, I have.

9   Q    What have you done?

10  A    I have assembled air quality data for both NO2 and for SO2

11  and reviewed that date.  The data that I evaluated was for a

12  period of time prior to, during and then up to the present day

13  or 2007.

14  Q    Where did those data come from?

15  A    Those data came from EPA databases, and they were based on

16  monitoring data that were located in Vigo County or in the

17  surrounding counties.

18  Q    Why are those air quality data maintained?

19  A    The purpose of these air quality data are essentially to

20  measure an area's status in terms of meeting ambient air

21  quality standards or the national ambient air quality

22  standards.

23  Q    We've heard a lot about that, so I won't dwell on what

24  those standards are.

25         Did you collect data for particular pollutants,

Vol. 4-902

1  Mr. Rarick?

2  A   Yes.

3  Q   For which pollutants?

4  A   For SO2 and NO2.

5  Q   Mr. Rarick, what did you do with those data?

6  A   The data for SO2 I plotted over time in order to take a

7  look at the trends in the data.

8  Q   Mr. Rarick, why have you focused on the local air quality

9  data in your review?

10 A   The local air quality data would determine whether an area

11 is an attainment or a non-attainment.  The local quality

12 data -- and those determinations then would be used to

13 determine which of the New Source Review rules one would be

14 subject to.  Those New Source Review rules being focused on

15 and dealing with local air quality.

16 Q   Have you prepared a demonstrative that -- to show the air

17 quality data you reviewed?

18 A   Yes, I have.

19         MR. VOLPE:  Can I see DR Dem 7?

20 BY MR. VOLPE:

21 Q   This exhibit is entitled "Annual SO2 Air Quality Data for

22 Vigo County."

23       All right, Mr. Rarick, what's going on here in this

24 chart?

25 A   A quick orientation.  The chart on the left-hand side is a

Vol. 4-903

1  plot of annual SO2 concentrations in micrograms per meter

2  cubed.

3        The blue and pink lines are the actual data from two

4  different monitors located in Vigo County.

5  Q   What's the yellow dotted line or dashed line?

6  A   The yellow dashed line is the National Ambient Air Quality

7  Standard or NAAQS, which is set at 80 microgram per cubic

8  meter annual average.

9  Q   What's the vertical dotted line?

10 A   That's just an indicator of roughly when the projects took

11 place -- when the first project took place.

12 Q   Mr. Rarick, from your perspective what is the significance

13 of what is shown on this chart?

14 A   I think there's a couple of things that it illustrates.

15 First of all, it clearly illustrates that prior to -- at the

16 time of the projects and since the projects, the annual max

17 has been met in Vigo County.

18       I think the second thing that one would look at, and

19 it relates back to the discussion of excess emissions, is

20 these are actuality air quality values that are measured at a

21 time that the actual emissions took place.  So when I look at

22 this, I can kind of mentally also realize that this also

23 representative of air quality with the actual emissions

24 occurring from Wabash station.

25 Q   Mr. Rarick, was Vigo County in attainment during this

1  whole period?

2  A    No, it was not.

3  Q    Can you tell me when it was not in attainment?

4  A    The area was not in attainment during the period of time

5  that starts at the left side of the graph up to about 1996.

6  That's when the area was redesignated as attainment.

7  Q    At some point, Mr. Rarick, did IDEM petition the EPA for a

8  change in Vigo County's attainment status?

9  A    Yes.  In fact, when I was at the agency, we were

10 developing regulations and assembling this same data in order

11 to make a petition to the EPA for redesignation to attainment.

12 Q    Remind me when you were at the agency, at IDEM?

13 A    That would have been from 1987 to 1993 roughly.

14 Q    At some point, have you reviewed IDEM's petition,

15 Mr. Rarick?

16 A    Yes, I have.

17 Q    In reviewing IDEM's petition, did IDEM make any

18 assumptions about operations at Wabash River?

19 A    Yes.  As part of the air quality review, they would have

20 done ambient air quality modeling, and that would have

21 embodied the emissions from Wabash River station into that

22 modeling.

23 Q    Is there information about the level at which the

24 assumptions -- about Wabash River's operations are set?

25 A    Yes.  In fact, at that time all of the modeling that we

1  were doing in conjunction with these types of reviews -- we

2  did the modeling by including the maximum allowable emissions

3  from a unit.  In other words, its potential to emit.  So it

4  would have included full capacity at its allowable levels.  So

5  the modeling ensured that the air quality standards could be

6  protected under any scenario of operation.

