1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF INDIANA
2                        INDIANAPOLIS DIVISION

3
     UNITED STATES OF AMERICA,        )
4           Plaintiff,                )
                                      )
5    STATE OF NEW YORK, STATE OF      )1:99-cv-1693-LJM-JMS
     NEW JERSEY, STATE OF CONNECTICUT,)
6    HOOSIER ENVIRONMENTAL COUNCIL    )
     and OHIO ENVIRONMENTAL           )
7    COUNCIL,                         )
            Plaintiff-Intervenors,    )Indianapolis, Indiana
8                                     )February 6, 2009
            -vs-                      )8:00 a.m.
9    CINERGY CORP., PSI ENERGY, INC., )
     and THE CINCINNATI GAS &         )Volume 5
10   ELECTRIC COMPANY,                )
            Defendants.               )

11

12

13

14                          **BEFORE THE**
                   **HONORABLE LARRY J. McKINNEY**

15

16              OFFICIAL REPORTER'S TRANSCRIPT OF

17                     TRIAL PROCEEDINGS

18

19

20   Court Reporter:     Cathy Easley Jones, RPR, FCRR
                         Official Court Reporter
21                       46 East Ohio Street, Room 291
                         Indianapolis, IN  46204

22

23

24

25          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
               COMPUTER-AIDED TRANSCRIPTION

Vol. 5-917

1                    **A P P E A R A N C E S**

2

FOR THE PLAINTIFF:          Mr. Justin A. Savage
3                           Mr. Phillip Brooks
                            Mr. Jason A. Dunn
4                           Ms. Jennifer A. Lukas-Jackson
                            Mr. Myles E. Flint, II
5                           Mr. Thomas A. Benson
                            Mr. Brent Marable
6                           U.S. DEPARTMENT OF JUSTICE
                            P.O. Box 7611
7                           Ben Franklin Station
                            Washington, DC  20530
8

9  FOR THE DEFENDANTS:       Mr. Mark D. Hopson
                            Mr. Frank R. Volpe
10                          Mr. Samuel B. Boxerman
                            Ms. Kathryn B. Thomson
11                          Ms. Meghan Delaney Berroya
                            Mr. Kosta S. Stojilkovic
12                          SIDLEY AUSTIN LLP
                            1501 K Street, NW
13                          Washington, DC  20005

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 5-918

1                    I N D E X   O F   W I T N E S S E S

2                                                          PAGE

THOMAS RARICK
3 Cross-examination by Mr. Benson ...............920
Redirect Examination by Mr. Volpe .............951
4 Recross-examination by Mr. Benson  ...........954

5 ROGER C. HARSZY
Direct Examination by Mr. Hopson ..............957
6 Cross-examination by Mr. Brooks ...............971
Redirect Examination by Mr. Hopson ...........990
7 Recross-examination by Mr. Brooks  ...........991

8 MICHAEL R. BOOTS
Direct Examination by Mr. Stojilkovic .........993
9 Cross-examination by Mr. Flint ...............1014
Redirect Examination by Mr. Stojilkovic ......1027
10 Recross-examination by Mr. Flint  ...........1031

11 RICHARD MCRANIE
Direct Examination by Ms. Delaney Berroya ....1032
12 Cross-examination by Mr. Benson ..............1045
Redirect Examination by Ms. Delaney Berroya ..1052

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 5-919

1              I N D E X   O F   E X H I B I T S

2                                                    PAGE

3  Plaintiffs' Exibit No.:

4  1971 ........................................1057
   2002 ........................................1055
5  2003 – 2010 .................................1055
   2011 ........................................1056
6  2012 ........................................1056
   2013 ........................................1056
7  2014 ........................................1057
   2052 ........................................1016.
8  2054 ........................................1026
   2071, Interrogatory 4 .......................1061
9  2073, Interrogatory 4 .......................1061
   2075, Interrogatory 13 ......................1061
10 2086, Entire Interrogatory ..................1062
   2087, Interrogatories 2 and 3 ...............1062
11 2100           ............................1057
   2112B .......................................1055
12 2113 ........................................1055
   2134 ........................................1056
13 2136 ........................................1056

14

15

16

17 Defendants' Exhibit No.:

18 DR–199 ......................................1033
   DR–330 ......................................1011
19

20

21

22

23

24

25

Vol. 5-920

1    *(In open court)*

2            THE COURT:  We're ready for some cross-examination

3    today?

4            MR. BENSON:  Yes, Your Honor.

5            THE COURT:  In case you're wondering, it's not still

6    Thursday.  It is Friday.

7        **THOMAS RARICK, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

8                    **CROSS-EXAMINATION**

9    BY MR. BENSON:

10   Q   Good morning, Mr. Rarick.

11   A   Good morning.

12   Q   My name is Tom Benson with the Department of Justice.  We

13   met before.

14   A   We have.

15   Q   I have a few questions for you today.  You talked a little

16   bit in your direct exam yesterday about air quality in Vigo

17   County?

18   A   Yes.

19   Q   You showed a diagram that SO2 concentrations in Vigo

20   County have tended to go down a bit since the time of the

21   project; do you recall that?

22   A   I recall having plotted it out over time.  I think they

23   went down a bit over the course of the span of time that was

24   plotted, yes.

25   Q   You know, don't you, that the actual emissions from the

Vol. 5-921

1  Wabash River plant went up during that same time, didn't they?

2  A   I remember looking in some detail at Unit 2, 3 and 5.  I

3  believe they may have also gone up at all of the units.

4  Q   Let's just talk about 2, 3 and 5 then.  The actual

5  emissions from 2, 3 and 5 went up from the time of the project

6  to the present time, correct?

7  A   That's my understanding.

8  Q   You compiled that data in performing your work as an

9  expert in this case, correct?

10  A   Actually, the data was provided to me in terms of the

11  actual emissions from all of the units up through 2007, yes.

12  Q   And you had collected that in your work papers?

13  A   I used that information, yes, in the documents that I

14  prepared, yes.

15  Q   If we plot those emissions based on the data that you

16  presented, we can show a trend of increasing SO2 emissions.

17        And if we could have the OM chart.  Can you see that

18  on your screen, Mr. Rarick?

19  A   Yes.

20  Q   That illustrates just what we talked about, that the

21  emissions have increased at Unit 2, 3 and 5 from the time of

22  the project to the present day, correct?

23  A   That appears to be correct, yes.

24  Q   And based on what you said a moment ago, that the actual

25  concentration in Vigo County is going down, it's fair to say,

Vol. 5-922

1  isn't it, that the percentage of emissions in Vigo County

2  coming from the Wabash River is actually going up; is that

3  right?

4  A   I'll take your representation.  I haven't really done an

5  analysis of comparison of the emissions -- the relative

6  contribution emissions from the Wabash River station to all of

7  the emissions in the county, if that was your question.

8  Q   But just as a matter of logic, if the total concentration

9  is going down and the Wabash emissions are going up, wouldn't

10  it stand to reason that Wabash, over time, is becoming a

11  larger contributor relative to the rest of the sources?

12  A   Again, I haven't done an analysis looking at the relative

13  contributions.  I would want to go back and take a look at the

14  air quality levels.  They kind of bounce around during that

15  period of time.  There are different measures of air quality

16  in terms of the averaging period.  So the relative

17  contribution of Wabash River station to measured air quality

18  values is a bit more complex than just looking at a single

19  trend line.

20  Q   And you haven't done that analysis, have you?

21  A   No, I have not.

22  Q   Now, in your direct when you talked about air quality, you

23  talked about SO2, right?

24  A   I did.

25  Q   And you talked a little bit about NOX as well?

Vol. 5-923

1  A    I talked about NO2, yes.

2  Q    NO2, I'm sorry.  Let's talk about another pollutant that

3  the Court has heard a lot about in the Plaintiffs' case that I

4  don't believe you talked about at all, and that's PM2.5.  You

5  didn't mention PM2.5 in your testimony yesterday?

6  A    No, I did not.

7  Q    You didn't provide any analysis of PM2.5 air quality in

8  this case.

9  A    No, I don't believe I did.

10 Q    Same thing with ozone, you didn't mention ozone in your

11 direct testimony, did you?

12 A    No, I did not.

13 Q    And you didn't provide any ozone air quality data in your

14 work in this case?

15 A    No, I did not.

16 Q    Now, you showed us some charts yesterday with -- talking

17 about tons of reductions that would result from Cinergy's

18 proposed remedy in this case; do you recall that?

19 A    Yes.

20 Q    If we could have DR Dem 3.  One of the calculations you

21 presented was the SO2 and NOX reductions through 2012 from

22 Cinergy's plan; is that correct?

23 A    That's correct.  The period of time was from the end of

24 June 2009 through September of 2012.  It was what was

25 represented by this chart.

Vol. 5-924

1  Q    So this is about a four-year period?

2  A    Thirty-nine months.

3  Q    Thirty-nine months, okay.  I believe you testified

4  yesterday that for this Dem 3 where you showed these

5  reductions for the plan through 2012, you're looking only at

6  Units 2, 3 and 5, correct?

7  A    That's correct.

8  Q    So these reductions are from reducing the emissions to

9  what we've been calling the Rosen baseline levels for those

10 three units; is that correct?

11 A    These calculations are a representation of reducing

12 emissions from, if you will, current levels down to a baseline

13 level, yes.

14 Q    So these reductions are simply a return to the level that

15 you say Cinergy hypothetically could have gotten as a permit

16 limit back at the time of the projects?

17 A    Yes.  The purpose of this is to merely show what

18 reductions would actually occur by taking the limitation to,

19 as you refer to it, to the Rosen baseline level.

20 Q    And that's what you have proposed Cinergy would have done

21 at the time of the project?

22 A    That's correct -- could have done.  If I can correct that,

23 I'm saying that's what I believe to be their most reasonable

24 option at the time that the projects took place would have

25 been to have taken a limit to those levels, yes.

Vol. 5-925

1  Q   We'll talk a little bit more about that in a minute.  Just

2  looking at this chart, if Cinergy shut these units down by

3  June 2009, the reductions would be much bigger, wouldn't they?

4  A   Reductions would be bigger than this, yes.

5  Q   And for SO2, for instance, the reduction would be

6  roughly -- roughly double this number here?

7  A   I haven't done the calculation to know what that would be.

8  It would be higher, as you suggest.

9  Q   If we could turn to Dem 4.  This is another calculation

10 that you did over a 20-year period.  I assume this takes into

11 account the same reductions that were on Dem 3 plus the

12 reductions from retiring those units after 2012; is that

13 correct?

14 A   Yes.

15 Q   And again, this is just for Units 2, 3 and 5, correct?

16 A   That's correct.

17 Q   Now, you heard Mr. Turner say yesterday that there was no

18 way that these smaller units were going to run for another 20

19 years, didn't you?

20 A   I don't know if I recall that specific part --

21         MR. VOLPE:  Objection, Your Honor.  He's

22 characterizing the testimony of Mr. Turner.

23         MR. BENSON:  I'm asking Mr. Rarick, who was in the

24 audience during Mr. Turner's testimony, what he remembers from

25 that testimony.

Vol. 5-926

1              MR. VOLPE:  That's not what he asked.

2              THE WITNESS:  I don't know if I remember that

3    specifically, no.

4    BY MR. BENSON:

5    Q   You don't recall?

6    A   No.

7    Q   If these units were going to shut down in less than 20

8    years, is it fair to say that you're taking credit for

9    reductions that were going to happen anyway?

10   A   Again, I haven't put this together to take credit one way

11   or the other but merely to represent what reductions would

12   occur were the proposed remedy to take place -- what would

13   occur otherwise if they went otherwise in their current state.

14   Q   But based on Mr. Turner's testimony, that's not an

15   accurate assumption, right, that they could run another 20

16   years?

17             MR. VOLPE:  Objection, Your Honor.  Mr. Benson is

18   characterizing Mr. Turner's testimony, not asking whether

19   Mr. Rarick's recollection -- what Mr. Rarick's recollection of

20   the testimony is.

21             MR. BENSON:  I suppose that time I was

22   characterizing Mr. Turner's testimony, but I would like to see

23   if he can respond to that point.

24             THE COURT:  I'll let him.

25             THE WITNESS:  I don't have any information

Vol. 5-927

1  independently about what these units could or couldn't do

2  going forward.  My preparation of this was given a scenario

3  and having done some emissions calculations, but it's not

4  based on my understanding of what could or couldn't have or

5  what would or wouldn't be reasonable.

6  BY MR. BENSON:

7  Q   Now, Mr. Rarick, you understand that both sides have

8  discussed shutting down these units -- Wabash River Units 2, 3

9  and 5 as a means to comply with the law.  Do you have that

10 understanding?

11 A   My understanding is the proposal right now would include

12 shutdown of the units.

13 Q   And shutdown would, therefore, be the method of compliance

14 with the New Source Review program that Cinergy violated back

15 in 1989 and 1990?

16 A   Again, I would characterize it merely as the proposed

17 remedy in this particular case to deal with the findings that

18 these units should have received permits back in the late

19 1980s.

20 Q   But would you agree that it's necessary to either shut

21 down -- it's either necessary to shut down or have these units

22 obtain a permit for them to come back into compliance with the

23 law?

24 A   It's my understanding that they need to comply in some

25 manner with the obligations of the New Source Review permit

1  program.  Over the course of the evaluations, I looked at

2  different ways of doing that, whether it was taking

3  limitations at the time of the projects or applying for and

4  obtaining permits under the requirements of the New Source

5  Review program.  I do understand that currently the proposal

6  is to shut down the units in 2012.

7  Q   And if shutdown is the means of compliance, then the

8  429,000 tons of SO2 that you've estimated here is simply the

9  consequence of coming into compliance with the law, correct?

10       MR. VOLPE:  I'm going to object, Your Honor, on two

11  bases.  One, this is outside the scope of his direct

12  testimony.  And two, the United States Department of Justice

13  moved in limine to exclude Mr. Rarick from giving legal

14  opinions in this case.  Now, they're asking him for a legal

15  opinion.

16       THE COURT:  I'm not sure that's a legal opinion that

17  he's asking for.  I'm going to let him answer.

18       THE WITNESS:  What this shows is, again, the

19  reductions that would occur by reducing emissions until 2012

20  and then shutting down as a reflection of the reductions that

21  would occur by the proposed remedy, which includes shutdown,

22  which I assume is a proposed remedy intended to try to comply

23  with the order of the Court, if the Court were so to order.

24  BY MR. BENSON:

25  Q   Again, these reductions are only for Units 2, 3 and 5,

Vol. 5-929

1  correct?

2  A    That's correct.

3  Q    Now, you said in your direct testimony yesterday that

4  you've never heard of this concept of excess emissions during

5  your time as a regulator; is that correct?

6  A    I guess to be a bit more precise on it, I've never

7  encountered the idea of calculating excess emissions into the

8  past because of a New Source Review or permit-related issue

9  that I've never encountered as a regulator or in my private

10  practice the necessity for or call for a look back at what

11  would have been characterized as excess emissions.

12  Q    But, of course, New Source Review you understand prohibits

13  emissions above a baseline without obtaining a permit, right?

14  You understand that as a regulator?

15  A    One of the options, an option I've suggested -- might be a

16  logical option -- would be to obtain a permit that would cap

17  emissions as one method in which one might satisfy

18  requirements for New Source Review rules.

19  Q    That wasn't really my question, Mr. Rarick.

20  A    Okay, I'm sorry.

21  Q    My question was, you understand that under the New Source

22  Review program, a source is not allowed to emit over its

23  baseline without obtaining a permit; is that correct, whether

24  it's a synthetic minor cap permit or New Source Review permit,

25  some type of permit must be acquired; isn't that right?

Vol. 5-930

1  A    The program is a preconstruction permit program.  So it

2  would require somebody to satisfy the requirement before going

3  forward, yes.

4  Q    And as you say, it's preconstruction.  So you have to

5  satisfy that before you actually do the modification, right?

6  A    That's correct.

7  Q    So these excess emissions the Plaintiffs have described

8  are something that's already barred by the law; is that right?

9  A    Again, one would have to obtain a preconstruction permit

10  before going forward, and that would be the obligation of the

11  source as I've said, yes.

12  Q    So the answer is yes?

13  A    I guess I don't know -- the characterization of whether

14  it's legal or illegal is something which I'm not prepared to

15  make an opinion on it.  It seems to me that that would cause

16  me to try to draw some kind of a conclusion in terms of

17  legality.

18  Q    You aren't opining, are you, that there is anything

19  inappropriate about measuring the consequences of these

20  violations by looking at what Plaintiffs have described as

21  excess emissions --

22          COURT REPORTER:  Please repeat your question.

23          MR. BENSON:  I'm sorry.

24  Q    You aren't opining, Mr. Rarick, are you, that there's

25  anything inappropriate about measuring the consequences of

1  these violations by looking at the yardstick of equitable --

2  I'm sorry -- of excess emissions?

3  A    What I've identified, whether it's appropriate or

4  inappropriate, is something I've not seen in other similar

5  types of enforcement actions related to failure to have

6  obtained a preconstruction permit.  So from the point of view

7  of appropriateness or inappropriateness, it's just something I

8  have not seen used in this type of a case.

9  Q    But you don't have an opinion on whether it's appropriate

10  or not?  That was really my question.

11  A    Again, I think the opinion I stated is it's something I

12  have not encountered.  As people have resolved these types of

13  matters I've been involved in, either in the Government or

14  private side, it has not been something that has been part of

15  that resolution.

16  Q    So you don't know one way or the other is what you're

17  saying?

18  A    Yes.

19  Q    Let's turn to the time of the projects.  You would agree,

20  wouldn't you, that once Cinergy decided to do the projects, it

21  had two options to comply with the law.  One is a synthetic

22  minor permit.  You described that yesterday.  The other is a

23  New Source Review permit, which would require installing BACT

24  or LAER.  We've heard a lot about those terms already.

25  A    That's correct.

Vol. 5-932

1  Q   In listening to your testimony yesterday, I believe you

2  said that Cinergy would have taken a cap on emissions at the

3  time of the projects; is that right?

4  A   That's correct.

5  Q   Now, in fact, you don't know what they would have done at

6  the time of the projects, do you?

7  A   No.  My opinion is that is the most reasonable, if not the

8  only reasonable, option for them to have taken at the time of

9  the projects.

10  Q   So you're saying that you believe it's likely that that's

11  what they would have done at the time of the projects?

12  A   Yes.  I believe that is the reasonable option that they

13  would have selected.

14  Q   But you can't say that that's -- you can't say with any

15  certainty that's what they would have done, can you?

16  A   Again, this is a look back at what could have happened or

17  would have happened, and so since it didn't take place, I

18  don't know what would have taken place.  I'm merely offering

19  an opinion on what I believe to be the most reasonable.

20  Q   It's fair to say you're not sure what would have happened

21  at the time?

22  A   Again, I don't know what would have happened because that

23  didn't take place at that time.

24  Q   Let's just get one thing out of the way real quickly.  I

25  think we can both agree the company didn't actually get a

Vol. 5-933

1  synthetic minor permit at the time of the projects, did it?

2  A    No, it did not.

3  Q    And it did not get a New Source Review permit at the time

4  of the project?

5  A    Yes.

6  Q    So you would agree that Cinergy violated the law when it

7  made these modifications without a permit?

8            MR. VOLPE:  Objection, Your Honor.

9            THE COURT:  Sustained.

10  BY MR. BENSON:

11  Q    You're not providing any opinion in your testimony before

12  this Court about whether it's appropriate for Cinergy to get a

13  synthetic minor permit today going forward to comply with the

14  law, are you?

15  A    No.  I looked at the issues in the past as they related to

16  the so-called excess emissions only but not in terms of what a

17  remedy would be, no.

18  Q    We'll stick with the past then.  You said yesterday that

19  it's very common to get a synthetic minor permit, right?

20  A    Yes.

21  Q    But it's not very common for coal-fired utilities, is it?

22  A    I don't have information to that effect.  I haven't

23  reviewed -- I think I referred the other day to the fact that

24  there's a clearinghouse for technical decisions on permits,

25  but there's no similar clearinghouse that would allow me to

Vol. 5-934

1   look to identify how common or uncommon it would have been to

2   obtain synthetic minor permits for this type of project.

3   Q    So you don't know?

4   A    I'm only aware of reviewing things.  In one instance -- in

5   a similar type of an instance where limitations were taken

6   similar to a synthetic minor that allowed a source to limit

7   emissions so that they didn't go through PSD.

8   Q    And that was on a coal-fired utility?

9   A    Yes, it was.

10  Q    But you're not aware of Cinergy or Duke obtaining a

11  synthetic minor permit for an electric generator, are you?

12  A    No.  I'm not aware of Cinergy or Duke having done so.

13  Q    We asked the company this, and the company's designated

14  30(b)(6) witness told us that Cinergy has never taken a cap

15  for a coal-fired EGU, would that surprise you?

16  A    I don't know if it would surprise me or not.  I'll take

17  your word for it.  I'm not aware of the statement.

18  Q    Now, you know, don't you, that the projects at issue were

19  justified based on whether they made sense economically,

20  right?

21  A    Yes, I presume so.

22  Q    Are you not sure?

23  A    I don't have any information to know what the planning

24  process was leading up to the projects in terms of why they

25  were done and whether they were economical or not.  I merely

Vol. 5-935

1  looked at the facts of what did take place and what the
2  ramifications were.
3  Q   Now, it's fair to say when you take a cap as part of a
4  synthetic minor, you're restricting your future operations,
5  right?
6  A   That's correct.
7  Q   Any restriction would affect the economic value of the
8  project and the potential future use of the plant, right?
9  A   It certainly is a factor.  I don't know that one could say
10  that taking a cap would necessarily limit the future use of
11  the plant, no.
12  Q   But it would change the economic evaluation of a
13  particular project, right?
14  A   It would certainly change all of the evaluations that
15  would be looked at, I would think.
16  Q   So you would have to do an economic analysis to decide
17  whether a given project still made sense if you were going to
18  get a synthetic minor cap for that project?
19  A   I think one would do an analysis looking at the outcome of
20  taking a synthetic minor cap and how one might have met it,
21  what the economics might have been in terms of meeting it in
22  different ways.  It would have been an analysis of that
23  nature.  That's a typical analysis.
24  Q   Part of that analysis is to make sure that the project
25  still makes sense economically if you take a cap, right?

Vol. 5-936

1  A   I would presume so, yes.

2  Q   And you have no information as to whether Cinergy actually

3  did that type of analysis for these projects?

4  A   No, I do not have any information to that effect.

5  Q   And you personally didn't look into whether it would have

6  made sense economically for Cinergy to do these projects if it

7  required a synthetic minor cap, correct?

8  A   I didn't do any economic analysis of such an option, no.

9  Q   And from your perspective, that would be pure speculation,

10 right?

11 A   Pure speculation in terms of what the costs would have

12 been, or I'm sorry --

13 Q   Right.  Any sort of retrospective economic analysis would

14 just be pure speculation, right?

15 A   I presume so, yes.  Yes.

16 Q   Are you aware that Cinergy itself has admitted that it

17 didn't look into whether it could accept a cap on emissions

18 for these projects?

19 A   I'm not aware of any analysis that was done at the time,

20 any documents from that time that analyzed whether they could

21 or couldn't have accepted a cap.

22 Q   Have you reviewed the deposition of Steven Pearl, Cinergy

23 witness in this case?

24 A   No, I haven't.

25 Q   You're not aware, are you, of whether Cinergy has done any

Vol. 5-937

1   evaluation since the time of the projects to look at whether

2   they could have been economically viable even taking a cap?

3   A   You mean if they had looked back to that point in time to

4   do an analysis -- a retroactive analysis?  Is that what you're

5   referring to?

6   Q   Exactly?

7   A   No.  I'm not aware of any such analysis.

8   Q   Let's look at your excess emissions as you calculated

9   them.  You said that you did it in a manner similar to

10  Dr. Fox, right?  I believe you said that yesterday?

11  A   Yes.

12  Q   You also said yesterday that if you take a cap, it

13  requires getting a permit, right?

14  A   That's correct.

15  Q   Again, you said yesterday that if you get -- that permit

16  will require you to stay under the cap on a 12-month -- for

17  each 12-month period, right?

18  A   Yes.

19  Q   It's what's known as a 12-month rolling basis?

20  A   Yes.

21  Q   And there's no provision that says if you're under the cap

22  for one 12-month period, you get to go over the cap for the

23  next 12-month period, is there?

24  A   No.  It is a rolling 12-month period.  Compliance is

25  determined for each 12-month period.

Vol. 5-938

1  Q    Now, in the calculation that you described in your

2  testimony to the Court yesterday, you didn't look at each

3  12-month period individually, did you?

4  A    No, I did not.

5  Q    Basically what you did is you summed the cap for the

6  entire period and compared that to the emissions for the

7  entire period, correct?

8  A    That's correct.

9  Q    And the numbers changed a little bit in what you presented

10 yesterday and what we had seen disclosed in your report.  I

11 want to make sure we're comparing apples to apples here.  In

12 your report, you disclosed a calculation of about 114,000 tons

13 of SO2 through December 2007, and that was the excess?

14 A    That would be correct.

15 Q    That's what you calculated as the excess based on the SO2

16 synthetic minor cap theory; is that right?

17 A    Yes.  My calculations were based, I think as you described

18 on a comparison of the actual emissions that took place versus

19 the emissions that would be allowed under a cap up through

20 December 2007.  That was the analysis I did, and it

21 approximated 114,000, yes.

22 Q    I believe the number you presented yesterday was about

23 127,000?

24 A    Yes.

25 Q    Is it fair to say it's the same methodology?  You just

Vol. 5-939

1  updated it for another year and a half or so?

2  A    Yes.  I moved it up through June of 2009, so an additional

3  18 months of a similar analysis would have -- is what I did.

4  Q    Now, we talked about how you looked at sort of the entire

5  period and compared the total emissions to the total allowable

6  cap emissions; but if you looked at the excess for each

7  calendar year, you would get a different number, wouldn't you?

8  A    Again, what I'm calculating is a concept of excess

9  emissions.  My purpose is not to calculate what would or

10  wouldn't have been in compliance but to get a measure of

11  excess emissions over the period of time.

12         So I did not look at individual years and take

13  differences.  I looked at the entire period as I think I've

14  described and a methodology to assess what excess emissions

15  were.

16  Q    Let's look at the data you present in your work papers

17  that were attached to your expert report, and if we could have

18  the summary data SO2 table?  This is a portion of a

19  spreadsheet that was produced to us with a Bates number

20  Rarick, leading zeros 177.  This is from the tab summary data

21  SO2.  Mr. Rarick, do you recognize this chart?

22  A    I produced a number of things associated with the

23  analysis.  This appears to be a part of that spreadsheet.

24  There were other portions of the spreadsheet as well; but yes,

25  it does appear to be that.

Vol. 5-940

1  Q   If I represent to you that we took this from Rarick 177 at

2  the SO2 -- I'm sorry -- the summary data SO2 tab, you wouldn't

3  disagree with me, would you?

4  A   I'll take your representation for that, yes.

5  Q   In this calculation, you did it a little differently than

6  you described on the stand yesterday.  As we can see here, you

7  did do a calculation of the excess for each year at each unit,

8  correct?  That's what those final three columns represent?

9  A   That's correct.  That's what it appears to include.

10  Q   So if there's a number -- a positive number in those final

11  three columns, that represents an excess over the synthetic

12  minor cap level for that unit for that year, correct?

13  A   Correct.

14  Q   And if there's a zero, it means that the unit was under

15  its synthetic minor cap for that year; is that correct?

16  A   Yes, precisely.  So in those instances, those years where

17  I show a zero, the emissions would actually have been lower

18  than what would have been allowed under a cap.

19       I guess the other point here is that in the analysis

20  that I presented in my paper, and which is included in another

21  portion of this spreadsheet, it looks at the aggregate of the

22  three units together rather than individually, given the time

23  frames and the analysis that I relied on in my report looked

24  at the aggregate of a cap of roughly 114,000 tons for the

25  three units combined.  This looks at them individually, but

Vol. 5-941

1  the analysis I did combined the units.

2  Q   When you say this looks at units individually, that's

3  consistent with what a synthetic minor permit cap would

4  require, correct?  It would be individual to each unit,

5  correct?

6  A   Not necessarily so, no.  I believe that it's often common

7  for when projects go forward, and there's a number of

8  different changes taking place at the same time that they

9  could be aggregated into a common cap.

10  Q   But these were four different projects performed at

11  different times, correct?

12  A   Yes, they were.

13  Q   And you see here that there's a total calculated at the

14  bottom of this chart of 120,484; and that's excess tons of

15  SO2, correct?

16  A   Yes.

17  Q   That's essentially the number that Dr. Fox came up with

18  when she did her analysis of the excess SO2 emissions compared

19  to a synthetic minor cap level; is that correct?

20  A   Yes.  In fact, I appreciate that.  I think that helps me

21  remember that one of the things I was trying to do in doing

22  this calculation was to merely replicate Dr. Fox so I could

23  understand what her methodology was.

24  Q   As you can see in this chart, the units exceeded their

25  synthetic minor cap most years, right?

Vol. 5-942

1  A    Yes.

2  Q    There's only a few -- I think if you count them up,

3  there's about six zeros in there out of about 53 total years

4  if you look at all the different units?  Does that sound

5  about right?

6  A    Sounds about right.

7  Q    Let's turn to what you calculated as excess emissions for

8  NOX.  I believe you testified yesterday that you came up with

9  a negative total excess emissions, right?

10          THE COURT:  Before we do that, can we call this a

11  demonstrative exhibit of some sort or whatever you want to

12  call it.  You did identify it, but I would like to have a

13  number.

14          MR. BENSON:  It will be PR Demo 3.

15          THE COURT:  Thank you.

16          MR. BENSON:  Sorry about that, Your Honor.

17  BY MR. BENSON:

18  Q    So we were going to talk about your excess NOX emissions

19  calculations.  As you told the Court yesterday, you came up

20  with a negative number, correct?

21  A    That's correct.

22  Q    So essentially what you're saying is if Cinergy had

23  complied with the law at the time of the projects, it would

24  have emitted more NOX than it actually did, right?

25  A    It would have been allowed to have emitted more NOX than

Vol. 5-943

1  it actually did over the period of time from the date of the

2  projects to 2007.

3        Let me correct it.  In the charts and the information

4  I presented yesterday, that was rolled forward to mid-2009.

5  Q    Right.  So the same way you updated your data through

6  mid-2009 like we just talked about for SO2?

7  A    Right.

8  Q    Now, let's look at your calculation.  You compared actual

9  emissions each year to what would have been emitted based on

10 your conclusion about the appropriate BACT rate at the time,

11 correct?

