IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:99-cv-01693-LJM-JMS |
| | ) | |
| CINERGY CORPORATION, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW (REMEDY PHASE)**

# TABLE OF CONTENTS

I.      STRUCTURE AND PURPOSE OF CLEAN AIR ACT .....................................1

II.     CASE BACKGROUND ...............................................................................3

III.    STANDARD FOR INJUNCTIVE RELIEF .................................................3

        A.      Plaintiffs Need Only Prove Risk Of Harm To Compel
                Injunctive Relief.......................................................................................4

        B.      Injunctions Are Usually Necessary In Environmental Cases ..................6

        C.      The Court's Equitable Authority Is At Its Apex When Public
                Interest Is Involved ..................................................................................7

IV.     HARM TO AREAS DOWNWIND OF WABASH RIVER ...............................7

        A.      Evidence Of Harm Demonstrated At Trial ...............................................8

        B.      Cinergy Fails To Contradict The Evidence of Harm ..............................11

                1.      Cinergy's Arguments Run Counter to NSR and the
                        Company's Own Statements..........................................................12

                2.      Cinergy's Comparisons to Other Benchmarks Are
                        Inapposite ....................................................................................15

V.      APPLICATION OF TRADITIONAL EQUITABLE FACTORS....................18

VI.     WABASH RIVER REMEDY .....................................................................21

        A.      Overview Of Wabash River Remedy ...................................................21

        B.      Prospective Compliance With The Law .................................................24

                1.      Closing Units 2, 3 and 5 to Comply with the Law.......................24

                2.      Timing of Closure ........................................................................25

                        a.      Cinergy's justifications for delay..........................25

                        b.      Appropriate closure schedule................................28

        C.      Mitigation Of Emissions Resulting From Violations ............................30

1.      Calculation of Excess Emissions ....................................................32

2.      Means of Mitigating Excess Emissions .........................................35

3.      Appropriate Mitigation Remedy ....................................................36

      a.      Controls..................................................................37

      b.      $SO_2$ allowance surrender .......................................38

D.      Equitable Analysis ....................................................................................39

1.      Consistency with the Harm...........................................................40

2.      Costs...............................................................................................42

E.      Cinergy's Calculated Risk To Refurbish Its Units Without Permits ....................43

VII.      THE BECKJORD VIOLATIONS WARRANT INSTALLATION OF PM CEMS TO MONITOR COMPLIANCE AND A $1.3 MILLION PENALTY ..................................46

A.      Injunctive Relief.......................................................................................46

B.      Penalty......................................................................................................47

CONCLUSION ............................................................................................................52

## TABLE OF AUTHORITIES

### Federal Cases

*Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531 (1987).........................................................6, 7

*Atchison, T. & S.F. Ry. V. Lennen*, 640 F.2d 255 (10th Cir. 1981) ................................................4

*Atl. States Legal Found. V. Tyson*, 897 F.2d 1128 (11th Cir. 1990)............................................51

*Braun v. Lorillard Inc.*, 84 F.3d 230 (7th Cir. 1996)....................................................................27

*Burlington N. R.R. v. Bair*, 957 F.2d 599 (8th Cir. 1992)...............................................................4

*Camp v. Boyd*, 229 U.S. 530 (1913) ...........................................................................................21

*Cmtys. For a Better Env't v. Cenco Refining Co.*, 179 F. Supp. 2d
      1128 (C.D. Cal. 2001).........................................................................................................20

*CSX Transp., Inc. v. Tennessee State Bd. Of Equalization*, 964 F.2d 548
      (6th Cir. 1992)...................................................................................................................4-5

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)..............................................................3

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007).................................................................1

*Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331 (4th Cir. 1983) ...........................................5, 19

*Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955 (10th Cir. 2002)..................36

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907)................................................................6

*Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440 (9th Cir. 1984)...............................................1-2, 18

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) .................................................................................52

*In the Matter of Columbia Gulf Transmission Co.*, 2 E.A.D. 824
      (E.A.B. June 21, 1989).......................................................................................................34

*Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617 (6th Cir. 2007) .......................................................5

*Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277 (1st Cir. 2006).............................19

*Marseilles Hyrdo Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643
      (7th Cir. 2002)...................................................................................................................29

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ...................................................................6

*Massachusetts Mut. Life Ins. Co. v. Associated Dry Goods Corp.*, 786 F. Supp.
    1403 (N.D. Ind. 1992)............................................................................................14

*Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985 (9th Cir. 2000) ..............30

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) .............................................................1

*New York v. Niagara Mohawk Power Co.*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003) ...............45-46

*N. Shore Gas Co. v. EPA*, 930 F.2d 1239 (7th Cir. 1991) .......................................42-43

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946).........................................7, 20, 21, 30, 39, 46

*Sierra Club v. Franklin County Power of Illinois, LLC*,
    546 F.3d 918 (7th Cir. 2008) ..................................................................5, 19-20, 21

*S. Pines Assoc. v. United States*, 912 F.2d 713 (4th Cir. 1990) ....................................31

*Tull v. United States*, 481 U.S. 412 (1987) .................................................................48

*TVA v. Hill*, 437 U.S. 153 (1978)...............................................................................3-4

*United States v. Alcoa, Inc.*, 98 F. Supp. 2d 1031 (N.D. Ind. 2000).......................21-22

*United States v. Alisal Water Corp.*, 362 F. Supp. 2d 1010 (N.D. Cal. 2002)................7

*United States v. Bethlehem Steel Corp.*, 38 F.3d 862 (7th Cir. 1994) .......................5, 19

*United States v. B & W Inv. Props.*, 38 F.3d 362 (7th Cir. 1994)............................48, 49

*United States v. Cinergy Corp.*, 495 F. Supp. 2d 893 (S.D. Ind. 2007).......................44

*United States v. Cinergy Corp.,* 582 F. Supp. 2d 1055
    (S.D. Ind. 2008) ......................................1, 4, 18, 20, 30, 31-32, 36, 41-42, 46

*United States v. City of New York*, 198 F.3d 360 (2d Cir. 1999)..................................43

*United States v. City of San Francisco*, 310 U.S. 16 (1940)..........................................4

*United States v. Deaton*, 332 F.3d 698 (4th Cir. 2003) ....................................30, 31, 36

*United States v. Holtzman*, 762 F.2d 720 (9th Cir. 1985).............................................36

*United States v. Lane Labs-USA, Inc.*, 427 F.3d 219 (3rd Cir. 2005) ............................7

*United States v. Louisiana-Pac. Corp*, 682 F. Supp. 1141 (D. Colo. 1988)................................25

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996)......................................6

*United States v. Miami Univ.*, 294 F.3d 797 (6th Cir. 2002) ........................................................7

*United States v. Midwest Suspension and Brake*, 824 F. Supp. 713 (E.D. Mich. 1993) .........48, 49

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) ...................................24

*United States v. Odessa Union*, 833 F.2d 172 (9th Cir. 1987) .....................................................4

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ..................................25

*United States v. Prod. Plated Plastics, Inc.*, 762 F. Supp. 722 (W.D. Mich. 1991).......... 5, 6-7, 24

*United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338 (E.D. Va. 1997)................................15

*U.S. Envtl. Prot. Agency v. Envtl. Waste Control, Inc.*,
  917 F.2d 327 (7th Cir. 1990) ............................................................. 5, 18-19, 48

*Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 224 F.R.D. 694
  (N.D. Ga. 2004) ...................................................................................................43

*U.S. Pub. Interest Research Group v. Atl. Salmon of Maine, LLC*, 339
  F.3d 23 (1st Cir. 2003)........................................................................................37

*Virginian Ry. V. Sys. Fed'n No. 40, AFL*, 300 U.S. 515 (1937) .................................................6, 7

*Wehner v. Syntex Corp.*, 682 F. Supp. 39 (N.D. Cal. 1987) ................................................. 30-31

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .........................................................24, 28

*Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990)..........................................1, 34

## Unreported Federal Cases

*Am. Farm Bureau Fed'n v. EPA*, --- F.3d ---, Nos. 06-1410, 06-1411, 06-1415,
  06-1416, 06-1417, 2009 WL 437050 (D.C. Cir. Feb. 24, 2009) ...................................9, 17

*Barlow v. Gen. Motors Corp.*, --- F. Supp. 2d ---, No. 1:02-CV-1077-DFH-TAB
  2009 WL 126595 (S.D. Ind. Jan. 20, 2009).........................................................................14

*In re Dist. Of Columbia Pub. Serv. Comm'n*, 114 FERC P 61017, 2006 WL
    41787 (Jan. 9, 2006)........................................................................................29

*Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*, No. 91-13-FR,
    1992 WL 252123 (D. Or. Sept. 24, 1992) ...............................................25, 46

*Sierra Club v. EPA*, --- F.3d ---, No. 07-4485, 2009 WL465539
    (6th Cir. Feb. 26, 2009)....................................................................................2

*State of North Carolina v. Tennessee Valley Auth.*, No. 1:06CV20, 2009 WL
    77998 (W.D.N.C. Jan. 13, 2009) ...........................................................9, 17-18

*United States v. A.A. Mactal Constr. Co. Inc.*, No. 89-2372-V, 1992 WL
    245690 (D. Kan. Apr. 10, 1992) ...................................................47-48, 49, 51

*United States v. Apex Oil Co., Inc.*, No. 05-CV-242-DRH, 2008 WL 2945402
    (S.D. Ill. July 28, 2008)...............................................................20-21, 41

*United States v. B & W Inv. Properties, Inc.*, No. 91 C 5886, 1994 WL
    53781 (N.D. Ill. Feb. 18, 1994).................................................................47, 49

*United States v. Cinergy Corp.*, No. 99-01693, 2007 WL 2914540
    (S.D. Ind. Sept. 28, 2007) ................................................................................3

## State Cases

*Weston Paper Co. v. Pope*, 57 N.E. 719 (Ind. 1900) ....................................................14

## Federal Statutes

16 U.S.C. § 824f ................................................................................................29

16 U.S.C. § 824o ................................................................................................29

16 U.S.C. § 824o(e)(3)........................................................................................29

42 U.S.C. § 7401 ...........................................................................................31, 42

42 U.S.C. § 7401(b)(1) .........................................................................................1

42 U.S.C. § 7408 .................................................................................................9

42 U.S.C. § 7411(a)(4).........................................................................................13

42 U.S.C. § 7413(b) .......................................................................................4, 52

42 U.S.C. § 7413(e) ................................................................................49

42 U.S.C. § 7470 ........................................................................................2

42 U.S.C. § 7470(4) ..................................................................11, 22, 37

42 U.S.C. § 7475(a) ...................................................................................2

42 U.S.C. § 7479(3) ...................................................................................2

42 U.S.C. § 7502(c)(5) ..............................................................................2

42 U.S.C. § 7503 ........................................................................................2

42 U.S.C. § 7503(c)(2) .............................................................................23

42 U.S.C. § 7651(a)(6) ..........................................................................9, 42

42 U.S.C. § 7651(l) ..................................................................................32

## Federal Regulations

40 C.F.R. § 50.4 .........................................................................................9

40 C.F.R. § 50.5 .........................................................................................9

40 C.F.R. § 50.7 .........................................................................................9

40 C.F.R. §50.10 .........................................................................................9

40 C.F.R. §50.11 .........................................................................................9

40 C.F.R. § 51.165(a)(3)(ii)(C)(1)(i) .......................................................23

40 C.F.R. § 51.166(b)(3)(i)(b) .................................................................23

40 C.F.R. § 51.166(k)(2) .........................................................................16

40 C.F.R. § 52.12(c) ................................................................................47

40 C.F.R. § 52.21(b)(23)(i) ................................................................13, 16

45 Fed. Reg. 52,676 (Aug. 7, 1980) ...................................................14, 23

51 Fed. Reg. 43,814 (Dec. 4, 1986) .........................................................23

62 Fed. Reg. 38,652 (July 18, 1997) ...............................................................13, 17

62 Fed. Reg. 38,856 (July 18, 1997) ...........................................................................17

67 Fed. Reg. 60,871 (Sept. 27, 2002) ................................................................... 23-24

69 Fed. Reg. 1786 (Jan. 12, 2004) ..............................................................................47

71 Fed. Reg. 61,144 (Oct. 17, 2006 ............................................................................17

72 Fed. Reg. 54,112 (Sept. 21, 2007) ................................................................... 15-16

73 Fed. Reg. 16,435 (Mar. 27, 2008) ..........................................................................17

## Congressional Materials

H.R. Rep. No. 91-1146 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356 .........................1

S. Rep. No. 92-414 (1971), *reprinted in* 1972 U.S.C.CA.N. 3668................................31

## Other Materials

*Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, No. 32A01-0605-CV-218,
    2007 WL 4349705 (Ind. App. Nov. 13, 2007)..................................................40

DAN R. DOBBS, THE LAW OF TORTS § 147 (2000).................................................5

Restatement (Second) of Torts § 840E (1979) ...................................................... 14-15

I.      STRUCTURE AND PURPOSE OF CLEAN AIR ACT

The Clean Air Act ("CAA" or "Act") passed in 1970 was intended in part to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again."  H.R. Rep. No. 91-1146, at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356, 5356; *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) (quoting legislative history).  One primary purpose of the statute is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1); *see also United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1057 (S.D. Ind. 2008) (quoting 42 U.S.C. § 7401(b)(1)).

