IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:99-cv-01693-LJM-JMS |
| | ) |
| CINERGY CORPORATION, *et al*. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**PLAINTIFFS' REPLY IN SUPPORT
OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

I.     Plaintiffs' Remedy Provides Complete Redress For Cinergy's Violations .......................3

    A.    Compliance with the Law ...................................................................................3

    B.    Mitigation of the Harm from Cinergy's Violations of Law...............................5

II.    Applicable Standard For Injunctive Relief .......................................................................6

III.    Plaintiffs Have Proved Irreparable Harm From The NSR Violations .............................11

    A.    Cinergy's Collateral Challenges to the PM2.5 and Ozone NAAQS Should Be
        Rejected.............................................................................................................12

    B.    The Excess $SO_2$ and $NO_X$ Emissions Harm Downwind Nonattainment Areas by
        Contributing to PM2.5 and Ozone Pollution ...................................................14

    C.    There Is Continuing Harm from Cinergy's Excess Emissions .......................17

    D.    The Harm Demonstrated Is Not *De Minimis* ................................................18

    E.    The $SO_2$ and $NO_x$ Emissions Are not Harmless .........................................19

    F.    Cinergy's Insistence on Mathematical Precision in Proving Harm Is Groundless......20

    G.    The Evidence Shows Harm from Acid Rain and Mercury ...........................20

IV.    Cinergy Has Provided No Compelling Reason To Forgo Complete Relief ....................21

    A.    The Cost of Plaintiffs' Remedy Does Not Compel Truncated Relief ........................22

    B.    Local Reliability Issues Do Not Compel Delaying Compliance with the Law ..........24

    C.    Plaintiffs Have Proved Cinergy Emitted More Pollution Than Allowed by Law .......26

        1.    The Excess emissions concept is a useful equitable yardstick for the Court.........26

        2.    Plaintiffs have proved significant excess emissions .............................27

    D.    Plaintiffs' Mitigation Remedy Has a Compelling Nexus to the Violations................28

        1.    Allowance surrender ................................................................................29

a.   Title IV compliance does not preclude allowance surrender ............................30

b.   Allowance surrender is an appropriate exercise of the Court's equitable authority ........................................................................32

2.   Emissions credit ........................................................................34

E.   Cinergy Bears Responsibility for the Calculated Risk that Resulted in this Enforcement Action ........................................................................35

F.   Injunctive Relief Is Not Barred by the Statute of Limitations ....................................40

V.   Beckjord ........................................................................41

A.   Injunctive Relief........................................................................41

B.   Penalty........................................................................42

CONCLUSION........................................................................44

TABLE OF AUTHORITIES

Federal Cases

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) ............................................31

*Alaska Dep't of Envtl. Conservation v. EPA.*, 540 U.S. 461 (2004)....................................31

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) ........................................................2, 7

*Am. Auto. Mfrs. Ass'n v. Commissioner*, 31 F.3d 18 (1st Cir. 1994) ...................................16

*Am. Trucking Ass'n v. EPA*, 175 F.3d 1027 (D.C. Cir 1999) ...............................................12

*Am. Trucking Ass'n v. EPA*, 283 F.3d 355 (D.C. Cir. 2002) ...............................................13

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987) ..............................................7

*Camp v. Boyd*, 229 U.S. 530 (1913) .......................................................................................2

*City of New York v. Anglebrook Ltd. P'ship*, 891 F. Supp. 908 (S.D.N.Y. 1995) ...............20

*Hawaiian Electric Co., Inc. v. EPA*, 723 F.2d 1440 (9th Cir. 1984) ...................................7

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) .........................................................................44

*Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617 (6th Cir. 2007) ............................................37

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994). ..........................................22

*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960) ..........................................2

*Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985 (9th Cir. 2000) ...................10

*North Carolina v. EPA,* 531 F.3d 896 (D.C. Cir. 2008) .......................................................32

*North Carolina v. Tenn. Valley Authority*, 593 F. Supp. 2d 812 (W.D.N.C. 2009) .............12, 24

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)..........................................................2, 9

*Sierra Club v. EPA*, 311 F.3d 853 (7th Cir. 2002) ..........................................................16-17

*Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918 (7th Cir. 2008) ..............11-12

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1 (1971) ...........................................28

*United States v. Bethlehem Steel Corp.*, 38 F.3d 862 (7th Cir. 1995) ...................................19

*United States v. B & W Inv. Props.,* 38 F.3d 362 (7th Cir. 1994) .........................................43

*United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272 (S.D. Ind. 2005) ...........................35, 37

*United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025 (S.D. Ind. 2005) ...........................40

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) ...........................................35

*United States v. Cinergy Corp.*, 495 F. Supp. 2d 892 (S.D. Ind. 2007) ................35, 37, 38, 39

*United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055  (S.D. Ind. 2008) ..........5, 6, 9, 10, 32, 33, 44

*United States v. Deaton*, 332 F.3d 698 (4th Cir. 2003) ........................................................5

*United States v. Dell'Aquilla*, 150 F.3d 329 (3d Cir. 1998) ................................................43, 44

*United States v. Huebner*, 752 F.2d 1235 (7th Cir. 1985) ....................................................9

*United States v. Midwest Suspension & Brake,* 824 F. Supp. 713 (E.D. Mich. 1993) .........43

*United States v. M.C.C. of Florida, Inc.*, 772 F.2d 1501 (11th Cir. 1985) ..........................9

*United States v. Telluride Co.*, 146 F.3d 1241 (10th Cir.1998) ...........................................41

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) ........................................................9

*U.S. EPA v. Envtl. Waste Control, Inc.*, 917 F.2d 327 (7th Cir. 1990)................................7, 11, 37

*U.S. Pub. Interest Research Group v. Atl. Salmon of Me., LLC,*

339 F.3d 23 (1st Cir. 2003) ................................................................10

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)  ........................................................3

*Whitman v. Amn. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001)  ...........................................12, 13

*Wilson v. Amoco Corp.*, 989 F. Supp. 1159 (D. Wyo. 1998) ...............................................20

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ..............................................36

Federal Statutes and Regulations

42 U.S.C. § 6901(b)(2) ................................................................20

42 U.S.C. § 7401 ...............................................................10, 44

42 U.S.C. § 7401(b)(1) ...............................................................12

42 U.S.C. § 7408(a)(1)(A) ...........................................................19

42 U.S.C. § 7408(a)(1)(B) ...........................................................14

42 U.S.C. § 7413(a)(3) ...............................................................33

42 U.S.C. § 7413(a)(5) ...............................................................31

42 U.S.C. § 7413(b) ...............................................................33, 44

42 U.S.C. § 7470 ...................................................................44

42 U.S.C. § 7470(4) .................................................................30

42 U.S.C. § 7477 ...................................................................31

42 U.S.C. § 7479(3) .................................................................28

42 U.S.C. § 7651(a)(6) ...............................................................19

40 C.F.R. § 52.12(c) .................................................................42

40 C.F.R. § 52.21(b)(3) ..............................................................34

Federal Register

71 Fed. Reg. 61,144 (Oct. 17, 2006) .................................................12

72 Fed. Reg. 54,112 (Sept. 21, 2007) ..............................................14, 15

Congressional Materials

H.R. Rep. No. 95-294, pt. 1, at 135 (1977) ...........................................................31

Other Materials

*Application of Duke Energy Indiana, Inc. for Approval of a Change in its Midwest*

*Independent System Operator Management Cost & Revenue Adjustment Factor*

*Under its Standard Contract Rider No. 68*, Order of the Indiana Utility Regulatory

Commission, 2008 Ind. PUC LEXIS 499 (Dec. 23, 2008)....................................................26

Brief in Response for Appalachian Power Co., *et al*., *Browner v. Amn. Trucking Ass'ns,*

*Inc.*, 531 U.S. 457 (2001) (Nos.99-1257, 99-1263, 99-1265) 2000 WL 3397949 ...............14

DAN R. DOBBS, THE LAW OF TORTS § 147, at 350-51 (West, 2000) ........................................37

*Preventing Undue Discrimination and Preference in Transmission Service*,

FERC Order, 2007 FERC LEXIS 2407, at *573-76 (Dec. 28, 2007) ...................................26

## INTRODUCTION

Air pollution from the Wabash River power plant harms human health and the

environment, and Cinergy's failure to comply with the New Source Review ("NSR") provisions

of the Clean Air Act resulted in more pollution and thus greater harm.  The evidence presented at

trial shows that pollution from the Wabash River power plant, *inter alia*, results in increased:

- Premature mortality;
- Cardiovascular problems;
- Respiratory problems (including asthma attacks);
- Acid rain; and
- Mental development problems, especially for children.

Plaintiffs' Proposed Findings of Fact ("Pl. FOF") ¶¶ 96-98, 116-17, 120-25, 136-41.  In

response, Cinergy can only argue that its additional pollution *may not* have caused more than *de

minimis* harm.  Cinergy's Proposed Conclusions of Law ("Cin. COL") (harm to health is *de

minimis*), 82 (ecological effects may be *de minimis*).  Cinergy's argument flies in the face of the

conclusions of the medical and scientific communities, the findings of government agencies

charged with protecting human health and the environment from air pollution, and decisions of

other courts that have considered similar issues.  As Cinergy said through counsel in closing

argument, "There are real benefits, local benefits and benefits to everybody downwind of these

plants from shutting down" Wabash River units 2, 3, and 5.  Trial Tr., Vol. 5-1116:5-7 (Feb. 6,

2009).  Cinergy's closing argument represents the consensus view, while its pleadings represent

the scientific fringe.

This tension results in an internally inconsistent remedy proposal.  Cinergy essentially

argues that closing Wabash Rivers units 2, 3, and 5 – after three and a half years of reduced

operation – is an appropriate remedy that will provide benefits to public health and the

environment, but that any further reductions from the same site would be unsupported by the

facts and the law.  This contention is logically and scientifically bankrupt: each of the Wabash River units burns coal and emits from the same smokestack.  If closing units 2, 3, and 5 will provide a benefit, then controlling units 4 and/or 6 to offset Cinergy's excess pollution will increase the benefit.  Cinergy's proposed remedy also asks the Court to ignore the full scope of the harm from its violations.  Closing the units only halts their contribution to the air pollution harm from the site, while doing nothing to ameliorate the effects of two decades of unpermitted pollution.  Such a remedy simply forces Cinergy to do today what the law required 20 years ago.

Sitting in equity, the Court need not and should not settle for Cinergy's delayed and limited remedy.  The Court's charge in equity is to render "complete rather than truncated justice."  *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *see also Camp v. Boyd*, 229 U.S. 530, 551 (1913) ("A court of equity ought to do justice completely, and not by halves").  "When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the *historic power of equity to provide complete relief in the light of statutory purposes.*"  *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291-92 (1960) (emphasis added); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975) ("it is the historic purpose of equity to secure complete justice") (internal citations and quotation marks omitted).  Cinergy has presented no compelling reason for the Court, and the communities downwind of the Wabash River plant, to settle for truncated justice in this case.  Complete justice requires both bringing the violating units into compliance with the law as quickly as possible and mitigating the harm to the environment and public health that resulted from Cinergy's violations.

I.      **Plaintiffs' Remedy Provides Complete Redress For Cinergy's Violations**

Plaintiffs have proposed a remedy that would fulfill the equitable obligation to "secure complete justice" in a manner consistent with the public interest.

