IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:99-cv-01693-LJM-JMS |
| | ) |
| CINERGY CORPORATION, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

PARTIAL CONSENT DECREE

## TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ........................................................................6

II.     APPLICABILITY ........................................................................................7

III.    DEFINITIONS ...........................................................................................8

IV.     CIVIL PENALTY .......................................................................................15

V.      SO$_2$ EMISSION REDUCTIONS AND CONTROLS ........................................16

VI.     SO$_2$ ALLOWANCE SURRENDER REQUIREMENTS .....................................18

VII.    PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED
        CONTROLS ..............................................................................................20

VIII.   ENVIRONMENTAL MITIGATION PROJECTS..............................................21

IX.     RESOLUTION OF CIVIL CLAIMS AGAINST DUKE....................................25

X.      PERIODIC REPORTING..............................................................................25

XI.     REVIEW AND APPROVAL OF SUBMITTALS ..............................................27

XII.    STIPULATED PENALTIES .........................................................................28

XIII.   FORCE MAJEURE ....................................................................................32

XIV.    DISPUTE RESOLUTION ............................................................................36

XV.     PERMITS..................................................................................................38

XVI.    INFORMATION COLLECTION AND RETENTION ......................................40

XVII.   NOTICES..................................................................................................41

XVIII.  SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS.........44

XIX.    EFFECTIVE DATE.....................................................................................46

XX.     RETENTION OF JURISDICTION.................................................................47

XXI.    MODIFICATION .......................................................................................47

XXII.   GENERAL PROVISIONS ............................................................................47

XXIII.  SIGNATORIES AND SERVICE ...................................................................51

XXIV.   PUBLIC COMMENT..................................................................................51

XXV.    CONDITIONAL TERMINATION OF ENFORCEMENT UNDER DECREE.................51

XXVI.   FINAL JUDGMENT ...................................................................................53

APPENDIX A – ENVIRONMENTAL MITIGATION PROJECTS
APPENDIX B –  MONITORING REQUIREMENTS AND EMISSION LIMITATIONS
          CALCULATIONS

WHEREAS, the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), filed a complaint on November 3, 1999, and amended complaints on March 1, 2000, December 19, 2002, and June 24, 2004, against Cinergy Corp., Cinergy Services, Inc., PSI Energy, Inc., and the Cincinnati Gas and Electric Company, (collectively, "Cinergy") pursuant to Sections 113(b), 165, and 167 of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7413, 7475, and 7477;

WHEREAS, the States of New York, New Jersey, and Connecticut ("the States"), after their motion to intervene was granted, filed a complaint on August 17, 2001, and amended complaints on May 29, 2003 and June 24, 2004, pursuant to Section 304 of the Act, 42 U.S.C. § 7604;

WHEREAS, Hoosier Environmental Council and Ohio Environmental Council ("Citizen Plaintiffs"), after their motion to intervene was granted, filed a complaint on May 1, 2002, and an amended complaint on June 24, 2004, pursuant to Section 304 of the Clean Air Act, 42 U.S.C. § 7604;

WHEREAS, in the Fifth and Sixth Claims for Relief in the United States' Third Amended Complaint, the United States alleges that Cinergy, now Duke Energy Corporation, including Duke Energy Indiana, Inc., Duke Energy Ohio, Inc., and Duke Energy Shared Business Services LLC (collectively, "Duke") violated the Clean Air Act and the Indiana State Implementation Plan by illegally modifying Units 1 and 3 at the Gallagher Generating Station ("Gallagher Plant"), a major emitting facility located in New Albany, Floyd County, Indiana, without obtaining the necessary permits and installing the necessary controls to reduce sulfur dioxide ("$SO_2$"), and further alleged that such emissions damage human health and the environment;

3

WHEREAS, in the Thirteenth Claim for Relief in the States' Second Amended Complaint, the States allege that Cinergy violated the Clean Air Act and the Indiana State Implementation Plan by illegally modifying Gallagher Units 1 and 3 without obtaining the necessary permits and installing the necessary controls to reduce $SO_2$, and further alleged that such emissions damage human health and the environment;

WHEREAS, in the Fifth, Sixth, and Seventh Claims for Relief in the Citizen Plaintiffs' First Amended Complaint, the Citizen Plaintiffs allege that Cinergy violated the Clean Air Act and the Indiana State Implementation Plan by illegally modifying Gallagher Units 1 and 3 without obtaining the necessary permits and installing the necessary controls to reduce $SO_2$, and further alleged that such emissions damage human health and the environment;

WHEREAS, the complaints filed against Duke sought injunctive relief and the assessment of civil penalties for alleged violations of, *inter alia*, the:

(a)     Prevention of Significant Deterioration and Nonattainment New Source Review provisions in Part C and D of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, 7501-7515; and

(b)     federally-enforceable state implementation plan developed by Indiana;

WHEREAS, EPA issued a notice of violation ("NOV") to Duke with respect to such allegations on November 2, 1999 and March 31, 2004;

WHEREAS, EPA provided Duke and the State of Indiana with actual notice pertaining to Duke's alleged violations, in accordance with Section 113(a)(1) and (b) of the Act, 42 U.S.C. § 7413(a)(1) and (b);

WHEREAS, the Plaintiffs allege that the complaints state claims upon which relief can be granted against Duke under Sections 113, 165, and 167 of the Act, 42 U.S.C. §§ 7413, 7475, and 7477, and 28 U.S.C. § 1355;

WHEREAS, a jury trial on liability was held in May 2008 that resulted, *inter alia*, in findings of Clean Air Act violations at Duke's Wabash River Station located in West Terre Haute, Vigo County, Indiana, and after a bench trial on remedy was held in February 2009, a partial final judgment was entered under Fed. R. Civ. P. 54(b) on the Wabash River claims, and the Plaintiffs and Duke have appealed that judgment to the United States Court of Appeals for the Seventh Circuit;

WHEREAS the Parties to this Consent Decree do not intend for entry of this Consent Decree to have any effect on the judgment or appeals of the Wabash River claims, but the Parties intend to release all other rights to appeal they may have in this matter (including, without limitation, rights to appeal any other claims dismissed before the trials or claims decided by the juries)  as provided herein;

WHEREAS, a jury trial on liability was held in May 2009 which found that Duke violated the law by performing pulverizer projects at Unit 1 and Unit 3 at the Gallagher Plant without complying with New Source Review for $SO_2$ at each Unit;

WHEREAS, a trial is scheduled to commence on January 25, 2010, to determine the appropriate injunctive relief for the two $SO_2$ violations at Gallagher Unit 1 and Unit 3 found by the jury on May 19, 2009;

WHEREAS, the Plaintiffs  anticipate that this Consent Decree, which requires Duke to Repower Gallagher Unit 1 and Unit 3 to combust Natural Gas or to Retire Gallagher Unit 1 and Unit 3, install and Continuously Operate Dry Sorbent Injection at

5

Gallagher Unit 2 and Unit 4, and perform Environmental Mitigation Projects, will achieve significant reductions of $SO_2$ emissions and thereby significantly improve air quality; and

WHEREAS, the Parties have agreed, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and at arm's length; that this settlement is fair, reasonable, in the public interest, and consistent with the goals of the Act; and that entry of this Consent Decree without further litigation regarding the appropriate injunctive relief for the violations found by the jury on May 19, 2009, is the most appropriate means of resolving this matter.

NOW, THEREFORE, without further adjudication of the appropriate injunctive relief for the two $SO_2$ violations found by the jury on May 19, 2009, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, Sections 113, 167, and 304 of the Act, 42 U.S.C. §§ 7413, 7477, and 7604.  Solely for the purposes of this Consent Decree, and no other purpose, venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. § 1391(b) and (c).  Solely for the purposes of this Consent Decree, and for no other purpose, Duke waives all objections and defenses that it may have to the Court's jurisdiction over this action, to the Court's jurisdiction over Duke, and to venue in this District.  Duke shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.  Solely for the purposes of the claims filed by the Plaintiffs in this matter and

resolved by this Consent Decree, for the purposes of entry and enforcement of this

Consent Decree, and for no other purpose, Duke waives any defense or objection based

on standing.  Except as expressly provided for herein, this Consent Decree shall not

create any rights in or obligations of any party other than the Plaintiffs and Duke.  Except

as provided in Section XXIV (Public Comment) of this Consent Decree, the Parties

consent to entry of this Consent Decree without further notice.

## II. APPLICABILITY

2.      Upon entry, the provisions of the Consent Decree shall apply to and be

binding upon and inure to the benefit of Plaintiffs and Duke, and their respective

successors and assigns, and upon Duke's officers, employees, and agents, solely in their

capacities as such.

3.      Duke shall be responsible for providing a copy of this Consent Decree to

all vendors, suppliers, consultants, contractors, agents, and any other company or

organization retained to perform any of the work required by this Consent Decree.

Notwithstanding any retention of contractors, subcontractors, or agents to perform any

work required under this Consent Decree, Duke shall be responsible for ensuring that all

work is performed in accordance with the requirements of this Consent Decree.  For this

reason, in any action to enforce this Consent Decree, Duke shall not assert as a defense

the failure of its officers, directors, employees, servants, agents, or contractors to take

actions necessary to comply with this Consent Decree, unless Duke establishes that such

failure resulted from a Force Majeure Event, as defined in Paragraph 94 of this Consent

Decree.

## III. DEFINITIONS

4.      For purposes of this Consent Decree, every term expressly defined by this Consent Decree shall have the meaning given to that term by this Consent Decree and, except as otherwise provided in this Consent Decree, every other term used in this Consent Decree that is also a term under the Act or the regulations implementing the Act shall mean in this Consent Decree what such term means under the Act or those implementing regulations.

5.      A "30-Day Rolling Average Emission Rate" for $SO_2$ shall be expressed in lb/mmBTU calculated using the following procedure: first, develop hourly average lb/mmBTU values for each hour of the Operating Day and the previous twenty nine (29) Operating Days in accordance with Appendix B of this Consent Decree, and second, average the hourly averages for the Operating Day and the previous twenty nine (29) Operating Days.  A new 30-Day Rolling Average Emission Rate shall be calculated for each new Operating Day.  Each 30-Day Rolling Average Emission Rate shall include all emissions of $SO_2$ that occur during all periods within each Operating Day including startup, shutdown, and Malfunction, provided, however, that reported emissions associated with a Malfunction shall be excluded for purposes of determining compliance with this Decree if the Malfunction is determined to be a Force Majeure Event pursuant to Section XIII (Force Majeure). The Parties expressly recognize that compliance with a 30-Day Rolling Average Emission Rate shall commence immediately upon the date specified, and that compliance as of such specified date (e.g., January 30) shall be determined based on data from that Operating Day and the 29 prior Operating Days (e.g., January 1-29).

8

6.   An "Annual $SO_2$ Tonnage Limitation" for Gallagher Unit 1 and Unit 3 means the limitations as specified in this Consent Decree on the total number of tons of $SO_2$ emitted from Gallagher Unit 1 and Unit 3, individually, during all periods of operation including, without limitation, all $SO_2$ emitted during periods of startup, shutdown, and Malfunction, during the relevant calendar year (i.e., January 1 through December 31). Compliance with the Annual $SO_2$ Tonnage Limitation for Gallagher Unit 1 and for Gallagher Unit 3 shall be  determined for each new calendar year.

7.   "CEMS" or "Continuous Emission Monitoring System" means, for obligations involving $SO_2$ under this Consent Decree, the equipment required to sample, analyze, measure and provide a permanent and continuous record of emissions of $SO_2$ in lb/mmBTU.  For purposes of this Consent Decree, the following components make up the Continuous Emissions Monitoring System:  $SO_2$ pollutant concentration monitor, diluent gas monitor (carbon dioxide), and a data acquisition and handling system.