7  Q    Did EPA eventually approve the redesignation of Vigo

8  County?

9  A    Yes, they did.

10  Q    I think you may have said this.  What year was that?

11  A    That was 1996, I believe.

12  Q    Did you review the air quality data for NOX?

13  A    Yes, I did.

14  Q    What did you FIND, Mr. Rarick?

15  A    I reviewed air quality data for Vigo County and

16  surrounding counties.  The data was a bit more sparse; but all

17  of that data showed that prior to, at the time of the projects

18  and since the projects, Vigo County and surrounding counties

19  were in attainment for the NO2 standard.

20  Q    Okay.  We're going to shift one more time and discuss the

21  proposed remedies in this case.

22        Mr. Rarick, have you prepared emission reduction

23  calculations that relate to some of the proposed remedies in

24  this case?

25  A    Yes, I have.

Vol. 4-906

1  Q   Let's look at Dem, Dem Demonstrative Exhibit No. 3?

2          MR. BENSON:  I object, Your Honor.  This is

3  different from what Mr. Rarick has identified in his report;

4  and as I look at it, I cannot track back to any analysis he's

5  disclosed.

6          MR. VOLPE:  Maybe Mr. Rarick can explain that,

7  Judge.

8          THE COURT:  Let's see if he can.  If he can't, to

9  your satisfaction, let me know.

10         MR. VOLPE:  All right.

11 BY MR. VOLPE:

12 Q   What's going on in this exhibit?

13 A   Maybe I can just make a couple preface comments.

14 Q   Okay.

15 A   The calculations that I've done up to this point and we've

16 talked about up to this point are all looking at the historic

17 record and calculating things retrospectively, if you will,

18 looking back.  The calculations I have here are looking

19 forward; and their purpose looking forward is to calculate

20 emission reductions, if you will, that would occur from the

21 proposed remedies.  So that's the distinction between these

22 two sets of information.

23 Q   Are these the same type of calculations that were

24 contained in your expert report?

25 A   I did calculations similar to this in the expert report.

Vol. 4-907

1  The calculations in the expert report were similar in nature,

2  but some of the proposed remedies have been different in terms

3  of the time frames associated with those remedies or the

4  nature of those remedies.  So I have done similar

5  calculations, but now consistent with different proposed

6  remedies.

7          MR. BENSON:  Your Honor, at this time I would renew

8  my objection, to the extent that he has changed the analysis

9  that went into looking at proposed remedies.  It's a different

10 opinion.  It hasn't been disclosed.  There was ample

11 opportunity to do so.

12         MR. VOLPE:  They're not different opinions, Judge,

13 just different math.  Same opinions.

14         THE COURT:  If math is all it is, we'll let it go.

15 You can cross-examine on that.

16 BY MR. VOLPE:

17 Q   Demonstrative No. 3, Mr. Rarick, which is entitled

18 "Cinergy Plan:  SO2 and NOX Reductions Through 2012," what's

19 being calculated here?

20 A   Okay.  What I'm looking at is a reduction from the levels

21 of emissions that have been occurring over the last several

22 years, to the extent that those emissions are now being

23 reduced by reduced operations down to a baseline, or to a

24 limited level of emissions, what the total emissions

25 reductions are associated with that reduced operation of

Vol. 4-908

1  Units 2, 3 and 5.

2  Q   What time frame is being covered here?

3  A   The time frame is mid 2009 through September 2012, the

4  period where there's a proposal to reduce operations.

5  Q   What do you calculate the SO2 reduction to be for that

6  time period?

7  A   33,500 tons.

8  Q   What do you calculate the NOX reduction to be for that

9  time period?

10  A   4,800 tons.

11          MR. VOLPE:  Can I see Dem No. 4, please,

12  demonstrative Exhibit No. 4?

13  BY MR. VOLPE:

14  Q   I should say, Mr. Rarick, that was for reduced operations

15  at Units 2, 3 and 5?

16  A   That's correct.

17  Q   This is demonstrative No. 4, which is entitled "Cinergy

18  Plan:  SO2 and NOX Over 20 Years."

19          Again, this is for Units 2, 3 and 5?

20  A   That's correct.

21  Q   So tell us what calculations are being done here in the --

22  for SO2 reduction and NOX reduction.