12 A    Again, I looked at the actual emissions that occurred over

13 the entire period of time compared with what would have been

14 allowed over the entire period of time based on the actual

15 coal consumption data.

16 Q    And that's how you came up with a negative number, because

17 the total allowables were more than the total emissions summed

18 up over about 20 years, correct?

19 A    Correct.  It was a reflection of the fact that the

20 facility actually had emissions below the .6 pounds per

21 million BTU for much of the period of time through the

22 application of the low-NOX burners.

23 Q    Now, you understand, however, that for a BACT permit, you

24 have to meet the limit consistently, right?

25 A    Correct.

Vol. 5-944

1  Q    It is not over a 20-year period that compliance is

2  measured?

3  A    I think what I had identified is BACT would have been a

4  limit of .6 on a 30-day rolling average basis.  So one would

5  have to show compliance on that basis with the BACT limit.

6  Q    So you would have to meet the limit every 30 days, right?

7  A    Correct.

8  Q    Essentially, what you did in this calculation is looked at

9  the limit over a 20-year period.

10 A    I looked at, again, as I described what would have been

11 allowed over that 20-year period versus what was actual over

12 that 20-year period.

13 Q    But that essentially means it's as if the BACT averaging

14 time was 20 years as opposed to 30 days, right?

15 A    The data that I used were individual years of data that

16 were added up for each of those individual years, so they were

17 12-month data points for each of those periods of time.

18 Q    Let's look at what your calculation shows.  Again, we've

19 taken a page -- or taken an excerpt from the Rarick 177

20 spreadsheet; and this is at the tab "Summary Data NOX."

21         MR. BENSON:  Your Honor, we'll label this PR Demo 4.

22 BY MR. BENSON:

23 Q    And if we could call out the bottom of the chart here.

24 Can you see that, Mr. Rarick?

25 A    Yes.  Thank you for blowing it up.  I can now, yes.

Vol. 5-945

1  Q    Do you recognize this as one of the charts you put

2  together for your work papers for your expert report in this

3  case?

4  A    Yes.  I believe it is.

5  Q    Okay.  In this chart, if we walk through the columns, the

6  first is MMBTU per year, we won't dwell on that.  The second

7  is what you calculated as the NOX emissions assuming your BACT

8  emissions rate, correct?

9  A    Correct.  I used a rate of .6 pounds per million BTU, and

10 then the BTUs per year in order to calculate that is the

11 allowable during that year.

12 Q    Then the third set of columns for Wabash River 3 and 5 --

13 that's just their actual emissions, right?

14 A    That's correct.

15 Q    And then the fourth set of columns is excess emissions

16 compared to what you calculated as the permit limit for the

17 year based on the .6 pounds per MMBTU, correct?

18 A    I'm sorry.  The last set of columns would appear to be the

19 difference between the actual and the allowable except that

20 it's got blank columns if it was a negative number.

21 Q    So if you see a number shown there, that means they were

22 over the .6 on an annual basis; is that correct?

23 A    That's correct.

24 Q    And if there's no number there, it means they were under?

25 A    That's correct.

Vol. 5-946

1  Q   If you sum it up, at the bottom there there's a number

2  there, 4,865?

3  A   Yes.

4  Q   So that's what you would have come up with if you looked

5  at the annual excess emissions from NOX -- for NOX compared to

6  your BACT -- proposed BACT emissions level; is that correct?

7  A   If one does not recognize the fact that for a number of

8  these years, the emissions are not over the limit but under

9  the limit.  If one were to allow the data to come forward and

10 look at the -- in fact, if you will, the negative numbers,

11 those negative numbers when you sum the whole chart would show

12 the data that I presented in my report.

13        Again, one of the reasons for having done this in the

14 thing is to look at the same methodology -- not that I agree

15 with that methodology but to look at the methodology that

16 Dr. Fox looked at in terms of how excess emissions may have

17 been calculated.  I don't necessarily agree with that as being

18 an appropriate way to look at the concept of excess emissions.

19 Q   But just to be clear, I think you said this a moment ago

20 for a synthetic minor cap, but it's true for BACT as well,

21 isn't it, that you have to comply with your BACT limit for

22 each averaging period, right?

23 A   That's correct.

24 Q   And again, if you're under the cap or under your BACT

25 limit for a given period, you don't get to emit more the next

Vol. 5-947

1  period, do you?

2  A    No.

3  Q    Let's look at one last analysis.  When you -- until your

4  NOX calculation that you testified to the Court about

5  yesterday, as we've talked about, you used a BACT emissions

6  limit as your point of comparison, correct?

7  A    That's correct.

8  Q    That was a shift from what you did for SO2.  For SO2 you

9  used a synthetic minor cap level, and for BACT you did an

10 emissions limit, right?

11 A    Correct.

12 Q    Now, you did actually calculate in your work papers what

13 the excess emissions for NOX would have been compared to a

14 synthetic minor cap, didn't you?

15 A    Yes.  In fact, I think in my expert report I provide some

16 data in terms of what a cap could have been.

17 Q    But you didn't present the excess emissions relative to

18 that cap in your testimony to the Court yesterday, did you?

19 A    No.  I calculated the excess emissions for BACT on the

20 presumption that they would have employed low-NOX burners as

21 BACT as the most reasonable option that they would have

22 selected at the time of the project.

23       So the excess emissions in both cases are based on

24 what I believe is the most reasonable presumption for how they

25 would have done the permit:  In one case, a cap; in one case,

Vol. 5-948

1  having accepting BACT limits.

2  Q   Let's look at the calculation that you performed, and if

3  we could have the top half of this PR Demo 4.  This is the

4  calculation that we just referenced a moment ago where you

5  went through and compared the actual emissions each year to

6  what a synthetic minor NOX cap would have been, correct?

7  A   Yes.

8  Q   And there isn't -- you didn't sum it up when you did this

9  in your work papers, but we were able to just use Excel and do

10 a sum.  If we could have Rarick 177 Mod 1, which we will mark

11 as PR Demo 5.  Again, the top half of that, please.

12         All we did here -- I assume you're familiar with

13 Excel?

14 A   Yes.

15 Q   You can sum up a column, and it will just give you the

16 number at the bottom.  We highlighted that in a sort of light

17 blue you can see there.

18 A   Yes.

19 Q   If you add up those numbers, you get about 5,200 tons of

20 NOX, correct?

21 A   I'll have to take your word for it.  While I trust what

22 Excel does, I can't do it in my head right here.

23 Q   Okay.  Fair enough.  And that calculation of 5,200

24 includes a number of negative numbers, doesn't it?

25 A   It does, yes.  It appears to do so, yes.

Vol. 5-949

1  Q   In this case -- and let me just walk through the columns

2  again, although we've done this before, just so we're clear

3  here.  You've got the year listed.  You've got the NOX

4  emissions for tons per year for both Wabash Units 3 and 5 and

5  then the excess compared to that baseline synthetic NOX level

6  for Wabash River 3 and 5, correct?

7  A   That appears to be correct, yes.

8  Q   Again, you've got the negative numbers in there, and so

9  that's tending to decrease or offset the years where you --

10 where Cinergy went over the cap, correct?

11 A   Yes, although I guess I would quibble a little bit with

12 the idea of offset.  I think that in an instance where one

13 were to have taken a cap -- and I recognize a cap wasn't taken

14 but were one to have taken a cap for these two projects, one

15 would have managed that cap.  I mean, that's how people deal

16 with compliance with caps.

17       So we do see some years here, and I think we saw it

18 with SO2 where we have numbers which are positive for one

19 unit, numbers which might be negative for another unit.  In

20 reality, had a cap been done, you would have seen them not

21 have operated the unit in excess of one number and then not

22 have operated the unit -- another unit up to its allowable

23 emission levels.

24       In terms of how these would actually operate in

25 practice, I believe that looking at the units together, the

Vol. 5-950

1  negatives and positives together, is a fair representation of

2  how they would have complied with the cap.

3  Q    But you don't know that, do you?  You don't know that for

4  any given year, Cinergy could have adjusted its emissions or

5  adjusted its operations to stay within the cap?

6  A    I think it's a reasonable presumption that had they had a

7  cap for the units together that they would have managed the

8  cap in that fashion.  I think that is a reasonable

9  presumption.  I don't know that they did, no.

10  Q    You don't know that they did?

11  A    No.

12  Q    As you stated earlier, under a cap, you don't get to carry

13  forward any tons you don't use one year.  That's right?

14  A    From a compliance point of view, if you have a cap, you

15  must comply on a 12-month rolling basis.

16  Q    Just as one last calculation, we also took what you've

17  showed here as excess emissions, but we took out the negative

18  numbers.  We just set them all equal to zero, and if we can

19  have NOX Cap 2.  We'll label this as PR Demo 6.  We

20  highlighted in yellow each of the years.  I'm sorry, if you

21  could call out the top again.

22

23        We've highlighted in yellow each of the years where

24  there was a negative number, we set it to zero just so we're

25  clear what we're doing.  The number you come up with if you do

Vol. 5-951

1 that is a little over 10,000 tons of excess NOX compared to a

2 synthetic minor baseline.  Does that look about right to you?

3 A    I'll take your representation on the summation of the

4 numbers.

5          MR. BENSON:  We have nothing further, Your Honor.

6          THE COURT:  Thank you.  Redirect?

7          MR. VOLPE:  Just a few questions, Your Honor.

8                    **REDIRECT EXAMINATION**

9 BY MR. VOLPE:

10 Q    Mr. Benson asked you a few questions, Mr. Rarick, about

11 the Wabash River emissions in comparison to the -- your

12 demonstrative related to the attainment status of Vigo County.

13 Remember those questions?

14 A    Yes.

15 Q    Can you see that, Mr. Rarick?

16 A    Yes, I do.

17 Q    When EPA changed the attaintment status --

18          THE COURT:  That's Demonstrative --

19          MR. VOLPE:  I'm sorry, Judge.  It's Demonstrative

20 Exhibit 7.

21 BY MR. VOLPE:

22 Q    When EPA changed the attainment status of Vigo County from

23 non-attainment to attainment, how were the emissions at Wabash

24 River modeled?

25          MR. BENSON:  Objection, Your Honor.  This wasn't

Vol. 5-952

1  part of the cross-examination, and I believe it wasn't gone

2  over on direct examination.

3            MR. VOLPE:  It was brought out on cross-examination.

4            THE COURT:  I think it was close enough.  Go ahead.

5                THE WITNESS:  They would have been modeled at

6  their maximum capacity and maximum allowable levels.

7  BY MR. VOLPE:

8  Q   Mr. Rarick, let me ask you an open-ended question about

9  the calculations that -- let me ask you a specific question

10 about the calculations that Mr. Benson showed you.

11       Do you remember the highlighted blue portions of those

12 demonstratives?

13 A   The last set of things that Mr. Benson showed me?

14 Q   Yes.

15 A   With the numbers at the bottom, the totals?

16 Q   Yes.

17 A   I believe so.

18 Q   Were those your calculations?

19 A   No, they were not.

20 Q   Mr. Rarick, why did you take into account the years the

21 units were under either the synthetic minor permit cap or --

22 for SO2 or the BACT limit for NOX in calculating this

23 theoretical excess emissions?

24 A   Again, I think -- let me respond first to the end of your

25 question.  They were theoretical calculations of excess

Vol. 5-953

1  emissions.  As I think I stated, there's no particular

2  framework or specification on how one would do these

3  calculations.  So I went about looking at what I thought was a

4  fair representation of excess emissions in absence of that

5  type of a methodology.

6       I think if you look at the last set of figures that

7  Mr. Benson showed me, you look at the later years, and you

8  continue to show -- those were the ones which related to a

9  cap, if you will.  They show some positive numbers.  But, in

10 fact, those units that have positive numbers would have been

11 needing a BACT limit.  In fact, those units had already

12 installed a second generation of low-NOX burners.

13      There was nothing in the concept of having accepted a

14 BACT limit that would have limited the amount that they used

15 those units.  They would have not been restricted on the use

16 of those units.

17      So those last set of numbers reflect not an excess of

18 what they have been allowed under the theory that I've

19 calculated but rather an excess on a different theory which I

20 didn't use, and I don't think would have been the most

21 reasonable theory that they would have permitted the units

22 under.

23           MR. VOLPE:  I have no further questions, Your Honor.

24           THE COURT:  Anything else?  Recross?

25           MR. BENSON:  Thank you, Your Honor.

Vol. 5-954

1                    **RECROSS-EXAMINATION**

2

3   BY MR. BENSON:

4   Q   Mr. Rarick, you mentioned the attainment modeling that the

5   State of Indiana did for SO2 and how it looked at the Wabash

6   River plant; and that was in your redirect; do you recall

7   that?

8   A   Yes.

9   Q   Now, the modeling didn't look at PM2.5 or ozone, did it?

10  A   No, it did not.

11  Q   And it looked at SO2 only within 50 kilometers of the

12  source of the Wabash River?

13  A   I don't recall the precise distance.  The models typically

14  used would look out a distance from the sources that it was

15  modeling, and I believe 50 kilometers is typically the range

16  of the models that I would have expected to have been used.

17  Q   Then Mr. Volpe asked you a question about whether the

18  calculations take we showed you or the data that was in your

19  charts that we just walked through were, quote, your

20  calculations, right?  Do you recall that?

21  A   Yes.

22  Q   You said they weren't your calculations; but it was your

23  data, wasn't it?

24  A   Again, the data was nothing -- the raw data that was

25  supplied was the same raw data that Dr. Fox used, that I used.

Vol. 5-955

1  I calculated some different scenarios in consideration of my

2  preparation of my expert report.  The expert report selected a

3  methodology that looked, as I described, how I did that

4  methodology and what I believe was a fair representation of

5  excess emissions.

6       But the -- Mr. Volpe, I think, was directing me to

7  some numbers which were not part of that spreadsheet but were

8  rather the data which you summed up and presented in that

9  chart.  That's what I was responding to in terms of I did not

10 do those summations nor bring those forward into my expert

11 report.

12 Q  But just to be clear, you collected and organized the data

13 such that you could analyze a synthetic minor cap for both

14 SO2, which you presented to the Court, and a synthetic minor

15 cap for NOX, which you didn't present to the Court; is that

16 correct?

17 A  That is correct.

18 Q  And you collected the data for such that you could do a

19 calculation of -- where you included negative years or

20 negative numbers in the calculation and such that you could

21 zero out those years when the source was below the cap,

22 correct?

23 A  As I said, I calculated things in both ways.  You showed

24 those in the demonstratives, and I calculated things that

25 included zeros instead of negative numbers again in order to

Vol. 5-956

1 understand how others had calculated similar things.

2 Q    And the calculations that you present to the Court

3 included the negative numbers?

4 A    Yes, they did.

5            MR. BENSON:  No further questions.

6            MR. HOPSON:  No further questions here; but if I can

7 take a five-minute break before the next witness?  I think if

8 I talk to Mr. Brooks for a few minutes, we can give you, when

9 we come back, an estimate of how long the remaining testimony

10 will last.

11            THE COURT:  Okay.  That would be great.

12            You can step down, sir.

13            COURT CLERK:  All rise.

14    *(Witness excused.)*

15    (A recess was taken.)

16            THE COURT:  Your next witness, sir.

17            MR. HOPSON:  Mr. Roger Harszy.  While Mr. Harszy is

18 coming up to the stand, Your Honor, and getting situated,

19 Mr. Brooks and I did talk, and here's an estimate, a

20 prediction.  We believe that our three witnesses, including

21 Mr. Harszy, will take between an hour and a half to an hour

22 and three-quarters of time.

23            Mr. Brooks believes he would reserve the same amount

24 of time for cross.  That means the evidence today should take

25 between three and three and a half hours, if that affects Your

Vol. 5-957

1  Honor's thoughts about scheduling.

2          THE COURT:  Okay.  All right.  We're within the

3  physical limits of the day.

4          MR. HOPSON:  Yes, sir.  Mr. Harszy, would you please

5  proceed to the witness stand?

6          **ROGER C. HARSZY, DEFENDANT'S WITNESS, SWORN**

7          THE COURT:  You may inquire.

8                    **DIRECT EXAMINATION**

9  BY MR. HOPSON:

10 Q   Thank you, sir.  Would you please state your name for the

11 record?

12 A   Roger C. Harszy.

13 Q   Where are you employed?

14 A   Midwest ISO.

15 Q   What is your position at the Midwest ISO?

16 A   I am the Vice President of Real Time Operations for

17 Midwest ISO.

18 Q   Can you tell the Court what is the Midwest ISO?

19 A   Midwest ISO is an independent system operator.  We have

20 responsibility to ensure the reliability of the high-voltage

21 transmission system across the Midwest.  We are also

22 responsible to ensure that enough electricity or electrical

23 supply is available to customers within the Midwest.

24 Q   You reference in your last question the high-transmission

25 grid across the Midwest.

Vol. 5-958

1  A    Yes.

2  Q    Could you just describe a little bit more what that is?

3  A    Certainly.  Across the Midwest, we have literally

4  thousands of miles of high-voltage transmission lines

5  crisscrossing the Midwest.  It's very similar to the

6  interstate highway system crossing the Midwest.  The

7  high-voltage transmission network is used to move electricity

8  from one part of the Midwest to other parts of the Midwest.

9  Q    Does MISO actually have or exercise some operational

10  control in their transmission of electricity on the grid?

11  A    Yes, we do.

12  Q    Do you have control rooms that affect the transmission on

13  the grid in real time?

14  A    We operate because of our large footprint -- our footprint

15  covers approximately 14 states across the Midwest, including

16  the Canadian province of Manitoba.  We operate two control

17  rooms to ensure that we at all times can protect the

18  reliability of the transmission grid and electric supply

19  across the Midwest.  One control room is located in Carmel,

20  Indiana.  The other control room is located in Saint Paul,

21  Minnesota.

22  Q    Okay, sir.  Can you see on that little screen in front of

23  you an exhibit called DR Demonstrative 64?

24  A    Yes.

25  Q    Is that a map of the regional territory, the geographic

Vol. 5-959

1  footprint of your organization?

2  A   Yes, it is.

3  Q   I want to talk for a minute about your tariff.  When I

4  refer to MISO's federal tariff, what am I talking about, sir?

5  A   The tariff you're referring to gives us authority to do a

6  number of things, including the responsibility for operating

7  the transmission grid.  It also gives us the ability to

8  operate an energy market.  That, in turn, gives us the

9  capability to dispatch the power plants across the entire

10 footprint as demonstrated on this map.

11 Q   When you say dispatch the power plants, the generating

12 units, sir, how does MISO dispatch the generating units?

13 A   We dispatch the generation based on two premises.  One is

14 to provide the most economic electric supply to the customers

15 in the Midwest.  The other aspect that we take into

16 consideration is maintaining the reliability of the

17 transmission system to make sure that when the output of one

18 particular power plant will not overload the transmission

19 system.

20 Q   Do you issue instructions to the owners of the generating

21 units in order to fulfill the obligations you just described?

22 A   Yes, we do.

23 Q   What federal agency issues or approves the tariff that

24 provides MISO with the authority you just described?

25 A   Federal Energy Regulatory Commission.

Vol. 5-960

1  Q    Was MISO asked to undertake some analysis of the potential

2  impact of the immediate shutdown of Wabash River Units 2, 3,

3  and 5?

4  A    Yes, we were.

5  Q    And I'm going to show you what's been previously marked

6  and moved into evidence as DR-321.  Rather than have you rely

7  on the screen, if Your Honor will allow me to approach, I'm

8  going to give him a copy.

9            THE COURT:  You may.

10 BY MR. HOPSON:

11 Q    Is that the analysis and report that we just referenced,

12 Mr. Harszy?

13 A    Yes, it is.

14 Q    Did you also give a deposition in this case previously?

15 A    Yes, I did.

16 Q    Was that in mid-September?

17 A    Yes, it was.

18 Q    Was the report prepared after your deposition?

19 A    The report was prepared after the deposition.

20 Q    Did you personally participate in the preparation of this

21 report, Mr. Harszy?

22 A    I requested the report be prepared to take the analysis

23 that had been done by the Midwest ISO and compile it into a

24 single document.

25 Q    When had that analysis been done that you just referenced?

Vol. 5-961

1  A    The analysis had been performed at various times within

2  the last 12 months in that regard.

3  Q    Were there persons -- persons from groups other than real

4  time operations that were involved in the preparation of the

5  report?

6  A    Yes, there was.

7  Q    What was the purpose of the report, sir?

8  A    The purpose of the report was to put the analysis involved

9  regarding the dispatch of the Wabash River generators and

10  their impact on the transmission system in the Midwest.

11  Q    Let me show you a particular page of your report, which I

12  hope will make it a little bit easier for us to talk about

13  this.  I'm showing a page -- these are not numbered.  The

14  report's not numbered, but for the record, it is Bates stamped

15  Cinergy 1665228, and that is part of the exhibit that we're

16  talking about, the MISO report; and I would just ask you, sir,

17  at the top of the page for your convenience, it's referred to

18  as Figure 1, Terre Haute Indiana region.  Can you just tell

19  Your Honor what you would call that figure or describe that

20  figure?

21  A    That document represents the transmission lines in the

22  Central Indiana area as well as represents the power plants

23  and their locations to those transmission lines.

24  Q    Can I refer to it, sir, as a transmission map; is that

25  accurate?

Vol. 5-962

1  A    You could refer to it as that.

2  Q    Let me show you a demonstrative.  I'm putting on the

3  screen a demonstrative, DR Dem 65, which is captioned Terre

4  Haute Transmission Map.  Can you see that, sir, on the screen

5  in front of you?

6  A    Yes, I can.

7  Q    Do you need a paper copy, or are you okay?

8  A    If you have a paper copy, that would be preferable.

9         MR. HOPSON:  May I approach, Your Honor?

10         THE COURT:  You may.

11  BY MR. HOPSON:

12  Q    Now, my first question is, is the Terre Haute transmission

13  map we're looking at, DR Dem 65, a simplified version of the

14  Figure 1 we just looked at?

15  A    Yes.

16  Q    Does it fairly and accurately represent the main

17  transmission lines that we're talking about when we refer to

18  the load pocket in the Terre Haute region?

19  A    Yes, it does.

20  Q    What's the conclusion of MISO's report, Mr. Harszy?

21  A    The result or the conclusion of the report indicates that

22  the assumption with Wabash Generators 2, 3, and 5 unavailable,

23  that there would be a significant problem serving the

24  electrical demand in the Terre Haute load pocket or the

25  customers in the Terre Haute load pocket.

Vol. 5-963

1  Q   I want to try to use the figure you have in your hand to

2  see if I can ask you some questions to draw that out a little

3  bit.  When you say serve load in the Terre Haute load pocket,

4  what does it mean to serve load, sir?

5  A   Make electricity available for the customers so that

6  the -- and customers located in that general vicinity of Terre

7  Haute.  That could be residential, commercial, or industrial

8  customers.  When they do require and want to use electricity,

9  it is, in fact, available to them.

10 Q   Let me start with a basic proposition.  If we look on this

11 map and assume that the Wabash River station -- for reasons

12 beyond the control of everyone in this courtroom -- it just

13 shut down, burned to the ground tomorrow morning, is there

14 another way in which MISO could get power into the Terre Haute

15 load pocket?

16 A   The Terre Haute load pocket is similar to many areas

17 across the Midwest.  The Midwest ISO and the local utilities

18 really have two ways to provide electricity to customers

19 within the Midwest.

20        The first, obviously, is to take the power generated

21 in a local power plant and deliver it directly into a customer

22 area or a load pocket.  The other way is to take electricity

23 and move it across the high-voltage transmission system which

24 crisscrosses the Midwest.

25        We could actually take electricity from a power plant

1  generated in Northern Indiana, Illinois, Michigan, move it

2  across the high-voltage transmission system and make it

3  available to customers in a load pocket such as Indianapolis

4  or some other area.

5  Q    Through what substation would you deliver generation into

6  the MISO -- I'm sorry -- into the Terre Haute load pocket

7  remotely?  Is there a specific substation that's at issue

8  here?  Let me ask that question.  Is there a specific

9  substation that's at issue here?

10  A    Can I ask for a point of clarification?

11  Q    Yes.

12  A    You had said previously that there was the assumption

13  there was no generation available at the Wabash River plant.

14  Is that assumption --

15  Q    Yes.  Let me strike that and start all over with the slow

16  question.  If the generation was unavailable from Wabash

17  River, would that put a load or a strain on any particular

18  substation?

19  A    Yes, it would.

20  Q    What substation is that?

21  A    That would be the Dresser substation.

22  Q    Would the shutdown of Wabash River Units 2, 3, and 5 in

23  2009 put a load on any particular substation?

24  A    Yes, it would.

25  Q    What risks has MISO identified with respect to the load on

Vol. 5-965

1  Dresser substation?  Do you want a different question?

2  A    I would like some clarity under what conditions?

3  Q    Just assuming that Wabash River 2, 3, and 5 were shut

4  down.

5  A    Thank you.  Under those conditions, the ability to move

6  enough electricity across the Midwest, we could deliver

7  electricity to the border of the Terre Haute area, but we

8  would be limited moving enough electricity through the Dresser

9  substation to meet the demands of the customers in the Terre

10  Haute load pocket at the time of summer peak.

11  Q    When you undertake this analysis, sir, that you just

12  described, are you applying NERC standards?

13  A    Yes, we are.

14  Q    Would you tell His Honor what NERC standards are?

15  A    NERC stands for North America Electric Reliability

16  Corporation.  It has set mandatory standards and requirements

17  that independent system operators must meet in order to be

18  compliant.

19  Q    Are those NERC standards reviewed or approved by any

20  federal agency?

21  A    Yes, they are.

22  Q    Does NERC in its standards identify the types of

23  contingencies that would go into a analysis like the one we're

24  describing in the courtroom today?

25  A    Yes, it does.

Vol. 5-966

1  Q   Did you apply NERC's standards in reviewing the potential

2  contingencies in connection with the report and analysis

3  you're providing?

4  A   Yes, we did.

5  Q   Do I understand correctly that the MISO report identifies

6  specific substations that are at risk in receiving sufficient

7  electricity in the event of a shutdown of Wabash River Units

8  2, 3, and 5?

9  A   Yes.

10 Q   Would you please, Mr. Harszy, identify for His Honor what

11 substations those are with reference to DR Demonstrative 65?

12 A   The load in the Terre Haute area is basically fed from a

13 loop which goes around the perimeter of the Terre Haute area.

14 It begins at Dresser, Allendale, Margaret, Fruit Ridge, East

15 Terre Haute, comes back through Wabash River and Water Street.

16      The ability to provide enough electricity through that

17 loop is limited by the transformer's equipment at the Dresser

18 substation.

19      In addition to that, under the assumption that

20 Generators 2, 3, and 5 were not available, under summer peak

21 conditions, we would also have difficulty moving that much

22 electricity on the transmission line from Dresser, Allendale,

23 and Margaret.

24 Q   Okay, sir.  Thank you.  And I want to just ask to what

25 extent, if any, does the MISO report that we have in evidence

1  analyze a risk or a contingency of overload on the Dresser

2  transformer?

3  A    It clearly identified an overload of the transformers at

4  Dresser under summer peak conditions.

5  Q    If there were an overload on the transformer or

6  transformers at Dresser in summer peak conditions, can you

7  tell us in practical terms what the consequences of that might

8  be?

9  A    We would take several steps to reduce the overload.  The

10  first step we would take would be to reduce generation at

11  other nearby power plants.  Based on our analysis, that would

12  not be sufficient in order to relieve the overload or

13  potential overload; and therefore, we would be in a situation

14  to direct the local utility to shed firm load in the Terre

15  Haute area at the time of summer peak conditions.

16  Q    I'm going to try to break that down into two questions

17  that I would ask you to elaborate on.  When you talk about the

18  need to reduce generation in the event of this overload, has

19  your report and analysis identified the specific generating

20  units at which that reduction in generation would have to

21  occur?

22  A    Yes, it has.

23  Q    Which units are they on our map, sir?

24  A    They would be the Merom unit, the Merom power plant, the

25  Vermillion, and the Cayuga power plants.

Vol. 5-968

1   Q   Does your report and analysis identify how much reduction

2   you would have to seek to get -- reduction in generation you

3   would seek to get in the event of this contingency?

4   A   Yes, it does.

5   Q   How much is it, sir?  Do you need to look at your report?

6   A   Yes.

7   Q   It's at 4.2.2.

8   A   Based on our analysis, 1143 megawatts of generation would

9   have to be reduced across those three power plants to help

10  mitigate the overload in the Dresser substation.

11  Q   I believe you said -- and you just correct me if I'm

12  wrong, that if the reduction of 1143 megawatts of generating

13  capacity at peak summer conditions were not sufficient to cure

14  the overload, you would have to shed load?

15  A   That is correct.

16  Q   What do you mean when you say you would have to "shed

17  load"?

18  A   We would contact the local utility and direct them to take

19  a certain specific amount of load or demand by the customers

20  and actually turn them off.

21  Q   Does the report contain an analysis of the extent to which

22  that impact on the Terre Haute region -- I'm going to ask the

23  question again.

24          Does the report contain an analysis of the impact on

25  the Terre Haute region in the event of that contingency?

Vol. 5-969

1  A   Yes, it does.

2  Q   What is the impact?

3  A   Approximately 25 percent of the load in the Terre Haute

4  pocket would be at risk.

5  Q   Does that include residential load?

6  A   It could include residential, industrial, or commercial.

7  Q   Are there any other problems, contingencies -- or let me

8  just use the word issues that could be triggered by taking

9  approximately 1143 megawatts of generation offline in peak

10 summer conditions?

11 A   That certainly would be a problem for us.

12      If we look at the entire state of Indiana,

13 1143 megawatts would be roughly 7 percent of the load for the

14 entire state of Indiana.  So it would not only become a risk

15 to the Terre Haute area; but if we were forced to reduce the

16 output of the Cayuga, Vermillion, and Merom substations by

17 that amount, it could put other areas in the Midwest at risk.

18 Q   Does the MISO report, sir, the report and analysis you

19 prepared contain some recommendations or I guess requirements

20 to help alleviate this problem?

21 A   Yes, it does.

22 Q   Could you tell Judge McKinney what those requirements are?

23 A   The two recommendations would be to add another

24 transformer at the Dresser substation.  Another recommendation

25 would be to add another 138,000-volt transmission line from

Vol. 5-970

1  Dresser, Allendale, and Margaret.

2  Q   Did you indicate in the MISO report that the installation

3  of a third transformer at Dresser is already planned?

4  A   Yes.

5  Q   To be clear, sir, was it planned prior to the time you

6  started work on this report?