Not satisfied with the results achieved under the 1970 statute, Congress added the New Source Review ("NSR") program to the Act in 1977 to ensure that additional requirements were imposed on new and modified sources of air pollution.  *New York v. EPA*, 413 F.3d 3, 10 (D.C. Cir. 2005) ("In 1977, Congress amended the Clean Air Act . . . to strengthen the safeguards that protect the nation's air quality.").  The Prevention of Significant Deterioration ("PSD") component of NSR – which applies to areas in attainment with national ambient air quality standards ("NAAQS") (or where attainment is unclassifiable) – was "aimed at giving added protection to air quality" while fostering economic growth in a manner consistent with preservation of existing clean air resources.  *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567 (2007).  In areas that already meet the NAAQS, this added protection was achieved, in part, by requiring the installation of "best available control technology" ("BACT") on new and modified sources that would otherwise increase pollution.  *Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1447 (9th Cir. 1984) ("Congress found that it was important to reduce pollution levels below

1

those mandated by the standards and that the best means of doing so was to require the installation of BACT on all sources which would otherwise increase pollution.").

Congress explicitly set forth five "purposes" for PSD:

(1) to protect public health and welfare from *any actual or potential adverse effect* which in the Administrator's judgment may reasonably be anticipate[d] to occur from air pollution or from exposures to pollutants in other media . . . *notwithstanding attainment and maintenance of all national ambient air quality standards*;

(2) to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value;

(3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;

(4) to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality *for any other State*; and

(5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decision making process.

42 U.S.C. § 7470 (emphasis added); *see also* Dkt. No. 1335 (Final Jury Instructions) at Instruction 16 (quoting 42 U.S.C. § 7470).  The requirements of PSD were designed "to prevent backsliding."  *Sierra Club v. EPA*, --- F.3d ---, No. 07-4485, 2009 WL 465539, at *1 (6th Cir. Feb. 26, 2009).

Under the NSR program, no major source can be built or modified unless various requirements are met, including obtaining a preconstruction permit setting forth emission limitations and applying state-of-the-art pollution controls.  42 U.S.C. §§ 7475(a), 7479(3), 7502(c)(5), 7503.

## II.    CASE BACKGROUND

The remedy phase of this case addresses the appropriate relief for two sets of violations of the Clean Air Act and related regulations.  First, after a trial in May 2008, a jury found that the equipment replacement projects at Wabash River units 2, 3, and 5 were modifications under the CAA for sulfur dioxide ("$SO_2$") and oxides of nitrogen ("$NO_X$"), and thus that Cinergy violated the New Source Review ("NSR") program of the Act by failing to obtain a permit and install pollution controls.  Dkt. Nos. 1338, 1339.  Second, the Court found on summary judgment that Defendants violated particulate matter ("PM") emissions limits set by the Ohio State Implementation Plan ("SIP") and an administrative settlement with EPA at Beckjord units 1 and 2 on four separate occasions.  *United States v. Cinergy Corp.*, No. 99-01693, 2007 WL 2914540 (S.D. Ind. Sept. 28, 2007).

The Parties presented evidence on the appropriate remedy for these violations in a five-day trial beginning February 2, 2009.

## III.    STANDARD FOR INJUNCTIVE RELIEF

The traditional standard for an injunction requires the plaintiff to show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As explained below, Plaintiffs' proof is sufficient to meet the traditional equitable standard.  While the traditional equitable considerations remain the starting point, however, courts must also consider the direction provided by Congress in shaping the contours of injunctive relief.  As the Supreme Court declared in *TVA v. Hill*, it is

> the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation. Once Congress . . . has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought.

437 U.S. 153, 194 (1978).  Congress's passage of the Clean Air Act demonstrated, as a general matter, the high priority placed on protecting the nation's air quality, and its passage of the PSD program in particular demonstrated the high priority placed on the use of state-of-the-art pollution reduction technologies at new and modified sources, even in areas that already meet the NAAQS.  These concerns should be reflected in determining whether an injunction shall issue and how extensive the relief shall be.

### A.     Plaintiffs Need Only Prove Risk Of Harm To Compel Injunctive Relief

"It is a *well-established rule* that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction."  *Burlington N. R.R. v. Bair*, 957 F.2d 599, 601 (8th Cir. 1992) (emphasis added) (citing *United States v. City of San Francisco*, 310 U.S. 16, 31 (1940); *Atchison, T. & S.F. Ry. v. Lennen*, 640 F.2d 255, 259-60 (10th Cir. 1981)); *see also United States v. Odessa Union*, 833 F.2d 172, 175 (9th Cir. 1987).  As this Court previously found, Congress explicitly provided for injunctive relief to redress violations of the Clean Air Act.  42 U.S.C. § 7413(b); *Cinergy*, 582 F. Supp. 2d at 1060-61.

The traditional equitable inquiry is unnecessary where a federal statute has been violated because, "Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits."  *Burlington N.*, 957 F.2d at 601-02 (citing *Lennen*, 640 F.2d at 259, 261); *cf. CSX Transp., Inc. v. Tennessee State Bd. of Equalization*, 964 F.2d

548, 551 (6th Cir. 1992) (where statute provides for injunction to "halt or prevent" violations "traditional equitable criteria do not govern the issuance of preliminary injunctions.").

The Seventh Circuit has stated that, "Where the plaintiff is a sovereign and where the activity *may endanger* the public health, 'injunctive relief is proper, without resort to balancing.'" *U.S. Envtl. Prot. Agency v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990) (emphasis added) (citing *Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 337-38 (4th Cir. 1983)) (additional internal citations omitted); *see also United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867-68 (7th Cir. 1994) (in environmental case with United States as plaintiff, it was "not improper for the district court to have awarded injunctive relief . . . without conducting an equitable balancing."); *United States v. Prod. Plated Plastics, Inc.*, 762 F. Supp. 722, 728 (W.D. Mich. 1991) ("[W]hen the plaintiff is a governmental entity, or private attorney general, and the activity may endanger public health, injunctive relief is proper without undertaking a balancing of the equities.") (citing *Lamphier*, 714 F.2d at 337-38). In addition, "[i]t is an accepted equitable principle that a court does not have to balance the equities in a case where the defendant's conduct has been willful." *Envtl. Waste Control,* 917 F.2d at 332; *Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918, 935 (7th Cir. 2008). In this case, Cinergy's violation was willful because it took a calculated risk by performing the projects despite knowing of the possibility that NSR would apply. Findings of Fact ("FOF") ¶¶ 71-75; *Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617, (6th Cir. 2007) ("The defendant is guilty of reckless, willful or wanton misconduct only if he was conscious of the risk or had specific reason to know about it and proceeded without concern") (citing DAN R. DOBBS, THE LAW OF TORTS § 147, at 350-51 (2000)).

The Supreme Court has made clear that sovereigns are "somewhat more certainly entitled to specific relief than a private party might be." *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907) (Holmes, J.). *Tennessee Copper* remains good law, and was recently cited by the Supreme Court for the proposition that states are "entitled to special solicitude in our standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

"[W]hen the United States or a sovereign state sues in its capacity as protector of the public interest, a court may rest an injunction entirely upon a determination that the activity at issue *constitutes a risk of danger to the public*." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996) (emphasis added) (referring to the idea as a "traditional principle[] of equity" and citing cases). The *Marine Shale* court cited *Tennessee Copper* as reflecting the proposition that a court's equitable discretion is more circumscribed when a government party is involved, due to the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute . . . and from the deference courts afford the political branches in identifying and protecting the public interest." 81 F.3d at 1359 (citing *Tennessee Cooper*, 206 U.S. at 237-38; *Virginian Ry. v. Sys. Fed'n No. 40, AFL*, 300 U.S. 515, 552 (1937)).

**B.    Injunctions Are Usually Necessary In Environmental Cases**

The Supreme Court recognized as early as *Tennessee Copper* that environmental injuries can rarely be redressed by monetary damages. 206 U.S. at 237 (noting "difficulty of valuing [quasi-sovereign rights to environmental protection] in money").

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *see also Prod. Plated Plastics*, 762 F. Supp at 729

("an injunction is normally the proper remedy for violations of an environmental statute."). Therefore, if the injury is sufficiently likely, the "balance of harms will usually favor the issuance of an injunction to protect the environment." *Vill. of Gambell*, 480 U.S. at 545.

### C.     The Court's Equitable Authority Is At Its Apex When Public Interest Is Involved

"Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *United States v. Miami Univ.*, 294 F.3d 797, 819 (6th Cir. 2002) (quoting *Virginian Ry.*, 300 U.S. at 552).

The Supreme Court has long recognized a district court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (citing *Virginian Ry.*, 300 U.S. at 552); *see also United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 231 (3d Cir. 2005).

"[T]he Court has the responsibility in this case of crafting a remedy that is protective of public health, and this responsibility necessarily takes preeminence over all other considerations." *United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1027 (N.D. Cal. 2002) (emphasis added) (decision under the Safe Drinking Water Act).

### IV.     HARM TO AREAS DOWNWIND OF WABASH RIVER

Plaintiffs demonstrated that pollution from the Wabash River power plant poses a risk to, has harmed, and is continuing to harm public health and the environment. For the reasons expressed below, the Court can find that Plaintiffs have indisputably shown a risk of harm to public health and the environment from Cinergy's Wabash River emissions. Indeed, the Court should find that Plaintiffs have proven several different types of actual harm. This evidence is summarized below and described in more details in Plaintiffs' Proposed Findings of Fact.

A.    **Evidence Of Harm Demonstrated At Trial**

The evidence presented at trial shows that the unpermitted emissions from Wabash River units 2, 3, and 5 resulted in additional PM2.5, ozone, mercury, and acid rain than would have occurred if Cinergy had complied with the law.  The Wabash River's excess emissions impact communities and natural areas where levels of pollution are already too high.  FOF ¶¶ 57-58, 119, 140-41.  For PM2.5, mercury, and acid rain, that harm is both chronic and cumulative, so that each ton of pollution is contributing to an ongoing harm.  FOF ¶¶ 97, 126, 137.

The evidence shows that Wabash River units 2, 3, and 5 emitted $SO_2$ and $NO_X$ in amounts greater than allowed by law.  FOF ¶¶ 12-50.  $SO_2$ and $NO_X$ both undergo transformations in the atmosphere to create fine particulate matter known as PM2.5.  $NO_X$ also transforms into ozone in the atmosphere.  FOF ¶¶ 51-55.  The evidence shows that PM2.5 and ozone are harmful to human health.  The scientific consensus is that PM2.5 causes premature mortality, cardiovascular effects, and respiratory problems.  FOF ¶¶ 96-98.  Ozone causes acute inflammation of the lungs, reduction in lung function, increased respiratory symptoms, increased asthma attacks, increased hospital admissions for respiratory illnesses, and day-to-day changes in mortality rates.  FOF ¶¶ 116-17.  Finally, the evidence shows that there is no relevant threshold for the health impacts from PM2.5 or ozone at the range of ambient levels found in the Eastern United States.[1]  FOF ¶¶ 111-12.  That is, certainly at the existing concentrations of PM2.5 or ozone in Indiana and the surrounding states, increasing the concentration will harm human health while decreasing the concentration will improve public health.  FOF ¶¶ 111-12, 114, 117.  This is true no matter the magnitude of the change, though bigger changes will naturally have bigger effects.  FOF ¶¶ 109, 114.

---

[1] The scientific research has resulted in no identifiable threshold for PM2.5, while the apparent threshold for ozone is well below ambient levels in the United States and so is not relevant to the ozone effects here.  FOF ¶¶ 111, 117.

In addition to the evidence specifically presented at this trial, there have been numerous prior statutory, regulatory, and legal findings that $SO_2$, $NO_X$, PM2.5, and ozone are harmful to human health and the environment.  Each of these substances is a "criteria" pollutant regulated by EPA because it causes harm to human health and the environment.  *See, e.g.*, 42 U.S.C. § 7408; 40 C.F.R. § 50.4-.5 ($SO_2$); 40 C.F.R. § 50.7 (PM2.5); 40 C.F.R. §50.10 (ozone); 40 C.F.R. §50.11 ($NO_X$).  Indeed, in the 1990 Clean Air Act Amendments, Congress explicitly found that: "reduction of total atmospheric loading of sulfur dioxide and nitrogen oxides will enhance protection of the public health and welfare and the environment."  42 U.S.C. § 7651(a)(6).  In a recent case, *State of North Carolina v. Tennessee Valley Authority,* the United States District Court for the Western District of North Carolina held that *TVA*'s coal fired power plants caused a public nuisance.  There, the court found that "PM2.5 exposure has significant negative impacts on human health, even when the exposure occurs at levels at or below the NAAQS."  No. 1:06CV20, 2009 WL 77998, at *7 (W.D.N.C. Jan. 13, 2009).  The *TVA* Court also found that these negative impacts include premature mortality.  2009 WL 77998, at *7-8.  S*ee also Am. Farm Bureau Fed'n v. E.P.A.*, --- F.3d ---, Nos. 06-1410, 06-1411, 06-1415, 06-1416, 06-1417, 2009 WL 437050, at *1 (D.C. Cir. Feb. 24, 2009) ("Studies have demonstrated that both fine and coarse PM can have negative effects on public health and welfare. For example, each is associated with increased mortality (premature death) rates and morbidity (illness) effects such as cardiovascular disease and decreased lung function.").  Thus, even absent the evidence presented at trial, the harms are well supported by these prior findings.