A.      **Compliance with the Law**

First, Plaintiffs' remedy would require Cinergy to close units 2, 3, and 5 by October 1, 2009, while operating the units at the minimum generation levels necessary to ensure electrical reliability in the Terre Haute area between the date of this Court's order and October 1, 2009. *See* Plaintiffs' Proposed Conclusions of Law ("Pl. COL"), Ex. 2, Pls. Proposed Order, ¶ 2. Plaintiffs' remedy of minimum generation reflects no more than what Mr. Turner acknowledged the company could do if ordered by this Court. Pl. FOF ¶ 195. Allowing generation as necessary this summer will avoid the potential risk that the closure of the units might result in blackouts in Terre Haute while still minimizing emissions and meeting the Court's obligation to "secure prompt compliance with the Act." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). The evidence presented at trial established that the risk to Terre Haute's service arises on days in which the temperature in that area exceeds 90 degrees. Pl. FOF ¶¶ 164–65; Cinergy's Proposed Findings of Fact, ("Cin. FOF"), ¶ 48. By delaying permanent closure until October 1, 2009, the Court will allow Cinergy to run units 2, 3, and 5 when necessary to protect service reliability this summer and provide time to fully address any reliability risk, including, for example, having the Midwest Independent Transmission System Operator, Inc. ("MISO") perform a full Attachment Y study. *See also* Pl. FOF ¶¶ 156–63. In addition, Plaintiffs do not object to an escape valve in which Cinergy or MISO could move for modification of the Court's order – if limited operation beyond October 1, 2009 is *necessary* to protect electric reliability in

Terre Haute – so long as the company can demonstrate that it has exhausted all other options.  Pl. COL at p. 28;  Pls. Proposed Order ¶ 3.

By contrast, Cinergy seeks to operate at its pre-project emissions levels until September 2012, which would permit 50,000 tons of $SO_2$ and $NO_X$ emissions over the next three years.  *See* Cinergy's Proposed Order ¶¶ 1-2.  Mr. Turner admitted that this level of generation – and emissions – is not connected to reliability concerns.  Pl. FOF ¶¶ 180-82.  Allowing a level of operation unrelated to that needed to protect service reliability and/or continued operation until September 2012 is inconsistent with the Court's obligation to secure prompt compliance with the law, and would permit additional, cumulative harm to public health and the environment.

Moreover, any delay simply brings the company closer to the date it would have retired the units anyway based solely on economic factors.  While Cinergy asserts in its pleadings that units 2, 3, and 5 could operate for "many" more years, Cin. COL at p. 51, Cinergy failed to respond to the evidence showing that the company (i) needed to perform the projects at issue in order to continue to run the units; (ii) has already enjoyed the additional operation that it hoped would result from its refurbishment program; and (iii) is studying the near-term retirement of units 2, 3, and 5.  Pl. FOF ¶¶ 6-11; 148.  Even without this litigation, Cinergy executive James Turner described the retirement of units 2 through 5 "*in 2012*" as "an important scenario to consider . . . These are the next oldest coal units on Duke Energy Indiana's system [and] likely the next units to face retirement."  Pl. FOF ¶ 148.  Thus, Cinergy's proposed retirement date of 2012 largely reflects Cinergy's business plan.  *Id.* ¶¶ 148-49.  Cinergy has already reaped the benefits of the calculated risk it took to refurbish the Wabash River units without complying with NSR.  It should not be granted three and a half additional years free from the requirements of the Clean Air Act.

### B.     Mitigation of the Harm from Cinergy's Violations of Law

The second element of Plaintiffs' proposed remedy is emissions reductions that redress the unpermitted pollution from units 2, 3, and 5 since the modifications found by the jury.  This Court has already decided that it would be consistent with the Clean Air Act "to order Defendants to take appropriate actions that remedy, mitigate and offset harms to the public and the environment caused by the Defendants' proven violations of the CAA [in order to] order a full and complete remedy for harms caused by a past violation."  *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1060-61 (S.D. Ind. 2008).  The only question remaining is how to do so.

Cinergy avoids the relevant question by simply arguing that any mitigation is inappropriate.  Cinergy's proposal to close units 2, 3, and 5 merely stops the air pollution from those sources – it does nothing to redress the harm from two decades of unpermitted emissions.[1] Cinergy seeks the Court's blessing on a remedy "for [its] failure to obtain a required permit [that goes] no further than requiring [it] to do what would have been lawful in the first place."  *Id*. (quoting *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003)).

Plaintiffs offer the concept of excess emissions as an equitable yardstick to measure the effects of Cinergy's violations.  While the Parties dispute the amount of excess emissions, the concept is simple: by failing to follow the law, Cinergy generated more pollution than it otherwise would have.  Plaintiffs submit that the appropriate mitigation requires reducing

---

[1] Cinergy suggests that closing units 2, 3, and 5 actually achieves *greater* reductions than would be required by NSR and thus that closure also redresses any excess emissions.  Had Cinergy opted to continue operating the units, Plaintiffs would have sought current, top-of-the-line technology.  The undisputed evidence at trial was that NSR at the present time would require control technology removing 99 percent of the $SO_2$ and 90 percent of the $NO_X$ from the units' emissions.  Pl. FOF ¶ 144.  Thus the additional reductions from closing the units compared to best available control technology ("BACT") controls are extremely small and would not provide meaningful mitigation.  Moreover, there is no evidence to support Cinergy's assertion that the units would continue to operate for a significant length of time absent this litigation.

Cinergy's emissions from other units at the Wabash River plant in the amount of the excess emissions.  The mitigation is thus linked in magnitude and effect to the violations.

As described below, this remedy is consistent with the standards for injunctive relief, compelled by the harm Plaintiffs demonstrated at trial, and overcomes Cinergy's various arguments for a truncated remedy.

## II.    Applicable Standard For Injunctive Relief

As explained in Plaintiffs' proposed findings of fact and conclusions of law, the Court need not mechanically apply the traditional equitable factors for injunctive relief in this case. Rather, as this Court has confirmed, the government's role as a plaintiff "seeking to protect the public interest" means that "the Court's equitable powers are even broader and more flexible than if only private parties were seeking relief." *Cinergy*, 582 F. Supp. 2d at 1060.  This broad and flexible equitable authority is further informed by the priorities established by Congress in the Clean Air Act in general and the NSR program in particular, and the "quite broad" grant of jurisdiction provided by Congress to help achieve those priorities.  *Id.*

Among the priorities established by Congress in the NSR program was the goal of reducing "pollution levels below those mandated by the [NAAQS]" through "installation of BACT on all sources which would otherwise increase pollution."  *Hawaiian Elec. Co., Inc. v. U.S. EPA*, 723 F.2d 1440, 1447 (9th Cir. 1984).  By any measure, Cinergy's failure to comply with the law resulted in massive amounts of unpermitted pollution from the Wabash River plant, directly contrary to the Congressional mandate for permits and state-of-the-art pollution controls on all modified sources, even those in areas that already meet the NAAQS.  The Court's equitable discretion must be informed by Cinergy's disregard for these priorities, as well as the overall context of this environmental enforcement case, which involves the United States and

other sovereign plaintiffs seeking to protect the public interest from harm caused by established violations of the law.  *See* Pl. COL at 4-6.  As the Supreme Court has explained, "It is true that equity eschews mechanical rules and depends on flexibility.  But when Congress invokes the Chancellor's conscience to further transcendant legislative purposes, what is required is the principled application of standards consistent with those purposes."  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975) (internal citations and quotation marks omitted).

The proof presented at trial easily meets the traditional four-factor standard for injunctive relief, particularly in light of this context.  Both Parties devote much of their pleadings to the harm resulting from the violations, and Plaintiffs answer Cinergy's arguments regarding the balance of hardship and the public interest in Section IV.  Cinergy asserts that Plaintiffs have an adequate remedy at law because Congress conferred authority to seek civil penalties, Cin. COL at pp. 84-85.  However, a civil penalty paid to the U.S. Treasury will not remedy the harm to downwind communities from Cinergy's pollution.  *See also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages"); *United States Envtl. Prot. Agency v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990) (finding that in environmental statute case involving closure of landfill that it was "beyond question, given the district court's findings, that a remedy at law would have been inadequate in this case.").

Rather that straightforwardly address the traditional equitable factors, Cinergy seeks to divide and conquer Plaintiffs' remedy by asserting that only one part of the injunctive relief proposed by Plaintiffs is actually designed to address the "statutory violations" found by the jury.  Cin. COL at p. 53.  Cinergy's attempt to divide Plaintiffs' proposed remedy into two parts, thereby only partly addressing Cinergy's NSR violations, is without merit.  The entirety of

Plaintiffs' proposed remedy is narrowly tailored to redressing Cinergy's violations at the Wabash River plant:  Plaintiffs seek prospective compliance for the violations by requiring Cinergy to permanently shut down its violating units, and mitigation of the harm from the violations by requiring Cinergy to reduce pollution from the Wabash River plant, on a ton-for-ton basis, by an amount equal to the amount of pollution that resulted *from* those violations.  Such mitigation, which proposes to offset reductions from the very same plant found to be in violation of NSR requirements, has an elegant nexus to Cinergy's NSR violations.

In addition, Cinergy's attempt to divide Plaintiffs' proposed remedy reveals a telling inconsistency in its argument.  On the one hand, Cinergy agrees that an injunction is necessary and appropriate to remedy its NSR violations: As Cinergy puts it, "Shutdown of Wabash River units 2, 3, and 5 is a significant remedy that is *appropriate for the statutory violations found by the jury*."  *See* Cin. COL at p. 57 (emphasis added).  As Cinergy argues elsewhere, even under its view of the caselaw, such injunctive relief can *only* be ordered if there is proof of irreparable harm.  *See id.* at pp. 54, 56.  Cinergy thus implicitly admits that the evidence demonstrates irreparable harm from its violations.  Indeed, Cinergy made this admission explicit in its closing argument, when it argued that downwind communities will see "real benefits" due to the reduction in ambient pollution levels from shutting down Wabash River units 2, 3, and 5.  Trial Tr., Vol. 5-1116:5-7 (Feb. 6, 2009).  Having conceded sufficient proof of harm to warrant shutting down units that increased emissions in violation of NSR, Cinergy cannot be heard to assert a lack of proof of harm when it comes to mitigating the harm from those *very same* violations.  After all, as Cinergy concedes, the *same* standard of harm applies to Plaintiffs' request for mitigation.  *See* Cin. COL at p. 68 ("As with any injunction, Plaintiffs must satisfy the familiar equitable four-part test . . .").

8

Cinergy also cites a number of cases that it says support the proposition that courts "routinely" deny injunctive relief seeking mitigation in environmental cases. *See* Cin. COL at p. 69. However, no such general rule can be found in the case law. *See Cinergy*, 582 F. Supp. 2d at 1060-62 and cases cited therein. Rather, the cases cited by Cinergy stand for the unremarkable proposition that courts apply the traditional factors for injunctive relief before ordering mitigation, and that there must be an equitable relationship between an injunctive remedy and the harm it is intended to mitigate. For instance, while Cinergy cites *United States v. Huebner*, 752 F.2d 1235 (7th Cir. 1985), for the proposition that courts "routinely find that equitable factors weigh against" ordering mitigation, Cin. COL at p. 69, the Seventh Circuit actually upheld the "majority" of the mitigation ordered by the district court in that case. *United States v. Huebner*, 752 F.2d at 1245. Similarly, contrary to Cinergy's assertions, *United States v. M.C.C. of Florida, Inc.*, 772 F.2d 1501 (11th Cir. 1985), did *not* hold that mitigation was an inappropriate remedy for established environmental violations. Rather, it held that mitigation *is* an appropriate remedy, and that where a particular proposed plan is determined to be infeasible, an *alternative* mitigation plan should be developed. *See id.* at 1507-08.