8.   "Citizen Plaintiffs" means, collectively, Hoosier Environmental Council and Ohio Environmental Council.

9.   "Clean Air Act" or "Act" means the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

10.   "Consent Decree" or "Decree" means this Consent Decree and the appendices attached hereto, which are  incorporated into this Consent Decree.

11.   "Continuously Operate" or "Continuous Operation" means that when DSI is used at Gallagher Unit 2 or Unit 4, it shall be used at all times such Unit is in operation, consistent with the technological limitations, manufacturers' specifications, and good engineering and maintenance practices for such equipment and the Unit.  The Parties

9

recognize that until the thirtieth (30th) Operating Day following January 1, 2011, Duke will be working to optimize performance of the DSI and to identify technological limitations and good engineering and maintenance practices for the DSI at these Units.

12.     "Date of Entry" means the date this Consent Decree is approved or signed by the United States District Court Judge.

13.     "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Southern District of Indiana.

14.     "Day" means calendar day, unless otherwise specified.

15.     "Dry Sorbent Injection" or "DSI" means an $SO_2$ control system consisting of the injection of trona or sodium bicarbonate (or a similar material of at least equal effectiveness in removing $SO_2$) in the gas stream upstream of the particulate control device to react with the acid gases and reduce the outlet $SO_2$ Emission Rate.

16.     "Duke" or "Defendant" means Duke Energy Corporation, including Duke Energy Indiana, Inc., Duke Energy Ohio, Inc., and Duke Energy Shared Business Services LLC, as well as their predecessors and successors in interest, including but not limited to Cinergy Corp., Cinergy Services, Inc., PSI Energy, Inc., and the Cincinnati Gas and Electric Company.

17.     "Emission Rate" means the number of pounds of $SO_2$ emitted per million BTU of heat input ("lb/mmBTU"), measured in accordance with this Consent Decree.

18.     "EPA" means the United States Environmental Protection Agency.

19.     "Environmental Mitigation Project" means a project funded or implemented by Duke as a remedial measure to mitigate alleged damage to human health

10

or the environment, including National Parks or Wilderness Areas, claimed to have been caused by the alleged violations described in the complaints or to compensate Plaintiffs for costs necessitated as a result of the alleged damages.

20.    "Gallagher Plant" means, solely for purposes of this Consent Decree, the electric steam generating plant located in New Albany, Floyd County, Indiana, that consists of four coal-fired boilers as of the Date of Lodging of this Consent Decree identified as Units 1, 2, 3, and 4.

21.    "IDEM" means the Indiana Department of Environmental Management.

22.    "Indiana SIP" means the Indiana State Implementation Plan, and any amendments thereto, as approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410.

23.    "lb/mmBTU" means one pound per million British thermal units.

24.    "Malfunction" means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner.  Failures that are caused in part by poor maintenance or careless operation are not Malfunctions.

25.    "MW" means a megawatt or one million watts.

26.    "Natural Gas" means natural gas received directly or indirectly through a connection to an interstate pipeline transporting natural gas governed by a tariff approved by the Federal Energy Regulatory Commission.

27.    "NSR Permit" means a permit issued pursuant to Parts C and/or D of Subchapter I of the Clean Air Act, and/or applicable New Source Review provisions of a state implementation plan.

11

28.     "Nonattainment NSR" means the new source review program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515, and the federal regulations codified at 40 C.F.R. Part 51, and the federally approved provisions of the Indiana SIP.

29.     "Operating Day" means any Day on which a Unit fires coal.

30.     "Operational or Ownership Interest" means part or all of Duke's legal or equitable operational or ownership interests in any Units at the Gallagher Plant.

31.     "Parties" means the United States, the States, the Citizen Plaintiffs, and Duke.  "Party" means one of the Parties.

32.     "Plaintiffs" means the United States, the States, and the Citizen Plaintiffs.

33.     "Project Dollars" means Duke's expenditures and payments incurred or made in carrying out the Environmental Mitigation Projects identified in Section VIII.B (Environmental Mitigation Projects) of this Consent Decree to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section VIII.B (Environmental Mitigation Projects) and Appendix A of this Consent Decree, and (b) constitute Duke's direct payments for such projects, or Duke's external costs for contractors, vendors, and equipment.

34.     "PSD" means the new source review program within the meaning of Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, the federal regulations codified at 40 C.F.R. Part 52, and the federally approved provisions of the Indiana SIP.

35.     "Repower" or "Repowered" means, solely for purposes of this Consent Decree, the permanent decommissioning of devices, systems, equipment, and ancillary or supporting systems (collectively, "Equipment") for Gallagher Unit 1 and Unit 3 that are

not shared with Gallagher Unit 2 and Unit 4, respectively, such that Gallagher Unit 1 and Unit 3 cannot be fired with coal, and the installation of all Equipment needed to fire Gallagher Unit 1 and Unit 3 with Natural Gas, including installation of the following combustion controls to reduce emissions of nitrogen oxides ($NO_x$):  low-$NO_x$ natural gas burners, an overfire air system, and flue gas recirculation.  Nothing herein requires the decommissioning of any Equipment that Gallagher Unit 1 and Unit 2 share and/or that Gallagher Unit 3 and Unit 4 share, that are necessary to operate Gallagher Unit 2 and/or Unit 4.  Nothing herein shall prevent Duke from (a) reusing any Equipment from Gallagher Unit 1 and/or Unit 3 at any other existing Unit or new emissions unit at the Gallagher Plant or another facility, provided that Duke applies for, and obtains, all required permits, if any, including, if applicable, an NSR Permit, or (b) selling any Equipment from Gallagher Unit 1 and/or Unit 3.

36.     "Retire" means that Duke shall (a) permanently shutdown and cease firing Gallagher Unit 1 and Unit 3 with any fuel and permanently decommission Equipment for Gallagher Unit 1 and Unit 3 that is not shared with Gallagher Unit 2 and Unit 4, respectively, such that Gallagher Unit 1 and Unit 3 cannot be fired with any fuel of any kind, and (b) initiate all necessary steps to remove Gallagher Unit 1 and Unit 3 from Indiana's air emissions inventory and amend all applicable permits to reflect the permanent shutdown status of Gallagher Unit 1 and Unit 3.  Nothing herein shall prevent Duke from (i) reusing any Equipment from Gallagher Unit 1 and/or Unit 3 at any other existing Unit or new emissions unit at the Gallagher Plant or at another facility, provided that Duke applies for, and obtains, all required permits, if any, including, if applicable, an NSR Permit, or (ii) selling any Equipment from Gallagher Unit 1 and/or Unit 3.  For

13

purposes of this Paragraph, if Duke seeks to commence operation of Retired Gallagher Unit 1 and/or Unit 3, such Retired Unit would be considered a "new emissions unit" at the Gallagher Plant.

37.     "$SO_2$" means sulfur dioxide, as measured in accordance with the provisions of this Consent Decree.

38.     "$SO_2$ Allowance" means an authorization or credit to emit a specified amount of $SO_2$ that is allocated or issued under an emissions trading or marketable permit program of any kind that has been established under the Clean Air Act or the Indiana SIP.

39.     "Surrender" or "Surrender of Allowances" means, for purposes of $SO_2$ Allowances, permanently surrendering allowances from the accounts administered by EPA and the State of Indiana, so that such allowances can never be used thereafter to meet any compliance requirement under the Clean Air Act, a State Implementation Plan, or this Consent Decree.

40.     "States" means the States of New York, New Jersey, and Connecticut.

41.     "Title V Permit" means the permit required for major sources under Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

42.     "Tonnage Equivalent" means, for purposes of determining the requisite number of $SO_2$ Allowances that must be surrendered pursuant to Paragraph 53, the number of $SO_2$ Allowances required to be surrendered based on the year the emissions occur and the relationship between $SO_2$ Allowances and tons emitted as specified in the definition of "CAIR $SO_2$ allowance" in 40 C.F.R. § 96.202.

43.     "Unit" means collectively, the coal pulverizer (if applicable), stationary equipment that feeds fuel to the boiler, the boiler that produces steam for the steam

14

turbine, the steam turbine, the generator, the equipment necessary to operate the generator, steam turbine, and boiler, and all ancillary equipment, including pollution control equipment.  An electric steam generating station may comprise one or more Units.

## IV. CIVIL PENALTY

44.     Within thirty (30) days from the Date of Entry of this Consent Decree, Duke shall pay the United States a civil penalty in the amount of $ 1,750,000.  The civil penalty shall be paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing USAO File Number 1999v00830 and DOJ Case Number 90-5-2-1-06965 and the civil action case name and case number of this action.  The costs of such EFT shall be Duke's responsibility.  Payment shall be made in accordance with instructions provided to Duke by the Financial Litigation Unit of the U.S. Attorney's Office for the Southern District of Indiana.  Any funds received after 2:00 p.m. EDT shall be credited on the next business day.  At the time of payment, Duke shall provide notice of payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case name and case numbers, to the Department of Justice and to EPA in accordance with Section XVII (Notices) of this Consent Decree.

45.     Failure to timely pay the civil penalty shall subject Duke to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Duke liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

46.     Payment made pursuant to this Section is a penalty within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and is not a tax-deductible expenditure for purposes of federal law.

## V.  SO$_2$ EMISSION REDUCTIONS AND CONTROLS

A.  Annual SO$_2$ Tonnage Limitations for Gallagher Units 1 and 3.

47.     Until such time as Gallagher Unit 1 and Unit 3 are Repowered to Natural Gas or Retired as required by this Consent Decree, Duke shall not exceed an Annual SO$_2$ Tonnage Limitation for Gallagher Unit 1 of 11,062 tons and an Annual SO$_2$ Tonnage Limitation for Gallagher Unit 3 of 9,385 tons.  Duke's first compliance obligation pursuant to this Paragraph shall be the calendar year from January 1, 2009 through December 31, 2009.  Compliance with the Annual SO$_2$ Tonnage Limitation for Gallagher Unit 1 and Unit 3 shall be determined  in accordance with Appendix B.

B.  SO$_2$ Emission Limitations and Control Requirements at Gallagher Units 1 and 3.

48.     Beginning on January 30, 2011, and continuing thereafter until such time as Gallagher Unit 1 and Unit 3 are Repowered to Natural Gas or Retired as required by this Consent Decree, Duke shall operate Gallagher Unit 1 and Unit 3 so that each Unit achieves and maintains a 30-Day Rolling Average Emission Rate for SO$_2$ of no greater than 1.70 lb/mmBTU.

49.     By no later than January 1, 2012, Duke shall elect whether to Retire Gallagher Units 1 and 3 or whether to Repower Gallagher Units 1 and 3 to Natural Gas.

         a.      If Duke elects to Retire Gallagher Units 1 and 3, then by no later than February 1, 2012, Duke shall Retire Gallagher Units 1 and 3.

16

      b.      If Duke elects to Repower Gallagher Units 1 and 3, then by no later than December 31, 2012, Duke shall have Repowered Gallagher Units 1 and 3. Duke shall provide notice of its election to Plaintiffs in accordance with Section XVII (Notice).

    C.  $SO_2$ Emission Limitations and Control Requirements at Gallagher Units 2 and 4.

50.     By no later than January 1, 2011, and continuing thereafter, Duke shall install and commence Continuous Operation of DSI at Gallagher Units 2 and 4.

51.     Commencing on the sixtieth (60th) Operating Day following January 1, 2011, and continuing thereafter, Duke shall Continuously Operate DSI at Gallagher Unit 2 and Unit 4 so as to achieve and maintain a 30-Day Rolling Average Emission Rate for $SO_2$ of no greater than 0.800 lb/mmBTU.