23  A   Okay.  This chart builds on the last chart.  In the last

24  chart we had reduced operations for roughly 39 months from mid

25  2009 to September of 2012.  At that point and going forward,

Vol. 4-909

1  an additional 16 years, there would be closures of Unit 2, 3

2  and 5.  So this graph includes the reductions calculated for

3  reduced operations and then has calculated the reductions

4  going guard for the next 16 years based on a presumption of

5  shutdown of Units 2, 3 and 5.

6  Q    For SO2 reductions, what do you calculate?

7  A    429,000 tons.

8  Q    And for NOX reductions, what do you calculate?

9  A    62,000 tons.

10  Q    Let's look at demonstrative Exhibit No. 10.  This

11  demonstrative is entitled "SO2 Reduction from Shutdown of unit

12  4 Over 20 Years Exceeds Excess."

13        What are you trying to depict here, Mr. Rarick?

14  A    Well, first of all, let me explain the bar on the left,

15  which is -- which has a value of 165,000.  That would be the

16  reduction in emissions that would come about for the closure

17  for a 20 year period of Unit 4.

18        So, in other words, I looked at the current levels of

19  emissions from Unit 4 and I took that times 20 years, if that

20  were closed, and that's how I came up with 165,000.

21  Q    So this calculation doesn't depend on when Unit 4 is

22  closed?

23  A    No, it does not.

24  Q    It just goes out 20 years from a date?

25  A    It just presumes a 20-year period.

Vol. 4-910

1  Q    Why did you pick a 20-year period, Mr. Rarick?

2  A    Picked a 20-year period because I was requested to look at

3  20 years based on certain theories of remedy.

4  Q    What is the SO2 reduction from the Unit 4, the Unit 4

5  shutdown?

6  A    165,000.

7  Q    What are you comparing here?

8       What's in the light blue column?

9  A    The number 127,000.  There, again, that goes back to the

10  calculation of excess emissions that I had calculated for the

11  historic records.  So this compares going forward reductions

12  that would occur from Unit 4 versus the -- my calculation of

13  excess emissions for the historic record.

14  Q    Did you use an average to obtain the baseline?

15  A    Yes.  Actually for Unit 4; and this is true for the other

16  units.  In order to determine what level of emissions are

17  currently taking place, I used the average emission levels for

18  the five-year period of 2003 to 2007.  I used that average

19  period and all the calculations were based on that.

20  Q    Why did you use a five-year average?

21  A    I used an average period or a five-year average to again

22  sort of dampen out any abnormal highs or lows that would occur

23  if I just used a single year.  It was also consistent in terms

24  of the manner in which I had taken averages and the

25  calculations done in my expert report.

Vol. 4-911

1           MR. VOLPE:  Just one more, Judge.  We're almost

2  done.

3           Can I see Demonstrative Exhibit 75?

4  BY MR. VOLPE:

5  Q   This is entitled "Plaintiffs' Suggested Control Remedy on

6  Units 4 and 6 Exceeds All Emissions Since Projects.

7           Can you describe what's going on in these columns

8  here?

9           MR. BENSON:  Objection.  Again, this is not anywhere

10 in Mr. Rarick's expert report.

11           MR. VOLPE:  This is actually based on Dr. Fox's

12 calculations, Mr. Rarick's calculation that he just explained,

13 and then the comparator between what would happen if he shut

14 down control Units 4 and 6, which he just explained.

15           THE COURT:  I'll let him testify.  Go ahead.

16 A   It may be easiest to start with the second two columns.

17           The 392,000 tons in the orange, and the 127,000 tons

18 on the column to the right, those are the same figures you've

19 seen in the earlier chart in terms of the Plaintiffs'

20 calculation of excess emissions and my calculation of excess

21 emissions.

22           The bar on the left represents the emission reductions

23 that would occur from the control of Units 4 and 6.

24 BY MR. VOLPE:

25 Q   Explain to me how that was calculated?

1  A   Okay.  That essentially looks at the current level of

2  emissions from Units 4 and 6.  It projects that level of

3  emissions to occur out over the next 20 years.  I've used a

4  consistent time frame of 20 years.

5       It then looks at 95 percent control of all of those

6  emissions and what that level of reduction would be.  So it's

7  95 percent control of Units 4 and 6 over 20 years.

8  Q   Again, that's the Plaintiffs' suggested remedy?

9  A   That's as I understand it, yes.

10  Q   If Unit 4 was shut down instead of controlled, what would

11  happen to the 719,000 amount?