7  A   Yes, it was.

8  Q   Let me ask you this.  If you did a so-called Attachment Y

9  study, would such a study contain some additional engineering

10  analysis beyond the analysis that's contained in the report

11  we're talking about today?

12  A   Yes, it would.

13  Q   Just give me a description of what that would consist of.

14  A   The Attachment Y type of study is a much more detailed

15  engineering analysis.  The analysis that's provided in this

16  document is only making reference to overloaded facilities.

17  If we did a full-blown Attachment Y engineering study, we

18  would look at more detailed engineering analysis such as

19  voltage collapse.  We would look at cascading events across

20  the State of Indiana.  It would be much more analysis, much

21  different scenarios reviewed in addition to what was done in

22  this brief analysis.

23  Q   Would an Attachment Y study lead you to the conclusion --

24  is it possible that an Attachment Y study would lead you to

25  conclude that the reliability issues identified in your report

Vol. 5-971

1  and analysis simply don't exist?

2  A    No.  I don't believe that.

3          MR. HOPSON:  I have no further questions, Your

4  Honor.

5          THE COURT:  Cross-examine.

6          MR. BROOKS:  Thank you, Your Honor.  Your Honor,

7  could I have just two seconds to consult with my engineer?

8          THE COURT:  If you need more than two seconds, sure.

9  Consult with him.

10     *(A discussion was held off the record.)*

11                    **CROSS-EXAMINATION**

12  BY MR. HARSZY:

13  Q    Good morning, Mr. Harszy.

14  A    Good morning.

15  Q    We've met before, right?

16  A    Yes.

17  Q    You recall, my name is Phil Brooks, and we met at your

18  deposition.  I just want to follow up on some of this

19  discussion about the Midwest ISO's report.  Now, just so we're

20  clear here, you were asked whether it was an Attachment Y

21  study.  What is an Attachment Y study?

22  A    An Attachment Y study is an in-depth engineering analysis

23  that we do in regard to one of the generation owners coming to

24  us with the expectation that a power plant or generator would,

25  in fact, be shut down.

Vol. 5-972

1  Q   Now when is a generation owner supposed to come to you and
2  tell you that they plan to shut down a plant?
3  A   In accordance with our tariff, it is 26 weeks prior to the
4  shutdown of a generator.
5  Q   When is the first time you heard that Units 2, 3, and 5 at
6  Wabash River might be shut down?
7  A   I believe the first time I heard that was just shortly
8  prior to the deposition I provided.
9  Q   That was based on a phone call that I made to one of the
10  attorneys there at MISO?
11  A   That's correct.
12  Q   Did Duke advise you this was a possibility?
13  A   I was not advised of it.
14  Q   Well, for planning purposes, that's what you do at MISO,
15  you look out into the future and take into account things that
16  might affect reliability?
17  A   Yes.
18  Q   And you want to plan for those, don't you?
19  A   That's right.
20  Q   Sometimes the loss of generation can have significant
21  impacts on transmission, right?
22  A   That's correct.
23  Q   Duke is a sophisticated transmission operator, aren't
24  they?
25  A   Yes.

Vol. 5-973

1   Q    They would know that as well, wouldn't they?

2   A    Yes.

3   Q    Isn't it also true, Mr. Harszy, that Duke participates

4   with MISO in the development of the long-term transmission

5   plans, right?

6   A    Yes.  There is input from the local utilities.

7   Q    They have their own models.  In fact, you guys use some of

8   the same power flow models to analyze transmission issues,

9   right?

10  A    That would be true.

11  Q    Now, you say this wasn't a full Attachment Y.  You didn't

12  have enough time to do an Attachment Y; is that right?

13  A    That is correct.

14  Q    You actually did this report because I issued a subpoena

15  for you to come to court to talk about these things; and I

16  sent a letter saying can you try to be prepared to talk about

17  a few things, and I listed them, didn't I?

18  A    That's correct.

19  Q    You decided that the best way to do that was try to put it

20  in paper so everybody could see it in advance, right?

21  A    Correct.

22  Q    In fact, when you do an attachment -- that's consistent

23  with your general practice, isn't it?

24  A    That's correct.

25  Q    You like to make the information available to everybody so

Vol. 5-974

1  that people can talk about what the facts are, right?

2  A   Correct.

3  Q   When you do an Attachment Y study, in fact, you put that

4  out with all of the analysis that went under it, all of the

5  modeling that you did to come up with that.  You provide that,

6  don't you?

7  A   Correct.

8  Q   And, in part, that's so that when you come to an

9  identification of a problem, if you have all this information,

10 then all the parties that are interested can look at the

11 assumptions and begin to talk about possible solutions, right?

12 A   That's right.

13 Q   Now, that's not really where we are with the MISO report

14 because it's not finished yet.  It's not a full Attachment Y,

15 right?

16 A   That is correct.

17 Q   Now, let me see if I understand the scenario in the report

18 that causes you the greatest concern.  Is it fair to say that

19 the scenario is that Wabash River Units 2, 3, and 5 are

20 offline, right, that's one element?

21 A   Yes.

22 Q   The other element is that the it's summer peak, right?

23 A   Yes.

24 Q   Summer peak is days of 90 degrees or higher in the Terre

25 Haute area, right?

Vol. 5-975

1  A    Correct.

2  Q    And even under that scenario, in your analysis, at that

3  point there's no problem, right?

4  A    No.  There is a problem.

5  Q    Maybe I'll have you show me in just a second.

6  A    Okay.

7  Q    But isn't it true in the analysis that you provide in

8  Table 4 of what we've marked as Defendants' Exhibit 321, that

9  the risk analysis there shown in Table 4 is predicated on the

10 loss of transmission facilities in addition to the shutdown of

11 Wabash River Units 2, 3, and 5?

12 A    Let me be very clear.  According to our NERC requirements,

13 we have to plan and operate that portion of the grid within

14 our footprint to withstand the single worst contingency.  So

15 when I talk about this concern, I have to take into account

16 the loss of a generator or a transmission element which could

17 be a transformer or transmission line in order for me to be

18 able to meet the NERC requirements.

19 Q    Fair enough.  And I hope I didn't suggest otherwise.  All

20 I mean is that when you do your analysis, sure, you're

21 thinking about the next worst thing; but I'm talking about in

22 the analysis when you run the models and you just turn off

23 Wabash River Units 2, 3, and 5 and you don't have a problem

24 with any of the transformers at Dresser, you're not in a

25 contingency situation, right, at that moment?

Vol. 5-976

1  A    Could you rephrase that question, please?

2  Q    Maybe I can ask it in a better way.  You say that you're

3  planning for the next worst contingency, right?

4  A    Correct.

5  Q    That's the NERC standard.  So when Units 2, 3, and 5 are

6  offline, the next worst contingency is the loss of one of

7  those transformers at Dresser, right?

8  A    Yes.

9  Q    That's what you're worried about, right, is the day that

10  one of those transformers go out, right?

11  A    Yes.

12  Q    That's what triggers the problems?

13  A    Yes.

14  Q    You have to then react to that loss of transformer, right?

15  A    Yes.

16  Q    Now, there are operating procedures you might use, like

17  you said, reducing generation somewhere, right?

18  A    Yes.

19  Q    You might open a line somewhere to relieve some pressure?

20  A    Yes.

21  Q    And really, this is the result, isn't it, of sort of what

22  little I know about ohms law, right?  When you lose one of

23  these facilities, electricity immediately rebalances itself to

24  flow, right?

25  A    To a certain degree, yes.

Vol. 5-977

1  Q    You have to react to that, don't you?

2  A    Let me make this very clear.  We operate to absorb and

3  withstand successfully the loss of a single transmission

4  element, a transmission line, or a transformer.  We have to be

5  able to react, provide enough electricity to the customers and

6  keep the remaining facilities within their capability.  That's

7  what we are required to do.

8  Q    Absolutely.  I can tell that you I'm happy that you do it,

9  and I'm sure everybody here is.  Don't take anything I'm

10  saying as critical.  I'm just trying to understand this, okay?

11        Let's look at Table 4 for just a minute, because I

12  want to understand how this works.  Again, you had some

13  preexisting analyses you could draw upon to talk about this

14  Dresser issue, right?

15  A    Yes.

16  Q    There were -- that was because you had already done some

17  modeling projections a year or so ago, right?

18  A    Correct.

19  Q    In those modeling projections, you projected out to

20  something like the year 2018, didn't you?

21  A    I don't know exactly how far we projected out, but it was

22  a number of years.

23  Q    One of the model years was the year 2013, right?

24  A    Yes.

25  Q    In that model, you looked at what would happen when the

Vol. 5-978

1  Edwardsport IGCC came on line, right, assumed sometime in

2  2012?

3  A    I don't recall that assumption.

4  Q    Do you actually have any sort of list of the assumptions

5  for the models that you ran?

6  A    Yes.  There are the list of input assumptions.

7  Q    Well, I thought we asked for that.  Did I not ask the

8  right way to get that stuff?  I know you provided me some

9  stuff, but I didn't see that.

10  A    I didn't see exactly what was provided to you.

11  Q    Okay.  That's fair enough.  I know it's all been a rush.

12        Let's talk about the 2013 model.  We don't know right

13  now whether the IGCC was in or out, but we do know, don't we,

14  that when you add or subtract generation, it always changes

15  the configuration of the flow, right?

16  A    To some degree, yes.

17  Q    And it certainly changes it in ways that are not

18  intuitively obvious to a layman, right?

19  A    Yes.

20  Q    So, in Table 4 here in Exhibit 321, this looks like a

21  table that was put together from some of these models, right?

22  A    It looks that way.

23  Q    You didn't actually put this together, did you?

24  A    No, I did not.

25  Q    Well, then, I'm just going to ask you based on your

Vol. 5-979

1  interpretation of what you see.

2          Looking at the top, it says Table 4 Planning Analysis

3  Thermal Violations.  What does that mean?

4  A   The thermal violations would be the equipment identified

5  is actually going to be carrying perhaps more than it was

6  capable of or rated at.

7  Q   Why do they call it a thermal violation?

8  A   Because the first impact of violating the thermal rating

9  is the equipment tends to heat up.

10 Q   Is the thermal -- is the temperature of the facility

11 monitored like a transformer?

12 A   Yes.

13 Q   And it's monitored in real time, isn't it?

14 A   Yes.

15 Q   Why is that?

16 A   To ensure that if, in fact, the temperature gets to a

17 critical state, something can be done so as not to overload

18 and possibly cause a transformer to fail.

19 Q   Now, on the left-hand side, it says "model year 2013

20 summer peak."  What do you interpret that to mean?

21 A   I interpret that to be the analysis for peak conditions

22 during the summer of 2013.

23 Q   And to the right of that, it says "area load

24 level:  358MW."  What does that mean?

25 A   358 megawatts.

Vol. 5–980

1  Q    Is that the summer peak load that's being modeled here?

2  A    Yes, it is.

3  Q    That's the summer peak projected for the year 2013?

4  A    Yes.

5  Q    Now, load forecasts come from the transmission owner or

6  the entity that actually sells the electricity, right?

7  A    Yes.

8  Q    So any load forecast that you would have used would have

9  come from Duke; is that right?

10  A    In this case, yes.

11  Q    Do you know when that load forecast was finalized?

12  A    No, I do not.

13  Q    Could have been more than a year ago?

14  A    Could.

15  Q    Would you expect that the current economic conditions

16  could affect a load forecast?

17  A    It could.

18  Q    Do you know what the load used for -- well, I'm sorry.

19  Let me just take you through this for a minute because I want

20  to make sure we understand Table 4.

21        So on the left-hand side, it says contingency.  What

22  is that?

23  A    Contingency would be the actual element which would be

24  unavailable, probably forced out in a very, very brief -- in a

25  matter of seconds in regard to a transformer or transmission

Vol. 5–981

1  line.

2  Q   So the contingency, the first one we see, for example, is

3  Dresser 345/138 Transformer 1.  That's the contingency?

4  A   Yes.

5  Q   So that means now you're going to tell us in this chart

6  what happens if that transformer goes out when the load is

7  358 megawatts; is that right?

8  A   Yes.

9  Q   Now we see a column that says "limiting element."  What

10  does that mean?

11  A   That would be the element that would be overloaded as a

12  result of that contingency.

13  Q   The next column it says "rating."  What is that?

14  A   That is the capability of that transformer.

15  Q   Now, ratings have various different designations, the

16  nominal rating, emergency rating, short-term emergency.  Which

17  rating is this?

18  A   I believe that's the normal rating.

19  Q   Now, transformers also have a 24-hour continuous emergency

20  rating, right?

21  A   They may or they may not.

22  Q   Do you know whether these transformers do?

23  A   I do not know.

24  Q   Now, let's move over to the next column.  Now this, it

25  says "percent overload."  What's being conveyed here?

Vol. 5-982

1  A    Under the contingency of the Dresser Transformer 1

2  immediately tripping out of service, that would result in

3  Transformer 2 being overloaded by 14 percent in the first

4  column, 10.7 percent under the other set of circumstances, and

5  7.5 percent in the last column.

6  Q    Okay.  Now, you would agree with me that if these

7  transformers have a 24-hour continuous emergency rating higher

8  than 343, then it would change the overload projection?

9  A    If there were a short-term emergency rating, it could.

10  Q    But we don't know the answer to that?

11  A    I do not know.

12  Q    Now, as I look here, the load is 358 megawatts, and the

13  rating is 543 megawatts; and yet, we've got an overload,

14  right?

15  A    Yes.

16  Q    That's because there are other things that change within

17  the system as a result of a piece of generation not being

18  available, right?

19  A    Yes.

20  Q    But the generation throughout the system is tied to what

21  happens at the transformer, right?  Well, let me give you a

22  concrete example from your report, because that wasn't a fair

23  question.

24        For example, if we turn over here to -- you've got

25  some flow charts here.  Let's look here -- it's physically

Vol. 5-983

1  page 17, and there's the planning analysis one-lines; do you

2  see those?

3  A   Yes.

4  Q   Now, those are basically four different single line

5  drawings that depict the contingencies that are identified in

6  Table 4, right?

7  A   Right.

8  Q   Can we call up that -- oh, we already have.  Thank you.

9         So if I look down here at the lower left, over there

10  in the red on this first planning one-line here in Section 6

11  of the report, you see down here on the left, what is that?

12  It says Merom?  What is that?

13  A   That would be the Merom power plant.

14  Q   The Merom power plant is on this because it's relevant to

15  the analysis, right?

16  A   Yes.

17  Q   In fact, it's relevant to the analysis because some

18  portion of the flow from Merom goes through Dresser, right?

19  A   Yes.

20  Q   It's also true, isn't it, that with Wabash River Units 2,

21  3, and 5 offline, there's essentially less pressure on the

22  system from the Wabash River side, and so it causes more flow

23  from Merom to go through Dresser; is that right?

24  A   Yes.

25  Q   Now, what are the generator ratings here at Merom?  You

Vol. 5-984

1  can tell from the one-line, can't you?

2  A   Yes.

3  Q   What are they?

4  A   Appears to be 590 and 597.

5  Q   Okay.  So that's about 1200 megawatts?

6  A   Yes.

7  Q   Now, that number is important to the analysis, right, the

8  number of megawatts there?

9  A   Yes.

10 Q   Because some percentage of that will shift to go through

11 the Dresser transformer without Wabash River Units 2, 3, and

12 5, right?

13 A   Yes.

14 Q   Do you know for a fact what the actual rating on the

15 generators at Merom is right now?

16 A   I do not know this particular moment, no.

17         MR. BROOKS:  Can we call up the Merom --

18 BY MR. BROOKS:

19 Q   And I don't know either, sir.  I just pulled this off the

20 Web.  I looked at this at Merom, and if you look over here on

21 this little screen shot from the Web, if you look in the left

22 column, down -- I think it's in the third paragraph.  I can't

23 really read it.  Is that where it is?  Somewhere in here we

24 see that there's a thousand kilowatts from that station?

25 You're having the same trouble I am.

Vol. 5-985

 1          THE COURT:  Does this exhibit have a number?

 2          MR. BROOKS:  Yes, Your Honor.  What number are we

 3  going to call this?

 4          MR. FLINT:  PR Demo 7.

 5          MR. BROOKS:  PR Demo 7.

 6  BY MR. BROOKS:

 7  Q   Would it help if I give you a paper?

 8          MR. BROOKS:  May I approach?

 9          THE COURT:  Yes.

10  BY MR. BROOKS:

11  Q   I'm sorry, it's in the second bullet there; do you see

12  that?

13  A   Yes, I do.

14  Q   1,016,000 kilowatts, that's about 1,000 megawatts, isn't

15  it?

16  A   Yes.

17  Q   That's about 200 megawatts less than what is shown on this

18  one-line, right?

19  A   Yes, it is.

20  Q   Do you know why there is a difference?

21  A   I do not know what the document is.  I don't know the

22  accuracy of this document.

23          THE COURT:  The document you're referring to is the

24  Dem 07?  Okay.

25  BY MR. BROOKS:

Vol. 5-986

1  Q   If there's a difference, we would need to ferret that out

2  to understand, wouldn't we?

3  A   Yes.

4  Q   Because it would have an effect on the analysis?

5  A   If that was the number that was actually being generated,

6  yes.

7  Q   If that number is, is -- the number here is overstated,

8  then it actually overstates the actual load in the model.  The

9  model will put more load on the Dresser transformers than is

10 identified in Table 4, right?

11 A   It could.

12 Q   Again, that's one of those things that in a full

13 Attachment Y study would be vented and discussed, right?

14 A   Yes.

15 Q   Mr. Harszy, do you know what the projected load for the

16 Terre Haute load pocket is for 2009?

17 A   Approximately 350 megawatts.

18 Q   That's the projection?

19 A   Yes.

20 Q   When was that projection done?

21 A   That was done last year.

22 Q   That hasn't been updated?

23 A   Not at this time.

24 Q   What was the load for 2007, do you know?

25 A   I don't have that total number.  No, I do not.

Vol. 5-987

1  Q   Would you agree with me that in 2007, all of Wabash River

2  went offline for a couple of days in October, didn't it?

3  A   Yes, that's true.

4  Q   And there was no blackout, right?

5  A   No, there was not.

6  Q   I'm not suggesting it was a pleasant situation.

7  A   It certainly was not.

8  Q   And operators had to take actions in order to keep the

9  system stable, right?

10 A   We had to take some extreme actions in order to ensure the

11 reliable supply to the Terre Haute area, yes.

12 Q   Because Units 2 through 6 are something on the order of

13 750 megawatts, right?

14 A   Approximately.

15 Q   752, I think.  Okay.

16          In some of the material that you did send us, there

17 was a spreadsheet that looked a lot like Table 4.  Can we pull

18 that up?  I just have one quick question about that.

19          Do you recognize this?  We'll mark that as PR Demo 8.

20 BY MR. BROOKS:

21 Q   Can you identify what we've marked as PR Demo 8?

22 A   Could I ask for a paper copy?  I'm having difficulty

23 reading it here.

24          MR. BROOKS:  May I approach?

25          THE COURT:  You may.

Vol. 5-988

1  BY MR. BROOKS:

2  Q    Is that familiar to you, sir?

3  A    Yes.

4  Q    What is it?

5  A    It's a summary of conditions for the model year 2013.

6  Q    Now, is that the information that underlies the report

7  that we have here in evidence as the MISO study?

8  A    Yes.

9  Q    Well, here's what I'm curious about, sir.  If we look at

10  the top of this table, it says "Model Year 2013 Summer Peak,"

11  and it says "Area Load Level:  305 Megawatts," doesn't it?

12  A    Yes, it does.

13  Q    If you look in the columns, you'll see that the percent

14  overload projected there is exactly the same as what we see in

15  Table 4, right?

16  A    Yes.

17  Q    But that's actually not physically possible, is it, that

18  you would have the exact same overload at 305 megawatts that

19  you would have at 358, right?

20  A    There would be a slight difference.

21  Q    No difference is depicted, right?

22  A    Does not appear to be.

23  Q    So again, in the Attachment Y study, this would be

24  something that would come up; and we would get to the bottom

25  of what the discrepancy is and whether it's a typo or whether

Vol. 5-989

1  it's substantive, right?

2  A    Yes.

3  Q    Now, Mr. Harszy, if Units 2, 3, and 5 at Wabash River were

4  for some odd reason suffer a catastrophic failure tomorrow --

5  I don't know how they all three would do it at the same time,

6  but assume that they did -- isn't it the case that Duke and

7  Midwest ISO would get their electrical engineers together and

8  figure out how to deal with that problem?

9  A    We would certainly meet with the local utility.

10  Q    And there are lots of things that you would talk about,

11  right?  You would talk about whether there were any spare

12  transformers that might be brought in before summer peak,

13  right?

14  A    Yes.

15  Q    And you would talk about whether there was any ability to

16  put in combustion turbine generation in the load pocket, if

17  not in the next six months, at least within the next year,

18  right?

19  A    Yes.

20  Q    And you would talk about ways that you might go back out

21  to the industrial customers to see if you could get a better

22  commitments on interruptible loads, right?

23  A    We would not do that.

24  Q    But Duke would?

25  A    I suspect a local utility would do that.

Vol. 5-990

1 Q    In the end, isn't it true that what we have right now is a

2 planning failure?  As we stand here looking at the possibility

3 of these units not being available this summer, would you say

4 it's a planning failure?

5 A    Based on the information that we have received at this

6 point, we have had possible scenarios that those generators

7 would not be available.  We have not had confirmation that

8 they will not be available.  Until we get that, there's not a

9 lot of additional work that we can do for a possible scenario.

10 Q    But if Duke had come to you a year ago and said hey, this

11 is a possible scenario, let's sit down and work this out just

12 in case, you could have done that, couldn't you?

13 A    We would have worked with them, yes.

14         MR. BROOKS:  I don't have any further questions.

15 Thank you, Your Honor.

16         THE COURT:  Redirect?

17                   **REDIRECT EXAMINATION**

18 BY MR. HOPSON:

19 Q    I'm going to put up very briefly here, sir, something that

20 you were handed that was not marked as an exhibit, I don't

21 think.  I have marked it as DR Dem 82.  It says, "Merom

22 Station Backgrounder."

23         COURT CLERK:  I believe that is also marked DR

24 Demo 7.

25         MR. HOPSON:  DR Dem0 7 as well.

Vol. 5-991

1  BY MR. HOPSON:

2  Q    Did I hear you say correctly, you don't know what that is?

3  A    That's correct.

4  Q    Do you know where you actually got the information about

5  the Merom system's generating capacity that's contained in

6  your report?

7  A    We got it from the generation owner.

8  Q    Do you believe that that was a reliable source of that

9  generation?

10  A    Yes, I do.

11  Q    Did any of the questions asked by Mr. Brooks today cause

12  you to doubt the fundamental conclusions in your analysis and

13  report?

14  A    No, it does not.

15          MR. HOPSON:  Thank you.

16          MR. BROOKS:  Brief recross.

17          THE COURT:  Yes.

18                    **RECROSS-EXAMINATION**

19  BY MR. BROOKS:

20  Q    Mr. Harszy, can I direct your attention to page 9 of

21  Exhibit 321?  Do you have that there?

22  A    I'm sorry, which exhibit is that?

23  Q    321.  That's the MISO study.

24  A    Yes.

25  Q    Okay.  If you look at the top, it says "regional

Vol. 5-992

1  overview."  It says, "There are three main generating plants

2  in the region:  Wabash River, Merom, and Worthington, with

3  about 800 megawatts, 1000 megawatts, and 300 megawatts gross

4  plant output respectively"?

5  A    Yes.

6  Q    You'll agree with me, won't you, that the 1000 megawatt

7  denomination here is tied to the Merom station in this

8  paragraph?

9  A    Yes.

10  Q    That's inconsistent with what we looked at in the one-line

11  drawing where it said 1200 megawatts, right?

12  A    Yes.  It's my understanding these numbers are rounded off

13  by our planning department.

14  Q    So there's a question to be resolved here, right?

15  A    I have confidence in the analysis based on the one-line

16  diagram of the power flows in the back of this analysis.

17  Q    But you agree with me that it's inconsistent with the text

18  in this report?

19  A    Yes.

20         MR. BROOKS:  No further questions.  Thank you.

21         MR. HOPSON:  No further questions.  Thank you,

22  Mr. Harszy.

23         THE COURT:  You may step down.

24     (Witness excused.)

25         THE COURT:  Your next witness, sir.

Vol. 5-993

 1            **MICHAEL R. BOOTS, DEFENDANT'S WITNESS, SWORN**

 2                        **DIRECT EXAMINATION**

 3            MR. STOJILKOVIC:  Your Honor, the Defense calls

 4   Michael Boots, Your Honor, just a brief summary.  Michael

 5   Boots is currently the technical services manager for fuel and

 6   material handling for the entire Duke Energy system.  Until

 7   January of this year, he was production manager at the Walter

 8   C. Beckjord station.

 9            In that capacity, he was generally responsible for

10   PM controls and testing at the station; and he will testify

11   today about the corrective actions and upgrades that Cinergy

12   has implemented to improve the performance of the PM controls

13   at Beckjord Units 1 and 2.

14            THE COURT:  All right.  Thank you.

15   BY MR. STOJILKOVIC:

16   Q   Please state your name for the record.

17   A   Michael R. Boots.

18   Q   Mr. Boots, are you currently employed?

19   A   Yes, I am.

20   Q   What is your current job?

21   A   I am the Technical Services Manager of Fuel and Material

22   Handling for the entire Duke Energy system.

23   Q   I'm going to ask you a bit today, Mr. Boots, about your

24   background and history with Duke Energy and its predecessors.

25   Is it all right with you if I generally refer to them as

Vol. 5-994

1  Cinergy?

2  A    That's fine.

3  Q    When did you start to work for Cinergy?

4  A    In October of 1974.

5  Q    Was that your first job in the utility industry?

6  A    Yes, it was.

7  Q    Where were you stationed?

8  A    At the Walter C. Beckjord station.

9  Q    How long did you stay at Beckjord?

10 A    Until January of 1980.

11 Q    What positions did you occupy between 1974 and 1980?

12 A    I was an Operations Helper and Assistant Auxiliary

13 Operator and then Auxiliary Operator.

14 Q    Can you tell us briefly what those positions involved?

15 A    Yes.  The Operations Helper was generally responsible for

16 checking equipment, taking readings on various equipment,

17 temperatures, pressures and readings.

18        The Assistant Auxiliary Operator was responsible for

19 checking all the equipment throughout the unit itself,

20 operating the ash handling systems and other various duties.

21 The Auxiliary Operator was responsible for checking the

22 boilers and the turbines, assisting the control operator on

23 startup and shutdown of the units.

24 Q    You indicated in 1980 you left the Beckjord station.

25 Where did you go?

Vol. 5-995

1  A    I went to our East Bend generating station in Rabbit Hash,

2  Kentucky.

3  Q    Did there come a time when you returned to Beckjord?

4  A    Yes.  I returned to Beckjord station in April of 1999.

5  Q    When you returned to Beckjord in April 1999, what was your

6  new position at the station?

7  A    I was at that time in a position called the Production

8  Team Group Leader.  Today that job is known as the Production

9  Manager.

10  Q    Can you tell us what a Production Team Group Leader or

11  Production Manager does?

12  A    He oversees the safe and efficient operation of the units

13  and second in command to the Station Manager.

14  Q    How long did you serve as Production Team Leader or

15  Production Manager at Beckjord?

16  A    Until January of this year.

17  Q    Did you hold any degrees or licenses relative to your work

18  as production manager?

19  A    I have an Associate's Degree in Business from the

20  University of Cincinnati, and I have a stationary engineer's

21  license from the State of Ohio.

22  Q    All right, Mr. Boots, I would like to talk about

23  particulate matter, and I'm generally going to refer to it as

24  PM.  Were PM emissions something you dealt with as Production

25  Manager at Beckjord?

Vol. 5-996

1  A    Yes.  I was generally responsible for making sure our PM

2  emissions were within our limits, along with the Station

3  Manager and Environmental Coordinator.

4  Q    Can you tell us how the various units at Beckjord control

5  PM emissions?

6  A    Through an electrostatic precipitator.

7  Q    Mr. Boots, if I could direct you to DR Dem 13.  Can you

8  just walk us very briefly through what a precipitator is?

9  A    Yes.  It's essentially a big box that collects particulate

10  matter.  The flue gas goes into it at the beginning and then

11  gets collected and exits out to the back of the stack.

12  Q    As Production Manager, were you involved in dealing with

13  the precipitators at the various Beckjord units?

14  A    Yes.  I would listen to the presentations if there were

15  issues or problems and then help with the decisions on what

16  those repairs would be.

17  Q    Were you also involved in decisions about other kinds of

18  equipment that interface with the precipitators?

19  A    Yes, I was.

20  Q    Now, what about testing for PM levels?  Did you have any

21  involvement in that?

22  A    Yes.  At a supervisory level, I would be responsible for

23  making sure that the tests were conducted in a fair manner,

24  that we had the units at their full operating capacity under

25  normal operating conditions with worse case conditions for

Vol. 5-997

1  coal.

2  Q   All right.  What was your role, if any, if a unit failed a

3  PM test?

4  A   Myself, along with the Station Manager, would be

5  responsible for making notifications first to corporate

6  headquarters to notify them we had failed a test and we were

7  going to be removing a unit from service.

8       We would then contact the load desk and notify them of

9  the same.  Then I would order an immediate shutdown of the

10  unit at that time.

11  Q   All right, Mr. Boots.  I would like to talk more

12  specifically about the PM test results at Beckjord Unit 1.

13  Are you familiar with the results of those tests?

14  A   Yes.  I'm familiar with results from the time that I was

15  at Beckjord and somewhat familiar with those before my time.

16  Q   Have you prepared a summary of those results?

17  A   Yes, I have.

18       MR. STOJILKOVIC:  Could we have the next slide,

19  please?

20  BY MR. STOJILKOVIC:

21  Q   Mr. Boots, just to make clear -- and I'm referring here to

22  DR Dem 80.  What did you use to prepare the summary?

23  A   I used the stack test results and engineering documents.

24  Q   Can you just tell us what the PM limit is at Beckjord Unit

25  1?

Vol. 5-998

1  A    It is 0.10 pounds per million BTU.

2  Q    Can you explain what that means?

3  A    It means that we are allowed to emit up to one-tenth of a

4  pound per million thermal units of energy that the unit

5  generates.

6  Q    And if I can direct you to DR Dem 80, it looks like you

7  began the tests here -- the listing of tests in February of

8  1998.  Was there a reason for that?

9  A    Yes.  That was when the consent order that we agreed to

10  went into effect.

11  Q    And it looks like -- well, Mr. Boots, can you just tell us

12  about the outcome of the first three tests there?