The evidence also shows that the $SO_2$ and $NO_X$ emissions from Wabash River harmed the environment.  Both $SO_2$ and $NO_X$ contribute to acidic deposition, also known as acid rain.  FOF ¶ 118.  Acid rain affects the health of forests, it can increase the acidity of lakes and rivers, and it

can harm fish populations.  FOF ¶¶ 121-25.  The Wabash River emissions contributed to these effects through the areas where the plant's emissions traveled, particularly in Indiana and the surrounding states.  FOF ¶ 120.

In addition, the evidence shows that by failing to install scrubbers and SCR at the time of the projects, Cinergy has emitted more mercury from units 2, 3, and 5 than it would have if it had followed the law.  FOF ¶¶ 128-33.  The Parties agree that these pollution controls produce a "co-benefit" of mercury removal.  FOF ¶¶ 130-31.  Mercury is also linked to the violations because acid rain exacerbates mercury contamination in the environment.  FOF ¶ 136.  A portion of the mercury emitted from sources like Wabash River enters the aquatic food chain as methyl mercury and can then be ingested by people eating fish.  Once ingested, methyl mercury causes health impact, most notably hindering of brain development in fetuses and children.  FOF ¶¶ 136-41.  Indiana and every other state issue "fish advisories" instructing residents to limit their intake of certain fish in order to avoid these effects.  FOF ¶ 140.  In a recent year, these mercury fish consumption advisories in Indiana alone covered 3,000 miles of streams, 40,000 acres of lakes, and the entire 59 mile shoreline along Lake Michigan.  FOF ¶ 141.

Finally, Cinergy's illegal emissions cause another important type of harm – the harm to downwind areas attempting to comply with – or "attain" – ambient air quality standards.  The evidence shows that Cinergy's illegal emissions impact areas downwind of the Wabash River plant which have slim margins between actual ambient air quality and the NAAQS for PM 2.5 and ozone.  FOF ¶¶ 56-81.  Such areas are already struggling to attain, or maintain, compliance with the NAAQS, and additional contributions of pollutants on the order of a tenth of a microgram or smaller are considered very significant to state and local governments charged, in the first instance, with meeting the standards.  FOF ¶¶ 84-90, 95.  Cinergy's contribution to air

pollution in such regions interferes with state and local regulators' ability to implement their own plans for attaining the NAAQS and preventing deterioration of air quality, in direct contravention of Congress's expressed intent "to assure that emissions from any source in any States will not interfere with any portion of the applicable implementation plan to prevent significant deterioration for *any other State*." 42 U.S.C. § 7470(4) (emphasis added). In addition to the public health harm resulting from air pollution, non-attainment status also causes economic harm to the areas that are designated, including loss of new industrial development and restricting growth of existing industry, with concomitant adverse impacts on jobs and local economies. FOF ¶¶ 91-92. Through its illegal operation, Cinergy creates an uneven playing field in which downwind communities and their local industries must to try to reach attainment despite the ongoing emissions from the Wabash River Plant. It is not fair.

### B.     Cinergy Fails To Contradict The Evidence Of Harm

Cinergy's evidence fails to rebut Plaintiffs' showing of various types of harm. As an initial matter, Cinergy simply did not address two components of the harm demonstrated by Plaintiffs and outlined above. Cinergy did not challenge the harm to the environment caused by acid deposition or the economic harm felt by areas struggling to reach attainment status. Instead, Cinergy sought primarily to challenge Plaintiffs' proof concerning human health effects, arguing in essence that the Wabash River emissions at issue have a small impact on ambient pollution levels and that the pollutants at issue are not as harmful as Plaintiffs' experts contend. These arguments are not compelling for at least three reasons. First, they are inconsistent with Cinergy's own statements to this Court. Second, they rely on strained comparisons or deviations from the scientific mainstream. Finally, they fail to recognize that as a purely legal matter, this is not a toxic tort or nuisance case, but rather a regulatory enforcement case with established

violations of the law that resulted in emissions of hundreds of thousands of tons of pollutants that Congress and EPA have regulated precisely because of their harmful nature.

### 1.    Cinergy's Arguments Run Counter to NSR and the Company's Own Statements

Any claim by Cinergy that the Wabash River emissions do not cause health effects is vitiated by Cinergy's own closing argument, where counsel stated that, "There are real benefits, local benefits and benefits to everybody downwind of these plants from shutting down" units 2, 3, and 5.  Trial Tr., Vol. 5-1116:5-7 (Cinergy's Closing Argument) (Feb. 6, 2009).  Cinergy cannot have it both ways: it cannot be that *its* proposed remedy of closing three units yields a health benefit, while arguing that the effects of its historic and ongoing emissions from those units are *de minimis*.  Tellingly, Cinergy has conceded that injunctive relief is proper in remedying the Wabash River violations, implicitly admitting that the evidence *does* show irreparable harm.

Cinergy presented evidence to support its assertion that power plants in general and Wabash River in particular do not cause significant impacts on public health.  However, as their expert was forced to admit on cross examination, the studies Cinergy relied upon did not address the primary sources of harm Plaintiffs have identified in this case (and the very evidence Cinergy was purporting to rebut).  The studies Cinergy relied upon have several deficiencies, but the most fundamental is that neither address PM2.5 nor ozone.  FOF ¶¶ 101-04.  Plaintiffs' harm evidence focused on those two pollutants.  Therefore Cinergy's evidence related to effects from *other pollutants* cannot rebut Plaintiffs' evidence.

Moreover, Cinergy expert Dr. Valberg's opinions are contrary to EPA's conclusions in setting the NAAQS, along with those of the scientific and medical communities.  While Dr. Valberg asserts that the sulfate portion of PM2.5 is harmless, Trial Tr., Vol. 4-808:24-810:22,

(Direct Exam of Dr. Peter Valberg) (Feb. 5, 2009), EPA expressly rejected this view and set a

NAAQS based on total PM2.5.  62 Fed. Reg. 38,652, 38,666 (July 18, 1997) ("[T]he current

review has examined the available evidence to determine whether it would tend to support

inclusion or exclusion of any physical or chemical classes of PM, for example sulfates. . . [T]he

available scientific information does not rule out any one of these components as contributing to

fine particle effects").  Dr. Valberg also suggests that EPA set the PM2.5 and ozone NAAQS far

too stringently because greater pollution concentrations are purportedly seen in disparate

locations such as food courts, copier machine rooms, and the People's Republic of China.

*Compare* Trial Tr., Vol. 4-816:19-818:4, 824:4-825:3 (Direct Exam of Dr. Peter Valberg) (Feb.

5, 2009), *with* 62 Fed. Reg. at 38,679.  While Dr. Valberg is entitled to his views, it seems

unlikely that U.S. EPA, the American Medical Association, and other mainstream public health

organizations are all wrong on the health effects of ozone and PM2.5.  FOF ¶¶ 97-98, 100, 109,

112-13, 116-17.

Cinergy's claim that the Wabash River emissions impact is small contradicts the structure

of NSR.  Congress made clear in passing the Clean Air Act that when a source "increases the

amount of *any* air pollutant" it must be subject to NSR (among other requirements).  *See, e.g.*, 42

U.S.C. § 7411(a)(4) (emphasis added).  In the NSR regulations, EPA has determined that

predicted emissions increases of 40 tons per year of $SO_2$ and $NO_x$ are significant.  *See, e.g.*, 40

C.F.R. § 52.21(b)(23)(i) ("Significant means, in reference to a net emissions increase . . . a rate

of emissions that would equal or exceed" 40 tons per year for $SO_2$ and $NO_x$).  In the preamble to

the NSR regulations, EPA explained that it was establishing categorical "significance" levels of

emissions, and that predicted emissions increases below such levels would be deemed *de*

*minimis*.  Requirements for Preparation, Adoption, and Submittal of Implementation Plans;

13

Approval and Promulgation of Implementation Plans, 45 Fed. Reg. 52,676, 52,705-09 (Aug. 7, 1980) (relevant excerpts attached as Exhibit 1).  The Agency found that its significance levels protected against the "cumulative effect" on air quality from "multiple sources in an area each making . . . emissions increase[s] . . . ."  *Id.* at 52,707, column 3.  EPA expressly rejected exempting modifications from NSR based on individualized assessments of a single facility's impacts on air quality:  "The Administrator [of EPA] has chosen to specify *de minimis* cutoffs in terms of emissions rate for applicability, BACT and air quality analysis purposes, with no provisions for case-by-case demonstration of a source's air quality impact."  *Id.* at 52,707, column 1.  *See also id.* at 52,722-23 (BACT triggered by predicted emissions rate increase).  The annual excess emissions of $SO_2$ – about 23,000 tons – are more than 500 times greater than EPA's NSR significance level of 40 tons per year.  Similarly, the total excess $NO_x$ emissions – about 2,200 tons – are 55 times greater than the significance level.   FOF ¶ 49.

Cinergy's argument is essentially that because *many* sources have contributed to the problem, it should not be held responsible.  As a preliminary matter this argument is flawed because it ignores the fact that Cinergy's contributions to the problem stem from the very violations of law that this Court is charged to remedy.  In addition, the long-standing principle of equity in nuisance cases is that no contributor gets a free pass just because others also contributed.  *See, e.g.*, *Weston Paper Co. v. Pope*, 57 N.E. 719, 721 (Ind. 1900) ("The fact that a water course is already contaminated from various causes does not entitle others to add thereto, nor preclude persons through whose land the water flows from obtaining relief by injunction against its further pollution.");[2] Restatement (Second) of Torts § 840E (1979) ("the fact that

---

[2] *Weston* is still cited with approval in federal court.  *See Barlow v. Gen. Motors Corp.*, --- F.Supp.2d ----, No. 1:02-CV-1077-DFH-TAB, 2009 WL 126595, at *10 (S.D. Ind. Jan. 20, 2009); *Massachusetts Mut. Life Ins. Co. v. Associated Dry Goods Corp.*, 786 F. Supp. 1403, 1424 (N.D. Ind. 1992).

other persons contribute to a nuisance is not a bar to the defendant's liability for his own contribution."). This principle is even more compelling when the contributor is violating a statutory program designed to ameliorate the very problem at issue. In such a situation, Cinergy's arguments are commonly made and just as commonly rejected, as illustrated in a penalty case under the Clean Water Act:

> During the entire trial, defendants' approach to their Permit violations was rather cavalier. They repeatedly argued there was no real harm caused by their numerous violations, and stressed that the Pagan River would still be environmentally damaged, and unsafe for swimming and shellfish harvesting, even if defendants complied with their Permit. Such arguments miss the mark. As the United States pointed out in closing argument: The goal of the Clean Water Act is bit by bit to clean up the waters of the United States.... The defendants cannot evade their responsibility for their part in the damage to the Chesapeake Bay through the discharge of phosphorus [and other effluents] into the Chesapeake Bay by saying, 'If you took ours out, it wouldn't make any difference' because everybody contributing to the Bay bears a responsibility for what went into the Bay.

*United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 342 n.8 (E.D. Va. 1997), *aff'd in part and rev'd in other part*, 191 F.3d 516 (4th Cir. 1999).

### 2.    Cinergy's Comparisons to Other Benchmarks Are Inapposite

Cinergy also amasses a number of comparisons that purport to show that the impact on ambient pollution levels caused by Cinergy's emissions is small.[3]   For instance, Cinergy argues that that the excess emissions are "small" based on a *proposed* EPA rule. Trial Tr., Vol. 3-624:12-629:14, 649:19-24 (Direct Exam of Stanley Hayes) (Feb. 4, 2009) (citing 72 Fed. Reg. 54,112 (Sept. 21, 2007)). The proposal suggests certain numeric thresholds for PM2.5 air quality impacts -- known as significant impact levels ("SILs") -- to be used as "screening tools" in

---

[3] The air quality impact of the entire remedy is larger than assumed in some of Cinergy's comparisons. Many of Plaintiffs' analyses were done strictly looking at a portion of what the Parties call excess emissions, *i.e.* a certain subset of emissions of units 2, 3, and 5. FOF ¶ 61. However, Plaintiffs' remedy will reduce these excess emissions and seeks further reductions at Wabash River as mitigation for past illegal emissions. For example, controlling Unit 6 as mitigation would roughly double the improvement in ambient pollution levels. FOF ¶ 82.

conducting air quality modeling for a PSD permit application.  72 Fed. Reg. at 54,112. Cinergy's expert, Mr. Hayes, admits that under certain circumstances the excess emissions exceed the proposed SILs, Trial Tr. Vol. 3-627:19-628:3 (Direct Exam of Stanley Hayes) (Feb. 4, 2009), but because most of the time they do not, Cinergy argues the impacts from the excess emissions are *de minimis*.