Finally, Cinergy argues that the Court lacks jurisdiction to require emission reductions at Wabash River units 4 and 6 because, Cinergy claims, injunctive relief is only appropriate "to prevent *future* violations." Cin. COL at p. 83 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis added by Cinergy)). Cinergy's proposition is wrong as a legal matter, as discussed immediately below, and ignores Plaintiffs' record evidence of continuing harm outlined in Section III.C. *W.T. Grant* is not a mitigation case, and the Court has already rejected Cinergy's argument when it held that, under cases such as *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), "it has the authority to order Defendants to take appropriate actions that

9

*remedy, mitigate and offset* harms to the public and the environment caused by the Defendants' proven violations of the CAA," and that its equitable authority therefore "includes the granting of retrospective remedial relief."  *Cinergy*, 582 F. Supp. 2d at 1060, 1066 (emphasis added).

Cinergy's related argument, that injunctions can only issue to mitigate "future harm," Cin. COL at p. 84, fails for the same reason: this Court is invested with the full scope of its equitable authority and may order what measures it deems necessary to not only bring Cinergy into compliance with the law, but to also ameliorate the harm caused by its violations.  As this Court has already held, this conclusion follows from both the caselaw and the structure of the Clean Air Act itself:

> Moreover, in this case an order requiring Defendants to take actions that remedy, mitigate, and offset harms caused to the public and the environment by their past CAA violations would seem to give effect to the CAA's purpose "to protect and *enhance* the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401 (emphasis added).  *See also* 42 U.S.C. § 7470 (stating the purpose of the PSD program is "to protect public health and welfare from any actual or potential adverse effect ... from air pollution").  This Court therefore concludes that its equitable authority granted by § 113(b) includes the authority to order relief aimed at redressing the harms caused by Defendants' established violations of the CAA.  In other words, this Court's equitable authority is not limited to providing prospective relief only.

*Cinergy*, 582 F. Supp. 2d at 1061-62.  Cinergy's jurisdictional argument boils down to its claim that mitigation "would in effect be a penalty" in this case.  Cin. COL at p. 84.  However, as explained below, that claim is belied by the tight nexus between Cinergy's established violations and Plaintiffs' requested injunctive relief.   "So long as the district court's equitable measures are reasonably calculated to remedy an established wrong, they are not an abuse of discretion."  *U.S. Pub. Interest Research Group v. Atl. Salmon of Me., LLC*, 339 F.3d 23, 32 (1st Cir. 2003)

(quoting *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000) (internal quotations omitted)).[2]

## III.    Plaintiffs Have Proved Irreparable Harm From The NSR Violations

The violations at the Wabash River power plant harm public health and the environment. Plaintiffs have shown that the violations resulted in hundreds of thousands of tons of excess emissions.  Pl. FOF ¶¶ 12-28, 40-48, PX 2112B (listing $NO_x$ and $SO_2$ emissions from the Wabash River plant).  Each ton of illegal emissions has a cumulative and chronic effect on communities downwind from the Wabash River smokestack, many of which already suffer from poor air quality and elevated pollution levels.  Pl. FOF ¶¶ 57-58, 97, 119, 126, 137, 140-141. Congress, EPA, and other courts have also found that the pollutants at issue are harmful.  Pl. COL at p. 9, 11.

However, Cinergy argues that the violations were nothing more than *de minimis* trifles, *e.g.*, Pl. COL at p. 76, 78-82, such that the Court need not exercise its equitable authority to order anything more than the unit retirements already under consideration in Cinergy's business plan. Cinergy's view of "harm" lies outside the mainstream of scientific thought, second-guesses the policy judgments that Congress made in crafting the Clean Air Act, and conflicts with traditional equity practice.  The harm from the violations is substantial and ongoing, far surpassing risks to public health that have been demonstrated to secure environmental injunctions in this Circuit. *See, e.g.*, *EPA v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 330-32 (7th Cir. 1990) (affirming injunction requiring closure of landfill based on the potential for contamination of private drinking wells).  As the Seventh Circuit found in upholding an injunction in a case that merely

---

[2] While Cinergy cites *Atlantic Salmon's* discussion of certain evidence of "ongoing harm" present in that case, the court nowhere held that such harm was the touchstone for injunctive relief.  Rather, the court made clear that district courts retain broad discretion to issue injunctive measures "for the purpose of *remedying* past violations."  339 F.3d at 32 (emphasis in original).

involved updating a PSD permit for a coal-fired power plant, "a valid PSD permit *would likely result in decreased emissions and improved public health*, which would further a stated goal of the Clean Air Act." *Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918, 936-37 (7th Cir. 2008) (emphasis added) (citing 42 U.S.C. § 7401(b)(1)).  A court hearing evidence similar to what Plaintiffs presented in this trial found that an injunction requiring pollution controls was warranted under nuisance law based in part on the harm from PM2.5 and ozone. *North Carolina v. TVA*, 593 F. Supp. 2d 812 (W.D.N.C. 2009); *see also* Pl. COL at pp. 9, 17-18. Twenty years of illegal emissions from the Wabash River plant need to end, and downwind communities should be given fair redress.

> **A.** **Cinergy's Collateral Challenges to the PM2.5 and Ozone NAAQS Should Be Rejected**

Cinergy asserts that the violations result in no harm to public health based on a series of arguments that second-guess the purpose and scope of the PM2.5 and ozone NAAQS.  First, Cinergy argues that the PM2.5 impacts from the excess emissions have no health effects because they mainly consist of sulfates, a compound that Dr. Valberg apparently views as harmless.  Cin. COL at p. 81.  However, Congress, EPA, and the mainstream scientific community disagree with Dr. Valberg, who routinely testifies in litigation that defendants' pollution causes no harm.  Pl. FOF ¶¶ 100, 115.  Thus, EPA has set the NAAQS based on the total PM2.5 in the air, including sulfates.  71 Fed. Reg. 61,144, 61,162–64 (Oct. 17, 2006).  Cinergy also argues that any impacts in PM2.5 and ozone attainment areas result in no harm, because the NAAQS removes all risks to human health and the environment.  Cin. COL at p. 77.  However, EPA and Plaintiffs' expert, Dr. Schwartz, agree that PM2.5 and ozone are "nonthreshold" pollutants, meaning that no known safe threshold has been found.  Pl. FOF ¶ 111; *See American Trucking Ass'n v. EPA*, 175 F.3d 1027, 1034 (D.C. Cir 1999), *aff'd in part, rev'd in part sub nom, Whitman v. American Trucking*

*Ass'n*, 121 S.Ct. 903 (2001) (describing ozone and PM 2.5 as non-threshold pollutants); *see, e.g.*,

71 Fed. Reg. at 61,152, 61, 153 n.11.  Cinergy is well aware of EPA's position.  Before the U.S.

Supreme Court, Cinergy joined an industry brief that argued that PM2.5 and ozone are non-

threshold pollutants.  *See* Brief in Response for the Respondents Appalachian Power Co., *et al.*,

filed in *Browner v. American Trucking Assocs., Inc.*, 2000 WL 33979493 (filed Feb. 28, 2000);

*Whitman v. American Trucking Ass'n*, 531 U.S. 457, 475 (2001)  ("It is . . . not conclusive for

delegation purposes that, as respondents argue, ozone and particulate matter are 'nonthreshold'

pollutants that inflict a continuum of adverse health effects at any airborne concentration greater

than zero and hence require the EPA to make judgments of degree.  A certain degree of

discretion, and thus of lawmaking, inheres in most executive or judicial action.") (internal

quotation marks, citations, and brackets omitted).  *American Trucking Ass'n v. EPA*, 283 F.3d

355, 369-70 (D.C. Cir. 2002) (setting NAAQS only requires EPA to "engage in reasoned

decision-making," not "definitively identify pollutant levels below which risks to public health

are negligible.") (internal quotation marks and citation omitted). In any event, Congress intended

the PSD program to address health impacts below the NAAQS, a point that Cinergy itself

emphasized to the Indiana Supreme Court in seeking insurance coverage for this case.  *Compare*

Pl. COL at p. 18-19, *with* Dkt. No.  1429-2 at internal p. 3-4 and note 1 (attaching Cinergy

pleading in state court litigation filed May 31, 2007).

Cinergy suggests that impacts in nonattainment areas are harmless because PM

concentrations may be several times higher than the NAAQS in food courts and coffee shops.

Cin. COL at p. 78; Cin. FOF ¶ 174.  Dr. Valberg admitted that these particles are not the same as

ambient particles, Trial Tr. Vol. 4-846:21-23 (Feb. 5, 2009), although he states that he uses the

data because Plaintiffs' expert never explicitly noted any difference between emissions from

pizza ovens and uncontrolled coal combustion.  *Id.* at Vol. 4-846:21-847:5.  Moreover, every

mainstream public health and medical organization disagrees with Dr. Valberg's views that the

NAAQS should be set much higher.  Pl. FOF ¶¶ 97, 100, 109-13.  Nor has Cinergy offered any

evidence that from any scientist or regulatory agency that believes that our country's air quality

problems result from baking bread and brewing coffee.  The fact that Cinergy would sponsor

such testimony serves only to illustrate the company's recalcitrance.

### B. The Excess SO$_2$ and NO$_X$ Emissions Harm Downwind Nonattainment Areas by Contributing to PM2.5 and Ozone Pollution

The excess SO$_2$ and NO$_X$ emissions cause harm, because they contribute to the formation

of PM2.5 and ozone pollution in nonattainment areas that EPA has already found have unhealthy

air quality.  Pl. FOF ¶¶ 56-81.  Cinergy does not dispute the relationship between its excess

emissions and the formation of "secondary" PM2.5 and ozone.  Pl. FOF ¶¶ 51-55.  It is equally

uncontested that the Wabash River plant contributes to PM2.5 and ozone levels in several

nonattainment areas, including Evansville, Indianapolis, Gary, Chicago, Dayton, and other

communities further downwind.  Pl. FOF ¶¶ 68-69, 74-76.  Cinergy, instead, characterizes the

impacts on these areas as "too small," because the excess emissions are responsible only for a

portion of the pollution measured by the NAAQS.  Cin. COL at pp. 77-78.  However, it is

uncontroverted that no single source would be responsible for all of the pollution measured by

those federal air quality standards.  Pl. FOF ¶ 84.  Indeed, Congress requires EPA to set a

NAAQS only for those air pollutants "*the presence of which in the ambient air results from*

*numerous or diverse* mobile or stationary sources . . . ."  42 U.S.C. § 7408(a)(1)(B) (emphasis

added).  Using Cinergy's approach, every source of air pollution would be small.  Pl. FOF ¶ 94.

Cinergy also argues that the excess emissions have a small air quality impact based on a

proposed EPA rule.  Cin. COL at pp. 78-80; (citing 72 Fed. Reg. 54,112 (Sept. 21, 2007)).  The

proposal suggests certain numeric thresholds for PM2.5 air quality impacts – known as significant impact levels ("SILs") – to be used as "screening tools" in conducting air quality modeling for a PSD permit application.  72 Fed. Reg. at 54,138 (Sept. 21, 2007).  Cinergy relies on this proposal to argue that "EPA *itself deems*" the air quality impacts from this 10-year-old enforcement action to be merely *de minimis*, such that the Court should reject EPA's own proposed remedy in this case.  Cin. COL at pp.79.   However, Cinergy admits that the proposal does not apply to the secondary PM2.5 or ozone at issue here.  *Id.*  Nor does the proposal somehow speak to the appropriate injunctive relief in an EPA enforcement action.   In any case, Cinergy's expert admitted that, under at least one circumstance, the excess emissions exceeded the proposed SIL level.  Trial Tr. Vol. 3-627:19-628:3 (Direct Exam of Stanley Hayes) (Feb. 4, 2009).