52.     Duke shall not be required to Continuously Operate DSI at Gallagher Unit 2 or Unit 4, respectively, if Duke (a) permanently ceases to emit any $SO_2$ from Gallagher Unit 2 or Unit 4 or (b) makes physical or operational changes to Gallagher Unit 2 or Unit 4 (including changes to allow combustion of Natural Gas, biomass or other low sulfur fuel, or the installation of an alternative $SO_2$ pollution control technology) that:  (i) alone and without the Continuous Operation of DSI, achieves and maintains a 30-Day Rolling Average Emission Rate for $SO_2$ of no greater than 0.60 lb/mmBTU and (ii) Duke makes these physical or operational changes, including, if applicable, the Continuous Operation of the alternative $SO_2$ pollution control technology, and the 30-Day Rolling Average Emission Rate of no greater than 0.60 lb/mmBTU, federally enforceable in accordance with applicable regulatory requirements, including obtaining all necessary construction and operating permits.

17

## VI.  SO$_2$ ALLOWANCE SURRENDER REQUIREMENTS

A.  Use and Surrender of SO$_2$ Allowances

53.     In addition to Duke's Title IV compliance obligations for Gallagher Units 1 and 3, and the other requirements of this Consent Decree, Duke shall Surrender the Tonnage Equivalent in SO$_2$ Allowances, in addition to the surrender required under existing law, for the total tons of SO$_2$ emitted from Gallagher Unit 1 and Unit 3 from May 19, 2009 (the date of the jury verdict), through the date that Gallagher Unit 1 and Unit 3 are Repowered to Natural Gas or Retired pursuant to Paragraph 49.

54.     Except as may be necessary to comply with the SO$_2$ Allowance Surrender requirements of Paragraphs 53, 55 or 86, Duke shall not use SO$_2$ Allowances to comply with any requirement of this Consent Decree, including by claiming compliance with any emission limitation required by this Consent Decree by using, tendering, or otherwise applying SO$_2$ Allowances to offset any excess emissions.

55.     Beginning in calendar year 2010, and continuing each calendar year thereafter, Duke shall Surrender the amount of SO$_2$ Allowances equal to the amount allocated to the Gallagher Plant for that calendar year that Duke does not need in order meet its federal and/or state Clean Air Act regulatory requirements for the Gallagher Plant.  Allowance Surrenders pursuant to Paragraph 53 shall be in addition to any Surrender required by this Paragraph.

56.     Nothing in this Consent Decree shall prevent Duke from purchasing or otherwise obtaining SO$_2$ Allowances from another source for purposes of complying with Paragraphs 53, 55, and 86, or federal and/or state Clean Air Act regulatory requirements to the extent otherwise allowed by law.

18

57.     The requirements in this Consent Decree pertaining to Duke's use and Surrender of $SO_2$ Allowances are permanent injunctions not subject to any termination provision of this Consent Decree.

B.  Method for Surrender of $SO_2$ Allowances

58.     Duke shall Surrender, or transfer to a non-profit third party selected by Duke for Surrender, all $SO_2$ Allowances required to be Surrendered pursuant to Paragraphs 53 and 55 by March 1 of the immediately following year.

59.     If any $SO_2$ Allowances required to be Surrendered under this Consent Decree are transferred directly to a non-profit third party, Duke shall include a description of such transfer in the next report submitted to Plaintiffs pursuant to Section X (Periodic Reporting) of this Consent Decree.  Such report shall: (i) identify the non-profit third party recipient(s) of the $SO_2$ Allowances and list the serial numbers of the transferred $SO_2$ Allowances; and (ii) include a certification by the non-profit third party recipient(s) stating that the recipient(s) will not sell, trade, or otherwise exchange any of the allowances and will not use any of the $SO_2$ Allowances to meet any obligation imposed by any environmental law.  No later than the third periodic report due after the transfer of any $SO_2$ Allowances, Duke shall include a statement that the non-profit third party recipient(s) Surrendered the $SO_2$ Allowances for permanent Surrender to EPA in accordance with the provisions of Paragraph 60 within one (1) year after Duke transferred the $SO_2$ Allowances to them.  Duke shall not have complied with the $SO_2$ Allowance Surrender requirements of this Paragraph until all third party recipient(s) have actually Surrendered the transferred $SO_2$ Allowances to EPA.

60.     For all $SO_2$ Allowances required to be Surrendered, Duke or the third party recipient(s) (as the case may be) shall first submit an $SO_2$ Allowance transfer request form (in paper or electronic format) to EPA's Office of Air and Radiation's Clean Air Markets Division directing the transfer of such $SO_2$ Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing.  As part of submitting these transfer requests, Duke or the third party recipient(s) shall irrevocably authorize the transfer of these $SO_2$ Allowances and identify – by name of account and any applicable serial or other identification numbers or station names – the source and location of the $SO_2$ Allowances being Surrendered.

## VII.  PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED CONTROLS

61.     Emission reductions that result from actions to be taken by Duke after the Date of Entry of this Consent Decree to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease for the purpose of netting or offset under the Clean Air Act's PSD and Nonattainment NSR programs.  Solely for purposes of this Paragraph, Subparagraph 52.b shall not be considered a requirement of this Consent Decree.

62.     The limitations on the generation and use of netting or offsets set forth in the previous Paragraph do not apply to emission reductions achieved by Gallagher Units 1, 2, 3, or 4 that are greater than those required under this Consent Decree.  For purposes of this Paragraph, emission reductions at Gallagher Units 1, 2, 3, or 4 are greater than those required under this Consent Decree if they result from Duke's compliance with a federally enforceable emission limit(s) that is more stringent than those limits imposed on

Gallagher Units 1, 2, 3, or 4 under this Consent Decree and under applicable provisions of the Clean Air Act or the Indiana SIP.

63.     Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by EPA or the State of Indiana for the purpose of attainment demonstrations submitted pursuant to § 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on National Ambient Air Quality Standards, PSD increment, or air quality related values, including visibility, in a Class I area.

## VIII.  ENVIRONMENTAL MITIGATION PROJECTS

64.     Duke shall implement the Environmental Mitigation Projects ("Projects") described in Appendix A to this Consent Decree and fund the categories of Projects described in Section B, below, in compliance with the approved plans and schedules for such Projects and other terms of this Consent Decree.

A.  Requirements for Projects Described in Appendix A ($5.25 million)

65.     In implementing the Projects described in Appendix A, Duke shall spend no less than $5,250,000 in Project Dollars within five (5) years from the Date of Entry of this Consent Decree.

66.     Duke shall submit plans for the Projects to the United States for review and approval pursuant to Section XI (Review and Approval of Submittals) of this Consent Decree in accordance with  Appendix A.

67.     Duke shall maintain, and present to the United States upon request, all documents to substantiate the Project Dollars expended and shall provide these documents to the United States within sixty (60) Days of a request for the documents.

68.     All plans and reports prepared by Duke pursuant to the requirements of this Section of the Consent Decree and required to be submitted to the United States shall be publicly available from Duke without charge, subject to the limitations in Paragraph 122.

69.     Duke shall certify, as part of each plan submitted to the United States for any Project, that Duke is not otherwise required by law to perform the Project described in the plan, that Duke is unaware of any other person who is required by law to perform the Project, and that Duke will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law as of the date of approval of the Project.

70.     Duke shall use good faith efforts to secure as much environmental benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree.

71.     If Duke elects (where such an election is allowed) to undertake a Project by contributing funds to another person or entity that will carry out the Project in lieu of Duke, but not including Duke's agents or contractors, that person or instrumentality must, in writing: (a) identify its legal authority for accepting such funding; and (b) identify its legal authority to conduct the Project for which Duke contributes the funds.  Regardless of whether Duke elected (where such election is allowed) to undertake a Project by itself or to do so by contributing funds to another person or instrumentality that will carry out the Project, Duke acknowledges that it will receive credit for the expenditure of such funds as Project Dollars only if Duke demonstrates that the funds have been actually spent by either Duke or by the person or instrumentality receiving them, and that such

expenditures met all requirements of this Consent Decree.  This Paragraph does not apply to the State Projects set forth in Section VII(B) or the U.S. Forest Service Mitigation set forth in Appendix A.

72.     Duke shall comply with the reporting requirements for Projects as described in Section X (Periodic Reporting) and Appendix A.

73.     In connection with any communication to the public or to shareholders regarding Duke's actions or expenditures relating in any way to the Projects required pursuant to this Consent Decree, Duke shall include prominently in the communication that the actions and expenditures were required as part of a consent decree.

B.  Mitigation Projects to be Conducted by the States ($1 million)

74.     The States, by and through their respective Attorneys General, shall jointly submit to Duke Projects within the categories identified in this Subsection for funding in an amount not to exceed $1 million.  The States may apply for such funds no sooner than thirty (30) Days from the Date of Entry of this Consent Decree.  The funds shall be allocated as follows:  $400,000 to New York, $330,000 to New Jersey, and $270,000 to Connecticut.  Duke shall not have approval rights for the State Projects funded under this Consent Decree.  Duke shall pay proceeds as designated by the States in accordance with the Projects submitted for funding within seventy-five (75) Days after being notified in writing by the State(s).  Duke's obligations with respect to State Projects shall be complete upon payment of the amount set forth above, and Duke shall have no responsibilities regarding the implementation of any State Projects in connection with this Consent Decree.

23

75.     Categories of Projects.  The States agree to use money funded by Duke to implement Projects that pertain to energy efficiency and/or pollution reduction.  Such Projects may include, but are not limited by, the following:

a.   Retrofitting land and marine vehicles (e.g., automobiles, off-road and on-road construction and other vehicles, trains, ferries) and transportation terminals and ports, with pollution control devices, such as particulate matter traps, computer chip reflashing, and battery hybrid technology;

b.   Truck-stop and marine port electrification;

c.   Purchase and installation of photo-voltaic cells on buildings;

d.   Projects to conserve energy use in new and existing buildings, including appliance efficiency improvement projects, weatherization projects, and projects intended to meet EPA's Green Building guidelines (see http://www.epa.gov/greenbuilding/pubs/components.htm) and/or the Leadership in Energy and Environmental Design (LEED) Green Building Rating System (see http://www.usgbc.org/DisplayPage.aspx?CategoryID=19), and projects to collect information in rental markets to assist in design of efficiency and conservation programs;

e.   Construction associated with the production of energy from wind, solar, and biomass;

f.   "Buy back" programs for dirty old motors (e.g., automobile, lawnmowers, landscape equipment);

g.   Programs to remove and/or replace oil-fired home heating equipment to allow use of ultra-low sulfur oil;

h.   Purchase and retirement of $SO_2$ Allowances; and

24

i. Funding program to improve modeling of the mobile source sector.

## IX.  RESOLUTION OF CIVIL CLAIMS AGAINST DUKE

76.     Entry of this Consent Decree shall resolve all civil claims of Plaintiffs against Duke that arose from any modifications commenced at Gallagher Units 1, 2, 3, and 4 prior to the Date of Lodging of this Consent Decree, including but not limited to those modifications alleged in the Notices of Violation and complaints filed by Plaintiffs in this litigation under any or all of:  (a) Parts C or D of Title I of the Act, 42 U.S.C. §§ 7470-7492, 7501-7515, and the regulations promulgated there under as of the Date of Lodging, (b) Section 111 of the Act, 42 U.S.C. § 7411 and 40 C.F.R. § 60.14, (c) the federally-approved and enforceable PSD and Nonattainment NSR provisions of the Indiana SIP, or (d) Sections 502(a) and 504(a) of Title V of the Act, 42 U.S.C. § 7661a and 7661c, and the regulations promulgated there under as of the Date of Lodging, but only to the extent that such claims under Title V are based on Duke's failure to obtain an operating permit that reflects applicable requirements imposed under Parts C or D of Title I or Section 111 of the Act.

77.     All Parties forever relinquish and waive any and all rights they may have to appeal any rulings, verdicts, or judgments based on the complaints filed by Plaintiffs, except with respect to the existing Wabash River appeal currently pending before the Court of Appeals for the Seventh Circuit.