12  A   The amount on the left there?

13  Q   Yes.

14  A   It would be a little bit larger because I would have shut

15  down rather than controlled Unit 4.

16          MR. VOLPE:  I have no further questions, Your Honor.

17          THE COURT:  I'm just about done for the day.  I

18  think we'll just start again in the morning at 8:00 o'clock.

19          MR. BENSON:  That's fine, Your Honor.

20          MR. HOPSON:  Can I raise one question, Your Honor,

21  very briefly?

22          THE COURT:  Yes.

23          MR. HOPSON:  I don't want to rely on my memory, but

24  I think when we talked at pretrial we talked a little bit

25  about post-trial briefing and closing.  My recollection is you

Vol. 4-913

1  said you probably wouldn't want a closing.

2          THE COURT:  No.

3          MR. HOPSON:  Okay, Frank, don't stay up all night

4  and write a closing.

5          THE COURT:  That's not what I said.

6          MR. HOPSON:  Frank --

7          THE COURT:  Unless I misunderstood you.  You just

8  said my recollection is you probably wouldn't want a closing.

9  I probably will want a closing.  But I may still want some

10 briefing after that.  But I would still like to have closings

11 because I may have some questions for you that I'm sure you

12 could clear up for me.

13         MR. HOPSON:  Have you decided yet, Your Honor, what

14 briefing you would like?

15         THE COURT:  No, but I would like you to be prepared,

16 each of you, for maybe 45 minutes worth of comments, including

17 my questions.

18         MR. SAVAGE:  Does Your Honor have a sense as to when

19 he would want closing?

20         THE COURT:  Right after the last witness.  I might

21 want to go back and have a drink of water before you come out.

22         MR. SAVAGE:  Thank you, Your Honor.

23         THE COURT:  I don't know how much time you have

24 tomorrow on this witness.

25         MR. BENSON:  It'll be shorter than today's crosses,

Vol. 4-914

1  but I'm not exactly sure how long.

2          THE COURT:  Are you making a comment about your

3  associates' length of cross?

4          MR. BENSON:  I just don't have that kind of stamina,

5  Your Honor.

6          THE COURT:  Good.  All right.  So how are we doing

7  then timewise?  What time do you suppose we'll finish

8  tomorrow?

9          MR. HOPSON:  I think that if we factor in half hour,

10 forty-five minute closings, we should be done by 2 or 3:00

11 o'clock.  The witnesses tomorrow are our shortest witnesses.

12         THE COURT:  I was going to deal with those two

13 outstanding things, but I don't have it in me to do that

14 tonight.  We'll do it tomorrow.

15         I would like to know, just so you can get a heads up

16 on this, I don't know why you want Ms. Ezell's testimony in

17 this case from that deposition.

18         MR. SAVAGE:  We think it's relevant, but if it would

19 bog down the proceedings --

20         THE COURT:  You can put it in, if I thought it was

21 worthwhile.

22         MR. SAVAGE:  Your Honor, if I may briefly explain,

23 Mr. Hopson has argued in opening statement, and Cinergy has

24 argued throughout this proceeding, that had it known of the

25 Government's position, interpretation of NSR, then we all

Vol. 4-915

1  wouldn't be here today.

2         Ms. Ezell, it appears in the deposition designation,

3  says that the company developed a position in this litigation

4  for how it interprets the emissions test for NSR; and it

5  continues to apply that in reviewing capital projects going

6  forward.

7         We're not asking Your Honor to rule on whether other

8  projects are illegal or not.  It's offered for the narrow

9  purpose of showing that despite this lawsuit, the company

10  continues to apply its own position.

11         THE COURT:  Okay.  I'll tell you now, I'll sustain

12  the objection to her testimony.  So we won't wait for tomorrow

13  for that.

14         MR. SAVAGE:  Very good.

15         THE COURT:  Then I'll have a ruling for you in the

16  morning on the other.

17         COURT CLERK:  All rise.

18         (The proceedings were adjourned at 4:30 p.m.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3        I, Cathy Jones, hereby certify that the foregoing is a

4   true and correct transcript from reported proceedings in the

5   above-entitled matter.

6

7

8    /s/ Cathy Jones                      February 5, 2009
    _____
9   CATHY JONES, RPR, FCRR
    Official Court Reporter
10   Southern District of Indiana
    Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25