13  A    Yes.  Those three tests all passed with an average rating

14  that you can see listed there.  They were below the limit.

15  Q    All right, Mr. Boots.  Then if we go to the fourth test

16  there, can you tell us about that one?

17  A    That test was a failure.

18  Q    Let me just ask you -- and you're referring there, just to

19  make clear, to the test on October 12th, 1999, right?

20  A    That is correct.

21  Q    Was anything happening in early October or late September

22  at Beckjord 1 to cause you to be concerned about this test

23  before it was done?

24  A    No.  Everything had looked good.  We had passed the

25  previous three tests, and nothing on the unit looked like we

Vol. 5-999

1  had any issues.

2  Q    What did you do when you found out about this failed

3  result in October of 1999?

4  A    When we received the preliminary results, we then removed

5  the units from services and hired a qualified inspector to

6  inspect the unit.

7  Q    Do you know who inspected the unit?

8  A    I believe that was Doug Zahn of ABB Consulting Services.

9  Q    What did Mr. Zahn find in his inspection?

10 A    His inspection found that the cause of the failure was due

11 to problems with our sulfur SO3 system.

12 Q    Can you explain what the SO3 system does?

13 A    I can better show you with the slide that we have prepared

14 for that.

15          MR. STOJILKOVIC:  All right.  Can we go to the next

16 slide, please?

17          THE WITNESS:  As you can see here going in on the

18 particulate matter from the units, above it you see an SO3

19 system.  That is a system that injects SO3 gas to the duct

20 work to condition the PM before it enters the precipitator.

21          THE COURT:  Excuse me just a minute.  That was?

22          MR. STOJILKOVIC:  I'm sorry, Your Honor.  That was

23 DR Dem 14 that we just saw.  I think we're just stepping into

24 DR Dem 15 here which is just the next continuation?

25          THE WITNESS:  Yes.  Now it is combined, and it ends

Vol. 5-1000

1  up changing the resistivity of the particulate matter so the

2  precipitator can collect it efficiently.

3  BY MR. STOJILKOVIC:

4  Q    Why do you want to change the resistivity of the

5  particulate matter?

6  A    We burn low sulfur coal, and for the precipitator to be

7  able to collect it at its optimum efficiency, you need to

8  condition it with the right amount of SO3.

9  Q    This is now DR Dem 16.  What does this show?

10  A    This shows the particulate matter passing through all the

11  plates and wires.  The particulate matter is given a negative

12  charge.  It is collected by a positive charge on the plates,

13  and then the flue gas exits out to the stack after that.

14  Q    Thank you, Mr. Boots.  We can put that down.  Did Mr. Zahn

15  make any recommendations on how to fix the problems you were

16  having with the SO3 conditioning system?

17  A    Yes.  He made recommendations to repair the system as well

18  as several other minor repairs.

19  Q    Did Cinergy make every recommended repair he made?

20  A    Yes.

21  Q    If we could go back to the stack test summary, and if we

22  could take off the yellow markings.

23         If we go back to this, Mr. Boots, can you tell us

24  about the first test after that October 1999 failure?

25  A    Yes.  The unit was restarted and tested on November 5,

Vol. 5-1001

1   1998, the average result of which was 0.034.  We passed.

2   Q   I want to clarify for the record, did you say 1998?

3   A   1999.  I'm sorry.

4   Q   Thank you.  Did you have any reaction to that passing

5   result in November?

6   A   We felt confident that we had found the root cause of the

7   problem that led to the failure and that the unit was back in

8   good shape.

9   Q   All right, Mr. Boots.  Let's continue on here.  It looks

10   like, according to your chart, there were next two failures in

11   May of 2000.  What did the company do when you found out about

12   the first of those failures?

13   A   We immediately shut the unit down.

14   Q   Did you have anyone take a look at the unit?

15   A   Yes.  This time we hired three contractors to come in and

16   inspect the unit.

17   Q   Which contractors were those?

18   A   They were Babcock & Wilcox and Power Process Engineering

19   and Storm Engineering.

20   Q   Why didn't you hire Mr. Doug Zahn of ABB like you did the

21   previous time?

22   A   We felt we could get more opinions and hopefully get to

23   the root cause of the problem.

24   Q   What did those various contractors tell you was the cause

25   of the May failures?

Vol. 5-1002

1  A    They all three concluded that it was due to a precipitator

2  rapper failure.

3  Q    All right, Mr. Boots.  I would also ask you to very

4  briefly explain what a rapper is?

5  A    I can better show you with a slide.

6  Q    Mr. Boots, just for the record, this is DR Dem 17.

7  A    At the top of the precipitator, you can see here, these

8  are the rappers, and they mechanically wrap the wires and

9  plates to remove the particulate that has been collected by

10 them.

11 Q    Can we just run the animation on this slide.  Is that what

12 we were talking about, Mr. Boots?

13 A    Yes, it was.

14 Q    Okay.  We can take that down.  Was anything done to

15 improve rapper perform at Beckjord 1 following the failed test

16 in May 4, 2000?

17 A    The failed card that had caused the rappers not to work

18 were replaced, and the rappers were tested and operation

19 verified and the unit was returned to service.

20 Q    Could we go back to the summary of the test results?  As I

21 believe we mentioned, there was also a failure later that same

22 month.  What did the company do after that second failure in

23 May?

24 A    When we received the preliminary results, we decided to

25 run a series of tests again to see if there was a safe load

1 that we could operate in a derate manner to do some more

2 evaluations.

3 Q   What do you mean by a derate?

4 A   We voluntarily reduce the output on a unit from its

5 capacity output down to a load that was less than that.

6 Q   Do you recall the load level you selected?

7 A   We ended up at 90 megawatts, which is about -- which is

8 nine-tenths of the output of that unit.

9 Q   Mr. Boots, why would you want to derate a unit when you

10 were having some concerns about PM emissions?

11 A   We wanted to give ourselves a margin and ensure we were in

12 continuous compliance for our PM emissions while we were

13 looking to replace the precip rappers and controls.

14 Q   I think you just got into where I wanted to go, which is

15 did the company do or make any kind of changes after May of

16 2000 that could have affected the performance of the PM

17 controls at Beckjord 1?

18 A   Yes.  We had already placed the orders for new precip

19 rappers and controls for the units.  It takes awhile and has a

20 long lead time before you get those.  We replaced those in

21 June of 2000.

22 Q   Did you make any other kinds of changes in 2000?

23 A   Yes.  We also at that time upgraded our SO3 controls and

24 replaced our sulfur pumps.

25 Q   Mr. Boots, I believe you mentioned that a 90-megawatt

Vol. 5-1004

1  derate was instituted after the failures in May.  How long did

2  the company keep that derate in place?

3  A    The derate was 290 megawatts.  It was a 10-megawatt

4  derate.  We kept that in place until December of 2000.

5  Q    When you took that derate off, were all these new controls

6  that you mentioned fully implemented and running?

7  A    Yes, they were.

8  Q    All right.  Mr. Boots, I just see here generally there

9  were a number of tests run in the second half of 2000.  Why

10  did the company run all those tests?

11  A    Having had two failures in May, we wanted to make sure

12  that the corrective actions we had taken addressed those

13  issues.

14  Q    All right.  If we could go to the second page of this

15  chart -- and just again for the record to clarify, we are

16  looking at DR Dem 80.

17        If I could just direct you here, Mr. Boots, it looks

18  like there was a -- well, if you could describe the second

19  line there.

20  A    That is a stack test from October 28, 2003, the average

21  result of which was 0.139, which we failed.

22  Q    Now, Mr. Boots, what, if anything, happened after that

23  test?

24  A    Well, this was, so to speak, the straw that broke the

25  camel's back.  We had addressed several issues prior to this

Vol. 5-1005

1  and not had the success we wanted to have.  It caused us to

2  look for a more systematic approach to the precipitator and

3  how to make repairs.

4  Q   What kind of approach did you end up taking?

5  A   We ended up turning to a company called NELS Consulting

6  Services to do a full evaluation of our precipitator.

7  Q   How did you learn about the NELS company?

8  A   We learned of NELS from engineers within our company and

9  also a precipitator expert in our company.

10 Q   What did NELS -- what kind of service did they provide for

11 you?

12 A   They performed a gas flow evaluation.

13 Q   Can you explain what gas flow is in the context of a

14 precipitator?

15 A   I can best show you with a slide as to what's going on.

16 Q   For the record, Mr. Boots, you're looking at DR Dem 18.

17 Can you just again very briefly explain what's going on here?

18 A   As I explained earlier, you had the flue gas coming into

19 the precipitator with the particulate matter in it, and then

20 you can see the large area at the top and all the particulate

21 matter at the top of the precipitator in this slide.

22       This shows that you have more gas flow going through

23 the top of your precipitator and not at the bottom.  So you're

24 not fully utilizing all of your precipitator plates for

25 collection efficiency.

Vol. 5-1006

1  Q   Can we have the next slide, please?  Just for the record,

2  this is DR Dem 19.  Please go ahead.

3  A   This slide shows you gas flows that are going through the

4  top and the bottom and through the wires themselves but not

5  through the middle of the precipitator.

6  Q   Now, Mr. Boots, what did NELS do to try to figure out

7  whether you were having some of these problems at Beckjord 1?

8  A   They came to the station and looked at the precipitator,

9  conducted field tests of the precipitator, and then they took

10  the design data for the precipitator and constructed a

11  one-twelfth scale model of our precipitator.

12  Q   A physical model?

13  A   Yes.

14  Q   What did their various models and studies show?

15  A   That we had uneven gas flow through the precipitator,

16  which I just demonstrated.

17  Q   What, if anything, did the company do about that?

18  A   At that time we hired NELS to construct and design a

19  series of vanes and baffles to even the gas flow through the

20  precipitator.

21  Q   Can you briefly explain how that would work?

22  A   I can best show you how that comes into play.

23  Q   All right.  Mr.  Boots, can you walk us through DR Dem 20?

24  A   Yes.  You can see where it says baffles.  It is pointing

25  down to the various baffles that are installed, and this is a

Vol. 5-1007

1  depiction of installing baffles to slow down and redirect the

2  gas flow so that it is uniformly distributed throughout the

3  precipitator for optimum collection efficiency.

4  Q   And if we can go just back to our stack test summary.  I'm

5  sorry, the Unit 1 stack test summary.  There you go.

6  Mr. Boots, when were the NELS modifications installed at

7  Unit 1?

8  A   The full set of installation and modifications was

9  complete in May of 2004.

10 Q   And has there been -- have there been any failed tests at

11 Unit 1 since the NELS baffles were installed?

12 A   No, there has not.

13 Q   How many tests have been run in that time?

14 A   We have ran six tests.

15 Q   Six or 7, Mr. Boots?

16 A   Six from that -- oh -- six tests in that, but I believe we

17 ran seven tests at some point in time.

18 Q   I'm sorry, I'm sorry.  We can go with yours.

19 A   I'm sorry, I see it.  I miscounted the first one.  There

20 are seven tests we ran.  The first test had multiple tests

21 associated with it.

22 Q   Just to make clear, what was the result of every single PM

23 stack test since the installation of the NELS modification in

24 May 2004?

25 A   They were all passed.

Vol. 5–1008

1  Q   Okay.  Now if we could go to the slide summarizing Unit 2.

2  Mr. Boots, I'm going to try to move through this a little more

3  quickly.  Can we just clear off the yellow markings?

4        Mr. Boots, can I just direct you to the first test

5  there that's marked as a failure on DR Dem 81?  When was that

6  test?

7  A   That was in October of 1999.

8  Q   Was anything unusual happening on the dates of that test?

9  A   Yes.  This test was conducted while we were performing a

10  test burn of an alternative fuel which happened to be a

11  mixture of coal and paper pellets.  We even had to go to the

12  Ohio EPA to be able to get permission to conduct the test

13  burn.

14  Q   What do you usually burn at Beckjord?

15  A   Coal.

16  Q   Why would you run a PM test at the same time you're

17  testing an alternative fuel type?

18  A   If this was going to be something that we were going to

19  burn going forward, we needed to know if our PM emissions

20  limits would be met at that time.

21  Q   Mr. Boots, have you at any time since the October 1999

22  test of Unit 2 burned this alternative coal at the unit?

23  A   No, we have not.

24  Q   Have you ever since that time burned it at any other

25  Beckjord unit?

Vol. 5-1009

1  A    No, we have not.

2  Q    Mr. Boots, then if I could jump to -- I do see that there

3  is a later on, another failure in April of 2006; is that

4  correct?

5  A    That's correct.

6  Q    Can you just tell us what, if anything, the company did

7  after that particular test?

8  A    As a result of that test, we ended up installing the NELS

9  modifications like we had with Unit 1.

10  Q    Why did you do this?

11  A    Like with Unit 1, we wanted to make sure we were

12  addressing PM on the unit as best we could.

13  Q    Mr. Boots, if I could ask you when those NELS

14  modifications were installed at Unit 2.

15  A    Those were installed in February of 2007.

16  Q    Why did you install them at that time as opposed to a

17  little bit earlier when the Unit 1 modifications were

18  installed?

19  A    Up to this point, Unit 2 had really -- had done very well.

20  We had a failure burning an alternative fuel, but that was an

21  anomaly.  So the unit had performed well, and we had not seen

22  any issues with that unit.  So we decided at that time to look

23  to NELS.

24  Q    Once you had a first concern, you decided to look at NELS?

25  A    That's correct.

Vol. 5-1010

1  Q   If I could -- we can put that down.  If I could go on to

2  another topic, Mr. Boots, and I'm getting close to the end

3  here.

4        While you've testified today, you've mentioned several

5  upgrades or repairs or equipment changes that were done to the

6  PM controls at Beckjord Units 1 and 2.  Do you have a sense of

7  how much money the company spent on those various changes?

8  A   Yes.  I've got a slide that helps show what that was.

9  Q   Could we have the next slide, please?

10        MR. STOJILKOVIC:  Your Honor, I would actually like

11  to note this next slide we are offering, it's DR-330, and

12  we're actually offering it as a summary exhibit.  It collects

13  and summarizes various cost data that's fairly voluminous.

14  We've provided it in advance for Plaintiffs.  There had

15  initially been an objection to it.  I don't know if the

16  objection still stands, but I'll give Mr. Flint an

17  opportunity.

18        MR. FLINT:  Our first objection is foundation.  The

19  objection was to foundation, I believe.

20        MR. STOJILKOVIC:  I think I can certainly try to lay

21  a foundation.

22  BY MR. STOJILKOVIC:

23  Q   Mr. Boots, how did you get the cost information that's

24  reflected in DR-330?

25  A   This data came from our capital and maintenance

Vol. 5-1011

1  expenditure documents.

2  Q    Are those the official records of how much money the

3  company spends on capital and maintenance improvements?

4  A    Yes, they are.

5         MR. STOJILKOVIC:  Your Honor, I would move at this

6  time to admit DR-330.

7         MR. FLINT:  No objection.

8         THE COURT:  Exhibit is admitted.

9    *(Defendants' Exhibit DR-330 was received in evidence.)*

10  BY MR. STOJILKOVIC:

11  Q   Mr. Boots, can you just tell us since 1998 how much money

12  the company has spent on repairs and upgrades to the PM

13  controls on Units 1 and 2?

14  A    Total cost of both is just under $4 million.

15  Q   Let me just ask you about a couple of the entries here.

16  If I see the first entry under both units, it's a replacement

17  of rapper and voltage controls.  I believe you talked about

18  that a little bit at Unit 1.  I see it was also done at

19  Unit 2.  Were these improvements made simply in order to fix a

20  problem associated with one stack test?

21  A    No.  These improvements were in place and ordered before

22  the stack test failure.  We were upgrading the controls to a

23  new digital and PLC control system.

24  Q    If I could also direct you to Item No. 3 for Unit 2, that

25  says dedicated SO3 injection skid and installation of POS

Vol. 5-1012

1  software.  And Mr. Boots, it looks like it's a little bit over

2  $840,000 on that?  Was that simply a knee-jerk response to a

3  test failure in Unit 2?

4  A    No.  This also was done prior to the failure.  It was

5  something that we had recognized that would allow us to fine

6  tune the SO3 injection for the units.  The SO2 skid is

7  something that causes the SO3 to be generated and then blown

8  into the furnace.  So it gives you finer control of that.

9  Before it was a shared skid with another unit, and we didn't

10  have that capability at that time.

11  Q    Finally, if I could just direct you to the NELS

12  modifications under each unit?  Could you tell us

13  approximately how much each of those cost?

14  A    About $850,000.

15  Q    And just to make clear, because I'm not sure I am not sure

16  I asked you this for Unit 2.  Has either Unit 1 or Unit 2

17  failed a PM test since the NELS modification were installed at

18  the particular unit?

19  A    No, they have not.

20  Q    We can take that down.  Just a couple more questions,

21  Mr. Boots.  We haven't heard a lot about this trial, although

22  I think it's in the Plaintiffs' trial brief; but I just want

23  to ask you quickly, did you ever consider whether the

24  precipitators at Units 1 and 2 were too small to handle the

25  job?

Vol. 5-1013

1  A   No.  They had worked well without failure, and no one had

2  ever told us that they were too small.

3  Q   Have they occasionally failed tests?

4  A   They have failed tests, but we have not had any failures

5  due to the precipitator itself failing.

6  Q   Did you ever get advice to enlarge the precipitators at

7  Beckjord Units 1 and 2?

8  A   There are lots of companies out there that are always

9  willing to sell you what they perceive as their expensive

10  solution to a problem; but no, we've never been told that.

11  Q   Has any Cinergy employee ever told you that that was the

12  right way to go about trying to fix these problems?

13  A   No, they have not.

14  Q   Mr. Boots, are the NELS changes you talked about in any

15  way comparable to trying to enlarge a precipitator?

16        MR. FLINT:  Objection, foundation.

17        THE COURT:  He can answer if he knows.

18        THE WITNESS:  That would be in the concept that by

19  installing the NELS modifications, you're installing baffles

20  and vanes that would slow the gas flow down through the

21  precipitator and redirect it into the entire surface area of

22  the precipitator so that it is being fully utilized; and you

23  have optimal performance of the precipitator, whereas without

24  them, you would not.  It would seem to be a much smaller

25  precipitator at that time.

Vol. 5-1014

1  BY MR. STOJILKOVIC:

2  Q    I see.  Last question, Mr. Boots.  For all the upgrades

3  and repairs we've talked about, why did the company choose to

4  do them rather than other possible upgrades or repairs?

5  A    That was a matter of engineering judgment.  We took the

6  best advice that was available to us from our engineers, and

7  we did what we thought was best.  We ended up spending a lot

8  of money as you just saw to do that.

9          MR. STOJILKOVIC:  Thank you.

10          THE COURT:  Thank you.  Cross-examine?

11          MR. FLINT:  Yes, Your Honor.

12                    **CROSS-EXAMINATION**

13  BY MR. FLINT:

14  Q    Good morning, Mr. Boots.

15  A    Good morning.

16  Q    We'll make this quick so it'll still be in the morning

17  when we're done.

18          As I understand it, based on your testimony, there are

19  a couple of things you had said.  You had talked about root

20  cause of the problem.  With respect to -- I think it was

21  talking about with respect to the Unit 1 failures.  You made

22  attempts to correct what you thought was the root cause; is

23  that correct?

24  A    Yes.

25  Q    I think to kind of summarize where you were going with

Vol. 5-1015

1 this, it sounds like the NELS study came in and sounds like --

2 well, let me ask you this.  Is it your view that the NELS

3 study corrected the root cause of the problem at the Beckjord

4 Unit 1 ESP?

5 A    In retrospect to PM emissions?

6 Q    Yes.  I'm sorry.  With respect to the PM emissions

7 violations that had occurred at Unit 1.

8 A    Yes.

9 Q    Prior to the 2004 NELS implementation or study and

10 implementation, had anyone ever told the Beckjord plant that

11 there was an air flow problem?

12 A    In?

13 Q    In the Unit 1 ESP?

14 A    In the -- I believe it was the fall of 2003 when we had

15 the failure, one of the reports suggested that we had

16 excessive gas flows through the precipitator.  That's what led

17 us to start looking at that issue.

18         MR. FLINT:  Could you call up -- I believe it's

19 Image 1, the Plaintiffs' Exhibit 2052.

20         Your Honor, there is an objection to this.  I'm not

21 sure if --

22         COURT CLERK:  Could you please articulate what

23 exhibit you're referring to?

24         MR. FLINT:  I'm sorry.  It is Plaintiffs'

25 Exhibit 2052.  The Defendants have an objection to it, I

Vol. 5-1016

1  believe.

2          MR. STOJILKOVIC:  Are you going to move it?

3          MR. FLINT:  I am going to move it into evidence.

4          MR. STOJILKOVIC:  We'll waive our objection.

5          THE COURT:  Plaintiffs' 52 is admitted.

6      *(Plaintiffs' Exhibit 2052 was received in evidence.)*

7  BY MR. FLINT:

8  Q   Mr. Boots, you were the 30(b)(6) deponent with respect to

9  the Beckjord plant; is that correct?

10 A   That's correct.

11 Q   And you understood at that time that you were giving

12 answers on behalf of the company at that deposition?

13 A   Yes, I did.

14 Q   At the time of that deposition -- and this was actually

15 Exhibit -- Plaintiffs' Exhibit 2052 happened to be Exhibit 17

16 to your deposition, correct?

17 A   Yes.

18 Q   At the time of your deposition, I showed you the document,

19 and your response was that you hadn't seen it before.

20 Subsequent to that deposition, Counsel confirmed that this

21 document had actually been created on March 30, 2004 by an

22 individual named Alan Burck.  Were you aware of that?

23 A   Yes.

24 Q   As a matter of fact, Mr. Burck is somebody that works at

25 the Beckjord plant -- or at least in 2004 he did?

Vol. 5-1017

1  A   That's correct.

2  Q   And he was involved in the process of hiring and

3  evaluating the NELS study; is that correct?

4  A   He was the individual who made the recommendation.  Then

5  that was given to station management to follow up on and then

6  make the final decision on it.

7  Q   In the process of preparing for his recommendation, he had

8  the opportunity to review an earlier study that had been

9  done -- that had been performed on, back in approximately 1972

10  by Research-Cottrell; is that correct?

11  A   Yes.  In his presentation, he cites a study from

12  Research-Cottrell from 1972.

13  Q   Isn't it correct in 1972, Research-Cottrell indicated that

14  the exact same gas flow issue that NELS identified in 2003 was

15  present at the Beckjord plant?

16          MR. STOJILKOVIC:  Objection, Your Honor.  I think if

17  he's examining him from the context of this document, it would

18  be fair to have the witness look at it.

19          MR. FLINT:  I'm happy to do that, Your Honor.  May I

20  approach?

21          THE COURT:  Yes.

22  BY MR. FLINT:

23  Q   There's the exhibit.  Could I actually call up the second

24  image, please?  Mr. Boots, if you would turn to --

25  unfortunately, the document is not -- there are Bates numbers

Vol. 5-1018

1  on it.  If you would turn to the ones that are Bates labeled

2  Cinergy 1323472.

3          MR. STOJILKOVIC:  Excuse me.  Counsel, excuse me.

4          MR. FLINT:  You need a copy?

5          MR. STOJILKOVIC:  Yes.  It's actually up.

6  BY MR. FLINT:

7  Q   It is actually up on the screen, but if it's easier to

8  look at the hard copy, that's fine.

9  A   Okay.

10  Q   Just -- I guess Research-Cottrell is actually the company

11  that designed the ESPs for Beckjord Unit 1 and Unit 2,

12  correct?

13  A   That is correct.

14  Q   Can we call out the first paragraph on this document?

15  That first paragraph, could you read that in, please?

16  A   Yes.  "An inspection of the resulting inlet velocity

17  profiles indicated excellent horizontal gas distribution

18  across the precipitator inlet opening but poor vertical

19  distribution with increasingly more gas at the bottom of the

20  collecting plates than at the top."

21  Q   During your direct testimony, you were shown some and

22  discussed some demonstrative exhibits, correct?

23  A   Yes.

24  Q   One of those demonstratives was showing what the NELS

25  study indicated was a problem, which was, I believe, the poor

Vol. 5-1019

1  vertical distributions of the gas through the system?

2  A    That was part of it.  I also mentioned that there were

3  high gas flow velocities along with the gas flow distribution.

4  So it was twofold.

5  Q    But part of the problem was the fact that there was poor

6  vertical distribution, correct?

7  A    There was poor vertical distribution that was being

8  exaggerated by the high velocities.

9  Q    And the poor vertical distribution -- actually, why don't

10  I pull up what I believe was Defendants' Demonstrative DR Dem

11  18.  Is this the demonstrative that I was just referring to?

12  A    Yes, it is.

13  Q    And with respect to the poor vertical distribution, in

14  looking at this, if you look at the top part here, I'm

15  assuming that's the top part of the unit?

16  A    That is correct.

17  Q    And the triangles down here at the bottom, are those also

18  called the hoppers?

19  A    Yes, they are.

20  Q    And those are located at the bottom of the unit?

21  A    Yes, they are.

22  Q    So both Research-Cottrell and NELS indicated there was a

23  problem with vertical distribution, and I think that this

24  slide shows it fairly well.  The problem with the vertical

25  distribution problem was the fact that when the gas was

Vol. 5-1020

1  flowing through, it was only hitting the top of the

2  precipitator, correct?

3  A    That's correct.

4  Q    Is, in essence, with respect to the poor vertical

5  distribution at Unit 1 that NELS identified in 2004, is it

6  true that that was also an issue that had been at the unit

7  since it was installed in approximately 1974?

8  A    It had been a unit issue from 1974; but it had not been an

9  issue as such that it was causing us issues with particulate

10  matter collection.  The gas flow velocities were at design at

11  that time, and the precipitator was able to handle that

12  un-uniform distribution.  The precipitator even passed its

13  performance test at that time with those same uneven gas

14  flows.

15  Q    But then let's move forward to the 1990s and 2000.   In

16  1999 there was a failure at Unit 1, correct?

17  A    Yes, there was.

18  Q    And in 2000 there were two more failures at Unit 1?

19  A    Yes.

20  Q    As a matter of fact, prior to 1999, there were earlier

21  violations at Unit 1 which led to the AOC, correct?

22  A    That's correct.

23  Q    And after the various projects that you discussed during

24  your direct testimony occurred, you came in and you made

25  changes, there was at least one more failure at Unit 1,

Vol. 5-1021

1  correct?

2  A   Made changes when?

3  Q   Well, here, let's do this.  Let's show what was -- hold on

4  just a second.  DR Dem 80 was actually the exhibit or the

5  demonstrative.  In that, let's talk about -- you talked about

6  changes that were made at Unit 1 in -- actually, I'm sorry.

7  That's the wrong one.  I'm looking for the cost summary.

8           COURT CLERK:  DR-330.

9           MR. FLINT:  I'll put it up here.

10 BY MR. FLINT:

11 Q   This is DR-330.  The failures that are at issue in this

12 case with respect to the penalty were failures that occurred

13 in 1990 and in 2000, correct?

14 A   1999.

15 Q   1999, you're right.  1999 and 2000?

16 A   That's correct.

17 Q   That's both at Unit 1 and Unit 2?

18 A   Yes.

19 Q   Except for the Unit 2 violation was in 1999.  That was the

20 one violation?

21 A   Correct.

22 Q   In looking at DR-330, on direct you testified these are

23 all the cost upgrades and repairs to Beckjord PM controls from

24 1998 to the present; is that correct?

25 A   Yes.

Vol. 5-1022

1  Q   Looking solely at Unit 1, and let's work down, there are

2  four items listed there.  The replacement of rapper and

3  voltage controls in 2000 and 2001, those occurred after the

4  three violations issued in this case, right?

5  A   Yes.

6  Q   Going down to No. 2, the replacement of sulfur pumps and

7  installation of new SO3 conditioning controls and POS software

8  2000-2002.  Again, those were conducted or those fixes or

9  upgrades occurred after the 1999 and 2000 violations?

10  A   Those fixes were done to issues that had not been pointed

11  out as root cause failures for the problem.  As I mentioned

12  with the rapper voltage controls, we already had the new

13  rapper and voltage controls on order and were awaiting

14  arrival.  Then we ended up with a failure during that time

15  period while we were waiting for them to arrive at the station

16  and then install them.

17       The sulfur pumps and the SO3 conditioning controls had

18  not caused a failure prior to that time either.

19  Q   Then -- but you'll agree -- so they did occur after the

20  dates of the failures?

21  A   The installations were after the dates of the failure,

22  yes.

23  Q   After they were installed, there was a subsequent failure,

24  even though it's not at issue in this case in terms of the

25  penalty?

Vol. 5-1023

1  A   There was a subsequent failure that was not associated

2  with any of these issues, that is correct.  It was a different

3  problem.

4  Q   Well, do you really know whether or not it was related to

5  these issues or another issue?

6  A   That was from the inspections that were done by the

7  qualified engineers that came in and inspected the units and

8  made their recommendations based on their findings as to what

9  the root cause of the failures were.

10  Q   I guess to clarify, which failure are you talking -- I was

11  referring to the 2003 failure.

12  A   That's the one I am referring to.

13  Q   Isn't that the one that led to the NELS study?

14  A   Yes, it did.

15  Q   And the NELS study, part of the conclusion of the NELS

16  study was that there was poor vertical distribution within the

17  ESP, correct?

18  A   But the engineers that came in and inspected the unit

19  found that there were issues with overconditioning of the

20  precipitator that caused the failure.  Therefore, they also

21  mentioned -- one of the inspectors mentioned the high gas flow

22  velocities.  He did not say he thought that that was the cause

23  of the failure; but as we had failed several tests prior to

24  this, we looked further into that issue.  And that's when we

25  discovered the underlying issues that were outstanding with

Vol. 5-1024

1  the gas flow, and we made a decision at that time to look to

2  NELS to come in and fully evaluate just how the precipitator

3  was operating.

4  Q   Okay.  You just -- in that response, you referred to the

5  underlying issues.  Isn't it correct that one of the

6  underlying issues was poor vertical distribution within the

7  ESP?

8  A   It was at that time along with the gas flow velocities

9  which we felt was really the root cause that made this problem

10 what it was at that time.  That problem had been there and had

11 not shown itself from prior inspections and prior outages.

12 This time we were starting to see issues that the inspection

13 contractor pointed out to us.  Therefore, we took it upon

14 ourselves to look into it further.

15 Q   But again, in 1972, there was a study of these ESPs.

16 There was actually a model that was constructed.  They did

17 flow distribution, analysis of it.  By them, I'm referring to

18 Research-Cottrell; and based on that research, they determined

19 that there was poor vertical gas distribution within the ESP,

20 correct?