The so-called SILs proposal is inapposite.  It does not create a legal or equitable exemption from NSR, which applies based on significant emissions increases. 40 C.F.R. § 52.21(b)(23)(i) (significance levels).  Rather, the proposal would provide guidance in the PSD permitting process, in which Cinergy has declined to participate here, necessitating this equitable proceeding.  Moreover, the proposed SILs apply *only* to "direct PM2.5 emissions" from a smokestack, 72 Fed. Reg. at 54,149, column 3 (proposed 40 C.F.R. § 51.166(k)(2)), and the analysis focuses on the area 50 kilometers or less from the smokestack.  Trial Tr. Vol. 3-643:18-644:5 (Cross Exam of Stanley Hayes) (Feb. 4, 2009).  The only PM2.5 at issue here is secondary PM2.5 formed in the atmosphere, which can occur hundreds of miles downwind.  FOF ¶ 52.

Cinergy also compared the impacts from Wabash River on ozone and PM2.5 ambient levels to the NAAQS to conclude the excess emissions cause only a "small" air quality impact. It is hardly surprising that the effect of a subset of emissions from *a single source* appears small compared to pollution concentrations reflecting all the thousands of sources that contribute to an area's air quality.  Mr. Hayes did not look at existing air quality conditions, which are caused by a variety of sources, but rather assumed that the Wabash River emissions were the only pollution in the atmosphere, and then compared them to the entire NAAQS for PM2.5 and ozone.  FOF ¶ 93.  That is a flawed comparison.  The NAAQS set ambient levels of pollution from *every single* emissions source that might impact a communities' air quality.  No single facility would be

16

responsible for polluting up to the entire level of the ozone NAAQS (75 ppb), the annual PM2.5 NAAQS (15 micrograms), or the daily PM2.5 NAAQS (35 micrograms). *See* 62 Fed. Reg. at 38,679 (July 18, 1997); 71 Fed. Reg. 61,144, 16,165, 61,171 (Oct. 17, 2006); 62 Fed. Reg. 38,856, 38,895 (July 18, 1997); 73 Fed. Reg. 16,435 (Mar. 27, 2008); FOF ¶ 84. Rather, the air is a commons where many different sources contribute pollution.

When compared to other sources of air pollution, the Wabash River excess emissions can be recognized as the substantial contributor that they are to air pollution in Indiana and the surrounding states. For instance, the $SO_2$ excess emissions from Wabash River units 2, 3, and 5 alone are:

* Among the top 5 percent of sources of $SO_2$ pollution in the Eastern United States;

* Equivalent to 2 percent of the all $SO_2$ emissions in Indiana; and

* More than double the $SO_2$ emissions from all sources in the six-county area covered by the Dayton Regional Air Pollution Control Agency. FOF ¶ 50.

The NAAQS comparison Cinergy poses is also flawed because it rests on the implicit assumption that there are no health risks where concentrations are below the NAAQS. This is simply not true. As a preliminary matter, the PM2.5 NAAQS was recently remanded to EPA by the D.C. Circuit. *Am. Farm Bureau Fed'n*, 2009 WL 437050. The court found that EPA "failed adequately to explain why, in view of the risks posed by short-term exposures and the evidence of morbidity resulting from long-term exposures, its annual standard is sufficient 'to protect the public health [with] an adequate margin of safety.'" *Id*. at *6. In addition, the evidence shows that in fact PM2.5 *does* cause health impacts at levels below the NAAQS. As the *TVA* court found: "[A]t a minimum, there is an increased risk of incidences of premature mortality in the general public associated with PM2.5 exposure, even for levels at or below the NAAQS standard

of 15 ug/m3," and "[t]here is also a causal relationship between PM2.5 (at NAAQS levels and below) and increased incidence of asthma, chronic bronchitis, and other cardiopulmonary illness." *TVA*, 2009 WL 77998, at *8. Ozone is also associated with premature mortality, as well as increased airway inflammation and asthma exacerbation, both at and below the NAAQS level. *Id.* at *10. Finally, as a legal matter, the NAAQS are not intended to be a level sufficient to protect from all harms. *Id.* at *8 n.6 ("EPA does not purport to set the NAAQS at a level which would entirely preclude negative health outcomes."). The PSD program is premised on the idea that the NAAQS are not sufficient to fully eliminate all health impacts:

> the ultimate purpose of the PSD program is to maintain air quality better than NAAQS. Indeed, Congress repeatedly emphasized that NAAQS alone were insufficient to protect public health and welfare. . . . In sum, Congress found that it was important to reduce pollution levels below those mandated by the standards and that the best means of doing so was to require the installation of BACT on all sources which would otherwise increase pollution.

*Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1446-47 (9th Cir. 1984).

## V.     APPLICATION OF TRADITIONAL EQUITABLE FACTORS

As described in Section II above, the traditional equitable factors need not be mechanically applied here because the case involves environmental harm, and Plaintiffs, including the United States and sovereign states, are acting to protect their citizens in an area where Congress has established priorities. *See United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1060 (S.D. Ind. 2008) (finding that in this case United States is a plaintiff and seeking to protect public interest, making the *Porter* language about especially broad equitable powers applicable).

Having heard the proof, the Court could order an injunction without resorting to the traditional equitable balancing *at all*. The Seventh Circuit has stated that, "Where the plaintiff is a sovereign and where the activity may endanger the public health, 'injunctive relief is proper,

without resort to balancing.'"  *U.S. Envtl. Prot. Agency v. Envtl. Waste Control, Inc.*, 917 F.2d

327, 332 (7th Cir. 1990) (citing *Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 337-38 (4th

Cir. 1983)) (additional internal citations omitted); *see also United States v. Bethlehem Steel

Corp.*, 38 F.3d 862, 867-68 (7th Cir. 1994) (in environmental case with United States as plaintiff,

it was "not improper for the district court to have awarded injunctive relief . . . without

conducting an equitable balancing.").  Moreover, because Cinergy took a calculated risk not to

apply for NSR permits, its willful conduct means the Court need not balance the equities.  FOF

¶¶ 223-26.  *Envtl. Waste Control,* 917 F.2d at 332; *Sierra Club v. Franklin County Power of

Illinois, LLC*, 546 F.3d 918, 935 (7th Cir. 2008).  At the least, if the traditional factors are

applied, the Court should consider the fact that this case involves sovereigns acting on behalf of

the public interest to enforce a federal statute designed to protect human health.  *See Maine

People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006) (finding trial court

should consider balance of harms in case under environmental statute, but adding, *"*We caution,

however, that the operation of that framework is inevitably colored by the nature of the case and

the purposes of the underlying environmental statute").

      Even considering the traditional equitable factors, Plaintiffs have demonstrated that

injunctive relief is necessary.  Cinergy itself tacitly concedes that *some* injunctive relief is

warranted by proposing to shut down the units, albeit on a delayed schedule more consistent with

its business plan.  FOF ¶¶ 148-49, 179, 189-90, 195.

      Plaintiffs have shown irreparable harm resulting from the NSR violations found by the

jury.  As described in greater detail in Section IV above and in the accompanying Proposed

Findings of Fact, emissions from the Wabash River plant cause serious health problems –

including premature death – across Indiana and several surrounding states.  This goes well

beyond the showing necessary for irreparable harm in an NSR case. Other courts have found that the mere fact that an NSR permit would reduce a source's emissions of air pollutions was a sufficient showing of irreparable harm. *Franklin County Power*, 546 F.3d at 936-37; *Cmtys. For a Better Env't v. Cenco Ref. Co.*, 179 F. Supp. 2d 1128, 1148 (C.D. Cal. 2001), *aff'd*, 35 Fed.Appx. 508 (9th Cir. 2002). In addition, the law applies equally to all companies, setting a level playing field. Thus, there is a harm to the regulatory program when it is violated, and that harm can only be redressed by a remedy that both brings the violator into compliance and restores the status quo ante, thus eliminating any benefit to evading the law. The Supreme Court has stated that injunctive relief can ensure broader compliance with the law where those found to violate are "compelled to restore [their] illegal gains." *Porter*, 328 U.S. at 400. As this Court earlier noted, "an order to remediate the direct effects of Cinergy's CAA violations could be considered 'appropriate and necessary to enforce compliance with' the CAA, give effect to its purposes, and assure future compliance." *Cinergy*, 582 F. Supp. 2d at 1062-63 (citing *Porter*, 328 U.S. at 400).

The balance of equities favors the type of comprehensive remedy described below. Such a remedy will benefit the public by reducing the human health and environmental harms from the Wabash River plant while promoting the Congressional goals set forth in the New Source Review provisions of the Clean Air Act. *See United States v. Apex Oil Co., Inc.*, No. 05-CV-242-DRH, 2008 WL 2945402, at *84 (S.D. Ill. July 28, 2008) (granting injunction in case under another environmental statute, the Resource Conservation and Recovery Act, because "it is clear that entry of the requested injunction would benefit the citizens of Hartford and promote the Congressionally-expressed public interest in "minimiz[ing] the present and future threat to human health and the environment posed by solid and hazardous wastes."). The Seventh Circuit

found last year that an injunction ordering a proposed power plant to simply *update* its NSR permit before beginning operation "would likely result in decreased emissions and improved public health, which would further a stated goal of the Clean Air Act." *Franklin County Power*, 546 F.3d at 936-37. The Seventh Circuit upheld injunctive relief in that case, finding that the public interest element of the traditional equitable balancing process favored requiring an updated permit. *Id*. Here the evidence shows that bringing Wabash River units 2, 3, and 5 into compliance with the law and mitigating its illegal emissions *will* result in decreased emissions and therefore improved public health. Just as in *Franklin County Power*, the public interest favors an injunction in this case, as described below.

## VI.    WABASH RIVER REMEDY

### A.    Overview Of Wabash River Remedy

While this case presents certain complicated issues of fact, it is fundamentally about the air pollution that resulted from Cinergy's violations of law and how to redress the harm from those violations. Sitting in equity to enforce the Clean Air Act, the Court's charge is to dispense "complete rather than truncated justice." *Porter,* 328 U.S. at 398; *see also Camp v. Boyd*, 229 U.S. 530, 551 (1913) ("A court of equity ought to do justice completely, and not by halves"). In a case like this one, complete justice has two components: bringing the violator into compliance and redressing the harm resulting from the violation.

For instance, in a situation where a source violated Clean Water Act permits by discharging additional pollution into a stream, equity is not satisfied by simply requiring the source to stop the excess discharge. Complete justice is only done when the contaminated sediment into which the additional pollution settled is removed. *See United States v. Alcoa, Inc.,* 98 F. Supp. 2d 1031, 1033 (N.D. Ind. 2000). While there is no method known to remove

Cinergy's pollution from the sky and the lungs of those who have breathed it in, the same principle applies here and can be achieved through additional future reductions at the Wabash River plant.  The illegal emissions from the Wabash River plant affect a given group of communities, and by reducing Cinergy's future emissions by an amount equal to its past illegal emissions, those communities will, over time, see their *total* exposure reduced to levels approximating those that would have occurred had Cinergy complied with the law.  These communities have all suffered health effects and some have also labored under the economic hardships of non-attainment status due, at least in part, to the Wabash River plant's excess emissions.  PSD was intended to eliminate such inequities.  42 U.S.C. § 7470(4) (Congressional PSD purpose "to assure that emissions from *any source in any State* will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality *for any other State*.") (emphasis added).

The need for both prospective relief and mitigation is also illustrated by Cinergy's own statement to the Seventh Circuit in this case.  Before that Court, Cinergy conceded that if its projects "triggered NSR, then Cinergy was required to obtain a preconstruction permit before starting each project and to retrofit each power plant with state-of-the-art controls during the maintenance work."  *United States v. Cinergy*, No. 06-1224, 2006 WL 951826, at *2 (7th Cir. 2006) (Cinergy Appellate Brief).  Thus permits and controls were required at the time of the projects.  Retiring the units obviates the need for permits and controls *going forward* and thus suffices as prospective compliance.  Closing the units in the future, however, does nothing to address the fact that Cinergy did not in fact obtain permits and pollution controls, but instead emitted two decades worth of pollution.  The appropriate mitigation is based on the

consequences of Cinergy's failure to comply with the law and flows from the pollution that was emitted in violation of the law.