Despite Cinergy's contentions, the excess emissions substantially contribute to PM2.5 and ozone levels in nonattainment areas.  The annual PM2.5 contributions from the excess emissions exceed a tenth of a microgram, and daily contributions range as high as 2.2 micrograms.  Pl. FOF ¶¶ 74, 77.  These impacts extend through several nonattainment areas in the midwest and reach as far as the Plaintiff-Intervenor states.  To be sure, Cinergy's excess emissions are not solely responsible for downwind areas being in nonattainment, and a remedy here will not solve all air quality problems in these areas.  As Cinergy itself has acknowledged, even new regulations – such as the Clean Air Interstate Rule ("CAIR") – will not accomplish all of those objectives.  PX-1939 at CINERGY 1343914 ("The emissions reductions contained in CAIR were not designed to solve all the nonattainment problems in the country or even in the Midwest.").  Simply stated, Cinergy's illegal emissions should not be permitted to make a bad

situation worse, regardless of the impacts of other air pollution sources.  Ordering such relief is consistent with traditional equitable relief awarded in nuisance cases.  *See* Pl. COL at pp. 14-15.

Cinergy accuses Plaintiffs of lacking an objective standard for judging the PM2.5 air quality impacts of the excess emissions.  Cin. COL at pp. 79-80.  However, it is undisputed that a contribution on the order of a tenth of a microgram would be considered important by state and local regulators charged with attaining the NAAQS.  Pl. FOF ¶ 95.  This consensus view reflects the realities of the air pollution problems in the Eastern United States.  Several communities have only a slim compliance margin with the NAAQS.  Only a few bad air days can push an area into non-compliance.  Pl. FOF ¶¶ 85-90.

Besides harming public health in nonattainment areas, the excess emissions contribute to adverse economic impacts in those downwind communities, which have to extract emission reductions from local industry to achieve the federal standards.  Pl. FOF ¶¶ 91-92.  Cinergy dismisses these economic impacts as *de minimis*, Cin. COL at pp. 81-82, but practically speaking, this can require controlling several sources of air pollution to achieve improvements in air quality equivalent to the excess emissions.  Pl. FOF ¶¶ 84.  For instance, the PM2.5 impact from the excess emissions is greater than the impact from all of the 324,000 diesel trucks registered in Indiana, Ohio, and Kentucky.  Pl. FOF ¶ 50; Trial Tr. Vol. 1-199:19-201:12 (Feb. 2, 2009) (Cross Exam of Lyle Chinkin).  It is unfair for downwind businesses to have to make up for Cinergy's illegal air pollution.  Similarly, Cinergy's recalcitrance should not put downwind communities at risk for the severe consequences that the Act imposes for failing to reach attainment, despite a state's best efforts.  *See, e.g.*, *American Automobile Manufacturers, Ass'n v. Commissioner*, 31 F.3d 18, 21 (1st Cir. 1994) ("States failing to meet the NAAQS risk sanctions, including the loss of federal highway funds."); *Sierra Club v. EPA*, 311 F.3d 853, 855 (7th Cir.

2002) (discussing sanction against St. Louis for failure to attain the ozone NAAQS by the deadline).

### C.      There Is Continuing Harm from Cinergy's Excess Emissions

Cinergy argues that the Court is powerless to mitigate past excess emissions, because those emissions pose no "continuing harm" to public health and the environment.  *Compare* Cin. COL at p. 84 ("it is not even *possible* for future reductions to undo any alleged continuing harm caused by emissions in the past"), *with id.* at p. 85 ("a remedial injunction generally cannot actually undo historical NSR violations, such as those at issue here").  However, Cinergy ignores the fact that the excess emissions form secondary pollutants – PM2.5, ozone, and acid rain – that have cumulative and chronic effects on public health and the environment.  Pl. FOF ¶¶ 57-58, 97, 119, 126, 137, 140-41.  Similarly, mercury has cumulative effects in the environment, including accumulation in fish.  *Id.* ¶¶ 135-38.  Reducing future emissions lessens these cumulative effects.  *Id.* ¶¶ 127, 139, 143.   Moreover, Dr. Schwartz testified that the benefits from a reduction in PM 2.5 concentrations would be seen both immediately and over the course of a few years, suggesting the ongoing effects of air pollution and reductions.  Trial Tr. Vol. 1-94:5-95:25 (Direct Exam of Dr. Schwartz).  Dr. Driscoll also testified that while improvements to the environment from reduced acid rain and mercury deposition occur slowly, some improvement could be observed even in the short term.  Trial Tr. Vol. 2-275:18-278:1; 285:24-287:6; 296:19-295:13. (Driscoll Feb. 3, 2009).

The ability of an injunction to remedy ongoing harm from Cinergy's emissions is confirmed by Cinergy's own statements to the Indiana Supreme Court.  Only a few years ago, Cinergy wrote a brief in that court in an attempt to secure insurance coverage for this case.  As Cinergy explained then:

* * * Congress' clear intent for NSR . . . is to clean up prior emissions.

The primary method to remediate polluted environmental media is to limit or reduce ongoing releases so that the harmful substances in the air, soil, or water can disperse and people, animals and plants allegedly injured by such substances can recover . . . . [R]estoring damage by air pollution usually can be accomplished by limiting or eliminating present sources of pollution . . . . That is *precisely* what the NSR program is designed to do.

Dkt. No. 1429-2, at p. 4-5 (emphasis in original) (citations and internal quotation marks omitted).

Plaintiffs agree.

### D.     The Harm Demonstrated Is Not *De Minimis*

Cinergy's contention that the emissions at issue are *de minimis* also fails when the excess emissions are compared to other sources of air pollution. The definition of *de minimis* is stretched well beyond its breaking point when it would encompass a source that is within the top 5 percent of $SO_2$ sources in the Eastern United States or equal to 2 percent of all $SO_2$ emissions in Indiana, as the Wabash River excess emissions are. Pl. FOF ¶ 50. Indeed, the excess emissions are more than double the *total* $SO_2$ emissions from *all* sources in the six-county area covered by the Dayton Regional Air Pollution Control Agency. *Id.* While Cinergy criticizes Plaintiffs' comparison of emissions to those from diesel trucks, it ignores these comparisons which clearly show that the Wabash River emissions are a major source of air pollution. Moreover, excess emissions in fact had an impact on public health for each of the effects Dr. Schwartz identified in his testimony, such as premature mortality, heart attacks, and pulmonary problems. Trial Tr., Vol. 1-93:23-96:13 (Direct Exam of Dr. Joel Schwartz).

The size of the Wabash River emissions also puts to rest Cinergy's concern that Plaintiffs are proposing a theory of liability in which *any* amount of harmful emissions is sufficient to warrant an injunction. Cin. COL at p. 76. Neither Plaintiffs nor the Court need to strain to draw

the line between what level of harm suffices to warrant injunctive relief – the magnitude of the harm from the Wabash River excess emissions far eclipse any such line.

### E.       The $SO_2$ and $NO_x$ Emissions Are Not Harmless

Cinergy attempts to distract from the PM2.5 and ozone harm proof by diverting attention to their precursor pollutants, $SO_2$ and $NO_x$, and arguing that those pollutants are harmless or their amounts *de minimis*.  The harm from the excess $SO_2$ and $NO_x$ emissions is fairly established by prior statutory and regulatory findings.  While Cinergy argues that Plaintiffs provided no proof that $SO_2$ and $NO_x$ are themselves harmful, Cin. COL at p.75, Plaintiffs need not do so, because EPA made that determination long ago.  Both $SO_2$ and $NO_X$ are criteria pollutants under the Act, a designation that follows only after EPA, in a formal rulemaking, has found them to "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare . . . ."  42 U.S.C. § 7408(a)(1)(A); *see also* Pl. COL. at p 9.   Similarly, Cinergy argues that the violations only involved a *de minimis* harm when, in fact, the amount of excess $SO_2$ and $NO_X$ emissions far exceeds 40 tons per year, the "significant" level of emissions increase that EPA determined should trigger compliance with NSR, including installation of the BACT. Cinergy does not dispute that EPA set this categorical significance level to protect against the cumulative effects that multiple sources can have on a community's air quality.  *See* Pl. COL at p. 13-14. Nor can Cinergy reasonably quarrel with Congress' finding that "reduction of total atmospheric loading of sulfur dioxide and nitrogen oxides will enhance protection of the public health and welfare and the environment."  42 U.S.C. § 7651(a)(6).  These legislative findings provide support for Plaintiffs' remedy.  *See, e.g.*, *United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 868 (7th Cir. 1995) (holding that hazardous waste violations under the Resource Conservation Recovery Act ("RCRA") were properly enjoined because "not only is the plaintiff

19

the United States, but" Congress had found that "'disposal of . . . hazardous waste in or on the

land without careful planning and management can present a danger to human health and the

environment.'") (quoting RCRA section 1002(b)(2), 42 U.S.C. § 6901(b)(2)).

### F.   Cinergy's Insistence on Mathematical Precision in Proving Harm Is Groundless

Cinergy repeatedly argues that Plaintiffs' harm evidence can be discounted because it is

not quantified.  *See, e.g.,* Cin. COL, at pp. 76, 82-83.  Cinergy, for example, argues that Plaintiffs

needed to conduct a risk assessment for each and every health effect of Cinergy's illegal

emissions.  *See, e.g.,* Cin. FOF ¶ 147.  But the law of remedy requires no such quantification,

only a reasonable showing of harm.  *Wilson v. Amoco Corp.*, 989 F. Supp. 1159, 1177 (D. Wyo.

1998) (awarding injunction to clean up hazardous waste, even though the risks from the waste

"will not be quantified"); *City of New York v. Anglebrook, Ltd. P'ship.*, 891 F. Supp. 908, 926

(S.D.N.Y. 1995) ("Quantifiable harm is, of course, not a prerequisite to irreparable harm.")

(Clean Water Act case).  Plaintiffs have met that burden.  Cinergy similarly insists that the Court

should credit its own "TERA" risk assessment as dispositive proof of no harm from the

violations.  Cin. FOF ¶¶ 151, 186.  But Cinergy ignores Plaintiffs' findings on the unreliability of

the report and its irrelevance to these proceedings. Pl. FOF ¶¶ 101-108.

### G.   The Evidence Shows Harm from Acid Rain and Mercury

Cinergy also argues in passing that Plaintiffs' evidence of ecological harm and harm from

mercury emissions may be *de minimis*.  Cin. COL at pp. 82-83.  For the former, the sum total of

Cinergy's argument is that Plaintiffs failed to present modeling evidence showing the *magnitude*

of the impacts of Cinergy's emissions.  Notably, Cinergy did not challenge Plaintiffs' evidence

that: (1) acid rain resulting from Cinergy's emissions will harm the health of forests, rivers, and

lakes; (2) the pattern of acid rain impacts tracks the pattern of impacts shown by Plaintiffs' air

quality modeling of Wabash River emissions, namely impacts throughout the Midwest, extending to the Northeast; and (3) that the impacted areas already suffer from cumulative acid levels that are too high.  Pl. FOF ¶¶ 119-26.  Moreover, the fact that the Wabash River's  excess emissions rank among the top 5 percent of $SO_2$ sources in the Eastern United States, Pl. FOF ¶ 50, disposes of any argument that its contribution to acid rain is *de minimis.*

For mercury, Cinergy first argues that the Court should ignore mercury altogether, claiming that it is unrelated to the $SO_2$ and $NO_X$ violations found by the jury and that NSR "expressly excludes consideration of mercury."  Cin. COL at pp. 82-83.  These arguments are makeweight.  There is no dispute that if Cinergy had installed a scrubber at the time of the projects, it would have emitted significantly less mercury over the last two decades.  Pl. FOF ¶¶ 129-132.  In addition, the $SO_2$ emissions exacerbate existing mercury contamination in the environment.  Pl. FOF ¶ 136.  The violations found by the jury thus also resulted in additional mercury pollution, and the Court can take that effect into account in determining the appropriate relief.  Moreover, Cinergy itself has previously admitted that mercury *may* be considered in determining BACT for pollutants like $SO_2$ and $NO_X$ when the control technologies will also affect mercury.  *See* Dkt. No. 1533 (Cinergy Trial Brief) at 31 n.8.