## X.  PERIODIC REPORTING

78.     By no later than thirty (30) Days after the end of the second full calendar quarter following the Date of Entry of this Consent Decree, and continuing on a semi-annual basis until termination of this Consent Decree, and in addition to any other

express reporting requirement in this Consent Decree, Duke shall submit to the Plaintiffs a progress report.

79. The progress report shall contain the following information: (a) the information necessary to determine compliance with the requirements of the following Paragraphs of this Consent Decree: 47, 48, 49, 49a., 49b., 50, 51, 52, 53, 55, 58, 59, 60, 62, 111, 115-118, and Sections VIII and XVIII, and (b) if Duke makes the election under Subparagraph 49.b, the information indicating that the Repowering of Gallagher Unit 1 and Unit 3 to Natural Gas may be delayed beyond December 31, 2012, including the nature and cause of the delay, and any steps taken by Duke to mitigate such delay.

80. In any periodic progress report submitted pursuant to this Section, Duke may incorporate by reference information previously submitted under its Title V permitting requirements, provided that Duke attaches the Title V permit report, or the relevant portion thereof, and provides a specific reference to the provisions of the Title V permit report that are responsive to the information required in the periodic progress report.

81. In addition to the progress reports required pursuant to this Section, Duke shall provide a written report to the Plaintiffs of any violation of the requirements of this Consent Decree within fifteen (15) calendar Days of when Duke knew or should have known of any such violation. In this report, Duke shall explain the cause or causes of the violation and all measures taken or to be taken by Duke to prevent such violations in the future.

82.     Each report shall be signed by Duke's Senior Vice President – Regulated

Fleet Operations or his or her equivalent or designee of at least the rank of Vice

President, and shall contain the following certification:

> This information was prepared either by me or under my direction or
> supervision in accordance with a system designed to assure that qualified
> personnel properly gather and evaluate the information submitted.  Based
> on my evaluation, or the direction and my inquiry of the person(s) who
> manage the system, or the person(s) directly responsible for gathering the
> information, I hereby certify under penalty of law that, to the best of my
> knowledge and belief, this information is true, accurate, and complete.  I
> understand that there are significant penalties for submitting false,
> inaccurate, or incomplete information to the United States.

83.     If any $SO_2$ Allowances are Surrendered to any third party pursuant to this

Consent Decree, the third party's certification pursuant to Paragraph 59 shall be signed

by a managing officer of the third party and shall contain the following language:

> I certify under penalty of law that,_____ [name of third party]
> will not sell, trade, or otherwise exchange any of the allowances and will
> not use any of the allowances to meet any obligation imposed by any
> environmental law.  I understand that there are significant penalties for
> submitting false, inaccurate, or incomplete information to the United
> States.

## XI.  REVIEW AND APPROVAL OF SUBMITTALS

84.     Duke shall submit each plan, report, or other submission required by

Section VIII (Environmental Mitigation Projects) of this Consent Decree to the United

States, whenever such a document is required to be submitted for review or approval

pursuant to this Consent Decree.  The United States, in consultation with the States and

Citizen Plaintiffs, may approve the submittal or decline to approve it and provide written

comments explaining the basis for declining such approval.  Within sixty (60) Days of

receiving written comments from the United States, Duke shall either: (a) revise the

submittal consistent with the written comments and provide the revised submittal to the

United States; or (b) submit the matter for dispute resolution, including the period of informal negotiations, under Section XIV (Dispute Resolution) of this Consent Decree.

85.     Upon receipt of the United States' final approval of the submittal, or upon completion of the submittal pursuant to dispute resolution, Duke shall implement the approved submittal in accordance with the schedule specified therein or another United States'-approved schedule.

## XII.  STIPULATED PENALTIES

86.     For any failure by Duke to comply with the terms of this Consent Decree, and subject to the provisions of Sections XIII (Force Majeure) and XIV (Dispute Resolution), Duke shall pay, within thirty (30) Days after receipt of written demand to Duke by the United States, the following stipulated penalties to the United States:

| **Consent Decree Violation** | **Stipulated Penalty (per Day, per violation, unless otherwise specified)** |
|---|---|
| a.  Failure to comply with the applicable Annual $SO_2$ Tonnage Limitation for Gallagher Unit 1 and Unit 3 | $5,000 per ton for the first 100 tons; $10,000 per ton for each ton over 100 tons, plus the Surrender of $SO_2$ Allowances in an amount equal to two times the number of tons by which the tonnage limitation was exceeded |
| b.  Failure to comply with the applicable 30-Day Rolling Average Emission Rate at Units 1, 2, 3, or 4 | $2,500 per Day where the violation is less than 5% in excess of the limits set forth in this Consent Decree; $5,000 per Day where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree; $10,000 per Day where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree |

28

| | |
|---|---|
| c.  Failure to make a timely election pursuant to Paragraph 49 | $1,000 per Day for the first 15 Days; $15,000 per Day for each Day thereafter |
| d. Failure to Retire or Repower Gallagher Unit 1 and Unit 3 as required by Paragraph 49 | $10,000 per Day for the first 30 Days; $37,500 per Day for each Day thereafter |
| e.  Failure to Surrender $SO_2$ Allowances as required by Paragraphs 53 or 55 | $37,500 per Day, plus $1,000 per $SO_2$ Allowance not Surrendered |
| f.  Using, selling, or transferring $SO_2$ Allowances except as permitted under this Consent Decree | The Surrender of $SO_2$ Allowances in an amount equal to four times the number of $SO_2$ Allowances used, sold, or transferred in violation of this Consent Decree |
| g.  Failure to install, commence operation, or Continuously Operate, DSI as required under this Consent Decree | $10,000 per Day for the first 30 days; $37,500 per Day for each Day thereafter |
| h.  Failure to implement any of the Environmental Mitigation Projects in compliance with Section VIII (Environmental Mitigation Projects) of this Consent Decree. | $1,000 per Day for the first 30 Days; $5,000 per Day for each Day thereafter |
| i.  Failure to operate $SO_2$ CEMS as required by this Consent Decree | $1,000 per Day |
| j.  Failure to apply for any permit required under this Consent Decree | $1,000 per Day |
| k.  Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree | $750 per Day for the first 10 Days, $1,000 per Day for each Day thereafter |
| l.  Failure to demonstrate the non-profit third-party Surrender of $SO_2$ Allowances | $2,500 per Day |
| m.  Failure to make payment as specified in Section IV (Civil Penalty) of this Consent Decree | $10,000 per Day |
| n. Any other violation of this Consent Decree. | $1,000 per Day |

29

87.     Violation of a 30-Day Rolling Average Emission Rate is a violation on every Day on which the average is based.  Where a violation of a 30-Day Rolling Average for the same pollutant and from the same Unit(s) recurs within periods of less than thirty (30) Days, Duke shall not pay a daily stipulated penalty for any Day of the recurrence for which a stipulated penalty has already been paid.

88.     All stipulated penalties shall begin to accrue on the Day after the performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases, whichever is applicable.  Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

89.     Duke shall pay all stipulated penalties to the United States within thirty (30) Days of receipt of written demand to Duke from the United States, and shall continue to make such payments every thirty (30) Days thereafter until the violation(s) no longer continues, unless Duke elects within twenty (20) Days of receipt of written demand to Duke from the United States to dispute the accrual of stipulated penalties in accordance with the provisions in Section XIV (Dispute Resolution) of this Consent Decree.

90.     Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 88 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.      If the dispute is resolved by agreement, or by a decision of Plaintiffs pursuant to Section XIV (Dispute Resolution) of this Consent Decree that is not appealed to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid within thirty (30) Days of the effective date of the agreement or of the receipt of Plaintiffs' decision;

b.      If the dispute is appealed to the Court and Plaintiffs prevail in whole or in part, Duke shall, within sixty (60) Days of receipt of the Court's decision or order, pay all accrued stipulated penalties determined by the Court to be owing, together with interest accrued on such penalties determined by the Court to be owing, except as provided in Subparagraph c, below;

c.      If the Court's decision is appealed by any Party, Duke shall, within fifteen (15) Days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined to be owing, together with interest accrued on such stipulated penalties determined to be owing by the appellate court.

Notwithstanding any other provision of this Consent Decree, the accrued stipulated penalties agreed by Plaintiffs and Duke, or determined by the Plaintiffs through Dispute Resolution, to be owing may be less than the stipulated penalty amounts set forth in Paragraph 86.

91.      All monetary stipulated penalties shall be paid in the manner set forth in Section IV (Civil Penalties).   All $SO_2$ Allowance Surrender stipulated penalties shall comply with the allowance surrender procedures set forth in Paragraphs 59-60.

92.     Should Duke fail to pay a stipulated penalty in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such stipulated penalties, as provided for in 28 U.S.C. § 1961.

93.     The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to Plaintiffs by reason of Duke's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of the Act for which this Consent Decree provides for payment of a stipulated penalty, Duke shall be allowed a credit for stipulated penalties paid against any statutory penalties also imposed for such violation.

### XIII.  FORCE MAJEURE

94.     For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of Duke or any entity controlled by Duke that delays compliance with any provision of this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite Duke's best efforts to fulfill the obligation.  "Best efforts to fulfill the obligation" include using the best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay and any adverse environmental effect of the violation is minimized to the greatest extent possible.

95.     Notice of Force Majeure Events.  If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which Duke intends to assert a claim of Force Majeure, Duke shall notify the Plaintiffs in writing as soon as practicable, but in no event later than twenty-

32

one (21) Days following the date Duke first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation. In this notice, Duke shall reference this Paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by Duke to prevent or minimize the delay and any adverse environmental effect of the violation, the schedule by which Duke proposes to implement those measures, and Duke's rationale for attributing a delay or violation to a Force Majeure Event. Duke shall adopt all reasonable measures to avoid or minimize such delays or violations. Duke shall be deemed to know of any circumstance which Duke or any entity controlled by Duke knew or should have known.

96. <u>Failure to Give Notice</u>. If Duke fails to comply with the notice requirements of this Section, the United States (after consultation with the States and Citizen Plaintiffs) may void Duke's claim for Force Majeure as to the specific event for which Duke has failed to comply with such notice requirement.

97. <u>The United States' Response</u>. The United States shall notify Duke in writing regarding Duke's claim of Force Majeure as soon as reasonably practicable. If the United States (after consultation with the States and Citizen Plaintiffs) agrees that a delay in performance has been or will be caused by a Force Majeure Event, the United States and Duke shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay actually caused by the event, or the extent to which Duke may be relieved of stipulated penalties or other remedies provided under the terms of this Consent Decree. In such circumstances, an

appropriate modification shall be made pursuant to Section XXI (Modification) of this Consent Decree.

98.    <u>Disagreement</u>.  If the United States (after consultation with the States and Citizen Plaintiffs) does not accept Duke's claim of Force Majeure, or if the United States and Duke cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XIV (Dispute Resolution) of this Consent Decree.

99.    <u>Burden of Proof</u>.  In any dispute regarding Force Majeure, Duke shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event.  Duke shall also bear the burden of proving that Duke gave the notice required by this Section and the burden of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event.  An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

100.    <u>Events Excluded</u>.  Unanticipated or increased costs or expenses associated with the performance of Duke's obligations under this Consent Decree shall not constitute a Force Majeure Event.

101.    <u>Potential Force Majeure Events</u>.  The Parties agree that, depending upon the circumstances related to an event and Duke's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; Malfunction of a Unit or emission control device; unanticipated coal supply or pollution control

34

reagent delivery interruptions; acts of God; acts of war or terrorism; and orders by a government official, government agency, other regulatory authority, or a regional transmission organization, acting under and authorized by applicable law, that directs Duke to supply electricity in response to a system-wide (state-wide or regional) emergency.  Depending upon the circumstances and Duke's response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of Duke and Duke has taken all steps available to it to obtain the necessary permit, including, but not limited to: submitting a complete permit application; responding to requests for additional information by the permitting authority in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority.