21 A   They stated that there was poor gas flow distribution in

22 the vertical sections, but it was not affecting the collection

23 efficiency of that precipitator.

24 Q   In the model precipitator or in the actual precipitator?

25 A   In the statements by Research-Cottrell, it was not noted

Vol. 5-1025

1  there were any issues with the collection efficiency due to

2  that.

3  Q   Why don't we move to another topic.  During direct

4  examination, you were also asked whether or not anyone's made

5  a comment about the size of the ESP, whether it was undersized

6  or not; is that correct?

7  A   Yes.

8  Q   I don't have this one on the system, but I've got hard

9  copies.  Let me grab them real quick.

10        This is Plaintiffs' Exhibit 2054, which I also think

11 there's an objection to.

12        MR. STOJILKOVIC:  Yes, Your Honor.  I would object

13 to this being moved into evidence if that's what Mr. Flint

14 intends to do.

15        MR. FLINT:  That is correct.

16        MR. STOJILKOVIC:  That is that -- well, first of all

17 just to explain, it is a Cinergy document.  We've established

18 that previously; but it's just a rough draft of -- that's

19 something one engineer wrote on an Excel spreadsheet.  I don't

20 think it qualifies as a party admission which I think is how

21 Mr. Flint is going to characterize it.

22        If he wants to try to impeach the witness with it,

23 we'll see where it goes.  But I don't think it's appropriate

24 to admit it into evidence.

25        MR. FLINT:  May I?  Your Honor, again, when

Vol. 5-1026

1   Mr. Boots was testifying as a 30(b)6 deponent for the company,

2   this was one of the documents I asked him about.  At that

3   point he said he was not familiar with the document.  However,

4   again, as with Exhibit 2054, Counsel followed up, let me know

5   this was a document that was drafted by the same individual

6   who drafted Exhibit 2054.  That individual's name is Alan

7   Burck.

8            It is -- as Mr. Boots has testified, Alan Burck was

9   involved in the analysis and recommendation to go forward with

10  the NELS study.  So I think that it is a party admission.

11            THE COURT:  Anything else?

12            MR. STOJILKOVIC:  Your Honor, I mean, I think it's

13  hearsay.  If Mr. Boots was asked about it at a 30(b)(6)

14  deposition, I don't think we objected to the inclusion of

15  anything he said about it in designations; but I think if this

16  document is going to be offered to show the truth of the

17  matter being asserted, I would certainly object to that.

18            THE COURT:  Exhibit is admitted.

19     *(Plaintiffs' Exhibit 2054 was received in evidence.)*

20            MR. FLINT:  Thank you, Your Honor.  May I approach

21  the witness?

22            THE COURT:  You may.

23            MR. FLINT:  Let me put this up on the ELMO so

24  everybody else can see.

25

Vol. 5-1027

1  BY MR. FLINT:

2  Q   Mr. Boots, the page of this document that I'm pointing

3  your direction to is this first one.  It's actually under

4  this title, "Reasons for Budget Requests."  Again, this is a

5  document that was prepared by Mr. Burck?

6  A   Yes.

7  Q   In this first line here, Mr. Burck states, "Unit 1

8  precipitator is marginal in size and operates too close to the

9  EPA emission limit of 0.1-pound per million BTU," correct?

10  A   That's what it states.

11         MR. FLINT:  I've got no further questions, Your

12  Honor.

13         THE COURT:  Redirect?

14                 **REDIRECT EXAMINATION**

15  BY MR. STOJILKOVIC:

16  Q   Mr. Boots, I would just like to clear up a couple things.

17         I believe Counsel showed you this document,

18  Plaintiffs' Exhibit 2052.

19  A   Yes.

20  Q   I believe that you talked about the results of some

21  Research-Cottrell analysis back in the 1970s that indicated

22  there may have been gas flow issues; is that right?

23  A   Yes.

24  Q   First of all, Mr. Boots, did Research-Cottrell recommend

25  installing this precipitator to the company?

Vol. 5-1028

1  A   Yes, they did.

2  Q   Did the precipitator pass any testing at the time it was

3  installed?

4  A   Yes.  As I stated before, it passed its performance test.

5  Q   Mr. Boots, I'm just trying to find the page that Mr. Flint

6  showed you.  I believe that was Bates label Cinergy 1323472.

7  If you could look towards the bottom part of that page, there

8  appears to be some handwritten notation; do you see that?

9  A   What page is that again?

10 Q   I'm sorry.  1323472.

11 A   Okay.

12 Q   Can you read that handwritten notation?

13 A   RC moved center PERF plate back 3 inches.

14 Q   What do you think RC stands for?

15 A   Research-Cottrell.

16 Q   What does this statement indicate to you?

17 A   They moved the center PERF plate back 3 inches from its

18 original installation that address the vertical gas flow

19 issues they had with the precipitator.

20 Q   Let me also ask you a more general question.  I believe

21 you talked some about velocity and how it relates to gas flow

22 problems.  Can you just explain that so we have it clear in

23 the record?

24 A   Yes.  The gas flow is the speed at which the gas is

25 traveling through the precipitator.  It has a design flow for

Vol. 5-1029

1  which it is to operate at for optimum efficiency.

2      Over time, components wear.  Units have air-in

3  leakage.  This gas flow is increased to the point where the

4  gas now would be going through the precipitator at a much

5  faster rate.

6  Q    Could I just have DR -- the gas flow charts.  DR Dem maybe

7  17?  We'll see.  DR Dem 18.  Mr. Boots, would velocity be how

8  fast all this gas and particles are passing across the

9  precipitator?

10  A    Yes, it would.

11  Q    If the velocity is slower, would you expect the same kinds

12  of problems or less or more problems?

13  A    You would have the same type of problems if you had uneven

14  gas flow.  I mean, it's still going to be there, but it's not

15  going to be to the magnitude that we saw when we installed the

16  NELS modifications, because you have slower gas flow.  So you

17  have more of a chance of retention time to collect the

18  particulate matter.

19  Q    Mr. Boots, when did you first become aware of a velocity

20  problem at the Beckjord 1 precipitator?

21  A    That was in late 2003.

22  Q    And when did the company begin exploring installing NELS?

23  A    Late 2003.

24  Q    Let me also ask you if I could have the ELMO again, the

25  other document that Counsel showed you, Plaintiffs'

1  Exhibit 2054.  I believe he directed you to this first line

2  under "Reason for Budget Request."

3         First of all, Mr. Boots, just looking at the whole

4  document, what is this document about?

5  A    It is a draft for a budget proposal request.

6  Q    What is that budget proposal request for?

7  A    For the installation of the NELS system of baffles and

8  vanes.

9  Q    Did the NELS system change the physical size of the

10 precipitators?

11 A    No, it did not.

12 Q    It changed gas flow, right?

13 A    That's right.  It slowed it down and it redirected it.

14 Q    Mr. Boots, I'll ask you a question.  I think it's pretty

15 similar to the question Mr. Flint asked you at your 30(b)(6)

16 when he asked you about this document.  Do you have any sense

17 of what Mr. Brooks meant by marginal in size?

18 A    No, I do not.

19 Q    In the context of the document being a NELS document, do

20 you think that statement had any relationship to the gas flow

21 issues?

22 A    I believe the gas flow issues made the precipitator seem

23 marginal in size just because I was not able to fully utilize

24 all the collection plates at their optimum collection

25 efficiency to collect PM because of the speed at which the gas

Vol. 5–1031

1  was going through the precipitator.

2          MR. STOJILKOVIC:  All right, Mr. Boots.  I have

3  nothing further.

4          THE COURT:  Thank you.  Recross?

5          MR. FLINT:  Yes, Your Honor, just a few questions.

6                  **RECROSS-EXAMINATION**

7  BY MR. FLINT:

8  Q   During your redirect, did you say that -- if I heard you

9  right, that it was your view that the unit was not marginal in

10  size?

11  A   I had not been told that the unit was marginal.

12  Q   Now, which brings out a point that I think you were asked

13  on direct with respect to what the NELS study did.  I thought

14  that you said it was essentially like increasing the size of

15  the unit, that by increasing the gas flow or better

16  distribution of the gas flow, it was equivalent to increasing

17  the size; is that correct?

18  A   I believe I said that it was, allowed the precipitator to

19  fully be optimized to utilize all of the collection efficiency

20  -- that by decreasing the gas flow, it allowed the

21  precipitator to fully be utilized and all of the plate

22  surfaces to be utilized for collection of PM.

23  Q   And isn't that similar to expanding the size of the unit?

24  A   It's still the same size.  It's just not being fully

25  utilized.

Vol. 5-1032

1           MR. FLINT:  That's all I have, Your Honor.

2           THE COURT:  Anything else?

3           MR. STOJILKOVIC:  Nothing else, Your Honor.

4           THE COURT:  All right.  You may step down.  We'll

5    take our 15 minutes at this time.

6           COURT CLERK:  All rise.

7           Court will recess for 15 minutes.

8        *(Witness excused.)*

9        (A recess was taken.)

10          THE COURT:  Your next witness?

11          MS. DELANEY BERROYA:  Meghan Delaney Berroya at

12   Cinergy.  Defendant calls Richard McRanie.

13          **RICHARD MCRANIE, DEFENDANT'S WITNESS, SWORN**

14                       **<u>DIRECT EXAMINATION</u>**

15          MS. DELANEY BERROYA:  Richard McRanie will be

16   providing expert testimony about Particulate Matter Continuous

17   Emissions Monitoring Systems, which I will be referring to as

18   PM CEMS as well as manual stack tests.

19          Specifically he will be discussing how these tests

20   work as well as the error associated with each method.  He

21   will also be providing his opinion about the appropriate use

22   of PM CEMS at Beckjord Units 1 and 2, as well as the

23   appropriate averaging time for the device.

24          Mr. McRanie has approximately 40 years of experience

25   with PM emissions measurements and control technology both as

Vol. 5-1033

1 a utility industry employee and more recently as a consultant.

2 He is currently a principal and co-founder of RMB Consulting &

3 Research, Inc.

4          Over the duration of his career, Mr. McRanie has

5 been involved in virtually every major national rule-making

6 concerning air emissions from electric utility sources.

7          Mr. McRanie is a consultant for Electric Power

8 Research Institutes' technical committees as well as the

9 primary consultant for Utility Air Regulatory Groups

10 Measurement Techniques Committee.

11          He was recently EPRI's lead consultant on a project

12 to develop a compliance assurance monitoring, which we refer

13 to as CAM, Protocol for Precipitators, and is presently

14 working with several large utilities to implement these CAM

15 rule projects.

16          Mr. McRanie's Curriculum Vitae sets out his

17 qualifications further, and pursuant to the parties'

18 agreement, I move to admit Mr. McRanie's CV, DR-199 into

19 evidence.

20          MR. BENSON:  No objection.

21          THE COURT:  It is admitted.

22     *(Defendants' Exhibit DR-199 was received in evidence.)*

23          MS. DELANEY BERROYA:  I would like to offer him as

24 an expert in PM control technology and emission measurement at

25 this time.

Vol. 5-1034

1              THE COURT:  All right.

2    BY MS. DELANEY BERROYA:

3    Q    Mr. McRanie, would you please state your name for the

4    record?

5    A    Richard McRanie.

6    Q    Are you familiar with Units 1 and 2 at the Beckjord power

7    station?

8    A    Yes, I am.

9    Q    How are you familiar with these units?

10   A    I traveled to the Beckjord plant last year, inspected the

11   Unit 2 precipitator, which was offline.  I also looked over

12   all of the associated equipment, the SO3 gas conditioning

13   system, the rapper controls, the voltage controls.

14   Q    Is there any other way in which you are familiar with

15   these units?

16   A    I have also reviewed drawings, specification sheets, other

17   documents concerning the design of the equipment.

18   Q    Can you briefly describe the units and their PM controls?

19   A    Both units are essentially identical, 100-megawatt gross

20   pulverized coal-fired boilers.  Both are equipped with ESPs.

21   The ESPs are also identical.  They are arranged in a

22   2-across-by-3-deep mechanical and electrical sectionalization

23   arrangement.

24   Q    How is compliance for PM determined for Units 1 and 2 for

25   Beckjord?

Vol. 5-1035

1 A    PM compliance is determined by the use of an EPA reference

2 test method.  It's called Method 5.

3 Q    Can you briefly describe how a PM CEMS works?

4 A    There are two basic concepts of PM CEMS being marketed in

5 the industry today.  The first is a beta attenuation device

6 which uses the attenuation of beta rays through a sample

7 collected on a collection plate.

8         The other devices are all optical devices that measure

9 various optical properties associated with particulates.

10 Q    Mr. McRanie, please contrast how a PM CEMS works with a

11 manual stack test currently used at Beckjord?

12 A    Well, the biggest difference is a PM CEMS does not measure

13 PM mass.  And reference, Method 5 measures PM mass.  The CEMs

14 measures a surrogate.  Something that's supposed to be related

15 to mass and at any given point in time, usually is.

16 Q    Do you have an opinion on whether PM CEMS are suitable for

17 compliance purposes at Beckjord's Units 1 and 2?

18 A    I do not think that they are suitable for compliance

19 purposes at Beckjord.

20 Q    Why not?

21 A    The error band is too high.  Excuse me.

22     *(A discussion was held off the record.)*

23         THE COURT:  I've got a question too.  I didn't

24 understand a word you used.  The CEMs measures a --

25             THE WITNESS:  A surrogate.  It's something that they

Vol. 5-1036

1  can measure other than measuring particulate mass.

2  BY MS. DELANEY BERROYA:

3  Q   You just said that you don't believe a PM CEMS is fit for

4  compliance because the error band is too high; is that right?

5  A   That's correct.

6  Q   Can you explain what you mean when you say that the error

7  band is too high?

8  A   There is a procedure.  It is called EPA Performance

9  Specification 11 that you have to use to calibrate a PM CEMS.

10  A PM CEMS has an output that goes up and down with

11  relationship to PM mass, but you don't really know how much it

12  is.  So you have to calibrate using PS 11.

13  Q   Is that at all related to the fact that the PM CEMS

14  measures a surrogate rather than measuring direct mass?

15  A   That's absolutely correct.

16  Q   Can you further explain that?

17  A   Well, when you take a Method 5 test, you draw a sample out

18  of the stack, you put it through a preweighed filter that has

19  been weighed in the laboratory prior to starting the test.

20  After you finish the test, you remove that filter, take it

21  back to the laboratory, and you actually weigh the mass that

22  has been collected on that filter.

23       You do some calculations, and you come up with how

24  many pounds per million mass particulate there is.  With the

25  PM CEMS, all you have initially is an output.  So I have to

1  take the Method 5 test in comparison to the PM CEMS, and

2  that's the procedure in PS 11 that I will use to calibrate.

3  Q    I believe you already touched on this a little bit, but

4  how does the error band from a manual stack test compare to

5  the error band inherent in a PM CEMS?

6  A    Well, the first thing that needs to be said is that any

7  time you make a measurement, there's error.  It might be a

8  little bit of error or it might be a large amount of error.

9  Because you're calibrating the PM CEMS with the reference

10 method, any error associated with the reference method

11 measurement is going to be buried in the calibration curve

12 associated with the PM CEMS when you finish all those tests.

13 Q    Are there standards that prescribe how you calibrate a PM

14 CEMS?

15 A    Yes.  That's the PS 11 that I just discussed.

16 Q    Have you prepared a chart to describe to the Court how a

17 PS 11 calibration works?

18 A    I have.

19 Q    Is DR Dem 21 that chart?

20 A    Yes.

21 Q    Can you please describe to the Court what this chart

22 shows?

23 A    I will.  PS 11 prescribes that in order to calibrate the

24 PM CEMS, the PM CEMS response you see is across the bottom of

25 the page.  You run Method 5 test versus that output of that PM

Vol. 5-1038

1  CEMS.  This is the output of the Method 5.  All the individual

2  dots that you see within -- on this graph are the individual

3  Method 5 tests at different mass loadings on the ESP.

4       PS 11 asks you to run three groups of tests at a low

5  PM emission rate and an immediate PM emission rate and a high

6  PM emission rate.

7       When you finish those tests, you do a calculation and

8  you put in what's called the best fit line.  That's this line

9  here in the middle, the orange line.  That's just a

10 mathematical sort of an average of all of those data points

11 that you've collected.

12

13       You then calculate what's called a tolerance interval.

14 The tolerance interval is shown by the outside lines, the two

15 blue lines.

16       To pass PS 11, that tolerance interval has to be less

17 than plus or minus 25 percent away from that center line.  So

18 basically, what you have is a error band and a loud error band

19 of plus or minus 25 percent.

20 Q    What percent of your results need to be within the

21 plus/minus 25 percent tolerance lines in order to be certified

22 under PS 11?

23 A    Well, it's not a fixed percent.  The importance of the

24 tolerance interval is what happens in the future, because

25 that's what the tolerance interval statistic tells you.

Vol. 5-1039

1       There's another test that you do to tell you that you

2  have a good test today when you finish these tests, but what

3  you're really interested in is how well is that instrument

4  going to measure PM emissions in the future.  That's what the

5  tolerance interval is all about.

6       What the tolerance interval says is that in the

7  future, there is a 98 percent probability that 75 percent of

8  the future data points will lie between those two lines.

9  Q    That's a lot of numbers, and it's a little bit confusing,

10  so do you have another kind of example that can explain how a

11  tolerance interval works?

12  A    That's kind of a mouthful.  Statistics is a little bit

13  touchy sometimes.  Let me try a good old everyday example for

14  you.  We have a state patrolman, and he's about to go to work.

15  He's going to work a section of road where the speed limit is

16  60 miles an hour.  So he takes out his radar gun.  He puts his

17  calibrator on it, and he calibrates it for exactly 60 miles an

18  hour.

19       He then goes out on the highway and then starts

20  measuring the speed of cars.  Let's assume for the case of

21  this example that every one of those cars is going exactly

22  60 miles an hour, exactly 60 miles an hour.  If he takes radar

23  gun readings and that radar gun has the same tolerance

24  interval allowed by PS 11, 750 of those cars, 75 percent, will

25  be read by that radar gun somewhere between 45 and 75 miles an

1  hour.

2        The other 25 percent will be read something greater

3  than 75 or less than 45.  I personally don't particularly want

4  to get a ticket for going 75 if I'm going 60; but that's

5  allowed by this tolerance interval.

6  Q   Is it possible for a PM CEMS to fail to be certified even

7  with that plus-or-minus tolerance interval?

8  A   Yes.  It's happened.

9  Q   Mr. McRanie, to your knowledge, has the EPA endorsed the

10  use of PM CEMS?

11  A   Endorsed is kind of a strong word.  EPA allows the use of

12  PM CEMS at the choice of the source.

13  Q   Are there CEMS for substances other than PM?

14  A   Oh, yes.  We've been using CEMS for a long time.  The acid

15  rain truly is a good -- or acid rain program is a good

16  example.  That program requires all coal-fired utilities east

17  of the Mississippi to install, operate, calibrate, certify

18  SO2, NOX, and stack flow rate CEMS.

19  Q   How does the tolerance interval of those technologies

20  compare to the tolerance interval of a PM CEMS?

21  A   Well, it's a little bit different statistic.  One of the

22  things you need to understand about gas CEMS, SO2, and NOX

23  CEMS is that those devices are calibrated every day using

24  NIST, N-I-S-T, traceable bottled gases.

25        So we keep those pretty tight.  It's required to be

Vol. 5-1041

1  calibrated every day.  Obviously you can't calibrate a PM

2  monitor every day.  You can't go out and run 15 Method 5 tests

3  on it.  We have to assume this will hold its calibration, but

4  the bottom line is that I have a test that I run periodically

5  on the gaseous CEMS.  It's called a Relative Accuracy Test

6  Audit.

7        The statistic is slightly different than the statistic

8  we have here on the PM CEMS, but it's still a precision type

9  of statistic; and those usually come in somewhere 5 percent or

10 less.  They're very good.

11 Q   Mr. McRanie, in your opinion, is there any reasonable use

12 for PM CEMS at Beckjord Units 1 and 2?

13 A   Yes.  I believe that they could be used as a performance

14 indicator.  As I said earlier, when the PM goes up, the PM

15 monitor goes up.  When the PM goes down, the PM monitor goes

16 down.

17       In many cases they have been used in a CAM-like

18 atmosphere, Compliance Assurance Monitoring program.  In the

19 basis of a Compliance Assurance Monitoring program is it has

20 several levels of action.  We call those action levels or

21 trigger levels.

22       Generally what we do is we set an action level at some

23 point below where you would expect the unit to be out of

24 compliance.  When that level is hit, the operator and the

25 people at the plant have got to get up and go do something.

Vol. 5-1042

1  They've got to go fix the machine.

2  Q   What if the operator gets up and they discover a problem

3  but they can't fix it right away?

4  A   Well, they can always drop load.  When you drop load on a

5  coal-fired unit, two things happen.  You're dropping the

6  amount of fuel that's being burned, and you're dropping the

7  amount of combustion air which reduces the ash going to the

8  precipitator, and it also reduces the velocity inside the

9  precipitator.  Both of those factors improve the performance

10  of the precipitator.

11  Q   Is there a type of PM CEMS that you would recommend for

12  Beckjord Units 1 and 2?

13  A   I recommend the optical device over the beta device.  The

14  optical device is cheaper, simpler, works very well, appears

15  to work just as good as the beta device, and is a lot easier

16  to install or maintain and it's more reliable.

17  Q   I also want to ask you about the concept of averaging

18  time.  Are you familiar with that term?

19  A   I am.

20  Q   And what does it mean?

21  A   Well, for example, when I go out and do a Method 5

22  compliance test, I'm required to do three test runs and

23  average those three test runs to get the final answer.  Each

24  of those test runs takes about an hour.  So we talk about the

25  averaging time being three hours.

Vol. 5-1043

1       Any emission limit contains three components:  The

2    numerical value, point 1; the test method, Method 5; and the

3    averaging time.  In the case of a manual stack test, three

4    hours.

5       The longer averaging time we have, the closer we get

6    to the truth, the closer we get to averaging out all that

7    measurement error.  For example, if we took our earlier case,

8    when we talk about the policeman making a thousand

9    measurements, if we took all those measurements, even though

10    they're scattered all over the map, if we took all those

11    measurements and added them up, they would be close to

12    60 miles an hour.

13       A longer averaging time enables you to squish the

14    error out of the measurement and arrive at the truth.

15    Q    What kind of averaging time would you recommend for the PM

16    CEMS at Beckjord?

17    A    That depends on how it was used.  If it were used for

18    direct compliance measurements, which I don't recommend.  I

19    would have to recommend a very long averaging time, something

20    on the order of 30-day rolling average.

21    Q    Why 30 days?

22    A    Well, it's long enough to allow you to get rid of all that

23    25 percent tolerance interval error.  There's about 720 hours

24    in 30 rolling days, and that's enough data points to squash

25    that error out.

Vol. 5-1044

1  Q    What if the CEMS was to be used for CAM purposes?  What

2  averaging time would you recommend in that instance?

3  A    You could get by with a shorter averaging time, something

4  on the order of seven days.  Because in that case, you're not

5  really searching for the absolute truth as far as the answer.

6  You just are working with the trends.  You're looking at the

7  averaging trends going up, the averaging trends coming down.

8  Both work.

9  Q    Are you familiar with the concept of an early alarm?

10  A    Oh, yeah.

11  Q    Would that fit into the averaging time for a CAM?

12  A    Well, I mentioned that earlier.  When you do a CAM-type

13  approach, you always have what we call the early alarm.  If we

14  had a seven-day averaging time, for example, we would probably

15  set an alarm -- an action item in the 8- to 12-hour range.

16  That's what we've done in the past on CAM-type applications.

17        Basically what that says is if you reach this alarm

18  level, somebody's got to go do something.  Somebody's got to

19  get up, get out of chair, go out, look at the precipitators,

20  the hoppers, the rappers, the controls.  They've got to do

21  something to get back below that alarm level.

22  Q    Mr. McRanie, are you aware that EPA regulations suggest a

23  24-hour averaging time for a PM CEM?

24  A    Yes, I am.

25  Q    Why are you not recommending a 24-hour averaging time?

Vol. 5-1045

1  A   I believe that interval is too short, No. 1,

2  statistically.

3        No. 2, that provision in the EPA rules, a provision in

4  Subpart D(a).  There's a provision in D.  Those are the rules

5  that govern coal-fired power plants.  That's totally optional.

6  It's at the choice of the source.

7        The people that exercise that option are operating

8  from 5 to 10 times below their limit, way below their limit.

9  So they're not worried about the error band.  When you're 10

10 times below your limit, the error band doesn't come into play

11 at all.  So it's an optional choice the source can make, and I

12 wouldn't recommend it in this case.

13        MS. DELANEY BERROYA:  Thank you, Mr. McRanie.  No

14 further questions.

15        THE COURT:  Cross-examine?

16        MR. BENSON:  Yes, Your Honor.

17                    **CROSS-EXAMINATION**

18

19 BY MR. BENSON:

20 Q   Good morning, Mr. McRanie.

21 A   Good morning.

22 Q   We've met before.  My name is Tom Benson --

23 A   Yes, Tom.

24 Q   -- for the Plaintiffs.

25        Let me ask first just as a general matter, you agree,

Vol. 5-1046

1  and it sounds like you testified that PM CEMS could be

2  installed at Beckjord Units 1 and 2, right?

3  A    Absolutely.

4  Q    And you agree that it would be helpful to establish

5  exactly what's going on at those units, correct?

6  A    I'm not sure what that question means.

7  Q    Certainly a year's worth of PM CEMS' data would give you

8  more information about the operation of the unit than a annual

9  stack test that measures three hours worth of data?

10  A    That's correct.

11  Q    You alluded to this in your direct testimony.  A number of

12  coal-fired electric generating units either have PM CEMS

13  installed or are in the process of installing them right now;

14  is that right?

15  A    That is correct.  And all of those units are equipped with

16  high-efficiency scrubbers.  You can't get particles through a

17  high-efficiency scrubber, and so there's no risk to them.

18  They're ten times below the standard, most of them.

19  Q    In some cases those PM CEMS are used for what you referred

20  to as direct compliance, right?

21  A    The only one that I have uncovered that is being used for

22  direct compliance is a unit in Kentucky that has yet to be

23  built.

24  Q    Are you referring to Trimble Unit 2?

25  A    Yes.

Vol. 5-1047

1  Q    But you haven't done any investigation for your work in

2  this case about what other units might be out there that

3  are -- either are or are planning to use PM CEMS for direct

4  compliance, right?

5  A    I contacted all of the people on the list that you

6  presented me at deposition, and none of those are for direct

7  compliance purposes other than Trimble 2.

8  Q    So you did that between the time of the deposition and

9  today?

10  A    Yes.

11  Q    Now you've alluded to this in your direct examination that

12  EPA has approved the use of PM CEMS for direct compliance

13  monitoring on coal-fired BTUs and a number of other sources,

14  correct?

15  A    They allow that if the source so chooses.

16  Q    And you took issue with the idea that EPA had endorsed the

17  method, and you said they allowed it.  You weren't sure if

18  they endorsed it.  If we could have the federal register page.

19        If we could turn on the screen to page -- well, first

20  let me just ask you, Mr. McRanie --

21  A    I can't see any of this.  This is totally washed out.

22              MR. BENSON:  Can I approach with the paper copy?

23              THE COURT:  You may.

24              MR. BENSON:  This is from the Federal Register.

25  It's 69 Federal Register 1786.  What are we up to on the

Vol. 5-1048

1  demonstratives?  This will be PR Demo 9.

2  BY MR. BENSON:

3  Q   Do you recognize that document, Mr. McRanie?

4  A   Yes.

5  Q   Can you briefly describe what it is?

6  A   It's Amendments to the Standards of Performance for New

7  Stationary Sources Monitoring Requirements.  It's dated

8  January 12, 2004.

9  Q   Is it fair to say this is EPA setting forth PS 11 which

10 you described in your direct testimony as the method for

11 certifying PM CEMS for use in compliance measurement?

12 A   Yes.

13 Q   And if we could turn to page 16 -- I'm sorry, I went too

14 far.  If we could turn to page 14 in this.  If we could call

15 out the first full paragraph.  The last sentence in that

16 paragraph says, "However, for rules that establish PM emission

17 limits, we believe that PM CEMS are the appropriate technology

18 for compliance monitoring."  You understand that's EPA's view?

19 A   I read that sentence.  They didn't follow through with

20 that though.

21 Q   The opinions that you've expressed today you've made to

22 EPA over the years, right?

23 A   Oh, absolutely.

24 Q   And they've taken them into account as they see fit?

25 A   I guess that's a fair statement, yes.

Vol. 5-1049

1  Q   And you're aware, as well, in addition to what we already

2  talked about, you're aware of a series of consent decrees that

3  the United States and other parties have entered with

4  coal-fired utilities that require those utilities to install

5  PM CEMS, aren't you?

6  A   Yes.  But they're not used for direct compliance

7  measurements.

8  Q   Based on your understanding of the CD language; is that

9  right?

10 A   That's correct.

11 Q   In your direct testimony, you talked about the concept of

12 an averaging time.  You said that an averaging time could be

13 used to squash out the error of a measurement.  Do you recall

14 that?

15 A   Yes.

16 Q   That was a great phrase, "squash out the error."  You said

17 that for different types of -- depending on what the PM CEMS

18 was used for, you would have a different averaging time.  So

19 you said maybe seven days if it was being used as a

20 performance monitor, but you would want an average time of 30

21 days if it was used for compliance; is that correct?

22 A   That's correct.

23 Q   You talked about the averaging time to the extent some

24 evaluations were higher than they ought to be.  Some values

25 would be lower, and they would get averaged together until you

Vol. 5-1050

1  were within a reasonable error band, right?

2  A    That entire statistic assumes that that will happen, and

3  that is true if there is no bias.

4  Q    And that's what you assumed in your direct testimony?

5  A    Well, PS 11 assumes that, so you have to assume it.

6  Q    Let's turn specifically to the Beckjord units for a

7  moment.  You would agree that the Beckjord Units 1 and 2

8  failed a series of stack tests over the last 10 years.  I

9  think you heard about it this morning through Mr. Boots'

10  testimony; is that right?

11  A    They failed three or four, yes.

12  Q    Three or four at Unit 1?

13  A    I don't -- I wasn't following the testimony when he was

14  counting.

15  Q    But you've looked at the data before?

16  A    Yes.

17  Q    And you would expect that they would continue to fail some

18  proportion of the time when no test is being taken, correct?