The legal and factual basis for each element of the Wabash River remedy is set forth in turn below. Each element is required as part of returning Cinergy to compliance with the law. Therefore, no emissions reductions resulting from the remedy ordered by the Court should be considered an "emission credit" under the NSR program such as "netting" credit or "offset" credit. *See, e.g.*, 40 C.F.R. § 51.166(b)(3)(i)(b) (netting is only permitted for decreases in actual emissions at the major stationary source "that are ... otherwise creditable."). At the outset of the NSR program, EPA explained that emission "credit" should not be given for simply complying with the law:

> First, a decrease is creditable only to the extent that 'the old level of actual emissions or the *old level of allowable emissions, whichever is lower*, exceeds the new level of actual emissions.' Since 'allowable emissions' encompasses any federally enforceable requirement, including any with a future compliance date, the underlined language prevents a company from taking credit for decreases that it had to make or will have to make in the future. *EPA concluded that to give credit for a decrease a company has had to make in order to bring an emissions unit into compliance was unwise, since together with the five-year 'contemporaneous' period, it would create an incentive to stay out of compliance. Furthermore, it would be contrary to the purposes of the Act and good sense to provide what is in essence a benefit for recalcitrance.*

45 Fed. Reg. 52,676, 52,701 (columns 2 & 3) (Aug. 7, 1980) (Exhibit 1) (emphasis added); *see also* 42 U.S.C. § 7503(c)(2) ("Emission reductions otherwise required by this chapter shall not be creditable as emissions reductions for purposes of any offset requirement."); 40 C.F.R. § 51.165(a)(3)(ii)(C)(1)(i) (offsets must be "surplus"); Emissions Trading Policy Statement; General Principles for Creation, Banking and Use of Emission Reduction Credits, 51 Fed. Reg. 43,814, 43,832 (Dec. 4, 1986) (providing that offsets must be "surplus" to other reductions required under the Clean Air Act); Approval and Promulgation of Air Quality State

Implementation Plan (SIP); Louisiana; Emission Reduction Credits Banking in Nonattainment Areas, 67 Fed. Reg. 60,871, 60,874 (Sept. 27, 2002) ("emission reductions required under . . . an order or decree cannot be classified as surplus" for purposes of creating an offset).  For the same reasons, there can be no mitigation "credit" in this case for emissions reductions resulting from Cinergy bringing units 2, 3, and 5 into prospective compliance with the law.

### B.      Prospective Compliance With The Law

#### 1.      Closing Units 2, 3, and 5 to Comply with the Law

The Parties agree that units 2, 3, and 5 should be shut down to bring them into compliance.  The analysis of *when* the units should be shut down must begin with the principle that the units are now, and have been for almost two decades, out of compliance with the law.  Given Cinergy's choice to shut down rather than control units 2, 3, and 5, the question before the Court is not how the units' closure might best be accommodated within Cinergy's preexisting plans; it is whether Cinergy has shown any compelling public interest that precludes immediate shutdown.

As the Supreme Court made clear in *Romero-Barcelo*, when faced with a violation of a statute, a district court has discretion, but must exercise that discretion to order the "relief it considers necessary to *secure prompt compliance* with the Act."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) (emphasis added).  While courts enjoy great discretion in equity, they may not "reject the balance that Congress has struck in a statute."  *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001).  The requirements of the statute set the floor for any injunctive relief.  *See United States v. Prod. Plated Plastics, Inc.*, 762 F. Supp. 722, 731 n.9 (W.D. Mich. 1991) ("The Court cannot order the defendants to do less than RCRA minimally requires.").

In this case, compliance can only be achieved by closing the units or obtaining NSR permits: "The requirements of the program have been met only upon *receipt* of PSD permits . . . after agency review and determination of BACT."  *United States v. Louisiana-Pac. Corp.*, 682 F. Supp. 1141, 1166 (D. Colo. 1988); *see also United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 850 (S.D. Ohio 2003) (a "modification triggers permitting requirements under the CAA as well as the duty to install pollution controls."); *Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*, No. 91-13-FR, 1992 WL 252123, at *23, (D. Or. Sept. 24, 1992) (applicable NSR rules require "without exception" that all major modifications, even those already constructed, are subject to control retrofit and other NSR requirements).

### 2.      Timing of Closure

Plaintiffs originally sought pollution controls or immediate shutdown of the violating units.  Cinergy has proposed closing the units in September 2012, while operating at reduced levels targeted to their baseline pollution levels before the projects.  The burden is on Cinergy to demonstrate why the public interest compels further delaying compliance with the law.  Cinergy has ventured two principal reasons for the delay,[4] both related to the need for generation from Wabash River.

### a.      Cinergy's justifications for delay

One of Cinergy's justifications for delay can be swiftly dispensed with.  The company presented evidence that it has obligations to maintain a certain amount of electrical capacity under its control, known as "reserve margin."  Closing Wabash River units 2, 3, and 5 would decrease Cinergy's owned capacity and force it to rely more heavily on purchased capacity.  This is simply the consequence of the business choice Cinergy made in deciding to shut the units

---

[4] Cinergy has also assailed the cost of the remedy sought by Plaintiffs.  Cost is addressed in Subsection D below because it applies to both components of the remedy.

down rather than run them while adding pollution controls.  Both Mr. Kahal and Mr. Turner testified that – even without generation from Wabash River units 2, 3, and 5 – Cinergy can purchase the power it needs to meet its contractual capacity obligations.  FOF ¶¶ 239-40.

Cinergy's other reason for delay is based on the evidence it presented that there is a potential risk of loss of electrical service to the Terre Haute, Indiana area under certain peak demand conditions if units 2, 3, and 5 are closed before September 2012.  Based on the cursory evidence presented to the Court, if (i) the temperature in the area is 90 degrees or more and (ii) one of the two 345kv to 138kv transformers at the Dresser substation fail, there is a chance that some additional contingency could occur that would result in partial loss of power to Terre Haute.

Loss of electrical service is a serious concern.  Unfortunately, Cinergy has not taken the steps required by its obligations to the Midwest Independent Transmission System Operator ("MISO") or common sense to prepare for closing these units.  In essence, Cinergy decided that September 2012 was the appropriate time to retire the units, and then only evaluated whether that closure date was viable.  FOF ¶¶ 148-49, 170-79, 189-90, 195.  Cinergy's failure to consider that its preferred closure date might not win the day has thus significantly complicated the issue before the Court.

For instance, before shutting down any unit, the company is required to request an Attachment Y study from MISO, but Cinergy admits that it failed to do so here, stating that it was premature given that its preferred retirement date was three years away.  FOF ¶¶ 155-56.  Cinergy has the capability to model the closure of units 2, 3, and 5 itself, but failed to do so.  FOF ¶ 152.  Instead Cinergy relied entirely at trial on a MISO study that was admittedly incomplete and testimony from Mr. Turner and MISO official Roger Harszy.  FOF ¶¶ 153-55,

157-63.  This is "specialized knowledge" within the meaning of Fed. R. Evid. 702, yet Cinergy presented no qualified expert and relied on a methodology admittedly inconsistent with MISO's non-litigation work.  *See, e.g.*, FOF ¶¶ 153-60; *Braun v. Lorillard Inc.*, 84 F.3d 230, 234 (7th Cir. 1996) ("district court is responsible for making sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work."). Finally, it is clear that there are measures Cinergy could take to eliminate the reliability risk, such as adding a transformer to a critical substation serving the Terre Haute area, adding generation or employing familiar techniques to reduce demand at critical times.  FOF ¶¶ 170-79.  Once again, however, Cinergy has scheduled the transformer project to coincide with its preferred retirement date in its business plan.

Cinergy's conduct puts the Court in a difficult position: it would be inappropriate to essentially reward Cinergy for its (at the least) short-sighted behavior by delaying shutdown until September 2012.  Moreover, it must be noted that Cinergy *chose* to achieve prospective compliance through shutting the units down, rather than installing pollution controls and obtaining NSR permits.  FOF ¶¶ 144-45, 162.  Thus any reliability problem is entirely of Cinergy's own making.  However, the Court's will not be asked here to issue an injunction that might cause blackouts in Terre Haute.

Both Parties have proposed ways for the units to operate enough to protect Terre Haute's power supply.  Cinergy's proposal falls short, however, because it is not connected to the amount of generation needed to ensure local reliability, as Cinergy conceded at trial.  Mr. Turner testified that Cinergy's reduced operation plan was not "tied to what's the bare minimum" the units could run to avoid a reliability problem, but was instead the "level that seems reasonable given where we have come from in this case."  FOF ¶ 182.  Notably, Cinergy provided no testimony that it

analyzed what the minimum amount of generation necessary would be.  *Id.*  In essence, Cinergy argues that the Terre Haute problem requires some level of continued operation and then proposes an operating level unrelated to that problem.  FOF ¶¶ 180-86.  Such a framework is inappropriate when the Court's responsibility is to "secure prompt compliance with the Act." *Weinberger*, 456 U.S. at 320. Any deviation from that prompt compliance must be limited and targeted to the compelling need that required it.

### b. Appropriate closure schedule

With that in mind, it is appropriate to allow the operation of Wabash River units 2, 3, and 5 during the summer of 2009, but only to the extent *necessary* to protect the reliability of electrical service to the Terre Haute load pocket.  As an initial matter, based on the testimony to the Court at trial, the period of necessary operations should be limited to some subset of days in which temperatures in Terre Haute exceed 90 degrees.  FOF ¶¶ 164-65, 183-85.

Because the period of peak demand is limited to the summer, Cinergy should be required to permanently close down Wabash River units 2, 3, and 5 on or before October 1, 2009.  To the extent that Cinergy or MISO believes that any limited summer operation beyond that date is *necessary* to protect the reliability of electrical service to the Terre Haute load pocket, Cinergy can move for a modification of the Court's order.  Such motion should include a statement of the actions taken and to be taken to redress any reliability concerns.  The burden should be on Cinergy to demonstrate that continued, limited operation of units 2, 3, and 5 is the only practical way to avoid an increased risk of blackouts in Terre Haute.

The Court could also avoid this issue entirely.  Should Cinergy marshal evidence to support its claims in this litigation, it has administrative avenues available to address any reliability concerns that are substantiated.  For instance, the Court could refer the issue to the

Federal Energy Regulatory Commission ("FERC"), if necessary.  *See Marseilles Hydro Power, LLC v. Marseilles Land & Water  Co.,* 299 F.3d 643, 652 (7th Cir. 2002).  FERC has authority to address reliability issues through certain procedures under the Federal Power Act ("FPA").  Even without any action from this Court, Cinergy or others could seek a declaratory order from the Commission that, under a specified set of facts, the lack of generation at Wabash River station risks violating reliability standards approved and enforceable under FPA Section 215, 16 U.S.C. § 824o, or otherwise threatens the reliability of the bulk power system.  Alternatively, FPA Section 215(e)(3) authorizes the Commission, on its own motion or upon complaint (*e.g.*, a complaint by MISO against Cinergy), to "order compliance with a reliability standard . . . if the Commission finds, after notice and opportunity for a hearing, that the user or owner of operator of the bulk power system has engaged or is about to engage in any acts or practices that constitute or will constitute a violation of a reliability standard."  16 U.S.C. § 824o(e)(3).   In addition, Section 207 of the FPA, 16 U.S.C. § 824f, would allow the Commission, upon complaint of a State commission, to order Cinergy and MISO to remedy any "inadequate or insufficient" service caused by the closure of the Wabash River units.  *Cf. In re Dist. of Columbia Pub. Serv. Comm'n*, 114 FERC P 61017, 2006 WL 41787 (Jan. 9, 2006) (FERC order addressing effect of utility plant shutdown on reliability of electricity grid); *In re Dist. of Columbia Pub. Serv. Comm'n*, Order No. 202-05-3, Dkt. No. EO-05-01 (Dec. 20, 2005) (Attachment 1 to Dkt. No. 1531) (DOE order issued under parallel FPA authority, and in conjunction with U.S. EPA order, allowing limited operation for a limited period of time of power plant which had shut down due to Clean Air Act concerns in order to avoid risk of blackout of downtown Washington D.C.).  The Court's order to shut down the Wabash River units could explicitly allow Cinergy (or a third-party) to file a petition under the FPA to obtain

an administrative order specifying the nature and extent of a genuine reliability risk posed by the inability to operate Wabash River units 2, 3 and 5, and identifying the specific actions necessary to ensure reliability.

### C.    Mitigation Of Emissions Resulting From Violations

The second element of the appropriate relief in this case is mitigation of the prior, illegal emissions from units 2, 3, and 5.

Once a source has violated the law, the Court's role is not limited to requiring future compliance:  "The authority to 'enforce' an existing requirement is more than the authority to declare that the requirement exists and repeat that it must be followed."  *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000).

This Court has already decided that "it has the authority to order Defendants to take appropriate actions that remedy, mitigate and offset harms to the public and the environment caused by the Defendants' proven violations of the CAA."  *See Cinergy*, 582 F. Supp. 2d at 1060.  Under the Act, this Court has "the equitable authority to order a full and complete remedy for harms caused by a past violation, and in doing so may go beyond what is necessary for compliance with the statute."  *Id.* at 1061.  By contrast, Cinergy essentially asks this Court to approve a remedy "for [its] failure to obtain a required permit [that goes] no further than requiring them to do what would have been lawful in the first place."  *Id.* (quoting *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003)).

A full and complete remedy for the harms caused by Cinergy's violation best comports with the equitable tradition and the purposes of the Clean Air Act.  *See, e.g. Porter*, 328 U.S. at 398; *Wehner v. Syntex Corp.*, 682 F. Supp. 39, 40 (N.D. Cal. 1987) (when acting to enforce a statute "intended for the public good  . . .  courts act *in the public interest* by restoring the status

quo . . . Such action is within the recognized power and within the highest tradition of a court of equity.").  The purpose of the Clean Air Act itself compels such a full remedy: "an order requiring Defendants to take actions that remedy, mitigate, and offset harms caused to the public and the environment by their past CAA violations would seem to give effect to the CAA's purpose 'to protect and *enhance* the quality of the Nation's air resources so as to promote the public health and welfare.'"  *Cinergy*, 582 F. Supp. 2d at 1061-62 (quoting 42 U.S.C. § 7401).