## IV.    Cinergy Has Provided No Compelling Reason To Forgo Complete Relief

Cinergy raises a number of purported problems with the proposed relief sought by Plaintiffs, but none rise to the level of denying the public complete relief for the violations found by the jury.  Once the Court determines that *some* injunction is appropriate, which the Parties here agree is the case, it is inevitable that some burden must be borne by the defendant to meet its obligations.  Cinergy asks this Court to view the burden in a vacuum, but the general rule is "that injunctive relief should be no more burdensome to the Defendant than *necessary to provide*

*complete relief to the plaintiffs*."  *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994) (quotation, citation omitted).  By precisely linking the mitigation to the excess emissions from the violations, and allowing Cinergy as much choice as possible in determining *how* to achieve the necessary emissions reductions, Plaintiffs' proposed remedy provides complete relief without undue burden.

### A.    The Cost of Plaintiffs' Remedy Does Not Compel Truncated Relief

Cinergy argues that the costs for both elements of Plaintiffs' remedy are too high.  First, Cinergy claims that delaying closure of the units until September 2012 will result in a substantial cost savings.  Cin. COL at p. 59.  Second, Cinergy contends that the costs of Plaintiffs' mitigation proposal are out of proportion with the benefits.  Cin. COL at pp. 92-93.  Each of these arguments is factually suspect.  Most importantly, Cinergy has failed to provide the Court any basis for determining whether these costs are problematic for the company or its customers; the unrebutted evidence from trial shows the opposite.

Cinergy's evidence related to the costs of shutdown prior to September 2012 suffers from two principle infirmities.  First, Cinergy simply failed to offer into evidence any of its purported cost information.  Its findings of fact rely on demonstratives that were not entered as exhibits, and Cinergy's witness did not actually testify to the costs that Cinergy now asserts in its pleadings.  *Cf.* Dkt. No. 1335 (Liability Trial Final Jury Instructions) at Instruction 12 ("demonstrative exhibits are used for convenience and . . . are not themselves evidence.").  Second, Cinergy's trial witness had no personal knowledge of the calculations going into its cost figures.  Trial Tr., Vol. 4-778:2-21 (Cross Exam of James Turner) (Feb. 5, 2009).  Thus, even

assuming that the cost figures were properly in evidence, the Court has no basis for concluding they are accurate. [3]

In contrast to the cost evidence of shutdown, Cinergy's cost evidence for Plaintiffs' mitigation proposal is properly in the record, but rests on a series of tenuous assumptions. For instance, Cinergy states that the allowance surrender sought by Plaintiffs could cost as much as $412 million, based on projected $SO_2$ allowance costs as high as $1,000 per allowance. Cin. COL at p. 93. However, the evidence at trial was undisputed that $SO_2$ allowances currently cost about $200 each. Pl. FOF ¶ 218. Thus Cinergy could dramatically reduce the cost by purchasing allowances now. Moreover, by simply adding the costs of controls and allowance purchases, Cinergy is double-counting. Absent an allowance surrender requirement by this Court, adding pollution controls *reduces* the need for allowances and thus the cost of allowance compliance. The allowance surrenders sought by Plaintiffs are allowances that Cinergy would have to acquire anyway to comply with the law in the absence of installing controls, so they reflect no *additional* cost. The additional cost is the cost of controlling units 4 and/or 6 to mitigate the harm caused by the violations found by the jury.

In all of its cost arguments, Cinergy fails to provide any basis for concluding that the costs are too high. *Cf.* Cin. COL at p. 79. The bare fact that Cinergy can present a calculation that Plaintiffs' remedy could cost $1 billion, even setting aside the flaws identified above in Cinergy's cost evidence, in itself does little to help the Court exercise its equitable discretion. Two facts are key. First, no evidence was presented at trial to suggest that Cinergy might not be able to pay for the remedy, an unsurprising conclusion given that Duke's shareholders have

---

[3] To the extent that Cinergy's cost numbers can be credited, they also illustrate the economic windfall Cinergy reaped by violating the law. If it is true that reducing operations to pre-project levels will cost about $88 million over three and a half years, Cin. COL at p. 59, the fact that Cinergy avoided tens of millions of dollars in costs *each year* for 20 years must be taken into account to the extent that Cinergy now argues that Plaintiffs' remedy is unduly expensive.

received an annual dividend in excess of $1 billion. Pl. FOF ¶ 229, 233.  Second, Plaintiffs

presented unrebutted evidence that even if Cinergy shifted all of the remedy costs to its

ratepayers, Duke Energy Indiana's would still be close to the Indiana average rates and well

below regional and national average rates.  Trial Tr., Vol. 3-468:4-472:18 (Direct Exam of

Matthew Kahal) (Feb. 4, 2009).

In any case, while there may be a benefit to the public in low electricity rates, that interest

cannot take precedence over the Congressional requirement to comply with the Clean Air Act.

*See* Pl. COL at p. 42-43.  Another court recently addressed this same balance in a common law

nuisance case and found:

> TVA's generation of power at low cost to the consuming public has a high social
> utility. Nonetheless, the vast extent of the harms caused in North Carolina by the
> secondary pollutants emitted by these plants outweighs any utility that may exist
> from leaving their pollution untreated.

*North Carolina v. Tennessee Valley Authority*, 593 F. Supp. 2d 812, 831 (W.D.N.C. 2009).

Congress has already made the balance that Cinergy is now asking this Court to revisit.

As described above, there is no factual, legal, or equitable reason to do so.

## B.        Local Reliability Issues Do Not Compel Delaying Compliance with the Law

Plaintiffs have proposed guidelines for operation of units 2, 3, and 5 that will avoid

causing reliability problems while minimizing emissions from the units.  *See* Pl. COL at pp. 28-

30, 52; Pl. Proposed Order at ¶¶ 2-3.  This compromise best balances the requirements of the

Clean Air Act with the necessity to ensure reliable power in Terre Haute.  Moreover, it will

allow the Court to reconsider the issue, if necessary, on a full record once Cinergy has exercised

due diligence in exploring its options – something it has so far declined to do.

Notably, Cinergy does *not* claim that Plaintiffs' proposal will endanger electrical

reliability, but only that it will require the Court to "engage in ongoing supervision of the levels

of operation of the Units." Cin. COL at p. 60. Cinergy's concern results from misunderstanding the nature of Plaintiffs' proposal. Plaintiffs propose two operating scenarios. Between the time of the Court's order and October 1, 2009, Cinergy should be required to operate the minimum amount necessary to ensure reliability in the Terre Haute load pocket. Based on the testimony at trial, this will be limited to 90 degree days during the summer and whatever periods before and after such times that are necessary to assure that the units are ready when needed. The second operating scenario begins on October 1, 2009. At that point, Cinergy will be required to shut down the units, unless it can demonstrate by a motion to this Court that some additional operation is necessary to provide reliable service in the Terre Haute area and that all other options have been exhausted.

Neither of these operating scenarios will require ongoing supervision by the Court. In the first scenario, Plaintiffs trust that Cinergy would take seriously its responsibility to minimize the operation of the units. If Cinergy fails to do so, Plaintiffs would be responsible for bringing the matter to the Court's attention. In the second scenario, the Court would only be involved if Cinergy believed – after the completion of the full Attachment Y study and a comprehensive review of options such as obtaining a spare transformer – it had no choice but to operate the units on a limited basis in future years. Moreover, Cinergy has never contested that this Court could avoid the issue entirely by having the Federal Energy Regulatory Commission ("FERC") address these reliability concerns using existing administrative mechanisms. Pl. COL at pp. 28-30. Cinergy, instead, suggests that MISO is "charged under federal law" with resolving these issues, and that its views are "conclusive." Cin. COL at p.62. Without denigrating MISO's role in operating the transmission system, MISO is a private entity that answers to FERC, not a United States agency delegated authority by Congress to have the final word on reliability concerns. *See*

Pl. COL at 28-30; *Preventing Undue Discrimination and Preference in Transmission Service*, FERC Order, 2007 FERC LEXIS 2407, at *573-76 (Dec. 28, 2007) (rejecting MISO's argument that it should be exempt from FERC civil penalties); *Application of Duke Energy Indiana, Inc. for Approval of a Change in its Midwest Independent System Operator Management Cost and Revenue Adjustment Factor Under its Standard Contract Rider No. 68*, Order of the Indiana Utility Regulatory Commission, 2008 Ind. PUC LEXIS 499 (Dec. 23, 2008) (approving Duke Energy's request to pass the costs of MISO's operations onto the ratepayers).

### C. Plaintiffs Have Proved Cinergy Emitted More Pollution Than Allowed by Law

#### 1. The Excess emissions concept is a useful equitable yardstick for the Court

Cinergy argues that because "excess emissions" are not referenced in the Clean Air Act or regulations that the concept has no place in equity. Cin. COL at p. 71. This argument is groundless. Excess emissions are simply an equitable yardstick that measures the real-world effect of Cinergy's violations. While Cinergy now calls excess emissions a "novel theory," Cinergy counsel referred to one version of Plaintiffs' excess emissions calculations as a "traditional 'but for' analysis" at trial. Trial Tr., Vol. 1-26:23-25 (Cinergy Opening Statement) (Feb. 2, 2009). In any event, there is nothing novel in trying to assess the nature and scope of the harm caused by a violation of law, as Plaintiffs have done here. Tellingly, while Cinergy objects to Plaintiffs' use of excess emissions, it offers no alternative measurement of the harm from its violations, but merely proposes its own excess emissions calculations.

Cinergy argues that uncertainty about what the appropriate assumptions are in calculating excess emissions means the concept itself is "wholly inconsistent with the CAA." Cin. COL at p. 74. While there may be some uncertainty in precisely what would have happened had Cinergy complied with the law, that uncertainty is the inevitable result of Cinergy's violations. Cinergy

argues that the excess emissions concept is "wholly inapposite for the NSR violations at issue here, because a pre-construction permit violation does not lead a party to exceed any pre-specified limits." Cin. COL at p. 73. Indeed, the *result* of the violation is that there are no "pre-specified limits" to violate. In Cinergy's view, failure to obtain a permit means amnesty from the limits such a permit would have required. Such a result is contrary to the purposes of the Clean Air Act and equity. *See* Pl. COL at pp. 45-46. The fact that excess emissions are not described in the statute does not mean the concept is contrary to this Court's rulings or the law, as Cinergy would have it. Cin. COL at pp. 71-73. By failing to obtain the required permits, Cinergy has emitted more pollution than allowed for two decades. The excess emissions are the actual, real-world result of Cinergy's violations, and such an equitable yardstick is critical for the Court to use in determining the appropriate remedy.[4]

### 2.   Plaintiffs have proved significant excess emissions

While the Parties differ in the *amount* of excess emissions resulting from Cinergy's violations, it is undisputed that Cinergy emitted more $SO_2$ and $NO_X$ than would have been allowed had it followed the law.