102.    As part of the resolution of any matter submitted to this Court under Section XIV (Dispute Resolution) regarding a claim of Force Majeure, the United States and Duke by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by the United States or approved by the Court.  Duke shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule (provided that Duke shall not be precluded from making a further claim of Force Majeure with regard to meeting any such extended or modified schedule).

## XIV.  DISPUTE RESOLUTION

103.    The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.

104.    The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Party advising of a dispute pursuant to this Section.  The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute.  The Party receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) Days following receipt of such notice.

105.    Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations among the disputing Parties.  Such period of informal negotiations shall not extend beyond thirty (30) calendar Days from the date of the first meeting among the disputing Parties' representatives unless they agree in writing to shorten or extend this period.  During the informal negotiations period, the disputing Parties may also submit their dispute to a mutually agreed upon alternative dispute resolution (ADR) forum if the Parties agree that the ADR activities can be completed within the 30-Day informal negotiations period (or such longer period as the Parties may agree to in writing).

106.    If the disputing Parties are unable to reach agreement during the informal negotiation period, the Plaintiffs shall provide Duke with a written summary of their

36

position regarding the dispute.  The written position provided by Plaintiffs shall be considered binding unless, within forty-five (45) Days thereafter, Duke seeks judicial resolution of the dispute by filing a petition with this Court.  The Plaintiffs may respond to the petition within forty-five (45) Days of filing.  In their initial filings with the Court under this Paragraph, the disputing Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

107.    The time periods set out in this Section may be shortened or lengthened upon motion to the Court of one of the Parties to the dispute, explaining the Party's basis for seeking such a scheduling modification.

108.    This court shall not draw any inferences nor establish any presumptions adverse to any disputing Party as a result of invocation of this Section or the disputing Parties' inability to reach agreement.

109.    As part of the resolution of any dispute under this Section, in appropriate circumstances the disputing Parties may agree, or this Court may order, an extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution. Duke shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that Duke shall not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

110.    The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.

## XV.  PERMITS

111.     Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires Duke to secure a permit to authorize Duke to Retire or Repower Gallagher Units 1 and 3 to Natural Gas, or to authorize construction and/or operation of DSI at Gallagher Units 2 and 4, including all preconstruction, construction, and operating permits required under state law, Duke shall make such application in a timely manner.

112.     Notwithstanding the previous Paragraph, nothing in this Consent Decree shall be construed to require Duke to apply for or obtain an NSR Permit for physical changes in, or changes in the method of operation of, Gallagher Units 1, 2, 3, or 4 that gave rise to claims that were resolved by Paragraph 76.

113.     When permits are required pursuant to Paragraph 111, Duke shall complete and submit applications for such permits to the appropriate authorities  to allow sufficient time for all legally required processing and review of the permit request, including requests for additional information.  Any failure by Duke to submit a timely permit application shall bar any use by Duke of Section XIII (Force Majeure) of this Consent Decree, where a Force Majeure claim is based on permitting delays.

114.     Notwithstanding the reference to Title V permits in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the Clean Air Act and its implementing regulations, including the federally approved Indiana Title V program.  The Title V permit shall not be enforceable under this Consent Decree, although any term or limit established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term has or will

become part of a Title V permit, subject to the terms of Section XXV (Conditional Termination of Enforcement Under Decree) of this Consent Decree.

115.    Within one hundred eighty (180) Days from the Date of Entry of this Consent Decree, and in accordance with federal and/or state requirements for modifying or renewing a Title V permit, Duke shall amend any applicable Title V permit application, or apply for amendments to its Title V permit, to include a schedule for all Unit-specific and Gallagher Plant-specific requirements established by this Consent Decree, including performance, operational, maintenance, and control technology requirements.

116.    By no later than January 1, 2012, Duke shall either apply to include the requirements and limitations enumerated in this Consent Decree into a federally enforceable non-Title V permit or request a site-specific amendment to the Indiana SIP to include the requirements and limitations enumerated in this Consent Decree.  The permit or Indiana SIP amendment shall require compliance with the following:  (a) any applicable 30-Day Rolling Average Emission Rate, (b) the Annual $SO_2$ Tonnage Limitation, (c) the requirement to Continuously Operate DSI at Gallagher Units 2 and 4, (d) the requirement to either Retire or Repower Gallagher Units 1 and 3, as appropriate, and (e) the requirements pertaining to the Surrender of $SO_2$ Allowances.

117.    Duke shall provide notice to the Plaintiffs under Section XVII (Notices) when it submits an application for any permit described in this Section, and shall provide the Plaintiffs with a copy of its application for any federally-enforceable non-Title V permit or SIP amendment, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment period.

118.     Prior to termination of this Consent Decree, Duke shall obtain enforceable provisions in its Title V permit for Gallagher Units 1-4 that incorporate (a) Unit-specific and Gallagher Plant-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree and (b) the $SO_2$ Allowance Surrender requirements.

119.     If Duke sells or transfers to an entity unrelated to Duke ("Third Party") part or all of Duke's Operational or Ownership Interest in Gallagher Units 1-4, Duke shall comply with the requirements of Section XVIII (Sales or Transfers of Operational or Ownership Interests) with regard to that Unit(s) prior to any such sale or transfer.

## XVI.  INFORMATION COLLECTION AND RETENTION

120.     Any authorized representative of the United States, including attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of the Gallagher Plant at any reasonable time for the purpose of:

a.      monitoring the progress of activities required under this Consent Decree;

b.      verifying any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.      obtaining samples and, upon request, splits of any samples taken by Duke or its representatives, contractors, or consultants; and

d.      assessing Duke's compliance with this Consent Decree.

121.     Duke shall retain, and instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) now in its or its contractors' or agents' possession or control, and that

40

directly relate to Duke's performance of its obligations under this Consent Decree for the following periods:  (a) until December 31, 2018  for records concerning physical or operational changes undertaken in accordance with Section V (SO$_2$ Emission Reductions and Controls) or (b) until December 31, 2015 for all other records.  This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.  The record retention periods specified herein shall be extended by the length of any delay caused by a Force Majeure Event pursuant to Section XIII (Force Majeure).

122.    All information and documents submitted by Duke pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless (a) the information and documents are subject to legal privileges or protection or (b) Duke claims and substantiates in accordance with 40 C.F.R. Part 2 that the information and documents contain confidential business information.

123.    Nothing in this Consent Decree shall limit the authority of EPA to conduct tests and inspections at Duke's facilities under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal or state laws, regulations, or permits.

XVII.  NOTICES

124.    Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC  20044-7611
DJ# 90-5-2-1-06965

and

Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios South, Room 1117
1200 Pennsylvania Avenue, N.W.
Washington, DC  20004

and

Air Enforcement & Compliance Assurance Branch
U.S. EPA Region V
77 W. Jackson St.
Mail Code AE17J
Chicago, IL 60604

As to the State of Connecticut:

Office of the Attorney General
Environmental Department
P.O. Box 120
Hartford, Connecticut
06141-0120

As to the State of New Jersey:

Kevin P. Auerbacher
Section Chief
Environmental Enforcement Section
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093

As to the State of New York:

42

Joseph M. Kowalczyk
Assistant Attorney General
Environmental Protection
New York State
Office of the Attorney General
The Capitol
Albany, New York  12224

As to the Citizen Plaintiffs:
Tim Maloney
Senior Policy Director
Hoosier Environmental Council
3951 N. Meridian St. Suite 100
Indianapolis, IN 46208
317-685-8800 ext. 115
812-369-8677 (cell)
tmaloney@hecweb.org

Trent A. Dougherty, Esq.
Director of Legal Affairs
Ohio Environmental Council
1207 Grandview Ave. Suite 201
Columbus, OH 43212
614.487.7506 (T)
614.487.7510 (F)
trent@theoec.org

Ann Brewster Weeks
Senior Counsel, Legal Director
Clean Air Task Force
18 Tremont Street, Suite 530
Boston, MA 02108
(617) 624-0234
(617) 359-4077 (cell)
(617) 624-0230 (fax)
aweeks@catf.us

Keith Guthrie
Attorney at Law
13242 South 600 East
Elizabethtown IN 47232
812-579-5926
kgmail@comcast.net

As to Duke:

Vice President – Environmental Health and Safety
Duke Energy Corporation
526 South Church Street
Charlotte, North Carolina 28202
704 382-8451
Mitchell.Griggs@duke-energy.com

and

Chief Legal Officer
Duke Energy Corporation
526 South Church Street
Charlotte, North Carolina 28202
704 382-2204
Marc.Manly@duke-energy.com

125.    All notifications, communications, or submissions made pursuant to this Section shall be sent as follows:  (a) by overnight mail or overnight delivery service to the United States; (b) by electronic mail to all Plaintiffs, if practicable, but if not practicable, then by overnight mail or overnight delivery service to the States and Citizen Plaintiffs, and (c) by certified mail or registered mail, return receipt requested with a copy by electronic mail to Duke.  All notifications, communications, and transmissions sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service.

126.    Any Party may change either the notice recipient or the address for providing notices to it by serving all other Parties with a notice setting forth such new notice recipient or address.

XVIII.  SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS

127.    If Duke proposes to sell or transfer an Operational or Ownership Interest to an entity unrelated to Duke ("Third Party"), it shall advise the Third Party in writing of

44

the existence of this Consent Decree prior to such sale or transfer, and shall send a copy of such written notification to the Plaintiffs pursuant to Section XVII (Notices) of this Consent Decree at least sixty (60) Days before such proposed sale or transfer.

128.     No sale or transfer of an Operational or Ownership Interest shall take place before the Third Party and Plaintiffs have executed, and the Court has approved, a modification pursuant to Section XXI (Modification) of this Consent Decree making the Third Party a party to this Consent Decree and jointly and severally liable with Duke for all the requirements of this Consent Decree that may be applicable to the transferred or purchased Interests.

129.     This Consent Decree shall not be construed to impede the transfer of any Interests between Duke and any Third Party so long as the requirements of this Consent Decree are met.  This Consent Decree shall not be construed to prohibit a contractual allocation – as between Duke and any Third Party – of the burdens of compliance with this Consent Decree, provided that both Duke and such Third Party shall remain jointly and severally liable for the obligations of the Consent Decree applicable to the transferred or purchased Interests.

130.     Notwithstanding Paragraph 129, if  the Plaintiffs agree, the Plaintiffs, Duke, and the Third Party that has become a party to this Consent Decree pursuant to Paragraph 128, may execute a modification that relieves Duke of liability under this Consent Decree for, and makes the Third Party liable for, all obligations and liabilities applicable to the purchased or transferred Interests.  Notwithstanding the foregoing, however, Duke may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Interests, including the

obligations set forth in Section VIII (Environmental Mitigation Projects).  Duke may propose and the Plaintiffs may agree to restrict the scope of the joint and several liability of any purchaser or transferee for any obligations of this Consent Decree that are not specific to the transferred or purchased Interests, to the extent such obligations may be adequately separated in an enforceable manner.