19  A    No, not at all.  If no test is being taken, I don't know

20  whether the unit is in compliance or not.  Now, the results

21  seem to indicate to me that since the NELS modification has

22  been put into those precipitators -- and that is a very

23  important modification by the way, that there have been no

24  failures.

25          So probability tells you that they're probably in

1  compliance; but I can't say to a hundred percent.

2  Q    So you can't say with certainty that they will

3  consistently be in compliance?

4  A    No one can.

5  Q    Now, the PM emissions that you've been talking about today

6  are direct emissions from the Beckjord plant, right?

7  A    I don't know what the word direct means.

8  Q    It's just what's coming out of the stack?

9  A    That's correct.

10 Q    As opposed to -- we've been talking earlier in the week

11 about PM that forms from emissions of SO2 or NOX once up in

12 the atmosphere, right?  That is a different kind of PM.

13 A    Let me clarify what you're trying to say, I think, is that

14 both Method 5, the compliance test method, the manual

15 compliance test method and the PM CEMS measure total

16 filterable particulate, primary particulate of all particle

17 sizes.  That's the way Method 5 is designed.  You calibrate

18 the PM monitor.  We're using Method 5.  So, it follows that

19 it's measuring total PM also.

20 Q    I apologize for a confusing question.  All I'm trying to

21 say is, I think you would agree what you're testifying about

22 today has nothing to do with the conversion of SO2 and NOX in

23 the atmosphere to PM?

24 A    No.

25 Q    And I believe you testified on your direct examination

Vol. 5-1052

1 that the SO2 and NOX emissions monitors that all the utilities

2 are required to use by law right now are very good in terms of

3 their accuracy?

4 A   They are very good.

5          MR. BENSON:  No further questions, Your Honor.

6          THE COURT:  Redirect?

7          MS. DELANEY BERROYA:  Very brief.

8                    **REDIRECT EXAMINATION**

9 BY MS. DELANEY BERROYA:

10 Q   Mr. McRanie, just to clarify, are there any regulations

11 that require the use of PM CEMS?

12 A   Not on coal-fired power plants.

13 Q   And Mr. Benson discussed that there are some units that

14 have chosen PM CEMS for a variety of purposes; is that right?

15 A   Yes.

16 Q   And he mentioned that -- do all of those units have

17 scrubbers?

18 A   Every single one.

19 Q   And why, in your opinion, is that?

20 A   Well, the regulations affecting coal-fired power plants --

21 state regulations, federal regulations all require the use of

22 an opacity monitor to measure stack, smoke density so to

23 speak.

24          When you put a wet scrubber on, you can't use an

25 opacity monitor because the stack's full of water droplets and

Vol. 5-1053

1  fog.  These new scrubbers are tremendous particulate reduction

2  devices.  They do an extraordinary job of removing particulate

3  as well as SO2.  You can't get any particle matter through

4  them.

5       So those people that are installing those new wet

6  scrubbers or building new units, because they are so low in

7  particulate emissions, they're choosing to put on the PM

8  monitor as an alternative to the opacity monitor which is

9  legal and allowed.

10      So they get the benefit from it, and they have no

11  risk.  They absolutely have no risk because the error band

12  doesn't come into play when you're as low in particulate

13  emissions as those units are.

14  Q   Does Beckjord Units 1 and 2 have a scrubber?

15  A   No, it does not.

16          MS. DELANEY BERROYA:  Thank you.

17          MR. BENSON:  We have no further questions.  We do

18  want to alert you we have a couple of housekeeping matters.

19          THE COURT:  Okay.  You can step down, sir.

20      (Witness excused.)

21          THE COURT:  Does Defense have any further witnesses?

22          MR. HOPSON:  No, Your Honor, we do not.

23          THE COURT:  Just one other evidentiary matter.

24  Those were the objections to -- what was the witness's name?

25          MR. HOPSON:  The rebuttal witness?

Vol. 5-1054

1          MS. THOMSON:  Mr. Runkle?

2          THE COURT:  Yes, I'm going to overrule those

3   objections.  Mr. Runkle's deposition, the designations are now

4   in.  Do you have anything else -- I guess I don't want you to

5   rest until I hear from the Plaintiff.  Plaintiff needs to rest

6   first.  That's the way it goes.  I let you out of that to

7   begin with.  So what else do you need before you rest?

8          MR. DUNN:  We just have a housekeeping measure,

9   Jason Dunn for the Plaintiffs.  On Wednesday, I think we

10  notified the Court of our intent to work with Cinergy about

11  some additional exhibits to move into the record, most of

12  which were referenced in the depo designations that were

13  received into the record on Wednesday.

14          And I have a list of documents that we would like to

15  go ahead and move in.  Most of them have been stipulated.  A

16  few have not, and we can address that on the record now if

17  Your Honor would like.

18          THE COURT:  That would be good.

19          MR. DUNN:  The first exhibit we would like to move

20  in, Plaintiffs' Exhibit 2112B, which is the Exhibit 22 to the

21  Pearl deposition.  And I believe Cinergy has stipulated to

22  that.

23          MS. THOMSON:  We have no objection to that, Your

24  Honor.

25          THE COURT:  2112B is admitted.

Vol. 5–1055

1

2      (*Plaintiffs' Exhibit 2112B was received in evidence.*)

3           MR. DUNN:  The next exhibit is 2113, which is

4  Exhibit 1 to the Pearl deposition.

5           MS. THOMSON:  We also have no objection to that.

6           THE COURT:  That exhibit is admitted.

7      (*Plaintiffs' Exhibit 2113 was received in evidence.*)

8           MR. DUNN:  The next is Plaintiffs' Exhibit 2002,

9  which is Exhibit 7 to the Geswein deposition.

10          MS. THOMSON:  No objection.

11          THE COURT:  Exhibit is admitted.

12     (*Plaintiffs' Exhibit 2002 was received in evidence.*)

13          MR. DUNN:  The next is Exhibit -- Plaintiffs'

14  Exhibit 2003 through 2010.  So 2003, 2004, 2005, 2006, 2007,

15  2008, 2009, and 2010.  And that compilation of exhibits is

16  Exhibit 6 to the Geswein deposition.

17          MS. THOMSON:  No objection.

18          THE COURT:  Those exhibits are admitted.

19     (*Plaintiffs' Exhibit 2003 through 2010 were received in*

20  *evidence.*)

21          MR. DUNN:  Plaintiffs' Exhibit 2011, which is

22  Exhibit 1 to the Geswein deposition.

23          MS. THOMSON:  No objection.

24          THE COURT:  Exhibit's admitted.

25

Vol. 5-1056

1    *(Plaintiffs' Exhibit 2011 was received in evidence.)*

2        MR. DUNN:  Plaintiffs' Exhibit 2012, which is

3  Exhibit 5 to the Geswein deposition.

4        MS. THOMSON:  No objection.

5        THE COURT:  Admitted.

6     *(Plaintiffs' Exhibit 2012 was received in evidence.)*

7        MR. DUNN:  Plaintiffs' Exhibit 2013, which is

8  Exhibit 8 to the Geswein deposition.

9        MS. THOMSON:  No objection.

10        THE COURT:  It's admitted.

11     *(Plaintiffs' Exhibit 2013 was received in evidence.)*

12        MR. DUNN:  Plaintiffs' Exhibit 2 -- 2136, which is

13  Exhibit 12 to the Turner deposition.

14        MS. THOMSON:  No objection.

15        THE COURT:  It's admitted.

16     *(Plaintiffs' Exhibit 2136 was received in evidence.)*

17        MR. DUNN:  2134, which is Exhibit 13 to the Turner

18  deposition.

19        MS. THOMSON:  No objection.

20        THE COURT:  It's admitted.

21     *(Plaintiffs' Exhibit 2134 was received in evidence.)*

22        MR. DUNN:  Plaintiffs' Exhibit 2014, which is

23  Exhibit 2 to the Jenner deposition.

24        MS. THOMSON:  No objection.

25        THE COURT:  It's admitted.

Vol. 5–1057

1     *(Plaintiffs' Exhibit 2014 was received in evidence.)*

2          MR. DUNN:  Plaintiffs' Exhibit 1971, which is

3     testimony of James Turner before the Indiana Utility

4     Regulatory Commission.

5          MS. THOMSON:  Give me just a minute on that.  No

6     objection.

7          THE COURT:  It's admitted.

8     *(Plaintiffs' Exhibit 1971 was received in evidence.)*

9          MR. DUNN:  Plaintiffs' Exhibit 2071, which is

10    July 7, 2008, Defendants' objections and responses to

11    Plaintiffs' first set of interrogatories.

12         MS. THOMSON:  My recollection is that we actually

13    address the next set of exhibits as a group.  We do have an

14    objection to all of those; and those are Cinergy's

15    interrogatory responses to discovery served by Plaintiffs.

16         THE COURT:  All right.  We'll address those as a

17    group.

18         MR. DUNN:  That's the final, well, actually --

19         MS. THOMSON:  Is there one we should address first?

20         MR. DUNN:  Plaintiffs' Exhibit 2100, which is an

21    e-mail from Kathryn Thomson providing mercury emissions data.

22         MS. THOMSON:  No objection to that.

23         THE COURT:  It's admitted.

24    *(Plaintiffs' Exhibit 2100 was received in evidence.)*

25         MR. DUNN:  And the remaining five exhibits, Your

Vol. 5-1058

1  Honor, are -- well, four of the five are interrogatory

2  responses.  One of the five is a, an interrogatory response

3  that was issued pursuant to the Court's order to provide

4  30(b)(6) testimony.  I can go through each -- I can give you

5  the relevance if you would like, or we can move them in in

6  their entirety.

7          THE COURT:  Let's do them one at a time.  You object

8  to each one of them?

9          MS. THOMSON:  Yes.  The reason is, Your Honor, is

10  that Plaintiffs haven't established an evidentiary basis for

11  the wholesale adoption of the interrogatory responses, and a

12  large portion of those were contention interrogatories

13  consisting largely of attorney and legal arguments, Your

14  Honor.

15          THE COURT:  Let me ask you this.  Are you offering

16  all of the group or just some discrete answers?

17          MR. DUNN:  For two of them, we're offering them all

18  because they're all relevant to either -- to cost issues.  And

19  for three of them I can identify particular pages.

20          THE COURT:  Let's talk about the particular ones

21  first.

22          MR. DUNN:  Okay.  I believe the only objection here

23  is relevance.

24          MS. THOMSON:  This will be the first time we know

25  what specific interrogatories you're referring to.

Vol. 5-1059

1          MR. DUNN:  I just learned this morning of Counsel's

2     objection to the admissibility of documents that they had

3     stipulated to.

4          MS. THOMSON:  No.  We've objected to these -- in any

5     event.

6          THE COURT:  Let's give you an opportunity to see

7     which ones you're talking about.  Let's have lunch.  We'll

8     come back at 1:00 o'clock.  We'll deal with those, and then

9     I'll hear your final statements.

10          MS. THOMSON:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          COURT CLERK:  All rise.  Court will recess until one

13     o'clock.

14       (A recess was taken.)

15

16

17

18

19

20

21

22

23

24

25

Vol. 5-1060

1                        AFTERNOON SESSION

2              THE COURT:  Good afternoon.  Do you have a trademark

3    and patent group in your office?

4              MR. HOPSON:  Yes, Your Honor.

5              THE COURT:  Well, I'm thinking about a copyright on

6    a new word.  Yes.  It describes what you have done to my court

7    reporter.  It's called acronymorphic.  You have placed my

8    court reporter in an acronymorphic state.

9              MR. HOPSON:  If she wants to sue over that, she has

10   plenty of defenses.

11             THE COURT:  I think what she wants to do, rather, is

12   recover.

13             All right, we had some matters of evidence we want

14   to deal with first, so let's have the specific questions that

15   you wanted in.  I think I've already admitted one, haven't I?

16             MS. THOMSON:  Yes, you did.

17             MR. DUNN:  Your Honor, Plaintiffs would move for

18   Exhibit 2071, specifically Interrogatory 4.

19             THE COURT:  You've given me a copy of that, haven't

20   you?

21             MR. DUNN:  Yes.  Specifically, Interrogatory 4.

22             THE COURT:  Specifically which?

23             MR. DUNN:  Interrogatory 4, and we have consulted

24   with Cinergy.

25             MS. THOMSON:  Yes, Plaintiffs have substantially

Vol. 5-1061

1  narrowed their request to specific interrogatories, Your

2  Honor.  We have no objection.  We looked at those over lunch,

3  and we have no objection.  We just want to make sure it's

4  clear which interrogatories are admitted for purposes of the

5  record.  So, we can do this quickly.

6          MR. DUNN:  So was that one admitted then?

7          MS. THOMSON:  No objection.

8          THE COURT:  It's admitted.

9    *(Plaintiffs' Exhibit 2071, Interrogatory 4 was received in*

10  *evidence.)*

11          MR. DUNN:  Plaintiffs would move Exhibit 2073,

12  Interrogatory 4.

13          MS. THOMSON:  No objection.

14          THE COURT:  It's admitted.

15    *(Plaintiffs' Exhibit 2073, Interrogatory 4 was received in*

16  *evidence.)*

17          MR. DUNN:  Plaintiffs would move Exhibit 2075,

18  Interrogatory 13.

19          MS. THOMSON:  No objection.

20          THE COURT:  It's admitted.

21    *(Plaintiffs' Exhibit 2075, Interrogatory 13 was received*

22  *in evidence.)*

23          MR. DUNN:  Plaintiffs would move Plaintiffs'

24  Exhibit 2087, Interrogatories 2 and 3.

25          MS. THOMSON:  2087?

Vol. 5-1062

1          MR. DUNN:  2087.

2          MS. THOMSON:  No objection.

3          THE COURT:  Those are admitted.

4      *(Plaintiffs' Exhibit 2087, Interrogatories 2  and 3 were*

5  *received in evidence.)*

6          MR. DUNN:  Plaintiffs would move for 2086, which is

7  the interrogatory that dealt with the 30(b)(6) deposition in

8  there.  We're moving the entire interrogatory response.

9          MS. THOMSON:  No objection.

10         THE COURT:  All right.  Thank you.

11     *(Plaintiffs' Exhibit 2086, Entire Interrogatory was*

12  *received in evidence.)*

13         MR. DUNN:  Thank you, Your Honor.

14         THE COURT:  All right.  Let's have a bit of an

15  argument here.  I do think that I'll have some briefing,

16  because what I would like for the briefing to do is to help us

17  with the specific evidentiary matter that supports the

18  argument that you're making so I won't have to be searching

19  through -- I will anyway, but I would like to have it as easy

20  for us as I can.  Make sure when you go through your brief and

21  you make some argument, you tell us specifically what the

22  exhibit numbers, et cetera are.

23         MR. HOPSON:  Would you like that, Your Honor, in the

24  form of findings of fact, conclusions of law as opposed to a

25  brief?

1        THE COURT:  Well, I suppose it depends on your skill

2   at either one.  Are you better at one than the other?  I don't

3   know.  Sometimes lawyers can write very helpful findings of

4   fact and conclusions of law, and sometimes they drone on like

5   a nest of wasps.

6        So if you could do findings of fact and conclusions

7   of law specifically referring to places in the record that

8   support the findings of fact, and then, of course, the

9   conclusions of law don't have to be numbered.  So, yes, that

10  would be all right if that is something you can do.

11  Mr. Brooks?

12        MR. BROOKS:  Yes, Your Honor.

13        THE COURT:  All right.  That would be good.  Can we

14  go 20, 10, and 5 on that, with 20 days for the Plaintiff to do

15  it, 10 days for your response, and then five days for your

16  reply?

17        MR. BROOKS:  Yes, Your Honor.  Is that 20 going to

18  be from Monday when we get the final transcripts?

19        THE COURT:  Okay, Monday.  I've seen cases where

20  I've wanted a brief done quickly, and I look at the senior

21  partner and I say, "Can you do that?"  And all the junior

22  ones are going like this (indicating.)  The senior one says,

23  "Sure, no problem, Judge."  Yes, we can do it on Monday.  Is

24  that all right with you?

25        MR. HOPSON:  Yes.

Vol. 5-1064

1          THE COURT:  So let me have a designated arguer up

2   here, and then I'll have a table of designated corroborators

3   behind you.  That we can do.

4          I wanted to make a couple of comments to begin with.

5   I guess it is kind of a Government lesson when we have three

6   branches of Government, and it is obvious that the legislative

7   branch spots the problem, has hearings on it and input from

8   all those concerned and then writes the law.

9          Then they send it over to the executive agency to

10  refine it with rules and regulations, and then the writing of

11  those rules of regulations, more hearings are held, more input

12  is had.  Then they have the scheme put together.  Then, of

13  course, the executive branch sends out individuals to enforce

14  it.  And then the third branch listens to the dispute between

15  the enforcer and the enforcee and makes a decision.

16         It's complicated in this case because of the time

17  from 1989 until today.  It's complicated because I've had this

18  on my calendar since 1999.  I'm not criticizing any of the

19  branches of Government in this case, because I have to take

20  some of that responsibility myself.  I suppose I could have

21  set this on a rocket docket in 1999.

22         Anyway, on top of that then we have kind of a system

23  where the Congress taketh away and then the Congress giveth

24  back; and that is in the middle of the enforcement proceedings

25  and in the middle of the time the case is set in this court.

1  So I think this is a -- this is a very complicated

2  circumstance.

3          Then we get imminent scientists who don't agree with

4  what we're doing or how we are measuring what we are doing.

5  So when we talk about this case, when we are -- when we take

6  this case up, we have to remember what we are really doing

7  here.  One is -- and that is, of course, we are here because

8  the jury found a specific NSR violation; and that violation

9  was that the Defendant in this case failed to appropriately

10 address the -- whether or not the new improvements were going

11 to cause more emissions.  So that's all we're doing.

12         That's what we're trying to figure out.  What is the

13 appropriate remedy for that?  Where is the irreparable harm,

14 how you measure that irreparable harm, and how you measure it

15 I guess and whether it exists.

16         So let me start by asking you this.  Give me a clear

17 articulation of your proposed remedy.  I don't know today if

18 the it is the same as you had in your trial brief or not.

19         MR. SAVAGE:  Yes, Your Honor.  We would be happy to

20 do that.

21                    CLOSING STATEMENT

22 BY MR. SAVAGE:

23         Your Honor, Plaintiffs' remedy has -- let me make

24 sure I get the count correct here -- really three components.

25 One is --

1        THE COURT:  If you're reading right out of your --

2        MR. SAVAGE:  No, I am not.  This is just as an aid

3    to make sure I get it right.  This is important.  The first is

4    prospective compliance with the law.  Prospective compliance

5    could come through controls, but Duke has chosen to shut down

6    which gives rise to many of the issues we see here today.

7        The second part of this is what we refer to as

8    mitigation.  This just means reducing on a ton-for-ton basis

9    the illegal or excess SO2/NOX that have come out of Wabash

10   River Units 2, 3, and 5 until they are shut down.  Then the

11   last component is the surrender of emission allowances to

12   secure the environmental benefit of the mitigation.

13       I can go through each of those --

14       THE COURT:  No.  I'm going to interrupt you here.

15   The next thing I want to ask you is -- a little more pointed

16   question, and that's this:  Is the NAAQS the appropriate

17   measure for irreparable harm when the worst case scenario you

18   have is a projected model value for excess emissions at

19   .15 micrograms per cubic meter?

20       MR. SAVAGE:  Your Honor, we would respectfully

21   submit that Mr. Hayes' comparison is not the appropriate

22   measure.  The NAAQS is a measure of air pollution from every

23   single source in the air.

24       If you take Mr. Hayes -- and let's look at an

25   example.  For daily PM2.5, that's 35 micrograms.  Your Honor,

1   there's nothing in the record that suggests any single source

2   would come anywhere near close enough to reaching that amount.

3   Here's the best truth test you have for that.  Mr. Hayes

4   testified that 475,000 tons of SO2 and 75,000 tons of NOX in

5   the AEP case, same type of case, coal-fired boilers, would not

6   exceed any of his tests.

7           And let's wrap it back and give it a little more

8   context.  Why does .15 micrograms or .10 micrograms matter?

9   First, Mr. Chinkin looked at the existing air quality in

10  non-attainment areas.  He looked at the data that is measured

11  in monitors in Evansville, Indianapolis, Gary, and he said

12  here's what the existing conditions are.

13          He then looked at what the plant was adding on top

14  of those, and he determined that the plant was adding air

15  pollution when the levels were already unhealthy and above the

16  NAAQS.

17

18          Mr. Hayes admitted on cross-examination he did not

19  do that.  All he did was he looked at 35 micrograms for the

20  daily PM2.5 standard or 15 micrograms, and he said compare it

21  to the increment from this sole plant.  And that's not an

22  appropriate comparison, Your Honor.

23          I think to take another step back from this,

24  Mr. Chinkin testified -- and it's not really disputed -- that

25  the excess SO2 emissions from this plant are equivalent from

Vol. 5-1068

1  the emissions from every single diesel truck in Indiana, Ohio,

2  Kentucky.  They're equivalent to 2 percent of the State of

3  Indiana's emissions.

4         Now how does that result in such a small change --

5  what the common person would consider such a small change in

6  ambient PM2.5 or fine particles?  It's because as Mr. Chinkin

7  explained and Mr. Paul explained, it takes a lot of SO2 and

8  NOX reductions to get a PM2.5 benefit.

9         Here's a great example right out of the real world.

10  EPA passed a rule called the Clean Air Interstate Rule or

11  CAIR, C-A-I-R.  It was thrown out in the courts.  The

12  technical results of that rule are still relevant, and

13  Mr. Chinkin talked about them.  And in CAIR, EPA proposed and

14  finalized a rule that would control SO2 and NOX emissions from

15  nearly every coal-fired power plant in the Eastern United

16  States.

17

18         What did the air quality modeling show from that?

19  And by the way, it was the same model we used, the CMAQ or

20  CMAQ model.  The model showed if you controlled every single

21  power plant in the country, your average air quality benefit,

22  the reduction in PM2.5 would only be a seventh of a microgram.

23  That's because you're averaging it over a year and over a long

24  distance.  Similarly, as .1 or .15 microgram impact is

25  averaged over a year.

Vol. 5-1069

1          Mr. Chinkin explained on some days in Indianapolis
2     you will have an impact that's in the micrograms.  In other
3     days you won't.  It's because the wind blows in different
4     directions.  There's different chemistry.

5          So we believe and respectfully submit, Your Honor,
6     that simply taking a look at the incremental change from the
7     excess emissions to an entire NAAQS is not the appropriate
8     comparison.

9          I think you will recall Mr. Hayes addressed this on
10    cross-examination.  It took two or three questions to clarify
11    this, but he admitted on cross-examination that an air quality
12    planner trying to get their area into attainment for the PM2.5
13    NAAQS would consider changes down to a tenth of a microgram
14    important.  And that's consistent with what Mr. Paul told you
15    in his struggle to try to get Dayton into attainment, and it
16    is also consistent with what Mr. Hayes said as well.

17         THE COURT:  What do you think generally of this
18    notion of dosage where we get two experts that talk about the
19    dose of sulfates?  How do you deal with that?

20         MR. SAVAGE:  Your Honor, we think it's important to
21    keep that scientific debate in context.  On the one hand, we
22    have Dr. Joel Schwartz who we presented from the Harvard
23    School of Public Health.  Dr. Schwartz is the most leading and
24    most cited author on the health effects of air pollution.
25    He's concluded that the relationship between public health and

Vol. 5-1070

1  PM2.5 is linear, and he's also explained to Your Honor that

2  there's no way to differentiate sulfate particles from other

3  particles.

4          THE COURT:  Didn't we have somebody else from

5  Harvard say it wasn't?

6          MR. SAVAGE:  That gentleman, Dr. Valberg, he's not

7  from Harvard.  He used to work there, but he's been a

8  consultant.

9          THE COURT:  He was canned?

10          MR. SAVAGE:  I don't think it's appropriate.

11          MR. HOPSON:  We give up.

12          THE COURT:  How can I get two imminently qualified

13  individuals to disagree like that?

14          MR. SAVAGE:  Well, Your Honor, respectfully -- and

15  we know Dr. Valberg from other cases.  He makes his living

16  around the country testifying, and Dr. Schwartz, this is his

17  first time testifying.  Dr. Valberg's opinions are outside --

18          THE COURT:  So you think Dr. Valberg's shelf life is

19  over?

20          MR. SAVAGE:  Your Honor, here's a key point.  You

21  saw the witnesses yourself.

22          THE COURT:  I did.

23          MR. SAVAGE:  You have your own impressions.  Put

24  that aside.  Dr. Schwartz informed the Court, and there's

25  really been no reasonable dispute that mainstream medical

Vol. 5-1071

1  organizations such as the American Medical Society, the

2  American Thoracic Society and others agree with Dr. Schwartz.

3  That also includes the Clean Air Scientific Advisory

4  Committee.

5         Now, I think that Cinergy relied on what has been

6  marked as one of the Plaintiffs' exhibits.  This is the

7  so-called CASAC letter.  Cinergy argued, well, this really

8  shows that Dr. Schwartz disagrees with EPA, and there's a

9  scientific debate on that.

10        Let us be clear.  EPA and Dr. Schwartz agree that

11  the effects from PM2.5 and the atmosphere are linear, meaning

12  if you have more in the atmosphere, it's worse for health.  If

13  you have less, it's better for health.  Where do they

14  disagree, on an immaterial issue, a policy judgment on where

15  to set the NAAQS.

16        That CASAC letter involved a PM2.5 rulemaking where

17  the NAAQS was slashed from 65 micrograms to 35 micrograms.

18  Dr. Schwartz, he thought it should have been lower, but that

19  was a policy call that EPA made.

20        I think it's also important to keep in mind that the

21  NAAQS, in essence, assumes emissions from lawfully complying

22  sources, a risk that we might be willing to accept from a

23  source that has the proper permits in our modern society where

24  we need industry should not necessarily be continenced if you

25  have a source that's violating in operation of the law.

Vol. 5-1072

1          Your Honor, we're not trying a toxic tort case or

2   trying to prove a particular harm to a parcel of land.  We're

3   bringing this case on behalf of the United States and

4   Plaintiff-Intervenors to protect public health and the

5   environment.

6          Circling back to one of Dr. Valberg's -- another of

7   Dr. Valberg's points.  He relied on something called the TERA

8   or TERA risk assessment.  This was Defendants' Exhibit 25.

9   The Defendants will argue, well, this is a risk assessment

10  specific to the Wabash River plant.

11         It's important to keep in mind that it did not look

12  at PM2.5 or ozone health effects.  As Dr. Valberg had to admit

13  upon cross-examination, the study was questionable.  No one,

14  including the Electric Power Research Institute, can find the

15  underlying air quality modeling that went into that study.

16         One key point, Your Honor -- and we've talked about

17  this at length.  Dr. Valberg was forced to admit on

18  cross-examination the National Academy of Sciences panel he

19  was a member of concluded that PM2.5 had no known health

20  effect -- or no known threshold for health effects.

21         If Your Honor feels that this dispute is difficult

22  to resolve, although we respectfully disagree, then there's

23  another way to conceptually look at this case.  The air

24  quality modeling that Mr. Chinkin talked about and that Mr.

25  Hayes largely agreed with, although he characterizes the

Vol. 5-1073

1  results, the air quality modeling undisputedly shows impacts

2  on areas that are declared non-attainment for PM2.5 and ozone.

3  That is a regulatory finding that the air in those areas is

4  already bad.

5      Mr. Chinkin went, and as I said, checked the days

6  that the model predicted an impact, and he checked those

7  against the monitors in those cities.  He found that the plant

8  was adding to that risk and to that harm for public health

9  that was already there.

10      THE COURT:  Okay.  Let's shift to the BACT and the

11  LAER determinations that might have been made in '86 or '87 or

12  '88 or '89, depending on your argument.  Let's talk about the

13  low-NOX burner versus the SCR.  I think your position is

14  Cinergy should have installed the SCR at the time that they

15  made these improvements; is that right?

16      MR. SAVAGE:  Your Honor, we just respectfully submit

17  that SCR would be a control technology that would be

18  considered.  If Your Honor would indulge us, I would like to

19  put just a little bit more conceptual framework on how the

20  low-NOX burner versus SCR in 1989 fits into the proof and then

21  come back to what we're thinking about.

22      THE COURT:  Okay.

23      MR. SAVAGE:  When we talk about excess or illegal

24  emissions, all we're really saying is that it's an equitable

25  yardstick for measuring the amount of emissions from the

Vol. 5-1074

1   violation of the Clean Air Act.

2         Your Honor is correct.  Dr. Fox, Mr. Rarick,

3   Mr. DePriest presented competing calculations of the amount of

4   excess emissions, and they particularly had a dispute about

5   whether low-NOX burners or SCR were available at the time of

6   the violation.

7         But in reviewing all of these calculations and

8   disputes, we just respectfully submit that this is equity, and

9   rough justice is all that's required in complying for the law.

10  I'm sorry, Your Honor, we have to provide a reliable basis for

11  you to issue a judgment upon, but it does not have to be

12  completely precise.

13        I think this issue of low-NOX burners and SCR for us

14  at least is the second way we look at excess emissions.  The

15  first way we look at it is all of the emissions after the

16  violations are excess or illegal for NOX or SO2.  Now there's

17  a few concepts built into that, and perhaps as a general rule,

18  that would not be appropriate.

19        There's two concepts that we respectfully submit in

20  looking at all the emissions as excess.  The first is the

21  company had no right to operate the modified units without a

22  permit; but I think more important and more tied to the record

23  in this case is that counting all of the emissions makes

24  common sense, because the violations at Wabash River Units 2,

25  3, and 5 were Life Extension projects.

Vol. 5-1075

1          If we could have the first image.  The unit wouldn't

2    have kept running and emitting unless Cinergy extended their

3    lives.  The first image here is Plaintiffs' Exhibit 1319 from

4    the liability trial.  It is in the record.  It is in evidence.

5          Next image, please.  Could we blow up this table

6    here?

7          Your Honor, this is a table from a page of this

8    exhibit at Page No. CINWA002122.  This is an admission, and we

9    think largely undisputed from the liability trial that Wabash

10   River Units 2, 3, and 5 would have been out of existence but

11   for these Life Extension projects.

12         THE COURT:  So, you know, it doesn't matter to you

13   then from there standpoint about these calculations,

14   whatever -- because they would have otherwise been out of

15   business, anything that they have -- that has gone out of that

16   stack since then?

17         MR. SAVAGE:  Exactly, Your Honor.  This is a

18   long-running case, and we want to make sure and present

19   different equitable yardsticks for the Court's consideration

20   of excess emissions.  We actually think this is the simplest

21   and easiest way to resolve this issue in this case.