In evaluating potential remedies for environmental enforcement cases, a court should evaluate whether the proposed remedy "(1) . . . would confer maximum environmental benefits, (2) . . . is "achievable as a practical matter," and (3) . . . bears an equitable relationship to the degree and kind of wrong it is intended to remedy."  *Deaton*, 332 F.3d at 714.  The *Deaton* formulation is particularly relevant here because the Clean Water Act enforcement provisions at issue in that case were "modeled after those of the CAA."  *Cinergy*, 582 F. Supp. 2d at 1061 (citing *S. Pines Assocs. v. United States*, 912 F.2d 713, 716 (4th Cir. 1990) (citing S. Rep. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3730)).

The third *Deaton* factor is achieved by measuring the pollution that Cinergy would *not* have emitted had it complied with the law, a concept the Parties have called excess emissions. Cinergy's argument that excess emissions are not described in the statute or in EPA regulations misses the mark; the PSD program *prohibits* emission increases above regulatory significance levels (in this case, 40 tons per year).  Excess emissions above these significance thresholds are not allowed in the first place; calculating these emissions is a way to measure the actual effects of Cinergy's violations.   In any case, nothing precludes the Court from using this equitable yardstick to measure the scope of the harm and the corresponding remedy.[5]  *See, e.g. Cinergy*,

_____

[5] Cinergy's argument that it had no excess emissions because it was always in compliance with the plant-specific allocations of the Clean Air Act's Title IV Acid Rain trading program is

582 F. Supp. 2d at 1060-61 ("Nothing in the CAA is a 'clear and valid legislative command' or raises a 'necessary and inescapable inference' that the full scope of the Court's equitable powers under § 113(b) is to be limited.").  The excess emissions concept the Parties presented at trial is a useful way to measure the effects of the violations.  Indeed, Cinergy counsel described the analysis as a "traditional 'but for' analysis" in opening statement.  Trial Tr., Vol. 1-26:23-25 (Cinergy Opening Statement) (Feb. 2, 2009).

In this case, there is no method for removing Cinergy's pollution from the lungs of those who have breathed it or from the lands and waters downwind of the plant.  The Court can order future reductions – *in addition to* the retirement of units 2, 3, and 5 – that will eventually balance out the pollution Cinergy never would have emitted if it had followed the law.  In order to best match the communities harmed by Cinergy's violations and the benefit from mitigation, the Court can order that the future reductions come from other units in the same airshed.  In this case, because Wabash River has other, uncontrolled units, the reductions can come from the very same smokestack.

### 1.    Calculation of Excess Emissions

The Parties offered several ways to calculate excess emissions.  Plaintiffs offered two affirmative calculations: the total illegal emissions from the units after the modifications and the

similarly makeweight.  The Acid Rain program and NSR *each* require emissions reductions. Title IV, added by the 1990 Clean Air Act Amendments, created additional substantive requirements applicable to electric utilities while confirming the continued existence of requirements imposed by others parts of the Act.  42 U.S.C. § 7651*l*.  ("Except as expressly provided, compliance with the requirements of this subchapter shall not exempt or exclude the owner or operator of any source subject to this subchapter from compliance with any other applicable requirements of this chapter.").  *See also* PX-2018 (Wabash River Title V Permit) at Cinergy1369632 ("No provision of the acid rain program, an acid rain permit application, an acid rain permit, an acid rain portion of an operation permit . . . shall be construed as . . . exempting or excluding the permittee . . . from compliance with any other provision of the Clean Air Act, including the provisions of Title 1 of the Clean Air Act").  Additionally, the SO2 cap and trade program did not begin operations until 1995, while there was no NOX cap and trade program until 2004.  FOF ¶ 214.

excess emissions compared to what would have been required with New Source Review pollution controls at the time of the projects.  FOF ¶¶ 12-16, 25-26, 46-47.  Plaintiffs also calculated the excess emissions assuming that Cinergy's expert was correct about the best available control technology ("BACT") as of the time of the project.  FOF ¶¶ 27-28, 48.  As described above, these metrics flow from what Cinergy itself acknowledges were the consequences of the projects being found to be modifications.  *United States v. Cinergy*, No. 06-1224, 2006 WL 951826, at *2 (7th Cir. 2006) (Cinergy Appellate Brief).

Cinergy also calculated excess emissions.  For $NO_X$ emissions, Cinergy performed a calculation similar to Plaintiffs' analysis based on BACT-level reductions, though Cinergy assumed a less effective control technology qualified as BACT at the time of the projects.  For $SO_2$, Cinergy chose an excess emissions approach based on the supposition that it could have obtained a different type of permit (known as a synthetic minor modification permit) that would have capped emissions at the time of the project.

Cinergy's calculations are flawed for three reasons.  First, the trial witness who performed the calculations on the company's behalf did so in a manner logically inconsistent with the purpose of the analysis.  Despite admitting that compliance with a permit would be measured at least every 12 months, Cinergy's witness calculated excess emissions by looking at the entire post-project period at once.  FOF ¶¶ 36-37.  This methodology has the effect of allowing years in which the company was below its emissions limit to offset the years above the limit.  FOF ¶¶ 37-38.  Given that the purpose of excess emissions is to compare Cinergy's actual emissions to what would have been allowed by law, including such offsets based on "negative" excess emissions distorts the analysis.  Second, Cinergy's assumption that it could have obtained a synthetic minor modification permit at the time of the projects is contradicted by the evidence.

33

The sole witness proposing such a permit admitted that whether it could have been used for these projects was "pure speculation." FOF ¶ 35. The evidence showed that such permits have never been used by Cinergy for the types of projects at issue, are not common for this type of power plant, and are antithetical to the very purpose of the modifications at issue, which were economically justified based on an expectation of *increased* operations. FOF ¶¶ 33-35. Third, Cinergy failed to show that low NO$_X$ burners rather than Selective Catalytic Reduction ("SCR") were the appropriate BACT technology for NO$_X$ at the time of the projects. Under the BACT framework, the burden is on the applicant to show that a given control is not available or applicable. FOF ¶¶ 43. The uncontested evidence showed that SCR had been applied to coal-fired utilities overseas and to oil- and gas-fired boilers in the United States. FOF ¶¶ 42. One of the "basic goals" of the 1977 Clean Air Amendment, including the BACT requirement, was to "stimulate the advancement of pollution control technology," a concept commonly called "technology-forcing." *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990). The technology-forcing goal means that the mere fact that no U.S. coal-fired unit had installed SCR at the time of the projects is insufficient to show that the technology was not available and applicable. BACT was designed to force sources into enhanced controls that their peers might not yet be using. The EPA Environmental Appeals Board ("EAB"), which hears appeals of certain NSR permit decisions, has described BACT as "principally a technology-forcing measure that is intended to foster rapid adoption of improvements in control technology." *In the Matter of: Columbia Gulf Transmission Co.*, 2 E.A.D. 824 (E.A.B. June 21, 1989). As Plaintiffs' expert Dr. Fox explained, somebody had to be first, and the time was ripe to install SCR on a U.S. coal-fired power plant. FOF ¶¶ 42.

The excess emissions concept is a reasonable way to measure the consequences from Cinergy's violations.  Setting aside the concededly speculative synthetic minor modification permit calculation, the Parties presented three $SO_2$ excess emissions calculations, looking at the period from the time of the projects through December 2007.  First, Plaintiffs calculated all unpermitted emissions from the units (378,000 tons), a proper approach because Cinergy operated illegally.  FOF ¶¶ 12.  Next, Plaintiffs calculated the excess emissions assuming 95 percent removal would have been required if Cinergy had gotten the necessary permits (359,000 tons).  FOF ¶ 25.  Finally, Plaintiffs calculated the excess emissions assuming – based on the opinion of Cinergy expert William DePriest – that 90 percent removal would have been required at the time of the projects (340,000 tons).  FOF ¶ 28.  Similarly, the Parties presented three NOX excess emissions calculations from the time of the projects through the end of December 2007.  Plaintiffs again calculated the total unpermitted emissions since the time of the projects (49,000 tons).  FOF ¶ 13.  The Parties also calculated excess emissions based on what should have been BACT at the time of the projects.  These calculations (once adjusted to eliminate years with "negative" excess emissions) ranged from 5,000 tons (assuming low NOX burners as BACT) to 30,000 tons (assuming SCR as BACT).  FOF ¶¶ 46-48.  Both the SO2 and NOX excess emissions will continue to accrue until the units are shut down, and a final accounting can be rendered at that time.

### 2.   Means of Mitigating Excess Emissions

Plaintiffs offered evidence, confirmed by Defendants, that Cinergy could install scrubbers at Wabash River units 4 and 6 designed to remove 99% of the $SO_2$ from those units' emissions.  FOF ¶¶ 196-202.  Plaintiffs also offered evidence that Cinergy could install SCR at units 4 and 6 designed to remove 90% of the $NO_X$ from those units' emissions.  FOF ¶¶ 205-07.  Cinergy

confirmed that SCR could be installed at the units, and did not challenge the removal efficiency.

FOF ¶ 206.  Based on those assumptions, Plaintiffs offered calculations that the excess emissions

resulting from the violations could be matched by reductions at units 4 and 6 approximately 12

years after the installation of scrubber and SCR controls.  FOF ¶¶ 209-11.  Should Cinergy wish

to mitigate the excess emissions at Wabash River using alternative means (such as retiring Unit

4), that would be appropriate as well.  Plaintiffs also presented evidence that Cinergy could

obtain sufficient $SO_2$ allowances to surrender allowances corresponding to the $SO_2$ excess

emissions over a 20-year period.  FOF ¶¶ 213-22.  Each element of the mitigation remedy is

feasible.

### 3.      Appropriate Mitigation Remedy

As described above, the Parties have measured the pollution emitted as a result of

Cinergy's failure to comply with the law.  This Court should look to craft mitigation that confers

the maximum environmental benefit related to the kind and degree of the harm from the

violations.  *Deaton*, 332 F.3d at 714.

Such an order is well within the Court's equitable authority "to order Defendants to take

appropriate actions that remedy, mitigate and offset harms to the public and the environment

caused by the Defendants' proven violations of the CAA [in order to] order a full and complete

remedy for harms caused by a past violation."  *Cinergy*, 582 F. Supp. 2d at 1060-61; *see also*

*Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 961 (10th Cir. 2002) ("'A

federal court's equity jurisdiction affords it the power to enjoin otherwise lawful activity when

necessary and appropriate in the public interest to correct or dissipate the evil effects of past

unlawful conduct.'") (quoting *United States v. Holtzman*, 762 F.2d 720, 724 (9th Cir. 1985))

(further citations omitted).  Granting the injunctive relief necessary to remedy the harm caused

by Cinergy's violations is necessary to "give[] meaning to the statute's grant of enforcement authority." *U.S. Pub. Interest Research Group v. Atl. Salmon of Maine, LLC*, 339 F.3d 23, 31 (1st Cir. 2003).

### a.      Controls

New Source Review requires controls at particular sources because each source has an impact on a discrete geographical area.  As Plaintiffs showed at trial, the harm from Wabash River has the greatest impacts on Indiana and surrounding states, though the harm also reaches as far as the Northeastern part of the country.  These impacts have occurred in contravention of the Congressional PSD purpose "to assure that emissions from *any source in any State* will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality *for any other State*."  42 U.S.C. § 7470(4) (emphasis added).  Simply shutting down Wabash River units 2, 3, and 5 does nothing to mitigate the historic impacts suffered in the areas affected by Wabash River's emissions.  Additional controls – or other emission reduction measures – at the same facility – targeted to the levels of historic excess emissions – will provide a benefit to the harmed areas that is proportionate to the undue burden they have suffered due to Cinergy's failure to comply with the law.

Cinergy should be required to achieve emissions reductions from Wabash River units 4 and 6 that equal the excess emissions.  These cumulative reductions can be achieved between the years 2010 and 2029.  Plaintiffs' evidence demonstrates that these reductions could be achieved through the installation of a scrubber and SCR, though Cinergy should be allowed to use other methods if they can deliver sufficient reductions.  The necessary reductions may be measured by comparing the actual emissions from units 4 and 6 to the pre-remedy baseline emissions in 2007:

approximately 37,500 tons of $SO_2$ and 4,760 tons of $NO_X$ for the two units combined.  FOF ¶¶ 12.

**b.    $SO_2$ allowance surrender**

As a corollary to the emissions reductions at units 4 and 6, Cinergy should be required to surrender to EPA – in addition to its existing requirements under the law – $SO_2$ emissions allowances in an amount equal to the excess emissions, with the total allowance surrender coming before 2029.[6]  This requirement will avoid a situation where reductions at Wabash River – ordered in equity to remedy violations of law – could result in increased emissions elsewhere, causing harm to another geographic area.

Cinergy admits that controls can "generate" or "free up" allowances; once a facility is controlled, the allowances that would otherwise be required can be used elsewhere in the Duke system or sold on the market.  FOF ¶¶ 215-16.  If the Court simply ordered the surrender of approximately 400,000 $SO_2$ allowances, without *any* requirement for controls at Wabash River, Cinergy might well *choose* to install controls at Wabash River in order to "generate" or free up the necessary allowances rather than buying them on the market.  By ordering controls and allowance surrender, the Court is not double- or triple-dipping, as Cinergy charged in its closing argument, but merely linking the mechanism for obtaining the necessary allowances to the source of the harm.  This ensures the best possible nexus between the violations and the remedy.