As described in Plaintiffs' initial post-trial pleadings, Plaintiffs offered two types of excess emissions calculations: first, the total, unpermitted emissions since the projects and, second, the emissions that would have been avoided through the installation of NSR-level controls. These calculations show that Cinergy emitted from 359,000 to 378,000 tons of $SO_2$ and from 30,000 to 49,000 tons of $NO_X$ as a result of its violations (through December 2007). Pl. FOF ¶¶ 12, 13, 16, 19, 25, 46; PX 2112B (listing emissions for the Wabash River units).

---

[4] Cinergy notes that the Court has ruled that the violations at issues occurred at the time of the projects and are not considered continuing violations. Cin. COL at p. 71. However, the *harm* from the violations continues to occur each day of operation as the unit pollutes more than would have been allowed if they complied with the law.

By contrast, Cinergy relies on a flawed calculation method and a compliance hypothetical that its own witness admits was "pure speculation" and still concedes that the company emitted 114,000 tons of $SO_2$ over and above what it claims would have been allowed.  Pl. FOF ¶¶ 33-38; Trial Tr., Vol. 5-938:9-21 (Cross Exam of Thomas Rarick) (Feb. 6, 2009).  Cinergy's post-trial pleadings do not respond to the flaws Plaintiffs identified in Cinergy's excess emissions calculations.

Similarly, while the Parties dispute what control technology would have been required under NSR at the time of the projects, Cinergy even failed to live up to the standard its own expert said would have required.  BACT requires that the permitting authority set an emissions *limit*.  42 U.S.C. § 7479(3) (definition of BACT).  Assuming Cinergy's witness correctly opined on the appropriate limit, Cinergy's own witness admitted that the units produced nearly 5,000 tons of $NO_X$ above what would have been allowed.  Pl. FOF ¶ 48.

### D.  Plaintiffs' Mitigation Remedy Has a Compelling Nexus to the Violations

Cinergy argues that there is an insufficient nexus between the mitigation Plaintiffs' seek and the violations found by the jury.  Cin. COL at p. 63.  Plaintiffs agree that, "As with any equity case, the nature of the violation determines the scope of the remedy."  *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971) (cited in Cin. COL at p. 63).  Plaintiffs' proposed mitigation is based on the excess emissions described above and calls for reductions in emissions of the same pollutants from the same smokestack, so the relief shares an elegant nexus with the violation.

Cinergy claims that the requested relief is disproportionate to the violations.  Cin. COL at p. 91.  This argument rests on a misapprehension of what Plaintiffs are seeking.  Plaintiffs simply seek complete mitigation of the excess emissions through reductions at units 4 and/or 6 within 20

years of the Court's order.  *See* Pl. Proposed Order at ¶ 4.  Cinergy tacitly argues that Plaintiffs'

excess emissions are wrong and thus that the requested relief is disproportionate.[5]  Cin. COL at

p. 91.  The relief follows the excess emissions, however; by definition the total reductions will be

equal to the total excess emissions as found by the Court, so there is no disproportionally.

Moreover, the method used to achieve the necessary reductions is left to Cinergy.  *See* Pl.

Proposed Order at ¶ 4.  Plaintiffs' evidence showed that, based on our evidence of excess

emissions, the total reduction *could* be met through scrubbers and SCRs at units 4 and 6 within

about 12 years of the installation of controls, Pl. FOF ¶¶ 210-11, but the choice remains

Cinergy's.  Cinergy claims that certain aspects of the mitigation remedy are unconnected to the

harm from the violations.  These arguments are addressed individually below.

### 1.   Allowance surrender

Cinergy attempts to use the Clean Air Act cap and trade program – Title IV of the Act –

as a shield to Plaintiffs' mitigation demand in two contradictory ways.  First, Cinergy claims that

because it has complied with its obligations under Title IV of the Clean Air Act, no mitigation is

required.  Cin. COL at p. 75.  Cinergy then argues that because Title IV is separate from the NSR

provisions at issue here, allowance surrender is inappropriate.  Cin. COL at p. 63-64.  Neither

argument withstands scrutiny.

---

[5] Cinergy also argues that controlling unit 6 would result in reductions exceeding the magnitude of the excess emissions from units 2, 3, and 5 combined.  Cin. COL at p. 67.  In fact, the unpermitted emissions from units 2, 3, and 5 come close to the emissions for unit 6.  For example, as reflected in the stipulated emissions provided by Cinergy, units 2, 3, and 5 collectively emitted about 23,000 tons of $SO_2$ in 2007, while unit 6 emitted almost 29,000 tons. PX-2112B.  Cinergy relied on a proposed finding of fact from Plaintiffs that *incorrectly* stated that the emissions from unit 6 were *twice* the excess emissions from units 2, 3, and 5.  Cin. COL at p. 67 (citing Pl. FOF ¶ 82).  The testimony at trial was that the emissions from units 2, 3, 5, *and 6* are roughly double those of 2, 3, and 5 alone.  Trial Tr., Vol. 1-177:6-178:1 (Direct Exam of Lyle Chinkin) (Feb. 2, 2009).

a.        **Title IV compliance does not preclude allowance surrender**

At the most fundamental level, Cinergy's first argument fails because its compliance with one statutory provision is no defense to a violation of another.[6]  *See* Pl. COL pp. 31-32 & note 5. Even if the total *nationwide* pollution levels would not have changed had Cinergy complied with the law at the time of the projects, the company's unpermitted pollution caused harm to a definable subset of communities: those downwind of the Wabash River plant.  Pl. FOF ¶¶ 56-92. These communities got more than their share of pollution, despite the cap and trade programs, because emissions should have been less from Wabash River.  The application of NSR at major sources like power plants also plays an important role in downwind communities' efforts to reach and maintain their air quality goals, as Dayton air regulator John Paul explained during the trial.  *See* Trial Tr., Vol. 2-243:3-10 (Direct Exam of John Paul) (Feb. 3, 2009) (explaining need for enforcement of national measures requiring pollution controls on out-of-state sources); *see also id*. at Vol. 2-239:11-20, Pl. FOF ¶ 87 (explaining importance of strategies that achieve reductions in ambient air quality).

Cinergy attempts to paint NSR as a strictly local program while claiming the Acid Rain Program is national.  *See, e.g.*, Cin. COL at p. 64.  In reality *both* programs have local and national elements.  In both cases, the individual sources of pollution are inevitably local, but the programs are geared to achieve nationwide air quality goals set by EPA.  While NSR confers important local benefits on downwind communities, the NSR provisions make clear that interstate pollution was at least part of the problem the program was designed to attack.  *See* 42 U.S.C. § 7470(4) (Congressional PSD purpose "to assure that emissions from *any source in any State* will not interfere with any portion of the applicable implementation plan to prevent

---

[6] Similarly, the fact that Cinergy installed pollution controls at other plants or outside the NSR framework does not militate against complete relief here.  *Contra* Cin. COL at p. 92.

significant deterioration of air quality *for any other State*.") (emphasis added).[7]  The House Report on the 1977 amendments that added the PSD program discussed the extensive evidence that "[a]ir is no respecter of political boundaries" and explained that "while emissions may not be 'significant' in the area or origin, when transported to another area and combined with pollutants from other areas, air quality may be drastically degraded."  H.R. Rep. No. 95-294, pt. 1, at 135 (1977).  Accordingly, "[a] policy of prevention of significant deterioration which controls a new source's emissions to the maximum extent practicable will help minimize the transport and buildup of pollutants from one area to another."  *Id.*  To accomplish that goal, Congress gave EPA enforcement authority in Sections 113(a)(5) and 167 to protect the national interests that extend beyond those of any particular State.  42 U.S.C. §§ 7413(a)(5), 7477; *Alaska Dep't of Environmental Conservation v. EPA*, 540 U.S. 461 (2004).

Finally, even if Cinergy's argument that compliance with Title IV obviates any excess emissions held up, the cap and trade program did not begin for $SO_2$ until 1995 and for $NO_X$ until 2003.  Cin. FOF ¶ 66; Pl. FOF ¶ 214.  Based on the stipulated $SO_2$ emissions set forth in PX-2112B, Cinergy generated more than 87,000 tons of $SO_2$ between the projects and the implementation of the cap and trade program even began.[8]  Application of NSR would have removed approximately 95 percent of those emissions, Pl. FOF ¶ 22, so even under Cinergy's theory the units emitted a huge amount of pollution on downwind communities before the cap and trade program took effect.

---

[7] Cinergy repeatedly cites *Alabama Power Co. v. Costle* for the proposition that NSR is a purely local program.  Cin. COL at pp. 65-66 (citing 636 F.2d 323, 364-68 (D.C. Cir. 1979)).  This is a misreading of the decision, which was determining whether the requirements in 42 U.S.C. § 7475(a) also applied in non-attainment areas.  *See Ala. Power*, 636 F.2d at 364.  While the court did note that there were *other* mechanisms for EPA to address interstate pollution, it hardly follows that PSD is *not* intended to address such pollution.  *See id.* at 365.

[8] This calculation somewhat understates the total unpermitted emissions because we omitted any emissions from the year of the project, because the stipulated emissions were not divided into pre- and post-project.  *See* PX-2112B.

**b.      Allowance surrender is an appropriate exercise of the Court's equitable authority**

Cinergy's second argument is undermined by its first: while NSR and cap and trade are undeniably different programs passed, by Congress at different times, both are aimed at reducing air pollution, so there is nothing untoward about considering the two in combination when sitting in equity.  The nexus between the allowance surrender and the violations is clear: because of the violations, Cinergy emitted more $SO_2$ and $NO_X$ than was allowed by law.  As part of the mitigation for those violations, Plaintiffs seek retirement of $SO_2$ allowances – i.e., a reduction in $SO_2$ emissions – in the same amount as the reductions at units 4 and/or 6 once controls are installed and operating.  This will ensure that $SO_2$ reductions achieved at Wabash River units 4 and/or 6 are not undone by increased emissions at other coal-fired power plants and provides a compelling nexus between the harm from the violations and the surrender of allowances.  *Contra* Cin. COL at p. 64.

Such an order is within the Court's authority.  Cinergy correctly notes that the D.C. Circuit in the *North Carolina v. EPA* decision found that EPA lacked the authority under Section 110 of the Act to remove allowances from the Acid Rain market established by Title IV of the Clean Air Act.  *See* Cin. COL at 66 (citing 531 F.3d 896, 921-22 (D.C. Cir. 2008)).  The decision says nothing about the Court's authority, as preserved by Section 113 of the Act, to order allowance surrender once its equitable jurisdiction has been invoked.  Indeed, it is entirely reasonable that such an act is within the Court's power, but outside that of EPA.  An agency's power is limited to the authority delegated by Congress, while the Court sitting in equity has full authority unless expressly limited by Congress.  *Compare North Carolina*, 531 F.3d at 922 (EPA "is a creature of statute, and has only those authorities conferred upon it by Congress") (internal citation and quotation marks omitted) *with Cinergy*, 582 F. Supp. 2d at 1060-61 ("Nothing in the

CAA is a 'clear and valid legislative command' or raises a 'necessary and inescapable inference' that the full scope of the Court's equitable powers under § 113(b) is to be limited."). The Clean Air Act itself is an example: EPA has the authority to issue penalty orders and require compliance, within certain limits, but it is only through civil judicial enforcement that the government can seek mitigation. *Compare* 42 U.S.C. § 7413(a)(3) *with* § 7413(b); *see also Cinergy*, 582 F. Supp. 2d at 1060.