131.    Paragraphs 127-130 of this Consent Decree do not apply if an Interest is sold or transferred solely as collateral security in order to consummate a financing arrangement (not including a sale-leaseback), so long as Duke: (a) remains the operator (as that term is used and interpreted under the Clean Air Act) of the subject Unit(s); (b) remains subject to and liable for all obligations and liabilities of this Consent Decree; and (c) supplies Plaintiffs with the following certification within thirty (30) Days of the sale or transfer:

> Certification of Change in Ownership Interest Solely for Purpose of Consummating Financing.  We, the Chief Executive Officer and General Counsel of Duke Energy ("Duke"), hereby jointly certify under Title 18 U.S.C. Section 1001, on our own behalf and on behalf of Duke, that any change in Duke's Ownership Interest in any Unit at the Gallagher Plant that is caused by the sale or transfer as collateral security of such Ownership Interest in such Unit(s) pursuant to the financing agreement consummated on [insert applicable date] between Duke and [insert applicable entity]: a) is made solely for the purpose of providing collateral security in order to consummate a financing arrangement; b) does not impair Duke's ability, legally or otherwise, to comply timely with all terms and provisions of the Consent Decree entered in *United States, et al. v. Cinergy Corp., et al.,* Civil Action No. IP99-1693; c) does not affect Duke's operational control of any Unit covered by that Consent Decree in a manner that is inconsistent with Duke's performance of its obligations under the Consent Decree; and d) in no way affects the status of Duke's obligations or liabilities under that Consent Decree."

## XIX.  EFFECTIVE DATE

132.    The effective date of this Consent Decree shall be the Date of Entry.

## XX.  RETENTION OF JURISDICTION

133.    The Court shall retain jurisdiction of this case after the Date of Entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for the interpretation, construction, execution, or modification of the Consent Decree, or for adjudication of disputes.  During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XXI.  MODIFICATION

134.    The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Plaintiffs and Duke.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court

## XXII.  GENERAL PROVISIONS

135.    Monitoring Provisions.

a.  <u>30-Day Rolling Average Emission Rates</u>.  For purposes of demonstrating compliance with the 30-Day Rolling Average Emission Rate for a Unit, Duke shall install and use CEMS in accordance with Appendix B of this Consent Decree.

b.  <u>Annual $SO_2$ Tonnage Limitations</u>.  For purposes of demonstrating compliance with the Annual $SO_2$ Tonnage Limitations specified in Paragraph 47, for calendar years 2009-2010 Duke shall use continuous emission monitoring systems in accordance with 40 C.F.R Part 75.  For purposes of demonstrating compliance with the Annual $SO_2$ Tonnage Limitation specified in Paragraph 47, for calendar year 2011 and each year thereafter until the Units have been Repowered or Retired in accordance with

47

Paragraph 49, Duke shall calculate the total annual number of tons of $SO_2$ from Gallagher Unit 1 and Unit 3 using data from the CEMS installed in accordance with Appendix B and apportioned heat input data derived from the flow rate monitors and $CO_2$ monitors in the common stacks of Units 1-2 and Units 3-4 that are installed and certified pursuant to 40 C.F.R. Part 75.  The equations for determining the total annual number of tons of $SO_2$ from Gallagher Unit 1 and Unit 3 are set forth in Section III of Appendix B.  Duke shall use the data substitution procedures of 40 C.F.R. § 75.33(b) (for $SO_2$) and § 75.35 (for $CO_2$) for any missing data period for the duct CEMS required by this Consent Decree.

136.    Nothing in this Consent Decree shall be construed as an obligation for Duke to operate Gallagher Units 1, 2, 3, or 4.  However, even if Duke is not operating Gallagher Units 1, 2, 3, or 4, it shall still comply with all Consent Decree requirements pertaining to such Units.

137.    If Duke seeks to obtain rate recovery for the work that is required by this Consent Decree, the Plaintiffs shall take no position regarding the appropriateness of such request.

138.    This Consent Decree is not a permit.  Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations.  The limitations and requirements set forth herein do not relieve Duke from any obligation to comply with other state and federal requirements under any applicable laws.

139.    This Consent Decree does not apply to any claim(s) of alleged criminal liability.

140.    In any subsequent administrative or judicial action initiated by any of the Plaintiffs for injunctive relief or civil penalties relating to the Gallagher Plant, Duke shall not assert any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by any of the Plaintiffs in the subsequent proceeding were brought, or should have been brought, in the instant case; provided, however, that nothing in this Paragraph affects the validity of Paragraph 76.

141.    Except as specifically provided by this Consent Decree, nothing in this Consent Decree shall relieve Duke of its obligation to comply with all applicable federal, state, and local laws and regulations. Subject to the provisions in Section IX (Resolution of Civil Claims Against Duke), nothing contained in this Consent Decree shall be construed to prevent or limit the rights of the Plaintiffs to obtain penalties or injunctive relief under the Act or other federal, state, or local statutes, regulations, or permits.

142.    Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8314 (Feb. 24, 1997)) concerning the use of data for any purpose under the Act generated either by the reference methods specified herein or otherwise.

143.    Each limit and/or other requirement established by or under this Consent Decree is a separate, independent requirement.

144.    Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed. For example, an Emission Rate of 1.10 is not

met if the actual Emission Rate is 1.11.  Duke shall round the fourth significant digit to the nearest third significant digit.  For example, if an actual Emission Rate is 1.104, that shall be reported as 1.10, and shall be in compliance with an Emission Rate of 1.10, and if an actual Emission Rate is 1.105, that shall be reported as 1.11, and shall not be in compliance with an Emission Rate of 1.10.  Duke shall report data to the number of significant digits in which the standard or limit is expressed.

145.     This Consent Decree does not limit, enlarge, or affect the rights of any Party to this Consent Decree as against any third parties.

146.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter herein.  No document, representation, inducement, agreement, understanding, or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

147.     Except as provided below, each Party to this action shall bear its own costs and attorneys' fees.  Duke shall reimburse the Citizen Plaintiffs' attorneys' fees and costs, pursuant to 42 U.S.C. § 7604(d), in the amount of $150,000 within thirty (30) Days of the Date of Entry of this Consent Decree.  Payment instructions shall be provided to Duke by the Citizen Plaintiffs within ten (10) days after the Date of Lodging.

## XXIII.  SIGNATORIES AND SERVICE

148.     Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

149.     This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

## XXIV.  PUBLIC COMMENT

150.     The Parties agree and acknowledge that final approval by the United States and the entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate.  Duke shall not oppose entry of this Consent Decree by this Court or challenge any provision of this Consent Decree unless the United States has notified Duke, in writing, that the United States no longer supports entry of the Consent Decree.

## XXV.  CONDITIONAL TERMINATION OF ENFORCEMENT UNDER DECREE

151.     <u>Termination as to Completed Tasks.</u>  As soon as Duke completes a requirement of this Consent Decree that is not ongoing or recurring, Duke may, by motion to this Court, seek termination of the provision or provisions of this Consent Decree that imposed the requirement.

152.     <u>Conditional Termination of Enforcement Through the Consent Decree.</u> Subject to the provisions of Paragraph 153, after Duke:

51

a.      has, for a period of three (3) years (i) successfully Repowered or Retired Gallagher Unit 1 and Unit 3 pursuant to Paragraph 49, and (ii) has successfully installed and commenced Continuous Operation of DSI at Gallagher Unit 2 and Unit 4 pursuant to Paragraphs 50 and 51; and

b.      has obtained final permits (i) as required by Paragraphs 111, 115, and 118 of this Consent Decree; (ii) that cover all Units in this Consent Decree; and (iii) that include as enforceable permit terms all Unit-specific and Gallagher Plant-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree, the $SO_2$ Allowance Surrender requirements, and other requirements specified in this Consent Decree;

then Duke may so certify these facts to the United States and this Court.  If the United States does not object in writing with specific reasons within forty-five (45) Days of receipt of Duke's certification, then, for any Consent Decree violations that occur after the filing of notice, the Plaintiffs shall pursue enforcement through the applicable permit(s) and not through this Consent Decree.

153.   <u>Resort to Enforcement Under this Consent Decree</u>.  Notwithstanding Paragraph 152, if enforcement of a provision in this Consent Decree cannot be pursued by Plaintiffs under the applicable permit(s) issued pursuant to the Clean Air Act or its implementing regulations ("CAA Permit"), or if a Consent Decree requirement was intended to be part of a CAA Permit and did not become or remain part of such permit, then such requirement may be enforced under the terms of this Consent Decree at any time.

## XXVI.  FINAL JUDGEMENT

154.    Upon approval and entry of this Consent Decree by this Court, this

Consent Decree shall constitute a final judgment among the Parties as to claims

addressed by this Consent Decree, pursuant to Section IX (Resolution of Claims).


SO ORDERED, THIS 03/18/2010




LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana




[Distribution list at end of document]

53

Signature Page for Consent Decree in:

United States of America *et al.*
v.
Cinergy Corporation, *et al.*, Civil Action No. 1:99-cv-01693-LJM-JMS

FOR THE UNITED STATES OF AMERICA:

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources
Division
U.S. Department of Justice
10th & Pennsylvania Avenue, N.W.
Washington, DC 20530

W. BENJAMIN FISHEROW
Deputy Chief
Environmental Enforcement Section

PHILLIP A. BROOKS
JUSTIN A. SAVAGE
THOMAS A. BENSON
JASON A. DUNN
MYLES E. FLINT, II
LOREN A. REMSBERG
KATHERINE A. VANDERHOOK
Environmental Enforcement Section
Environment & Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20530

Signature Page for Consent Decree in:

United States of America *et al.*
v.
Cinergy Corporation, *et al.*, Civil Action No. 1:99-cv-01693-LJM-JMS

FOR THE UNITED STATES OF AMERICA:

TIMOTHY M. MORRISON
United States Attorney
Southern District of Indiana


By: _____ for
THOMAS E. KIEPER
Assistant United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN  46204-3048

Signature Page for Consent Decree in:

United States of America *et al.*
v.
Cinergy Corporation, *et al.*, Civil Action No. 1:99-cv-01693-LJM-JMS

FOR THE UNITED STATES OF AMERICA:

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and
Compliance Assurance
United States Environmental
Protection Agency

ADAM M. KUSHNER
Director, Office of Civil
Enforcement
Office of Enforcement and
Compliance Assurance
United States Environmental
Protection Agency

ILANA SALTZBART
Attorney Advisor
Air Enforcement Division
Office of Enforcement and
Compliance Assurance
United States Environmental
Protection Agency

Signature Page for Consent Decree in:

United States of America *et al.*
v.
Cinergy Corporation, *et al.*, Civil Action No. 1:99-cv-01693-LJM-JMS

FOR THE UNITED STATES OF AMERICA:

BHARAT MATHUR
Acting Regional Administrator
U.S. Environmental Protection
Agency, Region 5
77 West Jackson Boulevard
Chicago, IL  60604

GAYLENE VASATURO
Associate Regional Counsel
U. S. Environmental Protection
Agency, Region 5

Signature Page for Consent Decree in:

*United States, et al.*

*v.*

*Cinergy Corporation, et al.*

**FOR THE STATE OF CONNECTICUT:**

KIMBERLY P. MASSICOTTE
Assistant Attorney General
Office of the Attorney General
55 Elm Street, P.O. Box 120
Hartford, Connecticut 06141-0120

SCOTT N. KOSCHWITZ
Assistant Attorney General
Office of the Attorney General
55 Elm Street, P.O. Box 120
Hartford, Connecticut 06141-0120

FOR THE STATE OF NEW JERSEY

ANNE MILGRAM
Attorney General

By: _____

JON C. MARTIN
Deputy Attorney General
25 Market Street, P.O. Box 093
Trenton, New Jersey  08625
Jon.martin@dol.lps.state.nj.us
Phone:  (609) 292-6945
Fax:     (609) 341-5031

Date: 12/16/09

Signature Page for Consent Decree in:

United States of America *et al*.

v.