22         Now, is this appropriate in every case?  Perhaps

23   not, but here, the records show the units would not be around

24   but for these projects.  That way Your Honor does not even

25   have to engage in the other issues that Dr. Fox disagreed with

Vol. 5-1076

1  the experts.  And let's turn to those, and I think Your Honor

2  had a good question, another way that we calculated excess

3  emissions.

4          So imagine Your Honor was not convinced by looking

5  at total emissions.  We also looked at the emissions that

6  could have been controlled with state-of-the-art pollution

7  controls at the time of the violations.  Dr. Fox did this.

8          It's important to recognize on cross-examination

9  this morning, Mr. Rarick admitted that using these historical

10 pollution controls available at the time of the violations was

11 a reasonable approach.

12         On the SO2 controls, we think there's largely

13 agreement between the parties; that a scrubber, a device that

14 takes the SO2 out of the power plant stack was available and

15 feasible at the time of the violations.

16         Now, where Your Honor saw the most dispute was over

17 the excess NOX calculations, assuming an SCR as Dr. Fox did or

18 assuming a low-NOX burner as Mr. Rarick and Mr. DePriest did.

19         I think it's really important for us not to

20 overstate our proof and to give some legal context here.

21 B-A-C-T or BACT and LAER, L-A-E-R, Lowest Achievable Emission

22 Rate, are technology forcing by nature.  And the post trial

23 briefing will show that to you, but let's not overstate this

24 and say that there was a commercial plant in the United States

25 operating with an SCR.  There wasn't.

Vol. 5-1077

1          However, there are various methods and metrics by

2     which regulators look at the availability of pollution

3     controls, and all we're saying is this is an available one

4     that would have been reasonably considered.  In equity, we

5     think that's sufficient.  I think it's really important for us

6     not to overstate this here.

7          THE COURT:  Doesn't that help you with your notion

8     of having a penalty in this case that is somehow associated

9     with the harm that you think Cinergy has done?

10         MR. SAVAGE:  I'm sorry, Your Honor.  We're not

11    seeking a penalty for the Wabash River violations.  Are you

12    asking whether our remedy could be considered punitive?

13         THE COURT:  Strike penalty and go with remedy.

14    Because your remedy is about as strict as you can make it,

15    isn't it?

16         MR. SAVAGE:  Your Honor, the laws that Congress

17    passed and EPA implements are strict.  I think as Mr. Rarick

18    admitted on cross-examination, there are two compliance

19    options, subject to Your Honor's equitable discretion, shut

20    down or control.  And there's a lot of options that Defendants

21    can take before, like Cinergy becoming the first electric

22    utility in the history of New Source Review to have a remedy

23    trial.  So yes, the law is strict, and we think it's important

24    to have compliance with the law here.

25         But Your Honor, we're not trying to be punitive.

Vol. 5-1078

1  We're trying to come up with equitable yardsticks by which to

2  measure the emissions from the violations and a remedy that

3  addresses that.

4          I think it's important to keep in mind and contrast

5  what Dr. Fox did with what Mr. Rarick did.  He assumed that

6  Cinergy could have received what's called the synthetic minor

7  permit.  There are so many terms flying around in this case,

8  it's important to keep in mind what that actually is.

9          That's a permit that a company gets before it does

10 the modification to make sure that its emissions don't go over

11 what's already there, plus the significance level.  And here

12 for SO2 and NOX, as Your Honor knows, significance level is 40

13 each.  So it would be the baseline plus, you know, 39 to keep

14 you under the amount of an increase.

15         Mr. Rarick used to be a regulator.  He used to work

16 at EPA and IDEM.  But here's where his calculation doesn't

17 make sense.  He doesn't know, and he's not familiar with these

18 Life Extension projects.  He admitted it would be -- check the

19 trial transcript -- sheer speculation for him to guess at what

20 Cinergy's economic motivations were at the time of the

21 project.

22         We respectfully submit that a synthetic minor permit

23 and a Life Extension project are mutually exclusive.  A

24 synthetic minor permit, by limiting emissions necessarily

25 limits operation.

Vol. 5-1079

 1          In contrast, a Life Extension project, the root and

 2   the purpose of it is to operate more, which is exactly what

 3   Cinergy did when you look at Dr. Fox's excess emissions

 4   calculations.

 5          Now, Dr. Fox also explained that utilities would not

 6   go through a Life Extension project only to do these caps, and

 7   I think it's important to recognize that the report reflects

 8   that Wabash River Units 2, 3, and 5 are what's called

 9   base-loaded units in the utility industry.  What does that

10   mean?  If they're available, they're going to run.

11          THE COURT:  I think I remember that from another

12   time.

13          MR. SAVAGE:  Now, Cinergy also raises a legal

14   argument about excess emissions.  There was another provision

15   of the Clean Air Act --

16          THE COURT:  Let me stop you again.  We're talking --

17   you're referring to these equitable standards, and that's fair

18   enough.  Mr. Turner comes in and he says, but in 2005 -- I

19   think it's 2005, somewhere in there -- he has the right to do

20   this cap and trade stuff.

21          As long as he keeps the system over which he has

22   control, underneath these numbers, he's fine.  He is doing

23   what he is supposed to do, which is provide cheaper energy to

24   the community and thereby make his economic contribution, et

25   cetera.  I suspect if I asked him -- I doubt if he would admit

Vol. 5-1080

1   it here in court, but he probably in his deepest darkest

2   thoughts thinks the EPA probably is a bunch of acrimonious

3   gnats flying around, interfering with his ability to provide

4   this cheap power, right?

5          MR. SAVAGE:  Yes.  I would like to briefly respond

6   to what Mr. Turner might say there.  At the outset, it is

7   important to recognize that the Plaintiffs do not dispute that

8   it's a good thing that Duke provides power.  All we're saying

9   is it has to be done in compliance with the law.

10         Mr. Turner is correct in that there's something

11  called a cap and trade program under Title IV of the Clean Air

12  Act, and it gives utilities what are known as SO2 allowances.

13  They're allocated to each unit within a utility's system; and

14  those allowances can be traded and sold among the utilities.

15         But it's important to recognize that that Title IV

16  program and similar ones like it did not repeal New Source

17  Review.  New Source Review has its roots in the 1970s.  It is

18  a command and control requirement.  I think Mr. Turner may

19  disagree about whether it's reasonable, and perhaps we all

20  have our own thoughts on that, but Your Honor, the United

21  States is here to enforce the laws as Congress wrote them.

22  And the fact is that New Source Review is a unit specific

23  requirement.

24         You have to put in your pollution controls

25  regardless of this overall cap on your system, and you have to

Vol. 5-1081

1  put in pollution controls regardless of Title IV.  This is so

2  fundamental of a point, and to avoid misunderstanding that EPA

3  makes utilities put this in their permits.  Your Honor saw

4  this in Plaintiffs' Exhibit 2017 and 2018.

5           All it basically says is that your compliance with

6  Title 4 does not obviate compliance with other requirements of

7  the act.  By 2005, Mr. Turner may be referring to what's

8  called the Clean Air Interstate Rule.  However, that was

9  vacated by the DC circuit.

10           THE COURT:  Is that on appeal someplace?  Is the

11  Supreme Court going to address that?

12           MR. SAVAGE:  Your Honor --

13           THE COURT:  I take that back.  To guess whether the

14  Supreme Court is going to address that is probably futile.  Is

15  it on search?

16           MR. SAVAGE:  My understanding, Your Honor, and we

17  sit on the floor with the Environmental Defense Section who

18  defended the rule is that it is not, but I could be mistaken.

19  The status right now is the Clean Air Interstate Rule was

20  vacated.  But then the DC circuit reconsidered and did what's

21  called a remand, which means for some uncertain period of

22  time, the rule will remain in effect until EPA can --

23           THE COURT:  When EPA looks at it again?

24           MR. SAVAGE:  Yes, until EPA can come back and take a

25  look at it and fix whatever problems that the Court

1  identified.  If it would be helpful to Your Honor, we would

2  like to just go through the prospective compliance that we

3  view with New Source Review.  This is the issue -- does Your

4  Honor need a moment?  I don't want to --

5           THE COURT:  No, go ahead.  I can multitask up here.

6  I can listen to you and look at my notes at the same time.

7           MR. SAVAGE:  I think this is a very timely subject,

8  because we heard from Mr. Harszy today.  We heard from

9  Mr. Turner today.  New Source Review, as Mr. Rarick

10 acknowledged, really for compliance purposes, recognizing Your

11 Honor's discretion.  For compliance purposes, there's two

12 options, control or shutdown.  Had Duke opted for control, we

13 probably wouldn't be here today, but Duke has chosen to shut

14 down.  So we think that requires prompt compliance.

15          Now, as we've heard, Duke and MISO have reliability

16 concerns that flow from that choice which mitigate against

17 immediate shutdown in that view.  We respectfully submit that

18 there are viable ways to address those concerns and still

19 obtain prompt compliance.

20          THE COURT:  So you want a six-month Attachment Y

21 study on that?

22          MR. SAVAGE:  That may be an option.  We actually

23 have thought about it in two different ways.  I think the

24 first way was articulated in our trial brief.  By first, I

25 don't mean this is our preference.  We just laid it out in our

Vol. 5-1083

1   trial brief.

2          To emphasize, the Federal Energy Regulatory

3   Commission has an established administrative process with

4   experts who review these issues, who know what the MTEP model

5   is, and they know how to work with utilities to make sure that

6   issues are resolved.  So there would be -- certainly be ways

7   to have FERC address the issue within the context of this

8   litigation while still moving forward expeditiously.

9          There is, in fact, a Seventh Circuit case that talks

10  about this issue of having agencies look at a piece of a case;

11  and it's called Marseilles Hydro Power versus Marseilles Land

12  And Water Company, 299 F.3d 643, 2002.  That case, the Seventh

13  Circuit commented on the authority of a federal court to refer

14  a discrete issue to FERC.

15         Even aside from that, I think the Plaintiffs' first

16  preference is that the Court order Wabash River Units 2, 3,

17  and 5 shut down unless and until Duke provides this Court a

18  limited operation plan.

19         Now, you've heard proof today about reliability

20  concerns, and I'll discuss this in a bit more detail.  But

21  what you haven't heard are the scope of those issues and a

22  proposed solution by Duke.  That really goes beyond what it

23  wants to do anyway.

24         So what we would submit, if the Court were to

25  entertain this, is that Duke may submit, by motion, a limited

Vol. 5-1084

1  summer peak operation plan for Wabash River Units 2, 3, and 5

2  in which it has demonstrated the following:  That it is taking

3  all possible steps to allow permanent shutdown of these units.

4  It has devised a plan that limits, to the greatest extent

5  possible, the hours of operation of Wabash River Units 2, 3,

6  and 5 to those times when there are no other options for

7  ensuring the liability of service.

8          Duke promptly takes all actions to obviate the need

9  for any generation from those units, and in other words, when

10  Duke has taken all possible steps to bring those units into

11  compliance, balance whatever reliability concerns may be out

12  there.

13          As I'll discuss in a moment and as we saw from

14  Mr. Harszy, those concerns are not fully developed.  There

15  hasn't been a Y, Y study as it was called.  There were some

16  unanswered questions about what the reliability issues were.

17          Now, in addition to seeking prospective compliance

18  with the law, Your Honor, we are also seeking what we call

19  mitigation.  This is a ton-for-ton reduction in the amount of

20  excess or legal pollutants from this plant which continue to

21  this day.

22          Now, what we propose is that Duke be required to

23  install a scrubber for SO2 and an SCR at Units 4 and 6; and if

24  Duke can shut down Unit 4 promptly, that's its choice.  But we

25  believe that it's appropriate to control Unit 6 regardless.

Vol. 5-1085

1   These controls will make sense.  Why is that?

2          There's a tight nexus to the violations at Wabash

3   River.  All the SO2 and NOX on Wabash River Unit 2 through 6

4   come out of the same smokestacks.  The same communities and

5   ecosystems have been harmed by Cinergy's violations of the

6   law.  Those communities would benefit.

7          In essence, there's a constituency from this

8   smokestack.  Mr. Chinkin testified that the air quality

9   benefit from controlling Unit 6 would be double the benefit of

10  the excess emissions.  And as Mr. DePriest left the stand, he

11  was explaining that controls on Unit 6 are feasible and even,

12  I believe, suggested some details on there.  And over the

13  years, that would remove the amount of excess emissions that

14  have come out of the stack previously to around 400,000 tons.

15         Now in addition to mitigation, the Plaintiffs are

16  also requesting the surrender of allowances.  I think we

17  talked about this before in terms of Title 4 of the Clean Air

18  Act has an SO2 allowance trading program.

19         The utility has to own enough allowances to cover

20  the actual emissions for a unit.  What happens is if the unit

21  installs controls, then the allowances that would have

22  otherwise been used by that unit are freed up.  They can be

23  used or sold elsewhere.

24         Plaintiffs' Exhibit 2080 explained this concept

25  nicely.  It's an interrogatory response.  It said that Cinergy

Vol. 5-1086

1  had studied installing a scrubber at Wabash River for the

2  express purpose of quote, to generate SO2 allowances.

3          So, in this case the paradigm is different.  There's

4  been an adjudicated violation, and we think it's equitable for

5  this Court to order allowances surrendered in the amount of

6  mitigation from controlling these other units at Wabash River.

7          In our view, that secures the environmental benefit

8  of the relief, and otherwise the remedy will be somewhat

9  hollow, because when Duke installs these controls at Wabash

10 River, it means these allowances are freed up and it will

11 allow the pollution to go elsewhere.

12          We don't think that type of windfall or shifting of

13 risks to other communities is appropriate in an equitable

14 proceeding to remedy a violation of law through mitigation.

15          THE COURT:  Let's look at Beckjord for just a short

16 time.  You've asked for a fine for Ohio and a fine for the

17 Government.

18          MR. SAVAGE:  At Beckjord?  Yes, Your Honor.  We

19 think the issues here are fairly minimal.  First, the parties

20 agree upon a continuous emission monitor for Beckjord.

21 Mr. McRanie wants a 30-day averaging period for that.

22 Plaintiffs will agree to this, provided that Your Honor's

23 injunction does not prohibit EPA using the data for other

24 purposes.

25          There's a provision in the Clean Air Act, Section

1   113(E)(1) that says that any credible evidence can be used to

2   show a violation.  So we're perfectly comfortable with Duke

3   putting in that CEMS, and it can pick its averaging period.

4   But the underlying data we should be free to use how we wish

5   in future proceedings that may not have arisen.

6          Second, we request a $1.32 million penalty.  The

7   parties have now stipulated to the amount of days of the

8   violation.  We believe that 28 days -- and we believe that a

9   statutory maximum is warranted because of deterrents and

10  because these are not temporary malfunctions but ongoing

11  problems where exceedances happened by nearly 300 to

12  400 percent in some instances.

13         If I may, just a few brief comments on Cinergy's

14  remedy.  In opening, we promised to show you this is largely

15  part of Cinergy's business plan.  I think we've done so.  If

16  you look at Plaintiffs' Exhibit 1971, that was Mr. Turner's

17  testimony before the jury verdict on May 16, 2008.  And he

18  said as part of a plan to modernize Duke's fleet of power

19  plants, it was looking at shutting the very units that Cinergy

20  now proposes to the Court as its remedy.

21         By his own admission, Mr. Turner knew not long after

22  the jury's verdict that we were seeking compliance, shut down

23  promptly or controls; but he did not ask for a study.  When

24  asked why he did not, he said he decided what was the most

25  appropriate remedy.

Vol. 5-1088

1          Now, we understand and we recognize that Mr. Harszy

2    has concerns and Duke has concerns.  It's important to focus

3    upon those concerns.  First, they deal with Terre Haute on

4    days when the temperature is above 90 degrees or higher, when

5    there's a thermal overload on the system, and when Duke loses

6    a transformer at the Dresser substation.

7          I think the Court can take judicial notice that in

8    Indiana there are, at most, weeks of 90-degree days, and

9    that's the only condition that MISO and Mr. Turner mentioned

10   as creating potential problems for reliability.

11          Your Honor, we do not want to overstate our proof,

12   but we think it's fairly well established that Duke has not

13   taken a serious look at this.  If you look at what Mr. Turner

14   said both in this court, in his deposition designations, and

15   what Mr. Geswein said, Duke is a sophisticated utility.  It

16   has transmission engineers.  The Dresser substation and

17   related transmission equipment is owned by Duke, not MISO.

18   And Duke has not looked into this solution as Mr. Harszy

19   confirmed.  It's done no analysis of whether it can operate on

20   an as-needed basis.

21          Instead what Duke has proposed is operation at what

22   are called the Rosen baseline.  What is that essentially?

23   It's what we discussed previously.  It's a synthetic minor.

24   It's the emissions that existed before the project.

25   Mr. Turner admitted that that calculation that our expert

Vol. 5-1089

1  performed for other purposes has no connection to the amount

2  of power needed to maintain reliable service.  Essentially,

3  what Duke wants is another 3 1/2 years of illegal operation

4  without a showing of -- that that is tied to a liability

5  concerns.

6          Now, there's also been no showing that Duke has

7  tried to expedite or quicken the purchase of a transformer.

8  Your Honor, we received evidence, and Mr. Turner talked about

9  this, that he approved the solution to this problem, a third

10 transformer at Dresser, only the Friday before trial.  Duke

11 has not checked to see whether the installation of this

12 transformer can be expedited.

13         Duke has not checked to see whether its sister

14 company, Duke North Carolina, has a spare.

15         Duke has not checked with Reliability First

16 Corporation to see if it has a spare transformer.

17         If you read carefully the deposition of Mr. Anthony

18 Geswein, which has been designated and in the record, it's

19 clear they haven't done much beyond what's in their current

20 planning.

21         Turning to Mr. Harszy and MISO -- and let's be clear

22 about this.  We are not asking this Court to put the Terre

23 Haute area at risk for even a possibility that there might be

24 a summertime blackout.  However, we do believe that Duke has

25 not seriously looked at the issue, and it's not made an effort

Vol. 5-1090

1   to both come into compliance and to address that issue.  We're

2   not convinced that Duke has done everything in its power to

3   address that.

4          As we discussed earlier, we think there are two

5   options here, to be ordered to come up with a plan to study

6   the issue and develop minimum generation for Your Honor's

7   consideration.  We would like to take a look at that, and

8   we'll -- we're advocates here, but we're also going to be

9   responsible.  We'll coordinate with our sister agencies to

10  that, and we'll make sure that Your Honor does both the right

11  thing and the reliable thing.

12         The other option we discussed is there are ways that

13  this discrete issue of summer peak operation, which is really

14  all that's at issue, could be addressed by FERC.

15         But in the meantime, we don't think it's either

16  fair, appropriate, or needed for reliability for this plant to

17  continue to operate.  Nor do we think that this issue of

18  reserve margin is an issue.

19         Reliability in Terre Haute is about the actual

20  electricity flowing over the lines.  This issue of reserve

21  margin is about Duke essentially entering into option

22  contracts.  Those contracts make sure that it has a cushion.

23  It's about 14 1/2 percent for reliability purposes.  Mr. Kahal

24  and Mr. Turner both testified that Duke could go out and buy

25  that reserve margin if the units were shut down.

Vol. 5-1091

1    On costs, Duke talked at length about this in the

2 opening.  Mr. Turner did not know the basis for the costs.  He

3 did not prepare them.  There's simply no genuine dispute that

4 Duke can pay for the remedy.  Mr. Kahal talked about this, and

5 Mr. Turner did not address it.

6    Finally, Your Honor -- and we've submitted this in

7 our trial brief.  We understand Duke's rate paying concerns.

8 We have to enforce the law as it is.  Under federal law, as

9 shown in our trial brief, state rate making is not a defense

10 to federal environmental violations.

11    There's really two reasons for that that's

12 particularly appropriate here.  Whatever controls or

13 mitigation the Court orders, the people of Indiana will see

14 the greatest benefit.  That's what the modeling showed.

15 That's what Mr. Chinkin's discussion of the air quality

16 monitoring showed.  Let's not forget what Dr. Driscoll said.

17 He was largely unrebutted.  He said there are thousands of

18 miles of streams in Indiana right now where the levels of

19 mercury are already too high.

20    By allowing operation that is not tied specifically

21 and tightly to whatever reliability concerns there are, that

22 simply allows more of that mercury to add into what's already

23 a bad situation.

24    The other reason that rate making is really not

25 appropriate here is because we're talking about impacts that

Vol. 5-1092

1    extend past the state line.

2           You know, Your Honor, just one final point.

3    Plaintiffs believe that it's important to ensure that both the

4    will of Congress and the jury are vindicated.  I mean, I'm

5    sure Duke's Counsel will be eloquent in explaining that

6    Mr. Turner has balanced many cost issues, control issues, and

7    others as the No. 2 person at Duke Energy.  But, Your Honor,

8    this company has been out of compliance for two decades.

9           And really a lot of these policy issues Congress has

10   balanced and decided in the first instance.  When looking at

11   ensuring strict compliance with the law, we also think it's

12   important, as Your Honor has found, to take into consideration

13   that Cinergy, its corporate predecessors, took some calculated

14   risks.

15          I think Mr. Hopson at one point misheard us and

16   thought we were saying an intentional tort.  All we're saying

17   is Cinergy took a calculated risk as this Court has previously

18   found in a published decision.

19          As you heard in opening statements, the prefiled

20   testimony of Mr. Raley and Mr. Barnes at Plaintiffs'

21   Exhibit 1959.  Those gentlemen worked for PSI.  They testified

22   before the Indiana Utility Regulatory Commission, and they

23   said exactly what we're here to talk about nearly 20 years

24   later, that there were risks from proceeding with Life

25   Extension projects in the face of the WEPCo determination.

Vol. 5-1093

1          We may disagree with how Congress framed it or EPA

2    framed it, but it's important in that there's a level playing

3    field.  This doesn't just apply to Duke, it applies to the

4    rest of the utility industry and the rest of the commerce in

5    the United States.  There are choices that are made in our

6    society to balance cost and harm and risk to public health and

7    the environment.

8          Here is a story that really brings this home.  You

9    may recall that Mr. Hayes talked about the Harding Street

10   station.  That's a coal-fired power plant right here in

11   Indianapolis.  That plant has installed the scrubbers and the

12   SCRs to reduce SO2 and NOX emissions.  That also, in turn,

13   reduces PM2.5.  Mr. Hayes talked about Indianapolis will still

14   need more to come into attainment.

15         If Duke can push its illegal emissions into

16   Indianapolis or other areas that are non-attainment, what does

17   that mean?  It means companies that are lawfully operating and

18   doing the right thing -- and not to accuse them of ill motives

19   but they are out of compliance with the law -- those companies

20   who are actually complying will have to make up the difference

21   to make sure that cities and communities downwind reach

22   attainment.

23         I've talked at length, and there's just one other

24   point.  The United States and Plaintiffs respectfully submit

25   that this is an important precedent for enforcement of the

Vol. 5-1094

1  Clean Air Act.  You know, this is a program that's been in

2  effect, New Source Review, since 1977.  This is the first

3  remedy trial involving an electric utility.

4          Your Honor, New Source Review works like an honor

5  system.  The company has to do a prediction and come in and

6  get its permit.  We don't have the people, sources, or staff

7  to monitor the hundreds or however many power plants there

8  are, nor is there any evidence that we knew about these

9  projects.

10          If a company that is found liable can largely stick

11 to its business plan, then it's going to be very difficult for

12 us, and there will be little incentive for companies to come

13 in in the first instance.

14          Unless Your Honor has any questions --

15          THE COURT:  I don't.  I think that's good,

16 Mr. Savage.  Thank you very much.

17          MR. SAVAGE:  Thank you very much.

18          MR. HOPSON:  Good afternoon, Your Honor.

19          THE COURT:  If I ask you a question that so stumps

20 you that you need help from your associates, free feel to call

21 on them.

22          MR. HOPSON:  I'm going to tag them right in here and

23 just go sit down.

24          THE COURT:  Let's begin with this.  Do you feel the

25 same way about these BACT and LAER determinations, or are

Vol. 5-1095

1  these important -- these numbers important to you in your

2  defense?

3          MR. HOPSON:  Well, they're important to us in our

4  defense, Your Honor, to the extent that this court ever

5  reaches issue of calculating excess emissions.

6          THE COURT:  So where do you think the Court should

7  start?

8          MR. HOPSON:  I think the place the Court should

9  start is with the NSR remedy; and the core NSR remedy that

10  brings my client into compliance with the preconstruction

11  permitting rules, the local unit specific permitting rules is

12  the shutdown.  That's the NSR remedy.

13          And I understand, Your Honor, and I think you do

14  too, that the whole question of saying where would we be but

15  for a violation of law that occurred 20 years ago is the kind

16  of a historical analysis that lawyers engage in every day.

17          But when we sit in the courtroom and we argue about

18  what controls would have been installed or what synthetic

19  minor would have been attained, the truth is -- the honest

20  truth is had the Government published their recovered

21  availability theory in the Federal Register; and had Cinergy

22  clearly known that these projects would trigger the

23  requirement of controls, they wouldn't have done the projects.

24  But I can't come to you in the context of a remedy proceeding

25  and say, for purposes of this remedy proceeding, let's assume

1  that they had never done the projects.

2          But Your Honor will recall that, from the liability

3  trial, there were quite a few cost-benefit analyses.  Let me

4  just show you one of them.

5          Can I have the ELMO, please?

6          I know Your Honor doesn't remember this, but this

7  was a Plaintiffs' Exhibit 1277; and it got lots and lots of

8  play during the liability trial because it had a very discrete

9  and specific cost-benefit analysis in it.  This was, in fact,

10  for Unit No. 3.  They call it the boiler retube.  It's one of

11  the projects that led to liability in this case.  It was the

12  biggest project I could find.  I looked through these files

13  over lunch.  It was the biggest one I could find; and the cost

14  of the project was $2,392,000 in the revised work order.

15          If somebody had told these engineers who were

16  preparing these cost benefit analyses, gentlemen, this could

17  trigger a requirement to install 100 million, $200 million

18  worth of controls, these would have never passed muster in the

19  first place.  If the law had been clear, if my client had

20  actually known the consequences of doing what they're calling

21  here a boiler retube, well, we wouldn't be here today.  But we

22  are.

23          So our position is since we're here, we should argue

24  about -- and first -- what is the NSR remedy?  And that is

25  what I want to address first, Your Honor, unless you have some

Vol. 5-1097

1 other questions.

2          THE COURT:  That's where I'm going to get sooner or

3 later.

4          MR. HOPSON:  At the outset, let me say this:  I wish

5 it was true that the Government was here to enforce the laws

6 as Congress wrote them because the laws as Congress wrote

7 them, the NSR rules don't have anything to do with the

8 national system of cap and trade.  They don't have anything to

9 do with allowances.  As the evidence showed, Your Honor, even

10 though the Cinergy emissions never violated system wide

11 limits, they're in here arguing that we should reduce

12 emissions at units for which there is no NSR violation and

13 that we should take system wide allowances -- allowances are

14 not specific to the units at issue here -- and surrender them

15 to the EPA for the purpose of bringing down national emissions

16 caps.  That's not enforcing the law as Congress wrote it.

17 That's rewriting the law in this litigation proceeding, and

18 it's consistent with a lot of other rewriting of the law

19 that's going on, whether it's the intramural squabble with the

20 EPA versus the FERC on these reliability issues, or whether

21 it's their experts who don't agree with the law as EPA wrote

22 it with regard to the NAAQS.

23          The bottom line is there's no legal nexus and

24 there's no logical nexus between any part of the remedy other

25 than shutdown and the NSR statute and regulations.  By that, I

Vol. 5-1098

1    mean that nothing happened, sir, in 1989 to 1992 at these

2    specific plants that we're talking about at Wabash River --

3    nothing happened there that affects allowances.  Nothing

4    happened there that caused excess emissions to be emitted from

5    the Cinergy system.

6          So when you turn away from that, you get back to the

7    questions that Your Honor asked at the beginning of the

8    Plaintiffs' closing.  Why is this equitable?  Why is this

9    proportionate?

10          As I told you in my opening, we understand that this

11   is an equitable proceeding.  We are asking the Court to apply

12   a balanced approach that takes into an account the

13   environmental interests.  Plaintiffs' approach to this is a

14   one-way ratchet.

15          I understand they're here and they have

16   environmental concerns, but there wasn't a word on the

17   Plaintiffs' side about what balance should be struck or what

18   other interests should be taken into account, whether it's the

19   reliability of the transmission system in Terre Haute or it's

20   the billion dollar cost of the remedy that they're advocating.

21   It's simply a one way ratchet.

22          There are other considerations which Your Honor

23   recognizes, reliability considerations and cost

24   considerations.  And that's not to say that I don't think

25   there should be costs.  We showed you what the costs of our

1  remedy would be.

2          THE COURT:  Do you think under the scheme, under

3  this NSR remedy and the evidence that we heard, is there -- I

4  don't think I heard from any of your experts -- and you tell

5  me if this is true or not or why this is true.  I didn't hear

6  anything about secondary particulate matter, about the concern

7  that the NOX takes on an extra oxygen and that involves the

8  ozone and those measures of secondary particulate matter that

9  we saw in the plumes that go all around, up as high in the

10 north as the northern part of Lake Michigan.  And here we've

11 criticized New Jersey for having lousy atmosphere and then

12 there's my Hoosier plume right in the middle of New Jersey.

13         MR. HOPSON:  I think the best testimony that I would

14 refer you to, Your Honor, on that is not only Mr. Valberg, but

15 I think in particular Mr. Hayes.  And I'm just seeing if I can

16 bring something up here to remind you of this.

17         Mr. Hayes looked at the same plumes that we heard

18 about in the Plaintiffs' case.  He used the exact same

19 modeling data which was, as you can see on this chart -- and

20 the chart is PR DEM 46.

21         He used the CALPUFF, CMAQ and CAMx data, same data

22 as the Plaintiffs; but what he did was, rather than have

23 Mr. John Paul come in and say as any regulator worth his salt

24 would, gee, this bothers me, he actually compared the air

25 quality data to some objective criteria.  One of the criteria

Vol. 5-1100

1   he used -- and let me just see if I can give you a citation.

2   I probably can't.

3          I apologize, Your Honor, I can't.  But these sills

4   that he compared the actual emissions to and the actual air

5   quality to are de minimus standards.  What these standards

6   are, are standards that EPA uses to say unless your source

7   meets these standards, you don't even have to model the impact

8   of your emissions.  They're much lower than the national

9   ambient air quality standards.

10         THE COURT:  So there's no concern under this system

11  for accumulation?