Moreover, there is no additional cost to requiring allowance surrender.  Cinergy currently has a plan to comply with its allowance surrender obligations, which includes surrendering allowances for the emissions from Wabash River units 4 and 6.  FOF ¶¶ 217, 220-21.  The

---

[6] No parallel surrender of NOX allowances is sought.  Plaintiffs informed the Court during closing arguments that they would not seek surrender of NOX allowances because the market for these allowances may not yet be fully established.  Trial Tr. Vol. 5-1121:22-25 (Plaintiffs' Closing Argument) (Feb. 6, 2009)

mitigation remedy essentially requires Cinergy to follow that business as usual plan for allowances by continuing to surrender the amount that would have been necessary for units 4 and 6 without controls.  FOF ¶ 220.  Thus there is no additional cost to Cinergy (after accounting for the costs of controls units 4 and 6).

Nothing in the law precludes the Court from ordering surrender of allowances as part of an NSR remedy.  Nothing in the statutory provisions establishing NSR or the allowances programs provides the "clear and valid legislative command" that indicates that Congress has opted to limit the Court's authority.  *See Porter*, 328 U.S. at 398.  Tellingly, several consent decrees that include allowance surrender as part of the remedy for alleged NSR violations have been approved by district courts.  *See, e.g.*, *United States v. Am. Elec. Power Serv. Corp*. Consent Decree (available at epa.gov/compliance/resources/decrees/civil/caa/americanelectricpower-cd.pdf) at ¶¶ 70-84, 91-99.

### D.      Equitable Analysis

Cinergy has asserted three primary deficiencies in the remedy proposed by Plaintiffs. First, Cinergy has stated that reliability concerns for the Terre Haute area compel operating the three Wabash River units at reduced levels until September 2012.  Second, Cinergy describes the proposed remedy as "triple-dipping," essentially arguing that the remedy is not consistent with the harm from the violations.  Finally, Cinergy argues that the costs of the remedy Plaintiffs have proposed are too great.  The first issue was addressed above, while the latter two are considered below.

### 1.      Consistency with the Harm

Cinergy's triple-dipping argument simply overreaches.  First the company describes as "double-dipping" any remedy that both requires prospective compliance with the law and redress of prior illegal emissions.  Trial Tr., Vol. 5-1115:2 – 1116:22 (Cinergy Closing Argument) (Feb. 6, 2009).  As described in some detail above and in this Court's decision on Cinergy's summary judgment motion, however, the Court has the authority to order mitigation for the harm caused by Cinergy's violations.  To castigate the exercise of such authority as double-dipping misunderstands the duty of equitable jurisdiction to provide "complete rather than truncated justice."  *Porter*, 328 U.S. at 398.  While shutting down Wabash River units 2, 3, and 5 will ensure prospective compliance with the law, and thus benefit those downwind, it does nothing to mitigate the harm from Cinergy's past non-compliance.  Cinergy's double-dipping argument implies that the Court's remedy for the violation should be the same whether the pollution from Cinergy's violations harmed those living downwind or not.  However, Cinergy itself has recognized – in state court insurance litigation related to its defense costs for this case – that the appropriate remedy includes both prospective compliance and mitigation.  In that litigation, the company argued that, "'Any other appropriate relief' is not an equipment injunction 'to require compliance.' *It includes environmental projects that mitigate past harm* and even payment of money damages."  *Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, No. 32A01-0605-CV-218, 2007 WL 4349705, at *2 (Ind. App. Nov. 13, 2007) (emphasis added) (Attachment E to Dkt. No. 1375).

Cinergy then assails as triple-dipping the surrender of allowances in addition to the installation of pollution controls at the remaining Wabash River units.  However, in the "cap and trade world" described by Mr. Turner (*see* FOF ¶ 214), requiring a corresponding allowance

surrender is appropriate both to ensure environmental benefit and to avoid potential perverse effects of the remedy.

First, without a corresponding allowance surrender, the reduction in emissions at Wabash could lead to increases in emissions elsewhere, as Cinergy sells the allowances it otherwise would need for Wabash River compliance.  Moreover, the allowance surrender aspect of the remedy does not impose an undue hardship on Cinergy.  The evidence showed that Cinergy's current plan is to go forward without pollution controls on units 4 and 6.  Under that scenario, Cinergy would have to purchase allowances to match those units' emissions.  With controls and allowance surrender, Cinergy's allowance purchases would be the same as under its prior plan.  The additional cost of the mitigation remedy is simply that of the controls, since the allowances are already budgeted for.  Allowing Cinergy to keep (and sell the allowances) would partially or fully offset the costs of the pollution controls and could create a windfall for the company.  FOF ¶¶ 215-20.

Notably, Cinergy has not identified any company or public interest that would be harmed by the so-called triple-dipping it has claimed in the proposed remedy (aside from the cost of the remedy).  While cost is a legitimate consideration, injunctive relief will almost inevitably cost the performing party something and is not typically a reason to withhold injunctive relief.  *See, e.g.*, *United States v. Apex Oil Co., Inc.*, No. 05-CV-242-DRH, 2008 WL 2945402, at *84 (S.D. Ill. July 28, 2008) (granting injunctive relief after finding that "Defendant offered no evidence that it would suffer particular hardship (other than its obvious need to bear the cost of complying with the order).").  This Court is charged with issuing an order that serves both the public interest and the purposes set forth by Congress in the Clean Air Act "'to protect and *enhance* the quality of the Nation's air resources so as to promote the public health and welfare.'"  *United States v.*

*Cinergy Corp.*, 582 F. Supp. 2d 1055, 1061-62 (S.D. Ind. 2008) (quoting 42 U.S.C. § 7401). Congress has explicitly stated, in creating the Acid Rain cap and trade program, that "reduction of total atmospheric loading of sulfur dioxide and nitrogen oxides will enhance protection of the public health and welfare and the environment." 42 U.S.C. § 7651(a)(6). A remedy in which the environmental benefit of the mitigation is compromised because pollution could be allowed to increase elsewhere fails to protect the public health or promote the purposes of the Clean Air Act.

### 2. Costs

Cinergy has argued that the proposed remedy is too expensive. This argument does not withstand scrutiny. As an initial matter, Cinergy failed to present evidence demonstrating how much money would be saved by its proposed remedy compared to that of Plaintiffs. Without such a comparison, there is no basis for the Court to find that there would be a meaningful difference in cost between the proposed remedies. Moreover, Cinergy did not argue that the costs from the remedy would harm the company or that they could not be borne. Cinergy can pay for this remedy. FOF ¶¶ 227-37. Cinergy's only argument was that it would shift the costs to ratepayers. This argument would be present in *any* case involving a regulated utility and is precluded as a matter of law. Ratepayer evidence is not an appropriate consideration in requiring compliance with federal environmental laws. In *N. Shore Gas Co. v. EPA*, the Seventh Circuit held that a public utility lacked standing to sue on behalf of its ratepayers to enjoin the remediation of harbor pollution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 930 F.2d 1239, 1243 (7th Cir. 1991) (Posner, J.). While the remediation may have imposed costs on the public utility, the possibility that the utility could pass those costs onto its ratepayers was irrelevant: federal environmental

"laws are intended for the protection of the environment, not for the protection of persons deemed responsible for the consequences of having polluted the environment . . . ." *Id.*

Similarly, the Second Circuit held in *United States v. City of New York* that ratepayers could not intervene to challenge a remedy at a local drinking water plant under the Safe Drinking Water Act because "the equitable power vested in the district court by the SDWA is more circumscribed than intervenors propose; it is available to ensure compliance with the statute and the regulations promulgated thereunder, not to rework or reject these legislative and regulatory determinations." *United States v. City of New York*, 198 F.3d 360, 366 (2d Cir. 1999); *accord Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 224 F.R.D. 694, 701 (N.D. Ga. 2004) (denying intervention to ratepayers in a Clean Water Act enforcement action because their concern that a consent decree would result in higher rates was not "an interest directly related to the environmental subject matter of the litigation").

### E.      Cinergy's Calculated Risk To Refurbish Its Units Without Permits

One final equitable consideration merits discussion.  While Cinergy has long maintained that it was unaware of the method for determining whether a source is required to obtain an NSR permit, the evidence suggests otherwise.  Cinergy's own documents indicate that failing to seek permits for the projects at issue was a calculated risk that has already paid off.

Wabash River units 2, 3, and 5 began operating in the mid-1950s and by the mid-1980s had reached the point where their reliability would likely decline precipitously without a suite of improvements known as refurbishment or life extension.  FOF ¶¶ 6-9.  Cinergy went ahead with refurbishment projects on the units with the stated expectation that the work would allow them to run until somewhere around 2003 to 2008.  FOF ¶¶ 8-11.

This Court has already found that "Cinergy had fair notice of the standards for determining whether its projects would cause a significant emissions increase for purposes of NSR." *United States v. Cinergy Corp.*, 495 F. Supp. 2d 892, 908-09 (S.D. Ind. 2007).  As this Court noted, "had Cinergy made any inquiry it probably would not be facing the allegations at issue in this lawsuit." *Id.* at 908.  The argument that Cinergy could not be certain its projects would trigger NSR has already been ruled "unpersuasive, if not outright disingenuous, in light of the fact that Cinergy never sought an applicability determination or applied for a permit prior to construction, much less made an attempt to complete emissions calculations."  Dkt. No. 1000 (Order on Motion to Reconsider Fair Notice Order) at 3.  While Cinergy continues to complain about the so-called Koppe-Rosen methodology upon which the jury based its verdict, this Court has already found "that as long as Cinergy was aware of the regulatory standards for determining whether a project may result in significant increases in emissions, *its understanding of the exact mathematical formula is irrelevant*."  *Cinergy,* 495 F. Supp. 2d at 906 (emphasis added).

In fact, Cinergy's own documents make clear that the company knew – at the time of the Wabash River projects – that such projects could result in NSR liability.  At the same time Cinergy was performing the first two Wabash River projects in the summer of 1989, the company was submitting sworn, written testimony to state regulators that outlined the risk that refurbishment projects like those at Wabash River would trigger NSR.  Cinergy submitted testimony from Mr. James Barnes that noted the EPA applicability determination for WEPCo units that was pending on appeal before the Seventh Circuit: "If EPA is upheld, a significant question would be raised as to PSI's ability to repair or replace deteriorated equipment that affects an existing facility's efficiency, *availability* or reliability, or restores operating capacity without having to install additional control equipment, including in some cases, scrubbers.  In

that PSI has plans to refurbish some of its existing stations, this is a significant concern."  FOF ¶ 224 (emphasis added).  The company's director of environmental programs added that the WEPCo determination "could result in retirement or scrubber installation in older units which are candidates for refurbishment."  *Id*.  As the Court has already concluded, "Cinergy was aware of the standards."  Dkt. No. 1000 (Order on Motion to Reconsider Fair Notice Order) at 3.

Cinergy has already gotten the additional life from units 2, 3, and 5 that it expected from its refurbishment projects.  While closing the units is a legitimate method for complying with the law going forward, there is also evidence that it was part of Duke's existing business plan.  FOF ¶ 148.  As Mr. Turner told the IURC in sworn testimony before the Jury's verdict, retiring units 2 through 5

> is an important scenario to consider given the high cost to retrofit these units with pollution control equipment, especially if more stringent environmental regulations are to be enacted. These are the next oldest coal units on Duke Energy Indiana's system . . . and, with more stringent environmental requirements, likely the next units to face retirement.

*Id.*.

All this suggests that Cinergy has in fact benefited from the length of time this case took to reach its conclusion.  The projects were necessary to keep the units running, and Cinergy has already gotten the additional service life it expected from the projects – without ever going through the NSR process.  Each additional year brought the company a year closer to the date at which economic considerations made it logical to retire units 2, 3, and 5 anyway.  This history makes clear that without complete mitigation, Cinergy will have evaded the requirements of NSR through the calculated risk it made in the 1980s.  Such a result is contrary to the purposes of the Clean Air Act and equity.  *See New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 663 (W.D.N.Y. 2003) (utility's "initial failure to comply with the requirements of the Clean

Air Act cannot now inure to its benefit."); *see also Or. Envtl. Council v. Or. Dep't of Envtl. Quality*, No. 91-13-FR, 1992 WL 252123, at *23 (D. Or. Sept. 24, 1992) (rejecting "windfall" for "modified sources that disregarded the SIP-mandated requirements"); *Porter*, 328 U.S. at 400 (injunctive relief can ensure compliance with the law when those found to violate are "compelled to restore [their] illegal gains."); *Cinergy*, 582 F. Supp. 2d at 1062-63 ("order to remediate the direct effects of Cinergy's CAA violations could be considered 'appropriate and necessary to enforce compliance with' the CAA, give effect to its purposes, and assure future compliance.") (citing *Porter*, 328 U.S. at 400).

## VII.   THE BECKJORD VIOLATIONS WARRANT INSTALLATION OF PM CEMS TO MONITOR COMPLIANCE AND A $1.32 MILLION PENALTY

The appropriate remedy for Cinergy's violations of limits on its PM emissions from Beckjord units 1 and 2 is also before the Court.  The Court found four violations of the applicable PM emission limits.  The Court found one violation of the Ohio State Implementation Plan ("SIP") at unit 2 and three violations at unit 1.  Each of the unit 1 infractions represents a violation both of the SIP and an administrative agreement between Cinergy and EPA.