Moreover, it is disingenuous of Cinergy to argue now that settlements in which other utilities have agreed to surrender allowances are irrelevant to whether a court can order such relief. *See* Cin. COL at p. 64 n.11. Cinergy sought judicial intervention in this case to compel discovery into prior NSR enforcement settlements, arguing that "identifying the differences and similarities between past NSR settlements and this case will be *instrumental* to the Court's determination of the appropriate equitable relief in this case." Dkt. No. 1406 at 6-7 (emphasis added); *see also* Dkt. No. 1410 (Order) at 4 ("The parties agree the consent decrees may be helpful to the Court's determination of appropriate relief.") (Magnus-Stinson, J.). Cinergy specifically cited the treatment of allowance surrenders in prior settlements as something worth exploring in this case. Dkt. No. 1406 at 7. The prior settlements demonstrate the importance of achieving compliance with the NSR provisions and mitigating past harm, including allowance surrender. For example, a settlement entered by the U.S. District Court for the Eastern District of Kentucky today requires the utility to install a scrubber and immediately surrender 53,000 $SO_2$ allowances to resolve alleged NSR violations at a single unit. Exhibit 1, *United States v. Kentucky Utilities Co.*, No. 5:07-cv-0075-KSF (E.D. Ky. March 17, 2009) at ¶¶ 19, 25.

Finally, the allowance surrender sought here will not harm the operation of the cap and trade markets. *Contra* Cin. COL at pp. 66-67. As the undisputed evidence showed at trial, an

order that requires both controls and a corresponding allowance surrender would be market neutral.  Pl. FOF ¶ 220.  Moreover, Plaintiffs have opted to tread cautiously in seeking allowance surrender and are not seeking any surrender of $NO_X$ allowances out of an abundance of caution. Plaintiffs would similarly forgo $SO_2$ allowances, if necessary to avoid harming the cap and trade program.

### 2.    Emissions credit

As Plaintiffs explained, the Clean Air Act and EPA's regulations allow companies to create "emission credits" under certain circumstances.  These credits – which are separate from Title IV allowances – are granted for going beyond the requirements of law.  *See* Pl. COL at pp. 23-24.  For example, a company can reduce emissions at a facility, and use that reduction, under certain circumstances as a "netting" credit to avoid NSR in the future at the facility.    40 C.F.R. § 52.21(b)(3); *see, e.g.,* Dkt. No. 983 (Opinion on Netting).

Plaintiffs' proposed Order simply seeks to ensure that Cinergy will not try to turn any reductions ordered by this Court into a "credit" to be emitted elsewhere.  Pl. Proposed Order ¶ 6. Cinergy argues that a ruling precluding it from using reductions ordered by this Court as emissions reductions credits toward future NSR permitting would be an inappropriate part of an injunction as unrelated to the violations.  Cin. COL at p. 68.  Yet, by definition, the emissions reductions ordered by this Court are related to the violations at issue.

Moreover, Cinergy argues that a bar on emission credits is unnecessary if the law otherwise prohibits such credits.  Cin. COL at p. 68.  It would serve judicial economy and avoid ambiguity to bar emission credits for any reductions ordered by this Court.  Plaintiffs' concern is not theoretical:  Mr. Turner testified at his deposition that the company was considering replacing Units 2, 3, and 5 at Wabash River with a gas-fired electric turbine, and he did not rule

out using the emission reductions from the shut down of those units to permit the new turbine. Tr. to Deposition of James Turner, pp. 170:1-174:4 (Nov. 11, 2008). It would be painfully ironic for Cinergy to use reductions required in this case as a basis for netting out of NSR requirements for new units at the Wabash River site, effectively bequeathing "grandfather" status to a new power plants. Plaintiffs simply request that the Court explicitly note that the requirements of its order may not be used to offset emissions increases at the plant, consistent with the Clean Air Act and EPA's regulations.

### E. Cinergy Bears Responsibility for the Calculated Risk that Resulted in this Enforcement Action

Cinergy asserts that the equities weigh against Plaintiffs' proposed remedy, because the company claims that it lacked notice of the emissions increase standard against which its projects would be measured, and that it had no way of knowing how projects that increase emissions due to "recovered availability" (i.e., increased hours of operation) could trigger NSR. Cin. COL at pp. 74, 86.

Cinergy is attempting to relitigate, yet again, issues that have already been decided. This Court has already held that the emissions standard that applied to Cinergy's projects was clear from the plain language of the regulations. *See United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272, 1278 (S.D. Ind. 2005). Cinergy appealed, and the Seventh Circuit affirmed this Court's reading of the regulations as their most natural reading. *See United States v. Cinergy Corp.*, 458 F.3d 705, 708-09 (7th Cir. 2006). This Court subsequently reiterated that Cinergy had both "fair notice" and actual knowledge of the standards for determining whether its projects would cause a significant emissions increase under the NSR regulations. *See United States v. Cinergy Corp.*, 495 F. Supp. 2d 892, 907-09 (S.D. Ind. 2007); *id.* at 907-08 ("Cinergy was actually aware that NSR regulations could apply when total annual emissions exceeded the threshold amounts, even

35

in the absence of an increase in the hourly rate of emissions."); Dkt. No. 1000 (Order on Motion to Reconsider Fair Notice Order) at 3-4 (rejecting Cinergy's claims of pre-project confusion and noting that Cinergy's engineer responsible for advising plant employees about NSR applicability was aware of the NSR standards). The time to litigate Cinergy's claims that it lacked notice of the NSR emission increase test is over: "The Court, in more than one Order, has expressly ruled on this matter against Defendants. The dispute about fair notice is no longer an issue in this case." Dkt. No. 1250 (Order on Plaintiffs' Motion in Limine) at 2.

Not only was Cinergy aware of the NSR standards, but, as explained in Plaintiffs' proposed conclusions of law and findings of fact, Cinergy's violations were willful in that it took a calculated risk in proceeding with the Wabash River projects. *See* Pl. COL at pp. 5, 19; Pl. FOF ¶¶ 224-26. At the same time Cinergy was performing those projects, the company submitted sworn testimony to state regulators that outlined the risk that refurbishment projects that improve "availability" would trigger NSR under EPA's 1988 WEPCo applicability determination. *See* Pl. COL at pp. 44-45. Cinergy attempts to wriggle out from this admission that it was aware of the risk of proceeding with projects that improve "availability" by pointing out that EPA's WEPCO determination was subsequently partially reversed by the Seventh Circuit. Cin. COL at p. 88. However, the Seventh Circuit rejected EPA's use of the so-called "actual-to-potential" test, not EPA's conclusion that projects that improve availability will trigger NSR if they allow a unit to operate more hours in a year. *See WEPCo v. Reilly*, 893 F.2d 901, 916-18. As this Court held the last time Cinergy made this argument, "Nothing in the *WEPCO* decision directed EPA to ignore the impact a physical change would have on the actual future operating hours of a unit." *Cinergy*, 384 F. Supp. 2d at 1277. Rather, the Seventh Circuit simply required a "more realistic" projection of the effect of a change on a source's annual

emissions.  *Id.*; *see also* Cinergy, 495 F. Supp. 2d at 906 ("the Court notes that Cinergy certainly had fair notice of the standards [for determining an emissions increase] after the *WEPCO* decision").  Thus, far from absolving Cinergy of the consequences of its actions, *WEPCO* further confirms that Cinergy did indeed take a calculated risk by proceeding with its projects without first seeking applicability determinations.

Cinergy nevertheless suggests that a finding of willfulness is precluded by the fact that the jury did not decide that issue.  Cin. COL at p.87.  But willfulness is not an element of liability under the Clean Air Act, a strict liability statute.  Rather, willfulness in an equitable issue to be decided in awarding relief.  *See, e.g*, *EPA v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990).   Regardless, holding that Cinergy's conduct was willful would be consistent with this Court's prior ruling on summary judgment.  *See, e.g.*, *Cinergy*, 495 F. Supp. 2d at 905 ("These circumstances should have made Cinergy aware that its conduct was risky; the fair notice doctrine will not save the company because the doctrine does not save parties who take calculated risks."); *Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617, 621 (6th Cir. 2007) ("The defendant is guilty of reckless, willful or wanton misconduct only if he was conscious of the risk or had specific reason to know about it and proceeded without concern") (citing DAN R. DOBBS, THE LAW OF TORTS § 147, at 350-51 (2000)).

Cinergy also complains about the specific "recovered availability" methodology used by Plaintiffs' experts Messrs. Koppe and Rosen upon which the jury based its verdict.  Cin. COL at p. 86.  But this Court has already held "that as long as Cinergy was aware of the regulatory standards for determining whether a project may result in significant increases in emissions, *its understanding of the exact mathematical formula is irrelevant*."  *Cinergy*, 495 F. Supp. 2d at 906 (emphasis added).  While Cinergy was clearly required to make a "preconstruction projection of

37

whether and how much emissions will increase at a particular unit following construction," *id.* at 908 n.11, Plaintiffs have not claimed that Cinergy must have used the exact calculations performed by Plaintiffs' experts in this enforcement action. Rather, Plaintiffs' calculations are based on the evidence produced by Cinergy in discovery. Nor have Plaintiffs claimed that the methodology employed by their experts is the *only* way to evaluate the impact of changes in emissions as a result of physical changes to a unit. In fact, Mr. Rosen said exactly this, and testified that Cinergy could have used its computer program, PROMOD, to evaluate this issue. Liability Trial Tr., Vol. 5-911:13 to 5-912:24 (Direct Exam of Richard A. Rosen) (May 12, 2008). Similarly, although Cinergy failed to do so, Cinergy's Director of Regulatory Strategy, Diane Jenner, testified that the company's PROMOD modeling tool gave it the ability to calculate the expected impact of its physical changes on generation. *See* Nov. 6, 2008 Deposition Tr. of Diane Jenner, at 137-39. The only reason Plaintiffs' experts performed their retrospective calculations was because Cinergy failed to seek an applicability determination or permit for its illegal modifications, necessitating this enforcement action.

Moreover, the jury found, as a matter of fact, that "a reasonable power plant owner or operator [should] have expected the [Wabash River projects at issue] to result in a significant net increase in emissions." Dkt. No. 1335 (Final Jury Instructions), at No. 17. Thus, although the record makes clear that Messrs. Rosen and Koppe employed time-honored and widely accepted principles commonly used by electric utilities to evaluate the impact of the projects on emissions, even if it were true that these two gentlemen had first thought of the entire methodology in 1999, that fact would be irrelevant to an equitable analysis – because there is no basis to find that Cinergy could not have known what the jury found to be so. Put another way, any claimed confusion on Cinergy's part has now been found to have been unreasonable by the jury.

38

Finally, Cinergy asserts that the time period between construction of its illegal modifications and the filing of this lawsuit weighs against granting injunctive relief in this case. Cin. COL at p. 89.  But that argument ignores the fact that the primary reason for the delay in this case is Cinergy's decision not to seek an applicability determination for its projects.  The NSR permitting program necessarily relies on sources, the information necessary to determine whether construction is likely to result in a significant net emissions increase, to evaluate their projects in the first instance and come forward as necessary to seek determinations of NSR applicability.  Indeed, EPA put sources such as Cinergy on specific notice as early as 1980 that they proceeded with unpermitted construction projects at their own risk, and that they must maintain adequate records of emissions calculations to justify the failure to obtain a permit:

> While today's regulations do not contain a formal preconstruction notice requirement, owners and operators are *hereby put on notice* for the following: (1) *sufficient records* regarding the details of contemporaneous emission increases and decreases or applicable source determinations of "potential to emit" *should be maintained so as to verify that no permit was required* should the Administrator so require under [CAA] section 114 ... and (3) *Any source which improperly avoids review and commences construction will be considered in violation of the applicable SIP and will be retroactively reviewed under the applicable NSR regulation*.