Cinergy Corporation, *et al.*, Civil Action No. 1:99-cv-01693-LJM-JMS

FOR THE STATE OF NEW YORK:

ANDREW M. CUOMO
Attorney General for the
 State of New York
The Capitol
Albany, New York 12224
(518) 402-2260

By: _____
Joseph M. Kowalczyk

Michael J. Myers
Robert Rosenthal
Assistant Attorneys General
Environmental Protection Bureau

Signature Page for Consent Decree in:

United States of America *et al.*
v.
Cinergy Corporation, *et al.*, Civil Action No. 1:99-cv-01693-LJM-JMS


FOR CITIZEN PLAINTIFFS:

KEITH GUTHRIE
Attorney for the Hoosier
Environmental Council and the Ohio
Environmental Council
13242 South 600 East
Elizabethtown IN 47232

Signature Page for Consent Decree in:

United States of America *et al*.
v.
Cinergy Corporation, *et al.*, Civil Action No. 1:99-cv-01693-LJM-JMS


FOR DEFENDANT:

JAMES L. TURNER
Group Executive; President and
Chief Operating Officer — U.S.
Franchised Electric and Gas

**APPENDIX A**
**ENVIRONMENTAL MITIGATION PROJECTS**

In compliance with and in addition to the requirements in Section VIII of this Consent Decree (Environmental Mitigation Projects), Duke shall comply with the requirements of this Appendix to ensure that the benefits of the $5,250,000 in federally directed Environmental Mitigation Projects ("Projects") are achieved.

## I.      Forest Service Mitigation

A.       Within forty-five (45) days from the Date of Entry, Duke shall pay to the United States Forest Service the sum of $250,000 to be used in accordance with 16 U.S.C. § 579c, for the improvement, protection, or rehabilitation of lands under the administration of the Forest Service.  The Forest Service Project(s) will focus on one or more of the following areas alleged by Plaintiffs in the underlying action to have been injured by emissions from the Gallagher Plant:  Hoosier National Forest, Pisgah National Forest, Nanatahala National Forest, Cherokee National Forest, Jefferson National Forest, and Daniel Boone National Forest.

B.       Payment of the amount specified in the preceding paragraph shall be made to the Forest Service pursuant to payment instructions provided to Duke before or after the Date of Lodging.  Notwithstanding Section I.A of this Appendix, payment of funds by Duke is not due until ten (10) days after receipt of payment instructions, or forty-five (45) days after the Date of Entry, whichever is later.

C.       Upon payment of the amount specified in Section I.A of this Appendix, Duke shall have no further responsibilities regarding the implementation of any Projects selected by the Forest Service in connection with this provision of the Consent Decree.

## II.     Additional Environmental Mitigation Projects

A.       Within one hundred and twenty (120) days of the Date of Entry, as further described below, Duke shall submit proposed Project(s) plan(s) to EPA for review and approval pursuant to Section XI of the Consent Decree (Review and Approval of Submittals) for completing the remaining $5 million in federally directed Projects over a period of not more than five (5) years from the Date of Entry, except as provided below.  The Parties agree, subject to the requirements of this Appendix, that Duke may in its discretion decide which of the Projects specified in Sections III, IV, and V to propose for United States approval.  Duke may, at its election, consolidate the plans required by this Appendix into a single plan.

1

## APPENDIX A
## ENVIRONMENTAL MITIGATION PROJECTS

B.     The Parties agree that Duke is entitled to spread its payments for Environmental Mitigation Projects over the five-year period commencing upon the Date of Entry. Duke is not, however, precluded from accelerating payments to better effectuate a proposed mitigation plan, provided that Duke shall not be entitled to any reduction in the nominal amount of the required payments by virtue of the early expenditures.  EPA shall determine prior to approval that all projects are consistent with federal law.

C.     All proposed Project plans shall include the following:

      1.     A plan for implementing the Project;
      2.     A summary-level budget for the Project;
      3.     A time-line for implementation of the Project; and
      4.     A description of the anticipated environmental benefits of the Project including an estimate of emission reductions (e.g., $SO_2$, $NO_x$, PM, $CO_2$) expected to be realized.

D.     Upon approval of the plan(s) required by this Appendix by the United States, Duke shall complete the approved Project(s) according to the approved plan(s). Nothing in this Consent Decree shall be interpreted to prohibit Duke from completing the Project(s) ahead of schedule.

E.     Duke shall spend no less than a total of $5 million in Project Dollars on one or more of the Projects specified in Section III, IV, and V of this Appendix, in accordance with the approved plan(s) for such Project(s).

F.     Commencing with the first progress report due pursuant to Section X (Periodic Reporting) of the Consent Decree, and continuing annually thereafter until completion of the Project(s), Duke will include in the progress report information describing the progress of the Project and the Project Dollars expended on the Project.

G.     In accordance with the requirements of Paragraph 84, within sixty (60) days following the completion of each Project, Duke shall submit to the United States for approval (with a courtesy copy to the States and Citizen Plaintiffs), a report that documents:

      1.     The date the Project was completed;
      2.     The results of implementation of the Project, including the estimated emission reductions or other environmental benefits achieved; and
      3.     The Project Dollars incurred by Duke in implementing the Project.

**APPENDIX A**
**ENVIRONMENTAL MITIGATION PROJECTS**


**III.    Acquisition and Restoration of Ecologically Significant Areas in Indiana, Kentucky, Ohio, Pennsylvania, West Virginia, or Virginia**

    A.    Duke may submit a plan to EPA for acquisition and/or restoration of ecologically significant areas in Indiana, Kentucky, Ohio, Pennsylvania, West Virginia, or Virginia ("Land Acquisition and Restoration").

    B.    In addition to the requirements of Section II.C of this Appendix, the proposed plan shall:

        1.    Describe the proposed Land Acquisition and Restoration projects in sufficient detail to allow the reader to ascertain how each proposed action meets the requirements set out below.  For purposes of this Appendix and Section VIII of this Consent Decree (Environmental Mitigation Projects), land acquisition means purchase of interests in land, including fee ownership, easements, or other restrictions that run with the land that provide for perpetual protection of the acquired land.  Restoration may include, by way of illustration, direct reforestation (particularly of tree species that may be affected by acidic deposition) and soil enhancement. Any restoration action must also incorporate the acquisition of an interest in the restored lands sufficient to ensure perpetual protection of the restored land.  Any proposal for acquisition of land must identify fully all owners of the interests in the land.  Every proposal for acquisition of land must identify the ultimate holder of the interests to be acquired and provide a basis for concluding that the proposed holder of title is appropriate for long-term protection of the ecological or environmental benefits sought to be achieved through the acquisition.

        2.    Describe generally the ecological significance of the area to be acquired or restored.  In particular, identify the environmental/ecological benefits expected as a result of the proposed action.  In proposing areas for acquisition and restoration, Duke shall focus on those areas that are in most need of conservation action or that promise the greatest conservation return on investment.

        3.    Describe the expected cost of the Land Acquisition and Restoration, including the fair market value of any areas to be acquired.

        4.    Identify any person or entity other than Duke that will be involved in the

3

**APPENDIX A**
**ENVIRONMENTAL MITIGATION PROJECTS**

land acquisition or restoration action.  Duke shall describe the third-party's role in the action and the basis for asserting that such entity is able and suited to perform the intended role.  For purposes of this Section of the Appendix, third-parties shall only include non-profits; federal, state, and local agencies; or universities.  Any proposed third-party must be legally authorized to perform the proposed action or to receive Project Dollars.

5.  Include a schedule for completing and funding each portion of the project.

IV.  **Hybrid Fleet Project**

A.  Duke may submit a plan for a hybrid and/or electric fleet project to reduce emissions from Duke's fleet of motor vehicles.  Duke has a substantial fleet of motor vehicles in the states where it operates, including vehicles in Indiana, Kentucky, and Ohio.  These motor vehicles are generally powered by conventional diesel or gasoline engines and include vehicles such as diesel "bucket" trucks.  The use of hybrid engine technologies in Duke's motor vehicles, such as diesel-electric engines, will improve fuel efficiency and reduce emissions of $NO_X$, PM, VOCs, and other air pollutants.

1.  As part of the plan for the Hybrid Fleet Project, Duke may elect to spend Project Dollars on the replacement of conventional motor vehicles in its fleet with newly manufactured hybrid and/or electric vehicles.

2.  In addition to the requirements of Section II.C of this Appendix, the proposed plan for the Hybrid Fleet Project shall:

a.  Propose the replacement of convention diesel engines in bucket trucks or other mobile sources with hybrid or electric engines, and/or propose the replacement of portions of Duke's fleet (including cars, vans, and pickup trucks) in Indiana, Ohio, and/or Kentucky with hybrid and/or electric vehicles.  For purposes of this subsection of this Appendix,  "hybrid and/or electric vehicle" means a vehicle that can generate and/or utilize electric power to reduce the vehicle's consumption of diesel or gasoline fuel.  Any such vehicle proposed for inclusion in the Hybrid Fleet Project shall meet all applicable engine standards, certifications, and/or verifications.

b.  Propose a method to account for the amount of Project Dollars that will be credited for each replacement made under subparagraph (a)

4

**APPENDIX A**
**ENVIRONMENTAL MITIGATION PROJECTS**

above, taking into account the incremental cost of such engines or vehicles as compare to conventional engines or vehicles and potential savings associated with the replacement;

    c.    Prioritize the replacement of diesel-powered vehicles in Duke's fleet.

    d.    Certify that Duke will use the Hybrid Vehicles for their useful life (as defined in the proposed Plan).

    B.    Notwithstanding any other provision of this Consent Decree, including this Appendix, Duke shall only receive credit toward Project Dollars for the incremental cost of hybrid and/or electric vehicles as compared to the cost of a newly manufactured, similar motor vehicle.

## V.    Markland Hydro Station Upgrade Project

    A.    Duke may propose the Markland Hydroelectric Generation Station ("Markland Station") Upgrade Project.  The Markland Station is an 81 MW gross capacity plant located on the site of a U.S. Army Corps of Engineers' lock and dam project along the Ohio River in Switzerland County, Indiana.  The Markland Station was constructed in the 1960's.  The Markland Station Upgrade Project is designed to significantly modernize the complete plant by replacing the three identical turbine runners with larger more efficient runners and spherical hub systems.  Replacing the turbine runners with more advanced technology will provide additional capacity at the plant, while using existing water flow volume more efficiently, and at the same time improve the dissolved oxygen levels. Additional megawatt output will be achieved with a wider spherical discharge ring for each unit and modern hydraulically matched blade designs for the turbine runners.  The modernization of the design of the units at Markland Station will allow for additional output using existing available renewable resources, and is expected to increase the gross generating capacity by as much as 16 megawatts.  However, a specific increase in megawatt output is not guaranteed.  The uprating of the megawatt capacity of the Markland Station's three turbine generators is expected to offset fossil fuel generation, thereby reducing emissions of $SO_2$, $NO_X$, PM, and other air pollutants.

    B.    This Project shall use $5 million in Project Dollars.  These Project Dollars will act as seed funding for the entire Project, which is expected to cost significantly more. For purposes of this Consent Decree, this Project includes the work necessary to increase the output of the dam, not other work that may be necessary

5

**APPENDIX A**
**ENVIRONMENTAL MITIGATION PROJECTS**

to maintain the existing equipment or output.  However, other such work may be performed by Duke along with the work required by this Project, in which case Duke shall not count its expenditures for any other such work as Project Dollars. The total expected cost of the Project work required to increase the output of the dam is expected to be on the order of several tens of millions of dollars.

C.      Notwithstanding Paragraph 69 of this Consent Decree, nothing in this Consent Decree or Appendix shall prevent Duke from using the Markland Station Upgrade Project to satisfy capacity reserve or other similar requirements that it may have, including but not limited to obligations imposed by a regional transmission operator such as the Midwest Independent Transmission System Operator. Furthermore, for purposes of the last clause of Paragraph 69 of the Consent Decree only, (*i.e.*, "Duke will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law as of the date of approval of the Project"), the Project shall be construed as including the equipment and/or work funded by the expenditure of up to $5 million in Project Dollars only.