12         MR. HOPSON:  No, sir.  That's why again, when I put

13  up one chart here, I put up the annual chart.  The EPA uses

14  three years of data when they model the NAAQS.  A lot of what

15  you heard from Plaintiffs was daily or 24 hour data.

16         You know, it's there.  It's real --

17         THE COURT:  The highest ones were.

18         MR. HOPSON:  The biggest number that you quoted

19  during Plaintiffs' argument was daily data.

20         THE COURT:  It was.

21         MR. HOPSON:  I wanted to show you what I thought was

22  one of the key charts that Mr. Hayes put up regarding the

23  annual data.

24         THE COURT:  So what do you do with the poor guy over

25  there in Dayton who's in charge of his community and he's

Vol. 5-1101

1  awfully close to compliance but not quite; and then somebody

2  else's plume encroaches in his area and he's out, and then

3  he's not in compliance; then the new spaghetti factory won't

4  come over and make spaghetti there in his place, so he's

5  losing jobs.

6          What about that?

7          MR. HOPSON:  I think about that.  Those are big time

8  policy considerations.  They're one of the considerations the

9  EPA was addressing in its recent CAIR Rules.

10          What the CAIR Rules address and what the cap and

11  trade rules address, and what the Plaintiffs call the acid

12  rain amendments to the Clean Air Act address are all these

13  national impacts.  It's all the movement of air around the

14  country; but there's no violation of those standards in this

15  courtroom today.

16          The violation that we're talking about respectfully

17  in the courtroom today, Your Honor, is a violation of a local

18  unit specific set of regulations that we call New Source

19  Review.  They're not intended to address the problem of a

20  gentleman in Dayton and the spaghetti factory and the transmit

21  of all these pollutants.  It's just not part of the statute.

22  There are other statutes that deal with this; and I guess, if

23  you will allow me to say this, the answer for the fellow in

24  Dayton is not with this branch of government.  It's with the

25  other two branches of government.

Vol. 5-1102

1           THE COURT:  Well, that certainly is paying attention

2     to my opening statements anyway.

3           So Dr. Schwartz should go somewhere else?

4           MR. HOPSON:  Dr. Schwartz is a very smart fellow,

5     but Dr. Schwartz said one really important thing during the

6     course of his testimony.  He said that he hasn't done anything

7     quantitative to measure the impacts of the emissions he's

8     talking about.  He says it's all linear.  Therefore, I think

9     this means in common sense terms every little bit hurts and

10    every little bit of reductions helps.

11          But that's not where Congress and the EPA are.  They

12    haven't passed a statute that says every little bit hurts and

13    every little bit of reductions helps.  They have passed

14    statutes that are local, but they have passed statutes with

15    national caps.  And they say to clients -- to companies like

16    my client, "Here is how you stay in compliance with clean air

17    on a national scope."  And there's not a whiff of evidence

18    that anything my client has done has violated those statutes.

19          THE COURT:  Your experts came in and talked about

20    the dosage.  And when we were talking about the particulate

21    matter they wanted to focus on sulfates.  There's nothing in

22    the EPA standard that's quite that specific.  We're talking

23    about everything 2.5 and under.

24          MR. HOPSON:  Right.

25          THE COURT:  So why did you subject me to that?

Vol. 5-1103

1        MR. HOPSON:  Oh, you know, we were just having a

2  slow day.

3        Actually, Your Honor, let me explain to you what

4  that debate is about.  The debate is this:  Mr. Schwartz and

5  Mr. Chinkin focused on PM mass, the whole thing.  Our guys

6  took the position, particularly Mr. Valberg, that that's not a

7  reasonable way to look at a coal-fired utility's contribution

8  to any health issues because what they're contributing is the

9  sulfate.

10        So Dr. Valberg told you the sulfates are not toxic

11  and it is just a very technical epidemiology and toxicology

12  debate.

13        The difference, I would submit -- the important

14  difference in the health effects evidence is not that point.

15  It is the point about whether and to what extent any of the

16  air modeling and the health effects or environmental effects

17  data that follows on the air modeling actually has been

18  quantified because quantifying that, doing a real risk

19  analysis, would be something that would be -- I respectfully

20  submit -- helpful to the Court in trying to strike an

21  equitable balance and in deciding if you want to go beyond the

22  shutdown remedy to achieve one of these other national

23  remedies, either to order some controls, to lower emissions

24  off the entire system or to cause a surrender of allowances.

25        It seems to me you would want to see some evidence

Vol. 5-1104

1  of irreparable injury.  You would want to do something about

2  the balance of the harms.  It seems to me you would want to

3  think about the public interests.  None of the health effects

4  testimony that came from this side of the courtroom helps you

5  to do that because as Mr. Chinkin said, he didn't measure his

6  fancy graphics and his plumes against any objective air

7  quality criteria.  That's at the February 2nd transcript, at

8  197 and 198.

9       We've shown you with Mr. Hayes' testimony that even

10 to the extent you try to apply this to the most sensitive

11 standards that had been proposed by the EPA, you don't come

12 anywhere close.

13      When you get beyond that, Dr. Schwartz admits that

14 his testimony on health effects is generic.  In other words,

15 he doesn't say I'm able to tell you that there are health

16 effects of this much caused by the excess emissions in this

17 case.  And the reason is none of these experts did a risk

18 assessment.

19      The only risk assessment that exists in this case,

20 again, it's not perfect; but the only risk assessment that is

21 in evidence in this case is the risk assessment prepared by my

22 client, which came into evidence I believe yesterday, the

23 so-called TERA study.

24      I recognize your question already implicitly

25 acknowledged that this does not have every secondary pollutant

Vol. 5-1105

1  in the model.  But they followed the EPA guidelines in doing

2  that risk assessment and that's what we got.

3          THE COURT:  Let me change the subject just a little

4  bit.  I think the evidence on this I probably just missed.

5  But when we're at Dresser and we've got two transformers --

6          MR. HOPSON:  Yes, sir.

7          THE COURT:  -- and all of 2, 3 and 5 are out of

8  business, and we've just bought more electricity that comes

9  over the transmission wires and it's, what, 350 volts or

10  whatever it is, and it slams into the transformer and

11  overwhelms it.

12          My factual question is, when 2, 3 and 5 are running,

13  those don't all go through Dresser too, do they?

14          MR. HOPSON:  Let me -- it's easier to show you, if

15  you'll indulge me a second, I'll show you on the map.  I'll

16  give you my best lawyer's understanding.

17          THE COURT:  I just wondered.  It must not because if

18  it does, then nothing changes.

19          MR. HOPSON:  I'll show you, Your Honor.  It's always

20  easier to deal with the paper.

21          THE COURT:  And I do appreciate the blue and yellow

22  charts I have to say.

23          MR. HOPSON:  I got a little heads up on that one.

24  It was totally intuitive.

25          THE COURT:  The pink threw me for a little bit, but

 1  the blue and yellow...

 2          MR. HOPSON:  Thank your staff for that.

 3          Here's the issue, Your Honor.  Just to make it

 4  simple, look at Terre Haute East, Fruitridge, Margaret and

 5  Allendale.

 6          THE COURT:  I see that.

 7          MR. HOPSON:  That's the place where MISO's worried

 8  about getting the power; and, in particular, they're worried

 9  about getting the power in there at 138KV because that's what

10  you need to serve there community.

11          The big blue line --

12          THE COURT:  I'm concerned because the new courthouse

13  in Terre Haute will be right over there.

14          MR. HOPSON:  I thought of a joke, but I'm not going

15  to say anything.

16          THE COURT:  It doesn't have anything to do with

17  dark, does it?

18          MR. HOPSON:  No.

19          230KV and 345KV are these blue lines, and you can

20  see the big generating units connected to it.

21          Here's the problem.  When Dresser potentially

22  overheats or you have a problem at Dresser, you can get the

23  power directly in from Wabash River.  You don't have to go

24  through Dresser because you can go across here or here and

25  down (indicating) and you can get the power into the area.

Vol. 5-1107

1          THE COURT:  That's why we talked about this dotted

2   line.

3          MR. HOPSON:  That's right.  That's what MISO wants

4   Cinergy to build is a third transmission line to further

5   bolster this connection between Dresser, Allendale and

6   Margaret that you would see referenced in the MISO report.

7          When you hear the testimony that there are two ways

8   to get power into the community, you can either do it through

9   local generation or you can do it through transmission off the

10  high voltage grid, Wabash River's the local generation in this

11  community.

12         THE COURT:  Okay.  Thank you.

13         MR. HOPSON:  While I'm on that, let me just talk for

14  a minute about the issue here and the extent to whether it's a

15  certainty.

16         I would agree with anything that Mr. Brooks or

17  Mr. Savage would say if they say, well, there's no certainty

18  that you're going to have the problem identified by MISO.

19  That's absolutely true.  Federal reliability standards always

20  are based upon contingencies.  They're always based on having

21  redundancy.  That's federal law.  It's not a situation when

22  you're dealing with the reliability on either the generation

23  side or the transmission side that you're trying to cut it as

24  close to the line as possible.

25         That's why we selected the Rosen baseline as our

Vol. 5-1108

1  offer, our tender, if you will, as a proposed remedy.  We

2  selected it because the Plaintiffs' expert calculated it,

3  because it was objective, because it was reasonable; and the

4  last thing we wanted to do is what Plaintiffs are now

5  recommending, which is go out and do a study that says, okay,

6  we need 32, 33, 43 capacity factor.  Whatever study we had

7  done and whatever capacity factor we would have recommended

8  would just be another dispute in this courtroom.  We defend

9  it.  They would nit-pick it.

10        THE COURT:  You don't think if you had asked them

11  for an Attachment Y, that would have just been another

12  controversy?  Is that what you're saying?

13        MR. HOPSON:  Yes.  To some extent, Your Honor, on

14  Attachment Y, which is a slightly different issue, maybe that

15  was a lawyer's mistake.

16        I heard about Attachment Y early this summer when we

17  started working on this case.  At the time I was told -- maybe

18  I should have gotten better advice, but I was told it took six

19  months at a minimum to do it.  We were looking at a November

20  remedy date, and I simply didn't do it.

21        By mid-summer or late summer, I guess, I had seen

22  Mr. Brooks had filed a notice of deposition with MISO; and our

23  debates about what to do about MISO kind of ended because

24  whatever MISO was going to say, they were going to say in

25  their deposition to Mr. Brooks.

Vol. 5-1109

1          You know, we can ask for an Attachment Y study; but

2    I heard Mr. Harszy on the stand.  And Your Honor will make

3    your own credibility determination, but I did not think that

4    he looked like somebody who had kind of just whipped this

5    thing together and hadn't given it much thought.

6          I asked him if an Attachment Y study would have

7    change his conclusions; and he said, "No, probably not."  In

8    fact, I think he said almost certainly not; but the transcript

9    will reflect what he said.

10          THE COURT:  Mr. Brooks did give him a couple of

11    questions.

12          MR. HOPSON:  Yeah, Mr. Brooks gave him a couple

13    questions.  The difference between -- I can't remember the

14    numbers now, 430 or 438 being the model demand, none of that

15    seemed to be too material to Mr. Harszy in terms of his

16    confidence level in his report.

17          But I do want to say to you, Your Honor, we're not

18    trying to overpromise here either.  We've tried at every step

19    of the way to be careful when we put together cost data, when

20    we put together emissions predictions and say to you a lot of

21    this stuff can't be perfectly parsed out, particularly when

22    you're talking about the future.  And a lot of utility

23    operations and utility regulations have the same problem.

24          As you now know, there are lots and lots of moving

25    parts; and it's very hard to say anything about the future

Vol. 5-1110

1  with certainty, whether you're talking about regulation or

2  whether you're talking about reliability.

3          THE COURT:  I wonder for the next Judge that takes a

4  look at this and he calls me up and says, "What should I do?"

5          I'll tell him that, "As soon as the verdict comes in

6  against the electric company, tell them you would like to see

7  an Attachment Y study."  I might just suggest that to him.

8          MR. HOPSON:  Yeah.

9          THE COURT:  Or her.

10         MR. HOPSON:  And tell him to wait at least six

11 months between the liability trial and the remedy stage so

12 nobody has a chance to complain that they didn't get an

13 Attachment Y study.

14         THE COURT:  I might not go that far.

15         MR. HOPSON:  I'm sorry.  I couldn't resist slipping

16 that one in.

17         Your Honor, you know, we weren't the only ones

18 pinched for time.  Everyone -- it's an overstatement -- but

19 many of the Plaintiff's experts when confronted about, "Well,

20 why didn't you do this" and "Why didn't you do that," they

21 said, "We didn't have time."

22         THE COURT:  I heard that.

23         MR. HOPSON:  I would like to talk a little bit about

24 excess emissions, just the general concept of it because we've

25 already talked a little bit about calculating it.  Let me just

Vol. 5-1111

1  make some quick observations based on the evidence.

2          The reason -- can I see chart No. 5 just to have it

3  when I'm talking about this?

4          The reasons the excess emissions in this case, the

5  numbers are so big, is it's been 20 years since the violation.

6  If we were litigating this case three years after the

7  violation, we wouldn't be talking so much about excess

8  emissions.

9          Second and more important, I would submit that the

10  idea that the Cinergy system has excess emissions is both

11  legally and factually flawed.

12          I think it's legally flawed to say that our

13  emissions are illegal.  As Your Honor ruled, this is not a

14  continuing violation, it's a preconstruction permit.

15          On the fact side, Your Honor heard -- and I don't

16  think it's really subject to much dispute -- that low-NOX

17  burners were, in fact, BACT during the era that we're talking

18  about and low-NOX burners were installed on these units.

19  Admittedly in one case, not contemporaneously but two years

20  later.  That just means there are no excess emissions of NOX

21  because the technology that was BACT was installed.

22          And while I appreciate the niceties and some of the

23  great lawyering that's going on in debating this with Rarick

24  and so forth, the simple point is that if you accept the fact

25  that low-NOX burners are BACT, you don't have to get into a

Vol. 5-1112

1  lot of calculations.

2        Can I see the ELMO?

3        I would just remind the Court -- I don't doubt for a

4  minute that you saw it the first time it was up.  But the EPA

5  was saying back in 1991 that SCRs are not in use in this

6  country.  It's an example -- I don't think it's the only

7  example, but I think bringing Dr. Fox to the stand to say that

8  SCRs are BACT is an example of what I referred to earlier as

9  the overreaching in the Plaintiffs' case.

10        The notion that everything is a one way ratchet is

11  also reflected by the fact that at the very same time the EPA

12  is saying that, in general, the utility presumption for NOX

13  should call for the combination or modification of low-NOX

14  burners.  I mean, this is indisputable, although I did enjoy

15  Dr. Fox saying that somebody's got to be first, I don't think

16  that's the standard for a BACT determination.  So there's no

17  excess emissions on the NOX side with respect to SO2.

18        You heard and the evidence is -- and I guess it's a

19  point of law as well as the evidence -- that the allowances

20  for SO2 under the so-called acid rain amendments or 1990

21  amendments of the Clean Air Act were based upon baseline

22  emissions from each Unit in '85 and '87.

23        Again, I thought that this was nicely illustrated in

24  the testimony -- I can never find this as quickly as I want

25  it.

Vol. 5-1113

1         In the testimony we heard from Mr. DePriest and

2    others, if you in fact accept the proposition, which I guess

3    is a question of law, illustrated on DR Dem 11 that this

4    baseline is where the SO2 allowances are set.  Nothing that

5    was done or not done at these individual Wabash River units in

6    1989, 1990 or 1992 could have really affected how many SO2

7    emissions were going to be emitted from this system.  It may

8    have emitted -- it may have.  I understand logically it could

9    have affected how many emissions came from Wabash River; but

10   when you talk about excess emissions, that's a national

11   standard.  That's a system wide standard.  There's no federal

12   law that caps emissions from Wabash River Units 2, 3 and 5.

13   There is a preconstruction permitting process under NSR; and

14   for that, we submit, the proper remedy is the shutdown remedy

15   that we have submitted.

16        Let me get off of that for a minute other than to

17   say that if, contrary to everything we've said about excess

18   emissions, if your reading of the law is completely different

19   than mine, if you want to calculate excess emissions, I would

20   submit, Your Honor, that we should try to calculate excess

21   emissions -- No. 5, please -- try to calculate excess

22   emissions in a manner that's consistent with the historical

23   record.  By that, I mean we should try to estimate excess

24   emissions not by simply saying, well, every ounce of emissions

25   that has come out of this Wabash River 2, 3 and 5 is illegal

Vol. 5-1114

1  and not saying, as Dr. Fox does, that but for the violation

2  Cinergy would have installed a wet FGD or SCR.

3          The truth is that, if you want to be historical

4  about this, you should look to the testimony of Mr. DePriest.

5  And I would ask for DR demonstrative 32.

6          Just give me the ELMO.

7          Sorry, Your Honor.  Technology is always the thing

8  that throws me here.

9          DR Demonstrative 32.  This shows -- and you may

10  remember.  It's not been that long ago -- Mr. DePriest

11  testified that here's the project period that I'm pointing to

12  in the center, June 1989 to March 1990 (indicating).  The

13  prior column shows you when they would have made -- when they

14  would have had to have made a BACT determination for these

15  units, and here's when the first SCRs first went into

16  operation in this country.

17          I'm not going to dwell on this any longer.  You've

18  already seen the Federal Register notices.  It's just

19  overreaching here.

20          And with respect to Mr. Rarick's testimony,

21  Mr. Rarick who served at EPA and IDEM, told us that in his

22  view, the more reasonable, more historical approach would be

23  to assume that there are -- that you could have gotten a

24  synthetic minor; and we calculated for you in Chart 8 the

25  difference between the actual emissions and emissions under

Vol. 5-1115

1  the hypothetical synthetic minor.

2         You know, I said it before, Your Honor, but I think

3  I need to say it again:  When we're dealing in our lawyerly

4  hypothetical; but for world, there's no perfect fit.  It's not

5  a perfect answer to say that Cinergy would have gotten a

6  synthetic minor; but it is a little bit ironic that the

7  Government stands up and argues that Cinergy could have never

8  lived with a synthetic minor on these units.  But when we

9  offer a synthetic minor on these units they say, "Well, that

10  level's way too high.  It's way more than they need."

11         It's got to be one or the other.  Either we can live

12  with a synthetic minor or we can't live with a synthetic

13  minor.  But the argument that they're making regarding the

14  shutdown is running head long into their argument here about

15  how you calculate excess emissions.

16         We submit that this is the right calculation of

17  excess emissions; but we also believe, and we think the

18  evidence clearly shows, that there's no such thing as excess

19  emissions.

20         Let me just make one observation here about

21  allowances and then if Your Honor has any other questions,

22  we'll address those.

23         THE COURT:  Okay.

24         MR. HOPSON:  To the extent that this argument about

25  excess emissions is really overreaching or double-dipping, the

Vol. 5-1116

1  argument about surrendering allowances is triple-dipping

2  because now we've not only shut down the units and obtained

3  real substantial environmental benefits -- I'm not going to go

4  back to the charts.  You've seen the charts.

5       There are real benefits, local benefits and benefits

6  to everybody downwind of these plants from shutting down these

7  units.  Whether you shut them down tomorrow or shut them down

8  in 2012 is a big difference in terms of reliability.  A

9  significant difference in terms of cost, but really not much

10  difference in the scheme of things in the long-term

11  environmental benefits.  So you've got that.  That's your NSR

12  remedy.

13       Your double-dip is reducing emissions other places.

14       Your triple-dip is coming in and saying, oh, and by

15  the way, let's go ahead and please have a surrender of 412,000

16  SO2 emissions and 55,000 NOX emissions.  Or, if you're feeling

17  generous today, 392,000 SO2 emissions and only 32,000 NOX

18  emissions.

19       The whole premise and whole notion of allowance

20  surrender is absolutely based on the idea that if you don't

21  get this, you don't get any real environmental benefit.  That

22  premise is wrong.

23       Second, while we're on the subject of this, I've

24  already said it and I'm not going to repeat myself.  I don't

25  understand how the Plaintiffs can stand in the well of this

1  courtroom and say, "We're only here seeking to apply the law

2  as it currently exists," while at the same time saying you

3  should reach out beyond the NSR statute into this whole

4  separate area of the Clean Air Act and be surrendering

5  allowances.

6       Finally -- maybe not finally, but certainly

7  importantly -- they're asking Your Honor, sitting as a court

8  in equity, to enter an injunction in circumstances where they

9  don't know, we don't know and respectfully, sir, you don't

10  know what the consequences are going to be.

11       As I reviewed with Mr. Kahal when he was on the

12  stand, the CAIR Rule was going to substantially revamp the way

13  that this whole cap and trade system works and it was struck

14  down last summer.

15       THE COURT:  I have looked, and I haven't found

16  anything to strike down so far.

17       MR. HOPSON:  If I had known you were so

18  accommodating, we would have helped you look, Your Honor.

19       THE COURT:  I'm not actually.

20       MR. HOPSON:  In any event, without the CAIR Rule, we

21  don't know in simple terms exactly how this cap and trade

22  system is going to operate.  I've warned you a couple times

23  that some of this predictive ability is limited and Mr. Kahal

24  admits their great uncertainty.

25       I'm not going to say a lot more about this other

Vol. 5-1118

1  than to make the very common sense observation that as a

2  sitting federal judge for some years, I know that you've been

3  in some cases -- criminal cases where you've imposed criminal

4  penalties, and I know you've imposed civil fines.  I believe

5  that every time you've done that, you've looked very carefully

6  at the amount of the penalty or the fine that you're imposing.

7  And you've thought about the offense conduct, and you've

8  thought about the conduct of the Defendants specifically; and

9  you've known exactly what the impact of that penalty is going

10 to be.

11        That's not this case.  You can't know what the

12 select surrender of 412,000 SO2 allowances is exactly going to

13 be, although we can roughly talk about it based on some

14 information and evidence.

15        And this is my last chart and my summing-up chart.

16 At least on costs.

17        A lot of cost numbers have bounced around in the

18 courtroom, and I want to tell you the ones that I've chosen to

19 put before the Court in this exhibit that is marked DR

20 Demonstrative 83.

21        Now, Mr. Kahal on the stand agreed with me that it

22 wasn't inappropriate to use a thousand dollars per allowance

23 for SO2 allowances; but rather than use that number, we've

24 used Mr. Kahal's average.  The same thing is true for the NOX

25 allowance surrender that Plaintiffs are proposing.

Vol. 5-1119

1          Then, on the cost to control SO2 and NOX on Units 4

2    and 6, Mr. DePriest said -- and I think Mr. DePriest was a

3    credible guy -- he said $413 million.

4          But rather than use his higher number, we used the

5    average of the numbers from Dr. Fox.  We used her numbers for

6    the operating costs and, finally, we used the numbers from

7    Mr. Turner on the Unit 2, 3 and 5 shutdown costs.

8          Can all these numbers be moved around a little bit?

9    You bet.  Skillful lawyers could argue about these numbers

10   till the proverbial cows come home.  But I think it's

11   important to keep in mind when the Court's sitting here and

12   being asked to impose a remedy in equity, for preconstruction

13   permit violations under NSR where the delay of 20 years is at

14   least in part attributable to the conduct of the Plaintiffs,

15   that to seek a billion-dollar remedy is really not

16   proportionate.  It's not proportionate.  There's no nexus.

17   There's no basis.  You haven't been shown the irreparable harm

18   that would justify, I submit, a billion-dollar remedy.

19          Let me say a few words about Beckjord, Your Honor.

20   Beckjord is an issue on which the parties are closer.  You

21   heard the testimony today of Mr. Michael Boots; and I think

22   his testimony, I think you will find his testimony generally

23   conveys the sense of good faith in which he tried to get this

24   problem with PM violations addressed.  He told you how much

25   people spent, and he sat there on the witness stand and he

Vol. 5-1120

1  told you that everything they did, they responded promptly --

2          THE COURT:  Let me ask you.  A thought occurred to

3  me as I listened to him.  He's getting ready to have a test of

4  new fuel and he throws the paper pellets in with the coal.

5          Is it just not thought of to give the person that's

6  got -- or the agency that's looking over your smoke stacks a

7  little phone call and say, "I'm getting ready to try this?"

8          MR. HOPSON:  That's a good question.  They had

9  obtained approval from Ohio EPA before running the test.

10          THE COURT:  He didn't say that though, did he?

11          MR. HOPSON:  No, he didn't.

12          MR. STOJILKOVIC:  I'm sorry, Your Honor, I believe

13  he did say that.

14          THE COURT:  He did say that?

15          MR. FLINT:  I don't believe he did, Your Honor.

16          MR. HOPSON:  The transcript will tell you.

17          THE COURT:  That's why we have Cathy.

18          MR. HOPSON:  On this regard, Your Honor, we also

19  heard from Mr. McRanie.  Let me just say this:  The parties

20  are both in agreement that PM CEMS should be installed.

21  Mr. McRanie this afternoon or morning endorsed an averaging

22  time of seven to 30 days.  Plaintiffs have not proposed any

23  specific averaging time, have not challenged Mr. McRanie's

24  proposal for how to average the PM CEMS measurements --

25          THE COURT:  I want to see those state troopers

Vol. 5-1121

1 sitting up there above that smoke stack firing away down in

2 the chimney.

3        MR. HOPSON:  I actually thought that was a pretty

4 good analogy, didn't you?

5        THE COURT:  Well, I don't know.  I think it would

6 insult the average trooper to think that his gun was that far

7 off.

8        MR. HOPSON:  Finally, Your Honor, we have contended

9 these PM CEMS should not be used for compliance purposes.  I

10 really think that's a question for briefing.  That was the

11 reason for Mr. McRanie's testimony, as I'm sure the Court is

12 aware.

13        If the Court has other questions, comments, I would

14 be happy to address them.

15        THE COURT:  That's good, Mr. Hopson.  Thank you very

16 much.

17        I'll give 15 minutes here since this is your burden.

18        Did you lose the coin toss with Ms. Himmelhoch to

19 come back or what?

20        MR. SAVAGE:  Please talk to Mr. Brooks.

21        Your Honor, a few points here.

22        First, on costs -- and I should have stated this in

23 the opening and Mr. Brooks reminded me.  We are no longer

24 seeking NOX allowance surrender because of the circumstances.

25 That market is not fully as developed as we wanted.  We

Vol. 5-1122

1  consulted with the client who operates these markets.  So that

2  can be taken off.

3         As to SO2 allowances.  Again, our client EPA

4  operates that market.  We think this is appropriate.

5         The other issue here that I would like to address is

6  this notion of triple-dipping.

7         First, the shutdown of these units cannot in and of

8  itself be mitigation.  That is prospective compliance.  At

9  law, EPA has long taken the position that you cannot get a

10  credit -- a pollution credit for complying with the law.

11  We'll show this to you in a briefing.  And we think in equity

12  that's a similar principle, that mitigation -- a concept that

13  this Court has recognized in a written opinion -- cannot be

14  accomplished simply by doing what the law already requires.

15         Now, Mr. Hopson also -- or Duke also argued that our

16  remedy was disproportionate because NSR is a local program.

17         If you look at the statute, Section 74,

18  7042 USC 7470 -- and this is 74704 -- it says and I quote --

19  and this is for prevention of significant deterioration, New

20  Source Review.  It says the purpose of that provision is, "The

21  purpose of this part are as follows:  To assure that emissions

22  from any source in any state will not interfere with any

23  portion of the applicable implementation plan to prevent

24  significant deterioration of air quality for any other state.

25  This is not solely a local program."

Vol. 5-1123

1          Moreover, Mr. Hopson made reference to the fact that

2    we asked to enforce the law as written.  The law includes

3    Section 113, which this Court has found preserves all this

4    equitable authority, including mitigation.  That concept is

5    just something we refer to as clean up your mess.  If you've

6    had pollution come out of the smoke stack, it's no different

7    than if you dumped it in the ground, put it in soil or water.

8    It needs to be recompensed.  It needs to be remedied.

9          In fact, we think some of the best explanations of

10   why this is equitable and fair are not in our briefing.

11   They're in Cinergy's, the insurance briefing that's already

12   part of this record that explains why this is a reasonable

13   approach.

14          Now, Mr. Hopson also mentioned the cost of

15   mitigation on this demonstrative that's -- in terms of NOX and

16   SO2 controls.  These are our proposed remedies for mitigation.

17   We believe a debt to public health and the environment is

18   owed; that there is an amount of excess illegal SO2 and NOX

19   emissions.  But if Cinergy has a cheaper way to accomplish

20   this from the same stack and achieve the same result, we would

21   not oppose that.  It's just that Cinergy has not come forward

22   with that.  So to the extent that they are to be heard on

23   this, propose something that would accomplish that goal.

24          Finally on costs, Your Honor.  It does cost quite a

25   bit to control a power plant, and that's because they have

Vol. 5-1124

1   quite a bit of air pollution.  I think as we've shown, one

2   ton -- one year's worth of excess SO2 emissions from this

3   power plant is equivalent to over 300,000 diesel trucks.

4   That's as much as are registered in the three state area of

5   Indiana, Kentucky and Ohio.  So there is a cost, but there's

6   also a benefit to public health and to the environment.

7           You know, Mr. Hopson also mentioned that Your Honor

8   has been on the bench and should act cautiously given the

9   consequences.  What I did not hear, however, is that Duke has

10  seriously tried to study the issue and have come up with

11  solutions.

12          Your Honor, we appreciate that Mr. Turner has a

13  business plan.  And I'm sure, as he started to testify, Duke

14  does many things.  But it needs to come into compliance with

15  the law that applies equally to all companies.  And as we've

16  suggested in closing, if Duke is serious about this

17  reliability issue, there are two solutions:  order the company

18  to do a study and come up with a minimum amount of generation

19  to address the issue or there's the Federal Energy Regulatory

20  Commission that could address it as well.

21          We're not trying to put ourselves as the United

22  States enforcing a law or Your Honor in the position of

23  turning the lights out or doing anything untoward.

24          We believe that the case, as I've said, is about

25  public health and the environment, assuring a level playing

Vol. 5-1125

1  field with the law and bringing this company into compliance

2  after 20 years.

3           We appreciate Your Honor's...

4           THE COURT:  Thank you, ladies and gentlemen.  I'll

5  look forward to your briefing and see if we can't get this

6  matter at least prepared for the second goat across the

7  bridge.

8           COURT CLERK:  All rise.

9           Court is adjourned.

10          *(The proceedings were adjourned at 2:52 p.m.)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3        I, Cathy Jones, hereby certify that the foregoing is a

4   true and correct transcript from reported proceedings in the

5   above-entitled matter.

6

7

8     /s/ Cathy Jones                        February 6, 2009
   _____
9     CATHY JONES, RPR, FCRR
      Official Court Reporter
10    Southern District of Indiana
      Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25