### A.      Injunctive Relief

For the most part, the Parties agree on the appropriate injunctive relief.  The evidence shows that the PM pollution controls on Beckjord units 1 and 2 are marginally sized and have historically had problems complying with the relevant PM emissions limit.  FOF ¶¶ 243, 269. The evidence at trial shows violations for both units 1 and 2 before and after the violations found by this Court in the period 1998 through 2000.  FOF ¶¶ 245-47, 253, 264, 265.  Given this history, as Cinergy's own expert on the subject testified, there can be no certainty that the unit is in compliance on any given day.  FOF ¶ 280.

At present, the only data that exists related to the units' PM emissions comes from stack tests done as infrequently as once per year.  FOF ¶ 279.  These stack tests are based on the average of three, one-hour samples of the PM emissions.  *Id.*  Devices that continuously measure PM emissions are available and could be used at Beckjord units 1 and 2.  FOF ¶ 273.  As Cinergy's expert testified, these devices, known as continuous emissions monitors or PM CEMS, would provide more useful data than the periodic stack tests.  FOF ¶ 279.

Cinergy's compliance with its PM emissions requirements is currently determined via the periodic stack tests.  Once the PM CEMS are installed, they could serve as the compliance device.  EPA has stated that "for rules that establish PM emission limits, we believe that PM CEMS are the appropriate technology for compliance monitoring."  69 Fed. Reg. 1786, 1791 (Jan. 12, 2004).  Cinergy's expert testified that PM CEMS , if used for compliance monitoring, should be based on a 30-day averaging time, while conceding that EPA typically uses a 24-hour period.  FOF ¶¶ 277, 278.  The Court need not resolve the proper compliance measure, but may take note of the fact that if the PM CEMS show emissions over the applicable limits, that will be evidence of a violation of those limits.  *See, e.g.*, 40 C.F.R. § 52.12(c) ("*any* credible evidence or information" is relevant to whether a source is violating the applicable standard) (emphasis added).

### B.    Penalty

The appropriate penalty for the Beckjord PM violations is $1.32 million, based on the statutory maximum per day penalty and the days of violation to which the Parties have agreed.

Congresses' intent was that violators of the Clean Air Act pay significant fines.  *United States v. B & W Invest. Props., Inc.*, No. 91 C 5886, 1994 WL 53781, at *4 (N.D. Ill. Feb. 18, 1994) *aff'd* 38 F.3d 362.   "It is clear from the statutory language of the Clean Air Act that

Congress envisioned penalties to serve strong deterrent purposes." *United States v. A.A. Mactal Constr. Co. Inc.,* No. 89-2372-V, 1992 WL 245690, at *1 (D. Kan. Apr. 10, 1992).  Discussing a similar penalty provision in the Clean Water Act, the United States Supreme Court found that, "The legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties." *Tull v. United States,* 481 U.S. 412, 422 (1987).

To serve as a deterrent, a civil penalty must be high enough to preclude violators from simply absorbing the penalty as a cost of doing business.  *A.A. Mactal Constr. Co.,* 1992 WL 245690, at *2.  Further, the likelihood that non-compliance will result in the imposition of a significant penalty must be high.  *Id.*  "[D]eterrence is effective only to the extent that the risk of incurring significant civil penalties for noncompliance is real and substantial."  *Id.*

The Seventh Circuit has made it clear that the assessment of a civil penalty "is committed to the informed discretion of the trial court."  *U.S. Envtl. Prot. Agency v. Envtl. Waste Control, Inc.,* 917 F.2d 327, 335 (7th Cir. 1990).  When considering penalties under the Clean Air Act, "courts generally presume that the maximum penalty should be imposed."  *United States v. B & W Inv. Props.,* 38 F.3d 362, 368 (7th Cir. 1994) (citing *United States v. Midwest Suspension & Brake,* 824 F. Supp 713, 735 (E.D. Mich. 1993)) ("in calculating the amount of civil penalties to be imposed on defendant, this court must start with the statutory maximum and make any downward adjustments based on the evidence adduced at trial.").

Here, the maximum fine is $27,500 per day per violation.  During the trial, the Parties stipulated to the days of non-compliance as shown in Defendants' Exhibit DR-333.  FOF ¶¶ 257, 260.  As agreed to by the Parties, unit 1 was in non-compliance for a total of 23 days and unit 2 was in non-compliance for a total of 2 days.  The $1.32 million penalty sought by the United

States is comprised of two components:  1) the statutory maximum penalty for Cinergy Corp. for the 23 days of violation / non-compliance with the 1998 AOC ($27,500 x 23 days = $632,500); and 2) the statutory maximum penalty for CG&E for the 25 days of violation / non-compliance with the Ohio SIP at units 1 and 2 ($27,500 x 25 days = $687,500).  FOF ¶¶ 253, 257, 260, 262.

The factors the court is to consider when determining if any downward adjustment in the statutory maximum penalty is justified are set forth in Section 113(e)(1) of the Clean Air Act:

> (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation.

42 U.S.C. § 7413(e).  The Act "does not prescribe with precision how or with what weight to apply" the factors.  *B & W Inv. Props.*, 38 F.3d at 368.  However, guidance may be obtained from a review of how other courts have considered the factors.  *See B & W Inv. Props.,* 1994 WL 53781 at *5 (imposing statutory maximum penalty of $1,675,000 against one defendant and slightly reducing penalty to $1,500,000 against second defendant due to the economic impact of the penalty on the business); *Midwest Suspension & Brake,* 824 F. Supp 713, 735-38 (E.D. Mich. 1993) (reducing penalty from statutory maximum of $650,000 to $50,000 due to the economic impact of the penalty on the business); *A.A. Mactal Constr. Co.,* 1992 WL 245690, at *2-3 (reducing penalty from statutory maximum of $475,000 to $126,000 due to the size of the business and the economic impact of the penalty on the business).

After considering the Section 113(e)(1) factors in this case, the Court should find that no downward adjustment in the statutory maximum penalty is justified for either Cinergy Corp. or

CG&E.  Therefore the appropriate penalty is the $1.32 million statutory maximum for the days of violation agreed to by the Parties.

*Size of the Business*.  The undisputed evidence adduced at trial showed that in 2007 Duke Energy had annual earnings of $1.5 billion and cash flow of $2.6 billion.   FOF ¶ 263.  Duke is a very large company, so this factor does not justify a reduction in the maximum statutory penalty.

*Economic Impact on the Business*.  Plaintiffs presented undisputed evidence at trial that a penalty of $1,320,000 would have no adverse impact on Duke Energy.  FOF ¶ 263. Accordingly, this factor does not justify a reduction in the maximum statutory penalty.

*Compliance History and Good Faith Efforts to Comply*.  One of Cinergy's predecessor companies repeatedly violated the Ohio SIP between 1990 and 1997.  FOF ¶¶ 245-47.  Those violations lead to the 1998 administrative settlement between EPA and Cinergy.  FOF ¶ 248. Under the terms of the 1998 settlement, Cinergy was required to attain, demonstrate, and maintain continuous compliance with the Ohio SIP.  FOF ¶ 249.  After entering into the 1998 agreement, Defendants continued to violate the Ohio SIP and the agreement itself.  FOF ¶ 254. In 2003, Cinergy began taking steps to address the causes of these violations, poor gas distribution in the precipitator, which the company had identified as a problem as early as 1974. Based on these repeated violations, the failure to achieve compliance after the first enforcement effort ended in settlement, and Defendants failure to address the gas distribution issue until 2004, there is no reason for this factor to justify a reduction in the statutory maximum penalty.

*Duration of the Violation*.  As discussed above, the parties are in agreement on the duration of the violations.

*Payments for Same Violations*.  Defendants have not paid a penalty for any of the violations at issue, so there is no cause for reducing the statutory maximum based on this factor.

*Economic Benefit of Non-Compliance.*  The economic benefit resulting from a violation is typically used as the "floor" for the penalty.  *A.A. Mactal Constr. Co.*, 1992 WL 245690, at *3 ("recovery of economic benefit is essential and that economic benefit should serve as the floor below which the maximum civil penalty should not be mitigated."); *see also Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1141 (11th Cir. 1990) ("[i]nsuring that violators do not reap economic benefit by failing to comply with the statutory mandate is of key importance if the penalties are successfully to deter violations.").  The Parties did not introduce evidence of the economic benefit Cinergy gained from non-compliance, so this factor neither establishes a floor below which the maximum civil penalty should not be reduced nor justify a reduction in the statutory maximum penalty.

*Seriousness of the Violation.*  This case involves numerous violations of the 1998 administrative settlement between EPA and Cinergy.  That settlement was consented to by Cinergy, and the company received a number of substantial benefits by entering into the agreement, including the avoidance of a federal court action and the ability to negotiate with the EPA on the precise method for addressing failed PM emissions tests.  Notwithstanding these substantial benefits, Cinergy failed to live up to its end of the bargain.  In addition, two of the emissions tests that are subject of the penalty sought by the United States, the October 12, 1999 failure at Unit 1 and the October 21 - 22, 1999 failure at Unit 2, were nearly 400 percent and 300 percent above the applicable PM limit, respectively.  FOF ¶¶ 256, 259.  The violations are significant both for their magnitude and because they represent a continuing failure to comply with the law.

## CONCLUSION

For nearly 40 years, Congress has worked to improve the air quality in our country. Congress explicitly enlisted the EPA in the effort, delegating to the agency the power to write rules and set standards for New Source Review and various other aspects of the larger campaign against air pollution.  Congress also enlisted the federal judiciary by including Section 113(b) of the statute allowing for civil judicial enforcement of the law.  42 U.S.C. § 7413(b); *see also Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944) ("The Administrator does not carry the sole burden of the war against inflation. The courts also have been entrusted with a share of that responsibility.").   Among other things, Congress explicitly granted the courts the authority to "require compliance . . . and to award any other appropriate relief."  42 U.S.C. § 7413(b).  This Court's equitable discretion "must be exercised in light of the large objectives of the [CAA]." *Hecht*, 321 U.S. at 331.

For the reasons set forth above, the appropriate remedy for the violations of law found by the jury at the Wabash River plant and the Court at the Beckjord plant includes:

1.	Closing Wabash River units 2, 3, and 5 by October 1, 2009.  Until that time, the units should only be operated the minimum amount necessary to ensure reliability of the electrical service in the Terre Haute load pocket;

2.	Mitigating past emissions from Wabash River units 2, 3, and 5 through $SO_2$ and $NO_X$ reductions at Wabash River units 4 and/or 6, along with surrender of $SO_2$ allowances up to the numbers of tons emitted before shutdown;

3.	Installation of PM CEMS at Beckjord units 1 and 2; and

4.	A penalty of $1.32 million for the Beckjord violations.

A Proposed Order is respectfully submitted for the Court's inspection as Exhibit 2.

Dated: March 3, 2009                  Respectfully submitted,
                                      JOHN C. CRUDEN
                                      Acting Assistant Attorney General
                                      Environment & Natural Resources Division

                                      PHILLIP BROOKS
                                      Special Counsel to the Chief

                                      /s/ Justin Savage

                                      /s/ Thomas A. Benson

                                      JUSTIN SAVAGE
                                      KATHERINE VANDERHOOK
                                      MYLES FLINT, II
                                      JENNIFER A. LUKAS-JACKSON
                                      JASON A. DUNN
                                      THOMAS A. BENSON
                                      Environmental Enforcement Section
                                      Environment & Natural Resources Division
                                      U.S. Department of Justice
                                      P.O. Box 7611
                                      Washington, D.C. 20530
                                      (202) 514-5261
                                      thomas.benson@usdoj.gov

                                      TIMOTHY M. MORRISON
                                      United States Attorney
                                      Southern District of Indiana

                                      THOMAS E. KIEPER
                                      Assistant United States Attorney
                                      Southern District of Indiana
                                      10 West Market Street, Suite 2100
                                      Indianapolis, IN  46204-3048

                                      ANDREW CUOMO
                                      ATTORNEY GENERAL
                                      OF THE STATE OF NEW YORK

                                      MICHAEL MYERS
                                      JOSEPH KOWALCZYK

Assistant Attorneys General
The Capitol
Albany, NY 12224
(518) 402-2594
ANNE MILGRAM
ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

MAURICE GRIFFIN
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-4503
(609) 984-2845

RICHARD BLUMENTHAL
ATTORNEY GENERAL
OF THE STATE OF CONNECTICUT
CARMEL MOTHERWAY
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120
(860) 808-5101

HOOSIER ENVIRONMENTAL COUNCIL
OHIO ENVIRONMENTAL COUNCIL

JONATHAN LEWIS
CLEAN AIR TASK FORCE
Staff Attorney and Climate Specialist
18 Tremont Street, Suite 530
Boston, MA 02108
    (617) 624-0234 x10

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing conclusions of law was filed with the Court's ECF system on March 3, 2009 and will be emailed to counsel of record through the ECF system.

 /s/ Justin A. Savage
Justin A. Savage