45 Fed Reg. 52,676, 52,725 (Aug. 7, 1980) (Exhibit 2).  In the face of this warning, its knowledge of the applicable NSR standards, and its expressed recognition of the risks associated with proceeding with projects that improve "availability," Cinergy nevertheless forged ahead with the Wabash River projects without seeking an applicability determination, and without even keeping any records of any emissions calculations.  As this Court has noted, "had Cinergy made any inquiry it probably would not be facing the allegations at issue in this lawsuit."  *Cinergy*, 495 F. Supp. 2d at 908.  Cinergy's equitable claims of confusion are thus "unpersuasive, if not outright disingenuous, in light of the fact that Cinergy never sought an applicability determination or applied for a permit prior to construction, much less made an attempt to

complete emissions calculations."  Dkt. No. 1000 (Order on Motion to Reconsider Fair Notice Order) at 3.  In short, while the delay between Cinergy's illegal modifications and the filing of this lawsuit is regrettable given the massive amounts of illegal pollution that have been emitted in the interim, the evidence unequivocally places the responsibility on Cinergy.

### F.     Injunctive Relief Is Not Barred by the Statute of Limitations

Cinergy argues that any mitigation in this case is essentially a penalty and thus barred by the statute of limitations.  Cin. COL at p. 95.  While Cinergy is correct that this Court has already found that no penalty can be assessed for violations that occurred more than five years prior to the filing of the complaint, Cinergy appears to misstate the Court's actual holding.  Cinergy claims that this Court ruled that an injunction requiring *compliance* would not be barred by the statute of limitations, but that the Court had not addressed whether Plaintiffs' mitigation proposal would be barred.  Cin. COL at p. 95 (citing *United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1031 (S.D. Ind. 2005)).  No such distinction is evident in the Court's decision, however. The Court expressly ruled that, "The injunctions Plaintiffs seek are not penalties."  *Cinergy*, 397 F. Supp. 2d at 1032; *see also id*. at 1031 (citing several cases that "refused to apply the statute of limitations to claims for injunctive relief in the [Clean Air] Act's enforcement suits.").  The Court's ruling reflects the settled principle that, even where a civil penalty period is time-barred, the public should not be punished because the United States did not act within the limitations period.  *See id.* at 1032.

In any event, the crux of Cinergy's argument is that Plaintiffs' proposed remedy is unrelated to the harmed caused by the violations and thus "goes beyond making the plaintiff whole."  Cin. COL at pp. 95-96 (citing *United States v. Telluride Co.*, 146 F.3d 1241, 1245-46 & n.6 (10th Cir.1998)).  This essentially reprises the company's argument that Plaintiffs' mitigation

request lacks a sufficient nexus with the harm from the violations, an argument separately addressed above.  *Cf.* Cin. COL at p. 97 (referring back to nexus discussion).  As described more fully earlier, Plaintiffs' mitigation proposal is specifically linked to the amount of pollution resulting from Cinergy's violations of law and calls for emissions reductions at Wabash River and allowance surrender in the same amount as the excess emissions.  Thus, just as there is a compelling nexus between the violations and the mitigation, that mitigation is designed to make Plaintiffs whole rather than exact a *de facto* penalty from Cinergy.

**V.      Beckjord**

**A.      Injunctive Relief**

The Parties agree that it is appropriate to install PM continuous emissions monitors known as PM CEMS at Beckjord units 1 and 2.  Plaintiffs' Proposed Order simply requires the installation of such monitors, and the regular reporting of the data collected to EPA, as a means to promote compliance.  Cinergy, by contrast, wishes to pre-judge how the PM CEMs data might be used by EPA or other parties in future proceedings, an issue that need not be decided here.  In any case, there are three ways the continuous emissions data from PM CEMS could be used. First, the data could be used strictly for the information of the plant operators.  Second, the data could be used as "credible evidence" of emissions from the units.  Finally, the data could be used as the direct method for assessing compliance with the applicable requirements.  The difference between the second and third possibilities consists in whether data showing emissions over the applicable limit is evidence of a violation or constitutes a violation *per se*.

Not surprisingly, Cinergy in its pleadings continues to argue that the PM CEMS should not be used as a direct measure of the units' compliance with the law.  Cin. COL at p. 103. While not addressed in Cinergy's proposed conclusions of law, the company's proposed order

includes language precluding the data from the PM CEMS *even as credible evidence* of a violation.  Cin. Proposed Order at ¶ 4.  There is no justification, and Cinergy proposes none, for barring the use of PM CEMS data as credible evidence.  *See, e.g.*, 40 C.F.R. § 52.12(c) ("*any* credible evidence or information" is relevant to whether a source is violating the applicable standard) (emphasis added).  Moreover, the evidence in this case makes clear that PM CEMS data can be used as a direct compliance measurement.  Cinergy's own expert trial witness testified that a 30-day averaging period would be sufficient to  "squash the error out" if the PM CEMS were used to measure compliance.  Pl. FOF ¶ 277.  In any event, the Court need not delve into the reliability of evidence for potential claims that may never arise.  Such questions are best resolved in a specific context.  Plaintiffs respectfully suggest that this particular issue be left for another day and another forum.

### B.    Penalty

Cinergy sets out the factors that the Court "must" consider in determining the penalty, but only addresses two of the seven factors.  Plaintiffs addressed each of the factors in our Proposed Conclusions of Law and will not repeat them here.  However Plaintiffs briefly respond to two complaints Cinergy lodged over the method of calculating the penalty.

Cinergy criticizes Plaintiffs for seeking penalties against both Cinergy Corp. and Cincinnati Gas & Electric Co. for the violations at unit 1.  Cin. COL at p. 102.  As an initial matter, this Court has already found that both entities are liable, Dkt. No. 984 ("Beckjord SJ Order") at p. 5, and there is no reason to reduce the penalty simply because the two liable entities share the same corporate parents.  Moreover, Cinergy Corp. chose to enter into an administrative settlement with EPA to resolve several failed PM emissions tests at Beckjord unit 1.  Pl. FOF ¶¶ 245-46, 248.  The 1998 AOC required Cinergy to, *inter alia*, attain, demonstrate, and maintain

continuous compliance with the Ohio SIP.  Pl. FOF ¶ 249.  Prior to entering into the contract, Cinergy had no such obligation, because it was neither the owner nor operator of the Beckjord Plant.  Beckjord SJ Order at p. 4.  Cinergy's "promise to ensure compliance with Ohio law went beyond what it was already obligated to do."  Beckjord SJ Order at p. 4.  Under the terms of the 1998 AOC, "Cinergy agreed that it would follow a three-year compliance program with semi-annual testing.  In exchange for these agreements by Cinergy, the EPA agreed to forbear action for prior violations."  Beckjord SJ Order at p. 4.  By entering into the contract, Cinergy avoided the imposition of higher penalties and enforcement actions for the pre-AOC violations.  During the term of that contract, Cinergy violated the contract not once, not twice, but *three times*.  Pl. FOF ¶ 254.  Cinergy should not be allowed evade its contractual obligations.

Cinergy also argues that the statutory maximum penalty is inappropriate.  Cin. COL at p. 99, 101-102.  Cinergy ignores the binding precedent that when considering penalties under the Clean Air Act, "courts generally presume that the maximum penalty should be imposed."  *United States v. B & W Inv. Props.,* 38 F.3d 362 (7th Cir. 1994), as amended on denial of rehearing and suggestion for hearing *en banc*; (citing *United States v. Midwest Suspension and Brake,* 824 F.Supp. 713, 735 (E.D. Mich. 1993)) ("in calculating the amount of civil penalties to be imposed on defendant, this Court must start with the statutory maximum and make any downward adjustments based on the evidence adduced at trial.").  Moreover, Defendants' reliance on *United States v. Dell'Aquilla,* 150 F.3d 329, 338 (3rd Cir. 1998), is misplaced.  *Dell'Aquilla* does not stand for the proposition that starting with the statutory maximum is necessarily inappropriate, but merely that it resulted in an untenable result in the particular circumstances at issue.  Unlike *Dell'Aquilla*, however, there can be no doubt that the imposition of a $1.32 million penalty for the Beckjord violations would have no adverse impact on Defendants, and Cinergy presented no

43

nothing to controvert this evidence.  Because the statutory maximum penalty under consideration in the present case poses no adverse impact on the defendants, the statutory maximum penalty should be the starting point for the court's penalty analysis.  Despite Cinergy's contentions, the appropriate penalty for the Beckjord violations remains $1.32 million, as set forth in Plaintiffs' Proposed Conclusions of Law at 47-51.  Notably, Cinergy failed to propose the penalty it deems appropriate in this case.

## CONCLUSION

Congress passed the Clean Air Act "'to protect and *enhance* the quality of the Nation's air resources so as to promote the public health and welfare.'"  *Cinergy*, 582 F. Supp. 2d at 1061 (quoting 42 U.S.C. § 7401).  The jury found that Cinergy violated the New Source Review program of the Clean Air Act, a program designed "'to protect public health and welfare from any actual or potential adverse effect ... from air pollution.'"  *Id*. at 1062 (quoting 42 U.S.C. § 7470).  Congress enlisted the judiciary to "require compliance . . . and to award any other appropriate relief," 42 U.S.C. § 7413(b), and so the Court's equitable discretion "must be exercised in light of the large objectives of the [CAA]."  *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944).

This Court can best serve the public interest and the goals established by Congress by ordering prompt compliance with the law and full mitigation of the harm from Cinergy's violations.  The public deserves a complete remedy for the violations of law found by the jury at the Wabash River plant and the Court at the Beckjord plant.  Plaintiffs respectfully request that the Court enter their proposed Order as the appropriate remedy for this case.


Dated: March 18, 2009                    Respectfully submitted,
                                         JOHN C. CRUDEN
                                         Acting Assistant Attorney General
                                         Environment & Natural Resources Division

                                         PHILLIP BROOKS
                                         Special Counsel to the Chief

                                         /s/ Justin Savage

                                         /s/ Thomas A. Benson
                                         JUSTIN SAVAGE
                                         KATHERINE VANDERHOOK
                                         MYLES FLINT, II
                                         JENNIFER A. LUKAS-JACKSON
                                         JASON A. DUNN
                                         THOMAS A. BENSON
                                         Environmental Enforcement Section
                                         Environment & Natural Resources Division
                                         U.S. Department of Justice
                                         P.O. Box 7611
                                         Washington, D.C. 20530
                                         (202) 514-5261
                                         thomas.benson@usdoj.gov

                                         TIMOTHY M. MORRISON
                                         United States Attorney
                                         Southern District of Indiana

                                         THOMAS E. KIEPER
                                         Assistant United States Attorney
                                         Southern District of Indiana
                                         10 West Market Street, Suite 2100

Indianapolis, IN  46204-3048

ANDREW CUOMO
ATTORNEY GENERAL
OF THE STATE OF NEW YORK

MICHAEL MYERS
JOSEPH KOWALCZYK
Assistant Attorneys General
The Capitol
Albany, NY 12224
(518) 402-2594
ANNE MILGRAM
ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

MAURICE GRIFFIN
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625-4503
(609) 984-2845

RICHARD BLUMENTHAL
ATTORNEY GENERAL
OF THE STATE OF CONNECTICUT
CARMEL MOTHERWAY
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120
(860) 808-5101

HOOSIER ENVIRONMENTAL COUNCIL
OHIO ENVIRONMENTAL COUNCIL

JONATHAN LEWIS
CLEAN AIR TASK FORCE
Staff Attorney and Climate Specialist
18 Tremont Street, Suite 530
Boston, MA 02108
    (617) 624-0234 x10

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing reply was filed with the Court's ECF system on March 18, 2009 and will be emailed to counsel of record through the ECF system.

/s/ Thomas A. Benson
Thomas A. Benson