D.      Notwithstanding any other provision of the Consent Decree or this Appendix, the cost of the Markland Station Upgrade Project shall be deemed to satisfy up to $5 million of the federally directed Environmental Mitigation Projects specified in this Appendix, provided that Duke completes the Project within seven (7) years from the Date of Entry of this Consent Decree.

6

**APPENDIX B**

**MONITORING REQUIREMENTS AND
EMISSION LIMITATION CALCULATIONS**

## I.     Monitoring Requirements

1.      Duke shall install CEMS as defined in Paragraph 5 of the Consent Decree at each of the Gallagher Units 1 through 4.  The CEMS shall include at least one $SO_2$ pollutant concentration monitor and one diluent monitor ($CO_2$) at each of the Gallagher Units 1 through 4.  The $SO_2$ and diluent monitors shall be installed in the outlet ductwork of the baghouses for each Unit.  Duke shall continue the use and operation of the Part 75 continuous emissions monitors in the two common stacks at the Gallagher Facility as required by 40 C.F. R Part 75.

2.      Duke represents that it believes it would be unable to certify flow rate monitors pursuant to 40 C.F.R. Part 75 in the outlet ductwork of the baghouses of each Unit prior to the common stacks.

3.      Duke shall comply with the following requirements for purposes of monitoring Unit-specific $SO_2$ emission rates from Gallagher Units 1 through 4:

   a.   Duke shall install, calibrate, certify and maintain the CEMS required by this Appendix pursuant to the procedures specified in 40 C.F.R. Part 60, Appendix B, Performance Specification 2 for $SO_2$.  Duke shall certify the CEMS in accordance with Performance Specification 2.  Seven day drift tests shall be conducted in accordance with Performance Specification 2 at loads of at least 50% capacity, and the relative accuracy test audit ("RATA") shall be conducted at a single load of at least 80% capacity.  Duke shall conduct a performance evaluation to certify such CEMS by no later than December 1, 2010.   Duke shall provide the United States with a copy of the written results of the performance evaluation certification tests pursuant to Section X (Periodic Reporting) within 30 Days of completion of such tests.

   b.   Duke shall perform daily zero and span checks in accordance with 40 C.F.R. § 60.13(d) and shall operate the CEMS in accordance with 40 C.F.R. 60.13(e).

   c.   Duke shall perform, and comply with, the Quality Assurance Procedures of 40 C.F.R. Part 60, Appendix F, including all annual and quarterly testing.  Duke shall conduct each RATA at the load specified in Paragraph 3.a, above.

d. Duke shall determine the $SO_2$ emission rate in lb/mmBTU as provided in 40 C.F.R. § 60.46(d) and 40 C.F.R. Part 60, Appendix A, Method 19.

e. "Diluent capping" (i.e., 5% $CO_2$) will be applied to the $SO_2$ emission rate for any hours where the measured $CO_2$ concentration is less than 5% following the procedures in 40 C.F.R. Part 75, Appendix F, Section 3.3.4.1.

f. Results of quality assurance testing, data gathered by the CEMS, and the resultant 30-day Rolling Average Emission Rates for Gallagher Units 1-4 are not required to be reported in the quarterly reports submitted to EPA's Clean Air Markets Division for purposes of 40 C.F.R. Part 75. Results will be maintained at the facility and available for inspection, and the 30-day Rolling Average Emission Rate will be reported in accordance with the requirements of the Consent Decree and Appendix B. Equivalent data retention and reporting requirements will be incorporated into the applicable permits for these Units.

g. Missing Data Substitution of 40 C.F.R § 75.33(b) for ($SO_2$) and § 75.35 (for $CO_2$) will be implemented as required by Paragraph 135 of the Consent Decree.


**II.    Calculation of 30-Day Rolling Average Emission Rate**

1. Outlet emission rates shall be calculated using the methodology specified in 40 C.F.R. Part 60 Appendix A, Method 19. Outlet emission rates will be based on the average of the valid recorded values calculated at each Unit, and calculated as follows:


Emission rate (lb $SO_2$/mmBtu) = 1.660 x $10^{-7}$ * $SO_2$ (in ppm) * Fc * 100 / $CO_2$ (in %)

2. The electronic data system must calculate the $SO_2$ and $CO_2$ values required by the equation in Section II, Paragraph 1 on an hourly basis as follows: The CEMS shall collect data once a second and such one-second readings shall be used to develop sixty-second averages which shall then be used to develop one-hour averages. Prior to the calculation of the $SO_2$ emission rate, hourly $SO_2$ and $CO_2$ readings will be rounded to the nearest tenth (i.e., 0.1 ppm or 0.1 % $CO_2$) and the resulting $SO_2$ emission rate will be rounded to the nearest thousandth (i.e., 0.001 lb/mmBTU) as provided in the Consent Decree. Duke must retain all sixty-second average $SO_2$ and $CO_2$ readings in accordance with 40 C.F.R. § 60.7(f).

2

3. From these hourly $SO_2$ emission rates, Duke shall comply with Paragraph 5 of the Consent Decree to calculate the applicable 30-Day Rolling Average Emission Rate for each Unit.

### III. Calculation of Annual Tons of $SO_2$ Emissions for Compliance With The Annual $SO_2$ Tonnage Limitation for Gallagher Unit 1 and Unit 3

The equations for determining the annual number of tons of $SO_2$ from Gallagher Unit 1 and Unit 3 shall be as follows:

    a. From 40 C.F.R. Part 75, Appendix F, equation F-15 (already calculated and reported under Part 75):

Stack total heat input mmBTU/hr = Volumetric Flow scfh x (1/Fc) * % $CO_2$ / 100

    b. From 40 C.F.R. Part 75, Appendix F, Equation F-21a (already calculated and reported under Part 75):

Unit level heat input = Stack total heat input x ($TOL_{cs}$ / $TOL_{unit}$) x (($MW_{unit}$ x $TOL_{unit}$) / (sum of all ($MW_{unit}$ x $TOL_{unit}$))

    c. From 40 C.F.R. Part 75, Appendix F, Equation F-24a (adapt the equation by substituting $SO_2$ lb/mmBTU from the duct $SO_2$ CEMS for $NO_x$ lb/mmBTU in the equation. Use unit level heat input in the equation):

$SO_2$ lb/hr = duct $SO_2$ lb/mmBTU x unit level heat input mmBTU/hr

    d. From 40 C.F.R. Part 75, Appendix F, Equation F-24 (adapt the equation by substituting $SO_2$ lb/hr, from Equation F-24a, for $NO_x$ lb/hr):

$SO_2$ lb = $SO_2$ lb/hr x $TOL_{unit}$

    e. To calculate tons of $SO_2$:

Total $SO_2$ tons = sum of hourly $SO_2$ lb values / 2000

Distribution to:

Scott R. Alexander
TAFT STETTINIUS & HOLLISTER LLP
salexander@taftlaw.com

Kevin P. Auerbacher
STATE OF NEW JERSEY, DEPT. OF LAW & PUBLIC SAFETY
auerbkev@law.dol.lps.state.nj.us

Thomas Andrew Benson
U.S. DEPARTMENT OF JUSTICE - ENVIRONMENTAL ENFORCEMENT
thomas.benson@usdoj.gov

Meghan Delaney Berroya
SIDLEY AUSTIN LLP
mberroya@sidley.com

Samuel B. Boxerman
SIDLEY AUSTIN LLP
sboxerman@sidley.com

Phillip  Brooks
US DEPARTMENT OF JUSTICE
phillip.brooks@usdoj.gov

Jayna Morse Cacioppo
TAFT STETTINIUS & HOLLISTER LLP
jcacioppo@taftlaw.com

Robert R. Clark
TAFT STETTINIUS & HOLLISTER LLP
rclark@taftlaw.com

Larry Martin Corcoran
ENVIRONMENTAL AND NATURAL RESOURCES DIVISION
larry.corcoran@usdoj.gov

Michael E. DiRienzo
KAHN DEES DONOVAN & KAHN
mdirienzo@kddk.com

Jason A. Dunn
UNITED STATES DEPARTMENT OF JUSTICE
jason.dunn@usdoj.gov

Thomas  Echikson
SIDLEY AUSTIN LLP
techikson@sidley.com

Steven David Ellis
ENVIRONMENTAL & NATURAL RESOURCES
steven.ellis@usdoj.gov

Julie L. Ezell
DUKE ENERGY LEGAL DEPARTMENT
julie.ezell@duke-energy.com

Cynthia Marie Ferguson
US DEPARTMENT OF JUSTICE - ENVIRONMENT & NATURAL RESOURCES
cynthia.ferguson@usdoj.gov

Myles E. Flint II
US DEPT OF JUSTICE
myles.flint@usdoj.gov

Richard Mark Gladstein
U.S. DEPARTMENT OF JUSTICE
richard.gladstein@usdoj.gov

Thomas Charles Green
SIDLEY AUSTIN LLP
tcgreen@sidley.com

R. Keith Guthrie
ATTORNEY AT LAW
kgmail@comcast.net

Mark D. Hopson
SIDLEY AUSTIN, LLP
mhopson@sidley.com

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov

Eugene J. Kelly Jr.
NEW YORK STATE ATTORNEY GENERAL
eugene.kelly@oag.state.ny.us

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Jung W. Kim
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
jung.kim@dol.lps.state.nj.us

James A. King
PORTER WRIGHT MORRIS & ARTHUR LLP
jking@porterwright.com

Scott N. Koschwitz
OFFICE OF THE ATTORNEY GENERAL
scott.koschwitz@po.state.ct.us

Joseph M. Kowalczyk
NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
joseph.kowalczyk@oag.state.ny.us

Jonathan F. Lewis
CLEAN AIR TASK FORCE
jlewis@catf.us

James A. Lofton
U.S. DEPARTMENT OF JUSTICE
jim.lofton@usdoj.gov

Jennifer Anne Lukas-Jackson
UNITED STATES DEPARTMENT OF JUSTICE
jennifer.lukas-jackson@usdoj.gov

Roger  Martella
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005

Jon C. Martin
STATE OF NEW JERSEY
jon.martin@dol.lps.state.nj.us

Kimberly P. Massicotte
OFFICE OF THE ATTORNEY GENERAL
kimberly.massicotte@po.state.ct.us

Dean M. Moesser
DUKE ENERGY CORPORATION
dmmoesser@duke-energy.com

Ryan C. Morris
SIDLEY AUSTIN LLP
rmorris@sidley.com

Michael Joseph Myers
NEW YORK STATE DEPARTMENT OF LAW
michael.myers@oag.state.ny.us

John D. Papageorge
TAFT STETTINIUS & HOLLISTER LLP
jpapageorge@taftlaw.com

Crissy Lyn Pellegrin
ENVIRONMENTAL PROTECTION AGENCY
pellegrin.crissy@epa.gov

Loren A. Remsberg
U.S. DEPARTMENT OF JUSTICE/ ENRD/EES
loren.remsberg@usdoj.gov

Robert T. Rosenthal
NEW YORK ATTORNEY GENERAL'S OFFICE
robert.rosenthal@oag.state.ny.us

Jeffrey K. Sands
UNITED STATES DEPT. OF JUSTICE
jeffrey.sands@usdoj.gov

Justin Aaron Savage
UNITED STATES DEPARTMENT OF JUSTICE
justin.savage@usdoj.gov

J. Jared Snyder
OFFICE OF THE ATTORNEY GENERAL
jared.snyder@oag.state.ny.us

Katherine Lynn Vanderhook
UNITED STATES DEPARTMENT OF JUSTICE
katherine.vanderhook@usdoj.gov

Gaylene  Vasaturo
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
vasaturo.gaylene@epa.gov

Frank R. Volpe
SIDLEY AUSTIN LLP
fvolpe@sidley.com